ACCEPTED
03-14-00510-CV
4243321
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/23/2015 10:52:08 AM
JEFFREY D. KYLE
CLERK

**No. 03-14-00510-CV**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/23/2015 10:52:08 AM
JEFFREY D. KYLE
Clerk

IN THE COURT OF APPEALS
FOR THE THIRD COURT OF APPEALS DISTRICT
AUSTIN, TEXAS

NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS AND HOLLY CLAUSE,
*Appellants and Cross-Appellees,*

**v.**

TRACY D. STRANDHAGEN,
*Appellee and Cross-Appellant.*

ON APPEAL FROM THE 353RD JUDICIAL DISTRICT COURT OF TRAVIS COUNTY, TEXAS
HON. ORLINDA NARANJO, PRESIDING; CAUSE NO. D-1-GN-13-002811

# APPELLEE'S BRIEF

Daniel H. Byrne
Texas Bar No. 03565600
Dbyrne@fbhh.com
FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, Texas 78701
Telephone: (512) 476-2020
Telecopy: (512) 477-5267

# IDENTITY OF PARTIES AND COUNSEL

| APPELLEES | APPELLANTS |
| --- | --- |
| Tracy D. Strandhagen | Noah S. Bunker, Paul Carrell, Everett Brew Houston, Jr., W. Andrew Buchholz, Scott J. Leighty, Jad L. Davis, and Holly Clause |
| Trial and Appellate Counsel:<br>Daniel H. Byrne<br>Texas Bar No. 03565600<br>dbyrne@fbhh.com<br>Lessie Fitzpatrick<br>Texas Bar No. 24012630<br>lfitzpatrick@fbhh.com<br>Christine E. Burgess<br>Texas Bar No. 00793428<br>cburgess@fbhh.com<br>**FRITZ, BYRNE, HEAD & HARRISON, PLLC**<br>98 San Jacinto Blvd., Suite 2000<br>Austin, Texas 78701<br>Tel: (512) 476-2020<br>Fax: (512) 477-5267 | Appellate Counsel:<br>Amanda G. Taylor<br>ataylor@textaxlaw.com<br>Texas Bar No. 24045921<br>**MARTENS, TODD, LEONARD, TAYLOR & AHLRICH**<br>301 Congress Avenue, Suite 1950<br>Austin, Texas 78701<br>Tel: (512) 542-9898<br>Fax: (512) 542-9899 |
| | Trial Counsel:<br>Kelly McDonald<br>kmcdonald@cmcdlaw.com<br>Carla Garcia Connolly<br>cconnolly@cmcdlaw.com<br>**CARLS, MCDONALD & DALRYMPLE, LLP**<br>901 South MoPac Expressway<br>Barton Oaks Plaza<br>Building 1, Suite 280<br>Austin, Texas 78746<br>Tel: (512) 472-4845<br>Fax: (512) 472-8403 |

## TABLE OF CONTENTS

**IDENTITY OF PARTIES AND COUNSEL** ........ i

**TABLE OF CONTENTS** ........ ii

**INDEX OF AUTHORITIES** ........ iv

**STATEMENT OF THE CASE** ........ ix

**RECORD ABBREVIATIONS** ........ x

**ISSUES PRESENTED** ........ xi

**I. NO REQUEST FOR ORAL ARGUMENT** ........ 1

**II. STATEMENT OF FACTS** ........ 1

**A. DR. STRANDHAGEN SOUGHT A DECLARATION THAT THE CONTRACTUAL PROVISION PURPORTING TO REQUIRE PAYMENT OF $500,000 IS AN UNENFORCEABLE PENALTY** ........ 1

**B. TRIAL COURT PROCEEDINGS** ........ 4

**III. SUMMARY OF THE ARGUMENT** ........ 6

**IV. ARGUMENT** ........ 8

**A. STANDARD OF REVIEW** ........ 8

**B. THE DISTRICT COURT DID NOT ERR BY GRANTING THE SUMMARY JUDGMENT** ........ 8

**1. Dr. Strandhagen carried her burden of proving that the $500,000 Termination Penalty Clause is an unenforceable penalty.** ........ 9

**a. Dr. Strandhagen need only prove that the $500,000 Termination Penalty Clause was not a reasonable forecast of just compensation.** ........ 9

**b. As matter of law, the $500,000 Termination Penalty Clause was not a reasonable forecast of just compensation on its face because the penalty amount was the same if Dr. Strandhagen terminated her employment on day one or after she performed for 99% of the employment contract term.** ...................12

**(1) A party challenging the enforceability of a purported liquidated damages clause based on its facial unreasonableness as a forecast of just compensation at the time the contract was made need not address actual damages.** ...........................................................................................12

**(2) Dr. Strandhagen has proven that the Termination Penalty Clause is facially invalid.** ..................................................................15

**2. Appellants' modification argument fails.** ..............................................20

**C. THE TRIAL COURT HAD JURISDICTION BECAUSE AN ACTUAL CONTROVERSY EXISTS BETWEEN THE PARTIES, AND IT IS RIPE FOR ADJUDICATION** ............................................................................................24

**V. PRAYER**...................................................................................................29

**CERTIFICATE OF SERVICE AND COMPLIANCE**.....................................31

## INDEX OF AUTHORITIES

*Am. Nat'l Ins. Co. v. Cannon*,
86 S.W.3d 801 (Tex. App.—Beaumont 2002, no pet.) ..........................................28

*Baker v. Int'l Record Syndicate, Inc.*,
812 S.W.2d 53 (Tex. App.—Dallas 1991, no writ.)........................................10, 12

*Bd. of Water Eng'rs v. San Antonio*,
283 S.W.2d 722 (Tex. 1955)..........................................................................25

*Cal. Prods., Inc. v. Puretex Lemon Juice, Inc.*,
334 S.W.2d 780 (Tex. 1960)..........................................................................25

*Carter v. Dripping Springs Water Supply Corp.*,
Cause No. 03-03-00753-CV, 2005 Tex. App. LEXIS 461
(Tex. App.—Austin, Jan. 21, 2005, no pet.).............................................................25

*Commercial Union Ins. Co. v. La Villa Indep. Sch. Dist.*,
779 S.W.2d 102 (Tex. App.—Corpus Christi 1989, no writ).................................17

*Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*,
679 S.W.2d 721 (Tex. App.—Houston [1st Dist.] 1984, no writ) ..............15, 16, 20

*Continental Holdings, Ltd. v. Leahy*,
132 S.W.3d 471 (Tex. App.—Eastland 2003, no pet.)...........................................21

*County of Cameron v. Brown*, 80 S.W.3d 549 (Tex. 2002) ....................................29

*Eberts v. Businesspeople Personnel Servs., Inc.*,
620 S.W.2d 861 (Tex. Civ. App.—Dallas 1981, no writ) ................................11, 17

*Farmers Ins. Exch. v. Rodriguez*, 366 S.W.3d 216
(Tex. App.–Houston [14th Dist.] 2012, pet. denied) ................................................29

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*,
426 S.W.3d 59 (Tex. 2014).................................. 8, 9, 10, 11, 12, 13, 14, 15, 18, 20

*Garden Ridge, L.P. v. Advance Int'l, Inc.*, 403 S.W.3d 432
(Tex. App.—Houston [14th Dist.] 2013, pet. denied) ............................10, 13, 16, 19

*GPA Holding, Inc. v. Baylor Health Care Sys.*,
344 S.W.3d 467 (Tex. App.—Dallas 2011, pet. denied)..................................10, 12

*Great Am. Prods. v. Permabon*d *Int'l*, 94 S.W.3d 675
(Tex. App.—Austin 2002, pet. denied) ....................................................................22

*Hamilton v. Tex. Prop. and Cas. Ins. Guar. Ass'n*,
No. 03-98-00355-CV, 1999 Tex. App. LEXIS 3163
(Tex. App.—Austin Apr. 29, 1999, no pet.).............................................................21

*Hampden Corp. v. Remark, Inc.*, No. 05-13-00529,
2014 Tex. App. LEXIS 6900
(Tex. App.—Dallas Oct. 10, 2014, pet. denied).......................................................22

*Healix Infusion Therapy, Inc. v. Bellos*, No. 11-02-00346-CV,
2003 Tex. App. LEXIS 9027
(Tex. App.—Eastland Oct. 23, 2003, no pet.) ...................................................12, 15

*Hirschfeld Steel Co., Inc. v. Kellogg Brown & Root, Inc.*,
201 S.W.3d 272 (Tex. App.—Houston [14th Dist.] 2006, no pet.)..........................28

*Hoover Slovacek, LLP v. Walton*, 206 S.W.3d 557 (Tex. 2006).............................23

*In re City of Dallas*, 977 S.W.2d 798
(Tex. App.—Fort Worth 1998, orig. proceeding)....................................................25

*In re Dow Corning Corp.*, 419 F.3d 543 (6th Cir. 2005)...................................11, 13

*In re Kasschau*, 11 S.W. 3d 305
(Tex. App.—Houston [14th Dist.] 1999, orig. proceeding) ....................................23

*In re OC, Inc.*, 552 F.3d 413 (5th Cir. 2008) ..........................................................21

*In re Poly-America, L.P.*, 262 S.W.3d 337 (Tex. 2008)..........................................23

*Kelley-Coppedge, Inc. v. Highlands Ins. Co.*,
980 S.W.2d 462 (Tex. 1998).....................................................................................21

*Khan v. Meknojiya*, No.03-11-00580-CV,
2013 Tex. App. LEXIS 7976
(Tex. App.—Austin June 28, 2013, no pet.)....................................................10, 12

*Lake River Corp. v. Carborundum Co.*,
769 F.2d 1284 (7th Cir. 1985)...........................................................................15

*LHR Enters., Inc. v. Geeslin*, No. 03-05-00176-CV,
2007 Tex. App. LEXIS 8849
(Tex. App.—Austin Nov. 7, 2007, pet. denied) ................................................26, 29

*Mayfield v. Hicks*, 575 S.W.2d 571
(Tex. App.—Dallas 1978, writ ref'd n.r.e.) .........................................13, 16, 18, 19

*MBM Fin. Corp. v. The Woodlands Operating Co., L.P.*,
292 S.W.3d 660 (Tex. 2009)......................................................................27, 28

*McFadden v. Fuentes*,
790 S.W.2d 736 (Tex. App.—El Paso 1990, no writ)............................................19

*McGinnis v. Union Pac. R.R. Co.*,
612 F. Supp. 2d 776 (S.D. Tex. 2009)..................................................................28

*Murphy v. Cintas Corp.*,
923 S.W.2d 663 (Tex. App.—Tyler 1996, writ denied)........................12, 14 18, 19

*Nexstar Broad., Inc. v. Gray*,
No. 09-07-00364, 2008 Tex. App. LEXIS 4736
(Tex. App.—Beaumont June 26, 2008, no pet.)...............................................11, 29

*Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.*,
971 S.W.2d 439 (Tex. 1998)...............................................................................25

*Paulsen v. Tex. Equal Access to Justice Found.*,
23 S.W.3d 42 (Tex. App.—Austin 1999, pet. denied) ...........................................27

*Phillips v. Phillips*, 820 S.W.2d 785 (Tex. 1991).......................9, 10, 13, 14, 16, 20

*Robinson v. Parker*, 353 S.W.3d 753 (Tex. 2011) ................................................29

*Rowan Cos., Inc. v. Griffin*, 876 F.2d 26 (5th Cir. 1989) ........................................28

*Rusk State Hosp. v. Black*, 392 S.W.3d 88 (Tex. 2012) .........................................29

*Southern Union Co. v. CSG Sys., Inc.*,
No. 03-04-00172-CV, 2005 Tex. App. LEXIS 564
(Tex. App.—Austin Jan. 27, 2005, no pet.).........................................10, 12, 15, 20

*Southwestern Bell Tel. Co. v. Delanney*,
809 S.W.2d 493 (Tex. 1991).......................................................................................23

*SP Terrace, L.P. v. Meritage Homes of Tex., LLC*,
334 S.W.3d 275 (Tex. App.—Houston [1st Dist.] 2010, no pet.) .............................9

*State v. Margolis*, 439 S.W.2d 695
(Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.)....................................................28

*Stewart v. Basey*, 245 S.W.2d 484 (Tex. 1952) ....................................10, 15, 16, 20

*Tex. Ass'n of Business v. Tex. Air Control Bd.*, 852 S.W.2d 440
(Tex. 1993)...................................................................................................................27

*Tex. Dep't of Pub. Safety v. Moore*,
985 S.W.2d 149 (Tex. App.—Austin, 1998, no pet.) .............................................25

*Transcontinental Realty Investors, Inc. v. Orix Capital Markets, LLC*,
353 S.W.3d 241 (Tex. App.—Dallas 2011, pet. denied).........................................29

*Transport. Ins. Co. v. WH Cleaners, Inc.*,
372 S.W.3d 223 (Tex. App.—Dallas 2012, no pet.) ..........................................8, 28

*Triton 88, L.P. v. Star Elec., LLC*,
411 S.W.3d 42 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ........................10, 15

*Urban Television Network Corp. v. Creditor Liquidity Solutions, LP*,
277 S.W.3d 917 (Tex. App.—Dallas 2009, no pet.) ..............................................17

*Valence Operating Co. v. Dorsett*,
164 S.W.3d 656 (Tex. 2005).........................................................................................8

*WesternGeco, LLC v. Input/Output, Inc*.,
246 S.W.3d 776 (Tex. App.—Houston [14th Dist.] 2008, no pet.)........................25

**RULES:**

Tex. R. Civ. P. 94..............................................................................................22

TEX. R. CIV. P. 166a(c)........................................................................................8

Tex. R. App. P. 43..............................................................................................30

**STATUTES:**

Tex. Civ. Prac. & Rem. Code §37.002 ..........................................................24

Tex. Civ. Prac. & Rem. Code §37.004 ..................................................24, 25, 28

**OTHER AUTHORITIES:**

RESTATEMENT (SECOND) OF CONTRACTS §208 ..................................................24

RESTATEMENT (SECOND) OF CONTRACTS §356 ...................................14, 19, 23

## STATEMENT OF THE CASE

This appeal arises from Dr. Tracy D. Strandhagen's request for a declaration that the $500,000 lump sum "liquidated damages" provision set forth in the parties' contract is an unenforceable penalty. The trial court held that it had jurisdiction to determine such matter, and granted summary judgment declaring the purported "one size fits all" liquidated damages provision an unenforceable penalty. Appellants appeal these decisions.

## RECORD ABBREVIATIONS

For the sake of simplicity, Dr. Strandhagen will use the same citation forms as the Appellants:

- "CR" refers to the primary Clerk's Record, pages 1-286, filed with this Court on 10/15/2014.

- "Sealed.CR" refers to the sealed document (Dr. Strandhagen's Employment Agreement), filed under seal with this Court on 12/22/2014. Because the district clerk did not assign separate "record pages" to this document, cites are to the original page numbers.

- "RR" refers to the Reporter's Record, pages 1-29, filed with this Court on 9/25/2014.

## ISSUES PRESENTED

1. Did the trial court err by granting summary judgment declaring the $500,000 purported liquidated damages provision to be an unenforceable penalty?

2. Did the trial court err by determining it had jurisdiction over Dr. Strandhagen's cause of action?

Appellee Tracy D. Strandhagen ("Dr. Strandhagen") submits the following brief:

## I. NO REQUEST FOR ORAL ARGUMENT

Dr. Strandhagen believes that the issues in this appeal are straightforward and can be determined without oral argument. Of course, if this Court grants Appellants' request for oral argument, Dr. Strandhagen respectfully requests that she be granted the opportunity to present her position and respond to Appellants' arguments at any oral argument of this matter.

## II. STATEMENT OF FACTS

### A. DR. STRANDHAGEN SOUGHT A DECLARATION THAT THE CONTRACTUAL PROVISION PURPORTING TO REQUIRE PAYMENT OF $500,000 IS AN UNENFORCEABLE PENALTY

Dr. Strandhagen is a licensed anesthesiologist with more than fifteen years of experience. She was among about 60 anesthesiologists, along with Appellants Noah S. Bunker, Paul Carrell, Everett Brew Houston, Jr., W. Andrew Buchholz, Scott J. Leighty, Jad L. Davis, and Holly Clause, who were partners in Austin Anesthesiology Group, LLP ("AAG"). CR.160. In October of 2011, AAG entered into a transaction (the "Buyout") whereby its operations were sold to American Anesthesiology of Texas, Inc. ("AAT"). *Id.* At the time of the Buyout, Dr. Strandhagen and the other AAG-affiliated physicians entered into separate employment agreements with AAT (almost all for a seven year term), wherein the

physicians agreed to work for AAT. *See id.*; CR.167, 173-78.[1] Contemporaneously, these same physicians entered into the Advisory Board and Internal Operations Agreement (the "Physicians' Agreement"). CR.162-83. The Physicians' Agreement created an "Advisory Board" to provide "binding advice and guidance" to the medical director elected under the agreement. CR.162. Appellants were the current members of that Advisory Board at the time this suit was initiated in 2013.

The Physicians' Agreement also contains a section entitled "Physician Obligations," which contains a purported liquidated damages clause. CR.167-68. Pursuant to this clause, the physicians purportedly agreed that if their employment with AAT ceased at any time before their individual employment agreements expired for any reason other than termination by AAT without cause,[2] the physician who ceased to be employed by AAT became obligated to pay the non-terminated physicians their pro rata share of a lump sum amount labeled as "liquidated damages," plus interest at 10% (the "Termination Penalty Clause").

---

[1] Appellants state that the period of time each physician agreed to be employed by AAT was tied to the amount of monetary compensation received from the Buyout. Appellants' Brief at 5. Like several assertions made in Appellants' Brief, this statement is not supported by the record citations provided. *Id.* (citing CR.144, 167-68). Nor did Appellants raise this immaterial issue in the trial court. In the case of Dr. Strandhagen, she was not provided any justification for the compensation paid to her in the Buyout or the rationale for the liquidated damage provision at issue here, as she was (like her other partners were) presented the Physicians' Agreement on a take-it-or-leave-it basis.

[2] There were also certain other limited exceptions such as death and other causes beyond Dr. Strandhagen's control not applicable here.

CR.168 §5(b). For the vast majority of physicians, including Dr. Strandhagen, the lump sum amount was immutably fixed at $500,000. *Id.*[3]

The amount of this Termination Penalty Clause is the same whether Dr. Strandhagen's employment terminated on day one of her employment with AAT (October 6, 2011) or day 2,554 (October 5, 2018); on its face the clause assesses the same damage amount for a physician that performs 99.96% of that doctor's employment contract as for one who breaches with 99.96% of the contractual obligation unfulfilled. *See id.*; Sealed.CR.12, §VIII.A (term of Employment Agreement was seven years from effective date).

Dr. Strandhagen's employment terminated in July 2013. *See* CR.161 ¶5; CR.141. AAT claimed that Dr. Strandhagen was terminated for cause, and Dr. Strandhagen claimed that she was terminated without cause.[4] CR.141-45. In the

---

3 Appellants claim that the few variations in the lump sum "liquidated damages" amounts were "presumably" tied to shorter lengths of time of for some physician's post-Buyout employment agreements with AAT. Appellants' Brief at 6. There is no evidence in the record to support this "presumption." Again, this is a new, immaterial factual assertion by Appellants, which was not made in the trial court.

4 In December of 2012, an employment dispute (which has since settled) arose between Dr. Strandhagen and AAT which eventually resulted in her filing a gender discrimination report to AAT. CR.39; *see* CR.85-87, 91-102. Dr. Strandhagen asserted that she was discriminated against because of her gender and that she was constructively discharged in July 2013. CR.91-102, 141-143; *see* CR.85-87. Although immaterial to the issues on this appeal, Dr. Strandhagen points out that Appellants incorrectly assert that the Buyout occurred "just two months" before Dr. Strandhagen complained about the discrimination. Appellants' Brief, p. 9 (citing to CR.93, 144). In fact, she reported the discrimination in response to an incident which occurred more than a year after the Buyout. *See* CR.144 (stating date of employment agreement in November 2011); CR.93 (first report of discrimination in February 2013).

fall of 2013, Dr. Strandhagen learned that Appellants took the position that she was terminated for cause, and her contention that they were planning to seek enforcement of the Termination Penalty Clause by soliciting other physicians to join in a lawsuit against her remains unrefuted.[5] CR.40. Rather than awaiting this lawsuit, Dr. Strandhagen opted to file suit seeking a declaration that the Termination Penalty Clause is an unenforceable penalty as a matter of law. CR.40-41.

## B. TRIAL COURT PROCEEDINGS

Appellants filed an Amended Plea to the Jurisdiction and Plea in Abatement (the "Plea to the Jurisdiction"), seeking dismissal of Dr. Strandhagen's claims based on lack of jurisdiction. CR.77-84. After considering the Plea to the Jurisdiction and Dr. Strandhagen's response (CR.109-45), the trial court dismissed Dr. Strandhagen's request for a declaration that she was terminated without cause, but retained jurisdiction over her request for a declaration that the Termination Penalty Clause was an invalid and unenforceable penalty. CR.184.

---

5 Despite many opportunities to do so, Appellants have never denied that they were taking steps to file suit to enforce the Termination Penalty Clause against Dr. Strandhagen, nor—until this appeal—have they even claimed to have been undecided about whether to pursue such a claim against her. *See generally*, CR.77-83 (no claim that Appellants were not intending to sue Dr. Strandhagen or that they were undecided on this course of action); *contrast to* Appellants' Brief, p. 38 (citing to CR.79-80, which does not support this point). Instead, they have repeatedly equivocated, contending only that no justiciable controversy existed because they had not yet confronted Dr. Strandhagen with their demands. CR.79.

Dr. Strandhagen later filed a Motion for Summary Judgment, with supporting evidence, seeking a determination that the Termination Penalty Clause is an unenforceable penalty. CR.154-83. Appellants filed their response to that motion, arguing that the Termination Penalty Clause is not an unenforceable penalty. CR.186-93. Appellants did not raise the issue of modification in their summary judgment response, nor did they plead modification in their answer. *Id.*; CR.74-76. Dr. Strandhagen filed a reply in support of her motion for summary judgment, *see* CR.194-201, and Appellants filed additional supplemental briefing. CR.202-11. After a full briefing on the issues, a hearing and post-hearing submissions, the trial court found that the "$500,000 purported liquidated damages clause" is an unenforceable penalty, and entered judgment accordingly. *See* CR.212. The trial court did not further specify the grounds for its judgment. *Id.*

The Appellants filed a Motion for New Trial, (1) asking the Court to reconsider its conclusion that the Termination Penalty Clause is an unenforceable penalty, (2) arguing for the first time that *even if* it is an unenforceable penalty, the Court should somehow re-write the penalty clause, and (3) asking the Court to reconsider its earlier determination that it had jurisdiction to decide whether the Termination Penalty Clause is an unenforceable penalty. CR.213-50. Dr. Strandhagen urged the trial court to reject all of Appellants' arguments, and she specifically argued that the newly raised modification argument should be rejected

both because it was untimely (and thus waived) and because it lacked merit. CR.254-70. After full briefing on the issues and a hearing, the trial court denied Appellants' Motion for New Trial without specifying the grounds for such determination. CR.271.

## III. SUMMARY OF THE ARGUMENT

The only claim before the trial court when it issued the Summary Judgment was Dr. Strandhagen's request to have the $500,000 lump sum Termination Penalty Clause declared an unenforceable penalty. This request was primarily predicated on the fact that on its face the amount required to be paid was not a reasonable forecast of just compensation at the time the contract was made as a matter of law. Alternatively, Dr. Strandhagen argued that the Termination Penalty Clause was an unenforceable penalty because it purported to render Dr. Strandhagen liable to Appellants for damages for her alleged breach of a contract (her employment agreement with AAT) to which Appellants are neither parties nor third-party beneficiaries. The trial court properly granted summary judgment (the "Summary Judgment") declaring the Termination Penalty an unenforceable penalty as a matter of law on May 20, 2014. CR.212.

Appellants attack the Summary Judgment on multiple grounds. These attacks fail because Dr. Strandhagen met her burden to conclusively negate an essential element of any enforceable liquidated damages provision, since on its

face the Termination Penalty was not a reasonable forecast of just compensation for breach at the time it was made as a matter of law. The Court must disregard Appellants' illogical and legally unsupportable suggestion that Dr. Strandhagen had the burden to negate both elements necessary to enforce such clauses; once she negated the "reasonable forecast" element there was no need for her to address the "difficulty of estimation" element. Appellants' newly fabricated argument that if the Termination Penalty is an illegal penalty, then the trial court erred by failing to re-write it instead of simply holding it to be unenforceable, was clearly waived by their failure to raise, plead or present evidence of this affirmative defense in any way before the Summary Judgment was rendered.[6]

Finally, Appellants attack the court's Order Granting in Part and Denying in Part Defendants' Amended Plea to the Jurisdiction (the "PTJ Order"), arguing that the trial court had no jurisdiction to decide whether the Termination Penalty Clause was an unenforceable penalty. Their jurisdictional challenge must be rejected because Dr. Strandhagen has shown (and Appellants effectively concede) that there is an actual controversy among the parties regarding the enforceability of the Termination Penalty Clause, as amply illustrated by the very vigorous briefing presented to this Court.

[6] If this Court somehow finds it appropriate to address the merits of Appellants' untimely modification argument, it should reject Appellants' faulty interpretation of this clause on the merits.

## IV. ARGUMENT

### A. STANDARD OF REVIEW

The trial court's grant of summary judgment will be reviewed *de novo*. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The Summary Judgment must be affirmed if there is no genuine issue as to any material fact and Dr. Strandhagen is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). Likewise, the trial court's denial of the Plea to the Jurisdiction will be reviewed *de novo*. *Transport. Ins. Co. v. WH Cleaners, Inc.*, 372 S.W.3d 223, 227 (Tex. App.—Dallas 2012, no pet.).

### B. THE DISTRICT COURT DID NOT ERR BY GRANTING THE SUMMARY JUDGMENT

As the Texas Supreme Court reiterated last year,

> The basic principle underlying contract damages is compensation for losses sustained and no more; thus, we will not enforce punitive contractual damages provisions. In *Phillips v. Phillips*, we acknowledged this principle and restated the two indispensible findings a court must make to *enforce* contractual damages provisions: (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation.

*FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 69 (Tex. 2014) (internal quotations and citations omitted; emphasis added) (hereinafter, "*FPL Energy*"). Unquestionably, if <u>either</u> of these two elements (difficulty of estimation or reasonable forecast) is negated, a liquidated damages provision is

unenforceable as a penalty. Here, the trial court did not err in determining that the Termination Penalty Clause is an unenforceable penalty because Dr. Strandhagen established as a matter of law that it was not a reasonable forecast of just compensation at the time the contract was made.

### 1. Dr. Strandhagen carried her burden of proving that the $500,000 Termination Penalty Clause is an unenforceable penalty.

Enforceability of a liquidated damages clause is a question of law for the court to decide. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). The burden of proving that a liquidated damages clause is an unenforceable penalty is on Dr. Strandhagen since she is the party seeking to invalidate the clause. *SP Terrace, L.P. v. Meritage Homes of Tex., LLC*, 334 S.W.3d 275, 287 (Tex. App.— Houston [1st Dist.] 2010, no pet.). Dr. Strandhagen met her burden to prove that the Termination Penalty Clause is an unenforceable penalty by proving that the clause was not a reasonable forecast of just compensation.

#### a. Dr. Strandhagen need only prove that the $500,000 Termination Penalty Clause was not a reasonable forecast of just compensation.

Appellants fundamentally misstate the legal standard for determining when a liquidated damages clause is an unenforceable penalty. In an argument that borders on the frivolous, they state incorrectly that Dr. Strandhagen must negate each of the two elements necessary to <u>enforce</u> a liquidated damages clause in order to prevail. *See* Appellants' Brief, pp. 17-22. This argument is fallacious—since

both elements must be present for the clause to be enforced, it logically and necessarily follows that if <u>either</u> element is negated, the clause is an unenforceable penalty. As noted above, recent Texas Supreme Court precedent verifies this. *FPL Energy*, 426 S.W.3d at 70-72.

The two-part Texas common law test for enforceability of a purported liquidated damages clause is repeatedly and consistently described as requiring two indispensible elements. Only if both of the following elements are present, may such a clause be <u>enforced</u>: (1) the harm caused by the breach is incapable or difficult of estimation, *and* (2) the amount of liquidated damages is a reasonable forecast of just compensation. *FPL Energy*, 426 S.W.3d at 69; *Phillips*, 820 S.W.2d at 788.[7] If one must establish two elements to prove a clause is enforceable, it logically follows that if either element is missing, the clause is unenforceable. Therefore, a liquidated damages provision is unenforceable if *either* of the liquidated damages elements set forth above is negated. Requiring a

---

[7] *E.g., Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952) ("All agree that to be *enforceable* as liquidated damages the liquidated damages must be uncertain *and* the stipulation must be reasonable") (emphasis added); *Khan v. Meknojiya*, No. 03-11-00580-CV, 2013 Tex. App. LEXIS 7976, *7 (Tex. App.—Austin June 28, 2013, no pet.); *Southern Union Co. v. CSG Sys., Inc.*, No. 03-04-00172-CV, 2005 Tex. App. LEXIS 564, *12 (Tex. App.—Austin Jan. 27, 2005, no pet.); *Triton 88, L.P. v. Star Elec., LLC*, 411 S.W.3d 42, 62 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Garden Ridge, L.P. v. Advance Int'l, Inc.*, 403 S.W.3d 432, 439 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (hereinafter "*Garden Ridge*"); *GPA Holding, Inc. v. Baylor Health Care Sys.*, 344 S.W.3d 467, 475 (Tex. App.—Dallas 2011, pet. denied); *Baker v. Int'l Record Syndicate, Inc.*, 812 S.W.2d 53, 55 (Tex. App.—Dallas 1991, no writ).

litigant to negate both essential elements to prevail would be absurd, which helps explain why no Texas court has ever so held.

The Texas Supreme Court confirmed that only one of these elements needs to be negated in *FPL Energy*, 426 S.W.3d at 70-72. In this 2014 case, the court found that the first element of the enforceability test—difficulty of estimation of the actual harm caused by breach of the contract (the element Appellants complain that Dr. Strandhagen failed to negate)—was satisfied. *Id.* at 70. It nevertheless held the clause unenforceable because the amount of liquidated damages called for was not reasonable. *Id.* at 70-72. There, as here, even where damages were difficult of estimation (which the trial court below was required to assume in the context of Dr. Strandhagen's summary judgment motion), the absence of the second necessary element was fatal to the clause's enforceability. Texas jurisprudence is replete with similar examples.[8]

[8] *E.g.*, *In re Dow Corning Corp.*, 419 F.3d 543, 550, 553 (6th Cir. 2005) (under Texas law, party challenging liquidated damages clause had burden to negate *one* of elements necessary to prove clause enforceable; where one element is negated, it is unenforceable penalty); *Nexstar Broad., Inc. v. Gray*, No. 09-07-00364, 2008 Tex. App. LEXIS 4736, *7-8 (Tex. App.—Beaumont June 26, 2008, no pet.) (holding liquidated damages provision unenforceable where it was unreasonable forecast of just compensation without any discussion of whether harm was difficult to estimate); *Eberts v. Businesspeople Personnel Servs., Inc.*, 620 S.W.2d 861, 863-65 (Tex. Civ. App.—Dallas 1981, no writ) (liquidated damages provision unenforceable where amount was not reasonable forecast of just compensation, even if the harm was difficult to estimate).

Appellants' reliance on what can most charitably be described as dicta[9] in lower Texas appellate court cases cannot overcome the longstanding Texas common law test, Texas Supreme Court precedent, or common sense. To prove the Termination Penalty Clause's unenforceability, Dr. Strandhagen was only required to negate one of the two elements needed to enforce a purported liquidated damages clause. Consequently, the Final Judgment must be affirmed since she showed that the Termination Penalty Clause was not a reasonable forecast of just compensation.

**b. As matter of law, the $500,000 Termination Penalty Clause was not a reasonable forecast of just compensation on its face because the penalty amount was the same if Dr. Strandhagen terminated her employment on day one or after she performed for 99% of the employment contract term.**

**(1) A party challenging the enforceability of a purported liquidated damages clause based on its facial**

---

[9] No case that Appellants cite for the proposition that Dr. Strandhagen must negate *both* elements of the test for enforceability so holds; never in the history of Texas common law has a court enforced a liquidated damages provision that was not a reasonable forecast of just compensation at the time it was made. Appellants' cases are readily distinguished. *See Khan*, 2013 Tex. App. LEXIS 7976, at *9-10 (holding lease provision at issue not a liquidated damages clause at all, so penalty analysis inapplicable); *Southern Union Co.*, 2005 Tex. App. LEXIS 564, at *13-20 (enforcing liquidated damages provision where party challenging provision failed to show *either* that harm was difficult to estimate or that the liquidated damages were an unreasonable forecast of loss); *GPA Holding, Inc.*, 344 S.W.3d at 476 (same); *Healix Infusion Therapy, Inc. v. Bellos*, No. 11-02-00346-CV, 2003 Tex. App. LEXIS 9027, *5-7 (Tex. App.—Eastland Oct. 23, 2003, no pet.) (same); *Murphy v. Cintas Corp.*, 923 S.W.2d 663, 665-66 (Tex. App.—Tyler 1996, writ denied) (liquidated damages provision enforceable where evidence showed that the harm was difficult to estimate and challenging party failed to show that the amount was unreasonable); *Baker*, 812 S.W.2d at 55-56 (liquidated damages provision for loss of damage to photos enforceable where evidence showed both that the harm was difficult to estimate and the amount not unreasonable).

**unreasonableness as a forecast of just compensation at the time the contract was made need not address actual damages.**

Importantly, since it is a "forecast," the reasonableness of the damage forecast is measured at the time of contracting. *FPL Energy*, 426 S.W.3d at 71. Thus, there is no necessity for a party like Dr. Strandhagen who is challenging the purported liquidated damages clause as facially unreasonable at the time of contracting to show actual damages, and no need for the Court to even evaluate the actual damages that were eventually sustained. *See, e.g., Phillips*, 820 S.W.2d at 788-89 (no fact issue regarding amount of actual damages where liquidated damages provision challenged on its face—not based on argument that actual damages incurred were much less than amount contracted for); *In re Dow Corning Corp.*, 419 F.3d at 552-53 (where party showed purported liquidated damages clause not reasonable estimate of just compensation for anticipated damages at time of contract, no need to consider whether such damages disproportionate to actual damages because burden already met) (applying Texas law); *Mayfield v. Hicks*, 575 S.W.2d 571, 575-76 (Tex. App.—Dallas 1978, writ ref'd n.r.e.) (liquidated damages provision that is the same whether breach is trivial or major is penalty on its face, even if breach at issue in suit is major breach); *see also Garden Ridge*, 403 S.W.3d at 438 (recognizing that "one way a party can show that a liquidated damages provision is unreasonable is by showing that the actual

damages incurred were much less than the amount contracted for," but party may also show unreasonableness on the face of a provision).[10]

Dr. Strandhagen chose to challenge the facial reasonableness of the purported liquidated damages clause at the time of contracting, rather than pursuing the alternative of showing that the clause was unreasonable "in light of actual damages." *See FPL Energy*, 426 S.W.3d at 72 (citation omitted); *Phillips*, 820 S.W.2d at 788 (noting that one way to show liquidated damages provision is unreasonable is to show actual damages were much less than amount contracted for). As such, she had no burden to show such actual damages.[11] None of the

---

[10] Neither of the two authorities relied upon by Appellants in support of this argument actually supports their contention that a challenge to the reasonableness of the Termination Penalty Clause required Dr. Strandhagen to prove her actual damages. The first, *Murphy v. Cintas Corp.* does not support this assertion. *See Murphy*, 923 S.W.2d at 664-66 (stating that party challenging clause failed to prove that it was not difficult to estimate damages and failed to explain why clause was not reasonable forecast of just compensation). The second, Section 356 of the Restatement (Second) of Contracts, has been interpreted by the Texas Supreme Court to stand for the proposition that "the time of making a contract as the moment to evaluate the reasonableness of a liquidated damages clause." *FPL Energy*, 426 S.W.2d at 70 n. 2. To the extent that §356 could be interpreted to only permit unreasonableness to be measured retrospectively in comparison to actual damages, it is contrary to Texas law, and as such unpersuasive.

[11] *Contrast to Phillips*, 820 S.W.2d at 788 (party challenging reasonableness of liquidated damages clause as grossly disproportionate to actual damages assumes burden to show actual damages); *cf. FPL Energy*, 426 S.W.3d at 71-72 (although clauses in question reasonably forecast damages "on their face," still unenforceable because not reasonable in comparison to actual damages eventually sustained).

cases cited by Appellants requires a party challenging the reasonableness of a purported liquidated damages clause on its face to show actual damages.[12]

**(2) Dr. Strandhagen has proven that the Termination Penalty Clause is facially invalid.**

The fundamental flaw evident on the face of the Termination Penalty Clause is its "one size fits all" approach to remediating an alleged breach. Such clauses are simply unenforceable under Texas law when the same remedy is provided for breaches of obviously varying magnitude. In other words, a liquidated damages clause is unenforceable as "a penalty if it provides for unreasonable damages for trivial breaches as well as reasonable damages for major breaches." *Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.*, 679 S.W.2d 721, 727 (Tex. App.—Houston [1st Dist.] 1984, no writ); *e.g., Stewart*, 245 S.W.2d at 672 (when purported liquidated damages provision provides same damages for trivial breaches as for material ones, it was unenforceable penalty); *see also Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1290 (7th Cir. 1985) (liquidated damages provision constitutes a penalty if the amount required to be paid is "invariant to the gravity of the breach"). This is because such "one size fits all"

12 *See Triton 88, L.P.*, 411 S.W.3d at 62 (party challenging reasonableness of liquidated damages clause failed to show *either* that the clause was facially unreasonable at time of contract or grossly disproportionate to actual damages); *Southern Union Co.*, 2005 Tex. App. LEXIS 564, at *16-18 (holding two-to-one ratio of liquidated to actual damages is not per se unreasonable); *Healix Infusion Therapy, Inc.*, 2003 Tex. App. LEXIS 9027, at *6 (party challenging reasonableness of liquidated damages clause on the ground that it was disproportionate to actual damages must prove actual damages).

provisions are not based on the injured party's likely damages but are intended to be punitive. *See FPL Energy*, 426 S.W.3d at 69 (policy is to compensate for "losses sustained and no more"); *Phillips*, 820 S.W.2d at 788 (party has no right to have court enforce liquidated damages provision that violates principle that party should be awarded "neither less nor more than his actual damages"). For these reasons, courts consistently strike down "one size fits all" clauses as unenforceable. *E.g.*, *Stewart*, 245 S.W.2d at 486 (striking down provision that provided same amount of damages for both trivial and materials breaches of a lease); *Garden Ridge*, 403 S.W.3d at 441-42 (contract provision permitting chargeback of 100% of merchandise cost for any unauthorized substitution of ordered product unreasonable forecast of damages); *Community Dev. Serv., Inc.*, 679 S.W.2d at 727 (court held liquidated damages provision in contract to purchase lots unenforceable penalty because amount was same for trivial and material breaches); *Mayfield*, 575 S.W.2d at 575-76 (liquidated damages provision that is the same whether breach is trivial or major is penalty, even if breach at issue in suit is major breach).

Here, the Physicians' Agreement purports to require Dr. Strandhagen to pay $500,000 to Appellants (and other physicians) if her Employment Agreement with AAT is terminated *at any time* during its seven-year term. This amount is the same whether Dr. Strandhagen's employment with AAT ended the day after the

Physicians' Agreement was signed or many years later. Appellants' actual damages (if any)—which they identify as arising from the impact of Dr. Strandhagen's early departure on their abilities to earn annual bonuses, loss of her experience and goodwill, Appellants' Brief, pp.3-4—would obviously be greater the earlier Dr. Strandhagen stopped working at AAT.[13] This principle was recognized by the Dallas Court of Appeals in *Eberts v. Businesspeople Personnel Servs., Inc.*, 620 S.W.2d at 864. In that case, an employment agency sued its former job counselor employee for violation of a non-compete covenant in his employment contract. *Id.* at 862. The employment contract contained a $10,000 liquidated damages clause for breach of the covenant. *Id.* at 863. The court held that the $10,000 liquidated damages provision could not be a reasonable estimation of damages for breach of non-compete covenant where the same amount applied whether the breach continued for one day or two years. *Id.* at 864-65. *Contrast to e.g., Urban Television Network Corp. v. Creditor Liquidity Solutions, LP*, 277 S.W.3d 917, 918-19 (Tex. App.—Dallas 2009, no pet.) (upholding liquidated

[13] In an argument that again defies common sense, Appellants suggest that their damages would be the same no matter when Dr. Strandhagen left the practice. Appellants' Brief, pp. 26-27. If the Appellants are damaged (as they suggest) in the form of their reduced abilities to earn annual bonuses, this would be because Dr. Strandhagen made the practice more profitable. *See* Sealed.CR.Annex A & B. Under that theory of damages, they would obviously suffer more damage if she stopped contributing to the success of the practice seven years early than they would if she left one day early. Similarly, if Appellants are indeed damaged as they suggest because Dr. Strandhagen takes her good will and experience with her when she leaves, then they would suffer more damage the longer they were deprived of such experience and good will.

damages clause that required payment that varied based on how much time was left on breached contract); *Murphy*, 923 S.W.2d at 665-67 (upholding liquidated damages clause designed to decrease amount of damages assessed over time); *Commercial Union Ins. Co. v. La Villa Indep. Sch. Dist.*, 779 S.W.2d 102, 107 (Tex. App.—Corpus Christi 1989, no writ) (upholding liquidated damages provision in construction contract that required payment of $100 for every day late).

Appellants attempt to salvage their facially invalid penalty by arguing that *even if* the Termination Penalty Clause may have been an unreasonable forecast of damages for some breaches, it is still enforceable in this case because Dr. Strandhagen failed to prove retrospectively that it was unreasonable in relation to the loss actually incurred here. Appellants' Brief, pp. 28-30. As noted above, Texas law imposes no such burden on a party asserting facial invalidity. Moreover, even if by happenstance a facially invalid liquidation provision might result in an outcome that is not unreasonable in a given circumstance, that eventuality does not salvage the enforceability of the clause. For example, in *Mayfield v. Hicks*, the parties had agreed to purported liquidated damages clauses in two equipment leases, which provided for the same damages whether the breach of the leases were material or minor. 575 S.W.2d at 575. The court rejected the lessors' argument that the provisions should not be treated as penalties because the

actual breaches at issue were material: "it is immaterial that the actual breach [was a major one]. A provision is a penalty if it provides for unreasonable payments for a minor breach." *Id.*; *see also FPL Energy*, 426 S.W.3d at 70 & n. 2 (citing *Mayfield* with approval for the proposition that the test for reasonableness of just compensation is "from the perspective of the parties at the time of contracting."). Appellants' authorities to the contrary are unpersuasive.[14]

Because the Termination Penalty Clause attempts to require payment of the same liquidated damages amount—$500,000—whether the breach of contract is a material breach or a trivial one,[15] it cannot have been a reasonable forecast of any

---

[14] Comment b and Illustration 2 to Section 356 of the Restatement (Second) of Contracts are not persuasive because they are contrary to Texas common law as set forth above. This is not surprising because Section 356 was patterned on the liquidated damages provisions in the UCC. RESTATEMENT (SECOND) OF CONTRACTS §356, Reporters Note. Texas courts have consistently recognized that the legal standards for evaluating enforceability of UCC liquidated damage provisions are "significantly different," since unlike Texas common law, even a facially unreasonable UCC-governed clause can be enforced under some circumstances. *Garden Ridge*, 403 S.W.3d at 447 (Frost, J., concurring); *e.g.*, *Phillips*, 820 S.W.2d at 788 (reciting legal standard from Texas common law and then differentiating UCC Section 2.718(a)); *McFadden v. Fuentes*, 790 S.W.2d 736, 737-38 (Tex. App.—El Paso 1990, no writ) (holding that legal standard for sales of goods under Section 2.718(a) is different from legal standard under Texas common law).

*Murphy* is not persuasive because it is inapposite on this point: Nowhere in the opinion is it suggested that the court determined that the liquidated damages clause at issue would have been an unreasonable forecast in some instances but that it was valid because the materiality of the breach at issue made it reasonable in the circumstances. *Murphy*, 923 S.W.2d at 665-67.

[15] Appellants attempt to avoid this result by pointing out that the Physicians' Agreement permits certain "early departures" without penalty. Appellants' Brief, p. 27; *see* CR.168-169, §§5(b) & (c) (penalty does not apply to physicians who die, are severely disabled and certain other exceptions). These narrow exceptions do not transform the $500,000 Termination Penalty Clause into an enforceable, customized damage estimate; for those to whom it applies it remains an enforceable "one size fits all" penalty.

damages the parties to the Physicians' Agreement were likely to suffer if Dr. Strandhagen breached her employment contract with AAT. Instead, the purpose of the Termination Clause Penalty was intended to penalize Dr. Strandhagen if she left AAT's employment even one day before the end of the term. For this reason, the Court properly granted summary judgment declaring that the purported liquidated damages clause is an unenforceable penalty.[16]

**2. Appellants' modification argument fails.**

Appellants argue that the trial court erred by declaring the Termination Penalty Clause unenforceable *even if Strandhagen properly proved that the Termination Penalty Clause was not a reasonable forecast of damages* because the clause should have been modified by the trial court. Appellants' Brief, pp. 33-35. This argument fails for three separate reasons: (1) Appellants waived this

[16] Appellants' reliance on standard contractual recitations about the reasonableness of the damage clause at issue (Appellants' Brief at 30-32) is unavailing. Boilerplate contractual language reciting that the Termination Penalty Clause is "liquidated damages" as opposed to a penalty has no bearing on whether that the provision is in fact a penalty. *E.g.*, *FPL Energy*, 426 S.W.3d at 66-67, 71-72 (striking "liquidated damages" clause negotiated by sophisticated parties, despite stipulation by parties that clause was not a penalty); *Stewart*, 245 S.W.2d at 485-87. Nor does it matter that Dr. Strandhagen "voluntarily" entered into the agreement. *See Phillips*, 820 S.W.2d at 788 ("The right of competent parties to make their own bargains is not unlimited. . . . A party has no right to have a court enforce a [contract term] that violates" the prohibition on penalties.); *see, e.g.*, *Community Dev. Serv.*, *Inc.*, 679 S.W.2d at 727 (in contract to purchase lot, liquidated damages provision was unenforceable penalty, even though parties supposedly intended the provision to estimate their damages in event of breach, because damages were same for material and trivial breaches and thus unreasonable). This Court's opinion in *Southern Union Co.* does not suggest a different outcome. *See* 2005 Tex. App. LEXIS 564, at *18-20 (simply rejecting argument that sliding scale liquidated damages clause that reduced the amount due depending on when the breach occurred was per se unreasonable).

argument, (2) even if Appellants had timely raised it, they failed to raise a fact issue on each element of this affirmative defense in their summary judgment response, and (3) the trial court could not have modified the Termination Penalty Clause even if it had been timely asked to do so.

Appellants did not raise this argument in their answer or in their response to Dr. Strandhagen's Motion for Summary Judgment.[17] CR.186-93; *see also* CR.202-11. By failing to timely raise this argument, they deprived the trial court of the opportunity to timely consider it, resulting in waiver, addressing it in their motion for new trial clearly was too late.[18] Appellants' decision not to ask the trial court to modify the Termination Penalty Clause until after the court had granted the Summary Judgment demonstrates precisely why the doctrine of waiver exists:

---

[17] Appellants attempted to raise modification for the first time in their Motion for New Trial, and Dr. Strandhagen argued that it was too late for Appellants to raise the issue. CR.267-69; *see also* RR.18-19.

[18] *See, e.g., Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 467 (Tex. 1998) (reinstating summary judgment in favor of insured and holding that insurer waived its argument that particular section of policy excluded coverage because insurer failed to raise that argument until its motion for new trial); *Continental Holdings, Ltd. v. Leahy*, 132 S.W.3d 471, 474 (Tex. App.—Eastland 2003, no pet.) (party's failure to raise issue of conclusive effect of arbitrators' award in response to motion for summary judgment constituted waiver of issue even though raised in motion for new trial); *Hamilton v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, No. 03-98-00355-CV, 1999 Tex. App. LEXIS 3163, *13 (Tex. App.—Austin Apr. 29, 1999, no pet.) (plaintiffs' failure to raise estoppel in responses to motion for summary judgment constituted waiver even though later raised in motion for new trial); *see also, e.g., In re OC, Inc.*, 552 F.3d 413, 423 (5th Cir. 2008) (rejecting argument that lower court erred by failing to sever or modify illegal provision from contract pursuant to severability and modification clauses because argument not raised in lower court).

litigants should give the trial court the opportunity to consider and resolve all errors before judgment is entered.

Appellants also failed to plead this affirmative defense[19] or offer any evidence to support it. *See generally* CR.186-93; CR.74-76. If Appellants sought to have the trial court modify the Physicians' Agreement, they bore the burden to plead and provide evidence to support each element of such defense. *See, e.g.*, *Hampden Corp. v. Remark, Inc.*, No. 05-13-00529, 2014 Tex. App. LEXIS 6900, *17 (Tex. App.—Dallas Oct. 10, 2014, pet. denied)(party asserting contract modification bears burden of proof). They failed to meet this burden. *See generally* CR.186-93.

Finally, even if this Court were to consider Appellants' new argument, it fails to provide valid grounds to reverse the Summary Judgment granted here. The trial court did not hold that the entire Physicians' Agreement is invalid; instead, it found that the $500,000 Termination Penalty Clause was unenforceable. CR.212. Appellants argue that instead of striking this illegal penalty from the Physicians' Agreement, the trial court should have modified the Termination Penalty Clause to some unspecified (and presumably lesser, reasonable) amount. Appellants' Brief,

---

19 This constitutes an affirmative defense because it seeks to avoid the outcome sought even if Dr. Strandhagen is correct that the Termination Penalty Clause as written is unlawful. *See* TEX. R. CIV. P. 94 (party must affirmatively plead "any other matter constituting an avoidance"); *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 683 (Tex. App.—Austin 2002, pet. denied) (affirmative defense is by nature one of avoidance, "which seeks to establish independent reason why the plaintiff should not prevail").

pp. 33-35. Appellants fail to cite to a single case that engages in such reformation of an illegal penalty clause, and their cases are readily distinguished. *E.g., In re Poly-America, L.P.*, 262 S.W.3d 337, 353, 356-57, 360 (Tex. 2008) (striking limitation of liability clause as unconscionable while stating in dicta that an arbitrator might choose to "modify" a provision that has not yet been proven to be unconscionable); *In re Kasschau*, 11 S.W.3d 305, 313 (Tex. App.—Houston [14th Dist.] 1999, orig. proceeding) (illegal provision that constituted incidental promise in contract may be severed by court). Instead, the courts routinely hold illegal provisions to be unenforceable in their entirety, even while leaving the remainder of the contract intact, as it did here. *E.g., Hoover Slovacek, LLP v. Walton*, 206 S.W.3d 557, 565 (Tex. 2006) (striking illegal termination fee provision and holding remainder of agreement, including contingent fee provision, enforceable); *Southwestern Bell Tel. Co. v. Delanney*, 809 S.W.2d 493, 497-98 (Tex. 1991) (assuming, if clause were found to be unconscionable, court would hold it unenforceable in its entirety) (Gonzales, J., concurring). There is no practical need for judicial modification here because the effect of striking an invalid liquidated damages clause is to simply require the non-breaching party to prove whatever actual damages have been sustained.[20]

---

20 The Restatement (Second) of Contracts likewise envisions that unenforceable contractual penalties should simply be excised from the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS §356 ("A term fixing unreasonably large liquidated damages is unenforceable on

## C. THE TRIAL COURT HAD JURISDICTION BECAUSE AN ACTUAL CONTROVERSY EXISTS BETWEEN THE PARTIES, AND IT IS RIPE FOR ADJUDICATION

After spending pages defending their position that Dr. Strandhagen is wrong to contend that the Termination Penalty Clause is unenforceable, Appellants argue that there is no real controversy for the Court to adjudicate because they had neither actually sued Dr. Strandhagen for breach of contract nor made a formal demand. Appellants' Brief at 38-43. However, neither a lawsuit nor a formal demand letter is a prerequisite to a suit for declaratory relief under a contract—the issue is whether there is a genuine controversy about its meaning and enforceability.

The Texas Declaratory Judgments Act (the "Act") is a remedial statute whose purpose is "to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations." TEX. CIV. PRAC. & REM CODE § 37.002(b). It is to be "liberally construed and administered." *Id.* Section 37.004 of the Act provides that a person interested under a contract may have determined "any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status, or other legal relations thereunder." *Id.* at § 37.004(a). The Act specifically permits courts to construe a contract "either before or after"

---

grounds of public policy as a penalty."); *contrast to* RESTATEMENT (SECOND) OF CONTRACTS §208 (if term is unconscionable, court may refuse to enforce entire contract, refuse to enforce unconscionable term, or "may so limit the application of any unconscionable term as to avoid any unconscionable result").

breach. *Id.* at § 37.004(b); *In re City of Dallas*, 977 S.W.2d 798, 805 (Tex. App.—Fort Worth 1998, orig. proceeding) ("The Declaratory Judgments Act expressly authorized a party to ask the trial court to construe the party's rights under a written contract *before* a breach of the contract occurs.") (emphasis in original).

A declaratory judgment is appropriate if: (1) a justiciable controversy exists as to the rights and status of the parties; and (2) the controversy will be resolved by the declaration sought. *Tex. Dep't of Pub. Safety v. Moore*, 985 S.W.2d 149, 153 (Tex. App.—Austin, 1998, no pet.). This Court has jurisdiction as long as the controversy involves a genuine conflict of tangible interest, as distinguished from a contingent or theoretical dispute. *Id.* at 153; *WesternGeco, LLC v. Input/Output, Inc*., 246 S.W.3d 776, 781 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *Carter v. Dripping Springs Water Supply Corp*., Cause No. 03-03-00753-CV, 2005 Tex. App. LEXIS 461, *11-15 (Tex. App.—Austin, Jan. 21, 2005, no pet.).

The ripeness inquiry focuses on whether the case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all. *See Patterson v. Planned Parenthood of Houston & Se. Tex., Inc.,* 971 S.W.2d 439, 442 (Tex. 1998). As part of this analysis, courts consider whether the declaratory judgment sought would actually settle the controversy between the parties. *See Cal. Prods., Inc. v. Puretex Lemon Juice, Inc.*, 334 S.W.2d 780, 783 (Tex. 1960); *Bd. of Water Eng'rs v. San Antonio*, 283 S.W.2d 722, 724 (Tex. 1955).

Thus, for example, in one of the cases cited by Appellants in their Brief, the Third Court of Appeals found that it had no jurisdiction to issue a purely advisory opinion where the parties seeking a declaratory judgment had *already obtained a final ruling in their favor* in an administrative proceeding resolving their controversy with the Department of Insurance. *LHR Enters., Inc. v. Geeslin*, No. 03-05-00176-CV, 2007 Tex. App. LEXIS 8849, *8, *13-14 (Tex. App.—Austin Nov. 7, 2007, pet. denied). In rejecting the argument that a justiciable controversy remained, the Court focused on whether the parties seeking a declaratory judgment would be impacted in some concrete way in the future. *Id.*

No such uncertain, hypothetical, or contingent events are presented here, and so this case is ripe. Appellants admit as much in their brief to this Court, both by arguing so extensively about the supposed error by the trial court, and as further illustrated when they acknowledge that Dr. Strandhagen's employment was terminated five years early, under circumstances where they contend she "would be liable for payment of liquidated damages." Appellants' Brief at 8. Dr. Strandhagen contends that the Termination Penalty Clause (which purports to require her to pay $500,000 within 5 business days of termination if her employment terminated for any reason other than "without cause") is unenforceable as a matter of law, regardless of the circumstances surrounding her termination. Before she filed suit, Dr. Strandhagen learned that Appellants were

planning to pursue her for collection of their share of the $500,000 Termination Penalty, and her pleading to that effect was never denied by Appellants.[21] CR.40, ¶16. Rather than dispute her contention that suit against her was imminent, Appellants coyly declined to address this contention, instead suggesting that Dr. Strandhagen's failure to develop proof to support these contentions deprives the court of jurisdiction. Appellants' Brief, pp. 38-43. This argument misconstrues the law, and the threshold for justiciability is easily met in this case. Texas law does not impose an "imminent litigation" requirement,[22] only that there be a genuine controversy. Parties are permitted to seek declarations of non-liability under a contract, and there need not even be a pending breach of that contract. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 668-69 (Tex. 2009) (also recognizing that declarations of non-liability under a contract have

---

[21] In determining whether they have jurisdiction over claims, "Texas appellate courts construe the pleadings in favor of the plaintiff and look to the pleader's intent." *Tex. Ass'n of Business v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993) (internal citations and quotations omitted).

[22] Appellants cite language in *Paulsen v. Tex. Equal Access to Justice Found.*, 23 S.W.3d 42, 46 (Tex. App.—Austin 1999, pet. denied) to support this "imminent litigation" threshold contention. In that case, this Court was asked to declare whether an attorney was subject to professional discipline for failure to participate in the Texas IOLTA program, pending definitive resolution of that program's constitutionality. *Id.* at 45. The *Paulsen* court recognized that it was faced with no real justiciable controversy since all of the parties to the suit actually *agreed* that an attorney could ethically participate in the IOLTA program, but the plaintiff's declaratory judgment was premised on the possibility that a third party might someday challenge the program. *Id.* at 45. Not surprisingly, the court found it did not have jurisdiction to issue such an advisory opinion without "the assertion of adverse interests." *Id.* at 45-47. Here, there is no suggestion of collusion among the parties to create jurisdiction; they clearly have adverse interests and a true dispute about the enforceability of the Termination Penalty Clause.

been among the most common suits filed under the Act); *Rowan Cos., Inc. v. Griffin*, 876 F.2d 26, 28 (5th Cir. 1989) ("The declaratory judgment vehicle . . . is intended to provide a means of settling an actual controversy before it ripens into . . . a breach of a contractual duty.").[23] To hold that a justiciable controversy is dependent on a threat of litigation would make the ripeness inquiry entirely and inappropriately "dependent on the subjective state of mind and intention of one party." *Transport. Ins. Co.*, 372 S.W.3d at 231.

Here, there is no question that Appellants maintain that Dr. Strandhagen is liable to them for their share of liquidated damages, and she disagrees. In cases where the operative facts have been much less certain than those here, Texas courts have nevertheless found an actual controversy to exist.[24] None of the cases cited

---

23 S*ee also, e.g., Rowan Cos., Inc.*, 876 F.2d at 27-28 (rejecting injured employee's argument that no justiciable controversy existed because he had not made any formal or informal demands for continued payment); *McGinnis v. Union Pac. R.R. Co.*, 612 F. Supp. 2d 776, 796-97 (S.D. Tex. 2009) (rejecting argument that no substantial controversy, and so no justiciable claim, exists where, among other things, insured had not been sued by anyone injured in the accident and there was no other pending litigation); *contrast to State v. Margolis*, 439 S.W.2d 695, 697-98 (Tex. Civ. App.—Austin 1969, writ ref'd n.r.e.) (holding absence of bona fide threat of prosecution of Texas anti-trust laws against companies meant no justiciable claim; appellees "may not compel the Attorney General to exercise his [prosecutorial] discretion by filing" DJA suit). Appellants' "imminent litigation" argument cannot be reconciled with section 37.004(b) of the Act which permits courts to construe a contract before breach even occurs (and therefore when it would be impossible for litigation to be "imminent"). *See* TEX. CIV. PRAC. & REM. CODE § 37.004(b); *see also MBM Fin. Corp.*, 292 S.W.3d at 669 & n. 50.

24 *See Hirschfeld Steel Co., Inc. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 278-279 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (determining that a declaratory judgment action regarding a the enforceability of a ten year warranty was ripe even though no warranty claims had yet been made); *Am. Nat'l Ins. Co. v. Cannon*, 86 S.W.3d 801, 806-807 (Tex. App.—Beaumont 2002, no pet.) (employed plaintiff had justiciable interest in determining whether upon leaving the company, the plaintiff would be required to comply with non-compete provisions).

by Appellants even suggest a different result.[25] For these reasons, the trial court did not err in entering the PTJ Order, and it should be affirmed.[26]

## V. PRAYER

Appellee Dr. Strandhagen requests this Court to affirm the Summary Judgment and the Order Granting in Part and Denying in Part Appellants' Amended Plea to the Jurisdiction. If either of the trial court's rulings is reversed,

---

[25] The cases cited by Appellants do not stand for the proposition that there must be a formal demand or an actual lawsuit on file before a case is ripe for adjudication, or that an injury must have already occurred for a claim to be ripe, nor do they hold that a court has no jurisdiction to issue a declaratory judgment on whether a liquidated damages provision is an unenforceable penalty. For example, in *Transcontinental Realty Investors, Inc. v. Orix Capital Markets, LLC*, 353 S.W.3d 241, 245 (Tex. App.—Dallas 2011, pet. denied), where no payment was due under a guaranty unless a pending appeal resulted in affirmance and the party primarily liable defaulted, the court concluded that exercise of jurisdiction to construe the guaranty was premature. *See id.* at 243-245. The language Appellants cite from *Nexstar Broad., Inc.*, 2008 Tex. App. LEXIS 4736, at *4, simply confirms the well-established principle that a court lacks jurisdiction over a "mirror image" counterclaim for declaratory judgment that merely denied the plaintiff's pending cause of action for breach of contract. *See also, e.g., LHR Enters., Inc.*, 2007 Tex. App. LEXIS 8849, *10-11 ("a person seeking declaratory relief need not have yet incurred an actual injury of the sort for which consequential relief might be granted. Instead, the Act is intended to provide a means to determine, before any wrong has actually occurred, the rights of parties . . .") (internal citations omitted); *Farmers Ins. Exch. v. Rodriguez*, 366 S.W.3d 216, 223, 229 & n. 6 (Tex. App. –Houston [14th Dist.] 2012, pet. denied) (third-party indemnity claim against home insurer not ripe where homeowner insurance policy contained "no action" provision and no final determination of indemnitee's liability yet made, but court did have jurisdiction over declaratory action against same indemnitee's automobile insurance coverage).

[26] If for some reason this Court were to determine that Dr. Strandhagen did not adequately plead or prove jurisdiction in the trial court, Dr. Strandhagen requests this Court to remand the case for further proceedings to give her a full and fair opportunity to present evidence to show jurisdiction. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 96 (Tex. 2012) (remand appropriate if pleadings and record neither demonstrate jurisdiction nor conclusively negate it); *County of Cameron v. Brown*, 80 S.W.3d 549, 559 (Tex. 2002) (remanding case to trial court when pleadings failed to show jurisdiction but did not affirmatively demonstrate incurable jurisdictional defect); *see also Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011) ("a claim is not required to be ripe at the time of filing," and suggesting that party need only "demonstrate a reasonable likelihood that the claim will ripen soon").

then this Court should remand to the trial court for further proceedings. Dr. Strandhagen further requests that this Court tax all costs against Appellants and award her such other and further relief, at law or in equity, to which she may be justly entitled. TEX. R. APP. P. 43.4.

Respectfully submitted,

FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, Texas 78701
Telephone: (512) 476-2020
Telecopy: (512) 477-5267

By: /s/ Daniel H. Byrne
Daniel H. Byrne
Texas Bar No. 03565600
Christine E. Burgess
Texas Bar No. 00793428
cburgess@fbhh.com
Lessie G. Fitzpatrick
Texas Bar No. 24012630
lfitzpatrick@fbhh.com

*Attorney for Appellee Tracy D. Strandhagen*

## CERTIFICATE OF SERVICE AND COMPLIANCE

I certify that on February 23, 2015, I served a copy of the foregoing Appellee's Brief on the counsel listed below by email. I also certify that according to the computer programs used to prepare this document, the word count is 8,639, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

Amanda G. Taylor
ataylor@textaxlaw.com
MARTENS, TODD, LEONARD & TAYLOR
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Facsimile: (512) 542-9899

*Attorney for Appellants/Cross-Appellees*

/s/ Daniel H. Byrne
Daniel H. Byrne

**APPENDIX INDEX**

A. Strandhagen Declaration

B. Physicians’ Agreement

C. Defendants’ First Amended Answer

D. Defendants’ Response to MSJ

E. Defendants' Reply to Supplemental Briefing in Support of MSJ

F. Summary Judgment Order

G. Letters

H. Plaintiff’s First Amended Petition

I. Defendants’ Amended Plea to the Jurisdiction

J. Authorities

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN,<br><br>PLAINTIFF,<br><br>v.<br><br>NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS, and HOLLY CLAUSE,<br><br>DEFENDANTS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br><br><br><br><br>TRAVIS COUNTY, TEXAS<br><br><br><br><br><br>353rd JUDICIAL DISTRICT |

**DECLARATION OF TRACY D. STRANDHAGEN**

1. My name is Tracy D. Strandhagen. I am over 18 years of age and am fully competent and authorized in all respects to make this Declaration. I have personal knowledge of all the facts stated herein, and they are all true and correct. This declaration is submitted in connection with Plaintiff's Motion for Summary Judgment filed in the above-styled litigation.

2. I am a licensed anesthesiologist with more than fifteen years of experience practicing medicine.

3. In 2011, I was a partner in Austin Anesthesiology Group, LLP ("AAG"). I entered into the Advisory Board and Internal Operations Agreement (the "Physicians' Agreement") with the other anesthesiologists who had also sold their interests in American Austin Anesthesiology Group, LLP ("AAG"") to American Anesthesiology of Texas, Inc. ("AAT") (the "Buyout"). A true and correct copy of that agreement is attached to this declaration as Exhibit 1-A.

4. At the time of the Buyout, I entered into an employment agreement with AAT (the "Employment Agreement"). The document filed under seal with the Court in this case at a hearing on January 10, 2014 is a true and correct copy of the Employment Agreement.



5. My employment with AAT was terminated in 2013.

*My name is Tracy D. Strandhagen, my date of birth is December 30, 1967, and my address is 600 Riders Trail Austin, Texas 78733. As authorized by section 132.001 of the Texas Civil Practice and Remedies Code, I declare under penalty of perjury that the foregoing is true and correct.*

Executed in Travis County, Texas, on the 9th day of January, 2014.

TRACY D. STRANDHAGEN

**ADVISORY BOARD AND INTERNAL OPERATIONS AGREEMENT**

This ADVISORY BOARD AND INTERNAL OPERATIONS AGREEMENT (this "Agreement") is made and entered into this __ day of October 2011, by and among the undersigned physicians who are employed by American Anesthesiology of Texas, Inc. (such employed physicians being referred to herein as the "Physicians"), a Texas non profit corporation certified as a health care organization by the Texas State Board of Medical Examiners (the "Company"), Noah Bunker, M.D., the Corporate Medical Director of the Company (the "Medical Director"), and Chi B. Vo, M.D., the Physician Partners' Representative under the Purchase Agreement (as defined below) (the "Partners' Representative").

RECITALS:

**WHEREAS,** as of the date hereof, the Company intends to acquire all of the issued and outstanding membership interests of Austin Anesthesiology Group, PLLC ("AAG"), pursuant to that certain Membership Interest Purchase Agreement, dated as of October 6, 2011, among the Company, AAG, AAG Holdings, AAG Sidecar LLC, those certain Physicians who are members of AAG, and the Physician Partners' Representative (the "Purchase Agreement") (unless the context shall otherwise require, capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Purchase Agreement);

**WHEREAS,** the Physicians desire to establish an Advisory Board and set forth certain understandings and agreements among themselves regarding the operations of their practice following the Closing under the Purchase Agreement; and

**WHEREAS,** a significant inducement to Physicians' entering into the Purchase Agreement, and consummating the transaction contemplated thereby, is the Physicians' agreement to be bound by the covenants set forth herein, which covenants are narrowly tailored and necessary to protect the Physicians' legitimate interests as a group.

**NOW THEREFORE,** in consideration of the foregoing recitals, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1. Advisory Board.

(a) The Physicians hereby establish a board (the "Advisory Board") to provide binding advice and guidance to the Medical Director on certain matters as further set forth herein. The Advisory Board shall consist of seven (7) members (each an "Advisory Board Member" and, collectively, the "Advisory Board Members"), each of whom must be a party to this Agreement, and one of which shall be the Medical Director. The Advisory Board Members (other than the Medical Director) will serve terms of three (3) years. Two (2) Advisory Board Members will be elected each year consistent with AAG's past practices for management committee elections. The Medical Director's term on the Advisory Board will be co-terminus with the term as Medical Director set forth in Section 3(a). The names of the Advisory Board

EXHIBIT
tabbies
1 - A
162

Members to serve as such shall be evidenced on Exhibit A attached hereto and made a part hereof, as amended upon any change of the Advisory Board.

(b) Any Advisory Board Member may resign at any time by giving written notice to all of the Physicians. The resignation of any Advisory Board Member shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

(c) An Advisory Board Member may be removed, with or without cause, by the affirmative vote of at least a majority of the Physicians. Furthermore, the Advisory Board may by majority vote cast a vote of "no confidence" in an Advisory Board Member, in which case the Advisory Board shall refer the matter to the Physicians for a vote to remove such Advisory Board Member.

(d) If an Advisory Board Member (the "Vacating Member") (i) is removed in accordance with Section 1(c) or (ii) resigns or otherwise vacates the position for any reason, the Physicians shall elect a new Advisory Board Member to replace the Vacating Member by the vote of a simple majority of the Physicians.

(e) Unless otherwise prohibited by any officer or Affiliate of the Company, any Advisory Board Member may examine the books and records of the Company for a purpose reasonably related to such Advisory Board Member's position as an Advisory Board Member.

(f) The Advisory Board Members will not receive any additional compensation from the Company for serving as Advisory Board Members.

(g) The Advisory Board may designate one or more committees. Any such committee, to the extent determined by the Advisory Board, shall have and may exercise all authority determined by the Advisory Board, subject to any restrictions contained herein. The terms, qualifications and duties of the members of such committees shall be determined by the Advisory Board and shall be substantially consistent with the past practices of AAG.

(h) Unless otherwise undertaken by an officer, director or other Affiliate of the Company, the Medical Director, with input from the Advisory Board, shall be responsible for implementing, documenting, carrying-out and enforcing the disciplinary procedures of the Company substantially consistent with the past practices of AAG.

2. Meetings of the Advisory Board.

(a) The Advisory Board may hold its meetings, both regular and special, in such manner as is determined by the Advisory Board from time to time.

(b) At least four (4) of the Advisory Board Members shall be necessary to constitute a quorum for the transaction of business; provided, that every act or decision done or

made by the Advisory Board shall require the affirmative vote of at least four (4) Advisory Board Members.

(c) Advisory Board Members may participate in any meeting of the Advisory Board by means of conference telephone or similar communications equipment, provided all persons participating in the meeting can hear one another, and such participation in a meeting shall constitute presence in person at the meeting.

(d) All votes required of the Advisory Board hereunder may be by voice vote unless a written ballot is requested, which request may be made by one Advisory Board Member.

(e) Any action, which under any provision of this Agreement is to be taken at a meeting of the Advisory Board, may be taken without a meeting by written consent signed by not less than the number of Advisory Board Members necessary to take the action at a meeting of the Advisory Board at which all Advisory Board Members were present and voted. Such written consent will be kept with the records of the Advisory Board.

(f) A majority of the Advisory Board Members may adjourn any Advisory Board meeting to meet again at a stated day and hour or until the time fixed for the next regular meeting of the Advisory Board.

3. Medical Director.

(a) The Physicians acknowledge and agree that Noah Bunker, M.D. has been appointed as the initial Medical Director of the Company pursuant to the Corporate Medical Director Agreement, dated as of the date hereof, by and between Noah Bunker, M.D. and the Company (the "Medical Director Agreement"). Notwithstanding the terms and conditions of the Medical Director Agreement, the initial Medical Director and each other Medical Director of the Company thereafter shall serve for single terms of four (4) years. Any Medical Director may seek re-election for subsequent term(s) of four (4) years each; provided, that the then-current Medical Director who is not re-elected must resign in accordance with the Medical Director Agreement with sufficient notice such that the Medical Director's term is limited to four (4) years. The Medical Director shall be elected by the affirmative vote of a simple majority of the Physicians.

(b) 1 In the event of a dispute between the Medical Director and the Advisory Board and/or the Physicians, a simple majority of the Physicians may cast a vote of "no confidence" in the Medical Director. In such event, the Medical Director shall have thirty (30) days from the date of such vote of no confidence to resolve the dispute with due notification to the Advisory Board and the Physicians of such dispute and the resolution thereof. Should the dispute remain unresolved following the expiration of such thirty (30) day cure period as determined by the Advisory Board in it sole discretion then upon the affirmative vote of a simple majority of the Physicians (excluding, for this purpose, the Medical Director), the Medical Director shall resign as the Medical Director. Furthermore, seventy-five percent (75%) or more of the Physicians (excluding, for this purpose, the Medical Director) (a "Supermajority of the

Physicians") may elect to remove the Medical Director at any time for any reason or for no reason; provided that the Physicians and the Medical Director understand and agree that such removal will be subject to the consent of the Company (such consent not to be unreasonably withheld or delayed). Any such resignation by or removal of the Medical Director pursuant to this Section 3(b) shall occur upon at least ninety (90) days' prior written notice to the Company and the Medical Director. The Physicians and the Medical Director also understand and agree that the Company may elect to remove the Medical Director for any reason or for no reason upon at least ninety (90) days' prior written notice to the Medical Director and the Partners' Representative. The Medical Director may voluntarily resign and terminate his or her services under the Corporate Medical Director Agreement for any reason or for no reason upon at least ninety (90) days' prior written notice to the Company and the Partners' Representative. A majority of the Physicians shall have the power and authority to appoint, by written notice to the Company, a replacement for any terminated Medical Director (a "Replacement Medical Director"), which replacement shall satisfy the qualifications set forth in Addendum 1 to the Corporate Medical Director Agreement ("Addendum 1") and otherwise be acceptable to the Company (such acceptance not to be unreasonably withheld or delayed). The parties acknowledge that under the terms of the Corporate Medical Director Agreement, if the Physicians fail to appoint a Replacement Medical Director who satisfies the qualifications set forth in such Addendum 1 and is otherwise acceptable to the Company (such acceptance not to be unreasonably withheld or delayed) on or before the ninety-first (91st) day following notice of the termination of the Medical Director or the date of death of the Medical Director, then the Company will have the power and authority to appoint a Replacement Medical Director in good faith. If, for any reason, there is a vacancy in the Medical Director position, then pending any replacement thereof in accordance with the terms hereof and the Corporate Medical Director Agreement, a majority of the Physicians shall have the right to immediately appoint a temporary successor to have responsibility for and authority to conduct the rights and duties granted to the Medical Director under the Purchase Agreement and the Physicans' Employment Agreements, which temporary successor shall satisfy the qualifications set forth in Addendum 1 and otherwise be acceptable to the Company (such acceptance not to be unreasonably withheld or delayed); provided that the Company shall appoint a temporary successor if none is appointed by a majority of the Physicians within ten (10) Business Days of any vacancy in the position of Medical Director. For the avoidance of doubt, the Advisory Board may at any time recommend to the Physicians that the Medical Director be removed upon the required vote of the Physicians specified above.

(c) The parties acknowledge that under the Corporate Medical Director Agreement, the Medical Director will receive an annual service stipend from the Company or general group funds of the practice in an amount equal to Ten Thousand Dollars ($10,000). The Medical Director shall defray personal costs of all non-clinical work, including per diem coverage, from any such stipend received for his or her duties as the Medical Director. The Advisory Board may determine in its sole discretion that the Medical Director should receive additional compensation or benefits in consideration for the Medical Director's services in such role, and in such event the Advisory Board shall recommend to the Medical Director the source of such additional compensation or benefits.

(d) The Medical Director shall abide by all of the terms and conditions of this Agreement. The Medical Director shall maintain his or her share of clinical responsibilities throughout his or her service term as Medical Director. The Medical Director is expected to be an effective liaison between the Company and the Physicians and is expected to faithfully and reciprocally communicate all expectations, demands and/or decisions as pertinent to the Company and the Physicians. The Medical Director shall not, and shall use commercially reasonable efforts to cause the Company not to, without seeking approval from the Advisory Board: (i) unilaterally hire or fire any Physicians, associate physicians or other professionals or office staff; (ii) unilaterally alter salaries of the Physicians, associate physicians or other professionals or office staff; (iii) unilaterally alter daily or monthly schedules; (iv) unilaterally alter physician service sites or times; or (v) make recommendations to the President of the Company on salary and bonus disbursement and the division and allocation of the "Performance Incentive Bonus," as defined in the Physicians' Employment Agreements; provided further, that the Medical Director shall make bonus disbursement reports available for inspection by the Physicians at the offices of the Practice. During the Initial Term of the Physicians' Employment Agreements and during the applicable period for negotiating the Renewal Term of the Physicians' Employment Agreements, the Medical Director shall not on behalf of the Company, either directly or indirectly, (i) negotiate, recommend, approve or offer any Physician employment terms and conditions inconsistent in any material respect with the employment terms and conditions of other Physicians (except for the pre-approval of Outside Activities (as defined in the Physicians' Employment Agreements)), or (ii) negotiate, recommend, approve or offer any Physician special incentives, bonuses or other benefits not offered to the other Physicians.

(e) The Corporate Medical Director shall use commercially reasonable efforts to delegate appropriate duties and responsibilities to the Advisory Board from time to time. The Medical Director shall use commercially reasonable efforts to share information from or related to the Company with the Advisory Board.

(f) Notwithstanding anything to the contrary herein, (i) in the event of any conflict between the terms of this Agreement and the Medical Director Agreement, then the terms of the Medical Director Agreement shall control; and (ii) in the event the Medical Director receives advice and/or directives from the Advisory Board and/or the Physicians that conflicts with advice and/or directives from the Company or its Affiliates, then the Physicians understand and agree that the Medical Director will follow the advice and/or directives from the Company and its Affiliates.

4. Partners' Representative.

(a) The Physicians acknowledge and agree that Chi B. Vo, M.D. has been appointed as the Partners' Representative pursuant to the Purchase Agreement and will act as an agent of the Physicians under the Purchase Agreement and is granted such powers as are delegated under the Purchase Agreement.

(b) Notwithstanding the foregoing and the powers that are delegated to the Partners' Representative under the Purchase Agreement, the Partners' Representative shall

provide to the Physicians prompt notice and copies of all notices and communications transmitted to the Partners' Representative by the Buyer under the Purchase Agreement. In addition, the Partners' Representative shall not, without first consulting in good faith with and receiving prior written consent from, a majority of the Physicians:

(A) waive provisions of the Purchase Agreement or any other Transaction Document;

(B) resolve any dispute arising under the Purchase Agreement or any other Transaction Document, including, but not limited to, as contemplated by Section 6 of the Purchase Agreement;

(C) make any material decisions with respect to the defense of any litigation described in Section 6.3 of the Purchase Agreement;

(D) agree to, negotiate, enter into settlements and compromises of, or demand arbitration with respect to any such claims referenced in subparagraphs (ii) and (iii) above; or

(E) take or fail to take any other actions that would have an adverse impact on the rights of the Physicians, economic or otherwise, under the Purchase Agreement.

(c) The Partners' Representative may resign by delivering written notice to the Physicians with a copy to the Buyer, at least thirty (30) days prior to the effective date of such resignation. A majority of the Physicians may terminate the appointment of the Partners' Representative, by delivering written notice thereto, with a copy to the Buyer, which notice shall designate the effective date of such termination not earlier than five (5) Business Days after the Buyer's receipt of such notice. In the event of such resignation or termination, a successor Partners' Representative shall be appointed by a majority of the Physicians and written notice of such appointment shall be delivered to the Buyer. If, at any time, the Partners' Representative has resigned or has been terminated and a successor Partners' Representative has not been appointed in accordance with the foregoing sentence, then unless and until a successor Partners' Representative is so appointed, the Medical Director shall be deemed to be the successor Partners' Representative for purposes of this Agreement and the Purchase Agreement. After the appointment (or deemed appointment) of a person as a successor Partners' Representative, all references to such Partners' Representative shall be deemed to include such successor.

5. Physician Obligations.

(a) Each Physician understands and agrees that (i) in addition to the consideration under the Purchase Agreement, beginning on January 1, 2013, the Physicians are eligible for certain bonuses under the Company's Physician Performance Incentive Program based upon the profits of the Company, (ii) he or she has entered into an Employment Agreement with the Company to perform certain services for the Company for an initial term as set forth in his or her Employment Agreement (the "Initial Term") and (iii) if he or she

terminates his or her employment with the Company prior to the expiration of the Initial Term, the Physicians may suffer harm, including, without limitation, increased workloads necessitated by such termination, material impairment of the ability of the Physicians to earn bonuses under the Company's Physician Performance Incentive Program, material impairment of the Physician' relationships with hospitals and other health-care facilities, third-party payors and other stakeholders, and hiring and training costs related to replacement physicians.

(b) In light of the foregoing, if a Physician's employment with the Company is terminated for any reason during the Initial Term of a terminating Physician's Employment Agreement other than a termination without cause by the Company, subject to Section 5(c) hereof, then such terminating physician (a "Terminating Physician") shall promptly pay to the non-terminating Physicians, but in any event within five (5) Business Days of the termination of such Terminating Physician's employment, as liquidated damages, and not as a penalty, the amount set forth below to be shared equally by the non-terminating Physicians (the "Liquidated Damages Amount"). If the Liquidated Damages Amount is not paid by the Terminating Physician within such five (5) Business Day period, then the Liquidated Damages Amount shall thereafter bear interest at the rate of ten percent (10%) per annum until such Liquidated Damages Amount, together with the accrued interest, is paid in full.

| Terminating Physician | Liquidated Damages Amount |
|---|---|
| Carolyn G. Biebas, M.D. | $400,000 |
| James C. Chapin, M.D. | $400,000 |
| Richard S. Himes, Jr., M.D. | $320,000 |
| Richard L. Laube, M.D. | $320,000 |
| Gary J. Mihm, M.D. | $240,000 |
| Sharon A. Oxford, M.D. | $400,000 |
| All other Physicians | $500,000 |

The Liquidated Damages Amount for Ann John, M.D. shall be (i) $375,000 if the termination date occurs prior to the two (2) year anniversary of employment with the Company, or (ii) $300,000 if the termination date occurs at anytime thereafter during the Initial Term of her Employment Agreement.

In addition to the Liquidated Damages Amount, the Terminating Physician shall reimburse the Company and the Physicians for all out of pocket costs and attorneys' fees incurred by the Company and/or the Physicians in any arbitration or litigation to enforce the Terminating Physician's Employment Agreement or this Agreement. The Physicians each acknowledge and agree that the Liquidated Damage Amount is reasonable in light of the anticipated harm which would be caused by a Terminating Physician's breach of or default under this Agreement, the difficulty of proof of loss, the inconvenience and non-feasibility of otherwise obtaining an adequate remedy, and the value of the transactions to be consummated under the Purchase Agreement and the other Transaction Documents.

(c) Notwithstanding the foregoing and for the avoidance of doubt, it is hereby acknowledged and agreed that the provisions set forth in this Section 5 shall not apply to a Physician in the event (i) of the death of such Physician, (ii) such Physician suffers a permanent Disability (as defined in the Physician's Employment Agreement) or an "own occupation" disability, (iii) such Physician is terminated due to a Material Decline or Right-Sizing (as such terms are defined in the Physician's Employment Agreement), (iv) the Company's contract with St. David's Healthcare Partnership is terminated, (v) of Physician's Qualifying Termination (as defined in the Physician's Employment Agreement), or (vi) of an approved termination pursuant to Section 5(d) below. The Physicians also acknowledge and agree that unforeseen conditions may arise during the Initial Term that may prompt a Physician to terminate his or her employment with the Company. Under such circumstances, a Physician may petition the Advisory Board and upon receiving the written consent of a majority of the Advisory Board, may terminate his or her employment with the Company without being required to pay the Liquidated Damages Amount and the out of pocket costs and attorneys' fees referenced in Section 5(b) above.

(d) Conflict of Interest. In the event that a Physician desires to voluntarily terminate his or her Employment Agreement in order to provide other services to the Company or its Affiliates, such Physician may petition the other Physicians to allow the termination of his or her employment with the Company, and upon receiving the written consent of at least a majority of the other Physicians, may terminate his or her employment with the Company without being required to pay the Liquidated Damages Amount and the out of pocket costs and attorneys' fees referenced in Section 5(b) above. During the Initial Term of the Physicians' Employment Agreements and during the applicable period for negotiating the Renewal Term of the Physicians' Employment Agreements, each Physician shall report to the Advisory Board the occurrence of any offer, negotiation or discussion whereby any such Physician would receive employment terms and conditions inconsistent in any material respect with the employment terms and conditions of other Physicians (except for the pre-approval of Outside Activities (as defined in the Physicians' Employment Agreements)), or any special incentives, bonuses or other benefits not offered to the other Physicians.

(e) The Physicians acknowledge and agree that nothing contained in this Agreement shall in any way limit or impair the Company's rights under any Employment Agreements or other agreements with the Physicians.

6. Indemnification.

(a) Any person who at any time serves or has served as an Advisory Board Member shall have a right to be indemnified by the Physicians to the fullest extent permitted by law against (i) reasonable expenses, including attorneys' fees, actually and necessarily incurred by him or her in connection with any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (and any appeal therein), and whether or not brought by or on behalf of the Physicians, seeking to hold him or her liable by reason of the fact that he or she is or was acting in such capacity, and (ii) reasonable payments made by him or her in satisfaction of any judgment, money decree, fine, penalty or settlement for which he or she may have become liable in any such action, suit or proceeding; provided

however, that an Advisory Board Member shall only be entitled to indemnification pursuant to this Section 6 so long as such Advisory Board Member acted in good faith in carrying out the decisions or actions which were the subject or basis of liability as set forth above in items (i) and (ii); provided further, that no Advisory Board Member shall be entitled to indemnification in the event of such Advisory Board Member's gross negligence.

(b) The Advisory Board shall take all such action as may be necessary and appropriate to require the Physicians to pay the indemnification required by this provision, including without limitation, to the extent needed, making a good faith evaluation of the manner in which the claimant for indemnity acted and of the reasonable amount of indemnity due him or her. The Physicians shall pay their Pro Rata Share of such indemnity claim to the claimant within ten (10) business days of receipt of notice of any such claim for indemnity. For purposes of this Section 6, the "Pro Rata Share" shall be an amount equal to the total amount of the indemnity claim approved by the Advisory Board divided by the then-current number of Physicians party to this Agreement. If a Physician's Pro Rata Share is not paid within ten (10) business days, then interest shall accrue at the rate of ten percent (10%) per annum until such Pro Rata Share, together with the accrued interest, is paid in full.

(c) Any person who at any time after the adoption of this provision serves or has served on the Advisory Board shall be deemed to be doing or to have done so in reliance upon, and as consideration for, the right of indemnification provided herein. Such right shall inure to the benefit of the legal representatives of any such person and shall not be exclusive of any other rights to which such person may be entitled apart from the provision of this provision.

(d) The Physicians shall (upon receipt of an undertaking by or on behalf of the Advisory Board Member involved) pay expenses (including attorneys' fees) incurred by such Advisory Board Member in defending any threatened, pending or completed action, suit or proceeding and any appeal therein whether civil, criminal, administrative, investigative or arbitrative and whether formal or informal or appearing as a witness at a time when he or she has not been named as a defendant or a respondent with respect thereto in advance of the final disposition of such proceeding.

7. Miscellaneous.

(a) Notices and Voting Procedures. All notices and other communications hereunder shall be in writing and may be given by personal delivery, reputable express courier, registered or certified mail (return receipt requested), or by email, in the discretion of the Advisory Board. Such notice shall be deemed effective when received if it is given by personal delivery, reputable express courier or email, and will be effective three (3) days after mailing by registered or certified mail, so long as it is actually received within five (5) days (and, if not so received within five (5) days, is effective when actually received), to the parties at the addresses specified on Exhibit B hereto or such other address of which notice is provided pursuant to this provision. Any vote, consent or approval of either the Advisory Board or the Physicians may be delivered and conducted by email ballot or any other means determined by the Advisory Board. Meeting minutes and voting records shall be recorded and disseminated by the Advisory Board in a manner substantially consistent with the past practices of AAG.

(b) Enforcement. The Physicians agree that a breach or violation of the terms of this Agreement by any of them may cause irreparable damage to the other, the exact amount of which is impossible to ascertain, and for that reason the Physicians agree that the non-breaching parties will be entitled to a decree of specific performance of the terms of this Agreement or an injunction restraining further breach or violation thereof by the breaching party or parties, said right to be in addition to any other remedies of the parties.

(c) Amendments. This Agreement may be amended only with the approval of at least a majority of the Physicians. Any amendments to this Agreement shall be binding on all Physicians, the Medical Director and the Partners' Representative.

(d) No Third Party Beneficiaries. This Agreement is entered into solely for the benefit of the parties hereto and no term, provision or covenant hereunder shall confer or be deemed to confer a benefit on any other person, other than as may be set forth herein.

(e) Assignment. No party hereto may assign, delegate or otherwise transfer any of such party's rights, interests or obligations under this Agreement.

(f) Severability. Each provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall, to the greatest extent possible, not affect the legality or validity of the remainder of this Agreement. In the event that any provision of this Agreement shall be declared by a court of competent jurisdiction to exceed the limits such court deems reasonable and enforceable, said provisions shall be deemed modified to the minimum extent necessary to make such provisions reasonable and enforceable.

(g) No Waiver. Neither the failure nor any delay on the part of any party hereto in exercising any right, power or privilege granted herein shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise of any other right, power or privilege which may be provided by law.

(h) Counterparts; Delivery by Facsimile. This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one agreement. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or by e-mail in PDF or similar format, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re-execute original forms of this Agreement and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or e-mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or e-mail as a defense to the formation of a contract and each such party forever waives any such defense.

(i) Controlling Law. This Agreement has been entered into in the State of Texas, and this Agreement, including any rights, remedies, or obligations provided for hereunder, shall be construed and enforced in accordance with the laws of the State of Texas.

(j) Non-Voting Physicians. Notwithstanding anything herein to the contrary, Richard S. Himes, Jr., M.D., Richard L. Laube, M.D. and Gary J. Mihm, M.D. (the "Non-Voting Physicians") shall not be entitled to vote on any matter set forth herein and are not eligible to serve on the Advisory Board; provided however, that such Non-Voting Physicians shall have all other rights, and be bound by all obligations, of the Physicians under this Agreement.

(k) Additional Physicians. From time to time after the Effective Date of this Agreement, the Advisory Board may invite new physicians hired by the Company ("New Physicians") to participate in the benefits and become bound by the terms of this Agreement by signing a joinder to this Agreement in a manner determined by the Advisory Board. In such event, the Advisory Board will determine any and all conditions, rights and duties associated with any New Physician's joinder to this Agreement and such New Physicians shall thereafter be "Physicians" hereunder for all purposes; provided however, that New Physicians shall not be subject to the provisions of Sections 4 and 5(a) through 5(d) of this Agreement and shall not be considered a "Physician" for the purposes of such sections.

(l) Replacement Medical Directors. Any Replacement Medical Director must become bound by the terms of this Agreement by signing a joinder to this Agreement in the form of Exhibit C hereto.

(m) Spousal Consent. As a condition precedent to the effectiveness of the Agreement, each Physician's spouse shall execute a consent substantially in the form attached hereto as Exhibit D.

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

PHYSICIANS:

______________________________
Erick S. Allen, M.D.

______________________________
Mark Archibald, M.D.

______________________________
Scott Bale, M.D.

______________________________
Shawn A. Barrett, M.D.

______________________________
T. Mark Bedillion, M.D.

______________________________
Carolyn G. Biebas, M.D.

______________________________
Ravneet K. Biring, M.D.

______________________________
Elizabeth L. Buchholz, M.D.

______________________________
W. Andrew Buchholz, M.D.

______________________________
Noah S. Bunker, M.D.

______________________________
Paul Carrell, M.D.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

_______________________________
James C. Chapin, M.D.

_______________________________
Holly Clause, M.D.

_______________________________
David J. Cross, M.D.

_______________________________
William J. Crowley, III, M.D.

_______________________________
B. Will Curtis, M.D.

_______________________________
Jad L. Davis, M.D.

_______________________________
Brian D. Dewan, M.D.

_______________________________
Khoa Do, M.D.

_______________________________
Allen D. Dornak, M.D.

_______________________________
Cedric Dupont, M.D.

_______________________________
Stanley R. Eckert, M.D.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

Joseph D. Eddings, M.D.

William A. Eilers, III, M.D.

S. Drake Fason, M.D.

Troy W. Gras, M.D.

Deborah L. Hamill, M.D.

Christine Harrison, M.D.

LD R. Herzog, M.D.

Steven S. Hewitt, M.D.

Richard S. Himes, Jr., M.D.

Everett Brew Houston, Jr., M.D.

Rima Jakstys, M.D.

23502.2-688675 v1

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

______________________________
Zeeyoung T. Jang, M.D.

______________________________
Jeffrey M. Jekot, M.D.

______________________________
Ann John, M.D.

______________________________
Joe D. Kocks, Jr., M.D.

______________________________
Richard L. Laube, M.D.

______________________________
Jonathan J. Lee, M.D.

______________________________
Scott J. Leighty, M.D.

______________________________
Suzanne N. Lima, M.D.

______________________________
Shelby Marquardt, M.D.

______________________________
Gary J. Mihm, M.D.

______________________________
George M. Miller, M.D.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

______________________________
Steven E. Miller, M.D.

______________________________
Martin C. Milliken, M.D.

______________________________
Paul B. Nelson, M.D.

______________________________
Jeffrey J. Nitzsche, M.D.

______________________________
Oliver E. Orth, M.D.

______________________________
Sharon A. Oxford, M.D.

______________________________
Dimpal R. Patel, M.D.

______________________________
M. Brett Pillow, M.D.

______________________________
Vijay K. Ravula, M.D.

______________________________
Jeffrey J. Rockwell, M.D.

______________________________
Kevin R. Shelly, M.D.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Advisory Board and Internal Operations Agreement to be effective as of the date first above written.

Gary W. Smith, M.D.

Tracy D. Strandhagen, M.D.

Ryan Sturgeon, M.D.

Chi B. Vo, M.D.

David J. Walton, M.D.

MEDICAL DIRECTOR:

Noah Bunker, M.D.

Address:

PARTNERS' REPRESENTATIVE:

Chi B. Vo, M.D.

Address:

**EXHIBIT A**

**ADVISORY BOARD**

| | |
|---|---|
| Noah S. Bunker, M.D. | (term expires on [October 6], 2015) |
| Paul Carrell, M.D. | (term expires on December 31, 2012) |
| Jad L. Davis, M.D. | (term expires on December 31, 2013) |
| LD R. Herzog, M.D. | (term expires on December 31, 2011) |
| Everett Brew Houston, Jr., M.D. | (term expires on December 31, 2013) |
| Jonathan J. Lee, M.D. | (term expires on December 31, 2012) |
| Jeffrey J. Rockwell, M.D. | (term expires on December 31, 2011) |

23502.2-688675 v1

# EXHIBIT B

## NOTICE ADDRESSES

| Last | First | Full Address |
|---|---|---|
| Allen | Erick S. | 6802 Edgefield Drive Austin TX, 78731-2906 |
| Archibald | Mark | 12909 Park Dr Austin TX, 78732 |
| Bale | Scott | 3421 Bunny Run Austin TX, 78746 |
| Barrett | Shawn A. | 1205 Norwalk Lane, Unit E Austin TX, 78703 |
| Bedillion | T. Mark | PO Box 50536 Austin TX, 78763-0536 |
| Biebas | Carolyn G. | 2504 Velasquez Austin TX, 78703 |
| Biring | Ravneet K. | 714 W. Monroe, #4 Austin TX, 78704 |
| Buchholz | Elizabeth L. | 1905 Manana Street Austin TX, 78730 |
| Buchholz | W. Andrew | 1905 Manana Street Austin TX, 78730 |
| Bunker | Noah S. | 2900 Round Table Road Austin TX, 78746 |
| Carrell | Paul | 3101 Toro Canyon Road Austin TX, 78746 |
| Chapin | James C. | 2003 Ringtail Ridge Austin TX, 78746 |
| Clause | Holly | 4017 Bunny Run Austin TX, 78746 |
| Cross | David J. | 511 Texas Ave Austin TX, 78705 |
| Crowley, III | William J. | 4505 Elkwater Cove Austin TX, 78746 |
| Curtis | B. Will | 421 West 3rd Street, #1910 Austin TX, 78701 |
| Davis | Jad L. | 2319 Woodway Round Rock TX, 78681 |
| Dewan | Brian D. | 5805 Gentle Breeze Terrace Austin TX, 78731 |
| Do | Khoa | 1753 Gaylord Drive Austin TX, 78728 |
| Dornak | Allen D. | 801 W. 5th St #1706 Austin, TX, 78703 |
| Dupont | Cedric | 29 Pascal Lane Austin TX, 78746 |
| Eckert | Stanley R. | 7713 Sandia Loop Austin TX, 78735 |
| Eddings | Joseph D. | 404 Talkeetna Ln Cedar Park TX, 78613 |
| Eilers, III | William A. | 502 Indigo Ln Georgetown TX, 78628 |
| Fason | S. Drake | 3410 Foothill Terrace Austin TX, 78731 |
| Gras | Troy W. | 1609 Lynnville Trail Austin TX, 78727 |
| Hamill | Deborah L. | 4005 Hidden Canyon Cove Austin TX, 78746 |
| Harrison | Christine | 708 Garner Avenue Austin TX, 78704 |
| Herzog | LD R. | 3010 Hatley Drive Austin TX, 78746 |
| Hewitt | Steven | 1105 Sprague Lane Austin TX, 78746 |
| Himes, Jr. | Richard S. | 714 Windsong Trail Austin TX, 78746 |
| Houston. Jr. | Everett B. | 2901 Wade Avenue Austin TX, 78703 |
| Jakstys | Rima | 4601 N Lamar Blvd Unit 5211 Austin TX, 78751 |
| Jang | Zeeyoung | 4009 Lewis Lane, #A Austin TX, 78756 |
| Jekot | Jeffrey M. | 3804 Woodcutter's Way Austin TX, 78746-1543 |
| John | Ann | 2002 Kinney Unit B Austin TX, 78704 |
| Kocks, Jr. | Joe D. | 1607 Mt. Larson Road Austin TX, 78746 |

| Laube | Richard L. | 412 Beardsley Lane Austin TX, 78746 |
|---|---|---|
| Lee | Jonathan J. | 1806 Intervail Dr. Austin TX, 78746 |
| Leighty | Scott J. | 3900 Walnut Clay Drive Austin TX, 78731 |
| Lima | Suzanne N. | 4112 Avenue B Austin TX, 78751 |
| Marquardt | Shelby | 1904 W. Koenig Lane Austin TX, 78756 |
| Mihm | Gary J. | 4708 Peace Pipe Path Austin TX, 78746 |
| Miller | George M. | 4603 Strass Dr Austin TX, 78731 |
| Miller | Steven E. | 7206 Villa Maria Lane Austin TX, 78759 |
| Milliken | Martin C. | 1810 Raleigh Avenue Austin, TX, 78703 |
| Nelson | Paul B. | 311 West 5th St. #1103 Austin TX, 78701 |
| Nitzsche | Jeffrey J. | 5408 Cuesta Verde Austin TX, 78746 |
| Orth | Oliver E. | 5013 Spartanburg Cove Austin TX, 78730 |
| Oxford | Sharon A. | 3606 Fall Trail Austin TX, 78731 |
| Patel | Dimpal R. | 4613 Twin Valley Circle Austin TX, 78731 |
| Pillow | M. Brett | 316 Eanes School Rd. Austin TX, 78746 |
| Ravula | Vijay K. | 4206 Bellvue Ave. Austin TX, 78756 |
| Rockwell | Jeffrey J. | 2914 Montebello Court Austin TX, 78746 |
| Shelly | Kevin R. | 3008 Pescadero Cove Austin TX, 78746 |
| Smith | Gary W. | 3416 Mt Bonnell Circle Austin TX, 78731 |
| Strandhagen | Tracy D. | 600 Riders Trail Austin TX, 78733 |
| Sturgeon | Ryan | 11425 Dona Villa Drive Austin TX, 78726 |
| Vo | Chi B. | 5911 Mountain Villa Drive Austin TX, 78731 |
| Walton | David J. | 3501 Native Dancer Cove Austin TX, 78746 |

**EXHIBIT C**

**JOINDER TO ADVISORY BOARD AND INTERNAL OPERATIONS AGREEMENT**

I hereby accept my appointment as Medical Director pursuant to the Advisory Board and Internal Operations Agreement dated October 6, 2011 (the "Agrement"), and agree to be bound by the terms of, and to comply with and fulfill all obligations, commitments, and agreements otherwise imposed upon the Medical Director thereunder.

______________________________

____________________, **M.D.**
"Replacement Corporate Medical Director"

**EXHIBIT D**

**FORM OF SPOUSAL CONSENT**

**WRITTEN CONSENT OF SPOUSE OF ____________________, M.D.**

In connection with that certain Advisory Board and Internal Operations Agreement entered into on October __, 2011 (the "Advisory Board Agreement"), by, between and among the individual physicians, including the Signatory (as defined below), whose names are set forth on the signature pages thereto (collectively, the "Physicians"), the undersigned, being the lawful spouse of ______________________, M.D. ("Signatory") hereby certifies as follows:

1. I hereby consent to the execution by Signatory of the Advisory Board Agreement and the performance by Signatory of Signatory's obligations under the Advisory Board Agreement.

2. I have had an opportunity to review the Advisory Board Agreement.

3. I have had an opportunity to consult with an attorney and other advisors regarding the Advisory Board Agreement and the transactions contemplated thereunder prior to executing and delivering this written consent.

4. I hereby acknowledge and agree that the Physicians and their respective agents and affiliates are entitled to rely on the consent provided hereunder.

**IN WITNESS WHEREOF,** the undersigned has duly executed this Written Consent on October ____, 2011.

____________________________________
Name:

____________________________
Witness

23502.2-688675 v1

Filed
13 October 23 A9:43
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-13-002811

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN, PLAINTIFF, | § § § § | IN THE DISTRICT COURT |
| v. | § § § | TRAVIS COUNTY, TEXAS |
| NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS, and HOLLY CLAUSE DEFENDANTS. | § § § § § § | 353RD JUDICIAL DISTRICT |

**DEFENDANTS' FIRST AMENDED ANSWER**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE, Defendants in the above entitled and numbered cause, and file their First Amended Answer, and would show unto the Court as follows:

**I.**

As authorized by Rule 92 of the Texas Rules of Civil Procedure, Defendants NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE generally deny each and every allegation contained in Plaintiff's Original Petition or any superseding or supplemental petitions, and respectfully request that Plaintiff be required to prove same by a preponderance of the evidence as required by the Constitution and the laws of the State of Texas.

**II.**

Defendants assert some and/or all of the issues the subject of Plaintiff's Declaratory Judgment have not matured and Plaintiff's claims should be dismissed.

III.

Defendants invoke §37.006 of the TEX. CIV. PRAC. & REM. CODE and assert all persons who have or claim any interest that would be affected by this declaratory action have not been made parties to this action.

IV.

Defendants invoke §37.008 of the TEX. CIV. PRAC. & REM. CODE, which states that the court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.

V.

Defendants assert that Plaintiff does not have a separate, valid cause of action against the named Defendants.

VI.

Defendants have retained the services of Carls McDonald & Dalrymple, L.L.P. to assist them in this matter. Accordingly, Defendants seek recovery of their attorneys' fees incurred in this matter pursuant to TEX. CIV. PRAC. & REM. CODE §37.009.

WHEREFORE, PREMISES CONSIDERED, Defendants NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE respectfully pray as follows:

1. That upon trial of this matter judgment be entered that Plaintiff take nothing;
2. That Defendants be awarded reasonable attorneys' fees;
3. That Defendants be discharged with their costs incurred herein; and
4. For such other and further relief to which Defendants may be justly entitled.

Respectfully submitted,

CARLS, MCDONALD & DALRYMPLE, L.L.P.
Barton Oaks Plaza 1
901 South Mopac Expressway
Suite 280
Austin, Texas 78746
(512) 472-4845
(512) 472-8403 (fax)

By: Kelly A. McDonald
Kelly A. McDonald
State Bar No. 13551275
Carla Garcia Connolly
State Bar No. 07631100

ATTORNEYS FOR DEFENDANTS
NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been sent by hand delivery, certified mail, return receipt requested, electronic means or facsimile to:

Daniel H. Byrne
Lessie G. Fitzpatrick
FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, TX 78701-4286
**VIA FAX**

in accordance with the Texas Rules of Civil Procedure, on the 23rd day of October, 2013.

Kelly A. McDonald
Kelly A. McDonald

1/30/2014 4:51:30 PM
Amalia Rodriguez-Mendoza
District Clerk
Travis County
D-1-GN-13-002811

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN, PLAINTIFF, | § | IN THE DISTRICT COURT |
| v. | § | TRAVIS COUNTY, TEXAS |
| NOAH S. BUNKER, PAUL CARRELL, EVERETT DREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS, and HOLLY CLAUSE DEFENDANTS. | § | 353RD JUDICIAL DISTRICT |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, NOAH S. BUNKER, PAUL CARRELL, EVERETT DREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE, Defendants in the above entitled and numbered cause, and file their Response in Opposition to Plaintiff's Motion for Summary Judgment, and would show the Court as follows:

### I. Summary of Argument

Plaintiff is not entitled to summary judgment because (1) she has failed to establish that the liquidated damages provision in the Advisory Board and Internal Operations Agreement is an unenforceable penalty; and (2) the liquidated damage provision does not require Defendants to assert rights under Plaintiff's employment agreement.

### II. Background

Plaintiff Tracy D. Strandhagen and the fifty nine other partners in Austin Anesthesiology Group, PLLC sold their membership interests to American

Anesthesiology of Texas, Inc. in October 2011. At the same time that the physicians negotiated the buyout, they negotiated and entered into employment agreements with the new group. To further shape their ongoing working relationships, the physicians also negotiated and entered into an Advisory Board and Internal Operations Agreement ("Agreement") among themselves, pursuant to which they established an advisory board from their members to provide advice and guidance to the medical director and committed to each other that they would not terminate their employment with the new company during their initial terms. They agreed that if a physician did terminate employment with the new company during the initial term, the other physicians would be subject to harm, including, increased workloads necessitated by the termination, material impairment of their ability to earn bonuses under the Physician Performance Incentive Program, material impairment of the physician's relationships with hospitals and other health care facilities, third party payors and other stakeholders, and hiring and training costs related to replacement physicians. In light of the difficulty of proof of loss and the inconvenience and non-feasibility of obtaining an adequate remedy, the terminating physician would pay the others a liquidated damage amount. For Plaintiff and most of the others, this amount was $500,000. The physicians expressly agreed that the liquidated damage amount was reasonable in light of the terms of their Agreement, the difficulty of proof of losses, the inconvenience and non-feasibility of otherwise obtaining an adequate remedy and the value of the transactions consummated under the purchase agreement and other transaction documents. *See* Agreement, attached as Exhibit 1-A to Plaintiff's Motion.

Plaintiff's employment terminated in 2013. The facts surrounding her termination are in dispute. They are the subject of legal proceedings she initiated with the EEOC and

the ongoing dispute between Plaintiff and her former employer. Plaintiff filed this declaratory judgment action asking the court to preemptively determine that (1) the liquidated damages provision in the Agreement could not be enforced against her because she was terminated without cause; and (2) the liquidated damages provision was an unenforceable penalty. The Court sustained Defendant's Plea to the Jurisdiction with regard to Plaintiff's claim that she was terminated without cause. Plaintiff now moves for summary judgment on her claim that the liquidated damages provision is unenforceable.

**III. Plaintiff's First Claim**

Plaintiff contends that the liquidated damages provision in the Agreement is an unenforceable penalty. Liquidated damages are an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach. *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427 (Tex. 2005), *citing Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 664 (Tex. 2005). Generally, a liquidated damages provision is enforceable if, at the time the contract is entered into, actual damages are difficult to estimate and the amount specified in the contract is a reasonable forecast of just compensation.

Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law, but if fact issues exist, they must be resolved before the legal issue can be decided. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991). A claim that a liquidated damages provision is an unenforceable penalty is an affirmative defense to the enforceability of the provision and the summary judgment movant has the burden of conclusively establishing every element of the defense. *Id.*;

*Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984); *Ryland Grp. v. Hood*, 924 S.W. 2d 120, 121 (Tex. 1996) (*per curiam*); *Liaquat Ali Khan v. Nizarali Meknojiya* No. 03-11-00580-CV, 2013 WL 3336874, at *2 (Tex. App. – Austin June 28, 2013, no pet.); *GPA Holding, Inc. v. Baylor Health Care System*; 344 S.W.3d 467, 475 (Tex. App. – Dallas 2011, pet denied).

In order to prevail on a motion for summary judgment that a liquidated damage clause was an unenforceable penalty, a movant would have to conclusively establish that:

(1) the harm caused by the breach is not incapable or difficult of estimation; and

(2) the liquidated damages amount agreed to among the parties is was not a reasonable forecast of just compensation.

*Phillips*, 820 S.W.2d at 788; *GPA Holding*, p. 476. Evidence related to the lack of difficulty of estimation of damages and the lack of reasonableness of the forecast must be viewed as of the time the contract was executed. *Baker v. International Record Syndicate, Inc.*, 812 S.W.2d 53 (Tex. App. – Dallas 1991, no pet.), *citing Mayfield v. Hicks*, 575 S.W.2d 571, 576 (Tex. Civ. App. - Dallas 1978, writ ref'd n.r.e.).

Additionally, the party seeking to invalidate the liquidated damages provision must prove the amount of the other party's actual damages and show that the liquidated damages are disproportionate to the actual damages. *Phillips* 820 S.W.2d at 788; *Baker* at p. 55; *citing Commercial Union Ins. Co. v. La Villa School Dist.*, 779 S.W.2d 102, 107 (Tex. App. - Corpus Christi 1989, no writ); *Garden Ridge v. Advance International, Inc.*, 403 S.W.3d 432, 440 (Tex. App. – Houston [14th Dist.] 2013, pet. filed), *citing Chan v. Montebello Dev. Co.*, No. 14-06-00936-CV, 2008 WL 2986379, at *3 (Tex. App. – Houston [14h Dist.] July 31, 2008, pet. denied).

Plaintiff cannot prevail on her motion for summary judgment because she has offered no evidence:

(1) that the damages for breach were not incapable or difficult to ascertain;

(2) the liquidated damages amount agreed to by the parties was not a reasonable forecast of just compensation when the Agreement was entered into; or

(3) of the actual amount of damages for her breach and that it is disproportionate to the stipulated liquidated damage amount.

In order to prevail, Plaintiff is required to conclusively establish all three elements. All three inquiries involve questions of fact. Plaintiff has not offered any facts to establish any of these three required elements.

Plaintiff contends only that because the damages would be the same if she breached on the first day or the last day, the amount of liquidated damages is not reasonable. She offers no law to support her contention that the liquidated damage amount must be calibrated to the date of her breach. It would not be reasonable or workable to impose such a requirement.

At the time the Agreement was entered into, it was unknown when a breach, if there was one, would occur. At the time the contract was entered into, the parties could not calculate what the actual damages would be for each identified type of harm that would be sustained, beginning on an unknown date in the future, or how long the harm would be suffered. Damage analysis is dependent upon a number of factors that could not be ascertained in advance, as well as factors that are highly subjective. For example, the effect of the termination on the other physicians' ability to earn bonuses would depend on the revenues and expenses at the time of the breach, the impact and duration of a decline in profits associated with the termination. To quantify damages to the physicians'

ongoing relationships with hospitals, surgery centers and third party payors, extensive information would be needed about specifics of those relationships at the time of the breach. The valuation of the harm caused by increased workloads necessitated by termination is a subjective analysis.

Given the amount of time and expense and likelihood for disagreement that would be involved in calculating damages for breach, there is no question why the physicians found it advantageous to estimate what they considered to be a fair amount of compensation for harm they believed would occur in the event of a breach. Liquidated damages provide a means for parties who are faced with unknown, uncertain and difficult to predict damages to blend all of these unknown factors and agree among themselves upon an estimate they consider to be reasonable in light of their assessment of the anticipated harm. Whether the liquidated damages amount might be unreasonable on the first or last day is not in issue. The issue is whether it was reasonable at the time of termination. Plaintiff failed to provide any evidence that it was unreasonable at the time of termination.

## IV. Plaintiff's Second Claim

In her second ground for summary judgment, Plaintiff asserts that the liquidated damages provision of the Agreement is not enforceable against her because it seeks to render her liable to the Defendants for breach of her employment agreement, which they are not parties to. She claims that because the Defendants were not parties to or third party beneficiaries to her employment agreement, they cannot seek damages from her for terminating her employment.

Plaintiff's assertion is without merit. Although superficially similar, Plaintiff's employment agreement with her former employer is not the same as the Advisory Board and Internal Operations Agreement she entered into with her physician colleagues. The contractual commitments were made in different contracts, between different parties, for different reasons, and for different consideration. The enforceability of the Agreement entered into between Plaintiff and Defendants and its liquidated damages provision does not require Defendants to have standing to assert rights under Plaintiff's employment agreement. Plaintiff's citation of *Resolution Trust Corp. v. Kemp*, 951 F.2d 657, 662 (5th Cir. 1992) is not on point. In that case, the appellant's claims were based solely on a subordination agreement to which it was not a party. Those facts are quite different from those presented in this case. Defendants entered into a separate agreement with Plaintiff. Defendants have not claimed rights under Plaintiff's employment agreement.

## V. Conclusion and Prayer

Plaintiff has failed to prove as a matter of law, all of the essential elements of the affirmative defense that the liquidated damages clause is an unenforceable penalty. She has failed to provide any evidence on the three elements she is required to prove in order to prevail. *See MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex. 1986). Further, evidence presented by Defendants reflects that issues of fact exist that would preclude a summary judgment on this issue. Plaintiff has failed to show that no genuine issue of material fact exists and that she is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). *Provident Life & Acc. Ins. Co. v. Knott,* 128 S.W.3d 211, 215-16 (Tex. 2003).

WHEREFORE, PREMISES CONSIDERED, Defendants NOAH S. BUNKER, PAUL CARRELL, EVERETT DREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT

J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE respectfully pray that the Court deny Plaintiff's Motion for Summary Judgment and award and such other and further relief to which Defendants may be justly entitled.

Respectfully submitted,

CARLS, MCDONALD & DALRYMPLE, L.L.P.
Barton Oaks Plaza 1
901 South Mopac Expressway Suite 280
Austin, Texas 78746
(512) 472-4845
(512) 472-8403 (fax)

By: Kelly A. McDonald
Kelly A. McDonald
State Bar No. 13551275
Carla Garcia Connolly
State Bar No. 07631100

ATTORNEYS FOR DEFENDANTS
NOAH S. BUNKER, PAUL CARRELL, EVERETT DREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been sent by certified mail, return receipt requested and by electronic means in accordance with the Texas Rules of Civil Procedure, on the 30th day of January, 2014 to:

Daniel H. Byrne
Lessie G. Fitzpatrick
FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, TX 78701-4286

Kelly A. McDonald
Kelly A. McDonald

2/25/2014 10:41:46 AM
Amalia Rodriguez-Mendoza
District Clerk
Travis County
D-1-GN-13-002811

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN,<br>PLAINTIFF, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT |
| v. | §<br>§<br>§ | TRAVIS COUNTY, TEXAS |
| NOAH S. BUNKER, PAUL CARRELL,<br>EVERETT DREW HOUSTON, JR.,<br>W. ANDREW BUCHHOLZ, SCOTT J.<br>LEIGHTY, JAD L. DAVIS, and<br>HOLLY CLAUSE<br>DEFENDANTS. | §<br>§<br>§<br>§<br>§<br>§ | 353RD JUDICIAL DISTRICT |

**DEFENDANTS' REPLY TO PLAINTIFF'S SUPPLEMENTAL BRIEIFING IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, NOAH S. BUNKER, PAUL CARRELL, EVERETT DREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE, Defendants in the above entitled and numbered cause, and file their Reply to Plaintiff's Supplemental Briefing Submitted to the Court after the February 20, 2014 hearing and would show the Court as follows:

After the hearing on Plaintiff's Motion for Summary Judgment, Plaintiff provided the Court with supplemental copies of the cases presented at the hearing, along with commentary on those cases and additional cases not cited in her motion or reply brief, or presented to the Court at the hearing. As Plaintiff's Reply brief to Defendants' Response was filed after 5:00 p.m. the evening before the summary judgment hearing, Defendants were not able to provide the Court with a rebuttal brief prior to the hearing. Defendants wish to respond to the points raised in Plaintiff's Reply brief and in the supplemental briefing submitted to the Court after the hearing.

Strandhagen asserts as the basis for her summary judgment motionthat the liquidated damage clause is an unenforceable penalty. Texas law consistently holds that such a claim is an affirmative defense and the party asserting the defense must establish each and every element of the defense. The party must establish that the harm caused by the breach is not hard to estimate and that the liquidated amount is not a reasonable forecast of just compensation. *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *Brownlee v. Brownlee,* 665 S.W.2d 111, 112 (Tex. 1984); *Ryland Grp. v. Hood*, 924 S.W. 2d 120, 121 (Tex. 1996) (*per curiam*); *GPA Holding, Inc. v. Baylor Health Care System*; 344 S.W.3d 467, 475 (Tex. App. – Dallas 2011, pet denied). None of the cases cited by Plaintiff support her assertion that in order to be granted a summary judgment on her claim that the liquidated damage clause is a penalty, she does not have to establish all of the elements of the affirmative defense. None of the cases cited by Plaintiff hold that the party seeking to invalidate a liquidated damage clause only needs to establish that the stipulated amount of damages is unreasonable.

By way of contrast, a party seeking to enforce a liquidated damage clause must establish that damages were difficult to estimate and the stipulated amount is a reasonable estimate of damages. *Phillips,* p. 788; *Stewart v. Basey,* 245 S.W. 2d 484, 486 (Tex. 1952). Whether moving to enforce a liquidated damages clause or have it struck as a penalty, the moving party has the burden of pleading and proving all elements.

The *Phillips, Stewart* and *Baker* cases cited by Plaintiff all discuss a movant's right to enforce a liquidated damage clause. In none of the cases, was the movant only required to satisfy half of the burden. In *Phillips*, the Texas Supreme Court refused

Martha Phillips' liquidated damage claim for ten times the amount of her actual damages, as had the trial court and court of appeals. The Texas Supreme Court reiterated that in order to enforce a liquidated damage clause, the court must find that the harm caused by the breach is hard to estimate and that the stipulated amount was a reasonable forecast of actual damages. *Id.* at p. 788. It explained that a contract provision that required a multiple of actual damages does not meet either prong of the test: (1) the harm caused by the breach was not incapable or difficult of estimation and (2) rather than forecasting damages, the clause required them to be determined then multiplied. *Id/* at p. 789.

In *Stewart,* the trial court and court of appeals refused Stewart's claim for liquidated damages. The Texas Supreme Court upheld the court of appeals' decision, holding that the harm caused by the breach would have to be hard to estimate and the agreed amount of damages would have to be a reasonable forecast of just compensation. Stewart did not meet that burden. *Id.* at p. 486-487.

In *Baker*, the jury awarded Baker actual damages for destruction of the negatives his photographs, despite his claim for a higher amount under the liquidated damages clause in his contract. The Dallas Court of Appeals overturned the trial court decision. It noted that under Texas law, a liquidated damages provision would be enforced when the court finds that the harm caused by the breach is incapable or difficult to estimate and the amount of liquidated damages is a reasonable forecast of actual damages. The Court held that Baker had established that an accurate determination of the damages was virtually impossible. In response to evidence reflecting a lower value of some of Baker's other photographs on the issue of the reasonableness of the damage forecast, the court noted that this was not evidence of the value of the photographs in question, as

photographs are unique and have many factors bearing on their actual value. The court explained that:

> "[p]roof of this loss is difficult; where damages are real but difficult to prove, injustice will be done if the court substitutes the requirements of judicial proof for the parties' own informed agreement as to what is a reasonable measure of damages.

*Id.* at 55-56.

In the *SP Terrace* case cited in Plainitiff's summary judgment reply brief, the Houston 1st District Court of Appeals reiterated the requirement that a party asserting that a liquidated damages clause is asserting an affirmative defense and bears the burden of proof. *SP Terrance, L.P. v. Meritage Homes of Texas, LLC;* 334 S.W.3d 275, 287 (Tex. App. – Houston [1st Dist.] 2010, no pet.) Citing the Dallas Court of Appeals' *Baker* decision discussed above, the court went on to note that "[g]enerally, that party must prove the amount of actual damages, if any, to demonstrate that the actual loss was not an approximation of the stipulated sum". *Id.* The Houston court went on to note that before a court can resolve the question of law as to whether the clause is a penalty, sometimes factual issues must first be resolved (*citing Phillips).* The court declined to remove the liquidated damages provision because SP Terrace presented no evidence that the clause operated as a penalty. *Id.* The court cited a similar holding from the Dallas Court of Appeals on this point (also cited in Plaintiff's reply), *Urban Television Network Corp. v. Creditor Liquidity Solutions, LP.* 227 S. W. 3d 917, 918-919 (Tex. App. – Dallas 2009, no pet).

In *Urban Television*, the Dallas Court of Appeals confirmed that a party asserting that a liquidated damages clause is a penalty has the burden of pleading and proving the elements of the defense. When the plaintiff established with summary judgment evidence

that defendant breached the contract, and its right to liquidated damages, the court ruled that the burden then shifted to the defendant to prevent evidence that the liquidated damage clause was a penalty, which it failed to do. *Urban Television Network Corp. v. Creditor Liquidity Solutions, LP.* 227 S. W. 3d 917, 918-919 (Tex. App. – Dallas 2009, no pet).

The *Commercial Union* case cited by Plaintiff involved a movant seeking to avoid a liquidated damages clause. *Commercial Union Ins. Co. v. La Villa School Dist.*, 779 S.W.2d 102, 107 (Tex. App. - Corpus Christi 1989, no writ). The La Villa ISD was awarded liquidated damages at trial under a construction contract. The contractor had asserted the clause was a penalty. The court of appeals noted that when a party asserts a liquidated damages clause is a penalty, it has the burden of establishing that defense. Contrary to Plaintiff Strandhagen's comments, the Corpus Christi Court of Appeals did not find that the contractor failed to prove *either* that damages were not difficult to estimate *or* that the amount was an unreasonable forecast (one or the other). There is no such language in the opinion. The court of appeals held that absent findings and conclusions from the trial court, it presumed the trial court found the damages were incapable or difficult to estimate and the liquidated damages constituted just compensation. *Id.* at pgs. 106-107.

The *Garden Ridge* case involved competing breach of contract claims. At issue was whether a charge back provision in the contract provided for liquidated damages or was a penalty. In its opinion holding that the provision was penalty, the court noted that Advance International established that the harm anticipated from its alleged noncompliance was not difficult to estimate; (2) Garden Ridge did not attempt to show the

charge back amounts were a reasonable estimate; and (3) Advance International met its burden to show that the chargeback amounts constituted a disproportionate estimate of actual damages. *Garden Ridge v. Advance International, Inc.*, 403 S.W.3d 432, 439-440 (Tex. App. – Houston [14th Dist.] 2013, pet. filed)

In *GPA Holdings*, the Dallas Court of Appeals held that GPA was not entitled to summary judgment on its claim that the liquidated damages clause was a penalty. *GPA Holding, Inc. v. Baylor Health Care System*; 344 S.W.3d 467, 475 (Tex. App. – Dallas 2011, pet denied). The court held that in order to obtain summary judgment on the affirmative defense of penalty, GPA was required to prove every element of the defense. GPA did not offer evidence to support either one. "The difficulty (or lack of difficulty) in estimation as well as the unreasonableness of the damages estimate where GPA's to prove". *Id* at p. 476. Like GPA, Plaintiff Strandhagen failed to offer evidence to establish that damages were not difficult to estimate or to establish that the stipulated amount was unreasonable.

*Nacogdoches Heart Clinic;* 2013 Tex. App. LEXIS 1066, *19-20 (Tex. App. - Tyler 2013, pet. denied) was not cited in Plaintiff Strandhagen's Motion for Summary Judgment or her reply brief. The Tyler Court of Appeals held that the covenant not to compete was unenforceable because it was overbroad and imposed a greater than necessary restraint. The court went on to note in dicta that in order for a liquidated damages clause to be enforceable, the harm caused by the breach must be difficult to estimate and the amount called for must be a reasonable forecast of just compensation. The amount to be paid ($100,000 per month) was equal to the amount of monthly compensation under the

contract. Thus, if NHC attempted to claim the liquidated damages, it would not be entitled to prevail, because it could not establish both of the required prongs. *Id.* at pgs. *19-20.

In *Nexstar,* the court of appeals would not enforce the liquidated damages clause because the liquidated damages were not in lieu of other damages. It is not relevant to this case. *Nexstar Broad, Inc. v. Gray*; 2008 Tex. App. LEXIS 4736, *7-8 (Tex. App. – Beaumont 2008, no pet.)

The *Community Development* case reiterates the requirement that liquidated damages be a reasonable forecast of just compensation. *Community Dev. Serv. Inc. v Replacement Parts Mfg., Inc.*; 670 S. W. 2d 721, 727 (Tex. App. – Houston [1st Dist.] 1984, no writ). There was no discussion of the test endorsed by the Texas Supreme Court for determining whether a liquidated damages clause is in fact a penalty. The court's determination was that a damage clause that that subjects parties to the same reparation for any default, no matter how large or small, would not be a reasonable forecast of just compensation. *Id.* at p. 726. It does not eliminate the requirement that a party seeking to overturn a liquidated damage clause must offer evidence that damages are not difficult to estimate and the forecast is not a reasonable measure of damages for breach at the time the agreement is entered into.

Plaintiff has conceded for purposes of her motion that damages in this case were difficult to quantify. She is not entitled to summary judgment because she has failed to establish this required element. Nor has she offered evidence sufficient to establish that the stipulated damage amount is unreasonable. She asserts only that the measure of damages agreed to among the parties is per se unreasonable because it does not provide a timing component. The time of the breach is not a controlling factor. The parties

identified multiple types of harm that would be suffered in the event of a breach: increased workloads, material impairment of the ability to earn bonuses and their relationships with hospitals, surgery centers and 3rd party payors, etc. These factors are highly subjective and dependent upon the facts and circumstances at the time of the breach. It is not a linear analysis resolved by a determination of the date of breach. As noted consistently by Texas courts, while the issue of whether a clause is a penalty is a question of law, very often there are fact issues that must be resolved first. Absent evidence as to whether the stipulated amount was a reasonable forecast at the inception of the agreement, she has failed to establish the second required element. Nor has she offered any evidence of what the actual damages were at the time of her breach to show that the stipulated amount was at odds with "just compensation". Plaintiff has failed to offer evidence of any of the elements of her claim. She has failed to meet her summary judgment burden.

In *Eberts*, the Dallas Court of Appeals held that because an injunction preventing breach had been entered, liquidated damages could not awarded at the same time. It did not speak to the burden that a summary judgment movant must meet in order to establish that a liquidated damage clause is a penalty. Rather, the case involved a defendant asserting that at trial, the plaintiff failed to meet its burden of establishing that the liquidated damages clause was a reasonable forecast of damages. *Eberts v. Businesspeople Personnel Servs., Inc.* 620 S.W. 2d 861, 863-865 (Tex. Civ. App. – Dallas 1981, no writ).

The *RTC, South Texas Water and Lake River* cases cited by Plaintiff all involve fact patterns in which third parties attempted to assert rights under contracts that they were not parties to. Additionally, the *Lake River* case does not involve Texas law. *Lake*

*River Corp. v. Carbo-Rundum Co.*, 769 F.2d 1284, 1290 (7th Cir. 1985); *Resolution Trust Corp. v. Kemp*, 951 F.2d 657, 662 (5th Cir. 1992); *South Texas Water Authority v. Lomas;* 223 S.W.3d 304 ((Tex. 2007). In contrast to these cases, Plaintiff Strandhagen entered into the Internal Operations and Advisory Board Agreement with her former partners at the time they sold their interests in Austin Anesthesiology Group. It is an entirely different agreement than her employment agreement. It has different parties, different promises made for different reasons, for different consideration than her employment agreement.

Plaintiff also asserted that her claim of penalty should not be treated as an affirmative defense because she is a plaintiff asserting a claim for declaratory judgment. She cites no authority to support her position. Plaintiff preemptively filed this suit in anticipation of a possible action by her former partners to enforce the liquidated damage clause, contending that it is a penalty. The fact that she filed suit in anticipation of a possible claim does not make her assertion that the clause is a penalty any less an affirmative defense than if she were a defendant asserting the argument.

For these reasons and as set forth in Defendant's Response to Plaintiff's Motion for Summary Judgment, Defendants urge the Court to Deny Plaintiff's Motion.

Respectfully submitted,

CARLS, MCDONALD & DALRYMPLE, L.L.P.
Barton Oaks Plaza 1
901 South Mopac Expressway Suite 280
Austin, Texas 78746
(512) 472-4845
(512) 472-8403 (fax)

By: Kelly A. McDonald
Kelly A. McDonald
State Bar No. 13551275
kmcdonald@cmcdlaw.com

Carla Garcia Connolly
State Bar No. 07631100
cgarcia@cmcdlaw.com

ATTORNEYS FOR DEFENDANTS
NOAH S. BUNKER, PAUL CARRELL, EVERETT DREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been sent by certified mail, return receipt requested and by electronic means in accordance with the Texas Rules of Civil Procedure, on the 25th day of February, 2014 to:

Daniel H. Byrne
Lessie G. Fitzpatrick
FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, TX 78701-4286

Kelly A. McDonald

NOTICE SENT: FINAL INTERLOCUTORY NONE
DISP PARTIES: ALL
DISP CODE: CVD / CLS 4619
REDACT PGS: ———
JUDGE OLN CLERK Cje

NO. D-1-GN-13-002811

| | | |
|---|---|---|
| **TRACY D. STRANDHAGEN** | § | **IN THE DISTRICT COURT** |
| | § | |
| **PLAINTIFF** | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W.ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS, and HOLLY CLAUSE,** | § § § § § § § | **353rd JUDICIAL DISTRICT** |
| | § | |
| **DEFENDANTS** | § | **TRAVIS COUNTY, TEXAS** |

Filed in The District Court of Travis County, Texas
MAY 20 2014
At 335 M.
Amalia Rodriguez-Mendoza, Clerk

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

On February 20, 2014, Plaintiff's Motion for Summary Judgment came on to be heard. After reading the pleadings, hearing the arguments presented by counsel, reviewing the case law, and considering the same, the Court finds that the Motion is GRANTED.

Therefore, IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiff's Motion for Summary Judgment is GRANTED, and the Court DECLARES that the $500,000 purported liquidated damages clause in the Advisory Board and Internal Operations Agreement is an unenforceable penalty.

All relief not expressly granted is DENIED.

SIGNED on this the 20 day of May, 2014.

JUDGE ORLINDA L. NARANJO
419TH DISTRICT COURT



FRITZ, BYRNE, HEAD & HARRISON, PLLC
*Attorneys at Law*

July 22, 2013

**VIA EMAIL davisw@jacksonlewis.com**
William T. Davis, Esq.
Jackson Lewis
500 N. Akard, Suite 2500
Dallas, Texas 75201

RE: Tracy Strandhagen; Mednax, Inc. a subsidiary of Anesthesiology Associates of Texas, Inc.

Dear Bill:

After further discussions with our client, we hereby notify you that under the circumstances and in light of the working conditions and hostile work environment perpetuated by local management (and ratified by Mednax), Dr. Strandhagen has concluded that she has been effectively terminated without cause and has no choice but to advise you that she will no longer be able to perform her functions as an anesthesiologist for the Mednax subsidiary Anesthesiology Associates of Texas, Inc.

Dr. Strandhagen filed her pending EEOC charge in the context of a history of pervasive gender discrimination resulting in hostile work environment within the Austin group for female physicians, particularly those like Tracy who express any reluctance to capitulate to the will of the male-dominated management of the practice. Most recently, Dr. Strandhagen has been threatened with mandatory but completely inappropriate career-threatening sanctions for declining to acquiesce with a male surgeon's request that she anesthetize a patient and jeopardize his health in violation of NPO guidelines.

As you know, Dr. Strandhagen reported to Mednax's Human Resources Department that she was a victim of gender discrimination shortly after this complaint was leveled by Dr. Rose (in the aftermath of her clinically appropriate decision to refuse to capitulate his request). However, Mednax initially failed to take any action to investigate Dr. Strandhagen's report, and followed up to a limited extent only after being prodded further by Dr. Strandhagen. In the meantime, local Mednax management perpetuated the hostile environment and also retaliated against Dr. Strandhagen by seeking to professionally brand her as a "disruptive physician" and ordering her to take a "disruptive physician" class. To our knowledge all the physicians that have reviewed the situation agreed with Dr.

98 SAN JACINTO BOULEVARD SUITE 2000 AUSTIN, TEXAS 78701 (512) 476-2020 FAX: (512) 477-5267 WWW.FBHH.COM





Strandhagen's clinical decision to refuse to acquiesce to Dr. Rose's demand (and we note that under AMA guidelines a key element of the disruptive physician classification requires some element of questionable clinical decisionmaking). We understand that in the entire history of this group, the "disruptive physician" stigma has been imposed only one other time also against a female physician who ultimately resigned. Adding insult to injury, we understand that since then rather than taking steps to rectify the environment and rescinding its demand that Tracy submit to a stigmatizing "boot camp," Mednax has ordered its generally younger and less experienced facility chiefs (all of whom are male) to "keep an eye" on Dr. Strandhagen.

As we informed you, Dr. Strandhagen was disheartened to recently learn that as a result of its belated investigation Mednax still thinks that her gender discrimination complaint lacks merit, and refuses to reverse its decision to require her to attend the "disruptive physician" training. As Mednax undoubtedly anticipated, this conduct and the other actions which local management continues to take have undermined her credibility with fellow physicians and medical staff, and resulted in intolerable working conditions for our client that are now impacting her ability to properly exercise independent and effective clinical judgment. Tracy cannot ethically continue to practice in this environment and considers that she has been terminated without cause within the meaning of her employment agreement.

Under the terms of her employment agreement, Dr. Strandhagen is therefore entitled to continue to receive her base salary for the remainder of the agreement's seven year term, subject to offsets to the extent that she succeeds in finding suitable employment in her specialty as permitted by the agreement. Upon confirmation that Mednax plans to fulfill its obligations under that agreement, including payment of her severance, Dr. Strandhagen is of course willing to fulfill all of her obligations under the agreement, including notifying the affected hospitals of her resignation of privileges, within the periods required under the agreement.

We look forward to Mednax's response to our client's position as outlined above. We will respond to Mednax's position that Tracy does indeed have behavioral issues which warrant this retaliation in the due course of the EEOC complaint process and any subsequent proceedings, but suffice it to say that we are confident that those contentions lack merit.

---

As I mentioned to you, I will be traveling for the next few days, so if we are unable to communicate feel free to contact my partner, Lessie Fitzpatrick.

Very truly yours,

Daniel H. Byrne by permission LGF

Daniel H. Byrne

DHB/mpy
cc: Client

 AMERICAN
ANESTHESIOLOGY

*Via UPS Overnight Mail*

September 30, 2013

Tracy D. Strandhagen, M.D.
600 Riders Trail
Austin, TX 78733

Re: **Tracy Strandhagen, M.D.'s Employment Agreement with American Anesthesiology of Texas, Inc. ("AAT") dated November 8, 2011 (the "Agreement").**

Dear Dr. Strandhagen:

You have failed to report to work and instead have continued to abandon your duties despite numerous requests to return to work. As you have been previously advised, this constitutes a material breach of the Agreement. You were advised of this breach by letters dated July 24, August 15, August 28, and September 12. You have been provided deadlines to comply with, which have been extended numerous times. Your continued failure to perform your duties has imposed a hardship on AAT and caused it to suffer damages.

As you know, you received a large portion of the purchase price when AAT acquired the practice and entered into the Agreement with you in connection with that transaction. The claims you previously made related to discrimination are inconsistent with the terms of the covenants, representations, and warranties you made in connection with the transaction, which induced AAT to close on the transaction. In addition, AAT investigated those claims and determined that they had no merit and also concluded that requesting you to attend training seminars was reasonable. It is important to AAT that all of its employees treat others courteously, respectfully, and with dignity, regardless of whether they are clinically correct. The failure to do so can adversely affect patient care.

The simple facts are that you have simply abandoned your duties, despite repeated requests to return to work and notices of breach being provided. Therefore, AAT must terminate your employment with cause as a result of your material breach.

This is notice of termination with cause of your employment with AAT, effective September 30, 2013, pursuant to Section VIII.B.2. (a), (g) and (m) of the Agreement.

You are reminded that all of the post termination clauses and restrictions in the Agreement shall remain in effect after your termination. These include, but are not limited to, your Confidentiality, Non-Compete, Non-Solicitation, and Non-Disparagement clauses. You are also reminded that you are required to resign privileges as required in Section IX.B. of the Agreement within five (5) business days. AAT expects you to honor your commitments under these provisions and will take all steps necessary to confirm your compliance. We request confirmation that you have resigned privileges as required within ten (10) business days of this letter. Please fax a copy of said resignations to the Credentialing Department at fax number: (954) 858-0591.

EXHIBIT
tabbies
C

Finally as a result of your employment with AAT being terminated for cause, AAT will maintain, at your expense, professional liability insurance covering your acts during your period of employment. The cost of such insurance is Six Thousand One Hundred and Thirty-Five and 00/100 Dollars ($6,135.00). The tail insurance cost, which is the current cost for an extended reporting period as determined in accordance with AAT's current insurance program, should be paid no later than thirty (30) days from the date of receipt of this correspondence. A check in the specified amount should be made payable to: American Anesthesiology, Inc. and sent to: American Anesthesiology, Inc., 1301 Concord Terrace, Sunrise, Florida, 33323, Attn: Ann Zugarramurdi. Going forward you are required to provide AAT with written notice of any lawsuit, claim, patient complaint, or physician report that you become aware of relating to the provision of medical services by you or any other employee of AAT or hospital within five (5) days of receiving such notice. Certificates of insurance will be forwarded to you by our Risk Management Department after the effective date of termination. If you have any questions, please call our Insurance Administrator at: (800) 243-3839 x 5285.

Sincerely,

Karl B. Wagner
President
American Anesthesiology, Inc.

***Via Fax: 512-477-5267 & Email: DByrne@FBHH.com***
Mr. Daniel H. Byrne
Fritz, Byrne, Head & Harrison, PLLC
98 San Jacinto Blvd., Suite 2000
Austin, TX 78701

Filed
13 August 14 P5:19
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-13-002811

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN,<br><br>PLAINTIFF,<br><br>v.<br><br>NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS, and HOLLY CLAUSE<br><br>DEFENDANTS. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT<br><br><br><br><br><br>TRAVIS COUNTY, TEXAS<br><br><br><br><br>353RD JUDICIAL DISTRICT |

**PLAINTIFF'S FIRST AMENDED PETITION**

Plaintiff TRACY D. STRANDHAGEN ("Strandhagen") files this First Amended Petition complaining of Defendants NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS, and HOLLY CLAUSE, as follows:

## I. DISCOVERY LEVEL

1. Plaintiff pleads that discovery should be conducted in accordance with a Level 3 discovery control plan under TEX. R. CIV. P. 190.4.

## II. PARTIES

2. Plaintiff is an individual residing in Travis County, Texas.

3. Defendant Noah S. Bunker is an individual residing in Travis County and may be served with citation at his work address 8140 North MoPac Expy, Building 3, Suite 210, Austin, TX 78759, or wherever he may be found.

4. Defendant Paul Carrell is an individual residing in Travis County and may be served with citation at his work address 8140 North MoPac Expy, Building 3, Suite 210, Austin, TX 78759, or wherever he may be found.

5. Defendant Everett Brew Houston, Jr. is an individual residing in Travis County and may be served with citation at his work address 8140 North MoPac Expy, Building 3, Suite 210, Austin, TX 78759, or wherever he may be found.

6. Defendant W. Andrew Buchholz is an individual residing in Travis County and may be served with citation at his work address 8140 North MoPac Expy, Building 3, Suite 210, Austin, TX 78759, or wherever he may be found.

7. Defendant Scott J. Leighty is an individual residing in Travis County and may be served with citation at his work address 8140 North MoPac Expy, Building 3, Suite 210, Austin, TX 78759, or wherever he may be found.

8. Defendant Jad L. Davis is an individual residing in Travis County and may be served with citation at his work address 8140 North MoPac Expy, Building 3, Suite 210, Austin, TX 78759, or wherever he may be found.

9. Holly Clause is an individual residing in Travis County and may be served with citation at his work address 8140 North MoPac Expy, Building 3, Suite 210, Austin, TX 78759, or wherever she may be found.

## III. JURISDICTION AND VENUE

10. Subject matter jurisdiction is proper because the amount in controversy exceeds the minimum jurisdictional limits of the Court. Personal jurisdiction over Defendants is proper because they are residents of the State of Texas.

11. Venue is proper in Travis County, Texas as the county of Defendants' residences and because all of the events or omissions giving rise to Plaintiff's claims occurred in Travis County. TEX. CIV. PRAC. & REM. CODE §15.002.

## IV. BACKGROUND FACTS

12. In 2011, Plaintiff Strandhagen was a partner along with Defendants and other anesthesiologists in Austin Anesthesiology Group, LLP ("AAG"), which specialized in anesthesiology and post-operative pain management. In or around October of 2011, AAG entered into a transaction (the "Buyout") whereby its operations were sold to American Anesthesiology of Texas, Inc. ("AAT"). AAT is an indirect subsidiary of Mednax, Inc. ("Mednax"), a publicly traded medical group that is a national provider of medical services, including anesthesia services.

13. At the time of the Buyout, Plaintiff and other AAG-affiliated individual physicians entered into separate employment agreements with AAT, whereby the physicians agreed to continue to work for AAT on terms and conditions set forth therein. At the same time, these same physicians entered into a separate agreement among themselves dated October 7, 2011 entitled "Advisory Board and Internal Operations Agreement" (the "Internal Agreement") (**Exhibit A** hereto). The Internal Agreement established an "Advisory Board" to provide "binding advice and guidance" to the medical director appointed under that agreement. Defendants are the current members of that Advisory Board. It also contains a section entitled "Physician Obligations" (referred to herein as the "Termination Penalty Provisions") whereby the physicians purportedly agreed that if their employment with AAT terminated at any time prior to January 1, 2018 (other than (among other exceptions) a termination without cause by ATT), the terminating physician became obligated to pay each of the other sixty-plus physicians

signing the Internal Agreement their pro rata share of a $500,000[1] lump sum, plus interest at 10%, purportedly as "liquidated damages." This amount (less than $10,000 per physician) is purportedly payable to the individual physicians severally.

14. In December of 2012 Plaintiff Strandhagen became embroiled in an employment dispute with AAT[2] which eventually resulted in Strandhagen reporting to Mednax management that she was a victim of gender discrimination. Three days after this report, Mednax (acting at all times on behalf of AAT) took an adverse employment action against Dr. Strandhagen by ordering her to attend a class for "disruptive physicians" which would stigmatize Dr. Strandhagen for the rest of her career.[3] Dr. Strandhagen declined to comply with this directive, and complained to both Mednax and the EEOC that this action was unlawful and a result of gender discrimination. She sought to mediate this dispute with Mednax/AAT as part of the EEOC's dispute resolution program, but after initially agreeing to mediate Mednax abruptly repudiated that agreement on July 27, 2013 and has since refused to proceed.

15. After a limited investigation that occurred only after prodding by Dr. Strandhagen, Mednax ostensibly determined that Dr. Strandhagen's gender discrimination

---

1 There are a handful of exceptions for physicians other than Plaintiff for whom the lump sum amount is somewhat smaller.

2 The dispute was precipitated by a complaint filed against Dr. Strandhagen by Dr. Harris Rose. Dr. Rose, a surgeon who is well known for his aggressive and bullying behavior, complained to Mednax that Dr. Strandhagen behaved inappropriately by failing to capitulate to his demand that she anesthetize a patient in violation of NPO guidelines. When Dr. Strandhagen declined to anesthetize the patient, the Dr. Rose called her partners, seeking to pressure her to reverse her clinically appropriate decision. One of these partners, a male, called Dr. Strandhagen and attempted to convince her (unsuccessfully) that she should proceed with the anesthesia. The Advisory Board ultimately concluded that Dr. Strandhagen's actions indeed adhered to NPO guidelines.

3 The attempt to brand Dr. Strandhagen's conduct as that of a "disruptive physician" is unfounded. American Medical Association defines disruptive behavior as personal conduct, whether verbal or physical, that negatively affects or that potentially may negatively affect patient care. <u>However, criticism that is offered in good faith with the aim of improving patient care should not be construed as disruptive behavior</u>. AMA Opinion 9.045 (emphasis added).

complaint was without merit and refused to reverse its directive that Dr. Strandhagen attend the stigmatizing "disruptive physician" class. As was intended by Mednax, these decisions damaged Dr. Strandhagen's reputation and undermined her authority and credibility with fellow physicians and medical staff, resulting in increasingly intolerable working conditions and impairing her ability to make clinically appropriate decisions for patients under her care, eventually leading to her constructive termination without cause on July 22, 2103. *See* **Exhibit B** (Byrne letter).

16. Dr. Strandhagen has learned that despite the fact that she was terminated by Mednax without cause, and despite the fact that the Termination Penalty Provisions are unenforceable as a penalty under Texas law, Defendants and perhaps others are seeking to pursue her for collection of their shares of the $500,000 termination penalty described in the Termination Penalty Provisions. A justiciable controversy thus exists between Plaintiff and Defendants.

## V. CAUSE OF ACTION

### A. DECLARATORY JUDGMENT

17. A substantial and justiciable controversy exists about the rights and the status of the parties under the terms of the Termination Penalty Provisions. Accordingly, Dr. Strandhagen seeks a declaratory judgment that she was terminated without cause and therefore the Termination Penalty Provisions are inapplicable to her. Additionally, Dr. Strandhagen seeks a declaratory judgment that the liquidated damages provision in the Termination Penalty Provisions is an invalid and unenforceable penalty as a matter of law because (1) it purports to render her liable to Defendants and the other physicians for damages for her alleged breach of a contract (her employment agreement with AAT) to which they are not parties or third party

beneficiaries, (2) the harm caused by a breach of the employment agreement as anticipated at the time it was entered into was not incapable or difficult of estimation, and (3) the amount required to be paid under the liquidated damages clause is not a reasonable forecast of just compensation, thereby rendering the Termination Penalty Provisions an unenforceable penalty under Texas law.

**B. ATTORNEYS' FEES**

18. Plaintiff has retained the services of Fritz, Byrne, Head & Harrison, PLLC to assist her in pursuing a declaratory judgment in this matter. Accordingly, Plaintiff seeks to recover her reasonable attorneys' fees incurred in this matter pursuant to TEX. CIV. PRAC. & REM. CODE § 37.009.

## VI. PRAYER

WHEREFORE, Plaintiff requests that Defendants be cited to appear and answer herein, and that on final hearing, the Court issue the declaratory relief as requested above, award Plaintiff reasonable attorneys' fees, and such other and further relief, at law or in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, Texas 78701-4286
Telephone: (512) 476-2020
Telecopy: (512) 477-5267

By: ______________________
Daniel H. Byrne
State Bar No. 03565600
Lessie G. Fitzpatrick
State Bar No. 24012630

ATTORNEYS FOR PLAINTIFF

Filed
13 October 23 A9:12
Amalia Rodriguez-Mendoza
District Clerk
Travis District
D-1-GN-13-002811

CAUSE NO. D-1-GN-13-002811

| | | |
|---|---|---|
| TRACY D. STRANDHAGEN, PLAINTIFF, | § | IN THE DISTRICT COURT |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. LEIGHTY, JAD L. DAVIS, and HOLLY CLAUSE DEFENDANTS. | § | 353RD JUDICIAL DISTRICT |

**DEFENDANTS' AMENDED PLEA TO THE JURISDICTION AND PLEA IN ABATEMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE, Defendants in the above entitled and numbered cause, and file their Amended Plea to the Jurisdiction and in the alternative, Plea in Abatement, and would show unto the Court as follows:

## I. Background

1. On August 14, 2013 Plaintiff filed her Original Petition and her First Amended Petition. Plaintiff states in her First Amended Petition that she is a physician and former partner of Austin Anesthesiology Group, LLP. In or around October 2011 American Anesthesiology of Texas, Inc. purchased Austin Anesthesiology Group, LLP and Plaintiff became employed by American Anesthesiology of Texas, Inc.

2. At the time of the purchase, Plaintiff also entered into a contractual agreement with the other partners of Austin Anesthesiology Group, LLP, entitled "Advisory Board and

Internal Operations Agreement." The contract contains a provision, which obligates a partner that terminates his/her employment without cause to pay the non-terminated partners of Austin Anesthesiology Group, LLP damages.

3. Plaintiff has filed a charge of discrimination with the The Texas Workforce Commission Civil Rights Division and the EEOC naming American Anesthesiology of Texas, Inc. and Mednax, Inc. as her employers, asserting she had been discriminated and retaliated against because of her gender, and that these actions resulted in her constructive termination. *See* Exhibits A and B.

4. Plaintiff asserts in her Petition that she has "learned .....Defendants and perhaps others are seeking to pursue her for collection..." under the Advisory Board and Internal Operations Agreement. Plaintiff seeks a declaratory judgment that she was terminated without cause and therefore the Termination Penalty Provisions of the "Advisory Board and Internal Operations Agreement" are not applicable to her.

5. Plaintiff also seeks a declaratory judgment that the liquidated damages provision in the Termination Penalty Provisions is an invalid and unenforceable penalty as a matter of law because (1) it purports to render her liable to Defendants and the other physicians for damages for her alleged breach of a contract (her employment agreement with AAT) to which they are not parties or third party beneficiaries, (2) the harm caused by a breach of the employment agreement as anticipated at the time it was entered into was not incapable or difficult of estimation, and (3) the amount required to be paid under the liquidated damages clause is not a reasonable forecast of just compensation rendering the Termination Penalty Provisions an unenforceable penalty under Texas law.

## II. Evidence

Defendants rely on the following evidence is support of this Amended Plea to the Jurisdiction and the same is incorporated herein for all purposes:

| | | |
|---|---|---|
| Exhibit A | - | Charge of Discrimination (filed on May 2, 2013); |
| Exhibit B | - | July 22, 2013 correspondence from Daniel H. Byrne (attorney for Plaintiff); |
| Exhibit C | - | Amended Charge of Discrimination (filed on September 26, 2013) (portions redacted); |
| Exhibit D | - | October 14, 2013 correspondence from Daniel H. Byrne (attorney for Plaintiff). |

## III. Plaintiff's Claims are Unripe

The Court lacks jurisdiction because Plaintiff's claims are not ripe. Plaintiff admits that she is seeking interpretation of a provision in a contract based upon learning she may be pursued in a breach of contract claim. It is undisputed Plaintiff has not been sued for breach of contract. Nor has any demand been made by the Defendants or by any of the former partners of Austin Anesthesiology Group, LLP under the Advisory Board and Internal Operations Agreement.

A declaratory judgment is not available to resolve issues that are not yet mature and are subject to change. *City of Garland v. Louton*, 691 S.W.2d 603, 605 (Tex.1985). The UDJA does not permit litigants to "fish in judicial ponds for legal advice." *California Prods. v. Puretex Lemon Juice, Inc.*, 334 S.W.2d 780, 781 (Tex.1960). Although a contract may be construed either before or after there has been a breach, the UDJA does not extend an open-ended invitation to parties seeking interpretation of their contracts. There must be some showing that litigation is imminent between the parties unless the contractual uncertainties are judicially resolved. *Paulsen v. Texas Equal Access to Justice Found.*, 23 S.W.3d 42, 46 (Tex. App.—Austin 1999, pet. denied). Subject matter jurisdiction requires there to be a live controversy between the parties. *State Bar of Texas v. Gomez,* 891 S.W.2 243, 245, (Tex. 1994). There is

no showing that litigation is imminent unless contractual uncertainties are resolved. The issues that are the subject of Plaintiff's request for declaratory judgment have not matured.

## IV. Court Lacks Jurisdiction Over Employment Claims

Plaintiff has filed a Charge of Discrimination with the Texas Texas Workforce Commission Civil Rights Division under both the Texas Commission on Human Rights Act ("TCHRA") Tex. Labor Code, Ch. 21 and Title VII of the Civil Rights Act of 1964.[1] In her Charge, she named Austin Anesthesiology Group, PLLC and later amended to substitute American Anesthesiology of Texas, Inc. ("AAT") and Mednax, Inc. as her employers, and asserted that she had been discriminated and retaliated against because of her gender, and that these actions resulted in her constructive termination. *See* Exhibits A and C. Plaintiff's claims in this suit stem from the employment-related claims she has brought in another forum, the Texas Workforce Commission Civil Rights Division. This Court does not have jurisdiction to hear Plaintiff's employment related claims while they are pending before the Texas Workforce Commission Civil Rights Division. Exhaustion of administrative remedies under Title VII and the TCHRA is a jurisdictional prerequisite to filing suit. *Barnes v. Levitt,* 118 F.3d 404, 408 (5th Cir. [Tex.] 1997) *cert, denied*, 523 U.S. 1136 (1998); *Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 488 (Tex. 1991). The UDJA cannot be used as a backdoor to district court to circumvent the procedures and remedies provided by the TCHRA. *See Texas Dept. of Public Safety v. Moore*, 985 S.W.2d 149, 156 (Tex. App. - Austin 1998, no pet.).

For the reasons set forth above, Plaintiff's lawsuit is subject to dismissal because this Court lacks jurisdiction.

[1] The Equal Employment Opportunity Commission ("EEOC") has certified the Texas Workforce Commission Civil Rights Division as an agency whose finings and resolutions it will usually accept. 29 CFR §§ 1601.75, 1601.80)

## V.     Alternative Plea in Abatement

In the alternative, this case should be abated because Plaintiff has failed to join as necessary parties those whose interests would be affected by the declarations sought. The UDJA provides that when declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties. Tex. Civ. Prac. & Rem. Code §37.006.

The threshold issue in Plaintiff's declaratory judgment action is whether she was terminated without cause by AAT. In the Advisory Board and Internal Operations Agreement, which Plaintiff requests the Court to interpret in the present case, "the physicians" purportedly agreed that if their employment with AAT terminated at any time prior to January 1, 2018, other than a termination without cause by AAT, the terminating physician became obligated to pay each of the other sixty-plus physicians signing the Internal Agreement a sum of money. *See* Plaintiff's First Amended Petition, pages 3-4. Plaintiff has admitted sixty-plus physicians who are parties to the agreement potentially have an interest and would be affected by the declaration made the basis of this suit, yet she has sued only the seven (7) members of the advisory board. As the contractual rights of all sixty-plus physicians would be affected by the declaratory judgment sought, they must be joined as parties. *April Sound Management Corp v Concerned Property Owners for April Sound Inc., a Texas Non-profit Corporation and Developer for April Sound Subdivision*, 153 S.W.3d 519 (2004).

Plaintiff alleges that AAT and Mednax, Inc., as her employers, discriminated and retaliated against because of her gender, and that these actions resulted in her constructive termination. *See* Exhibits A and C. She is asking the Court to declare that she was terminated without cause by her employers, but the entities she has identified as her employers and whose

conduct she contends lead to her termination are not parties to the suit. Further, Plaintiff does not assert the Defendants were in any way involved in her termination.

Plaintiff's allegations in her Charge of Discrimination are the same as those asserted in this suit. Plaintiff claims discriminatory treatment occurred in December 2012 when Dr. Harris Rose lodged a complaint against her. *See* Exhibit C, page 6. Plaintiff relies on the same facts in the present case for her assertion that in December 2012 she became embroiled in a dispute with AAT. *See* Plaintiff's First Amended Petition, page 4. On October 14, 2013, attorney Daniel H. Byrne, acting on behalf of Plaintiff, notified attorney Hunter T. McLean, attorney for Mednax, Inc. that it is Plaintiff's position that she was not "terminated for cause." *See* Exhibit D. Thus, the Plaintiff has conceded in her Charge of Discrimination that AAT and Mednax, Inc. have an interest "that would be affected by the declaration" of whether she was terminated "with cause" or "without cause" and neither of these entities are parties to this action.

A Plea in Abatement in a declaratory judgment action is appropriate if necessary parties are absent. *Dahl v. Hartman*, 14 S.W.3d 434, 435-36 (Tex. App—Houston [14th Dist.] 2000, pet denied). In *Dahl*, the trial court abated a declaratory judgment action and ordered the Plaintiff to serve additional parties. When the Plaintiff failed to do so, the trial court dismissed the Plaintiff's case.

Texas Rule of Civil Procedure 39(a) also requires joinder. The rule provides that a person subject to service shall be joined as a party if:

(1) in his absence complete relief cannot be accorded among those already parties; or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest.

If Defendant's Plea to the Jurisdiction is not granted, this case should be abated and Plaintiff ordered to serve Mednax, Inc., American Anesthesiology of Texas, Inc. and all parties to the Advisory Board and Internal Operations Agreement.

**VI.**

WHEREFORE, PREMISES CONSIDERED, Defendants NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE respectfully pray as follows:

1. That the Court grant Defendants' Amended Plea to the Jurisdiction and the Court dismiss any and all of Plaintiff's claims; or
2. In the alternative, the Court grant Defendants' Plea in Abatement and order Plaintiff to serve Mednax, Inc., American Anesthesiology of Texas, Inc. and all parties to the Advisory Board and Internal Operations Agreement; and
3. Defendants be discharged with their costs incurred herein; and
4. For such other and further relief to which Defendants may be justly entitled.

Respectfully submitted,

CARLS, MCDONALD & DALRYMPLE, L.L.P.
Barton Oaks Plaza 1
901 South Mopac Expressway
Suite 280
Austin, Texas 78746
(512) 472-4845
(512) 472-8403 (fax)

By: Kelly A. McDonald
Kelly A. McDonald
State Bar No. 13551275
Carla Garcia Connolly
State Bar No. 07631100

ATTORNEYS FOR DEFENDANTS

NOAH S. BUNKER, PAUL CARRELL, EVERETT BREW HOUSTON, JR., W. ANDREW BUCHHOLZ, SCOTT J. HEIGHTY, JAD L. DAVIS and HOLLY CLAUSE

**CERTIFICATE OF SERVICE**

I certify that in accordance with the Texas Rules of Civil Procedure, on the 23rd day of October, 2013 a true and correct copy of the foregoing has been sent by hand delivery, certified mail, return receipt requested, electronic means or facsimile to:

Daniel H. Byrne
Lessie G. Fitzpatrick
FRITZ, BYRNE, HEAD & HARRISON, PLLC
98 San Jacinto Boulevard, Suite 2000
Austin, TX 78701-4286
**VIA FAX**

Kelly A. McDonald

Kelly A. McDonald



STATEMENT OF TRACY STRANDHAGEN

I am Tracy Strandhagen, and my address is 600 Riders Trail, Austin, Texas 78733 (512.750.8286). I would like to file a charge of gender discrimination and retaliation against Austin Anesthesiology Group, P.L.L.C./Mednax, Inc., which is located at 8140 North MoPac Expressway, Building 3, Suite 120, Austin, Texas 78759 (512.343.2292). Austin Anesthesiology Group ("AAG") has over 100 employees, and Mednax, which I believe is its parent organization, has over 500 employees nationwide. I believe that I am being discriminated against on the basis of gender and retaliated against for speaking out against discrimination.

I began working as an anesthesiologist for AAG's predecessor group in 2000 and have a good work record. I have been nominated by the Austin Association of Operating Room Nurses for Physician of the Year and have a work record that demonstrates my commitment to our patients and sound patient care.

*Gender Discrimination*

I have been subjected to a series of discriminatory conduct that affects the terms, conditions, and privileges of my employment because I am female (and as I explain below, also because I have raised issues of gender discrimination with my employer). I have been singled out for discriminatory treatment and disciplined for conduct that would not have led to discipline or adverse employment action against a male employee or physician. When I have stood my ground or advocated for better patient care, I have been told that I am being too forceful, am "making waves," need to "fly below the radar."

and the like. Needless to say, when a male physician stands up for what he believes in (or is even abrupt or rude), there is no discipline forthcoming and, he is judged as simply being a good, forceful doctor. Because of this gender stereotyping, I have recently been told by my employer that I am a "disruptive physician" and am being required to travel to Chicago for three days of counseling. At first, I was told that I would be required to pay for this training, and now it is unclear who will be paying for my time and expenses. This is a very significant adverse employment action, as being labeled a "disruptive physician" can have a profound negative effect on a doctor's career. Furthermore, the term "disruptive physician" is almost a term-of-art in the medical profession, with very clear guidelines on what conduct can lead to the "diagnosis" (so to speak) of who is a disruptive physician. I do not meet these guidelines, but my employer is trying to brand me as such and requiring this training, so as to jeopardize my career and employment opportunities, all because of my gender. Specifically, to my knowledge, only one other physician at our group has been sent to such counseling and she, too, was a female, who was denigrated by criteria or expectations that would not have led to any discipline or adverse action being taken against a male physician or employee.

*Retaliation*

I believe that I have also been singled out for such treatment because I complained about gender discrimination and stereotyping to my employer. Most recently, I sent a written complaint to my employer in January 2013, and was then told that I was being disruptive and was ordered to take this counseling for being a disruptive physician.

 

Furthermore, as far back as 2004, I reported what I believed to be different treatment for women employees with regard to maternity leave and other treatment. Now, after my most recent complaint, I am being told that the adverse employment action being heaped upon me is for events that occurred back in 2003 and 2004, which I thought had been long-since resolved.

I believe that my employer has taken, and is continuing to take, adverse employment action against me because of my gender and because I reported discriminatory treatment to my supervisors and to our Human Resources Department. I would like this charge cross-filed with the Texas Workforce Commission-Civil Rights Division, please.

I am represented by *Philip Durst, of the Austin law firm of Deats Durst Owen & Levy, P.L.L.C., 1204 San Antonio, Suite 203, Austin, Texas 78701 (512-474-6200; 512-474-7896 (fax))* and ask that he be provided copies of any information regarding my charge. I ask that this statement, which is intended to be a general description of the events and cannot possibly contain all details about my years of employment with my employer be considered part of my charge.

TRACY STRANDHAGEN, M.D.

DATED: 4-30-13

# AUTHORITIES



**AMERICAN NATIONAL INSURANCE COMPANY AND AMERICAN NATIONAL PROPERTY AND CASUALTY COMPANY, Appellants v. FRANK E. CANNON II, CLIFTON MARK GRAYLESS, DEBORAH GLENN, AND ROBERT WESTOVER, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, Appellees**

**NO. 09-01-511 CV**

**COURT OF APPEALS OF TEXAS, NINTH DISTRICT, BEAUMONT**

***86 S.W.3d 801*; *2002 Tex. App. LEXIS 6933***

**May 16, 2002, Submitted**
**September 26, 2002, Opinion Delivered**

**NOTICE:** [**1] PUBLISH

**PRIOR HISTORY:** On Appeal from the 221st District Court Montgomery County, Texas. Trial Cause No. 00-01-00371-CV.

**DISPOSITION:** REVERSED AND REMANDED.

**COUNSEL:** John L. Carter, Karen Jewell, Catherine B. Smith - Vinson & Elkins - Houston. Janet Rushing, David LeBlanc - Greer, Herz & Adams - Galveston. Greg Abbott - Bracewell & Patterson - Austin. Warren W. Harris, Richard C. Kroger - Bracewell & Patterson - Houston. Mark Ramsey, Adrian V. Villacorta - Ramsey & Murray - Houston, for appellants.

Paul Dobrowski, David P. Andis - Dobrowski & Associates - Houston. Stephen McClain - McClain & Harrell - Conroe, for appellees.

**JUDGES:** Before Walker, C.J., Burgess and Gaultney, J.J.

**OPINION BY:** DAVID B. GAULTNEY

**OPINION**

[*804] This interlocutory appeal is from a class certification order. Appellant American National Insurance Company ("ANICO") is a life insurance company. Appellant American National Property and Casualty [*805] Company ("ANPAC") is a property and casualty insurance company and a subsidiary of appellant ANICO. The four named plaintiffs, Frank E. Cannon II, Clifton Mark Grayless, Deborah Glenn, and Robert Westover ("plaintiffs"), sold ANPAC and ANICO insurance pursuant to agent agreements.

THE AGREEMENTS

*General Agent Agreements*

The agreements provide, in part, that plaintiffs will not solicit ANPAC or ANICO policyholders in a specific territory for a specified time period after termination of the agreements. The proscribed time period under the ANPAC contract is one year; the ANICO time period is two years. Under the ANPAC contract, "territory" is defined as an area "within a twenty-five (25) mile radius of the Agent's office. This territory may be enlarged upon written request [**2] from the Agent and written approval from the Company." The territory covered by the ANICO agreement is "any territory in which [the Agent is] properly licensed."

*Agent Advance Agreements*

Three of the four plaintiffs also signed Agent Advance Agreements with ANPAC. Although ANPAC agents are paid by commission on the policies they actually sell, ANPAC can, under the contract, make payments of compensation to the agents in advance of sales. The advance payments are to be offset against the agents' earned commissions. The ANICO agreements contain similar provisions.

THE LAWSUIT

Plaintiffs assert they were defrauded. They claim they were each told they would "own their own business" and, if terminated, would not have to repay any money previously advanced to them. Plaintiffs also claim they were wrongfully terminated. Their pleadings allege individual claims of breach of contract, fraud, and negligent misrepresentation, as well as violations of the Deceptive Trade Practices Act and the Insurance Code. Plaintiffs request actual and punitive damages for themselves and actual damages for a class of agents similarly situated.

The trial court's class certification order named plaintiffs [**3] to represent the following persons in a class action:

[Class A] All persons in Texas who, from January 1, 1993[,] to the present, executed an independent contractor agreement with ANPAC and/or ANICO containing a non-competition provision; and

[Class B] All persons who, from January 1, 1993[,] to the present, executed any advance agreement with ANPAC and/or ANICO.

The trial court certified the following two issues for class treatment:

1. [Class A] Declaratory judgment, wherein Plaintiffs . . . request this Court to declare that the covenants not to compete contained in the ANICO and ANPAC agreements are not "ancillary to or part of an otherwise enforceable agreement at the time the agreement [was] made" and that they do not otherwise comply with *section 15.50 et. seq. of the Texas Business and Commerce Code*; and

2. [Class B] Declaratory judgment, wherein Plaintiffs . . . request this Court to declare that any balance owing ANICO and/or ANPAC pursuant to the advance agreements does not have to be paid upon termination of the relationship.

The class certification order provides that individual issues will be tried to a jury [*806] after the trial court rules [**4] on the two issues certified for class treatment.

JURISDICTION

We first consider ANPAC's contention that the trial court lacked jurisdiction because the four class representatives lack standing or their claims are not ripe. *See The M.D. Anderson Cancer Ctr. v. Novak, 52 S.W.3d 704, 710, 44 Tex. Sup. Ct. J. 905-711 (Tex. 2001)* (standing); *see also Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 851, 43 Tex. Sup. Ct. J. 731 (Tex. 2000)* (ripeness). To establish standing, a plaintiff must show "a distinct injury to the plaintiff and 'a real controversy between the parties, which . . . will be actually determined by the judicial declaration sought.'" *Brown v. Todd, 53 S.W.3d 297, 305, 44 Tex. Sup. Ct. J. 948 (Tex. 2001)* (quoting *Texas Workers' Compensation Comm'n v. Garcia, 893 S.W.2d 504, 517-18 (Tex. 1995))*. Ripeness focuses on when the action may be brought; advisory opinions or adjudications based on contingent or hypothetical facts are precluded by dismissal of claims that are not ripe. *See Gibson, 22 S.W.3d at 851-852*. If the plaintiff lacks individual standing or the claim is not ripe, the court should dismiss the suit for want of jurisdiction. *See M.D. Anderson, 52 S.W.3d at 711*; [**5] *see also Gibson, 22 S.W.3d at 853*.

ANPAC's standing and ripeness arguments, as they pertain to the non-compete provisions, are as follows: (1) if the time frame on the named plaintiff's non-compete provision is operative at the beginning of litigation but expires during the course of the suit, the party has no standing; (2) if, on the other hand, the named plaintiff is still an agent of the company and the non-compete clause has not been triggered, the party has no standing and the claim is not ripe. Generally, a personal stake must exist at the beginning of litigation and continue throughout the lawsuit's existence. *See Southern Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 514-16, 31 S. Ct. 279, 55 L. Ed. 310 (1911)*; *see also United States Parole Comm'n v. Geraghty, 445 U.S. 388, 394, 398, 404, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980)*. An exception to the general rule may apply when a claim on the merits is capable of repetition, yet evades review. *Id. 445 U.S. at 398*; *see also Sosna v. Iowa, 419 U.S. 393, 402, 95 S. Ct. 553, 42 L. Ed. 2d 532 (1975)*. In this case we need not consider [**6] the applicability of the exception. The fact that the non-compete period here expires during the litigation does not mean the plaintiff has no personal stake and lacks standing; if the plaintiff suffers injury as a result of the provision, the plaintiff would continue to have an interest in a determination of the invalidity of the clause. Furthermore, the employed plaintiff has a justiciable interest in determining whether, upon leaving the company, the plaintiff would be required to comply with the non-compete provision, particularly when, as here, counterclaims to enforce the non-compete clauses have been filed.

Similarly, ANPAC points out that if class representatives are currently agents, whether they will have to pay money after termination of their relationship with ANICO is unknown and cannot be ascertained until termination occurs. But in a declaratory judgment action, a party to a contract may file suit to declare rights under a contract if the circumstances show the presence of "'ripening seeds of controversy.'" *See City of Waco v. Texas Natural Resource Conservation Comm'n, 2002 Tex. App. LEXIS 3231*, No. 03-01-00217- CV, 2002 WL 924192, at *4 (Tex. App.--Austin, May 9, 2002, no pet. h.) [**7] (quoting *Texas Dep't of Banking v. Mount Olivet Ceme-*

*tery Ass'n, 27 S.W.3d 276, 282* (Tex. App.--Austin 2000, pet. denied). Here, plaintiffs assert that contracts and related oral representations warrant a declaration by the trial court that no money need be repaid under the [*807] advance agreements once the contract is terminated. In contrast, appellants maintain the monies advanced under these contracts must be repaid. Appellants have sought to enforce both the advance agreements and non-compete provisions by filing counterclaims against the named plaintiffs herein and by making demand upon or filing suit against other agents in the State. We conclude the issues are ripe and the plaintiffs have standing. ANPAC's issue one is overruled.

STANDARD OF REVIEW

The appellate review standard for a class certification order is abuse of discretion. *Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425, 439, 43 Tex. Sup. Ct. J. 706 (Tex. 2000)*. The trial court abuses its discretion if it acts without reference to any guiding principles or acts arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 242 (Tex. 1985)*. A failure by a trial court to [**8] analyze or apply the law correctly is an abuse of discretion. *McDaniel v. Yarbrough, 898 S.W.2d 251, 253, 38 Tex. Sup. Ct. J. 337 (Tex. 1995)*.

To obtain class certification, the proponent of the class must satisfy all four criteria in *Rule 42(a)* and at least one of the conditions in *Rule 42(b)*. *See TEX. R. CIV. P. 42*; *see also Bernal, 22 S.W.3d at 433*. The order here relies on three separate *Rule 42(b)* provisions.

*RULE 42(b)(4)*

We first consider the trial court's certification of the class under *Rule 42(b)(4)*. A class action satisfies (b)(4) if two requirements are met: if questions of law or fact common to the members of the class predominate over any questions affecting only individual members; and if the class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See TEX. R. CIV. P. 42(b)(4)*. The test for predominance is not whether common issues outnumber uncommon issues, but rather whether "common or individual issues will be the object of most of the efforts of the litigants and the court." *Bernal, 22 S.W.3d at 434*. Predominance is determined by identifying the substantive issues that [**9] are dispositive of the litigation, assessing which issues will predominate, and determining whether these predominating issues are common to the class. *See Bernal, 22 S.W.3d at 434*. The (b)(4) requirement of predominance precludes class action litigation where the sheer complexity and diversity of the individual issues would overwhelm or confuse a jury or severely compromise a party's ability to present viable claims or defenses. *Bernal, 22 S.W.3d at 434, 437*.

CLASS A

For Class A claims, plaintiffs request a declaration that the non-compete covenants were not ancillary to or part of an otherwise enforceable agreement at the time the agreements were made and that the covenants do not otherwise comply with *section 15.50, et. seq. of the Texas Business & Commerce Code*. Both the ANICO and ANPAC contracts contain similar non-compete clauses, the main differences being the scope of the geographical and time restrictions. *Section 15.50* provides that a non-compete covenant is enforceable if the covenant:

. is ancillary to or part of an otherwise enforceable agreement;

. is made at the time the other agreement is made;

. contains reasonable limitations [**10] as to time;

. contains reasonable limitations as to geographical area;

. contains reasonable limitations as to scope of activity to be restrained; and,

[*808] . imposes no more restraint than is necessary to protect the goodwill or other business interest of the promisee.

*See TEX. BUS. & COM. CODE ANN. § 15.50(a)* (Vernon 2002).

The legal conclusion as to whether a particular geographical restraint is reasonable would include consideration of the class member's market territory and individual circumstances. Agents for ANPAC and ANICO are located throughout Texas. Under the ANPAC agreement the geographical restriction is a twenty-five mile radius of the agent's office unless enlarged by agreement. Under the ANICO agreement the non-compete provision covers the area in which the agent is licensed. What the restricted geographical territory actually is for each individual agent, whether the territory has been enlarged, whether the twenty-five mile zone described in the ANPAC contract corresponds to an agent's territory, and whether or not the geographical limitations in both contracts are reasonable in view of the relevant market factors will require [**11] individual determinations. If the trial court does find any of the non-compete clauses unenforceable because of unreasonable limitations -- for example, a geographical restriction covering the entire license area -- the trial court is required by statute to reform each covenant to the extent necessary to make it reasonable. *See TEX. BUS. & COM. CODE ANN. § 15.51(c)* (Vernon 2002). *Section 15.51(c)* provides in part, that if the covenant not to compete is "ancillary to or part of an

otherwise enforceable agreement but contains limitations as to time, geographical area, or scope of activity to be restrained that are not reasonable . . . the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant . . . to be reasonable[.]" *Id.; see generally B.J. Software Sys., Inc. v. Osina, 827 S.W.2d 543, 546* (Tex. App.--Houston [1st. Dist.] 1992, no pet.). In reforming covenants found to be unreasonable, the court should take into account individual circumstances. *See Evan's World Travel, Inc. v. Adams, 978 S.W.2d 225, 233- 34* (Tex. App.--Texarkana 1998, no pet.) (geographical restriction [**12] reformed). Fact specific individual determinations would be unavoidable here. *See generally Dairyland County Mut. Ins. Co. of Texas v. Casburg, 63 S.W.3d 590, 592* (Tex. App.--Beaumont 2001, pet dism'd w.o.j.) ("Little value is gained from a class action where factual distinctions make the class unmanageable.") (citing *Barnes v. American Tobacco Co., 161 F.3d 127, 143 (3d. Cir. 1998))*. In this case, *Section 15.50*'s reasonableness determinations cannot be made on a class-wide scale.

CLASS B

For Class B claims, the plaintiffs request a declaration that any balance owed by an agent under an advance agreement does not have to be repaid. The plaintiffs pleaded the basis of their request as being representations made by appellants to plaintiffs to that effect. Yet in a supplemental letter brief to the trial court prior to class certification, plaintiffs disavowed any reliance on oral representations as the basis for a declaration of no amount owed; plaintiffs told the trial judge that their issue was grounded in "the 'four corners' of the agreements.'" Plaintiffs maintain the same argument on appeal.

The issue certified for class treatment requires the [**13] trial court to declare whether any outstanding balance must be paid upon termination of the relationship. The ANICO advance agreement provides that the company is authorized to bring suit for collection of any unpaid balance. The general agent agreement also gives ANICO a first lien which it may foreclose as permitted [*809] by law and provides that ANICO can offset the indebtedness against the agent's commissions, fees, or other compensation. In the ANPAC advance agreement, the agent assigns to the company the right, title, and interest in any compensation payable to the agent under the advance agreement in consideration for the advance payments. ANPAC is given the right to reduce and offset any amounts owed to it against commissions, fees, and other compensation payable to the agent. The written agreements clearly speak of an agent's indebtedness in connection with advance payments that are not repaid.

The Class B issue, as certified, involves more than a determination of the precise meaning of the language in the advance agreements. As worded, the scope of the issue necessarily encompasses any representations referenced in the plaintiffs' pleadings. Plaintiffs pleaded oral modifications [**14] of the written contracts, misrepresentation, and fraud -- all issues that may turn on individual circumstances. Although plaintiffs' letter brief to the trial court indicates plaintiffs do not rely on any oral representations regarding the written advance agreements, their pleadings, both before and after the certification order, state otherwise. The issues, as broadly worded, include the claims made in plaintiffs' pleadings. What each class member in this case was told regarding monies owed under the advance agreements, along with any reliance on those representations, would require individual determination. Because individual issues predominate over common issues, *Rule 42(b)(4)* is not satisfied. *See generally Peltier Enters., Inc. v. Hilton, 51 S.W.3d 616, 623* (Tex. App.--Tyler 2000, pet. denied) ("answering the questions of materiality and reliance as to one plaintiff does not answer the same question as to other putative class members.").

*RULE 42(b)(2)*

The trial court also relied on *Rule 42(b)(2)* in certifying the class. A class action cannot be certified under (b)(2) unless the "party opposing the class has acted or refused to act on grounds generally applicable [**15] to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole[.]" *TEX. R. CIV. P. 42(b)(2)*. As under section (b)(4), the merits of each putative class member's claims, under both the non-compete agreement and the advance payment agreement, depend on that individual's circumstances: for example, the reasonableness of the non-compete restrictions given the individual's circumstances, and the individual's reliance on any misrepresentation regarding advance payments. Under section (b)(2) these individual factors preclude injunctive relief or corresponding declaratory relief without consideration of individual circumstances, at least as the issues are broadly worded in the certification order.

Furthermore, in a *section 42(b)(2)* class action, the injunctive or declaratory relief sought must predominate over the monetary relief sought. *See TCI Cablevision of Dallas v. Owens, 8 S.W.3d 837, 847* (Tex. App.--Beaumont 2000, pet. dism'd by agr.). Any monetary relief sought in a (b)(2) class action must be incidental to the related claims for injunctive relief or corresponding declaratory relief. Incidental [**16] damages flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief. *See Allison v. Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998)* (applying *FED. R. CIV. P. 23(b)(2)*, the counterpart to *Rule 42(b)(2)*). Rather than being dependent on subjective, individual circumstances

of class members, incidental damages should be amenable to [*810] easy calculation, using objective standards. *Allison, 151 F.3d at 425*. As the *Allison* court explained, "Liability for incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; it should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations. Thus, incidental damages will, by definition, be more in the nature of a group remedy, consistent with the forms of relief intended for (b)(2) class actions." *Id. at 415*.

Given the nature of the relief requested here and the degree to which recovery of damages in both classes requires individualized proof and determinations, the damages requested by plaintiffs are not sufficiently [**17] "incidental" to permit them in a class action under *Rule 42(b)(2)*. The damages sought here are more of an individual remedy and less of a group remedy -- dependent more upon the varying circumstances and merits of each potential member's case. *Rule 42(b)(2)* is not satisfied. *See generally Casburg, 63 S.W.3d at 592*.

*RULE 42(b)(1)(A)*

The trial court also relied on *Rule 42(b)(1)(A)* in certifying the class. *Rule 42(b)(1)(A)* requires a showing that the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class and establish incompatible standards of conduct for the party opposing the class. But as we have noted, *TEX. BUS. & COM. CODE ANN. § 15.50* requires an individual determination of the reasonableness of the non- compete restrictions; the reasonableness depends on the individual facts and circumstances affecting the individual agent. *See generally Texas Dep't of Transp. v. Barrier, 40 S.W.3d 153, 159-60* (Tex. App.--Houston [14th Dist.] 2001, no pet.). Similarly, the enforcement of the advance [**18] agreements depends on the varying circumstances and merits of each potential member's case. *Rule 42(b)(1)(A)* is not satisfied.

The trial court's certification order is vacated and this case is remanded to the trial court for proceedings consistent with this opinion.

REVERSED AND REMANDED.

DAVID B. GAULTNEY

Justice



**JEFF BAKER D/B/A JEFF BAKER PHOTOGRAPHY, Appellant v. INTERNATIONAL RECORD SYNDICATE, INC., Appellee**

**No. 05-90-00914-CV**

**COURT OF APPEALS OF TEXAS, Fifth District, Dallas**

***812 S.W.2d 53*; *1991 Tex. App. LEXIS 1962*; *15 U.C.C. Rep. Serv. 2d (Callaghan) 875***

**June 4, 1991, Filed**

**PRIOR HISTORY:** [**1] On Appeal from the 116th Judicial District Court; Dallas County, Texas; Trial Court Cause No. 89-5233-F.

**DISPOSITION:** Reversed and Rendered.

**COUNSEL:** Dana Andrew Lejune.

Will Pryor.

**JUDGES:** Chief Justice Craig Trively Enoch and Justices T.C. Chadick [1] and Spencer Carver. [2] Opinion by Chief Justice Craig Trively Enoch.

1 The Honorable T.C. Chadick, Justice, Retired, Supreme Court of Texas, sitting by assignment.

2 The Honorable Spencer Carver, Justice, Retired, Court of Appeals, Fifth District of Texas at Dallas, sitting by assignment.

**OPINION BY:** ENOCH

**OPINION**

[*54] OPINION ON MOTION FOR REHEARING

The opinion of this court issued April 15, 1991 is withdrawn. This is the opinion of the court. Jeff Baker, d/b/a Jeff Baker Photography (Baker), appeals a judgment rendered in his favor in a breach of contract case. The trial court determined that a liquidated damages provision was unenforceable and awarded damages to Baker based on jury findings. We reverse the trial court's judgment and render judgment for Baker.

International Record Syndicate (IRS) hired Baker to take photographs of the musical group Timbuk-3. Baker mailed thirty-seven "chromes" (negatives) to IRS [**2] via the business agent of Timbuk-3. When the chromes were returned to Baker, holes had been punched in thirty-four of them. Baker sued for the damages to these chromes. The trial court submitted the issues of actual damages and attorney's fees to the jury. The jury found $ 15,000 in actual damages and $ 5000 for attorney's fees. The trial court rendered judgment awarding $ 51,000 in actual damages and $ 5000 for attorney's fees. The damage award was pursuant to a liquidated damages clause, which set damages at $ 1500 per chrome. The trial court later modified the judgment, awarded Baker the $ 15,000 actual damages found by the jury, and eliminated the attorney's fee award.

LIQUIDATED DAMAGES

The provision printed on Baker's invoice states: "reimbursement for loss [*55] or damage shall be determined by a photograph's reasonable value which shall be no less than $ 1,500 per transparency." A liquidated damages clause is meant to be the measure of recovery in the event of nonperformance or breach of a contract. *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (Tex. 1952)*. The determination of whether a contractual clause is enforceable as a liquidated damages provision or [**3] void as a penalty is a question of law. *Mayfield v. Hicks, 575 S.W.2d 571, 576* (Tex. Civ. App.--Dallas 1978, writ ref'd n.r.e.).

The Uniform Commercial Code provides:

> Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of

> the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

*TEX. BUS. & COM. CODE ANN. § 2.718(a)* (Tex. UCC) (Vernon 1968).

Under Texas law, a liquidated damages provision will be enforced when the court finds (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation. *Advance Tank & Constr. Co. v. City of DeSoto, 737 F. Supp. 383, 384 (N.D. Tex. 1990)*; *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2 (Tex. 1979)*. This might be termed the "anticipated harm" test. The party asserting that a liquidated damages clause is, in fact, a penalty provision has the [**4] burden of proof. *Commercial Union Ins. Co. v. La Villa School Dist., 779 S.W.2d 102, 106* (Tex. App.--Corpus Christi 1989, no writ). Evidence related to the difficulty of estimation and the reasonable forecast must be viewed as of the time the contract was executed. *Mayfield, 575 S.W.2d at 576*.

Baker testified that he had been paid as much as $ 14,000 for a photo session, which resulted in twenty-four photographs and that several of these photographs had also been resold. Baker further testified that he had received as little as $ 125 for a single photograph. Baker also testified he once sold a photograph for $ 500. Subsequently, he sold reproductions of the same photograph three additional times at various prices; the total income from this one photo was $ 1500. This particular photo was taken in 1986 and was still producing income in 1990. Baker demonstrated, therefore, that an accurate determination of the damages from the loss of a single photograph is virtually impossible.

Timbuk-3's potential for fame was an important factor in the valuation of the chromes. At the time of the photo session, Timbuk-3's potential was unknown. In view of the inherent difficulty in determining [**5] the value of a piece of art, the broad range of values and long-term earning power of photographs, and the unknown potential for fame of the subject, $ 1500 is not an unreasonable estimate of Baker's actual damages.

Additionally, liquidated damages must not be disproportionate to actual damages. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be declared a penalty and recovery limited to actual damages proven. *Commercial Union Ins. Co., 779 S.W.2d at 107*. This might be called the "actual harm" test. The burden of proving this defense is upon the party seeking to invalidate the clause. *Id*. The party asserting this defense is required to prove the amount of the other party's actual damages, if any, to show that the actual loss was not an approximation of the stipulated sum. *Id. at 106-07*; *Johnson Eng'rs, Inc. v. Tri-Water Supply Corp., 582 S.W.2d 555, 557* (Tex. Civ. App.--Texarkana 1979, no writ).

While evidence was presented that showed the value of several of Baker's other projects, this was not evidence of the value of the photographs in question. The evidence clearly shows that photographs are [**6] unique items with many factors bearing on their actual value. Each of the thirty-four chromes may have had a different [*56] value. Proof of this loss is difficult; where damages are real but difficult to prove, injustice will be done the injured party if the court substitutes the requirements of judicial proof for the parties' own informed agreement as to what is a reasonable measure of damages. The evidence offered to prove Baker's actual damages lacks probative force. IRS failed to establish Baker's actual damages as to these particular photographs.

Even assuming that the jury's findings as to damages are an accurate assessment, we do not agree that that sum is so disproportionate to the stipulated sum so as to abrogate the parties' agreement. Consequently, we conclude that the facts and circumstances of this case require that we reach a decision contrary to the one made by the trial court. We sustain Baker's first point of error and hold that the liquidated damages clause is enforceable.

ATTORNEY'S FEES

In his original petition, Baker pleaded a breach of contract and sought attorney's fees pursuant to *section 38.001 of the Civil Practice and Remedies Code*. At trial, Baker's [**7] attorney took the stand and testified that a one-third or 40% contingency fee was reasonable. All testimony on reasonableness and necessity of attorney's fees was unrebutted. The jury awarded Baker $ 5000 in attorney's fees. The trial court then rendered judgment setting aside the award of attorney's fees. For a trial court to disregard a jury's findings and enter a judgment notwithstanding the verdict, it must determine that there is no evidence upon which the jury could have made its findings. *Dowling v. NADW Mktg., Inc., 631 S.W.2d 726, 728 (Tex. 1982)*; *Collision Center Paint & Body, Inc. v. Campbell, 773 S.W.2d 354, 356* (Tex. App.--Dallas 1989, no writ).

We review the evidence in the light most favorable to the jury finding, considering only the evidence and inferences that support the finding and rejecting the evidence and inferences contrary to the finding. *Navarette v. Temple Indep. School Dist., 706 S.W.2d 308, 309 (Tex.*

*1986)*; *Collision Center, 773 S.W.2d at 357.* Where there is more than a scintilla of competent evidence to support the jury's finding, then the judgment notwithstanding the verdict should be reversed. *Collision Center, 773 S.W.2d at 356-57*. [**8] We sustain Baker's second point of error.

We reverse the judgment of the trial court. We render judgment for Baker in the amount of $ 51,000 for actual damages and $ 5000 for attorney's fees. TEX. R. APP. P. 80(b)(3).

Reversed and Rendered.



**Board of Water Engineers of the State of Texas v. City of San Antonio**

**No. A-5083**

**Supreme Court of Texas**

***155 Tex. 111*; *283 S.W.2d 722*; *1955 Tex. LEXIS 553***

**October 26, 1955, Decided**

**SUBSEQUENT HISTORY:** [***1] Rehearing Overruled November 23, 1955.

**PRIOR HISTORY:** Error to the Court of Civil Appeals for the Third District, in an appeal from Travis County.

**DISPOSITION:** The judgments of both courts are affirmed.

**HEADNOTES**

**Declaratory Judgments -- Prerequisites.**

In an action seeking a declaratory judgment the prerequisite requirements for such process is that there shall be a real controversy between the parties which will be actually determined by the judicial declaration asked for.

**Jurisdiction -- Statutes -- Rights and Remedies.**

An action by a city to have the State Board of Water Engineers approve its application to take water from a watershed other than its own, claiming that the statute forbidding such right and upon which the board, in refusing such permit, based its action is unconstitutional, presents a justiciable controversy as to the constitutionality of the statute and the rights of the parties thereunder. Because plaintiff failed to ask for other specific relief than that of a declaratory judgment was no bar to his action.

**Statutes -- Amendments.**

In construing the constitutional rule that no bill shall contain more than one subject which shall be expressed in [***2] its title, the rule that the caption of an amendatory act is not necessarily deficient because it merely stated that a particular prior law or a particular section thereof is being amended does not apply unless the actual amendment is germane to the subject matter of the original act or the portion thereof which the caption of the amendatory act declares to be amended.

**Statutes -- Constitutional Law.**

An amendment to an act of the legislature, creating a corporation to furnish water to certain entities and authorizing such agency to contract with federal authorities, to borrow money and issue bonds, and perform other duties for the promotion of said corporation, which contains new matter precluding the diversion of water from its watershed was void under the constitutional rule that no bill shall contain more than one subject which must be expressed in its caption.

**SYLLABUS**

The City of San Antonio, Texas, seeking to establish a priority for securing a more ample supply of water for its city needs, filed an application with the State Board of Water Engineers for permission to establish a priority to withdraw water from the Guadalupe River watershed. The board refused to grant [***3] such application because Article 1434a R.S. prohibits the withdrawal of water from said watershed, for the purpose of transporting it to a point outside of said watershed. Other facts will be found in the opinion of the Court.

The City of San Antonio filed a suit against said board seeking a declaratory judgment declaring the provisions of Section 1a of Article 1434a, to be unconstitutional. The trial court rendered judgment favorable to the city. The Court of Civil Appeals affirmed that judgment, *273 S.W. 2d 913*. The Board of Water Engineers has brought error to the Supreme Court.

**COUNSEL:** *John Ben Shepperd*, Attorney General, *Burnell Waldrep* and *Johns Reeves*, Assistant Attorney Generals, for petitioner.

The Court of Civil Appeals erred in holding that a justiciable controversy was presented, and that the provisions of section 1a of Article 1434a are in violation of *Article III, section 35, of the Constitution of Texas. Cowan v. Cowan, 254 S.W. 742*, error refused; *Cobb v. Harrington, 144 Texas 360, 190 S.W. 2d 709*; *Praetorians v. State, 184 S.W. 2d 300*; *Gulf Ins. Co. v. James, 143 Texas 424, 185 S.W. 2d 966*.

*Boyle, Wheeler, Gresham, Davis & Gregory* and *J. D.* [***4] *Wheeler*, all of San Antonio, for respondent.

In reply to petitioner's contentions cited *Arnold v. Leonard, 114 Texas 535, 273 S.W. 2d 799*; *Hamilton v. St. Louis, S.F. & T. Ry. Co., 115 Texas 455, 283 S.W. 475*; *Rodriguez v. Gonzales, 148 Texas 537, 227 S.W. 2d 791*.

**JUDGES:** Mr. Justice Garwood delivered the opinion of the Court.

**OPINION BY:** GARWOOD

**OPINION**

[*112] [**723] This so far successful suit by the respondent, City of San Antonio, against our petitioner, Board of Water Engineers of the State of Texas, presents questions as to (a) existence *vel non* of a justiciable controversy within our Uniform Declaratory Judgments Act of 1943 (Art. 2524-1, Vernon's Tex. Civ. Stats. Ann.) and (b) validity of a given statutory amendment (Sec. 1-a of Art. 1434a, Vernon's Tex. Civ. Stats. Ann.) as against our constitutional restrictions concerning subjects and captions of legislative acts (Art. III, Sec. 35) and local or special laws (Art. III, Sec. 56), Vernon's Ann. State Constitution.

[*113] The source of the controversy is the proposed construction by the Guadalupe River Authority of the so-called Canyon Dam in Comal County, a flood control project to be financed in whole or part [***5] by the United States. Evidently the corresponding federal laws and regulations permit of municipalities such as the respondent City participating in the project in order to augment their own water supply by building the dam higher than it would otherwise be and furnishing the necessary funds for this purpose. This participation, however, is in effect conditioned upon permission from the petitioner Board for the taking of the additional impounded waters in question.

The respondent City, one of the three largest in Texas, is faced with a serious water-supply problem by reason of a large and rapid increase in population and water consumption within and around its corporate limits, coupled with a serious fall in its potential underground water supply. While the City is located outside of the natural watershed of the Guadalupe River and could make use of the Canyon Dam waters only by means of an expensive pipe line, it has become interested in the dam project, as other cities of the state have done in other and comparable situations, to the point of making detailed studies and attempting to secure priorities for a portion of the excess waters it might make or help to make available [***6] if it should participate in the enterprise.

In the latter connection, Art. 7496, Vernon's Tex. Civ. Stats. Ann., provides, generally speaking, for an application or "presentation" to the Board by "any person who desires to investigate the feasibility of any water appropriation or use of water" in certain large quantities, upon approval and filing of which by the Board, the study may be made and a priority for the corresponding work and water appropriation established as of the filing date, subject to specified conditions as to beginning and completion of the work. The respondent City made such a presentation, but the Board refused to approve or file it, stating in effect that it would have approved and filed it as a proper and meritorious application under the statute, but for the single fact of the City being located beyond the natural watershed of the river and thus prohibited from diverting the waters by the express terms of Sec. 1-a of Art. 1434a, supra. [1]

1 "Sec. 1a. It shall be unlawful for any person, firm, association, or corporation to withdraw any water from the Guadalupe River or Comal River or any tributaries of such rivers or springs emptying into such rivers, or either of them, for the purpose of transporting such water to any point or points located outside of the natural watersheds of such rivers.

"Any such withdrawal or attempted withdrawal of water from said rivers, springs, and/or tributaries may be enjoined in a suit for injunction brought by any person, municipality, or corporation owning riparian rights in or along said rivers. The venue of such suits shall be in the District Court of the county where such withdrawal or attempted withdrawal occurred."

[***7] The respondent City thereupon instituted this suit for declaratory [*114] judgment that Sec. 1-a is unconstitutional. Its pleadings did not specifically allege arbitrariness upon [**724] the part of the Board nor specifically pray for ancillary relief such as mandatory injunction or mandamus. They did clearly allege the above-mentioned facts concerning the attempted filing of the respondent's presentation, including the Board's ex-

clusive reliance on Sec. 1-a for its refusal to approve and file. Parts of the relief prayed were (1) a determination "that the plaintiff has the legal right to have the presentation accepted and filed with priority" and (2) "other relief, general and special."

The trial court rendered the declaratory judgment as prayed. Following this the petitioner Board, pending its appeal, proceeded to file the respondent's presentation but with the express reservation that such filing was conditioned upon affirmance of the trial court judgment. The Austin Court of Civil Appeals has affirmed it. *273 S.W. 2d 913*.

No point appears to be made that the case is moot or otherwise nonjusticiable merely by reason of the actual filing of the application, [***8] and we think the conditional character of the Board's approval would have rendered such a view untenable had it been urged. But lack of a justiciable controversy is argued, as we understand the briefs, on the theory that the respondent's failure to allege an abuse of discretion or arbitrariness concedes a discretion of the Board to treat Art. 1434a, Sec. 1-a, supra, as valid in the absence of a contrary adjudication, and therefore also the discretion to refuse approval and filing of the respondent's application. This alleged concession is said to make the suit one for a mere "advisory opinion" as to the constitutionality of the statute in question. We do not so regard it.

The expressions "advisory opinion" and "justiciable controversy" as here used refer to the requirements, which undoubtedly exist as prerequisite to the declaratory judgment process, that (a) there shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought. See Hodges, General Survey of the Uniform Declaratory [*115] Judgment Act in Texas, Vol. 8, Vernon's Tex. Civ. Stats. Ann., p. XI (1951); also Sec. 6, Art. 2524-1, supra; *Cobb v. Harrington,* [***9] *144 Texas 360, 190 S.W. 2d 709, 172 A.L.R. 837*; Railroad Commission v. Houston Natural Gas Corp., (Tex. Civ. App., cited in Cobb v. Harrington) *186 S.W. 2d 117*; *Garwood Irr. Co. v. Lundquist (Tex. Civ. App.), 252 S.W. 2d 759*; wr. of er. refused; McDonald, Texas Civil Practice, Vol. 1, Sec. 2.01.

But to admit the legal fact, if it is a fact, that the petitioner Board may properly await the judgment of a court before ignoring the prohibition of Sec. 1-a, supra, is not to admit that there is no dispute over whether the Board has the ultimate duty to cease refusing to approve and file the respondent's application and whether the respondent has the present right, which it expressly pleaded and prayed to have declared, that such approval be given and filing accepted. If it were otherwise, there would rarely be a proper case for declaratory judgment concerning the validity of a statute, because there will be very few statutes

which are not *presumptively* valid. That Sec. 1-a is presumptively valid is all that the respondent has admitted, if admitting anything. The controversy is as to whether it is *actually* valid. Clearly this is a real and practical controversy, because the [***10] respondent insists on its application being approved and filed despite the statute, on which the Board relies, and asserts valuable rights of a property nature to be effective or ineffective depending upon such approval and filing. Clearly, too, the judicial declaration in suit will determine the controversy, because the Board will approve and file the City's application if the statute is declared invalid and will properly continue to refuse to do so if it is declared valid.

Nor is there merit to the apparently further contention that a justiciable controversy is absent because of the failure of the respondent to pray specifically for other than declaratory relief. Even assuming the actual prayer for "other relief, general [**725] and special" to be without significance, the argument is yet in the very teeth of Secs. 1 and 8 of Art. 2524-1, supra, and, indeed, of the main purpose of declaratory judgments, which is to permit of settling actual controversies by appropriate judicial declaration, without necessarily invoking "traditional relief," such as injunction or other writs, damages and the like. Indeed, it has been observed that some of the "traditional remedies," such [***11] as decrees removing a cloud or cancelling an instrument, are themselves but declaratory judgments, despite that their names may suggest otherwise. See Hodges, supra, p. VII. [*116] The lack of a prayer for traditional types of relief does not of itself even suggest absence of the essential requirements of a real controversy, determinable by the suit.

The real issue in the case is whether Sec. 1-a, supra [1] is void because of Art. III, Sec. 35 of our State Constitution, stating that:

"No bill shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof, as shall not be so expressed."

1    See note one on page 113.

Well prior to the existence of Sec. 1-a, the bulk of the present Art. 1434a was enacted as Senate Bill No. 103, Chapter 76, p. 202, Acts of the First Called Session, 43rd Legislature (1933). The object of the Act, expressed in its [***12] first section, was to provide for the formation of corporations by three or more citizens of the State "for the purpose of furnishing a water supply to towns, cities, and private corporations and individuals." Sec. 1 of the Act also detailed sundry provisions concerning dividends, sinking fund for replacements and the like as properly includible in the charter. Sec. 2 of the Act authorized

such corporations as might be organized under the Act to contract with all federal agencies, borrow money, issue bonds and do other such things for the promotion of their corporate purposes. The remaining six sections provided for additional specific powers and duties of such corporations, more or less in elaboration of Sections 1 and 2. In no part of the Act does a word such as "river," "stream," "watercourse," "watershed," "dam" or "lake" occur.

Sec. 1-a was enacted in 1941 as part, although a large part, of a purported amendment to Sections 1 and 2 of the 1933 Act above mentioned by House Bill 953, Chap. 407, Acts 47th Legislature, Regular Session. The caption of the Amendatory Act read:

"An Act amending Sections 1 and 2 of Chapter 76, Senate Bill No. 103, page 202, General and Special [***13] Laws, passed at the First Called Session of the Forty-third Legislature; and declaring an emergency."

The body of the Act declared Sec. 1 of the earlier Act to be "amended so as to read as follows." Then followed "Section 1," in terms identical with the original Sec. 1 except for the insertion [*117] of a few words giving these corporations the additional powers to supply "sewer service" and to serve "military camps and bases." Then as a distinct paragraph, although without any separate enacting clause, came "Section 1-a" [1], which was completely new. Then followed an enacting clause re-enacting "Section 2" with addition of merely a few words so as expressly to permit corporate borrowings from sources in addition to federal agencies. The next provision, or emergency clause, referred only to the need of "the additional *powers* hereby conferred upon water supply corporations authorized by said Chapter 76" (emphasis ours) as the emergency, thus omitting any reference to the subject matter of Sec. 1-a" [1],

1 See note one on page 113.

[***14] Keeping in mind the constitutional provision above quoted, we thus note two features of the amending act: (a) there is conceivably more than "one subject" involved in an act, of which Sec. 1-a prohibits all persons from taking water from [**726] the Guadalupe and Comal Rivers to other watersheds, and of which the remainder deals with the general subject of organization and corporate powers of water supply and sewer corporations; and (b) the caption of the amending act does not expressly refer to Sec. 1-a or its content, unless by the words "amending Sections 1 and 2 of" the former law.

The petitioner Board, in upholding Sec. 1-a, relies largely on the rule that the caption of an amending act is not necessarily deficient because it merely states that a particular prior law or particular section thereof is being amended and does not give further particulars. *The State v. McCracken, 42 Texas 383*; *Gunter v. Texas Land and Mortgage Company, 82 Texas 496, 501-2, 17 S.W. 840, 842-3*; *English and Scottish-American Mortgage and Investment Company, Ltd. v. Hardy, 93 Texas 289, 297-8, 55 S.W. 169, 171*. But this rule, of course, has its limits. Indeed, it might well be argued that the [***15] "one subject" requirement of the Constitution, although part of the same sentence containing the title or caption requirement, should operate independently of the latter, so as to invalidate an amendatory or original act containing more than one subject, even though all of the diverse subjects be covered in full detail in the caption. In any event, as hereinafter shown, the cited rule sustaining general captions of amending acts does not apply unless the actual amendment is germane to the subject matter of the original act or, as the case may be, the portion thereof which the caption of the amendatory act declares to be amended. And [*118] while conceivably a lack of germaneness in the instant case between Sec. 1-a and the rest of the Act might invalidate the section under either the "one subject" or caption requirements, the more relevant decisions speak largely in terms of the latter, and therefor so shall we.

The Gunter case, supra, voided an amendatory act because the caption, while giving *numbers* of a title and sections as being amended, omitted to state to what existing body of laws or law these numbers corresponded. The opinion acknowledges the rule relied on by [***16] the petitioner Board; but it does so with the observation " although it might seem to us that a different rule would be more in harmony with the requirements of the Constitution," and shows clearly that the purposes of these requirements would be defeated by extending the rule so as, in effect, to make the body of the amendatory act itself explanatory of its own caption [2]. Similarly the English and Scottish-American Mortgage Co., case, supra, in referring to the rule, said:

"The reason must be that the naming of the article to be amended directs attention to all of the provisions therein, as the subject of the amending act, and that such provisions can be ascertained by reading the article to be amended." (*93 Texas 289, 298, 55 S.W. 169, 171*.)

In other words, the rule invoked by the petitioner Board is justified only because and to the extent that the reader of the caption of the amendatory bill and the existing law or section to which the caption refers will thereby ascertain the subject of the amendatory bill without having to read the amendatory bill itself.

2 "The constitution declares that the 'subject shall be expressed in the title,' and it cannot be said that this has been done where the title does no more than to furnish a reference to some other writing, document, or law from which by search

> the true purpose of a title may be ascertained. If such had been the intention of the people the peremptory language would not have been used. No one would contend that a title as follows, 'An Act in reference to the subject embraced in the bill to which this is the title' would be sufficient, although such a title attached to a bill would give most easy reference to sources of information from which the subject of the contemplated law might be ascertained. This is so because the Constitution requires the subject of an act to be given in the title to it, and a mere reference to something else for the information thus required to be given is not sufficient." (*82 Texas 502, 17 S.W. 842*).

[***17] [**727] Obviously, however, if the provisions of the law or section to be amended involve a subject different from that actually dealt with in the body of the amending act, a reading of the [*119] former will not disclose to the reader the true subject of the amending act but, on the contrary, will mislead him as to the latter. And so, as in the English and Scottish-American Mortgage Co., case, supra, we find that references to the rule of general amendatory captions are couched in limiting language such as "any amendment *germane to the subject treated in the article referred to*" (emphasis supplied).

In *Katz v. State, 122 Texas Crim. Rep. 231, 54 S.W. 2d 130*, the body of the amendatory bill dealt with the occupation tax on "money lenders," which in the original act ( Art. 7047 R.C.S. 1925) was the subject matter of Sec. *15*. The caption of the amendatory bill read, " to amend Section *14* relating to and imposing an occupation tax on money lenders and defining same ." Actually Sec. 14 of Art. 7047 dealt with the tax on "loan brokers," and accordingly the amendment was held void, notwithstanding that its caption reference to Sec. 14 of Art. 7047 [***18] (loan brokers) was qualified by the words "money lenders," which was the actual subject of the amendment. The language of the court is of interest. [3] *Ex parte Turner, 122 Texas Crim. Rep. 357, 55 S.W. 2d 833,* is to the same effect.

> 3 "The courts of this state have held that a reference to number of an article in a code, such as our Revised Statutes, is sufficient in the title of an act amendatory thereof, to allow any amendment germane to the subject treated in the article referred to. *English & Scottish-American Mortg. & Inv. Co. v. Hardy, 93 Texas 289, 55 S.W. 169*; *State v. McCracken, 42 Texas 384*. The reason for the holding appears to be that the naming of the article to be amended directs attention to all of the provisions therein, as the subject of the amending act, and that such provisions can be ascertained by reading the article to be amended. However, when the Legislature restricts the title of an amendatory act by reference to the number in the code of the article amended, and announces its purpose to deal with the original bill in respect to particular matters therein, it is bound to govern itself accordingly, and keep within what it had itself declared would be the limits of its proposed action. Sutherland Statutory Construction (2d Ed.), vol. 1, sec. 139; *State v. American Sugar Refining Co., 106 La. 553, 31 So. 181, 186*."

[***19] Thus the essential germaneness of Sec. 1-a of Art. 1434a to the subject matter of Secs. 1 and 2 of the original act depends on whether a reader of the latter sections, concerning organization and powers of water supply corporations and nowhere mentioning rivers in general or in particular, would by his reading reasonably be forewarned of a subject such as a general prohibition against diverting waters from the Guadalupe or Comal Rivers to points beyond their respective watersheds. To state the question is, we think, to answer it, particularly when we consider that the hypothetical readers of the caption and earlier law are not merely members of the legislature but also "the people." See *Gulf Ins. Co. v. James, 143 Texas 424, 431-2,* [*120] *185 S.W. 2d 966, 970*. As the respondent appropriately argues, the City of San Antonio, or perhaps some individual citizen or partnership not the least interested in the subject of the organization and corporate powers of water supply corporations, but very interested in the waters of the Guadalupe and Comal Rivers. might reasonably have read the caption in question and old Secs. 1 and 2 (or, for that matter, every section) of Art. 1434a and concluded [***20] that the proposed amendment would in all probability not affect their interests.

We thus consider Sec. 1-a to be invalid under Sec. 35 of Art. III of the Constitution and accordingly find it unnecessary to consider the effect of Sec. 56 of Art. III, concerning local or special laws.

The judgments of the trial court and Court of Civil Appeals are affirmed.

Opinion delivered October 26, 1955.

Rehearing overruled November 23, 1955.



**California Products, Incorporated, Et Al v. Puretex Lemon Juice, Incorporated**

**No. A-7421**

**Supreme Court of Texas**

***160 Tex. 586*; *334 S.W.2d 780*; *1960 Tex. LEXIS 563*; *3 Tex. Sup. J. 255***

**March 23, 1960, Decided**

**SUBSEQUENT HISTORY:** [***1] Rehearing Overruled May 18, 1960.

**PRIOR HISTORY:** Error to the Court of Civil Appeals for the Fourth District in an appeal from Willacy County.

**DISPOSITION:** Judgment of the Court of Civil Appeals is affirmed.

**HEADNOTES**

**Declaratory Judgments.**

The declaratory judgment statute was not designed to aid litigants to seek legal advice at the hands of the courts, but there must be a justiciable controversy between the parties in suit before a declaratory judgment action will lie.

**SYLLABUS**

This is a suit by petitioners seeking a declaratory judgment as to whether a bottle which they proposed to manufacture and use for the production of their products would be in violation of an injunction previously issued enjoining them from using a bottle similar to the one used by respondents, before they proceed further in its manufacture. A trial court's judgment in favor of petitioners was reversed and judgment rendered by the Court of Civil Appeals that they take nothing. *334 S.W. 2d 449*. Petitioners have brought error to the Supreme Court.

**COUNSEL:** *Robert H. Kern, Jr.*, of McAllen, *James & Conner* and *Allen B. Conner*, of Fort Worth, for petitioners.

*Strickland, Wilkins, Hall & Mills* and *J. E. Wilkins* [***2] , of Mission, for respondents.

**JUDGES:** Mr. Justice Griffin delivered the opinion of the Court.

**OPINION BY:** GRIFFIN

**OPINION**

[*587] [**780] Petitioners herein, hereafter called plaintiffs, filed this suit in the 107th District Court of Willacy County, Texas, against respondent herein, hereafter called defendant, seeking a declaratory judgment to determine whether or not a certain bottle in which plaintiffs expected to sell lemon and lime juice would violate a judgment of the 107th District Court entered June 3, 1952. The prior suit in the 107th District Court was between the same parties, except petitioners herein were defendants and respondent herein was plaintiff. In the first suit between the parties, Puretex, as plaintiff, recovered a permanent injunction against California Products and Davis prohibiting them from marketing their lemon and lime juice in bottles which resembled in appearance the bottles used by plaintiff. This judgment was an agreed judgment and there was no appeal taken from it and it became final. After the entry of the above decree, petitioner files this declaratory judgment suit.

[**781] Trial was had before a jury and two special issues were answered [***3] by the jury. The first issue asked the jury to find from a preponderance of the evidence whether plaintiff planned to have bottles made of the kind set out in a blueprint introduced in evidence, such bottles to be used as containers in which to market its lemon and lime juice. The jury answered this issue in the affirmative which was favorable to the plaintiff. The second issue asked the jury to find from a preponderance

of the [*588] evidence whether the bottle and its markings which plaintiff proposed to use to market its lemon and lime juice "will not so closely resemble in appearance the bottle of the defendant and its markings as to be liable to deceive a reasonably prudent buyer, exercising such ordinary care and observation as shoppers generally may be expected to use so as to mislead such buyer into believing that this bottle contains Puretex lemon or lime juice." The jury answered, "It will not be likely to deceive." On this verdict, the court rendered judgment for plaintiff-California Products, Inc. The judgment entered by the trial court reads, in part, as follows:

"That the terms of the agreed judgment entered by this Court on June 3, 1952, in Cause No. 1860, [***4] entitled Puretex Lemon Juice, Inc. v. California Products, Inc., and Charles H. Davis, properly construed, do not prohibit the use by Plaintiffs herein, in the marketing of lemon and lime juices, of a bottle resembling the said bottle of Defendant in any respect whatsoever, but the purport and meaning thereof is to prevent the use by Plaintiffs of a bottle so resembling in appearance that of Defendant's bottle as to be calculated to mislead and deceive the buying public, and;

"That the use by Plaintiff, California Products, Inc. of its proposed bottle, above described in the marketing of its lemon and lime juices will not be violative of, or inconsistent with, the injunction issued by this Court in said Cause No. 1860."

Defendant appealed to the Court of Civil Appeals. That Court reversed and rendered denying plaintiff any relief. The basis for the opinion of the Court of Civil Appeals was (1) plaintiffs had shown no justiciable interest, and were only seeking an advisory opinion from the Court and (2) the trial court had no right to modify and change the terms of the judgment entered some five years in the past. *324 S.W. 2d 449*.

We granted the petition for writ of error on [***5] plaintiffs' first point. This asserted error by the Court of Civil Appeals in holding there was not an actual, real, or bona fide controversy between the parties. Petitioners-plaintiffs also have points on the error of the Court of Civil Appeals in holding that the trial court had no right to modify and change the terms of the previous judgment.

All parties agree that there must be a justiciable controversy between the parties before a declaratory judgment action [*589] will lie. That is well settled law. *Board of Water Engineers v. City of San Antonio, 1955, 155 Texas 111, 283 S.W. 2d 722*(1); *Parks v. Francis, Texas Civ. App., 1947, 202 S.W. 2d 683*(5), no writ history; *Southern Traffic Bureau v. Thompson, Texas Civ. App., 1950, 232 S.W. 2d 742*(10), ref., n.r.e.; Anderson, *Declaratory Judgments*, 2d Ed., Vol. 1, p. 38, section 9; 16 Am. Jur. 282, section 9; Hodges, *General Survey of the Uniform Declaratory Judgments Act in Texas*, Vernon's Texas Civil Statutes, Vol. 8, p. VII. The Court of Civil Appeals has cited and discussed some additional authorities and we will not repeat them.

"The rule with respect to the necessity for a justiciable controversy may be stated [***6] in the vernacular in this wise: The Uniform Declaratory Judgments Act does not license litigants to fish in judicial ponds for legal advice." Anderson, *Declaratory Judgments*, 2d. Ed., Vol. 1, p. 47, quoting from *Lide v. Mears, 231 N.C. 111, 56 S.E. 2d 404*.

[**782] The case nearest in point to the case at bar which we have been able to find is the case of *Ladner v. Siegel, 294 Pa. 368, 114 Atl. 274*, (1928). Plaintiffs Ladners owned certain residences on land purchased from defendant Siegel. On the remaining land adjoining plaintiffs' residences, Siegel proposed to erect a shopping center. One of the buildings was to be occupied by a garage operated for the general repair and service of automobiles for the public. The Ladners brought suit against Siegel seeking to restrain him from erecting and occupying the garage as a violation of the residential district use. The Ladners won this suit and secured their injunction. That cause became final.

Thereafter Siegel filed a declaratory judgment action asking the court to fix his rights in the conduct of the garage in case it was carried on in such a way as not to constitute a private nuisance. The court was presented with [***7] the question of determining a method by which Siegel would operate the garage, and then asked to determine whether or not such method of operation would be permitted in this residential district. The trial court entered a judgment setting out a method whereby the garage could be operated so as not to constitute a private nuisance.

On appeal the Supreme Court of Pennsylvania says the crucial question is "do the circumstances here disclosed give any jurisdiction to the court below to enter a declaratory judgment?" [*590] The Court then quotes from the Declaratory Judgments Act which provides that courts of record "within their respective jurisdictions, shall have power to declare rights, status, and other legal relations" between parties where there is a real matter in controversy. (These are the identical provisions in our statute -- Art. 2524-1.) The Court then says the Declaratory Judgments Act gives the court no power to grant advisory opinions, or to determine matters not essential to the decision of the actual controversy although such questions may in the future require adjudication, or passing upon contingent or certain other situations. The court then says:

"* * [***8] * In the present case, the question of whether the use of the garage as now contemplated would constitute an offensive business in the neighborhood, and a private nuisance, affecting not only complaints, but others residing near by, could not be determined until its actual operation at some future date."

And the Court further says:

"* * * If such a proceding [as sought] was to be countenanced, then approval would be given to applications in any like equity case to have a determination as to whether the court's order should be held ineffective, under stated facts depending on contingent and future events, with resulting confusion, and the decree would lack the finality which is contemplated in law. If petitioners believe the operation intended to be unobjectionable under the order made, they may proceed at their own risk. * * * 'Construction of a decree cannot be given until the question comes regularly before the court in proceedings requiring construction and application to acts alleged to have been done or omitted under it.' 21 C.J. 689."

To the same effect see *Shattuck v. Shattuck, 1948, 67 Ariz. 122, 192 P. 2d 229*(18); *Glassford v. Glassford, 1953, 79 Ariz. 220, 262 P.* [***9] *2d 382*(3); *National Biscuit Co. v. Kellogg Co., 1938 (Dist. Ct. Del.) 2 F. Supp. 801*; *J. Greenebaum Tanning Co. v. National Labor Relations Board (7th Cir.) 129 F. 2d 487*(2); 154 A.L.R. 740, et seq.

In the case of *Southern Traffic Bureau v. Thompson, Texas Civ. App., 1950, 232 S.W. 2d 742*, ref., n.r.e., it was said:

"The Uniform Declaratory Judgments Act does not provide for the giving of merely advisory opinions on the part of courts. In government this is a duty of the executive branch. In private [*591] business it is the function of [**783] the legal profession. *City and County of Denver v. Lynch, 92 Colo. 102, 18 P. 2d 907, 86 A.L.R. 907*.

"It is further a well established rule that a declaratory judgment should not be based upon facts which are particularly subject to mutation and change as are the facts here. Anderson on Declaratory Judgments, p. 195, section 72."

A declaratory judgment rendered herein would not settle the controversy between the parties. The permanent injunction in Cause No. 1860 is still outstanding. A violation of that judgment is subject to be punished for contempt in a proper proceeding. It cannot be determined whether or not a proposed [***10] bottle will be violative of the injunction issued on June 3, 1952 until California Products seeks to market its product in a bottle in the same market with Puretex. Only in this way can it be determined whether the California Products' bottle is of the size and appearance that it misleads and deceives the buying public into believing that it is securing Puretex products rather than California products.

We agree with the Court of Civil Appeals that this proceeding is one in which an advisory opinion is sought. Should we decide that the bottle proposed to be used by California Products did violate the injunction, we would settle nothing. California could continue indefinitely to propose bottles of different sizes, shapes and colors on which it could seek an equally indefinite number of advisory opinions as to whether such bottles violate the injunction. Such procedure would accomplish nothing. California Products should propose a bottle which it thinks does not violate the injunction, use it and litigate the material issue on a contempt hearing.

We affirm the judgment of the Court of Civil Appeals.

Associate Justice Greenhill not sitting.

Opinion delivered March 23, 1960.

[***11] Rehearing overruled May 18, 1960.



**H. C. Carter, Appellant v. Dripping Springs Water Supply Corporation, Appellee**

**NO. 03-03-00753-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***2005 Tex. App. LEXIS 461***

**January 21, 2005, Filed**

**PRIOR HISTORY:** [*1] FROM THE DISTRICT COURT OF HAYS COUNTY, 274TH JUDICIAL DISTRICT. NO. 02-1912, HONORABLE ROBERT T. PFEUFFER, JUDGE PRESIDING.

**DISPOSITION:** Reversed and Remanded.

**COUNSEL:** For APPELLANT: Mr. Matthew T. Slimp, Mr. Terry L. Scarborough, HANCE, SCARBOROUGH , WRIGHT, WOODWARD & WEISBART, L.L.P., Austin, TX.

For APPELLEE: Ms. Karey Nalle Oddo, Mr. Craig T. Enoch, WINSTEAD, SECHREST & MINICK, P.C., Austin, TX.

**JUDGES:** Before Justices Kidd, Patterson and Puryear; Justice Kidd Not Participating.

**OPINION BY:** David Puryear

**OPINION**

**MEMORANDUM OPINION**

H.C. Carter ("Carter") entered into an agreement with Dripping Springs Water Supply Corporation ("DSWSC") in which Carter agreed to sell property to DSWSC for the purpose of developing a wastewater treatment facility. One of the provisions of the contract allowed Carter to repurchase the property in question if Drippings Springs was unable to build the treatment facility. Carter filed suit to enforce the buyback provision, but the district court granted DSWSC's plea to the jurisdiction and dismissed the case. Carter appeals the district court's grant of the plea to the jurisdiction. We will reverse the order and remand the cause.

**FACTUAL AND PROCEDURAL BACKGROUND**

Carter is an individual residing in Hays County, Texas. DSWSC is a non-profit member-owned Texas water-supply corporation [*2] with its principal place of business in Dripping Springs, Texas. In February 1997, Carter entered into an unimproved-property purchase contract with DSWSC for the sale of approximately seventeen acres. DSWSC acquired the property for the purpose of building a wastewater treatment facility. The contract contained the following buyback provision:

> In the event [DSWSC] is unable to obtain environmental, historical, archeological, permitting or such other clearance or approvals from governmental regulatory agencies after the purchase of the property, or for any other reason [DSWSC]'s wastewater facility cannot go forward, [DSWSC] must hold the property for a period of two years from the date of closing. [DSWSC] must then offer [to] resell the exact same property to [Carter] for $ 87,500.00 and hold such offer to [Carter] open for six (6) months from date of notice. At anytime after receiving notice to repurchase the land, but not after six months from receipt of notice, [Carter] shall repurchase the land for the sum of $ 87,500.00, plus the cost of any boundary survey which may be required by [Carter] or any third party lender. [DSWSC] shall furnish a title policy [*3] and convey good title by general warranty deed to [Carter] in the event of such repurchase. (altered to substitute "DSWSC" for "Buyer" and "Carter" for "Seller").

The parties interpret the buyback provision in different ways. Carter takes the position that the buyback agreement creates a two-year time limit in which DSWSC is required to obtain all the necessary permits to build the facility and proceed in building the facility. Further, Carter alleges that when the two-year period of time expired, the contract gave Carter the right to repurchase the property for six months thereafter. Carter insists that DSWSC did not satisfy the two-year provision because it did not obtain all the permits necessary to build the facility; he asserts that DSWSC never applied for nor received a site-development permit from the City of Dripping Springs, which is necessary for the development of any land that is within the corporate limits of the City of Dripping Springs or its extraterritorial jurisdiction. *See* Dripping Springs, Tex., Ordinance No. 52-B § 10A (2001), at p. 13. [1] However, DSWSC counters by contending that it has been able to obtain the necessary permits to proceed with the [*4] facility. Specifically, DSWSC insists its proposed wastewater facility has been permitted by the Texas Commission on Environmental Quality ("the Commission"). [2] Further, DSWSC asserts that it has a certificate of convenience and necessity authorizing it to provide water service in portions of Hays County and a Texas Pollutant Discharge Elimination System permit, which allows it to provide wastewater treatment and disposal services in Hays County.

1 It is worth noting that the City of Dripping Springs passed an ordinance specifying that the seventeen acres in question lie within the extra-territorial jurisdiction of Dripping Springs. *See* Dripping Springs, Tex., Ordinance No. 1310.26 (2003).

2 For convenience, we will refer to both the Commission and its predecessor, the Texas Natural Resource Conservation Commission, as the Commission.

Carter also contends that it is not possible for DSWSC to build the treatment facility and insists that, as a result, Carter is entitled to repurchase the property. [*5] Carter asserts that because of the passage of an ordinance by the City of Dripping Springs and because of a provision in the contract requiring DSWSC to construct a 150-foot natural-vegetative buffer along the property boundary, it is physically impossible for DSWSC to build a treatment facility on the property in question. The ordinance in question was enacted in May 2001, and the ordinance listed restrictions for building an organized disposal system within Dripping Springs or within its extraterritorial jurisdiction. *See* Dripping Springs, Tex., Ordinance No. 52-D (2001). Specifically, the ordinance stated that the plans for an organized disposal system will not be approved if any portion of the system's treatment facilities, storage ponds, or surface irrigation components are located within 500 feet of the boundary of any city park or any land owned by an organization whose purpose is to protect, promote, maintain, or restore any structure listed on the National Register of Historic Places. In the ordinance, an organized disposal system is defined as "any publicly or privately owned system for the collection, treatment and/or disposal of sewage from more than one residence, [*6] duplex or commercial building that is installed and operated in accordance with the terms and conditions of a valid permit issued by" the Commission. The facility discussed in the contract was a wastewater treatment facility that could provide service to 120 single-family lots. Carter claims the seventeen acres is next to a park and a recorded historical landmark. Therefore, Carter insists the 500-foot provision applies to the property in question.

DSWSC counters and contends that, under the contract, it has a reasonable amount of time to exhaust all alternatives, that the buyback provision does not have a two-year time limit, and that before Carter can seek to repurchase the property, DSWSC must give Carter notice. Further, DSWSC contends the ordinance does not apply to the property in question, it is not impossible for DSWSC to build the facility on the property in question, and unless Carter can prove as a matter of law that it is physically impossible for it to build the facility, then Carter's claims are not ripe, and he is not entitled to proceed in district court.

In July 1997, Carter offered to purchase lot twenty, which is another piece of property owned by DSWSC that was [*7] purchased in order to access the original seventeen acres. Carter contends that the offer did not contain a time limit and that the offer was never revoked. Carter also alleges the Board of Directors of DSWSC held a meeting and agreed to accept Carter's offer to purchase lot twenty. In August 1997, Joel Wilkinson, who was an employee of DSWSC, sent Carter a letter stating that the Board had agreed to grant Carter the first right to purchase the lot at the price DSWSC had paid in the event the lot and the seventeen-acre tract were not used for developing wastewater facilities. Carter asserts that he believed, based on his prior interactions with Wilkinson during the original contract formation, that Wilkinson was authorized to accept Carter's offer; however, DSWSC denies that Wilkinson had the authority to accept Carter's offer. Further, Carter asserts that his offer and DSWSC's acceptance letter created an amendment to the original contract and that he is entitled to purchase the seventeen acres and lot twenty.

In April 2001, Carter wrote a letter to the president of DSWSC asking to purchase lot twenty and the original

seventeen acres under the buyback provision of the contract, [*8] and he tendered $ 10,000 as a down payment. Carter stated in the letter that if DSWSC refused to sell the property to him, he would be forced to sue DSWSC. DSWSC refused to sell any of the property to Carter.

Carter filed suit seeking a declaratory judgment regarding his rights and obligations under the buyback provision of the contract. Carter contended that DSWSC had not received all the necessary permits and approvals for the wastewater facility to go forward and that it was not possible for DSWSC to build the wastewater facility as required under the terms of the contract. Carter sought a declaration that, as a result of DSWSC's alleged inability to obtain permits and inability to build the facility, he was entitled to exercise his right to purchase the seventeen acres and lot twenty.

Carter then filed an amended motion for summary judgment. In response, DSWSC filed its own motion for summary judgment and a plea to the jurisdiction, styled as a motion to dismiss for lack of jurisdiction, and asserted the following: (1) Carter's claims were not ripe for review and (2) Carter lacked standing to sue. Both parties attached attorney's fees affidavits to their pleadings.

The district [*9] court denied both motions for summary judgment and granted DSWSC's plea to the jurisdiction without findings of fact or conclusions of law. Further, the district court also awarded $ 22,986.94 to DSWSC for attorney's fees. In response, Carter filed a motion for reconsideration and contended that the district court could not award attorney's fees if it granted DSWSC's plea to the jurisdiction. The district court denied the motion for reconsideration, signed an order dismissing Carter's action without prejudice, and awarded DSWSC $ 22,986.94 in attorney's fees.

Carter filed a request for findings of fact and conclusions of law to determine what evidence the trial court had relied on in sustaining DSWSC's plea to the jurisdiction. Also, Carter filed a motion for new trial. The district court denied both the request and the motion for new trial. Carter appeals the district court's decisions and asserts the district court erred by granting DSWSC's plea to the jurisdiction, by awarding DSWSC attorney's fees, by denying Carter's motion for a new trial, and by concluding that some of Carter's objections to the attorney's fees were waived.

**DISCUSSION**

The purpose of a plea to the jurisdiction [*10] is to defeat a cause of action without regard to whether the claims raised are meritorious. *Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554, 44 Tex. Sup. Ct. J. 125 (Tex. 2000)*. When deciding a plea to the jurisdiction, the court should not reach the merits of the case. *Id.* A court should look to the facts alleged in the pleadings and may consider evidence when necessary to resolve the jurisdictional questions in issue. *Id. at 555*. A court should construe the pleadings liberally in a way that favors jurisdiction unless the petition affirmatively demonstrates a lack of jurisdiction. *See Peek v. Equip. Serv. Co., 779 S.W.2d 802, 804, 33 Tex. Sup. Ct. J. 77 (Tex. 1989)*.

**Ripeness**

In its plea to the jurisdiction, which the district court granted, DSWSC alleged that Carter's claims were not ripe. Specifically, DSWSC's plea to the jurisdiction contended that Carter's claims were not ripe because (1) no facts support Carter's charge that it was impossible for DSWSC to build its wastewater facility; (2) the property in question is outside Dripping Springs's city limits and, therefore, not bound by the city ordinances that Carter alleges prevent DSWSC from building its [*11] facility; (3) the buyback provision does not specify when DSWSC must send notice to Carter of his right to repurchase the property; and (4) no notice has been received by Carter, so Carter is not entitled to enforce the buyback provision.

For a claim to be justiciable, the claim must be ripe, and the concept of ripeness emphasizes the need for a concrete injury and focuses on when an action may be brought. *Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 851, 43 Tex. Sup. Ct. J. 731 (Tex. 2000)*. Under the ripeness doctrine, courts consider whether, at the time a lawsuit is filed, the facts are sufficiently developed and show that an injury has or is likely to occur. *Id. at 852*. A case is not ripe if determining whether a plaintiff has a concrete injury depends on events that have not come to pass or that are based on hypothetical or contingent facts. *Id.*

A declaratory judgment, on the other hand, is appropriate if a justiciable controversy exists as to the rights and status of the parties and if the controversy will be resolved by the declaration sought. *Bonham State Bank v. Beadle, 907 S.W.2d 465, 467, 38 Tex. Sup. Ct. J. 768 (Tex. 1995)*. Determining whether a court has jurisdiction [*12] over a declaratory-judgment action is a question of law and is subject to de novo review. *Paulsen v. Texas Equal Access to Justice Found., 23 S.W.3d 42, 44 (Tex. App.--Austin 1999, pet. dism'd), order withdrawn on other grounds* (April 26, 2001); *see* Texas *Dep't of Transp. v. City of Sunset Valley, 146 S.W.3d 637, 646, 47 Tex. Sup. Ct. J. 1252 (Tex. 2004)* (subject matter jurisdiction reviewed de novo). *The Uniform Declaratory Judgment Act* gives an individual whose rights and legal relations are at issue in a contractual dispute a vehicle where he can solicit the court to resolve questions of construction or validity under a contract. *National County Mut. Fire Ins. Co. v. Johnson, 829 S.W.2d 322, 324 (Tex. App.--Austin*

*1992), aff'd, 879 S.W.2d 1, 37 Tex. Sup. Ct. J. 75 (Tex. 1993). Section 37.004(b) of the Uniform Declaratory Judgment Act* provides that "[a] contract may be construed before or after there has been a breach." *Tex. Civ. Prac. & Rem. Code Ann. § 37.004(b)* (West 1997).

DSWSC asserts on appeal that, in this case, determining whether Carter has a concrete injury depends upon events that have not yet come to pass; therefore, DSWSC insists that [*13] the case is not ripe. Further, DSWSC contends that the facts supporting Carter's right to seek a declaratory judgment were not in existence at the time Carter filed suit and that the conditions that needed to be met in order for Carter to demand DSWSC resell the property to him had not occurred. Specifically, DSWSC asserts that Carter's ability to repurchase the seventeen acres and lot twenty was contingent upon DSWSC being unable to obtain permits for the wastewater facility or being prevented from going forward with development. However, DSWSC insists that neither one of these events has occurred. In addition, DSWSC urges that the six-month-notice provision requires that DSWSC send notice to Carter informing him of his right to repurchase the property before the buyback provision takes effect and that the requirement does not specify when DSWSC must send notice to Carter. Because no notice has been sent, DSWSC insists that Carter is not able to force the sale of the properties and that his claims are, therefore, not ripe.

In support of its position that a case is not ripe if the injury depends on events that have not yet occurred and that a court may not rule on a hypothetical fact [*14] situation, DSWSC relies on many cases. *See, e.g., Camarena v. Texas Employment Comm'n, 754 S.W.2d 149, 31 Tex. Sup. Ct. J. 563 (Tex. 1988)* (exemption denied most agricultural workers benefits, but case not ripe because Commission had, at time of judgment, not attempted to deny benefits); *Firemen's Ins. Co. v. Burch, 442 S.W.2d 331, 12 Tex. Sup. Ct. J. 49 (Tex. 1968)* (asking court to declare liability of insurance company upon a judgment that may be rendered in the future is purely speculative, so declaratory judgment inappropriate). However, these cases are distinguishable from this case because here a court is not being asked to make a declaration based upon facts that may or may not occur in the future. Rather, this case asks a court to choose between two competing interpretations of a contract whose terms are dependent upon future events. *See, e.g., Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 42 Tex. Sup. Ct. J. 130 (Tex. 1998)* (court asked to declare whether insurance contract's pollution exclusion clause excluded Kelley from clean up costs).

Thus, DSWSC is urging an interpretation contrary to Carter's, but if these issues are not determined by a trial court on the merits and [*15] if the contract provisions are not construed, the parties will never receive a resolution on the merits. Essentially what the trial court did was to decide on the merits that DSWSC was still "going forward" under the contract, but, under this view, the case would never be ripe for resolution.

For ripeness to bar Carter's claim, we would have to assume that DSWSC's construction of the contract is correct. However, the contract can be construed in other ways. Under DSWSC's interpretation, the events triggering the buyback provision have not occurred; however, under Carter's interpretation, the events triggering the buyback provision have already occurred. Carter asserts that the buyback provision requires DSWSC to resell the property to Carter two years after the date of closing if DSWSC is not able to obtain all the necessary permits and approvals by that time and that the failure to do so is a breach of the contract. Further, Carter insists that the language "and hold such offer to Seller open for six (6) months from date of notice" does not create a condition precedent under which DSWSC must give Carter notice before he can repurchase the property. Rather, Carter contends that the [*16] six-month provision refers to the six-month period after Carter has been offered the property in which he could exercise his mandatory right to purchase the property. DSWSC, on the other hand, alleges that the six-month notice requirement means that DSWSC must give Carter notice of his buyback right before Carter can sue. Both Carter's and DSWSC's readings of the contract are reasonable, and Carter is entitled to have the court determine what the buyback provision means.

Whether it is possible for DSWSC to build its facility on the property in question as a result of the city ordinances and the vegetative buffer requirement is a determination the trial court must make because it is an argument on the merits. Because the only way to resolve these disputed issues is a trial on the merits, we hold that Carter's claims are ripe for consideration.

**Standing**

Although DSWSC's plea to the jurisdiction contained allegations of both ripeness and standing, the district court did not differentiate between the two allegations when it granted DSWSC's plea. On appeal, DSWSC has only argued the ripeness issue. However, we will examine the standing issue briefly.

In DSWSC's plea to the [*17] jurisdiction, which the trial court granted, DSWSC alleged that Carter did not have standing to file this suit because there was a variation in how Carter was identified in his original petition and request for declaratory relief and in the general warranty deed.

We review a claim that a trial court lacks subject-matter jurisdiction under a de novo standard. *See Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928, 41*

*Tex. Sup. Ct. J. 517 (Tex. 1998)*. A party interested in a contract or other writings constituting a contract who desires to have the contract construed by a court in order to determine his rights, status, or other legal relations affected by the contract has standing to file suit. *See Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a)* (West 1997).

*Name Discrepancy*

DSWSC contends that because the general warranty deed names H.C. Carter, Trustee as guarantor and because the plaintiff's original petition and request for declaratory judgment was filed by H.C. Carter, individually, then the trial court lacked subject-matter jurisdiction over the claim. DSWSC contends that because the property was conveyed by H.C. Carter, Trustee rather than H.C. Carter, then Carter was not [*18] the "seller" under the contract and, therefore, Carter had no interest to adjudicate. Further, DSWSC argues that, as a result of the discrepancy in names, Carter did not possess title to the seventeen acres at the time of contract or at the time the general warranty deed was obtained and, therefore, did not satisfy all the conditions precedent required to maintain this suit.

However, a party does not always have to be identified in the exact same manner in every document for a claim to be valid, especially when there is no evidence that a different person was meant to be identified. *See, e.g., Salazar v. Tower, 683 S.W.2d 797, 799 (Tex. App.--Corpus Christi 1984, no writ)* (omission of "Jr." insufficient to establish lack of identity). This proposition seems especially true where, as here, the difference was the presence of a title and not a difference in a name.

Further, to the extent that DSWSC argued that Carter does not have the capacity to sue because the deed names H.C. Carter, Trustee, DSWSC is urging a distinction that does not matter under the facts of this case. Even assuming Carter acted as an agent, an agent may sue in his own name when the agent [*19] contracts in his own name. *See Perry v. Breland, 16 S.W.3d 182, 187 (Tex. App.--Eastland 2000, pet. denied)*. Carter contracted in his own name as evidenced by the contract at issue in this case, which defines Carter as the seller. In addition, Carter and DSWSC should be allowed to present evidence at trial on whether or not Carter has satisfied all the necessary prerequisites for filing suit.

We hold that the trial court has subject-matter jurisdiction over this case, and we hold that Carter has standing to file this claim.

**CONCLUSION**

Because we conclude that the claims presented were ripe for resolution, that the trial court had subject-matter jurisdiction, and that Carter had standing to file the suit, we reverse the district court's order granting DSWSC's plea to the jurisdiction and remand the case for further proceedings not inconsistent with this opinion. [3]

3 Because we are reversing the order of the district court, we need not address the issue of attorney's fees or objections to attorney's fees.

[*20] David Puryear, Justice



**COMMERCIAL UNION INSURANCE COMPANY AND TOCON CONSTRUCTION CORPORATION, Appellants, v. LA VILLA INDEPENDENT SCHOOL DISTRICT, Appellee. and LA VILLA INDEPENDENT SCHOOL DISTRICT, Appellant, v. BILL CAUDLE, SR., Appellee**

**No. 13-88-642-CV**

**COURT OF APPEALS OF TEXAS, Thirteenth District, Corpus Christi**

***779 S.W.2d 102*; *1989 Tex. App. LEXIS 2568***

**October 12, 1989**

**SUBSEQUENT HISTORY:** [**1] Motion for Rehearings Overruled November 9, 1989.

**PRIOR HISTORY:** On Appeal from the 332nd District Court of Hidalgo County, Texas.

**JUDGES:** Norman L. Utter, Seerden and Benavides, JJ.

**OPINION BY:** UTTER

**OPINION**

[*104] La Villa Independent School District (La Villa), brought suit against Commercial Union Insurance Company (Commercial), Tocon Construction Corporation (Tocon), and Bill Caudle, Sr., alleging numerous theories of recovery as to each defendant for problems that developed with respect to a gymnasium that Tocon constructed. Commercial filed a performance bond on this project in favor of La Villa, and Caudle was the president, chief executive officer, and majority shareholder of Tocon. After a bench trial, the court ordered that La Villa recover $ 12,950.00 and attorneys' fees from Commercial and Tocon, jointly and severally, but denied any recovery against Caudle. The trial court's order specifically denies La Villa's Deceptive Trade Practice Act claims, but does not otherwise specify under which theory La Villa is being permitted to recover. The court further denied all of the defendant's counterclaims, including Tocon's counterclaim regarding a "liquidated damage provision" [**2] in its contract with La Villa. We affirm in part and reverse in part.

La Villa entered into a construction contract with Tocon, the general contractor, dated March 16, 1983, for the construction of a new gymnasium. Pursuant to the requirements of the contract and *Tex. Rev. Civ. Stat. Ann. art. 5160* (Vernon 1987), Tocon furnished La Villa with a performance bond, dated March 16, 1983, for $ 196,050.00, with Commercial as surety. This amount was later increased to $ 196,462.00 to reflect the full amount of the contract price. On April 1, 1983, Rudy Gomez, La Villa's architect, issued notice to Tocon to proceed. This notice informed Tocon that work was to begin within ten days of the notice and that Tocon had until August 8, 1983 to complete the project. Tocon thereafter commenced construction of the gymnasium.

On November 7, 1983, a certificate of substantial completion was issued by the architect and La Villa, as reflected on that certificate, accepted the work completed and assumed full possession on January 19, 1984. Tocon was subsequently notified of various deficiencies which needed correction. A letter from Gomez dated January 16, 1984 informed Tocon that there was a problem [**3] with paint discoloration. Although Tocon corrected several other defects and represented that it would correct the problem with the paint discoloration, Tocon failed to remedy this problem. On August 13, 1985, La Villa accepted a $ 12,950.00 bid to re-paint the gymnasium from another contractor. On February 20, 1986, La Villa filed this suit to recover its losses.

In considering a "no evidence", "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co., 715 S.W.2d 629 (Tex. 1986)*; *Dyson v. Olin Corp., 692*

*S.W.2d 456 (Tex. 1985)*; *Glover v. Texas General Indemnity Co., 619 S.W.2d 400 (Tex. 1981)*; *Garza v. Alviar, 395 S.W.2d 821 (Tex. 1965)*; *Allied Finance Co. v. Garza, 626 S.W.2d 120* (Tex. App. -- Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L. Rev. 361 (1960).

There were no findings of fact and conclusions of law filed in this cause. Absent findings of fact and conclusions of law, all questions of fact should be presumed to support the judgment, and the judgment [**4] should be affirmed if it can be upheld on any legal theory that finds support in the pleadings and in the evidence. *Point Lookout West, Inc. v. Whorton, 742 S.W.2d 277, 278 (Tex. 1987)*; *Campbell & Son Construction Co. v. Housing Authority of Victoria, 655 S.W.2d 271, 274* (Tex. App. -- Corpus Christi 1983, no writ).

Commercial and Tocon's first through third points of error contend that the trial [*105] court erred in granting a recovery against Commercial upon the surety bond. They argue that the evidence conclusively showed that the claim was barred by limitations and that the trial court's holding to the contrary was against the overwhelming weight and preponderance of the evidence.

The record reflects that the performance bond stated that "any suit under this bond must be instituted before the expiration of two (2) years from the date on which final payment under the Contract falls due." However, the performance bond also stated that it was being ". . . executed pursuant to the provisions of *Article 5160 of the Revised Civil Statutes* of Texas as amended, and all liabilities on this bond . . . shall be determined in accordance with the provisions of said Article [**5] . . . ." Gomez filed a certificate of substantial completion on November 7, 1983, and Tocon requested final payment on November 29, 1983. Gomez sent La Villa a letter dated December 1, 1983, wherein he submitted Tocon's request for final payment, but stated various amounts were going to be retained to correct deficiencies and for liquidated damages. La Villa made this payment by check dated February 14, 1984. La Villa filed this suit to recover its losses on February 20, 1986.

The issues are whether the one or two year statute of limitations is applicable, and whether the trial court's determination that the case was not barred by limitations is supported by the evidence.

The events of this transaction occurred as follows:

1. March 16, 1983 -- parties enter a contract and bond

2. April 1, 1983 -- notice to proceed is issued by the architect

3. August 8, 1983 -- date of completion as specified in the architect's notice to proceed

4. November 7, 1983 -- date of substantial completion signed by architect

5. January 16, 1984 -- architect states that there is a problem with paint discoloration

6. January 19, 1984 -- date of substantial completion accepted [**6] by school district

7. February 14, 1984 -- last payment made by school district received by Tocon

8. March 26, 1984 -- letter by architect regarding paint problem

9. November 27, 1984 -- Caudle/Tocon letter stating that paint work will be subcontracted out

10. October 1, 1985 -- attorney demand letter

11. February 20, 1986 -- suit filed.

Under *Tex. Rev. Civ. Stat. Ann. art. 5160* G, no suit shall be instituted on a bond after the expiration of one year *after the date of final completion of such contract*. However, the performance bond in question stated that any suit must be instituted before the expiration of two years *from the date on which final payment* under the contract falls due.

We find that under either application of the statute of limitations, this case is barred by limitations. The evidence was that on November 7, 1983, La Villa's architect signed the certificate of substantial completion. On January 19, 1984, La Villa accepted the certificate of substantial completion. On February 14, 1984, payment was received. Suit was not filed until February 20, 1986, which is more than two years after La Villa accepted the certificate of substantial [**7] completion.

It is settled that a surety on a bond is entitled to rely on the architect's certificate of completion as final discharge of its duty on the bond. *Transamerica Insurance Co. v. Victoria Housing Authority, 669 S.W.2d 818* (Tex. App. -- Corpus Christi 1984, writ ref'd n.r.e.); *City of Midland v. Waller, 430 S.W.2d 473 (Tex. 1968)*. In *Transamerica*, this Court held that substantial completion of a contract is regarded as full performance. *Transamerica, 669 S.W.2d at 822*. The contract between La Villa and Tocon defines the date of substantial com-

pletion as "the Date certified by the Architect when Construction is sufficiently complete, in accordance with the Contract Documents, so the Owner can [*106] occupy or utilize the work or designated portion thereof for the use of which it is intended." If we apply Article 5160 G, this case should have been filed no later than one year after January 19, 1984, the date the school district accepted the certificate of substantial completion. If we apply the two year statute, the suit should have been brought before the expiration of two years from February 14, 1984, the date the last payment was made to Tocon by [**8] the school district. Under either interpretation, the case is barred.

La Villa argues that the statute was extended by the representations by Tocon that they were going to repair the paint problems. The representations by Tocon might have been used to toll the statute of limitations regarding any liability the contractor might have had to the owner if such question was in issue, but we hold that it would not serve to toll the statute regarding the surety whose duty under the bond is discharged upon completion of the contract. La Villa does not direct us to any portions of the record in which Commercial took any affirmative act which would toll the statute of limitations as to it. We sustain Tocon and Commercial's first three points of error.

Commercial and Tocon's fourth through sixth points of error contend the trial court erred in refusing to grant Tocon an offset of $ 9,100.00, plus interest and attorneys' fees. They complain that the evidence conclusively showed that the "liquidated damage provision" under which La Villa retained the $ 9,100.00 was a penalty provision and that the trial court's holding to the contrary was against the overwhelming weight and preponderance of the [**9] evidence.

The contract between Tocon and La Villa provided that:

> TIME OF COMMENCEMENT AND SUBSTANTIAL COMPLETION
>
> The Work to be performed under this Contract shall be commenced as noted in the Notice to Proceed, and, subject to authorized adjustments, Substantial Completion shall be achieved not later than as noted in the Notice to Proceed.
>
> The Owner will suffer financial loss if the Project is not Substantially Complete on the date set forth in the Contract Documents. The Contractor (and his Surety) shall be liable for and shall pay to the Owner the sums thereinafter stipulated as fixed, agreed and liquidated damages for each calendar day of delay until the work is Substantially Complete:
>
> One Hundred Dollars ($ 100.00)

Pursuant to this provision, La Villa withheld $ 9,100.00 from Tocon's payment because of Tocon's failure to complete the project on the date set forth in the contract. Alejas Salazar, the superintendent of the La Villa Independent School District, testified that the teachers and the students suffered an inconvenience because they did not have full use of the building. Salazar further testified that he could not actually calculate dollar [**10] for dollar the damages suffered by the inconvenience, but that a hundred dollars a day would be a reasonable amount to retain as liquidated damages. Salazar also testified that the liquidated damage provision was included in the contract to provide retribution should they suffer monetarily.

The right of parties to make their own bargains is not unlimited, but rather is limited by the universal rule for measuring contractual damages based on just compensation for the loss or damage actually sustained. *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (1952)*. A liquidated damage provision will be enforced when the court finds: (1) the harm caused by the breach is incapable or difficult of estimation; and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation. *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2 (Tex. 1979)*; *Stewart, 245 S.W.2d at 486*; *Stewart v. Basey, 241 S.W.2d 353, 357* (Tex. Civ. App. -- Austin 1951, writ ref'd). However, the party asserting that a liquidated damages clause is, in fact, a penalty provision has the burden of proving this defense. *Johnson Engineers, Inc. v. Tri-Water* [**11] *Supply Corp., 582 S.W.2d 555, 557* (Tex. Civ. App. -- Texarkana 1979, no writ). In order to meet this [*107] burden, the party asserting the defense is required to prove the amount of the other parties' actual damages, if any, to show that the liquidated damages are not an approximation of the stipulated sum. *Id.; see also Robinson v. Granite Equipment Leasing Corp., 553 S.W.2d 633, 637* (Tex. Civ. App. -- Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Oetting v. Flake Uniform & Linen Service, Inc., 553 S.W.2d 793, 795* (Tex. Civ. App. -- Fort Worth 1977, no writ). If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages must be declared a penalty and recovery limited to the actual damages proven.

Since no findings and conclusions were filed by the trial court, we presume that the trial court found that the damages caused by Tocon's breach were either incapable or difficult to estimate and that the liquidated damages constituted just compensation. No evidence was offered regarding the extent, if any, of La Villa's actual damages

pertaining to the inability to use the gymnasium, and the record clearly supports the [**12] difficulty in ascertaining damages resulting from the delay in use to a secondary school's gymnasium. *See City of Marshall v. Atkins, 60 Tex. Civ. App. 336, 127 S.W. 1148, 1151* (Tex. Civ. App. 1910, writ dism'd); *but see Loggins Construction Co. v. Steven F. Austin State University Board of Regents, 543 S.W.2d 682, 685-86* (Tex. Civ. App. -- Tyler 1976, writ ref'd n.r.e.) (held that withholding $ 250.00 a day for delayed usage of a football stadium was a penalty as a matter of law). Therefore, after reviewing the entire record, we hold that the trial court did not err in refusing to offset $ 9,100.00, plus attorneys' fees and interest from the damages it awarded La Villa. Appellants' fourth through sixth points of error are overruled.

By their seventh through tenth points of error, Commercial and Tocon contend the trial court erred in awarding attorney's fees to La Villa. They complain that the award of attorney's fees was unreasonable and unnecessary because Tocon agreed to pay the full amount due, plus attorney's fees, prior to suit being filed, but that La Villa declined such payment when "Tocon refused to surrender its right to claim that the 'liquidated damage provision' [**13] was invalid and to recover sums withheld thereby." They also argue that there is either no evidence or insufficient evidence to support an award of attorney's fees to La Villa.

The record and the above complaints reveal that Tocon placed a condition upon its settlement offer; i.e. that Tocon would retain the right to claim that the liquidated damage provision was invalid. We further disagree with Commercial and Tocon's assertions that the amount offered was all that La Villa was entitled to receive. The contract expressly permits the liquidated damages, and La Villa was within their rights to seek such an award. Therefore, La Villa was not offered to be paid all that it was seeking in damages.

Although *Tex. Civ. Prac. & Rem. Code Ann. § 38.002(3)* (Vernon 1986) does include, as a prerequisite to a recovery of attorney's fees, that "payment for the just amount owed must not have been *tendered* before the expiration of the 30th day after the claim is presented (emphasis added)," an *offer to settle* is insufficient as a defense to a claim for attorney's fees. Even had there been a tender in this case, it has been held that a tender of an amount less than the amount claimed is [**14] legally insufficient to avoid the awarding of attorney's fees. *Hoot v. Quality Ready-Mix Co., 438 S.W.2d 421, 428-29* (Tex. Civ. App. -- Corpus Christi 1969, no writ); *Barreda v. Merchants National Bank, 206 S.W. 726, 727* (Tex. Civ. App. -- San Antonio 1918, no writ). Further, attorney fees are recoverable under the statute regardless of when suit is filed if payment is not made within the thirty day period. *Gateley v. Humphrey, 151 Tex. 588, 254 S.W.2d 98, 101 (1952)*; *Aransas Natural Gas Co. v. Renfro, 430 S.W.2d 591, 592* (Tex. Civ. App. -- Waco 1968, writ ref'd n.r.e.). We finally note that the trial court could have found and concluded that Tocon failed to make a good faith attempt to settle this case.

Raymundo Lopez, La Villa's attorney, testified that he spent 126 hours on the case prior to trial, and an additional twenty [*108] hours during the trial of the case. He further testified that his normal rate is $ 85.00 an hour for out of court time and $ 100.00 an hour for court time, and requested various amounts for post-judgment attorney's fees. He also testified that the above amounts were fair, reasonable and customary attorney's fees in Hidalgo County, [**15] Texas.

In the absence of findings of fact and conclusions of law, we will presume that the court found such facts as were necessary to support the judgment. *Commercial Credit Corp. v. Smith, 143 Tex. 612, 187 S.W.2d 363, 365 (1945)*; *Bennett v. State National Bank, 623 S.W.2d 719, 722* (Tex. Civ. App. -- Houston [1st Dist.] 1981, writ ref'd n.r.e.). We hold that there is sufficient evidence to support La Villa's amount of attorney's fees to La Villa. *Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (Vernon 1986). We overrule Commercial and Tocon's seventh through tenth points of error.

By its first point of error, La Villa contends the trial court erred in refusing to enter judgment against Caudle in his individual capacity for his own conduct and for the conduct of Tocon. By its second point of error, La Villa asserts the trial court erred in refusing to modify or correct the judgment and in not granting a new trial. By its fourth point of error, La Villa argues that the trial court erred because entering judgment for Caudle was so against the great and overwhelming weight of the evidence as to be manifestly erroneous and unjust.

When reviewing a jury verdict to determine the [**16] factual sufficiency of the evidence, the court of appeals must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986)*; *Dyson v. Olin Corp., 692 S.W.2d 456, 457 (Tex. 1985)*. However, absent findings of fact and conclusions of law, all questions of fact should be presumed to support the judgment, and the judgment should be affirmed if it can be upheld on any legal theory that finds support in the pleadings and in the evidence. *Point Lookout West, Inc. v. Whorton, 742 S.W.2d 277, 278 (Tex. 1987)*; *Campbell & Son Construction Co. v. Housing Authority of Victoria, 655 S.W.2d 271, 274* (Tex. App. -- Corpus Christi 1983, no writ).

The corporate fiction shall be disregarded, even though corporate formalities have been observed and

corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. *Castleberry v. Branscum, 721 S.W.2d 270, 271 (Tex. 1986)*. Specifically, the corporate fiction shall be disregarded: [**17]

> (1) when the fiction is used as a means of perpetrating fraud;
>
> (2) where a corporation is organized and operated as a mere tool or business conduit of another (alter ego);
>
> (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;
>
> (4) where the corporate fiction is employed to achieve or perpetrate monopoly;
>
> (5) where the corporate fiction is used to circumvent a statute, and(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

*Id. at 272*. However, the corporate veil should be pierced and personal liability imposed upon an individual only under the most compelling of circumstances. *Aztec Management & Investment Co. v. McKenzie, 709 S.W.2d 237, 239* (Tex. App. -- Corpus Christi 1986, no writ); *Hickman v. Rawls, 638 S.W.2d 100, 102* (Tex. App. -- Dallas 1982, writ ref'd n.r.e.). The fact that a majority or even all of the stock in a corporation is owned by a single individual does not of itself make the corporation the alter ego of the individual or, without more, justify the piercing of the corporate veil. *See Massachusetts v. Davis, 140 Tex. 398,* [**18] *168 S.W.2d 216, 224 (1942), cert. denied, 320 U.S. 210, 87 L. Ed. 1848, 63 S. Ct. 1447 (1943)*; *Aztec Management, 709 S.W.2d at 239*.

[*109] Tocon commenced business sometime around March 15, 1978 and has received both a corporate charter and a certificate of good standing from the State of Texas. Tocon has enacted bylaws, filed franchise and income tax returns, appointed or elected directors and officers, and held stockholder and director's meetings. Eugene Vaughn was the original president, but Caudle is the current president of the corporation. Tocon issued shares of stock for cash consideration when it was first organized with Vaughn and Caudle each receiving fifty percent of the shares in the corporation. In 1980-1981, Vaughn and Caudle each sold Marvin Luksa five percent of the shares they owned.

It was decided near the completion of the La Villa project that Tocon was going to terminate its construction business. Luksa left Tocon in January of 1984 after deciding not to purchase the corporation. The record reflects that this occurred after the La Villa contract had been substantially completed and that Tocon was solvent and in good operating condition when he [**19] left. Thereafter, Tocon bought Luksa's shares for around $ 25,000.00.

Vaughn's subsequent death triggered a buy/sell agreement that had been previously created. Tocon thereafter purchased Vaughn's interest as follows: 3,050 shares at $ 3.57 per share; 3,050 shares to be bought at a future date at ten percent of the book value established by a 1984 audit report. Ultimately, Tocon suffered a cash shortage which resulted in Caudle, as the sole remaining shareholder, loaning cash to the corporation, which by the time of trial amounted to $ 20,000.00. However, all other debts, including pre-1984 loans made by Caudle, have been paid and Tocon still has a substantial amount of equipment and computer software.

Caudle received $ 1,500.00 in salary in 1985, but has not received remuneration of any kind from Tocon since that time. The record, as a whole, reveals that Tocon has always been operated as an independent entity and that the shareholder's personal accounts have not been commingled with Tocon's accounts. The record further reveals that La Villa contracted with Tocon without personal guarantees from its shareholders and that Luksa, not Caudle, originally handled the La Villa project.

[**20] After weighing all the evidence, we hold that the verdict is not so contrary to the overwhelming weight of the evidence as to be clearly unjust and wrong.

We can find no basis which would permit us to pierce Tocon's corporate veil or to impose liability upon Caudle as an individual. Although Caudle did write various letters stating that he would personally fund the payment for the corrective work, these letters were apparently written for settlement purposes so as to avoid litigation and these offers were obviously not accepted by La Villa. We overrule La Villa's first, second, and fourth points of error.

By its third point of error, La Villa contends the trial court erred in admitting exhibits M21-M36 and M38 into evidence. La Villa complains that although it requested Caudle to produce these documents by a "Request for Production and Inspection of Documents" on January 9, 1989, Caudle failed to produce these documents prior to the time he offered them at trial.

The record reveals that La Villa expressly stated that it had no objection when M21 was offered for admission into evidence and that M22-25 either do not exist or were never offered and admitted into evidence. In fact, [**21] M22-25 do not appear to be listed in the exhibit index and have not been made a part of the record on appeal. The record further reveals that Caudle testified regarding the

contents of M26-M36 and M38 in detail without objection just before they were offered for admission into evidence. The record also reflects that La Villa called Caudle to testify during its case-in-chief and that Caudle testified that he had personally *loaned* money to Tocon so that it could handle its financial obligations. M26-36 constitute various promissory notes and the respective checks which were executed between Caudle/Bill Caudle Properties and Tocon.

We hold that La Villa has waived error, if any, committed by the trial court. A party may not complain on appeal [*110] of the improper admission of evidence when that party, itself, introduced evidence of a similar character. *McInnes v. Yamaha Motor Corp., U.S.A., 673 S.W.2d 185, 188 (Tex. 1984), cert. denied, 469 U.S. 1107, 105 S. Ct. 782, 83 L. Ed. 2d 777 (1985)*; *Pouncy v. Garner, 626 S.W.2d 337, 340* (Tex. App. -- Tyler 1981, writ ref'd n.r.e.). The admission of improper evidence is also waived when testimony to the same effect has [**22] been previously admitted without objection. *Badger v. Symon, 661 S.W.2d 163, 164* (Tex. App. -- Houston [1st Dist.] 1983, writ ref'd n.r.e.); *Hundere v. Tracy & Cook, 494 S.W.2d 257, 263-64* (Tex. Civ. App. -- San Antonio 1973, writ ref'd n.r.e.). Moreover, to be timely, an objection to the admission of evidence must be made *before* testimony has been adduced regarding the substance of the objectionable evidence. *Montes v. Lazzara Shipyard, 657 S.W.2d 886, 889* (Tex. App. -- Corpus Christi 1983, no writ); *Harry Brown, Inc. v. McBryde, 622 S.W.2d 596, 600* (Tex. App. -- Tyler 1981, no writ). Here, La Villa waited until after Caudle testified in detail as to the contents of M26-M36 and M38 before lodging its objection. We overrule La Villa's third point of error.

By its fifth point of error, La Villa contends the trial court erred in refusing to file findings of fact and conclusions of law. La Villa argues that its motion for new trial had the effect of extending the time within which a request for findings of fact and conclusions of law could have been properly filed.

*Tex. R. Civ. P. 296* expressly provides that the request for findings of fact and conclusions [**23] of law "shall be filed within ten days after the final judgment is signed." Although the filing of a motion for new trial used to extend the period within which such a request could be filed, amendments to *Tex. R. Civ. P. 296* which became effective April 1, 1984, expressly deleted all references regarding a motion for new trial. Further, *Tex. R. Civ. P. 306a* now provides that "the date of judgment or order is signed as shown of record shall determine the beginning of the periods prescribed by these rules . . . [including] requests for findings of fact and conclusions of law."

The record reflects that the judgment in this case was signed on September 7, 1988, but that La Villa did not file a request for findings of fact and conclusions of law until September 19, 1988. Therefore, La Villa's request was untimely and the trial court did not err in refusing to file findings of fact and conclusions of law. *Lynd v. Wesley, 705 S.W.2d 759, 764* (Tex. App. -- Houston [14th Dist.] 1986, no writ). We overrule La Villa's fifth point of error.

The judgment is REVERSED and RENDERED that La Villa take nothing against Commercial. The judgment of the trial court is otherwise AFFIRMED. [**24]



**COMMUNITY DEVELOPMENT SERVICE, INC., d/b/a CHAMPION EQUITY CORPORATION, APPELLANT v. REPLACEMENT PARTS MANUFACTURING, INC., APPELLEE**

**No. 01-84-0092-CV**

**COURT OF APPEALS OF TEXAS, First District, Houston**

***679 S.W.2d 721*; *1984 Tex. App. LEXIS 6484***

**October 18, 1984**

**PRIOR HISTORY:** [**1] Appeal from the 268th District Court of Fort Bend County, Texas Trial Court Cause No. 37,750A.

**OPINION BY:** DOYLE

**OPINION**

[*722] This is an appeal from a judgment awarding appellee damages for breach of contract in the amount of $71,820 actual damages, plus $11,440.60 prejudgment interest.

[*723] On October 6, 1978, appellant, Community Development Service, Inc., d/b/a, Champion Equity Corporation (Champion Equity) entered into a contract with appellee, Replacement Parts Manufacturing, Inc. (RPM) to purchase 144 residential lots over a three-year period. Title to the lots was to be acquired as each one was "taken down" or closed. Appellant was also required to pay interest to appellee and property taxes on any of the 144 lots for which legal title had not been acquired.

Between October 1978 and October 1980, appellant "took down" only 30 lots. Additionally, appellant stopped making tax and interest payments to appellee. Consequently, in October, 1980 appellee notified appellant that the contract was cancelled. In response thereto, appellant filed suit alleging that appellee had breached his contract by failing to deliver lots with construction of the roads in [**2] accordance with the City of Stafford and Federal Housing Authority (FHA) specifications. Appellee filed a counter-claim, alleging that appellant's failure to pay property taxes and interest constituted a material breach of the contract.

The jury found that appellant materially breached the contract and found that appellee suffered damages in the amount of $71,820 based on the lost profits on the non-sale of 114 residential lots.

In its first two points of error, appellant contends that the trial court erred in entering judgment based on the jury's response to special issue numbers 11 and 12 because appellant did not have a contractual obligation to pay property taxes as they accrued or to pay interest to appellee in October 1980. Thus, as a matter of law, such failure did not constitute a material breach of the contract in question.

In response to special issues 11 and 12, the jury specifically found that appellant's failure to pay interest and property taxes as they accrued to appellee in October 1980 constituted a material breach of the contract.

Appellant relies on his contractual interpretation of paragraphs II (b) and (c) of the contract of sale to substantiate his contention. [**3] These paragraphs describe the manner in which the purchase price of the lots shall be paid:

> (c) The balance of the total purchase price shall be payable to Seller as follows:
>
> (1) The sum of $310,500.00 (representing remaining 90% of lot price multiplied by 30 lots) shall be paid to Seller 60 days after notification to Buyer by Seller, which shall include certification of lot completion, at which time Seller shall convey to Buyer by general warranty deed, insured by owners title policy, good and indefeasible title to Buyer to 30 lots selected by Buyer, and

> * * *
>
> (4) The sum of $351,900.00 (representing remaining 90% of lot purchase price multiplied by 34 lots) shall be paid to Seller within 1095 days of said notification to Buyer by Seller of lot completion at which time Seller shall convey title as above described to remaining 34 lots.
>
> Provided however, (a) Buyer may at any time tender to Seller $10,350.00 per lot and demand that Seller convey title to lots selected by Buyer and the purchase price of any lots so acquired shall be counted in reduction of the next due installment of Buyer to Seller as above described; (b) Buyer shall pay all taxes as due from the date of [**4] lot completion and furnish Seller with copy of said paid tax receipts and (c) Buyer shall pay Seller interest at the rate of 10% per annum on the unpaid balance outstanding, such interest to commence upon the date of lot completion and to be payable quarterly thereafter.

Specifically, the appellant contends for the first time on appeal, that the last paragraph cited above, which describes the appellant's duty to pay taxes and interest to appellee, is part of paragraph II (c).

The contract also provides as follows:

> Provided that the obligations of Seller as enumerated in paragraphs (a) - (f) of Paragraph I on pages 1-2 of this Contract [*724] shall be conditions precedent to the obligations of Buyer as set forth in Paragraphs II(b) and (c) of this Contract with respect to each group of lots to be purchased thereunder.

Appellant urges this court to find that the above contractual language requires the seller (appellee) to fulfill certain "conditions precedent" before the buyer (appellant) will be responsible for payment of taxes and interest as allegedly required in paragraph II (c). Some of the conditions which the seller is required to fulfill are described in paragraph [**5] I(a):

Seller agrees to the following:

> (a) Seller shall clear the street right-of-way and utility easements within Kingsway, it being understood that (1) any additional clearing shall be done by Buyer at its expense, and (2) Seller shall minimize damage to the trees within Kingsway; (b) each lot or reserve being conveyed shall be free of trash, garbage, or any improvements not contemplated hereby, and except for clearing of trees, be in a condition suitable for commencement of construction of single family detached housing; . . .

Appellant claims that because appellee failed to keep each lot free of trash, the appellee had not fulfilled the conditions which activate appellant's responsibility for taxes and interest. The appellee argues that the language does not constitute a condition precedent, but merely a covenant, the breach of which might be a defense to any contract action by appellee against appellant.

As a general rule, where neither party has alleged that the contract is vague or ambiguous, the construction of the contract is a question of law for the court. *City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515 (Tex. 1968)*. The court also construes [**6] the meaning of contracts where neither party makes allegations specifying the language subject to different interpretation, so that the opposing party is prepared to offer evidence explaining the meaning. *Sale v. Contran Corporation, 486 S.W.2d 161* (Tex. Civ. App. -- Dallas 1972, writ ref'd n.r.e.). The court is required to give effect to the intention of the parties as expressed or as it is apparent in the writing. *Pitts v. Ashcraft, 586 S.W.2d 685* (Tex. Civ. App. -- Corpus Christi 1979, writ ref'd n.r.e.).

In the instant case, reading the contract as a whole and considering the surrounding circumstances, the trial court could have reasonably concluded that the paragraph which contained the language, "Buyer shall pay all taxes as due from the date of lot completion and furnish Seller with copy of said paid tax receipts", was not part of paragraph II (b) and (c) of the contract which set forth the conditions precedent to the obligation of buyer to pay the balance of the purchase price. Instead, the court could have construed the provision as being a written covenant, contained in a separate paragraph.

The passage containing the language starts a new paragraph which [**7] introduces an alternative method of purchasing the lots, and outlines the seller's obligation to pay taxes and interest. If the parties had intended this section to be part of paragraph II (c), they could have easily included it numbered as (c)(5) or clearly shown that

it was part of (c)(4). Moreover, it is well established that if the intent of the parties is doubtful, or if a condition would impose an absurd or impossible result, then the agreement will be interpreted as creating a covenant rather than a condition. *Hohenberg Bros. Co. v. George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976)*.

In the case at bar, to hold that the appellee's three-year obligation to make tax and interest payments on the lot was suspended until appellant cleared the occasional debris that accumulated on the lots would impose "an absurd result" particularly in light of the other conditions which suspend tax and interest payments.

Paragraph II (b) provides for payment only upon the completion of the development of 144 lots. Paragraph II (c) provides that the balance of the total purchase price is only payable sixty days after seller notifies [*725] the buyer by sending certification of lot [**8] completion and conveying to buyer a general warranty deed.

The paragraph clearly demonstrates the parties' intention to condition appellant's obligation to pay the balance on the lots on their certification as being complete. Since such intent is not clearly demonstrated in the paragraph requiring the payment of taxes and interest, we find that the appellee's obligation to pay taxes and interest was not part of paragraph II (b) or (c) and was therefore not conditioned on appellee's keeping the lots clear of trash and debris. Points of error one and two are overruled.

In points of error three, four, and five, appellant contends that the trial court erred in granting judgment in favor of appellee for damages because there was no evidence, or alternatively insufficient evidence of the "benefit of the bargain" or the value of the property at the time appellee knew or should have known of the breach as compared to the value the property should have had at that time.

Generally, the measure of damages for breach of contract is the amount necessary to place plaintiff in a financial position equal to that which it would have had if the contract had been performed by both parties. [**9] *Little Darling Corp. v. Ald, Inc., 566 S.W.2d 347* (Tex. Civ. App. -- Dallas 1978, no writ). Under this standard, the injured party is compensated only for the damages or loss actually sustained. *North American Corp. v. Allen, 636 S.W.2d 797* (Tex. App. -- Corpus Christi 1982, no writ).

Lost profits are recoverable under this standard if the evidence shows that the loss of profits was a material and probable consequence of the breach of the act complained of and the amount due is shown with sufficient certainty. *Id. at 799*; *see also Little Darling Corp., supra.*

Generally, lost profits are properly calculated by deducting the costs of the injured party's performance supported by data from the actual contract price. *Wilfin, Inc. v. Williams, 615 S.W.2d 242, 244* (Tex. Civ. App. -- Dallas 1981, writ ref'd n.r.e.). However, a witness may also provide evidence of lost profits by testifying as to what his profit would have been, based on his knowledge of the cost of performance of each element of the contract and subtracting the total of such costs from the contract price. *Wilfin, Inc., supra at 245*.

In the instant case, the jury was given the following [**10] instructions for determining the damages:

> INSTRUCTION
>
> In connection with the following Special Issue, you are only to consider such damage, if any, that you find from a preponderance of the evidence was shown to have been the natural, probable, and foreseeable consequence of Champion Equity's conduct or to have been within the contemplation of the parties. You may consider only those losses, if any, the payment of which would place R.P.M., Inc. as nearly as possible in the position it would have occupied had Champion Equity performed the contract, if, indeed it did not. You may consider only such damage, if any, that was actually sustained and you shall not speculate as to damages which, although possible, have not been proved by a preponderance of the credible evidence.

The jury was also to consider only such damage, if any, that they found from

> a preponderance of the evidence would give Champion Equity the benefit of its bargain as of the date Champion Equity knew of the breach or should have known of the breach, if any, of R.P.M., Inc. You are further instructed that benefit of its bargain is the difference between the value of what Champion Equity had at [**11] the time it knew or should have known of the breach and the value of what Champion Equity should have had at that time.

The jury was instructed to consider only such losses that would place appellee in the position it would have occupied had the breach not occurred. According to this instruction, lost profits would be included [*726] within the foreseeable consequences of a lost sale, and

would be recoverable if supported by the evidence. *Wilfin, Inc., supra.*

Evidence of appellee's lost profits was provided by Mr. Webster, who was the president and sole stockholder in appellee's corporation. Mr. Webster testified without objection that the costs of appellee's performance included a 10% down payment on its lots owned by Mr. Shipwash, which were to be resold by appellee to appellant.

The appellee had contracted to pay Mr. Shipwash $9720 per lot. Appellee then contemplated selling these same lots to appellant for $11,500 each.

Appellant had paid a down payment of 10% or $1,150 per lot to appellee, and had contracted to pay the remaining $10,350 per lot over a period of three years. Appellee had anticipated that his gross profit would be $630 per lot. Appellant's [**12] breach of contract, after purchasing only 30 of the 144 lots, caused appellee to lose $630 profit on each of the remaining 114 lots, or a total of $71,820. Mr. Webster's testimony provided competent evidence of appellee's "benefit of the bargain" which included lost profits. Appellant's third, fourth, and fifth points of error are overruled.

In its sixth point of error, appellant contends that the trial court erred in awarding appellee damages because the damages awarded were barred by the liquidated damages clause contained in the contract for deed.

The contract for deed provided as follows:

> Seller shall give Buyer thirty (30) days written notice of any default hereunder and should the Buyer fail to correct such default within ten (10) days from receipt of notice, Seller, its successors or assigns, shall have, as its sole remedy the right to declare this agreement terminated and Buyers earnest money forfeited. In the event of default by Seller, Buyer's sole remedy is that the earnest money shall be refunded and this agreement terminated.

Appellant contends that this provision limited damages for any default by buyer to the earnest money paid to appellee. The jury [**13] found in response to special issue no. 15 that the earnest money totalled $165,600. Appellant further contends that since the above provision is enforceable as liquidated damages, and the appellee was in possession of the earnest money, the trial court was barred from awarding additional damages to appellee. The appellant further contends that the provision is unenforceable because it provides for a penalty to secure performance of the contract.

The leading case relating to appellant's contention is *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (1952)* which sets out the applicable rule in cases similar to the instant one:

> In those cases in which courts enforce stipulations of the parties as a measure of damages for the breach of covenants, the principle of just compensation is not abandoned and another principle substituted therefor. What courts really do in those cases is to permit the parties to estimate in advance the amount of damages, provided they adhere to the principle of just compensation. Restatement of Contracts, Sec. 339, accurately expresses the rule as follows:
>
> > (1) An agreement, made in advance of breach fixing the damages therefor, is not [**14] enforceable as a contract and does not affect the damages recoverable for the breach, unless
> >
> > (a) the amount so fixed is a reasonable forecast *of just compensation* for the harm that is caused by the breach, and
> >
> > (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation. (emphasis added)

In *Stewart*, the court held that the "stipulated damage provision" in a lease would be treated as a penalty because the provision was not narrowly drawn or limited to the breach of any one major covenant, but could also be triggered by the breach of a trivial or unimportant convenant. The Texas [*727] Supreme Court emphasized that the provision did not adhere to the rule of "just compensation." *Id. See also Bethel v. Butler Drilling, 635 S.W.2d 834* (Tex. App. -- Houston [14th Dist.] 1982, writ ref'd n.r.e.); (Court refused to uphold a liquidated damages provision in a lease, which was triggered equally by the nonpayment of rent or the breach of any other covenant); *Mayfield v. Hicks, 575 S.W.2d 571* (Tex. Civ. App. -- Dallas 1978, writ ref'd n.r.e.); (Court condemned a similar provision as a penalty because the contract [**15]

provided the same reparation for breach of each and every covenant); *Loggins Constr. Co. v. Stephen F. Austin St. Univ., 543 S.W.2d 682* (Tex. Civ. App. -- Tyler 1976, writ ref's n.r.e.).

Under the principle of just compensation, "The general rule is that if such a provision is for a penalty to secure performance of the contract, it is unenforceable and the party claiming a breach is required to prove his actual damages." However, if the parties actually intended the provision to constitute their estimate of the damages that would actually be sustained by the party harmed by the breach, and the amount so fixed is a reasonable estimate of just compensation for the harm contemplated by the breach, and the amount of the damages is incapable or hard to determine, it is enforceable. The parties' intention in making the provision is not controlling in this respect. *Loggins Construction Co., supra; Brace v. Dante, 466 S.W.2d 66, 69* (Tex. Civ. App. -- Dallas 1971, no writ).

Applying this principle of law to the contractual provision before this court, we conclude that the parties intended that the provision constitute an estimate of their damages in the event of a breach. However, [**16] the amount fixed is not a reasonable forecast of just compensation for the harm caused by any breach of the contract.

The provision states that "upon any default hereunder by the buyer" or "in the event of default" by the seller, the sole remedy shall be the retention, or refund respectively, of any earnest money tendered. The defect in this provision which makes it a penalty rather than a liquidated damage provision, is that upon the occurrence of any default, even a minor one, by either party, the injured party may terminate the contract and keep over $160,000 in earnest money as damages.

A provision becomes a penalty if it provides for unreasonable damages for trivial breaches as well as reasonable damages for major breaches. *Stewart, supra; Bethel, supra*; and *Mayfield, supra.* It is immaterial that the actual breach was for default in tax and interest payments. *Mayfield, supra.* If the seller failed to keep any one lot entirely free from trash, or if the buyer paid the taxes but failed to furnish seller with a copy of paid tax receipts, either injured party could terminate the contract and demand to keep the earnest money. Certainly, such minor breaches could [**17] not be held to warrant termination of the contract plus the award or retention of any earnest money.

Because the clause in this case subjects the parties to the same reparation for any default under the contract, we hold that the provision is a penalty rather than one of liquidated damages. Therefore, the trial court did not err in awarding damages to appellee and the appellant's sixth point of error is overruled.

In its last point of error, appellant contends that the trial court erred in awarding damages to appellee based on the jury's response to special issue 13 because the appellee receives an inequitable windfall, recovering both the earnest money and $71,820 in lost profits. Appellant contends that this result is inequitable in that the award grants recovery of both liquidated damages and recovery of profits.

In special issue 13, the jury was instructed to consider only those losses, if any, the payment of which would place appellee as nearly as possible in the position it would have occupied had the appellant performed the contract. The jury was further instructed to consider only those damages that were shown to be the natural, probable, [*728] and foreseeable consequences [**18] of appellant's conduct.

The appellee contends that the jury correctly found that appellant's forfeited earnest money did not give appellee the benefit of its bargain and did not put appellee in the position it would have occupied had appellant performed the contract. Appellee points out that except for the defective liquidated damages provision, the contract does not provide that the earnest money must be returned once the parties began performance. Appellee urges this court to find that the jury rightfully considered the "realities of the transaction made the basis of this lawsuit."

The jury had sufficient evidence before it from which it could conclude that the retention of appellant's earnest money by appellee did not adequately compensate appellee for the harm caused by appellee's breach and did not place appellee in the position it would have occupied had the appellant performed the contract.

The record reflects that the earnest money contracted for and received by appellee reduced the amount of the outstanding purchase price. Both parties agree that between November 10, 1978 and March 1979, appellant closed or "took down" 30 lots under the contract for deed. Moreover, [**19] appellant paid approximately $222,021 in interest on lots not taken down. Several homes were built and sold on the lots "taken down." Clearly, both parties had begun performance of the three-year contract. This is important because there is no evidence that any of the "earnest money" was placed in an escrow account to secure performance of the contract. In fact, appellee testified that the majority of the money appellant paid to appellee was immediately passed to Mr. Shipwash in order to pay off the appellee's debt to Mr. Shipwash on the parallel contract. The record also reflects that appellee subtracted the amounts received from appellant on the "taken down" lots, including the $165,000 earnest money, before appellee computed his lost profits.

Therefore, the jury's finding, that appellee would need an additional $71,820 in order to be fairly and reasonably compensated for damages sustained by appellant's breach, was supported by the evidence and did not constitute a "double recovery." Appellant's seventh point of error is overruled.

The judgment of the trial court is affirmed.



**Continental Holdings, Ltd., Appellant v. Jim Leahy, Individually; Brown, Parker & Leahy, L.L.P.; and Thompson & Knight, L.L.P., Appellees**

**No. 11-02-00326-CV**

**COURT OF APPEALS OF TEXAS, ELEVENTH DISTRICT, EASTLAND**

***132 S.W.3d 471*; *2003 Tex. App. LEXIS 9952***

**November 20, 2003, Decided**

**PRIOR HISTORY:** [**1] Appeal from Dallas County.

**DISPOSITION:** Affirmed.

**COUNSEL:** For Plaintiff or Petitioner: Coyt Randal Johnston, Robert L. Tobey, Johnston & Tobey, Dallas, TX. Roy Ryden Anderson, Professor of Law, Southern Methodist University School of Law, Dallas, TX.

For Defendant or Respondent: David N. Kitner, Christine Roseveare, Strasburger & Price, Attorneys At Law, Dallas, TX. P. Michael Jung, Strasburger & Price, Dallas, TX.

**JUDGES:** Panel consists of: Arnot, C.J., and Wright, J., and McCall, J.

**OPINION BY:** TERRY McCALL

**OPINION**

[*472] This is a legal malpractice case. Continental Holdings, Ltd. sued its former lawyers, Jim Leahy, Individually; Brown, Parker & Leahy, L.L.P.; and Thompson & Knight, L.L.P. (the Lawyers). The Lawyers represented Continental in an arbitration proceeding in which Continental sought to recover damages from Western Atlas International, Inc. resulting from Western's breach of a contract. The arbitrators determined that Western breached the contract and awarded some of the damages sought by Continental. However, the arbitrators found that Continental did not meet its burden of proof on its alleged benefit of the bargain damages and denied Continental recovery of those damages.

In this case, Continental alleged that the Lawyers breached their duties to Continental in the arbitration proceeding by failing to introduce evidence that was sufficient to satisfy its burden of proof on the benefit of the bargain damages. Continental also alleged [**2] that the arbitrators would have awarded it benefit of the bargain damages but for the Lawyers' negligence. The Lawyers moved for summary judgment, asserting that their alleged negligence did not proximately cause any damage to Continental because a limitation-of-liability provision in Continental's contract with Western excluded recovery of benefit of the bargain damages. The trial court granted summary judgment to the Lawyers. We affirm.

Issues Presented

Continental presents five issues for review. In its first issue, Continental asserts a general complaint that the trial court erred in granting summary judgment. In its second and third issues, Continental asserts that the trial court erred in granting summary judgment because (a) the arbitrators ruled that the limitation-of-liability provision in the contract did not prevent the recovery of benefit of the bargain damages and (b) the arbitrators' ruling on the limitation-of-liability issue was binding on the trial court. In its fourth issue, Continental argues that the trial court erred in granting summary judgment because, irrespective of the arbitrators' ruling, the contract permitted it to recover benefit of the bargain [**3] damages for Western's breach. In its fifth issue, Continental asserts that, if the contract did not unambiguously permit or deny recovery of Continental's benefit of the bargain damages, the cause should be remanded to the trial court for a resolution of the factual dispute presented by the ambiguous contract.

Background Facts

Continental agreed to perform geophysical services for Western under the contract. [*473] The contract required Continental to provide Western with the vessel, the *M/V Pacific Titan*, fully crewed, for a period of 12 months. The start date for the contract was October 1, 1998. A number of disputes arose between Continental and Western; and, on December 29, 1998, Western issued a notice of termination of the contract. Continental asserted that Western's termination of the contract was wrongful.

Continental and Western submitted a number of their disputes to arbitration, including the issue whether Western had the right to terminate the contract. The arbitrators determined that Western's termination of the contract constituted a breach of the contract. Under the contract, the charter rate for the *M/V Pacific Titan* was $ 33,000 per day. Continental argued [**4] that, as a result of Western's breach, it was entitled to recover $ 33,000 a day for the full contract term of one year. The arbitrators disagreed in their findings:

> 20. The classic measure of contract damages is to put the injured party in the position it would have been in had the contract been performed. Awarding Continental the day rate of $ 33,000 per day for a full year, as urged by Continental, does not, however, accomplish this goal. If the contract clearly called for such a remedy in the event of early termination, and we find that it does not, the remedy would constitute an impermissible penalty.
>
> 21. One way to compensate Continental for its damages would be to consider the revenues expected to be earned, less the expenses saved as a consequence of the breach. It was Continental's burden to prove its damages with reasonable certainty. The undated budget produced at the hearing does not alone constitute competent evidence of the expenses saved as a consequence of the breach. Continental did not sustain its burden of proof on any "benefit of the bargain" damages, and we therefore decline to award such damages.

The arbitrators did, however, award the following damages [**5] to Continental: (1) $ 1,056,000 for services performed under the contract before Western terminated it; and (2) $ 2,251,405 for costs that Continental incurred in performing the contract.

Continental defines its benefit of the bargain damages under the contract as "those profits that it would have earned on the *Pacific Titan* Contract itself, but for [Western's] breach." Continental argues that it is entitled to recover those lost profits from the Lawyers. In their motion for summary judgment, the Lawyers asserted that, because the limitation-of-liability provision in Continental's contract with Western precluded Continental's recovery of lost profits damages, their alleged negligence in failing to present sufficient evidence of lost profits in the arbitration proceeding did not proximately cause any damage to Continental. The trial court granted summary judgment to the Lawyers on this ground.

Standard of Review

This appeal involves the review of a traditional motion for summary judgment. We will apply the well-recognized standard of review for traditional summary judgments. We must consider the summary judgment evidence in the light most favorable to the non-movant, indulging [**6] all reasonable inferences in favor of the non-movant, and determine whether the movant proved that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Nixon v. Mr. Property Management Company, Inc., 690 S.W.2d 546, 28 Tex. Sup. Ct. J. 384 (Tex.1985)*; *City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671, 23 Tex. Sup. Ct. J. 7 (Tex.1979)*. A defendant [*474] is entitled to summary judgment if it either disproves an element of each of the plaintiff's causes of action or establishes an affirmative defense on each of the plaintiff's causes of action as a matter of law. *American Tobacco Company, Inc. v. Grinnell, 951 S.W.2d 420, 425, 40 Tex. Sup. Ct. J. 658 (Tex.1997)*; *Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911, 40 Tex. Sup. Ct. J. 438 (Tex.1997)*.

The Effect of the Arbitration Award

The Lawyers argue that Continental waived the issue of the conclusive effect of the arbitrators' award - that the contract did not prevent recovery of benefit of the bargain damages - by failing to present the issue to the trial court in its response to the Lawyers' motion for summary judgment. The record establishes that Continental raised the issue for the first [**7] time in its motion for rehearing and/or new trial. *TEX.R.CIV.P. 166a(c)* provides that "issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal." Continental's failure to raise the issue of the conclusive effect of the arbitrators' award in its response to the Lawyers' motion for summary judgment constituted a waiver of the issue. *Kelley-Coppedge, Inc. v. Highlands Insurance Company, 980 S.W.2d 462, 467, 42 Tex. Sup. Ct. J. 130 (Tex.1998)*(holding that a party waived reliance on an argument that it asserted for the first time in a motion for

new trial)(citing *McConnell v. Southside Independent School District, 858 S.W.2d 337, 343, 36 Tex. Sup. Ct. J. 792 (Tex.1993)*, and *City of Houston v. Clear Creek Basin Authority, supra at 676*). Continental's second and third issues are overruled.

Even if Continental had presented this issue in its response to the Lawyers' motion for summary judgment, the arbitration award would not have bound the trial court on the limitation-of-liability issue. Continental argues that, although the arbitrators did not refer to the limitation-of-liability provision [**8] in their award, the arbitrators addressed the limitation-of-liability issue and decided the issue in its favor. To support its argument, Continental asserts that "the arbitrators would never have discussed Continental's lost revenue and absence of evidence of expenses saved, had those profits been excluded by the *Pacific Titan* Contract." The Lawyers respond that the limitation-of-liability provision in the contract was an affirmative defense of Western and that the arbitrators never reached that affirmative defense issue because of Continental's insufficient evidence on benefit of bargain damages.

An arbitration award is conclusive on the parties as to all matters of fact and law submitted to the arbitrators because the award has the effect of a judgment of a court of last resort. *CVN Group, Inc. v. Delgado, 95 S.W.3d 234, 238, 46 Tex. Sup. Ct. J. 366 (Tex.2002)*; *Powell v. Gulf Coast Carriers, Inc., 872 S.W.2d 22, 24 (Tex.App. - Houston [14th Dist.] 1994, no writ)*. This case is not a direct appeal from an arbitration award. Rather, Continental attempts to rely on the arbitration award in this collateral proceeding against its former lawyers. In collateral proceedings, [**9] the courts apply collateral estoppel principles to arbitration awards. *Postlewaite v. McGraw-Hill, 333 F.3d 42, 48 (2nd Cir. 2003)*; *Drago Daic, Trustee v. Nauru Phosphate Royalties, (Texas), Inc., 27 S.W.3d 695, 701 (Tex.App. - Beaumont 2000, pet'n den'd)*; *Fluor Daniel, Inc. v. H.B. Zachry Company, Inc., 1 S.W.3d 166, 169 (Tex.App. - Corpus Christi 1999, pet'n den'd)*. "The doctrine of collateral estoppel precludes relitigation of any ultimate issue of fact actually litigated and essential to the judgment in a prior suit." *Tarter v. Metropolitan Savings & Loan Association, 744 S.W.2d 926, 927, 31 Tex. Sup. Ct. J. 195 (Tex.1988)*. If an issue was not actually [*475] decided in a prior arbitration proceeding or if its resolution was not necessary to the arbitration award, its litigation in a subsequent proceeding is not barred by collateral estoppel. *Postlewaite v. McGraw-Hill, supra at 48*.

Thus, collateral estoppel would have precluded the Lawyers from litigating the limitation-of-liability issue only if (1) the arbitrators decided the limitation-of-liability issue and (2) the arbitrators' ruling on the limitation-of-liability [**10] issue was essential to the arbitration award. *Postlewaite v. McGraw-Hill, supra at 48*; *Tarter v. Metropolitan Savings & Loan Association, supra at 927*. We need not determine whether the arbitrators decided the limitation-of-liability issue because, even if they did, their ruling on the issue was not essential to their award. The limitation-of-liability provision in the contract constitutes an affirmative defense. *See Regency Advantage Limited Partnership v. Bingo Idea-Watauga, Inc., 928 S.W.2d 56, 63 (Tex.App. - Fort Worth 1995), aff'd in part and rev'd in part, 936 S.W.2d 275, 39 Tex. Sup. Ct. J. 1040 (Tex.1996)*. The arbitrators ruled that Continental failed to meet its burden of proof on the issue of its "lost profits" damages. It is not necessary to address an affirmative defense when a plaintiff does not first establish its affirmative claims for relief. Therefore, a finding on the limitation-of-liability issue was not essential to the arbitrators' award because of their finding of failure of proof. Even if Continental had presented a collateral estoppel defense in the trial court, the doctrine of collateral estoppel would not have [**11] barred the Lawyers from litigating the limitation-of-liability issue. *Postlewaite v. McGraw-Hill, supra at 48*.

Continental's Alleged Damages and the Limitation-of-Liability Provision

The limitation-of-liability provision in Paragraph 13.2 of the general agreement of the contract provides that:

> Neither [Western] or [Continental] shall bear any liability to the other for loss of production, loss of profits, loss of business or any other indirect or consequential damages, including, inter-alia, special and punitive damages.

Continental asserts that the term "loss of profits" is modified by the phrase "or any other indirect or consequential damages" so as to prevent only the recovery of "indirect" or "consequential" lost profits damages. Continental argues that the limitation-of-liability provision does not preclude its claim for damages because it is seeking to recover "direct" lost profits damages.

Continental correctly states that breach of contract damages are categorized as (1) "direct" or "general" damages or (2) "consequential" or "special" damages. *See Frost Nat. Bank v. Heafner, 12 S.W.3d 104, 111 n. 5 (Tex.App.* [**12] *- Houston [1st Dist.] 1999, pet'n den'd)*. Furthermore, lost profits damages may take the form of "direct" damages or the form of "consequential" damages. *See Hycel, Inc. v. American Airlines, Inc., 328 F. Supp. 190, 193 (S.D. Tex. 1971)*; *Imaging Systems International, Inc. v. Magnetic Resonance Plus, Inc., 227*

*Ga. App. 641, 490 S.E.2d 124 (Ga. 1997)*. Profits lost on the breached contract itself, such as the amount that Continental would have received on the contract less its saved expenses, are classified as "direct" damages. Profits lost on other contracts or relationships resulting from the breach are classified as "indirect" damages. *See Imaging Systems International, Inc. v. Magnetic Resonance Plus, Inc., supra.* Continental's alleged lost profits damages are "direct" damages.

The issue is whether the limitation-of-liability provision precludes the recovery of "direct" profits damages. In construing a written contract, the primary concern of [*476] the court is to ascertain the true intentions of the parties as expressed in the instrument. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518, 23 Tex. Sup. Ct. J. 280 (Tex.1980).* [**13] To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless. *Coker v. Coker, 650 S.W.2d 391, 26 Tex. Sup. Ct. J. 368 (Tex.1983)*; *Southland Royalty Company v. Pan American Petroleum Corporation, 378 S.W.2d 50, 7 Tex. Sup. Ct. J. 171 (Tex.1964)*; *Universal C. I. T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 158 (Tex.1951)*. No single provision taken alone will be given controlling effect; rather, all of the provisions must be considered with reference to the whole instrument. *Myers v. Gulf Coast Minerals Management Corporation, 361 S.W.2d 193, 196, 6 Tex. Sup. Ct. J. 24 (Tex.1962)*; *Citizens Nat. Bank in Abilene v. Texas & P. Ry. Co., 136 Tex. 333, 150 S.W.2d 1003, 1006 (Tex.1941)*. The courts give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense. *Heritage Resources, Inc. v. NationsBank, 939 S.W.2d 118, 122, 39 Tex. Sup. Ct. J. 537 (Tex.1996)*.

We will apply these rules of construction in determining whether the contract precludes [**14] Continental's recovery of "direct" lost profits damages. The contract included: (1) a general agreement; (2) a supplemental agreement; and (3) a supplemental agreement No. 2. The contract provided Continental with a specific remedy in the event of early termination for reasons other than Continental's default. Section III, Paragraph 6 of the general agreement provided:

CONTRACT RATE

[Western] shall pay [Continental] in accordance with the rates, charges and fees, and on the terms set out in Supplemental Agreement....*Additionally, in the event of early termination for reasons other than [Continental's] default, [Continental] shall be compensated according to the schedule contained in Supplemental Agreement*. (Emphasis added)

Paragraphs 2 and 3 of the supplemental agreement provided in part:

> 2. The daily charter rate for the *Pacific Titan* is US $ 33,000.00 per day. This amount is payable for each day the vessel is under contract, regardless of whether or not the vessel is acquiring seismic data.
>
> 3. In addition, the *Pacific Titan* will receive US $ 55.00 per CMP kilometer for all accepted CMP kilometers.

Thus, the early termination remedy [**15] set forth in Section III, Paragraph 6 of the general agreement and Paragraphs 2 and 3 of the supplemental agreement provided that Continental would receive: (1) $ 33,000 for each day that the vessel was under contract and (2) $ 55 per CMP kilometer for all accepted CMP kilometers. The vessel was under contract until December 29, 1998, the date that Western terminated the contract.

The early termination remedy limited Continental's recovery of damages under the schedule to the time period that the vessel was under contract. In this case, however, Continental seeks to recover "direct" lost profits for the time period that the contract would have been in effect had Western not terminated it. As such, Continental's alleged "direct" lost profits damages relate to a time period that the vessel was no longer under contract; therefore, Continental's requested remedy is inconsistent with the early termination remedy. The contract's early termination remedy is consistent with interpreting the limitation-of-liability provision to preclude the recovery of "direct" lost profits. Otherwise, Continental would be permitted to recover [*477] damages in excess of those permitted by the early termination remedy.

[**16] Other rules of contract construction also support a conclusion that Western and Continental intended to preclude the recovery of "direct" lost profits damages. The plain, ordinary, and generally accepted meaning of the term "loss of profits" includes "direct" damages and "indirect" damages. *Hycel, Inc. v. American Airlines, Inc., supra; Imaging Systems International, Inc. v. Magnetic Resonance Plus, Inc., supra.* Continental's and Western's use of the phrase "or any other indirect or consequential damages" does not establish that they intended to alter the plain meaning of "loss of profits." If Continental and Western had intended to preclude only the recovery of "indirect" lost profits, they did not need to include the phrase "loss of profits" in the provision because a general prohibition of recovery of "indirect" damages would include "indirect" lost profits. Therefore,

to adopt Continental's interpretation of Paragraph 13.2 would render the term "loss of profits" meaningless.

We find that Paragraph 13.2 unambiguously precludes the recovery of "direct" and "indirect" lost profits damages. Continental's first, fourth, and fifth issues are overruled.

[**17] This Court's Ruling

The judgment of the trial court is affirmed.

TERRY McCALL

JUSTICE



**COUNTY OF CAMERON, PETITIONER v. CHARLENE MILLS BROWN, INDIVIDUALLY, CLIFTON LINWOOD BROWN, INDIVIDUALLY AND AS LEGAL REPRESENTATIVES OF THE ESTATE OF NOLAN BARRETT BROWN, DECEASED, AND JEFF FARRINGTON, RESPONDENTS**

**NO. 00-1020**

**SUPREME COURT OF TEXAS**

***80 S.W.3d 549*; *2002 Tex. LEXIS 58*; *45 Tex. Sup. J. 680***

**October 3, 2001, Argued**
**May 23, 2002, Opinion Delivered**

**PRIOR HISTORY:** [**1] ON PETITIONS FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS.
*Brown v. Texas DOT & Cameron County, 2000 Tex. App. LEXIS 5560 (Tex. App. Corpus Christi Aug. 17, 2000)*

**DISPOSITION:** Judgment of the Court of Appeals reversing dismissal by the trial court is affirmed; cause remanded to the trial court for further proceedings.

**COUNSEL:** For PETITIONER: Kraehe, Mr. George Christian, Brownsville, TX.

For RESPONDENT: Jensen, Mr. Brian L., Jensen Rosen & Steinberg, Houston, TX, Bright, Mr. David T., Watts & Heard, Corpus Christi, TX, Prestia, Mr. Joseph, Presita & Ornelas, Edinburg, TX.

**JUDGES:** JUSTICE O'NEILL delivered the opinion of the Court, in which CHIEF JUSTICE PHILLIPS, JUSTICE ENOCH, JUSTICE BAKER, JUSTICE HANKINSON, and JUSTICE RODRIGUEZ joined. JUSTICE JEFFERSON filed a concurring opinion, in which JUSTICE OWEN joined. JUSTICE RODRIGUEZ filed a concurring opinion. JUSTICE HECHT filed a dissenting opinion.

**OPINION BY:** Harriet O'Neill

**OPINION**

[*552] In this wrongful-death action, plaintiffs claim that a failed block of lights at the end of an elevated and curving causeway, with narrow shoulders and limited access, suddenly and unexpectedly plunged motorists into darkness and constituted a premises defect for which the Texas Tort Claims Act waives governmental immunity. The trial court ruled that the plaintiffs' pleadings fail to state a claim under the Act, [**2] and granted the defendants' pleas to the jurisdiction. The court of appeals reversed, holding that the pleadings and evidence established a premises defect for which immunity was waived. S.W.3d . We must decide whether the plaintiffs' pleadings, together with pertinent jurisdictional evidence, are sufficient to raise a premises-defect claim within the Act's immunity waiver.

The defendants argue that the failed lighting cannot under any circumstances constitute a premises defect because the resulting darkness was open and obvious, and not an unreasonably dangerous condition. But whether or not that ultimately proves to be the case, we hold that the pleadings and jurisdictional evidence do not affirmatively negate the existence of an unreasonably dangerous condition. Thus, the trial court should not have dismissed the plaintiffs' claims on this basis. The plaintiffs' pleadings do fail, however, to allege another necessary premises-defect element -- that the plaintiffs did not actually know of the dangerous condition. Because the plaintiffs must be afforded an opportunity to amend to remedy this omission, we affirm the court of appeals' judgment reversing and remanding [**3] the case to the trial court.

**I. Background**

This case arises from an auto accident that occurred on the Queen Isabella Causeway, which is the only bridge connecting [*553] South Padre Island to the Texas mainland. Nolan Brown was crossing the causeway at about 3:00 a.m., traveling east toward South Padre, when he lost control of his truck. Brown's truck struck the concrete median that separates the two east-bound lanes from

the two west-bound lanes, skidded, and turned over on its side. When it came to rest, Brown's passenger exited the vehicle through the sunroof. While Brown was attempting the same escape, an oncoming car driven by Hector Mucio Martinez crashed into Brown's truck. Brown died at the scene.

The record indicates that the causeway curves, has narrow shoulders, and rises approximately 109 feet above the bay. Once drivers enter the causeway, a concrete median prevents them from turning around. When the accident in this case occurred, a block of streetlights on the causeway's eastern section was not functioning. The first part of the bridge was illuminated for traffic heading toward South Padre Island, but there was no illumination at the accidents' scene.

The [**4] State owns the causeway and its streetlight system. However, Cameron County assumed certain maintenance responsibilities over the causeway's streetlight system under an agreement with the Texas Department of Transportation ("TxDOT"). [1] Correspondence between TxDOT and the County shows that maintaining the causeway's streetlights had been a problem since at least 1995. In November of that year, Kenneth Conway, a county park-system director, wrote to TxDOT's district engineer that thirty causeway streetlights were not functioning and presented a "serious safety hazard." In an April 1996 letter to TxDOT, Conway wrote that "inconsistent lighting on the causeway presents a safety hazard to the traveling public, particularly motorists who may be stranded in poorly lit sections." By August 1996, over thirty streetlights had failed, and the record indicates that at least that many were not functioning a month later when the accidents occurred.

1 Among themselves, TxDOT and the County disputed their respective responsibilities under the maintenance agreement. The lower courts did not consider this issue, nor do the parties raise it here.

[**5] Brown's survivors sued TxDOT, the County, the contractor the County hired to repair the streetlights, and Martinez. The plaintiffs alleged that Brown was stranded in a poorly lit section of the causeway when he was fatally injured, and that defective wiring caused the streetlights to fail, creating an unreasonably dangerous condition. They alleged that the causeway's condition constituted a premises defect, a special defect, or a misuse of personal property, for which the Tort Claims Act waives governmental immunity. Brown's passenger intervened to seek recovery for his own injuries.

TxDOT and the County filed special exceptions and pleas to the jurisdiction, arguing that the plaintiffs' allegations failed to state claims within the Act's sovereign-immunity waiver. Specifically, the defendants argued that providing roadway illumination is a discretionary function, so that they owed no duty to ensure illumination on the causeway. Defendants further argued that there was no duty to warn motorists of the failed lighting because the defective condition, which they describe as "darkness," was open and obvious, and not an unreasonably dangerous condition as a matter of law.

In response, [**6] the plaintiffs acknowledged that the defendants had no initial duty to illuminate the causeway, but claimed that the decision to install streetlights gave rise to a nondiscretionary duty to maintain [*554] them. Plaintiffs further responded that, because the causeway entrance was illuminated, the sudden darkness from the block of failed lighting came upon drivers unexpectedly, thus leaving the question of the condition's open and obvious nature for the jury to consider.

After an evidentiary hearing, and without ruling on the defendants' special exceptions, the trial court granted the defendants' jurisdictional pleas, dismissed the claims against them, and severed them from the underlying claims against the contractor and Martinez. The court of appeals reversed the trial court's judgment, holding that (1) maintaining the causeway's streetlights was not a discretionary function exempt from the Tort Claims Act's immunity waiver, and (2) the plaintiffs' allegations and the pertinent jurisdictional evidence were sufficient to raise a premises-defect claim under the Act. *2000 Tex. App. LEXIS 5560*, __ S.W.3d __. We granted review to consider whether the plaintiffs' claims fall within the Tort Claims Act's sovereign-immunity [**7] waiver.

**II. The Tort Claims Act**

The State, its agencies, and subdivisions, such as counties, generally enjoy sovereign immunity from tort liability unless immunity has been waived. *See TEX. CIV. PRAC. & REM. CODE §§ 101.001(3)(A)-(B), 101.025*; *Texas Dep't of Transp. v. Able, 35 S.W.3d 608, 611, 43 Tex. Sup. Ct. J. 1055 (Tex. 2000)*. The Tort Claims Act expressly waives sovereign immunity in three general areas: "'use of publicly owned automobiles, premises defects, and injuries arising out of conditions or use of property.'" [2] *Able, 35 S.W.3d at 611* (quoting *Lowe v. Texas Tech Univ., 540 S.W.2d 297, 298 (Tex. 1976))*. But the Act does not waive immunity for discretionary decisions, such as whether and what type of safety features to provide. *See TEX. CIV. PRAC. & REM. CODE § 101.056; State v. San Miguel, 2 S.W.3d 249, 251, 42 Tex. Sup. Ct. J. 1139 (Tex. 1999)*.

2 Although the plaintiffs alleged that the causeway's failed lighting constituted a premises defect, a special defect, and a misuse of tangible property, the court of appeals considered only

their premises-defect claim. Here, too, the parties focus almost exclusively on that claim. Thus, we consider only whether the pleadings and jurisdictional evidence raise a premises-defect claim within the Act's sovereign-immunity waiver.

[**8] The Act provides that a governmental unit is liable for injury and death caused by a condition of real property "if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *TEX. CIV. PRAC. & REM. CODE § 101.021(2)*. With respect to ordinary premises defects, however, the Act specifically limits the governmental duty owed to a claimant to "the duty that a private person owes to a licensee on private property." *TEX. CIV. PRAC. & REM. CODE § 101.022(a)*. Thus, a governmental unit may be liable for an ordinary premises defect only if a private person would be liable to a licensee under the same circumstances.

A licensee asserting a premises-defect claim generally must show, first, that the defendant possessed -- that is, owned, occupied, or controlled -- the premises where the injury occurred. *Wilson v. Texas Parks & Wildlife Dep't, 8 S.W.3d 634, 635, 43 Tex. Sup. Ct. J. 148 (Tex. 1999)* (per curiam denying petition for review) (citing *City of Denton v. Van Page, 701 S.W.2d 831, 835 (Tex. 1986))*. A property possessor must not injure a licensee by willful, wanton, [**9] or grossly negligent conduct, and must use ordinary care either to warn a licensee of a condition that presents an unreasonable risk of harm of which the possessor is actually aware and the licensee is not, or to make the condition reasonably safe. [*555] *State Dep't of Highways & Pub. Transp. v. Payne, 838 S.W.2d 235, 237 (Tex. 1992)*.

Here, the plaintiffs have not alleged that the defendants injured them willfully or wantonly, or that they were grossly negligent. And although the defendants argue generally, as a policy matter, that the court of appeals' decision impinges upon governmental units' discretion in deciding whether and what kind of lighting to install along roadways, they do not challenge the court of appeals' holding that the plaintiffs' claims in this case are based upon the defendants' maintenance of the causeway lighting and thus do not concern discretionary acts. Accordingly, we consider only whether the plaintiffs' pleadings and jurisdictional evidence are sufficient to allow them to maintain a premises-defect claim within the Act's immunity waiver.

**III. Standard of Review**

**In deciding a plea to the jurisdiction, a court may not weigh the claims'** [**10] **merits but must consider only the plaintiffs' pleadings and the evidence pertinent to the jurisdictional inquiry.** ***Texas Natural Res. Conservation Comm'n v. White, 46 S.W.3d 864, 868, 44 Tex. Sup. Ct. J. 667 (Tex. 2001)*****;** ***Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554, 44 Tex. Sup. Ct. J. 125-55 (Tex. 2000)*****.** [3] When we consider a trial court's order on a plea to the jurisdiction, we construe the pleadings in the plaintiff's favor and look to the pleader's intent. ***See Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993)*****;** ***Peek v. Equipment Serv. Co. of San Antonio, 779 S.W.2d 802, 804-05 (Tex. 1989)*****. When a plaintiff fails to plead facts that establish jurisdiction, but the petition does not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend.** ***See Peek, 779 S.W.2d at 804-05*****;** ***Texas Dep't of Corrections v. Herring, 513 S.W.2d 6, 9-10 (Tex. 1974)*****. On the other hand, if the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the** [**11] **plaintiff an opportunity to amend.** ***See Peek, 779 S.W.2d at 804-05*****.**

3 **The County argues that the court of appeals erred in considering evidence outside of the pleadings in reviewing the pleas to the jurisdiction. Given our holdings in *Bland* and *White*, which the County does not cite, this argument has no merit.** ***Bland, 34 S.W.3d at 554-55*****;** ***White, 46 S.W.3d at 868*****.**

**IV. Discussion**

Defendants argue that, for several reasons, the plaintiffs have either failed to allege or their pleadings effectively negate certain elements of a premises-defect claim within the Act's immunity waiver. First, the County contends that it neither owned nor exercised exclusive control over the causeway or its streetlight system, and therefore cannot be held liable for the alleged premises defect. Second, the County contends that the plaintiffs have not alleged a condition posing an unreasonable risk of harm because it was not foreseeable that Brown would lose control [**12] of his vehicle and then be struck by a motorist while attempting to exit the wreckage. Third, the defendants claim that any risk of harm presented by the alleged defect was not unreasonable when weighed against the burden that governmental entities would face if the defendants here could be held liable for the failed block of lighting. Fourth, the defendants characterize the alleged dangerous condition as "darkness at night," and argue that this condition is so open and obvious that knowledge of the condition should be imputed to causeway motorists. Finally, the defendants contend that, even if knowledge of the dangerous condition cannot be [*556] imputed to the plaintiffs, the plaintiffs nevertheless failed to plead an element necessary to maintain their

premises-defect claim, that is, that they did not actually know of the danger.

**A. Possession of the Premises**

The County argues that it cannot be subjected to a premises-liability claim within the Act's immunity waiver because it neither owned nor exercised exclusive control over the causeway or its streetlight system. *See Wilson, 8 S.W.3d at 635*. But a premises-liability defendant may be held liable for a dangerous [**13] condition on the property if it "assumed control over and responsibility for the premises," even if it did not own or physically occupy the property. *Van Page, 701 S.W.2d at 835*; *see also Wilson, 8 S.W.3d at 635*. The relevant inquiry is whether the defendant assumed sufficient control over the part of the premises that presented the alleged danger so that the defendant had the responsibility to remedy it. *Cf. Van Page, 701 S.W.2d at 833-34* (concluding that the city did not assume control over a storage building, which was on plaintiff's lot and which housed the alleged dangerous condition). Here, the plaintiffs allege that the County "maintained the [causeway] pursuant to a contract with the State." And it is undisputed that the County assumed certain maintenance responsibilities over the causeway's streetlight system. Construing the pleadings in the plaintiffs' favor, we conclude that they adequately allege the first element of a premises-liability claim - that the County possessed the property. *See id.*

**B. Foreseeablity of Harm**

A condition poses an unreasonable risk of harm for premises-defect purposes when there [**14] is a "sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen." *Seideneck v. Cal Bayreuther Assocs., 451 S.W.2d 752, 754 (Tex. 1970)* . The County contends that the pleaded condition did not pose an unreasonable risk of harm because a reasonably prudent person could not have foreseen that a driver such as Brown would lose control of his vehicle and then, while exiting the wreckage, be struck by another motorist. But foreseeability does not require that the exact sequence of events that produced an injury be foreseeable. *See Walker v. Harris, 924 S.W.2d 375, 377, 39 Tex. Sup. Ct. J. 777 (Tex. 1996)*; *see also Clark v. Waggoner, 452 S.W.2d 437, 440 (Tex. 1970)* (stating that foreseeability prong of proximate cause does not "require that [defendants] anticipate just how injuries will grow out of [the] dangerous situation"). Instead, only the general danger must be foreseeable. *Walker, 924 S.W.2d at 377.* Here, focusing on the general danger and the causeway's particular characteristics, we cannot say that the plaintiffs failed to plead, or that their [**15] pleadings affirmatively negate, their premises-liability claim's unreasonable-risk-of-harm element. As the court of appeals observed, "the Causeway is more dangerous than an ordinary road" upon the complete failure of a large block of streetlights. *2000 Tex. App. LEXIS 5560* at *8, S.W.3d at . The causeway curves and ascends to an approximate height of 109 feet above the water, its shoulders are narrow, and concrete barriers prevent motorists who drive onto it from turning around. We cannot say, as a matter of law, that it is unforeseeable that a significant and unexpected change in lighting at night on a narrow and curving causeway could impair a motorist's ability to avoid obstacles that lie ahead. While Brown's alleged lack of care may be an issue of comparative responsibility for the jury to decide, *see TEX. CIV. PRAC. & REM CODE § 33.012*, it does not render the subsequent harm in this case unforeseeable. [*557] Furthermore, we cannot determine from the pleadings and the limited jurisdictional evidence that Brown was in fact negligent in operating his vehicle.

Importantly, correspondence in the record reveals that the defendants themselves knew of the general [**16] danger that the causeway's numerous, nonfunctioning streetlights posed. Kenneth Conway, the County's park-system director, described the failed lighting as "a serious public safety issue" and "a serious safety hazard." In a letter to TxDOT, Conway specifically identified the danger posed to motorists "stranded in poorly lit sections" of the causeway. The general foreman of the contractor hired to repair the lights, too, recognized the danger. He wrote in a letter that the causeway's lighting system posed an "extreme hazard." Considering the pleaded facts and the record evidence, we cannot conclude that the events in question were not foreseeable.

**C. Unreasonableness of Risk**

The defendants argue that conditions on the causeway did not present a risk of harm that was unreasonable when measured against the burden that governmental entities would face if the County and TxDOT could be held liable in this case. They contend that allowing the plaintiffs' claims to proceed will effectively require governmental entities to either light every stretch of public roadway or remove all lighting, because any unexpected illumination change might constitute a premises defect for which they [**17] may be held liable. Governmental entities could face liability, they claim, for every streetlight that might flicker or go out. But our holding is not so broad. A governmental unit's sovereign immunity is not waived for failure to install lighting, which is a discretionary decision, or even for not repairing lighting that has been installed if an unreasonably dangerous condition is not thereby created. Our decision rests upon the causeway's unique characteristics and the nature of the particular dangerous condition alleged.

The County analogizes the dangerous condition alleged here to visual obstructions along roadways caused by overgrown vegetation. We have recognized that holding counties liable for failing to remove such obstructions could impose a significant burden on counties. *See Jezek v. City of Midland, 605 S.W.2d 544, 546-47 (Tex. 1980)*. But the County misconstrues the plaintiffs' pleadings. Unlike *Jezek*, the condition alleged here is not simply a naturally occurring one that causes a visual obstruction, but rather a malfunctioning block of artificial lighting that the defendants failed to maintain, causing a sudden and unexpected change in driving [**18] conditions.

**D. Knowledge of the Condition**

Tort law has long recognized that a landowner has a privilege to "make use of the land for his own benefit, and according to his own desires." PROSSER & KEETON, PROSSER & KEETON ON TORTS § 57, at 386 (Lawyers' ed. 1984). The extent of that privilege, however, varies depending upon the character of the owner's consent to others' entry on the premises. *See RESTATEMENT (SECOND) OF TORTS § 342 cmt. h*. Because a licensee enters for his or her own purposes, "he has no right to demand that the land be made safe for his reception, and he must in general . . . look out for himself." PROSSER & KEETON, PROSSER & KEETON ON TORTS § 60, at 412 (Lawyers' ed. 1984). If a licensee is aware of a dangerous condition, he has all that he is entitled to expect, that is, an opportunity for an intelligent choice as to whether the advantage to be gained by coming on the [*558] land is sufficient to justify him in incurring the risks involved. *RESTATEMENT (SECOND) OF TORTS § 342 cmt. l*. Thus, to establish liability for a premises defect, a licensee must prove that he or she did not actually know of the condition. *See Payne, 838 S.W.2d at 237*. [**19]

**1. Imputed Knowledge**

Defendants contend that the dangerous condition here is nothing but "darkness at night," which is so open and obvious that knowledge of the condition must be imputed to causeway users. This imputed knowledge, they claim, negates an essential element of the plaintiffs' premises-defect claims. *See id.* But construing the plaintiffs' allegations in favor of jurisdiction, as we must, the dangerous condition alleged is not merely "darkness" but a failed block of artificial lighting that caused a sudden, unexpected and significant transition from light to darkness. This condition may or may not have been open and obvious to ordinary users considering the causeway's particular characteristics. Specifically, the record indicates that the causeway is narrow, curves, and rises high above the bay. A cement median barrier separates the two travel lanes in each direction and prevents drivers from turning back once embarking upon the bridge. Only a relatively narrow shoulder beside the traffic lanes is available to accommodate vehicles in emergency situations.

On the evening in question, the causeway was lit at the point of entry, but there was no illumination further [**20] along the causeway at the accident scene. The relevant inquiry is whether the lighting failure was open and obvious to motorists entering the causeway, because that is the point at which they could choose to avoid the condition or otherwise protect themselves. *Cf. Harvey v. Seale, 362 S.W.2d 310, 312 (Tex. 1962)* (stating that a licensee "can remain off the premises if he does not wish to subject himself to the risk of injury" from an open and obvious condition). Construing the pleadings and the jurisdictional evidence in the plaintiffs' favor, and considering the causeway's particular characteristics, we cannot say that sudden darkness created by the failed lighting at the accident scene was a danger open and obvious to motorists entering the illuminated causeway so that knowledge of the condition should be imputed to them as a matter of law. Accordingly, we cannot conclude that the pleadings affirmatively negate the plaintiffs' lack of actual knowledge.

**2. Actual Knowledge**

The defendants contend that, even if we cannot impute knowledge of the alleged dangerous condition from the pleadings, the plaintiffs failed to plead that they did not actually know of the [**21] condition. [4] The defendants contend that the trial court's dismissal order should be upheld on this basis. We agree that the plaintiffs failed to allege this necessary premises-defect element. Moreover, we disagree with the court of appeals' conclusion that we can infer this element from the pleadings. Nevertheless, the court of appeals did not err in reversing the trial court's judgment and remanding, because the plaintiffs' [*559] pleadings do not affirmatively demonstrate an incurable jurisdictional defect, but merely a pleading deficiency. Because the trial court did not rule on the defendants' special exceptions and allow the plaintiffs an opportunity to amend their pleadings, omitting this element cannot support the trial court's judgment. *See Herring, 513 S.W.2d at 9-10* (holding that when the allegations do not "affirmatively negate" a claim, dismissal for failure to state a claim is appropriate only when the plaintiff has been "given an opportunity to amend after special exceptions have been sustained"); *see also 7* WILLIAM V. DORSANEO III, *TEXAS LITIGATION GUIDE § 70.03[4][f]* (stating that after a trial court sustains special exceptions, "the pleader must [**22] be given, as a matter of right, an opportunity to amend"). Accordingly, we affirm the court of appeals' judgment

reversing and remanding the case, because the plaintiffs should be afforded an opportunity to amend their pleadings.

4 At oral argument, plaintiffs suggested for the first time that the relevant inquiry is not whether Brown actually knew of the dangerous condition, but whether Martinez, the motorist who struck him, knew. While it is true that Martinez is also a licensee, the ultimate issue is whether the defendants acted reasonably toward Brown and his passenger. Thus, the proper focus is whether the plaintiffs themselves actually knew of the alleged dangerous condition.

**V. Conclusion**

We hold that, considering the causeway's particular characteristics, the large block of nonfunctioning streetlights, and the defendants' own knowledge of the danger to causeway users, the pleadings do not affirmatively negate the existence of an unreasonably dangerous condition. We conclude, however, that [**23] the plaintiffs failed to plead that they did not actually know of the dangerous condition, an element necessary to prove a premises-defect claim. Because this pleading defect is one for which the plaintiffs should be afforded an opportunity to amend, we affirm the court of appeals' judgment reversing the trial court's dismissal for lack of jurisdiction and remanding the case to the trial court.

Harriet O'Neill

Justice

**CONCUR BY:** WALLACE B. JEFFERSON; XAVIER RODRIGUEZ

**CONCUR**

JUSTICE JEFFERSON, joined by JUSTICE OWEN, concurring in the judgment.

The Court holds that the unique characteristics of the causeway constitute an "unreasonably dangerous condition" for which governmental entities may be liable under the Texas Tort Claims Act. But the Court never articulates a principle to identify in future cases the characteristics that will give rise to a cause of action within the terms of the Act. In this area of governmental immunity, the Court's "I know it when I see it" analysis exacts too great a price. The resulting uncertainty from the Court's lack of guidance will, I fear, inundate courts with claims against state and local governments for what amounts to discretionary decisions involving [**24] the design and illumination of Texas roadways. In my view, this uncertainty is unwarranted because darkness is not an unreasonably dangerous condition. Thus, I would hold that the respondents have failed to state a cause of action under the Torts Claims Act. But because the respondents' pleadings do not negate jurisdiction, I respectfully concur in the Court's judgment only.

Certainly, the facts of the case are disturbing. The accident occurred on the South Padre Island Causeway, a lengthy stretch of elevated, curving highway connecting a major tourist destination to the mainland. Although continuous illumination was installed along the route, on the night of the accident a bank of lights was not functioning. They had been malfunctioning for some time, and the County's park-system director considered this fact to be "a serious safety hazard." Nolan Brown lost control of his truck at that site [*560] and the truck hit a median and overturned. Another vehicle crashed into the overturned truck, resulting in Brown's death. These tragic facts are unique, but then, so are the facts of many other accidents.

The Court identifies a number of factors that purportedly distinguish this case from other [**25] thoroughfares. We are told, for example, that this case involves a causeway that curves and ascends, has narrow shoulders, concrete barriers, and a block of malfunctioning lights that caused "a sudden and unexpected change in driving conditions." *2000 Tex. App. LEXIS 5560* at *7, S.W.3d . Although the number of causeways in this State are relatively few, the remaining factors, alone or in combination, describe highways and byways in every county and city throughout the State.

Public roads are generally constructed, owned, and maintained by governmental entities. For that reason, those entities are potential defendants in nearly every automotive accident case. In many cases, competent attorneys can argue plausibly that the circumstances in their client's case are at least as unique as the circumstances here. Because the Court's opinion does not identify any limiting principle, accidents on roads with defective illumination, curves or hills, or with concrete barriers or narrow shoulders, will be sure to inspire litigation in which *County of Cameron* will become the standard rebuttal to jurisdictional pleas.

The installation of roadway lighting is a discretionary decision that governmental agencies [**26] balance along with other resource-allocation decisions. No statute requires that governmental entities provide roadway lighting. And no statute requires governmental entities to warn of absent lighting or changed conditions of roadway lighting. The Legislature has entrusted these matters to governmental discretion. But beginning today, governmental entities must exercise this discretion at their peril.

After today, governmental entities will balance the decision to illuminate roadways against the real possibility that those lights, once installed, might fail and thrust drivers into "sudden darkness" at night. They will weigh

the social utility of additional lighting against the very real threat that scarce resources will be spent defending claims involving accidents where some segment of those lights has malfunctioned. Assuming those entities are risk averse, the prudent course may well be to adopt a conservative stance and reduce or eliminate highway-lighting initiatives. However, this Court should not impose that Hobson's choice on governmental entities.

More than two decades ago, in *Jezek v. City of Midland, 605 S.W.2d 544 (Tex. 1980)*, this Court recognized the [**27] obvious dangers in imposing a similar duty on counties. We stated: "It would be a rigorous burden indeed for a rural county in a state such as Texas to police and remove vegetation from roads when they cause visual obstruction." *Id. at 547*. But today, instead of reaffirming what we said in *Jezek*, the Court attempts to distinguish this case because "the condition alleged here is not simply a naturally occurring one that causes a visual obstruction, but rather a malfunctioning block of artificial lighting that the defendants failed to maintain . . . ." *2000 Tex. App. LEXIS 5560* at *7, __ S.W.3d __. I am not persuaded by the Court's distinction. Darkness is certainly naturally occurring and a governmental entity's failed attempts to protect against the dangers posed by darkness do not create an unreasonably dangerous condition. At some point along every highway, streetlights end, plunging drivers into darkness. And requiring governmental entities to shield drivers from every transition from light to dark along a roadway would be a heavy burden indeed.

[*561] Today's decision is even more alarming because, under the Court's analysis the ultimate question - whether the roadway is "unreasonably dangerous" [**28] - is answered not only by the existence of malfunctioning lights, but also by the extent to which the roadway has hills or curves, barriers or narrow shoulders. Because these roadway design decisions are discretionary, they should not be used to aid in establishing liability. *State v. Rodriguez, 985 S.W.2d 83, 85, 42 Tex. Sup. Ct. J. 318 (Tex. 1999)* ("Design of any public work, such as a roadway, is a discretionary function involving many policy decisions, and the governmental entity responsible may not be sued for such decisions."). While I do not believe the Court intends to impose liability for discretionary acts, the absence of any principled basis for limiting the scope of the Court's opinion is deeply troublesome and will undoubtedly jeopardize discretionary road-design decisions.

Some areas of the law permit case-by-case development, leaving it to later courts to discern any emerging pattern. But in my view, it is unnecessary in this area of the law. Darkness, however characterized, cannot constitute an unreasonably dangerous condition. The harm to our jurisprudence of so holding is simply too great. We generally allow litigants to amend to cure pleading defects when the pleadings [**29] do not allege enough jurisdictional facts. *Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993)*. While it may be unlikely that the respondents will be able to plead sufficient jurisdictional facts, they should be allowed that opportunity. For this reason only, I concur in the Court's judgment.

WALLACE B. JEFFERSON

JUSTICE

JUSTICE RODRIGUEZ, concurring.

The plaintiffs acknowledge that the governmental defendants were not required by any law to illuminate the causeway. Their initial decision to illuminate the highway was a discretionary act. *CIV. PRAC. & REM. CODE § 101.056*. The question then arises: after a governmental unit decides to install streetlights, does it have a duty to ensure that the lights work properly?

The Court decides, and I agree, that the plaintiffs' pleadings and the evidence in this case are sufficient to raise a premises defect claim. "If a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property . . . ." *Id. § 101.022(a)*. We have previously stated in *City of Grapevine v. Roberts, 946 S.W.2d 841, 40 Tex. Sup. Ct. J. 623 (Tex. 1997)*, [**30] that:

> if the condition was an ordinary premise defect, the [governmental unit] owed [the plaintiff] the same duty that a private landowner owes a licensee. Generally, the duty a landowner owes a licensee is not to injure the licensee through willful, wanton, or grossly negligent conduct. An exception to the general rule is that if the landowner has knowledge of a dangerous condition and the licensee does not, the landowner has a duty either to warn the licensee or to make the condition reasonably safe.

*Id. at 843* (citations omitted). I agree that the governmental units knew that the lights were not working properly. I also agree that Brown should be afforded the opportunity to replead regarding whether he did not actually know about the allegedly dangerous condition.

I write separately, however, to state that I join in the judgment because our current law mandates this result. I share, however, the concerns expressed by JUSTICE HECHT that the "burden on the governments of Texas will be felt" by this opinion. It should be noted that the Texas Department of Transportation reports that there are approximately 79,297 "centerline" [*562] miles of roads and highways [**31] maintained by the State. [1] In addition, there are 142,170 miles of county roads in Texas. [2]

1    Pocket Facts, Texas Department of Transportation (March 2002).

2    *Id.*

Whether to install lights in the first instance is an exercise of the government's discretion. But once having done so, the maintenance of such a lighting system is ministerial and does not afford immunity from liability. This leads to the absurd result that when a governmental unit builds new roads or streets it should decide not to light them.

The Court's opinion is limited to deciding whether a plea to the jurisdiction was properly granted, and it does not subject the governmental defendants to any liability. Upon remand, Brown will still need to cure his pleading defect and establish causation. The problem that exists, however, is that numerous other governmental defendants will now incur substantial litigation costs ascertaining when bulbs in exterior light fixtures burned out, what caused the light bulbs to burn out, and whether [**32] the bulbs have been burned out for so long that the governmental entity should have discovered that fact and replaced them. Plaintiffs will second guess (1) when government employees should have arrived to do the necessary repairs, (2) whether the governmental employees should have erected temporary signs, and (3) how many employees should have been dispatched to work on the lights. *See   City of Baytown v. Peoples, 9 S.W.3d 391* (Tex. App.-Houston [14th Dist.] 1999, no pet.).

In *Tarrant County Water Control & Improvement District No. 1 v. Crossland, 781 S.W.2d 427* (Tex. App.--Ft. Worth 1989, writ denied), the plaintiffs were fatally injured in a nighttime boating accident. There is a bridge in the portion of the reservoir where they were killed. A boat must slow down to sit lower in the water in order to go safely under the bridge because of the amount of clearance between the water and the underside of the bridge. *Id. at 430*. The plaintiffs were killed when their heads struck the underside of the bridge. *Id.* The plaintiffs' estates argued that the bridge and reservoir areas should have been lighted and that warning signs should [**33] have been provided. In reversing a jury award of over $ 1.2 million, the court of appeals noted that the plaintiffs did not point to any specific act or omission other than the lack of lights at the bridge. *Id. at 432*. The Second Court of Appeals noted that "the decedents faced the most common and obvious danger known to man, darkness." *Id. at 435*. The Second Court of Appeals further observed "why [should] the bridge . . . be considered more dangerous than any other unlighted recreational area. With 4,790 square miles of inland water and more than 200 major reservoirs, Texas ranks second behind Minnesota for the most inland water among the continental states . . . . In summary, vast areas of Texas are devoid of artificial

illumination, and the State has no duty to light the great outdoors." *Id.* [3]

3    Indeed, in *Jezek v. City of Midland, 605 S.W.2d 544 (Tex. 1980)*, this Court similarly recognized that counties did not have a duty to clear or warn of vegetation that obstructed a driver's vision. We stated: "It would be a rigorous burden indeed for a rural county in a state such as Texas to police and remove vegetation from roads when they cause visual obstruction." *Id. at 547*.

[**34]   The Second Court of Appeals was correct. There is no duty to light "the vast areas of Texas" and the 300,000 plus miles of highways, roads, and streets in this State. Ironically, the Court's opinion today   [*563] provides no incentive for governmental units to increase public safety in that regard. I defer to the Legislature to act upon the County's public policy arguments regarding the financial burden that may be placed on counties to maintain all exterior lighting.

XAVIER RODRIGUEZ

JUSTICE

**DISSENT BY:** Nathan L. Hecht

**DISSENT**

JUSTICE HECHT, dissenting.

Assume for me, if you will, that all roadways that are dark at night are unreasonably dangerous. This is hard, I know, since almost all of the roadways in the world are dark at night, and for that reason most cars are equipped with headlamps. But assume that darkness at night is unreasonably dangerous so that we can take that issue off the table. (As an aside, I should point out that sunshine can also make a roadway unreasonably dangerous because it gets in your eyes; but that is not this case, and the Court wisely reserves that issue for, as it were, another day.) Before a governmental entity in Texas can be liable for an unreasonably dangerous [**35]   condition in a roadway, there must be proof either that the condition was a "special defect" -- like an excavation or obstruction [1] -- or that the plaintiff did not know of the condition. [2] Since nighttime darkness is nothing like an excavation or obstruction, Texas law leaves a plaintiff but one avenue (if you will) of recovery for damages caused by the relatively regular going down of the sun, and that is to prove that he could not see that it was dark.

1    *TEX. CIV. PRAC. & REM. CODE § 101.022(b)*; *State Dep't of Highways. & Pub. Transp. v. Payne, 838 S.W.2d 235, 238 (Tex. 1992)*.

2    *Payne, 838 S.W.2d at 237*.

Now one might say: well, that's impossible; any fool driving along can tell by looking whether a roadway is light or dark. But the Supreme Court of Texas is not any fool; it has an easy answer for such skepticism when "the dangerous condition alleged is not merely 'darkness' but a failed block of artificial lighting that caused [**36] a *sudden, unexpected and significant transition from light to darkness*." [3] Mind you, no one claims in this case that he was driving along and the roadway lighting *suddenly went off*. The lights had been off for awhile, long enough for Cameron County to know about it; if that were not true, the County would not be liable for the darkness for another reason, and that is that it did not know the lights were out. [4] But Cameron County knew the lights were out on a section of the Queen Isabella Causeway for the same reason that Nolan Brown and Hector Martinez and anyone else driving along, or anyone else who just looked, knew it: because it was dark there. So when the Court says the darkness was "sudden", it means nothing more than that the causeway was lighted for a stretch, and then for a stretch it wasn't. By saying that the darkness was "unexpected", I suppose the Court means that Brown and Martinez had not anticipated as they were driving along that the lights might be out. But when they came upon the darkness, they surely must have thought to themselves, "Hmmm, the highway's dark here," just as if they had come to the end of any lighted roadway. So however unexpected the darkness [**37] may have been, it was still plain as day, so to speak. And when the Court says the "transition from light to darkness" was "significant", I confess I haven't a clue what it means. The distinction between darkness that is "significant" and plain old insignificant darkness is lost on me.

3 *Ante* at (emphasis added).

4 *Payne, 838 S.W.2d at 237*.

It seems obvious that any driver moving down the road can see whether it is dark [*564] no matter how "sudden, unexpected and significant" that darkness is, so I don't quite see what difference any of this makes to whether the plaintiff can prove that he did not know that an obviously dark roadway was dark. Either he could see the road was dark or he couldn't, and how is it possible that he couldn't and be licensed to drive? It look lighted but it really wasn't? Well, the Court says, it was the condition of the causeway that made all the difference.

The causeway is narrow, curves, and rises high above the bay. A cement median barrier separates [**38] the two travel lanes in each direction and prevents drivers from turning back once embarking upon the bridge. Only a relatively narrow shoulder beside the traffic lanes is available to accommodate vehicles in emergency situations. [5]

5 *Ante* at .

I must say that I cannot quite grasp the Court's point here. The conditions of the unlighted causeway may have made it unreasonably dangerous, but we have already assumed (against all common sense) that every unlighted roadway is unreasonably dangerous, even a straight, wide, flat, low one. The issue is not how narrow or curvy or high a roadway is, or how many lanes it has or how wide its shoulder is; the issue is whether a driver can see that it's dark or not. Dark, narrow roadways look just as dark as dark, wide roadways. Widening roads, or straightening them up, or leveling them off, or giving them shoulders does not lighten them up very much.

Like any driver on any unlighted roadway in the world, Brown should have known when he came upon the dark part [**39] of the causeway that if he stopped for some reason, a driver coming along behind him might plough into him, and Martinez should have known that if he outran his headlights, he might hit something. But, again, none of this has anything to do with whether a driver coming up on a dark road can see that it's dark, which determines whether the plaintiffs can possibly win this case.

So is there any point to this part of the Court's discussion? No. Then why is it in the opinion? I can't say. Wholly apart from everything that's been said so far, "the relevant inquiry," the Court says, is "whether the lighting failure was open and obvious to motorists entering the causeway, because that is the point at which they could choose to avoid the condition or otherwise protect themselves." [6] Now, at last, we're onto something. This at least makes sense. All the plaintiffs must prove in this case is that when Brown entered the causeway, he could not see far enough ahead to know that some of the lights were out. He has not pleaded this, the Court says, but he should be allowed to amend. Well, I for one am strongly in favor of a reasonable opportunity to amend. I do not favor waiver of valid claims [**40] and defenses because of the inadvertent mistakes inevitable for even the ablest counsel. But there's no point in having the plaintiffs amend their pleadings if they're still going to lose as a matter of law. Amendment is futile unless, if they allege that Brown did not know when he entered the causeway that some of it was not lighted, they can prevail. Is that allegation, if proved, sufficient to make the County liable for the darkness? Yes, says the Court. Well, then, the County should just pay up. Unless it can prove that Brown had supervision (including x-ray vision to see through the bridge) or was clairvoyant, it can't possibly escape liability, because no one but Superman and Nostradamus could [*565] possibly have known, entering the causeway, that the lights were out ahead. (I assume, as we all must, that Brown hadn't been over the causeway enough at night to know that sometimes the lights were out, and that even if

he had, he had every reasonable expectation that the lights would have been fixed since his last crossing.)

6    *Ante* at    .

[**41] To put the Court's holding as plainly as possible: Had the causeway been wider, flatter, or straighter, and had it had wider shoulders, Brown could either have looked down the road and seen that it was dark in one spot and then turned back, or pulled over, or somehow stayed in the light (even though he did not know he needed to because he did not know he was about to wreck his truck on the concrete barrier in the median), but he could do none of those things; and even though Brown saw the darkness when he came upon it, it was sudden, unexpected, and significant, and besides, he did not know of the darkness *when he entered the causeway*; so therefore the County is liable. Logic does not flow through this like a quiet stream, I know, but I am trying to restate the Court's position as accurately as I can. Even if this rule, bizarre as it is, were correct, I am at a loss to understand its application to this case. What difference could it possibly have made to Brown had he known when he entered the causeway that part of it was unlit? He never thought he was going to wreck his truck, in the darkness or the light. No reasonable driver could possibly have thought, well, if part of this [**42] causeway is dark and I wreck my vehicle there, others may not be able to see me, so I'll cross if it's lit, but if it's not, I'm staying on the mainland.

"The relevant inquiry" posited by the Court raises the precise concern expressed by the County as well as amici curiae, the Texas Municipal League, the Texas City Attorneys Association, and the Texas Municipal League Intergovernmental Risk Pool, which is, as the Court recognizes, that "allowing the plaintiffs' claims to proceed will effectively require governmental entities to either light every stretch of public roadway or remove all lighting, because any unexpected illumination change might constitute a premise defect for which they may be held liable." [7] The Court never dismisses this concern because, truth to tell, it's valid. How often will it happen that a driver enters a lighted portion of a roadway without being able to see a dark spot ahead? Lots. And what difference does it make whether lights are out or whether the lighted portion has just ended? Most drivers still won't know, when they start out, where the darkness is up ahead. So if the Court means what it says today, and "the relevant inquiry" is what a driver can [**43] see when he first enters a lighted roadway, then the governments of Texas simply need to redo their budgets or raise taxes or both to cover the costs of extra lighting and litigation like this.

7    *Ante* at    .

And if that's what the Court thinks, why not just say so? Why not just say: Look, if you choose to light a roadway, you must maintain the lighting or face liability for accidents that happen in areas of darkness. Two reasons, I suppose. One, such a rule of liability could move governments not to light roadways at all rather than face liability for inevitable lighting failures, thereby placing the traveling public in greater danger. And two, the rule cannot take into account that lighting must end somewhere, and why the effect of that darkness on motorists is any different from failed lighting is inexplicable.

It may be, however -- one cannot always tell for sure -- that the Court does not really [*566] mean what it says. Indeed, in another case decided today, *Rocor International, Inc. v. National* [**44] *Union Fire Insurance Co.*, [8] the Court discloses that it did not really mean what it said in *American Physicians Insurance Exchange v. Garcia*. [9] So it does happen, much too often, and it may be that this case is just another "restricted railroad ticket, good for this day and train only." [10] While we can't say that all highways should be lighted, or even that existing lighting should be repaired, maybe the plaintiffs in this undeniably tragic case will get something in settlement. This occasional propensity of the Court to try to help out a particularly sympathetic litigant without destroying the law emerged in an oral argument not long ago. Professor Laurence H. Tribe, arguing a case in this Court, was actually asked, "Can't we just have a rule for this case alone without implicating other, similar cases?" "Not and be a court," he replied, more than a little surprised. If the Court's "relevant inquiry" is for real, then the law of premises liability has been changed fairly significantly -- like light to dark. The burden on the governments of Texas will be felt, and we should just say so. If not, then we have not acted like a court.

8    *2002 Tex. LEXIS 60*, S.W.3d    (Tex. 2002).
[**45]
9    *876 S.W.2d 842 (Tex. 1994)*.
10    *Smith v. Allwright, 321 U.S. 649, 669, 88 L. Ed. 987, 64 S. Ct. 757 (1944)* (Roberts, J., dissenting).

Either way, I respectfully dissent.

Nathan L. Hecht

Justice



**Gerald E. Eberts, Appellant v. Businesspeople Personnel Services, Inc., Appellee**

**No. 20573**

**COURT OF APPEALS OF TEXAS, Fifth District, Dallas**

***620 S.W.2d 861*; *1981 Tex. App. LEXIS 4027***

**August 6, 1981**

**PRIOR HISTORY:** [**1] From A District Court of Collin County, Texas

**COUNSEL:** For Appellant: Mr. James R. Caton - McKinney, Texas. For Appellee: Mr. Jerry W. Mills - Dallas, Texas.

**JUDGES:** Clarence A. Guittard, Chief Justice.

**OPINION BY:** GUITTARD

**OPINION**

[*862] Businesspeople Personnel Services, Inc., sued its former employee, Gerald E. Eberts, to restrain him from competing in violation of restrictive covenants in his employment contract and also for liquidated damages. The trial court, sitting without a jury, granted the injunction and awarded recovery of damages in an amount less than that stipulated in the contract. Defendant Eberts appeals. We affirm the injunction and modify the judgment by denying recovery of damages.

1. *Special Exceptions*

Defendant complains of the court's action in overruling his special exceptions because the petition was factually insufficient to allege a cause of action. The special exceptions, however, fail to point out that the petition is insufficient to allege grounds for injunctive relief. They complain, rather, that various allegations of the petition are conclusions of the pleader and are too vague and general to give defendant fair notice. Defendant [**2] does not show in what manner the generality of the pleadings deprived him of a reasonable opportunity to defend. He made no objection to plaintiff's evidence on the ground that it came as a surprise or was not within the scope of the pleadings. Consequently, any error in overruling the special exceptions is waived. *Banner Dairies v. Geers, 292 S.W.2d 169, 171* (Tex. Civ. App. -- El Paso 1956, writ dism'd); *Pounds v. Jenkins, 157 S.W.2d 173, 176* (Tex. Civ. App. -- Texarkana 1941, no writ).

2. *Injunctive Relief*

Defendant urges that there is no evidence, or insufficient evidence, to show that injunctive relief is necessary for the protection of plaintiff's business and goodwill. Our review of the record reveals evidence sufficient to support the trial court's findings in this respect. The court found that plaintiff had trained defendant as a job counselor in providing placement and counselling services; that defendant had established and maintained substantial goodwill for plaintiff between himself and plaintiff's clients and prospective clients; that defendant had access to confidential business information, including lists of clients and business methods; that defendant [**3] resigned his employment with plaintiff and began an employment agency business with his wife; that he advertised the services of such agency and contacted various employers who were previous or prospective customers of plaintiff; that defendant had declared his intention to continue such competitive activities before he was restrained by the court; and that plaintiff's goodwill and its relationship with its clients had been damaged. These findings support the court's conclusions that defendant's actions constitute a material breach of his employment agreement and that the injunction prayed for was reasonably necessary to protect plaintiff's goodwill from further competitive activities by defendant and safeguard plaintiff's confidential business information. Consequently, we hold that there is sufficient evidence to support the injunctive relief granted.

Defendant further contends that the contract was unenforceable because of wrongful conduct by plaintiff. Although defendant alleged certain breaches of the employment contract, the court made no finding of fact as to that issue, and defendant made no request for additional findings as authorized by *rule 298 of the Texas Rules of* [**4] *Civil Procedure*. Consequently, this defense was waived. *Elliott v. Bowden, 564 S.W.2d 825, 828* (Tex. Civ. App. -- Corpus Christi 1978, writ ref'd n.r.e.); *Micrea, Inc. v. Eureka Life Insurance Co. of America, 534 S.W.2d 348, 357* (Tex. Civ. App. -- Fort Worth 1976, writ ref'd n.r.e.).

Defendant complains that the injunction in the terms of the contract is overbroad and is unenforceable for want of specificity. We cannot agree. The injunction restrains defendant from engaging in the business of a private employment agency or agent within a one-hundred mile radius from the Dallas County Courthouse until [*863] February 15, 1982, and from assisting in the finding of employees for employers, or employment for employees for a commission or fee, within that area for that period. The injunction further restrains defendant from disclosing plaintiff's confidential records, business methods, and names of its customers and clients. This decree conforms to the terms of the contract and we find from the record that it meets the test of reasonableness as to time and space established by *Weatherford Oil Tool Co. v. Campbell, 161 Tex. 310, 340 S.W.2d 950, 951 (1960)*. Consequently, [**5] it is valid and enforceable. *Gonzales v. Norris of Houston, Inc., 575 S.W.2d 110, 113* (Tex. Civ. App. -- Houston [14th Dist.] 1978, writ ref'd n.r.e.); *Integrated Interiors, Inc. v. Snyder, 565 S.W.2d 350, 352* (Tex. Civ. App. -- Fort Worth 1978, writ ref'd n.r.e.). Defendant has not suggested any manner in which it should be reformed so as to limit its scope in any other respect. Consequently, we need not consider whether such a reformation would be proper.

3. *Damages*

Finally, defendant urges that the trial court erred in awarding "liquidated damages" of $ 7,500 because the evidence is insufficient to meet plaintiff's burden of proof as to reasonableness. Plaintiff makes no attempt to justify the award of $ 7,500 as based on evidence of actual damages, but presents a counterpoint urging that it is entitled to recover the $ 10,000 liquidated damages stipulated in the contract. We conclude that the trial court's award of $ 7,500, which it characterized as "liquidated damages," cannot be supported either as actual damages or as liquidated damages, and that the $ 10,000 payment stipulated is an unenforceable penalty in view of the specific enforcement of the contract [**6] by injunction.

The award of $ 7,500 cannot be supported as actual damages because, as defendant contends, the evidence does not establish any basis for the recovery of that amount. The only testimony concerning damages was by plaintiff's president, who testified that he was unable to state the amount of any damages from defendant's breach of the contract other than expenses of litigation, including attorney's fees and loss of time by himself and other employees. There was no estimate of the amount of commissions lost because of defendant's competition in the period between the termination of his employment with plaintiff on February 15, 1980, until he was restrained from further competition on March 4, 1980. The trial court found that plaintiff has expended $ 5,000 for attorney's fees and expenses of suit. This record contains neither pleading nor proof supporting recovery of $ 7,500 as either a statutory or a contractual attorney's fee. Expenses of litigation are not recoverable as damages unless expressly provided by statute or contract. *Hammonds v. Hammonds, 158 Tex. 516, 313 S.W.2d 603, 605 (1958)*; *Wm. Cameron & Co., Inc. v. American Surety Co. of New York, 55* [**7] *S.W.2d 1032, 1035* (Tex. Comm'n App. 1932, opinion adopted). This rule applies to a litigant's loss of time. *Phillips v. Latham, 523 S.W.2d 19, 27* (Tex. Civ. App. -- Dallas 1975, writ ref'd n.r.e.).

Neither is plaintiff entitled to recovery of the full $ 10,000 as the liquidated damages stipulated in the contract. Plaintiff argues that the liquidated damages provision is enforceable because the amount stipulated is payable in lieu of actual damages that are difficult to ascertain. This argument is inconsistent with the petition, which alleges and prays for both actual and liquidated damages. If this inconsistency is ignored, we must consider whether the provision for $ 10,000 liquidated damages is a reasonable forecast of just compensation for the harm expected as a result of a breach; otherwise the provision is an unenforceable penalty. *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (1952)*; RESTATEMENT OF CONTRACTS, § 339 (1932).

The provision in question is as follows:

> First Party and Second Party agree that the actual damages to First Party resulting from any breach of this non-compete agreement by Second Party will be and are uncertain, intangible [**8] and not readily or accurately ascertainable; that a fair [*864] and reasonable estimate of the damages to First Party that will result therefrom under the circumstances is Ten Thousand Dollars ($ 10,000.00); and the parties desiring to dispense with the high costs to each of litigating the issue of actual damages; it is, therefore, agreed that in the event Second Party shall breach the above non-compete covenant, he (she) shall pay to First Party the sum of Ten

> Thousand Dollars ($ 10,000.00) as liquidated damages which shall be in addition to (and not in lieu of) First Party's right to specific performance of such covenant by Second Party and the right to pursue same in a court of equity (injunctive relief).

In support of the reasonableness of this provision, plaintiff argues that the trial court found that the average fee earned by plaintiff was about $ 3,000 per placement. Plaintiff insists: "It is not unreasonable to estimate that within a two-year period at least [four fees] from such placements ($ 12,000) would be lost due to the competition of an ex-employee." This argument assumes that defendant would not be restrained by injunction during the two-year period. Actually, [**9] defendant was free to compete less than three weeks, and there is no evidence that plaintiff has lost any business because of defendant's competition within that period or that defendant violated the injunction after the restraining order was issued. If enforceable, the contract would exact a payment of $ 10,000 for any breach of the restrictive covenant, whether the breach continues for only one day or for two years, and would authorize an injunction enforcing the restriction for any portion of the period remaining. Under these circumstances the $ 10,000 cannot be considered a genuine pre-estimate of the harm to be suffered by any single breach. 5A CORBIN, CONTRACTS, § 1071, at 401 (1964). Consequently, it falls within the condemnation of *Stewart v. Basey, supra*, and other Texas decisions holding that a stipulation for a liquidated damages should be treated as an unenforceable penalty if the contract contains several matters of different degrees of importance and the sum stipulated is payable for the breach of any, even the least. *Accord: Krenek v. Wang Laboratories, Inc., 583 S.W.2d 454* (Tex. Civ. App. -- Waco 1979, no writ); *Servisco v. Tramco, Inc., 568 S.W.2d* [**10] *434, 437* (Tex. Civ. App. -- Texarkana 1978, writ ref'd n.r.e.).

The present contract may be enforceable if it is regarded as giving plaintiff an option to elect between injunctive relief and liquidated damages. Also, if actual damages are proved, plaintiff may be entitled to damages for a breach that occurred before the suit was filed as well as to an injunction restraining subsequent breaches. Payment of damages, however, constitutes satisfaction for any injury that may be caused by the breach, whereas an injunction has the effect of a decree of specific performance restraining any breach that would otherwise cause damage. Therefore, if the court grants an injunction preventing the breach from continuing and becoming total, it should not at the same time give judgment for the full amount of liquidated damages specified in the contract. *Wirth & Hamid Fair Booking, Inc. v. Wirth, 265 N.Y. 214, 192 N.E. 297, 300-01 (1934)*; 5A CORBIN, CONTRACTS, § 1071, at 401 (1964); *see McMurray v. Faust, 224 Iowa 50, 276 N.W. 95, 100 (1937)*; *Heatwole v. Gorrell 35 Kan. 692, 12 P. 135, 138-39 (1886)*. The inconsistency of these remedies is similar to that recognized by this court [**11] in *Robert G. Beneke & Co. v. Cole, 550 S.W.2d 321, 322* (Tex. Civ. App. -- Dallas 1977 no writ), in which we held that liquidated damages could not be recovered in addition to actual damages, notwithstanding a provision in the contract purporting to authorize such a recovery.

Plaintiff relies on *Mayhall v. Proskowetz, 537 S.W.2d 320* (Tex. Civ. App. -- Austin 1976, writ ref'd n.r.e.) as supporting its contention that a provision for liquidated damages for competition by a former employee is enforceable. In that case, however, there was no claim for injunction; thus liquidated damages were not, as here, recovered in addition to injunctive relief. Rather, the contract provided for a liquidated sum of $ 5,000 because of the difficulty of proving [*865] damages, and that amount was presumably fixed in lieu of all other compensation as satisfaction for a breach that might continue for the entire three-year period. Consequently, we do not regard *Mayhall* as contrary to our holding in the present case.

Plaintiff also argues in support of the reasonableness of the liquidated damage provision that the amount stipulated is based on anticipated expenses of litigation [**12] rather than loss of business and goodwill from defendant's breach. Plaintiff's president testified that he thought $ 10,000 was reasonable because of time already lost and attorney's fee already incurred, and that he chose the $ 10,000 figure because he knew that attorney's fees were expensive and that litigation would cause loss of time for him and other personnel involved. If the liquidated damage provision is based on an estimate of the attorney's fee, it does not conform to the requirement in *Stewart, supra at 487*, that the damages be difficult of accurate estimation, because attorney's fees are routinely proved and recovered when authorized by contract or by statute. Regardless of whether a recovery of an attorney's fee would have been proper in this case if based on proper pleading and proof, which the present record does not show, we hold that an estimate of the attorney's fee and other expenses anticipated in enforcing a contract does not support the reasonableness of a provision for liquidated damages.

With respect to the injunction, the judgment is affirmed, and with respect to the recovery of damages, the judgment is reversed and judgment is rendered that plaintiff [**13] take nothing. Costs are divided equally.



**FARMERS INSURANCE EXCHANGE AND ALLSTATE COUNTY MUTUAL INSURANCE COMPANY, Appellants v. JUAN RODRIGUEZ, Appellee**

**NO. 14-10-00995-CV**

**COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON**

***366 S.W.3d 216*; *2012 Tex. App. LEXIS 1217***

**February 16, 2012, Opinion Filed**

**SUBSEQUENT HISTORY:** Petition for review denied by *Rodriguez v. Farmers Ins. Exch. & Allstate County Mut. Ins. Co., 2013 Tex. LEXIS 306 (Tex., Apr. 19, 2013)*

**PRIOR HISTORY:** [**1]
On Appeal from the 125th District Court, Harris County, Texas. Trial Court Cause No. 2008-33641.

**JUDGES:** Panel consists of Justices Frost, Seymore, and Jamison.

**OPINION BY:** Martha Hill Jamison

**OPINION**

[*219] Appellee Juan Rodriguez was injured while helping his neighbor Michael Woodling remove a deer stand from Woodling's trailer. Rodriguez sued Woodling for negligence and, in the same case, Rodriguez's automobile insurer, appellant Allstate County Mutual Insurance Company, seeking coverage under an uninsured/underinsured motorist (UIM) policy. Rodriguez later amended his petition to add Woodling's insurer, appellant Farmers Insurance Exchange, seeking liability coverage for Woodling under his homeowner's policy. In a pre-trial partial summary judgment, the court declared the claims were covered by both insurance policies. At trial, the jury found no negligence on the part of Rodriguez, found that Woodling was negligent, and found that Woodling's negligence caused Rodriguez's damages. The primary issues on appeal pertain to the trial court's subject matter jurisdiction over the claims against Farmers and interpretation of standard form language in the Allstate automobile policy.

Farmers appeals the trial court's grant of [**2] summary judgment against Farmers in favor of Rodriguez, denial of Farmers' plea to the jurisdiction, and entry of declaratory judgment finding coverage under the Farmers insurance policy. In three issues, Farmers contends the trial court lacked subject matter jurisdiction over Rodriguez's claim against Farmers, the homeowner's policy issued by Farmers does not provide liability coverage for Woodling, and Rodriguez filed an impermissible direct action against Farmers without satisfying conditions precedent in Woodling's insurance policy. We hold the trial court erred by granting summary and declaratory judgments against Farmers and denying Farmers' plea to the jurisdiction because Rodriguez's claim against Farmers was not ripe when the court made its rulings. We therefore reverse and render judgment dismissing Rodriguez's claims against Farmers for lack of subject matter jurisdiction.

Allstate appeals the trial court's summary judgment in favor of Rodriguez against Allstate and declaratory judgment finding coverage under the UIM policy. In four issues, Allstate contends its policy does not cover Rodriguez's injury but the Farmers policy does. We hold the UIM provisions in Rodriguez's [**3] automobile policy provide coverage for his injury. We therefore affirm the trial court's summary judgment and declaratory judgment against Allstate.

***Undisputed Factual Background***

The following facts are undisputed. Using a trailer hitched to his pickup truck, [*220] Woodling[1] transported a deer stand from his deer lease to his residence. He pulled into his driveway and attempted to remove the deer stand from the trailer. He pushed the deer stand out of the trailer until the legs on the stand touched the driveway. He left the stand resting at a 30-degree angle against the trailer. He then attached a come-along[2] to a fence post and to the stand and attempted to raise the stand upright. Re-

alizing he could not accomplish the task alone, he requested assistance from his neighbor, Rodriguez.

1 Woodling is not a party to this appeal.

2 A come-along is a tool used for moving heavy loads or for tightening wire. COLLINS ENGLISH DICTIONARY (2003 ed.).

Rodriguez and Woodling decided to lift the stand manually by walking forward out of the trailer and onto the driveway. They began in the trailer, each using both hands to push the stand upward. Then they stepped onto the driveway and took "one or two" more steps. [**4] When the stand was no longer touching the trailer, Woodling realized it was too heavy and yelled, "Juan, I can't hold it. Jump." Woodling then jumped away, leaving Rodriguez alone to hold the stand, which weighed approximately 350 pounds. The stand fell, and Rodriguez was injured.

The liability provisions of the Farmers homeowners policy contain the following exclusion for bodily injury claims: "arising out of the ownership, maintenance, operation, use, loading or unloading of . . . trailers [or] semi-trailers" except for "trailers or semi-trailers while not being towed by or carried on a motor vehicle."

Rodriguez's Allstate automobile policy included UIM coverage for damages Rodriguez was "legally entitled to recover from the owner . . . of an uninsured [or underinsured] motor vehicle [including any type of trailer] because of bodily injury sustained by [Rodriguez and] caused by an accident." Under the Allstate policy, the uninsured or underinsured owner's liability must "arise out of the ownership, maintenance or use of the uninsured motor vehicle." (Emphasis added.)

***Procedural History***

Rodriguez filed suit against Woodling and Allstate on June 2, 2008, asserting a negligence claim against [**5] Woodling and a claim against Allstate for UIM coverage. Rodriguez amended his petition on September 16, 2008, adding Farmers as a defendant and seeking declarations that the exclusion from liability coverage in the Farmers policy did not apply or, alternatively, that Rodriguez's damages arose from the use of a trailer covered by the Allstate policy.

Farmers filed a motion to sever, contending Rodriguez's joinder of Farmers was improper.[3] Rodriguez moved for partial summary judgment against Farmers, seeking a declaration that Farmers had a contractual obligation to indemnify Woodling. Farmers moved for summary judgment based on improper joinder, lack of ripeness, and applicability of its "trailers or semi-trailers" exclusion. Allstate moved for summary judgment, asserting that the accident did not arise out of the *use* of an uninsured motor vehicle so that the Allstate policy did not apply. The trial court granted Rodriguez's motion and denied motions filed by Allstate and Farmers. In a combined plea to the jurisdiction and motion to vacate the court's order granting partial summary judgment, Farmers reasserted its jurisdictional arguments [*221] before trial of the underlying personal injury [**6] claim. The court denied the combined motion.

3 The record does not show whether the trial court ruled on that motion.

Before trial, Allstate, while contesting coverage under its policy, stipulated to be bound by the jury's findings on negligence and damages. The jury found Woodling 100% negligent and awarded damages to Rodriguez totaling $233,123.71. Rodriguez subsequently filed a motion for summary judgment against Allstate, seeking a declaration that his injuries were covered under the Allstate policy, which the trial court granted. After reducing the jury award based on the amount of Rodriguez's incurred medical expenses, the trial court entered judgment awarding Rodriguez $211,618.42, plus interest and costs, and declaring that Rodriguez's injuries were covered under both the Farmers and Allstate policies.

***Standards of Review***

**Traditional Summary Judgment**.

To prevail on a traditional *Rule 166a(c)* summary-judgment motion, a movant must prove that there is no genuine issue regarding any material fact and that it is entitled to judgment as a matter of law. See *Tex. R. Civ. P. 166a(c)*; *Little v. Tex. Dep't of Criminal Justice, 148 S.W.3d 374, 381 (Tex. 2004)*. A plaintiff moving for a traditional [**7] summary judgment must conclusively prove all essential elements of its claim. *See Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999)*.

A defendant may prevail by traditional summary judgment if it conclusively negates at least one essential element of a plaintiff's cause of action. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004)*. A movant seeking traditional summary judgment on an affirmative defense has the initial burden of establishing entitlement to judgment as a matter of law by conclusively establishing each element of his affirmative defense. *See Chau v. Riddle, 254 S.W.3d 453, 455 (Tex. 2008)*; *see also Tex. R. Civ. P. 166a(b)-(c)*. A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *See City of Keller v. Wilson, 168 S.W.3d 802, 816 (Tex. 2005)*.

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995)*. The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in [**8] their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes, 236 S.W.3d 754, 755 (Tex. 2007)*.

On appeal, we review de novo a trial court's summary judgment ruling. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009)*. In our review, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *See Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006)*. When, as here, the parties file competing motions for summary judgment and the trial court grants one motion and denies the other, this court should review both parties' summary-judgment evidence and determine all questions presented. *Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005)*; *English v. B.G.P. Int'l, Inc., 174 S.W.3d 366, 370 (Tex. App.--Houston [14th Dist.] 2005, no pet.)*.

**Subject-matter jurisdiction**.

The absence of subject-matter jurisdiction may be raised by a plea to the [*222] jurisdiction or another procedural vehicle such as a motion for summary judgment. *Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 554 (Tex. 2000)*.[4] [**9] When a plea to the jurisdiction challenges jurisdictional facts, as here, we consider the evidence submitted by the parties. *Stinson v. Ins. Co. of Penn., 286 S.W.3d 77, 83 (Tex. App.--Houston [14th Dist.] 2009, pet. denied)*. The standard of review for a jurisdictional plea based on evidence generally mirrors that of a traditional motion for summary judgment. *Id*.

4 Thus, it was appropriate for Farmers to assert in its summary-judgment motion that the trial court lacked subject-matter jurisdiction. *See Blue, 34 S.W.3d at 554*. Farmers subsequently filed a plea to the jurisdiction on the same jurisdictional grounds.

**Declaratory judgment**.

In reviewing a declaratory judgment, we refer to the procedure for resolution of the issue at trial to determine the applicable standard of review on appeal. *Tex. Civ. Prac. & Rem. Code § 37.010*; *English, 174 S.W.3d at 370*; *see also Gen. Agents Ins. Co. of Am. v. El Naggar, 340 S.W.3d 552, 557 (Tex. App.--Houston [14th Dist.] 2011, pet. denied)*. Here, because the trial court implicitly resolved the declaratory judgment issues by ruling on motions for summary judgment, we review the propriety of the trial court's grant of the declaratory judgments under the [**10] same standards applicable for review of summary judgments. *English, 174 S.W.3d at 370*. Therefore, we must determine whether the trial court properly granted Rodriguez's declaratory judgment requests and, if not, enter the judgment which should have been entered by the trial court. *Id*.

***Jurisdiction over Claim against Farmers***

In its third issue, Farmers contends Rodriguez lacked standing to sue Farmers and Rodriguez's claim against Farmers was not ripe, depriving the trial court of subject-matter jurisdiction. We agree with Farmers that Rodriguez's claim was not ripe.[5]

5 Accordingly, we do not reach the other issues presented by Farmers regarding whether Rodriguez's injury was covered by the Farmers policy, whether Rodriguez filed an impermissible direct action against Farmers without first satisfying conditions precedent in the policy, or whether Rodriguez had standing to bring his claim against Farmers. We likewise do not reach two of Allstate's issues asserting that Rodriguez's injuries are covered under the Farmers policy (issues three and four).

Ripeness is a threshold issue that implicates subject-matter jurisdiction. *Robinson v. Parker, 353 S.W.3d 753, 755 (Tex. 2011)*. In evaluating [**11] ripeness, courts consider "whether, *at the time a lawsuit is filed*, the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Id*. (emphasis in orig.) (citation omitted). Although a claim is not required to be ripe at the time of filing, if a party cannot demonstrate a reasonable likelihood that the claim will soon ripen, the case must be dismissed. *Id*. A case is not ripe when resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. *Id. at 756* (citing *Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 852 (Tex. 2000))*. "[T]he essence of the ripeness doctrine is to avoid premature adjudication . . . [and] to hold otherwise would be the essence of an advisory opinion, advising what the law would be on a hypothetical set of facts." *Id*. (citing *Patterson v. Planned Parenthood of Houston and Se. Tex., 971 S.W.2d 439, 444 (Tex. 1998))* (second alteration in original).

[*223] A tort claimant has no direct claim against the tortfeasor's liability insurer until the insured tortfeasor is adjudged liable to the tort claimant.[6] *Angus Chem. Co. v. IMC Fertilizer, Inc., 939 S.W.2d 138, 138 (Tex. 1997)* [**12] (per curiam); *State Farm Cnty. Mut. Ins. Co. of*

*Tex. v. Ollis, 768 S.W.2d 722, 723 (Tex. 1989)* (per curiam); *Great Am. Ins. Co. v. Murray, 437 S.W.2d 264, 265 (Tex. 1969)*. A party injured by the insured is a third-party beneficiary of a liability insurance policy, but he cannot enforce the policy directly against the insurer until it has been established, by final judgment or agreement, that the insured has a legal obligation to pay damages to the injured party. *Ollis, 768 S.W.2d at 723*. It is undisputed that when the trial court granted Rodriguez summary judgment against Farmers, Woodling's obligation to pay damages to Rodriguez had not been established by final judgment or by agreement. Therefore, Rodriguez's claim against Farmer's was not ripe when the trial court granted summary judgment. *See Certain Underwriters at Lloyds, London v. Four J's Cmty. Living Ctr., Inc., No. H-11-0713, 2011 U.S. Dist. LEXIS 138687, 2011 WL 6026689, at *1-2 (S.D. Tex. Dec. 2, 2011)* (holding that, under Texas law, tort plaintiff did not yet have claim under tort defendant's insurance policy because final judgment had not yet been rendered upon jury verdict in plaintiff's favor); *Robinson, 353 S.W.3d at 755-56* (holding that declaratory-judgment [**13] claims were not yet ripe because there was no showing that claimants had suffered a concrete injury); *Gibson, 22 S.W.3d at 853* (noting that to allow premature adjudication of contingent situations would "eschew the ripeness doctrine" and "create an impermissible advisory opinion.").

6 This principle applies where the insurance policy contains a so-called "no action" provision. *See Struna v. Concord Ins. Servs., Inc., 11 S.W.3d 355, 359 (Tex. App.--Houston [1st Dist.] 2000, no pet.)*. Section I, ¶ 11 of the Farmers policy is a "no action" provision.

Though a claim is not required to be ripe at the time of filing, if a party cannot demonstrate a reasonable likelihood that the claim will soon ripen, the case must be dismissed. *See Robinson, 353 S.W.3d at 755*. The record does not reflect any agreement establishing Woodling's obligation to pay Rodriguez damages.[7] Therefore, Rodriguez cannot demonstrate a reasonable likelihood that his claims against Farmers will soon ripen in the case under review, and these claims must be dismissed for lack of subject-matter jurisdiction. *See id*.

7 Rodriguez cannot obtain a final judgment against Woodling until Rodriguez's claim against Farmers is adjudicated [**14] because Farmers and Woodling are both parties. But Rodriguez's claim is not ripe and cannot be adjudicated until after Rodriguez obtains a final judgment against Woodling.

In *Firemen's Insurance Co. v. Burch*, the Supreme Court of Texas held that there can be no justiciable controversy regarding the insurer's duty to indemnify before a judgment has been rendered against an insured. *442 S.W.2d 331, 332-34 (Tex. 1968)*. The supreme court has recognized a limited exception to this rule that applies "when the insurer has no duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*." *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997)* (emphasis in original); *see also D.R. Horton-Tex., Ltd. v. Markel Int'l Ins. Co., 300 S.W.3d 740, 744 (Tex. 2009)*.

Rodriguez sued Farmers seeking payment based on Farmers' purported duty to indemnify Woodling. While generally acknowledging that a third party may not [*224] sue an insurance company for payment under its policy without a judgment against the insured, Rodriguez argues the exception recognized in *Griffin* should be applied here because "undisputed [**15] facts pertaining to the duty to indemnify . . . were included in the summary judgment record [and] are consistent with the factual record at trial and the fact-finder's disposition of the personal injury lawsuit." We find no merit in this argument.

The holding in *Griffin* pertained to an underlying tort suit for injuries sustained in a drive-by shooting. *D.R. Horton-Tex., Ltd., 300 S.W.3d at 744-45* (citing *Griffin, 955 S.W.2d at 84*). The policy in that case excluded coverage for intentional torts. *Griffin, 955 S.W.2d at 83*. The *Griffin* court thus concluded no "conceivable set of facts" could be developed in the underlying case that would transform the intentional shooting into an auto accident covered by the policy. *D.R. Horton-Tex., Ltd., 300 S.W.3d at 745*. The court held that the duty to indemnify may be adjudicated before judgment is entered on the claim against the insured, when the facts negate both the duty to defend and the duty to indemnify.[8] *Griffin, 955 S.W.2d at 84*. Here, the duty to defend is not at issue.[9] More importantly, even though the parties do not dispute the underlying accident facts, the jury was required to decide and apportion liability before judgment could be [**16] entered. Thus, when the lawsuit was filed, coverage of Rodriguez's injury under the Farmers policy was contingent on the jury's future liability finding, if any, including apportionment between Woodling and Rodriguez. The *Griffin* exception is inapplicable. *See D.R. Horton-Tex., Ltd., 300 S.W.3d at 743-45* (distinguishing *Griffin*); *Burlington Northern and Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 334 S.W.3d 217, 219-20 (Tex. 2011)* (same). We hold that Rodriguez's claims against Farmers were not ripe and that the trial court lacked jurisdiction to grant summary judgment against Farmers declaring coverage under the Farmers policy. The trial court erred in denying Farmers' plea to the jurisdiction,

and the proper remedy is to reverse the trial court's judgment as to Rodriguez's claims against Farmers and render judgment dismissing these claims for lack of subject matter jurisdiction.

8 The duty to indemnify requires payment of all covered claims and judgments against an insured, whereas the duty to defend requires tender of a defense in any lawsuit brought against the insured that seeks damages for an event potentially covered by the policy. *D.R. Horton-Tex., Ltd., 300 S.W.3d at 743*. [**17] An insurer's duty to defend is justiciable before the entry of judgment on a claim against the insured. *See English, 174 S.W.3d at 371*.

9 Rodriguez's injury, moreover, did not arise from an intentional tort.

We sustain Farmers' third issue.

***Coverage of Rodriguez's Injury by the Allstate Policy***

In two issues, Allstate argues the trial court erred by denying its summary judgment motion against Rodriguez, granting summary judgment in favor of Rodriguez, and declaring that UIM language in his automobile policy provide coverage for his injury. In reference to the "use" exclusion, Allstate contends that "loading and unloading" a trailer is not *use* as contemplated under the Allstate policy, and even if it were, there is no coverage because Rodriguez's injury did not "arise out of" the use of the trailer. We are not persuaded by these arguments.

The Allstate policy specifies that liability of the owner of an uninsured or underinsured vehicle "must arise out of the ownership, [*225] maintenance, or *use* of the uninsured motor vehicle."[10] (Emphasis added.) The term "use" is not defined in the policy. Allstate urges us to hold that "loading and unloading" is excluded because the "use" clause omits these activities [**18] as a matter of law. We decline to do so.

10 The policy defines "uninsured motor vehicle" to include underinsured motor vehicles.

Automobile insurers in Texas are required to provide UIM coverage in all policies. The quoted language from the Allstate policy mirrors statutory requirements. *See Tex. Ins. Code § 1952.101(a)*. The purpose of UIM coverage is to protect conscientious drivers from financial loss caused by irresponsible parties, and courts liberally construe the UIM statutes. *Tex. Farm Bureau Mut. Ins. Co. v. Sturrock, 146 S.W.3d 123, 128 (Tex. 2004)*; *Stracener v. United Servs. Auto. Ass'n, 777 S.W.2d 378, 382 (Tex. 1989)*. Texas state and federal courts applying Texas law have concluded that automobile liability policies may cover loading and unloading of a vehicle even when those terms are not specifically included in the policy. *See, e.g., Emcasco Ins. Co. v. Am. Int'l Specialty Lines Ins. Co., 438 F.3d 519, 525 (5th Cir. 2006)*; *Panhandle Steel Prods. Co. v. Fidelity Union Cas. Co., 23 S.W.2d 799, 801 (Tex. Civ. App.--Fort Worth 1929, no writ)* (holding injury of passerby that occurred after iron beam was unloaded from truck and was being carried across sidewalk was result of use [**19] of truck). The parties have not cited, and research has not revealed, any Texas cases construing UIM policies that have held the term "use" without a "loading and unloading" clause excludes coverage for loading and unloading.

Allstate cites *Liberty Mutual Insurance Co. v. American Employers Insurance Co., 556 S.W.2d 242 (Tex. 1977)* for the proposition that the inclusion of a "loading and unloading" endorsement in an insurance policy expands coverage from the coverage afforded by the phrase "ownership, maintenance, or use." *Id. at 244*. But the court in *Liberty Mutual* did not construe UIM coverage or the "ownership, maintenance, or use" clause.[11] It analyzed whether injured workers were "borrowers" of the automobile to determine if they were insured persons under the policy.[12] *Id. Liberty Mutual* does not hold that the "use" of a vehicle may never include "loading and unloading" merely because the policy does not include those terms. *See id*. Moreover, the intent to exclude coverage must be expressed in clear and unambiguous [*226] language. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex. 1991)*. If Allstate intended to exclude loading and unloading [**20] from the scope of coverage, then it was incumbent upon it to expressly and clearly state the exclusion in the policy. *See Nat'l Auto. & Cas. Ins. Co. v. Glens Falls Ins. Co., 493 S.W.2d 909, 911-12 (Tex. Civ. App.--Tyler 1973, no writ)* (holding clause expressly excluding "loading and unloading" of vehicle was effective). Having failed to do so, Allstate may not now complain.[13] *See Nat'l Union Fire Ins. Co., 811 S.W.2d at 555*.

11 The commercial policy in Liberty Mutual included "loading and unloading."

12 *Liberty Mutual* involved competing automobile and general liability policies. *Id. at 243*. The automobile policy excluded nonemployees of the insured unless they were "borrowers" of vehicles owned by the insured. *Id.* A "borrower" was defined by the court as "someone who has, with permission of the owner, temporary possession and use of the property of another for his own purposes." *Id. at 244*. Before the addition of the loading and unloading endorsement to the standard automobile liability policy, neither the automobile policy nor the standard liability policy defined which insurer had liability coverage for injuries sustained upon the premises of one who was

insured under a general liability [**21] policy during the loading and unloading of a vehicle not owned or hired by the general liability insured. *Id*. The court concluded the policy exclusion for persons who were unloaders but not "borrowers" of the vehicle was intended to limit the insurer's liability for injuries of nonemployees who were not borrowers of the vehicle. *Id. at 245*. By contrast, the Allstate policy covers injuries to Rodriguez caused by the owner or operator of an uninsured or underinsured motor vehicle, including "trailer[s] of any type." It does not expressly limit Allstate's liability based on whether an injured party is a "borrower" of a vehicle.

13 Allstate also cites an unreported federal district court's opinion that held a "use" clause (without "loading and unloading" language) would not cover injuries sustained by a patient who travelled in an ambulance to the hospital. *See St. Paul Fire & Marine Ins. Co. v. Am. Int'l Surplus Lines Ins. Co., No. 3:95-CV-0790-D, 1997 U.S. Dist. LEXIS 4956, 1997 WL 160192, at *3-4 (N.D. Tex. Mar. 31, 1997)*. The court held that "the acts of providing emergency medical care and of carrying a person from some location to an ambulance are . . . a necessary incident to the operation of an ambulance service, [**22] but are not fairly described as the use of an ambulance." *1997 U.S. Dist. LEXIS 4956, [WL] at *3*. The inclusion of a loading and unloading clause would not alter the court's reasoning or result.

Allstate further argues that Rodriguez's injuries did not "arise out of" any use of the trailer. We disagree. Texas courts broadly define "use" of a motor vehicle in the context of insurance policies. *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc., 323 S.W.3d 151, 156 (Tex. 2010)*. It is a "general catchall . . . , designed and construed to include all proper uses of the vehicle." *Lyons v. State Farm Lloyds & Nat'l Cas. Co., 41 S.W.3d 201, 205 (Tex. App.--Houston [14th Dist.] 2001, pet. denied)* (citing *State Farm Mut. Auto. Ins. Co. v. Pan Am. Ins. Co., 437 S.W.2d 542, 545 (Tex. 1969))*. "Use" means "to put into action or service; to employ for or apply to a given purpose." *Id*. (citing *LeLeaux v. Hamshire-Fannett I.S.D., 835 S.W.2d 49, 51 (Tex. 1992))*. In *Mid--Century Ins. Co. of Tex. v. Lindsey, 997 S.W.2d 153 (Tex. 1999)*, the court employed the following factors suggested in two insurance treatises[14] to help determine when a motor vehicle has been in "use" under a similar UIM insuring provision:

> For an injury to fall [**23] within the "use" coverage of an automobile policy (1) the accident must have arisen out of the inherent nature of the automobile, as such; (2) the accident must have arisen within the natural territorial limits of an automobile, and the actual use must not have terminated; (3) the automobile must not merely contribute to cause the condition which produces the injury, but must itself produce the injury.[15]

*Id. at 157*.[16]

14 *See* 6B JOHN A. APPLEMAN, INSURANCE LAW AND PRACTICE § 4317, at 367-69 (Buckley ed. 1979); 8A COUCH ON INSURANCE 3d § 119:37, at 119-56 (2005).

15 The *Lindsey* court noted this is not an "absolute test," but the factors are helpful in focusing the analysis. *997 S.W.2d at 157-58*; *see also Mid-Continent Cas. Co., 323 S.W.3d at 155 n.4*. The test is only a conceptual framework to analyze the inclusion or exclusion at issue. *Mid-Continent Cas. Co., 323 S.W.3d at 155 n.4*

16 The court acknowledged that the third factor may be difficult to define because it is not always clear how the vehicle, as opposed to other things, contributed to an accident. *Lindsey, 997 S.W.2d at 157*; *see also Mid-Continent Cas. Co..323 S.W.3d at 156*.

Using the factors elucidated in *Lindsey* as a framework, and [**24] taking into consideration the broad definition of "use" recognized in Texas jurisprudence, we conclude that Rodriguez's injury resulted from use of the trailer as a matter of law.

[*227] Inherent nature. It is in the inherent nature of a trailer that it will be used to haul and tow materials. *Cf. Mid-Continent Cas. Co., 323 S.W.3d at 155* ("[I]t is in the inherent nature of a 2000 Ford F-250 Super Duty pickup truck on a cell tower job site that it will be used to haul and tow materials."); *Panhandle Steel Prods. Co., 23 S.W.2d at 801* (holding, when delivery of material was main purpose of haul, "loading and unloading were as necessary to accomplish that purpose as was the driving of the truck from plaintiff's place of business to the point of delivery"). That process includes not only the immediate action of loading and unloading materials from the trailer but also moving them from their starting point to their destination.[17] *See Liberty Mut. Ins. Co., 556 S.W.2d at 244*; *Travelers Ins. Co. v. Emp'r's Cas. Co., 380 S.W.2d 610, 612 (Tex. 1964)*; *Panhandle Steel Prods. Co., 23 S.W.2d at 801*. Using a trailer in this manner is "not an unexpected or unnatural use of the vehicle." *See Mid-Continent Cas. Co., 323 S.W.3d at 155* [**25] (citing *Lindsey, 997 S.W.2d at 158*); *Commercial Standard Ins. Co., 455 S.W.2d at 717*.

17 Here, the parties do not dispute that the deer stand did not reach its final destination.

Natural territorial limits. The accident was within the "natural territorial limits" of the trailer, even though Woodling and Rodriguez had taken a few steps out of the trailer. In *Mid-Continent Casualty Company and Lindsey*, this factor was satisfied even though both accidents occurred outside the insured vehicles. *See Mid-Continent Cas. Co., 323 S.W.3d at 155* (holding injuries sustained when rope that was anchored on one end to the truck broke arose from use of truck); *Lindsey, 997 S.W.2d at 160* (holding injury arose out of use of truck when child entered through sliding rear window and accidentally discharged loaded shotgun mounted over rear window, injuring person in nearby vehicle, because child did not stray from purpose of entering truck by playing with gun or trying to shoot it).

The Supreme Court has adopted the complete operation doctrine, which defines the terms "loading and unloading" in the context of an insurance policy. "'[L]oading and unloading' embraces not only the immediate transference of the [**26] goods to or from the vehicle, but also the complete operation of transporting the goods between the vehicle and the place from or to which they are being delivered." *Liberty Mut. Ins. Co., 556 S.W.2d at 244*; *Travelers Ins. Co., 380 S.W.2d at 612*.[18] Any activities involved in moving the goods to their final physical destination are themselves included in the term "unloading" and thus qualify as a use of the vehicle for insurance purposes. *See Travelers Ins. Co., 380 S.W.2d at 613-14*. The court noted, "[w]hen a vehicle is being unloaded it is being used to the same extent as if it were being driven, and the person doing the unloading is entitled to the same protection as the owner or operator." *Id. at 614*; *see also Commercial* [*228] *Standard Ins. Co. v. Am. Gen. Ins. Co., 455 S.W.2d 714, 716-17 (Tex. 1970)* (quoting *Travelers Ins. Co*.). We conclude under these circumstances that Woodling and Rodriguez were using the trailer when the accident occurred.

18 The cited cases that apply the complete operation doctrine involved third party claims arising from liability provisions of standard automobile insurance policies, whereas this case involves a liability claim arising under a UIM provision. *Liberty* [**27] *Mutual* and *Travelers Insurance Company*, however, both construe language in standard automobile policies that is identical to the language in the Allstate UIM provision providing coverage for injuries "aris[ing] out of the ownership, maintenance, or use" of the insured vehicle. *See Liberty Mut. Ins. Co., 556 S.W.2d at 243 n.1*; *Travelers Ins. Co., 380 S.W.2d at 612*. The UIM policy, moreover, expressly covers as an "[u]ninsured motor vehicle" "a land motor vehicle or *trailer of any type*." (Emphasis added.) Thus, the same principles apply here.

Cause. The third factor is whether the vehicle produced the injury. *Lindsey, 997 S.W.2d at 157*. The Supreme Court of Texas has stated that the causation inquiry in this context involves "but for" causation. *Mid-Continent Cas. Co., 323 S.W.3d at 156*. A but for cause is "one without which the event would not have occurred." *Transcon. Ins. Co. v. Crump, 330 S.W.3d 211, 223 (Tex. 2010)*.

Rodriguez's accident would not have occurred if Rodriguez had not been assisting Woodling in unloading the deer stand from the trailer. *See Mid-Continent Cas. Co., 323 S.W.3d at 156* (holding rope would not have broken causing injuries if truck had not been used to hoist [**28] headache ball). The accident did not merely happen near the trailer: Woodling and Rodriguez could not have accomplished the same result without the presence of the trailer, and, as we have noted, the use of a trailer includes unloading materials. *See id.*; *Panhandle Steel Prods. Co., 23 S.W.2d at 802*.[19] The trial court properly found the "use" clause in Allstate's policy covered Rodriguez's injury.

19

> [S]ince the act of unloading was one of the natural and necessary steps to the undertaking to deliver the [truck's contents], and followed in natural sequence the use of the truck to that end, which use was specifically contemplated and covered by the policy, we believe that the conclusion is unavoidable that the use of the truck was the primary and efficient cause of the injury, even though it should not be held to be the proximate cause.

*Panhandle Steel Prods. Co., 23 S.W.2d at 802*.

This case is not controlled by the cases cited by Allstate in support of its argument that the accident was not caused by the use of a trailer as such. The cases cited by Allstate regarding UIM policies involved *intentional* shootings from one vehicle into another that were held to be incidental to the use of [**29] the vehicles. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Whitehead, 988 S.W.2d 744, 745 (Tex. 1999)*; *Collier v. Emp'rs Nat'l Ins. Co., 861 S.W.2d 286, 289 (Tex. App.--Houston [14th Dist.] 1993, writ denied)*. Here, as we have held, Rodriguez was injured while he was unloading the trailer--which was a

proper use--so his injury was not merely incidental to the use of the trailer.

*National Union Fire Insurance Co. v. Merchants Fast Motor Lines, Inc., 939 S.W.2d 139 (Tex. 1997)* involved a duty to defend. An insurer's duty to defend is determined from the four corners of the pleadings and the language of the insurance policy. *Id. at 141*. In such cases, if the petition does not allege facts within the scope of coverage, the insurer is not required to defend a suit against its insured. *Id*. The petition in *National Union* alleged only that a driver was operating the insured's truck when he negligently discharged a firearm injuring the plaintiff. *Id. at 142*. The insurance policy only covered claims where the injury was caused by an accident *resulting from* the use of a covered auto. *Id*. Accordingly, the allegations did not give rise to a duty to defend by the insurer. *Id*.; *see also Mid-Continent Cas. Co., 323 S.W.3d at 156*. [**30] Here, we are not dealing with the duty to defend; thus, the same pleading standard does not apply.[20]

20 *Lindsey*, by contrast to *National Union*, was not a duty-to-defend case, but involved an action to recover UIM benefits, as in this case. *See 997 S.W.2d at 154*. Thus, the allegations in the petition were not at issue. The plaintiff proved the vehicle was in use at the time of the accident because the child's "sole purpose was to gain entry into the truck" through the back window and he did not stray from that purpose. *Lindsey, 997 S.W.2d at 158*. He did not play with the gun or try to shoot it. *Id*.; *see also Mid-Continent Cas. Co., 323 S.W.3d at 154-55*.

[*229] The other two cases cited by Allstate were not insurance coverage cases, but instead involved claims under the Texas Torts Claims Act (TTCA). The TTCA waives governmental immunity for "property damage, personal injury, or death aris[ing] from the operation or use of a motor driven vehicle."[21] *LeLeaux, 835 S.W.2d at 51* (citing *Tex. Civ. Prac. & Rem. Code § 101.021(1)(A)*). The required "operation or use" under the TTCA is by the governmental employee. *Id. LeLeaux* involved a school bus that was not in operation when a student jumped up from [**31] where she had been sitting in the open rear doorway of the empty school bus and hit her head on the door frame. *835 S.W.2d at 51*. The court held that the injury did not arise from the use of the bus because the driver was not aboard when the injury occurred--in other words, the injury did not arise from the school district's or its driver's operation or use of the bus--and immunity was not waived. *Id. at 52*. *Brown v. Houston Independent School District, 123 S.W.3d 618 (Tex. App.--Houston [14th Dist.] 2003, pet. denied)*, involved an officer who pulled over a woman in his patrol car and sexually assaulted her *in her own vehicle*. *Id. at 619*. Thus, the assault did not occur in the patrol car, but in a vehicle which was not operated by the officer. *Id. at 622*; *see also Mid-Continent Cas. Co., 323 S.W.3d at 156*. Here, by contrast, the use of the vehicle covered by the Allstate policy was not similarly limited to a particular user. Moreover, Rodriguez's injury arose from using the trailer as a trailer while he was unloading it. *See Mid-Continent Cas. Co., 323 S.W.3d at 155*; *Lindsey, 997 S.W.2d at 160*.

21 Waivers of sovereign immunity must be construed narrowly. *LeLeaux, 835 S.W.2d at 51*.

We hold [**32] that the trial court did not err by rendering summary judgment against Allstate in favor of Rodriguez and by declaring that Woodling's liability arose from the use of the trailer. We overrule Allstate's first and second issues.

***Conclusion***

We hold that Rodriguez's claims against Farmers were not ripe and thus the trial court did not have jurisdiction to enter a judgment against Farmers. Therefore, as to the claims against Farmers, we reverse the trial court's judgment and render judgment that these claims be dismissed for lack of subject-matter jurisdiction.

We further hold that the trial court did not err by entering summary judgment and declaratory judgment in favor of Rodriguez against Allstate. We affirm that portion of the declaratory judgment finding Woodling's liability arose from "use" of the trailer and finding coverage over Rodriguez's injury under the Allstate policy.

/s/ Martha Hill Jamison

Justice



**FPL ENERGY, LLC, FPL ENERGY PECOS WIND I, L.P., FPL ENERGY PECOS WIND II, L.P., AND INDIAN MESA WIND FARM, L.P., PETITIONERS, v. TXU PORTFOLIO MANAGEMENT COMPANY, L.P. N/K/A LUMINANT ENERGY COMPANY, LLC, RESPONDENT**

**NO. 11-0050**

**SUPREME COURT OF TEXAS**

***426 S.W.3d 59*; *2014 Tex. LEXIS 272*; *57 Tex. Sup. J. 325***

**October 15, 2012, Argued**
**March 21, 2014, Opinion Delivered**

**SUBSEQUENT HISTORY:** Released for Publication May 2, 2014.

**PRIOR HISTORY:** [**1]

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS. *TXU Portfolio Mgmt. Co., L.P. v. FPL Energy, LLC, 328 S.W.3d 580, 2010 Tex. App. LEXIS 5905 (Tex. App. Dallas, 2010)*

**COUNSEL:** For American Wind Energy Company LLC, Amicus Curiae: Gene Grace, AWEA, Washington, DC.

For REC Stakeholders, Amicus Curiae: Pamela Stanton Baron, Attorney at Law, Austin TX.

For FPL Energy, LLC, Petitioner: Allen Ryan Paulsen, Anne McGowan Johnson, Ben L. Mesches, Nina Cortell, Haynes & Boone, L.L.P., Dallas TX; Jeffrey M. Tillotson, John D. Volney, Lynn Tillotson Pinker & Cox, L.L.P., Dallas TX.

For TXU Portfolio Management Company, L.P., Respondent: Daniel Lee Gus, James W. Walker, Walker Sewell LLP, Dallas TX; James C. Ho, Gibson Dunn & Crutcher LLP, Dallas TX; Lawrence J.C. VanDyke, Office of the Attorney General, Solicitor General's Office, Austin TX.

**JUDGES:** JUSTICE GREEN delivered the opinion of the Court.

**OPINION BY:** Paul W. Green

**OPINION**

[*60] JUSTICE GREEN delivered the opinion of the Court.

In this contract interpretation case, TXU Portfolio Management Company, L.P. (TXUPM) contracted to receive electricity and renewable energy credits (RECs) from wind farms owned by FPL Energy, LLC. FPL failed to provide the required [**2] electricity and RECs. TXUPM sued FPL for breach of contract; FPL counterclaimed, arguing TXUPM failed to provide FPL with sufficient transmission [*61] capacity. The trial court granted two partial summary judgments. First, it issued a declaratory judgment that the contracts required TXUPM to provide transmission capacity. Second, it declared the contracts' liquidated damages provisions unenforceable. The remaining issues were tried to a jury, and the trial court entered take-nothing judgments for both parties. Both parties appealed. The court of appeals reversed both summary judgment rulings. *328 S.W.3d 580, 591 (Tex. App.--Dallas 2010, pet. granted)*.

We address the following issues: (1) did TXUPM owe FPL a contractual duty to provide adequate transmission capacity to FPL; (2) if FPL breached and TXUPM did not, do the liquidated damages provisions apply to energy *and* RECs or only to RECs; and (3) are the liquidated damages provisions in these contracts enforceable? We affirm the court of appeals' holding that TXUPM owed no contractual duty to provide transmission capacity. However, we hold the liquidated damages provisions apply only to RECs and are unenforceable as a penalty. Accordingly, [**3] we reverse the court of appeals' judgment in part and remand the case to the court of appeals to determine damages.

**I. Factual and Procedural Background**

In Texas, the electric industry consists of three main components: power generation, power transmission, and power distribution. Electric producers own and operate generating facilities. The Electric Reliability Council of Texas, Inc. (ERCOT), with few exceptions, manages the transmission of electricity through an interconnected network--or grid--of transmission lines. Finally, retail electric providers distribute electricity directly to consumers.

In 1999, the Legislature created ambitious goals for renewable energy in Texas. *See* Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, *sec. 39.904*, 1999 Tex. Gen. Laws 2543, 2598-99. The Legislature charged the Public Utility Commission of Texas (PUC) with establishing minimum renewable energy production requirements for all Texas electric providers. *TEX. UTIL. CODE § 39.904(c)(1)*. The Legislature also tasked the PUC with establishing a REC trading program. *Id. § 39.904(b)*. A REC reflects one megawatt hour (MWh) "of renewable energy that is physically metered and verified in Texas." *16 TEX. ADMIN. CODE § 25.173(c)(13)*. [**4] Electric producers thus simultaneously create both electricity from renewable sources and the corresponding RECs, yet producers may choose to sell the two separately. *Id. § 25.173(d)*. The REC trading program allows electric providers unable to satisfy the minimum renewable energy requirements to purchase and hold RECs "in lieu of capacity from renewable energy technologies." *TEX. UTIL. CODE § 39.904(b)*; *see 16 TEX. ADMIN. CODE § 25.173(d)(2)*.

TXU Electric, a retail electric provider (and a different entity than TXUPM), solicited proposals from renewable energy producers to meet the new renewable energy production requirements. In 2000, TXU Electric entered agreements with two wind farm subsidiaries of FPL: Pecos Wind I, L.P. and Pecos Wind II, L.P. Also in 2000, FPL acquired a third party's rights to a similar contract with TXU Electric for Indian Mesa Wind Farm, L.P. Under the contracts, FPL sells TXU Electric RECs and the renewable electric energy used to produce those credits. TXU Electric assigned the contracts to TXUPM, a power marketer and, importantly, not a retail electric provider. The contracts with Pecos Wind I and II are identical. The Indian Mesa contract largely contains [**5] the same provisions, but, as [*62] explained below, the parties point to relevant differences in support of their claimed intent at the time of contracting. Two provisions of these contracts give rise to this dispute: one provision governing TXUPM's transmission responsibilities and one providing for liquidated damages in the event that FPL fails to meet certain production requirements.

For approximately four years, FPL failed to produce the agreed upon electricity and RECs. TXUPM filed suit seeking damages for FPL's breach of the contracts. FPL counterclaimed, arguing that it could not meet its obligations because of congestion on the ERCOT grid. When the grid lacks capacity to transmit all energy produced in an area, ERCOT issues curtailment orders instructing certain facilities to cease production. FPL claims it received curtailment orders from ERCOT which, along with an unexpected lack of wind in the area, caused it to produce less energy than promised. FPL blamed the congestion and resulting curtailment orders on TXUPM, insisting that TXUPM bore responsibility to ensure transmission capacity for all energy FPL could produce.

Both parties filed motions for partial summary judgment. Each [**6] sought declaratory judgment to clarify the portions of the contracts relating to transmission capacity and liquidated damages. The trial court issued several rulings. First, the court declared that the contracts unambiguously required TXUPM to provide all transmission services, including transmission capacity, to FPL. Second, the court determined that the liquidated damages provisions in the contracts were not enforceable, and thus void, because a liquidated damages amount of $50 per REC was not a realistic forecast of damages.

Consistent with these rulings, the trial court's instructions to the jury indicated that TXUPM was required to provide transmission capacity and that the liquidated damages were unenforceable. The jury found that TXUPM should receive $8.9 million in compensatory damages for FPL's failure to deliver renewable energy, yet the jury determined that TXUPM secured cover for the missing electricity by acquiring substitute electricity. The jury also found that TXUPM owed no compensatory damages to FPL for TXUPM's alleged failure to ensure transmission capacity. The trial court entered judgment on the jury's verdict, ordering that (1) FPL take nothing on its claims; and [**7] (2) TXUPM take nothing, despite the jury's damage award, because TXUPM covered.

The court of appeals affirmed the take-nothing judgment for the damages claims but reversed and rendered judgment on the issues related to declaratory relief. *328 S.W.3d at 591*. The court held that the contracts did not require TXUPM to provide the necessary transmission capacity. *Id. at 587*. As to liquidated damages, the court of appeals held that the provisions were enforceable because damages were difficult to estimate, the $50 rate was a reasonable estimate of just compensation, and FPL could not meet its burden to show that the $50 rate was disproportionate to TXUPM's actual damages. *Id. at 587-90*.

We granted FPL's petition for review and address the three issues before us--whether TXUPM was responsible for ensuring transmission capacity, whether the liquidated

damages provisions apply to failure to deliver electricity, and whether the liquidated damages provisions are enforceable. *55 Tex. Sup. Ct. J. 320 (Feb. 17, 2012)*.

**II. Contract Interpretation**

Before deciding the enforceability of the liquidated damages provisions, we must resolve two matters of contract interpretation [*63] --TXUPM's responsibility for transmission [**8] capacity and the scope of the liquidated damages provisions. Our analysis begins with the legal question of the contracts' ambiguity. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp., 294 S.W.3d 164, 168 (Tex. 2009)*. If we can give a clear and definite legal meaning to a contract, it is not ambiguous as a matter of law. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London, 327 S.W.3d 118, 133 (Tex. 2010)*. An ambiguous contract, however, has a doubtful or uncertain meaning or is reasonably susceptible to multiple interpretations; we will not find ambiguity simply because the parties disagree over a contract's meaning. *Dynegy Midstream Servs., 294 S.W.3d at 168*. Our primary concern in contract interpretation is to "ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)*. We consider the entire writing to harmonize and effectuate all provisions such that none are rendered meaningless. *Id*. Further, we "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served." *Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 312 (Tex. 2005)* (per curiam) [**9] (quoting *Reilly v. Rangers Mgmt., Inc., 727 S.W.2d 527, 530 (Tex. 1987))*.

**A. Transmission Capacity**

We first consider whether the contracts require TXUPM to provide adequate transmission capacity to FPL. The trial court and the court of appeals found section 2.03 unambiguous, a finding the parties do not challenge. *328 S.W.3d at 584-85*. We may, nonetheless, declare a contract ambiguous, *see J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 231 (Tex. 2003)*, but we hold that section 2.03, when construed in light of the entire contracts, has a definite legal meaning and, thus, is unambiguous. *See Gilbert Tex. Constr., 327 S.W.3d at 133*.

Section 2.03(a) of the contracts, entitled "Transmission," reads as follows:

> TXU Electric shall provide, by purchasing or arranging for, all services, including without limitation Transmission Services, Ancillary Services, any control area services, line losses except for line losses on [FPL's] side of the Delivery Point, and transaction fees, necessary to deliver Net Energy to TXU Electric's load from the Renewable Resource Facility throughout the Contract Term ("Required Transmission Services").

Section 1.02(a) of the contracts defines "Net Energy" as "the amount [**10] of electric energy in MWh produced by the Renewable Resource Facility and *delivered to the Connecting Entity*." (emphasis added). Under section 2.02, a Connecting Entity owns any "transmission or distribution system with which the Renewable Resource Facility is interconnected." The Connecting Entity serves as the "Delivery Point."

FPL urges a broad view of TXUPM's responsibility for transmission services. FPL contends that TXUPM's obligation to provide transmission services "without limitation" encompasses the *capacity* to deliver electricity from the Renewable Resource Facility (i.e. FPL) to the load (i.e. TXUPM's customer base). In support, FPL argues that Net Energy can refer only to a quantity and has no bearing on how and when delivery occurs. FPL further argues that the more specific language, "from the Renewable Resource Facility," should trump Net Energy, which is defined elsewhere in the contracts. *See Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133-34 (Tex. 1994)* (stating the rule that, in contract interpretation, a more specific provision will control over a general [*64] statement). FPL points to congestion beyond the Delivery Point, explaining that as electricity is generated [**11] and delivered virtually simultaneously, it cannot stop and wait at the Delivery Point for congestion to clear. In a compelling visual, FPL suggests that the transmission towers might burn down if FPL generated and sent electricity without an available, guaranteed path to the consumer. FPL complains that TXUPM caused the grid congestion and thus prompted the resulting curtailment orders.[1]

> 1 The record shows that FPL earlier claimed that TXUPM: (1) prioritized its own fossil fuel-derived energy; (2) knowingly overstated to ERCOT its intention to transmit fossil fuel energy, resulting in curtailment orders for wind-produced energy; and (3) exercised its authority as a "Qualified Scheduling Entity," whose responsibility is to report anticipated electricity generation to ERCOT, to influence ERCOT's schedule for energy transmission on the grid. FPL's briefs, however, do not pursue these arguments. FPL petitioned this Court to review the meaning of the contracts as to TXUPM's obligations to provide transmission services, not TXUPM's alleged role in creating congestion. Thus, we will not consider these arguments. *See Guitar Holding Co., L.P. v. Hudspeth Cnty. Underground Water Conserva-*

*tion Dist. No. 1, 263 S.W.3d 910, 918 (Tex. 2008)* [**12] (holding issues waived if not presented in the petition for review or in the briefs).

TXUPM interprets the contracts as placing the risk of transmission system incapacity on FPL. TXUPM notes that the contracts identify "lack of transmission capacity" as an "Uncontrollable Force" outside the reasonable control of the parties. If capacity is beyond the control of the parties, TXUPM questions, how then can TXUPM bear responsibility for failure to provide capacity? Section 4.05 of the contracts reinforces this point by making clear that FPL must pay liquidated damages for failure to supply RECs *even if* the failure was the result of inadequate transmission capacity. Finally, TXUPM argues that the contracts' definition of Net Energy binds this Court; incorporating Net Energy, as defined, into section 2.03 means that TXUPM owes a duty to provide transmission services *only* after the Delivery Point. Under TXUPM's interpretation, if FPL could not deliver electricity because of congestion, FPL bore the risk and, thus, must bear the consequences. We agree with TXUPM's interpretation.

We begin by recognizing the apparent textual conflict. Read in isolation, section 2.03 contains language supportive [**13] of either a broad or narrow interpretation of TXUPM's transmission service responsibilities. "[F]rom the Renewable Resource Facility" implies that TXUPM would have to secure transmission capacity so FPL could deliver electricity. But the use of the term Net Energy, which exists only upon FPL's delivery to the Connecting Entity, suggests that TXUPM bears responsibility only if the grid possesses capacity for TXUPM to deliver any generated electricity.

We cannot interpret a contract to ignore clearly defined terms, *see Frost Nat'l Bank, 165 S.W.3d at 313*, and, thus, we must accord Net Energy its due meaning. The contracts assigned TXUPM responsibility only for transmission services required to deliver Net Energy, and Net Energy represents the amount of energy produced by FPL *and* delivered to the Connecting Entity. TXUPM's responsibility for transmissions services, then, begins once FPL-generated electricity reaches the Connecting Entity on the grid--the Delivery Point. The contracts' use of the phrase "from the Renewable Resource Facility" is simply a designation of where the energy originated. It does not alter the definition of Net Energy provided in section 1.02 or in other sections [**14] throughout the contracts.

[*65] The placement of section 2.03 in the context of all interconnection requirements reinforces this conclusion. Section 2.02 requires FPL to "make all arrangements . . . necessary to interconnect . . . with a transmission or distribution system," i.e. the Connecting Entity. Transmission systems are owned and operated by transmission service providers. *See 16 TEX. ADMIN. CODE § 25.5(143), (144)*. As between the original contracting parties, the contracts required a separate agreement to address interconnection if TXU Electric was the connecting entity; the parties do not suggest any such agreement exists. Between TXUPM and FPL, no such agreement can exist because TXUPM, as a power marketer, cannot own transmission systems. *See id. § 25.5(83)* (defining "power marketer" to exclude owners of transmission systems). The contracts obligate FPL to secure interconnection with a Connecting Entity, or transmission service provider, which under the PUC rules cannot be TXUPM. *See id. § 25.5(83), (143)*. Reading sections 2.02 and 2.03 together, FPL must make all interconnection arrangements so that electricity can reach the Delivery Point, and TXUPM must ensure that facilities [**15] exist beyond the Delivery Point to allow for delivery to consumers. These provisions do not speak to the situation here, where both parties claim to meet their responsibilities but congestion on the grid inhibits energy generation and delivery.

Given these facts, then, we must consider which party is responsible for congestion beyond the Delivery Point. While FPL blames grid congestion on TXUPM, we believe the contracts recognize such congestion as beyond both parties' control. Section 6.02(a) of the contracts addresses "Uncontrollable Force," including "[e]vents or circumstances that are outside of a Party's reasonable control," which "may include . . . lack of transmission capacity or availability." The contracts mention transmission capacity only in this section. Congestion and curtailment issues, which affect transmission capacity and availability, must fall within this provision. Section 6.02(b) goes on to excuse a party from performance in the event of an Uncontrollable Force if certain criteria are met; there is no dispute that FPL did not meet those criteria.

Section 4.05, entitled "Effect of Outages and Uncontrollable Force," outlines the general rule that payment and other [**16] calculations in sections 4.01-.10 *are not* impacted by Uncontrollable Force. The exception to this rule, discussed below, applies to reduce the Annual Quantity of RECs that FPL must produce for TXUPM only when PUC substantive rules would excuse the shortfall. The exception does not excuse FPL from its obligation to deliver electricity. In essence, the contracts allocate the risk of curtailment and congestion to FPL by clearly establishing that such events affect contract obligations only in certain instances not found here. We must respect and enforce this assignment of risk. *See Gym-N-I Playgrounds, Inc. v. Snider, 220 S.W.3d 905, 912 (Tex. 2007)* ("Freedom of contract allows parties to bargain for mutually agreeable terms and allocate risks as they see fit.").

To summarize, the contracts obligate FPL to interconnect with a Connecting Entity, which cannot be TXUPM. TXUPM bears responsibility for providing transmission services from the Delivery Point at the Connecting Entity. To the extent that lack of transmission capacity impairs electricity generation at the wind farms, the contracts provide that such lack of capacity is an Uncontrollable Force and FPL, therefore, bears the risk.

We [**17] note that this analysis does not fail because of the unique nature of electricity, [*66] despite FPL's assertions. Admittedly, electricity generation, transmission, and distribution occur almost simultaneously. But even if electricity moves too fast to pinpoint its physical location, the parties certainly can conceptualize its location for the purpose of creating energy contracts like the ones in question today. Several contractual provisions make this clear: section 2.03(a) assigns FPL responsibility for any loss of electricity on its side of the Delivery Point; and section 3.01(b) makes FPL responsible for maintenance and operational compliance with ERCOT guidelines for facilities up to the Delivery Point. This conceptualization of electricity's location pervades the contracts, and the parties assigned different responsibilities and liabilities based upon that understanding.

Here, ERCOT issued curtailment orders, effectively constraining energy generation, rather than energy transmission. FPL was therefore prevented from generating electricity and meeting its contractual obligations. Although ERCOT made final curtailment decisions, that does not mean that neither party bore the risk in [**18] the event of congestion and curtailment.

We hold that the contracts did not require TXUPM to provide transmission capacity for FPL but rather allocated risk of inadequate transmission capacity to FPL.

**B. Liquidated Damages**

We next consider the breadth of the liquidated damages provision in section 4.04. The court of appeals did not address the ambiguity of the section, and neither party argues the provision is ambiguous. We conclude that the provisions are unambiguous because we may discern a definite legal meaning by construing the provisions in light of each contract as a whole. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London, 327 S.W.3d 118, 133 (Tex. 2010)*.

The provisions state in relevant part:

> If there is a Net Deficiency for a year . . . . [FPL] shall pay [TXUPM] a Deficiency Payment equal to the product of (i) the difference in MWh between (a) the Net Deficiency, and (b) the MWh of Transferred RECs, times (ii) the Deficiency Rate. The Deficiency Payment is intended to be liquidated damages and not a penalty.

Vastly simplified, a Net Deficiency occurs when FPL fails to meets its "Annual Quantity" REC quota, even taking into account past overproduction.

Section 4.04(f) [**19] sets the Deficiency Rate as follows:

> The initial Deficiency Rate is $50 per MWh, based upon the $50 per MWh number in [PUC] Substantive Rule *§ 25.173*. If the $50 per MWh in that Rule is amended, then the Deficiency Rate is automatically adjusted to the amended number stated in that Rule. If [PUC] Substantive Rule *§25.173* is amended or repealed without replacement so that the $50 number is no longer in the [PUC] Substantive Rules, then the Deficiency Rate is $50. To the extent that the [PUC] determines the annual average market value of RECs applicable to [TXUPM] for a year, then the Deficiency Rate for that year will be the lesser of (i) the $50 per MWh (as it may be later amended), and (ii) twice the annual average market value of RECs applicable to [TXUPM] as determined by the [PUC] . . . . For a year for which there is a Deficiency Payment due, [TXUPM] shall make reasonable efforts to obtain a determination of the annual average market value of RECs by the [PUC], but nothing in this Section or in this Agreement obligates [TXUPM] to turn in fewer RECs than are required of [*67] it by the [PUC] program administrator in order to obtain such a determination.

TXUPM argues that the contracts [**20] cover both energy and RECs, and, therefore, the liquidated damages clauses must apply to both. TXUPM reads subsections (d) and (f) in the context of contract Article IV (sections 4.01-.10), entitled "Payment, Records, and Billings." According to TXUPM, because FPL simultaneously produces RECs and energy, the parties simply use RECs as a counting mechanism for both, rather than a term limited strictly to RECs. In support, TXUPM references section 4.02, which provides the contracts' payment terms, whereby TXUPM must pay FPL a unified price for an Annual Quantity of MWhs of Renewable Energy comprised of both energy and RECs. Sections 4.03 and

4.04(a)-(c) outline a quarterly and annual reconciliation process to smooth any discrepancies based on the differences between continuous production of electricity and the quarterly issuance of RECs. Section 4.04(d), the argument goes, necessarily incorporates the language used in the other sections. That section states: "[FPL] may elect to obtain and transfer RECs to [TXUPM] that were not produced at the Renewable Resource Facility to completely or partially offset the Net Deficiency . . . not to exceed the sum of (i) 20% of the Annual Quantity, [**21] and (ii) the Uncontrollable Force Deficiency for that year." Thus, TXUPM argues, Section 4.04(d) as a whole must refer to the Annual Quantity of both energy and RECs.

In response, FPL points to the absence of "Net Energy" or "Renewable Energy" anywhere in the liquidated damages provisions and highlights several clauses consistent with an exclusive focus on RECs. First, section 4.04(d), quoted above, contains a mechanism for FPL to deliver RECs from another source if FPL cannot produce the RECs at its own facilities. That provision deals only with RECs, and not electricity. Second, the Deficiency Rate is tied to the PUC's substantive rules on REC penalties. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former *16 TEX. ADMIN. CODE § 25.173(o)*) (Pub. Util. Comm'n of Tex.). The PUC rules impose penalties for failure to retire sufficient RECs, not for failure to deliver electricity. *Id*. Third, the Indian Mesa contract more clearly limits the liquidated damages provision to RECs by eliminating the entire provision in the event that RECs cease to exist. For the reasons below, we hold that the liquidated damages clauses [**22] apply only to RECs.

At the outset, we note that sophisticated parties have broad latitude in defining the terms of their business relationship. *See Forest Oil Corp. v. McAllen, 268 S.W.3d 51, 58 (Tex. 2008)* (articulating the principle that Texas courts should uphold contracts "negotiated at arm's length by 'knowledgeable and sophisticated business players' represented by 'highly competent and able legal counsel'" (quoting *Schlumberger Tech. Corp. v. Swanson, 959 S.W.2d 171, 180 (Tex. 1997))*. We must construe contracts by the language contained in the document, with a mind to Texas's strong public policy favoring preservation of the freedom to contract. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc., 389 S.W.3d 802, 811-12 (Tex. 2012)*; *see also Cross Timbers Oil Co. v. Exxon Corp., 22 S.W.3d 24, 26 (Tex. App.--Amarillo 2000, no pet.)* ("In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose."). Therefore, the lack of reference to electricity or energy in the liquidated damages provisions is critical.

Where the parties intended to address both energy and RECs, the contracts do [*68] so. In section 4.02, the payments are based [**23] on "all RECs and Net Energy produced by [FPL]." Section 4.03 contains explicit references to section 4.02 and the payments under section 4.02. The liquidated damages provisions, in contrast, provide no such reference. We will not, as TXUPM urges, selectively import terms from other provisions to compensate for the absence of the term "energy"; rather, we conclude that the omission was intentional and deliberate. *See Tenneco Inc. v. Enter. Prods. Co., 925 S.W.2d 640, 646 (Tex. 1996)* ("We have long held that courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained.").

This interpretation does not conflict with, or render meaningless, any other provision of the contracts. To the contrary, other provisions recognize that RECs often receive differential treatment. Section 3.03(b) provides that if TXUPM cannot take delivery of electricity, FPL may sell electricity to the Connecting Entity, but must then sell the REC so produced to TXUPM. Section 4.04(d) allows FPL to cover REC deficiencies with RECs from other sources. These distinctions make sense because an electricity provider may readily obtain RECs on [**24] the open market, whereas it is more difficult for providers to arrange for substitute electricity to meet their commitments.

Support for differential treatment of RECs also flows from the regulatory scheme incorporated by reference into the contracts. Section 4.04(f) incorporates a Deficiency Rate from the PUC rules, then found in *Texas Administrative Code Title 16, section 25.173*. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former *16 TEX. ADMIN. CODE § 25.173(o)*) (Pub. Util. Comm'n of Tex.). *Section 25.173*, at the time of contracting, assignment, and breach, contained a mechanism for excusing REC deficiencies due to events "beyond [the] reasonable control of the provider." *Id*. Such events included lack of transmission capacity or curtailment orders from ERCOT. *See id*. (former *16 TEX. ADMIN. CODE § 25.173(o)(4), (5)*). The contracts incorporate this mechanism through section 4.05, which reduces the Annual Quantity to the extent that Administrative Code *section 25.173* excused penalties for REC deficiencies. In sum, the contracts reduce FPL's REC obligations when the PUC provides an excuse for the deficiency.

The [**25] very inclusion of the Deficiency Rate, which reflects the *actual* penalty TXUPM would have to pay for a REC deficiency, suggests the liquidated damages clause was intended to compensate only for REC deficiencies. To underscore this point, we note that when the parties entered the contracts, TXU Electric was sub-

ject to regulatory penalties for REC deficiencies. *See id*. (former *16 TEX. ADMIN. CODE § 25.173(c)(1)*). If FPL failed to deliver both electricity and RECs, and TXU Electric consequently could not meet its REC requirements, the PUC would assess a penalty against TXU Electric. The liquidated damages clause would yield $50 per REC, or the equivalent of the regulatory penalty. This would compensate TXU Electric for the undelivered REC, but what about the undelivered electricity? Liquidated damages would provide no compensation to TXU Electric for FPL's failure to deliver electricity. This belies TXUPM's assertion that the provisions were intended to compensate for both RECs and electricity. We conclude that the liquidated damages clauses compensate for REC deficiencies and leave common law remedies available for electricity deficiencies.

[*69] The Indian Mesa contract further solidifies [**26] our interpretation. Section 10.02 of the Indian Mesa contract provides that "if RECs cease to exist, then Section 4.03 and Section 4.04 of this Agreement will be automatically deleted." This section preserves the agreement as an electricity-only contract if RECs disappear. Because the liquidated damages provision becomes a nullity without RECs, we must conclude that the provision is intended to compensate only for REC deficiencies. To do otherwise would render the provision meaningless, and this we cannot do. See *Coker, 650 S.W.2d at 393*.

Limiting the liquidated damages provisions to their plain language also has the benefit of advancing stability in the renewable energy marketplace, including the vital role of RECs. Under the legislative scheme, RECs and energy are "unbundled." *TEX. UTIL. CODE § 39.904(b)*; ERCOT Nodal Protocols § 14.3.2(1) (January 1, 2013). Electric providers may either generate their own renewable energy or purchase RECs on the open market. *16 TEX. ADMIN. CODE § 25.173(d), (l)*. Though FPL and TXUPM chose to contract for both in this case, we should not allow that fact to cloud our analysis. As amici curiae REC stakeholders have pointed out, a contrary holding could [**27] impede the REC market, which facilitates renewable energy development by allowing prospective electric producers to secure a guaranteed long-term revenue stream. Yet if, as TXUPM urges, "REC" does not mean only REC, substantial uncertainty may arise regarding the desirability of such investments, the meaning of existing contracts, the negotiation of future contracts, and the ease of regulatory compliance. We are loath to interfere with a functioning market when the language of the contracts does not so require.

The plain language of the liquidated damages provisions, the differential treatment of RECs and electricity in the contracts, and the separate provisions of the Indian Mesa contract all support a limited interpretation of a REC. We hold that the liquidated damages provisions apply only to REC deficiencies.

### III. Enforceability of Liquidated Damages

We next consider the enforceability of the liquidated damages provisions when applied only to RECs. FPL contends that the provisions impose an unenforceable penalty when applied to compensate only for REC deficiencies. Although TXUPM argues primarily that the provisions reasonably forecast damages for electricity *and* RECs--a position foreclosed [**28] by our holding in this case--TXUPM's arguments regarding the difficulty of estimation of REC-based damages and the reasonableness of the forecast of damages still resonate. Because the liquidated damages provisions fail our test for enforceability, however, we hold the provisions unenforceable.

The basic principle underlying contract damages is compensation for losses sustained and no more; thus, we will not enforce punitive contractual damages provisions. *See Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (Tex. 1952)*. In *Phillips v. Phillips*, we acknowledged this principle and restated the two indispensable findings a court must make to enforce contractual damages provisions: (1) "the harm caused by the breach is incapable or difficult of estimation," and (2) "the amount of liquidated damages called for is a reasonable forecast of just compensation." *820 S.W.2d 785, 788 (Tex. 1991)* (citing *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2 (Tex. 1979))*. We evaluate both prongs of [*70] this test from the perspective of the parties at the time of contracting.[2] In *Phillips* we recognized that, under this test, a liquidated damages provision may be unreasonable "because [**29] the actual damages incurred were much less than the amount contracted for." *820 S.W.2d at 788*. A defendant making this assertion may be required to prove the amount of actual damages before a court can classify such a provision as an unenforceable penalty. *Id*. While the question may require a court to resolve certain factual issues first, ultimately the enforceability of a liquidated damages provision presents a question of law for the court to decide. *Id*.

2 *Polimera v. Chemtex Envtl. Lab., Inc., No. 09-10-00361-CV, 2011 Tex. App. LEXIS 3886, at *12 (Tex. App.--Beaumont May 19, 2011, no pet.)* (mem. op.); *Baker v. Int'l Record Syndicate, Inc., 812 S.W.2d 53, 55 (Tex. App.--Dallas 1991, no writ)*; *Mayfield v. Hicks, 575 S.W.2d 571, 576 (Tex. Civ. App.--Dallas 1978, writ ref'd n.r.e.)*; *Muller v. Light, 538 S.W.2d 487, 488 (Tex. Civ. App.--Austin 1976, writ ref'd n.r.e.)*; *Schepps v. Am. Dist. Tele. Co. of Tex., 286 S.W.2d 684, 690 (Tex. Civ. App.--Dallas 1955, no writ)*; *Zucht v. Stewart Title Guar. Co., 207 S.W.2d 414, 418*

*(Tex. Civ. App.--San Antonio 1947, writ dism'd)*; *accord* RESTATEMENT (SECOND) OF CONTRACTS *§ 356 cmt. b* (1981) (identifying the time of making a contract as the moment to evaluate [**30] the reasonableness of a liquidated damages clause).

**A. Difficulty of Estimating Damages**

We first consider the difficulty of estimating damages at the time of contracting. TXUPM emphasizes the uncertainty of the market for RECs. FPL counters that all parties knew a REC marketplace would soon exist and provide transparent pricing by the time the obligations under the contracts became due. We agree with TXUPM that damages for RECs were difficult to estimate at the time of contracting.

The implementing legislation for the REC scheme passed in 1999, Act of May 27, 1999, 76th Leg., R.S., ch. 405, § 39, *sec. 39.904*, 1999 Tex. Gen. Laws 2543, 2598-99, but at the time of contract formation in 2000, the market for RECs did not yet exist. The nature of FPL's obligation compounded the difficulty. The contracts required FPL to deliver an annual quantity of RECs. TXUPM could not identify the specific time, and thus the spot price in the REC market, in order to calculate the damage for any specific REC deficiency. Even if the contracts anticipate a healthy marketplace for RECs, the uncertain success of a novel legislative scheme surely poses a challenge to predicting damages. Indeed, as explained previously, [**31] the Indian Mesa contract foresaw the potential disappearance of the REC scheme and provided for continuation of the contract in the event of the scheme's demise. The uncertain marketplace for RECs suffices to meet the "difficulty of estimation" prong of the contractual damages test.

**B. Reasonableness of Damage Forecast**

We next turn to the second prong, the reasonableness of the forecast of damages. FPL argues that the liquidated damages provisions, which derive directly from the regulatory penalty scheme, impose the maximum penalty in all situations. FPL points to an ameliorative provision in the penalty regulations that excuses REC deficiencies due to lack of transmission capacity or the actions of a governmental authority, such as an ERCOT curtailment. *See* 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former *16* TEX. ADMIN. CODE *§ 25.173(o)*) (Pub. Util. Comm'n of Tex.). Many of TXUPM's counter-arguments are inextricably tied to contractual damages provisions [*71] based on RECs and electricity, and we need not acknowledge those arguments here. TXUPM does assert, however, that the liquidated damages provisions were [**32] not intended as indemnity clauses and therefore are not limited to application only if TXUPM were actually assessed a penalty.

We view the reasonableness of the forecast from the time of contracting. *E.g., Mayfield v. Hicks, 575 S.W.2d 571, 576 (Tex. Civ. App.--Dallas 1978, writ ref'd n.r.e.)*; *accord* RESTATEMENT (SECOND) OF CONTRACTS *§ 356 cmt. b* (1981) (identifying the time of making a contract as the moment to measure the reasonableness of anticipated loss). We are not persuaded, as FPL urges, to attach a "penalty" label merely because the liquidated damages clause derives from a "penalty" scheme; that does not, standing alone, make it a penalty. *Stewart, 245 S.W.2d at 486* ("[T]he courts will not be bound by the language of the parties.").

Although the initial per-REC deficiency rate is $50, the contracts also provide:

> To the extent that the [PUC] determines the annual average market value of RECs applicable to [TXUPM] for a year, then the Deficiency Rate for that year will be the lesser of (i) the $50 per MWh (as it may be later amended), and (ii) twice the annual average market value of RECs applicable to [TXUPM] as determined by the [PUC].

The contracts thus anticipate that the amount [**33] of damages may be tied to market value, rather than an arbitrary number. Further, section 4.05 of the contracts anticipates that the PUC substantive rules will affect the REC requirements:

> The exception . . . is that the Annual Quantity for a year is decreased to the extent that [TXUPM] is excused from paying a penalty by reason of any event under *Section 25.173(o)(4)* and *(5)* of the [PUC] Substantive Rules that adversely affected production of RECs by the Renewable Resource Facility in that year.

As discussed above, former PUC rules, then found in *Title 16, Section 25.173 of the Texas Administrative Code*, excused REC deficiencies due to lack of transmission capacity or curtailment orders. 24 Tex. Reg. 9142 (1999), *adopted* 25 Tex. Reg. 82 (2000), *amended by* 32 Tex. Reg. 5165 (2007), *proposed* 32 Tex. Reg. 487 (former *16* TEX. ADMIN. CODE*§ 25.173(o)*) (Pub. Util. Comm'n of Tex.). The contracts therefore contemplate that REC obligations of the parties, and the resulting damages, are a product of and intertwined with the regulatory scheme. The liquidated damages provisions attempt to integrate these ame-

liorative processes, and thus, on their face, reasonably forecast damages.

Yet the facts of [**34] this case demonstrate the chasm between the liquidated damages provisions as written and the result of the provisions under the court of appeals' judgment. First, the number of deficient RECs varies significantly between TXUPM's assertion and what the regulatory scheme would indicate. FPL had a collective deficiency of 580,000 RECs, yet 62% (or about 360,000) were not produced because of transmission congestion and associated ERCOT curtailment orders, which are excused by the PUC rules. *Id*. TXU Electric was subject to PUC penalties for REC deficiencies at the time of contract formation. *Id*. (former *16 TEX. ADMIN. CODE § 25.173(c)(1)*). Upon assignment to TXUPM, a power marketer, no party was subject to PUC penalties. *See 16 TEX. ADMIN. CODE § 25.5(83)* (defining power marketer as an wholesaler seller of electricity who does not own generation, transmission, or distribution facilities in Texas, which would exclude TXUPM from REC penalties). This change in relationship did [*72] not undermine each contract, but it fundamentally changed the basis for the liquidated damages provisions. Those provisions presuppose that TXU Electric or its successors would respond to potential penalties for REC [**35] deficiencies. When those successors have no REC penalty obligations, they may, as occurred here, fail to secure a regulatory excuse for deficiencies that would obviate any need for the liquidated damages provisions. If the PUC could assess a penalty against TXUPM, the penalty would be based on the 220,000 RECs attributable to lack of wind, not congestion.

Second, the Deficiency Rate calculation failed to tie the damages to market value as the contracts contemplate. Section 4.04(f) of the contracts allows for a Deficiency Rate of either $50 or twice the annual average market value of RECs "[t]o the extent that the [PUC] determines the annual average market value." The PUC expressly declined TXUPM's request for such a determination. The actual market value of a REC during the period in question ranged from $4 to $14. The fortuity of a PUC determination thus utterly controls the damages, irrespective of the actual market value. For instance, the appropriate amount of damages should fall in the range of $8 to $28 (twice the average market value), depending on what the PUC would have determined as the actual market value of a REC in each year.

In combination, this creates an unacceptable [**36] disparity. The court of appeals assessed damages at $29 million. If we use the REC deficiency of 220,000 (as reduced under PUC rules), and the reduced Deficiency Rate of $28 (the upper bound of the possible range), actual damages equal only $6,160,000. To reach damages of $29 million on a 220,000 REC deficiency would require an effective deficiency rate of $132 per REC. The disparity grows if we consider that TXUPM also avoided the contract price of $24 per MWh of Renewable Energy--which includes a REC and a MWh of electricity. Although only a portion of the $24 is attributable to the REC not purchased, it nonetheless would further diminish TXUPM's actual damages. In *Phillips*, we recognized that a liquidated damages provision may be unreasonable in light of actual damages. *820 S.W.2d at 788*. The burden of proving unreasonableness falls to FPL. *See id*. The court of appeals held that FPL failed to meet this burden, yet the court's evaluation was based on evidence of damages for electricity *and* RECs. *328 S.W.3d at 589-90*. Our holding on the scope of the liquidated damages clauses limits our consideration to damages for REC deficiencies. The evidence reviewed in this opinion demonstrates [**37] that FPL has met its burden.

*Phillips* did not create a broad power to retroactively invalidate liquidated damages provisions that appear reasonable as written. See *820 S.W.2d at 788*. Nor do we create such a power here. But when there is an unbridgeable discrepancy between liquidated damages provisions as written and the unfortunate reality in application, we cannot enforce such provisions. The forecast of damages was flawed by its reliance on events that did not and perhaps cannot occur--a PUC determination of the market value of RECs and a failure to secure a regulatory excuse for curtailment-based REC deficiencies. When the liquidated damages provisions operate with no rational relationship to actual damages, thus rendering the provisions unreasonable in light of actual damages, they are unenforceable. *See id*. Because the liquidated damages provisions operate as a penalty, we hold the provisions unenforceable.

**IV. Conclusion**

We hold that the contracts do not require TXUPM to provide transmission capacity [*73] to FPL, and thus TXUPM did not breach the contracts. FPL may owe damages for its breach, but the liquidated damages provisions in the contracts are unenforceable as a penalty. Accordingly, [**38] we reverse in part the judgment of the court of appeals and remand the case to the court of appeals to determine damages consistent with this opinion.

Paul W. Green

Justice

OPINION DELIVERED: March 21, 2013



**GARDEN RIDGE, L.P., Appellant v. ADVANCE INTERNATIONAL, INC., AND HERBERT A. FEINBERG, Appellees**

**NO. 14-11-00624-CV**

**COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON**

***403 S.W.3d 432; 2013 Tex. App. LEXIS 4497; 80 U.C.C. Rep. Serv. 2d (Callaghan) 548***

**April 9, 2013, Opinion Filed**

**SUBSEQUENT HISTORY:** Petition for review denied by *Garden Ridge, L.P. v. Advance Int'l, Inc., 2014 Tex. LEXIS 876 (Tex., Oct. 3, 2014)*

**PRIOR HISTORY:** [**1]

On Appeal from the 164th District Court, Harris County, Texas. Trial Court Cause No. 2009-80706.

**COUNSEL:** For APPELLANT: Leif Alexander Olson, Jared Gregory Leblanc, HOUSTON, TX.

For APPELLEE: Constance H. Pfeiffer, Jeffrey Todd Bentch, HOUSTON, TX.

**JUDGES:** Panel consists of Justices Frost, Christopher, and Jamison. (Frost, J., concurring).

**OPINION BY:** Tracy Christopher

**OPINION**

[*434] Appellant Garden Ridge, L.P. (Garden Ridge) sued Advance International, Inc., and Herbert A. Feinberg (collectively, Advance) for breach of contract and a declaratory judgment that Garden Ridge had [*435] complied with its contracts with Advance. Advance counterclaimed for breach of contract. The jury found in favor of Advance. Although Garden Ridge accepted two shipments of inflatable snowmen from Advance, Garden Ridge refused to pay anything for either shipment, claiming that one shipment was nonconforming. Garden Ridge based its refusal to pay on chargeback provisions outlined in the parties' contracts. Advance argued that the chargeback provisions are unenforceable penalties.

On appeal, Garden Ridge argues that the trial court committed reversible error when it (1) refused to submit a question on prior material breach, (2) improperly instructed the jury on damages, and (3) commented on the weight of the evidence in its instructions on breach of contract. We conclude that the chargeback provisions [**2] as applied in this case are unenforceable as a matter of law as penalties, and we overrule Garden Ridge's jury charge issues. We therefore affirm the trial court's judgment.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Garden Ridge is a Houston-based chain of housewares and home décor stores. Advance International, a company owned by Feinberg, is one of Garden Ridge's vendors. In 2009, Advance sent Garden Ridge quote sheets for lighted inflatable holiday snowmen, which included a color photo of each item and described its cost, weight, dimensions, and packaging. The two snowmen on the quote sheets each wore a scarf, held a broom that stated "Merry Christmas" on it, and waved; one stood eight feet tall, and the other stood nine feet tall. We refer to this snowman as "waving snowman." Advance then sent two sample snowmen[1] to Garden Ridge; one of the samples did not match its quote sheet. The sample eight-foot snowman wore a Santa-type hat and held a "Merry Christmas" banner. We refer to this snowman as "banner snowman."

1 *See* App. A.

Garden Ridge sent Advance two purchase orders, one for approximately 950 nine-foot waving snowmen (PO '721), and the other for approximately 3,500 eight-foot waving [**3] snowmen (PO '743), based on the quote sheets. Garden Ridge planned to sell each nine-foot

waving snowman for $59.99, and each eight-foot waving snowman for $39.00. Garden Ridge planned to mark down the eight-foot waving snowmen to $20.00 each during its one-day Thanksgiving Shop-a-Thon sale, and it prepared and had printed an advertising circular promoting this special price and picturing the eight-foot waving snowman.

Five days before Thanksgiving, Garden Ridge realized that the eight-foot snowmen that Advance sent were not waving snowmen, but instead were banner snowmen. The nine-foot snowmen that Advance sent were waving snowmen. Garden Ridge decided to honor the $20.00 Shop-a-Thon price on the nine-foot waving snowmen. There were no customer complaints, and both the eight-foot banner snowmen and the nine-foot waving snowmen sold well.

The parties' contracts consist of the purchase orders, the vendor cover letter, and the vendor compliance manual. Based on liquidated-damages provisions outlined in the vendor compliance manual, Garden Ridge assessed chargebacks against Advance for its alleged noncompliance violations. For Advance's "purchase order" violation--by sending the eight-foot [**4] banner snowman instead of the waving snowman, Garden Ridge charged back to Advance the entire merchandise cost plus the cost of freight on PO '743 as a "unauthorized substitution" chargeback, which totaled [*436] $49,176.00. In addition to paying nothing for the eight-foot banner snowmen, Garden Ridge paid nothing for the nine-foot waving snowman despite the fact that those snowmen complied with PO '721. Garden Ridge charged back to Advance the entire merchandise cost plus the cost of freight on the nine-foot waving snowmen as a "merchant initiated" chargeback, which totaled $29,178.00. Additionally, from September through November 2009, Garden Ridge assessed another $13,241.84 in noncompliance chargebacks to Advance on other merchandise for "ticketing/packing" violations involving not marking cartons sequentially or otherwise mislabeling them, and for "purchase order" violations involving short or incomplete orders.

Advance demanded payment for its snowmen and other items and staged protests at Garden Ridge's headquarters. Thereafter, Garden Ridge sued Advance for breach of contract and a declaratory judgment that Garden Ridge had complied with the contracts. Advance counterclaimed for breach [**5] of contract and asserted that Garden Ridge's claims were barred because the chargeback provisions are unenforceable as penalties. Garden Ridge defended against Advance's counterclaim by asserting that Advance breached the contracts first.

At trial, Garden Ridge's divisional merchandise manager/vice president Linda Troy admitted that Garden Ridge made approximately $113,000 in profit on the

snowmen it received from Advance, and further testified that Garden Ridge made all the money it would have made if the snowmen were delivered exactly as ordered. One of Garden Ridge's buyers, Sheria Cole, admitted she did not know of any dollar amount that Garden Ridge was harmed by the snowmen shipment and that Garden Ridge had less-than-zero receipt cost for the snowmen. Cole also testified that she was unaware of anyone at Garden Ridge having done any actual-harm calculations from the unauthorized substitution of the eight-foot banner snowmen or any calculations to determine whether Garden Ridge's chargebacks were reasonably proportional to any actual harm it suffered. Garden Ridge acknowledges that it did not argue any amount of actual damages other than zero and that the record reflects no actual [**6] damages resulting from Advance's noncompliance violations.

The trial court granted Advance's motion for directed verdict on Garden Ridge's breach-of-contract claim because of lack of evidence on damages resulting from Advance's noncompliance violations, but did not grant Advance's motion for directed verdict on Garden Ridge's declaratory-judgment claim or Advance's motion for directed verdict seeking to have Garden Ridge's chargeback provisions declared legally unenforceable as penalties.

The trial court submitted to the jury questions on Garden Ridge's declaratory-judgment claim and on Advance's breach-of-contract claim, but refused to submit a question on Garden Ridge's prior-material-breach defense. On Garden Ridge's declaratory-judgment claim, the jury found that Garden Ridge did not comply with the terms of the three listed agreements (to purchase the eight-foot snowmen, to purchase the nine-foot snowmen, and to purchase other items listed in the "summary of chargebacks" exhibit). On Advance's breach-of-contract claim, the jury found that Garden Ridge failed to comply with these agreements by failing to pay for the eight-foot snowmen, the nine-foot snowmen, and other items listed [**7] in the chargeback exhibit. The jury, in separate findings, awarded Advance damages in the amount of $49,176.00 for the eight-foot snowmen, $29,781.00 for the nine-foot snowmen, and $500.00 for other items listed in the chargeback exhibit. The trial [*437] court rendered final judgment on the jury's verdict and on a stipulation for legal fees.

Garden Ridge appeals the trial court's final judgment, arguing in three issues that the trial court committed reversible error in its jury charge. First, Garden Ridge contends that the trial court erred in refusing to submit a jury question on Garden Ridge's affirmative defense of prior material breach. Second, Garden Ridge argues that the trial court erred by improperly instructing the jury in the damages question on the reasonableness of Garden Ridge's chargebacks. Third, Garden Ridge complains that

the trial court's inclusion of instructions on acceptance and contract price in the breach-of-contract question were improper comments on the weight of the evidence.

## II. ANALYSIS

### A. Refusal to submit prior-material-breach question

Garden Ridge concedes that it is not entitled to a jury question on prior material breach if this court determines that the chargeback [**8] provisions are unenforceable as penalties. Thus, we first proceed to address the legal question of whether the chargeback provisions are enforceable.

### 1. Do the chargeback provisions at issue assess liquidated damages or penalties?

The parties agree that this case is governed by the Uniform Commercial Code, as adopted by Texas, which applies to transactions involving goods. *TEX. BUS. & COM. CODE ANN. § 2.102* (West 2009).[2] The parties agree that *section 2.718(a) of the UCC*, on liquidation of damages, governs the enforceability of the chargeback provisions in this case. *Section 2.718(a)* provides:

> (a) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

*Id. § 2.718(a)*. The parties also agree that if the chargeback provisions governing Advance's noncompliance violations at issue are unenforceable as penalties, Garden Ridge no longer has any basis to argue that Advance committed [**9] any prior material breach.[3] But what the parties do not agree on is the proper analysis by which courts determine the legal question of whether a liquidated-damages provision is unenforceable as a penalty.

2 Under the UCC, a buyer can reject, accept, or partially accept nonconforming goods. *TEX. BUS. & COM. CODE ANN. § 2.601* (West 2009). The buyer must pay at the contract rate for goods it accepts. *Id. § 2.607(a)*. A buyer who notifies the seller of his intention to do so may deduct damages resulting from any breach of the contract from any part of the price still due under that contract. *Id. § 2.717*. Garden Ridge does not dispute that it accepted the snowmen, and there is no evidence that its actions fall within *section 2.717*.

3 Advance further contends that prior material breach never can be asserted in any UCC case that concerns nonconforming goods. *See Glenn Thurman, Inc. v. Moore Constr., Inc., 942 S.W.2d 768, 771-72 (Tex. App.--Tyler 1997, no writ)*. However, we need not decide this issue to finally dispose of this appeal. *See TEX. R. APP. P. 47.1*.

### a. Determining whether a liquidated-damages provision constitutes a penalty

Whether a contractual provision is an enforceable liquidated-damages [**10] provision [*438] or an unenforceable penalty is a question of law for courts to decide. *Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex. 1991)* (citation omitted). The party asserting that a liquidated-damages clause is a penalty provision bears the burden of pleading and proof. *See id. at 789* (citing *TEX. R. CIV. P. 94*).

"Liquidated damages" ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach. *Flores v. Millennium Interests, Ltd., 185 S.W.3d 427, 431 (Tex. 2005)* (citing *Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 664 (Tex. 2005))*. "The common law and the Uniform Commercial Code have long recognized a distinction between liquidated damages and penalties." *Id.* (citing *TEX. BUS. & COM. CODE § 2.718(a)*, and *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 485-86 (1952))*. *Section 2.718(a)* codified the common-law distinction between liquidated damages and penalties as part of Texas' adoption of the UCC's article on sales. *Id. at 432*.

In *Phillips v. Phillips*, the Texas Supreme Court restated the common-law test for determining whether to enforce a liquidated-damages provision. *820 S.W.2d at 788*. "In order to [**11] enforce a liquidated damages clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Id.* (citing *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2 (Tex. 1979)*, and comparing to *TEX. BUS. & COM. CODE § 2.718(a)*). The *Phillips* court explained that one way a party can "show that a liquidated damages provision is unreasonable" is by showing that "the actual damages incurred were much less than the amount contracted for," which requires the party "to prove what those actual damages were." *Id.* Thus, in such a case, "factual issues must be resolved before the legal question can be decided." *Id. Phillips*, however, involved no fact issues because the contractual provision at issue "by which one party agrees to pay the other some multiple of actual damages for breach of the agreement does not meet

either part of the legal test for an enforceable liquidated damages provision." *Id. at 789*. The *Phillips* court therefore declared the provision at issue--which called for "liquidated damages ten times the amount [the limited [**12] partner] loses as a result of" a breach of trust--unenforceable as a penalty on its face. *Id. at 787, 789*.

The common-law test as described in *Phillips* closely tracks the language of *section 2.718(a) of the UCC*. The code allows damages to be liquidated "only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy." *TEX. BUS. & COM. CODE ANN. § 2.718(a)*. It further states: "A term fixing unreasonably large liquidated damages is void as a penalty." *Id*. The first clause of *section 2.718(a)*--"reasonable in the light of the anticipated or actual harm caused by the breach"--correlates to "reasonable forecast of just compensation," from the common-law test. *See id*.; *Phillips, 820 S.W.2d at 788*. The second and third clauses of *section 2.718(a)*--"the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy"--correlate to "that the harm caused by the breach is incapable or difficult of estimation," from the common-law test. *See TEX. BUS. & COM. CODE ANN. § 2.718(a)*; *Phillips, 820 S.W.2d at 788*. [**13] Further, the sentence that "[a] term fixing unreasonably large liquidated damages is [*439] void as a penalty" under *section 2.718(a)* correlates to "a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for." *See TEX. BUS. & COM. CODE ANN. § 2.718(a)*; *Phillips, 820 S.W.2d at 788*. We therefore conclude that the common-law test as described in *Phillips* and the UCC test as outlined in *2.718(a)* reflect the same essential factors and the same type of reasonableness test. Thus, common-law case law continues to inform our analysis here.

**b. Do actual damages matter**

Garden Ridge argues that the test is conducted entirely on an *ex ante* basis. That is, if, at the time the contract is formed, actual damages are difficult to estimate and the amount specified in the contract is a reasonable forecast of just compensation, a liquidated-damages term is enforceable. Garden Ridge contends that the test contains no *ex post* actual-harm assessment to determine reasonableness. Thus, according to Garden Ridge, Advance could only show that the chargeback provisions were unenforceable as penalties if, *ex ante*, actual damages are easy to estimate [**14] or the liquidated damages are based on an unreasonable forecast. Garden Ridge asserts that Advance did not meet its burden because Garden Ridge's CFO, Bill Uhrig, testified that the chargeback schedule was created because actual damages from noncompliance violations are difficult to calculate, and that the schedule was based on computations and estimations by Garden Ridge's executive and purchasing staff.

Garden Ridge primarily relies on two cases from the Dallas Court of Appeals. *See GPA Holding, Inc. v. Baylor Health Care Sys., 344 S.W.3d 467 (Tex. App.--Dallas 2011, no pet.)*; *Baker v. Int'l Record Syndicate, Inc., 812 S.W.2d 53 (Tex. App.--Dallas 1991, no writ)*. Neither of these cases, however, supports Garden Ridge's position that the test is to be conducted solely on an *ex ante* basis.

In *GPA Holding*, the appellate court found that GPA, a third-party administrator for self-funded health plans, did not meet its burden to establish that a "clause requiring payment of normal billed charges [instead of the original provider discounted rates] after 45 days" in GPA's hospital services agreement with Baylor was an unenforceable penalty. *344 S.W.3d at 476*. GPA did not prove that "the harm [**15] from late payment is [not] difficult to estimate, or that the normal billed charges were an unreasonable forecast of the *loss actually sustained*." *Id.* (emphasis added). Nothing in the *GPA Holding* court's analysis precludes a consideration of reasonableness based on actual damages; and in fact, the court assessed Baylor's actual damages, i.e., whether the normal billed charges were a "reasonable amount for the health care services and supplies provided in the charges at issue in this case." *Id*.

In *Baker*, while the appellate court noted that evidence related to the difficulty of estimation and the reasonableness of the damages forecast should be viewed as of the time the contract was executed, or the "anticipated harm" test, the court also expressly stated: "Additionally, liquidated damages must not be disproportionate to actual damages. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be declared a penalty . . . ." *812 S.W.2d at 55*. The *Baker* court called this the "actual harm" test: "The party asserting this defense is required to prove the amount of the other party's actual damages, if any, to show that the actual loss [**16] was not an approximation of the stipulated sum." *Id*. This "actual harm" test is entirely consistent with what the Texas [*440] Supreme Court stated in *Phillips*, that a party can show unreasonableness based on "the actual damages incurred [being] much less than the amount contracted for." *820 S.W.2d at 788*.

This court also has recognized that actual harm factors into the test to determine whether a liquidated-damages provision is an enforceable penalty. In *Chan v. Montebello Development Co*., we described the *Phillips*

test as follows: "The test for determining whether a provision is valid and enforceable as liquidated damages is (1) if the damages for the prospective breach of the contract are difficult to measure; and (2) the stipulated damages are a reasonable estimate of actual damages." *Chan v. Montebello Dev. Co., No. 14-06-00936-CV, 2008 Tex. App. LEXIS 5980, 2008 WL 2986379, at *3 (Tex. App.--Houston [14th Dist.] July 31, 2008, pet. denied)* (citing *Phillips, 820 S.W.2d at 788*). Further, we stated:

> In order to meet this burden, the party asserting the defense is required to prove the amount of the other parties' actual damages, if any, to show that the liquidated damages are not an approximation of the stipulated [**17] sum. If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages must be declared a penalty . . . .

*2008 Tex. App. LEXIS 5980, [WL] at *3-4* (citations omitted).

Most importantly, the UCC reasonableness test explicitly refers to actual harm, providing that one way a liquidated-damages provision can be invalidated is where the stipulated amount proves unreasonable in light of "the anticipated or *actual* harm caused by the breach." *TEX. BUS. & COM. CODE ANN. § 2.718(a)* (emphasis added). In addition, the UCC expressly provides that "[a] term fixing unreasonably large liquidated damages is void as a penalty." *Id.*; *see id*. cmt. 1. In order to determine whether a term fixes unreasonably large liquidated damages, it follows that courts would need to consider what actual harm, if any, was caused by the breach and then compare it to the stipulated amount of liquidated damages.

Thus, both the common law and the UCC allow for courts to determine the reasonableness of a liquidated-damages clause by considering whether the defendant has shown that the stipulated amount was "unreasonably large" compared to the actual damages. *See TEX. BUS. & COM. CODE ANN. § 2.718(a)*; *Phillips, 820 S.W.2d at 788*.

**c.** [**18] **Comparing the amount of the chargebacks to Garden Ridge's actual damages**

Advance argues that it proved that the harm anticipated from its alleged noncompliance was not difficult to estimate, that Garden Ridge did not even attempt to determine a chargeback amount that was reasonable in light of the anticipated or actual harm, and that the liquidated damages Garden Ridge assessed are disproportionate to its actual damages. We conclude Advance met its burden to show that the chargeback amounts constituted a disproportionate estimation of Garden Ridge's actual damages; therefore, the chargeback provisions are void as penalties under the UCC.

Advance elicited evidence from Garden Ridge employees Troy and Cole sufficient to prove that Garden Ridge suffered no actual damages as a result of Advance's substitution of the eight-foot banner snowmen. The trial court also determined that Garden Ridge suffered no actual damages from any of Advance's noncompliance violations when the court directed a verdict against Garden Ridge on its breach-of-contract claim; Garden Ridge does not challenge that ruling. And Garden Ridge [*441] itself acknowledges it argued no amount of actual damages other than zero and [**19] the record shows that Garden Ridge suffered no actual damages resulting from Advance's noncompliance violations.

Thus, Advance has shown that the chargebacks assessed by Garden Ridge for Advance's "unauthorized substitution" and "merchant initiated" noncompliance violations--100% of the invoiced merchandise cost plus freight for the eight-foot banner snowmen and the nine-foot waving snowmen, for a total of $79,457.00--were unreasonably large when compared to Garden Ridge's actual damages of zero. Advance also has shown that the additional chargebacks assessed by Garden Ridge for Advance's "short or incomplete order," "carton markings," and "cartons not numbered correctly" noncompliance violations on other merchandise--totaling approximately $13,000--were unreasonably large when compared to Garden Ridge's actual damages of zero. Therefore, as a matter of law, we conclude that, under these circumstances,[4] the chargeback amounts were unreasonable, and that the chargeback provisions are unenforceable as penalties under the UCC because they fixed unreasonably large liquidated damages. Accordingly, we overrule Garden Ridge's first issue.

4 Advance further argues that the chargeback provisions are [**20] unenforceable on their face, as in *Phillips*. However, while Advance was able to prove that Garden Ridge suffered no actual damages here, perhaps there may exist circumstances whereby the nature of the unauthorized substitution, short or incomplete order, mismarked carton, or other noncompliance issue leading to a merchant-initiated chargeback would not result in actual damages of zero and whereby the chargeback amounts *when compared to* those actual damages would not be disproportionate.

**d. Whether the amount of the chargebacks is reasonable in light of Garden Ridge's anticipated harm**

Even if the concurring opinion is correct that Advance also had to prove the stipulated damages were

unreasonable in light of the anticipated harm in order for us to conclude that the chargeback provisions are unreasonable under *section 2.718(a)*, we conclude that Advance has done so in this case. As explained in subsection II.A.1.c., Advance has shown that the stipulated amounts are unreasonable in light of the *actual* harm--zero--suffered by Garden Ridge. Further, Advance has shown that the stipulated amounts are unreasonable in light of the harm *anticipated* by Garden Ridge.

Here, according to the challenged [**21] liquidated-damages provisions, Garden Ridge anticipated at the time of contract that an unauthorized substitution of any type would result in harm of 100% of the cost of the merchandise, plus freight. In fact, Garden Ridge's buyer Cole testified that Garden Ridge had the discretion to assess the full 100% chargeback, even if the only deviation in the snowmen had been green versus red buttons. Cole further testified that she was not aware of any instance where Garden Ridge had decided not to issue a chargeback because there was "no harm, no foul" or where Garden Ridge had exercised its discretion to not charge back "fully" for an unauthorized substitution. Garden Ridge's CFO Uhrig agreed that a button-color substitution would constitute noncompliance, for which Garden Ridge could charge back the full 100% of merchandise cost. In other words, no matter what the degree of substitution, and no matter whether the substitution is even anticipated to result in any harm, Garden Ridge's unauthorized-substitution rule provides that Garden Ridge keeps the merchandise without paying the vendor any [*442] thing and makes the vendor cover the freight.

Even though, according to Uhrig, Garden Ridge is "very [**22] good at estimating our costs," he admitted that at the time it was developing the chargeback schedule Garden Ridge did not perform any actual studies on what costs it would incur due to vendor noncompliance. Further, Uhrig could not explain any specifics on how Garden Ridge "figure[d] out what the costs are and what would be appropriate charge-backs." Cole also testified that she was not aware of Garden Ridge having performed any analysis as to whether the 100% chargeback amount reasonably approximates the anticipated harm that Garden Ridge would suffer from an unauthorized substitution. Despite this lack of detail regarding the 100% chargeback amount for anticipated harm from vendor violations, Uhrig testified that "on average" charging back 100% somehow reflected Garden Ridge's costs for unauthorized substitutions. Uhrig further indicated that Garden Ridge's chargebacks communicate to vendors, "Don't do this"; and Garden Ridge's CEO, Tim Kibarian, agreed that chargebacks are the "penalty" if its vendors do not follow its rules.

We therefore conclude that Advance has proven that Garden Ridge's liquidated-damages provisions do not reasonably reflect Garden Ridge's anticipated harm for [**23] an unauthorized substitution, where the challenged provisions allowed Garden Ridge to charge back 100% of merchandise cost plus freight for any unauthorized substitution, no matter how slight and no matter if Garden Ridge even anticipated incurring any harm.

**B. Instruction on damages**

Garden Ridge next argues that the trial court committed reversible error by including the following instruction as part of its question on Advance's damages:

> The unauthorized substitution provision in the Vendor Compliance Manual is unreasonable if the actual damages that Garden Ridge incurred were much less than the charge-back amount.

During the charge conference, Garden Ridge objected to the inclusion of this instruction as improper because whether the chargeback provisions constitute penalties was a question reserved for the court, not the jury. Garden Ridge further objected that the trial court should not include this instruction because it would permit the jury to assess damages on a basis that is not permitted in the law--that is, there is no actual-damages component to whether a liquidated damages provision is unreasonable and thus constitutes a penalty.[5] The trial court overruled Garden [*443] Ridge's objections, [**24] which properly are preserved for our review. *See Thota v. Young, 366 S.W.3d 678, 689 (Tex. 2012)*.

5 Advance argues that Garden Ridge failed to preserve this particular complaint about the allegedly *ex ante* nature of the liquidated-damages determination. Garden Ridge specifically objected to the inclusion of this particular instruction. The context of the charge conference also reveals that although Garden Ridge requested and the trial court allowed an instruction paraphrasing the first sentence of *section 2.718(a)* to indicate when liquidated damages were reasonable, Garden Ridge did not agree to the trial court's inclusion of the instruction addressing reasonableness with regard to "actual damages" because that particular instruction, in contrast with the previous instruction Garden Ridge requested and the court allowed, did not reflect a "legally permissible" basis for the jury to award damages to Advance. Thus, Garden Ridge sufficiently made the trial court aware of its complaint that its actual incurred damages should not be included in any reasonableness assessment by the jury of whether the chargebacks constituted penalties, and the trial court overruled Garden

Ridge's complaint. [**25] *See Thota v. Young, 366 S.W.3d 678, 689 (Tex. 2012)* ("[T]he procedural requirements for determining whether a party has preserved error in the jury charge are explained by one basic test: 'whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.'" (quoting *State Dep't of Highways v. Payne, 838 S.W.2d 235, 241 (Tex. 1992))).*

We review a trial court's decision whether to submit a particular instruction in its charge for abuse of discretion. *Id. at 687* (citing *In re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000))*; *City of Houston v. Proler, 373 S.W.3d 748, 760 (Tex. App.--Houston [14th Dist.] 2012, no. pet. h.)* (citing *Shupe v. Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006))*. The trial court has considerable discretion to determine proper jury instructions, and "[i]f an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper." *Thota, 366 S.W.3d at 687* (quoting *La.-Pac. Corp. v. Knighten, 976 S.W.2d 674, 676 (Tex. 1998))*. "An instruction is proper if it (1) assists the jury, (2) accurately states the law, and (3) finds support in the pleadings [**26] and evidence." *Id.* (citing *Columbia Rio Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 855-56 (Tex. 2009))*. We will not reverse a judgment for a charge error unless that error was harmful because it "probably caused the rendition of an improper judgment" or "probably prevented the petitioner from properly presenting the case to the appellate courts." *Id.* (citing *TEX. R. APP. P. 44.1(a)* and *61.1*); *Proler, 373 S.W.3d at 760* (citing *La.--Pac. Corp., 976 S.W.2d at 676 (Tex. 1998))*; *see also Bed, Bath & Beyond, Inc. v. Urista, 211 S.W.3d 753, 757 (Tex. 2006)*. We examine the entire record to determine whether the instruction probably caused an improper judgment. *Thota, 366 S.W.3d at 686-87*; *Urista, 211 S.W.3d at 757*.

As discussed above in subsection II.A.1.b, a party can prove that a liquidated-damages clause is unenforceable and void as a penalty if it shows that the actual damages incurred by the other party are much less than or disproportionate to the contracted-for amount. The complained-of instruction here essentially tracks the language from *Phillips*--that a liquidated-damages provision is unreasonable and unenforceable as a penalty "because the actual damages incurred were much [**27] less than the amount contracted for." *See 820 S.W.2d at 788*. Therefore, the instruction properly stated the "actual harm" portion of the common-law test. *Id.*; *see also Chan, 2008 Tex. App. LEXIS 5980, 2008 WL 2986379, at *3*. Further, the complained-of instruction correlates to the equivalent portion of the UCC test that "[a] term fixing unreasonably large liquidated damages is void as a penalty." *TEX. BUS. CODE ANN. § 2.718(a)*.

However, because the instruction concerns whether the chargeback provisions are unreasonable and thus unenforceable as penalties, which is a legal issue for the trial court to decide, *Phillips, 820 S.W.2d at 788*, we conclude that the trial court improperly submitted this instruction[6] to the jury. The complained-of instruction describes a reasonableness [*444] analysis that the trial court itself was supposed to conduct--this instruction, despite its proper statement of the law, would not assist the jury. *See Thota, 366 S.W.3d at 687*. Moreover, although the *Phillips* court indicated that in some cases the jury might have to resolve a factual issue before the trial court can decide the ultimate legal question of enforceability, here, no fact issues remained; the trial court already had found that [**28] Garden Ridge suffered no breach-of-contract actual damages due to Advance's noncompliance violations when the court directed a verdict against Garden Ridge on that claim. *See 820 S.W.2d at 788*. As a matter of law, these chargebacks were unreasonable and void as penalties; "consequently, [the instruction] w[as] surplusage, expressly prohibited by the Texas Supreme Court in *Acord v. General Motors Corp., 669 S.W.2d 111, 116 (Tex. 1984)*." *Bean v. Baxter Healthcare Corp., 965 S.W.2d 656, 664 (Tex. App.--Houston [14th Dist.] 1998, no pet.)*; *see also Elloway v. Pate, 238 S.W.3d 882, 896 (Tex. App.--Houston [14th Dist.] 2007, no pet.)* (citing *Acord, 669 S.W.2d at 116*). The trial thus abused its discretion by unnecessarily instructing the jury on the reasonableness of Garden Ridge's chargebacks.

6 The trial court also improperly submitted the previous instruction, which Garden Ridge requested and which essentially tracks the first sentence of *section 2.718*:

> Parties may agree in a contract to damages payable upon a breach if that contractual amount is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility [**29] of otherwise obtaining an adequate remedy.

*See TEX. BUS. & COM. CODE ANN. § 2.718(a)*. We note that this instruction also properly references "actual harm" as a component of the reasonableness test.

Our review of the record reveals, however, that this abuse of discretion was harmless.[7] Including a surplus instruction on the law is only harmful when it amounts to

a comment on the weight of the evidence. *Bean, 965 S.W.2d at 664* (discussing *Acord, 669 S.W.2d at 113, 116)*. Although the trial court instructed jurors about a potential situation where Advance's damages may be reduced to essentially nothing--that is, if Garden Ridge's chargebacks actually were reasonable and thus enforceable as a matter of law--including this instruction was not "reasonably calculated to cause [nor] probably did cause prejudicial harm to appellant[]" Garden Ridge. *See Acord, 669 S.W.2d at 116* (citation omitted). Moreover, by including this instruction, the trial court "did not offer [its] opinion, assume the truth of a material fact, exaggerate, minimize, or withdraw relevant evidence." *See Bean, 965 S.W.2d at 664*. [**30] Therefore, including the surplus instruction did not constitute a comment on the weight of the evidence.

7 Garden Ridge insists that we must presume harm pursuant to *Harris County v. Smith, 96 S.W.3d 230 (Tex. 2002)*, and *Crown Life Ins. Co. v. Casteel, 22 S.W.3d 378 (Tex. 2000)*. The Texas Supreme Court, however, has refused to extend the presumed-harm scenario to instruction error. *See Thota, 366 S.W.3d at 692-93* (concluding that "even assuming the new and independent cause instruction in this charge constituted error, it does not raise a *Casteel* issue"); *Urista, 211 S.W.3d at 756-57* (declining to extend *Casteel's* presumed-harm analysis to trial court's submission of an erroneous unavoidable-accident instruction).

Nor did including the improper instruction mislead or confuse the jury in its determination of damages on Advance's breach-of-contract claim. Advance presented evidence relating to over $92,000 in chargebacks Garden Ridge assessed, and evidence that these chargebacks reflected what Garden Ridge deducted from Advance's merchandise invoices. The jury's answers to what was "the difference between what Garden Ridge agreed to pay and what it actually paid for [the] snowmen" reflect [**31] that the jury considered the contract rate as what Garden Ridge agreed to pay for the nine-foot and eight-foot snowmen within PO '721 and PO '743, which included collection of freight, and that Garden Ridge actually paid nothing whatsoever to Advance for these snowmen. Thus, the jury found that for the snowmen Advance had proven its full amount of damages--that the differences reflected the exact amounts Garden Ridge charged [*445] back. The jury's answer to what was "the difference between what Garden Ridge agreed to pay and what it actually paid for other items charged back on [Advance's] Exhibit" reflects that the jury considered the evidence presented on the remaining approximately $13,000 in chargebacks and determined that Advance had proven damages on $500 of these other chargebacks. Therefore, the erroneous instruction did not probably cause the rendition of an improper judgment; and we overrule Garden Ridge's second issue.

### C. Instructions on breach of contract

In its final issue, Garden Ridge argues that the trial court's inclusion of the UCC's definition regarding what constitutes the acceptance of goods--*section 2.606(a)*[8]--and the UCC's provision that the buyer must pay the contract [**32] rate for goods it accepts--*section 2.607(a)*[9]--in its instructions to the jury on Advance's breach-of-contract claim constituted an impermissible comment on the weight of the evidence. During the charge conference, Garden Ridge objected to the inclusion of these instructions as unnecessary because Garden Ridge did not dispute that it accepted the goods. Garden Ridge thus contends that these "surplusage" instructions improperly "nudged" the jury toward Advance's theory of the case. The trial court overruled Garden Ridge's objections, which properly are preserved for our review. *See Thota, 366 S.W.3d at 689*.

8 *Section 2.606(a)* provides:

> (a) Acceptance of goods occurs when the buyer
>
> (1) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or
>
> (2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (3) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

*TEX. BUS. & COM. CODE ANN. § 2.606(a)*.

9 "The [**33] buyer must pay at the contract rate for any goods accepted." *TEX. BUS. & COM. CODE ANN. § 2.607(a)*.

This is a UCC breach-of-contract case in which Advance pleaded, and presented evidence, that Garden Ridge breached by accepting and then not paying the contract price for the snowmen and other goods at issue. The parties do not dispute that their contracts are governed by the

UCC. *Section 2.606(a)* and *section 2.607(a)*, the sources of the trial court's instructions, are located in the UCC subchapter concerning "Breach, Repudiation, and Excuse." Further, both of these instructions properly state the law. *TEX. BUS. & COM. CODE ANN. § 2.606(a)* & *2.607(a)* (West 2009). These instructions thus are proper because they (1) assisted the jury in answering the breach question, (2) accurately stated the law, and (3) found support in the pleadings and evidence. *See Thota, 366 S.W.3d at 687* (citing *Hawley, 284 S.W.3d at 855-56*). We therefore conclude that the trial court did not abuse its discretion by submitting the complained-of trial instructions.

**III. CONCLUSION**

Accordingly, having overruled all of Garden Ridge's issues, we affirm the trial court's judgment.

/s/ Tracy Christopher

Justice

Panel consists [**34] of Justices Frost, Christopher, and Jamison. (Frost, J., concurring).

[*446] **APPENDIX A**

**CONCUR BY:** Kem Thompson Frost

**CONCUR**

In an issue of first impression in this court, the majority construes *Texas Business and Commerce Code Section 2.718(a)* in a manner that conflicts with the unambiguous language of that provision and with opinions from two sister courts of appeals. By allowing a breaching party to show that a liquidated-damages provision is unreasonable based only upon a comparison between the amount of the stipulated damages and the amount of the actual damages incurred, the majority exposes liquidated-damages provisions in sale-of-goods contracts to a legal standard that may bar enforcement of many such provisions based upon a hindsight analysis that the Texas Legislature never intended.

**Text of the Applicable Statute**

Appellant/plaintiff Garden Ridge, L.P. asserts that the liquidated-damages provisions in its contracts for the sale of goods with appellee/defendant Advance International, Inc. are enforceable. Advance maintains that these provisions are void as penalties and unenforceable. Both sides agree, and the law provides, that this issue is governed by *Texas Business and Commerce Code section 2.718(a)*, [**35] which provides in its entirety as follows:

> (a) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

*Tex. Bus. & Comm. Code Ann. § 2.718(a)* (West 2013).

We review the trial court's interpretation of applicable statutes de novo. *See* [*447] *Johnson v. City of Fort Worth, 774 S.W.2d 653, 655-56 (Tex. 1989)*. In construing a statute, our objective is to determine and give effect to the Legislature's intent. *See Nat'l Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex. 2000)*. If possible, we must ascertain that intent from the language the Legislature used in the statute and not look to extraneous matters for an intent the statute does not state. *Id*. If the meaning of the statutory language is unambiguous, we adopt the interpretation supported by the plain meaning of the provision's words. *St. Luke's Episcopal Hosp. v. Agbor, 952 S.W.2d 503, 505 (Tex. 1997)*. We must not engage in [**36] forced or strained construction; instead, we must yield to the plain sense of the words the Legislature chose. *See id*.

**Interpretation of the Statutory Text**

Advance, as the party asserting that the liquidated-damages provisions are penalties, had the burden of proving that these provisions do not satisfy the applicable legal standard for an enforceable liquidated-damages provision under *Section 2.718(a)*. *Baker v. International Record Syndicate, Inc., 812 S.W.2d 53, 55 (Tex. App.--Dallas 1991, no writ)*. Under the plain meaning of *Section 2.718(a)*, it was incumbent upon Advance to establish that the amount of damages set by the provisions

in question was not reasonable in light of the anticipated harm and the actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. *See Tex. Bus. & Comm. Code Ann. § 2.718(a)*.

Both *Section 2.718(a)* and Texas common law provide that a liquidated-damages provision is enforceable as long as it is not a penalty. *See id.*; *Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex. 1991)* (discussing legal standard under Texas common law). But, to prove that a provision is a penalty [**37] under Texas common law, a party must prove that (1) the harm caused by the breach is not incapable or difficult of estimation, or (2) that the amount of liquidated damages called for is not a reasonable forecast of just compensation. *See Phillips, 820 S.W.2d at 788*. The Supreme Court of Texas has indicated that a party may prove that the amount of liquidated damages is not a reasonable forecast of just compensation under the common-law test only by showing that the actual damages incurred were much less than the liquidated-damage amount. *See id*.

As can be seen by comparing the legal standard under *Section 2.718(a)* and the legal standard under Texas common law, the two legal standards are significantly different. *See McFadden v. Fuentes, 790 S.W.2d 736, 737-38 (Tex. App.--El Paso 1990, no writ)* (holding that the legal standard under *Section 2.718(a)* is different from and supersedes the legal standard under Texas common law in sales-of-goods cases); George E. Henderson, *A New Chapter 2 for Texas*: *Well-Suited or Ill-Fitting? 41 TEX. TECH. L. REV. 235, 488-91 (2009)* (attaching law professor's analysis concluding that the legal standard under *Section 2.718(a)* is different from the legal standard [**38] under Texas common law). *See also Phillips, 820 S.W.2d at 788* (reciting the legal standard from Texas common law and then citing *Section 2.718(a)* with a "*Cf.*" signal, indicating that the statute is different from the common law but deals with an analogous subject matter).

Under *Section 2.718(a)*, Advance had the burden of proving that the amount of damages set by the provisions in question was not reasonable in the light of both the anticipated harm and actual harm caused by the breach. *See Tex. Bus. & Comm. Code Ann. § 2.718(a)*; *Henderson, supra, 41 TEX. TECH. L. REV. at 491* (attaching law [*448] professor's analysis concluding that under *Section 2.718(a)* a liquidated-damages provision is valid if reasonable with respect to *either* anticipated harm *or* actual harm caused by the breach). Under the unambiguous meaning of the word "or" in the statute, a liquidated-damages provision may be reasonable based upon *either* anticipated harm *or* actual harm caused by the breach. *See Comdisco, Inc. v. Tarrant County App. Dist., 927 S.W.2d 325, 327 (Tex. App.--Fort Worth 1996, writ ref'd)* (holding, in Supreme Court of Texas precedent, that unambiguous meaning of "or" in statute was the disjunctive).[1] If a [**39] liquidated-damages provision may be reasonable based upon *either* anticipated harm *or* actual harm caused by the breach, then Advance, as the party with the burden of proving the provision is unenforceable, had to establish unreasonableness under *both* anticipated harm *and* actual harm caused by the breach. *See Tex. Bus. & Comm. Code Ann. § 2.718(a)*.

1 In cases decided after June 14, 1927, the Supreme Court of Texas's notation of "writ refused" or "petition refused" denotes that the court of appeals's opinion is the same as a precedent of the Supreme Court of Texas. *See Yancy v. United Surgical Partners Int'l, Inc., 236 S.W.3d 778, 786 n.6 (Tex. 2007)*.

The majority concludes that the legal standard under *Section 2.718(a)* is the same as the legal standard under Texas common law and that Advance did not have to show that the liquidated-damages provision was not reasonable in light of the anticipated harm. *See ante* at pp. 7-12. This conclusion is contrary to the plain meaning of the statutory text, under which the liquidated-damages amount may be reasonable based upon either anticipated harm or actual harm caused by the breach. *See id*. The majority treats the statutory sentence "[a] term fixing [**40] unreasonably large liquidated damages is void as a penalty" as equivalent to the following sentence from *Phillips's* articulation of the common law rule: "a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for." *See ante* at p. 9 (considering second sentence from *Section 2.718(a)* as equivalent to this sentence from *Phillips*); *Tex. Bus. & Com. Code Ann. § 2.718(a)*; *Phillips, 820 S.W.2d at 788*. In the second sentence of *Section 2.718(a)*, the Legislature did not address the legal standard by which courts are to determine whether a liquidated-damages provision is void as a penalty; that standard is addressed in the first sentence of *Section 2.718(a)*. *See Tex. Bus. & Com. Code Ann. § 2.718(a)*.

The majority relies upon the Supreme Court of Texas's decision in *Flores v. Millennium Interests, Ltd. See 185 S.W.3d 427 (Tex. 2005)*. The *Flores* court addressed the circumstances under which a seller of real property under a contract for deed may be liable for the statutory "liquidated damages" afforded in *Texas Property Code section 5.077(c)*. *See id. at 429-33*. In a general discussion of the meaning of the term "liquidated damages," [**41] the *Flores* court correctly stated that both Texas common law and *Section 2.718(a)* recognize a distinction between an enforceable liquidated-damages provision and a void penalty. *See id. at 431*. The *Flores* court did not state that the legal standards under *Section 2.718(a)* and the common law are the same, nor did the *Flores* court address the

legal standard a party must satisfy to show that a liquidated-damages provision is a penalty under *Section 2.718(a)*. *See id. at 429-33*. The *Flores* case does not support the majority's analysis.

The majority also relies upon the Supreme Court of Texas's decision in *Phillips*. [*449] *See 820 S.W.2d at 788*. The *Phillips* court addressed the legal standard under Texas common law. *See id*. Determining the proper legal standard under *Section 2.718(a)* was not before the *Phillips* court, and the court did not address this issue. *See id*. The *Phillips* court did not state that the legal standards under *Section 2.718(a)* and the common law are the same. *See id*. Instead, after reciting the legal standard under Texas common law, the *Phillips* court cited *Section 2.718(a)* with a "*Cf*." signal, indicating that the statute is different from the common law but deals with an analogous [**42] subject matter. *See id*. The *Phillips* court did not address the difference between the two legal standards, and this difference was not necessary to the disposition of that case. *See id*. The *Phillips* case does not support the majority's analysis regarding the legal standard under *Section 2.718(a)*.

The majority further relies upon this court's opinion in *Chan v. Montebello Development Company*. *See No. 14-06-00936-CV, 2008 Tex. App. LEXIS 5980, 2008 WL 2986379, at *3-6 (Tex. App.--Houston [14th Dist.] July 31, 2008, pet. denied)* (mem. op.). The *Chan* court addressed the legal standard under Texas common law. *See id*. Because the determination of the proper legal standard under *Section 2.718(a)* was not before the *Chan* court, the court did not address this issue. *See id*. Nor did the *Chan* court state that the legal standards under *Section 2.718(a)* and the common law are the same. *See id*. The *Chan* case does not support the majority's analysis regarding the legal standard under *Section 2.718(a)*.

**An Unwarranted Hindsight Analysis**

Under the legal standard the majority adopts today, parties breaching sale-of-goods contracts may avoid enforcement of liquidated-damages provisions based upon a hindsight analysis. This approach [**43] not only contravenes the statutory text but also undermines important freedom-of-contract values that are a cornerstone of Texas jurisprudence.

Texas has a fundamental public policy in favor of a broad freedom of contract. *See Nafta Traders, Inc. v. Quinn, 339 S.W.3d 84, 95 (Tex. 2011)* (stating that "[a]s a fundamental matter, Texas law recognizes and protects a broad freedom of contract"). Liquidated-damages provisions in commercial transactions benefit both sides by providing certainty and predictability. By including *Section 2-718(a)* in Texas's version of the Uniform Commercial Code, the Texas Legislature recognized the utility of liquidated-damages clauses and parties' willingness and desire to choose this remedy in transactions involving the sale of goods. *See Tex. Bus. & Com. Code Ann. § 2.718(a)*. The Legislature also recognized that in certain situations, liquidated-damages provisions should not be enforceable, and the Legislature crafted a specific legal standard for making this determination. *See id*.

When a buyer and a seller agree to a liquidated-damages provision, both parties have a potential upside and a potential downside. The idea is that, even though the non-breaching [**44] party's expectation damages may be far greater than the amount specified in the liquidated-damages clause, the non-breaching party's recovery is capped at the amount of specified liquidated damages. Under freedom-of-contract principles, courts must honor the parties' agreement unless the stipulated amount is shown to be unreasonable under *Section 2.718(a)*. *See id*. Under this standard, as discussed above, the party asserting that the provision is void as a penalty must prove that the stipulated amount is unreasonable based both on the harm anticipated at the time of contracting and the actual harm caused by the breach. At the [*450] time of contracting, unknown factors often make estimation and calculation of potential damages uncertain.[2] This uncertainty at the time of contracting is often what makes the determination of liquidated damages difficult. Hindsight has a way of making estimations that were reasonable at the time seem unreasonable after a breach. By the time a breach has occurred and the dispute has come to court, the costs and valuations are often easier to estimate and, with hindsight, honest estimates made at the inception of the contract might prove to be too high or too low. [**45] This is part of the risk of doing business that parties embrace when agreeing to a liquidated-damages provision. In evaluating these provisions, courts should not lose sight of important principles of freedom of contract and must uphold the sanctity of contract unless the liquidated-damages provision is shown to be a penalty under the standard articulated by the Legislature in *Section 2.718(a)*. *See id*.

2 A retail merchant that advertises its products in mass media has a distinct need for the seller to provide conforming goods because the retail merchant must be able to furnish conforming goods to the public. Patrons who see an advertisement and come to the retail merchant's store reasonably may expect to be able to purchase the item advertised. Garden Ridge testified that when the product is not as advertised, the merchant suffers loss of customer goodwill. It may often be difficult to estimate the amount of damages from the loss of goodwill and patronage accompanying the breach of a seller who fails to deliver conforming goods the retail merchant had advertised.

With the legal standard adopted by the majority today, the court fails to honor the Legislature's intent of providing leeway [**46] for the parties to have stipulated to an amount of liquidated damages that was reasonable under conditions prevailing at the time of contracting but that ends up not measuring damages in a completely accurate manner in a particular case. Enforcing liquidated-damages provisions when they accurately gauge actual damages and not enforcing them when they do not deprives the non-breaching party of the remedy it bargained to receive, contrary to *Section 2.718(a)*. *See id*.

**A Possible Resolution on the Horizon**

The Supreme Court of Texas has yet to address the legal standard a party must satisfy to show that a liquidated-damages provision is a penalty under *Section 2.718(a)*. With today's opinion from this court, there are now three different and conflicting views on this question from the three intermediate appellate courts that have addressed this issue. *Compare ante* at p. 6-12, *with TXU Portfolio Management Co. v. FPL Energy, LLC, 328 S.W.3d 580, 587-88 (Tex. App.--Dallas 2010, pet. granted), and with McFadden, 790 S.W.2d at 737-38*. The Supreme Court of Texas has granted review in a case in which this issue has been presented. *See* Petition for Review, *FPL Energy, LLC v. TXU Portfolio Management Co., No. 11-0050, 2012 Tex. LEXIS 134 (Tex. granted Feb. 17, 2012)* [**47] . If this issue is not addressed in the Supreme Court of Texas's opinion in the *FPL Energy* case, uniformity and predictability in the application of *Section 2.718(a)* would be served by high-court review of this issue in this case or another.

**Conclusion**

The majority's interpretation of *Section 2.718(a)* is more restrictive than the legal standard provided by the Legislature under the plain meaning of that statute. But, because no error asserted by Garden Ridge probably caused the rendition of an improper judgment or probably prevented Garden Ridge from properly presenting this case on appeal, the trial court's judgment should be affirmed. Accordingly, [*451] though I respectfully decline to join the majority opinion, I concur in the court's judgment.

/s/ Kem Thompson Frost

Justice



**GPA HOLDING, INC., Appellant v. BAYLOR HEALTH CARE SYSTEM [1], Appellee**

1 The trial court's judgment recites that the full name of the plaintiff is "Baylor Health Care System, on behalf of Baylor All Saints Medical Center, Baylor Heart and Vascular Hospital, Baylor Specialty Hospital, Baylor Institute for Rehabilitation, Baylor University Medical Center, Baylor Medical Center at Garland, Baylor Regional Medical Center at Grapevine, Baylor Medical Center at Irving, Our Children's House at Baylor, Baylor Regional Medical Center at Plano, and Baylor Medical Center Ellis County."

**No. 05-09-00586-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

***344 S.W.3d 467*; *2011 Tex. App. LEXIS 3713***

**May 18, 2011, Opinion Filed**

**SUBSEQUENT HISTORY:** Released for Publication September 13, 2011.
Rehearing denied by *GPA Holding, Inc. v. Baylor Health Care Sys., 2011 Tex. App. LEXIS 7446 (Tex. App. Dallas, Aug. 9, 2011)*
Petition for review denied by, Motion to strike denied by *GPA Holding, Inc. v. Baylor Health Care Sys., 2012 Tex. LEXIS 1077 (Tex., Dec. 14, 2012)*
Petition for review denied by *GPA Holding, Inc. v. Baylor Health Care Sys., 2013 Tex. LEXIS 171 (Tex., Mar. 1, 2013)*

**PRIOR HISTORY:** [**1]
On Appeal from the 298th Judicial District Court, Dallas County, Texas. Trial Court Cause No. 06-00120.

**COUNSEL:** For APPELLANT: David Michael Walsh, IV, Chamblee & Ryan, P.C., Dallas, TX.

For APPELLEE: Ben Taylor, Fulbright & Jaworski L.L.P., Dallas, TX.

**JUDGES:** Before Justices Morris, Moseley, and Myers. Opinion By Justice Moseley.

**OPINION BY:** JIM MOSELEY

**OPINION**

[*470] Opinion By Justice Moseley

In this breach of contract case, appellant GPA Holding, Inc. challenges the trial court's summary judgment awarding damages to appellee Baylor Health Care System based on GPA's obligation to pay certain health care claims. Because we conclude the trial judge correctly interpreted the three written contracts governing the parties' relationship, we affirm the trial court's judgment.

I. BACKGROUND

Baylor provides health care services to individual patients. Many of Baylor's patients are members of health plans. Baylor has many contracts with health benefit entities, including insurance companies and preferred provider organizations (PPOs), through which individual patients gain access to Baylor's hospitals and services at discounted rates.

Private Healthcare Systems, Inc. (PHCS) operates a network of PPOs. PHCS enters into contracts known as preferred provider agreements with health care providers (such as Baylor) to negotiate discounts from the providers' full charges for health [**2] care services. PHCS also enters into contracts known as subscriber services agreements with insurance companies, employer health plans, managed care organizations, and third-party ad-

ministrators, to provide them and their members access to health care services at the discounted rates established by the preferred provider agreements.

GPA is a third-party administrator; its customers are self-funded health plans. Third-party administrators provide claims handling services and administrative support to health plans. By contracting with various PPO networks, such as PHCS, GPA also offers its customers--and their members--access to medical services from a network of providers (e.g. Baylor) at discounted rates.

Baylor sued GPA for failure to pay for health care services Baylor provided to members of certain health care plans administered by GPA. GPA in turn filed a third-party action against PHCS. Both Baylor and GPA moved for summary judgment; Baylor in fact filed several motions for partial summary judgment. The trial judge granted Baylor's motions and denied GPA's motion. The parties then entered into an agreed final judgment and severance, by which GPA's third-party claims against PHCS were [**3] severed into a separate cause, and final judgment was entered for Baylor. GPA appeals the judgment in favor of Baylor. PHCS is not a party to this appeal.

II. STANDARD OF REVIEW

The standards for reviewing summary judgments are well-established, [*471] and we follow them in reviewing this appeal. *See Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985)* (summary judgment standards of review). When both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *City of Garland v. Dallas Morning News, 22 S.W.3d 351, 356 (Tex. 2000)*. When the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both parties and determine all questions presented. *Id*. The reviewing court should render the judgment that the trial court should have rendered or reverse and remand if neither party has met its summary judgment burden. *Id*.

If a defendant moves for summary judgment on an affirmative defense, it must conclusively establish each essential element of the affirmative defense. *Selz v. Friendly Chevrolet, Ltd., 152 S.W.3d 833, 836 (Tex. App.--Dallas 2005, no pet.)* ("To prevail [**4] on summary judgment, a defendant as movant must either disprove at least one element of each of the plaintiff's theories of recovery or plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action."). Similarly, if a party seeks to avoid summary judgment by way of an affirmative defense, it must come forward with summary judgment evidence sufficient to raise a fact issue on each element of its affirmative defense. *See Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984)*. Whether a contractual provision is an unenforceable penalty and not a liquidated damage clause is an affirmative defense. *See TEX. R. CIV. P. 94*; *Phillips v. Phillips, 820 S.W.2d 785, 789 (Tex. 1991)* ("Although penalty is not among the affirmative defenses enumerated in *Rule 94, TEX. R. CIV. P.*, the listing in that rule is not exclusive. Penalty is, in the language of the rule, a 'matter constituting an avoidance or affirmative defense' [citations omitted].")

The interpretation of an unambiguous contract is a question of law for the court. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650-51 (Tex. 1999)*. The court's primary concern [**5] in interpreting a written contract is to determine the mutual intent of the parties as manifested in the contract. *Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)*. The parties' intent must be taken from the agreement, and the agreement must be enforced as written. *Wells Fargo Bank, Minn., N.A. v. N. Cent. Plaza I, L.L.P., 194 S.W.3d 723, 726 (Tex. App.-Dallas 2006, pet. denied)*. We favor an interpretation that affords some consequences to each part of the agreement so that none of the provisions will be rendered meaningless. *Coker, 650 S.W.2d at 394*. Unless the agreement shows that the parties used a term in a technical or different sense, we give the terms their plain, ordinary, and generally accepted meaning. *Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996)*. Under generally accepted principles of contract interpretation, all writings that pertain to the same transaction will be considered together, even if they were executed at different times and do not expressly refer to one another. *DeWitt Cnty. Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 102 (Tex. 1999)*. This rule, however, is a device for ascertaining and giving effect to the intention of the parties and cannot [**6] be applied arbitrarily. *Id*.

III. DISCUSSION

A. The Contracts

Baylor relies on three written contracts to establish its claim against GPA. First, Baylor relies on a Subscriber Services Agreement between PHCS and GPA dated April 17, 1998, amended by an Amendment, [*472] Assignment, and Assumption of the Subscriber Services Agreement with effective dates of September 1, 2002 and January 1, 2003. Under the Subscriber Services Agreement, GPA [2] became a subscriber to PHCS's "comprehensive medical management system." [3] As a subscriber to PHCS's network, GPA could offer its customers access to PHCS's network of medical care providers at the discount rates negotiated by PHCS.

2   The Subscriber Services Agreement was actually between PHCS and a Texas corporation named "Group & Pension Administrators, Inc." The parties entered into a Rule 11 agreement that "[f]or purposes of this case, G&P Administrators, Inc, and GPA Holding, Inc. agree that they can be treated as one entity for the purpose of discovery and liability." In accordance with this agreement, in this opinion we will refer only to GPA.

3   The Subscriber Services Agreement recites its purpose:

> A. PHCS is in the business of providing provider networks [**7] and a comprehensive medical management system, including utilization review, quality assurance, and other cost containment related services throughout the United States.
>
> B. Plans offered and managed by Subscriber [GPA] provide health benefits and/or services to eligible participants under health benefit plans.
>
> C. Plans offered and managed by Subscriber generally include financial incentives to encourage eligible participants to choose treatment from providers who have contracted with entities, such as preferred provider organizations and exclusive provider organizations, who are in the business of offering provider discounts and other managed medical benefits.
>
> D. Subscriber is interested in and intent upon becoming a subscriber for services of PHCS, thus availing itself of the PHCS comprehensive medical management system.

Second, Baylor relies on a Hospital Services Agreement (HSA) between Baylor and PHCS dated January 1, 2002. Under the HSA, Baylor became a "Preferred Provider" in PHCS's network. It agreed to provide-at discounted rates [4] -health care services ("Covered Services") to persons ("Members") covered by "Health Plans" (including PPOs) created or sponsored by a "Payor" (a defined [**8] term in the HSA). As part of the HSA, PHCS warranted that its contracts with each Payor

obligate the "Payor (or its designee) to comply with the duties and obligations of [the HSA], including, but not limited to, paying for Covered Services rendered to Members in accordance with the provisions of Article IV of [the HSA]."

4   Except as discussed herein.

Third, Baylor relies on a Subscriber Acknowledgment between GPA and PHCS effective January 1, 2003. The Subscriber Acknowledgment refers to both the Subscriber Services Agreement and the HSA, reciting that GPA and PHCS have entered into the Subscriber Services Agreement and that PHCS has entered into contracts with health care providers for participation in its network. The Subscriber Acknowledgment requires GPA "to pay or arrange to pay PHCS Preferred Providers [which would include Baylor] in accordance with the PHCS Preferred Provider Agreement for such Preferred Provider, for the markets and the networks for which [GPA] has purchased provider network Services from PHCS." (First brackets added.) B. Is GPA a "Payor"?

In its first issue, GPA contends the trial court erred in granting Baylor's motion for summary judgment because GPA is not [**9] a "payor" under the HSA. At the outset, GPA makes a procedural argument that summary judgment was improper because Baylor did not move for summary judgment on this issue. We disagree.

[*473]   Baylor filed four motions for partial summary judgment. In its first motion, Baylor requested that the trial court interpret the three contracts at issue and "find, as a matter of law, that GPA is bound by the terms and conditions of the HSA with respect to the health care claims at issue in this case, including the requirements of Section 4.4(a)." In its own motion for summary judgment, GPA argued, "GPA is not a 'Payor' obligated to pay under the terms of the Baylor/PHCS Agreement," and Baylor filed a summary judgment response again arguing that GPA was bound by the terms of the agreement.

The trial court granted Baylor's motion and denied GPA's, necessarily deciding that GPA was a "Payor" bound by the provisions of the HSA, including section 4.4(a). We reject GPA's argument that the issue was not presented to and decided by the trial court.

Turning to GPA's substantive argument, GPA asserts the HSA defines "Payor" very narrowly. It argues the evidence established that GPA's clients--and not itself--were "Payors" [**10] under the HSA. It contends that as a third party administrator, it did not actually pay claims but only offered administrative services to facilitate payment of claims by the employer-funded health plans that were GPA's clients. Because the HSA's payment provisions apply only to "Payors" and GPA is not a Payor, GPA contends it is not responsible to pay for

Baylor's services, and thus that the trial court erred in entering summary judgment in favor of Baylor.

> The HSA defines a "Payor" as an insurance company, employer health plans, Taft-Hartley fund, plan sponsors or other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans.

GPA offered the affidavits of Kathy Enochs, the chief operating officer of GPA, and Madalyn Straughn, the vice president of operations for GPA, to establish that GPA is not an insurance company, employer health plan, Taft-Hartley fund, or plan sponsor. Enochs also testified that GPA was not a "payor" under the definition in the contract.

GPA does not dispute it is a party to the Subscriber Services Agreement and the Subscriber Acknowledgment. [**11] In fact, Enochs testified GPA could not access PHCS's preferred providers at a discount without the Subscriber Services Agreement and the Subscriber Acknowledgment. She testified GPA entered into the agreement with PHCS "to market their network to our plans that we administer."

In Exhibit J to the Subscriber Services Agreement, under "Duties of the Subscriber," paragraph 2(b) provides, "The Subscriber [i.e. GPA] shall abide by the terms of any agreement with a Participating Provider [e.g. Baylor] entered into by PHCS on behalf of the Subscriber with regard to the provision of PPO services." (Brackets added.) In the Subscriber Acknowledgment, GPA "agrees to pay or arrange to pay PHCS Preferred Providers in accordance with the PHCS Preferred Provider Agreement for each such Preferred provider, for the markets and the networks for which Subscriber has purchased provider network Services from PHCS."

The discounts offered to GPA's customers were the result of the relationships among the parties to all three agreements. If PHCS did not contract with Baylor under the HSA, there would be no discount to PHCS's subscribers on the fees for Baylor's services. If GPA did not in turn contract with [**12] PHCS to take advantage of the discounts offered in the HSA, those [*474] discounts would not have been available to GPA's customers.

In *Baylor University Medical Center v. Epoch Group, L.C., 340 F. Supp. 2d 749, 755 (N. D. Tex. 2004)*, similar contracts were held to "constitute a single, unified contract" requiring a claims supervisor to timely pay Baylor's clean claims. While we are not bound by a decision of a federal district court, we may consider federal precedent when it is well-reasoned and helpful. *See Davenport v. Garcia, 834 S.W.2d 4, 20 (Tex. 1992)* ("With a strongly independent state judiciary, Texas should borrow from well-reasoned and persuasive federal procedural and substantive precedent when this is deemed helpful, but should never feel compelled to parrot the federal judiciary.").

As here, there were three contracts in *Epoch Group*: a HSA between PHCS and Baylor, a subscriber services agreement between PHCS and Epoch, and a payor acknowledgment between PHCS and Epoch. *Epoch Group, 340 F.Supp. 2d at 752*. Discussing its conclusion that the three documents constituted a single, unified contract, the court reasoned:

> Indeed, all three instruments were required to complete the relationship [**13] between the parties. The Subscriber Services Agreement, which provided discounts from PHCS to Payors, could not operate effectively without PHCS contracting with providers through hospital services agreements. The very foundation of the discounts offered in [the] Subscriber Services Agreement appears to be the agreements between PHCS and providers such as Baylor. Moreover, Payor Acknowledgments serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements.

*Id. at 755* (citation omitted).

GPA distinguishes *Epoch Group*, arguing the court did not decide the question whether Epoch was a "payor" under the HSA. Perhaps because Epoch signed a document called "payor acknowledgment" instead of "subscriber acknowledgment," the issue whether Epoch was a "payor" for purposes of the agreements was not presented to the *Epoch Group* court. Regardless of the titles of the two agreements, however, their substance was the same: to commit the payor or subscriber "to comply with the terms and conditions of the provider agreements," so that provider discounts set forth in hospital services agreements could be extended to the subscriber's customers. [**14] *See id. at 755*.

We conclude, as did the trial court, that GPA is bound by the HSA. Reading the three agreements together, GPA committed to abide by the terms of the HSA and to pay or arrange to pay Baylor in accordance with the HSA. Even though the summary judgment evidence showed that GPA was not an "insurance company, employer health plan[],

Taft-Hartley fund, [or] plan sponsor[]," we conclude the evidence (i.e. the three contracts) proves as a matter of law that GPA falls within the contractual definition of "other similarly situated entities or organizations which are obligated (directly or through its designee) to pay for Covered Services for Members in accordance with such Health Plans." We overrule GPA's first issue.

B. "Liquidated Damages" or "Penalty"?

The HSA also contains terms regarding payment of claims:

> 4.4 ***Claim Processing***
>
> (a) Payor (or its designee) shall pay all Clean Claims for Covered Services [*475] within forty-five (45) calendar days of receipt of a Clean Claim containing the information set out in Section 4.3 from Hospital in accordance with the applicable reimbursement rates attached on Schedule 1. . . . If Payor (directly or through its designee) does not pay within forty-five [**15] (45) days of receipt of a Clean Claim, Payor shall no longer be eligible for the rates set forth on Schedule 1 and shall be obligated to pay Hospital at Hospital's Normal Billed Charges and hospital may elect to terminate this Agreement . . . .

In its second issue, GPA contends the trial court erred in denying its motion for summary judgment because the amount of damages awarded against it under this provision constituted an unenforceable liquidated damages penalty.

GPA complains that the above section, by requiring payors to pay the hospital's "Normal Billed Charges" unless the payor pays a Clean Claim within 45 days, "fixes compensation for breach in advance of the breach," and is thus an impermissible penalty.

"The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Flores v. Millenium Interests, Ltd., 185 S.W.3d 427, 431 (Tex. 2005)*; *see also Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 664 (Tex. 2005)* ("[l]iquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations"). Whether a contract [**16] term is a liquidated damages clause is a question of law for the court. *Valence Operating Co., 164 S.W.3d at 664*.

If a court determines that a contract term is a liquidated damages clause, the court may then determine whether the clause is enforceable, or whether it is an unenforceable penalty. The policy underlying the prohibition against penalties is to ensure that a party to a contract receives "just compensation," that is, "neither more nor less than his actual damages." *Phillips, 820 S.W.2d at 788* (quoting *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 485-86 (1952))*. In order to enforce a liquidated damages provision and determine the provision is not a penalty, "the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips, 820 S.W.2d at 788* (quoting *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2 (Tex. 1979))*.

Baylor argues that section 4.4 is neither a liquidated damages provision nor a penalty. Baylor asserts that section 4.4 "does not fix in advance compensation for GPA's failure to perform," but [**17] rather "provides a two-tiered pricing structure that grants GPA discounts (often substantial) if claims are paid within forty-five days." Baylor further contends that even if section 4.4 is a liquidated damages provision, it is enforceable under Texas law and is not a penalty because damages are difficult or impossible to estimate, and Baylor's normal billed charge is a reasonable forecast of just compensation.

For purposes of this opinion, we will assume without deciding that section 4.4(a) of the HSA is a liquidated damages provision, and examine whether the clause is also an unenforceable penalty under the factors set forth in *Phillips*.

The party asserting that a liquidated damages clause is an unenforceable penalty (here, GPA) bears the burden of proof. *Urban Television Network Corp.* [*476] *v. Liquidity Solutions, Ltd., 277 S.W.3d 917, 919 (Tex. App.-Dallas 2009, no pet.)* (citing *Murphy v. Cintas Corp., 923 S.W.2d 663, 665-66 (Tex. App.-Tyler 1996, writ denied))*. GPA moved for summary judgment on the issue whether section 4.4(a) of the HSA is an unenforceable penalty. To obtain summary judgment on the affirmative defense of penalty, GPA must prove each element of the defense. *See Brownlee, 665 S.W.2d at 112*; [**18] *Selz, 152 S.W.3d at 836*; *see also Phillips, 820 S.W.2d at 789*. GPA argues the payment of "Normal Billed Charges" is not a reasonable forecast of just compensation, and the harm caused by late payment is not incapable or difficult of estimation. *See Phillips, 820 S.W.2d at 788*. In support of its motion for summary judgment, GPA offered evidence comparing the discounted rates to the hospital's normal billed rates for the charges at issue. GPA offered a chart attached to the af-

fidavit of Madalyn Straughn that showed the percentage difference between the discounted rate and the normal billed charge for each of the charges at issue. GPA notes "the overwhelming majority of the percentage charges are 33% or more."

In response to GPA's motion for summary judgment, Baylor offered evidence regarding the difficulty of estimation and the reasonableness of the charges. Baylor offered the affidavit of Janda Edwards to explain that Baylor's normal billed charge "is the amount Baylor charges for services and supplies to entities or individuals who do not have access to a discount through a contract with Baylor." Edwards explained Baylor's normal billed charge "is established by each facility and is [**19] based upon an analysis of many factors including the service provided, the amount of personnel time needed to provide the service, the amount of capital equipment needed to provide the service, the amount of routine equipment needed to provide the service, the overhead, and market value." Edwards also testified that Baylor's normal billed charge is a reasonable amount for the health care services and supplies provided in the charges at issue in this case.

GPA quotes from Edwards's affidavit and argues, "Baylor offered no justification attempting to show how the changed billing rate was a reasonable estimate of the cost associated with payments being untimely." GPA posits that a "more reasonable" calculation would be "a $30 service fee and 18% annual interest," and argues, "our society routinely deals with late payments by a modest service fee and interest, and thus Baylor's damages were calculable." GPA does not offer evidence to support these arguments, however. The difficulty (or lack of difficulty) in estimation as well as the unreasonableness of the damages estimate were GPA's to prove. *Urban Television Network Corp., 277 S.W.3d at 919*. General statements about a "more reasonable" [**20] or "modest" rate are not evidence that the harm from late payment is difficult to estimate, or that the normal billed charges were an unreasonable forecast of the loss actually sustained. *See Phillips, 820 S.W.2d at 788*. GPA also emphasized that Baylor itself referred to the normal billed charge as a "penalty." The substance of the provision controls, however. *See Arthur's Garage, Inc. v. Racal-Chubb Security Systems, Inc., 997 S.W.2d 803, 810 (Tex. App.-Dallas 1999, no pet.)* (provision entitled "liquidated damages" was actually a limitation of liability provision, so penalty analysis was not appropriate). Because GPA did not meet its burden of establishing that the clause requiring payment of normal billed charges after 45 days was an unenforceable penalty, the trial judge did not err in denying GPA's motion for summary judgment on this issue. We overrule GPA's second issue.

[*477] C. Claims arising before 2003

In its third issue, GPA argues the trial judge erred by awarding damages for the period of time before GPA signed the Subscriber Acknowledgment Form. While GPA admits signing the Subscriber Services Agreement in 1998, it argues that it did not agree to "pay or arrange to pay" until [**21] the 2003 amendments set forth in the Subscriber Acknowledgment. Therefore, GPA argues, any claims arising in 2002 or before were included improperly in the trial court's judgment.

Baylor counters that GPA's obligations were set forth in the Subscriber Services Agreement, including the agreement to abide by any agreement between PHCS and a hospital, and those obligations did not change in 2003. Because GPA accepted the benefits of the agreements before 2003, Baylor argues, it must also accept the obligations.

We agree with Baylor that GPA's obligation to abide by the HSA did not change in 2003. While the "pay or arrange to pay" language does not appear in the Subscriber Services Agreement, GPA did agree at that time to abide by the provisions of the HSA, and, as noted in *Epoch Group*, "the very foundation" of the discounts offered to GPA's customers are "the agreements between PHCS and providers such as Baylor." *Epoch Group, 340 F. Supp.2d at 755*. The *Epoch Group* court commented that the payor acknowledgments "serve no apparent purpose other than to commit Payors to comply with the terms and conditions of the provider agreements." *Id*. The contractual relationship among the parties was [**22] established when GPA signed the Subscriber Services Agreement and began to take advantage of the discounted rates offered under the HSA. The trial court did not err in awarding damages for the period of time before GPA signed the Subscriber Acknowledgment. We overrule GPA's third issue.

CONCLUSION

We overrule GPA's issues and affirm the trial court's judgment.

JIM MOSELEY

JUSTICE



**Great American Products, Appellant v. Permabond International, a Division of National Starch and Chemical Company, Appellee**

**NO. 03-00-00683-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***94 S.W.3d 675*; *2002 Tex. App. LEXIS 7175***

**October 10, 2002, Filed**

**NOTICE:** [**1] PUBLISH

**SUBSEQUENT HISTORY:** Released for Publication February 7, 2003.

**PRIOR HISTORY:** FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT. NO. C98-504A, HONORABLE DON G. HUMBLE, JUDGE PRESIDING.

**DISPOSITION:** Affirmed.

**COUNSEL:** For Appellant: Mr. Thomas H. Crofts, Jr., Mr. Michael J. Murray, Crofts, Callaway & Jefferson, A Professional Corporation, San Antonio, TX.

For Appellee: Mr. Martin L. Mayo - Scott & Mayo, P.C., Houston, TX. Mr. Barry Abrams - Abrams, Scott & Bickley LLP, Houston, TX.

**JUDGES:** Before Chief Justice Aboussie, Justices B. A. Smith and Puryear.

**OPINION BY:** [*676] David Puryear

**OPINION**

Appellant Great American Products ("Great American") appeals the district court's judgment that Great American take nothing in its suit against appellee Permabond International ("Permabond"). Great [*677] American sued Permabond on a variety of tort, extra-contractual, statutory, and contract theories, claiming that Permabond sold defective adhesive which caused certain product failures and economic losses. The jury failed to find for Great American on any of its tort, extra-contractual, or statutory theories. Although the jury answered favorably for Great American on certain unconditionally submitted issues, the jury also affirmatively found that Great American had agreed to be bound by the warranty disclaimer and limited remedy provisions contained in Permabond's invoices. Great American moved for judgment, asking the trial court to disregard the jury's finding that Great American had agreed to the warranty disclaimer and limited remedy provisions. Permabond [**2] also moved for judgment, asserting that the jury finding that Great American had agreed to be bound by the warranty disclaimer and limited remedy provisions rendered immaterial its findings relating to any breach of warranty, breach of agreement, damages, and attorney's fees. The trial court rendered judgment that Great American take nothing. After the court denied its motion for new trial, Great American appealed. We will affirm the judgment of the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

This dispute arises out of the sale of an industrial adhesive by Permabond to Great American. Great American is a wholesale manufacturer and assembler of various gift items, including glassware affixed with pewter emblems. Great American uses industrial adhesive to attach pewter emblems to the glassware. The glassware is then placed under an ultraviolet light which cures the adhesive (UV adhesive), permanently affixing the emblem. Great American has claimed to use this process, or one similar to it, successfully for approximately twelve years prior to the dispute with Permabond.

Permabond is a division of National Starch and Chemical Company ("National Starch"). National Starch [**3] makes a variety of industrial products that in turn are incorporated into other products. Permabond manu-

factures and sells various types of UV adhesive, including the UV adhesive at issue in this case.

Before the events giving rise to this suit, Great American had purchased and used other Permabond adhesives for several years. In December 1994, Permabond suggested that Great American begin purchasing a Permabond UV adhesive. However, after looking at Great American's operation, Permabond's sales engineer told Great American that it did not currently have a suitable product that would work with Great American's system.

In late 1995, Permabond informed Great American that it had developed an adhesive suitable for Great American. According to Great American, Permabond's representatives consistently assured Great American that changing to Permabond's adhesive would not require Great American to substantially modify its existing manufacturing process. Permabond delivered the adhesive for testing. After sampling and testing the Permabond adhesive, Great American agreed to purchase it, signing a blanket order agreement in March 1996.

The blanket order agreement stated in pertinent [**4] part that: "All sales are subject to National Starch and Chemical Company's standard terms and conditions as set forth in its invoices." According to Great American, Permabond did not explain those terms and conditions, but simply began shipping the adhesive. In response, Permabond contends that during the course of dealing with Great American [*678] over the years, it consistently communicated the fact that Permabond would not and could not be responsible for damages that Great American might later claim resulted from the use of Permabond's adhesives. Furthermore, it claims that this limitation was conveyed in each invoice sent with the purchase of a Permabond product and that Great American never disputed any of the disclaimers it received from Permabond.

With each shipment of its adhesive to Great American, Permabond sent a two-sided invoice that stated the quantity and price on the front and set out the "terms of sale" on the reverse side. Among the terms was a disclaimer of warranty which stated in pertinent part:

> 1. SELLER HEREBY EXCLUDES ANY AND ALL WARRANTIES, GUARANTEES, OR REPRESENTATIONS WHATSOEVER, EXPRESS OR IMPLIED AND EXPRESSLY EXCLUDES ANY AND ALL WARRANTIES AS TO MERCHANTABILITY [**5] OR FITNESS FOR A PARTICULAR PURPOSE . . . . BUYER ASSUMES RISK FOR RESULTS OBTAINED FROM USE OF THESE GOODS WHETHER USED ALONE OR IN COMBINATION WITH OTHER PRODUCTS. SELLER'S LIABILITY HEREUNDER SHALL BE LIMITED TO REPLACEMENT OF ANY GOODS WHICH ARE NOT OF SELLER'S STANDARD QUALITY, AND SUCH REPLACEMENT SHALL BE BUYER'S EXCLUSIVE REMEDY.

As evidenced by the disclaimer, the invoice provided that replacement was the exclusive remedy for nonconforming adhesive. [1]

> 1 The invoice also stated:
>
> 2. While Seller may from time to time offer recommendations and advice with respect to the use of its products, it is understood that Buyer, in acting on any such recommendation or advice does so entirely at its own risk.
>
> . . . .
>
> 9. THE GOODS COVERED BY THIS INVOICE ARE SOLD EXPRESSLY ON THE CONDITION OF BUYER'S ASSENT THAT THESE TERMS OF SALE, INCLUDING THE EXCLUSION OF WARRANTIES GOVERN THIS PURCHASE AND SALE. BUYER'S FAILURE TO OBJECT TO THESE TERMS OF SALE WITHIN FIVE DAYS AFTER THE DATE OF SELLER'S ACKNOWLEDGMENT & TERMS OF SALE (IF SUCH AN ACKNOWLEDGMENT WAS MADE TO HIS ORDER) OR BUYER'S TAKING DELIVERY OF ANY GOODS SUPPLIED HEREUNDER, WHICHEVER IS SOONER, SHALL CONSTITUTE SUCH ASSENT.

[**6] Great American timely remitted the payments charged on each invoice. However, Great American claims it never expressly accepted the "terms of sale" on the invoices. Permabond contends the invoice disclaimer put Great American on notice that Great American would have no recourse for relying on the recommendations or advice of Permabond, and Great American agreed that its exclusive remedy would be replacement adhesive.

The parties dispute the extent of the express warranty made to Great American by Permabond. Great American contends Permabond expressly warranted that the adhesive it supplied would be suitable for use in Great American's manufacturing process, without substantial modification, and would perform satisfactorily if implemented into that process. Permabond contends it made only a limited warranty that it would provide Great American with its standard quality adhesive.

The blanket order agreement expired on April 30, 1997. Great American continued to purchase adhesive from Permabond but claims that after the blanket order agreement [*679] expired, there was no expression, either in Great American's purchase order or in Permabond's response, and no other evidence which

suggested [**7] the parties had continued to be bound by the "terms of sale" set forth in the invoices. Permabond contends that Great American never informed Permabond that it did not consider itself bound by the warranty exclusion and limited remedy provisions set out on each invoice. Permabond also contends that the exclusion of warranty provisions and limited remedy provisions in the invoices were part of the parties' course of dealing and course of performance and were in accord with standard industry practices.

In July 1997, Things Remembered, a customer of Great American, reported that the pewter emblems on its glass mugs were falling off. The first failures reported by Things Remembered were all produced at an Anchor Hocking plant in Ohio, which had been employed to do some of Great American's manufacturing while the company relocated to Texas from Illinois. Great American claims that the plant had just begun using the Permabond adhesive and had used the lighting system that was recommended by Permabond to properly cure the adhesive. Subsequently, more problems were noted by Great American in products manufactured at its New Braunfels plant.

After Great American became aware of problems with [**8] the UV adhesive, it notified Permabond. Permabond dispatched representatives to the New Braunfels facility to investigate the problem. After running tests on the adhesive, Permabond informed Great American that it thought Great American's curing light source was inadequate and this was the source of the problem. Great American claims that Permabond did not acknowledge its earlier assurances that its product was compatible with Great American's existing manufacturing process. Furthermore, Great American claims that Permabond did not explain the Anchor Hocking problems which occurred despite Great American's use of Permabond's preferred fusion-lighting system.

After testing the adhesive, Permabond supplied Great American with an alternative UV adhesive to address the problems that Great American had experienced. Great American used this adhesive for a short period, but eventually returned to the original adhesive it used before the Permabond product.

Great American filed suit in June 1998. The case was tried before a jury. The trial court submitted the charge proposed by Great American which included the following liability theories: deceptive trade practices, breach of warranties, [**9] breach of contract, fraud, negligent misrepresentation, and negligence. As to the deceptive trade practices claims, fraud claims, and negligent misrepresentation claims, the jury failed to find Permabond liable.

When asked in Question No. 3 and Question No. 4 whether Permabond failed to comply with *any* warranty and whether this failure was a producing cause of damages to Great American, the jury answered affirmatively. [2] The questions submitted did not differentiate between express and implied warranties. For the breach of [*680] warranty claim, the jury awarded Great American $ 70,000 for repair and replacement expenses and $ 250,000 in lost profits.

> 2 Question No. 3 of the jury charge was "Do you find that Permabond failed to comply with any warranty? You are instructed . . . that 'failed to comply' means any of the following." The question then listed and defined the following warranties: (1) express warranty; (2) the implied warranty of merchantability; (3) the implied warranty of fitness for a particular purpose; and (4) the implied warranty of good and workmanlike performance. Question No. 4 of the jury charge was " Was the failure, if any, of Permabond to comply with a warranty a producing cause of damages to GAP?"

[**10] In a series of answers to the sub-parts of Question No. 7, [3] the jury found that Great American and Permabond had agreed to the following: (A) Permabond would provide adhesive suitable for use in Great American's manufacturing facility, (B) Permabond would provide technical service regarding adhesive supplied for use in the Great American process, (C) Great American would pay Permabond for adhesive it supplied that was suitable for use in Great American's manufacturing facility, and (D) the parties would be bound by the standard terms and conditions as stated in Permabond's invoices.

> 3 Question No. 7 of the jury charge was "Did the agreement between GAP and Permabond include any of the following terms: (A) Permabond would provide adhesive suitable for use in GAP's manufacturing facility, (B) Permabond would provide technical service regarding adhesive supplied for use in the GAP process, (C) GAP would pay Permabond for adhesive it supplied that was suitable for use in GAP's manufacturing facility, (D) The parties would be bound by the standard terms and conditions as stated in Permabond's invoices." The jury answered "yes" to each subpart of Question No. 7.

[**11] In Question No. 8, [4] which dealt with the breach of contract claim, the jury found Permabond failed to comply with the terms of the agreement inquired about in Question No. 7. As to the breach of contract claim, the jury awarded Great American $ 70,000 for repair and replacement expenses and $ 250,000 in lost profits.

4 Question No. 8 of the jury charge was " Did Permabond fail to comply with the agreement?"

Following the return of the jury's verdict, but before the rendition of judgment, Permabond moved for entry of judgment in its favor asserting that the jury's answer to Question No. 7(D), that the parties were bound by the terms and conditions set forth in the invoices, negated the jury's findings relating to the breach of warranty and breach of contract claims because the invoices effectively disclaimed express and implied warranties. Alternatively, Permabond requested that the court enter judgment *non obstante veredicto* (notwithstanding the verdict). *See Tex. R. Civ. P. 301*.

In response, [**12] Great American contended that the jury's answers required judgment in its favor. Great American asked the trial court to disregard the jury's finding that Great American had agreed to be bound by the standards and terms stated in Permabond's invoices, which included the warranty disclaimer and limited remedy provision. It argued that because Permabond had expressly warranted its goods and services, its attempted disclaimer was ineffective.

The trial court rendered judgment that Great American take nothing. Great American then moved to modify the judgment and alternatively for a new trial, but the court denied the motion. In five issues on appeal, Great American contends that: (1) the trial court erred in rendering judgment that Great American take nothing because the blanket order agreement had expired at the time of the breach and a proper construction of the verdict entitles Great American to recover damages for both breach of warranty and breach of contract; (2) even if there were an effective disclaimer of implied warranty, the trial court erred in not rendering judgment [*681] that Great American recover for breach of express warranty, because the disclaimer was legally inoperative [**13] as to the express warranty; (3) even if there were an effective disclaimer of warranty, the trial court erred in not rendering judgment that Great American recover for breach of contract, because, as a matter of law, Permabond's invoices did not disclaim responsibility for breach of the agreement; (4) even if there were an effective limitation of remedy, the trial court erred in not rendering judgment that Great American recover damages, because, as a matter of law, the limitation of remedy provision in Permabond's invoices failed of its essential purpose; and (5) the trial court erred in not rendering judgment that Great American recover attorney's fees awarded by the jury.

**DISCUSSION**

***Breach of Express Warranty***

In its second issue, Great American complains that the trial court erred in not rendering judgment that it recover for breach of express warranty. Great American asserts that the jury's affirmative answer to Question No. 3 regarding breach of *any* warranty necessarily means that the jury found that Permabond breached an *express* warranty. We disagree.

The question regarding breach of warranty submitted to the jury states in pertinent part:

Do [**14] you find that Permabond failed to comply with any warranty?

You are instructed in answering this Question that the term "failed to comply" means any of the following:

. Failing to comply with an express warranty

. Implied Warranty of Merchantability

. Implied Warranty of Fitness for Particular Purpose

. Implied Warranty of Good and Workmanlike Performance

Answer "Yes" or "No."

Because of the ambiguous nature of the jury question, one cannot discern whether the jury's affirmative answer relates to one or more of the implied warranties or to the express warranty. Based on the plain meaning of the instruction, an affirmative answer to "any of the following" is *not* a finding of breach of express warranty.

In order to recover for the breach of an express warranty, a plaintiff must prove: (1) an express affirmation of fact or promise by the seller relating to the goods; (2) that such affirmation of fact or promise became a part of the basis of the bargain; (3) that the plaintiff relied upon said affirmation of fact or promise; (4) that the goods failed to comply with the affirmations of fact or promise; (5) that the plaintiff was injured by such failure [**15] of the product to comply with the express warranty; and (6) that such failure was the proximate cause of plaintiff's injury. *Morris v. Adolph Coors Co., 735 S.W.2d 578, 587* (Tex. App.--Fort Worth 1987, writ ref'd n.r.e.). Great American had the burden to plead, prove, and submit all elements but failed to do so. In essence, Great American is asking this Court to deem a finding of breach of express warranty based on an ambiguous jury submission so as to invalidate the trial court's judgment. This we will not do.

Great American requested Jury Question No. 3, and the trial court submitted it over Permabond's objections. The jury answered this question in the affirmative. It is unknown whether the jury found an express warranty by Permabond. Even assuming the validity of Great American's argument regarding express warranties, where a jury's findings are capable of two constructions and one

would reconcile the findings in favor of the judgment, reconciliation in favor of the judgment that was rendered on the jury verdict is mandatory. *Materials Mktg. Corp. v. Spencer, 40 S.W.3d 172, 176* (Tex. App.--Texarkana 2001, no pet.). We overrule issue two.

[**16] [*682] ***Disregarding Jury Findings***

In issues one and three, Great American argues that the trial court erred by disregarding, or failing to reconcile, certain jury findings in support of the jury's verdict. Underlying these issues is the apparent conflict between the jury's answers to Questions Nos. 3 and 8 (that Permabond breached a warranty and breached its agreement) and the jury's answer to Question No. 7(D) (that Great American agreed to be bound by the standard terms and conditions in Permabond's invoices). [5] As discussed, the standard terms and conditions in Permabond's invoices disclaimed all warranties and limited Great American's remedy to replacement of the glue.

5 In issue one, Great American specifically claims that because the blanket order agreement had expired at the time of breach, the jury findings of breach of warranty and breach of agreement can be reconciled by construing the answer to Question No. 7(D) as a finding that the parties had *once* agreed to be bound, but that the agreement was not in force when the breach occurred. However, that is not how the jury charge reads. The jury was instructed that the parties had "entered into an agreement regarding the purchase and sale" of the Permabond adhesive. The jury was asked whether that agreement included the agreement to be bound by the standard terms contained in Permabond's *invoices.* In answering Question No. 7, the jury was directed to consider the parties' course of dealing, usage of trade, and course of performance. There is nothing in the charge or question that referenced the blanket order agreement. In addition, there is nothing to indicate the jury was thinking about some prior, expired blanket order agreement when it answered Question No. 7. In answering Question No. 7(D) affirmatively, the jury expressly found that Great American had agreed to be bound by the terms and conditions stated in the invoices; therefore, the terms and conditions in the invoices were found to be part of the parties' agreement.

[**17] A trial court may disregard a jury's answers that have no support in the evidence or when the answers to the questions are immaterial. *Southeastern Pipe Line Co., Inc. v. Tichacek, 997 S.W.2d 166, 172, 42 Tex. Sup. Ct. J. 772 (Tex. 1997)*; *see also Southwestern Bell Tel. Co. v. FDP Corp., 811 S.W.2d 572, 577, 34 Tex. Sup. Ct. J. 690 (Tex. 1991)* (rendering take nothing judgment and holding that limited warranty and limited remedy provision rendered irrelevant any jury finding regarding lost profits). A question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, *e.g.*, a question of law, or when it was properly submitted but has been rendered immaterial by other findings. *Id*. A trial court may disregard a finding on an immaterial issue and render judgment on the remaining findings; such a judgment is not considered a judgment notwithstanding the verdict. *Kuehnhoefer v. Welch, 893 S.W.2d 689, 692* (Tex. App.--Texarkana 1995, writ denied).

In the instant case, Permabond filed a motion for judgment in which it urged the trial court to disregard the jury's findings of breach of warranty and breach of agreement based on the [**18] jury's affirmative answer to Question No. 7(D), finding that Great American agreed to be bound by the standard terms and conditions, *i.e.*, the disclaimer of warranties contained in its invoices. In the alternative, Permabond asked for a judgment notwithstanding the verdict based on insufficient evidence. The trial court ultimately rendered final judgment for Permabond that Great American take nothing by its suit.

We agree with Permabond that the jury's answer to Question No. 7(D) rendered its answers relating to breach of warranty immaterial. In answering Question No. 7(D), the jury impliedly found that Great American agreed to be bound by the standard terms and conditions, including the disclaimer and limitation of remedy, [*683] contained in its sales invoices. Once the jury found that Great American agreed to be bound by the standard terms and conditions on Permabond's invoices, the jury's findings of breach of warranty became immaterial. A disclaimer of warranty is an affirmative defense. *Tex. R. Civ. P. 94*; *Johnston v. McKinney Am., Inc., 9 S.W.3d 271, 280* (Tex. App.--Houston [14th Dist.] 1999, pet. denied). An affirmative defense is by its nature "one of confession [**19] and avoidance" which seeks to establish an independent reason why the plaintiff should not prevail. *Texas Beef Cattle Co. v. Green, 921 S.W.2d 203, 212, 39 Tex. Sup. Ct. J. 523 (Tex. 1996)* (jury's finding of affirmative defense of justification rendered immaterial finding of actual malice).

In addition, the jury's answer to Question No. 7(D) rendered its answer to Question No. 8 immaterial because Permabond expressly provided in its invoices that a buyer's exclusive remedy for substandard goods was limited to replacement of the goods. By answering all sub-parts to Question No. 7 in the affirmative, the jury specifically found: (1) Permabond agreed to provide suitable adhesive and technical service to Great American; (2) Great American agreed to pay Permabond for the adhesive if suitable; and (3) both parties agreed to be bound by the terms included in Permabond's invoices. In answering

Question No. 8 affirmatively, the jury found that Permabond had failed to comply with its part of the agreement, specifically, providing suitable adhesive and technical service to Great American. At the same time, by finding that the parties agreed to be bound by the terms and conditions of the invoices, the [**20] jury also found that the remedy for failure to comply with the agreement was limited to replacement of the defective product.

The record reveals that the issue of disclaimer was addressed throughout the trial, during closing arguments, and was raised by Permabond in its pleadings below. Permabond's general manager testified that Permabond's disclaimer of warranty and limitation of remedy language was standard in the chemical industry, or a "usage of trade." Additionally, from the testimony of Great American's CEO and purchasing agent, the jury could infer that Great American, based on its prior course of dealing with Permabond, should have been aware of the disclaimer language contained on Permabond's invoices and correspondence. Furthermore, the preface to Question No. 7 of the court's charge specifically instructed the jury on course of dealing and usage of trade:

A "course of dealing" is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions or other conduct.

A "usage of trade" is any practice or method of dealing having such regularity of [**21] observance in place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

Where an agreement for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

Finally, we note that Great American requested the charge of which it now complains. In summary, we hold that the trial court did not err by disregarding the jury's answers to the breach of warranty and breach of agreement questions. We overrule issues one and three.

[*684] ***Limited Remedy Failed of Essential Purpose?***

In issue four, Great American urges that, as a matter of law, the limited remedy Permabond provided in its invoices failed of its essential purpose and that the jury's inconsistent answers can be reconciled on this basis. Permabond responds that Great American failed to submit a jury question on the issue or raise the issue in its pleadings below and thus has waived it on appeal. Great American counters that its [**22] failure to submit a jury question on whether Permabond's limited remedy failed of its essential purpose is not fatal to its pursuit of this issue on appeal. *See Mercedes Benz of N. Am., Inc. v. Dickenson, 720 S.W.2d 844* (Tex. App.--Fort Worth 1986, no writ). In *Mercedes Benz*, the court of appeals considered the issue of whether a limited remedy failed of its essential purpose, reasoning that the defendant could not complain of the plaintiff's failure to plead the issue or to submit a jury question on the issue in the absence of special exceptions to the plaintiff's pleadings. *Id. at 853-54.* The court relied on *Roark v. Allen* in which the supreme court rejected the appellate court's determination that the plaintiffs' petition was insufficient to support the submission of special issues to the jury on the issue of negligence. *Roark v. Allen 633 S.W.2d 804, 1982 Tex. LEXIS 313, 25 Tex. Sup. Ct. J. 348 (Tex. 1982)*. However, unlike the instant case, the *Roark* plaintiffs submitted a jury question on the issue of negligence, although they did not plead it specifically in their petition. *Id. at 809*. In the instant case, Great American not only failed to plead but also [**23] failed to submit a jury question on the issue of whether the limited remedy failed of its essential purpose; therefore, we hold it has waived this issue on appeal. *Tex. R. App. P. 33.1*; *see also Henderson v. Ford Motor Co., 547 S.W.2d 663, 668-69* (Tex. App.--Amarillo 1977, no writ).

***Attorney's fees***

In issue five, Great American claims the trial court erred in not rendering judgment on the jury's award of attorney's fees to Great American. To recover attorney's fees under *Section 38.001 of the Texas Civil Practice and Remedies Code*, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages. *See Tex. Civ. Prac. & Rem. Code Ann. § 38.001* (West 1997); *Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390, 40 Tex. Sup. Ct. J. 610 (Tex. 1997)* (citing *State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 437, 38 Tex. Sup. Ct. J. 947 (Tex. 1995))*. Great American has neither prevailed on any cause of action for which attorney's fees are recoverable, nor has it recovered any damages. Issue five is overruled.

**CONCLUSION**

Having overruled all of Great [**24] American's issues on appeal, we affirm the judgment of the district court.

David Puryear, Justice



**Patricia Hamilton, Leonard Smith, and Latisha Hamilton, Appellants v. Texas Property and Casualty Insurance Guaranty Association; George Piccoli as Receiver for International Underwriters Insurance Company; White's Wrecker Service; and Lawrence Newhouse, Appellees**

**NO. 03-98-00355-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***1999 Tex. App. LEXIS 3163***

**April 29, 1999, Filed**

**NOTICE:** [*1] PURSUANT TO THE TEXAS RULES OF APPELLATE PROCEDURE, UNPUBLISHED OPINIONS SHALL NOT BE CITED AS AUTHORITY BY COUNSEL OR BY A COURT.

**PRIOR HISTORY:** FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT. NO. 94-12823, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING.

**DISPOSITION:** Affirmed.

**JUDGES:** Jan P. Patterson, Justice. Before Justices Jones, Kidd and Patterson.

**OPINION BY:** JAN P. PATTERSON

**OPINION**

Appellants Patricia Hamilton, Leonard Smith, and Latisha Hamilton, [1] appeal from a summary judgment in favor of appellees, Texas Property and Casualty Insurance Guaranty Association ("Guaranty Association"), White's Wrecker Service (the "insured") and Lawrence Newhouse. [2] The Hamiltons sued appellees for personal injuries they suffered in an automobile accident. Appellees filed a motion for partial summary judgment which was granted by the trial court and became a final judgment. [3] The Hamiltons now appeal the granting of the motion.

1 For convenience and clarity, we will refer to the appellants as the "Hamiltons." Patricia Hamilton was the driver of the appellants' automobile, and the remaining appellants were her passengers. Latisha Hamilton also sued as next friend for Senquinsha Howard, a minor.

[*2]

2 For convenience, we will refer collectively to the Guaranty Association, White's Wrecker, and Newhouse as appellees except where necessary to name them individually. George Piccoli, the Delaware receiver for International Underwriters Insurance Company ("the receiver") was served but did not answer.

3 The claim of Senquinsha Howard was settled and approved by the court. The partial summary judgment granted to appellees became a final judgment on March 31, 1997, by combining the partial summary judgment with the court's approval of the minor's settlement. The Hamiltons appeal only the summary judgment ruling that does not affect the claim of the minor.

This appeal involves interpretation of the Texas Property and Casualty Insurance Guaranty Act (the "Guaranty Act"). [4] The Guaranty Act provides for the payment by the Guaranty Association of "covered claims" up to a statutorily mandated maximum cap in the event a member insurance company becomes insolvent. The question raised is whether an injured third party may seek recovery when the insurance company is in receivership in Delaware, [*3] has been declared an impaired insurer in Texas, and the statute of limitations has expired as to the insured party. We hold that, under the circumstances of this case, the Hamiltons may not recover. We will affirm the trial court's summary judgment.

4 *See Tex. Ins. Code Ann. art. 21.28-C* (West Supp. 1999).

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of the case are uncontested. On February 19, 1992, a White's Wrecker Service truck driven by Lawrence Newhouse collided with the Hamiltons' vehicle. White's Wrecker was insured by International Underwriters Insurance Company ("IUIC"), a Delaware insurance company. On March 11, 1993, IUIC was placed in receivership in Delaware and was designated an impaired insurer by the Texas Commissioner of Insurance on March 22, 1993. The impairment of IUIC authorized the Guaranty Association to pay "covered claims" [5] against IUIC insureds.

5 A "covered claim" is defined as "an unpaid claim of an insured or third-party liability claimant that arises out of and is within the coverage and not in excess of the applicable limits of an insurance policy to which this Act applies, issued or assumed . . . by an insurer licensed to do business in this state. . . ." *Tex. Ins. Code Ann. art. 21.28-C, § 5(8)* (West Supp. 1999).

[*4] The Hamiltons' attorney received a letter dated July 6, 1993, from an adjuster, apparently on behalf of the Guaranty Association, acknowledging the Association's involvement in the claim. The letter described the procedure for filing claims with the Guaranty Association and further stated: "The Association is considered the insurer to the extent of its obligation on covered claims and to that extent has all the rights, duties, and obligations of the impaired insurer as if the insurer had not become impaired." The Hamiltons filed proofs of claim with the Delaware receiver in November and December, 1993. On June 20, 1994, they sued White's Wrecker Service and Lawrence Newhouse for personal injuries sustained as a result of the collision. They also named the Guaranty Association and the Delaware receiver in the lawsuit.

Appellees moved for summary judgment on the grounds that, under Texas law, the Hamiltons could not maintain a direct cause of action against the Guaranty Association, and that the claims against White's and Newhouse were barred by the two-year statute of limitations. The trial court granted the motion, holding that the Hamiltons could not maintain a direct cause of action [*5] against the Association and that all claims of plaintiffs (except the minor's) were barred by the applicable two-year statute of limitations. [6]

6 Actions for personal injury must be brought within two years of the injury. *See Tex. Civ. Prac. & Rem. Code Ann. § 16.003* (West 1986).

## THE GUARANTY ACT

The Guaranty Act establishes an association of all property and casualty insurers licensed to transact business in Texas. *See* Guaranty Act § 6. [7] By assessing contributions from solvent member insurers, the Guaranty Association maintains a guaranty fund which assumes insolvent insurers' obligations with respect to statutorily defined "covered claims." *Id. § 5(8)*. The fund is held by the Guaranty Association to pay insureds' claims up to a statutorily mandated maximum cap in the event the insurance company becomes insolvent. The stated purposes of the Act are: (1) to protect policyholders and claimants from financial loss because of the impairment of an insurer, and (2) to provide a mechanism [*6] for the payment of "covered claims" under certain insurance policies. *Id.* § 2.

7 The Texas Insurance Code creates three separate guaranty funds: the Texas Title Insurance Guaranty Association to administer "covered claims" of an "impaired" title insurance company authorized to do business in the state, Tex. Ins. Code Ann. art. 9.48, § 14; the Texas Property and Casualty Insurance Guaranty Association to provide funds to the receiver for the payment of "covered claims" of an "impaired" member of the association, *Tex. Ins. Code Ann. art. 21.28-C, § 14*; and the Life, Accident, Health, and Hospital Service Insurance Guaranty Association to provide funds to the receiver for payment of the "contractual obligations" of an "impaired" member company, Tex. Ins. Code Ann. art. 21.28-D, § 6. The procedures as well as the definitions of "covered claim" are defined by the applicable statutory provision.

The receiver and the Guaranty Association are creatures of statute. [8] Prior to 1992, the Texas receiver had dual [*7] responsibilities: liquidation of the company and the administration, evaluation, and payment of claims with funds advanced by the various guaranty funds. The Guaranty Association, under the old statute, played no claims-processing role but merely provided an extra purse for the payment of claims the receiver determined were "covered claims." *See Chandler v. Gutierrez, 906 S.W.2d 195, 198* (Tex. App.--Austin 1995, writ denied).

8 *See* Couch on Insurance, *Guarantee Associations* § 6:27 (3d ed. 1997).

In 1991, the Texas Legislature made substantial changes to the insurance liquidation statute. [9] The changes included the transfer of the receiver's duty to administer, evaluate, and pay claims to the Guaranty Association for all companies placed in receivership on

or after January 1, 1992. Specifically, the Guaranty Association undertook "to discharge the policy obligations of the impaired insurer, including the duty to defend insureds under a liability policy, to the extent that policy obligations [*8] are covered claims" under the Act. [10] *See* Guaranty Act § 8(b). It is this changed role of the Guaranty Association that is disputed by the parties. Because of the procedural posture of this case, we do not address the changed role of the Association in the handling of claims.

9 The Guaranty Act was amended in 1991 and became effective on January 1, 1992. The amended Act applies to any company designated an impaired insurer on or after January 1, 1992. The Act has been amended since 1992, but those amendments are not relevant to this appeal.

10 Article 21.28-C section 8(d) authorizes the Association to:

> investigate and adjust, compromise, settle, and pay covered claims to the extent of the association's obligation and deny all other claims. The association may review settlements, releases, and judgments to which the impaired insurer or its insureds were parties to determine the extent to which those settlements, releases, and judgments may be properly contested. Any judgment taken by default or consent against an insured or the impaired insurer, and any settlement, release, or judgment entered into by the insured or the impaired insurer, is not binding on the association, and may not be considered as evidence of liability or of damages in connection with any claim brought against the association or any other party under this Act.

Guaranty Act § 8(d).

[*9] **DISCUSSION**

In granting the appellees' motion for summary judgment, the trial court specified two grounds in its order: (1) that appellants did not have a direct cause of action against the Guaranty Association and (2) that the claims were barred by the two-year statute of limitations. On appeal, the Hamiltons challenge the court's granting of summary judgment only on the basis of the statute of limitations. Since the judgment is final as to the Guaranty Association regarding its direct action bar, we need only address the remaining defendants, White's Wrecker and Newhouse.

We review the record under the familiar precepts of summary judgment law that a summary judgment is proper only when a movant establishes that there is no genuine issue of material fact and that he is therefore entitled to judgment as a matter of law. In deciding whether there is a disputed issue of material fact, matters in the record that favor the nonmovant will be taken as true and every reasonable inference from the record must be resolved in favor of the nonmovant. *See Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548-49 (Tex. 1985)*. A defendant who conclusively establishes all of the [*10] elements of an affirmative defense is entitled to summary judgment. *See Cathey v. Booth, 900 S.W.2d 339, 341 (Tex. 1995)*.

When a defendant moves for summary judgment on its affirmative defense, it must prove each element of its defense as a matter of law, leaving no issues of material fact. *See Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 927 (Tex. 1996)*. When the defendant moves for summary judgment on a statute of limitations defense, the defendant must conclusively (1) prove when the cause of action accrued, and (2) if the plaintiff pleaded a tolling provision, negate its application as a matter of law. *See Jennings v. Burgess, 917 S.W.2d 790, 793 (Tex. 1995)*. Once the movant has established a right to a summary judgment as a matter of law, the burden shifts to the non-movant. The non-movant must then respond to the motion for summary judgment by presenting to the trial court summary judgment proof sufficient to raise a fact issue. *See Casso v. Brand, 776 S.W.2d 551, 556 (Tex. 1989)*.

The uncontroverted summary judgment evidence establishes that the Hamiltons' claims are barred by the statute of limitations. The automobile accident occurred on February [*11] 19, 1992. The lawsuit was filed on June 20, 1994, more than two years following the date their cause of action accrued. Once appellees demonstrated that the Hamiltons filed their lawsuit more than two years following the accrual of their cause of action, the burden shifted to the Hamiltons to produce evidence sufficient to raise a fact issue that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979)*. This they failed to do.

The Hamiltons contend that they relied upon a letter to their lawyer to delay the filing of their lawsuit and that they were misled by the letter into believing that they should await denial of their claims before filing suit. Specifically, on July 6, 1993, a claims adjuster, on behalf

of the Guaranty Association, sent a letter to the Hamiltons' attorneys "to notify you of your rights and obligations." The letter went on to state:

You must file your third party liability claim against an insured of International Underwriters, with the Association. In the event the Association denies your claim, you are entitled to appeal that denial by filing suit against the insured in the same manner as you [*12] would file suit if International Underwriters had not become impaired.

In November and December 1993, the Hamiltons filed proofs of claim with the Delaware receiver. They filed this lawsuit in July 1994.

Relying solely upon the July 1993 letter, the Hamiltons contend that they were not told in the letter that their claims were subject to a statute of limitations and that the letter was misleading as to the procedure to be followed for third party claims. They assert that these factual issues regarding the Association's conduct are sufficient to estop appellees from asserting a limitations defense. Because appellees adduced conclusive evidence that the suit was barred by the limitations period, the burden was on appellants, as the non-movants, to produce summary judgment evidence sufficient to raise a fact issue on estoppel in avoidance of the affirmative defense of limitations.

The scope of review in an appeal from a summary judgment is necessarily limited. It is well recognized that a summary judgment motion must expressly state the grounds upon which it is made and will stand or fall on those grounds alone. *See McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337,* [*13] *339 (Tex. 1993)*. Likewise, the answer or response to the motion must set forth the grounds upon which the non-movant relies to defeat the motion. Issues not expressly and timely presented by written answer or response may not be considered on appeal as grounds for reversal. *See Tex. R. Civ. P. 166*-a(c); *see also Cincinnati Life Ins. Co. v. Cates, 927 S.W.2d 623, 625 (Tex. 1996)*; *Abbott Labs., Inc. v. Segura, 907 S.W.2d 503, 507 (Tex. 1995)*; *Clear Creek Basin Auth., 589 S.W.2d at 678*.

Reviewing the record, we find that the issue of estoppel was not timely presented to the trial court. The Hamiltons failed to address estoppel in either their response to the motion for summary judgment or in their supplemental response. They raised for the first time the issue of estoppel in their Motion for New Trial. This, alone, does not put the issue before this court. *See Hruska v. First State Bank of Deanville, 747 S.W.2d 783, 785 (Tex. 1988)*; *Keightley v. Republic Ins. Co., 946 S.W.2d 124, 126* (Tex. App.--Austin 1997, no writ). When a motion for new trial is filed after a summary judgment has been granted, as here, the district court is entitled to consider only the [*14] record as it existed prior to granting the summary judgment. *See Parchman v. United Liberty Life Ins. Co., 640 S.W.2d 694, 696* (Tex. App.--Houston [14th Dist.] 1982, writ ref'd n.r.e.). Having raised no issue of estoppel in response to the motion for summary judgment, as it was their burden to do, appellants are not entitled to raise the issue on appeal.

Even if the issue of estoppel could now be raised by the Hamiltons, it is without merit. First, it is moot as to the Guaranty Association. Appellants' estoppel argument does not apply to the Association because the summary judgment is final on other grounds. Moreover, a plaintiff may invoke equitable estoppel to prevent an opponent from pleading limitations if the opponent, his agent, or representatives made representations that induced the plaintiff to delay filing suit within the applicable statute of limitations. *See Cook v. Smith, 673 S.W.2d 232, 235* (Tex. App.--Dallas 1984, writ ref'd n.r.e.). To invoke equitable estoppel, proof must be made of the following elements: (1) a false representation or concealment of a material fact; (2) made with actual or constructive knowledge of the facts; (3) to a party without knowledge [*15] or the means of knowledge of the real facts; (4) with the intention that it should have been acted upon; and (5) the party to whom it was made must have relied upon or acted upon it to his prejudice. *See id.*; *Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 932 (Tex. 1952)*.

As evidence in support of their response to appellees' motion, the Hamiltons attached the following five documents: a copy of the appellees' motion for summary judgment; a copy of a partial summary judgment order rendered in another district court case, which was never appealed and has no precedential value in this case; a copy of a letter from an adjusting firm to the Hamiltons' counsel dated July 28, 1992 seeking additional information about their injuries; the notification letter of July 1993 from a second adjusting firm, presumably on behalf of the Guaranty Association to the Hamiltons' counsel; and a Plan of Operation of the Guaranty Association, which was not in effect at the time of the Hamiltons' claims, containing claims-handling information for the Association.

There is no summary judgment evidence on any element of estoppel sufficient to raise a fact question that would defeat summary [*16] judgment. At most, there is argument of counsel that the July 1993 letter, standing alone, is misleading. No affidavits or testimony were submitted to show, for example, that the Hamiltons' attorneys, who received the letter, were without knowledge

of the real facts, that the Guaranty Association intended for the Hamiltons or their attorney to rely on the letter, that the Hamiltons or their counsel relied upon the letter, or even that the letter was wrong or misleading. In addition, the record is devoid of any showing that White's Wrecker or Newhouse engaged in any conduct that would warrant the invocation of equitable estoppel. The Hamiltons have failed to carry their burden of adducing evidence to defeat the affirmative defense and the evidence is, in any event, insufficient to constitute estoppel. Accordingly, we overrule appellants' first issue.

As their second issue on appeal, the Hamiltons contend that the trial court erred in failing to grant a new trial because of unresolved issues of disputed fact. They also argue that newly acquired evidence is relevant to their claim that the Guaranty Association should be equitably estopped from asserting a limitations defense. [*17] Appellants attached to the motion the Association's Plan of Operation which sets forth the Association's claims-handling procedures. They argue that, under the plan, the Association was required to deny appellants' claims in writing and that the document constitutes new evidence supporting their estoppel argument. The record reflects that the document attached to the motion was the Association's Plan of Operation which was approved in June 1996 and was not in effect during the period of the lawsuit.

To be entitled to a new trial on the basis of newly discovered evidence, the party seeking the new trial must satisfy the court that: (1) the evidence has come to the knowledge of the party since the trial; (2) it could not have been discovered earlier by the exercise of reasonable diligence; (3) it is not cumulative; and (4) it is so material that it would probably produce a different result if a new trial was granted. *See Jackson v. Van Winkle, 660 S.W.2d 807, 809 (Tex. 1983).* Except for the first prong, the Hamiltons wholly fail to make the requisite showing.

A trial court has broad discretion in deciding whether to grant a new trial based upon new evidence, and the trial court's [*18] discretion will not be disturbed on appeal absent a showing of a manifest abuse of discretion. *See Champion Int'l Corp. v. Twelfth Court of Appeals, 762 S.W.2d 898, 899 (Tex. 1988).* Finding no abuse of discretion in the ruling of the trial court, we overrule appellants' second issue on appeal.

As a final issue on appeal, appellants argue that because the Guaranty Association is a quasi-governmental entity, its use of the limitations defense violates the "open courts" provision of the Texas Constitution. Appellants did not raise this constitutional argument in the trial court, and therefore, we may not consider it on appeal. *See Boyd v. Fuel Distribs., Inc., 795 S.W.2d 266, 271* (Tex. App.--Austin 1990, writ denied). We overrule the third issue.

**CONCLUSION**

We conclude that the trial court did not err in granting partial summary judgment to appellees, and we affirm the judgment of the trial court.

Jan P. Patterson, Justice

Before Justices Jones, Kidd and Patterson

Affirmed

Filed: April 29, 1999



**HAMPDEN CORPORATION AND FANTASY DIAMOND CORPORATION, Appellants v. REMARK, INC. AND ROBERT KRAMER, Appellees**

**No. 05-13-00529-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

***2014 Tex. App. LEXIS 6900***

**June 25, 2014, Opinion Filed**

**SUBSEQUENT HISTORY:** Petition for review denied by *Remark, Inc. v. Hampden Corp., 2014 Tex. LEXIS 1024 (Tex., Oct. 10, 2014)*

**PRIOR HISTORY:** [*1]

On Appeal from the 366th Judicial District Court, Collin County, Texas. Trial Court Cause No. 366-00342-06.

*Hampden Corp. v. Remark, Inc., 331 S.W.3d 489, 2010 Tex. App. LEXIS 10052 (Tex. App. Dallas, 2010)*

**COUNSEL:** For Appellants: Jeffrey S. Levinger, Dallas, TX.

For Appellees: Evan Lane (Van) Shaw, Dallas, TX; Janet R. Randle, Dallas, TX.

**JUDGES:** Before Justices Lang, Myers, and Brown. Opinion by Justice Lang.

**OPINION BY:** DOUGLAS S. LANG

**OPINION**

**MEMORANDUM OPINION**

Opinion by Justice Lang

Appellees Remark, Inc. ("Remark") and Robert Kramer filed a breach of contract claim against appellants Hampden Corporation ("Hampden") and Fantasy Diamond Corporation ("Fantasy Diamond") based on a dispute respecting compensation under a sales agreement. Following a bench trial and a subsequent appeal to and remand by this Court,[1] the trial court rendered judgment awarding Remark (1) $67,483.36 in damages and prejudgment interest against Hampden; (2) $228,611.30 in damages and prejudgment interest against Fantasy Diamond; and (3) attorney's fees, costs, and post-judgment interest against both appellants.

1 *See Hampden Corp. v. Remark, Inc., 331 S.W.3d 489 (Tex. App.--Dallas 2010, pet. denied)*.

In four issues on appeal, appellants contend the trial court erred because (1) the agreement in question was modified as a matter of law, which precludes any recovery; (2) plaintiffs' claim is barred by "waiver or estoppel"; (3) the damages awarded by the trial court improperly [*2] included treble damages under the Texas Sales Representatives Act, *see* TEX. BUS. & COM. CODE ANN. *§ 54.004* (West 2009); and (4) plaintiffs were not entitled to the attorney's fees awarded.

We decide in favor of appellants on their first issue. Consequently, we need not address appellants' remaining issues. We reverse the trial court's judgment and render a take-nothing judgment in favor of appellants. Because the law to be applied in this case is well settled, we issue this memorandum opinion. *See TEX. R. APP. P. 47.2, 47.4*.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are not disputed by the parties. Hampden and Fantasy Diamond design, manufacture, and sell jewelry and watches. In approximately 1988, Irving Wein, Fantasy Diamond's chairman at that time, contacted Kramer about facilitating sales of those products to retailer JCPenney. Later that same year, Kramer and Remark, a company formed by Kramer, entered into an agreement with Fantasy Diamond and a predecessor to Hampden[2] pursuant to which Remark received commissions on both companies' net sales to JCPenney.

2    Hereafter, "Hampden" is used in this background section of this opinion to refer to appellant Hampden and/or its  [*3] predecessors.

In 1996, Remark was requested by Hampden and Fantasy Diamond to sign a "standard Sales Representation Agreement" and Remark did so (the "1996 Agreement"). The 1996 Agreement provided in part (1) the "Sales Representative," Remark, was to be paid a 5% commission on the net sales of Hampden and Fantasy Diamond products to JCPenney; (2) the agreement would "continue and remain in full force and in effect until cancelled by either party, which cancellation may be effected by either party giving to the other 15 days' notice in writing of its intent to cancel, said notice to be mailed by certified or registered mail"; and (3) "[t]he relationship between the Company and the Sales Representative is and shall be that of independently contracting parties and not that of employer/employee."

In 2002, Wein's son, Joseph Wein, became chairman and chief executive officer of both Fantasy Diamond and Hampden. In October of that year, Kramer received separate letters from Louis Price, president of Fantasy Diamond, and Jim Herbert, president of Hampden, stating that as of January 1, 2003, Remark's commission on net sales to JCPenney would be reduced to 2.5%. Each letter requested that Kramer  [*4] indicate his agreement by "signing below and returning the original" to the sender. Kramer signed and returned each of those letters (collectively, the "2002 Agreement").

Following a meeting with Kramer in summer 2004, Joseph Wein sent Kramer a letter dated July 1, 2004 (the "July 1, 2004 letter"), that stated in part

> Per our conversation, we will convert payment to REMARK from commission to retainer beginning immediately.
>
> Beginning July 1, 2004 REMARK will earn a retainer at an annualized rate of $100,000, or a monthly rate of $8,333.33.
>
> Beginning January 1, 2005, REMARK will earn a retainer at an annualized rate of $75,000, or a monthly rate of $6,250.
>
> Of course, this retainer is "at will" and can be modified or terminated by either of us at any time.

(emphasis original). The letter was on Fantasy Diamond letterhead and the closing stated "Warm personal regards, FANTASY DIAMOND CORPORATION" (emphasis original), followed by Joseph Wein's signature.

Several months later, Joseph Wein sent Kramer a letter dated January 18, 2005 (the "January 18, 2005 letter"), that stated in part (1) "[d]uring those conversations last summer, I told you that you . . . must be prepared for reducing income from  [*5] Fantasy and Hampden going forward"; (2) "neither Fantasy nor Hampden requires ongoing outside representation at JCPenney or anywhere else"; and (3) on December 31, 2005, the "retainer" payments "will end entirely" and "our representative relationship will cease." Remark received monthly retainer payments from Fantasy Diamond and Hampden through 2005. No payments were made to Remark or Kramer by Fantasy Diamond or Hampden after December 31, 2005.

In 2006, Remark and Kramer ("plaintiffs") sued Fantasy Diamond and Hampden ("defendants") for, among other claims, breach of contract. In their sixth amended petition, the live petition at the time of the judgment now complained of, plaintiffs asserted in part that defendants breached the 2002 Agreement by failing to pay plaintiffs as required under that agreement and such breach "also violates [the Texas Sales Representatives Act] and entitles Plaintiffs to damages for three (3) times the unpaid commissions" and reasonable attorney's fees and costs. Defendants filed general denial answers.

At the November 17, 2008 bench trial, defendants argued in part that the 2002 Agreement was modified by the parties when defendants provided notice of a change [*6] in compensation in 2004 and plaintiffs accepted that change by their "continued performance," i.e. accepting retainer payments from defendants.[3] Plaintiffs argued at trial that the 1996 Agreement, rather than the 2002 Agreement, was the operative agreement between the parties and was breached by defendants.

3    Additionally, as to the alleged modification, defendants also asserted that subsequent to the July 1, 2004 letter, Joseph Wein sent Kramer a letter dated July 30, 2004, that stated the payments of $8,333 per month would continue through June 2005 and the amount of the monthly payments would change to $6,250 beginning July 1, 2005, rather than January 1, 2005. Defendants referred to that letter and the July 1, 2004 letter, collectively, as the "notice letters" and/or "the 2004 Agreement." However, at trial, Kramer testified he did not remember receiving the July 30, 2004 letter.

In a post-trial brief, defendants contended plaintiffs' claim respecting breach of the 1996 Agreement was not supported by plaintiffs' pleadings. The trial court (1) granted plaintiffs leave to file a post-trial "seventh amended petition" asserting breach of the 1996 Agree-

ment and (2) rendered judgment in [*7] plaintiffs' favor based on breach of the 1996 Agreement.

Defendants appealed to this Court. In December 2010, this Court concluded the trial court erred by granting plaintiffs leave to file their post-trial pleading. This Court vacated the trial court's judgment and remanded the case to the trial court "to allow it to consider the evidence at trial in light of the claims pleaded in Remark and Kramer's sixth amended petition." *Hampden Corp., 331 S.W.3d at 499*.

On remand in the trial court, plaintiffs filed a "Motion for Final Judgment." Therein, plaintiffs stated in part that Kramer agreed to the reduction of the commission from 5% to 2.5% in October 2002. Plaintiffs asserted "[t]his commission change to the 1996 commission structure, constitutes the 2002 agreement, which essentially modified the 1996 commission rate, leaving all terms of the 1996 agreement as part of the 2002 agreement." However, plaintiffs contended Kramer "never agreed to have the 2.5% commission altered in any manner." Additionally, plaintiffs alleged that "[s]ubsequently, Defendants ceased paying any commissions or payments to Plaintiff, without providing proper notice as called for in the contract." Plaintiffs claimed [*8] damages based on 2.5% of defendants' net sales to JCPenney from January 1, 2003, through October 2008, minus the amounts actually paid to plaintiffs by defendants during that time. Further, plaintiffs asserted that in light of defendants' breach, plaintiffs are entitled to "three times the unpaid commissions" and reasonable attorney's fees and costs pursuant to the Texas Sales Representatives Act.

Defendants filed an "Opposition to Plaintiffs' Motion for Final Judgment and Cross-Motion for Take-Nothing Judgment." Therein, defendants contended in part that they did not breach the 2002 Agreement because "it was modified by mutual agreement effective July 1, 2004" and plaintiffs "were paid everything they were owed under the 2004 Agreement." Specifically, defendants stated

> In analogous cases involving at-will employment, "either party may impose modifications to the employment terms as a condition of continued employment." When an employer notifies an employee or independent contractor of changes in the terms of their relationship, the employee or independent contractor "must accept the new terms or quit." If he "continues working with knowledge of the changes, he has accepted the changes [*9] as a matter of law." Thus, to prove a modification of an at-will contract, a party must show (1) that it gave notice of the change, and (2) the other party accepted the change.

(citing and quoting *Hathaway v. Gen. Mills, Inc., 711 S.W.2d 227, 228-29 (Tex. 1986))*. Further, according to defendants,

> Fantasy Diamond and Hampden conclusively established that (1) they provided Plaintiffs notice of the changes to the 2002 Agreement, and (2) Plaintiffs accepted those changes as a matter of law. After discussing their financial issues with Kramer, and instead of invoking their unilateral right to terminate their relationship with Kramer and Remark, Defendants notified Kramer that, effective July 1, 2004, they would cease paying him based on a commission structure and instead would begin paying a fixed monthly retainer--specifically, $8,333 per month from July 1, 2004 until June 30, 2005 and $6,250 per month beginning on July 1, 2005. Although Kramer was not asked to countersign Defendants' notice letters, he acknowledged that he received them; he did not quit and instead continued to work as a sales representative for Defendants for the next 18 months; and he accepted and retained all of the monthly [*10] retainer payments without complaint. Under these circumstances, Plaintiffs' continuing work and retention of payments constitute acceptance of the 2004 Agreement as a matter of law.

(citations to record omitted).

Plaintiffs and defendants both cited evidence from the November 2008 trial record in their motions, including, in part, copies of the 1996 Agreement; the 2002 Agreement; the July 1, 2004 letter; and the January 18, 2005 letter. Additionally, defendants cited the following testimony of Kramer on direct examination:

> Q. . . . So 2002 and 2003, you moved forward and you're now receiving two and a half percent on commissions that you had generated--on sales rather that had been made from Fantasy and Hampden to JCPenney. You're getting two and a half percent now, correct?
>
> A. Correct.

Q. And then in 2004, another letter sent to you saying, hey, we're going to change the deal again. We're not going to give you two and a half percent, we're going to give you a flat fee per month. Do you remember that letter?

A. I remember the letter, but that was a shocker.

Further, Kramer testified as follows on cross-examination:

Q. Now, when you were talking to Mr. Price and Mr. Herbert about this change [*11] of compensation from 5 to two and a half percent, they each told you that their companies were going through financial difficulties, correct?

A. I have no recollection of that.

. . . .

Q. You did this to help protect these companies by being able to pay you an amount that they could afford?

A. Correct.

. . . .

Q. Did [Joseph Wein] tell you [in summer 2004] that you had to be prepared to reduce your income from these companies and not be dependent on them going forward?

A. I think he said that. And I said that's not something that his father would ever have done.

. . . .

Q. . . . [Y]ou did receive [the July 1, 2004 letter], correct?

A. Yes.

Q. And this was following your conversation with Mr. Wein about your compensation, correct?

A. Right.

. . . .

Q. And then in January of 2005, you received . . . a letter from Mr. Wein in which he's describing for you the fact that your independent contractor relationship with his--the companies would expire, end on December 31, 2005. Do you remember receiving that letter?

A. Yes.

. . . .

Q. And over . . . the years, [Hampden] and Fantasy Diamond Corporation paid you several hundred--in excess of millions of dollars for compensation for your services rendered, did they [*12] not?

A. I've never totaled it up. I don't know what the amount is.

Q. There's no dispute--is there any dispute that they paid you all the commissions you were due until 2002 when the agreement was changed to two and a half percent, and they then paid you two and a half percent until the agreement was changed in 2004, and that they then paid you your retainer amount in 2004 and 2005? There's no dispute that those amounts were paid to you, correct?

A. Correct.

In a reply to defendants' response and cross-motion, plaintiffs argued in part (1) "there was conflicting testimony as to whether Kramer ever knew that his continued efforts were to be interpreted as an acceptance," which knowledge "is critical to whether the continued effort of the 'employee' will be deemed acceptance" and (2) in *Hathaway*, the court "found that the intent of the parties was not to modify the contract, and continued employment was NOT acceptance of terms not intended." (emphasis original).

At the hearing on plaintiffs' motion for final judgment and defendants' opposition and cross-motion, defendants asserted, *inter alia*, their argument described above that the 2002 Agreement was modified by the parties in 2004 as a matter [*13] of law pursuant to *Hathaway*. Plaintiffs asserted in response to that argument that (1) under *Hathaway*, "the employee has to have knowledge of the modification, and it must know the nature and changes and certainty of their imposition, and that was what was missing here" and (2) "[n]o one ever told Bob Kramer, by the way, if you take this money, you are accepting this deal."

Defendants filed a post-hearing response to plaintiffs' reply in which they asserted in part "[b]y citing to [*Hathaway*], Plaintiffs acknowledge (as they must) that only two elements are required to prove a modification of an at-will employment or sales representative contract: (1) unequivocal notice of the change, and (2) acceptance of the change."

In a reply to that response, plaintiffs asserted that "in none of the cases cited by Defendants was there, as here, a

clear history of modification procedures." According to plaintiffs' reply, "[t]here is absolutely NO evidence that the parties intended to alter the clear prior method of modifications, providing a signature line on letterhead or signature from ALL DEFENDANTS, and/or signature line for KRAMER to sign and or acknowledge the change" and "[n]othing put KRAMER [*14] on 'unequivocal notice' that these documents, combined with continued working by KRAMER, would bind REMARK as binding modifications." (emphasis original). Additionally, in the conclusion to their reply, plaintiffs stated as follows:

> As established by the documentary and oral testimony at trial, DEFENDANT FANTASY DIAMOND CORPORATION'S proffer of evidence of a modification:
>
> 1. Contradicted their earlier methods of modification;
>
> 2. Did not advise KRAMER/REMARK the earlier methods of modification with signature were being altered;
>
> 3. Did not advise KRAMER/REMARK that continued service would mean acceptance of the terms;
>
> 4. Reference oral negotiations that were expressly contested and refuted by Plaintiff; and
>
> 5. Did not mention HAMPDEN
>
> As such, KRAMER/REMARK'S continued service did not accept the alleged modifications to the 2002 agreement . . . .

(emphasis original). Attached to plaintiffs' reply were excerpts from trial testimony of Kramer in which he stated he did not "agree to" the 2004 changes to his compensation.

In a final judgment dated January 22, 2013, the trial court rendered judgment in favor of Remark as described above.[4] Defendants filed a timely request for findings of fact and conclusions [*15] of law and a notice of past due findings of fact and conclusions of law. No findings of fact or conclusions of law were issued by the trial court. Additionally, defendants filed a "Motion to Vacate, Modify, Correct, or Reform the Judgment" in which they asserted, *inter alia*, the modification arguments described above. That motion was overruled by operation of law. This appeal timely followed.

4 Although Kramer was a plaintiff in the trial court, the trial court's January 22, 2013 final judgment does not award him any relief in his individual capacity. Kramer did not appeal the trial court's judgment. He has filed an "Appellees' Opening Brief" in this appeal jointly with appellee Remark.

## II. MODIFICATION OF THE 2002 AGREEMENT

### *A. Standard of Review*

We review the legal sufficiency of the evidence to support a trial court's judgment after a bench trial under the same standards applicable to a jury's verdict. *See Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996)*; *Roberson v. Robinson, 768 S.W.2d 280, 281 (Tex. 1989)*; *Ashcraft v. Lookadoo, 952 S.W.2d 907, 910 (Tex. App.--Dallas 1997)*, pet. denied, *977 S.W.2d 562 (Tex. 1998)*. When there are no findings of fact or conclusions of law filed, the trial [*16] court's judgment implies all findings of fact necessary to support it. *See, e.g., BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002)*; *Holt Atherton Indus., Inc. v. Heine, 835 S.W.2d 80, 83 (Tex. 1992)*; *Weisfeld v. Tex. Land Fin. Co., 162 S.W.3d 379, 381 (Tex. App.--Dallas 2005, no pet.)*. If a reporter's record is filed, an appellant may challenge the legal and factual sufficiency of the trial court's implied findings. *See, e.g., Heine, 835 S.W.2d at 84*; *Roberson, 768 S.W.2d at 281*; *Volume Millwork, Inc. v. W. Houston Airport Corp., 218 S.W.3d 722, 729 (Tex. App.--Houston [1st Dist.] 2006, pet. denied)*.

When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which the party had the burden of proof, it must show that the evidence establishes as a matter of law all vital facts in support of the issue. *Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001)*; *PopCap Games, Inc. v. MumboJumbo, LLC, 350 S.W.3d 699, 710 (Tex. App.--Dallas 2011, pet. denied)*. The appellant must show that there is no evidence to support the trial judge's finding and that the evidence conclusively establishes the finding urged by the appellant. [*17] *See R.J. Suarez Enters. Inc. v. PNYX L.P., 380 S.W.3d 238, 245 (Tex. App.--Dallas 2012, no pet.)*. In our review, we must credit evidence favorable to the finding if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)*. "Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." *Id. at 816*.

### *B. Applicable Law*

Contract modification is an affirmative defense. *Intec Sys., Inc. v. Lowrey, 230 S.W.3d 913, 918 (Tex. App.--Dallas 2007, no pet.)* (citing *Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984))*. The party asserting it bears the burden of proof. *Id*. (citing *Hathaway, 711 S.W.2d at 229*); *see White v. Harrison, 390 S.W.3d 666, 674 (Tex. App.--Dallas 2012, no pet.)*.

***C. Application of Law to Facts***

In their first issue, appellants contend the trial court erred by rendering judgment against them on appellees' claim for breach of the 2002 Agreement to pay a 2.5% commission because "as a matter of law, Plaintiffs agreed in July 2004 to a new fixed monthly retainer arrangement that defendants fully performed." Appellants argue [*18] "[t]here is no evidence to support an implied finding that plaintiffs did not agree to the July 2004 letter changing the commission to a fixed monthly retainer" and "the evidence conclusively establishes that they did agree to that change." Specifically, according to appellants, (1) contract modifications in "employment-related contexts" require only two elements, "unequivocal notice of the change and acceptance of the change by continued employment" and (2) both of those elements were conclusively established by the evidence in this case. Further, appellants assert "[i]n implicitly holding otherwise--i.e., that Plaintiffs did not 'agree' to the modification set forth in the [July 2004 notice letters]--the court below appears to have disregarded the undisputed evidence or misunderstood the controlling law on contract formation."[5]

5 Appellants assert "[t]he trial court's rulings are necessarily implicit because it did not file any findings of fact or conclusions of law despite Defendants' timely request and past due notice." However, appellants state, "this Court need not follow the usual remedy of abating the appeal and remanding the case because the material facts in question are not [*19] disputed and the trial judge (who did not try this case) would do no more than review the same record as this Court would."

Appellees respond that the trial court "was correct in rendering its finding that Defendants breached the [2002 Agreement] because there was never any modification to that agreement." According to appellees, this Court "should affirm the trial court's finding that there was no intent to modify the 2002 agreement, and that because Defendants/Appellants did not provide unequivocal notice, Plaintiffs'/Appellees' continued service was not an agreement of the terms of any post-2002 proposed modification."

In support of their arguments on this issue, both sides cite *Hathaway*. *See 711 S.W.2d at 227*. In that case, plaintiff Gregg N. Hathaway was employed by defendant General Mills, Inc. under an "employment at will contract"[6] to sell shirts for General Mills on a commission basis. *Id. at 228*. On January 21, 1980, Hathaway met with General Mills' national sales manager to discuss lowering Hathaway's 1980 commission rate. *Id*. Hathaway testified he disagreed with the rate change and was told by the national sales manager to discuss the proposed new commission rate with Gary [*20] Duncan, Hathaway's regional sales manager. *Id*. Further, Hathaway testified Duncan told him not to worry about the rate change and that Duncan would "take care of the situation." *Id*. Hathaway continued to work for General Mills.

6 It is not clear from the opinion in *Hathaway* whether the "employment at will contract" in that case was in writing. *See id*.

In February 1980, General Mills sent Hathaway a letter proposal containing the new rates. *Id*. Hathaway testified that Duncan told him not to sign the letter and that Duncan would "talk to" the national sales manager about the rate changes. *Id*. Hathaway did not sign the letter. *Id*. After firing Hathaway in April 1980, General Mills offered to pay him under the proposed new, lower commission rates for his work to that time. *Id*. Hathaway sued General Mills for the old, higher commissions, alleging that he never accepted the new rates. *Id*. The case was tried before a jury. *Id*.

In its answers to the jury questions, the jury found (1) Hathaway did not accept or ratify the commission rate change and (2) General Mills ratified Hathaway's refusal to accept the changes. *Id*. Based on those findings, the trial court rendered judgment in favor of Hathaway. [*21] *Id*. This Court reversed, holding that Hathaway accepted the lower rates as a matter of law by continuing to work for General Mills knowing of the changed rates. *Id*.

On appeal to the supreme court, Hathaway argued General Mills did not clearly notify him of the rate changes and, therefore, he did not accept the modification as a matter of law by remaining with General Mills. *Id*. The supreme court agreed. *Id*. That court stated "to prove a modification of an at will employment contract, the party asserting the modification must prove two things: (1) notice of the change; and (2) acceptance of the change." *Id. at 229*. Specifically, that court stated

> To prove notice, an employer asserting a modification must prove that he unequivocally notified the employee of definite changes in employment terms. Cases dealing with employment modifications require that the employee have knowledge of the proposed modification. Fairness also dictates this rule. To have knowledge of a modification, the employee must know the

> nature of the changes and the certainty of their imposition.
>
> The employer asserting a modification must also prove that the employee accepted the proposed changes. If the employer proves [*22] that he has unequivocally notified the employee of the changes, the employee's continuing employment will constitute acceptance as a matter of law.

*Id*. (citations omitted). The supreme court reasoned that the record, which included Hathaway's testimony that he was told to discuss the changes with Duncan and was told by Duncan not to worry and that Duncan would "take care of it," showed evidence of "conflicting signals from General Mills' managers" that made "unequivocal notification" a jury question. *Id*. The supreme court concluded that because General Mills did not conclusively prove or request a jury question on notification, that element must be deemed in support of the judgment and against unequivocal notification. *Id*.

In the case before us, appellants argue, without citing authority, that the sales representative agreement between the parties is "analogous" to an "at-will employment contract." Further, appellants assert in their appellate brief that courts have "consistently applied" the principles stated in *Hathaway* "to enforce modifications of compensation agreements with sales representatives, and to reject their claims for breach of the original agreement." In support of that [*23] assertion, appellants cite several Texas cases involving employee/employer relationships and one federal case involving a non-employee sales agent. *See Mitsubishi Aircraft Int'l, Inc. v. Maurer, 675 S.W.2d 286 (Tex. App.--Dallas 1984, no writ)* (involving employee sales representative); *L.G. Balfour Co. v. Brown, 110 S.W.2d 104 (Tex. Civ. App.--Fort Worth 1937, no writ)* (involving employee sales representative); *Perkins v. Ulrich, No. 14-05-00992-CV, 2007 Tex. App. LEXIS 3088, 2007 WL 1191903 (Tex. App.--Houston [14th Dist.] Apr. 24, 2007, no pet.)* (involving sales associate employed by home builder); *Bell v. Phillips, No. 14-00-01189-CV, 2002 Tex. App. LEXIS 2734, 2002 WL 576036 (Tex. App.--Houston [14th Dist.] Apr. 18, 2002, no pet.)* (involving employee sales representative); *Century Sales, Inc. v. Jupiter Aluminum, Inc., No. 4:02-CV-0607-A, 2002 U.S. Dist. LEXIS 24578, 2002 WL 31875610 (N.D. Tex. Dec. 20, 2002)* (involving non-employee sales agent).

The record shows the 1996 Agreement stated "[t]he relationship between the Company and the Sales Representative is and shall be that of independently contracting parties and not that of employer/employee." However, like appellants, appellees assert that the requirements stated in *Hathaway* are applicable to this appeal and, [*24] as described above, cited *Hathaway* in support of their arguments on remand in the trial court. Therefore, we adopt the proposition utilized by the Fourteenth Court of Appeals in Houston in *Price Pfister, Inc. v. Moore & Kimmey, Inc., 48 S.W.3d 341, 350 n.2 (Tex. App.--Houston [14th Dist.] 2001, pet. denied)*, that "[a]lthough *Hathaway* specifically deals with an at-will employment contract, we will accept as true both parties' assertion that its analysis should be applied to the parties' agreement in this case." *Id*. (applying *Hathaway* requirements in case involving non-employee sales representative); *see also Tex. Farm Bureau Mut. Ins. Cos. v. Sears, 84 S.W.3d 604, 606 (Tex. 2002)* (applying law pertaining to at-will employment after concluding independent insurance agent whose contract with insurance company provided either party could terminate without cause upon ten days' notice was "an at-will agent" and "as the parties acknowledge, his relationship with [the insurance company] has all the characteristics of at-will employment").[7]

> 7 Like the court in *Price Pfister*, we "express no opinion, however, whether *Hathaway* governs oral agreements outside of the context of at-will employment." [*25] *Price Pfister, 48 S.W.3d at 350 n.2*.

Appellees argue this case is distinguishable from the cases cited by appellants and fails to meet the requirements of *Hathaway* because appellants' "unilateral proposed 'modification'" altered the parties' "prior modification procedures." According to appellees,

> There is absolutely NO evidence that the parties intended to alter the clear prior method of modifications, providing a signature line on letterhead or signature from ALL DEFENDANTS, and/or signature line for KRAMER to sign and or acknowledge the change. Nothing put KRAMER on "unequivocal notice" that these documents, combined with continued working by KRAMER, would bind REMARK as binding modifications.

(emphasis original). Additionally, appellees contend (1) "FANTASY DIAMOND CORPORATION'S proffer of evidence of a modification . . . [d]id not mention HAMPDEN" (emphasis original); (2) the parties' "prior modifications with signatures and from both defendants" "expressly contradict any interpretation of [the July 2004 notice letters] as BINDING MODIFICATIONS" (emphasis original); and (3) Kramer "unequivocally denied

agreeing to" or "negotiating" any of the new terms. In support of those arguments, [*26] appellees cite (1) *In re Halliburton Co., 80 S.W.3d 566, 569 (Tex. 2000)*, in which the supreme court, in concluding the notice in that case was unequivocal and the employee's continuing employment constituted acceptance, quoted language in the "notice documents" that "explained" the modification, stated the effective date, and "explained that by working after that date an employee would indicate that he or she accepted the provision" and (2) *Hathaway*.[8]

8 Additionally, appellees cite *Stowers v. Harper, 376 S.W.2d 34 (Tex. Civ. App.--Tyler 1964, writ ref'd n.r.e.)* for the same statement of law quoted above from *Hathaway*.

To the extent appellees contend *In re Halliburton* requires appellants to show Kramer knew his continued service and acceptance of the monthly retainer payments would indicate he accepted the alleged modification, we cannot agree. While *In re Halliburton* quotes portions of a notice that so advised the employee in that case, the law specifically stated and applied in that case is the two-part test from *Hathaway* and no additional elements of proof are described or imposed by the *In re Halliburton* court. *See In re Halliburton, 80 S.W.3d at 568-69, 572-73*.

Next, we consider appellees' [*27] assertion that the July 1, 2004 letter did not "mention" Hampden. Appellees do not specifically explain how this assertion is material to their argument. To the extent this assertion can be construed as an argument that appellees were not given notice that the alleged modification pertained to Hampden as well as Fantasy Diamond, the record shows Kramer testified (1) Joseph Wein told him in summer 2004 that he had to be prepared to reduce his income from "these companies" and not be dependent on "them" going forward and (2) Kramer received the July 1, 2004 letter from Joseph Wein following that conversation. The July 1, 2004 letter stated in part "[p]er our conversation, we will convert payment to REMARK from commission to retainer beginning immediately." The letter was signed by Joseph Wein, who was chairman and chief executive officer of both Fantasy Diamond and Hampden. While the July 1, 2004 letter did not "mention" Hampden, the record shows that letter was written pursuant to a conversation between Kramer and Joseph Wein respecting payments from both Fantasy Diamond and Hampden. Further, there is no evidence in the record that any party intended or understood that the change from [*28] commission to retainer pertained only to Fantasy Diamond.

As to appellee's remaining arguments, *Hathaway* provides that if an employer proves he "unequivocally notified" an at-will employee of "definite changes in employment terms," the employee's continuing employment will constitute acceptance of the changes as a matter of law. *Hathaway, 711 S.W.2d at 229*. "To have knowledge of a modification, the employee must know the nature of the changes and the certainty of their imposition." *Id*. The July 1, 2004 letter (1) stated that pursuant to a prior conversation between Kramer and Joseph Wein, which the record shows pertained to reducing Kramer's income from both Fantasy Diamond and Hampden, payment to Remark would be converted to retainer "beginning immediately" and (2) set forth in detail the amounts of the retainer payments to be received by Remark. Although appellees cite *Hathaway* and *In re Halliburton* in support their position that appellants were required to advise them that "the earlier methods of modification with signature were being altered" neither of those cases mentions or addresses any "earlier methods of modification" or any requirement to advise as to alteration of such. *See* [*29] *id. at 228-29*; *In re Halliburton, 80 S.W.3d at 568*. Further, appellees cite *Hathaway* to support their position that "prior modifications with signatures and from both defendants" "expressly contradict" any interpretation of the July 1, 2004 letter as a binding modification. However, unlike the case before us, *Hathaway* involved "conflicting signals" during the parties' communications pertaining to the alleged modification in question in that case. *Hathaway, 711 S.W.2d at 229*. Appellees cite no authority, and we have found none, to support the position that the "prior modifications" alleged by appellees constitute "conflicting signals" pursuant to *Hathaway*. Finally, Kramer's testimony that he "unequivocally denied agreeing to" or "negotiating" any of the alleged modifications is immaterial to our analysis of whether the record establishes the two elements required by *Hathaway*. *See id*.

On this record, we conclude the evidence conclusively established appellants "unequivocally notified" appellees of the change in question and appellees accepted that change. Accordingly, we conclude the parties' 2002 Agreement was modified as a matter of law. *See id*.

We decide in favor of appellants on their [*30] first issue.

**III. CONCLUSION**

We decide appellants' first issue in their favor. In light of our resolution of that issue, we need not address appellants' remaining issues.[9]

9 Additionally, appellees (1) state in the fact section of their appellate brief that "[n]o notice via certified mail was ever provided as required under the terms of the agreement" and (2) asserted in part during oral argument before this Court that the fifteen-day notice of termination by certified or registered mail as required by the parties' agreement "did not occur here." However, appellees

stated during oral argument (1) although the trial court's judgment from which this appeal is taken did not specifically address the termination date of the parties' agreement, the damages awarded by the trial court appear to be based on a termination date of December 31, 2005 and (2) appellees do not contest that the parties' agreement was terminated effective December 31, 2005. Appellees did not appeal the trial court's judgment, nor do they assert a cross-issue or argument in their appellate brief respecting the termination date of the agreement. Therefore, appellees' assertions respecting the termination date of the parties' [*31] agreement present nothing for this Court's review. *See TEX. R. APP. P. 25.1(c), 38.2*.

We reverse the trial court's judgment and render a take-nothing judgment in favor of appellants.

/Douglas S. Lang/

DOUGLAS S. LANG

JUSTICE

**JUDGMENT**

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that appellees REMARK, INC. and ROBERT KRAMER take nothing on their claims.

It is **ORDERED** that appellants HAMPDEN CORPORATION and FANTASY DIAMOND CORPORATION recover their costs of this appeal from appellees REMARK, INC. and ROBERT KRAMER.

Judgment entered this 25th day of June, 2014.

/Douglas S. Lang/

DOUGLAS S. LANG

JUSTICE



**Healix Infusion Therapy, Inc., Appellant v. Nicholaos C. Bellos, M.D., P.A., Appellee**

**No. 11-02-00346-CV**

**COURT OF APPEALS OF TEXAS, ELEVENTH DISTRICT, EASTLAND**

***2003 Tex. App. LEXIS 9027***

**October 23, 2003, Decided**

**PRIOR HISTORY:** [*1] Appeal from Dallas County.

**DISPOSITION:** Affirmed.

**COUNSEL:** For Plaintiff or Petitoner: Murphy Klasing, Kenneth Moursund Jr., McGinnis, Lockridge & Kilgore, Houston, TX.

For Defendant or Respondent: Cathy Hendrickson, Kevin A. Kinnan, Ryan Downton, Bruce Howell, Arter & Hadden, Attorneys at Law, Dallas, TX. Jeffrey Hellberg Jr., Flanary Carter Schubert, P.C., Attoneys at Law, Dallas, TX.

**JUDGES:** Panel consists of: Arnot, C.J., and Wright, J., and McCall, J.

**OPINION BY:** JIM R. WRIGHT

**OPINION**

Memorandum Opinion

The trial court granted a motion for summary judgment filed by Nicholaos C. Bellos, M.D., P.A. and enforced a contractual liquidated damages clause against Healix Infusion Therapy, Inc. The trial court awarded Dr. Bellos $ 10,000.00 in his suit against Healix. The trial court also awarded attorney's fees to Dr. Bellos. In two issues on appeal, Healix argues that the liquidated damages clause is an unenforceable penalty and that there are genuine issues of material fact regarding damages. [1] We affirm.

1 The award of attorney's fees is not contested in this appeal.

Dr. Bellos sued Healix in another lawsuit; the parties reached a settlement in that suit. Both parties agreed not to disclose the nature of the settlement agreement. The agreement provided for $ [*2] 10,000.00 in liquidated damages in the event of a breach by either party. After the settlement agreement was signed, Methodist Hospitals of Dallas (Methodist), where Dr. Bellos practiced, sent $ 6,385.13, which it owed to Dr. Bellos, because it mistakenly believed that Healix held a lien against Dr. Bellos. Healix sent a letter and a copy of the settlement agreement to Methodist to show that there was no lien. Dr. Bellos claimed that Healix breached the settlement agreement when Healix furnished the agreement to Methodist, and he sued Healix to recover under the liquidated damages provision of the agreement.

A trial court must grant a motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *TEX.R.CIV.P. 166a(c)*; *Lear Siegler, Inc. v. Perez, 819 S.W.2d 470, 471, 35 Tex. Sup. Ct. J. 154 (Tex.1991)*. Once the movant establishes a right to a summary judgment, the non-movant must come forward with evidence or law that precludes summary judgment. *City of Houston v. Clear Creek Basin Authority, 589 S.W.2d 671, 678-79, 23 Tex. Sup. Ct. J. 7 (Tex.1979)*. When reviewing a summary judgment, [*3] the appellate court takes as true evidence favorable to the non-movant. Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *American Tobacco Company, Inc. v. Grinnell, 951 S.W.2d 420, 425, 40 Tex. Sup. Ct. J. 658 (Tex.1997)*; *Nixon v. Mr. Property Management Company, Inc., 690 S.W.2d 546, 548-49, 28 Tex. Sup. Ct. J. 384 (Tex.1985)*. In order to succeed on an affirmative defense in a summary judgment proceeding, a defendant must establish every element of the affirmative

defense. *American Tobacco Company, Inc. v. Grinnell, supra.*

Courts will enforce liquidated damages provisions in contracts when the court finds that the harm resulting from a breach of the contract is incapable or difficult to estimate and when it also finds that the amount provided as liquidated damages is a reasonable forecast of just compensation. *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2, 23 Tex. Sup. Ct. J. 142 (Tex.1979)*. The "difficulty of estimation" and "reasonable forecast" questions must be determined from evidence of the circumstances which existed at the time the parties executed the agreement. *Baker v. International Record Syndicate, Inc., 812 S.W.2d 53* [*4] *(Tex.App. - Dallas 1991, no writ)*. Courts will not enforce liquidated damages clauses which do not meet those criteria because the clauses would constitute unenforceable penalties. *Phillips v. Phillips, 820 S.W.2d 785, 35 Tex. Sup. Ct. J. 220 (Tex.1991)*. Determining whether a liquidated damages clause is enforceable or whether it is an unenforceable penalty is a question of law. *Phillips v. Phillips, supra.*

In this case, the initial burden was on the movant. However, when a party raises the affirmative defense of penalty, that party assumes the burden to conclusively establish the defense. *Baker v. International Record Syndicate, Inc., supra.* Therefore, the burden was upon Healix to prove that the contractual liquidated damages was an unenforceable penalty.

The settlement agreement offered as summary judgment evidence by Dr. Bellos showed that the parties agreed to keep the nature of the settlement agreement confidential. The parties further agreed that a breach of the confidentiality clause would result in imminent and irreparable harm and that the damages for a breach of confidentiality would be $ 10,000.00. Healix admitted in its response to Dr. Bellos's [*5] request for admissions that it agreed to the confidentiality of the agreement and that it agreed to the $ 10,000.00 liquidated damages clause. Dr. Bellos's affidavit reflected that he agreed to the confidential nature of the agreement and that he had performed all acts required of him under the settlement agreement. His affidavit further showed that Methodist subjected him to a re-credentialing process every two years. He was unaware of how the disclosure of the agreement would affect the re-credentialing process, but states that he has been harmed in a manner that is "incapable of or difficult of estimation."

As part of its proof, Healix attached the affidavit of Heather Hughes-Glass, the corporate risk manager for Healix. In her affidavit, Heather Hughes-Glass stated that, as soon as she became aware of the confidentiality provision of the agreement that was sent to Methodist, she contacted Dean Matthys, the corporate risk manager for Methodist, to have him destroy the agreement. She further stated that Matthys indicated that only he and his assistant were aware of the settlement agreement. Also included in the summary judgment evidence was an affidavit given by Matthys as well [*6] as a letter from Matthys to Healix. These documents indicated that the copy of the settlement agreement was destroyed soon after it was received by Methodist and that the only two people to see the agreement, Matthys and his assistant Lisa Irby, were not involved with the re-credentialing process at Methodist. Finally, Healix offered as summary judgment evidence Dr. Bellos's response to a request for disclosure that any economic damages suffered by Dr. Bellos were difficult to estimate.

This evidence does not meet the burden Healix must bear: that at the time the agreement was made damages could be easily ascertained and that the amount of the liquidated damages award was not a reasonable forecast of just compensation. Healix contends that the award of liquidated damages is disproportionate to the actual damages suffered by Dr. Bellos because Dr. Bellos did not have any actual damages. To emphasize this point, Healix relies on *Baker*. "If the liquidated damages are shown to be disproportionate to the actual damages, then the liquidated damages can be declared a penalty and recovery limited to actual damages proven." *Baker v. International Record Syndicate, Inc., supra at 55*. [*7] Healix still must show that, at the time the agreement was made, the amount of the liquidated damages was not a reasonable forecast. To prove this defense, Healix must prove actual damages, if any, to show that the actual loss was not an approximation of the stipulated sum. *Baker v. International Record Syndicate, Inc., supra.* That damages are not yet ascertainable is not tantamount to evidence of "zero" damages.

The summary judgment evidence establishes that there was an agreement between Healix and Dr. Bellos that prohibited the disclosure of the nature of the settlement agreement and that Dr. Bellos performed all the required acts under the agreement. Healix breached the agreement by sending a copy of the agreement to Methodist. Because we find that Healix failed to meet its burden of proof on the penalty issue and because Healix failed to raise a genuine issue of material fact, we hold that the trial court did not err when it granted Dr. Bellos's motion for summary judgment. Healix's issues on appeal are overruled.

The judgment of the trial court is affirmed.

JIM R. WRIGHT

JUSTICE



**HIRSCHFELD STEEL COMPANY, INC., Appellant v. KELLOGG BROWN & ROOT, INC. AND HARRIS COUNTY-HOUSTON SPORTS AUTHORITY, Appellees**

**NO. 14-04-00504-CV**

**COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON**

***201 S.W.3d 272*; *2006 Tex. App. LEXIS 7152***

**August 15, 2006, Judgment Rendered**
**August 15, 2006, Opinion Filed**

**PRIOR HISTORY:** [**1] On Appeal from the 270th District Court. Harris County, Texas. Trial Court Cause No. 02-24591.

**DISPOSITION:** Affirmed.

**COUNSEL:** For APPELLANTS: Steven J. Lownds, Dallas, TX; Marcie Lynn Schot, Dallas, TX; Roger D. Townsend, Houston, TX.

for APPELLEES: Daniel J. Kraftson, McLean, TX; E. Katherine Strahan, Houston, TX; Gene L. Locke, Houston, TX; Kerry McMahon, Houston, TX; Nicholas A. Simms, Houston, TX.

**JUDGES:** Panel consists of Justices Fowler, Frost, and Guzman.

**OPINION BY:** Kem Thompson Frost

**OPINION**

[*275] This case arises out of the construction of what is now known as Minute Maid Park and involves disputes among the owner of the ball park, the general contractor, and one of its subcontractors. The subcontractor sued the general contractor asserting contract claims for retainage and contract damages as well as seeking a declaratory judgment against both the owner and the general contractor that the subcontractior's ten-year warranty on the park's retractable roof was void. The general contractor asserted a counterclaim for breach of contract and declaratory relief. The trial court granted summary judgment denying the subcontractor's claims for declaratory relief against the general contractor and the owner. After a jury trial, the trial court rendered judgment that both the subcontractor and the general contractor take nothing on their claims against each other. On appeal, the subcontractor (1) challenges the legal and factual sufficiency of the jury's finding that it did not substantially perform [**2] its duties under the subcontract, (2) asserts the trial court abused its discretion in admitting evidence regarding the warranty, (3) claims the trial court erred in not rendering judgment in its favor on an allegedly separate and independent contract claim for maintenance work on the roof, and (4) argues the trial court erred in rendering summary judgment dismissing its declaratory-judgment claims. In its cross-appeal, the general contractor asserts the trial court erred in denying it attorney's fees under provisions of the subcontract allowing the prevailing party in litigation between the subcontractor and the general contractor to recover attorney's fees. We affirm the trial court's judgment.

**I. FACTUAL AND PROCEDURAL BACKGROUND**

Appellee Harris County-Houston Sports Authority (hereinafter the "Sports Authority") is the owner of Minute Maid Park, a state-of-the-art professional baseball stadium located in downtown Houston. In December 1997, the Sports Authority and appellee Kellogg Brown & Root, Inc. ("Kellogg") entered into a contract for the construction of Minute Maid Park (hereinafter the "Construction Contract"). In May of 1998, Kellogg and appellant Hirschfeld Steel [**3] Company, Inc. (hereinafter "Hirschfeld") entered into a subcontract, under which Hirschfeld agreed to provide various metal systems for Minute Maid Park (hereinafter the "Subcontract"). As part of the Subcontract, Hirschfeld agreed to design and build

all structural, architectural, electrical, and mechanical components required to provide a complete and working retractable roof system for Minute Maid Park (hereinafter "Roof System"). Under the Subcontract, Hirschfeld [*276] also was required to warrant various aspects of the Roof System for ten years.

***Performance of First-Year Maintenance Services***

Hirschfeld subcontracted with Uni-Systems, Inc. to perform some of the services required under the Subcontract. Uni-Systems provided some first-year maintenance services for the Roof System, but a dispute arose over who was supposed to pay for these services. The Sports Authority asserted that first-year maintenance services were included in the Construction Contract and should be performed at no additional cost to the Sports Authority. Kellogg asserted that these services were not included in the Construction Contract and that Kellogg was entitled to a change order under that contract [**4] giving it additional compensation for providing these services. As between the Sports Authority and Kellogg, an arbitration panel eventually ruled against the Sports Authority's position and determined that Kellogg was not obligated to provide the first-year maintenance services without receiving additional compensation. In any event, Uni-Systems allegedly provided various first-year maintenance services and sought payment from Hirschfeld for these services. Hirschfeld settled with Uni-Systems and then sought payment from Kellogg for the first-year maintenance services allegedly provided on its behalf by Uni-Systems.

***Subcontractor's Suspension of Ten-Year Warranty***

On September 22, 2000, Hirschfeld sent a letter to Kellogg stating that Hirschfeld was declaring the ten-year warranty suspended based on the Sports Authority's alleged failure to perform maintenance on the Roof System allegedly required by the ten-year warranty. Hirschfeld asserted that the warranty would be suspended until Hirschfeld reinstated the warranty based on the occurrence of various events, including completion of all repairs necessitated by the Sports Authority's failure to perform the required maintenance [**5] and the performance of all required maintenance on the roof mechanism. Hirschfeld did not thereafter reinstate its ten-year warranty.

***Settlement Agreement Between Owner and General Contractor***

Kellogg and the Sports Authority finally resolved all of their differences regarding this project and entered into a settlement agreement effective March 29, 2002. This agreement provided that Kellogg would receive final payment from the Sports Authority by April 26, 2002. In this agreement, Kellogg agreed that the ten-year warranty on the Roof System is in full force and effect and is enforceable directly against Kellogg notwithstanding the purported revocation of this warranty by Hirschfeld.

***Litigation***

In May 2002, Hirschfeld filed this lawsuit against Kellogg and the Sports Authority. Hirschfeld asserted claims against Kellogg for retainage under the Subcontract and other contract damages. Hirschfeld also sought a declaratory judgment against both the Sports Authority and Kellogg that its ten-year warranty on the retractable roof was void because of an alleged failure to perform required maintenance on the Roof System. Kellogg counterclaimed for breach of contract and [**6] declaratory-judgment relief.

The Sports Authority and Kellogg filed motions for summary judgment asserting, among other things, that (1) the trial court lacked subject matter jurisdiction over [*277] Hirschfeld's declaratory-judgment claims regarding the ten-year warranty because the claims were not ripe and (2) as a matter of law, the Subcontract does not make performance of maintenance on the Roof System a condition precedent to the existence of Hirschfeld's warranty. The trial court granted both motions for summary judgment and dismissed Hirschfeld's claims for a declaratory judgment that its warranty was void.

The contract claims of Kellogg and Hirschfeld were tried to a jury. The jury found that (1) Hirschfeld did not substantially perform its duties under the Subcontract; (2) $ 1,259,922 remains unpaid under the Subcontract; (3) remedying or repairing Hirschfeld's defects and/or omissions would cost $ 500,000; (4) Hirschfeld performed first-year maintenance through its subcontractor Uni-Systems as directed by Kellogg; and (5) $ 240,000 is the fair and reasonable value of the first-year maintenance provided by Hirschfeld through its subcontractor Uni-Systems.

The trial court signed [**7] a final judgment incorporating its summary-judgment rulings on Hirschfeld's declaratory-judgment claims and ordering that Hirschfeld and Kellogg take nothing by their claims. The trial court denied Kellogg's request for attorney's fees under a provision in the Subcontract allowing the prevailing party in litigation between the parties to recover its attorney's fees. Hirschfeld appealed, and Kellogg cross-appealed.

**II. ISSUES PRESENTED**

On appeal, Hirschfeld raises the following issues:

> (1) Is the evidence legally and factually sufficient to support the jury's finding that

Hirschfeld did not substantially perform its duties under the Subcontract?

(2) Did the trial court reversibly err in admitting allegedly irrelevant testimony regarding Hirschfeld's suspension of its warranty?

(3) In light of the jury's findings, did the trial court erroneously refuse to render judgment in favor of Hirschfeld on its claim for $ 240,000 and attorney's fees based on its claim regarding first-year maintenance?

(4) Did the trial court err in granting summary judgment as to Hirschfeld's claims against Kellogg and the Sports Authority for declaratory judgment regarding the ten-year [**8] warranty?

In its cross-appeal, Kellogg asserts the trial court erred by not awarding Kellogg its attorney's fees.

**III. STANDARDS OF REVIEW**

In reviewing the trial court's traditional summary judgment as to Hirschfeld's declaratory-judgment claims, we take as true all evidence favorable to the non-movant, and we make all reasonable inferences in the non-movant's favor. *Dolcefino v. Randolph, 19 S.W.3d 906, 916 (Tex. App.--Houston [14th Dist.] 2000, pet. denied)*. If the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the non-movant to raise a genuine, material fact issue sufficient to defeat summary judgment. *Id*.

In construing the Subcontract, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464, 42 Tex. Sup. Ct. J. 130 (Tex. 1998)*. To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex.* [*278] *Utils. Elec. Co., 995 S.W.2d 647, 652, 42 Tex. Sup. Ct. J. 656 (Tex. 1999).* [**9] Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118, 121, 39 Tex. Sup. Ct. J. 537 (Tex. 1996)*. A contract is ambiguous when its meaning is uncertain and doubtful or is susceptible to more than one reasonable interpretation. *Id*. However, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157, 47 Tex. Sup. Ct. J. 40 (Tex. 2003)*.

**IV. ANALYSIS**

**A. Did the trial court err in granting summary judgment as to the declaratory-judgment claims relating to the ten-year warranty?**

In its fourth issue, which we address first, Hirschfeld asserts that the trial court erred in granting summary judgment as to its claims for declaratory judgment regarding the ten-year warranty. In their motions for summary judgment, Kellogg and the Sports Authority argued the trial court lacked subject matter jurisdiction because the declaratory-judgment claims are not ripe and, in the alternative, they fail on the merits. The trial court granted the motions without specifying [**10] the grounds. Because the trial court dismissed the claims with prejudice rather than without prejudice, it does not appear that the trial court concluded it lacked jurisdiction under the ripeness doctrine. However, it is possible the trial court found a lack of ripeness and rendered an improper judgment based on this determination. Furthermore, even if the trial court did not conclude the declaratory-judgment claims were not ripe, we still would lack jurisdiction if this were so. Therefore, we must address the ripeness issue in any event.

In deciding a ripeness issue, we ask whether, at the time a lawsuit is filed, the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote. *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc., 971 S.W.2d 439, 442, 41 Tex. Sup. Ct. J. 1001 (Tex. 1998)*. The ripeness inquiry thus focuses on whether the case involves uncertain or contingent future events that may not occur as anticipated or may not occur at all. *Id*. By maintaining this focus, the ripeness doctrine serves to avoid premature adjudication. *Id*.

The Texas Declaratory Judgment Act is a remedial statute whose purpose [**11] is to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. *TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b)* (Vernon 1997). We must construe and administer this statute liberally. *Id*. A court of record, acting within its jurisdiction, has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. *Id. § 37.003(a)* (Vernon 1997). A person with an interest in a written contract may ask a court to determine any question of construction or validity arising under the contract and obtain a declaration of rights, status, or other legal relations thereunder. *Id. § 37.004(a)* (Vernon 1997). A contract may be construed either before or after a breach. *Id. § 37.004(b)*.

Kellogg and the Sports Authority assert that Hirschfeld's declaratory-judgment claims regarding the ten-year warranty are not ripe because so far no warranty claims have been made or threatened. However, the record reflects that there is a real and current controversy regarding this warranty. Kellogg relies on its interpretation of the warranty to support the trial court's take-nothing [**12] judgment on Hirschfeld's contract [*279] claim. If Hirschfeld's construction of the warranty is correct, this court's analysis of Hirschfeld's first and second issues on appeal will be affected. After careful consideration, we conclude that Hirschfeld's declaratory-judgment claims regarding the ten-year warranty are ripe. *See Patterson, 971 S.W.2d at 442*; *City of Waco v. Tex. Nat. Res. Conserv. Comm'n, 83 S.W.3d 169, 175-78 (Tex. App.--Austin 2002, pet. denied)* (holding that declaratory-judgment claims were ripe). Therefore, we have appellate jurisdiction over these claims, and the trial court erred to the extent it granted summary judgment on this basis.

We now must decide whether the trial court erred in refusing to grant Hirschfeld's request for a declaratory judgment that its ten-year warranty is void and its revocation of this warranty was effective. Hirschfeld argues that it no longer owes any obligations under the ten-year warranty on the Roof System because alleged express conditions precedent--scheduled inspections and maintenance--did not occur. Hirschfeld asserts that the performance of the inspections and maintenance is a condition precedent [**13] to the existence of the ten-year warranty as a matter of law, or in the alternative, that the Subcontract is ambiguous in this regard.

The Subcontract states the following:

> 4. This Subcontractor shall provide a Ten (10) Year Warranty for the Mechanized Retractable Roof System which incorporates the Structural Steel, Roof Deck and Roof Mechanization System in its entirety. The Ten-Year Warranty shall provide the following coverage:
>
> a. This Subcontractor shall warrant the structural steel and deck against all defects in quality and workmanship, manufacture and installation for a period of ten (10) years, from the date of Substantial Completion of the project.
>
> b. This Subcontractor shall warrant the roof mechanism against all defects in quality and workmanship, manufacture and installation for a period of ten (10) years, from the date of Substantial Completion of the project.
>
> c. This Subcontractor shall warrant the design of the roof mechanism and the roof Structure [sic] against errors and omissions for a period of ten (10) years from the date of Substantial Completion of the project.
>
> 5. This Subcontractor shall warrant the interface between design of [**14] the structural Roof [sic] system and the roof mechanism for a period of ten (10) years from the date of final completion of the project. The following clarifications are acknowledged as a basis of Subcontractor's [Guaranteed Maximum Price]:
>
> a. This Subcontractor shall warrant the design, manufacture, and installation of the roof mechanism to perform [its] intended purpose of; [sic] opening and closing the roof structure without excessive noise, excessive vibration, and/or excessive wear for a period of ten (10) years from the date of Substantial Completion of the project.
>
> b. Acts of God and other normal insurable risks are excluded from this warranty.
>
> c. Architectural elements (i.e. glass, roof membrane) are excluded from this warranty.
>
> d. Adequacy of design of structural roof components to perform as a static roof is excluded from this warranty (i.e. if the roof design is determined to be adequate for a static roof under design loads, this Subcontractor will guarantee the performance of the roof structure and mechanism to jointly perform their designed function; if the roof design [*280] were to be determined to be inadequate for a static roof under design loads, [**15] this Subcontractor does not warrant that inadequacy).
>
> 6. This Subcontractor shall specify and publish a ten- (10) year written maintenance program for the Roof Mechanization System, which includes a manufacturer recommended maintenance schedule. The ten- (10) year maintenance program shall be submitted to the Architect/Engineer of record. *However, the Architect/Engineer of record's review comments must not diminish the integrity of the*

> *specified maintenance program as a condition of the ten- (10) year warranty, unless the subject revisions are accepted by the Contractor*. This Subcontractor's ten (10) [sic] year written maintenance program shall include but is not limited to the folllowing:
>
> a. A schedule of daily and weekly inspections required to be performed by the Owners [sic] Roof Mechanization System operator, which will facilitate identification of potential maintenance issues.
>
> b. A schedule of quarterly required maintenance and inspections to be performed by a maintenance contractor to be selected by the Owner. The Owner shall publish quarterly reports to this Subcontractor, (copied to the Contractor) [sic] The Owner's quarterly maintenance and inspections [**16] shall include (at a minimum) but are not limited to the following:
>
> 1. The maintenance contractor selected by the Owner shall grease all wheel bearings, lubricate all open gearing, clean power feed rail, clean microwave guide, clean all electrical component cooling fins.
>
> 2. The maintenance contractor selected by the Owner shall perform a full system inspection, utilizing a minimum of sixty (60) man hours and two (2) technicians. The full system inspection shall be developed and published by this Subcontractor in accordance with the completed design, and reviewed by the Architect/Engineer of record.
>
> 3. The maintenance contractor selected by the Owner shall perform a "point by point" inspection, developed and published by this Subcontractor in accordance with the completed design reviewed by the Architect/Engineer of record on this project.
>
> c. A schedule of annual maintenance and inspections required to be performed by the maintenance contractor selected by the Owner, which shall include all structural, mechanical, and electrical components, including finishes. An inspection report shall be published to this Subcontractor (and copied to the Contractor) [sic] By [**17] the Owner, which includes detailed observations and recommendations. The Owner's annual maintenance and inspections shall include (at a minimum) but are not limited to the following:
>
> 1. The maintenance contractor selected by the Owner shall perform a "point by point" inspection, developed and published by this Subcontractor in accordance with the completed design, and submitted to the Architect/Engineer of record on this project. The Owner shall submit a copy of the inspection report to this Subcontractor and the Contractor.
>
> 2. The maintenance contractor selected by the Owner shall implement a local observation system that will be monitored via modem at all times, each time the roof is operated. The Owner shall submit pertinent information regarding the location of the observation post and contact information shall be submitted to this Subcontractor and the Contractor. [*281] The Owner shall dispatch a local technician to the site in the event any problems are detected, and notify this Subcontractor accordingly. This Subcontractor shall advise the Owner as required to resolve any operational malfunctions. This Subcontractor shall maintain a permanent record regarding issues of this [**18] nature throughout the life of the warranty [sic] A complete report regarding issues of this nature shall be submitted to the Contractor by the Subcontractor.

Attachment B of the Subcontract (emphasis added).

Relying primarily on the italicized language above, Hirschfeld asserts that the written maintenance program described in Paragraph 6 above is a condition precedent and that, if this maintenance program is not followed, then its ten-year warranty is void. To determine whether a condition precedent exists, the intention of the parties must be ascertained, and that can be done only by looking at the entire contract. *Criswell v. European Crossroads Shopping Ctr., Ltd., 792 S.W.2d 945, 948, 33 Tex. Sup. Ct. J. 598 (Tex. 1990)*. To make performance specifically conditional, a term such as "if," "provided that," "on condition that," or some similar phrase of conditional language normally must be included. *Id*. If no such language is used, the terms typically will be construed as a covenant in order to prevent a forfeiture. *Id*. Though there is no requirement that such phrases be utilized, their ab-

sence is probative of the parties' intention that a promise be made, rather than [**19] a condition imposed. *Id*. In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. *Id*. When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition. *Id*. Because of their harshness in operation, conditions are not favored in the law. *Id*.

There is no language in the Subcontract stating that there will be a ten-year warranty from Hirschfeld "if," "provided that," or "on condition that" the written maintenance program is followed. There is no contract language stating that nonperformance of the maintenance program will void the warranty. [1] Hirschfeld focuses on a sentence that uses the word "condition"; however, this sentence notably does not use the term "condition precedent." The term "condition" can mean a condition precedent, but it also can be used more generally to mean a term or provision in a contract that is not a condition precedent. *See* BLACK'S LAW DICTIONARY 312-13 (8th ed. 2004) (defining condition as "a future and uncertain event on which [**20] the existence or extent of an obligation or liability depends" and also as "a term, provision, or clause in a contract"). In Attachment B of the Subcontract, the parties first describe the ten-year warranty required of Hirschfeld in sections 4 and 5, and then, in section 6, they require Hirschfeld to publish a ten-year written maintenance program, which Hirschfeld must submit to the Architect/Engineer. The sentence upon which Hirschfeld relies states that, although the Architect/Engineer may make comments and suggest revisions to this maintenance program, these comments and suggested revisions [*282] alone do not change the maintenance program unless Kellogg accepts them. In the course of stating this, the parties provided in the Subcontract that the Architect/Engineer's comments "must not diminish the integrity of the specified maintenance program *as a condition* of the ten- (10) year warranty, unless the subject revisions are accepted by the Contractor." However, given that these sophisticated parties do not indicate in any other sentence of the Subcontract that performance of the written maintenance is a condition precedent to the existence of Hirschfeld's warranty obligation, it seems [**21] unlikely that if they intended as much they would have mentioned it only in passing as they were addressing the effect of the Architect/Engineer's comments on the written maintenance program.

> 1 Elsewhere in the Subcontract, the parties used language creating an express condition precedent. For example, in section 22(C)(8) of the Subcontract's Attachment A, the parties state that "[n]otwithstanding any provision of this Subcontract to the contrary, it is further expressly agreed that final payment by the [Sports Authority] to [Kellogg] is an absolute condition precedent to final payment by [Kellogg] to [Hirschfeld]."

Sections 4 and 5 require Hirschfeld to warrant for ten years (1) the Structural Steel, Roof Deck and roof mechanism against all defects in quality and workmanship, manufacture, and installation, (2) the design of the roof mechanism and roof structure against errors and omissions, (3) the interface between the design of the structural roof system and the roof mechanism, and (4) the design, [**22] manufacture, and installation of the roof mechanism to perform its intended purpose of opening and closing the roof structure without excessive noise, excessive vibration, and/or excessive wear. Given these substantial warranties, it would not be reasonable to interpret the passing reference in the Subcontract as stating a condition precedent, and it would not be reasonable to interpret this statement as an intention to void the ten-year warranty based on the failure to make one daily inspection or the failure to grease one wheel bearing, as required by the written maintenance program in section 6.

After considering the entire Subcontract under the applicable legal standard, we conclude that, under the unambiguous language of the Subcontract, performance of the written maintenance plan is not a condition precedent to the existence of Hirschfeld's ten- year warranty. *See Criswell, 792 S.W.2d at 948-49* (holding that contract language did not make sale of the property on a condominium basis a condition precedent to plaintiff's entitlement to compensation); *Sturges v. System Parking, Inc., 834 S.W.2d 472, 474 (Tex. App.--Houston [14th Dist.] 1992, writ* [**23] *dism'd by agr.)* (concluding there was no condition precedent under contract as a matter of law). The trial court did not err in granting the traditional motions for summary judgment filed by the Sports Authority and Kellogg and in dismissing with prejudice Hirschfeld's declaratory-judgment claims regarding the ten-year warranty. [2] Accordingly, we overrule Hirschfeld's fourth issue.

> 2 Kellogg also asserted a no-evidence motion for summary judgment regarding these claims; however, by concluding the trial court did not err in granting the traditional motion, we need not analyze this additional ground for summary judgment.

**B. Is the evidence legally and factually sufficient to support the jury's finding that the subcontractor did not substantially perform its duties under the Subcontract?**

In its first issue, Hirschfeld attacks the legal and factual sufficiency of the evidence to support the jury's

finding that Hirschfeld failed to substantially perform its duties under the Subcontract. Because Hirschfeld [**24] had the burden of proof as to this issue, for Hirschfeld to succeed in its legal-sufficiency challenge, we must conclude that Hirschfeld conclusively proved it substantially performed its duties under the Subcontract as a matter [*283] of law. *See Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241, 44 Tex. Sup. Ct. J. 664 (Tex. 2001)*. Hirschfeld asserts it made this showing and therefore the trial court should have awarded it attorney's fees and $ 759,922--the difference between the amount the jury found was unpaid under the Subcontract ($ 1,259,922) and the cost of remedying or repairing Hirschfeld's defects and omissions as found by the jury ($ 500,000). In making this determination, we must consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson, 168 S.W.3d 802, 822, 48 Tex. Sup. Ct. J. 848 (Tex. 2005)*. We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *See id. at 827*. We must determine whether the evidence at trial would enable a reasonable and fair-minded person to find the facts at issue. [**25] *See id*. The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See id. at 819*. Evidence is conclusive only if reasonable people could not differ in their conclusions. *See id*.

As to Hirschfeld's factual-sufficiency challenge, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain, 709 S.W.2d 175, 176, 29 Tex. Sup. Ct. J. 214 (Tex. 1986)*. After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co., 715 S.W.2d 629, 635, 29 Tex. Sup. Ct. J. 301 (Tex. 1986)*. The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. v. Pascouet, 61 S.W.3d 599, 615-16 (Tex. App.--Houston [14th Dist.] 2001, pet. denied)*. We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 407, 41 Tex. Sup. Ct. J. 683 (Tex. 1998).* [**26] The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *Pascouet, 61 S.W.3d at 616*.

The jury found that Hirschfeld did not substantially perform its duties under the Subcontract based on the following instruction regarding substantial performance:

> To establish "substantial performance" Hirschfeld must show that: [sic] it has not willfully departed from the terms of the Subcontract, that it has not omitted essential points of the Subcontract, that it has honestly and faithfully performed the construction contract in its material and substantial particulars, and that the only variance from the strict and literal performance of the Subcontract consists of technical or unimportant omissions or details.

With the exception of using a different word to refer to the Subcontract, this instruction regarding the meaning of "substantial performance" is identical to the instruction proposed by Hirschfeld in its pretrial submission to the trial court. At trial, no party objected to this instruction as to what constitutes "substantial performance." [3] Therefore, we review the sufficiency of the evidence under [**27] the above instruction, without regard to whether it is a correct statement of the law. *See St.* [*284] *Joseph Hosp. v. Wolff, 94 S.W.3d 513, 530, 46 Tex. Sup. Ct. J. 142 (Tex. 2003)* (stating that appellate courts in civil cases review sufficiency of evidence based on the definitions contained in the charge, unless a party objects to the charge and points out the correct definition that is not being used in the charge); *Osterberg v. Peca, 12 S.W.3d 31, 55, 43 Tex. Sup. Ct. J. 380 (Tex. 2000)* (holding that court could not review the sufficiency of the evidence based on a particular legal standard because that standard was not submitted to the jury and no party objected to the charge on this ground or requested that the jury be charged using this standard); *L&F Distributors v. Cruz, 941 S.W.2d 274, 279, 286 (Tex. App.--Corpus Christi 1996, writ denied)* (holding that parties are bound by a charge that misinforms the jury about the substantive law unless a party properly brings the defect in the charge to the trial court's attention).

3 Although Kellogg objected that this instruction failed to specifically state that substantial completion of a project or building is not necessarily the same as a contractor substantially performing its responsibilities under the contract, the instruction given was consistent with Kellogg's proposed additional instruction. The trial court simply declined to give a more specific instruction in this regard.

[**28] As discussed above, the Subcontract required Hirschfeld to warrant various matters relating to the Roof System for ten years. [4] According to the March 29, 2002 Settlement Agreement between the Sports Authority and Kellogg (hereinafter "Settlement Agreement"), the ten-year warranty commenced on August 1, 2000. Although Kellogg may have admitted in its coun-

terclaim that Hirschfeld "provided" Kellogg with a ten-year warranty, this does not prevent Kellogg from asserting, as it has, that Hirschfeld suspended, revoked, or repudiated the warranty that it provided.

> 4 As quoted above, sections 4 and 5 of Attachment B of the Subcontract state that Hirschfeld "shall warrant" for a period of ten years (1) the design of the Roof System, (2) the interface between the design of the structural roof system and the roof mechanism, and (3) the design, manufacture, and installation of the roof mechanism to perform its intended purpose. In section 20(B) of Attachment A of the Subcontract, Hirschfeld also agreed to "promptly make good, without cost to [Kellogg] or [the Sports Authority], any and all defects due to faulty workmanship and/or materials which may appear within the guarantee or warranty period(s) established in the Contract Documents."

[**29] On September 22, 2000, Hirschfeld sent a letter to Kellogg stating the following:

> . After the Roof System was put in service and used to support the Sports Authority's use of Minute Maid Park, the Sports Authority failed to perform or cause to be performed the level of maintenance required by Hirschfeld's ten-year warranty on the Roof System and required by the manufacturer's "O & M manual [sic]." As a result of this failure, Hirschfeld believed as of September 22, 2000, that the roof mechanism was unreliable and potentially in disrepair.
>
> . Additionally, because the required maintenance was not being performed by or on behalf of the Sports Authority, the terms of Hirschfeld's ten-year warranty have not been satisfied.
>
> . Hirschfeld believes the Sports Authority's failure to comply with these warranty requirements "entitles [Hirschfeld] to declare its warranty obligations suspended until such time as the roof mechanism commissioning has been completed, all repairs necessitated by [the Sports Authority's] failure to perform the required maintenance have been competed, the manufacturer has inspected and certified that the roof mechanism is in compliance with all [**30] original requirements and operating parameters for such mechanism, and [the Sports Authority] or its authorized representative has demonstrated that the required maintenance is being performed on the roof mechanism."
>
> . If all of these conditions are satisfied, then Hirschfeld will acknowledge that [*285] the ten-year warranty is reinstated, effective retroactively to the date the roof mechanism was put in service by the Sports Authority.

Hirschfeld did not reinstate its ten-year warranty after sending this letter.

Although Kellogg and Hirschfeld have different positions as to when any final payment by Kellogg to Hirschfeld was due, under either party's interpretation, the final payment from Kellogg to Hirschfeld, including any retainage owed, was not due before April 26, 2002. [5] There was evidence before the jury that Hirschfeld provided the ten-year warranty but then suspended it on September 22, 2000, and thereafter did not reinstate it. At trial, Hirschfeld's corporate representative testified that (1) the ten-year warranty on the Roof System was "an important and critical part of the undertaking"; (2) something was communicated to the effect that if Hirschfeld was unwilling [**31] to offer a ten-year warranty on the Roof System, then Kellogg would not enter into the Subcontract with Hirschfeld; (3) when the parties entered into the Subcontract, "the 10-year warranty that Hirschfeld promised to provide was an essential part of the contract" and (4) he considers the words "suspend" and "revoke" in this context to be essentially the same. There is evidence that from September 22, 2000 forward, Hirschfeld asserted that the ten-year warranty was suspended and not in effect based on the alleged failure to perform an alleged condition precedent--the written maintenance plan. As discussed above, this maintenance plan is not a condition precedent to the existence of the ten-year warranty. Under the applicable standard of review, Hirschfeld did not conclusively prove that (1) it did not willfully depart from the terms of the Subcontract, (2) it did not omit essential points of the Subcontract, (3) it honestly and faithfully performed the construction contract in its material and substantial particulars, and (4) the only variance from the strict and literal performance of the Subcontract consists of technical or unimportant omissions or details. Furthermore, under the [**32] applicable standard of review, we conclude that there is factually sufficient evidence to support the jury's finding that, under the jury charge definition, Hirschfeld did not substantially perform its duties under the Subcontract.

5 At trial, Kellogg asserted that any final payment to Hirschfeld was not due until Kellogg received final payment from the Sports Authority on April 26, 2002. Hirschfeld asserted that, under change order 18 to the Subcontract, final payment from Kellogg was due thirty days after Kellogg issued a final "Certificate for Payment" following Hirschfeld's full performance of the Subcontract (with certain exceptions). Hirschfeld asserted that the relevant parts of the Subcontract had been fully performed and that the Settlement Agreement constituted the final "Certificate for Payment." Under this theory, final payment, if any, was due thirty days after March 29, 2002, on April 28, 2002.

On appeal, Hirschfeld asserts that it conclusively proved substantial performance at trial based on [**33] the following arguments:

> . Kellogg admitted in the Settlement Agreement that the project was completed by August 1, 2000, and, under Texas law, substantial completion of the Project is the same as substantial performance by Hirschfeld of all of its duties under the Subcontract.
>
> . Kellogg and the Sports Authority received the benefit of their bargain. Hirschfeld performed its work under the Subcontract, and only minor repairs were necessary. Under Texas law, this showing is all that is needed for Hirschfeld to establish substantial performance of its obligations under the Subcontract.
>
> [*286] . The cost of the backcharges on the Subcontract were less then one percent of the Subcontract price. More than ninety-nine percent of the work required by the Subcontract allegedly was performed satisfactorily.
>
> . Once Hirschfeld provided the warranty, any subsequent suspension, revocation, or repudiation of the warranty would be a breach-of-warranty issue that cannot be considered in determining whether Hirschfeld substantially performed all of its duties under the Subcontract, as shown by this court's opinion in *Coastal Chem., Inc. v. Brown, 35 S.W.3d 90, 93 (Tex.* [**34] *App.--Houston [14th Dist.] 2000, pet. denied).*
>
> . Any alleged failure to perform contractual covenants that do not include any work on the construction project should not be considered in determining whether Hirschfeld substantially performed all of its duties under the Subcontract.

Without commenting on the validity of any of these substantive legal arguments, as a threshold matter, we note that all of these arguments involve legal standards for what constitutes "substantial performance" that were not submitted to the jury. Significantly, no party objected to the failure to submit these legal standards to the jury, and no party requested that these legal standards be submitted to the jury. Therefore, we cannot use these legal standards in our review of the sufficiency of the evidence to support the jury's finding that Hirschfeld did not substantially perform its duties under the Subcontract. *See Wolff, 94 S.W.3d at 530*; *Osterberg, 12 S.W.3d at 55*; *L&F Distributors, 941 S.W.2d at 279, 286*. Accordingly, we overrule Hirschfeld's first issue.

**C. Did the trial court reversibly err in admitting allegedly irrelevant testimony** [**35] **regarding the subcontractor's suspension of its warranty?**

In its second issue, Hirschfeld asserts the trial court abused its discretion in determining that evidence regarding Hirschfeld's suspension of its ten-year warranty was relevant. Hirschfeld claims that it preserved this alleged error by its pretrial motion under *Texas Rule of Civil Procedure 248,* which states:

> When a jury has been demanded, questions of law, motions, exceptions to pleadings, and other unresolved pending matters shall, as far as practicable, be heard and determined by the court before the trial commences, and jurors shall be summoned to appear on the day so designated.

*TEX. R. CIV. P. 248*.

Nowhere in its *Rule 248* motion does Hirschfeld ask the trial court to exclude any evidence or argue that any evidence is irrelevant. Furthermore, our record does not reflect that Hirschfeld obtained a ruling on this motion.

Hirschfeld also asserts that it preserved error by the following objection at trial:

> [Counsel for Kellogg]: Now, you're aware, aren't you, that it's Hirschfeld's position in this case that it has revoked the

warranty with regard [**36] to the ten-year warranty?

[Counsel for Hirschfeld]: Objection, Your Honor. This is a judiciary [sic] admission on this issuance of the warranty and there is an issue on this in the motion.

[Trial Court]: Approach.

(At the Bench, off the record)

Overruled.

Hirschfeld did not assert in this objection that any evidence was irrelevant. Because it did not voice in the trial court the evidentiary [*287] complaint it raises in its second issue on appeal, Hirschfeld failed to preserve error as to this issue. *See Hardin v. Hardin, 161 S.W.3d 14, 27 (Tex. App.--Houston [14th Dist.] 2004, no pet.)*. In any event, even if error had been preserved, we could not conclude that the trial court abused its discretion in admitting this evidence. Accordingly, we overrule Hirschfeld's second issue.

**D. In light of the jury's findings, did the trial court erroneously refuse to render judgment in favor of the subcontractor for damages plus attorney's fees based on its claim regarding first-year maintenance?**

In its third issue, Hirschfeld asserts that, based on the jury's verdict, the trial court should have rendered judgment in its favor on its claim for $ [**37] 240,000 plus attorney's fees for first-year maintenance work performed under a contract independent from the Subcontract. The jury found that (1) Hirschfeld performed first-year maintenance through its subcontractor Uni-Systems as directed by Kellogg and (2) $ 240,000 is the fair and reasonable value of the first-year maintenance provided by Hirschfeld through its subcontractor Uni-Systems. Hirschfeld asserts that, even if it did not substantially perform the Subcontract so as to be entitled to relief thereunder, it still is entitled to recover against Kellogg under an alleged independent oral contract based on these two jury findings. [6] Hirschfeld asserts it does not seek to recover under a theory of quantum meruit.

6 If this work fell under the Subcontract, then Hirschfeld's failure to substantially perform the Subcontract would bar its recovery. *See Dobbins v. Redden, 785 S.W.2d 377, 378, 33 Tex. Sup. Ct. J. 273 (Tex. 1990)*.

Although Kellogg asserts that Hirschfeld never pleaded such a claim for breach of an alleged [**38] oral contract for first-year maintenance, we presume for the sake of argument that Hirschfeld did plead such a claim. Nonetheless, we conclude that these two jury findings do not entitle Hirschfeld to relief under this theory. The jury was neither asked about the formation of this alleged oral contract nor instructed that it existed. Even if Kellogg directed Hirschfeld to perform first-year maintenance through its subcontractor Uni-Systems, this direction could have been given even if the maintenance work in question constituted additional work covered by the Subcontract, as asserted by Kellogg. Likewise, a determination of the fair and reasonable value of these services would be appropriate to a quantum meruit claim or to a claim under the Subcontract if no rate of compensation was specified. Even if the second finding were held to be a damages question on this alleged contract claim, we could not imply findings that these damages resulted from a breach of the alleged oral contract because such findings would not be in support of the trial court's judgment. *See TEX. R. CIV. P. 279* (stating that appellate courts will imply findings of omitted and unrequested [**39] essential elements of a claim whose absence from the charge did not draw an objection, if (1) at least one essential element necessarily referable to that claim was found by the jury, (2) there is factually sufficient evidence to support a finding on the omitted elements, and (3) the implied findings support the trial court's judgment); *Gulf States Utilities Co. v. Low, 79 S.W.3d 561, 564, 45 Tex. Sup. Ct. J. 724, 45 Tex. Sup. Ct. J. 793 (Tex. 2002)* (holding that findings may be deemed under *Rule 279* only when they support the trial court's judgment).

After reviewing the record, we conclude that Hirschfeld did not conclusively prove the existence and breach of an independent [*288] oral contract with Kellogg for the provision of first-year maintenance services. Therefore, Hirschfeld's failure to obtain jury findings on this issue precludes recovery on this claim. *See TEX. R. CIV. P. 279* (stating that "[u]pon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived"); *In re S.A.P., 156 S.W.3d 574, 577, 48 Tex. Sup. Ct. J. 368 (Tex. 2005)*. Accordingly, we overrule Hirschfeld's third issue.

[**40] **E. Did the trial court err in denying the general contractor recovery of its attorney's fees under the Subcontract?**

The Subcontract contains a provision entitling "[t]he prevailing party in any litigation arising out of any dispute between [Kellogg] and [Hirschfeld]" to recover its attorney's fees and all other costs incurred as a result of this litigation. [7] During trial Hirschfeld and Kellogg stipulated that if either of them were entitled to recover attorney's fees, then a reasonable and necessary amount of such fees would be $ 1.2 million. [8] The trial court refused to award

Kellogg such fees and did not award either side any amount of attorney's fees.

7 Kellogg also relies on another provision of the Subcontract allowing Kellogg to recover attorney's fees if it is determined to be the "prevailing party" in the litigation; however, the scope of this provision is not broader than the quoted provision and this clause involves the same inquiry into whether Kellogg was the "prevailing party" in this litigation.

8 Though the parties stipulated as to the aggregate amount of fees for each side in the litigation, neither party undertook to segregate fees on a claim-by-claim basis, and neither party has argued that the Subcontract entitled it to fees as a "prevailing party" on a claim-by-claim basis.

[**41] In its issue on cross-appeal, Kellogg asserts that the trial court erred in impliedly concluding that it was not a "prevailing party" entitled to attorney's fees under the Subcontract. Hirschfeld went to trial on a petition that asserted breach-of-contract and declaratory-judgment claims against Kellogg. [9] Likewise, Kellogg went to trial on a counterclaim asserting breach-of-contract and declaratory-judgment claims against Hirschfeld. Although Kellogg requested separate liability and damages questions on its contract counterclaims, the trial court apparently concluded that a jury finding that Hirschfeld did not substantially perform its duties under the Subcontract would be equivalent to a finding that Hirschfeld breached the Subcontract and therefore did not submit a separate liability question as to Kellogg's contract counterclaim. Likewise, the trial court apparently reasoned that question three could serve as part of the determination of the amount that should be deducted from the retainage if Hirschfeld proved substantial performance and that this question also could be used to determine Kellogg's damages, if any, under its counterclaim. During closing argument at trial, Kellogg, [**42] without objection, argued that the answer to question three should be at least $ 3.9 million and as much as $ 5.2 million. The jury answered "$ 500,000." Therefore, at trial, Kellogg sought to recover as much as $ 5.2 million on its contract counterclaim. This amount would be $ 3,940,078 if $ 1,259,922 (the amount found by the jury to be unpaid under the Subcontract) is subtracted from the $ 5.2 million. [10]

9 More than four months before trial, Hirschfeld dropped from its petition negligence and fraud claims that it had been asserting.

10 Even though the $ 500,000 found by the jury in question three is less than the $ 1,259,922 found by the jury to be unpaid under the Subcontract, Kellogg sought in the trial court to recover the entire $ 500,000 under its counterclaim. The trial court denied this relief, and Kellogg has not appealed this ruling.

[*289] On appeal, Kellogg points to its pleadings and emphasizes the language in its counterclaim, which states that Kellogg sought to recover no more than $ 700,000 [**43] in addition to keeping the retainage. Although Kellogg's counterclaim does say this, Kellogg overlooks the reality that, if the jury had answered "$ 5.2 million" to question three of the charge, as Kellogg requested, then Kellogg would have been entitled to amend its counterclaim and recover the greater amount awarded by the jury. *See Greenhalgh v. Service Lloyds Ins. Co., 787 S.W.2d 938, 939-40, 33 Tex. Sup. Ct. J. 387 (Tex. 1990)* (stating that trial court would have abused its discretion if it had denied plaintiff's request to amend his petition after trial to ask for $ 128,000 in punitive damages, which was the amount awarded by the jury, rather than $ 100,000, which was the amount requested in his live petition during trial); *Whole Foods Mkt. Sw., L.P. v. Tijerina, 979 S.W.2d 768, 776 (Tex. App.--Houston [14th Dist.] 1998, pet. denied)* (stating that "[a]n amendment is mandatory if it is merely procedural in nature such as conforming the pleadings to the evidence at trial").

In its counterclaim, Kellogg also sought declaratory relief as to eleven matters. Both in its motion for entry of judgment and in one of its motions to modify judgment, Kellogg continued to request [**44] declaratory relief under its counterclaim. Kellogg also sought to recover $ 500,000 based on the jury's answer to question three. Nonetheless, the trial court adhered to its original judgment, which ordered that both Hirschfeld and Kellogg take nothing on all of their claims.

In sum, at trial, Hirschfeld sought approximately $ 2 million in contract damages plus declaratory relief against Kellogg, and Kellogg asserted a counterclaim for approximately $ 4 to $ 5 million plus declaratory relief against Hirschfeld. The trial court's judgment ordered that both parties take nothing on their claims. In this context, we conclude the trial court did not err in determining that neither Hirschfeld nor Kellogg was a "prevailing party" in this litigation entitled to all of its attorney's fees under the Subcontract. *See Western Skies P'ship/Physician's Healthcare Assocs., L.C. v. Physician's Healthcare Assocs. L.C., 2004 Tex. App. LEXIS 4438, No. 08-02-00231-CV, 2004 WL 1078491, at *4 (Tex. App.--El Paso May 13, 2004, no pet.)* (holding in memorandum opinion that trial court did not err in concluding that, under contractual provisions awarding fees to "prevailing party" in the litigation, no party prevailed [**45] because all parties recovered nothing on their claims and counterclaims). Accordingly, we overrule Kellogg's cross-issue.

**V. CONCLUSION**

Under the unambiguous language of the Subcontract, performance of the written maintenance plan is not a condition precedent to the existence of Hirschfeld's ten-year warranty. Therefore, the trial court did not err in dismissing with prejudice Hirschfeld's declaratory-judgment claims regarding the ten-year warranty. Under the applicable standard of review, there is legally and factually sufficient evidence to support the jury's finding that Hirschfeld did not substantially perform its duties under the Subcontract. Hirschfeld did not preserve error as to whether the trial court abused its discretion by admitting allegedly irrelevant testimony regarding Hirschfeld's suspension of its ten-year warranty. Based on the jury's findings and the evidence at trial, we conclude the [*290] trial court did not err in refusing to render judgment in favor of Hirschfeld on its claim seeking compensation for first-year maintenance services. As to Kellogg's cross-appeal, we conclude the trial court did not err in denying Kellogg recovery of all its attorney's fees [**46] in this litigation under the "prevailing party" provisions in the Subcontract.

Having overruled all of the issues raised in the appeal and cross-appeal, we affirm the trial court's judgment.

/s/ Kem Thompson Frost

Justice



**HOOVER SLOVACEK LLP, FORMERLY HOOVER, BAX & SLOVACEK, LLP, PETITIONER, v. JOHN B. WALTON, JR., RESPONDENT**

**NO. 04-1004**

**SUPREME COURT OF TEXAS**

***206 S.W.3d 557*; *2006 Tex. LEXIS 1129*; *50 Tex. Sup. J. 125***

**December 1, 2005, Argued**
**November 3, 2006, Delivered**

**SUBSEQUENT HISTORY:** [**1] Released for Publication December 22, 2006.

**PRIOR HISTORY:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE EIGHTH DISTRICT OF TEXAS. From Winkler County; 8th district (08-03-00366-CV, 149 S.W.3d 834, 10-14-04).
*Hoover Slovacek LLP v. Walton, 2006 Tex. LEXIS 646 (Tex., 2006)*
*Walton v. Hoover, Bax & Slovacek, L.L.P., 149 S.W.3d 834, 2004 Tex. App. LEXIS 9107 (Tex. App. El Paso, 2004)*

**DISPOSITION:** The court affirmed the reversal of the trial court's judgment, reversed the court of appeals' take-nothing judgment, and remanded to the court of appeals for further consideration of whether there was good cause for the client to terminate the representation.

**COUNSEL:** For PETITIONER: Mr. Mike A. Hatchell, Ms. Molly H. Hatchell, Mr. Charles R. Watson, Jr., LOCKE LIDDELL & SAPP, L.L.P., Austin, TX; Mr. Steven L. Hughes, MOUNCE, GREEN, MYERS, SAFI & GALATZAN, El Paso, TX; The Honorable Thomas R. Phillips, BAKER BOTTS, L.L.P., Austin, TX.

For RESPONDENT: Mr. John M. Phalen, Jr., Mr. Daniel J. Sheehan, Jr., Mr. Michael L. Atchley, DANIEL SHEEHAN & ASSOCIATES, L.L.P., Dallas, TX.

**JUDGES:** CHIEF JUSTICE JEFFERSON delivered the opinion of the Court, in which JUSTICE O'NEILL, JUSTICE WAINWRIGHT, JUSTICE BRISTER, JUSTICE GREEN, and JUSTICE JOHNSON joined. JUSTICE HECHT filed a dissenting opinion, in which JUSTICE MEDINA and JUSTICE WILLETT joined.

**OPINION BY:** Wallace B. Jefferson

**OPINION**

[*559] We deny Walton's motion for rehearing and grant Hoover Slovacek's motion for rehearing.

We withdraw our opinion of June 30, 2006 and substitute the following in its place.

In this case, we must determine whether an attorney hired on a contingent-fee basis may include in the fee agreement a provision stating that, in the event the attorney is discharged before completing the representation, the client must immediately pay a fee equal to the present value of the attorney's interest in the client's claim. We conclude that this termination fee provision is contrary to public policy and unenforceable. We affirm the court of appeals' judgment in part, reverse in part, and remand to the court of appeals for further proceedings.

[**2] **I Background**

In June 1995, John B. Walton, Jr. hired attorney Steve Parrott of Hoover Slovacek LLP (Hoover) to recover unpaid royalties from several oil and gas companies operating on his 32,500 acre ranch in Winkler County. The engagement letter granted Hoover a 30% contingent fee for all claims on which collection was achieved through one trial. Most significantly, the letter included the following provision:

> You may terminate the Firm's legal representation at any time . . . . Upon termination by You, You agree to immedi-

ately pay the Firm the then present value of the Contingent Fee described [herein], plus all Costs then owed to the Firm, plus subsequent legal fees [incurred to transfer the representation to another firm and withdraw from litigation].

Shortly after signing the contract, Walton and Parrott agreed to hire Kevin Jackson as local counsel and reduced Hoover's contingent fee to 28.66%. Parrott negotiated settlements exceeding $ 200,000 with Texaco and El Paso Natural Gas, and Walton paid Hoover its contingent fee. Parrott then turned to Walton's claims against Bass Enterprises Production Company (Bass), and hired accountant Everett Holseth to perform [**3] an audit and compile evidence establishing the claims' value. [1] Meanwhile, Walton authorized Parrott to settle his claims against Bass for $ 8.5 million.

1 Holseth never completed the audit, but testified that he estimated the value of Walton's claims at $ 2 million to $ 4 million.

In January 1997, Parrott made an initial settlement demand of $ 58.5 million. Bass's attorney testified that Parrott was unable to support this number with any legal theories, expert reports, or calculations, and that the demand was so "enormous" he basically "quit listening." The following month, however, Bass offered $ 6 million not only to settle Walton's claims, but also to purchase the surface estates of eight sections of the Winkler County ranch, acquire numerous easements, and secure Walton's royalty interests under the leases. Walton refused to sell, but authorized Parrott to accept $ 6 million to settle only Walton's claims for unpaid royalties. Walton also wrote Parrott and expressed [*560] discontent that Parrott did not consult [**4] him before making the $ 58.5 million demand. According to Walton, Parrott responded by pressuring him to sell part of the ranch and his royalties for $ 6 million. In March 1997, Walton discharged Parrott, complaining that Parrott was doing little to prosecute his claims against Bass and had damaged his credibility by making an unauthorized and "absurd" $ 58.5 million demand.

Walton then retained Andrews & Kurth LLP, which, in November 1998, settled Walton's claims against Bass for $ 900,000. By that time, Hoover had sent Walton a bill for $ 1.7 million (28.66% of $ 6 million), contending that Bass's $ 6 million offer, and Walton's subsequent authorization to settle for that amount, established the present value of Walton's claims at the time of discharge. Walton paid Andrews & Kurth approximately $ 283,000 in hourly fees and costs, but refused to pay Hoover.

When Hoover sought to intervene in the settlement proceedings between Walton and Bass, the trial court severed Hoover's claim, and the parties tried the case before a jury. Richard Bianchi, a former state district judge in Harris County, testified as Hoover's expert witness. Bianchi opined that a 28.66% contingent fee was, "if [**5] anything, lower than normal, but certainly reasonable under these circumstances," and that "it would only be unconscionable to ignore the agreement of the parties." He also testified that charging more than Walton ultimately recovered from Bass "doesn't change the deal they made. That's just a bad business deal." In contrast, Walton's local counsel, Kevin Jackson, testified that he had never heard of attorneys charging a percentage based on the present value of a claim at the time of discharge rather than the client's actual recovery, and that the $ 1.7 million fee was unconscionable.

The jury failed to find that Walton discharged Hoover for good cause or that Hoover's fee was unconscionable. The trial court entered judgment on the verdict, which awarded Hoover $ 900,000. [2] The court of appeals reversed and rendered a take-nothing judgment for Walton, concluding that Hoover's fee agreement was unconscionable as a matter of law. *149 S.W.3d 834, 847*. We granted Hoover's petition for review. *2005 Tex. LEXIS 758, 49 Tex. Sup. Ct. J. 15 (Oct. 14, 2005)*. Because our reasoning differs from the court of appeals' in some respects, we affirm its judgment in part, reverse in part, and [**6] remand this case to the court of appeals.

2 The jury was instructed to multiply the present value of Walton's claims at the time Hoover was discharged by 28.66%. Thus, the jury presumably valued the claims at $ 3.14 million ($ 900,000/ .2866 = $ 3.14 million). The court of appeals speculated that, because $ 900,000 is the exact amount for which Walton settled with Bass, perhaps the jury inadvertently failed to multiply this value by 28.66%. *149 S.W.3d 834, 842 n.3*. Walton challenges the legal sufficiency of the evidence supporting the jury's implicit finding that his claims were worth $ 3.14 million, but because we conclude that Hoover's termination fee provision is unenforceable, we do not reach this issue.

**II**

**Discussion**

When interpreting and enforcing attorney-client fee agreements, it is "not enough to simply say that a contract is a contract. There are ethical considerations overlaying the contractual relationship." *Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 868, 43 Tex. Sup. Ct. J.*

*806 (Tex. 2000)* [**7] (Gonzales, J., concurring and dissenting).

> In Texas, we hold attorneys to the highest standards of ethical conduct in their dealings with their clients. The duty is highest when the attorney contracts [*561] with his or her client or otherwise takes a position adverse to his or her client's interests. As Justice Cardozo observed, "[a fiduciary] is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." Accordingly, a lawyer must conduct his or her business with inveterate honesty and loyalty, always keeping the client's best interest in mind.

*Id. at 866-67* (alteration in original) (citations omitted). The attorney's special responsibility to maintain the highest standards of conduct and fair dealing establishes a professional benchmark that informs much of our analysis in this case.

Although contingent fee contracts are increasingly used by businesses and other sophisticated parties, their primary purpose is to allow plaintiffs who cannot afford an attorney to obtain legal services by compensating the attorney from the proceeds of any recovery. [**8] *Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818, 40 Tex. Sup. Ct. J. 591 (Tex. 1997)*. The contingent fee offers "the potential of a greater fee than might be earned under an hourly billing method" in order to compensate the attorney for the risk that he or she will receive "no fee whatsoever if the case is lost." *Id*. In exchange, the client is largely protected from incurring a net financial loss in connection with the representation. [3] This risk-sharing feature creates an incentive for lawyers to work diligently and obtain the best results possible. [4] A closely related benefit is the contingent fee's tendency to reduce frivolous litigation by discouraging attorneys from presenting claims that have negative value or otherwise lack merit. [5]

3 Depending on the terms of the agreement, clients sometimes pay court costs and other expenses of the litigation.

4 *See* Lester Brickman, *Contingent Fees Without Contingencies:* Hamlet *Without the Prince of Denmark?, 37 UCLA L. REV. 29, 43 (1989)* (arguing that contingent fees are appropriate only in cases where there is a realistic risk of nonrecovery).

[**9]

5 *See* Ted Schneyer, *Legal-Process Constraints on the Regulation of Lawyers' Contingent Fee Contracts, 47 DEPAUL L. REV. 371, 389-90 (1998)* (arguing that institutional constraints have made regulation of contingent fees excessive and ineffective).

In Texas, if an attorney hired on a contingent-fee basis is discharged without cause before the representation is completed, the attorney may seek compensation in quantum meruit or in a suit to enforce the contract by collecting the fee from any damages the client subsequently recovers. *Mandell & Wright v. Thomas, 441 S.W.2d 841, 847, 12 Tex. Sup. Ct. J. 346 (Tex. 1969)* (citing *Myers v. Crockett, 14 Tex. 257 (1855))*. Both remedies are subject to the prohibition against charging or collecting an unconscionable fee. *TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(a), reprinted in* TEX. GOV'T CODE, tit. 2, subtit. G app. A (TEX. STATE BAR R. art. X, § 9). [6] Whether a particular fee amount or contingency percentage charged by the attorney is unconscionable under all relevant circumstances of the representation [**10] is an issue for the factfinder. [7] *See, e.g., Curtis v. Comm'n for* [*562] *Lawyer Discipline, 20 S.W.3d 227, 233 (Tex. App.--Houston [14th Dist.] 2000, no pet.)* (concluding that the evidence was sufficient to support a finding that a contingent fee equaling 70-100% of the client's recovery was unconscionable). On the other hand, whether a contract, including a fee agreement between attorney and client, is contrary to public policy and unconscionable at the time it is formed is a question of law. *See, e.g., TEX. BUS. & COM. CODE § 2.302* (courts may refuse to enforce contracts determined to be unconscionable as a matter of law); *SkiRiver Dev., Inc. v. McCalla, 167 S.W.3d 121, 136 (Tex. App.--Waco 2005, pet. denied)* ("The ultimate question of unconscionability of a contract is one of law, to be decided by the court."); *Pony Express Courier Corp. v. Morris, 921 S.W.2d 817, 821 (Tex. App.--San Antonio 1996, no writ)* (distinguishing procedural and substantive aspects of unconscionability).

6 Although the Disciplinary Rules do not define standards of civil liability for attorneys, they are persuasive authority outside the context of disciplinary proceedings, and we have applied *Rule 1.04* as a rule of decision in disputes concerning attorney's fees. TEX. DISCIPLINARY R. PROF'L CONDUCT preamble P15; *see also Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 205, 45 Tex. Sup. Ct. J. 470 (Tex. 2002)*; *Bocquet v. Herring, 972 S.W.2d 19, 21, 41 Tex. Sup. Ct. J. 650 (Tex. 1998)*; *Arthur Andersen, 945 S.W.2d at 818*.

[**11]

7 Under the Disciplinary Rules, a fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable. *TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(a)*. The reasonableness of a fee is determined by considering all relevant circumstances relating to the representation, including:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal services properly;
>
> (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(b), cited in Arthur Andersen, 945 S.W.2d at 818*.

[**12] Hoover's termination fee provision purported to contract around the *Mandell* remedies in three ways. First, it made no distinction between discharges occurring with or without cause. Second, it assessed the attorney's fee as a percentage of the present value of the client's claim at the time of discharge, discarding the quantum meruit and contingent fee measurements. Finally, it required Walton to pay Hoover the percentage fee immediately at the time of discharge.

In allowing the discharged lawyer to collect the contingent fee from any damages the client recovers, *Mandell* complies with the principle that a contingent-fee lawyer "is entitled to receive the specified fee only when and to the extent the client receives payment." *RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35(2)* (2000). Hoover's termination fee, however, sought immediate payment of the firm's contingent interest without regard for when and whether Walton eventually prevailed. Public policy strongly favors a client's freedom to employ a lawyer of his choosing and, except in some instances where counsel is appointed, to discharge the lawyer during the representation [**13] for any reason or no reason at all. *See Martin v. Camp, 219 N.Y. 170, 114 N.E. 46, 48 (N.Y. 1916)* (describing this policy as a "firmly established rule which springs from the personal and confidential nature" of the attorney-client relationship); *see also Whiteside v. Griffis & Griffis, P.C., 902 S.W.2d 739, 746 (Tex. App.--Austin 1995, writ denied)* (noting that the policy supporting a client's freedom to select his attorney precludes the application of commercial standards to agreements that restrict the practice of law); *TEX. DISCIPLINARY R. PROF'L CONDUCT 1.15* cmt. 4 ("A [*563] client has the power to discharge a lawyer at any time, with or without cause . . . ."). Nonetheless, we recognize the valid competing interests of an attorney who, like any other professional, expects timely compensation for work performed and results obtained. Thus, attorneys are entitled to protection from clients who would abuse the contingent fee arrangement and avoid duties owed under contract. Striving to respect both interests, *Mandell* provides remedies to the contingent-fee lawyer who is fired without cause. Hoover's termination fee provision, [**14] however, in requiring immediate payment of the firm's contingent interest, exceeded *Mandell* and forced the client to liquidate 28.66% of his claim as a penalty for discharging the lawyer. Because this feature imposes an undue burden on the client's ability to change counsel, Hoover's termination fee provision violates public policy and is unconscionable as a matter of law.

Notwithstanding its immediate-payment requirement, several additional considerations lead us to conclude that Hoover's termination fee provision is unenforceable. In *Levine v. Bayne, Snell & Krause, Ltd.*, we refused to construe a contingent fee contract as entitling the attorney to compensation exceeding the client's actual recovery. *40 S.W.3d 92, 95, 44 Tex. Sup. Ct. J. 387 (Tex. 2001)*. In that case, the clients purchased a home containing foundation defects, and stopped making mortgage payments when the defects were discovered. *Id. at 93*. They agreed to pay their lawyer one-third of "any amount received by settlement or recovery." *Id*. A jury awarded the clients $ 243,644 in damages, but offset the award against the balance due on their mortgage, resulting in a net recovery of $ 81,793. *Id* [**15] . The lawyer sued to collect $ 155,866, a fee equaling one-third of the gross recovery plus pre- and post-judgment interest and ex-

penses. *Id*. In refusing to interpret "any amount received" as permitting collection of a contingent fee exceeding the client's net recovery, we emphasized that the lawyer is entitled to receive the contingent fee "'only when and *to the extent the client receives payment*.'" *Id. at 94* (quoting *RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 35*). A reasonable client does not expect that a lawyer engaged on a contingent-fee basis will charge a fee equaling or, as in this case, exceeding 100% of the recovery. [8] In *Levine*, we noted that "'[l]awyers almost always possess the more sophisticated understanding of fee arrangements. It is therefore appropriate to place the balance of the burden of fair dealing and the allotment of risk in the hands of the lawyer in regard to fee arrangements with clients.'" *Id. at 95* (quoting *In re Myers, 663 N.E.2d 771, 774-75 (Ind. 1996))*. We believe Hoover's termination fee provision is unreasonably susceptible to overreaching, [**16] exploiting the attorney's superior information, and damaging the trust that is vital to the attorney-client relationship.

8 Hourly fee agreements and cases in which the prevailing party recovers attorney's fees from an opposing party do not implicate the concerns presented here. Thus, pursuant to statute or a contract between the parties, it is not uncommon for courts to approve fee-shifting awards that exceed the damages recovered by the client. *See, e.g., Hruska v. First State Bank of Deanville, 747 S.W.2d 783, 785, 31 Tex. Sup. Ct. J. 292 (Tex. 1988)* (upholding $ 12,570 fee where the client recovered $ 2,920); *Sibley v. RMA Partners, L.P., 138 S.W.3d 455, 458-59 (Tex. App.--Beaumont 2004, no pet.)* (upholding $ 82,748 fee where the client stood to recover approximately $ 43,000).

The Disciplinary Rules provide that a contingent fee is permitted only where, quite sensibly, the fee is "contingent on the outcome of the matter for which the service is rendered." *TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(d)*. [**17] [*564] Hoover's termination fee, if not impliedly prohibited by *Rule 1.04(d)*, is directly forbidden by *Rule 1.08(h)*, which states that "[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for the client, except that the lawyer may . . . contract in a civil case with a client for a contingent fee that is permissible under *Rule 1.04*." *Id. 1.08(h)(2)*. Thus, even if Hoover's termination fee provision is viewed as transforming a traditional contingent fee into a fixed fee, it nonetheless impermissibly grants the lawyer a proprietary interest in the client's claim by entitling him to a percentage of the claim's value without regard to the ultimate results obtained.

Examining the risk-sharing attributes of the parties' contract reveals that Hoover's termination fee provision weighs too heavily in favor of the attorney at the client's expense. Specifically, it shifted to Walton the risks that accompany both hourly fee and contingent fee agreements while withholding their corresponding benefits. In obligating Walton to pay a 28.66% contingent fee for any recovery obtained by Parrott, the fee caused Walton to bear [**18] the risk that Parrott would easily settle his claims without earning the fee. But Walton also bore the risk inherent in an hourly fee agreement because, if he discharged Hoover, he was obligated to pay a 28.66% fee regardless of whether he eventually prevailed. This "heads lawyer wins, tails client loses" provision altered *Mandell* almost entirely to the client's detriment. Indeed, the only scenario in which Hoover's termination fee provision would benefit Walton is if he expected the value of his claim to significantly increase after discharging Hoover. In that case, Walton could limit Hoover's fee to 28.66% of a relatively low value, and avoid paying 28.66% of a much larger recovery eventually obtained with new counsel. Thus, it is conceivable that a client viewing the events in hindsight could find that the arrangement worked out to his benefit. At the time of contracting, however, the client has no reason to desire such a provision because the winning scenario is not only unlikely, but also entirely arbitrary in relation to its timing and occurrence. Moreover, to the extent the client believes the value of his claim will increase as a result of employing new counsel, a rational [**19] client would forego the representation altogether rather than agree to the provision. In sum, the benefits of Hoover's termination fee provision are enjoyed almost exclusively by the attorney.

Hoover's termination fee provision is also antagonistic to many policies supporting the use of contingent fees in civil cases. Most troubling is its creation of an incentive for the lawyer to be discharged soon after he or she can establish the present value of the client's claim with sufficient certainty. Whereas the contingent fee encourages efficiency and diligent efforts to obtain the best results possible, Hoover's termination fee provision encourages the lawyer to escape the contingency as soon as practicable, and take on other cases, thereby avoiding the demands and consequences of trials and appeals. Moreover, the provision encourages litigation of a subset of claims that would not be pursued under traditional contingent fee agreements.

Finally, Hoover's termination fee provision creates problems relating to valuation and administration, but not in the manner articulated by the court of appeals. The court of appeals viewed the parties' contract as empowering Parrott alone to determine [**20] the value of Walton's claims at the time of discharge, concluding that

"[a]n agreement that leaves the damages to be paid upon termination by one party wholly [*565] within the unfettered discretion of the other party is so one-sided as to be substantively unconscionable." *149 S.W.3d at 846* (citations omitted). We disagree, because nothing in their fee agreement indicates that Parrott retained such discretion. On the contrary, the contract is silent with respect to valuation. Nevertheless, its silence in that respect exposes an additional defect--the contract fails to explain how the present value of the claims will be measured. It does not describe how the nature and severity of the client's injuries will be characterized, nor does it state whether any other factors, such as venue, availability and quality of witnesses, the defendant's wealth and the strength of its counsel, and the reprehensibility of the defendant's conduct will apply to the calculation. Lawyers have a duty, at the outset of the representation, to "inform a client of the basis or rate of the fee" and "the contract's implications for the client." *Levine, 40 S.W.3d at 96* (citing *RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS §§ 38(1), 18*). [**21] We have stated that "to impose the obligation of clarifying attorney-client contracts upon the attorney 'is entirely reasonable, both because of [the attorney's] greater knowledge and experience with respect to fee arrangements and because of the trust [the] client has placed in [the attorney].'" *Levine, 40 S.W.3d at 95* (quoting *Cardenas v. Ramsey County, 322 N.W.2d 191, 194 (Minn. 1982))* (alterations in original). For these reasons, the "failure of the lawyer to give at the outset a clear and accurate explanation of how a fee was to be calculated" weighs in favor of a conclusion that the fee may be unconscionable. *TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04* cmt. 8. And while experts can calculate the present value of a claim at the time of discharge, this extra time, expense, and uncertainty can be avoided under hourly billing and the traditional contingent fee, even in cases in which a discharged attorney seeks compensation from a disgruntled client.

Our conclusion that Hoover's termination fee provision is unconscionable does not render the parties' entire fee agreement unenforceable. *See RESTATEMENT (SECOND) OF CONTRACTS § 208* [**22] (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result."); *Williams v. Williams, 569 S.W.2d 867, 871, 21 Tex. Sup. Ct. J. 400 (Tex. 1978)* (explaining that an illegal provision generally may be severed if it does not constitute the essential purpose of the agreement); *In re Kasschau, 11 S.W.3d 305, 313 (Tex. App.--Houston [14th Dist.] 1999, no pet.)* (concluding that an unenforceable provision may be severed if the parties would have entered into the contract without it). Walton paid Hoover its contingent fee for settlements that Parrott negotiated with Texaco and El Paso Natural Gas, and Walton does not contend that this portion of the agreement is unconscionable. On the contrary, in his brief to the court of appeals, Walton argued in the alternative that Hoover was limited to recovering 28.66% of the $ 900,000 settlement reached in the Bass litigation and requested rendition of judgment in that amount. Severing the termination [**23] fee provision, the remainder of the fee agreement is enforceable. Thus, if Hoover were discharged without cause, it would be entitled to either its contingent fee or compensation in quantum meruit. *Mandell, 441 S.W.2d at 847*.

The court of appeals rendered a take-nothing judgment against Hoover, holding the entire fee agreement unenforceable and denying a recovery in quantum meruit because Hoover failed to present evidence [*566] of the reasonable value of its services. *149 S.W.3d at 847*. We agree that Hoover no longer has a claim for quantum meruit, but we disagree with the take-nothing judgment. In the trial court, Hoover sought to enforce the contract's termination fee provision. Our holding, however, severs the termination fee provision, leaving a contingent fee contract subject to *Mandell*. The jury (1) found that Walton did not comply with the contract and (2) failed to find that Walton had good cause to discharge Hoover. Under *Mandell*, therefore, Hoover was entitled to its contingent fee: 28.66% of $ 900,000, or $ 257,940. In the trial court, and again in his appellate brief, Walton argued that Hoover was entitled to only this amount, and Hoover [**24] requested this relief in the alternative in its brief to this Court. [9]

9 Because the trial court's judgment awarded Hoover the more favorable recovery under its termination fee provision, Hoover was not required to raise the alternative theory as a cross point on appeal. *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co., 747 S.W.2d 785, 787, 31 Tex. Sup. Ct. J. 310 (Tex. 1988)*. Hoover's contention that it is entitled to enforce its contingent fee arises from the court of appeals' judgment. It may be raised in this Court without having first filed a motion for rehearing in the court of appeals. *TEX. R. APP. P. 49.9*; *see also Bunton v. Bentley, 153 S.W.3d 50, 53, 48 Tex. Sup. Ct. J. 197 (Tex. 2004)*.

In the court of appeals, however, Walton challenged the factual and legal sufficiency of the evidence supporting the jury's finding on the good-cause issue. Because the court of appeals reversed and rendered judgment, it did not reach Walton's sufficiency points. Accordingly, we remand the case to that court for [**25] consideration of those issues.

**III**

**Conclusion**

Hoover's termination fee provision penalized Walton for changing counsel, granted Hoover an impermissible proprietary interest in Walton's claims, shifted the risks of the representation almost entirely to Walton's detriment, and subverted several policies underlying the use of contingent fees. We hold that this provision is unconscionable as a matter of law, and therefore, unenforceable. We affirm that part of the court of appeals' judgment reversing the trial court's judgment, but reverse its take-nothing judgment, and remand this case to the court of appeals for further proceedings. *TEX. R. APP. P. 60.2(a), (d).*

Wallace B. Jefferson

Chief Justice

**DISSENT BY:** Nathan L. Hecht

**DISSENT**

JUSTICE HECHT, joined by JUSTICE MEDINA and JUSTICE WILLETT, dissenting.

I withdraw my dissenting opinion dated June 30, 2006 and substitute this one in its stead.

No rational plaintiff changes lawyers midway through a case in order to recover less, and John B. Walton, Jr. was not irrational. So when he retained what is now the law firm of Hoover Slovacek LLP to collect royalties for oil and gas produced on his 32,500-acre [**26] ranch for a contingent fee of 28.66% of any recovery, he must have reasoned that if he had to discharge the firm it would be to maximize recovery, in which event the firm should not receive a percentage of the final recovery and thereby benefit from services rendered by the new lawyers but should be paid only what the fee was worth at the time of discharge. Without an agreement on the subject, if Hoover Slovacek were discharged for good cause, it might have the right to be paid the value of its services [*567] rendered, [1] but if it were discharged without good cause, it would be entitled to its full contingent fee from the final recovery. [2] Walton and Hoover Slovacek agreed instead that if he terminated the representation, with or without cause, he would "immediately pay the Firm the then present value of the Contingent Fee". Hoover Slovacek would not receive a percentage of the final recovery if discharged without cause, and Walton would pay the value of the fee, which could take into account more than the time spent and thus might be more or less than the value of the services rendered by the firm based on an hourly rate.

1 *Compare Royden v. Ardoin, 160 Tex. 338, 331 S.W.2d 206, 209, 3 Tex. Sup. Ct. J. 149 (Tex. 1960)* (holding that an attorney suspended from practice before completion of representation was not entitled to recover on the contract or for quantum meruit, but stating: "If an attorney, without just cause, abandons his client before the proceeding for which he was retained has been conducted to its termination, or if such attorney commits a material breach of his contract of employment, he thereby forfeits all right to compensation." (internal quotation marks omitted)), *and Kelly v. Murphy, 630 S.W.2d 759, 761-762 (Tex. App.--Houston [1st Dist.] 1982, writ ref'd n.r.e.)* (holding that an attorney who dismissed his client's lawsuit without authorization was not entitled to recover for quantum meruit), *with Rocha v. Ahmad, 676 S.W.2d 149, 156 (Tex. App.--San Antonio 1984, writ dism'd)* (holding that attorney discharged for good cause was nevertheless entitled to recover for quantum meruit, and stating: "If the former client pleads and proves good cause for discharge, . . . then the attorney is not entitled to recover under the contract of employment. In such a case, the attorney may attempt to recover a fee for services rendered up to the time of discharge under quantum meruit.").

[**27]

2 *Mandell & Wright v. Thomas 441 S.W.2d 841, 847, 12 Tex. Sup. Ct. J. 346 (Tex. 1969)* ("In Texas, when the client, without good cause, discharges an attorney before he has completed his work, the attorney may recover on the contract for the amount of his compensation." (citing *Myers v. Crockett, 14 Tex. 257 (1855)*; *White v. Burch, 19 S.W.2d 404 (Tex. Civ. App.--Fort Worth 1929, writ ref'd)*; *White v. Burch, 33 S.W.2d 512 (Tex. Civ. App.--Fort Worth 1930, writ re f'd )*; *Cottle County v. McClintock & Robertson, 150 S.W.2d 134 (Tex. Civ. App.--Amarillo 1941, writ dism'd judgment cor.)))*. One might well think that the most the client would owe in such circumstances would be the contractual fee prorated for the services the lawyer actually performed. *See RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 40 cmt. c* (2000) ("Allowing a discharged or withdrawing lawyer to recover compensation under a fee contract with the client is sometimes more appropriate . . . where the client discharges a contingent-fee lawyer without cause just before the contingency occurs, perhaps in order to avoid paying the contractual percentage fee. . . . [T]he contractual fee is prorated for the services actually perform ed . . . ."). But that is not Texas law, and the parties in this case have not suggested it should be.

[**28] What appears to have been a good-faith effort by lawyer and client to reach a fair arrangement for handling the difficult possibility of estrangement was, according to the Court, *unconscionable*, meaning that "a competent lawyer could not form a reasonable belief that the fee is reasonable." [3] This, of course, does not reflect very well on Hoover Slovacek or its distinguished counsel in this case, who have advocated the reasonableness of the fee, and the Court's condemnation of what might appear to be a rather innocuous fee agreement may also come as a surprise to a large number of other lawyers who have up until now considered themselves competent. Worse still, the Court says, the agreement violated public policy, which means, not that it was bad, but that it "contravene[d] some positive statute or some well-established rule of law". [4] The [*568] Court does not actually identify a statute or rule of law that has been contravened, and truthfully, none has been. In fact, the agreement has done no devilry at all. To be sure, Walton and Hoover Slovacek have fought hard over how much is owed, the firm claiming at least $ 1.7 million (28.66% of $ 6 million, which Walton once may have [**29] though this claims were worth), maybe more, while the client admits to owing no more than $ 257,940 (28.66% of the$ 900,000 his claims actually settled for), and maybe nothing at all. But fighting over an agreement does not make the agreement unconscionable and against public policy, or the number of valid agreements would be much smaller.

3 *TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04(a)* ("A fee is unconscionable if a competent lawyer could not form a reasonable belief that the fee is reasonable.").

4 *Lawrence v. CDB Servs., Inc., 44 S.W.3d 544, 553, 44 Tex. Sup. Ct. J. 554 (Tex. 2001)* ("'Public policy, so me courts have said, is a term of vague and uncertain meaning, which it pertains to the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law.'"); *Town of Flower Mound v. Stafford Estates Ltd. Partnership, 135 S.W.3d 620, 628, 47 Tex. Sup. Ct. J. 497 (Tex. 2004)*; *Texas Commerce Bank, N.A. v. Grizzle, 96 S.W.3d 240, 250, 46 Tex. Sup. Ct. J. 318 (Tex. 2002)*;.*Churchill Forge, Inc. v. Brown, 61 S.W.3d 368, 373, 45 Tex. Sup. Ct. J. 116 (Tex. 2001)*.

[**30] What does make an agreement unconscionable and against public policy, according to the Court, is not its terms, which seem fair enough in this case, or any consequence to the parties, as yet unrealized here, but what *might* happen if the agreement were made between other parties or in other circumstances. If a court can imagine circumstances in which an agreement *could be* unconscionable -- and here, the Court has tried to list every conceivable way that could happen, and then some -- it *is* unconscionable. Here are the seven reasons the Court gives for holding this termination fee agreement unconscionable and against public policy:

. *The agreement does not distinguish between discharges with and without cause.* True, but surely a lawyer and client can agree to a termination fee that avoids wrangling over whether discharge was with or without cause, given the intrinsic uncertainties in that issue. Walton and Hoover Slovacek settled on a termination fee that Walton, at least, surely thought would be less than a percentage of the ultimate recovery, and the firm, perhaps, thought might be more than the value of services rendered at an hourly fee. Mere compromise is not [**31] unconscionable, but if it were, no matter here. Walton undertook to prove that he discharged Hoover Slovacek with cause but failed to convince the jury, so even if the agreement had drawn the distinction, he could not take advantage of it. At this point, the distinction is irrelevant.

. *If the contingent fee were worth more at the time of discharge than at the end of the case, it would be a bad deal for the client.* So it would, but a fee agreement is not unconscionable and against public policy merely because it *could* be a bad deal for the client. As noted at the outset, a rational plaintiff does not change lawyers to recover less, and if that is what Walton did, he has himself to blame. The Court criticizes this agreement because it would benefit the client only when the claim is improved by changing lawyers, but since the client is in control, benefit to the client should always be intended and, absent misjudgment, achieved. Moreover, there is no evidence in *this case* that Hoover Slovacek's contingent fee was ever worth more than it would have been at the end of the case. If the fee was worth as much at discharge as it would have been at the end, the agreement gave the [**32] firm only what Texas law would if there had been no termination clause, since it has not been established that discharge was for cause. [*569] Walton *could*have made a bad deal, but there is no evidence he *did*.

. *Ascertaining the value of a contingent fee mid-case is hard.* There is some tension between this argument and the previous one, which assumes that a contingent fee can be valued before the end of the case to the client's detriment. Actually, the value of a contingent fee mid-case may well be impossible to prove with sufficient certainty for recovery, even in a case like this one involving only economic damages. Walton's lawyer first demanded $ 58.5 million to settle, the defendants countered with $ 6 million and conditions, Walton demanded $ 6 million without conditions, the defendants offered $ 300,000, and the case finally settled for $ 900,000, due largely to new

and unforeseen developments. Walton discharged Hoover Slovacek 22 months into a 42-month-long case. What was Hoover Slovacek's contingent fee worth at discharge? That question has been fully tried but has still not been answered -- there is no evidence what a willing buyer would have paid a willing seller for [**33] a claim like Walton's the day he discharged Hoover Slovacek -- and it may not be answerable. Even if the audit of royalty payments Walton commissioned had been completed, uncertainties remained in determining whether he had been underpaid. But the Court seems not to notice that Hoover Slovacek bears the burden of proving the value of its fee, and any difficulty in carrying that burden does not prejudice Walton, it benefits him.

. *A lawyer who knows that the value of a claim is declining has an incentive to misbehave, provoke discharge, collect more than he would in the end, and turn to more lucrative business.* This argument rejects what the previous one asserts, that the value of a contingent fee is hard to predict. But more importantly, the Court appears to assume a jurisdiction in which lawyers do not owe clients a fiduciary duty, the intentional breach of which is a tort remedied by actual and exemplary damages. A lawyer as wicked as the Court's imagination may be more deterred by the threat of punitive damages than the threat of a voided contract. In any event, no evidence in this case hints at anything even approaching this *pollo poco* nightmare.

. *The agreement required* [**34] *Walton to pay up at discharge.* But if there had been no agreement, Walton would undisputedly have been required to pay Hoover Slovacek at discharge the value of its services rendered. The impoverished client the Court hypothesizes -- certainly not Walton -- who could afford representation only on a contingent fee, would be required to pay for the value of the discharged lawyer's services at termination. To agree to what the law would otherwise provide can hardly be unconscionable. Even so, it *would in fact have been* no burden on Walton. He could have paid Hoover Slovacek, just as he paid his new lawyers $ 283,000 at an hourly rate. And in any event, in over nine years, Walton has not yet paid Hoover Slovacek one cent for prosecuting his claims against the Bass defendants.

. *The agreement violated professional rule 1.08(h) by allowing Hoover Slovacek to acquire an interest in Walton's claim other than by a contingent fee authorized by rule 1.04.* Here the circularity is dizzying. To restate the argument: if the agreement was unconscionable in violation of *rule 1.04 of the Texas Disciplinary Rules of Professional Conduct*, it gave Hoover Slovacek an interest [**35] in Walton's claim prohibited by *rule 1.08(h)*, which excepts only interests created by an agreement valid under *rule 1.04*, which this agreement was not, if indeed it wasn't. If the termination fee was not unconscionable, *rule 1.08(h)* is [*570] inapplicable, and if the termination fee was unconscionable, *rule 1.08(h)* is inconsequential. Either way, *rule 1.08(h)* is irrelevant.

. *A client should not reasonably expect a contingent fee to equal or exceed the recovery.* Certainly not, but even if that *could* ever occur with a termination fee like the one in this case, and it is not at all clear that it ever could, it *has not happened*in this case. Walton settled for $ 900,000, and there is no evidence that he owes Hoover Slovacek more than 28.66% of that amount. The Court notes that its concerns do not extend to hourly fee agreements, but it is not clear why only contingent fees are subject to abuse. [5]

5 *See RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34 cmt. c* (2000) ("Accordingly, the reasonableness of a fee due under an hourly rate contract, for example, depends on whether the number of hours the lawyer worked was reasonable in light of the matter and client. It is also relevant whether the lawyer provided poor service, such as might make unreasonable a fee that would be appropriate for better services, or services that were better or more successful than normally would have been expected . . . .").

[**36] In sum, the Court "believe[s] Hoover's termination fee provision is unreasonably susceptible to overreaching, exploiting the attorney's superior information, and damaging the trust that is vital to the attorney-client relationship." [6] Although I think the Court's arguments are strained at best, even if they had more substance, a fee agreement should not be voided as unconscionable and against public policy based merely on what *could* happen but was not intended and has not in fact occurred. It *could have happened* that Hoover Slovacek provoked its own discharge for nefarious reasons, or that Walton discharged Hoover Slovacek for cause, or that when he did, the termination fee exceeded the contingent fee, or that he was somehow prejudiced by the difficulty in evaluating the termination fee, or that he had to pay before any recovery was realized, or that the fee exceeded his recovery. Any of these things *could have happened*, but *none did*. Walton and Hoover Slovacek anticipated exactly what occurred and tried to make suitable provision for it. Whether their agreement was unconscionable, and therefore abhorrent to public policy and void, should be determined by their [**37] initial expectations and the actual consequences, not on hyperbolic hypothesizing in hindsight. As the comment to *rule 1.04* states:

> [F]ee arrangements normally are made at the outset of representation, a time when

many uncertainties and contingencies exist, while claims of unconscionability are made in hindsight when the contingencies have been resolved. . . . Except in very unusual situations, therefore, the circumstances at the time a fee arrangement is made should control in determining a question of unconscionability. [7]

Agreements are unconscionable when they are not or cannot be proper, not when it is merely possible for them to be improper.

6 *Ante* at      .

7 *TEX. DISCIPLINARY R. PROF'L CONDUCT 1.04* cmt. 7; *see also RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 34 cmt. c* ("Although reasonableness is usually assessed as of the time the contract was entered into, later events might be relevant. . . . [E ]vents not known or contemplated when the contract was made can render the contract unreasonably favorable to the lawyer or, occasionally, to the client. . . . To determine what events client and lawyer contemplated, their contract must be construed in light of its goals and circumstances and in light of the possibilities discussed with the client . . . .").

[**38]   Again, it matters not whether the parties have behaved admirably throughout. [*571] Walton does seem to have had an inflated view of the value of his claims (about 900%), though perhaps no more than many clients, and he may not have had good cause to discharge Hoover Slovacek -- at least he could not convince a jury he did. And Hoover Slovacek may have been overly aggressive, at first in pursuing the defendants (demanding $ 58.5 million to settle a $ 900,000 claim) and then in pursuing Walton (demanding millions for a legal fee worth $ 257,940). But Hoover Slovacek's lawyers are not here on disciplinary charges, and Walton is not applying for Client of the Year. An agreement is not unconscionable because a party acts unconscionably -- and there is certainly no evidence that Walton or Hoover Slovacek did.

If the Court is serious about today's analysis, many more fee agreements and other contracts will be unconscionable. The Court says that "[h]ourly fee agreements . . . do not implicate the [same] concerns" it has about the agreement in this case, [8] but they do. Fees based on hourly rates seemingly reasonable at the outset *could* end up being excessive in easily imaginable circumstances, [**39]   but that mere potential does not invalidate an agreement.

8 *Ante* at      .

But the Court may not be serious. It may be that today's decision will be limited to this one particular fee agreement in this one isolated situation, portending nothing for fee agreements in general. [9] If so, then the rules governing fee agreements will merely have a minor exception, and only the Court's authority to articulate general rules will suffer. Of course, the careful lawyer on a contingent fee can simply charge what the law allows for termination of representation without good cause: the full fee. The client will be penalized for changing lawyers and will pay for services not rendered, but it will not be unconscionable.

9   *See County of Cameron v. Brown, 80 S.W.3d 549, 565-566, 45 Tex. Sup. Ct. J. 680 (Tex. 2002)* (Hecht, J., dissenting) ("It may be, however -- one cannot always tell for sure -- that the Court does not really mean what it says. . . . [I]t may be that this case is just another 'restricted railroad ticket, good for this day and train only.'" (citing *Smith v. Allwright, 321 U.S. 649, 669, 64 S. Ct. 757, 88 L. Ed. 987 (1944)* (Roberts, J., dissenting))).

[**40]   We have taken as given that the only fee a Texas lawyer is prohibited from charging is one that is illegal or unconscionable because that is what *rule 1.04(a) of the Texas Disciplinary Rules of Professional Conduct* provides. [10] In most states, lawyers cannot charge unreasonable fees; [11] not so in Texas. In Texas, a lawyer is [*572]   prohibited only from charging a fee that a competent lawyer could not reasonably believe to be reasonable. [12] Of course, Texas law does not *award* lawyers unreasonable fees, so one could argue that notwithstanding *rule 1.04(a)*, a lawyer suing to collect a fee must prove that it is reasonable, not merely that it is not unconscionable. In matters other than lawyer discipline, the Disciplinary Rules of Professional Conduct have been held to "provide guidelines and suggest the relevant considerations" without supplying the rule of decision, [13] and one could argue that the role of *rule 1.04(a)* in enforcing fee agreements is similarly limited. [14] But none of the parties here does.

10   *TEX . DISCIPLINARY R. PROF'L CONDUCT 1.04 (a)* ("A lawyer shall not enter into an arrangement for, charge, or collect an illegal fee or unconscionable fee.").

[**41]

11    ALASKA R. PROF'L CONDUCT Rule 1.5(a); ARIZ. R. PROF'L CONDUCT ER 1.5(a); ARIZ. R. PROF'L CONDUCT, ER 1.5(a); *ARK. R. PROF'L CONDUCT, Rule 1.5(a), (e)(3)*; COLO. R. PROF'L CONDUCT Rule 1.5(a), (f); COLO. R. CIV. P. Ch. 23.3 (contingent fees), Rules 3, 7; *CONN. R. PROF'L CONDUCT, Rule 1.5(a)*; DEL. R. PROF'L CONDUCT, Rule 1.5(a);

D.C. R. PROF'L CONDUCT Rule 1.5(a); GA. R. PROF'L CONDUCT Rule 4-102, Rule 1.5(a); *HAW. R. PROF'L CONDUCT Rule 1.5(a)*; *IDAHO R. PROF'L CONDUCT Rule 1.5(a)*; ILL. R. PROF'L CONDUCT Rule 1.5(a); *IND. R. PROF'L CONDUCT Rule 1.5 (a)*; KAN. R. PROF'L CONDUCT Rule 1.5(a), (e) (court review); KY. R. PROF'L CONDUCT SCR 3.130(1.5(a)); LA. R. PROF'L CONDUCT Rule 1.5(a), (f)(5) (unearned fee/expense deposit/retainer provision); MD. R. PROF'L CONDUCT Rule 1.5(a); MINN. R. PROF'L CONDUCT Rule 1.5(a); *MISS. R. PROF'L CONDUCT Rule 1.5(a)*; *MO. R. PROF'L CONDUCT Rule 4-1.5(a)*; MONT. R. PROF'L CONDUCT Rule 1.5(a); NEV. R. PROF'L CONDUCT Rule 155.1; *N.J. RULES PROF'L CONDUCT RPC 1.5(a)*; N.M. R. PROF'L CONDUCT RULE 16-105(A); *N.D. R. PROF'L CONDUCT Rule 1.5(a)*; OKLA. R. PROF'L CONDUCT Rule 1.5(a); R.I. R. PROF'L CONDUCT Rule 1.5(a); S.C. R. PROF'L CONDUCT Rule 1.5(a); S.D. R. PROF'L CONDUCT Rule 1.5(a); *TENN. R. PROF'L CONDUCT Rule 1.5(a)*; VT. R. PROF'L CONDUCT Rule 1.5(a); *VA. R. PROF'L CONDUCT Rule 1.5(a)*; WASH. R. PROF'L CONDUCT Rule 1.5(a); W. VA. R. PROF'L CONDUCT Rule 1.5(a); *WIS. R. PROF'L CONDUCT SCR 20:1.5(a)*; and WYO. R. PROF'L CONDUCT Rule 1.5(a). *See also* ABA MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.5(a) (no "unreasonable" fees or expenses) (1983); ABA ETHICS 2000 REVISED MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.5(a), (e)(3) (2003); and *RESTATEMENT OF THE LAW GOVERNING LAWYERS §§ 34-35* (contingent fees, incorporating *§ 34*) (2000).

[**42]

12    *See supra* note 2.

13    *In re Users System Services, Inc., 22 S.W.3d 331, 334, 42 Tex. Sup. Ct. J. 812 (Tex. 1999)*; *In re EPIC Holdings, Inc., 985 S.W.2d 41, 48, 42 Tex. Sup. Ct. J. 235 (Tex. 1998)*; *National Medical Enterprises, Inc. v. Godbey, 924 S.W.2d 123, 132, 39 Tex. Sup. Ct. J. 698 (Tex. 1996)*; *Henderson v. Floyd, 891 S.W.2d 252, 254, 38 Tex. Sup. Ct. J. 166 (Tex. 1995)* (per curiam); *Spears v. Fourth Court of Appeals, 797 S.W.2d 654, 656, 34 Tex. Sup. Ct. J. 66 (Tex. 1990)*; *Ayres v. Canales, 790 S.W.2d 554, 556 n.2, 33 Tex. Sup. Ct. J. 504 (Tex. 1990)*.

14    *Cf. Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 205, 45 Tex. Sup. Ct. J. 470 (Tex. 2002)* (referring to *Rule 1.04* to determine a permissible referral fee); *Bocquet v. Herring, 972 S.W.2d 19, 21, 41 Tex. Sup. Ct. J. 650 (Tex. 1998)* (referring to *Rule 1.04* for factors indicating reasonableness of attorney fee); *Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818, 40 Tex. Sup. Ct. J. 591 (Tex. 19 97)* (same).

The Court remands the case to the court of appeals to review the sufficiency of the evidence regarding the jury's failure to find that Walton discharged Hoover Slovacek [**43] for good cause. In the end, Hoover Slovacek may recover as much or more without the termination fee provision. This is certainly an odd way of applying unconscionability. I would enforce the termination fee agreement. Accordingly, I respectfully dissent.

Nathan L. Hecht

Justice



**IN RE THE CITY OF DALLAS, TEXAS**

**NO. 2-98-207-CV**

**COURT OF APPEALS OF TEXAS, SECOND DISTRICT, FORT WORTH**

***977 S.W.2d 798*; *1998 Tex. App. LEXIS 5352***

**August 25, 1998, Delivered**

**DISPOSITION:** [**1] Dallas's petition for writ of mandamus denied.

**COUNSEL:** SAM A. LINDSAY AND LINDA LAWSON GAITHER, CITY OF ATTORNEYS OF DALLAS, TEXAS AND CARRINGTON, COLEMAN, SLOMAN, AND BLUMENTHAL, L.L.P. AND JAMES E. COLEMAN, JR., ELIZABETH D. WHITAKER, LYNDON F. BITTLE, AND AMY K. HUNT OF DALLAS, TEXAS.

KELLY, HART & HALLMAN, P.C. AND DEE J. KELLY, MARSHALL M. SEARCY, AND BRIAN S. STAGNER OF FORT WORTH, TEXAS.

RANDALL W. WILSON AND THOMAS W. PATERSON OF HOUSTON, TEXAS AND E. LAWRENCE VINCENT, JR. OF DALLAS TEXAS.

HARRIS, FINLEY & BOGLE, P.C. AND BILL F. BOGLE AND RUSSELL R. BARTON OF FORT WORTH, TEXAS AND LOCKE, PURNELL, RAIN, HARRELL, P.C. AND MORRIS HARRELL, MICHAEL V. POWELL, CYNTHIA KEELY TIMMS, AND ELIZABETH E. MACK OF DALLAS, TEXAS.

**JUDGES:** PANEL M, CAYCE, C.J.; DAUPHINOT and BRIGHAM, JJ.

**OPINION BY:** JOHN CAYCE

**OPINION**

[*800] ORIGINAL PROCEEDING

**OPINION**

The question presented in this mandamus proceeding is whether the trial court abused its discretion in denying the City of Dallas's motion to transfer venue to Dallas County under the mandatory venue provision of *section 65.023(a) of the Texas Civil Practice and Remedies Code*. Specifically, we have been asked to decide whether the primary relief sought in the underlying suit filed by the City of Fort Worth is the issuance of a permanent injunction, which would require that the suit be tried in Dallas County, or the rendition of a declaratory judgment, which would allow the suit to be tried in Tarrant County. We hold that the primary relief sought by Fort Worth is declaratory, not injunctive, and that venue in Tarrant County is proper. Accordingly, we hold that the trial court did not abuse its discretion in denying the motion to transfer venue and we deny Dallas's petition for writ of mandamus.

**BACKGROUND**

In 1968, after years of conflict between the cities of Dallas and Fort Worth over airport development, the cities [**2] reached an agreement for the development of a new regional airport, DFW Airport. The city managers of Dallas and Fort Worth signed a "Contract and Agreement" (the Contract), effective April 15, 1968, and the city councils adopted a "1968 Regional Airport Concurrent Bond Ordinance" (the Joint Bond Ordinance), effective November 12, 1968. [1] In the Contract, the cities created a joint venture for the construction, development, and operation of DFW airport. [2] As contemplated by the Contract, the cities both passed the Joint Bond Ordinance to provide for issuance of bonds to finance DFW Airport. Dallas and Fort Worth further agreed to phase out interstate commercial passenger air service from their respective local airports, transfer such service [*801] to DFW Airport, and refrain from any future acts or policies that would compete with DFW Airport. The cities also agreed

that they would, "through every legal and reasonable means promote the optimum development of the lands and Facilities comprising the Regional Airport at the earliest practicable date . . . ."

1 We shall sometimes collectively refer to the Contract and the Joint Bond Ordinance as the 1968 agreement.

[**3]

2 The Contract provides that the duration of the joint venture shall be perpetual, "unless sooner terminated and dissolved by operation of law or by mutual agreement of the Cities of Dallas and Fort Worth; provided, however, that the same shall not be dissolved by mutual agreement of the parties if such action would violate the terms or provisions of any outstanding joint revenue bonds relating to the Project."

Following the deregulation of the airline industry in 1978, Congress enacted the Wright Amendment, which dictated that passenger planes could fly from Love Field only to cities in Texas and four bordering states: New Mexico, Oklahoma, Arkansas, and Louisiana. [3] Since its passage, this federal legislation has been integral in furthering the cities' 1968 agreement to protect DFW Airport from expanded interstate competition with Love Field.

3 *See* Act of Feb. 15, 1980, Pub. L. No. 96-192, § 29(c), 1980 U.S.C.C.A.N. (94 Stat. 48); *see also* S. REP. No. 96-329, *reprinted in* U.S.C.C.A.N. 54, 86-87. For a summary of the historical background concerning the development of DFW Airport, see *City of Dallas v. Continental Airlines, Inc., 735 S.W.2d 496, 497-500* (Tex. App.--Dallas 1987, writ denied).

[**4] Both cities have repeatedly reaffirmed the 1968 agreement since its execution. In 1992, the Dallas and Fort Worth city councils enacted a joint resolution confirming their ongoing commitment to DFW Airport and to the covenants they made in the 1968 agreement. As recently as last year, the cities passed the "Twenty Ninth Supplemental Regional Airport Concurrent Bond Ordinance," authorizing the issuance of DFW Regional Airport joint revenue refunding bonds, one of the many supplemental bond ordinances the cities have passed over the past thirty years.

The relations between the two cities began to change, however, in October 1997, when Congress passed a bill called the Shelby Amendment. This legislation amended the Wright Amendment to allow turn-around passenger air travel from Love Field to three additional states: Kansas, Alabama, and Mississippi. [4] The Shelby Amendment also removed much of the Wright Amendment's prohibition against the use of reconfigured jet aircraft, as long as the total number of passenger seats is limited to 56 or less. [5]

4 *See* Act of Oct. 27, 1997, Pub. L. No. 105-66, § 337(b), 1997 U.S.C.C.A.N. (111 Stat. 1447); *see also* H.R. REP. No. 105-313, at 45 (1997), *reprinted in* 1997 U.S.C.C.A.N. 1991, 2005.

[**5]

5 *See* Act of Oct. 27, 1997, Pub. L. No. 105-66, § 337(a).

Soon after the passage of the Shelby Amendment, Dallas city officials took the public position that federal law mandates that Dallas expand Love Field service in accordance with the loosened restrictions of the Shelby Amendment and began to explore the possibility of expanding passenger air service out of Love Field. Anticipating that Dallas would eventually allow commercial flights outside the scope of the 1968 agreement, Fort Worth filed the underlying suit against Dallas, naming the Dallas/Fort Worth International Airport Board (the DFW Board) and Legend Airlines, Inc. (Legend), among others, as co-defendants. [6]

6 In addition to Dallas, the DFW Board and Legend, Fort Worth sued Jeffrey P. Fegan, the DFW Board's executive director, and Astraea Aviations Services, Inc. d/b/a Dalfort Aviation. American Airlines, Inc. later intervened in the suit on Fort Worth's side.

[**6] The gravamen of Fort Worth's complaint is that Dallas continues to be bound by the 1968 agreement, notwithstanding the loosened flight restrictions for Love Field allowed by the Shelby Amendment. Fort Worth requests a declaratory judgment under the Uniform Declaratory Judgments Act (the Declaratory Judgments Act) [7] to construe the 1968 agreement and asks the trial court for a "declaration" that Dallas is prohibited under the 1968 agreement from expanding commercial flight operations into and out of Love Field.

7 *See TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001-.011* (Vernon 1997).

On October 31, 1997, Dallas and Legend each moved to transfer venue of the underlying suit to Dallas County. Among the grounds asserted for changing venue, Dallas and Legend contended that Fort Worth's suit is primarily a request for a permanent injunction, and not for a declaratory judgment. Therefore, Dallas and Legend asserted the case is governed by section 65.023(a) of the Texas Civil Practice and Remedies Code, [*802] which provides [**7] that venue in a suit for an injunction is mandatory in the county of the defendant's residence. [8]

8 *See TEX. CIV. PRAC. & REM. CODE ANN. § 65.023(a)* (Vernon 1997); *see also TEX. CIV. PRAC. & REM. CODE ANN. § 15.016* (Vernon 1986) ("An action governed by any other statute prescribing mandatory venue shall be brought in the county required by that statute.").

In May 1998, Continental Airlines, Inc. and Continental Express, Inc. (collectively, Continental) announced that Continental would begin scheduled interstate passenger service between Love Field and Cleveland, Ohio on July 1, 1998. In an apparent reaction to this announcement, Fort Worth amended its pleadings to name Continental as a defendant to the suit. [9] Continental then moved to transfer venue to Dallas County on the same bases as Legend.

9 Fort Worth also joined Mesa Airlines, Inc.

[**8] On June 15, 1998, Fort Worth applied for a temporary restraining order (TRO) and a temporary injunction to prevent Continental from scheduling passenger flights between Love Field and Cleveland in contravention of the cities' 1968 agreement, until final resolution of the underlying lawsuit. After a four-day hearing that began on June 29, the trial court granted a temporary injunction against Continental. [10] That ruling is the subject of a separate appeal to this court. [11]

10 Fort Worth seeks no relief, injunctive or otherwise, against Legend.

11 *Continental Airlines, Inc. v. City of Fort Worth, Texas*, No. 2-98-211-CV.

Meanwhile, on June 19, 1998, a hearing was held on Dallas, Continental, and Legend's motions to transfer venue. The trial court denied the motions, and Continental and Legend filed separate petitions for writs of mandamus with this court.

Departing somewhat from its position in the trial court, Continental contended in this court that venue is mandatory in Harris County, [12] or, [**9] in the alternative, Dallas County. Continental claimed that Fort Worth's suit is purely injunctive in nature because Continental has no contract with Fort Worth to construe by declaratory judgment, [13] and because the only relief Fort Worth seeks against Continental is coercive--a TRO and a temporary injunction. Legend also contended that Fort Worth's suit was purely injunctive because Fort Worth did not seek damages or other noninjunctive relief. On June 23, 1998, we denied those petitions without written opinion. [14]

12 Continental's principal office is in Harris County.

13 Continental is a proper party to the suit notwithstanding the fact that it is not a party to the 1968 agreement. When declaratory relief is sought, all persons or entities who have or claim any interest that would be affected by the declaration must be made parties. *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.006(a)* (Vernon 1997).

14 *See In re Continental Airlines, Inc.*, No. 2-98-184-CV (Tex. App.--Fort Worth June 23, 1998, orig. proceeding) (not designated for publication), *pet. pending*, No. 98-0598 (Tex. July 3, 1998); *In re Legend Airlines, Inc.*, No. 2-98-189-CV (Tex. App.--Fort Worth June 23, 1998, orig. proceeding) (not designated for publication), *pet. pending*, No. 98-0599 (Tex. July 3, 1998).

After we denied Continental's and Legend's requests for mandamus relief, both parties filed mandamus proceedings in the Supreme Court of Texas. The supreme court has set those petitions for oral argument on September 9, 1998.

[**10] We write in this proceeding to address the merits of Dallas's petition because, unlike the temporary ancillary relief Fort Worth sought and obtained against Continental to preserve the status quo until the dispute below is resolved, the principal and primary relief Fort Worth seeks in the underlying suit is directly against Dallas; [15] that is, a declaration by the trial court that Dallas is prohibited by the 1968 agreement from allowing Continental, Legend, and other defendants to schedule expanded passenger flights from Love Field. The issue we must decide is whether the relief Fort Worth seeks against Dallas is primarily injunctive in nature, as Dallas claims, or declaratory, as Fort Worth asserts. If Dallas is correct, the case must be transferred to Dallas County. Otherwise, the case may remain in Tarrant County. Dallas does not complain that it would not [*803] receive a fair and impartial trial if the case remains in Tarrant County. [16]

15 Fort Worth does not seek any *direct* relief against either Continental or Legend.

16 A defendant may obtain a change of venue by alleging and proving that it cannot obtain an impartial trial in the county where the action is pending. *See TEX. R. CIV. P. 257(c)*.

## [**11] STANDARD OF REVIEW

In deciding whether a writ of mandamus is appropriate, we recognize that mandamus will issue only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy at law. *See Republican Party v. Dietz, 940 S.W.2d 86, 88 (Tex. 1997)* (orig. proceeding). A trial court clearly abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and preju-

dicial error of law. *See Walker v. Packer, 827 S.W.2d 833, 839 (Tex. 1992)* (orig. proceeding). A trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker, 827 S.W.2d at 840*. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion and may result in mandamus. *See id.*

A defendant raises the question of proper venue by objecting to a plaintiff's venue choice through a motion to transfer venue. *See TEX. R. CIV. P. 86*; *Wilson v. Texas Parks & Wildlife Dep't, 886 S.W.2d 259, 260 (Tex.1994)*. The fact that mandatory venue lies in another county provides one basis for a venue transfer. *See* [**12] *TEX. R. CIV. P. 86(3)(b)*. If the plaintiff's chosen venue rests on a permissive venue statute and the defendant files a meritorious motion to transfer based on a mandatory venue provision, the trial court must grant the motion. *See Wichita County v. Hart, 917 S.W.2d 779, 781 (Tex. 1996)*; *Langdeau v. Burke Inv. Co., 163 Tex. 526, 358 S.W.2d 553, 556 (1962)*. An erroneous denial of such a motion is reviewable by mandamus. *See TEX. CIV. PRAC. & REM. CODE ANN. § 15.0642* (Vernon Supp. 1998). In such a situation, the relator does not have to show an inadequate remedy at law -- only that the trial court erroneously refused to enforce a mandatory venue provision. *See KJ Eastwood Inv., Inc. v. Enlow, 923 S.W.2d 255, 258* (Tex. App.--Fort Worth 1996, orig. proceeding).

**MANDATORY VENUE UNDER *SECTION 65.023(a)***

*Section 65.023* provides:

[A] writ of injunction against a party who is a resident of this state shall be tried in a district or county court in the county in which the party is domiciled.

*TEX. CIV. PRAC. & REM. CODE ANN. § 65.023(a)* (Vernon 1997). The important right provided to a defendant under this statute to defend a suit for permanent injunction in the [**13] county of the defendant's domicile originated with our first state legislature in 1846, and it has been preserved since that time by all successive legislatures. [17]

17 *See* Act approved May 13, 1846, 1st Leg., § 152, 1846 Tex. Gen. Laws 363, 406, *reprinted in* 2 H.P.N. GAMMEL, THE LAWS OF TEXAS 1838-1846, at 1669, 1712 (Austin, Gammel Book Co. 1898); TEX. CIV. STAT. art. 2996 (1895); *TEX. REV. CIV. STAT. ANN. art. 4656* (Vernon 1952), *repealed by* Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 9, 1985 Tex. Gen. Laws 3242, 3322 (current version at *TEX. CIV. PRAC. & REM. CODE ANN. § 65.023* (Vernon 1997)).

In determining whether a lawsuit constitutes a suit for permanent injunction for the purpose of determining proper venue, we only look to the express relief sought in the allegations and prayer of the plaintiff's petition. *See Renwar Oil Corp. v. Lancaster, 154 Tex. 311, 276 S.W.2d 774, 775 (1955)*. When those pleadings show that the issuance of a permanent injunction is the primary and principal [**14] relief sought in the lawsuit, venue is mandatory in the county of the defendant's domicile. *See Brown v. Gulf Television Co., 157 Tex. 607, 306 S.W.2d 706, 708 (1957)* (construing the predecessor statute to *section 65.023(a)*); *Guion v. Gibson, 439 S.W.2d 715, 716* (Tex. Civ. App.--Houston [14th Dist.] 1969, no writ). On the other hand, if a review of the allegations and the prayer in the plaintiff's petition shows that issuance of a permanent injunction would be merely ancillary to a judgment awarding declaratory relief, the requirement that the suit be brought in the county of the defendant's domicile does not apply. *See Brown, 306 S.W.2d at 708*; *Guion, 439 S.W.2d at 716*.

[*804] **INJUNCTIVE VS. DECLARATORY RELIEF**

An injunction is coercive and equitable in nature. *See Valley Oil Co. v. City of Garland, 499 S.W.2d 333, 335* (Tex. Civ. App.--Dallas 1973, no writ). The function of injunctive relief is to restrain motion and to enforce inaction. *See Boston v. Garrison, 152 Tex. 253, 256 S.W.2d 67, 70 (1953)*; *R.I.O. Sys., Inc. v. Union Carbide Corp., 780 S.W.2d 489, 493* (Tex. App.--Corpus Christi 1989, writ denied).

To be entitled to injunctive relief, a plaintiff [**15] must prove the existence of a wrongful act, imminent harm, irreparable injury, and the absence of an adequate legal remedy. *See Morris v. Collins, 881 S.W.2d 138, 140* (Tex. App.--Houston [1st Dist.] 1994, writ denied). Fear or apprehension of the possibility of injury is not sufficient; the plaintiff must prove that the defendant has attempted or intends to harm the plaintiff in the future. *See State v. Morales, 869 S.W.2d 941, 946-47 (Tex. 1994)*; *Frey v. DeCordova Bend Estates Owners Ass'n, 647 S.W.2d 246, 248 (Tex. 1983)*; *Morris, 881 S.W.2d at 140*.

In contrast, a declaratory judgment is one that simply declares the rights, status, or other legal relations of the parties without ordering anything to be done. *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.003(a), (b)* (Vernon 1997) (trial court has "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed," and the declaration "has the force and effect of a final judgment or decree"); *Harris County Tax Assessor-Collector v. Reed, 210 S.W.2d 852, 854* (Tex. Civ. App.--Austin 1948, no writ) (holding that when party brings a declaratory judgment action, no relief [**16] other than declaratory judgment need be sought). The purpose of a declaratory judgment is to settle and to afford relief from uncertainty and insecurity with respect

to these rights, statuses, and other legal relations. *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b)*. Actual injury or harm is not a prerequisite to a declaratory judgment lawsuit; a trial court may construe a contract in a declaratory judgment action before a breach occurs. *See id. § 37.004(b)*; *Hasty, Inc. v. Inwood Buckhorn Joint Venture, 908 S.W.2d 494, 499* (Tex. App.--Dallas 1995, writ denied).

The law presumes that the defendant will recognize and respect the rights declared by a declaratory judgment and will abide by the judgment in carrying out its duties. *See Valley Oil Co., 499 S.W.2d at 335-36*. However, ancillary injunctive relief may be obtained when the evidence shows that the defendant will not comply with the judgment. *See Texas Education Agency v. Leeper, 893 S.W.2d 432, 446 (Tex. 1994)*; *Commissioners' Court v. Rayburn, 264 S.W.2d 552, 555* (Tex. Civ. App.--Beaumont 1954, no writ). The Declaratory Judgments Act itself expressly authorizes a party to obtain supplemental ancillary [**17] relief, including a permanent injunction, to enforce a declaratory judgment. *See Valley Oil Co., 499 S.W.2d at 336* (holding that declaratory judgment does not bar subsequent proceeding for coercive relief to enforce rights established by judgment where losing party contravenes judgment); *see also TEX. CIV. PRAC. & REM. CODE ANN. § 37.011* ("Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application must be by petition to a court having jurisdiction to grant the relief.").

**FORT WORTH'S PETITION ONLY REQUESTS DECLARATORY RELIEF**

Dallas contends that the language in Fort Worth's prayer asking the trial court to declare that Dallas is "prohibited, under the Contract and the Joint Bond Ordinance" from expanding commercial flights to and from Love Field, when read in the context of other language in the body of Fort Worth's petition, compels us to find that the primary relief sought by Fort Worth against Dallas is a permanent injunction. We disagree. None of the cited language, either standing alone or combined with other allegations in Fort Worth's petition, supports a finding that Fort Worth's suit against Dallas [**18] is primarily injunctive in nature.

Nowhere in its petition or prayer for relief does Fort Worth request that the trial court order Dallas, or any other defendant, to do [*805] or not to do anything. Rather, the petition and prayer request seven elements of relief, each of which consists only of a declaration. Although the last, standardized phrase of Fort Worth's prayer reserves the right to seek "further relief," including injunctive relief, this remedy is expressly authorized by the Declaratory Judgments Act [18] and is ancillary to Fort Worth's request for a declaratory judgment. The reservation of Fort Worth's statutory right to obtain supplemental injunctive relief to enforce the requested declaratory judgment, if necessary, does not transform the primary objective of Fort Worth's suit from a declaratory judgment into a permanent injunction.

18 *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.011*.

Dallas also singles out two phrases in the 24-page body of the petition as proof that Fort Worth is primarily seeking [**19] to enjoin Dallas--"irreparable harm is imminent" and "the status quo will be changed." Dallas's reliance on this language is misplaced. First, when read in context, it is clear that the phrase "irreparable harm is imminent" was inserted in the petition merely to introduce a series of paragraphs explaining why Fort Worth believes it is necessary to sue Dallas for a declaratory judgment. These allegations properly advise the trial court that the controversy is ripe for adjudication. [19] Nor does the allegation that "the status quo will be changed" if Dallas breaches the 1968 agreement change the nature of the primary relief sought by Fort Worth to a permanent injunction. The Declaratory Judgments Act expressly authorizes a party to ask the trial court to construe the party's rights under a written contract *before* a breach of the contract occurs. [20] In such a case, it is customary and proper to describe, as Fort Worth has done, the alleged consequences that may flow from a future breach of the contract.

19 A declaratory judgment is appropriate only if a real and substantial controversy exists between the parties. *See Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995)*. Declaratory judgment actions are frequently attacked on grounds that the claims are hypothetical or abstract and therefore do not present a justiciable controversy. *See, e.g., Firemen's Ins. Co. v. Burch, 442 S.W.2d 331, 332-35 (Tex. 1968)*; *Lane v. Baxter Healthcare Corp., 905 S.W.2d 39, 41-42* (Tex. App.--Houston [1st Dist.] 1995, no writ); *Powell v. Estelle, 580 S.W.2d 169, 171* (Tex. Civ. App.--Austin 1979, writ ref'd n.r.e.), *cert. denied, 444 U.S. 892, 62 L. Ed. 2d 129, 100 S. Ct. 198 (1970)*.

[**20]

20 *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(b)*.

Finally, Dallas asserts that Fort Worth's suit is merely a well-masked request for a permanent injunction and urges us to look beyond the live pleadings to divine another motive and intent for this suit that is not found in the pleadings. We refuse to engage in such speculation. [21]

There is no indication in the record before us that, contrary to the explicit allegations in its pleadings, Fort Worth is actually seeking an injunction to permanently enjoin Dallas from operating Love Field in a manner inconsistent with the 1968 agreement. The record plainly shows that Fort Worth is only seeking a "declaration" from the trial court that, among other things, Love Field service remains restricted by the 1968 agreement. The issuance of a permanent injunction in the underlying case would be necessary and proper if, and only if, it were shown that a party intended to contravene the trial court's final decision. *See Leeper*, *893 S.W.2d at 446*. We are confident that the parties in this case will abide by the trial court's declarations, whatever [**21] they may ultimately be.

21 We are also unaware of any Texas case in which a court has construed a plaintiff's pleadings as impliedly seeking primarily injunctive relief when the plaintiff only expressly asked for a declaratory judgment. In those cases where courts have construed a suit for declaratory relief as one primarily seeking injunctive relief, the plaintiff expressly requested the issuance of a permanent injunction. *See Burton v. Rogers, 504 S.W.2d 404, 405 (Tex. 1973)* (plaintiff requested both permanent injunction and declaratory judgment); *Guion, 439 S.W.2d at 717* (request for permanent injunction was undisputed); *Rainbo Baking Co. v. Aiken, 362 S.W.2d 660, 660* (Tex. Civ. App.--San Antonio 1962, no writ) (undisputed that primary and ultimate purpose of lawsuit was permanent injunction).

**CONCLUSION**

The primary relief Fort Worth seeks against Dallas is declaratory in nature, not injunctive. The fact that a declaratory judgment [*806] adverse to Dallas's position may, if Dallas abides by [**22] the judgment, have the effect of restricting passenger air service out of Love Field to that allowed by the 1968 agreement does not transform Fort Worth's declaratory judgment action into a suit for a permanent injunction for venue purposes.

Because we hold that the primary relief sought in Fort Worth's suit is a declaratory judgment, *section 65.023 of the Texas Civil Practice and Remedies Code* does not apply. Accordingly, we hold that the trial court did not abuse its discretion in denying Dallas's motion to transfer venue, and we deny the relief requested in Dallas's petition for writ of mandamus.

JOHN CAYCE

CHIEF JUSTICE

PANEL M: CAYCE, C.J.; DAUPHINOT and BRIGHAM, JJ.

DELIVERED AUGUST 25, 1998



**In re: DOW CORNING CORP., Debtor. BEAR STEARNS GOVERNMENT SECURITIES, INC., , et al., Appellants, v. DOW CORNING CORP., et al., Appellees.**

**05a0360p.06**

**No. 04-1916**

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

***419 F.3d 543*; *2005 U.S. App. LEXIS 17967*; *2005 FED App. 0360P (6th Cir.)*; *45 Bankr. Ct. Dec. 46***

**July 27, 2005, Argued**
**August 22, 2005, Decided**
**August 22, 2005, Filed**

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Eastern District of Michigan at Detroit. No. 01-71843--Denise Page Hood, District Judge.

**COUNSEL:** ARGUED: Abraham Singer, PEPPER HAMILTON, Detroit, Michigan, for Appellants.

David L. Ellerbe, NELIGAN, TARPLEY, STRICKLIN, ANDREWS & FOLEY, Dallas, Texas, for Appellees.

ON BRIEF: Abraham Singer, Mary K. Deon, PEPPER HAMILTON, Detroit, Michigan, for Appellants.

David L. Ellerbe, NELIGAN, TARPLEY, STRICKLIN, ANDREWS & FOLEY, Dallas, Texas, for Appellees.

**JUDGES:** Before: MOORE and COLE, Circuit Judges; and WISEMAN, District Judge. *

> * The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

**OPINION BY:** Ransey Guy Cole

**OPINION**

[*546] [***2] R. GUY COLE, JR., Circuit Judge. Twenty-seven Texas plaintiffs seeking recovery for injuries resulting from allegedly faulty breast implants engaged in settlement negotiations with the implants' manufacturer, Dow Corning Corp., a Michigan company. After the discussions reached an impasse over terms covering the consequences in the event settlement payments were not timely, Dow Corning suggested a clause requiring payments of $ 100 [**2] per day to each plaintiff for any time during which settlement payments were late. The plaintiffs agreed to this clause, and entered into the settlement agreement, later selling their right to settlement payments to Appellant Bear Stearns. When Dow Corning declared bankruptcy and began to miss payments under the settlement agreement, Bear Stearns attempted to enforce the clause via a bankruptcy claim. The district court, on Dow Corning's motion for summary judgment, held that the clause was a penalty unenforceable under Texas law, and also found that a condition precedent to the contractual provision of liquidated damages had not been met. Bear Stearns now appeals, arguing that the condition precedent was in fact met, and that Dow Corning should be estopped from asserting that the clause is a penalty. Because the clause is a penalty unenforceable under Texas law, and because Texas courts preclude parties from being estopped from asserting an illegality defense, we **AFFIRM** the decision below.

**I.**

Following revelations that many of Dow Corning's silicone-based breast implants were faulty, numerous suits were filed against Defendant-Appellee Dow Corning Corp. ("Dow Corning"). [**3] Twenty-seven Texas residents ("Plaintiffs") filed suit in Texas state court in 1994, alleging various claims against Dow Corning. Dow Corning found itself "under significant pressure" to settle these twenty-seven cases, especially since any findings of fact made in these cases (the "Texas cases") could have

significant adverse effects upon Dow Corning's position in a related multi-district case and related global settlement discussions then pending in federal court in Alabama. Dow Corning was also motivated to settle because of its view that the Texas cases were filed in a "plaintiff-friendly" forum. Dow Corning thus hired Ken Feinberg, a noted expert in settlement practice, to engage in settlement negotiations with the Plaintiffs.

[*547] But for one sticking point, the negotiations went smoothly. Both parties agreed that Texas law would control the settlement agreement. Dow Corning would pay the Plaintiffs a total of $ 17 million over the course of several years, in a series of seven installments. This payment would be secured by an "Agreed Judgment" filed in Texas court, though the judgment would be enforced only if Dow Corning failed to make a timely settlement payment. Plaintiffs' counsel [**4] would be responsible for determining what portion of the $ 17 million each individual Plaintiff would receive. Further, if Dow Corning ever were late on an installment payment, the entire settlement amount would come due. However, near the end of negotiations, Plaintiffs' counsel insisted on a clause (the "no credit clause") which provided that if Dow Corning ever failed to make a timely payment, it would not receive credit against the judgment for previously made payments. For example, under this clause, if Dow Corning failed to make a required final payment of $ 200,000 to a particular Plaintiff, that Plaintiff would be able to enforce the "agreed judgment" against Dow Corning for the full settlement amount of $ 1,400,000, rather than merely for the $ 200,000 portion of the judgment remaining unpaid. This would occur despite the fact that the Plaintiff in this example would already have received $ 1,200,000 of the $ 1,400,000 due. Plaintiffs' counsel justified this clause by stating that it would provide a significant incentive for Dow Corning to pay scheduled payments on time.

Not wishing to place itself in a position where it could potentially be required to "double-pay" a significant [**5] portion of the settlement, Dow Corning steadfastly objected to the no credit [***3] clause. However, Dow Corning by its own admission at this time felt "a tremendous sense of urgency to finalize the settlement." Accordingly, Dow Corning's attorneys proposed replacing the no credit clause in each Plaintiff's agreement with language requiring a "penalty" of $ 100 to be paid for each day that Dow Corning was late in paying a particular Plaintiff. After insisting that all uses of "penalty" be changed to "liquidated damages," and after making some insignificant stylistic changes, Plaintiffs' attorneys agreed to insert the following language proposed by Dow Corning:

> In the event that [Dow Corning] fails to make any payment in accordance with [the] Agreement, and Plaintiff must seek enforcement of the judgment to obtain the amounts due, then [Dow Corning] will pay to Plaintiff, as liquidated damages, the sum of One Hundred Dollars ($ 100.00) per day for each day that payment is not made from the date payment was due until the date Plaintiff receives the full amount due and owing under the terms of this agreement. These liquidated damages shall be in addition to the assessment [**6] of costs and interest as provided in the agreed judgment and the acceleration of installment payments as provided in [] the Agreement.

The Plaintiffs' attorneys noted at that time that if the new provision provided for a "penalty," the provision would not be enforceable under Texas law.

The parties agreed on this language, and inserted the clause into each settlement agreement. Dow Corning paid the first installment payment, totalling $ 4 million, on December 1, 1994. However, on May 15, 1995, Dow Corning filed for bankruptcy in the Eastern District of Michigan, and thereafter failed to make any further payments under the settlement agreement -- the second installment having been due on July 1, 1995. All of the Plaintiffs timely filed claims in bankruptcy court for the amounts due under the settlement agreement. In February 1997, while the bankruptcy [*548] case was pending, the Plaintiffs all sold their claims to Appellant Bear Stearns Investment Products, Inc., and related entities (collectively, "Bear Stearns"). Bear Stearns was then substituted for the Plaintiffs in the bankruptcy case.

Years later, a reorganization plan was approved for Dow Corning. The plan included payment [**7] to Bear Stearns of the full remaining settlement amount of $ 13 million, plus post-petition interest of $ 9.6 million. [1] During bankruptcy proceedings, Bear Stearns also claimed liquidated damages in the amount of $ 8.75 million pursuant to the settlement agreement. Dow Corning filed an objection to this portion of Bear Stearns's claim, and the bankruptcy court, without any written findings, sustained the objection and disallowed the liquidated damages portion of the claim. Bear Stearns appealed to the district court. Since Dow Corning was fully solvent and had agreed to pay whatever the district court determined was due, the court allowed the confirmed plan to become effective while the liquidated damages appeal was pending. As a result, just after the plan's effective date, on June 1, 2004, Bear Stearns was paid the $ 22.6

million both parties agreed was due under the plan. Meanwhile, Bear Stearns and Dow Corning each had filed a motion for summary judgment in district court with regard to the additional liquidated damages. The district court denied Bear Stearns's motion, and granted summary judgment to Dow Corning, finding that the liquidated damages clause was a penalty unenforceable [**8] under Texas law, and that even if it were not, a condition precedent to any award of liquidated damages had not been met. The district court then certified the grant of summary judgment as final, under *Fed. R. Civ. P. 54(b)*, since the ruling conclusively resolved all claims with regard to the liquidated damages clause. This timely appeal followed.

1 Bear Stearns is also an appellant in another Dow Corning appeal currently pending before this Court. All parties agree that the legal issues presented by the two appeals are effectively unrelated and that Dow Corning will pay additional post-petition interest on all money due under the settlement agreement if such additional interest is awarded to Bear Stearns as a result of the other appeal.

[***4] **II.**

**A. Choice of Law and Standard of Review**

Both parties agree that, pursuant to the settlement agreement's choice-of-law provision, the construction and enforcement of terms of the settlement agreement is governed [**9] by the laws of Texas. Though there is a circuit split over what choice-of-law provisions a federal court exercising bankruptcy jurisdiction should apply, *compare, e.g., Liberty Tool, & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.), 277 F.3d 1057, 1069 (9th Cir. 2002)* (requiring use of federal choice-of-law principles) *with, e.g., In re Gaston & Snow, 243 F.3d 599, 604-07 (2d Cir. 2001)* (describing this split in great detail and requiring use of the forum state's choice-of-law principles); *see also, e.g., In re Southwest Equip. Rental, 1992 U.S. Dist. LEXIS 21396, No. CIV 1-90-62, 1992 WL 684872, at *9 n.48 (E.D. Tenn Jul. 9, 1992)*, both Michigan choice-of-law rules and general equitable choice-of-law policies support enforcing parties' agreed-upon choice-of-law clauses absent any strong public policy concerns to the contrary. *See, e.g., Mill's Pride, Inc. v. Cont'l Ins. Co., 300 F.3d 701, 705 (6th Cir. 2002)* ("Michigan choice of law rules . . . require a court to balance the expectations of the parties to a contract with the interests of the states involved to determine which state's law to apply." (citations omitted)); *Restatement (Second) of Conflicts of Law* [*549] *§ 302* [**10] (1971) (suggesting similar principles in the non-state-specific context). As we are aware of no public policy disfavoring application of Texas law in the instant case, we agree with the parties and the district court, and apply Texas law in determining the enforceability of the subject contract terms.

Since the instant claims were brought in bankruptcy court pursuant to federal bankruptcy jurisdiction, federal procedural rules apply. Therefore, we review the district court's legal conclusions *de novo*. *In re Batie, 995 F.2d 85, 88 (6th Cir. 1993)*; *In re Dow Corning Corp., 280 F.3d 648, 656 (6th Cir. 2002)*. In applying state law, we anticipate how the relevant state's highest court would rule in the case and are bound by controlling decisions of that court. *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc., 249 F.3d 450, 454 (6th Cir. 2001)*. Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently. *Id*.

Under federal procedural law, in deciding a motion for summary judgment in a bankruptcy proceeding, this Court must determine [**11] if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed R. Civ. P. 56(c)*; *see also Fed. R. Bankr. P. 7056* ("*Rule 56 F.R.Civ.P.* applies in adversary proceedings."). As usual, we view the evidence in the light most favorable to the non-moving party. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-88, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. However, since the instant appeal is from both the grant of summary judgment to Dow Corning *and* the denial of summary judgment to Bear Stearns, it is appropriate to consider the evidence in the light most favorable to each party.

Finally, under Texas law, the determination of whether a contract term is properly a liquidated damages provision or instead an unenforceable penalty is purely a question of law. *See, e.g., Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 664, 48 Tex. Sup. Ct. J. 671 (Tex. 2005)* [**12] ("Whether a contract term is a liquidated damages provision is a question of law for the court to decide."); *S. Union Co. v. CSG Sys., 2005 Tex. App. LEXIS 564, No. 03-04-00172-CV, 2005 WL 171349, at *4 (Tex. Ct. App. Jan. 27, 2005*) ("Whether the liquidated damages provision is enforceable is a question of law."). "Sometimes, however, factual issues must be resolved before the legal question can be decided. For example, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were." *Phillips v. Phillips, 820 S.W.2d 785, 788, 35 Tex. Sup. Ct. J. 220 (Tex. 1991)*.

[***5] **B. Liquidated Damages**

Bear Stearns first argues that the $ 100 per day provision is a valid liquidated damages clause. Under Texas law, a "liquidated damages" term is treated as a penalty, unenforceable for reasons of public policy, except when all three of the following conditions are met:

> First, [(1)] the anticipated damages for a breach must be difficult or impossible to estimate. Also, [(2)] the amount of liquidated damages must be a reasonable forecast of the [**13] amount necessary to render just compensation. In addition, [(3)] 'liquidated damages must not be disproportionate to actual damages,' as measured at the time of the breach. Thus, if the liquidated damages are disproportionate [*550] to the actual damages, the clause will not be enforced and recovery will be limited to the actual damages proven.

*Thanksgiving Tower Partners v. Anros Thanksgiving Partners, 64 F.3d 227, 232 (5th Cir. 1995)* (footnotes omitted) (quoting *Baker v. Int'l Record Syndicate, 812 S.W.2d 53, 55 (Tex. Ct. App. 1991))*. Further, "the party seeking to prevent enforcement bears the burden of proof on these [three] issues." *Id.*; *see also Fluid Concepts, Inc. v. DA Apartments Ltd. P'ship, 159 S.W.3d 226, 231 (Tex. Ct. App. 2005)* (concluding that trial court had erred in granting summary judgment to defendant where defendant had presented no evidence supporting denial of liquidated damages, despite plaintiff's failure to provide any proof in support of such damages). Accordingly, to defeat Bear Stearns's motion for summary judgment and to prevail on its own summary judgment motion, Dow Corning bore the burden of [**14] proving that any one of the preceding conditions had not been met. Finally, Texas law grants strong deference to enforcement of contract terms, including liquidated damages terms, shown to be mutually bargained for by equally competent parties. *S. Union, 2005 Tex. App. LEXIS 564, 2005 WL 171349, at *5* (citing *Shel-al Corp. v. Am. Nat'l Ins. Co., 492 F.2d 87, 94 (5th Cir. 1974))*. The district court ruled against Bear Stearns, finding that none of the prongs of the liquidated damages test were met.

*1. Were Future Damages Stemming From Breach Difficult to Estimate?*

Bear Stearns first argues that the district court erred when it determined that all liquidated damages clauses in contracts for the payment of money are unenforceable penalties. The district court concluded that since interest can be paid to offset any delay in receiving money due under a contract, damages for such contracts will always be easy to estimate. For this proposition, the district court relied significantly on language from *Langever v. R.G. Smith & Co., 278 S.W. 178, 179 (Tex. Ct. App. 1925)*:

> In determining the intention of the parties to such stipulation, certain well-recognized [**15] rules of construction enter into the consideration, an important one of which is, the certainty or uncertainty of the actual damages which a breach will occasion, and the ease or difficulty of ascertaining or proving such damages; hence, in a case of a contract for the payment of money simply, a stipulation to pay a fixed sum, in default of performance, will be regarded as an agreement for a penalty and not as a covenant for liquidated damages--the reason for this rule being that, for the nonpayment of money, the law awards damages measured by interest, and hence there is no difficulty in ascertaining the damages in such a case.

*Id*. While this passage from *Langever*, taken alone, is supportive of the district court's holding, the district court ignored the fact that this was only one factor to be considered under Texas law. The plaintiff in *Langever* alleged that, due to non-payment on the contract at issue, he had lost significant profits (as, presumably, he was intending to reinvest the money once received), and that the liquidated damages term had been an attempt to estimate the result of his not having been paid. [***6] Despite the dicta cited by the district [**16] court in the instant case, the *Langever* court went on to state first that, "Where it is certain that damages will flow, and where it is certain they cannot be accurately measured, or where it appears their ascertainment, if possible, will be difficult, the best reasons exist for respecting the agreement of the parties in advance upon a sum mutually satisfactory." *Id*. The *Langever* [*551] court then granted enforcement of the clause, despite its dicta, noting that "Any effort to establish the actual damages for a breach of a contract such as the one under consideration here would be attended with such unusual considerations and surrounded with such uncertainty and difficulties as to take the case out of the usual class of cases of mere default in the payment of money, and thus to afford fair grounds for sustaining an agreement for liquidated damages." *Id*.

Accordingly, *Langever* merely stands for Texas's consistent law that liquidated damages clauses in contracts for payment of money are unenforceable *except* when damages are particularly difficult to estimate. Bear Stearns argues that the liquidated damages clauses in the instant case were intended to compensate for difficulties

[**17] encountered by the Plaintiffs were they not to receive the settlement monies they were expecting to receive. According to Plaintiffs' attorneys, such damages specifically included losses sustained by the Plaintiffs' inabilities to meet obligations they had made based on the promise of Dow Corning to make payments under the settlement agreement. Bear Stearns alleges that such difficulties would have been particularly difficult to estimate here, because Plaintiffs' difficulties included damages beyond the usual "lost investment opportunities" and inabilities to make house and car payments. Rather, Bear Stearns asserts that the clause was also intended to compensate for difficulties resulting from a failure to be able to meet future obligations incurred in expectation of receiving settlement payments, including obligations such as future (and inherently unpredictable) medical services required due to illness caused by the allegedly faulty implants, and also Plaintiffs' "decisions to discontinue working if they could afford to do so."

On this prong, Dow Corning raises two arguments in addition to that relied upon by the district court. First, Dow Corning argues that the items Bear Stearns [**18] claims would be "damages" following non-payment are actually damages that the initial settlement itself had contemplated, and thus the liquidated damages clause effectively would double-pay for these amounts. Bear Stearns responds by noting that the liquidated damages provision was *not* intended to cover medical expenses resulting from the faulty implants, but rather to compensate for additional costs associated with receiving late payments from Dow Corning. We agree with Bear Stearns that this conclusion is reasonable in light of *Langever*, which specifically allowed liquidated damages in a situation in which future damages resulting from non-payment were likely to be more than the time-value of monies owed under the original contract.

Dow Corning's second argument is that the parties simply were not anticipating any additional damages from non-payment, difficult to calculate or otherwise. Dow Corning cites to the fact that the liquidated damages clause was initially proposed as a "penalty," and that none of the attorneys in the case from either side could remember any discussions regarding difficult-to-calculate damages. In contrast, Bear Stearns notes that at least one of [**19] the Plaintiffs' attorneys stated specifically that "the liquidated damages provision was to recognize that [Plaintiffs] would have losses sustained by their inability to meet the obligations that they had made based on the promise of Dow Corning to make payments under this Agreement." These duelling assertions, however, go to the question of whether the provision was *actually* a just forecast of any damages, and not to whether such damages, if contemplated, would be difficult to calculate. Dow Corning does not argue that the damages [*552] resulting from non-payment of settlement monies, including inability to meet future medical and other obligations, would be easy to calculate. Obviously, the twenty-seven Plaintiffs would each face differing levels of such damages, and in this particular case, no party has argued that the Plaintiffs' medical or other obligations were uniform or predictable. Accordingly, Dow Corning has failed to show that the anticipated damages would not be difficult to estimate.

[***7] *2. Was the Liquidated Damages Clause a Reasonable Forecast of Just Compensation for Such Damages?*

The district court also gave two reasons for concluding that Bear Stearns [**20] ought to lose on prong two, regarding whether the amount of liquidated damages was a reasonable forecast of the amount necessary to render just compensation. Unsurprisingly, Dow Corning agrees with both. First, the district court found that the $ 100 per day simply was not a forecast of compensation for any damages, but rather was initially intended as a penalty. Second, the district court concluded that even if the Plaintiffs' attorneys had intended this clause as compensation for damages, there was no evidence that the likely amount of such damages was ever estimated at all or that it was compared with $ 100 per day, nor was any evidence provided that any negotiations over what amount would be reasonable compensation had ever occurred. The district court concluded that the clause thus was not a "reasonable forecast of just compensation."

Bear Stearns argues that the burden was on Dow Corning to prove that the clause was not a reasonable forecast, and that Dow Corning simply has not presented any evidence that the clause was not a reasonable forecast of damages. However, this argument both discounts the evidence Dow Corning has presented and overstates Dow Corning's burden. Dow Corning [**21] has presented evidence that the parties did not discuss potential uncertain damages resulting from breach, and has also presented evidence that the clause was initially proposed as a penalty untied to any potential damages.

Bear Stearns argues that the district court unfairly shifted the burden of proof to Bear Stearns. However, such a shifting was not improper in light of evidence presented by Dow Corning that is probative of a lack of both intent to provide just compensation and the existence of any consideration of any estimates of what just compensation would be. Bear Stearns's only statement to counter Dow Corning's evidence of a lack of connection between the clause and any estimate of damages is that "given the large number of individual Plaintiffs and the difficulty in estimating each Plaintiff's actual damages in the event of a breach by Dow, the $ 100 per day figure was a reasonable estimate of those damages." This argument

may reasonably rebut one of Dow Corning's other arguments, that the damages were not reasonably predictive of damages potentially or actually incurred by any one specific Plaintiff. Regardless, however, the fact that there are numerous Plaintiffs or that [**22] each Plaintiff's damages were uncertain does not logically imply that $ 100 per day *was* a reasonable estimate of damages.

Bear Stearns further argues that "having proposed the $ 100 per day figure, Dow clearly believed it was reasonable at the time." However, such an inference cannot be made. When Dow Corning proposed the $ 100 figure, the uncontradicted evidence shows that it intended the figure as a penalty, and *not* as a reasonable estimation of some set of damages. Bear Stearns cites no evidence tying the $ 100 figure to any of the types of damages it claims Plaintiffs were estimated to face [*553] post-breach, while Dow Corning cites evidence probative of an absence of a concern for whether $ 100 was just compensation. For this reason alone, Bear Stearns's arguments fail. *See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (requiring a party defending against a motion for summary judgment to provide more than a "scintilla" of evidence to support the conclusion that there is a genuine issue of material fact for trial).

The district court also held that the $ 100 per day provision was not a reasonable estimate of just compensation [**23] for the anticipated damages because such liquidated damages would constitute double recovery for damages already compensated by the base settlement payments. *See, e.g., Eberts v. Businesspeople Personnel Servs., Inc., 620 S.W.2d 861 (Tex. Ct. App. 1981)* (disallowing double recovery via liquidated damages); *Robert G. Beneke & Co., Inc. v. Cole, 550 S.W.2d 321 (Tex. Ct. App. 1977)* (same). However, Bear Stearns properly notes that the damages for which it is claiming liquidated damages are *not* damages contemplated by the underlying contract, since the [***8] damages at issue here are those resulting from a breach of the settlement agreement itself (*e.g.* difficulties or other costs resulting from inability to pay medical bills or other bills which Plaintiffs had incurred relying on the availability of settlement money), and *not* those for which the settlement payments are supposed to compensate the Plaintiffs (*e.g.* expenses resulting directly from potentially faulty implants). Accordingly, the district court should not have concluded that enforcement of the liquidated damages clause would constitute double recovery. Nonetheless, because [**24] Dow Corning provided evidence that the provisions were not actually reasonable estimations of any anticipated damages from breach, the second prong of the liquidated damages test, and thus the result of the entire test, was properly resolved in Dow Corning's favor.

*3. Are the Liquidated Damages Disproportionate to the Actual Damages Incurred by Plaintiffs?*

Because Dow Corning has met its burden of proving that the clause was not a reasonable estimation of any anticipated damages, the entire three-part test must be resolved in its favor. *See, e.g., Baker, 812 S.W.2d at 55*. Therefore, we need not determine whether the "liquidated damages" under the clause would be disproportionate to any actual damages incurred by Plaintiffs.

**C. Quasi-Estoppel and Unenforceable Liquidated Damages Clauses**

Under Texas law, the illegality of a liquidated damages clause is an affirmative defense that must be asserted by a defendant when it is not clear from the face of the agreement that the clause is illegal. *See, e.g., Phillips v. Phillips, 820 S.W.2d 785, 789-90, 35 Tex. Sup. Ct. J. 220 (Tex. 1991)*. Bear Stearns argues that the doctrine of quasi-estoppel should prevent [**25] Dow Corning from being able to assert this affirmative defense, and therefore that the liquidated damages clause should be enforced. Quasi-estoppel is appropriate where "it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P., 22 S.W.3d 857, 864, 43 Tex. Sup. Ct. J. 806 (Tex. 2000)* (citing *Atkinson Gas Co. v. Albrecht, 878 S.W.2d 236, 240 (Tex. Ct. App. 1994))*. Bear Stearns argues that since Dow Corning proposed the clause in order to induce settlement with the Plaintiffs, thereby avoiding costly litigation, Dow Corning cannot now assert that the clause is illegal. However, regardless of whether quasi-estoppel would be appropriate here, [*554] Texas courts have clearly stated that one cannot be estopped from arguing that a contract term is illegal for public policy reasons. *See, e.g., In re Kasschau, 11 S.W.3d 305, 312-14 (Tex. Ct. App. 1999)*; *see also In re Calderon, 96 S.W.3d 711, 719-20 (Tex. Ct. App. 2003)*. Accordingly, under Texas law, Dow Corning simply cannot be estopped from asserting the affirmative defense [**26] of illegality, even if quasi-estoppel would otherwise be applicable. Because Dow Corning did indeed assert this defense, and because we conclude that this defense has merit, Bear Stearns's argument fails.

**III.**

Because we conclude that Dow Corning met its burden of showing that the liquidated damages clause at issue is a penalty clause unenforceable under Texas law for reasons of public policy, we need not address whether a condition precedent to enforcement of the clause was met. We therefore **AFFIRM** both the district court's denial of Bear Stearns's summary judgment motion and the grant of summary judgment to Dow Corning.



**IN RE RICHARD ALLEN KASSCHAU, Relator**

**NO. 14-99-00737-CV**

**COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON**

***11 S.W.3d 305*; *1999 Tex. App. LEXIS 9300***

**December 16, 1999, Opinion Filed**

**PRIOR HISTORY:** [**1] Appeal from 312TH DISTRICT COURT, Harris County; James D. Squier, Judge.

This Opinion Substituted on Overrule of Rehearing for Withdrawn Opinion of November 10, 1999, Previously Reported at: *1999 Tex. App. LEXIS 8399*.

**DISPOSITION:** Petition Denied.

**COUNSEL:** Linda Marshall - of Houston, TX, for relator.

Shawn Russel Casey - of Houston, TX, for respondent.

**JUDGES:** Panel consists of Justices Yates, Fowler and Frost.

**OPINION BY:** KEM THOMPSON FROST

**OPINION**

[*308] **ORIGINAL PROCEEDING WRIT OF MANDAMUS OPINION ON REHEARING**

The motion for rehearing of relator, Richard Allen Kasschau, is overruled. The court's opinion of November 10, 1999, is withdrawn and this opinion is substituted in its place.

In this original proceeding, the relator seeks a writ of mandamus directing the trial court to vacate two orders in the underlying divorce case: (1) denying reinstatement of an "original counter petition" for divorce, and (2) setting aside a mediated settlement agreement. Because the first order is not reviewable by mandamus and the second order was not a clear abuse of discretion, we deny the writ.

**BACKGROUND**

Luckmi Kasschau ("Luckmi"), the real party in interest, sued the relator, Richard Allan Kasschau ("Richard"), for divorce in the 312th District Court of Harris County. In her petition, Luckmi sought not only dissolution of the marriage, but also conservatorship and support [**2] of their two children and division of the community estate. Richard answered the suit with a general denial, a plea for confirmation of his separate property, and a request for reimbursement, attorney's fees, and expenses. The parties subsequently agreed to mediation. The parties settled all issues at mediation and the court approved the settlement. [1]

1 The copy of the mediated settlement agreement provided by Richard is neither file-stamped nor signed by the court. Nevertheless, the reporter's record from a later hearing establishes that the court signed and approved the agreement.

Before the court entered judgment, however, Luckmi nonsuited her divorce petition. Unaware of the nonsuit, Richard filed an "original counter-petition" for divorce. In his counter-petition, Richard sought enforcement of the mediated settlement agreement, denied paternity of the second child born during the marriage, and asserted various tort claims against Luckmi and Shivi Kumar Pawa ("Shivi"), the alleged father of the second child. [**3] Luckmi subsequently filed in the same court a new petition for divorce, seeking the same relief sought in her first suit. Luckmi also denied Richard's paternity of the second child and sought various temporary orders.

Meanwhile, back in the first suit, Richard filed a motion to reinstate his counter-petition for divorce and to consolidate the two divorce actions. He also asked the court to enter judgment on the mediated settlement agreement. Luckmi opposed the motion for judgment,

asserting that: (1) certain conditions precedent to judgment had not been satisfied; namely, Shivi had not filed an intervention as contemplated [*309] by the settlement agreement, and (2) the settlement agreement was void because it required Richard to turn over certain audiotape recordings of Luckmi for destruction by the parties' attorneys, an act Luckmi claimed would be illegal. *See TEX. PEN. CODE ANN. §§ 16.02(b)(1), 37.09(a)(1)* (Vernon 1994).

At a hearing on these motions, the trial court granted the motion to consolidate the two divorce actions based on its conclusion that Luckmi's nonsuit did not defeat the mediated settlement agreement. The court, however, denied Richard's motion to reinstate the [**4] counter-petition, finding that only Richard's claim for attorney's fees survived the nonsuit. The court withdrew its approval of the mediated settlement agreement, finding the agreement void and unenforceable because it required performance of an illegal act. The court put its first two rulings in writing by order signed the same day as the hearing.

After the hearing, Richard filed a request to enforce the terms of the mediated settlement agreement, except for the allegedly illegal provision. In the meantime, Shivi filed an intervention seeking to establish paternity, conservatorship and support of the second child. After the trial court signed an order setting aside the entire mediated settlement agreement, Richard filed this petition for writ of mandamus. [2]

2 Luckmi objects to the documents included in the appendix to the petition. These were the only documents provided in support of mandamus relief. A petition for writ of mandamus must contain an appendix, which must include "a certified or sworn copy of any order complained of, or any other document showing the matter complained of." *See TEX. R. APP. P. 52.3(j)*. The orders of which Richard complains are included in the appendix and appear to be signed by the trial court, but are not file-stamped. The verification of Richard's counsel states only "that the pleadings contained in the appendix are true and correct copies." While the verification makes no mention of "orders, motions or other documents," we construe "pleadings" in this instance to include all the documents in the appendix.

[**5] **MANDAMUS**

Mandamus relief is available if the trial court violates a duty imposed by law or clearly abuses its discretion, either in resolving factual issues or in determining legal issues when there is no adequate remedy at law. *See Walker v. Packer, 827 S.W.2d 833, 839-40 (Tex. 1992)*. A trial court clearly abuses its discretion by making an arbitrary and unreasonable decision that amounts to a clear and prejudicial error of law. *See Johnson v. Fourth Court of Appeals, 700 S.W.2d 916, 917 (Tex. 1985)*. Richard complains the trial court violated a duty imposed by law by refusing to reinstate his counter-petition and declining to enter judgment on the mediated settlement agreement. We address each of these complaints and the question of whether Richard has an adequate remedy by appeal.

**Reinstatement of the Counter-Petition**

Richard first contends the trial court violated a ministerial duty by refusing to reinstate his "original counter-petition," even though it was filed after Luckmi's nonsuit. Under *Texas Rule of Civil Procedure 162*, a plaintiff has an absolute, unqualified right to take a nonsuit before she introduces all her [**6] evidence, as long as the defendant has not made a claim for affirmative relief. *See BHP Petroleum Co., Inc. v. Millard, 800 S.W.2d 838, 840 (Tex. 1990)*; *General Land Office v. Oxy U.S.A., Inc., 789 S.W.2d 569, 570 (Tex. 1990)*; *Greenberg v. Brookshire, 640 S.W.2d 870, 871 (Tex. 1982)* (per curiam). The trial court's refusal to grant a nonsuit in the absence of a defendant's claim for affirmative relief violates a ministerial duty and can be corrected by mandamus. *See Quanto Int'l Co., Inc. v. Lloyd, 897 S.W.2d 482, 485* (Tex. App.--Houston [1st Dist.] 1995, orig. proceeding). Similarly, the trial court's reinstatement of a case after the court has lost jurisdiction because of a nonsuit may also be reviewed by [*310] mandamus. *See id*. (citing *Johnson v. Harless, 651 S.W.2d 259, 260 (Tex. 1983)*. Neither of these situations is present here.

The trial court did not refuse to grant a nonsuit nor did it attempt to reinstate the case without jurisdiction to do so. Instead, the court merely refused to consider Richard's counter-petition for divorce. We can see no reason to remedy the court's ruling by mandamus [**7] rather than by an appeal. The requirement that a person seeking mandamus relief establish the lack of an appellate remedy is a "fundamental tenet" of mandamus practice. *See In re Masonite Corp., 42 Tex. Sup. Ct. J. 789, 793* ( June 17, 1999 ) (J. Baker dissenting) (and cases cited therein). An appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining mandamus. *See id*. Although, on rare occasions, exceptional circumstances may justify mandamus relief despite the presence of a generally adequate appellate remedy, such circumstances do not exist when a trial court's ruling is merely incidental to the trial process and does not permanently deprive a party of substantial rights. *See id. at 793*. Furthermore, the mere fact that a trial court's erroneous order will result in an eventual reversal on appeal does not mean that trial will be a "waste of judicial resources." *See id*. Rather, mandamus should

issue only in situations involving manifest and urgent necessity and not for grievances to which other remedies may apply. *See id. at 792*. Because Richard neglects to explain why the court's ruling on his motion to reinstate cannot be [**8] remedied by an appeal, we decline to address the court's ruling by mandamus.

**Judgment on the Mediated Settlement Agreement**

Richard also contends the trial court violated a ministerial duty by refusing to enter judgment on the mediated settlement agreement. *Sections 6.602(b)* and *153.0071(d)* of the Family Code state that "a mediated settlement agreement is binding on the parties if the agreement: (1) provides in a separate paragraph that the agreement is not subject to revocation; (2) is signed by each party to the agreement; and (3) is signed by the parties' attorney, if any, who is present at the time the agreement is signed." Section 157.0071(d) adds the requirement of "an underlined statement that the agreement is not subject to revocation." Finally, subsections (c) and (e) of these statutes provide that "a party is entitled to judgment" on a mediated settlement agreement that meets the above requirements "notwithstanding Rule 11 . . . or another rule of law."

It is undisputed that the mediated settlement agreement in the underlying case meets the requirements of *sections 6.602(b)* and *153.0071(d)*. Relying on these Family Code provisions, Richard argues that Luckmi could [**9] not revoke her consent to the agreement by nonsuiting her divorce action and that the trial court violated a ministerial duty by refusing to enter judgment on the agreement. Citing the noted arbitration case, *Jack B. Anglin v. Tipps, 842 S.W.2d 266, 271-73 (Tex. 1992)*, Richard also argues that without mandamus relief, he will be deprived of the rapid, inexpensive alternative to litigation provided by the Family Code. We need not compare mediated settlement agreements under the Family Code to arbitration agreements. Instead, we conclude that Richard lacks an adequate remedy from the trial court's ruling because he will be deprived of the settlement's benefits if forced to expend further time and resources litigating a suit that may have been settled. *See, e.g., Mantas v. Fifth Court of Appeals, 925 S.W.2d 656, 659 (Tex. 1996)* (holding that relator who settled case on appeal lacked adequate remedy for appellate court's refusal to abate appeal pending suit to enforce settlement agreement); *see also Harris County Appraisal Dist. v. Johnson, 889 S.W.2d 531, 533-34* (Tex. App.--Houston [14th Dist.] 1994, orig. proceeding) (mandamus [*311] is appropriate [**10] to compel a district judge to proceed to trial and judgment).

While we find the court's refusal to enter judgment on the mediated settlement agreement is a proper subject for mandamus, we conclude that the trial court did not violate a ministerial duty in this case. One of the two reported cases addressing *section 153.0071 of the Family Code* holds that subsection (e) requires the trial court to enter judgment on a mediated settlement agreement that meets the requirements of subsection (d). *See Alvarez v. Reiser, 958 S.W.2d 232, 234* (Tex. App.--Eastland 1997, writ denied). [3] In *Alvarez*, the husband sued the wife for divorce. *958 S.W.2d at 233*. The wife answered and filed a cross-petition for divorce. *See id*. At mediation, the parties reached a settlement agreement that complied with the requirements of section 153.071(d). *See id*. The trial court entered judgment on the mediated settlement agreement even though the wife had withdrawn her consent to the agreement. *See id*. The wife appealed and the appellate court affirmed, concluding that: (1) a party's unilateral withdrawal of consent does not negate the enforceability of a mediated settlement [**11] agreement that complies with *section 153.0071(d)*, and *(2)* "a separate suit for enforcement of a contract is not necessary." *Id. at 234*.

3 *Spinks v. Spinks, 939 S.W.2d 229* (Tex. App.--Houston [1st Dist.] 1997, no writ) is the only other reported case addressing *section 153.0071*. In that case, the court held that a party could revoke a mediated settlement agreement that did not comply with section 153.071(d). *See id. at 230*.

Here, the issue is not whether Luckmi could revoke her consent to the mediated settlement agreement, but whether the agreement itself was valid and enforceable. Notably, the lower court did not rule that Luckmi had revoked her consent to the mediated settlement agreement by taking a nonsuit. To the contrary, in consolidating the two divorce actions, the court expressly stated that Luckmi's nonsuit did not defeat the agreement. Instead of immediately entering judgment on the mediated settlement agreement, however, the trial court reviewed [**12] the agreement and concluded it was void.

Neither the plain language of the Family Code nor the holding in *Alvarez* foreclose the court's action. First, as noted, *sections 6.602* and *153.0071* of the Family Code provide that "a party is entitled to judgment" on a mediated settlement agreement if certain requirements of those statutes are met. Where, as here, the legislature has not defined the terms in the statute, we must apply their ordinary meaning. *See In re Clark, 977 S.W.2d 152, 156* (Tex. App.--Houston [14th Dist.] 1998, orig. proceeding). "Entitle" means in part "to grant a legal right to or qualify for." *See* BLACK'S LAW DICTIONARY 553 (7th ed. 1999). That a party has a "right to" judgment, or "qualifies for" judgment on a mediated settlement agreement does not deprive the court of discretion to review an agreement before entering judgment. Second, while *Alvarez* precludes a party from revoking consent to a mediated set-

tlement agreement that complies with *section 153.0071*, it does not hold that the court's duty to enter judgment on such an agreement is ministerial. A court's duty to enter judgment on a settlement agreement becomes ministerial only [**13] after it has first rendered judgment on that agreement. *See In re Bland, 960 S.W.2d 123, 124* (Tex. App. Houston [1st Dist.] 1997, orig. proceeding) (J. O' Connor dissenting) (citing *Dunn v. Dunn, 439 S.W.2d 830, 832 (Tex. 1969))*; *see also In the Marriage of Beavers, 648 S.W.2d 729, 732* (Tex. App.-- Amarillo 1983, no writ). Here, the trial court approved the settlement agreement, but never rendered judgment on the agreement. *See, e.g., S & A Restaurant Corp. v. Leal, 892 S.W.2d 855, 857-58 (Tex. 1995)* (holding that approval of a settlement does not necessarily constitute a rendition of judgment in the absence of a clear intent to render judgment). As a [*312] result, the court had no ministerial duty to enter judgment and thus, did not violate such a duty.

Notwithstanding this legal conclusion, the facts of the underlying case demonstrate that the parties did not intend for the court to immediately enter judgment on the settlement agreement. Specifically, the mediated settlement agreement expressly contemplates certain contingencies in connection with Shivi's intervention. It states that the court would likely require an [**14] intervention to resolve certain issues regarding the second child and that entry of a decree would be delayed, and agreed temporary orders entered while these issues were resolved. Thus, the facts of this case establish the trial court's discretion to review the agreement before entering judgment. Accordingly, we hold that the trial court did not violate a ministerial duty by refusing to enter judgment on the mediated settlement agreement.

**Legality of the Mediated Settlement Agreement**

Finally, Richard contends the trial court clearly abused its discretion by setting aside the entire mediated settlement agreement on grounds of illegality. "A contract to do a thing which cannot be performed without violation of the law" violates public policy and is void. *See Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146, 148-149 (1947)*; *see also Montgomery v. Browder, 930 S.W.2d 772, 778* (Tex. App.--Amarillo 1996, writ denied). The rationale behind the rule is not to protect or punish either party to the contract, but to benefit and protect the public. *See Montgomery, 930 S.W.2d at 778*; *see also Plumlee v. Paddock, 832 S.W.2d 757, 759* [**15] (Tex. App.-Fort Worth 1992, writ denied). Because of the presumption in Texas that contracting parties are knowledgeable of the law and contract accordingly, courts will generally leave the parties as they find them. *See id.* Thus, "where the illegality does not appear on the face of the contract, it will not be held void unless facts showing its illegality are before the court." *See Lewis, 199 S.W.2d at 149*. Here, the trial court concluded from the facts before it that the settlement agreement called for the performance of an illegal act. *See TEX. PEN. CODE ANN. § 16.02(a)(1)* (Vernon 1994) (" a person commits an offense if he intentionally intercepts . . . a wire, oral, or electronic communication").

At the hearing on Richard's motions, the court heard uncontroverted testimony that Richard secretly tape recorded Luckmi's phone conversations with various third persons. [4] Aware of these tape recordings at the time of mediation, the parties put the following provision in their settlement agreement:

> Husband ordered to deliver all tape recordings of Wife and transcripts and all copies thereof to Linda Marshall [husband's attorney] by 5:00 p.m., five days [**16] after entry of decree. Attorneys to meet, inspect, and destroy all of same. Parties enjoined from disseminating or distributing a copy of tapes or transcripts.

4 Luckmi testified that after filing for divorce, she discovered a recording device attached to a phone in the garage of the house where she and Richard lived. She testified that the device also contained a tape of her conversations with others including, her mother, Shivi, and friends. Luckmi testified that she was unaware of the recording device or the tape and that she did not give permission to anyone to record her conversations. Luckmi also testified that when she confronted Richard, he acknowledged installing the device and making the recordings. When Richard was questioned on this topic, his counsel invoked the Fifth Amendment on Richard's behalf and instructed him not to answer.

Taking into account that Shivi and others might urge authorities to bring criminal charges against Richard, the court concluded that this provision illegally required [**17] the parties to destroy evidence in a potential criminal proceeding brought at the instance of non-parties to the settlement agreement. [5] *Section 37.09(d)(1) of* [*313] *the Penal Code* states that "a person commits an offense if the person knowing that an offense has been committed, alters, destroys, or conceals any record, document or thing with intent to impair its verity, legibility or availability as evidence in any *subsequent* investigation or official proceeding." *TEX. PEN. CODE ANN. § 37.09(d)(1)* (Vernon Supp. 1999) (emphasis added). This statute makes it a crime to alter or destroy evidence of a crime even before the commencement of a criminal proceeding. Richard argues the provision in question is legal because it does not require *immediate* destruction of the tapes and correspondingly prohibits dissemination of them. The Penal Code does not provide a time after which a person, knowing that an offense has been committed,

may legally destroy evidence. Richard contends, however, that "if they waited until the statute of limitations expired . . . the agreement would be fully and lawfully performed." We reject the notion that once the statute of limitations on the state wire tap [**18] law runs, destruction of the tapes would no longer violate *§ 37.09(d)(1)*, and, therefore, could not be characterized as an illegal act. [6] Richard's argument incorrectly assumes that the mere passage of time transforms an illegal act into a legal one. The statute of limitations is an affirmative defense; it does not bar prosecution for violation of a statute. *See Proctor v. State, 967 S.W.2d 840, 844 (Tex. Crim. App. 1998)* (defense created by statute of limitations is forfeited if not asserted before the guilt/innocence stage of trial). An act prohibited by *§ 37.09(d)(1)* does not magically become legal upon the expiration of the statute of limitations. While the running of the limitations period provides the accused with a potential defense to any prosecution for violation of the statute, it does not change the nature or character of the act. For this reason, we are unable to find that the trial court committed a clear and prejudicial error of law by declaring the settlement agreement illegal and unenforceable based on its finding that the agreement, on its face, called for a violation of *§ 37.09(d)(1)*.

5 These non-parties include Shivi. Under the settlement agreement, Richard agreed to release Shivi of all claims, except for child support. However, the release was conditioned on Shivi releasing claims against Richard.

[**19]

6 We note that *§ 37.09(d)(1)* applies to the destruction of evidence that might be used in "any subsequent investigation or official proceeding" and is not limited to a violation of the state wire tap laws.

Nevertheless, Richard argues the court abused its discretion in refusing to eliminate any illegal provision and enforce the remainder of the settlement agreement. As a general rule, where part of the consideration for an agreement is illegal, the entire agreement is void if the contract is entire and indivisible. *See Montgomery, 930 S.W.2d at 778*. The doctrine of severability is an exception that applies in circumstances in which the original consideration for the contract is legal, but incidental promises within the contract are found to be illegal. *See id*. In such a case, the court may sever the invalid provision and uphold the valid portion, provided the invalid provision does not constitute the main or essential purpose of the agreement. *See Rogers v. Wolfson, 763 S.W.2d 922, 925* (Tex. App.--Dallas 1989, writ denied). Severability of the contract [**20] is determined by the intent of the parties as evidenced by the language in the contract. *See Montgomery, 930 S.W.2d at 778-79*; *see also McFarland v. Haby, 589 S.W.2d 521, 524* (Tex. App.--Austin 1979, writ ref'd n.r.e.). The issue is whether the parties would have entered into the agreement absent the illegal parts. *See Rogers, 763 S.W.2d at 925*; *see also McFarland, 589 S.W.2d at 524*. Therefore, we must determine the central and essential purpose of the settlement agreement.

Richard argues that the resolution of the various issues related to divorce, not the destruction of the tapes, was the essential purpose of the settlement agreement. In contrast, Luckmi argues that the destruction [*314] of the tapes was the consideration for her release of claims against Richard and, thus, was an essential purpose of the agreement. Given the structure of the settlement agreement and its interrelated terms and provisions, we cannot say that the trial court acted without reference to guiding rules and principles in concluding that the agreement is entire and indivisible. Because the court found part of the consideration for the settlement [**21] agreement illegal, it was justified in finding the entire agreement void and unenforceable. Therefore, we find the trial court did not abuse its discretion by declaring the entire agreement void and refusing to enforce it.

Lastly, Richard argues that Luckmi is estopped from questioning the agreement's validity because she accepted a $ 1000 cash payment under its terms. A void contract cannot be rendered enforceable by estoppel. *See Reyes v. Storage & Processors, Inc., 995 S.W.2d 722, 725 n.3* (Tex. App.--San Antonio 1999, pet. filed) (holding that employee who accepted benefits of void agreement limiting worker's compensation benefits was not estopped from complaining about agreement). Thus, Luckmi is not estopped from questioning the agreement's validity. Therefore, we find no clear abuse of discretion by the trial court in setting aside the entire agreement.

**CONCLUSION**

In conclusion, we recognize that there are competing public policy interests at stake here. On the one hand, courts are responsible for carrying out this state's policy of encouraging the peaceable resolution of disputes involving the parent-child relationship through voluntary settlement [**22] procedures. *See TEX. CIV. PRAC. & REM. CODE ANN. §§ 154.002, 154.003* (Vernon 1997). On the other hand, public policy prohibits courts from enforcing illegal contracts. *See Lewis, 199 S.W.2d at 151*; *see also Montgomery, 930 S.W.2d at 778*. Here, we are unable to find the trial court violated the public policy encouraging settlements by refusing to enforce a settlement agreement that it found contained an illegal provision. Accordingly, because the trial court neither violated a duty imposed by law nor clearly abused its discretion by refusing to enter judgment on the mediated settlement agreement, we deny mandamus relief.

/s/ Kem Thompson Frost

Justice

Petition Denied and Opinion filed December 16, 1999



**In The Matter Of: OCA, INC, formerly doing business as Orthodontic Center of America; ORTHALLIANCE NEW IMAGE; ORTHODONTIC CENTERS OF TEXAS INC; PEDOALLIANCE INC; ORTHOALLIANCE, INC, a Delaware Corporation, Debtors; DOUG CROSBY, DDS, DONALD B DOAN, DDS, GLENWOOD JORDAN, DDS, ELGIN E WELLS; Plaintiffs-Appellees, OCA INC, A Delaware Corp; PEDOALLIANCE INC; Plaintiffs-Appellants; RICHARD R WOEHRLE, DDS, MS; MICHAEL M DILLINGHAM DDS PC, a Texas Professional Corporation; MICHAEL M. DILLINGHANI, DDS; AUSTIN ORTHODONTIC SPECIALISTS; ROBERT P. BUCK; BUCK ORTHODONTICES ASSOCIATES PC; STEPHEN N COLE; BAY AREA ORTHODONTICES PC, Plaintiffs-Appellees v. ORTHALLIANCE NEW IMAGE; ORTHONDONTIC CENTERS, OF TEXAS INC; Defendants-Appellants; DUDLEY M HODGKINS; DUDLEY M HODGKINS, DDS, MSD, PC, A Texas Professional Corp; WILLIAM R IZZARD; RUBY IZZARD DDS PC, Defendants-Appellee, ORTHOALLIANCE INC, a Delaware Corporation; Defendant-Appellant, RON RISINGER, D.D.S.; RON RISINGER, DDS PC, Movants -Appellees; ROBERT PACKARD; PACKARD ORTHODONTICS PA, Amicus Curiae**

**No. 07-30430**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

***552 F.3d 413*; *2008 U.S. App. LEXIS 26509*; *50 Bankr. Ct. Dec. 277***

**December 12, 2008, Filed**

**PRIOR HISTORY:** [**1]

Appeal from the United States Bankruptcy Court for the Eastern District of Louisiana.

*Penny v. Orthalliance, Inc., 255 F. Supp. 2d 579, 2003 U.S. Dist. LEXIS 4719 (N.D. Tex., 2003)*

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For DOUG CROSBY, DDS, DONALD B DOAN, DDS, GLENWOOD JORDAN, ELGIN E WELLS, Plaintiffs - Appellees: William C Gambel, Milling Benson Woodward, New Orleans, LA.

For OCA INC, A Delaware Corp, PEDOALLIANCE INC, Plaintiffs - Appellants: Robert John Clary, William L Foreman, Owens, Clary & Aiken, Dallas, TX; Warren Horn, Heller, Draper, Hayden, Patrick & Horn, New Orleans, LA.

For MICHAEL M DILLINGHAM DDS PC, a Texas Professional Corporation, MICHAEL M DILLINGHAM, DDS, AUSTIN ORTHODONTIC SPECIALISTS, Plaintiffs - Appellees: J David Forsyth, Sessions, Fishman & Nathan, New Orleans, LA; Peter Charles Forbes, Horowitz Forbes LLP, Denver, CO.

For ROBERT P BUCK, BUCK ORTHODONTICS ASSOCIATES P C, STEPHEN N COLE, BAY AREA ORTHODONTICS P C, Plaintiffs - Appellees: Bruce A Cranner, Michael H Pinkerton, David Phillip Curtis, Frilot LLC, New Orleans, LA.

For ORTHALLIANCE NEW IMAGE, ORTHONDONTIC CENTERS OF TEXAS INC, ORTHOALLIANCE INC, a Delaware Corporation, Defendants - Appellants: Robert John Clary, William L Foreman, Owens, Clary & Aiken, Dallas, TX; Warren Horn, Heller, Draper, Hayden, Patrick & Horn, New Orleans, [**2] LA.

For DUDLEY M HODGKINS, DUDLEY M HODGKINS DDS, MSD, PC, A Texas Professional Corp, Defendants - Appellees: Kell Corrigan Mercer, Brown McCarroll, Austin, TX.

For WILLIAM R IZZARD, RUDY IZZARD DDS PC, Defendants - Appellees: William C Gambel, Milling Benson Woodward, New Orleans, LA.

For RON RISINGER, D.D.S. R, RON RISINGER, DDS PC, Movants - Appellees: Joseph Naus, Michael Allyn Stroud, Wiener, Weiss & Madison, Shreveport, LA.

For ROBERT PACKARD, PACKARD ORTHODONTICS PA, Amicus Curiaes: Sean Joseph McCaffity, Rochelle Hutcheson & McCullough, Plano, TX.

**JUDGES:** Before GARWOOD, CLEMENT, and ELROD, Circuit Judges.

**OPINION BY:** GARWOOD

**OPINION**

[*416] GARWOOD, Circuit Judge:

Debtors-appellants OCA, Inc., formerly doing business as Orthodontic Centers of America, Inc.; OrthAlliance New Image, Inc.; Orthodontic Centers of Texas, Inc.; PedoAlliance, Inc.; and OrthAlliance, Inc. (collectively "OCA") directly appeal the January 17, 2007 interlocutory order of the bankruptcy court granting partial summary judgment and holding that the Business Services Agreements or Management Agreements (collectively the "BSAs") that OCA entered with a number of orthodontists and their professional corporations (collectively the "Orthodontists") [1] were [**3] illegal under Texas law. We affirm.

1 The following dentists and professional corporations were parties to this appeal: Doug Crosby, D.D.S.; Donald B. Doan, D.D.S.; Elgin E. Wells; Dudley M. Hodgkins; Dudley M. Hodgkins, D.D.S., M.S.D., P.C., a Texas Professional Corporation; Lisa L. Kerns; Lisa Loomis Kerns, D.D.S., P.C., a Texas Professional Corporation; William F. Terhune; William F. Terhune, D.M.D., P.C., a Texas Professional Corporation; William R. Izzalrd; Rudy Izzard, D.D.S., P.C.; Richard R. Woehrle, D.D.S., M.S.; Michael M. Dillingham, D.D.S., P.C., a Texas Professional Corporation; Michael M. Dillingham, D.D.S.; Austin Orthodontic Specialists, Inc.; Robert P. Buck; Buck Orthodontics Associates, P.C.; Stephen N. Cole; Bay Area Orthodontics, P.C.; Ron Risinger, D.D.S.; Ron Risinger, D.D.S., P.C.; Don A. Woodworth, D.D.S.; Woodworth Orthodontics, P.A.. Lisa L. Kerns; Lisa Loomis Kerns, D.D.S., P.C., a Texas Professional Corporation; William F. Terhune; William F. Terhune, D.M.D., P.C., a Texas Professional Corporation; and Richard R. Woehrle, D.D.S., M.S. were dismissed as parties to this appeal before oral argument because they reached a settlement with OCA.

**FACTS AND PROCEEDINGS** [**4] **BELOW**

This case arises out of a dispute over various BSAs, which OCA had entered into with Orthodontists in the state of Texas. [2] According to the terms of the BSAs, OCA purchased or leased office space and purchased equipment for each office. OCA was also responsible for billing patients, filing insurance claims, hiring nondental personnel, setting dress codes, and managing a bank account through which the dental practice's funds flowed. The Orthodontists were not authorized to withdraw funds from the operating account, so OCA periodically transferred money from these accounts to pay the Orthodontists their compensation. In exchange, the Orthodontists agreed to work a minimum number of hours each week at the practice and not to perform orthodontic work outside that office. The Orthodontist would receive an hourly rate for seeing patients, and OCA would receive an hourly management fee in addition to being reimbursed for its overhead. Profits were then split according to the respective ownership interests of OCA and the Orthodontists. The BSAs were to be in force for long periods of time, some up to forty years, and their terms severely restricted the Orthodontists' ability to terminate [**5] or assign them.

2 OCA entered into contracts with orthodontists in many states, but this appeal only deals with contracts between OCA and orthodontists practicing in Texas.

The Orthodontists entered this case at various points in the litigation stream. Appellee orthodontist Buck initially brought suit against Orthalliance, Inc. in [*417] Texas state court seeking an accounting and a declaration that his BSA was void for illegality under Texas law. The case was removed to federal court and later transferred to the United States District Court for the Northern District of Texas on November 11, 2002. Appellee orthodontist Cole brought a similar suit that was eventually consolidated with Buck's case and others in *Penny v. OrthAlliance, Inc. ("Penny")*, Case No. 3:01-CV-1569-N, in the Northern District of Texas, in June 2004. [3] The district court severed Cole's and Buck's cases from the *Penny* litigation in July 2005. OCA's filing for chapter 11 protection in the proceedings below in the Eastern District of Louisiana stayed Cole's and Buck's cases on March 6, 2006. The bankruptcy court, however, lifted the stay for

the purpose of allowing the Northern District of Texas district court to rule on whether [**6] Buck's and Cole's BSAs were void for illegality under Texas law. On November 20, 2006, the district court for the Northern District of Texas held that the BSAs were void for illegality because they were nearly identical to the contracts in *Penny* that were held to be illegal under *Texas Occupation Code § 251.003(a)(4)*. The district court then transferred the remainder of the case to the bankruptcy court for the Eastern District of Louisiana.

3 *See Penny v. Orthalliance, Inc., 255 F. Supp. 2d 579 (N.D. Tex. 2003)*.

Appellee orthodontist Izzard terminated his BSA in April 2005, before OCA filed for bankruptcy. Appellees orthodontists Wells, Doan, Dillingham, Crosby, Jordan, Hodgkins, and Woodworth were still performing under their respective BSAs when OCA filed for bankruptcy.

After filing for chapter 11 protection, OCA, as debtor in possession, commenced adversary proceedings in the bankruptcy court against Hodgkins and Izzard seeking a declaration that their BSAs were not void for illegality under Texas law. Appellees orthodontists Doan, Crosby, Wells, and Dillingham brought adversary proceedings seeking to have their BSAs declared void for illegality. In a contested proceeding, appellee [**7] orthodontist Woodworth filed a motion for summary judgment, which sought to have his BSA declared void for illegality. The bankruptcy court held a joint hearing to determine the legality of all of the Texas BSAs on January 10, 2007. At this hearing, the bankruptcy court announced from the bench that it was granting the Orthodontists' motions for partial summary judgment and holding that the BSAs were void for illegality under Texas law based on several prior Texas federal district court rulings in similar cases. The bankruptcy court entered its Order Granting Partial Summary Judgment on January 17, 2007.

On January 19, 2007, OCA moved to have the bankruptcy court certify its interlocutory judgment for direct appeal under *28 U.S.C. § 158(d)(2)*, and the Orthodontists moved to have the January 17, 2007 order made final. On March 7, 2007, the bankruptcy court granted OCA's motion and certified that the requirements to directly appeal its January 17, 2007 order to the Fifth Circuit were present. It also denied the Orthodontists' motions to make its earlier judgment final." [4] CA filed its petition for direct review of the bankruptcy court's interlocutory order with the Fifth Circuit on March; [**8] 16, 2007. The petition was granted on May 15, 2007.

4 On March 9, 2007, the bankruptcy court separately denied Woodworth's motion to make his judgment final and granted OCA's motion to certify the bankruptcy court's January 17, 2007 order for direct appeal with respect to Woodworth.

[*418] **JURISDICTION**

OCA directly appealed to this court the bankruptcy court's January 17, 2007 interlocutory order pursuant to *28 U.S.C. § 158(d)(2)*. This statute was enacted to provide for direct review of bankruptcy court judgments, orders, or decrees by the applicable court of appeals in cases where the bankruptcy court or the district court certify that there is no controlling decision from the Supreme Court or circuit court, the case involves a matter of public importance, there are conflicting precedents, or an immediate appeal may materially advance the progress of the bankruptcy proceeding. *28 U.S.C. § 158(d)(2)(A)(i)--(iii)*. If this certification is made, the applicable court of appeals has jurisdiction if it authorizes the direct appeal. *Id. § 158(d)(2)(A)*.

On March 7, 2007, the bankruptcy court certified that this case met the requirements for direct appeal because it involved a question of law on which [**9] there was no controlling decision by the Fifth Circuit or the Supreme Court, it involved a matter of public importance, and a direct appeal would materially advance the progress of the case. A panel from this court granted OCA's petition for leave to appeal under *section 158(d)*. The only question is whether *section 158(d)(2)* permits this court to hear direct appeals from interlocutory orders of bankruptcy courts. [5]

5 Prior to the adoption of *section 158(d)(2)*, this court generally lacked jurisdiction to review interlocutory orders of bankruptcy courts. *Promenade Nat'l Bank v. Phillips (In re Phillips), 844 F.2d 230, 231 (5th Cir. 1988)*.

The text of the statute grants the courts of appeals "jurisdiction of appeals described in the *first sentence* of *subsection (a)*." *Id. § 158(d)(2)(A)* (emphasis added). The first sentence of *section 158(a)* grants district courts jurisdiction over bankruptcy appeals from interlocutory orders or decrees if granted leave by the district court. *Id. § 158(a)(3)*. Since interlocutory orders are included in the first sentence of *subsection (a)* and all of the other jurisdictional prerequisites of *section 158(d)(2)* are met, this court has jurisdiction to hear OCA's [**10] direct appeal from the bankruptcy court. [6]

6 Woodworth argues that his appeal is not properly before this court because the certification for direct appeal of his case was not signed until March 9, 2007, which was more than 30 days after the judgment was entered on January 17, 2007. At oral argument Woodworth argued that his case was distinguishable from the other orthodontists because his was a contested proceeding, not an

adversarial proceeding, and his judgment is final. Assuming *arguendo* that Woodworth is correct and his judgment is final, his argument still fails because a party may request certification for direct appeal up 60 days after the entry of the judgment, order, or decree. *28 U.S.C. § 158(d)(2)(E)*. This 60 day limit applies regardless of whether the judgment, order, or decree is final or interlocutory. OCA received certification for direct appeal on March 9, 2007, which is within 60 days of the entry of the judgment or order to be appealed on January 17, 2007. Therefore, the appeal was timely filed. Additionally, Woodworth argued that his case was not properly included in OCA's petition for leave to appeal to the Fifth Circuit. After reviewing the record, however, we [**11] conclude that OCA did properly include Woodworth in its petition for direct appeal, so this court does have jurisdiction over his appeal.

Since this is an appeal from an interlocutory order from the bankruptcy court regarding a question of law on which there is no controlling precedent, we will treat this appeal essentially as we treat certified questions from district courts. *See 28 U.S.C. § 1292(b)*.

**DISCUSSION**

The Texas Occupations Code prohibits a person from practicing dentistry without a [*419] license. *Tex. Occ. Code § 256.001*. Texas defines practicing dentistry as engaging in any one of ten different activities. *See Tex. Occ. Code § 251.003(a)*. In this case, the bankruptcy court granted the Orthodontists' motions for partial summary judgment and held that the BSAs between OCA and the Orthodontists were void for illegality because they enabled OCA, which is unlicensed, to practice dentistry without a licence by owning, maintaining, or operating a place of business in which it employed or engaged by contract someone else to practice dentistry. *Tex. Occ. Code § 251.003(a)(4)*. [7] OCA argues that this ruling was erroneous because it is a corporation and is hence not a "person" under *section 251.003(a)(4)*, [**12] the bankruptcy court should have permitted the parties to use the severability clause in the BSAs to cure the BSAs' illegality, and the bankruptcy court failed to consider whether an assignment of part of OCA's rights or obligations under the BSAs to an affiliate would have rendered the BSAs legal.

7 *Section 251.003(a)(4)* provides "(a) For purposes of this subtitle, a person practices dentistry if the person: . . . (4) owns, maintains, or operates an office or place of business in which the person employs or engages under any type of contract another o person to practice dentistry; . . . ."

*I. Standard of Review; Applicable Law*

When directly reviewing an order from a bankruptcy court, findings of fact are reviewed for clear error and conclusions of law are reviewed *de novo*. *FED. R. BANKR. P. 8013*; *Drive Fin. Servs., L.P. v. Jordan, 521 F.3d 343, 346 (5th Cir. 2008)*. A lower court's grant of summary judgment presents a question of law reviewed de novo. Since all of the BSA's in this appeal involved the practice of dentistry in Texas, Texas law governs their enforceability. *See Butner v. United States, 440 U.S. 48, 99 S.Ct. 914, 918, 59 L. Ed. 2d 136 (1979)* ("Property interests are created and defined by state law. . [**13] . . [T]here is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.")

*II. Are Corporations "Persons" for Purposes of Section 251.003(a)(4)*

Legislation governing the operations of dentists is codified in the Texas Occupations Code (the "Code"). When the Code was recodified in 1999, the legislature added *section 1.002*, which provides that the "Government Code (Code Construction Act), applies to the construction of each provision in this code except as otherwise expressly provided by this code." *Tex. Occ. Code § 1.002*. The Texas Government Code defines the term "person" to include corporations "unless the statute or context in which the word or phrase is used requires a different definition." *Tex. Gov't Code § 311.005(2)*.

*Section 251.003(a)* does not contain its own definition of "person," but nevertheless, OCA argues that the term should not be read to include corporations. The basis of its argument is that the recodification of the Code was not meant to enact substantive change in the law and the prior version of *section 251.003(a)(4)* did not itself expressly include corporations in its definition of person. [**14] *See Tex. Occ. Code § 1.001(a)* (stating that the revisions were not meant to make any substantive changes).

The previous version of *section 251.003(a)(4)* provided that anyone who engaged in the following conduct was engaged in dentistry:

> "(4) Any one who owns, maintains or operates any office or place of business where *he* employs or engages under any [*420] kind of contract whatsoever, any other person or persons to practice dentistry as above defined shall be deemed to be practicing dentistry *himself*, and shall *himself* be required to be duly licensed to is practice dentistry as hereinabove defined and shall be subject to all of the other

> provisions of this Chapter, even though the person or persons so employed or engaged by *him* shall be duly licensed to is practice dentistry as hereinabove defined." Tex. Rev. Civ. Stat. art. 4551a(4) (1935) (emphasis added) ("Article 4551a(4)").

OCA argues that the references to he, himself, and him limit the definition of "person" to natural persons.

OCA also notes that Article 4551a(4) was passed in 1935 along with an identical criminal statute, Tex. Penal Code art. 754a(4) (1935) ("Article 754a(4)"), which only applied to natural persons. OCA argues that the [**15] doctrine of *in pani materia* requires the civil statute and the penal statute to be read in harmony because they were adopted by the same legislature regarding the same subject matter. *See Garrett v. Mercantile Nat'l Bank at Dallas, 140 Tex. 394, 168 S.W.2d 636, 637 (Tex. 1943); Braun v. State, 40 Tex. Crim. 236, 49 S.W. 620, 622-23 (Tex. Crim. App. 1899)*. Consequently, the civil statute should be read to only apply to natural persons because the criminal statute's application was limited to natural persons.

One problem with this argument is that when these statutes were passed Texas did not subject corporations to criminal liability. *See* Robert W. Hamilton, *Corporate Criminal Liability in Texas*, 47 TEX. L. REV. 60, 60 (1968) (noting that Texas did not subject corporations to criminal prosecutions at that time); *see also* Linda C. Anderson, *Corporate Criminal Liability for Specific Intent Crimes and Offenses of Criminal Negligence--The Direction of Texas Law*, 15 ST. MARY'S L.J. 231, 233 (1984) (stating that the Texas Penal Code was revised in 1974, and that revision incorporated many of Professor Hamilton's suggestions and imposed criminal liability on corporations). Since Texas did not subject corporations to criminal [**16] prosecution before 1974, the fact that Article 754a(4) did not apply to corporations tells us little about whether Article 4551(a)(4), a civil statute, was meant to apply to corporations. [8]

> 8 Furthermore, Texas courts apply the doctrine of *in pari materia* to resolve contradictions between two statutes that cover similar subjects. *S. Pac. Co. v Sorey, 104 Tex. 476, 140 S.W. 334, 336 (Tex. 1911)*. But it is not contradictory for a civil sanction to be broader than a criminal sanction for the same conduct.

That still leaves OCA's argument that the previous iteration of *section 251.003(a)(4)* did not apply to corporations. However, since at least 1925 it has been the law in Texas that in civil statutes "unless a different meaning is apparent from the context" the word 'Person' includes a corporation." Article 23(2) Revised Civil Statutes of Texas, 1925, repealed by Acts 1985, 69th Leg. ch. 479, § 224. This provision was essentially replaced by the above referenced provision of *TEX. GOV'T CODE § 311.005(2)*, likewise enacted by Acts 1985, 69th Leg., ch. 479, § 1. *See also, e.g., James N. Tardy Co v. Tarver, 120 Tex. 591, 39 S.W.2d 848, 850 (Tex. 1931)* ("person" in Texas civil statute includes corporation under Article [**17] 23); *Wyche v. Wichita Engineering Co., 374 S.W.2d 728, 732 (Tex. Civ. App.-Dallas 1964, writ ref'd n.r.e.)* (same); *United States v. Texas Construction Co., 237 F.2d 705, 706 (5th Cir. 1955)* (same; not citing Article 23).

Assuming *arguendo* that OCA's argument is correct, we would have to determine how to apply recodified *section 251.003(a)(4)* [*421] when, on the one hand, there is the general legislative directive that the recodification was not meant to make substantive changes to the law, *Tex. Occ. Code § 1.001(a)*, and, on the other hand, the current statutory definition of "person" includes corporations "unless the statute or context in which the word or phrase is used requires a different definition." *Tex. Gov't Code § 311.005(2)*. When presented with a similar situation, the Texas Supreme Court held that a legislative statement that an amendment did not make substantive changes to a law does not overcome the unambiguous language of a recodified statute that the legislature enacts, even if the language in the new statute does change the prior law. *Fleming Foods of Tex., Inc. v. Rylander, 6 S.W.3d 278, 283-84 (Tex. 1999)*. In reaching this decision, the Texas Supreme Court noted that if the [**18] general statement that none of the changes made during the recodification was allowed to overturn the current plain language in the statute, no citizen would be able to know what the current law was without combing through volumes of session laws. *Id. at 284-85*. That was deemed to be an unacceptable result. *Id. at 285*. Given the holding in *Rylander*, the only remaining question would be whether the current statutory language unambiguously includes corporations within the definition of person. As stated above, the Code's definition of person includes corporations unless the statute's text or context requires a different definition. *Tex. Gov't Code § 311.005(2)*. The text of the statute does not require a deviation for the general definition because its wording does not refer exclusively to a natural person. *Tex. Occ. Code § 251.003(a)(4)*.

This construction is supported by another subsection of the statute and a revisor's note. Following the definition of what constitutes practicing dentistry, the statute specifically excludes a number of persons from that definition. [9] *Tex. Occ. Code § 251.004(a)*. In this section, Dental Health Service Corporations incorporated under the Texas Non-Profit [**19] Corporation Act are specifically excluded. *Id. § 251.004(a)(8)*. [10] If corporations were not "persons" under *section 251.003(a)*, there would have

been no reason for the legislature to specifically exclude these particular entities. Additionally, the *section 251.003* revisor's note four comments that the previous version of *section 251.003(a)(5)* [Article 4551a section (5)] referred to a "person, firm, group, association, or corporation," but that was replaced with "person" because "under *Section 311.005(2)*, Government Code (Code Construction Act), 'person' is defined to include a corporation or any other legal entity. That definition applies to the revised law." *Tex. Occ. Code § 251.003(a)* revisor's note 4 (for the 1999 revision of Article 4551a into the Occupations Code). OCA argues that the revisor's note is inapplicable because it refers to *section 251.003(a)(5)* (relating to dental appliance fitting etc.), not *section 251.003(a)(4)*. This objection is misplaced, however, because "person" has the same meaning throughout *section 251.003(a)*.

9 These exclusions were added in 2001, after the recodification.

10 *Section 251.004(a)(8)* provides: "(a) A person does not practice dentistry as provided [**20] by *Section 251.003* if the person is: . . . (8) a Dental Health Service Corporation chartered under Section A(1), Article 2.01, Texas Non-Profit Corporation Act (Article 1396-2.01, Vernon's Texas Civil Statutes); . . . ."

Since the plain language of the Code unambiguously includes corporations in its definition of "person," that language must be given effect even if the previous version of *section 251.003(a)(4)* did not apply to corporations.

[*422] *III. Are the BSAs illegal*

Under Texas law, a contract is illegal, and thus void, if the contract obligates the parties to perform an action that is forbidden by the law of the place where the action is to occur. *Miller v. Long-Bell Lumber Co., 148 Tex. 160, 222 S.W.2d 244, 246 (Tex. 1949)*. Contracts are presumptively legal, so the party challenging the contract carries the burden of proving illegality. *Franklin v. Jackson, 847 S.W.2d 306, 310 (Tex. App.--El Paso 1992, writ denied)*. "When two constructions of a contract are possible, preference will be given to that which does not result in violation of law." *Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146, 149 (Tex. 1947)*.

The bankruptcy court, relying on decisions from various federal district courts for the Northern, Eastern, and [**21] Western districts of Texas interpreting similar BSAs, granted partial summary judgment in favor of the Orthodontists and held that the BSAs were illegal under *Texas Occupation Code § 251.003(a)(4)* because, as written, they allowed OCA to practice dentistry without a license by owning, maintaining, or operating a place of business in which OCA engaged someone else in the practice of dentistry. *See Penny v. Orthalliance, Inc., 255 F. Supp. 2d 579, 581-83 (N.D. Tex. 2003)*; *Becka v. Orthodontic Ctrs. of Am., Inc., No. 4:03-CV-80, 2005 U.S. Dist. LEXIS 46904, *10-11 (E. D. Tex. Mar. 31, 2005)*; *Buck v. OrthAlliance, Inc., No. 3:05-CV-1485-N, 2006 U.S. Dist. LEXIS 98128, *5 (N.D. Tex. Nov. 20, 2006)*; *Turner v. OCA, Inc., No. M0-05-CV-091, 2006 U.S. Dist. LEXIS 98129, *11 (W.D. Tex. Dec. 5, 2006)*. [11] OCA or its subsidiaries were the defendants in each of those cases, and OCA has not argued that the BSAs at issue in this case are materially different from those at issue in *Penny*, *Becka*, or *Turner*. A review of the record confirms that their terms are Substantially similar.

11 The opinion in *Becka* was later vacated upon the agreement of the parties. *Packard v. OCA, Inc., No. 4:05-CV-273, 2007 U.S. Dist. LEXIS 98064, *12 (E.D. Tex. Feb. 23, 2007)* (magistrate judge). [**22] Since the bankruptcy court ruled on January 17, 2007, two other Texas federal district courts have held that other very similar BSAs, which are not a part of this appeal, violated Texas law. *Packard 2007 U.S. Dist. LEXIS 98064, at *13-14*; *Orthodontic Ctrs. of Tex., Inc. v. Wetzel*, No. 1-06-CA-626-LY, slip op. at 5-8 (W.D. Tex. Jul. 10, 2007);

OCA does not directly dispute that the terms of the BSAs enable it to practice dentistry under *section 251.003(a)(4)* . Instead, it argues that the BSAs do not run afoul of various regulations promulgated by the Texas State Board of Dental Examiners. This argument, however, is irrelevant, because the regulations cited by OCA were promulgated to define whether a "person" was "practicing dentistry" under *section 251.003(a)(9), not section 251.003(a)(4)*, of the Code. *See Tex. Occ. Code § 254.0011*. [12]

12 *Section 251.003(a)(9)* provides that

> "a person practices dentistry if the person: . . .
>
> (9) controls, influences, attempts to control or influence, or otherwise interferes with the exercise of a dentist's independent professional judgment regarding the diagnosis or treatment of a dental disease, disorder, or physical condition; . . . ."
>
> Section 251.003(a)(9) is modified by § 251.003(b) [**23] which provides:
>
> "(b) The practice of dentistry under Subsection (a)(9) does not:

> (1) require an entity to pay for services that are not provided for in an agreement; or
>
> (2) exempt a dentist who is a member of a hospital staff from following hospital bylaws, medical staff bylaws, or established policies approved by the governing board and the medical and dental staff of the hospital."
>
> *Section 254.0011* provides:
>
> (a) The board may adopt rules relating to the practice of dentistry as described by Section 251.003(a)(9) to prohibit a dentist from engaging in contracts that allow a person who is not a dentist to influence or interfere with the exercise of the dentist's independent professional judgment.
>
> (b) Rules adopted by the board under this subtitle may not preclude a dentist's right to contract with a management service organization. Rules affecting contracts for provision of management services apply the same to dentists contracting with management service organizations and to dentists otherwise contracting for management services.

[*423] By failing to argue why it believes that the bankruptcy court's holding that the BSAs violated *section 251.003(a)(4)* was erroneous, OCA has failed to raise an issue [**24] that would merit reversing the bankruptcy court's judgment. Furthermore, given the pervasiveness of the involvement in the practice of dentistry that the BSAs require OCA to engage in, the fact that every district court that has considered whether similar BSAs violate Texas law has held that they were void for illegality, and the longstanding tradition in Texas preventing [A> condemning <A] unlicensed individuals or corporations (other than professional corporations in the relevant profession) from in substance owning a controlling equity interest in the practice of a licensed learned health professional, *see, e.g., Garcia v. Texas Board of Medical Examiners, 384 F. Supp. 434, 437-440 (W.D. Tex. 1974)*; *Flynn Bros. Inc. v. First Medical Associates, 715 S.W.2d 782, 784-85 (Tex. App.--Dallas 1986, writ ref'd n.r.e.)*, we hold that the bankruptcy court did not err.

*IV. Severance*

OCA next argues that the bankruptcy court erred by holding that the BSAs were void for illegality because they contained severability and modification clauses, so the bankruptcy court should have severed or modified the illegal portions of the BSAs in order to cure any defects instead of voiding them for illegality. [**25] To support its argument, OCA cites a case in which this court held that an indemnity agreement was not void for illegality merely because one provision of the agreement was illegal. *Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 721-22 (5th Cir. 1995)*. The Orthodontists respond by arguing that reformation is not applicable in this situation because the portion of the contract that is illegal is the main or essential purpose of the agreement, not merely an incidental promise. *See Williams v. Williams, 569 S.W.2d 867, 871 (Tex. 1978)*.

We first note that in the proceedings below, OCA did not raise this severability argument in its motion for partial summary judgment. It only raised this contention orally at the hearing to determine whether the BSAs were facially illegal, and at that time, OCA's position was that, if the bankruptcy court held that the BSAs were illegal, it should then hold an additional hearing, before certifying the issue for appeal, to consider whether provisions could be severed to cure the illegality. In response, the bankruptcy court stated that it would not hold a "reformation hearing until some higher court decides whether they're illegal or not." OCA acquiesced [**26] to that decision, and never filed a motion to hold a reformation hearing. It is *only* on appeal that OCA argued that Texas law requires a court to consider severability before voiding a contract for illegality. However, this court generally does not consider arguments first raised on appeal. *See Kinash v. Callahan, 129 F.3d 736, 739 n.10 (5th Cir. 1997)*.

Furthermore, while Texas law does allow a severability clause to save a contract that contains illegal provisions, the existence of a severability clause does not guarantee that a contract will always thus be saved from illegality. *Williams* makes it clear that severability is *only* [*424] appropriate when the illegal provision is not an essential part of the contract. *569 S.W.2d at 871*. Even OCA's cited precedent acknowledges this limitation. *Avenell, 66 F.3d at 722* ("'[W]here the *subject matter of the contract is legal*, but the contract contains an illegal provision . . . the illegal provision may be severed and the valid portion of the contract enforced."' (quoting *Panasonic Co. v. Zinn, 903 F.2d 1039, 1041 (5th Cir. 1990))* (emphasis added)). In this case, the illegal portions of the BSA are not simply incidental provisions.

As written, the [**27] BSAs create an interlocking set of obligations that required OCA to exercise considerable control over the Orthodontists' practices. For in-

stance, OCA conducted the financial and marketing activity of the practices, and it maintained the facilities, equipment, and support personnel required to operate the practices. The BSAs also stipulated how much each Orthodontist was required to work, and greatly restricted their ability to perform services outside of the BSAs. In exchange for these services, OCA charged a fee that was tied to the profits of the practices. The BSAs provided little to no ability for the Orthodontists to oversee any of OCAs decisions related to their practice. Ultimately, the Orthodontists were essentially only left with control over diagnosing and treating their patients. Accordingly, the subject matter of the agreement runs afoul of *section 251.003(a)(4)*'s prohibition of unlicensed persons from owning, operating, or maintaining a premises at which those persons also employ or engage another person to practice dentistry.

OCA has never attempted to identify any specific provisions of the BSAs that could be severed to make the BSAs compliant with *section 251.003(a)(4)*. [**28] Instead, OCA repeatedly states that since the statute only prohibits both owning, operating, or maintaining a premise *and* engaging someone else in the practice of dentistry, this court could sever provisions so that OCA would only be performing one of these functions. Even if that might be possible (and we do not hold that it is), nevertheless OCA's failure to identify specific provisions of the BSAs to be severed, renders this court unable to determine whether such severance would cure the BSAs' illegality.

As a result, we decline to reverse the judgment of the bankruptcy court on 'the basis of OCA's argument that provisions of the BSAs could be severed to cure the illegality.

*V. Assignment*

Finally, OCA contends that the bankruptcy court should not have held that the BSAs were void for illegality because the BSAs grant OCA the power to assign its obligations, without the consent of the Orthodontists, if the assignee is a controlled affiliate of OCA. The Orthodontists counter that OCA never raised this argument in the bankruptcy court, so it is waived.

A thorough review of the record confirms that OCA did *not* raise the issue of assignment in the bankruptcy court. At oral argument, OCA [**29] also admitted that it had not raised the assignment issue below. Since this issue was not properly presented to the bankruptcy court, it cannot be raised now for the first time on appeal. *See Kinash, 129 F.3d at 739 n.10*.

Additionally, it is unclear whether Texas corporate law would allow OCA to assign its obligations to one of its controlled affiliates in order to avoid the requirements of *section 251.003(a)(4)*. *See Pan E. Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1132-33 (5th Cir. 1988)* (holding that Texas low permitted disregarding the corporate form because the corporation was established [*425] to circumvent a statute); *see also Flynn Bros., Inc., 715 S.W.2d at 785* (holding that it was illegal to form a corporation to avoid the Texas Medical Practice Act's restrictions against unlicensed persons practicing medicine). Moreover, OCA has provided no legal basis to support its conclusion that since it *could have* assigned its obligations, the contracts are not void for illegality.

OCA cites an Illinois case in which a court rejected a claim that a contract was void for illegality because the contract had been assigned and the assignment cured the illegality. *Heller Equity Capital Corp. v. Clem Envtl. Corp., 232 Ill. App. 3d 173, 596 N.E.2d 1275, 1280, 173 Ill. Dec. 396 (Ill. App. 1992)*. [**30] *Heller* is distinguishable, however, because in that case the curing assignment had already occurred. *Heller, 596 N.E.2d at 1280*. Here OCA has not alleged that it has even attempted to have any of its obligations under the BSA actually assigned to one of its affiliates. [13]

13 OCA has not attempted to make any assignments to cure the defects in the BSAs even though four separate federal district court judgments have voided similar BSAs for illegality under Texas law.

OCA also cites Texas cases, which stand for the general proposition that a contract that could have been performed in a legal manner should not be voided because it was performed in an illegal manner. *See Lewis, 199 S.W.2d at 149*; *Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc., 138 S.W.3d 915, 921 (Tex. App.--Dallas 2004, pet. struck)*. *Lewis* and *Signal Peak* are also not on point because both of those cases dealt with contracts that were not facially illegal, meaning there was a way for the parties to legally fulfill their obligations under the express terms of the contract. In this case, the bankruptcy court correctly held that the BSAs, as written, cannot be performed legally by the current parties.

Without knowing [**31] which obligations would be assigned to which affiliates, it is impossible for this court to determine whether the assigned BSA could be performed legally. For this reason and because OCA failed to raise this argument below, we decline to reverse the judgment of the bankruptcy court on this ground.

**CONCLUSION**

For the foregoing reasons, the judgment of the bankruptcy court is AFFIRMED.



**IN RE POLY-AMERICA, L.P., IND. AND D/B/A POL-TEX INTERNATIONAL, AND POLY-AMERICA GP, L.L.C., RELATORS**

**NO. 04-1049**

**SUPREME COURT OF TEXAS**

***262 S.W.3d 337*; *2008 Tex. LEXIS 770*; *51 Tex. Sup. J. 1237*; *28 I.E.R. Cas. (BNA) 140*; *156 Lab. Cas. (CCH) P60,669***

**January 25, 2006, Argued**
**August 29, 2008, Opinion Delivered**

**SUBSEQUENT HISTORY:** Released for Publication October 10, 2008.

**PRIOR HISTORY:** *In re Luna, 175 S.W.3d 315, 2004 Tex. App. LEXIS 8241 (Tex. App. Houston 1st Dist., 2004)*

**COUNSEL:** For Poly-America, L.P., RELATOR: Ms. Erica W. Harris, Susman Godfrey L.L.P., Houston, TX.; Mr. Craig T. Enoch, Winstead PC, Austin, TX.; Mr. Adam Brian Ross, Poly-America, LP, Grand Prairie, TX.

For Mr. Johnny Luna, REAL PARTIES: Mr. G. Scott Fiddler, Law Office of G. Scott Fiddler, P.C., Houston, TX.

For Texas Association of Business, AMICUS CURIAE: Mr. Jeffrey C. Londa, Ogletree Deakins Nash Smoak & Stewart, P.C., Houston, TX.

For Society for Human Resource Management Texas State Council, AMICUS CURIAE: Ms. Audrey Elaine Mross, Davis Munck Butrus, P.C., Dallas, TX.

For The Texas Trial Lawyers Association, AMICUS CURIAE: Mr. Kirk L. Pittard, Durham & Pittard, LLP, Dallas, TX.; Mr. Peter M. Kelly, Law Office of Peter M. Kelly, P.C., Houston, TX.

**JUDGES:** [**1] JUSTICE O'NEILL delivered the opinion of the Court, in which CHIEF JUSTICE JEFFERSON, JUSTICE HECHT, JUSTICE WAINWRIGHT, JUSTICE MEDINA, JUSTICE GREEN, and JUSTICE JOHNSON joined. JUSTICE BRISTER filed a dissenting opinion. JUSTICE WILLETT did not participate in the decision.

**OPINION BY:** Harriet O'Neill

**OPINION**

[*344] ON PETITION FOR WRIT OF MANDAMUS

In this retaliatory-discharge case, the employee's employment contract contains an arbitration agreement that requires the employee to split arbitration costs up to a capped amount, limits discovery, eliminates punitive damages and reinstatement remedies available under the Workers' Compensation Act, and imposes other conditions on the arbitration process. We must decide whether any or all of these provisions are unconscionable and, if they are, whether the contract's severability clause preserves the arbitration right. We hold that the trial court did not abuse its discretion in allowing the arbitrator to assess the unconscionability of the agreement's fee-splitting and discovery-limitation provisions as applied in the course of arbitration. We further hold that the arbitration agreement's provisions precluding remedies under the Workers' Compensation Act are substantively [**2] unconscionable and void under Texas law. However, those provisions are not integral to the parties' overall intended purpose to arbitrate their disputes and, pursuant to the agreement's severability clause, are severable from the remainder of the arbitration agreement, which we conclude is otherwise enforceable. Accordingly, we conditionally grant the petition for mandamus.

**I. Facts**

Johnny Luna began his employment with Pol-Tex International, d/b/a Poly-America, L.P., in October 1998. Upon his hiring, Luna signed an agreement to submit "all claims or disputes" to arbitration. Approximately four years later, Luna signed an amended agreement to arbitrate that contained substantially the same provisions. Both the 1998 and 2002 agreements provide that they are governed by the Federal Arbitration Act (FAA). *9 U.S.C. §§ 1-14*. Additionally, both agreements contain a series of requirements for the arbitration between the parties. All claims must be asserted within a maximum of one year from the occurrence of the event from which the claim arises. Fees associated with arbitration -- including but not limited to mediation fees, the arbitrators' fees, court reporter fees, and fees to secure a place [**3] for a hearing -- are to be split between the parties, with the employee's share capped at "the gross compensation earned by the Employee in Employee's highest earning month in the twelve months prior to the time the arbitrator issues his award." Each side is permitted limited forms of discovery: twenty-five interrogatories (including sub-parts), twenty-five requests for production or inspection of documents or tangible things, and one oral deposition of no more than six hours. Parties may not use written depositions or requests for admission; the agreement prohibits discovery of either party's financial information except for the employee's earnings if the employee seeks lost wages, back pay, and/or front pay; and all aspects of the arbitration are deemed confidential. Finally, the arbitrator is stripped of authority to award punitive, exemplary, or liquidated damages, or to order reinstatement of employment.

In December 2002, Luna suffered a work-related neck injury when he accidentally hit his head on a pipe. Poly-America's company doctor examined Luna and diagnosed him with an acute cervical spine flexion injury. Luna subsequently filed a workers' compensation claim and began receiving [**4] physical therapy. Approximately two weeks later, Luna returned to work on a release for light duty; however, Luna continued to suffer pain and utilized previously scheduled vacation time to recover from his injury. After being warned by the company doctor that he needed to return to work and get off of workers' compensation if he wanted to keep his job, [*345] Luna returned to work without restrictions on January 10, 2003. Upon his return, Luna noticed that another person was already being trained for his position, and he claims that his supervisor began to harass him. One month later, Luna told his supervisor that his neck continued to bother him and that he needed to return to the company doctor; the next day that Luna was scheduled to work, he was fired.

Luna filed this suit asserting claims for unlawful retaliatory discharge under *section 451.001 of the Labor Code* ("the Workers' Compensation Act"). *TEX. LAB. CODE § 451.001-.003*. Claiming that Poly-America acted with malice, ill will, spite, or specific intent to cause injury, Luna sought both reinstatement and the imposition of punitive damages. He additionally sought a declaratory judgment that the arbitration agreement was unenforceable [**5] because, among other reasons, its provisions violated public policy and were unconscionable. Luna submitted two affidavits -- his own, and that of an expert witness -- in support of his claims. Poly-America responded with a motion to compel arbitration which, after a hearing, the trial court granted.

Luna sought a writ of mandamus in the court of appeals, reasserting his argument that provisions of the arbitration agreement were substantively unconscionable. The court of appeals held that, in light of the fee-splitting provisions and limitations on remedies, the arbitration agreement as a whole was substantively unconscionable. *175 S.W.3d 315, 318*. Poly-America sought review in this Court. We hold that the arbitration agreement's provision that eliminates available remedies under the Workers' Compensation Act is unenforceable, but we find that provision severable from the arbitration agreement as a whole and conditionally grant Poly-America's writ of mandamus.

## II. Standard of Review

Mandamus is the proper means by which to seek review of an order compelling arbitration under the FAA. *In re Am. Homestar of Lancaster, Inc., 50 S.W.3d 480, 483 (Tex. 2001)*. In *In re Palacios,* we recognized [**6] that it is "important for federal and state law to be as consistent as possible" in enforcement and review of provisions under the FAA. *221 S.W.3d 564, 565 (Tex. 2006)* (per curiam) (quoting *In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 739 (Tex. 2005)*). Federal courts may not review orders compelling arbitration and staying litigation ("compel-and-stay orders") by interlocutory appeal. *See 9 U.S.C. § 16(b)(1)* ("[A]n appeal may not be taken from an interlocutory order . . . granting a stay of any action under *Section 3* of this title."). Accordingly, as we noted in *Palacios,* it would be inappropriate to exercise our own mandamus power in a manner inconsistent with the federal courts' practice. *See Palacios, 221 S.W.3d at 565*. Although mandamus review is generally available in federal courts to review non-appealable interlocutory rulings, mandamus is granted only in exceptional cases. *See generally Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 288-90, 108 S. Ct. 1133, 99 L. Ed. 2d 296 & n.13 (1988)* (holding that, where a particular order is not appealable, mandamus is available and "will be appropriate in exceptional cases"). As we acknowledged in *Palacios,* federal courts have applied this template to [**7] orders that cannot be appealed under the FAA, although they almost never grant mandamus relief. *221*

*S.W.3d at 565-66* ("Even after *Green Tree [Financial Corp.--Alabama v. Randolph, 531 U.S. 79, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)]*, the Fifth Circuit has held that federal mandamus review of an order staying a case for arbitration may still be available if a party can meet a 'particularly [*346] heavy' mandamus burden to show 'clearly and indisputably that the district court did not have the discretion to stay the proceedings pending arbitration.'") (quoting *Apache Bohai Corp. v. Texaco China, B.V., 330 F. 3d 307, 310-11 (5th Cir. 2003)*). This general rule has been broadly applied to unappealable ancillary interlocutory orders in proceedings under the FAA, *see, e.g., Georgiou v. Mobil Exploration & Prod. Servs., Inc. U.S., 190 F.3d 538, 1999 WL 642871 at *3 (5th Cir. 1999)* (dismissing appeal of order staying litigation in favor of arbitration proceeding in foreign forum, and denying mandamus because plaintiffs failed to carry the "particularly heavy burden" to warrant mandamus relief from such an order); *Cofab Inc. v. Phila. Joint Bd., Amalgamated Clothing & Textile Workers Union, AFL-CIO-CLC, 141 F.3d 105, 110 (3d Cir. 1998)*; [**8] and appears to also apply to compel-and-stay orders under *section 16(b)(1)*, *see Douglas v. U.S. Dist. Court, 495 F.3d 1062, 1065 (9th Cir. 2007)* (granting mandamus relief from compel-and-stay order); *Manion v. Nagin, 255 F.3d 535, 538-40 & n.4 (8th Cir. 2001)* (dismissing appeal of various interlocutory orders, including order compelling arbitration, and denying mandamus because Manion had not made "any showing that he [was] entitled to such extraordinary relief"); *McDermott Int'l, Inc. v. Underwriters at Lloyds Subscribing to Memorandum of Ins. No. 104207, 981 F.2d 744, 748 (5th Cir. 1993)* ("This court has recognized that [mandamus review of an order compelling arbitration] may be available [but] McDermott has failed to satisfy [the] demanding standard."). [1]

1 While it is true that several of these cases pre-date the Supreme Court's decision in *Green Tree*, they do not pre-date the authority on which the Supreme Court relied in noting that an order compelling arbitration and staying rather than dismissing the underlying litigation "would not be *appealable*." *531 U.S. at 87 n.2* (citing *9 U.S.C. § 16(b)(1)*) (emphasis added). Unlike the present case, the two cases in which the courts denied [**9] mandamus relief from compel-and-stay orders did not involve claims that enforcement of the arbitration provisions would prevent the plaintiffs from vindicating important statutory rights. *See Manion, 255 F.3d 535*; *McDermott Int'l, Inc., 981 F.2d 744*. In *Douglas*, the Ninth Circuit granted mandamus relief, concluding that a choice-of-law provision in the arbitration agreement would not allow enforcement of the agreement under circumstances that the forum state would deem unconscionable. *Douglas, 495 F.3d at 1068*.

Although federal precedent in this area is not uniformly clear, it appears a federal court would be permitted -- albeit not compelled -- to address the merits of the mandamus arguments in this case. If such review were categorically unavailable and unconscionability determinations the sole realm of arbitrators, as the dissenting Justice proposes, development of the law as to this threshold issue would be substantially hindered if not precluded altogether. Nevertheless, federal precedent counsels against granting relief unless the stringent requirements for mandamus are met. *See Gulfstream, 485 U.S. at 289*. Federal courts grant mandamus only upon demonstration of a "clear and [**10] indisputable" right to issuance of the writ: "First, the party seeking the issuance of the writ must have no other adequate means to attain the relief he desires. . . . Second, the petitioner must satisfy the burden of showing that his right to issuance of the writ is clear and indisputable. Third . . . the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *Cheney v. U.S. Dist. Court, 542 U.S. 367, 380-81, 124 S. Ct. 2576, 159 L. Ed. 2d 459 (2004)*. Our own mandamus standard is similar, requiring a demonstration that [*347] the trial court clearly abused its discretion by failing to correctly analyze or apply the law and a determination that the benefits of mandamus outweigh the detriments such that an appellate remedy is inadequate. *See In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 135-36 (Tex. 2004)*. Because arbitration is intended to provide a lower-cost, expedited means to resolve disputes, mandamus proceedings will often, if not always, deprive the parties of an arbitration agreement's intended benefits when a compel-and-stay order is at issue; accordingly, courts should be hesitant to intervene. With these standards in mind, we turn to the compel-and-stay [**11] order in this case.

### III. Unconscionability and the Federal Arbitration Act

Poly-America argues that the FAA's "strong presumption" favoring arbitration applies in this case, and furthermore that the FAA preempts all state public-policy grounds for finding the agreement to arbitrate unenforceable. *See In re R&R Personnel Specialists of Tyler, Inc., 146 S.W.3d 699, 705 (Tex. 2004)* (holding that the FAA preempts "any public policy underlying the Texas workers' compensation statutes that is contrary to the enforceability of arbitration agreements"). Because neither this presumption nor federal preemption applies in a state court's assessment of whether parties have entered into a valid and enforceable agreement to arbitrate under state contract law, we disagree.

*Section 2 of the FAA* provides that arbitration agreements "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" *9 U.S.C. § 2* (emphasis added). Thus, an agreement to arbitrate is valid under the FAA if it meets the requirements of the general contract law of the applicable state. *In re AdvancePCS Health L.P., 172 S.W.3d 603, 606 (Tex. 2005)* (citing *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*). [**12] In determining the validity of an agreement to arbitrate under the FAA, courts must first apply state law governing contract formation. *See 9 U.S.C. § 2*; *First Options, 514 U.S. at 944*.

The United States Supreme Court has repeatedly emphasized that "state law, whether of legislative or judicial origin, is applicable [to the determination of the validity of an agreement to arbitrate] if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry v. Thomas, 482 U.S. 483, 493 n.9, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987)*. Thus, courts "may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." *Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)*; *see also Perry, 482 U.S. at 493 n.9* ("A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [*section 2*].").

However, the purpose and language of the FAA require only that agreements to arbitrate be placed "upon the *same* footing as other contracts." *Doctor's Assocs., 517 U.S. at 687* (quoting *Scherk v. Alberto-Culver Co., 417 U.S. 506, 511, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974)*) (emphasis added); *see also* H.R. REP. NO. [**13] 68-96, at 1 (1924) (noting that by enacting *section 2*, Congress sought to place agreements to arbitrate "upon the same footing as other contracts, where [they] belong[]"). *Perry* makes clear that state courts may not fashion special rules regarding the enforceability [*348] of arbitration contracts *per se*. *See Perry, 482 U.S. at 492 n.9*. Furthermore, once an enforceable contract to arbitrate is found, there is a strong federal presumption in favor of arbitration such that myriad doubts -- as to waiver, scope, and other issues not relating to enforceability -- must be resolved in favor of arbitration. *See, e.g., In re FirstMerit Bank, 52 S.W.3d 749, 752 (Tex. 2001)*; *Prudential Sec. Inc. v. Marshall, 909 S.W.2d 896, 898-99 (Tex. 1995)*. However, a state court must initially determine -- through the neutral application of its own contract law -- whether an enforceable agreement exists in the first instance, and whether "generally applicable contract defenses . . . may be applied to invalidate arbitration agreements without contravening" the policies of the FAA. *Doctor's Assocs., 517 U.S. at 687*. Thus, in this case, if a contract limiting damages or restricting other remedies under the Workers' [**14] Compensation Act is *generally* unenforceable under Texas law, an arbitration contract with these same limitations will also be unenforceable.

Nevertheless, under Texas law, as with any other contract, agreements to arbitrate are valid unless grounds exist at law or in equity for revocation of the agreement. The burden of proving such a ground -- such as fraud, unconscionability or voidness under public policy -- falls on the party opposing the contract. *See FirstMerit Bank, 52 S.W.3d at 756*. Thus, while we reject Poly-America's assertions that we must apply a presumption favoring arbitration in assessing whether the parties entered into an enforceable agreement under Texas law and that the FAA preempts Texas public policies that may make certain contractual provisions generally unenforceable, Luna nevertheless bears the burden to establish that the challenged provisions are unenforceable.

## IV. Arbitration and Unconscionability Under Texas Law

### A. General Standard

Agreements to arbitrate disputes between employers and employees are generally enforceable under Texas law; there is nothing *per se* unconscionable about an agreement to arbitrate employment disputes and, in fact, Texas law has historically [**15] favored agreements to resolve such disputes by arbitration. *See Advance PCS, 172 S.W.3d at 608*; *EZ Pawn Corp. v. Mancias, 934 S.W.2d 87, 90 (Tex. 1996)*; *Cantella & Co. v. Goodwin, 924 S.W.2d 943, 944 (Tex. 1996)*.

Unconscionable contracts, however -- whether relating to arbitration or not -- are unenforceable under Texas law. A contract is unenforceable if, "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *FirstMerit Bank, 52 S.W.3d at 757*; *see also In re Halliburton Co., 80 S.W.3d 566, 571 (Tex. 2002)* ("[S]ubstantive unconscionability . . . refers to the fairness of the arbitration provision itself."). Unconscionability is to be determined in light of a variety of factors, which aim to prevent oppression and unfair surprise; in general, a contract will be found unconscionable if it is grossly one-sided. *See* DAN B. DOBBS, 2 LAW OF REMEDIES 703, 706 (2d ed. 1993); *see also RESTATEMENT (SECOND) OF CONTRACTS § 208, cmt. a* (1979) ("The determination that a contract or term is or is not unconscionable [**16] is made in the light of its setting, purpose, and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other

invalidating causes; the policy also overlaps with rules which render particular [*349] bargains or terms unenforceable on grounds of public policy."). Although not subject to precise doctrinal definition, *see Sw. Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 498 (Tex. 1991)* (GONZALEZ, J., concurring), unconscionability -- as delineated by the above principles -- has been recognized and applied by this Court for well over a century. *See, e.g., Flanagan v. Pearson, 61 Tex. 302, 307 (1884)*; *Fowler v. Stoneum, 11 Tex. 478, 493 (1854)*; *Hemming v. Zimmerschitte, 4 Tex. 159, 166 (1849)*; *Luckett v. Townsend, 3 Tex. 119, 131 (1848)*.

Whether a contract is contrary to public policy or unconscionable at the time it is formed is a question of law. *Hoover Slovacek LLP v. Walton, 206 S.W.3d 557, 562 (Tex. 2006)*. Because a trial court has no discretion to determine what the law is or apply the law incorrectly, its clear failure to properly analyze or apply the law of unconscionability constitutes an abuse [**17] of discretion. *See Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992)*.

**B. Arbitration and Statutory Rights**

An arbitration agreement covering statutory claims is valid so long as the arbitration agreement does not waive the substantive rights and remedies the statute affords and the arbitration procedures are fair, such that the employee may "effectively vindicate his statutory rights." *In re Halliburton, 80 S.W.3d at 572*. Federal courts, analyzing the enforceability of arbitration provisions relating to federal statutory claims, have noted that such contracts are not enforceable when a party is forced to "forgo the substantive rights afforded by the statute," as opposed to merely "submit[ting] to resolution in an arbitral, rather than a judicial, forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)*. In the context of federal claims, either an expression of federal intent to exclude certain categories of claims from arbitration, *see Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991)*, or the excessive waiver of statutory rights, *see Mitsubishi, 473 U.S. at 628*, may render a particular dispute un-arbitrable. State courts, bound by the FAA [**18] under the supremacy clause, have more limited power, as the FAA preempts state laws that specifically disfavor arbitration. *Perry, 482 U.S. at 492 n.9*; *see Jack B. Anglin Co. v. Tipps, 842 S.W.2d 266, 271 (Tex. 1992)* (holding that the FAA preempts state statutes to the extent they are inconsistent with the FAA's purpose to require courts to compel arbitration when the parties have so provided in their contracts).

However, where a particular waiver of substantive remedies or other provision of a contract is unconscionable -- independent of the agreement to arbitrate -- it will be

unenforceable even though included in an agreement to arbitrate. *See Gilmer, 500 U.S. at 33* ("[A]rbitration agreements are enforceable, 'save upon such grounds as exist at law or in equity for the revocation of any contract.'") (quoting *9 U.S.C. § 2*). To determine the permissibility of restrictions on a particular worker's access to statutory rights, we analyze the provisions of the actual statute at issue; thus, to analyze the enforceability of the various restrictions and waivers in the employment contract at issue in this case, we turn to the retaliatory-discharge provisions of the Texas Workers' Compensation [**19] Act, *TEX. LAB. CODE §§ 451.001-.003*.

**C. Purpose and Structure of the Texas Workers' Compensation Act's Anti-Retaliation Provisions**

The Texas Workers' Compensation Act was enacted to protect Texas [*350] workers and employees. *Fid. & Cas. Co. of N.Y. v. McLaughlin, 134 Tex. 613, 135 S.W.2d 955, 956 (Tex. 1940)*. The Texas Legislature enacted the original Workers' Compensation Act in 1913 in response to the needs of workers who, despite a growing incidence of industrial accidents, were increasingly being denied recovery. *Kroger Co. v. Keng, 23 S.W.3d 347, 350 (Tex. 2000)*; *Tex. Workers' Compensation Comm'n v. Garcia, 893 S.W.2d 504, 510 (Tex. 1995)*. In order to ensure compensation for injured employees while protecting employers from the costs of litigation, the Legislature provided a mechanism by which workers could recover from subscribing employers without regard to the workers' own negligence, *see Kroger, 23 S.W.3d at 351*, while limiting the employers' exposure to uncertain, possibly high damage awards permitted under the common law, *see Reed Tool Co. v. Copelin, 689 S.W.2d 404, 407 (Tex. 1985)*. In light of the purposes of the Workers' Compensation Act as a whole, "[i]t is the settled policy of this State [**20] to construe liberally the provisions of the . . . [l]aw, in order to effectuate the purposes for which it was enacted." *Huffman v. S. Underwriters, 133 Tex. 354, 128 S.W.2d 4, 6 (Tex. 1939)* (citations omitted). As we have recently noted, "[b]ecause we should liberally construe the Workers' Compensation Act in favor of the injured worker, a strained or narrow construction of [the Act] would be improper. Moreover, it would be injudicious to construe the statute in a manner that supplies by implication restrictions on an employee's rights that are not found in . . . [the] plain language." *Kroger, 23 S.W.3d at 349*.

The Texas Workers' Compensation Act provides that a subscriber to the workers'-compensation system may not "discharge or in any other manner discriminate against an employee because the employee has . . . filed a workers' compensation claim in good faith." *TEX. LAB. CODE § 451.001-.001(1)*. The Legislature's purpose in enacting *section 451.001* was to protect persons entitled to benefits under the Act and to prevent them from being discharged

for seeking to collect those benefits. *See Tex. Steel Co. v. Douglas, 533 S.W.2d 111, 115 (Tex. Civ. App.--Fort Worth 1976, writ ref'd n.r.e.)*. Since recovery [**21] of benefits under the Workers' Compensation Act is the exclusive remedy available to injured employees of subscribing employers, *see TEX. LAB. CODE § 408.001(a)*, the availability of remedies for retaliatory discharge protects employees' exercise of their statutory rights to compensation under the Act. *See Padilla v. Carrier Air Conditioning, 67 F. Supp. 2d 650, 664 (E.D. Tex. 1999)*; *Mid-South Bottling Co. v. Cigainero, 799 S.W.2d 385, 389 (Tex. App.--Texarkana 1990, writ denied)*. In accordance with these principles, the anti-retaliation provisions of the Act must protect employees even before they have actually filed a claim, because otherwise "the law would be completely useless and would not accomplish the purpose for which it was enacted. . . . [A]ll the employer would have to do in order to avoid the consequences of the statute would be to fire the injured workman before he filed the claim." *Tex. Steel Co., 533 S.W.2d at 115*.

"The decisions of this State do not look with favor upon contracts waiving rights arising under the Workmen's Compensation Law." *Huffman, 128 S.W.2d at 6*. Such waivers affect not only the individual employee subject to the waiver, but also the public, which [**22] bears the cost of the workers' compensation program. *See Holt v. Cont'l Group, Inc., 708 F.2d 87, 91 (2d Cir. 1983)* ("A retaliatory discharge carries with it the distinct risk that other employees may be deterred from protecting their rights under the Act."). Therefore, we [*351] have invalidated contracts that purport to relieve employers of their obligations under the Workers' Compensation Act. *See James v. Vernon Calhoun Packing Co., 498 S.W.2d 160, 162 (Tex. 1973)* (noting that "[w]e are much impressed with the idea that there is a large element of public interest in the administration of [the Workers' Compensation Act]"); *Hazelwood v. Mandrell Indus. Co., 596 S.W.2d 204, 206 (Tex. Civ. App.--Houston [1st Dist.] 1990, writ ref'd n.r.e.)* ("If . . . this balance [established by the Act] is tipped so that the employee's benefits under the statute are substantially reduced, the clear intent of the legislature is thwarted."). We have likewise held unenforceable contracts that explicitly relieve employers of tort liability, relying either on common law prohibitions against such contracts, *see Barnhart v. Kansas City M. & O. Ry. Co. of Tex., 107 Tex. 638, 184 S.W. 176, 179 (Tex. 1916)*, or upon the Workers' [**23] Compensation Act, *see Petroleum Cas. Co. v. Smith, 274 S.W.2d 150, 151 (Tex. Civ. App.--San Antonio 1954, writ ref'd)* (noting that "[t]he right to workmen's compensation is statutory, and cannot be abridged by private agreements or special applications for employment"); *Clevenger v. Burgess, 31 S.W.2d 675, 678 (Tex. Civ. App.--Beaumont 1930, writ ref'd)*; *Tex. Employers Ins. Ass'n v. Peppers, 133 S.W.2d 165, 167 (Tex. Civ. App.--Galveston 1939, writ dism'd)* ("[T]he courts will not enforce contracts which are either expressly or impliedly prohibited by the [Workers' Compensation] Act.").

This case concerns the validity of a subscribing employer's use of an agreement that, in the course of requiring arbitration between the parties in work-related disputes, imposes a series of procedural and substantive limits on the employee's rights. We must analyze the challenged limitations in light of the policies underlying the Workers' Compensation Act, and the purposes of its anti-retaliation provisions, to determine whether they improperly shift the cost of injury from a subscribing employer onto its employees in contravention of the Act's provisions. *Cf. Lawrence v. CDB Servs., Inc., 44 S.W.3d 544, 550 (Tex. 2001)* [**24] (noting that the agreements did not "shift the risk of on-the-job injuries to the employees"); *see also Gentry v. Superior Court, 42 Cal. 4th 443, 64 Cal. Rptr. 3d 773, 782, 165 P.3d 556 (Cal. 2007), cert. denied 552 U.S. 1296, 128 S. Ct. 1743, 170 L. Ed. 2d 541 (2008)* (noting that under California law, when an employee is bound by a predispute arbitration agreement to adjudicate nonwaivable statutory employment rights, the arbitration agreement may not limit damages, discovery must be sufficient to arbitrate the claim, there must be a written arbitration decision, and the employer must pay all costs "unique to arbitration").

**V. The Challenged Arbitration Provisions**

**A. Limitation of Remedies**

The Workers' Compensation Act specifies that "[a] person who violates *section 451.001* is liable for reasonable damages incurred by the employee as a result of the violation," and that "[a]n employee discharged in violation of *section 451.001* is entitled to reinstatement in the former position of employment." *TEX. LAB. CODE § 451.002(a)--(b)*. We have previously explained that "reasonable damages" are not limited to actual damages, *see Azar Nut Co. v. Caille, 734 S.W.2d 667, 669 (Tex. 1987)*, but may include future damages, as well as exemplary or punitive damages when it is [**25] shown that the employer acted with actual malice in retaliating against the employee for filing a workers' compensation claim. *See Cont'l Coffee Prods. v. Cazarez, 937 S.W.2d 444, 454 (Tex. 1996)*; *Carnation Co. v. Borner, 610 S.W.2d 450, 454-55* [*352] *(Tex. 1980)*. The arbitration agreement in this case eliminates two types of remedies available under the anti-retaliation provisions of the Workers' Compensation Act, prohibiting the arbitrator from ordering reinstatement or awarding punitive damages. *See TEX. LAB. CODE § 451.002* (providing for reinstatement and an award of reasonable damages). Luna contends these limitations render the agreement uncon-

scionable and unenforceable because they prevent him from effectively vindicating his statutory rights in arbitration, thus undercutting the basic assumptions of the FAA. *See Gilmer, 500 U.S. at 28* (noting that claims under other federal statutes are appropriate for arbitration so long as the litigant can effectively vindicate any statutory rights). The court of appeals agreed with Luna. *175 S.W.3d at 323-24*. Although it noted other courts' decisions upholding punitive-damages waivers, *id. at 323*, and further noted that preclusion of statutory [**26] remedies may not always portend unconscionability, *id.*, the court held that the preclusion of remedies here interfered with Luna's ability to bring his retaliatory-discharge claim under the Workers' Compensation Act and thus weighed toward the contract's unconscionability, *id.*

Poly-America argues that the court of appeals' decision conflicts with *Pony Express Courier Corp. v. Morris, 921 S.W.2d 817, 822 (Tex. App.--San Antonio 1996, no writ)*, and decisions of other courts indicating that limitations of remedies are permissible, *e.g., Inv. Partners v. Glamour Shots Licensing, Inc., 298 F.3d 314, 318 n.1 (5th Cir. 2002)*. Because we view the anti-retaliation provisions of the Workers' Compensation Act as a non-waivable legislative system for deterrence necessary to the nondiscriminatory and effective operation of the Texas Workers' Compensation system as a whole, we agree with Luna that the provisions eliminating key remedies under the statute are unenforceable.

An arbitration agreement covering statutory claims is valid so long as "the arbitration agreement does not waive substantive rights and remedies of the statute and the arbitration procedures are fair so that the employee may effectively [**27] vindicate his statutory rights." *In re Halliburton, 80 S.W.3d at 572*. "'[B]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.'" *Gilmer, 500 U.S. at 26* (quoting *Mitsubishi, 473 U.S. at 628*). In this case, Luna contends Poly-America acted with actual malice in unlawfully discharging him, a claim for which the Workers' Compensation Act allows punitive damages. *See TEX. LAB. CODE § 451.002*; *Azar Nut Co., 734 S.W.2d at 668*. Permitting an employer to contractually absolve itself of this statutory remedy would undermine the deterrent purpose of the Workers' Compensation Act's anti-retaliation provisions. In creating the Texas Workers' Compensation Act, the Legislature carefully balanced competing interests -- of employees subject to the risk of injury, employers, and insurance carriers -- in an attempt to design a viable compensation system, all within constitutional limitations. *See Garcia, 893 S.W.2d at 521*. Were we to endorse Poly-America's position and permit enforcement of these remedy limitations, a subscribing employer could avoid the Act's [**28] penalties by conditioning employment upon waiver of the very provisions designed to protect employees who have been the subject of wrongful retaliation.

Our decision in *Lawrence, 44 S.W.3d 544*, is fully consistent with this view. There, employees of a non-subscribing employer [*353] elected, after they were hired, to participate in an employer benefit plan that would provide injured employees with specified benefits in lieu of common law remedies. *Id. at 545-46*. We refused to void the agreement on public-policy grounds, discerning "no clear legislative intent to prohibit agreements such as those presented." *Id. at 545*. We emphasized that participation in the workers' compensation program is voluntary for employers in Texas, and that courts are ill equipped to weigh whether a non-subscribing employer's particular benefits plan would undermine the purposes of the Workers' Compensation Act. *See id. at 551-53*. [2] Our decision was specifically tailored to *non-subscribing* employers who elected *not* to participate in the workers' compensation program. Importantly, we distinguished cases involving contracts imposed as a condition of employment, emphasizing that "[t]he distinction between an employment [**29] contract that requires a prospective employee, as a condition of the receipt or retention of employment, to agree to limit the employer's liability . . . and a voluntary occupational insurance program, in which the employee has the option to enroll . . . is decisive." *Lawrence, 44 S.W.3d at 550* (quoting *Brito v. Intex Aviation Servs., Inc., 879 F. Supp. 650, 654 (N.D. Tex. 1995)*) (citing *Clevenger, 31 S.W.2d at 678*; *Barnhart, 184 S.W. at 176*)).

> 2 The Texas Legislature, exercising its policy-making role, responded immediately and outlawed such plans. *See TEX. LAB. CODE § 406.033(e)*.

This case presents just such a liability-limiting provision, imposed as a condition of employment, which we suggested in *Lawrence* would violate public policy. *See id.* Such waivers would allow subscribing employers to enjoy the Act's limited-liability benefits while exposing workers to exactly the sort of costs -- of injuries paid for by the employee for fear of retribution for making a claim -- that the Act is specifically designed to shift onto the employer. The balance established by the Act is thus "tipped so that the employee's benefits under the statute are substantially reduced, [and] the clear intent [**30] of the legislature is thwarted." *Hazelwood, 596 S.W.2d at 206*. As we have previously refused to enforce private agreements that allow subscribing employers to reap the system's benefits while burdening employees with the cost of injury, so too we find the provisions of the present contract -- which substantively limit Poly-America's liability for wrongful retaliation and thereby undermine the

deterrent regime the Legislature specifically designed to protect Texas workers -- void under Texas law. *See Tex. Steel, 533 S.W.2d at 115*; *Holt, 708 F.2d at 91*.

### B. Fee-Splitting Provision

The arbitration agreements provide that, in the event of a claim, all fees related to arbitration -- including but not limited to mediation fees, the arbitrators' fees, costs of procuring a location for a hearing, and court reporter fees -- will be split equally between the employer and the employee, with the employee's contribution capped at an amount equal to "the gross compensation earned by the Employee in Employee's highest earning month in the twelve months prior to the time the arbitrator issues his award." The court of appeals held that this provision "weigh[ed] heavily toward a finding of substantive [**31] unconscionability." *175 S.W.3d at 322*. Poly-America argues that this was clear error: first, because the court of appeals improperly inferred that Luna could not afford likely arbitration costs based solely on subjective evidence and, second, because it failed to compare such costs to the [*354] expected costs of litigation. [3] Luna responds that it was Poly-America that failed to present evidence of the comparative cost of litigation and that the evidence presented was sufficient to allow an objective determination that the likely costs of arbitration were beyond Luna's financial means. We begin with the evidentiary challenge.

> 3 The Society for Human Resource Management Texas State Council submitted an *amicus* brief supporting Poly-America's arguments, arguing that the court of appeals wrongfully failed to compare Luna's alleged costs with the prospective cost of litigation. The Texas Trial Lawyers Association likewise submitted an *amicus* brief supporting Luna, arguing that unconscionability should be determined by comparing "the general financial condition of the claimant's peer group" to estimated arbitration costs.

### 1. Evidentiary Challenge

Poly-America claims that the court of appeals, by crediting [**32] Luna's factual allegations concerning his financial inability to share arbitration costs, improperly applied a new evidentiary standard that will require all parties seeking to compel arbitration to engage in expensive discovery whenever a resisting party submits cursory and subjective evidence that arbitration costs are "unaffordable." This evidentiary burden, Poly-America argues, is contrary to Texas law and policy that supports summary disposition of motions to compel arbitration. In response, Luna contends the facts upon which the court of appeals relied could have been controverted by affidavit or cross-examination, which Poly-America failed to do; consequently, the court of appeals based its ruling on the undisputed facts established by Luna's affidavits. Both parties cite *Anglin, 842 S.W.2d at 269*, to support their respective positions. There, we defined the proper circumstances under which a trial court should hold a full evidentiary hearing on a motion to compel arbitration:

> Because the main benefits of arbitration lie in expedited and less expensive disposition of a dispute, and the legislature has mandated that a motion to compel arbitration be decided summarily, we think [**33] it unlikely that the legislature intended the issue to be resolved following a full evidentiary hearing in all cases. We also envision that the hearing at which a motion to compel arbitration is decided would ordinarily involve application of the terms of the arbitration agreement to undisputed facts, amenable to proof by affidavit. With these considerations in mind, we hold that the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts.

*Id.* Because the only facts Luna presented on the motion to compel were uncontroverted under this standard -- Luna's affidavits accompanying his original petition were neither contradicted nor challenged in Poly-America's response -- we believe the court of appeals acted properly in crediting those facts on appeal.

Luna attached to his original petition his own affidavit and that of an expert witness providing detailed estimates of the likely cost [**34] of arbitration in Luna's case, and Luna's expected share under the agreement's capped fee-splitting provision based on his monthly salary (approximately $ 3,300.00) as a Poly-America supervisor. Luna described his anticipated share of the arbitration costs as "way more money than I can afford," and averred that, if he [*355] had to pay such an amount to have his claim determined, he would be unable to pursue his claim against the company unless he could find an attorney willing to pay those fees. Luna recounted that he had attempted to retain two attorneys, but they had refused to represent him on a contingent-fee basis because of the arbitration agreement.

Poly-America did not dispute these facts but asserted legal arguments in its pleadings that the cost provisions, as written or as applied, were not unconscionable under Texas law. At the hearing on its motion to compel, Poly-America again asserted only legal arguments in response to Luna's challenge to the cost-splitting provision. There is no indication in the record that the trial court discredited or otherwise viewed the facts recited in Luna's affidavits as insufficient; rather, on the basis of Poly-America's legal arguments, the trial [**35] court granted the motion to compel. This disposition was consistent with our statements in *Anglin* in which we indicated that motions to compel should be decided summarily unless disputed issues of fact require a full evidentiary hearing. *See id.*

However, the court of appeals clearly differed from the trial court in its view of the law. It held that the trial court's granting of the motion to compel -- in light of Luna's averred inability to afford his likely arbitration costs and the agreement's other limitations -- was an abuse of discretion. *175 S.W.3d at 318-20*. In doing so, the court of appeals properly credited the undisputed facts contained in Luna's affidavits as to the total expected cost of arbitration and Luna's anticipated share based upon his pre-termination monthly income. *Id. at 319-20*. Poly-America contends the court of appeals improperly ruled based on Luna's subjective, and thus practically incontrovertible, belief that he could not afford arbitration, which does not satisfy this Court's requirements of "specific" evidence to support claims of unconscionably expensive arbitration. *See In re U.S. Home Corp., 236 S.W.3d 761, 764 (Tex. 2007)*. However, the court of appeals [**36] relied not solely upon Luna's belief but upon his and his expert's specific monetary estimates, which provided objective support for Luna's uncontroverted claim that arbitration costs would preclude his pursuit of the lawsuit. *See 175 S.W.3d at 319*. The court of appeals did not, therefore, rely solely on subjective and incontrovertible allegations.

**2. Unconscionability of Fee-Splitting Provisions**

Poly-America alternatively challenges the court of appeals' conclusion that the agreement's cost-allocation provisions favor a finding of unconscionability because the court did not consider the relative costs that Luna would likely incur if the case were litigated in court -- costs that, based on Poly-America's estimates, would greatly exceed the capped cost of arbitration -- and Luna failed to provide any evidence of the actual cost of arbitration that he would bear. Although we have no doubt that some fee-splitting provisions may operate to discourage employees like Luna from seeking vindication of their rights under the Workers' Compensation Act, we must agree with Poly-America that the trial court did not abuse its discretion in ordering arbitration in this case.

Courts across the country [**37] have universally condemned the use of fee-splitting agreements in employment contracts that have the effect of deterring potential litigants from vindicating their statutory rights in an arbitral forum. *See Green Tree, 531 U.S. at 90-91*. Some courts have gone so far as to find fee-sharing agreements unenforceable *per se. See, e.g., Cole v. Burns Int 'l Sec.* [*356] *Servs., 323 U.S. App. D.C. 133, 105 F.3d 1465, 1483-85 (D.C. Cir. 1995), cited in Halliburton, 80 S.W.3d at 572*; *Shankle v. B-G Maint. Mgmt. of Colo., Inc., 163 F.3d 1230, 1233-35 (10th Cir. 1999)*; *Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054, 1062 (11th Cir. 1998)*. These courts reason that "an employee can never be required, as a condition of employment, to pay an arbitrator's compensation in order to secure the resolution of statutory claims . . . . [T]his would surely deter the bringing of arbitration and constitute a *de facto* forfeiture of statutory rights." *Cole, 105 F.3d at 1468*; *accord Shankle, 163 F.3d at 1235* ("Such a result clearly undermines the remedial and deterrent functions of . . . anti-discrimination laws.").

We agree that fee-splitting provisions that operate to prohibit an employee from fully and effectively vindicating statutory [**38] rights are not enforceable. *See Halliburton, 80 S.W.3d at 572*. However, this Court joins the majority of other courts which -- though recognizing the same policy concerns articulated by courts holding fee-splitting arrangements *per se* unconscionable -- require *some evidence* that a complaining party will likely incur arbitration costs in such an amount as to deter enforcement of statutory rights in the arbitral forum. *See U.S. Home Corp., 236 S.W.3d at 764*; *FirstMerit Bank, 52 S.W.3d at 756-57*. As federal courts have likewise recognized:

> [I]n some cases, the potential of incurring large arbitration costs and fees will deter potential litigants from seeking to vindicate their rights in the arbitral forum . . . . [I]f the fees and costs of the arbitral forum deter potential litigants, then that forum is clearly not an effective, or even adequate, substitute for the judicial forum . . . . [T]he burden of demonstrating that incurring such costs is likely under a given set of circumstances rests, at least initially, with the party opposing arbitration.

*Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 659-60 (6th Cir. 2003)*; *accord Bradford v. Rockwell Semiconductor Sys., Inc., 238 F.3d 549, 556 (4th Cir.*

*2001)*; [**39] *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 16 (1st Cir. 1999)*.

Luna contends the magnitude of the fee he could incur under the arbitration agreement, which he estimates to be as high as $ 3,300, will prevent him from pursuing his claim. Poly-America counters that litigation costs would be much higher, and therefore the arbitration agreement's capped cost-splitting provision benefits the employee and cannot be unconscionable. It is true that in evaluating the enforceability of fee-splitting provisions, some courts take into account the relative costs of arbitration versus litigation. *See, e.g., Bradford, 238 F.3d at 556 n.5* (focusing upon "a claimant's expected or actual arbitration costs and his ability to pay those costs, measured against a baseline of the claimant's expected costs for litigation and his ability to pay those costs"). However, at this stage of the proceedings, much of this evidence is necessarily speculative, and thus counsels against a court's *ex ante* interference with arbitration.

We do not doubt that arbitration costs might be so high in a given case as to preclude access to the forum. But "the 'risk' that [a claimant] will be saddled with [**40] prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Green Tree, 531 U.S. at 91*. Luna has not demonstrated that the ability to pursue his claim in the arbitral forum hinges upon his payment of the estimated costs; to the contrary, depending upon the circumstances, Luna may not have to bear any cost at all, and [*357] Poly-America has presented some evidence that the capped cost-splitting arrangement may even benefit Luna. The fee-splitting provision in Luna's arbitration agreement caps his share of costs at "the gross compensation earned by Employee in Employee's highest earning month in the *twelve months prior to the time the arbitrator issues his award*." (Emphasis added). Luna, however, presented evidence of his "highest monthly salary *in the year preceding [his] termination from the company*," a period necessarily earlier than that relevant under the arbitration agreement. The record contains no fact-based estimation of Luna's wages in the relevant time period and, thus, no evidence of his likely share of arbitration costs.

Just as we allow litigants who demonstrate an inability to pay costs to proceed with their claims in court, however, we see [**41] nothing that would prevent arbitrators from fairly adjusting employee cost provisions when necessary to allow full vindication of statutory rights in the arbitral forum. *See TEX. R. CIV. P. 145*. The contract presented in this case specifically provides that the arbitrator may modify unconscionable terms; if the cost provisions precluded Luna's enforcement of his non-waivable statutory rights, they would surely be unconscionable for the reasons we have explained and the arbitrator would be free to modify them. The arbitrator is better situated to assess whether the cost provision in this case will hinder effective vindication of Luna's statutory rights and, if so, to modify the contract's terms accordingly. *See Halliburton, 80 S.W.3d at 572*. We conclude the trial court did not abuse its discretion in refusing to declare the contract's cost-splitting provision unconscionable and nullify the arbitration agreement.

**C. Discovery Limitations**

The 2002 agreement provides that each party may serve on the other a single set of twenty-five interrogatories (including sub-parts) and one set of twenty-five requests for production or inspection of documents or tangible things. Additionally, the agreement [**42] includes limitations alleged by Luna to be unconscionable: (1) a limitation of each party to a single, six-hour deposition; (2) a prohibition on requests for admission; (3) a ban on inquiry into Poly-America's finances; and (4) a confidentiality provision requiring confidentiality of the parties and their attorneys regarding all aspects of the arbitration. Luna contends these limitations make it virtually impossible for him to prove his claim of retaliatory discharge and render the arbitration agreement unconscionable.

Although an issue of first impression in this Court, several courts around the country have analyzed the enforceability of similar arbitration provisions limiting parties' access to various forms of discovery. Applying a rule functionally equivalent to that used to analyze fee-splitting provisions, these courts refuse to enforce such limitations when adequate evidence is presented that a plaintiff's ability to present his or her claims in an arbitral forum is thereby hindered. *See, e.g., Hulett v. Capitol Auto Group, Inc., No. 07-6151-AA, 2007 U.S. Dist. LEXIS 81380, 2007 WL 3232283, at *4--*5 (D. Or. Oct. 29, 2007)* (holding discovery restrictions that prohibited requests for admission or interrogatories [**43] and limited parties to three depositions unconscionable because they "serve to unreasonably withhold information from plaintiff that would otherwise be available through discovery, thus hindering her ability to present her claims in an arbitration forum"); *accord Ostroff v. Alterra Healthcare Corp., 433 F. Supp. 2d 538, 547 (E.D. Pa. 2006)*. Courts upholding arbitration provisions containing discovery limitations have done so in recognition of the same principle, but determined that a particular [*358] party failed to provide adequate evidence that the provisions "prove insufficient to allow . . . claimants . . . a fair opportunity to present their claims." *Gilmer, 500 U.S. at 31*; *see, e.g., In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 286-87 (4th Cir. 2007)*; *Amisil Holdings, Ltd. v. Clarium Capital Mgmt., No. C06-05255MJJ, 622 F. Supp. 2d 825, 2007 U.S. Dist. LEXIS 69550, 2007 WL 2768995, at *4 (N.D. Cal. Sept. 20, 2007)* ("[Claimant] has not adequately demonstrated why arbitration under

the AAA rules would deny it a fair opportunity to present its claims.").

We agree with these courts that, where the underlying substantive right is not waivable, *ex ante* limitations on discovery that unreasonably impede effective prosecution of such rights [**44] are likewise unenforceable. However, because the relevant inquiry depends upon the facts presented in a given case and the particular discovery limitations' effect upon the relevant statutory regime, we are doubtful that courts -- assessing claims and discovery limitations before arbitration begins -- are in the best position to accurately determine which limits on discovery will have such impermissible effect.

In this case, Luna's expert witness testified that in most employment-discharge cases the employer only needs to take the plaintiff's deposition, while the plaintiff generally needs testimony from a number of witnesses to disprove the employer's likely defense that termination was based on poor performance. Additionally, the expert stated, the employee will likely wish to depose additional witnesses to show a pattern or practice of discrimination, whereas the employer typically has a ready pool of available employees and managers to assist in preparing for the arbitration. For these reasons, the expert concluded, the arbitration agreement's discovery limitations "significantly reduce the plaintiff's ability to prevail in arbitration, regardless of how strong a plaintiff's case [**45] is on the merits."

We agree that if the discovery limitations the arbitration agreement imposes operate to prevent effective presentation of Luna's claim they would be unenforceable. But at this point in the proceedings, without knowing what the particular claims and defenses -- and the evidence needed to prove them -- will be, discerning the discovery limitations' potential preclusive effect is largely speculative. The assessment of particular discovery needs in a given case and, in turn, the enforceability of limitations thereon, is a determination we believe best suited to the arbitrator as the case unfolds. As with cost-sharing, discovery limitations that prevent vindication of non-waivable rights or "prove insufficient to allow [Luna] a fair opportunity to present [his] claims," *Gilmer, 500 U.S. at 31*, would be unconscionable and thus not binding on the arbitrator, as the agreement in this case specifically acknowledges. At this point in the proceedings, though, we cannot conclude that the evidence presented to the trial court compelled a finding that the discovery limitations were *per se* unconscionable. Thus, the trial court did not abuse its discretion.

**D. Prohibition on Inquiry** [**46] **into "Good Cause"**

Luna claims the arbitration provision that prohibits the arbitrator's ability "to apply a 'just cause' or 'good cause' standard to claims relating to Employee's claims concerning his employment or separation therefrom" is substantively unconscionable because it prohibits, in a retaliatory-discharge case, inquiry into whether the employer had a valid, nondiscriminatory reason for firing the employee. Poly-America contends the contract cannot be read as Luna claims, and in fact does not [*359] prevent such an inquiry. We agree with Poly-America, and with the court of appeals, that this prohibition does not operate as Luna asserts; rather, the prohibition simply emphasizes that the contract relates to at-will employment. *See Montgomery County Hosp. Dist. v. Brown, 965 S.W.2d 501, 502 (Tex. 1998)*. Thus, the prohibition prevents the arbitrator from substituting a "good cause" requirement for the "at will" standard. The provision does not, however, prohibit inquiry into whether Poly-America improperly terminated Luna in retaliation for his filing of a workers' compensation claim. Because we read the provision merely to articulate an accepted rule of employment contracts, and not [**47] to restrict a necessary inquiry into the motivations behind Poly-America's termination of Luna in this case, we agree with the court of appeals that the provision is not unconscionable. *See In re Palm Harbor Homes, Inc., 195 S.W.3d 672, 678 (Tex. 2006)* (rejecting a claim that an arbitration provision was substantively unconscionable where the challenged provision "effectively incorporate[d] established provisions of contract law").

**E. One-Year Limitations Period**

The arbitration agreement includes a clause that requires written notice of a claim to be filed within a maximum of one year from the events giving rise to an arbitrable claim. Luna contends this provision unconscionably shortens the two-year statute of limitations applicable to claims of retaliatory discharge. *See Johnson & Johnson Med., Inc. v. Sanchez, 924 S.W.2d 925, 927 (Tex. 1996)*. However, as Luna filed this case well within the one-year period and thus suffered no prejudice from this provision, it is immaterial to Luna's claims of substantive unconscionability.

**F. Lifetime Application**

Finally, Luna argues that the arbitration agreement unconscionably applies even to claims that may arise after Luna's employment with Poly-America [**48] has ended and which may have nothing to do with Luna's employment. While we can imagine circumstances that might present a closer question, Luna's claims here concern his employment and termination, the central focus of the agreement. We thus agree with the court of appeals that this provision does not render the arbitration agreement *per se* unconscionable. *See 175 S.W.3d at 326*.

**VI. Severability**

The arbitration agreement in this case contains a severability clause, which provides as follows:

> Should any term of this Agreement be declared illegal, unenforceable, or unconscionable, the remaining terms of the Agreement shall remain in full force and effect. To the extent possible, both Employee and Company desire that the Arbitrator modify the term(s) declared to be illegal, unenforceable, or unconscionable in such a way as to retain the intended meaning of the term(s) as closely as possible.

Poly-America argues that, even if elements of its arbitration agreement with Luna are unconscionable, arbitration is nevertheless required because the unconscionable provisions are severable from the general agreement to arbitrate. [4] Luna [*360] contends the unconscionable provisions are integral to the entire [**49] contract and are therefore not severable. The court of appeals agreed with Luna, stating that the fee-splitting and remedies-limitation provisions "together deprive Luna of his opportunity to vindicate his claim in the arbitral forum" and concluding that "those provisions are integral to the purpose of the agreement and cannot be severed." *175 S.W.3d at 328*. The court of appeals came to this conclusion, it appears, by identifying the fee-splitting and remedies-limitation provisions as weighing in favor of unconscionability "as a whole," but the court did not identify any particular provision that, by itself, would defeat the agreement's purpose. *See id. at 322, 324*. We have determined, however, that the remedies-limitation provisions are individually unconscionable and void, and see no reason why they cannot be easily excised from the contract without defeating its underlying purpose.

> 4 The Court received briefs from *amici curiae* the Texas Association of Business and the Society for Human Resource Management Texas State Council, both of which argue that the court of appeals erred in refusing to sever the provisions it deemed unconscionable from the remainder of the arbitration agreement. [**50] The brief submitted by *amicus curiae* the Texas Trial Lawyers Association argues that such severance would be improper.

An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement. *See Williams v. Williams, 569 S.W.2d 867, 871 (Tex. 1978)*; *see also Hoover Slovacek, 206 S.W.3d at 565* (citing *RESTATEMENT (SECOND) OF CONTRACTS § 208* (1981)). Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself. *See John R. Ray & Sons, Inc. v. Stroman, 923 S.W.2d 80, 86 (Tex. App.--Houston [14th Dist.] 1996, writ denied)* (citing *Hanks v. GAB Bus. Servs., Inc., 644 S.W.2d 707, 708 (Tex. 1982)*). The relevant inquiry is whether or not parties would have entered into the agreement absent the unenforceable provisions. *See Patrizi v. McAninch, 153 Tex. 389, 269 S.W.2d 343, 348 (Tex. 1954)*; *see also City of Beaumont v. Int'l Ass'n of Firefighters, Local Union No. 399, 241 S.W.3d 208, 215 (Tex. App.--Beaumont 2007, no pet.)* (citing *Rogers v. Wolfson, 763 S.W.2d 922, 925 (Tex. App.--Dallas 1989, writ denied))*; [**51] *Stroman, 923 S.W.2d at 86* (citing *Frankiewicz v. Nat'l Comp. Assocs., 633 S.W.2d 505, 507-08 (Tex. 1982)*). We have previously allowed severance of illegal contract provisions where the invalid provisions were "only a part of the many reciprocal promises in the agreement" and "did not constitute the main or essential purpose of the agreement." *Williams, 569 S.W.2d at 871*.

The 2002 version of the arbitration agreement in this case is over five pages long and contains numerous provisions not challenged by Luna as imposing any unconscionable burdens: procedures for mediation, selection of a neutral arbitrator, filing of motions, and other general provisions governing arbitration procedures. We agree with Poly-America that the intent of the parties, as expressed by the severability clause, is that unconscionable provisions be excised where possible. Furthermore, it is clear by the contract's terms that the main purpose of the agreement is for the parties to submit their disputes to an arbitral forum rather than proceed in court. *See id.* Excising the unconscionable provisions we have identified will not defeat or undermine this purpose, which we have upheld in the context of agreements to [**52] arbitrate employment disputes. *See AdvancePCS, 172 S.W.3d at 608*; *EZ Pawn Corp., 934 S.W.2d at 90*; *Cantella & Co., 924 S.W.2d at 944*.

**VII. Conclusion**

We hold invalid, as substantively unconscionable and void, provisions of the parties' [*361] contract that prohibit the award of punitive damages or reinstatement and thus inhibit effective vindication of Luna's retaliatory-discharge claim in an arbitral forum. We further hold that the trial court did not abuse its discretion in allowing the arbitrator to determine whether the fee-splitting agreement and discovery limitations -- as applied in the course of arbitration -- are unconscionable. Because we

find the invalid remedies-limitation provisions severable from the agreement to arbitrate, which we conclude is otherwise enforceable, the trial court did not abuse its discretion in compelling arbitration. Accordingly, we conditionally grant the writ of mandamus.

Harriet O'Neill

Justice

**OPINION DELIVERED:** August 29, 2008

**DISSENT BY:** Scott Brister

**DISSENT**

JUSTICE BRISTER, dissenting.

The hard thing about granting mandamus relief is knowing when to stop. This Court has tried over the years to set mandamus boundaries through various tests, all of which soon generated exceptions, [**53] and most of which were met with objections that the "established" boundaries of mandamus were being ignored.

Only two years ago, we held in *In re Palacios* that mandamus review was available for "orders that *deny* arbitration, *but not* orders that *compel* it." [1] We noted that this was a reversal of previous practice, [2] but was necessitated by the Supreme Court's 2000 opinion in *Green Tree Financial Corp. v. Randolph*, which said that orders compelling arbitration "would not be appealable" unless they included final dismissal of the case. [3] Today the Court comes full circle, saying once again that mandamus review of orders compelling arbitration is "proper," though courts should be "hesitant" about it. [4] Apparently, so long as one expresses qualms, *Palacios* is a dead letter.

1 *221 S.W.3d 564, 566 (Tex. 2006)* (emphasis added).
2 *Id. at 565* (noting abrogation of *Freis v. Canales, 877 S.W.2d 283, 284 (Tex. 1994)*).
3 *531 U.S. 79, 87 n.2, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)*.
4 S.W.3d , .

Of course, firm rules governing mandamus are made to be broken, as issuance of the writ is primarily a matter of judgment and prudence. [5] As the United States Supreme Court said in 2004, mandamus is appropriate if a party shows a clear right, [**54] no alternative remedy, and that mandamus is "appropriate under the circumstances." [6] This test (especially the last prong) defies precise application, but years of judicial effort have failed to produce a better one. As a result, reasonable judges will sometimes [*362] disagree whether mandamus is "prudent" or "appropriate under the circumstances," and sometimes decide differently in one case than the next. But departing from *Palacios* is neither prudent nor appropriate for at least five reasons.

5 *See, e.g., CSR Ltd. v. Link, 925 S.W.2d 591, 597 (Tex. 1996)* ("Because of the size and complexity of the asbestos litigation, the most *prudent* use of judicial resources in this case is to permit a preliminary resolution of the fundamental issue of personal jurisdiction by writ of mandamus.") (emphasis added); *In re Dean, 527 F.3d 391, 396 (5th Cir. 2008)* ("The decision whether to grant mandamus is largely prudential."); *In re Atlantic Pipe Corp., 304 F.3d 135, 140 (1st Cir. 2002)* (concluding mandamus was "prudent under the circumstances"); *In re Chimenti, 79 F.3d 534, 539 (6th Cir. 1996)* (noting availability of interlocutory appeal was merely one of several factors affecting court's "prudential [**55] considerations" regarding issuance of mandamus).
6 *Cheney v. U.S. Dist. Court for Dist. of Columbia, 542 U.S. 367, 380-81, 124 S. Ct. 2576, 159 L. Ed. 2d 459 (2004)* (holding mandamus should issue when there is (1) no other adequate remedy, (2) a "clear and indisputable" right, and (3) "the writ is appropriate under the circumstances").

First, Congress amended the Federal Arbitration Act in 1988 so that it "permits immediate appeal of orders *hostile* to arbitration, . . . but bars appeal of interlocutory orders *favorable* to arbitration." [7] Texas law is to the same effect. [8] As the trial court's order here was favorable to arbitration, we should defer to the cost-benefit analysis already conducted by the federal and state legislatures. [9] We cannot simply substitute mandamus when interlocutory appeal is prohibited without running into serious *Supremacy Clause* problems; [10] "[f]requent pre-arbitration review would inevitably frustrate Congress's intent to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." [11]

7 *Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 86, 121 S. Ct. 513, 148 L. Ed. 2d 373 (2000)* (construing *9 U.S.C. § 16*) (emphasis added).
8 *See TEX. CIV. PRAC. & REM. CODE § 171.098*; *In re Palacios, 221 S.W.3d 564, 566 (Tex. 2006)*.
9 *I* [**56] *n re McAllen Med. Ctr., Inc., 275 S.W.3d 458, , 2008 Tex. LEXIS 456 (Tex. 2008)* ("Although mandamus review is generally a matter within our discretion, our place in a government of separated powers requires us to consider also the priorities of the other branches of Texas government.").

10  *See U.S. CONST. art. VI, cl. 2* ("[T]he Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

11  *Perry Homes v. Cull, 258 S.W.3d 580, 587, 2008 Tex. LEXIS 423 (Tex. 2008)* (quoting *Preston v. Ferrer, 552 U.S. 346, , 128 S. Ct. 978, 169 L. Ed. 2d 917 (2008)* and *Moses H. Cone Mem 'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 22, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)*) (internal quotations omitted).

Second, the trial court ordered these parties to arbitration five years ago. Had mandamus proceedings not intervened, this dispute would have long since been concluded. Surely the time and expense incurred arbitrating this case would have been less than that incurred in mandamus review. And now that mandamus review is concluded, the parties must go to arbitration anyway. Given our state's strong public policy favoring freedom of contract, [12] claims that a contract [**57] is unconscionable are asserted far more often than they are sustained. After today's decision, it is hard to see how any arbitration cannot be stopped in its tracks by alleging unconscionability.

12  *Fairfield Ins. Co. v. Stephens Martin Paving, LP, 246 S.W.3d 653, 664 (Tex. 2008)*; *Fortis Benefits v. Cantu, 234 S.W.3d 642, 649 (Tex. 2007)*; *Lawrence v. CDB Servs., Inc., 44 S.W.3d 544, 553 (Tex. 2001)*.

Third, today's opinion is purely advisory; if an arbitrator ignores it, there is little we can do. Both federal and state law require courts to enforce an arbitrator's decision, no matter what it is, with very few exceptions. [13] The allowable exceptions concern extrinsic or procedural matters like corruption, fraud, or refusing to hear evidence; [14] they do not include (as the Supreme Court just held) disregarding the law, even if a legal error is "manifest." [15] What is the benefit of mandamus review if the resulting order can be ignored?

13  *See 9 U.S.C. §§ 9-11*; *TEX. CIV. PRAC. & REM. CODE §§ 171.087-171.088, 171.091*.

14  *Id.*

15  *Hall St. Assocs., L.L.C. v. Mattel, Inc., 552 U.S. 576, , 128 S.Ct. 1396, 1404, 170 L. Ed. 2d 254 (2008)*.

[*363]  Fourth, even if most arbitrators would comply with an appellate court's mandamus [**58] rulings, issuing them creates a hybrid procedure unknown to the arbitration acts. As already noted, those statutes commit matters concerning the law and the merits to the arbitrators and foreclose judicial review of the details of the result. This also appears to violate the parties' agreement in this case, which authorized the arbitrator to address unconscionability:

> Should any term of this Agreement be declared illegal, unenforceable, or unconscionable, the remaining terms of the Agreement shall remain in full force and effect. To the extent possible, both Employee and Company desire that the Arbitrator modify the term(s) declared to be illegal, unenforceable, or unconscionable in such a way as to retain the intended meaning of the term(s) as closely as possible.

Telling the arbitrators in advance what legal rulings they should make (as the Court does today) is an improper way to circumvent these restrictions.

Fifth and finally, the Court decides an important question in the abstract that the arbitration may render moot. The Court concedes that unconscionability of the fee-splitting and discovery-limiting clauses should be deferred to the arbitrator. But unconscionability of the remedy-stripping [**59] clause is just as fact-based, and just as speculative until all the facts are arbitrated. The fairness of such clauses is not as one-sided as the Court suggests; many employees might actually *prefer* cash for lost wages (and no appellate delays) rather than reinstatement or a long shot at punitive damages. As the Court notes, several courts have held that such "limitations of remedies are permissible." [16] Twice in 2003 the Supreme Court declined to hold that a remedy-stripping arbitration clause violates the FAA -- each time deferring the question until after arbitrators had addressed it. [17] We should do the same here.

16  S.W.3d at  .

17  *See PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 406-07, 123 S. Ct. 1531, 155 L. Ed. 2d 578 (2003)* (holding that "since we do not know how the arbitrator will construe the remedial limitations" barring treble damages, "the proper course is to compel arbitration"); *Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444, 454, 123 S. Ct. 2402, 156 L. Ed. 2d 414 (2003)* (remanding for arbitrator to determine whether contracts prohibited class arbitration).

We have never held (as the Court holds repeatedly today) that an arbitration agreement is invalid unless an employee can "effectively vindicate his statutory rights." [18] We [**60] did not say so in *In re Halliburton Co.* (as

the Court's citations aver), where that phrase appears only in a parenthetical describing an opinion by an intermediate appellate court in Michigan, an opinion we neither approved nor adopted. [19] Nor does the Court's judgment comply with this new standard. Despite the remedy limits imposed here, an arbitrator could still award Johnny Luna 50 years of future lost wages, which would certainly seem to "effectively vindicate his statutory rights." Even more than the fee-splitting or discovery-limiting provisions, it is simply too early to tell whether the remedy-stripping provisions will be unfair to Luna at all.

18 S.W.3d at , , , & .

19 *80 S.W.3d 566, 572* (citing *Rembert v. Ryan's Family Steak Houses, Inc., 235 Mich. App. 118, 596 N.W.2d 208, 226 (Mich. Ct. App. 1999)*).

Such an important and controversial question should not be decided in such an offhanded and abstract way. We should instead wait to see whether the arbitration [*364] award makes such a decision necessary; "if it is not necessary to decide more, it is necessary not to decide more." [20]

20 *PDK Labs. Inc. v. U.S. D.E.A., 360 U.S. App. D.C. 344, 362 F.3d 786, 799 (D.C. Cir. 2004)* (Roberts, J., concurring).

The Court overlooks [**61] all these problems on the ground that mandamus "has been broadly applied" by federal courts to review orders compelling arbitration. [21] But the string citations that follow do not support that claim. Of the five cases cited, three predated *Green Tree,* [22] and a fourth did not involve a trial court order favorable to arbitration. [23] The single case granting mandamus relief from an order favorable to arbitration was by the Ninth Circuit, the court widely recognized as the "most hostile," [24] "far to the left of center," [25] and "renegade" court in the country in employment arbitration cases. [26] Even so, mandamus was granted in that case only because arbitrating the single class representative's case could moot the class action he had brought, wiping it out without appellate review. [27] In short, there is no "broad" consensus for doing precisely the opposite of what Congress and the Texas Legislature intended.

21 S.W.3d at .

22 *Geourgiou v. Mobil Exploration & Prod. Servs., Inc. US, 190 F.3d 538 (5th Cir. 1999)*; *Cofab Inc. v. Phil. Joint Bd., Amalgamated Clothing & Textile Workers Union, 141 F.3d 105 (3d Cir. 1998)*; *McDermott Intern., Inc. v. Underwriters at Lloyds Subscribing to Memorandum of Ins. No. 104207, 981 F.2d 744 (5th Cir. 1993)*.

23 *Manion v. Nagin, 255 F.3d 535, 540 (8th Cir. 2001)* [**62] (involving injunction to obtain salary payments pending arbitration); *see also Cofab, 141 F.3d at 110* (involving temporary stay of motion to enforce arbitration award pending NLRB review of related matter).

24 *See* Adam Borstein, *Arbitrary Enforcement: When Arbitration Agreements Contain Unlawful Provisions, 39 LOY. L.A.L. REV. 1259, 1275 (2006)* ("This combination of finding unconscionability and favoring public policy over enforcement of the FAA has made the Ninth Circuit more hostile towards unlawful arbitration provisions than any other federal circuit."); Michael G. McGuinness & Adam J. Karr, *California's "Unique" Approach to Arbitration: Why This Road Less Traveled Will Make All the Difference on the Issue of Preemption Under the Federal Arbitration Act, 2005 J. DISP. RESOL. 61, 91-92 (2005)*("[T]he conclusion that California courts--and the Ninth Circuit--are imposing their own biases against arbitration is inescapable."); Steven M. Warshawsky, *Gilmer, the Contractual Exhaustion Doctrine, and Federal Statutory Employment Discrimination Claims, 19 LAB. LAW. 285, 303 n.180 (2004)* ("The Ninth Circuit continues to be hostile to mandatory arbitration agreements."); Dennis R. Nolan, *Employment* [**63] *Arbitration After Circuit City, 41 BRANDEIS L.J. 853, 890 (2003)* ("[D]espite Congress's broad endorsement of arbitration in the FAA and the Supreme Court's repeated confirmation of that policy, many judges (not all of them on the Ninth Circuit) remain deeply skeptical if not openly hostile."); *Hai Jiang, Do We Allow Contract Law to Administer Civil Rights Remedies? Casenote on Haskins v. Prudential Insurance Co.,* 2003 L. REV. MICH. ST. U. DET. C.L. 251, 260 (2003) ("The Ninth Circuit is the most hostile to arbitration of employment discrimination claims among the circuit courts . . . .").

25 *See* Earl Greene III, Note, *Armendariz v. Foundation Health Psychcare Services, Inc.: The California Supreme Court Searches For a Middle Ground*, 1 J. AM. ARB. 105, 108-09 (2001) ("On a mandatory arbitration agreement enforcement continuum, the Ninth Circuit would be sitting far to the left of center as it seems to be more concerned with protecting the statutory rights of employees than toeing the line with the Supreme Court.")

26 *See* Jennifer LaFond, Notes, *The Private Enforcement of Public Laws in Armendariz v. Foundation Health Psychcare Servs., 29 PEPP. L. REV. 401, 414 n.127 (2002)* ("The Ninth Circuit [**64] is the renegade circuit with respect to . . .

[whether] employees can be compelled to arbitrate statutory claims.").

27 *Douglas v. U.S. Dist. Court, 495 F.3d 1062, 1068-69 (9th Cir. 2007)*.

[*365] It is certainly true that leaving matters like unconscionability to arbitrators will mean development of the law is "substantially hindered," [28] but the same could be said of arbitration in *all* cases. It is hard to see the allure of a system in which decision-makers can ignore the law, unless of course one is planning to ignore the law oneself. Based on its popularity, few arbitrators apparently go that far. But even carefully selected judges and jurors make mistakes, and carefully selected arbitrators are surely no less fallible. Nevertheless, these are policy matters that only Congress can address or amend; we cannot disregard the express legislative limits on interlocutory review merely by calling it mandamus when we think the questions are important and the issues well-briefed.

28 S.W.3d at .

While appeal from arbitration awards is very limited, that appeal is an adequate remedy unless the benefits of mandamus outweigh the costs. [29] Considering the costs expended so far, I doubt Johnny Luna [**65] would consider them outweighed by getting the right to seek reinstatement in arbitration (which employees rarely request) and punitive damages (which they rarely get). Accordingly, I agree with the Court that the court of appeals erred in reviewing and reversing the trial court's order compelling arbitration. But I disagree that we have any place reviewing those matters either. To that extent, I respectfully dissent.

29 *In re BP Products N. Am., Inc., 244 S.W.3d 840, 845 (Tex. 2008)*; *In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 136 (Tex. 2004)*.

Scott Brister

Justice

OPINION DELIVERED: August 29, 2008



**KELLEY-COPPEDGE, INC., PETITIONER v. HIGHLANDS INSURANCE COMPANY, RESPONDENT**

**No. 97-0926**

**SUPREME COURT OF TEXAS**

***980 S.W.2d 462*; *1998 Tex. LEXIS 152*; *47 ERC (BNA) 1860*; *141 Oil & Gas Rep. 412***

**April 28, 1998, Argued**
**November 12, 1998, Delivered**

**DISPOSITION:** [**1] Reverseed the court of appeals and rendered judgment for KCI.

**JUDGES:** JUSTICE SPECTOR delivered the opinion of the Court, in which CHIEF JUSTICE PHILLIPS, JUSTICE ENOCH, JUSTICE ABBOTT and JUSTICE HANKINSON joined. JUSTICE GONZALEZ filed a dissenting opinion, in which JUSTICE HECHT, JUSTICE OWEN and JUSTICE BAKER joined.

**OPINION BY:** ROSE SPECTOR

**OPINION**

[*463] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS

In this case, we consider whether Kelley-Coppedge, Inc. (KCI), an independent contractor, "occupied" the easement on which it was performing operations, thereby invoking the pollution exclusion clause of a commercial general liability policy. The court of appeals held that KCI did occupy the easement and therefore rendered summary judgment that KCI take nothing. *950 S.W.2d 415*. We reverse and render judgment for KCI.

**I**

While laying pipe along an easement, KCI, an oil and gas pipeline contractor, inadvertently struck a Mobil Oil pipeline causing the release of 1600 barrels of crude oil. The spill damaged a third party's land upon which the easement was located.

At the time, Highlands Insurance Co. covered KCI under a commercial general liability policy. [**2] After the spill, KCI notified Highlands, took steps to mitigate potential damage, and entered into agreements with Mobil and the adjoining landowner to clean up the soil in accordance with Texas Railroad Commission standards. Highlands eventually paid to repair the Mobil pipeline and for the lost oil. When KCI presented Highlands with the cleanup costs, however, Highlands denied the claim.

KCI then sued Highlands for a declaratory judgment on Highlands's coverage obligations, breach of insurance contract, and attorneys' fees. Both parties moved for summary judgment. Finding that the insurance contract's pollution exclusion clause did not exclude KCI's cleanup costs, the trial court granted summary judgment for KCI and overruled Highlands's motion. The trial court later granted KCI summary judgment on damages for $ 435,000.

The court of appeals reversed and rendered summary judgment for Highlands. 950 S.W.2d at 419. Relying on *Tri County Service Co. v. Nationwide Mutual Insurance Co., 873 S.W.2d 719, 719* (Tex. App.--San Antonio 1993, writ denied), the court held that because KCI had the right to be on the easement to perform operations, it occupied the easement for the purposes [**3] of the insurance policy. *950 S.W.2d at 419*. Because section f.(1)(a) of KCI's policy excluded coverage for the release of pollutants from [*464] premises it "owned or occupied," the court held that KCI could not recoup its cleanup costs from Highlands. *Id.* We granted KCI's petition for review and now reverse and render judgment for KCI.

**II**

The issue we must resolve is whether the pollution exclusion clause contained in KCI's insurance policy with Highlands excluded coverage for KCI's cleanup costs. The relevant portions of the pollution exclusion clause are

subsections f.(1)(a), f.(1)(d), and f.(2)(a). Exclusion f.(1) of the policy excludes coverage for:

"Bodily injury" and "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

(a) At or from any premises, site or location which is or was at any time owned or *occupied by,* or rented or loaned to, any insured;

* * *

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations:

(i) if the pollutants are [**4] brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor;

Exclusion f.(2) excludes coverage for:

Any loss, cost or expense arising out of any

(a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants . . . . (emphasis added).

This dispute turns on whether or not the term "occupied by" in the policy encompasses KCI's activities on the easement. Highlands contends that "to occupy" is simply "to take up significant parts of an occupied space" or "to be there." KCI contends that something more than mere presence is needed, and that Highlands's interpretation of section f.(1)(a) renders section f.(1)(d) meaningless and the insurance contract ambiguous as a whole.

**A**

Initially, we note that we interpret insurance policies in Texas according to the rules of contract interpretation. *Balandran v. Safeco Ins. Co. of America, 972 S.W.2d 738,* (1998); *National Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995)*; *Forbau v. Aetna* [**5] *Life Ins. Co., 876 S.W.2d 132, 133 (Tex. 1994)*. In *CBI*, we set forth guidelines courts are to follow when interpreting insurance contracts:

The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. Parol evidence is not admissible for the purpose of creating an ambiguity.

If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous. Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered. Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument.

*907 S.W.2d at 520* (citations omitted). *See also Heritage Resources, Inc. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996)* (observing that when construing unambiguous instruments "we give terms their plain, ordinary, [**6] and generally accepted meaning . . ."). We must also attempt to give effect to all contract provisions so that none will be rendered meaningless. *Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 158 (Tex. 1951)*; *see also* Michael Sean Quinn, *Liability Insurance Contracts: A Primer*, 34 TEX. J. BUS. L. 2, 19-20 (1997). We proceed with these principles as our guide.

[*465] Each party argues an alternate meaning for the term "occupy" as used in the policy. An ambiguity does not arise, however, merely because the parties advance conflicting contract interpretations. *Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 458 (Tex. 1997)*. Only when, after applying the applicable rules of construction, a contract term is susceptible of two or more reasonable interpretations will the term be ambiguous. *Glover v. National Ins. Underwriters, 545 S.W.2d 755, 761 (Tex. 1977)*. We find no ambiguity in this contract.

Highlands contends that the plain meaning of "to occupy" is "to take up space." Thus, KCI's mere presence on the easement constitutes "occupation" as contemplated by the pollution exclusion clause. Because section f.(1)(a) excludes coverage for any pollutant [**7] discharge from any premises the insured "occupied," KCI cannot recover its cleanup costs. In support of its definition of "occupy," Highlands cites *Tri County, 873 S.W.2d at 720*, the only Texas case to consider this issue.

Tri County was a paving subcontractor working under contract to pave an H.E.B. parking lot. Tri County began its operations in September 1990 and finished them in December 1990. After Tri County sprayed oil on the parking lot, heavy rains washed the oil into a nearby creek. H.E.B. then removed the oil from the creek and docked Tri County for the cost of cleanup. Tri County claimed this loss under its commercial general liability (CGL) policy with Nationwide. Nationwide later denied coverage, invoking a pollution exclusion clause identical to that at issue here. Tri County then sued Nationwide.

Tri County argued that it never "occupied" the parking lot because it held no property interest in the site. After holding that the clause was unambiguous, the court of appeals held that the plain, ordinary meaning of "occu-

pied" did not necessarily mean ownership, and was broad enough to encompass Tri County's operations. *873 S.W.2d at 721*. Highlands argues that we should [**8] reach the same conclusion as the *Tri County* court and hold that KCI "occupied" the easement.

KCI, however, contends that accepting Highlands's definition of occupy would render exclusion f.(1)(d) meaningless. KCI argues that if any presence, no matter how transitory, is occupancy under section f.(1)(a), then this section excludes *all* operations of the insured, including those performed by contractors or subcontractors, regardless of whether the insured owns the property or not. Thus, section f.(1)(d)'s provision excluding coverage for the insured's operations on another's land would be surplusage. In support of this argument, KCI cites *United States Fidelity & Guaranty Co. v. B&B Oil Well Service, Inc., 910 F. Supp. 1172 (S.D. Miss. 1995)*.

In that case, B&B, an oil well contractor, had contracted to rework some oil wells. A number of landowners on whose land the oil wells were located sued B&B alleging that the landowners' property had been contaminated by pollutants from B&B's operations. USF&G, which insured B&B under a CGL policy nearly identical to that between KCI and Highlands, sought a declaratory judgment that under the contracts of insurance issued to B&B, B&B [**9] had no coverage for the contamination. *Id. at 1175*.

While the court ultimately held that another provision excluded coverage, the court also held that because B&B was not an "occupier" of the premises, section f.(1)(a) of the insurance contract did not bar coverage. *910 F. Supp. at 1178-81*. As here, the insurer relied on *Tri County* in arguing that the insured occupied the premises. However, the court distinguished the case from *Tri County* by framing the question before it as: "Does occasional, limited work performed by a subcontractor, such as B&B, at a well site operated and controlled by another amount to occupancy?" *Id. at 1178.* Answering the question in the negative, the court stated that "if any sort of occupancy, 'no matter how transitory or for whatever purpose,' were deemed sufficient to invoke subsection (a) of this pollution exclusion, 'the remaining subsections, (b) through (d), would be meaninglessly superfluous.'" *Id.* (quoting *Schumann v. New York, 160 Misc. 2d 802, 610 N.Y.S.2d 987, 991 (Ct. Cl. 1994))*. "In the court's view, . . . each aspect of the 'occupancy' definition suggests something other than a transient, nonpossessory relation to the [**10] [*466] property. Subsection (a) is thus inapplicable." *Id.* (footnote omitted). Thus, *B&B Oil Well Service* held that a well contractor reworking a well was not an occupier because its presence was too transient and nonpossessory to be occupancy.

Highlands, the court of appeals, and the *Tri County* court all rely on our decision in *Hernandez v. Heldenfels, 374 S.W.2d 196, 200 (Tex. 1963)*, to support their definitions of "occupy." They contend we set forth a definition of "occupy" broad enough to cover the contractor's activities in *Tri County* and the contractor's activities in the case at hand.

In *Heldenfels*, however, we implied that an "occupier" is one who has "exclusive control" of premises. *See id. at 198*. We stated:

> The thesis of the appellate court is that as Heldenfels was the occupier of the premises -- the roadway in question -- and Hernandez had no business with Heldenfels and was not engaged in furthering Heldenfels' interest in any way, he was necessarily a licensee. Had Heldenfels been entitled as a matter of right to an exclusive possession of the premises as against the owner, this theory might be tenable. However, as we view the record, there is [**11] no evidence that Southwestern, as the owner, granted to . . . Heldenfels an exclusive right. Heldenfels Brothers had the right to occupy such portions of the roadway as were necessary for them to use in carrying out the obligations which they had assumed as a subcontractor, but they did not have the right to bar the owner and its employees therefrom. . . . Both Heldenfels and Hernandez were using the roadway because the interests of Southwestern as the owner required such use. Both, in a sense, were invitees of the owner and . . . each owes a duty to prevent injury to the other through negligence.

*374 S.W.2d at 198-99*. In sum, we suggested that for a contractor to be an "occupier" of premises, it must have an exclusive right of possession to that premises.

In *Heldenfels*, however, the meaning of "occupied" was not at issue, and the passage that the *Tri County* court quoted was merely a recitation of the assumed fact that the subcontractor had "the right to occupy such portions of the roadway as were necessary" for the performance of its work. Thus, the *Tri County* court incorrectly stated that *Heldenfels* "articulated a definition" of "occupy." Moreover, the language [**12] quoted above suggests, like *B&B Oil Well Service*, that we intended something more than mere presence for a subcontractor to "occupy" premises.

Both parties cite *Gregory v. Tennessee Gas Pipeline Co., 948 F.2d 203 (5th Cir. 1991)*, as support for their position. In *Gregory*, the city of Natchitoches, Louisiana, created a lake to provide for the city's drinking water supply. A gas company maintained a facility next to the lake and allegedly discharged chemicals into the lake. As a result, several landowners sued the gas company and the city. The city then filed a third-party complaint against its insurer, seeking coverage. Claiming that the city "occu-

pied" the lake under exclusion (a) (the same as KCI's section f.(1)(a)) and was therefore excluded from coverage, the insurer denied coverage. The city claimed that, while it did own the bed of the lake, it did not own "the waters, fish, flora, or fauna of the lake." *Id. at 205*. Thus, the issue before the court was whether the city "occupied" the lake as that term was used in the insurance contract. *948 F.2d at 204-06*.

Because the city "created the lake, owns at least a large portion of the bed, and maintains and uses the [**13] lake and its waters for a drinking water supply," the court held that the city did occupy the lake. *Id. at 207*. The court defined "occupy" as "to keep or hold for use." *Id.* [1]

1 At least one state court's holding is in line with *B&B Oil Well Service* and *Gregory*. *See C.O. Falter, Inc. v. Crum & Forster Ins. Cos., 79 Misc. 2d 981, 361 N.Y.S.2d 968, 974 (Sup. Ct. 1974)* ("Construed in its ordinary sense and given its intended meaning, the word 'occupy' suggests . . . continued physical presence [on the premises ]. This exclusion is intended to deprive an insured from the benefit of coverage for damages it causes while 'occupying' the [premises]. Plaintiff's occasional trips to the [premises] to make minor improvements do not suggest that it 'occupied' the damaged property within the intent of the exclusion and at the time of the loss.").

[*467] We agree with KCI that if the court of appeals was correct that any presence, no matter how transitory, constitutes occupancy under section f.(1)(a), then [**14] section f.(1)(d) is rendered meaningless. Subparagraph (a) applies to releases at or from premises owned or controlled by the contractor. Subparagraph (d) broadens the scope of the exclusion to include releases at or from premises owned by a third party at which the contractor is performing operations, *but only if* the contractor brings the pollutants onto the site. By negating coverage for a contractor's entire operations at a job site, the court of appeals' interpretation leaves section f.(1)(d) nothing to exclude. Under the court of appeals' interpretation, there would be absolutely no reason to include (d) since (a) already excludes all of the contractor's operations, whether or not the contractor owns or controls the premises on which it is performing operations. Under that reading, a contractor's off-premises coverage is completely eliminated.

A reading that does give meaning to both provisions is that section f.(1)(a) refers to operations on premises owned or controlled by the contractor, while section f.(1)(d) refers to operations taking place on a third-party's premises. This reading is consistent with the plain, ordinary, and generally accepted meaning of "occupied" when [**15] read in context with the other terms in the clause, "owned," "rented," and "loaned." In short, we agree with *Gregory* that to "occupy" means "to hold or keep for use," and we conclude that KCI's interpretation of the word "occupy" in section f.(1)(a) is the only reasonable interpretation. We therefore hold that section f.(1)(a) unambiguously does not apply to exclude coverage for KCI's cleanup costs. [2]

2 Highlands also claims that exclusion f. is an "absolute pollution exclusion." Nevertheless, the cases Highlands cites for support concern policies with much broader pollution exclusion clauses. *See National Union Fire Ins. Co., 907 S.W.2d at 519* (policies excluding coverage for the "discharge, dispersal, release or escape of pollutants, *anywhere in the world*" and "*however caused and whenever occurring*") (emphasis added).

Even the secondary authorities cited by Highlands indicate that coverage is available under exclusion f. in certain instances, including "off-site pollution releases." Most telling, however, is that in Highlands's own policy with KCI is an endorsement entitled "Total Pollution Exclusion." This endorsement is a substitute for exclusion f. in the policy and would exclude all pollution coverage. However, by its own terms, the endorsement does not apply in the state of Texas. Because this endorsement does not apply in Texas, Highlands cannot claim that exclusion f. is an absolute pollution exclusion clause.

[**16] **B**

Finally, Highlands argues that section f.(2)(a) explicitly excludes KCI from coverage for its cleanup costs. Nevertheless, Highlands waived reliance on this portion of the policy because it asserted its applicability for the first time in its motion for new trial. *McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d 337, 343 (Tex. 1993)* (holding that an issue not presented in a response to a motion for summary judgment cannot later be raised on appeal); *City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 676 (Tex. 1979)*. As a result, exclusion f.(2)(a) does not operate to exclude KCI from recovering its cleanup costs. We express no opinion on whether KCI's costs would have been excluded had Highlands not waived reliance on this section.

## III

We hold that the term "occupied by" in this insurance policy's pollution exclusion clause does not encompass KCI's operations on a third-party's premises. The provision unambiguously excludes costs for pollution spillage from or on the insured's own premises. We therefore reverse the court of appeals and render judgment for KCI.

Rose Spector

Justice

OPINION DELIVERED: November 12, 1998

**DISSENT BY:** RAUL [**17] A. GONZALEZ

**DISSENT**

JUSTICE GONZALEZ, joined by JUSTICE HECHT, JUSTICE OWEN, and JUSTICE BAKER, dissenting.

The Court concludes that an insured did not "occupy" the work site where it caused an oil spill, and therefore the pollution exclusion provision in the insured's commercial general liability insurance policy did not preclude [*468] coverage. I disagree and would affirm the judgment of the court of appeals.

Natural Gas Pipeline Company of America ("NGP") contracted Kelley-Coppedge, Inc. ("KCI") to construct pipelines for NGP. Their contract expressly obliged NGP to "furnish right-of-way" as appropriate to KCI and specifically granted KCI "the right to conduct operations for the construction of pipelines (gas, water, drain and sewage) over a strip of ground fifty feet (50') in width." For a period of no fewer than nineteen days, KCI placed workers and equipment on NGP's easement in Wise County. In the course of laying pipeline along this easement, KCI's workers punched a hole in a crude oil pipeline, causing the discharge of 1,600 barrels of crude oil at the location KCI was working.

Section f.(1)(a) of KCI's insurance policy excluded coverage for pollution-related losses, damage [**18] or injuries "at or from any premises, site or location which is or was at any time owned or *occupied* by, or rented or loaned to, any *insured*." Section f.(1)(d) excluded coverage of the same at any place "on which any *insured* or any contractors or *subcontractors* working directly or indirectly on any insured's behalf are *performing operations* . . . if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor."

The Court concludes that to "occupy" means "to hold or keep for use," citing *Gregory v. Tennessee Gas Pipeline Co., 948 F.2d 203, 207 (5th Cir. 1991)*, in support of this definition. In *Gregory*, the court concluded that the City of Natchitoches "occupied" the lake it created, even if it did not "own" the lake, because it regulated the lake levels and used the lake to supply the city's drinking water. *Id. Gregory* held that one who "holds or maintains [property] for use" also "occupies" it. *Id.* It does not follow, however, that one who does not hold or maintain property for use does not "occupy" it. Nevertheless, the *Gregory* court's construction of the [**19] term "occupy" actually supports Highland's position. In *Gregory*, the city did not have *exclusive* control over and use of the lake, but others also used it for recreational purposes. *See 948 F.2d at 204-05*. *Gregory* supports the proposition that one may "occupy" a premises without owning or having exclusive use of it.

This Court also misreads *Hernandez v. Heldenfels, 374 S.W.2d 196 (Tex. 1963)*, to suggest that in order for a contractor to be an "occupier" of a premises, it must have an exclusive right of *possession* to the premises. First, our interpretation of the term "occupier" in *Heldenfels* applied only to premises liability actions, not to insurance coverage. Second, not even in the context of premises liability law must an "occupier" of land actually "possess" the land. One who "is entitled to exclusive control" of a premises, even if not an owner, may be an "occupier" of the land. *See id. at 198*. Third, just because one who has an exclusive right of possession or control of a property may be deemed an "occupier" of the property does not mean that the converse is true -- that one who does not have a right to exclusive possession or control of a property [**20] is *not* an occupier. Even so, while it performed its pipe-laying operations, KCI had what is tantamount to exclusive control through a contractual "right of way" on NGP's easement.

The Court's reliance on *C.O. Falter, Inc. v. Crum & Forster Insurance Cos., 79 Misc. 2d 981, 361 N.Y.S.2d 968 (Sup. Ct. 1974)*, and *United States Fidelity & Guaranty Co. v. B&B Oil Well Service, Inc., 910 F. Supp. 1172 (S.D. Miss. 1995)*, is also misplaced. The *C.O. Falter* court construed the word "occupy" to mean "continued physical presence," not "occasional trips to the [premises] to make minor improvements." *361 N.Y.S.2d at 974*. Similarly, the *B&B Oil* court concluded that "occasional, limited work performed by a subcontractor, such as B&B, at a well site operated and controlled by another" did not amount to occupancy. *910 F. Supp. at 1178*. The *B&B Oil* court compared the occasional workover operations B&B performed on wells to the work of a plumber or telephone repairman. *Id. at 1178 n.7*. KCI's physical presence on the easement, by contrast, was not occasional, limited, or brief; nor was it merely engaged in routine maintenance operations. Rather, KCI placed a crew and [*469] heavy [**21] machinery at the job site over a period of several days.

Based on any of the preceding definitions, KCI clearly "occupied" the easement. The various constructions placed on the term "occupancy" in the preceding cases, however, are not controlling. Because the term "occupied" is not ambiguous, "it is the court's duty to give the words used their plain meaning." *See Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984)*.

Based on the plain, ordinary, and generally accepted meaning of occupied, a person or thing occupies a space if it is *there*. One may occupy a vehicle, a hotel room, or even an airplane seat or bathroom for a short period of time without ever possessing or controlling it. The term occupy and its cognates are routinely defined as indicating physical presence or proximity in the automobile insurance context. *See, e.g., Genthner v. Progressive Cas. Ins. Co., 681 A.2d 479, 482 n.1 (Me. 1996)* (citing cases deciding who could be covered as an "occupant" under general automobile insurance policies). KCI unambiguously occupied NGP's easement by being there and using it to construct a pipeline.

KCI argues that if mere presence and use of a premises constitutes [**22] occupancy under section f.(1)(a) of the policy, then section f.(1)(d) is rendered meaningless. However, as Highland contends, the two sections have independent, non-overlapping meanings because section f.(1)(a), unlike section f.(1)(d), does not exclude pollution damages on a third party's premises occupied by an insured's *subcontractor* rather than the *insured*. The policy indemnified KCI for any vicarious liability it might incur for pollution-related damages caused by a KCI subcontractor who did not bring the pollutants to the site, but excluded it for any damages for which KCI was directly responsible. Stated another way, the insurance policy provided coverage for pollution-related damages in only a narrow set of circumstances -- circumstances over which KCI had minimal control and for damages arising only out of vicarious liability. [1]

1 In general, an employer is not vicariously liable for the negligence of its subcontractor. *See Baptist Memorial Hosp. Sys. v. Sampson, 969 S.W.2d 945, 947 (Tex. 1998)*. However, an employer may be liable for the negligence of its subcontractor if the employer retains the right or power to control the manner in which the subcontractor performs its work but fails to exercise reasonable care in supervising the contractor. *See Hoechst-Celanese Corp. v. Mendez, 967 S.W.2d 354, 356 (Tex. 1998)*.

[**23] Finally, we should not hold that some redundancy or overlapping application in multiple policy provisions renders any of the provisions meaningless. It is not uncommon for contracts to have redundant terms, expressions and provisions, especially when specific provisions require regulatory pre-approval or when standard-form contracts are crafted to accommodate a wide variety of clients and circumstances. *See Grain Dealers Mut. Ins. Co. v. McKee, 943 S.W.2d 455, 458 (Tex. 1997)*. The use of several terms and overlapping provisions is usually intended to clarify the scope and intent of the instrument and insulate it from any misunderstanding.

Because I disagree with the Court's definition of "occupy," I dissent.

Raul A. Gonzalez

Justice

OPINION DELIVERED: November 12, 1998



**Liaquat Ali Khan, Appellant v. Nizarali Meknojiya, Appellee**

**NO. 03-11-00580-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***2013 Tex. App. LEXIS 7976***

**June 28, 2013, Filed**

**PRIOR HISTORY:** [*1]
FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT NO. D-1-GN-08-001931, HONORABLE LORA J. LIVINGSTON, JUDGE PRESIDING.

**DISPOSITION:** Reversed and Remanded.

**COUNSEL:** For appellant: Mr. D. Todd Smith, Smith Law Group, P.C., Austin, TX.

For appellee: Mr. Timothy J. Herman, Howry Breen & Herman, L.L.P., Austin, TX.

Mr. John Sepehri, Texas Apartment Association, Austin, TX.

**JUDGES:** Before Chief Justice Jones, Justices Goodwin and Field.

**OPINION BY:** Scott K. Field

**OPINION**

**MEMORANDUM OPINION**

Landlord Liaquat Ali Khan sued tenant Nizarali Meknojiya for breach of the parties' commercial lease. In the suit, Khan sought damages pursuant to the lease's holdover provision, contending that Meknojiya became a holdover tenant as a of result Khan's termination of the lease. Meknojiya moved for summary judgment on the sole ground that Khan's recovery under the holdover provision is barred as a matter of law because it represents an unenforceable penalty in the form of "double-rent." The trial court granted partial summary judgment in favor of Meknojiya, and following a bench trial only on attorney's fees, the court rendered a final judgment that Khan take nothing on his claims and that Meknojiya recover attorney's fees. Because we conclude that the holdover provision is not an unenforceable penalty, we reverse the trial court's judgment and remand the case for further proceedings.

**BACKGROUND**

Khan owns commercial property located in Austin, Texas. [*2] In 1996, Khan and Meknojiya entered into a written lease agreement, and Meknojiya began operating a convenience store on the leased premises. The parties renegotiated their lease ("the lease") in March 2002. The renegotiated lease required Meknojiya to pay $4,500 per month in "base rent" and included the following paragraph, which the parties refer to as a "holdover provision":

> 2.07 Holding Over. If Tenant does not vacate the Leased Premises upon the expiration or earlier termination of the Lease, Tenant shall be a tenant at sufferance for the holdover period and all of the terms and provisions of this Lease shall be applicable during that period, except that Tenant shall pay Landlord (in addition to additional rent payable under this Lease and any other sums payable under this Lease) as base rental for the period of such holdover an amount equal to two times the base rent which would have been payable by Tenant had the holdover period been a part of the original terms of the Lease (without waiver of Landlord's right to recover damages as permitted by law).

According to Khan, Meknojiya committed a series of breaches following execution of the 2002 lease. For instance, Khan contends that [*3] Meknojiya (1) failed to obtain or renew required insurance, (2) failed to provide

the required insurance documentation, and (3) permitted a corporation owned by other individuals to operate the convenience store without obtaining Khan's prior written consent. Khan notified Meknojiya in writing, through counsel, that Meknojiya was in default of the lease and that Khan was exercising his option to terminate the lease effective May 1, 2002. Nevertheless, despite additional notices of default, Meknojiya continued to occupy the premises and to pay $4,500 per month until January 2, 2007, the date the lease was set to have expired by its own terms.

Khan subsequently sued Meknojiya for breach of the lease, asserting that upon Meknojiya's breach of the lease and Khan's notification that the lease was terminated, Meknojiya occupied the property as a tenant at sufferance. *See ICM Mortg. Corp. v. Jacob, 902 S.W.2d 527, 530 (Tex. App.--El Paso 1994, writ denied)* (citing *Restatement (First) of Property § 22* (1936)) ("A tenant at sufferance is a person who has been in lawful possession of property but who wrongfully remains as a holdover after his right to possession has expired."). Khan sought damages [*4] in an amount equal to the difference that Meknojiya actually paid during the alleged holdover period and the amount that Meknojiya was required to pay for the same time period under paragraph 2.07.

Khan moved for partial summary judgment, asserting that he conclusively established all elements of his claim for breach of the lease.[1] Meknojiya filed a response and subsequently moved for summary judgment asserting that Khan's recovery was barred as a matter of law because the double-rent rate under paragraph 2.07 constitutes an unenforceable penalty. After conducting a hearing, the trial court granted Meknojiya's motion for summary judgment but denied Khan's motion. Following a bench trial on Meknojiya's remaining counterclaim for attorney's fees, the trial court rendered a final judgment incorporating the trial court's order granting summary judgment in favor of Meknojiya and ordering Khan to pay $60,191.71 in attorney's fees.[2] In three issues on appeal, Khan argues that the trial court erred in granting summary judgment in favor of Meknojiya and consequently, in awarding Meknojiya attorney's fees as the prevailing party.

1 Khan also asked the trial court to render summary judgment that [*5] he was entitled to attorney's fees, but to reserve judgment on the amount of fees for a separate hearing.

2 Paragraph 13.03 of the lease states:

> Attorney's Fees. The prevailing party in any legal proceeding brought under or with a relation to this agreement shall be entitled to recover form the non-prevailing party, their reasonable attorney['s] fees, court costs and expenses, including but not limited to travel and witness costs.

**STANDARD OF REVIEW**

We review a trial court's ruling on summary judgment de novo. *Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005)*. A moving party is entitled to summary judgment if (1) there are no genuine issues of material fact and (2) the movant is entitled to judgment as a matter of law. *Tex. R. Civ. P. 166a(c)*. A party who moves for traditional summary judgment on another party's claim is entitled to summary judgment when he negates at least one essential element of that claim or conclusively establishes each element of an affirmative defense. *Science Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997)*. When reviewing the trial court's summary judgment ruling, we take as true all evidence favorable to the nonmovant, and we indulge [*6] every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co., 164 S.W.3d at 661*.

In part, Khan's arguments on appeal raise matters of contract construction. In construing a written agreement, we must ascertain and give effect to the parties' intentions as expressed in the agreement. *Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 311-12 (Tex. 2005)* (per curiam). We consider the agreement as a whole and attempt to harmonize and give effect to all provisions of the contract. *Id*. If the contract language can be given a certain or definite legal meaning, then the language is not ambiguous, and this Court will construe the contract as a matter of law. *SAS Inst., Inc. v. Breitenfeld, 167 S.W.3d 840, 841 (Tex. 2005)* (quoting *Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983))*.

**DISCUSSION**

Meknojiya moved for traditional summary judgment on the sole ground that the lease's holdover provision, calling for double rent, is an unenforceable liquidated-damages provision, i.e. a penalty. This assertion by Meknojiya is an affirmative defense that he had the burden of pleading and proving. *See Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex. 1991)*. As a result, [*7] to be entitled to summary judgment, Meknojiya had to conclusively establish every element of this defense. *See Ryland Grp., Inc. v. Hood, 924 S.W.2d 120, 121 (Tex. 1996)* (per curiam).

"The universal rule for measuring damages for the breach of a contract is just compensation for the loss or

damage actually sustained." *Phillips, 820 S.W.2d at 788*. Accordingly, a liquidated-damages provision is not enforceable if, in effect, it is a penalty. *See id*. ("Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide."). A liquidated-damages provision is enforceable only if a court finds that (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation. *Id*. Whether a liquidated-damages provision is an unenforceable penalty is a question of law for the court, although sometimes factual issues must be resolved before the court can decide the legal question. *Id*.

In his first and second issues on appeal, Khan argues that the trial court erred in granting Meknojiya's summary-judgment motion because [*8] Meknojiya failed to conclusively establish the essential elements of his affirmative defense of penalty. Specifically, Khan argues that, as a matter of law, paragraph 2.07 is not an unenforceable penalty provision because it is not a liquidated-damages provision at all. Instead, according to Khan, paragraph 2.07 simply sets forth the parties' agreed rental rate for any holdover period. Based on the unambiguous language of the lease, we agree.

Whether a contract term is a liquidated-damages provision is a question of law for the court. *Valence Operating Co., 164 S.W.3d. at 664*. "The term 'liquidated damages' ordinarily refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach." *Flores v. Millennium Interests, Ltd., 185 S.W.3d 427, 431 (Tex. 2005)*. Here, paragraph 2.07 sets an agreed-upon rental rate for situations in which the tenant has failed to surrender the leased premises upon expiration of the lease term or earlier termination by one of the parties. The provision itself describes the amount due during the holdover period as "base rental for the period of such holdover." Further, paragraph 2.07 states that payment [*9] of such rental amounts do not waive the landlord's right to recover "damages as permitted by law." In other words, based on the plain language of the lease, there is no indication that the parties intended the amounts owed under paragraph 2.07 as a means of forecasting damages in the event of a breach. And, while rent under paragraph 2.07 may, in certain circumstances, form the basis of measuring damages, it does not independently set a damages amount or attempt to calculate damages. Simply put, any amount owed under paragraph 2.07 does not equate to a stipulated measure of damages; rather, it is an agreed-upon rental amount that is due under particular circumstances.

Our conclusion that paragraph 2.07 of the lease is not a liquidated-damages provision, and therefore is not a penalty, is consistent with that of our sister court of appeals in Dallas in analyzing whether a similar clause operated as a penalty provision. *See Meridien Hotels, Inc. v. LHO Fin. P'ship I, L.P., 255 S.W.3d 807 (Tex. App.--Dallas 2008, no pet.)*. In *Meridien Hotels*, the landlord leased hotel space to the tenant under a lease that required the tenant to pay 1.5 times the base rental amount if the tenant remained [*10] in the space upon termination of the lease by one of the parties or the lease term's expiration.[3] *Id. at 822*. The landlord sent the tenant a notice of termination of the lease, but the tenant remained in the hotel space anyway. *Id. at 814*. The landlord eventually sued the tenant, seeking multiple types and amounts of damages, including $2,130,136 in holdover rent, plus prejudgment interest, all of which the trial court awarded. *Id*.

3 Specifically, the lease at issue in *Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.*, contained the following provision:

> Any holding over by Tenant after the expiration or sooner termination of this Agreement shall be treated as a daily tenancy at sufferance at a rate equal to one and one-half (1.5) times the Rent and other charges herein provided (prorated on a daily basis).

*255 S.W.3d 807, 822 (Tex. App.--Dallas 2008, no pet.)*

The tenant appealed, claiming that the holdover rent provision was an unlawful penalty and that, as a result, the trial court erred in awarding pre-judgment interest on that amount. *Id. at 822*. Concluding that the holdover rental rate did not constitute a penalty, the court of appeals concluded that the provision "does not [*11] punish appellants; it instead requires that if appellants make the decision to hold over beyond the term of the lease, they must pay a higher rate for doing so. Appellants were on notice that [the landlord] considered the lease terminated, yet they chose to stay, having agreed in the lease to pay 1.5 times the usual rent for doing so." *Id*.

Likewise, in this case, paragraph 2.07 of the parties' lease agreement sets out in advance the rent to be paid should the tenant choose to remain on the premises after one of the parties terminates the lease or the lease expires by its own terms, creating a tenancy at sufferance. Upon expiration or termination of the lease, the tenant must decide whether to (1) leave the leased premises (assuming he is not forcibly removed) or (2) hold over under the lease as a tenant at sufferance and pay additional rent at the agreed holdover rate. Such additional rent is not a

penalty; in fact, it does not represent liquidated damages at all. Rather, the additional rent is the agreed-to, bargained-for amount of rent due and owing in the event of a holdover.[4]

4 Meknojiya relies on *Phillips v. Phillips, 820 S.W.2d 785 (Tex. 1991)*, for the proposition that a contractual [*12] provision in which one party agrees to pay the other some multiple of damages is an unenforceable penalty. *Phillips* is a classic illustration of a liquidated-damages provision that constitutes an unlawful penalty. In the midst of divorce proceedings, a husband and wife agreed to create a limited partnership rather than divide their substantial assets. *Id. at 786-87*. The agreement contained the following provision: "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breaches of trust." *Id. at 787*. In other words, once actual damages were established for breach of the parties' contract, they would be multiplied by ten to reach the damages award. *Id. at 789*. The supreme court held that this provision was an unenforceable penalty provision, rather than an enforceable liquidated damages provision. *Id*.

Meknojiya's reliance on *Phillips* in this case is misplaced. First, unlike paragraph 2.07, the provision at issue in *Phillips* was undisputedly a liquidated-damages provision. As previously discussed, paragraph 2.07 is not a liquidated-damages provision at all, but instead is a rental [*13] amount that is triggered if and when the lease expires or is terminated. Second, the liquidated-damages provision at issue in *Phillips* was an unenforceable penalty on its face because the amount awarded by the provision was computed by multiplying actual damages (once established). *See id. at 789*. Here, paragraph 2.07 does not require a separate determination of damages or the application of any multiplier to that amount. Thus, even if we were to conclude that paragraph 2.07 is a liquidated-damages provision, unlike the court in *Phillips* we could not conclude that it constitutes a penalty on its face.

Because paragraph 2.07 of the parties' lease agreement is not a liquidated-damages provision, it cannot be an unenforceable penalty, as a matter of law. We therefore conclude that the trial court erred in granting summary judgment in favor of Meknojiya on this ground. In addition, because Meknojiya should not have prevailed on summary judgment, it follows that he was not entitled to attorney's fees. We sustain appellant's first and second issues on appeal.[5]

5 In his third issue on appeal, Khan argues that, even if the double-rent rate set forth in paragraph 2.07 represents liquidated damages, [*14] Meknojiya failed to satisfy his burden to establish that it is an unenforceable penalty. Having sustained Khan's first and second issues on appeal, we do not address this issue. *See Tex. R. App. P. 47.1*.

**CONCLUSION**

Because we conclude that the trial court erred in granting summary judgment, we reverse the trial court's judgment and award of attorney's fees in favor of Meknojiya. We remand the case to the trial court for further proceedings consistent with this opinion.

Scott K. Field, Justice

Before Chief Justice Jones, Justices Goodwin and Field

Reversed and Remanded

Filed: June 28, 2013



**LAKE RIVER CORPORATION, Plaintiff-Appellee-Cross-Appellant, v. CARBORUNDUM COMPANY, Defendant-Appellant-Cross-Appellee**

**Nos. 84-1623, 84-1688**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

***769 F.2d 1284*; *1985 U.S. App. LEXIS 21908***

**April 22, 1985, Argued**
**August 9, 1985, Decided**

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Northern District of Illinois, Eastern Division, No. 82 C 6292-Thomas R. McMillen, Judge.

**DISPOSITION:** AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

**COUNSEL:** Michael R. Turoff, Arnstein, Gluck, Lehr, Barron & Milligan, Chicago, Illinois, for Plaintiff.

Glen H. Kanwit, Hopkins & Sutter, Chicago, Illinois, for Defendant.

**JUDGES:** Eschbach and Posner, Circuit Judges, and Gibson, Senior Circuit Judge. *

> * Hon. Floyd R. Gibson of the Eighth Circuit, sitting by designation.

**OPINION BY:** POSNER

**OPINION**

[*1286] POSNER, Circuit Judge.

This diversity suit between Lake River Corporation and Carborundum Company requires us to consider questions of Illinois commercial law, and in particular to explore the fuzzy line between penalty clauses and liquidated-damages clauses.

Carborundum manufactures "Ferro Carbo," an abrasive powder used in making steel. To serve its midwestern customers better, Carborundum made a contract with Lake River by which the latter agreed to provide distribution services in its warehouse in Illinois. Lake River would receive Ferro Carbo in bulk from Carborundum, "bag" it, and ship the bagged product to Carborundum's [**2] customers. The Ferro Carbo would remain Carborundum's property until delivered to the customers.

Carborundum insisted that Lake River install a new bagging system to handle the contract. In order to be sure of being able to recover the cost of the new system ($89,000) and make a profit of 20 percent of the contract price, Lake River insisted on the following minimum-quantity guarantee:

> In consideration of the special equipment [i.e., the new bagging system] to be acquired and furnished by LAKE-RIVER for handling the product, CARBORUNDUM shall, during the initial three-year term of this Agreement, ship to LAKE-RIVER for bagging a minimum quantity of [22,500 tons]. If, at the end of the three-year term, this minimum quantity shall not have been shipped, LAKE-RIVER shall invoice CARBORUNDUM at the then prevailing rates for the difference between the quantity bagged and the minimum guaranteed.

If Carborundum had shipped the full minimum quantity that it guaranteed, it would have owed Lake River roughly $533,000 under the contract.

After the contract was signed in 1979, the demand for domestic steel, and with it the demand for Ferro Carbo, plummeted, and Carborundum [**3] failed to ship the guaranteed amount. When the contract expired late in 1982, Carborundum had shipped only 12,000 of the

22,500 tons it had guaranteed. Lake River had bagged the 12,000 tons and had billed Carborundum for this bagging, and Carborundum had paid, but by virtue of the formula in the minimum-guarantee clause Carborundum still owed Lake River $241,000 -- the contract price of $533,000 if the full amount of Ferro Carbo had been shipped, minus what Carborundum had paid for the bagging of the quantity it had shipped.

When Lake River demanded payment of this amount, Carborundum refused, on the ground that the formula imposed a penalty. At the time, Lake River had in its warehouse 500 tons of bagged Ferro Carbo, having a market value of $269,000, which it refused to release unless Carborundum paid the $241,000 due under the formula. Lake River did offer to sell the bagged product and place the proceeds in escrow until its dispute with Carborundum over the enforceability of the formula was resolved, but Carborundum rejected the offer and trucked in bagged Ferro Carbo from the East to serve its customers in Illinois, at an additional cost of $31,000.

Lake River brought this [**4] suit for $241,000, which it claims as liquidated damages. Carborundum counterclaimed for the value of the bagged Ferro Carbo when Lake River impounded it and the additional cost of serving the customers affected by the impounding. The theory of the counterclaim is that the impounding was a conversion, and not as Lake River contends the assertion of a lien. The district judge, after a [*1287] bench trial, gave judgment for both parties. Carborundum ended up roughly $42,000 to the good: $269,000 + $31,000-$24100-$17,000, the last figure representing prejudgment interest on Lake River's damages. (We have rounded off all dollar figures to the nearest thousand.) Both parties have appealed.

The only issue that is not one of damages is whether Lake River had a valid lien on the bagged Ferro Carbo that it refused to ship to Carborundum's customers -- that, indeed, it holds in its warehouse to this day. Although Ferro Carbo does not deteriorate with age, the domestic steel industry remains in the doldrums and the product is worth less than it was in 1982 when Lake River first withheld it. If Lake River did not have a valid lien on the product, then it converted it, and must pay Carborundum [**5] the $269,000 that the Ferro Carbo was worth back then.

It might seem that if the minimum-guarantee clause was a penalty clause and hence unenforceable, the lien could not be valid, and therefore that we should discuss the penalty issue first. But this is not correct. If the contractual specification of damages is invalid, Lake River still is entitled to any actual damages caused by Carborundum's breach of contract in failing to deliver the minimum amount of Ferro Carbo called for by the contract. The issue is whether an entitlement to damages, large or small, entitles the victim of the breach to assert a lien on goods that are in its possession though they belong to the other party.

Lake River has not been very specific about the type of lien it asserts. We think it best described as a form of artisan's lien, the "lien of the bailee, who does work upon or adds materials to chattels . . . ." *Restatement of Security § 61, comment on* clause (a), at p. 165 (1941). Lake River was the bailee of the Ferro Carbo that Carborundum delivered to it, and it did work on the Ferro Carbo -- bagging it, and also storing it (storage is a service, too). If Carborundum had refused to pay for the [**6] services that Lake River performed on the Ferro Carbo delivered to it, then Lake River would have had a lien on the Ferro Carbo in its possession, to coerce payment. Cf. *National Bank of Joliet v. Bergeron Cadillac, Inc., 66 Ill. 2d 140, 143-44, 361 N.E.2d 1116, 1117, 5 Ill. Dec. 588 (1977)*. But in fact, when Lake River impounded the bagged Ferro Carbo, Carborundum had paid in full for all bagging and storage services that Lake River had performed on Ferro Carbo shipped to it by Carborundum. The purpose of impounding was to put pressure on Carborundum to pay for services not performed, Carborundum having failed to ship the Ferro Carbo on which those services would have been performed.

Unlike a contractor who, having done the work contracted for without having been paid, may find himself in a box, owing his employees or suppliers money he does not have -- money he was counting on from his customer -- Lake River was the victim of a breach of a portion of the contract that remained entirely unexecuted on either side. Carborundum had not shipped the other 10,500 tons, as promised; but on the other hand Lake River had not had to bag those 10,500 tons, as it had promised. [**7] It is not as if Lake River had bagged those tons, incurring heavy costs that it expected to recoup from Carborundum, and then Carborundum had said, "Sorry, we won't pay you; go ahead and sue us."

A lien is strong medicine; it clogs up markets, as the facts of this case show. Its purpose is to provide an effective self-help remedy for one who has done work in expectation of payment and then is not paid. The vulnerable position of such a person gives rise to "the artisan's privilege of holding the balance for *work done in the past." United States v. Toys of the World Club, Inc., 288 F.2d 89, 94 (2d Cir. 1961)* (Friendly, J.) (emphasis added). A lien is thus a device for preventing unjust enrichment -- not for forcing the other party to accede to your view of a contract dispute. "The right to retain possession of the property to enforce a possessory lien continues until such time as the charges [*1288] for such materials, labor and services are paid." *Bull v. Mitchell, 114 Ill. App. 3d 177, 181, 448 N.E.2d 1016, 1019, 70 Ill. Dec. 138 (1983)*; cf. Ill. [**8]

Rev. Stat. ch. 82, § 40. Since here the charges were paid before the lien was asserted, the lien was no good.

Lake River tries to compare its position to that of a conventional lien creditor by pointing out that it made itself particularly vulnerable to a breach of contract by buying specialized equipment at Carborundum's insistence, to the tune of $89,000, before performance under the contract began. It says it insisted on the minimum guarantee in order to be sure of being able to amortize this equipment over a large enough output of bagging services to make the investment worthwhile. But the equipment was not completely useless for other contracts -- Lake River having in fact used it for another contract; it was not the major cost of fulfilling the contract; and Lake River received almost $300,000 during the term of the contract, thus enabling it to amortize much of the cost of the special equipment. Although Lake River may have lost money on the contract (but as yet there is no proof it did), it was not in the necessitous position of a contractor who completes his performance without receiving a dime and then is told by his customer to sue for the price. The recognition of a [**9] lien in such a case is based on policies akin to those behind the rule that a contract modification procured by duress will not be enforced. See, e.g., *Selmer Co. v. Blakeslee-Midwest Co., 704 F.2d 924 (7th Cir. 1983)*. When as a practical matter the legal remedy may be inadequate because it operates too slowly, self-help is allowed. But we can find no case recognizing a lien on facts like these, no ground for thinking that the Illinois Supreme Court would be the first court to recognize such a lien if this case were presented to it, and no reason to believe that the recognition of such a lien would be a good thing. It would impede the marketability of goods without responding to any urgent need of creditors.

*Conrow v. Little, 115 N.Y. 387, 393, 22 N.E. 346, 347 (1889)*, on which Lake River relies heavily because the lien allowed in that case extended to "money expended in the preparation of instrumentalities," is not in point. The plaintiffs, dealers in paper, [**10] had made extensive deliveries to the defendants for which they had received no payment. See *id. at 390-91, 22 N.E. at 346*. If Lake River had bagged several thousand tons of Ferro Carbo without being paid anything, it would have had a lien on the Ferro Carbo; and maybe -- if *Conrow* is good law in Illinois, a question we need not try to answer -- the lien would have included not only the contract price for the Ferro Carbo that Lake River had bagged but also the unreimbursed, unsalvageable cost of the special bagging system that Lake River had installed. But that is not this case. Carborundum was fully paid up and Lake River has made no effort to show how much if any money it stood to lose because the bagging system was not fully amortized. The only purpose of the lien was to collect damages which would have been unrelated to -- and certainly exceeded -- the investment in the bagging system.

It is no answer that the bagging system should be presumed to have been amortized equally over the life of the contract, and therefore to have been only half amortized when Carborundum broke the contract. [**11] Amortization is an accounting device; it need not reflect cash flows. There is no evidence that when the contract was broken, Lake River was out of pocket a cent in respect of the bagging system, especially when we consider that the bagging system was still usable, and was used to fulfill another contract.

The hardest issue in the case is whether the formula in the minimum-guarantee clause imposes a penalty for breach of contract or is merely an effort to liquidate damages. Deep as the hostility to penalty clauses runs in the common law, see Loyd, *Penalties and Forfeitures*, 29 Harv. L. Rev. 117 (1915), we still might be inclined to question, if we thought ourselves free to do so, whether a modern court should refuse to enforce a penalty clause where the signator [*1289] is a substantial corporation, well able to avoid improvident commitments. Penalty clauses provide an earnest of performance. The clause here enhanced Carborundum's credibility in promising to ship the minimum amount guaranteed by showing that it was willing to pay the full contract price even if it failed [**12] to ship anything. On the other side it can be pointed out that by raising the cost of a breach of contract to the contract breaker, a penalty clause increases the risk to his other creditors; increases (what is the same thing and more, because bankruptcy imposes "deadweight" social costs) the risk of bankruptcy; and could amplify the business cycle by increasing the number of bankruptcies in bad times, which is when contracts are most likely to be broken. But since little effort is made to prevent businessmen from assuming risks, these reasons are no better than makeweights.

A better argument is that a penalty clause may discourage efficient as well as inefficient breaches of contract. Suppose a breach would cost the promisee $12,000 in actual damages but would yield the promisor $20,000 in additional profits. Then there would be a net social gain from breach. After being fully compensated for his loss the promisor would be no worse off than if the contract had been performed, while the promisor would be better off by $8,000. But now suppose the contract contains a penalty clause under which [**13] the promisor if he breaks his promise must pay the promisee $25,000. The promisor will be discouraged from breaking the contract, since $25,000, the penalty, is greater than $20,000, the profits of the breach; and a transaction that would have increased value will be forgone.

On this view, since compensatory damages should be sufficient to deter inefficient breaches (that is, breaches that cost the victim more than the gain to the contract breaker), penal damages could have no effect other than to deter some efficient breaches. But this overlooks the earlier point that the willingness to agree to a penalty clause is a way of making the promisor and his promise credible and may therefore be essential to inducing some value-maximizing contracts to be made. It also overlooks the more important point that the parties (always assuming they are fully competent) will, in deciding whether to include a penalty clause in their contract, weigh the gains against the costs -- costs that include the possibility of discouraging an efficient breach somewhere down the road -- and will include the clause only [**14] if the benefits exceed those costs as well as all other costs.

On this view the refusal to enforce penalty clauses is (at best) paternalistic -- and it seems odd that courts should display parental solicitude for large corporations. But however this may be, we must be on guard to avoid importing our own ideas of sound public policy into an area where our proper judicial role is more than usually deferential. The responsibility for making innovations in the common law of Illinois rests with the courts of Illinois, and not with the federal courts in Illinois. And like every other state, Illinois, untroubled by academic skepticism of the wisdom of refusing to enforce penalty clauses against sophisticated promisors, see, e.g., Goetz & Scott, *Liquidated Damages, Penalties and the Just Compensation Principle*, 77 Colum. L. Rev. 554 (1977), continues steadfastly to insist on the distinction between penalties and liquidated damages. See, e.g., *Bauer v. Sawyer, 8 Ill. 2d 351, 359-61, 134 N.E.2d 329, 333-34 (1956)*; *Stride v. 120 West Madison Bldg. Corp.*, 132 Ill. App. 3d 601, 605-06, *477 N.E.2d 1318, 1321, 87 Ill. Dec. 790 (1985)*; [**15] *Builder's Concrete Co. v. Fred Faubel & Sons, Inc., 58 Ill. App. 3d 100, 107, 373 N.E.2d 863, 869, 15 Ill. Dec. 517 (1978)*. To be valid under Illinois law a liquidation of damages must be a reasonable estimate at the time of contracting of the likely damages from breach, and the need for estimation at that time must be shown by reference to the likely difficulty of measuring the actual damages from a breach of contract after the breach occurs. If damages would be easy to determine then, or if the estimate greatly exceeds a reasonable upper estimate [*1290] of what the damages are likely to be, it is a penalty. See, e.g., *M.I.G. Investments, Inc. v. Marsala, 92 Ill. App. 3d 400, 405-06, 414 N.E.2d 1381, 1386, 47 Ill. Dec. 265 (1981)*.

The distinction between a penalty and liquidated damages is not an easy one to draw in practice but we are required to draw it and can give only limited weight to the district court's determination. Whether a provision for damages is a penalty clause or a liquidated-damages clause is a question of law rather than fact, [**16] *Weiss v. United States Fidelity & Guaranty Co., 300 Ill. 11, 16, 132 N.E. 749, 751 (1921)*; *M.I.G. Investments, Inc. v. Marsala, supra, 92 Ill. App. 3d 400, 406, 414 N.E.2d 1381, 1386*, and unlike some courts of appeals we do not treat a determination by a federal district judge of an issue of state law as if it were a finding of fact, and reverse only if persuaded that clear error has occurred, though we give his determination respectful consideration. See, e.g., *Morin Bldg. Products Co. v. Baystone Construction, Inc., 717 F.2d 413, 416-17 (7th Cir. 1983)*; *In re Air Crash Disaster Near Chicago, 701 F.2d 1189, 1195 (7th Cir. 1983)*; 19 Wright, Miller & Cooper, Federal Practice and Procedure § 4507, at pp. 106-110 (1982).

Mindful that Illinois courts resolve doubtful cases in favor of classification as a penalty, see, e.g., *Stride v. 120 West Madison Bldg. Corp., supra*, 132 Ill. App. 3d at 605, 477 N.E.2d at 1321; *Pick Fisheries, Inc. v. Burns Electronic Security Services, Inc., 35 Ill. App. 3d 467, 472, 342 N.E.2d 105, 108 (1976)*, [**17] we conclude that the damage formula in this case is a penalty and not a liquidation of damages, because it is designed always to assure Lake River more than its actual damages. The formula -- full contract price minus the amount already invoiced to Carborundum -- is invariant to the gravity of the breach. When a contract specifies a single sum in damages for any and all breaches even though it is apparent that all are not of the same gravity, the specification is not a reasonable effort to estimate damages; and when in addition the fixed sum greatly exceeds the actual damages likely to be inflicted by a minor breach, its character as a penalty becomes unmistakable. See *M.I.G. Investments, Inc. v. Marsala, supra, 92 Ill. App. 3d at 405-06, 414 N.E.2d at 1386*; cf. *Arduini v. Board of Educ., 93 Ill. App. 3d 925, 931-33, 418 N.E.2d 104, 109-10, 49 Ill. Dec. 460 (1981)*, rev'd on other grounds, *92 Ill. 2d 197, 441 N.E.2d 73, 65 Ill. Dec. 281 (1982)*; 5 Corbin on Contracts § 1066 (1964). This case is within the gravitational field of these principles [**18] even though the minimum-guarantee clause does not fix a single sum as damages.

Suppose to begin with that the breach occurs the day after Lake River buys its new bagging system for $89,000 and before Carborundum ships any Ferro Carbo. Carborundum would owe Lake River $533,000. Since Lake River would have incurred at that point a total cost of only $89,000, its net gain from the breach would be $444,000. This is more than four times the profit of $107,000 (20 percent of the contract price of $533,000) that Lake River expected to make from the contract if it had been performed: a huge windfall.

Next suppose (as actually happened here) that breach occurs when 55 percent of the Ferro Carbo has been shipped. Lake River would already have received $293,000 from Carborundum. To see what its costs then

would have been (as estimated at the time of contracting), first subtract Lake River's anticipated profit on the contract of $107,000 from the total contract price of $533,000. The difference -- Lake River's total cost of performance -- is $426,000. Of this, $89,000 is the cost of the new bagging system, a fixed cost. The rest ($426,000-$89,000=$337,000) presumably consists of variable costs [**19] that are roughly proportional to the amount of Ferro Carbo bagged; there is no indication of any other fixed costs. Assume, therefore, that if Lake River bagged 55 percent of the contractually agreed quantity, it incurred in doing so 55 percent of its variable costs, or $185,000. [*1291] When this is added to the cost of the new bagging system, assumed for the moment to be worthless except in connection with the contract, the total cost of performance to Lake River is $274,000. Hence a breach that occurred after 55 percent of contractual performance was complete would be expected to yield Lake River a modest profit of $19,000 ($293,000-$274,000). But now add the "liquidated damages" of $241,000 that Lake River claims, and the result is a total gain from the breach of $260,000, which is almost two and a half times the profit that Lake River expected to gain if there was no breach. And this ignores any use value or salvage value of the new bagging system, which is the property of Lake River -- though admittedly it also ignores the time value of money; Lake River paid $89,000 for that system before receiving any revenue from the contract.

To complete the picture, assume that the [**20] breach had not occurred till performance was 90 percent complete. Then the "liquidated damages" clause would not be so one-sided, but it would be one-sided. Carborundum would have paid $480,000 for bagging. Against this, Lake River would have incurred its fixed cost of $89,000 plus 90 percent of its variable costs of $337,000, or $303,000. Its total costs would thus be $392,000, and its net profit $88,000. But on top of this it would be entitled to "liquidated damages" of $53,000, for a total profit of $141,000 -- more than 30 percent more than its expected profit of $107,000 if there was no breach.

The reason for these results is that most of the costs to Lake River of performing the contract are saved if the contract is broken, and this saving is not reflected in the damage formula. As a result, at whatever point in the life of the contract a breach occurs, the damage formula gives Lake River more than its lost profits from the breach -- dramatically more if the breach occurs at the beginning of the contract; tapering off at the end, it is true. Still, over the interval between the beginning of Lake River's performance and nearly the end, the clause could be expected to generate [**21] profits ranging from 400 percent of the expected contract profits to 130 percent of those profits. And this is on the assumption that the bagging system has no value apart from the contract. If it were worth only $20,000 to Lake River, the range would be 434 percent to 150 percent.

Lake River argues that it would never get as much as the formula suggests, because it would be required to mitigate its damages. This is a dubious argument on several grounds. First, mitigation of damages is a doctrine of the law of court-assessed damages, while the point of a liquidated-damages clause is to substitute party assessment; and that point is blunted, and the certainty that liquidated-damages clauses are designed to give the process of assessing damages impaired, if a defendant can force the plaintiff to take less than the damages specified in the clause, on the ground that the plaintiff could have avoided some of them. It would seem therefore that the clause in this case should be read to eliminate any duty of mitigation, that what Lake River is doing is attempting to rewrite the clause to make [**22] it more reasonable, and that since actually the clause is designed to give Lake River the full damages it would incur from breach (and more) even if it made no effort to find a substitute use for the equipment that it bought to perform the contract, this is just one more piece of evidence that it is a penalty clause rather than a liquidated-damages clause. See *Northwest Collectors, Inc. v. Enders, 74 Wash. 2d 585, 594, 446 P.2d 200, 206 (1968)*.

But in any event mitigation would not mitigate the penal character of this clause. If Carborundum did not ship the guaranteed minimum quantity, the reason was likely to be -- the reason was -- that the steel industry had fallen on hard times and the demand for Ferro Carbo was therefore down. In these circumstances Lake River would have little prospect of finding a substitute contract that would yield it significant profits to set off against the full contract price, which is the method by which it proposes to take account of mitigation. At argument Lake River suggested that it [*1292] might at least have been able to sell the new bagging equipment to someone for something, and the figure $40,000 was proposed. If the [**23] breach occurred on the first day when performance under the contract was due and Lake River promptly sold the bagging equipment for $40,000, its liquidated damages would fall to $493,000. But by the same token its costs would fall to $49,000. Its profit would still be $444,000, which as we said was more than 400 percent of its expected profit on the contract. The penal component would be unaffected.

With the penalty clause in this case compare the liquidated-damages clause in *Arduini v. Board of Education, supra*, which is representative of such clauses upheld in Illinois. The plaintiff was a public school teacher whose contract provided that if he resigned before the end of the school year he would be docked 4 percent of his salary. This was a modest fraction of the contract price. And the

cost to the school of an untimely resignation would be difficult to measure. Since that cost would be greater the more senior and experienced the teacher was, the fact that the liquidated damages would be greater the higher the teacher's salary did not make the clause arbitrary. Even the fact that the liquidated damages were the same whether the teacher resigned at the beginning, [**24] the middle, or the end of the school year was not arbitrary, for it was unclear how the amount of actual damages would vary with the time of resignation. Although one might think that the earlier the teacher resigned the greater the damage to the school would be, the school might find it easier to hire a replacement for the whole year or a great part of it than to bring in a replacement at the last minute to grade the exams left behind by the resigning teacher. Here, in contrast, it is apparent from the face of the contract that the damages provided for by the "liquidated damages" clause are grossly disproportionate to any probable loss and penalize some breaches much more heavily than others regardless of relative cost.

We do not mean by this discussion to cast a cloud of doubt over the "take or pay" clauses that are a common feature of contracts between natural gas pipeline companies and their customers. Such clauses require the customer, in consideration of the pipeline's extending its line to his premises, to take a certain amount of gas at a specified price -- and if he fails to take [**25] it to pay the full price anyway. The resemblance to the minimum-guarantee clause in the present case is obvious, but perhaps quite superficial. Neither party has mentioned take-or-pay clauses, and we can find no case where such a clause was even challenged as a penalty clause -- though in one case it was argued that such a clause made the damages unreasonably *low*. See *National Fuel Gas Distribution Corp. v. Pennsylvania Public Utility Comm'n, 76 Pa. Commw. 102, 126-27 n.8, 464 A.2d 546, 558 n.8 (1983)*. If, as appears not to be the case here but would often be the case in supplying natural gas, a supplier's fixed costs were a very large fraction of his total costs, a take-or-pay clause might well be a reasonable liquidation of damages. In the limit, if *all* the supplier's costs were incurred before he began supplying the customer, the contract revenues would be an excellent measure of the damages from breach. But in this case, the supplier (Lake River, viewed as a supplier of bagging services to Carborundum) incurred only a fraction of its costs before performance began, and the interruption of performance generated a considerable cost saving that is not reflected [**26] in the damage formula.

The fact that the damage formula is invalid does not deprive Lake River of a remedy. The parties did not contract explicitly with reference to the measure of damages if the agreed-on damage formula was invalidated, but all this means is that the victim of the breach is entitled to his common law damages. See, e.g., *Restatement, Second, Contracts § 356, comment a* (1981). In this case that would be the unpaid contract price of $241,000 minus the costs that Lake River saved by not having to complete the contract (the variable costs on the other 45 percent of the Ferro Carbo [*1293] that it never had to bag). The case must be remanded to the district judge to fix these damages.

Two damage issues remain. The first concerns Carborundum's expenses of delivering bagged Ferro Carbo to its customers to replace that impounded by Lake River. The district judge gave Carborundum the full market value of the bagged Ferro Carbo. Lake River argues that it should not have to pay for Carborundum's expense of selling additional Ferro Carbo -- additional in the sense that Carborundum is being given credit for the full retail value of the product that Lake River withheld. [**27] To explain, suppose that Carborundum had an order for $1,000 worth of bagged Ferro Carbo, which Lake River was supposed to deliver; and because it refused, Carborundum incurred a transportation cost of $100 to make a substitute shipment of bagged Ferro Carbo to the customer. Carborundum would still get $1,000 from the customer, and if that price covered the transportation cost it would still make a profit. In what sense, therefore, is that cost a separate item of damage, of loss? On all Ferro Carbo (related to this case) sold by Carborundum in the Midwest, Carborundum received the full market price, either from its customers in the case of Ferro Carbo actually delivered to them, or from Lake River in the case of the Ferro Carbo that Lake River refused to deliver. Having received a price designed to cover all expenses of sale, a seller cannot also get an additional damage award for any of those expenses.

If, however, the additional Ferro Carbo that Carborundum delivered to its midwestern customers in substitution for Ferro Carbo previously delivered to, and impounded by, Lake River would have been sold in the East at the same price but lower cost, Carborundum would have had an additional [**28] loss, in the form of reduced profits, for which it could recover additional damages. But it made no effort to prove such a loss. Maybe it had no unsatisfied eastern customers, and expanded rather than shifted output to fulfill its midwestern customers' demand. The damages on the counterclaim must be refigured also.

Finally, Lake River argues that Carborundum failed to mitigate its damages by accepting Lake River's offer to deliver the bagged product and place the proceeds in escrow. But a converter is not entitled to retain the proceeds of the conversion even temporarily. Lake River had an opportunity to limit its exposure by selling the bagged product on Carborundum's account and deducting what it claimed was due it on its "lien." Its failure to follow this

course reinforces our conclusion that the assertion of the lien was a naked attempt to hold Carborundum hostage to Lake River's view -- an erroneous view, as it has turned out -- of the enforceability of the damage formula in the contract.

The judgment of the district court is affirmed in part and reversed in part, and the case is returned to that court to redetermine both parties' damages in accordance with the principles [**29] in this opinion. The parties may present additional evidence on remand, and shall bear their own costs in this court. Circuit Rule 18 shall not apply on remand.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.



**LHR Enterprises, Inc.; Task Services, Inc.; Business Staffing, Inc.; Harry Sewill; Rick Chapman; and Transglobal Mortgage, Inc., Appellants v. Mike Geeslin, in His Official Capacity as Commissioner of Insurance for the State of Texas; Texas Department of Insurance; and State Office of Administrative Hearings for the State of Texas, Appellees**

**NO. 03-05-00176-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***2007 Tex. App. LEXIS 8849***

**November 7, 2007, Filed**

**SUBSEQUENT HISTORY:** Petition for review denied by *LHR Enters. v. Geeslin, 2008 Tex. LEXIS 178 (Tex., Feb. 22, 2008)*

**PRIOR HISTORY:** [*1]
FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT. NO. GN402881, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING.

**DISPOSITION:** Dismissed on Appellees' Motion.

**COUNSEL:** For Appellant: Mr. Bogdan Rentea, Rentea & Associates, Austin, TX.

For Appellee: Mr. Kristofer S. Monson, Assistant Solicitor General, Austin, TX.

**JUDGES:** Before Justices Patterson, Puryear and Pemberton.

**OPINION BY:** David Puryear

**OPINION**

**MEMORANDUM OPINION**

The procedural history of this case is complicated by its relationship to another case before the Department of Insurance ("Department"). Although we will discuss the various proceedings in more detail later in the opinion, we will briefly summarize the proceedings here. The Commissioner of Insurance became concerned that LHR Enterprises, Inc.; Transglobal Mortgage, Inc.; Business Staffing, Inc.; Task Services, Inc.; Rick Chapman; and Harry Sewill (cumulatively "the appellants") were engaged in the unauthorized practice of insurance and referred the matter to the State Office of Administrative Hearings ("SOAH"). In response, the appellants filed a declaratory-judgment action in district court seeking declarations that the Commissioner did not have the authority to refer the matter for a hearing before SOAH. Shortly thereafter, the Commissioner and the Department filed a plea to the jurisdiction contending that the district court did not have jurisdiction [*2] over the case because the appellants had failed to show a valid waiver of sovereign immunity. The district court granted the plea, and the appellants appealed the judgment of the district court. We will dismiss this case for want of subject-matter jurisdiction.

**BACKGROUND**

**Proceedings Before SOAH**

The case presently before us is related to another case involving the appeal of an administrative order. Because it is helpful in explaining the outcome of this appeal, we will briefly review some of the facts of the related case.

In 2004, the staff of the Department of Insurance ("Staff") became concerned that several companies and individuals, including the appellants, were engaged in the unauthorized business of insurance. *See Tex. Ins. Code Ann. §§ 101.051* (specifying what constitutes business of insurance), *.102* (prohibiting unauthorized business of insurance) (West Supp. 2006). In particular, the Staff believed that the appellants and others were improperly engaged in the business of providing various companies'

employees with workers' compensation insurance coverage.

After formalizing their concerns, the Staff filed a report with the Commissioner that detailed the allegations against the [*3] appellants and others. The report also contained the Staff's recommendation that the Commissioner order that all the parties investigated (1) be held jointly and severally liable for any unpaid workers' compensation claims, (2) pay monetary penalties, and (3)cease practicing the business of insurance in Texas. *See id. §§ 84.041* (providing that if Staff determines that insurance violations have occurred, they have the authority to file report with Commissioner that specifies facts forming basis of their conclusion and also specifies any penalty that they feel should be imposed), *.021* (West Supp. 2006) (authorizing Commissioner to impose penalty on individual who violates insurance law, rule, or order).

In July 2004, the Commissioner referred the matter to SOAH for a contested-case hearing to determine whether the appellants and others had engaged in the unauthorized business of insurance and whether a cease-and-desist order prohibiting the parties from engaging in the allegedly improper actions should be issued. *See, e.g., id. §§ 31.021(a)* (requiring Commissioner to "administer and enforce" insurance code), *40.002* (requiring SOAH to conduct hearing when required under insurance code), [*4] *101.151* (West Supp. 2006) (authorizing Commissioner to set hearing to determine whether cease-and-desist order should be imposed if, among other things, Commissioner has reason to believe that individual has violated insurance provision or rule).

During the proceedings, the investigated parties, including the appellants, filed pleas to the jurisdiction and a motion for summary disposition. The administrative law judge overseeing the case denied the motions, and the investigated parties appealed the administrative law judge's ruling to the Commissioner. The Commissioner denied the appeal. Subsequently, a hearing was scheduled before SOAH.

**Declaratory-Judgment Action**

Soon after the Commissioner requested a hearing before SOAH, the appellants filed a petition for declaratory relief in the district court. *See Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011* (West 1997 & Supp. 2006) (Uniform Declaratory Judgments Act). The propriety of the district court's judgment is the subject of this appeal.

In their petition, the appellants sought, among other things, a declaration that the Commissioner did not have the authority to require a hearing before SOAH. Specifically, they sought a declaration [*5] that the Commissioner has no authority to require a hearing or impose administrative penalties on individuals that are neither licensed to engage in the business of insurance nor regulated by the insurance code. *See Tex. Ins. Code Ann. § 84.021* (West Supp. 2006) (authorizing Commissioner to impose administrative penalties on individuals who are "licensed or regulated" under insurance code or another Texas insurance law).

In addition, the appellants also sought a declaration that the Commissioner may not refer a matter to SOAH for a determination of whether a cease-and-desist order should be issued to stop an individual from engaging in certain activities when the statutory time for requesting a hearing has expired. *See id. §§ 101.151(a)* (authorizing Commissioner to set hearing concerning issuance of cease-and-desist order and specifying that Commissioner is required to provide notice of hearing), *.152* (providing that unless parties agree otherwise, hearing must be held "not earlier than the fifth day or later than the 30th day after" notice was given), *.153* (West Supp. 2006) (allowing Commissioner to issue cease-and-desist order after hearing has been held).

In response to the appellants' [*6] petition, the Commissioner and the Department filed a plea to the jurisdiction. In their plea, they argued that because this case is essentially a suit against state agencies, the appellants had the burden of proving a waiver of sovereign immunity. Further, the Commissioner and the Department contended that because the appellants failed to plead and prove a waiver, the district court did not have jurisdiction over the appellants' claims.

Ultimately, the district court granted the plea to the jurisdiction, and the appellants appeal the district court's judgment.

**DISCUSSION**

The appellants raise three issues on appeal. First, they argue that the district court erred when it granted the plea to the jurisdiction. Specifically, they contend that their suit does not implicate sovereign immunity because it seeks declaratory and injunctive relief against state officials acting beyond their statutory authority. *See Texas Natural Res. Comm'n v. IT-Davy, 74 S.W.3d 849, 855 (Tex. 2002)* (explaining that "[p]rivate parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority" but that "such suits are not 'suits against the State' . . . because suits [*7] to compel state officers to act within their official capacity do not attempt to subject the State to liability" and, therefore, "do not implicate the sovereign-immunity doctrine" (citation omitted)). Second, the appellants argue that the district court erred by failing to declare that the Commissioner does not have the authority to impose administrative penalties on individuals who are not li-

censed or regulated under the provisions of the insurance code. Finally, the appellants insist that the district court erred when it failed to declare that the Commissioner may not refer a matter to SOAH for a hearing if the referral is not made within the time allowed by statute.

After the appellants filed this appeal, the SOAH hearing for determining whether the appellants and the other investigated parties had engaged in the unauthorized practice of insurance was held. After the hearing concluded, the Commissioner issued a final order, which specified that none of the appellants had violated any insurance provision or regulation and that, accordingly, no sanction or penalty should be imposed upon them. Shortly thereafter, the Commissioner and the Department filed a motion to dismiss this appeal. [*8] [1] In their motion, the Commissioner and the Department argue that because a final order has been issued absolving the appellants of any wrongdoing, this Court no longer has subject-matter jurisdiction over the appellants' declaratory claims. Because our resolution of the motion to dismiss is dispositive of this appeal, we will now turn to the various arguments made by the parties regarding the motion to dismiss.

1 As part of their motion to dismiss, the Commissioner and the Department attached a copy of the final order.

The appellants seek relief under the Uniform Declaratory Judgment Act. *See Tex. Civ. Prac. & Rem. Code Ann. § 37.001-.011*. The Act allows an individual "whose rights, status, or other legal relations are affected by a statute" to "have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." *Id. § 37.004(a)* (West 1997). In this case, the appellants seek declarations concerning the authority of the Commissioner. This Court has previously recognized that individuals may request declaratory relief regarding whether state agencies or officers have acted beyond [*9] their statutory authorities. *See, e.g., Texas Dep't of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co., 212 S.W.3d 870, 874-75 (Tex. App.--Austin 2006, pet. denied)* (holding that claimant may seek declaration that agency's issuance of advisories was outside agency's statutory authority). However, while individuals may employ the Act to challenge actions as beyond an agency's or officer's authority, a court must still have subject-matter jurisdiction over the case before it may properly issue a declaration. Subject-matter jurisdiction may be considered for the first time on appeal, and appellate courts may raise that issue on their own accord. *See Aguilar v. Weber, 72 S.W.3d 729, 731 (Tex. App.--Waco 2002, no pet.)*. The Act does not expand the scope of a trial court's subject-matter jurisdiction but merely authorizes a court "to declare rights, status, and other legal relations" when subject-matter jurisdiction is already present. *See Tex. Civ. Prac. & Rem. Code Ann. § 37.003(a)* (West 1997) (court may act "within its jurisdiction"); *Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 444 (Tex. 1993)*. Although the Act does not expand the jurisdiction of a trial court, [*10] "[a] suit under the [Act] is not confined to cases in which the parties have a cause of action apart from the Act itself." *TexasDep'tof Pub. Safety v.Moore, 985 S.W.2d 149, 153 (Tex. App.--Austin 1998, no pet.)*.

In order for a court to have jurisdiction to consider a declaratory-judgment action, there must be a "justiciable controversy as to the rights and status of" the parties, and the requested declaration "must actually resolve the controversy." *Brooks v. Northglen Ass'n, 141 S.W.3d 158, 163-64 (Tex. 2004)*. "A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interests and not merely a theoretical dispute." *Moore, 985 S.W.2d at 153*; *see also City of Euless v. Dallas/Fort Worth Int'l Airport Bd., 936 S.W.2d 699, 703 (Tex. App.--Dallas 1996, writ denied)* (explaining that if there is no actual controversy between parties, declaratory judgment is improper). However, a person seeking declaratory relief need not have yet incurred an actual injury of the sort for which consequential relief might be granted. *See Bexar Metro. Water Dist. v. City of Bulverde, 156 S.W.3d 79, 88 (Tex. App.--Austin 2004, pet.denied)*. Instead, [*11] the Act is intended to provide a means to determine, before any wrong has actually occurred, the rights of parties when a controversy has arisen and is remedial in nature. *Id.*

The need for a justiciable controversy is related to the jurisdictional concepts of standing and ripeness and does not supersede these concepts. *See Texas Dep't of Ins v.Reconveyance Servs., Inc.,240 S.W.3d 418, 451, 2007 Tex. App. LEXIS 7262, at *38 (Tex. App.--Austin 2007, no pet. h.)*. Ripeness is a necessary component of subject-matter jurisdiction, *Atmos Energy Corp. v. Abbott, 127 S.W.3d 852, 857 (Tex.App.--Austin 2004, no pet.)*, and concerns when a claim may be made, *Patterson v. Planned Parenthood, 971 S.W.2d 439, 442 (Tex. 1998)*. The requirement that a claim be ripe for review is based on the prohibition against issuing advisory opinions. *Id.; see also Tex. Const. art. II, § 1* (separation of powers); *Northglen Ass'n, 141 S.W.3d at 164* (explaining that separation of powers provision bars issuance of advisory opinions). A claim is ripe if the facts involved demonstrate that "an injury has occurred or is likely to occur." *Patterson, 971 S.W.2d at 442*; *see also City of Waco v. Texas Natural Res. Comm'n, 83 S.W.3d 169, 175 (Tex. App.--Austin 2002, pet. denied)* [*12] ("In determining whether a cause is ripe for judicial consideration, we look to see if the facts have sufficiently developed to show that

an injury has occurred, or is likely to occur"). In other words, there must be a concrete injury for the claim to be ripe. *See Atmos Energy Corp., 127 S.W.3d at 858*. A claim is not ripe if it is based on hypothetical or contingent facts that may not occur as anticipated or may not occur at all. *See Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 852 (Tex. 2000)*.

In this case, there is no concrete dispute to resolve. The appellants pled the following, relevant jurisdictional facts as the basis for their suit:

> On June 24, 2004, pursuant to *section 84.041* of the insurance code, the Staff delivered to the Commissioner a report "in which it alleged that these Plaintiffs engaged in activities in the State of Texas in violation of the Texas Insurance Code, and recommended that administrative penalties be assessed against them in the aggregate amount of $ 2,000,000."
>
> "[T]he Staff, on July 16, 2004, filed with SOAH and served on these Plaintiffs a Notice of Hearing, thereby initiating a contested case . . . [which] was assigned Docket No. 454--4-75940H."
>
> The [*13] pleadings then recount that the appellants filed a plea to the jurisdiction and general denial in the SOAH proceeding, that the Staff filed a response asserting various statutory bases for jurisdiction, that the administrative law judge denied the appellant's plea to the jurisdiction and summary disposition motion, and that they appealed the decision to the Commissioner, who upheld it.
>
> The appellants pled that they "have not and will not voluntarily subject themselves to the [Department]'s jurisdiction" and sought a declaration that "the Commissioner as a matter of law does not have jurisdiction over the Plaintiffs to take the action contemplated by the July 16, 2004 Notice of Hearing."

Subsequently, as previously discussed, the Commissioner issued a final order in the complained-of contested-case proceeding. The Commissioner's order concluded that none of the appellants were engaged in the unauthorized practice of insurance or had violated any insurance provisions or regulations and that, therefore, no penalty should be imposed upon the appellants. As the State argues, these developments resolve the controversy on which Appellants' suit is based, i.e., the subject matter of the July [*14] 16, 2004 Notice of Hearing has been resolved in Appellants' favor.

Appellants nonetheless urge that a justiciable controversy remains because the Commissioner's order states a conclusion of law that, "Under *Tex. Ins. Code § 84.021*, the Commission may impose an administrative penalty on a person, including an entity, that is licensed or regulated under and who violates the Insurance Code or rules adopted or orders issued thereunder." However, absent another impending hearing or other action by the Department adversely impacting the appellants in some concrete way, the Commissioner's legal conclusion amounts to a bare, abstract statement of legal opinion, and any judicial determination regarding the conclusion would necessarily be no more than a mere abstract advisory opinion. *Cf. Waco Indep. Sch. Dist., 22 S.W.3d at 852* (explaining that "ripeness doctrine allows courts to avoid premature adjudication, and serves the constitutional interests in prohibiting advisory opinions").

We conclude that we do not have subject-matter jurisdiction over this appeal and, therefore, grant the Commissioner and the Department's motion to dismiss the case. *See Tex. R. App. P. 43.2* (explaining that one of [*15] permissible types of appellate judgments is to dismiss appeal); *South Tex. Water Auth. v. Lomas, 223 S.W.3d 304, 308 (Tex. 2007)* (dismissing case after determining court did not have subject-matter jurisdiction over case).

David Puryear, Justice

Before Justices Patterson, Puryear and Pemberton

Dismissed on Appellees' Motion

Filed: November 7, 2007



**Cecil W. Mayfield, David Hughes, Margaret H. O'Neal and John Robert Trimmier, Appellants v. Dave Hicks and Dave Hicks Company, Inc., Appellees**

**No. 19540**

**Court of Civil Appeals of Texas, Fifth District, Dallas**

***575 S.W.2d 571*; *1978 Tex. App. LEXIS 3847***

**October 24, 1978**

**SUBSEQUENT HISTORY:** [**1] Rehearing Denied November 28, 1978.

**PRIOR HISTORY:** From a District Court of Dallas County, Texas

**COUNSEL:** Philip C. McGahey, Bagby, McGahey, Ross & DeVore, Arlington, for appellants.

Don R. Hanmer, Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, for appellees.

**OPINION BY:** AKIN

**OPINION**

[*573] This is an appeal from an instructed verdict rendered against the guarantors of two equipment leases. Dave Hicks Company sued Four C Corporation, the primary obligor, for amounts due under the first equipment lease agreement and sued Mayfield, Hughes, O'Neal and Trimmier, the guarantors, on a guaranty of Four C Corporation's obligations under this lease. Dave Hicks, individually, also sued Four C Corporation for the amounts due under a second equipment lease and sued the guarantors under the terms of a similar guaranty. Four C Corporation neither filed an answer nor participated at trial. The trial judge, acting on the provisions of an alleged liquidated damage clause in each lease, granted a default judgment in favor of Dave Hicks Company against Four C Corporation for $ 289,401.08, plus $ 15,000 in attorneys' fees and also granted a default judgment in favor of Dave Hicks, [**2] individually, against Four C Corporation for $ 20,765.51 and attorneys' fees of $ 2,500. [1] Both plaintiffs were then granted an instructed verdict against the guarantors.

1. These default judgments have now become final since no appeal was taken from them.

Only the guarantors appeal from the trial court's judgment asserting, among other grounds, certain defenses to the leases that go to the question of the liability of Four C [*574] Corporation on the leases. In response, appellees argue that guarantor-appellants are collaterally estopped from asserting any defenses going to questions relating to the liability of the primary obligor, Four C, or to the extent of that liability, since the judgment against Four C is now final. Additionally, guarantor-appellants contend that the guaranties were ambiguous, that consideration for the guaranties had failed, that attorneys' fees were not recoverable under the guaranties, that all offsets and credits had not been allowed them, and that the liquidated damage [**3] provision of the lease was a penalty. With respect to the defenses to the leases, we hold that these guarantors are not collaterally estopped and, thus they may assert all defenses available to the primary obligor. We also hold that the "liquidated damage" provision of the lease is a penalty rather than a provision for just compensation. Accordingly, we reverse and remand so that appellees may prove their actual damages.

Collateral Estoppel

Appellees argue that the trial court properly instructed a verdict for the appellees because the liability of the primary obligor on the leases had been finally determined by the default judgments and that the appellants, as guarantors, are collaterally estopped from asserting any defenses to the liability of the primary obligor, Four C Corporation, under the leases. In this respect, they contend that since the judgment is final as to Four C, the rule applies that a judgment against the principal obligor conclusively establishes the extent of the principal's liability with respect to a guarantor, if that judgment is obtained in

a suit of which the guarantor had full knowledge and an opportunity to defend, citing *R. G. McClung Cotton Co. v.* [**4] *Cotton Concentration Co., 479 S.W.2d 733, 742* (Tex.Civ.App.-Dallas 1972, writ ref'd n.r.e.); *Empire Steel Corp. v. Omni Steel Corp., 378 S.W.2d 905* (Tex.Civ.App.-Fort Worth 1964, writ ref'd n.r.e.); *Latimer v. Texas & N. O. R. Co., 56 S.W.2d 933* (Tex.Civ.App.-Beaumont 1933, writ ref'd); *Young v. Bank of Miami, 175 S.W. 1102* (Tex.Civ.App.-Amarillo 1915, writ ref'd). Although we agree with the principle asserted by appellees, it is not applicable to the facts in this case because the guarantors have not had an opportunity to defend which is a predicate to the application of collateral estoppel. 1 Freeman on Judgments § 447, at 978 (5th ed. 1925). Indeed, in the cases cited by appellees, those courts applied the rule where the primary obligor's liability had been established in an action where the guarantor had an opportunity to defend but either did not so do or did so unsuccessfully as in *Young v. Bank of Miami, supra*, and subsequently attempted to attack that judgment in a later action by the obligee against the guarantor. It is only in this situation that courts have applied collateral estoppel. Here, the guarantors attempted to assert the defenses available to their principal [**5] in the trial court rather than consciously ignore the opportunity to present such defenses. There was no other opportunity to defend because there had been no prior action. Thus, the general rule that guarantors have the right to raise any defenses to the guaranteed obligation that the principal may have applies. Accordingly, we hold that where a guarantor has notice of the action against his principal and he takes part in the suit, he is not bound by the adjudication of the principal's liability by a default judgment against his principal in the same action. This is true because the guarantor may have had no authority to answer in the principal's behalf or to defend in the name of his principal. Indeed, before collateral estoppel applies, the opportunity to defend must be such that the guarantor can actually control the suit with respect to any defenses including those available to the primary obligor. *U. S. Wire & Cable Corp. v. Ascher Corp., 34 N.J. 121, 167 A.2d 633, 637 (1961)*. Thus, where the guarantor is merely given notice that the primary obligor expects the guarantor "to assist" in the conduct of the defense, it is insufficient notice or control so as to preclude the [**6] guarantor from asserting the same defenses in a subsequent suit or in the same suit. 1 Freeman on Judgments § 449, at 984-85 [*575] (5th ed. 1925). Accordingly, we must now turn to all points of error asserted by appellants.

Liquidated Damages or Penalty

Appellants contend that the clauses in both leases which entitle the lessor to repossess the equipment and sue for unpaid rentals is an unenforceable penalty, and thus no basis for appellees' actual damages. The lessors argue, however, that the provision is a valid stipulation of liquidated damages, for which the lessee became liable upon default. We agree with appellants that the provision is a penalty rather than a liquidated damage provision and that the question of actual damages should be submitted to the jury. The provision in each lease provides:

> Upon the occurrence of an event of Default, and at any time thereafter, Lessor, in addition to any other rights and remedies he may have, Shall have the right to . . . Take possession of the Equipment, whereupon Lessee's right to use the same under and subject to the terms and provision of this Lease, and any other right or interest of Lessee to or in the Equipment [**7] shall absolutely cease, But such taking by Lessor shall not relieve Lessee of its obligations and liabilities hereunder . . . . If Lessor repossesses the Equipment, Lessor shall have the right, at his option, to lease the Equipment to any other party . . . or Lessor may sell the Equipment or salvage the valuable components thereof. In the event of any such leasing or sale, There shall be due from Lessee, and Lessee will immediately pay to Lessor, the difference between the amount of rentals to be received from any third person, or the purchase price at said sale, as the case may be, And the total unpaid rental and other amounts to be paid herein, plus all costs and expenses of Lessor in repossessing, transporting, repairing, releasing, selling or otherwise handling the equipment. (Emphasis added)

The vice in this provision that makes it a penalty rather than a liquidated damage provision is that upon the occurrence of even a minor default by the lessee, the lessor may then declare the lessee in default, take possession of the equipment, and, in addition, demand payment of all lease payments called for in the lease. The coupling of repossession with acceleration of rent, [**8] irrespective of the type of breach, is the defect in this provision. It is immaterial that the actual breach was for nonpayment of rentals. A provision is a penalty if it provides for unreasonable payments for a minor breach. For example, the leases here provide that an event of default occurs if the lessee does not punctually perform any of the obligations contained in the leases and the leases obligate the lessee to keep the equipment in good appearance. Conceivably, if the lessee did not punctually keep the

equipment in good appearance, then the lessor could declare the lessee to be in default. Such a minor breach could then lead to draconian penalties disproportionate to any actual damage that the lessors may suffer. In *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 487 (1952)*, the supreme court condemned a similar provision as a penalty because the lease provided the same reparation for breach of each and every covenant in the lease, thus violating the principle of just compensation. Consequently, that court concluded that the provision in that case to be a penalty rather than a provision for liquidated damages. Since the clause in our case subjects the lessee to the [**9] same reparation for the breach of any covenant, we likewise hold that the provision is a penalty rather than one for liquidated damages. *United States Leasing Corp. v. Smith, 555 S.W.2d 766, 770* (Tex.Civ.App.-Tyler 1977, writ ref'd n.r.e.); Annot., 104 A.L.R. 132 (1936); 5 Williston on Contracts § 779 (3rd ed. 1961).

Although appellees pleaded that the breach was for unpaid rentals, it does not save the provision from being a penalty because that question turns on whether the provision provides for reasonable compensation. Of course, it would be unreasonable to permit the lessor to repossess and to require the lessee or its guarantors to pay the entire rentals set forth in the lease for [*576] any insignificant, technical breach. Thus, the question of whether the provision is a penalty or a liquidated damage clause is determined by the reasonableness of the provision with respect to just compensation. Since we have held this provision to be a penalty, it will not support the damages in the judgment instructed by the trial court. On remand the question of actual damages is one of proof to be determined by the jury.

Nevertheless, appellees argue that the instructed verdict [**10] was proper because appellants failed to request proper special issues inquiring whether the liquidated damage clause was a penalty. We cannot agree because any jury issues pertaining to whether a contractual clause is enforceable as a liquidated damage provision or void as a penalty are immaterial since this determination is a question of law for the trial court, rather than a jury question and must be viewed as of the time the contract was executed. *Schepps v. American District Telegraph Co. of Texas, 286 S.W.2d 684, 690* (Tex.Civ.App.-Dallas 1955, no writ); *Zucht v. Stewart Title Guaranty Co., 207 S.W.2d 414, 418* (Tex.Civ.App.-San Antonio 1947, writ dism'd ); *Muller v. Light, 538 S.W.2d 487, 488* (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e.). Thus, appellees' contention lacks merit. Since we have held that the trial court erred in instructing a verdict, we turn now to other questions that may arise upon retrial.

Attorneys' Fees

Appellants contend next that the trial court erred in granting judgment against them for attorneys' fees under the guaranties. They assert that although the lease obligated Four C Corporation to pay attorneys' fees, since the guaranty agreement does [**11] not expressly provide for attorneys' fees, the guarantor is not liable for them, citing *Miller v. Bush, 42 S.W.2d 156, 159* (Tex.Civ.App.-Waco 1931, writ ref'd). Miller is not, however, controlling because in that case the attorneys' fees were not allowed because neither the guaranty nor the obligation guaranteed provided for attorneys' fees. Consequently, that court applied the rule that guarantors are not liable for attorneys' fees, unless they are provided for in the contract guaranteed, or, if that contract is silent with respect to attorneys' fees, unless the guaranty so provides. In this case the contract guaranteed expressly provides for attorneys' fees and the guaranty agreement specifically binds the guarantor to pay all indebtedness incurred by the lessor by reason of the lessor's default. This, of course, includes attorneys' fees incurred in asserting the rights of the obligee. Since the lease agreements provide for attorneys' fees against the principal obligor, and since the guaranties cover any and all indebtedness that the primary obligor may owe, the attorneys' fees are included as a part of the guaranteed debt. *Gubitosi v. Schoellkopf Products, Inc., 545 S.W.2d* [**12] *528, 538* (Tex.Civ.App.-Tyler 1976, no writ); *Young v. J. F. Zimmerman & Sons, Inc., 434 S.W.2d 926, 927* (Tex.Civ.App.-Waco 1968, writ dism'd); *McGhee v. Wynnewood State Bank, 297 S.W.2d 876, 884* (Tex.Civ.App.-Dallas 1957, writ ref'd n.r.e.). Accordingly, we hold that trial court properly concluded that attorneys' fees were recoverable from the guarantors.

Interest

Additionally, appellants complain of the refusal of the trial court to admit evidence showing that certain sums allegedly guaranteed by appellants Wharton and Mayfield were interest, and, therefore, not within the guaranty. In this respect, they contend that, as a matter of law, these guarantors cannot be made liable for interest. We cannot agree. Since the lease provides for interest and since that is the contract guaranteed, the trial court properly permitted recovery of interest on the same rationale as that of attorneys' fees, discussed Supra.

Admission of Summaries

Appellants next argue that the trial court erred in admitting into evidence certain appellees' exhibits which were summaries of accounts relating to payment [*577] made to appellees on the leases and pertain to certain payments made and credits [**13] due. They assert that these summaries were hearsay since the proper predicate for their admission into evidence under *Tex.Rev.Civ.Stat.Ann. art. 3737e* (Vernon Supp.1978)

was not laid. We agree because it was not shown that the original records were voluminous or that appellants had had access to the original underlying records. *Black Lake Pipe Line Co. v. Union Construction Co., 538 S.W.2d 80, 93-94 (Tex.1976)*; *Hanson Southwest Corp. v. Dal-Mac Construction Co., 554 S.W.2d 712, 723* (Tex.Civ.App.-Dallas 1977, writ ref'd n.r.e.).

Consideration

Appellants also assert that the instructed verdict was improper because there were issues raised by the evidence as to whether the guaranty agreements were supported by consideration. In this respect, they contend that they presented evidence that the guarantors were to receive stock or stock options in Four C Corporation as consideration for acting as guarantors and that since the guarantors failed to receive this stock, there was no consideration for the execution of the guaranties. Whether appellants failed to receive stock from the primary obligor is immaterial. Rather, our question is whether consideration exists between the plaintiffs [**14] and the guarantors. In this respect sufficient consideration exists if the primary obligor receives some benefit. *Bonner Oil Co. v. Gaines, 108 Tex. 232, 191 S.W. 552 (1917)*; *Hargis v. Radio Corp. of America, Electronic Components, 539 S.W.2d 230, 232* (Tex.Civ.App.-Austin 1976, no writ); *Estes v. Oilfield Salvage Co., 284 S.W.2d 201, 204* (Tex.Civ.App.-Dallas 1955, no writ). Here it is undisputed that the equipment covered by both of these leases was delivered to Four C in reliance on the guaranties and that the primary obligor received the benefit of its bargain. We conclude, therefore, that this contention is without merit.

Appellants next contend that since the guaranties were executed after the leases, the consideration for the leases cannot also serve as consideration for the guaranties. We cannot agree. Before addressing the merits of this contention, we first note that all written contracts are presumed to be supported by consideration. Tex.Rev.Civ.Stat.Ann. art. 27 (Vernon 1969); *Unthank v. Rippstein, 386 S.W.2d 134, 138 (Tex.1964)*; *Maykus v. Texas Bank & Trust Co. of Dallas, 550 S.W.2d 396* (Tex.Civ.App.-Dallas 1977, no writ); *Waters v. Waters, 498 S.W.2d 236,* [**15] *240-41* (Tex.Civ.App.-Tyler 1973, writ ref'd n.r.e.). Thus the guaranties themselves import consideration and the burden is on appellants to show lack of consideration. Maykus, Supra, at 398. This appellants have failed to do.

Finally, appellants urge that since there were questions of fact as to whether the lease agreements and guaranties were executed several months apart, consideration for the leases cannot serve as consideration for the guaranties. One guaranty shows that it was executed six days after the lease; however, the date on the other guaranty was identical to the date of the lease. Some testimony was to the effect that some of the guarantors actually signed the guaranties as long as several months after the lease. The evidence is, however, undisputed that the guarantors would execute the guaranties and that without the guaranties the lessors would not furnish the equipment. We conclude that appellants' contention lacks merit. In *Maykus v. Texas Bank & Trust Co. of Dallas, 550 S.W.2d 396, 398* (Tex.Civ.App.-Dallas 1977, no writ), the promissory note was dated August 8, 1973, and the guaranty was dated August 15, 1973, and the argument was advanced by appellant [**16] that this shifted the burden to appellee to show new consideration. In rejecting this contention, we stated that this apparent discrepancy did not refute the presumption of consideration inherent in the guaranty agreement, and, therefore, held that:

> (M)ere evidence of a time discrepancy in execution between a note and a written guaranty agreement is legally insufficient to rebut the statutory presumption of consideration which supports a separate guaranty accord.

[*578] Thus, the mere fact that a guaranty agreement was executed subsequent to the passing of consideration for the principal obligation does not rebut the statutory presumption of consideration nor does it shift the burden of proof to the plaintiffs to show additional consideration.

Ambiguity

Finally, appellants argue that the trial court erred in refusing to submit issues to the jury with respect to their allegation that the guaranties are ambiguous and further, that the trial court erred in determining as a matter of law that the guaranties were not ambiguous. Appellants urge that the guaranties are ambiguous because the agreements provide in one part that all guarantors are "jointly and severally" [**17] liable and that they bind themselves to pay "any and all indebtedness" which would indicate a general liability of each signer for the total indebtedness as set out in the equipment leases, and then the same instrument later provides that "the undersigned shall not be required to pay the lessor hereunder more than the sum set out adjacent to the undersigned names." Thus, appellants contend that on the face of the instrument it calls for two different liabilities. We cannot agree. First, it was not error for the trial judge to refuse to submit issues on the alleged ambiguity of the guaranties because the question of whether a written agreement is ambiguous is a question of law for the court, rather than for a jury question. *Davis v. Andrews, 361 S.W.2d 419* (Tex.Civ.App.-Dallas 1962, writ ref'd n.r.e.). Secondly,

a reading of the guaranty agreements clearly indicates that the agreements are capable of only one meaning and that is that each guarantor is jointly and severally liable for the indebtedness of Four C Corporation under each lease except that none of the guarantors can be required to pay more than the amount stated by each guarantor's name. Accordingly, the guaranty agreements [**18] were not ambiguous.

Reversed and remanded.



**MBM FINANCIAL CORPORATION, ET AL., PETITIONERS, v. THE WOODLANDS OPERATING COMPANY, L.P., RESPONDENT**

**NO. 08-0390**

**SUPREME COURT OF TEXAS**

***292 S.W.3d 660*; *2009 Tex. LEXIS 634*; *52 Tex. Sup. J. 1221***

**March 12, 2009, Argued**
**August 28, 2009, Opinion Delivered**

**PRIOR HISTORY:** [**1]
ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE NINTH DISTRICT OF TEXAS.
*MBM Fin. Corp. v. Woodlands Operating Co., L.P., 251 S.W.3d 174, 2008 Tex. App. LEXIS 2535 (Tex. App. Beaumont, 2008)*

**COUNSEL:** For MBM Financial Corporation, PETITIONERS: Jennifer Bruch Hogan, Richard P. Hogan Jr. and Matthew E. Coveler, Hogan & Hogan, L.L.P., Phillip R. Livingston and Deanna H. Livingston, Livingston & Livingston, LLC, Houston, TX.

For Woodlands Operation Company, L.P., RESPONDENT: Karen D. Smith, Kirby D. Hopkins and Rachael McDonell Rolon, Drucker, Ruthledge & Smith, L.L.P., The Woodlands, TX.

**JUDGES:** JUSTICE BRISTER delivered the opinion of the Court. JUSTICE O'NEILL did not participate in the decision. Scott Brister, Justice.

**OPINION BY:** Scott Brister

**OPINION**

[*663] Since *Jarndyce v. Jarndyce*, [1] there have been charges that some cases benefit the lawyers more than the clients. But suits cannot be maintained solely for the attorney's fees; a client must gain something before attorney's fees can be awarded. While making losing parties bear their own attorney's fees may add injury to insult, the American Rule has long been that each party pays its own lawyers.

1 CHARLES DICKENS, BLEAK HOUSE (1853).

In this case, the plaintiff obtained a judgment for $ 1,000 in damages and almost $ 150,000 in attorney's fees. But there was no evidence to support the amount of the $ 1,000 award, and it is too large to constitute nominal damages. As the award to the client must be set aside, the attorney's fee award must also. Accordingly, we reverse and render a take-nothing judgment.

**I. Background**

The Woodlands Operating Company leased the 19 copiers at issue here from MBM Financial Corporation [2] and installed them in late 2000 and early 2001. Each machine [**2] was covered by a separate four-year lease, with annual renewals thereafter unless notice was sent between 90 and 180 days before the end of the existing term. The leases required the Woodlands to return the copiers to a location MBM specified.

2 The equipment was leased from MBM Financial Corporation, now known as MBM Financial Interest L.P., and serviced by Marimon Business Systems, Inc. The two companies were operated from the same location by the same employees, and Anthony Marimon was the chief operating officer of both. Because the parties and judgment treat the two corporations as the same, we refer to both herein as "MBM," the party listed as lessor.

The Woodlands decided not to renew the leases in mid-2004 and asked MBM for the end-of-term dates and instructions for return. MBM employees provided the dates and approved a draft termination letter from the Woodlands. But when the actual termination letter arrived

(viewing the evidence in the light favorable to the trial court's judgment), [3] MBM's president unilaterally changed the dates so the notice would be untimely and demanded rent for another year. To bolster MBM's position, he signed the leases and inserted commencement dates [**3] for the first time after the Woodlands filed suit. Until suit was filed, MBM also refused to designate a return location for the bulky equipment.

3 *See City of Keller v. Wilson, 168 S.W.3d 802, 819-21 (Tex. 2005)* (discussing jury verdicts). The same standard of review applies to a trial court's findings following a bench trial. *See Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994)*.

The Woodlands sued, asserting claims for breach of contract, fraud, and declaratory relief. MBM counterclaimed for additional rent of $ 160,000, though it later dropped that claim. After a two-day bench trial, the trial court rendered judgment awarding the Woodlands $ 1,000 in damages and $ 145,091.59 in attorney's fees through trial. The court of appeals affirmed the damages and part of the fee award. [4] On appeal, MBM challenges both.

4 *251 S.W.3d 174, 184*.

**II. Nominal Damages & Breach of Contract**

At trial, the Woodlands requested only nominal damages. The judgment describes the $ 1,000 award as "actual damages," but the trial court's findings and conclusions describe them as "actual damages in the form of nominal damages." [*664] We agree with MBM that no evidence supports $ 1,000 as either.

The only damages mentioned [**4] at trial related to wasted time the Woodlands spent trying to get MBM's cooperation. But there was no evidence about the value of that time--either the quantity or the cost of it. The Woodlands blamed this gap on the difficulty of tracking the lost time, but never explained why it could not have been estimated. If the difficulty of proof always discharged the burden of proof, many litigants would simply not bother. [5] While the Woodlands could have estimated the value of wasted time, it could not ask the trial court to pull a figure from thin air.

5 *See, e.g., Wal-Mart Stores, Inc. v. Gonzalez, 968 S.W.2d 934, 937 (Tex. 1998)* ("[T]hat proof of causation is difficult does not provide a plaintiff with an excuse to avoid introducing some evidence of causation." (quoting *Schaefer v. Tex. Employers' Ins. Ass'n, 612 S.W.2d 199, 205 (Tex. 1980)))*.

Nevertheless, the Woodlands argues the award was justified as nominal damages. We agree nominal damages are available for breach of contract, as this Court has stated at least a dozen times. [6] As we wrote in 1853:

> The law is, that if the contract is proven to be broken, the law would give some damage, sufficient to authorize a verdict for the plaintiff, [**5] although, in the absence of proof of special loss, the damages would be nominal only. [7]

We are hardly alone in recognizing nominal damages for breach of contract; so do the First and Second Restatements, [8] Williston, [9] Corbin, [10] and Black's Law Dictionary. [11] While more generous damage measures make nominal damages rare, and some judges have questioned the reason behind them, [12] we agree that nominal [*665] damages may be recovered for breach of contract.

6 *See, e.g., Lubbock Mfg. Co. v. Sames, 598 S.W.2d 234, 237 (Tex. 1980)*; *Travelers Ins. Co. v. Employers Cas. Co., 380 S.W.2d 610, 614-15 (Tex. 1964)*; *Woodward v. Harlin, 121 Tex. 46, 39 S.W.2d 8, 9 (Tex. 1931)*; *Malakoff Gin Co. v. Riddlesperger, 108 Tex. 273, 192 S.W. 530, 532 (Tex. 1917)*; *Porter v. Kruegel, 106 Tex. 29, 155 S.W. 174, 175 (Tex. 1913)*; *Raymond v. Yarrington, 96 Tex. 443, 73 S.W. 800, 804 (Tex. 1903)*; *Davis v. Tex. & P. Ry., 91 Tex. 505, 44 S.W. 822, 823 (Tex. 1898)*; *Seibert v. Bergman, 91 Tex. 411, 44 S.W. 63, 64 (Tex. 1898)*; *East Line & Red River R.R. v. Scott, 72 Tex. 70, 10 S.W. 99, 102 (Tex. 1888)*; *Stuart v. W. Union Tel. Co., 66 Tex. 580, 18 S.W. 351, 352 (Tex. 1885)*; *Moore v. Anderson, 30 Tex. 224, 231 (1867)*; *Hope v. Alley, 9 Tex. 394, 395 (1853)*; *McGuire v. Osage Oil Corp., 55 S.W.2d 535, 537 (Tex. Comm'n App. 1932, holdings approved)*; [**6] *see also* Note, *Pleading--Necessity of Damage to Cause of Action*, 9 TEX. L. REV. 111, 112 (1930) (citing cases).

7 *Hope, 9 Tex. at 395*.

8 *Restatement (Second) of Contracts § 346(2)* (1981) ("If the breach caused no loss or if the amount of the loss is not proved under the rules stated in this Chapter, a small sum fixed without regard to the amount of loss will be awarded as nominal damages."); *accord* Restatement (First) of Contracts § 328 (1932).

9 *See* 24 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 64:6 (4th ed. 2002) ("An unexcused failure to perform a contract is a legal wrong. An action will therefore lie for the breach although it causes no injury. Nominal damages may then be awarded.").

10 *See* 11 JOSEPH M. PERILLO, CORBIN ON CONTRACTS § 55.10 (rev. ed. 2005) ("[F]or every breach of contract, a cause of action exists. . . . If the aggrieved party has suffered no compensable damages, a judgment for nominal damages will be entered.").

11 BLACK'S LAW DICTIONARY 418 (8th ed. 2004) (defining nominal damages as "[a] small amount fixed as damages for breach of contract without regard to the amount of harm").

12 *See Chronister Oil Co. v. Unocal Ref. & Mktg. (Union Oil Co. of Ca.), 34 F.3d 462, 466 (7th Cir. 1994)* [**7] (Posner, C.J.) (stating that "for reasons we do not understand every victim of a breach of contract, unlike a tort victim, is entitled" to nominal damages).

But $ 1,000 is not nominal damages. "[T]he usual meaning of the phrase 'nominal damages' refers to an award of one dollar." [13] Despite substantial changes over the centuries in what a dollar will buy, it remains the standard award in federal cases, [14] and in Texas cases as well. [15] A few cases have awarded nominal damages of $ 10 and even $ 100, [16] but nominal damages are supposed to be a "trifling sum," [17] and $ 1,000 hardly falls in that category. [18]

13 *Harkins v. Crews, 907 S.W.2d 51, 61 (Tex. App.--San Antonio 1995, writ denied)*; *accord ITT Commercial Fin. Corp. v. Riehn, 796 S.W.2d 248, 257 (Tex. App.--Dallas 1990, no writ)* (stating that "nominal damages [are] traditionally the sum of one dollar or perhaps ten dollars"); *see also* Perillo, *supra* note 10 ("The usual amount of nominal damages is six cents or one dollar . . . .").

14 *See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 783, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*; *Farrar v. Hobby, 506 U.S. 103, 107, 113 S. Ct. 566, 121 L. Ed. 2d 494 (1992)*; *Carey v. Piphus, 435 U.S. 247, 267, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978)*.

15 *See, e.g., Henry S. Miller Co. v. Evans, 452 S.W.2d 426, 434 (Tex. 1970)*; [**8] *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc., 219 S.W.3d 563, 584 (Tex. App.--Austin 2007, pet. denied)*; *State v. Miles, 458 S.W.2d 943, 944 (Tex. Civ. App.--Waco 1970, writ ref'd n.r.e.)*; *Lucas v. Morrison, 286 S.W.2d 190, 192 (Tex. Civ. App.--San Antonio 1956, no writ)*; *Caswell v. J.S. McCall & Sons, 163 S.W. 1001, 1002 (Tex. Civ. App.--Austin 1913, no writ)*.

16 *See, e.g., Williams v. Kaufman County, 352 F.3d 994, 1014-15 (5th Cir. 2003)* (nominal damages of $ 100); *Malakoff Gin Co. v. Riddlesperger, 108 Tex. 273, 192 S.W. 530, 532 (Tex. 1917)* (nominal damages of $ 10); *see also* David Pearce & Roger Halson, *Damages for Breach of Contract: Compensation, Restitution and Vindication*, 28 Oxford J. Legal Stud. 73, 76 n.25 (2008) (noting that English cases can be found awarding nominal damages of £ 1, £ 2, £ 5, £ 10, and £ 15).

17 Black's Law Dictionary 418 (8th ed. 2004).

18 *See, e.g., Nicholas v. Pa. State Univ., 227 F.3d 133, 146 (3rd Cir. 2000)* (Alito, J.) (holding trial court properly reduced nominal damages award from $ 1,000 to $ 1).

It appears from the record that the trial court awarded $ 1,000 as rough compensation for the wasted time the Woodlands incurred. But nominal damages [**9] are not for compensation; they are for cases in which there are no damages, or none that could ever be proved. [19] While a few older cases hold otherwise, [20] in recent decades the rule in Texas has been that nominal damages are not available when the harm is entirely economic and subject to proof (as opposed to non-economic harm to civil or property rights). [21] Thus, in *Gulf States Utilities* [*666] *Co. v. Low*, we rejected nominal damages because actual damages had been incurred, yet the plaintiff failed to prove the amount. [22] "While mathematical precision is not required to establish the extent or amount of one's damages, one must bring forward the best evidence of the damage of which the situation admits . . . ." [23] On this record, the $ 1,000 damage award to the Woodlands cannot be sustained as either actual or nominal damages.

19 Black's Law Dictionary 418 (8th ed. 2004) (defining nominal damages as "[a] trifling sum awarded when a legal injury is suffered but when there is no substantial loss or injury to be compensated"); *see County of Dallas v. Wiland, 216 S.W.3d 344, 356 (Tex. 2007)* (noting that denial of procedural due process justified award of nominal damages when no harm resulted); [**10] *see also Malakoff Gin Co., 192 S.W. at 532*; *Raymond v. Yarrington, 96 Tex. 443, 73 S.W. 800, 804 (Tex. 1903)*; *McGuire v. Osage Oil Corp., 55 S.W.2d 535, 537 (Tex. Comm'n App. 1932, holdings approved)*; Williston & Lord, *supra* note 9.

20 *See State v. Jackson, 388 S.W.2d 924, 926 (Tex. 1965)*; *Davis v. Tex. & P. Ry., 91 Tex. 505, 44 S.W. 822, 823 (Tex. 1898)*; *Moore v. Anderson, 30 Tex. 224, 231 (1867)*; *Hope v. Alley, 9 Tex. 394, 395 (1853)*.

21 *See Gulf Coast Inv. Corp. v. Rothman, 506 S.W.2d 856, 858 (Tex. 1974)* (rejecting claim for nominal damages when evidence showed plaintiff suffered no economic damage); *see also Coastal Oil & Gas Corp. v. Garza Energy Trust, 268 S.W.3d 1,12 n.36 (Tex. 2008)* (stating that nominal damages are available for mere trespass against

possessory interest, but reversionary interest owner must prove actual economic damages); *Wiland, 216 S.W.3d at 356-57* (stating that nominal damages are available for denial of procedural due process); *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co., 974 S.W.2d 51, 53 (Tex. 1998)* (per curiam) (stating that nominal damages are available for loss of credit reputation).

22 *79 S.W.3d 561, 567 (Tex. 2002)*.

23 *Rothman, 506 S.W.2d at 858*.

While we normally remand [**11] for a new trial when there is some evidence to support an amount of actual damages, [24] in this case there was no evidence about the amount of damages at all. And "where the record shows as a matter of law that the plaintiff is entitled only to nominal damages, the appellate court will not reverse merely to enable him to recover such damages." [25] Accordingly, we must render judgment that the Woodlands take nothing as damages on its breach of contract claim.

24 *See Guevara v. Ferrer, 247 S.W.3d 662, 670 (Tex. 2007)*; *Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299,314-15 (Tex. 2006)*.

25 *Travelers Ins. Co. v. Employers Cas. Co., 380 S.W.2d 610, 614-15 (Tex. 1964)*; *accord* Williston & Lord, *supra* note 9 ("[A] judgment for the defendant will not be reversed merely to give the plaintiff nominal damages unless some substantial right of the plaintiff will thereby be protected.").

**III. Attorney's Fees: Breach of Contract**

Chapter 38 of the Civil Practices and Remedies Code allows recovery of attorney's fees in breach of contract cases: "A person may recover reasonable attorney's fees . . . in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract." [**12] [26] To recover fees under this statute, a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages. [27] The second requirement is implied from the statute's language: for a fee recovery to be "in *addition* to the amount of a valid claim," the claimant must recover some amount on that claim.

26 *Tex. Civ. Prac. & Rem. Code § 38.001*.

27 *Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 201 (Tex. 2004)* (per curiam); *Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997)*; *State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 437 (Tex. 1995)*.

While *some* damages are necessary to recover fees under this statute, [28] this Court has never said whether *nominal* damages are enough. But as the Woodlands can recover neither actual nor nominal damages, that question is not before us. Accordingly, the Woodlands' fee award cannot be affirmed based on Chapter 38.

28 *Mustang Pipeline Co., 134 S.W.3d at 201*; *Green Int'l, 951 S.W.2d at 390*; *Beaston, 907 S.W.2d at 437*.

**IV. Attorney's Fees: Fraud Arising From Breach of Contract**

Alternatively, the Woodlands argues it is entitled to attorney's fees based on fraud arising from a breach of contract, pointing to this [**13] Court's reference to such an award in *Gill Savings Ass 'n v. Chair* [*667] *King*. [29] But in *Gill* we merely reinstated bankruptcy and appellate fees; we did not address the court of appeals' award of fees for both contract and fraud on the basis that they were inextricably intertwined. [30] We explicitly rejected this intertwining exception in *Tony Gullo Motors I, L.P. v. Chapa* and reiterated that fees are not allowed for torts like fraud. [31] Thus, even if the Woodlands' fraud claim arose from a breach of contract, that is no basis for an attorney's fee award.

29 *797 S.W.2d 31, 31 (Tex. 1990)* (per curiam).

30 *See 783 S.W.2d 674, 680 (Tex. App.--Houston [14th Dist.] 1989), aff'd as modified, 797 S.W.2d 31 (Tex. 1990)*.

31 *212 S.W.3d 299, 311-14 (Tex. 2006)*.

**V. Attorney's Fees: Bad Faith & Vexatious Conduct**

The Woodlands also argues it is entitled to attorney's fees because MBM "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." The rules of civil procedure allow fees as a sanction against a party who files pleadings in bad faith [32] or abuses the discovery process. [33] But the Woodlands filed no motion for sanctions pursuant to those rules. Its fee claim was not based on MBM's *litigation* [**14] conduct but on its *pre-litigation* conduct; such fees are recoverable only if a contract or statute so provides. As the Woodlands cannot recover fees based on contract or fraud, allegations that the breach was in bad faith or the fraud vexatious do not change that result.

32 *See TEX. R. CIV. P. 13*.

33 *See, e.g., Tex. R. Civ. P. 215.1(d), 215.2(b)(8), 215.4(b), 215.5(b)*.

**VI. Attorney's Fees: Declaratory Judgment & Breach of Contract**

The court of appeals affirmed part of the attorney's fee award based on the Declaratory Judgments Act. [34] MBM asserts four reasons why declaratory relief was improper and cannot support a fee award. We disagree

that declaratory relief was improper but agree it cannot support the fee award here.

34 *251 S.W.3d 174, 183-84*.

First, MBM argues that declaratory relief is not available for contract claims (like those here) that are "fully matured and predicated upon a terminated relationship." But the Act says relief is available in contract cases "before *or after* there has been a breach," [35] so a matured breach is explicitly covered by the Act. [36] Further, declaratory relief is often available after a relationship has been terminated, as in cases concerning noncompetition [**15] covenants signed by former employees, [37] or offsetting judgments between former litigants. [38] MBM notes that we justified declaratory relief in [*668] *BHP Petroleum Co. v. Millard* by referring to an "ongoing and continuing relationship," but that was solely to show that the defendant's counterclaim (relating to the parties' future rights) went beyond the plaintiff's claim (relating to past damages alone). [39] We disagree that a party can immunize itself against declaratory relief by simply terminating any ongoing relationship.

35 *Tex. Civ. Prac. & Rem. Code § 37.004(b)* (emphasis added).

36 *See RESTATEMENT (SECOND) OF JUDGMENTS § 33 cmt. a* (1982) ("But while the declaratory action is perhaps most important as a kind of preventive device, its use is not so restricted; it is also sometimes permitted after the wrong has been committed, when a coercive remedy could be awarded to or against the plaintiff in the declaratory action.").

37 *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 852, 2009 Tex. LEXIS 124 (Tex. 2009)* (declaring former employee's noncompetition covenant enforceable); *see also Lowenberg v. City of Dallas 261 S.W.3d 54, 59 (Tex. 2008)* (per curiam) (affirming declaratory judgment [**16] regarding unlawful tax that had been repealed).

38 *Bonham State Bank v. Beadle, 907 S.W.2d 465, 468 (Tex. 1995)*.

39 *800 S.W.2d 838, 841-42 (Tex. 1990)*.

Second, MBM urges that declarations of non-liability should be barred in contract cases, just as they are in tort cases. As we said in *Abor v. Black*:

> Because [the Act] appears to give the courts jurisdiction over declarations of non-liability of a potential defendant in a tort action, we find that the . . . District Court had jurisdiction over the suit. However, we hold that the trial court should have declined to exercise such jurisdiction because it deprived the real plaintiff of the traditional right to choose the time and place of suit. [40]

But the "real plaintiff" and the "traditional right to choose the time and place of suit" are materially different in contract and tort cases. The "real" plaintiff in a tort action is the injured party, yet both parties often suffer injury if a contract collapses. When each party claims the other breached (as is usually the case), [41] it is hard to say who ought to be the "real" plaintiff. Here, for example, why should MBM get to choose the time and place of suit rather than the Woodlands? The Act itself [**17] specifically contemplates declarations that are negative (non-liability) as well as affirmative (liability). [42] And historically, declarations of non-liability under a contract have been among the most common suits filed under the Act, including:

> . suits by insurers to declare non-liability under a duty-to-defend clause, [43]
>
> . suits by employees to declare non-liability under a covenant not to compete, [44] and
>
> . suits by a party to declare non-liability for higher or additional payments. [45]

Extending the bar against declarations of non-liability from tort to contract cases would drastically handicap declaratory-judgment practice in Texas.

40 *695 S.W.2d 564, 566 (Tex. 1985)*.

41 *See, e.g., Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 200 (Tex. 2004)* (per curiam); *Bennett v. Cochran, 96 S.W.3d 227, 228 (Tex. 2002)* (per curiam); *Callahan & Assocs. v. Orangefield Indep. Sch. Dist., 92 S.W.3d 841, 842 (Tex. 2002)* (per curiam); *State ex rel. Dep't of Criminal Justice v. VitaPro Foods, Inc., 8 S.W.3d 316, 321 (Tex. 1999)*; *Stuart v. Bayless, 964 S.W.2d 920, 921 (Tex. 1998)* (per curiam); *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 43 (Tex. 1998)*; *Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 386 (Tex. 1997)*; [**18] *Stewart Title Guar. Co. v. Aiello, 941 S.W.2d 68, 70 (Tex. 1997)*; *Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex. 1990)*.

42 *Tex. Civ. Prac. & Rem. Code § 37.003(b)* ("The declaration may be either affirmative or

negative in form and effect, and the declaration has the force and effect of a final judgment or decree.").

43 *See, e.g., Fairfield Ins. Co. v. Stephens Martin Paving, LP, 246 S.W.3d 653 (Tex. 2008)*; *Farmers Tex. County Mut. Ins. Co. v. Griffin, 955 S.W.2d 81 (Tex. 1997)* (per curiam); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchants Fast Motor Lines, Inc., 939 S.W.2d 139 (Tex. 1997)* (per curiam); *Liberty Mut. Fire Ins. Co. v. Sanford, 879 S.W.2d 9 (Tex. 1994)* (per curiam).

44 *See, e.g., Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844 2009 Tex. LEXIS 124 (Tex. 2009)*; *In re AutoNation, Inc., 228 S.W.3d 663 (Tex. 2007)*.

45 *See, e.g., Yzaguirre v. KCS Res., Inc., 53 S.W.3d 368, 370 (Tex. 2001)*; *VitaPro Foods, Inc., 8 S.W.3d at 321*.

[*669] Third, MBM argues that declaratory judgments are available only if there is no adequate alternative cause of action. But this has never been the rule in Texas. Shortly after the Legislature passed the Act in 1943, [46] this Court adopted exactly [**19] the opposite rule, stating that "the existence of another adequate remedy does not bar the right to maintain an action for declaratory judgment" and finding this rule supported by "better reasoning." [47] The federal courts follow the same rule, as *Federal Rule of Civil Procedure 57* makes clear: "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." We agree the Act cannot be invoked when it would interfere with some other exclusive remedy [48] or some other entity's exclusive jurisdiction. [49] But prohibiting declaratory judgments whenever a breach of contract claim is available would negate the Act's explicit terms covering such claims. [50]

46 Uniform Declaratory Judgments Act, 48th Leg., R.S., ch. 164, 1943 Tex. Gen. Laws 265.

47 *Cobb v. Harrington, 144 Tex. 360, 190 S.W.2d 709, 714 (Tex. 1945)*; *accord Tex. Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970)*; *Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922, 924 (Tex. 1948)*; *see also McKinley v. McKinley, 496 S.W.2d 540, 542 (Tex. 1973)*.

48 *See, e.g., Martin v. Amerman, 133 S.W.3d 262, 267 (Tex. 2004)* (noting that the Property Code describes trespass-to-try-title actions [**20] as *"the* method for determining title"); *John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst, 90 S.W.3d 268, 289 (Tex. 2002)* (noting that Natural Resources Code provisions authorizing declaratory suits by coastal property owners do not provide for fees).

49 *See, e.g., In re Sw. Bell Tel. Co., 235 S.W.3d 619, 625 (Tex. 2007)* (holding declaratory relief unavailable until administrative remedies were exhausted); *Thomas v. Long, 207 S.W.3d 334, 342 (Tex. 2006)* (same); *State v. Morales, 869 S.W.2d 941, 942 (Tex. 1994)* (holding civil courts can declare criminal laws unconstitutional only in limited circumstances); *Canyon Creek Land Corp., 456 S.W.2d at 894* (holding civil courts generally should not entertain declaratory actions to overturn an administrative agency's interpretation of a penal statute the agency is to enforce); *Cobb, 190 S.W.2d at 714* ("We do not hold that the declaratory judgment procedure may be used when a statute provides an administrative board or other special tribunal or special procedure for the particular type of case in hand as, for example, a workmen's compensation case.").

50 *See Tex. Civ. Prac. & Rem. Code § 37.004(a), (b)* (stating that "[a] contract may be construed [**21] either before or after there has been a breach," and that "[a] person interested under . . . writings constituting a contract . . . may have determined any question of construction or validity arising under the . . . contract").

Yet while declaratory relief may be obtained under the Act in all these circumstances, that does not mean attorney's fees can too. Texas has long followed the "American Rule" prohibiting fee awards unless specifically provided by contract or statute. [51] By contrast, the Declaratory Judgments Act allows fee awards to either party in all cases. [52] If repleading a claim as a declaratory judgment could justify a fee award, attorney's fees would be available for all parties in all cases. That would repeal not only the American Rule but also the limits imposed on fee awards in other statutes. Accordingly, the rule is that a party cannot use the Act as a vehicle to obtain otherwise impermissible attorney's fees. [53]

51 *See Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 310-11 (Tex. 2006)*.

52 *See Tex. Civ. Prac. & Rem. Code § 37.009*.

53 *See Martin, 133 S.W.3d at 267*; *THPD, Inc. v. Cont'l Imports, Inc., 260 S.W.3d 593, 619-20 (Tex. App.--Austin 2008, no pet.)*; *Warrantech Corp. v. Steadfast Ins. Co., 210 S.W.3d 760, 770 (Tex. App.--Fort Worth 2006, pet. denied)*; [**22] *Sani v. Powell, 153 S.W.3d 736, 745 (Tex. App.--Dallas 2005, pet. denied)*; *City of Houston v. Texan Land & Cattle Co., 138 S.W.3d 382, 392 (Tex. App.--Houston [14th Dist.] 2004, no pet.)*; *Sw. Guar. Trust Co. v. Hardy Road 13.4 Joint Venture, 981 S.W.2d 951, 957 (Tex. App.--Houston [1st Dist.] 1998, pet. denied)*;

*Boatman v. Lites, 970 S.W.2d 41, 43 (Tex. App.--Tyler 1998, no pet.)*.

[*670] The Act was originally "intended as a speedy and effective remedy" for settling disputes before substantial damages were incurred. [54] It is "intended to provide a remedy that is simpler and less harsh than coercive relief, if it appears that a declaration might terminate the potential controversy." [55] But when a claim for declaratory relief is merely tacked onto a standard suit based on a matured breach of contract, allowing fees under Chapter 37 would frustrate the limits Chapter 38 imposes on such fee recoveries. And granting fees under Chapter 37 when they are not permitted under the specific common-law or statutory claims involved would violate the rule that specific provisions should prevail over general ones. [56] While the Legislature intended the Act to be remedial, [57] it did not intend to supplant all [**23] other statutes and remedies. [58]

54 *Cobb, 190 S.W.2d at 713*.

55 *Restatement (Second) of Judgments § 33 cmt. c* (1982).

56 *See, e.g., Tex. Gov't Code § 311.026(b)* (requiring that specific statutory provisions prevail over general ones in statutory construction); *Strong v. Garrett, 148 Tex. 265, 224 S.W.2d 471, 475 (Tex. 1949)* (noting the "general rule" that specific descriptions in deeds prevail over general ones).

57 *See Tex. Civ. Prac. & Rem. Code § 37.002(b)*.

58 *Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922, 924 (Tex. 1948)* ("[T]he remedy afforded by the Declaratory Judgment Act is additional and does not supplant any existing remedy."); *Restatement (Second) of Judgments § 33 cmt. c* ("[D]eclaratory actions are to supplement rather than supersede other types of litigation.").

At trial, the Woodlands recovered no damages on its breach of contract claim, so it cannot recover fees under Chapter 38. Allowing it to recover the same fees under Chapter 37 would frustrate the provisions and limitations of the neighboring chapter in the same Code. [59] Accordingly, we hold the Woodlands cannot recover attorney's fees under the Declaratory Judgments Act.

59 *Cf. City of Waco v. Lopez, 259 S.W.3d 147, 153-55 (Tex. 2008)* [**24] (holding the Legislature did not intend to allow claimants to elect between Human Rights and Whistleblower Acts because differing procedures and remedies would frustrate legislative goals).

Nevertheless, the Woodlands argues it is entitled to fees because the declaratory relief it sought did more than merely duplicate the issues litigated in its contract and fraud claims. The five declarations the Woodlands obtained in the judgment were:

> 1. that the Woodlands "complied with its contractual obligations to provide notice of its intent not to renew";
>
> 2. that MBM "improperly failed to timely designate a carrier and location for the return";
>
> 3. that MBM's manipulation of the termination dates barred it from making "any claim that [the Woodlands] failed to provide timely notice";
>
> 4. that the Woodlands "relied to its detriment on the termination dates provided by MBM"; and
>
> 5. that the Woodlands "has suffered damage as a direct result of its detrimental reliance upon the termination dates provided by MBM."

[*671] Whether the Woodlands sent timely notice of cancellation and MBM failed to designate a return location were part and parcel of the Woodlands' contract claim. And whether MBM misrepresented the [**25] termination dates and the Woodlands relied on those misrepresentations were duplicative of the Woodlands' fraud claim. Thus, the declarations sought by the Woodlands merely duplicated issues already before the trial court.

It is easy to understand the Woodlands' frustration with MBM. Viewing the evidence in the proper light, MBM withheld information, changed renewal dates, and manipulated the truth to try to get more rent than it was entitled to. It raised dodges, defenses, and counterclaims at various stages that all eventually collapsed in a heap, but only after forcing the Woodlands to incur legal fees and costs. But to recover those fees, the Woodlands had to recover damages for breach of contract. That it failed to do. As Chief Justice Calvert wrote for this Court almost 50 years ago:

> Perhaps every successful litigant should be permitted to recover his attorney fees from the opposite party. But whether that policy would be wise is for the Legislature, not the courts, to decide. Apparently the Legislature has not thought it wise. [60]

Accordingly, we reverse the judgment of the court of appeals and render judgment that [**26] the Woodlands take nothing.

Scott Brister

Justice

OPINION DELIVERED: August 28, 2009

60 *Van Zandt v. Fort Worth Press, 359 S.W.2d 893, 896 (Tex. 1962)*.



**DAVID L. MCFADDEN, Appellant, v. PEDRO ZARAGOSA FUENTES, Appellee**

**No. 08-89-00402-CV**

**COURT OF APPEALS OF TEXAS, Eighth District, El Paso**

***790 S.W.2d 736*; *1990 Tex. App. LEXIS 967*; *12 U.C.C. Rep. Serv. 2d (Callaghan) 728***

**April 25, 1990**

**PRIOR HISTORY:** [**1] Appeal from 34th District Court of El Paso County, Texas. TC No. 86-8580, William Moody, Judge.

**COUNSEL:** ATTORNEY FOR APPELLANT, Harris, Hon. Ralph E., El Paso, Texas.

ATTORNEY FOR APPELLEE, Broaddus, Jr., Hon. Francis C., El Paso, Texas.

**JUDGES:** JERRY WOODARD, Justice, Fuller, Woodard and Koehler, JJ.

**OPINION BY:** WOODARD

**OPINION**

[*737] OPINION

This is an appeal from a summary judgment in favor of the Defendant, Mr. Fuentes. We reverse.

The parties contracted for Fuentes' purchase of certain bowling, restaurant and bar equipment. On the execution of the agreement, $ 20,000.00 was paid, $ 30,000.00 was to be paid on or before March 1, 1986 and $ 135,000.00 was to be paid on May 1, 1986, which was the date Fuentes was to take possession of the property. The contract was prepared by the attorney for the seller. It provided that "[i]n the event Buyer fails to pay the full purchase price for the personal property as provided for herein on or before May 1, 1986, Seller shall have the right to retain all money paid pursuant to the terms and conditions of this Agreement, and cancel this Agreement." Under the contract, $ 20,000.00 was deposited with the attorney for the seller [**2] as earnest money to be held in escrow until the terms of the agreement had been complied with. On January 13, 1986, the attorney sent Fuentes notice that if the $ 30,000.00 of March 1, 1986 was not timely made, "Mr. McFadden (seller) will have no alternative but to cancel the agreement and retain all money paid pursuant to the terms of the agreement." On September 10, 1986, the seller filed suit for consequential damages caused by the breach of contract.

The focal point of the appeal is whether the exacted $ 20,000.00 was a penalty of forfeiture to be applied toward consequential damages for a breach of contract, or whether it was proper liquidated damages that had been stipulated to by the parties whereby "cancellation" of the contract precludes any further damage award.

To be enforceable as liquidated damages under common law, the damages must be uncertain and the stipulation must be reasonable. *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484 (1952)*. However, in 1965, the Uniform Commercial Code was enacted in Texas. The specific provisions of the UCC supersede the common law applicable to transactions in goods. *Tex.Bus.&Com.Code Ann. sec. 2.718* (Vernon 1968), provides for [**3] liquidated damages in the agreement subject to their reasonableness in light of anticipated or actual harm, difficulties in proving loss and inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. *Section 2.719* now provides that remedies in case of default can be contracted for, including an exclusive or sole remedy where expressly agreed upon. *Section 2.719*, Uniform Commercial Code Comment states:

(2) Subsection (1)(b) creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed.

The limitation or exclusion of consequential damages must not be unconscionable, but unconscionability would

be a matter of confession and avoidance, and was not affirmatively pleaded in this case. The pertinent paragraphs of the contract are as follows:

(1) With the execution of this Agreement, (the buyer shall) deposit $ 20,000.00 in escrow with Ralph E. Harris, said deposit representing earnest money to be held in escrow by the said Ralph E. Harris until such time as all terms and conditions of this Agreement are complied with; [**4] . . .

. . . . .

(2) In the event Buyer fails to pay the full purchase price for the personal property as provided for herein on or before May 1, 1986, Seller shall have the right to retain all money paid pursuant to the terms and conditions of this Agreement, and cancel this Agreement.

The contract further provides that the buyer has the option to cancel the contract or extend the closing date if the property becomes damaged by fire or other casualty. It also provides that if the seller is unable to convey the property, the money shall be [*738] returned to buyer, and the buyer has the right to cancel the agreement.

In the interpretation of contracts, the primary concern of courts is to ascertain and to give effect to the intentions of the parties as expressed in the instrument. *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517 (Tex. 1980)*. To achieve this object, the Court will examine and consider the entire instrument so that none of the provisions will be rendered meaningless. If a written instrument is so worded that a court may properly give it a certain or definite legal meaning or interpretation, it is not ambiguous. On the other hand, [**5] a contract is ambiguous only when the application of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of the two meanings is proper meaning. *Id. at 519*.

*Tex.Bus.&Com.Code Ann sec. 2.106(d)* states "'Cancellation' occurs when either party puts an end to the contract for breach by the other and its effect is the same as that of 'termination' except that the cancelling party

also retains any remedy for breach of the whole contract or any unperformed balance." Whenever a statute or other legal rule requires a specified "legal meaning" to be given to certain words, the requirement is that the use of those words shall produce a particular legal effect whether the contracting parties intended to produce it or not. 3 Corbin On Contracts, sec. 550, at 196-197 (West 1960). A mistake in understanding what the legal definition is would be a mistake of law. Corbin, sec. 619, at 766. A mistake of law has not been pleaded by the parties.

We hold that there is no evidence establishing that any stipulated sum is reasonable in light of (1) the anticipated or actual harm caused by the breach; (2) the difficulties of proof or loss; and (3) the difficulty [**6] of otherwise obtaining an adequate remedy as required by *Section 2.718(a)*, and therefore, no valid liquidated damage provision has been established. Further, even if this were so, under the facts of this case, forfeiture of the sum would be precluded from being a sole remedy by the provisions of *Section 2.719(a)(2)* which require express agreement for such a limitation of remedy. The language in this case expressly retains any remedy for breach of the whole contract by the solitary use of the legal phrase "cancel the agreement." It would be valid argument generally, however, that if a liquidated damage clause were created under *Section 2.718*, it would logically self operate to be the exclusive remedy selection as contemplated by *Section 2.719*.

The movant for summary judgment has the burden of showing that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law. In deciding whether or not there is a disputed fact issue precluding summary judgment. evidence favorable to the nonmovant will be taken as true. Every reasonable inference must be indulged in favor of the nonmovants and any doubts resolved in their favor. *Nixon v. Mr. Property Management* [**7] *Company, Inc., 690 S.W.2d 546 (Tex. 1985)*.

Judgment of the trial court is reversed and the cause is remanded for trial.



**CHRISTOPHER MCGINNIS, INDIVIDUALLY, AND BY NEXT FRIEND, BUFFY MCGINNIS, Plaintiffs, VS. UNION PACIFIC RAILROAD CO., Defendant and Third-Party Plaintiff, METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS, Intervenor VS. LIBERTY MUTUAL FIRE INSURANCE COMPANY AND THOSE CERTAIN INDIVIDUAL UNDERWRITERS of LLOYD'S LONDON, FORMING SYNDICATE 1861 AND SYNDICATE 2003 SUBSCRIBING SEVERALLY TO POLICY NUMBER 576/UF7273700 FOR THE 2003 LLOYD'S YEAR OF ACCOUNT, Third-Party Defendants.**

**CIVIL ACTION NO. 3:07-CV-32**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, GALVESTON DIVISION**

***612 F. Supp. 2d 776*; *2009 U.S. Dist. LEXIS 33687***

**March 14, 2009, Decided**

**SUBSEQUENT HISTORY:** Reconsideration granted by, in part, Reconsideration denied by, in part *McGinnis v. Union Pac. R.R. Co., 2009 U.S. Dist. LEXIS 81383 (S.D. Tex., Sept. 8, 2009)*

**PRIOR HISTORY:** *McGinnis v. Union Pac. R.R. Co., 2008 U.S. Dist. LEXIS 112602 (S.D. Tex., Apr. 24, 2008)*

**COUNSEL:** [**1] For Christopher McGinnis, Individually, and by next friend, Buffy McGinnis, Plaintiff: George William Gore, LEAD ATTORNEY, Attorney at Law, Houston, TX.

For Union Pacific Railroad Company, Defendant, ThirdParty Plaintiff: John L Hagan, LEAD ATTORNEY, Jones Day, Houston, TX; Benton R Bond, Union Pacific RR Co, Spring, TX.

For Liberty Mutual Fire Insurance Company, Third Party Defendant: Michael Phillips, LEAD ATTORNEY, Phillips Akers PC, Houston, TX.

For Certain Underwriters at Lloyd's, London, Subscribing to Policy Number 576/UF7273700, Third Party Defendant: John Martin Ribarits, LEAD ATTORNEY, Preis Roy, Houston, TX; Jennifer E Michel, Preis & Roy, Lafayette, LA; Leah N. Englehardt, Preis & Roy, A PLC, New Orleans, LA.

For Tonicstar Limited, Member of Syndicate 1861 and 2003 and Catlin Sydicate Ltd., Member of Syndicate 2003, Subscribing Severally, and Not for One another to Policy Number 576/UF2727300, Third Party Defendant: John Martin Ribarits, LEAD ATTORNEY, Preis Roy, Houston, TX.

For Metropolitan Transit Authority of Harris County, Texas, Intervenor: Bryan S Dumesnil, LEAD ATTORNEY, Bracewell Giuliani LLP, Houston, TX; William G Hagans, Bracewell & Giuliani LLP, Houston, TX.

**JUDGES:** KEITH [**2] P. ELLISON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** KEITH P. ELLISON

**OPINION**

[*782] **MEMORANDUM AND ORDER**

Before the Court are the Motions for Summary Judgment of Third-Party Defendants Liberty Mutual Fire Insurance Company ("Liberty Mutual") (Docket Entry ("Doc.") No. 64) and Underwriters of Lloyd's, London ("Lloyd's") (Doc. No. 66), and all objections, responses and replies thereto (respectively, Doc. Nos. 74, 76, 84 & 85; Doc. Nos. 76, 81, 87, 88 & 90). Also before the Court are the Partial Motions for Summary Judgment of

Third-Party Plaintiff Union Pacific Railroad Company ("UP") (Doc. Nos. 67 & 69) and Intervenor Metropolitan Transit Authority ("Metro") (Doc. No. 65), and all objections, responses and replies thereto (respectively, Doc. Nos. 71, 77, 89 & 91; Doc. Nos. 70, 78, 86).

After reviewing the Motions, all related filings, and the relevant law, the Court finds, for the reasons discussed below, that Liberty Mutual's Motion for Summary Judgment should be granted in part and denied in part, that Lloyd's Motion for Summary Judgment should be denied, [**3] that UP's Motions for Partial Summary Judgment of UP should be granted in part and denied in part, and that Metro's Motion for Partial Summary Judgment should be granted in part and denied in part.

**I. FACTUAL BACKGROUND**

**A. Metro's Light Rail Project**

In 2001, Metro began construction of a light rail transportation system in Houston, Texas. The initial phase of the light rail project included the construction of a 7.5 mile light rail system with 16 stations, downtown street improvements, a Transit Administration building, Park and Ride lots, a test track, a rail operations building, and the design, manufacture, assembly, testing and acceptance of 18 light rail vehicles ("LRVs"). Metro obtained seven major contracts for the construction of the light rail system. One of Metro's contracts for construction was with Siemens Transportation Systems ("Siemens"), the Vehicle and Systems Contractor. Metro's contract with Siemens was on a "ready to go" turnkey basis, which meant that Siemens was responsible for virtually all aspects of the light rail project related to the vehicles and systems, including the track, the LRVs, fare collection, catenary, sub-stations, signaling, and communications. In [**4] particular, the "ready to go" contract made Siemens responsible for the installation of the 18 LRVs, which each required separate testing before Metro would take final acceptance for their use in its light rail transportation system. This testing, [*783] or "burning-in" process, also referred to as commissioning, necessitated Siemens' use of a suitable test track. Siemens was also required to provide Metro employees with operator training and to supervise the LRVs.

**B. Metro's Lease Agreement with Union Pacific**

In order to facilitate the installation or testing by Siemens of Metro's new fleet of LRVs, Metro entered into negotiations with Union Pacific ("UP") for a five year lease agreement to construct, maintain, and operate a test track on UP's land. Because the premises Metro sought to lease for its light rail project were located in close proximity to a railroad right-of-way owned by UP, on which it operated two active rail lines, there was an increased risk that accidents might arise from Siemens' use of the property. Due to the increased risk, Metro and UP agreed to incorporate two important requirements into the lease agreement to protect UP. First, pursuant to the terms of the lease agreement, [**5] Metro was required to purchase specified insurance to protect UP from the increased risk. The agreement provides:

> [Metro] shall, at its sole costs and expense, procure and maintain during the life of this Agreement the following insurance coverage:
>
> A. Commercial General Liability insurance. This insurance shall contain broad form contractual liability with a single limit of at least $ 5,000,000 each occurrence or claim and an aggregate limit of at least $ 10,000,000. Coverage must be purchased on a post 1998 ISO or equivalent form.
>
> * * *
>
> B. Railroad Protective Liability insurance naming only [UP] as the insured with a combined single limit of $ 2,000,000 per occurrence with a $ 6,000,000 aggregate
>
> * * *
>
> C. Workers Compensation and Employers Liability insurance ...
>
> * * *
>
> D. Umbrella or Excess Policies In the event [Metro] utilizes Umbrella or excess policies, these policies shall "follow form" and afford no less coverage than the primary policy.

(Doc. No. 55, Ex. A-4 at Bates 1590-91.)

Metro separately agreed to release and indemnify UP for losses as follows:

> [Metro], to the extent it may lawfully do so, waives and releases any and all claims against [UP] for, and agrees to indemnify, defend and [**6] hold harmless [UP], its affiliates, and its and their officers, agents and employees ("Indemnified Parties") from and against, any loss, damage (including without limitation, punitive or consequential damages), injury, liability, claim, demand, cost or expense (including,

> without limitation, attorneys' fees and court costs), fine or penalty (collectively, "Loss") incurred by any person (including, without limitation, [UP], [Metro], or any employee of [UP] or [Metro]) and arising from or related to (i) any use of the Premises by [Metro] or any invitee or licensee or [Metro], (ii) any act or omission of [Metro], its officers, agents, employees, licensees or invitees, or (iii) any breach of this Lease by [Metro].

(*Id.* at Bates 1587.) The agreement limited the indemnity to situations where UP was not solely negligent. (*Id.*)

**C. The Insurance Policies**

To secure insurance coverage for the light rail transportation system, Metro retained the services of Willis of Texas, an insurance broker. With the assistance of Willis of Texas, Metro purchased a Railroad Protective Liability policy ("RPL"), a Wrap-Up policy, and an Umbrella or Excess [*784] policy. First, with regard to the RPL, in exchange for Metro's [**7] payment of a $ 29,760 advance premium, which was based on a contract cost of $ 30,000,000, Liberty Mutual issued RPL policy number TE2-691-004173-031. The RPL listed "Union Pacific Railroad Company" as the Named Insured and "Metropolitan Transit Authority of Harris County" as the "Designated Contractor." (Doc. No. 64, Ex. A.) The policy provided liability limits in the amount of $ 2,000,000 per occurrence, or an aggregate limit of $ 4,000,000. The effective dates of coverage under the RPL were from March 14, 2001 to September 14, 2004. (*Id.*)

Liberty Mutual also issued Wrap-Up policy number RG2-691-004173-011, in which "Metropolitan Transit Authority of Harris County" was listed as the Named Insured. (Doc. No. 64, Ex. B.) The Wrap-Up policy, consisting of three layers, included an Owner Controlled Consolidated Insurance Program ("OCCIP"), a General Amendatory Endorsement ("GAE"), and a Commercial General Liability Insurance ("CGL") policy. (*Id.*) The policy provided a limit of liability for personal injury and property damage to $ 2,000,000 per occurrence, a general aggregate limit (other than Products-Completed Operations) of $ 4,000,000, and a Products-Completed Operations Aggregate [**8] Limit of $ 4,000,000. (*Id.*) The effective dates for coverage under this policy were from March 14, 2001 to September 14, 2001.

In addition, Lloyd's issued Commercial Umbrella or Excess policy number 576/UF72727000, with effective dates of coverage from March 14, 2001 to September 14, 2004. (Doc. No. 65, Ex. B.) The "Schedule" listed "the Assured" as "The Metropolitan Transit Authority of Harris County, Texas (Metro) and others, all as more fully set forth in the attached Policy Wording." The Declarations listed the "Named Insured" as "THE METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS (METRO), Contractors, Subcontractors of any tier and Consultants and Sub-Consultants of any tier, for whom any afore-mentioned Insureds have agreed by contract to furnish the insurance coverage provided under this policy per the project." (*Id.*) As set forth in the Declarations page, the Umbrella policy provided limits of $ 50,000,000 per occurrence, $ 50,000,000 General Aggregate (in accordance with Section III, Limits of Insurance), and $ 50,000,000 Products-Completed Operations Aggregate for the period (otherwise in accordance with Section III, Limits of Insurance). The Declarations page also [**9] provided that there was a $ 25,000 "Self Insured Retention (inclusive of Defense Costs)." (*Id.*)

**D. The Accident, Subsequent Claims & Settlements**

On January 23, 2004, Christopher McGinnis, a UP worker, was operating one of UP's Hyrail vehicles. He was traveling to a work site on the railroad tracks. As he waited behind another Hyrail vehicle that had already crossed the LRV test track and had maneuvered onto the rail road tracks, another UP employee manually lifted the crossing arm so that McGinnis could also cross the test track and maneuver his Hyrail vehicle onto the railroad tracks. McGinnis was not aware that a LRV was approaching the crossing. The LVR, unable to stop, collided with McGinnis s Hyrail vehicle. The collision seriously injured McGinnis. Several individuals on the LRV also sustained injuries.

Following the collision, the individuals on the LRV who were injured brought suit against UP and McGinnis, and McGinnis filed the instant suit against UP. UP placed Liberty Mutual on notice of the loss, tendered both the claims and suits brought against it to Liberty Mutual under the RPL policy, and demanded a defense [*785] and indemnity. In addition, pursuant to the contractual indemnification [**10] obligation in the Lease Agreement, UP tendered the claims and suits brought against it to Metro. Metro, in turn, tendered UP's demands for contractual indemnity to Liberty Mutual and demanded a defense and indemnity under the CGL policy. Liberty Mutual denied UP's demand for defense and indemnity under the RPL policy. Liberty Mutual also denied Metro's demand for coverage. UP and Metro made similar demands for defense and indemnity to Lloyd's under the Umbrella policy, but their demands were denied.

After conducting an investigation of the accident, UP decided to settle the claims brought by the individuals on the train, as well as the lawsuit brought by McGinnis. UP alleges that it paid close to six million dollars to settle all

the bodily injury and property damages claims arising out of the accident.

## II. PROCEDURAL BACKGROUND

Plaintiff Christopher McGinnis filed his Complaint against UP on January 19, 2007. McGinnis settled his claims UP on March 23, 2007. On March 29, 2007, before the case was officially closed, UP filed its Third-Party Complaint against Liberty Mutual and Lloyd's for the following: (1) breach of contract under the RPL and the Umbrella policy; (2) declaratory judgment; [**11] (3) violations of *Sections 541.060*, *541.061*, *541.151*, and *542.051* of the Texas Insurance Code; (4) fraud; and (5) in the alternative, reformation of the policies based on mutual mistake, and relief based on waiver and estoppel. (Doc. Nos. 9 & 46.) Metro successfully intervened in the action on April 5, 2007. (Doc. Nos. 13 & 14.) Metro's Complaint, and Amended Complaint in Intervention, allege the same causes of action brought by UP. (Doc. No. 47.)

Meanwhile, on April 5, 2007, Liberty Mutual and Lloyd's filed a lawsuit based on the same policies and events in the 133rd Judicial District Court of Harris County, Texas, effecting service on April 10, 2007. Discovery in the state case was conducted for use in either court. Thereafter on January 30, 2008, UP filed an Amended Third-Party Complaint (Doc. No. 46) and Metro filed an Amended Intervenor Complaint (Doc. No. 47.) Amended Answers were then filed by Third-Party Defendants Liberty Mutual and Lloyd's.

Each of the parties then filed Motions for Summary Judgment. On June 16, 2008, Liberty Mutual and Lloyd's filed their respective Motions for Summary Judgment with each maintaining that, for various reasons, no coverage exists under the Railroad [**12] Protection Liability policy ("RPL"), the Wrap-Up policy, or the Umbrella policy. Also on June 16, 2008, Metro filed its Motion for Partial Summary Judgment (Doc. No. 65) and, on June 19, 2008, UP filed Motions for Partial Summary Judgment with regard to the RPL and the Umbrella policy. (Doc. Nos. 67 & 69.) The parties have filed their respective responses and replies and, thus, this case is ripe for adjudication.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*. A fact is "material" if its resolution in favor of one party might affect the outcome of the suit under governing law. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *see also United* [*786] *States v. Arron, 954 F.2d 249, 251 (5th Cir. 1992)*. "An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cooper Tire & Rubber Co. v. Farese, 423 F.3d 446, 454 (5th Cir. 2005)*.

Under *Rule 56(c)*, [**13] the moving party bears the initial burden of informing the court of the basis for its belief that there is an absence of a genuine issue for trial and of identifying those portions of the record that demonstrate such an absence. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *see also, Burge v. Parish of St. Tammany, 187 F.3d 452, 464 (5th Cir. 1999)*.

Where the moving party meets its initial burden under *Rule 56(c)*, the burden then shifts to the nonmovant to show a genuine issue of material fact exists that precludes summary judgment. "[T]he nonmoving party must come forward 'with specific facts showing that there is a *genuine issue for trial.*'" *Matsushita, 475 U.S. at 586-87* (quoting *FED. R. CIV. P. 56(e)*) (emphasis in original); *see also, Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. To sustain the burder, the nonmoving party must produce evidence admissible at trial. *See Anderson, 477 U.S. at 242*; *see also, Thomas v. Price, 975 F.2d 231, 235 (5th Cir. 1992)* ("To avoid summary judgment, the nonmoving party must adduce evidence which creates a fact issue.").

At the summary judgment stage, the court views the facts in a light most favorable to [**14] the nonmoving party and draws all reasonable inferences in favor of the nonmovant, but only when "there is a 'genuine' dispute as to those facts." *Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007)*; *see also Goodson v. City of Corpus Christi, 202 F.3d 730, 735 (5th Cir. 2000)* ("[T]he nonmoving party may not rest on the mere allegations or denial of its pleadings, but must respond by setting forth specific facts indicating a genuine issue for trial."). "[A] nonmovant cannot overcome summary judgment with conclusory allegations and unsubstant ared assertions." *Mace v. City of Palestine, 333 F.3d 621, 624 n. 7 (5th Cir. 2003)*; *see also Johnston v. City of Houston, Tex., 14 F.3d 1056, 1060 (5th Cir. 1994)* ("only evidence-not argument, not facts in the complaint--will satisfy the burden."). Nor can the nonmovant overcome summary judgment by showing "some metaphysical doubt as to the material facts" in an attempt to create a genuine dispute. *Matsushita, 475 U.S. at 584-86*.

## IV. ANALYSIS

Texas rules of contract interpretation apply in this diversity case. *Canutillo Indep. Sch. Dist. v. National*

*Union Fire Ins. Co., 99 F.3d 695, 700 (5th Cir.1996)*. The interpretation [**15] of insurance contracts is governed by the same rules that apply to contracts generally. *Id.* They must be interpreted to effectuate the intent of the parties at the time the contracts were formed. *Kelley-Coppedge, Inc. v. Highlands Ins. Co., 980 S.W.2d 462, 464 (Tex. 1998)*; *Glover v. Nat'l Ins. Underwriters, 545 S.W.2d 755, 761 (Tex. 1977)*. When the words of a policy are unambiguous, they are to be given their plain, ordinary, and generally accepted meaning, unless the policy clearly indicates that the contractual terms have been used in a different of technical sense. *Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 (Tex. 1984)*. When the language of a policy is susceptible to more than one construction, however, it should be construed strictly against the insurer and liberally in favor of the insured. *Barnett v. Aetna Life Ins. Co., 723 S.W.2d 663, 666 (Tex. 1987)*; *see also, Nat'l Union Fire Ins. Co. v. Hudson Energy Co., 811 S.W.2d 552, 555* [*787] *(Tex. 1991)* (holding that any ambiguities in a policy are construed against the drafter). Where the question of interpretation involves an exception or limitation on the insurer's liability under the policy, an even more stringent construction [**16] is required. *Barnett, 723 S.W.2d at 666*.

## V. RAILROAD PROTECTIVE LIABILITY ACT

### A. Liberty Mutual and UP's Cross Motions for Summary Judgment

Liberty Mutual and UP have filed cross motions for Summary Judgment regarding the RPL policy. Liberty Mutual contends that there is no coverage for UP under the RPL for the following reasons: (1) the bodily injury and property damage were not related to or in connection with the "work" described in the policy; and (2) any coverage would be excluded based on the "completed work" exclusion, the non-insured's contractual liability exclusion, and the sole proximate cause exclusion. (Doc. No. 64.) UP responds that the bodily injury and property damage fall were covered, and that Liberty Mutual failed to establish the application of its policy exclusions. (Doc. No. 74.)

UF seeks declaratory relief under the RPL policy based on the following grounds: (1) that the policy provides coverage for bodily injury or property damage arising out of acts or omissions at the test track and related to work or operations performed by Metro or its subcontractors; (2) that liability is established, as a matter of law, by the settlement of the underlying claims; (3) that [**17] Liberty Mutual breached its duty to defend UP; (4) that the "completed work" exclusion does not apply; and (5) that Liberty Mutual breached its duty to pay for property damage to UP's Hyrail vehicle. (Doc. No. 67.) UP also contends that it is entitled to recover attorney fees from Liberty Mutual. (*Id.*)

### B. Coverage for Bodily Injury and Property Damage

Liberty Mutual contends that, under the RPL policy, the covered work, as described in the Declarations, was clearly and unambiguously limited to laying the test track, and the accident occurred after the test track was completed. Conversely, UP maintains that the covered work, as described in the Declarations, was not limited to (or intended to be limited to) the construction of the test track, but also included the testing or commissioning of the LRV on the test track.

The Court starts with the policy language. As contained in "Section I - Coverages," the RPL provides:

> ... [Liberty Mutual] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" ... [artsing] out of acts or omissions at the "job location" which are related to or are in connection with the "work" described [**18] in the Declarations.

(Doc. No. 64, Ex. A; Doc. No. 65, Ex. A-6.)

There is no dispute that UP is the named insured under the policy. (Doc. No. 64, Ex. A.) Nor can there be any dispute that UP was "legally obligated to pay" damages because of "bodily injury" or "property damage." *Lennar Corp. v. Great Am. Ins. Co., 200 S.W.3d 651, 680 (Tex.App.--Houston [14th Dist.] 2006, pet. denied)* (interpreting "legally obligated to pay" to mean an obligation imposed by law, such as an obligation to pay pursuant to a judgment, settlement, contract or statute); *Comsys Info. Tech. Servs. v. Twin City Fire Ins. Co., 130 S.W.3d 181, 189 n. 3 (Tex.App.--Houston [14th Dist.] 2003, pet. denied)* (recognizing a judgment is not the only manner by which an insured can become legally obligated to pay because a legal obligation can also arise [*788] out of a contract, such as a settlement); *Texas Prop. & Cas. Ins. Guar. Ass'n v. Boy Scouts of Am., 947 S.W.2d 682, 691 (Tex.App.--Austin 1997, no writ)*. The policy defines "job location" as follows: "the job location designated in the Declarations including any area directly related to the 'work' designated in the Declarations. 'Job location' includes the ways next to [**19] it." (Doc No. 64, Ex. A, Section V -- Definitions.) The Declarations page designates "Houston, Texas" as the "job location." (*Id.*) [1] The bodily injury or property damage arose out of acts or omissions at the job location, which was Houston, Texas.

1 Inconsistent with the Declarations page, Liberty Mutual erroneously refers to the Job Location as "a two-mile span 25 feet from existing track." (Doc. No. 64 at 6.)

The dispute between the parties is over the policy provision which requires that the acts or omissions at the "job location" must be related to or connected with the "work" as described in the Declaration. "Related to or connected with" is not defined in the policy. Texas courts have broadly construed the phrase "aris[ing] out of [or] . . . related to or . . . in connection with." *Utica Nat'l Ins. Co. v. American Indem. Co., 141 S.W.3d 198, 203 (Tex. 2004)* ("'arise out of' means that there is simply a 'causal connection or relation,' which is interpreted to mean that there is but for causation, though not necessarily direct or proximate causation"); *Scottsdale Ins. Co. v. Texas Sec. Concepts & Investigation, 173 F.3d 941, 943 (5th Cir. 1999)* (phrase "arising out of" means that "a [**20] claim need only bear an incidental relationship to the described conduct[.]"); *Fontenot v. Mesa Petroleum Co., 791 F.2d 1207, 1214 (5th Cir. 1986)* (language "arising in connection herewith" contained in indemnity agreement unambiguously encompasses all activities reasonably incident to or anticipated by principal activity of contract). The policy defines "work" to mean "work or operations performed by the 'contractor' including materials, parts or equipment furnished in connection with the work or operations." "Operations," while not defined in the policy, [2] ordinarily means "the operating of or putting and maintaining in action of something (as a machine or an industry)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONAEY 1581 (1993).

2 When not defined in an insurance policy, a court will give the terms used in the insurance contract their ordinary and generally accepted meaning. *Pa. Pulp & Paper Co. v. Nationwide Mut. Ins. Co., 100 S.W.3d 566, 574 (Tex.App.--Houston [14th Dist.] 2003, pet. denied)*.

The cornerstone of the parties' dispute centers on the meaning and scope of the "work" described in the Declarations. In particular, Item 6 of the Declarations page, which is titled the "Designation [**21] of the Job Site and Description of Work," provides the following:

> Two mile test track built 25 feet from existing track. Metro will be laying track across an existing bridge that runs over Union Pacific tracks (no bridge construction).

(Doc. No. 64, Ex. A.) Liberty Mutual contends that "[t]he above designation unambiguously limits the scope of the 'work' to the laying of a two-mile test track" and since the accident occurred after the test track was completed, there is no coverage. UP counters that Liberty Mutual's position is flawed for several reasons. First, UP contends that Liberty Mutual only reaches this interpretation by reading the first and second sentences together and, thus, arguing that the work described in the Declarations only consisted only of laying the "[t]wo mile test track" that was "25 feet from existing track." UP maintains that Liberty Mutual has improperly [*789] merged the two sentences together because each sentence actually refers to a separate job site. In support of its argument, UP offers evidence, in the form of the RPL Policy Questionnaire, which it states clarifies that the two sentences, in fact, refer to two separate areas or job sites where an exposure point [**22] existed. Second, UP argues that, once clarified, Item 6 is ambiguous because it can reasonably be read as describing the job site (*i.e.*, the two-mile test tract which was built 25 feet from an existing track) as opposed to providing a description of the work to be done at this location.

**1. Whether an Ambiguity Exists**

Determining whether an ambiguity exists in a contract is a question of law which a court decides in light of the surrounding circumstances. *R&P Enterprises LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980)*. "A court may conclude that a contract is ambiguous even in the absence of such pleading by either party." *Sage Street Assocs. v. Northdale Construction Co., 863 S.W.2d 438, 445 (Tex. 1993)*; *see also, Texas v. American Tabacco Co., 463 F.3d 399, 407 n. 14 (5th Cir. 2006)*. A contract is not ambiguous if it can be given a definite or certain meaning as a matter of law. *Nat'l Union Fire Ins. Co. v. CBI Industries, Inc., 907 S.W.2d 517, 520 (Tex. 1995)*. An ambiguity will exist if the contract language is "uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)*. An ambiguity does not arise [**23] based merely on conflicting interpretations of the contract language. *Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994)*. Parole evidence is also not admissible to render a contract ambiguous. *Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 732 (Tex. 1981)*.

An ambiguity may be patent (*i.e.,* evident on the face of the contract), or latent (*i.e.,* apparent when a contract is applied to the subject matter with which the contract deals). *CBI Indus., Inc., 907 S.W.2d at 520* (a latent ambiguity exists when the contract appears to convey a sensible meaning on its face, but it cannot be carried out without further clarification). When a latent ambiguity arises, the focus shifts to the facts and circumstances under which the agreement was made (*Centerpoint En-*

*ergy Houston Elec., L.L.P. v. Old TJC Co., 177 S.W.3d 425, 431 (Tex.App.--Houston [1st Dist.] 2005, pet. denied)),* and parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement. *CBI Indus., Inc., 907 S.W.2d at 520*; *see also, Balandran v. Safeco Ins. Co. of America, 972 S.W.2d 738, 741 (Tex. 1998)* (court examined surrounding circumstances); *Bache Halsey Stuart Shields, Incorp. v. Alamo Savings Assoc. of Texas, 611 S.W.2d 706, 708 (Tex.Civ.App.--San Antonio 1980, no writ)* [**24] (quoting *Murphy v. Dilworth, 137 Tex. 32, 151 S.W.2d 1004, 1005 (Tex. 1941)* ("[W]here a question concerning the interpretation of a contract arises, a court will 'take the wording of the instrument, consider the same in light of the surrounding circumstances and apply the pertinent rules of construction thereto and thus settle the meaning of the contract.'")). "This does not mean, however, that the parties may prove the making of an agreement different from that expressed in the written contract, nor that the unambiguous language used in the contract may be violated or the legal effect thereof changed." *Murphy, 151 S.W.2d at 1005*. Instead, "[i]t can do no more than explain the doubtful relations of the instrument consistently with the relations of the parties, the subject matter of the contract, and the other incidents thereof." *Id. at 1006*.

[*790] In the instant case, in an attempt to show the surrounding circumstances from which a latent ambiguity emerged, UP asks the Court to consider the RPL Policy Questionnaire. While Liberty Mulual objects to the introduction of the RPL Application on the ground that consideration of the extrinsic evidence it is improper, the Court **OVERRULES** the objection as the [**25] evidence is permissible to show the circumstances surrounding the contract.

As urged by UP, the RPL Policy Questionnaire clarifies the circumstances surrounding the policy. The responses to the RPL Policy Questionnaire were provided to Liberty Mutual by Willis of Texas. (Doc. No. 67, Ex. 4.) The responses to the questionnaire provided that the total estimated cost of the job was $ 30 million with an estimated $ 4.5 to $ 4.7 million of the total amount attributed to the cost of the work within 50 feet of the railroad tracks. (*Id.*) In response to a quest on regarding the "duration of the work within 50 feet of tracks," Willis of Texas responded that "[b]ecause LRV testing will be done assume testing will occur on tracks within 25 feet of existing track for the term." (*Id.*) Further, when asked about the "Location/Description of Project plus work directly affecting railroad operations," Willis of Texas responded that "[t]here will be a two mile test track built 25 feet from existing track. Metro will by laying track across an existing bridge that runs over Union Pacific tracks (no bridge construction)." (*Id.*) However, Willis of Texas further qualified that "[t]wo exposure points exist. [**26] The rail yard where the light rail vehicles (LRVs) are being assembled and tested and railroad overpass. The overpass is an existing bridge." (*Id.*)

In light of the surrounding circumstances of the contract, the two sentence description contained in Item 6 referred to two different sites. Given this clarification, as urged by UP, the Court agrees that an ambiguity exists because an alternate, but just as reasonable, interpretation of Item 6 is that the first sentence ("Two mile test track built 25 feet from existing track) merely describes the location where work would be done, but not the action to be taken at that location.

**2. The Effect of the Ambiguity**

Generally, Texas law provides that, when an insurance contract is susceptible to more than one reasonable interpretation, a court must resolve the uncertainty by adopting the construction that most favors the insured. *Barnett, 723 S.W.2d at 666*. This rule is derived from the more general rule that ambiguous contracts are construed against the drafter. *Balandran, 972 S.W.2d at 741 n.1*; *Temple-Eastex, Inc. v. Addison Bank, 672 S.W.2d 793, 798 (Tex. 1984)*. However, in the present case, the Court's concern is that the description of the [**27] work found in Item 6 of the Declarations was derived, almost verbatim, from the RPL application that Willis of Texas completed and provided to Liberty Mutual, and, given the incorporated language, it is far from clear what the parties actually intended. Therefore, the Court cannot automatically find coverage based on ambiguity in the insurance agreement. Because the Court finds that this coverage dispute cannot be resolved based on available rules of contract interpretation, the court must resort to parole evidence to determine whether the contracting parties intended the RPL to provide coverage for building the test track, as well as for the use of the track to commission the LRVs. While it is true that the parties have offered parole evidence regarding their intent, the scope of the light rail project, the carrier's classification of the policy, the amount of the premium paid in relation to the project, and the purported post-accident conduct by Liberty Mutual in extending the policy for testing, [*791] genuine issues of material fact exist which preclude this Court from deciding this issue as a matter of law. Instead, the Court reserves for the trier of fact the disputed issue concerning [**28] the scope of the work as set forth in the Item 6 of the Declarations. Accordingly, on the issue of coverage under the RPL policy, Liberty Mutual's Motion for Summary Judgment and UP's Motion for Partial Summary Judgment on this issue of coverage under the RPL policy are both denied.

**C. Coverage for UP's Property Damage**

UP also seeks a declaration that it is entitled to coverage for the damage to its property. (Doc. No. 67 at 21.) Liberty Mutual responds that the policy's liability coverage will not extend to cover damage to UP's own property. (Doc. No. 71 at 17.) UP clarifies that it is not making a claim under Coverage A (Liability), but is instead making a claim under Coverage B (first-party property damage coverage). (Doc. No. 91 at 19.) Coverage B provides:

> We will pay for "physical damage to property" to which this insurance applies. The "physical damage to property" must occur during the policy period. The "physical damage to property" must arise out of acts or omissions at the "job location" which are related to or in connection with the "work" described in the Declarations. The property must be owned by or leased or entrusted to you under a lease or trust agreement.

(Doc. No. 64, [**29] Ex. A.) The policy defines "physical damage to property" as "direct and accidental loss of or damage to rolling stock and their contents, mechanical construction equipment or motive power equipment, railroad tracks, roadbeds, catenaries, signals, bridges or buildings." (*Id.*)

Liberty Mutual does not dispute that the damage to UP's signal clearly falls within the definition of "physical damage to property." Liberty Mutual disputes whether the Hyrail vehicles involved in the accident fall within the definition of "physical damage to property" because they are not mechanical construction equipment or motive power equipment." (Doc. No. 71 at 17.) The policy does not define "mechanical construction equipment" or "motive power equipment" and, as such, the terms should be given their plain, ordinary meaning. (Doc. No. 91 at 19.) UP urges that the "undisputed evidence is that the two [Hyrail] vehicles involved in the Accident were 'mechanical [track] construction equipment' and/or 'motive power equipment' in the ordinary sense of those words." (*Id.*) The Court agrees with UP; however, this does not resolve the dispute. Similar to the coverage provision discussed above, Coverage B still requires [**30] that the "physical damage to property must arise out of acts or omissions at the 'job location' which are related to or in connection with the 'work' described in the Declarations." (Doc. No. 64, Ex. A.) For the same reasons previously discussed, the Court reserves for the trier of fact the disputed issue concerning the scope of the work as set forth in the Item 6 of the Declarations. Accordingly, UP's Motion for Partial Summary Judgment as to the RPL's coverage for property damage is denied.

**D. The Completed Work Exclusion**

Liberty Mutual and UP have also filed cross-motions on whether the RPL excludes coverage for bodily injury or property damage that occurs after the work is completed. In particular, the Completed Work Exclusion in the policy provides:

> The "work" will be deemed completed at the earliest of the following times:
>
> > (1) When all the "work" called for in the "contractor's" contract has been completed.
> >
> > [*792] (2) When all the "work" to be done at the "job location" has been completed.
> >
> > (3) When that part of the "work" done at the "job location" has been put to its intended use by you, the governmental authority or other contracting party.

"Contractor" is defined under the policy to mean [**31] "the contractor designated in the Declarations and includes all subcontractors working directly or indirectly for that 'contractor' but does not include you." Metropolitan Transit Authority of Houston is listed on the Declarations page as the "Designated Contractor." In addition, the policy defines "work" to mean "work or operations performed by the 'contractor,' including materials, parts or equipment furnished in connection with the work or operations."

There is no real dispute that the test track at this job location was laid or that the testing of the light rail trains was in progress. Instead, once again, the dispute centers on the meaning and scope of "work" as defined in the policy and as harmonized with the "work" described in the Declarations. (*See* Doc. No. 91 at 18.) Liberty contends that the completed work exclusion was triggered because the earliest of the times delineated was when Metro completed laying the test track 25 feet from the UP track, and the test track was put to its intended use by the contracting party, whereas UP counters that the "work" did not just consist of laying the track, but also included the testing or commissioning of each of the light rail trains. [**32] Once again, for the same reasons previously discussed, the Court reserves for the trier of fact the disputed

issue concerning the scope of the work as set forth in the Item 6 of the Declarations. Accordingly, both Liberny Mutual's Motion for Summary Judgment and UP's Motion for Partial Summary Judgment on this point must be denied.

**E. The Non-Insured Contract Liability Exclusion**

Liberty Mutual maintains that coverage does not extend to UP under the RPL due to the non-insured contract liability exclusion. (Doc. No. 64 at 11-12.) The policy excludes coverage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." (Doc. No. 64, Ex. A.) For the purposes of the exclusion, Union Pacific did not assume the liability in a contract or agreement; rather, it was Metro who assumed the liability, and Metro is not an insured as defined under the policy. Thus, this exclusion is inapplicable and Liberty Mutual's Motion for Summary Judgment on this point is denied.

**F. Sole Proximate Cause of Loss Exclusion**

Liberty Mutual claims that "Union Pacific is solely to blame for the accident" and, therefore, coverage is precluded based on the policy's [**33] sole proximate cause of loss exclusion. (Doc. No. 64 at 12.) The RPL policy contains an exclusion for "Acts or Omissions of Insured." The exclusion provides:

> "Bodily injury" or "property damage", the sole proximate cause of which is an act or omission of any insured other than acts or omissions of any of "your designated employees". This exclusion does not apply to injury or damage sustained at the "job location" by any of "your designated employees" or employee of the "contractor", or by any employee of the governmental authority or any other contracting party (other than you) specified in the Declarations.

(Doc. No. 54, Ex. A at 2.)

UP counters that Liberty Mutual has not established, as a matter of law, that UP was "the sole proximate cause" of this accident. UP initially maintains that this exclusion is limited to UP or its corporate [*793] executives and does not apply to any alleged negligence on the part of either UP worker Christopher McGinnis or the other UP worker involved in the accident. For purposes of this exclusion, the policy defines "insured" as: "(1) 'you' (the named insured shown in the declarations or [UP]); (2) your 'executive officers' and directors, but only with respect [**34] to their duties as your officers and directors; (3) your stockholders; and (4) any railroad operating over your tracks." (*Id.*, Ex. A at 3.) Notably, as urged by UP, the policy's definition of "insured" does not include all UP employees. [3]

> 3 Although irrelevant given the facts in this case, the policy also defined "insured" to include "your designated employees" which were defined as: "(a) [a]ny supervisory employee of yours at the 'job location'; (b) [a]ny employee of yours while operating, attached to or engaged on work trains or other railroad equipment at the 'job location' which are assigned exclusively to the 'contractor'; or (c) [a]ny employee of yours not described in a. or b. above who is specifically loaned or assigned to the work of the 'contractor' for the prevention of accidents or protection of property." (Doc. No. 64, Ex. A at 7.)

Under Texas law, exclusions in an insurance policy must be construed narrowly. *Barnett, 723 S.W.2d at 666*; *Glover, 545 S.W.2d at 761*. Had Liberty Mutual wanted to exclude coverage when the sole proximate cause of the loss was caused by either UP or any of UP's employees, it could have explicitly done so, and the failure to include UP's employees [**35] within the explicit definition of "insured" suggests that this particular policy exclusion should be construed against Liberty Mutual. *Barnett, 723 S.W.2d at 665*. Notwithstanding this fact, summary judgment is inappropriate because, as conceded by the parties (*See* Doc. No. 74 at 16-20; Doc. No. 84 at 9 n. 11), the determination of whether UP's acts or omissions were the sole proximate cause of the collision is normally a question of fact. *See generally, Texas Pacific Indem. Co. v. Bldg Material Distrib. Inc., 508 S.W.2d 488, 489 (Tex.Civ.App.--Waco 1974, writ ref'd n.r.e.)* (sole proximate cause was defined for a jury to mean "the only proximate cause [and] [i]f there is more than one proximate cause of an event, then no single proximate cause can be the sole proximate cause."). Furthermore, as urged by UP, this exclusion does not apply to bodily injury or property damage sustained by employees of the "contractor," or by any employee of the governmental authority, or any other contracting party specified in the declarations. "Contractor" is defined to include the contractor designated in the Declarations, which is Metro, and "all subcontractors working directly for that 'contractor' [**36] [Metro]." (Doc. No. 64, Ex. A. at p. 6 of 7.) Thus, with regard to the injury or damage sustained by either Metro employees or employees of its subcontractors, the exception to the exclusion applies. Thus, this exclusion would not preclude coverage for the $ 465,702.05 UP paid to settle injury or damage claims brought by either Metro employees or its subcontractors. (Doc. No. 74 at 17.)

Accordingly, based on the reasons stated, Liberty Mutual's Motion for Summary Judgment based on the sole proximate cause of loss exclusion is denied.

**G. Fraud, Mutual Mistake And Estoppel**

Liberty Mutual seeks dismissal of UP and Metro's claims of fraud, mutual mistake and estoppel as it relates to the RPL policy. (Doc. No. 64 at 21-24.) These issues, however, are inextricably linked to the determination regarding the scope of work to which the RPL policy applied. The Court, having reserved the disputed issue concerning the scope of the work to a trier of fact, defers these issues as well. Liberty Mutual's Motion for Summary Judgment on the ground that [*794] UP and Metro's claims for fraud, mutual mistake, and estoppel with regard to the RPL is denied.

**H. UP's Insurance Code Claims**

Liberty Mutual seeks dismissal [**37] of UP's claims which allege violations of various insurance provisions. Liberty Mutual contends that where there is no coverage, there can be no violation. Liberty Mutual also asserts that UP's claims under the insurance code are barred by limitations. (Doc. No. 64 at 20.) The Court concludes that the determination of these issues is best deferred pending the resolution of the coverage issues. Liberty Mutual's Motion for Summary Judgment on this ground is, therefore, denied without prejudice to reconsideration if appropriate.

**I. Attorney's Fees**

UP seeks to recover attorney fees for the prosecution and defense of this suit pursuant to *Sections 37.009* and *38.001* of the Texas Civil Practice and Remedies Code. (Doc. No. 67 at 22.) Liberty Mutual argues that UP is not entitled to recover attorney's fees under *Section 38.001* because it has not prevailed. (Doc. No. 71 at 24.) Liberty Mutual also argues, relying on *Utica Lloyd's of Texas v. Mitchell, 138 F.3d 208, 209 (5th Cir. 1998)*, that UP is not entitled to attorney's fees under *Section 37.009*. (Doc. No. 71 at 24.)

*Section 38.001 of the Texas Civil Practice & Remedies Code*, in relevant part, provides that "[a] person may recover reasonable [**38] attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for: ... an oral or written contract." *TEX. CIV. PRAC. & REM.CODE § 38.001*. In order to recover attorney's fees pursuant to *Section 38.001*, a party must be a prevailing party and recover actual damages on its claim. *See Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex.1997)* ("To recover attorney's fees under *Section 38.001*, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover [actual] damages."); *see also, Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 201 (Tex.2004)* (per curiam) (noting that even though the claimant had a valid claim, it "was not entitled to recover attorney's fees because it was not awarded damages on its breach of contract claim"). In this case, it is premature to consider UP's entitlement, if any, to attorney's fees under *Section 38.001*. *See Solis, 951 S.W.2d at 390*.

*Section 37.009 of the Texas Civil Practice & Remedies Code* provides that in any proceeding under the Texas Uniform Declaratory Judgments Act ("DJA"), "the court may award costs and reasonable and necessary attorney's [**39] fees as are equitable and just." *TEX. CIV. PRAC. & REM.CODE §37.009*. However, as urged by Liberty Mutual, the Fifth Circuit's holding in Utica forecloses UP's request for attorney's fees under *Section 37.009*. *Utica Lloyd's of Texas v. Mitchell, 138 F.3d 208, 209 (5th Cir. 1998)* (holding that "a party may not rely on the Texas DJA to authorize attorney's fees in a diversity case because the statute is not substantive law."); *see also, Camacho v. Texas Workforce Comm'n, 445 F.3d 407, 409-410 (5th Cir.)* (reaffirming validity of *Utica), cert. denied, 549 U.S. 826, 127 S. Ct. 349, 166 L. Ed. 2d 44 (2006)*.

UP's Motion for Partial Summary Judgment seeking attorney's fees under *Section 37.009* is denied with prejudice, but its request for attorney's fees under *Section 38.001* is denied, without prejudice, as premature.

**VI. WRAP UP POLICY**

**A. Liberty Mutual's Motion for Summary Judgment**

**1. Whether UP is an Insured**

Liberty Mutual maintains that UP is not an insured under the Wrap Up [*795] policy. UP responds by requesting the Court to defer any determination of whether it is an insured under this policy until after addressing the RPL policy. In particular, UP argues that if no coverage is afforded under the RPL, then it may qualify as an [**40] insured under the GAE. However, considering UP's response to Liberty Mutual's Motion, the Court sees no compelling reason to defer this determination.

Metro procured a Wrap-Up policy for the Light Rail Project. As explained by Liberty Mutual, the Wrap Up policy consists of "a three-layered pyramid" of coverage with the base layer being the Commercial General Liability ("CGL") policy, which was modified by a General Amendatory Endorsement ("GAE"), and then further modified by the Owner Controlled Consolidated Insurance Program Amendment of Coverage ("OCCIP" Amendments). (Doc. No. 64 at 12-13, Ex. B.)

The OCCIP Amendment provides that the insureds protected by the Wrap Up policy include the First Named Insured (Metro), the Additional Named Insureds set forth in the Schedule of the OCCIP Amendment, and any Additional Named Insureds identified in the underlying CGL or GAE. (Doc. No. 64, Ex. B at Bates "Metro 1484".) The "ADDITIONAL NAMED INSURED SCHEDULE" provides:

> All subcontractors of any tier, as their interests may appear, for whom the First Named Insured has agreed by contract to provide general liability coverage under the owner controlled insurance program, excluding vendors, suppliers, [**41] off-site fabricators, material dealers and others who merely make deliveries to or from the Project Site(s).

(Doc. No. 64, Ex. B at Bates "Metro 1485".) UP is not a subcontractor of Metro. Thus, UP is not an additional insured under the provisions of the OCCIP policy. UP also does not qualify as the Named Insured or as an additional insured under the definitions contained in the CGL policy. (Doc. No. 64, Ex. B at Bates "Metro 1465; 1509; 1519-20".)

Finally, the GAE policy contains a "Blanket Additional Insured" Amendment that provides:

> SECTION II - WHO IS AN INSURED is amended to include as an insured any person, organization, state or other political subdivision, trustee or estate for whom you have agreed in writing to provide liability coverage. But:
>
> The insurance provided by this amendment:
>
> 1. Applies only to "personal injury" or "property damage" arising out of (a) "your work" or (b) premises or other property owned by or rented to you;
>
> 2. Applies only to coverage and limits of insurance required by the written agreement, but in no event exceeds either the scope of coverage or the limits of insurance provided in this policy; and
>
> 3. Does not apply to any person, organization, state or [**42] other political subdivision, trustee or estate for whom you have procured separate liability insurance while such insurance is in effect, regardless of whether the scope of coverage or limits of insurance of this policy exceed those of such other insurance or whether such other insurance is valid and collectible.

(Doc. No. 64, Ex. B at Bates "Metro 1479".) In the present case, while it is true that Metro was required by the Lease Agreement to provide coverage for UP, there is no dispute that Metro procured separate liability insurance for UP in the form of the RPL. [4] Nor is there any dispute [*796] that the RPL policy was in effect on the date of the incident. The Court, therefore, grants Liberty Mutual's Motion for Summary Judgment on the ground that UP is not an insured under the Wrap-Up policy.

4 By the terms of the terms of the Lease of Property agreement, Metro was required, at its own cost and expense, to procure an RPL policy for UP. (Doc. No. 64, Ex. C.)

**VII. METRO'S CLAIM FOR DECLARATORY RELIEF** [5]

5 The issue regarding whether Metro's action presents a justiciable controversy is one which is raised against Metro by both Liberty Mutual and Lloyds under their respective policies. In fact, [**43] in their respective Motions for Summary Judgment against Metro, Liberty Mutual and Lloyd's adopted and incorporated by reference each others arguments. To avoid unnecessary duplication, the Court addresses all the insurance carriers arguments against Metro based on justiciability herein.

Liberty Mutual and Lloyd's assert that Metro should not be permitted to proceed with its Complaint in Intervention seeking declaratory relief because no justiciable controversy exists between the parties--namely, Metro and UP.

The federal Declaratory Judgment Act provides, in part, the following:

> In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

*28 U.S.C. § 2201*. The purpose of the Act "is to settle 'actual controversies' before they ripen into violations of law or a breach of contractual duty." *Hardware Mut. Cas. Co. v. Schantz, 178 F.2d 779, 780 (5th Cir. 1949)*. A district court has discretion in deciding whether to entertain a declaratory judgment action. *St. Paul Ins. Co. v. Trejo, 39 F.3d 585, 590 (5th Cir. 1994)*. [**44] In making this determination, the court must consider (1) whether the declaratory action is justiciable; (2) whether the court has authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action. *Orix Credit Alliance, Inc. v. Wolfe, 212 F.3d 891, 895 (5th Cir. 2000)*.

The law provides that for an action to be justiciable, an "actual controversy" must exist between the parties. *Wolfe, 212 F.3d at 895*. In other words, to be justiciable, the action "must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based on the possibility of a factual situation that may never develop." *AXA RE Prop. & Cas. Ins. Co. v. Day, 162 Fed. Appx. 316, 319 (5th Cir. 2006)* (quoting *Brown & Root, Inc. v. Big Rock Corp., 383 F.2d 662, 665 (5th Cir. 1967))*; *see generally,* 10B Charles A. Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2757 (2008).

In the present case, Liberty Mutual and Lloyds contend that no substantial controversy exists between the parties for several reasons. First, they contend that Metro "has never been sued by the McGinness [sic] Plaintiffs or any other person injured in the Accident," [**45] and "[a]t this point in time, more than four years after the Accident, it is clear that no meritorious bodily injury claims will ever be made against METRO." (Doc. No. 64 at 18.) This argument is not persuasive. Even if the injured parties' suits against Metro were barred by the statutory limitation period for torts, any such bar would not preclude UP from pursuing Metro on its contractual indemnity claim. *See Houston Lighting & Power Co. v. Eller Outdoor Advertising Co. of Texas, 635 S.W.2d 133, 134-35 (Tex.App.-Houston [1st Dist.] 1982, writ ref'd n.r.e)*.

Second, Liberty Mutual and Lloyd's argue that, despite the contractual indemnity agreemens, Metro "has never paid a dime to Union Pacific as a result of the Accident," [*797] and "[w]hatever demands, if any, Union Pacific may have made to METRO, the demands were never reduced to a final judgment and are not the subject of any pending litigation." (Doc. No. 64 at 18.) Metro counters that the carrier's argument "completely ignores the fact that the critical inquiry is whether METRO has a justiciable controversy," not with UP, but with the insurance carriers. (Doc. No. 76 at 3.) Metro maintains that a controversy exists between itself and [**46] the insurance carriers regarding the obligations under the insurance contract and, thus, it is entitled to seek a declaration of its rights against the carriers. (*Id.*) The Court agrees. *See TEX. CIV. PRAC. & REM.CODE ANN. § 37.004(a)* (Vernon Supp. 2007) (authorizing a person interested under a written contract to seek declaratory relief); *American States Inc. Co. v. Bailey, 133 F.3d 363, 368 (5th Cir. 1998)* (recognizing that even where a tort action has not proceeded to judgment, a dispute concerning an insurer's duty to defend or indemnify its insured for losses sustained by a third party presents an actual controversy within the meaning of the federal Declaratory Judgment Act); *Farmers Texas County Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997)* (recognizing the necessity of a declaratory judgment action to determine the party's obligation to defend or indemnify even before either a judgment is rendered or a settlement reached); *see generally, Collier v. Allstate County Mut. Ins. Co., 64 S.W.3d 54, 62* (recognizing duty to indemnify arises after claim has been adjudicated by judgment, settlement or contract to be legally responsible to pay damages).

Third, Liberty Mutual and [**47] Lloyd's contend that Metro's contractual indemnity obligation to UP is "wholly illusory" and, thus, unenforceable, for the following reasons: (1) the indemnity obligatior does not satisfy the basic conspicuous test required of indemnity agreements in Texas; (2) a condition precedent to indemnity by Metro is the lack of sole negligence on the part of UP; (3) Metro is not legally liable for any claims stemming from the accident because it enjoys sovereign immunity; and (4) Metro's indemnity agreement with UP is void because it violates *Article XI, § 7 of the Texas Constitution*, which forbids a governmental entity from creating a debt. (Doc. No. 64 at 19; Doc. No. 66 at 5-10.) The Court will address each argument in turn. [6]

6 The Court once again notes that, while presented in a different order, these same arguments are made by both Liberty and Lloyd's in their Motions for Summary Judgment. (Doc. No. 66 at 5-10.)

**A. Whether Validity Of Indemnity Agreement & The Express Negligence Rule Precludes Metro From Bringing This Action**

Under Texas law, release or indemnity agreements are valid and enforceable. However, because such provisions involve an extraordinary shifting of risk, Texas requires [**48] compliance with fair notice requirements. *See Dresser Indus., Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 508-09 (Tex. 1993)*. The fair notice requirement is two-fold: (1) the party seeking to enforce a release provision must comply with the express negligence doctrine, and (2) the provision must be conspicu-

ous. *Id.* Under the express negligence rule, "a party's intent to be released from [or indemnified for] all liability caused by its own future negligence must be expressed in unambiguous terms within the four corners of the contract." *Arthur's Garage, Inc. v. Racal-Chubb Sec. Sys. Inc., 997 S.W.2d 803, 814 (Tex.App.--Dallas 1999, no pet.)* (citing *Ethyl Corp. v. Daniel Const. Co., 725 S.W.2d 705, 708* [*798] *(Tex. 1987)*; *see also, Storage & Processors, Inc. v. Reyes, 134 S.W.3d 190, 192 (Tex. 2004)*. The conspicuousness rule provides that the releasing language must be conspicuously written so that a reasonable person against whom it is to operate should notice it. *Reyes, 134 S.W.3d at 192*; *Dresser, 853 S.W.2d at 508 n.2*; *Cate v. Dover Corp., 790 S.W.2d 559, 561 (Tex. 1990)* (party who, prior to entering into contract, has actual knowledge of its terms cannot escape enforcement of those terms [**49] on the ground that the terms are inconspicuous); *Costal Transp. Co. v. Crown Cent. Petroleum Corp., 20 S.W.3d 119, 126 (Tex.App.--Houston [14th Dist. 2000, pet. denied)* (holding indemnity agreement read by indemnitor conspicuous and rejecting indemnitor's argument that indemnitee must show that indemniton actually noticed the indemnity language when reading the agreement).

The language "any negligence" contained in the Lease Agreement (Doc. No. 65, Ex. A-4, at Bates 1587) expressly identifies Metro's intent to release UP from liability for UP's negligence (*see Reyes, 134 S.W.3d at 192*); thus, the provision satisfies the express negligence doctrine. *See Atlantic Richfield Co. v. Petroleum Pers. Inc., 768 S.W.2d 724, 726 (Tex. 1989)* (although not differentiating between degrees of negligence, a contractual indemnity provision that incluced "any negligent act of ARCO" was sufficient to satisfy the express negligence doctrine). Turning to the conspicuousness rule, Metro concedes that it had actual knowledge of the release provision in the agreement which renders compliance with the fair notice requirement irrelevant. *See Reyes, 134 S.W.3d at 192* (conspicuousness rule satisfied where party [**50] has actual knowledge). The indemnity provision contained in the Lease Agreement is valid and enforceable under Texas law.

**B. Whether Condition Precedent In Indemnity Agreement Precludes Metro From Bringing This Action**

Liberty Mutual and Lloyd's next argue that no substantial controversy exists between Metro and UP because Metro's contractual obligation to indemnify UP is contingent on a determination that UP is not solely negligent. (Doc. No. 64 at 19.) This argument is not persuasive. *See generally,* 10B Charles A. Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 2757 at 476 (2008) (recognizing that "[i]t is clear that in some instances a declaratory judgment is proper even though there are future contingencies that will determine whether a controversy ever actually becomes real"). Further, at issue is Metro's contract with its insurance carrier, not with UP.

**C. Whether Sovereign Immunity Precludes Metro from Bringing This Action**

Liberty Mutual and Lloyd's claims that no substantial controversy exists because Metro enjoys sovereign immunity and, thus, will never be legally liable for any damages. (Doc. No. 64 at 19; Doc. No. 66 at 6-9.) Metro counters that it lawfully purchased insurance [**51] to cover UP's potential liability stemming from and as a condition of the Lease Agreement, a fact known to the carriers, and, in the alternative, any immunity Metro may enjoy does not shield the insurance carriers or excuse their performance under the insurance contract. (Doc. No. 76 at 12-20; Doc. No. 86 at 4-8.)

In Texas, sovereign or governmental immunity deprives a trial court of subject matter jurisdiction for lawsuits in which the state or certain governmental units have been sued unless the entity consents to suit. *Texas Dep't of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999)*; *Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 405 (Tex. 1997)*, superseded by statute on other [*799] grounds as stated in *General Serv. Com'n v. Little-Tex Insulation Co., Inc., 39 S.W.3d 591, 593 (Tex. 2001)*; *Duhart v. State, 610 S.W.2d 740, 741 (Tex. 1980)*; *Hosner v. De Young, 1 Tex. 764, 769 (1847)*. Governmental immunity includes two distinct principles, immunity from suit and immunity from liability. *Jones, 8 S.W.3d at 638*; *Fed. Sign, 951 S.W.2d at 405*. Immunity from liability is an affirmative defense, while immunity from suit deprives a court of subject matter jurisdiction. *Jones, 8 S.W.3d at 638*; *Fed. Sign, 951 S.W.2d at 405*.

It [**52] is true that a governmental entity does not waive immunity from suit simply by contracting with a private party. *LittleTex, 39 S.W.3d at 594*. Nevertheless, "legislative control over waiving immunity from suit does not mean that the State can freely breach contracts with private parties, or that the State can use sovereign immunity as a shield to avoid paying for benefits the State accepts under a contract." Rather, when a governmental entity contracts with a private party, it waives immunity from liability. *Id.; Tooke v. City of Mexia, 197 S.W.3d 325, 344-45 (Tex. 2006)*; *Ben Bolt-Palito Blanco Consol. Indep. School Dist. v. Political Subdivisions Prop./Casualty Joint Self-Insurance Fund, 212 S.W.3d 320, 327 (Tex. 2006)*; *Catalina Development Inc. v. County of El Paso, 121 S.W.3d 704, 705 (Tex. 2003)*.

In the present case, the insurance carriers [7] contend that even if Metro had waived immunity from liability by entering into the lease agreement with UP, its immunity

from suit has not been waived and, as such, the carriers are shielded from indemnity. In support of their position, the carriers rely on cases that hold that, unless waived, a governmental entity, like Metro, is immune from [**53] suit. Notably, however, the carriers point to no authority that extends the immunity of a governmental entity to its insurance carriers. Instead, as urged by Metro, analogous case law supports the opposite conclusion--namely, that Metro's immunity will not shield the insurance carrier. *United Services Auto. Ass'n v. Blakemore, 782 S.W.2d 277, 279 (Tex.App--Waco 1989, writ denied)* (in a case where the driver enjoyed sovereign immunity from both suit and damages, the court determined that the driver's immunity did not preclude recovery from the insurance carrier who provided uninsured motorist coverage; to hold otherwise, "[t]he policy language would be rendered absolutely meaningless by interpreting 'legally entitled to recover' as the ability to sue the United States" when sovereign immunity precluded suit). Similarly, in the context of bankruptcy cases, courts have determined that, even where a debtor is discharged, this does not preclude recovery from an insurance carrier who may be liable on behalf of the debtor. *Watkins v. United States, 462 F.Supp. 980, 991 (S.D. Ga. 1977)* (explaining that "any difference between [sovereign immunity] and the effect of a bankruptcy discharge, is [**54] legally insufficient" and, therefore, concluding that uninsured motorist coverage was available even though state enjoyed sovereign immunity); *Matter of Edgeworth, 993 F.2d 51, 54 (5th Cir. 1993)* (recognizing that "scope of a *section 524(a)* injunction does not affect the liability of liability insurers and does not prevent establishing their liability by proceeding against a discharged debtor."); *In re Jet Florida Systems, Inc., 883 F.2d 970, 975 (11th Cir. 1983)* (emphasizing that neither bankruptcy's "'fresh start' policy" nor "*§ 524* was designed to immunize 'third parties such as insurers who may be liable on behalf of the debtor,' and the insurer [*800] should not gain a benefit that was not intended or in any way computed within the rate charged for its policy."). As aptly explained by one court, "[a]ny other outcome would result in a windfall to insurers, which receive premiums as the *quid pro quo* for providing insurance. Any other outcome would also disadvantage both innocent, third party, personal injury claimants ...." *In re White, 73 B.R. 983, 985 (Bkrtcy D. D.C. 1988)*. Further, to allow the insurance carrier to escape liability on this basis would be "fundamentally wrong." *In re Lembke, 93 B.R. 701, 703 (Bkrtcy D. N.D. 1988)*. [**55] The holdings in these cases persuades this Court that, while the purpose of sovereign immunity is to protect Metro (and the public), it will not shield third parties, like insurance carriers, who may be liable on behalf of Metro.

7 *Supra* note 8.

**D. Whether *Article XI, § 7 Of The Texas Constitution* Precludes Metro From Bringing This Action**

Liberty Mutual and Lloyd's contend that the indemnity clause in the lease agreement is void because it creates an impermissible debt under the *Texas Constitution. Article 11, § 7* of the Texas Constitution, Vernon's Ann. St., provides, in part, that:

> (N)o debt for any purpose shall ever be incurred in any manner by any city or county unless provision is made, at the time of creating the same, for levying and collecting a sufficient tax to pay the interest thereon and provide at least two per cent (2%) as a sinking fund; * * *.

This section, by its own terms, appears limited to city and counties. Moreover, neither insurance carrier offers any authority to indicate that this section would be applied to a governmental entity such as Metro.

Assuming *Section 7* applied to Metro, Texas law does provide that an indemnity agreement is a "debt" within the meaning of [**56] *Article 11, § 7 of the Texas Constitution*. *Brown v. Jefferson County, 406 S.W.2d 185, 188 (Tex. 1966)*; *Texas & New Orleans R.R. v. Galveston County, 141 Tex. 34, 169 S.W.2d 713 (1943)* (citing to *McNeill v. City of Waco, 89 Tex. 83, 33 S.W. 322 (1895)* and *Stevenson v. Blake, 131 Tex. 103, 113 S.W.2d 525 (1938))*. However, this does not mean, as suggested by the insurance carriers, that the indemnity obligation contained in the Lease Agreement created an impermissible debt in violation of the Texas Constitution. For example, in *Brown*, the Texas Supreme Court concluded that an indemnification obligation incurred by a county government was valid and enforceable, even though there was a theoretical possibility that the county's future financial obligations under the indemnity obligation might exceed the county's taxing authority. *Brown, 406 S.W.2d at 189-90*. Distinguishing the facts of its case from *Texas & New Orleans R.R. v. Galveston County*, where the county incurred an open-ended indemnity agreement, which spanned 99 years, without providing any mechanism for paying a future claim under the obligation, the Court in *Brown* upheld the county's obligation because, at the time it agreed to the indemnification, [**57] the county put in place sufficient provisions to ensure the satisfaction of any claim on the obligation. *Id.*

Similar to *Brown*, when Metro assumed the indemnity obligation, it provided a mechanism for the payment of claims that might arise under the indemnity agreement by purchasing the insurance policies. In addition, Metro can levy any necessary taxes to fund its obligations in-

curred in connection with the light rail project. Thus, the Court cannot conclude that the indemnity obligation contained in the Lease Agreement created an impermissible [*801] debt in violation of the Texas Constitution.

**E. Whether Metro's Allegations Of Insurance Code Violations Should Be Dismissed In Absence Of Coverage Under the Policy**

Liberty Mutual seeks dismissal of Metro's claims under various provisions of the Insurance Code on the grounds that where there is no coverage, there can be no violation of the Insurance Code provisions. Liberty Mutual also contends Metro's claims are barred by the two year stature of limitations. (Doc. No. 64 at 20.) Metro responds by urging that, to the extent there is coverage under the policy, it would be premature for the Court to address the viability of the extra-contractual [**58] issues, particularly before any discovery is completed. The Court agrees. Liberty Mutual's Motion for Summary Judgment on this ground is denied without prejudice.

**VIII. Metro's Motion for Partial Summary Judgment on the Wrap-Up Policy**

Metro seeks a declaration that the accident and the resulting liability of Metro and UP triggered Liberty Mutual's obligations under the CGL policy. Metro contends that "[t]he general liability policy issued by Liberty Mutual to Metro contractually obligates Liberty Mutual to indemnify Metro and Union Pacific for personal injuries and property damage claims resulting from the accident that gives rise to this coverage dispute." (Doc. No. 65 at 3.) Metro also contends that "Liberty Mutual incorrectly states that at least two exclusions preclude coverage: (1) the 'Products-Completed Operations Hazard' exclusion and (2) the 'auto' exclusion." (*Id.*) In response Liberty Mutual asserts the following: (1) whatever coverage applies to Metro as a result of the accident is not ripe for adjudication in this declaratory judgment action; (2) Metro is not "legally obligated to pay" any damages because of bodily injury or property damage; and (3) Liberty Mutual does not [**59] contend that the "Products-Completed Operations hazard" precludes coverage under the Wrap-Up policy. (Doc. No. 70 at 2-4.) The Court proceeds to address the issues.

In the Wrap-Up policy, the CGL Coverage Form contains an insuring agreement which provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

(Doc. No. 64, Ex. B (CGL policy tab).) According to the OCCIP Amendment, the insurance agreement only applies to bodily injury, property damage, and personal injury arising out of:

> 1. Operations performed for the First Named Insured or Additional Named Insured by an Additional Named Insured at a Project Site listed in the Designated Project Schedule; or
>
> 2. Acts or omissions of the First Named Insured in connection with its supervision of operations performed by an Additional Named Insured at a Project Site listed in the Designated Project Schedule....

(Doc. No. 64, Ex. B (OCCIP Amendment tab).)

Metro contends that the undisputed facts giving rise to the accident establish coverage under the insuring agreement. First, for purposes of the insuring agreement, there is no dispute [**60] that the First Named Insured is Metro. Second, Metro maintains that Siemens was an Additional Named Insured under the Wrap-Up policy. In order to qualify as an Additional Named Insured, Siemens must be [*802] Metro's subcontractor for whom Metro "agreed by contract to provide general liability coverage under the owner controlled insurance program ["OCIP"], excluding vendors, suppliers, off-site fabricators, material dealers and others who merely make deliveries to or from the Project Site(s)." (Doc. No. 64, Ex. B (OCCIP Amendment tab) at Bates "Metro 1484".) While Liberty Mutual concedes that "the Siemens contract provides that Metro will provide an OCIP policy for Siemens," it asserts that "it is not clear that Siemens is Metro's subcontractor or that Siemens is not a vendor or off-site fabricator." (Doc. No. 70 at 6.) Based on the plain language of this policy provision, vendors and off-site fabricators are excluded only if they "merely" make deliveries to or from the Project Site, which, based on the undisputed evidence, would clearly not have included Siemens.

Third, Metro contends that there is no dispute that: (1) the bodily injury and property damage arose out of the commissioning of [**61] LRV 115; (2) that Siemens was performing operations for Metro by supervising the commissioning of LRV 115; and (3) that Siemens was engaged in these operations for Metro at a "Project Site listed in the Designated Project Schedule." (Doc. No. 65 at 13-15.) In support of its contentions, Metro relies on the affidavit of Sharon K. Messa, the Risk Manager for Metro who monitored and directed the resolution of any claims resulting from the light rail project. (Doc. No. 65, Ex. A at 2, PP 1-3.) In her affidavit, Messa swears to the following:

> Siemens delivered the first LRV to METRO in April 2003 and the installation and commissioning of these vehicles, including the training fo METRO's LRV operators, began shortly thereafter. On January 23, 2004, a light rail vehicle ("LRV 115") being commissioned by Siemens and being operated by a METRO employee on the test track located on the Lease premises collided with a Union Pacific welding truck at crossing # 755612H, also identified as the intersection of Kirby Drive and the railroad tracks in Houston, Harris County, Texas (the "Accident"). At the time of the Accident, Siemens was training and supervising the METRO employee that was operating LRV [**62] 115.

(*Id.* at 8-9, P 20.) Liberty Mutual asserts that, aside from the affidavit of Sharon K. Messa, which it claims is conclusory and not based on personal knowledge, there is no evidence that Siemens was "even present at the time of the Accident, let alone conducting operations." (Doc. No. 70 at 6.) However, given Messa's position with Metro (*i.e.*, Risk Manager who monitored and directed the resolution of any claims resulting from the light rail project), the Court simply cannot agree with Liberty Mutual and, therefore, overrules Liberty Mutual's objection to Messa's affidavit.

Fourth, Metro contends that the accident did not occur within the "Products-Completed Operations Hazard." (Doc. No. 65 at 15-16.) Metro claims that the undisputed facts demonstrate that Metro's "work" was ongoing at the time of the accident because the Siemens' Contract called for commissioning of all 18 LRVs prior to final acceptance for use in Metro's operation of the Light Rail system. Notably, however, in its response, Liberty Mutual clearly states that it "does not contend that the "products-completed operations hazard" precludes coverage under the Wrap-Up policy. (Doc. No. 70 at 3.)

Finally, perhaps the central [**63] issue related to the insuring agreement is whether Metro is "legally obligated to pay" for bodily injury or property damage. Liberty Mutual maintains that "legally obligated to pay" can only be established by a judgment against the insured, and since Metro [*803] is immune from suit, this has not been established, and, until such point in time as it is, Liberty Mutual is under no obligation to pay under the Wrap-Up policy. There is, of course, no dispute that the Lease Agreement contained the indemnity agreement or that the agreement was entered into before the accident occurred. Nor is there any dispute that, in the Lease Agreement, Metro contractually agreed to assume UP's tort liability as long as UP was not the sole, direct cause of the loss. Finally, there is no dispute that UP has paid to settle the claims arising from this accident and requested Metro indemnify it for the amount it paid pursuant to the indemnity agreement.

Turning back to the insurance policy, the Court finds that the phrase "legally obligated to pay" is not defined in the policy. However, giving the phrase its ordinary meaning (*Pa. Pulp & Paper Co. v. Nationwide Mut. Ins. Co., 100 S.W.3d 566, 574 (Tex.App.--Houston [14th Dist.] 2003, pet. denied)* [**64] (recognizing that courts give terms used in an insurance contract their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical sense)), "it means an obligation imposed by law, such as an obligation to pay pursuant to a judgment, settlement, contract, or statute." *Lennar Corp., 200 S.W.3d at 680*; *see also, Comsys, 130 S.W.3d at 189 n. 3* (recognizing a judgment is not the only manner by which an insured can become "legally obligated to pay," because a legal obligation can also arise out of a contract or a settlement); *Boy Scouts of America, 947 S.W.2d at 691* (same). Here, Metro's legal obligation to pay is by contract. Once UP settled the claims and suits arising from this accident, Metro's obligation under the agreement was triggered. Accordingly, Metro's Motion for Partial Summary Judgment on the grounds that coverage is triggered under the Wrap-UP policy is granted. [8]

> 8 Metro also moves for summary judgment on whether the Wrap-Up policy's auto exclusion precluded coverage and whether the Lease Agreement constituted the Insured Contract. Liberty Mutual does not dispute Metro's position on either; therefore, Metro's Motion for Partial Summary [**65] Judgment is granted as on both issues.

## IX. UMBRELLA POLICY

### A. Lloyd's, Metro, and UP's Motions for Summary Judgment

With regard to the Umbrella policy, the parties have filed competing Motions for Summary Judgment. In its Motion for Summary Judgment, Lloyd's maintains that the action against it must be dismissed on the following grounds: (1) Metro and UP lack standing to pursue their claims (Doc. No. 66 at 5-6); (2) immunity bars UP from asserting any claim against Metro (*Id.* at 6-9); (3) the indemnity provision in the lease agreement is void (*Id.* at 9-10); (4) UP is not an additional insured under the Umbrella policy (*Id.* at 11-12); (5) the auto exclusion precludes coverage for the accident (*Id.* at 12-13); (6) the

Umbrella policy only provides coverage during construction (*Id.* at 13-15); (7) the claims are barred by late notice (*Id.* at 15); (8) the insured(s) failed to obtain Lloyd's consent to settle the McGinnis case (*Id.* at 15-16); (9) the Umbrella policy restricts legal action against the insurer because the sums sought by Metro and UP were not judicially determined (*Id.* at 16-17); (10) Lloyd's had no duty to defend because the Complaint alleged facts excluded by the policy (*Id.* at 17); [**66] and (11) even to the extent coverage existed, Lloyd's did not act in bad faith (*Id.* at 17-18). Metro and UP have responded to each of Lloyd's arguments.

In addition, both UP and Metro have filed Motions for Partial Judgment. In its [*804] Motion, UP maintains that it is an insured under the Umbrella policy (Doc. No. 69 at 8-12), the scope of coverage includes the test track and operations on the test track as required under the contract documents (*Id.* at 18-19), the auto exclusion does not preclude coverage under the policy (*Id.* at 13-18), and it is entitled to attorneys fees from Lloyd's under *section 38.006 of the Texas Civil Practice and Remedies Code*. (*Id.* at 12-13).

In its Motion, Metro maintains that Lloyd's is obligated to indemnify Metro for the amounts it owes UP (Doc. No. 65 at 15), the "Products-Completed Operations Hazard" is not applicable because Metro's work was not complete on the date of the accident (*Id.* at 16), the auto exclusion does not preclude coverage (*Id.* at 16-22), and all the conditions precedent of the Umbrella policy have been performed. (*Id.* at 22).

**B. Metro's Standing**

In its Motion, similar to the claim asserted by Liberty Mutual, Lloyd's maintains that Metro lacks [**67] standing to bring this suit. (Doc. No. 66 at 5-6.) Having discussed the issue above, the Court will not reiterate it herein. Lloyd's Motion for Summary Judgment on the ground that Metro lacks standing to bring this Declaratory Judgment is denied.

**2. Whether UP Lacks Standing Because It Is Not An Additional Insured**

Lloyd's maintains that UP is not an insured under the Umbrella policy. Lloyd's also maintains that Texas is not a direct action state and UP, being nothing more than a third-party claimant, "has no standing to pursue any claims against [it]." (Doc. No. 66 at 6; 11-12.) Conversely, in its Motion, UP maintains that it is an insured under the Umbrella policy based on the following: (1) pursuant to the terms of the Lease Agreement, if Metro purchased an Umbrella or Excess policy, Metro was required to name UP as an additional insured; and (2) UP qualifies as an insured based on the definitions contained in the Umbrella policy. (Doc. No. 81 at 2, 8.)

It is true that by the terms of the Lease Agreement, Metro was required, at its own cost and expense, to procure and maintain commercial liability insurance, railroad protection insurance, liability insurance, worker's compensation and [**68] employer's liability insurance, and umbrella or excess policies, in the event lessee utilizes umbrella and excess policies .... (Doc. No. 64, Ex. C). Further, Exhibit C of the Lease provides that "[a]ll policy(ies) required above (excluding Workers Compensation) ... name [UP] as an additional insured." (*Id.*) Contrary to UP's contentions, as written, this provision cannot be read as requiring Metro to buy an umbrella or excess policy under the Lease Agreement for UP. Instead, the Lease Agreement merely provides that "in the event" Metro purchases one, it shall "follow form" and "afford no less coverage than the primary policy." UP's argument, therefore, fails.

The Court now examines the definitions of "insured" found in the policy. The Umbrella policy, in relevant part, defines "insured" as follows:

> 4. Any person or organization, other than the Named Insured, included as an additional insured in the policies listed in the Schedule of Underlying Insurance but not for broader coverage than is available to such person or organization under such underlying policies.
>
> * * * *
>
> 7. Any person, organization, trustee, or estate to whom you are obligated by a written Insured Contract to provide insurance [**69] such as is afforded by this policy but only with respect to:
>
>> a. liability arising out of operations conducted by you or on your behalf; or
>>
>> [*805] b. facilities owned or used by you.

(Doc. No. 66, Ex. B at 10.) The term "Insured Contract" means: "[a]ny oral or written contract or agreement entered into by you and pertaining to your business under which you assume the tort liability of another party to pay for Bodily Injury, Property Damage, Personal Injury or Advertising Injury to a third person or organization. Tort liability means a liability that would be imposed by law in

the absence of any contract or agreement." (*Id.* at 11.) Under the policy "you" "refers to the Named Insured" which, in this case, is Metro. (*Id.* at 7, 10.)

For purposes of paragraph (4), while the Schedule of Underlying Insurance includes the RPL and the Wrap-Up policy, UP was the named insured, not an additional insured, under the RPL policy. Further, UP was not a named or additional insured under the Wrap-Up policy. [9] Accordingly, contrary to its argument, UP would not qualify as an insured under subparagraph 4.

9 An issue would appear to exists as to whether, based on the Lease Agreement, Metro was required to name UP as [**70] an additional insured under the CGL. However, since this issue was not clearly raised by the parties, the Court declines to address it.

Turning to paragraph (7), UP maintains that the Lease Agreement, which required Metro to indemnify UP for tort liabilities, is an "Insured Contract" under the Umbrella policy. Lloyd's disputes UP's contention on the basis that the Lease Agreement is invalid. Lloyd's argument is unavailing. A concern regarding the validity of the indemnity agreement is a separate and distinct determination from construing the scope of an "insured contract" under an insurance policy. *Mid-Continent Cas. Co. v. Swift Energy, 206 F.3d 487, 492-93 (5th Cir. 2000)* (construing "insured contract" broadly when carrier challenged demand for coverage); *LeBlanc v. Global Marine Drilling Co., 193 F.3d 873, 875 (5th Cir. 1999)*; *Certain Underwriters at Lloyd's London v. Oryx Energy Co., 142 F.3d 255, 258 (5th Cir. 1998)*; *see also, Motiva Enterprises, L.L.C. v. Liberty Mut. Ins. Co., 2006 U.S. Dist. LEXIS 81373, 2006 WL 3246039, * 9-10 (S.D.Tex. 2006)*. As urged by UP, the indemnity agreement contained in the Lease Agreement is an "Insured Contract" for purposes of the Umbrella policy. Thus, under paragraph IV.E.7, [**71] UP is an "insured" under the Umbrella policy. [10]

10 UP's coverage as an additional insured under the Umbrella policy is separate from Metro's coverage as the named insured. *See Evanston Ins. Co. v. Atofina Petrochemicals, Inc., 256 S.W.3d 660, 663-64 (Tex. 2008)* (recognizing difference between contractual liability coverage supporting the contractor's (named insured's) indemnity, and the coverage owed directly to Atofina as an additional insured).

Accordingly, Lloyd's Motion for Summary Judgment on the ground that UP is not an insured under the Umbrella policy and, thus, has no standing to bring this action is denied; and UP's Motion for Partial Summary Judgment on these grounds is granted.

**3. Whether Governmental Immunity Or *Article XI, §7 Of The Texas Constitution* Preclude This Action**

Lloyd's contends, similar to Liberty Mutual's arguments, that governmental immunity (Doc. No. 66 at 6-9), and a violation of *Article 11, § 7 of the Texas Constitution* precludes this action. (*Id.* at 9-10.) Having addressed these issues above, the Court will not reiterate its discussion here. Lloyd's Motion for Summary Judgment on these points is denied.

**4. Whether the Auto Exclusion Precludes Coverage**

Lloyd's, [**72] Metro and UP all seek summary judgment regarding the application [*806] of the auto exclusion. In its Motion, Lloyd's argues that UP and Metro's claims are specifically excluded because the accident arises from the use of an auto, which, by endorsement, is not covered under the policy. (Doc. No. 66 at 12-13.) In their respective Motions, Metro and UP dispute Lloyd's contention that the auto exclusion applies and argue that a Hyrail vehicle is "mobile equipment" and, thus, not excluded. (Doc. No. 65 at 21-27; Doc. No. 69 at 13-18.)

The auto exclusion in the Umbrella policy is found in "Endorsement No. 16." The exclusion reads: "It is understood and agreed that this Insurance does not apply to Bodily Injury or Property Damage arising out of the ownership, maintenance, operation, use, loading or unloading of any Auto." [11] Under the policy, "auto" is defined as "a land motor vehicle, trailer or semi trailer designed for travel on public roads, including any attached machinery or equipment. But auto does not include mobile equipment." (Doc. No. 66, Ex. A, at Bates UW/Wil00009.)

11 Unlike the CGL policy, which by its terms is limited to the operation and use of an auto by "any insured," the auto exclusion [**73] in the umbrella policy is more broadly worded and applies to the use of "any auto" regardless of insured status.

Based on the policy language, Lloyd's argues that the truck or welding truck, as referred to in various documents, [12] is a land motor vehicle and, being licensed and registered, was designed for travel on the public roads and, thus, it is clearly an "auto.". Conversely, Metro and UP contend that the Hyrail vehicle qualifies as "mobile equipment," as defined in the policy, for two reasons. First, Metro and UP maintain that the Hyrail vehicle falls under the policy's first definition of "mobile equipment" which broadly reads, in part: "any of the following type of land vehicles, including any attached machinery or equipment," such as "bulldozers, farm machinery, fork-

lifts and other vehicles designed for use principally off public roads." There is, of course, no dispute that the Hyrail vehicle is a land vehicle. Further, as urged by the parties, the operative issue is not whether the vehicle can or does travel on public roads, but whether it was designed for use principally off public roads. *Doty v. Safeco Ins. Co., 400 So.2d 718, 723 (La.App. 1981)* (explaining that the phrase [**74] "designed for use principally off public roads" makes clear that the determining issue is not whether the vehicle is or can be used on public roads, but the primary purpose for which the vehicle is designed or structurally suited). While Lloyd's appears to suggest that the fact the Hyrail vehicle is registered negates this interpretation, there is nothing in the policy provision that requires the vehicle not be subject to motor vehicle registration to fall within its parameter. In fact, whether the vehicle was registered and licensed to operate on the public roadways is not controlling in deciding that it was not designed for use principally off public roads. *Republic Ins. Co. v. Bolton, 564 S.W.2d 440, 442 (Tex.Civ.App.--Dallas 1978, writ ref'd n.r.e.)* (recognizing that "[t]he vehicle's susceptibility to state inspection and licensing, together with its present use as a racing vehicle, were simply evidentiary considerations bearing on the vehicle's design."). Rather, as stated, the purpose for which the vehicle's use was principally "designed" is the operative question. *See generally, Malbrough v. Wheat, 428 So.2d 1110, 1113 (La.App. 1st Cir. 1983)* (although a farm tractor may be [**75] driven on public [*807] roads, the evidence established that it was not principally designed for this purpose).

> 12 In its pleadings, Lloyd's makes much of the terms that lay people use to refer to the Hyrail vehicle; however, this is not relevant when determining whether the vehicle falls within the policy's definitions.

In the present case, Metro and UP offer evidence, by way of an affidavit from Jeffrey Crook, which supports their contentions that the Hyrail is "mobile equipment." (Doc. No. 67, Ex. E (Affidavit of Jeffrey Crook).) Lloyd's objects to Crook's affidavit (Doc. Nos. 72 & 73) on the basis that Crook lacks personal knowledge, and his affidavit is based on hearsay, conclusory opinions, and speculation. However, having considered Crook's affidavit, the Court finds that Lloyd's objections are without merit and, thus, they are overruled. Accordingly, the competent summary judgment evidence before this Court demonstrates that the truck, modified into a Hyrail vehicle, was "designed for use principally" on the railroad tracks and, thus, off public roads. The mere fact that the Hyrail vehicle can operate on public roads does not alter this conclusion. *See Malbrough, 428 So.2d at 1113*;

Second, [**76] Metro and UP maintain that the Hyrail vehicle falls under the policy's fourth definition of "mobile equipment" because it is a vehicle that is "maintained primarily to provide mobility to permanently mounted . . . [p]ower cranes." Significantly, the definition does not require that the vehicle be maintained for the "sole" purpose of providing mobility to the power crane. Instead, as provided by the very terms of the policy, the vehicle must only be maintained (not used) primarily to provide mobility to a permanently mounted power crane. The competent evidence before the Court establishes that the Hyrail was equipped with a "telescope power crane with [a] 20-foot reach that [was] permanently mounted to the vehicle." (Doc. No. 67, Ex. E (Affidavit of Jeffrey Crook).) While the Hyrail had other uses, the evidence before the Court establishes that it was maintained primarily to provide mobility to the permanently mounted power crane for work done on the railroad tracks.

Not dissuaded, Lloyd's insists that the mobile equipment exception to the auto exclusion specifically provides that "self-propelled vehicles with the following types of permanently attached equipment are not mobile equipment [**77] but will be considered autos . . . welding." However, as urged by UP, this argument is flawed. Definition number 6, by its own terms, serves as a "catch-all" provision and applies only when the other provisions do not. (Doc. No. 89 at 18-20.) In addition, as written, the second phrase of Definition number 6 ("[h]owever..."), can only be construed to modify this particular provision or paragraph, as opposed to all the preceding classes of mobile equipment.

Accordingly, having failed to establish the application of the auto exclusion, Lloyd's Motion for Summary Judgment on this ground must be denied, and both Metro's and UP's Motions for Partial Summary Judgment on this issue must be granted.

**5. Whether Coverage Under Umbrella Policy Limited To Construction**

Lloyd's argues that the Umbrella policy does not respond to the claims at issue because the construction of the test track was completed. (Doc. No. 66 at 13-15; *see also,* Doc. No. 77 at 21-22; Doc. No. 87 at 15.) Lloyd's relies upon the "Risk, Interest, Location and Limits of Liability" provision contained in the "Schedule," the "Divided Work Endorsement" found in Endorsement No. 19, and the definitions contained in Endorsement No. 1 concerning [**78] the "Project Site" and "Work." UP responds that the Umbrella policy cannot reasonably be interpreted to be limited to construction of the test track. (Doc. No. 69 at 18; *see also,* Doc. No. 89 at 20-21.)

[*808] The "Risks, Interests, Location and Limits of Liability" provision found in the "Schedule" provides the following:

> This Policy provides Umbrella Liability coverage in respect of the construction of Light Rail System - 7.5 miles with 16 stations, including (but not limited to) Downtown improvement, Transit Administration Building and Park/Ride Lots, as per wording attached hereto which is hereby declared to be incorporated in and to form an integral party of this Policy.

(Doc. No. 66, Ex. B at Bates UW/Wil 4.)

In addition, the "Divided Risk Endorsement" states that "[i]t is hereby understood and agreed that this Policy applies only to liability which arises in connection with Work, at or emanating from the Project Site." (Doc. No. 66, Ex. A at Bates 41.) Endorsement No. 1 defines "Work" as "[t]he entire completed construction or the various separately identifiable parts required to be furnished under the contract documents." (*Id.* at Bates 24.) In addition, "Project Site" means "[t]hat area [**79] described in the construction contract documents including the area available for Contractor operations, access routes, right-of-ways, and approved additional sites necessary or incidental thereto." (*Id.*) "Contractor" includes "[a]ny individual, partnership, firm or corporation which has entered into a Contract for construction with The Metropolitan Transit Authority of Harris County, Texas (Metro) to perform Work at the Project Site unless such entity is specifically excluded from the OCIP."

Based on these policy provisions, Lloyd's argues that the Umbrella policy "clearly only provides coverage with respect to construction of the listed items" and "[n]o coverage is afforded for operational use of the listed items. (Doc. No. 66 at 14.) Lloyd's interpretation of these policy provisions is too strained. Under the policy, the "Project Site" includes the test track, not only because it was the "area described in the construction contract documents" (Doc. No. 65-2, Ex. A at 2, P5; 7, P17), but also because it was the "area available for Contractor operations," which included the testing or commissioning the LRVs. In addition, as provided in the policy language, "the construction of the [**80] Light Rail System" included "the final design, manufacturing, supply, installation, testing, training, spare parts, and operations and maintenance technical support" of the LRVs was a necessary and required part of the construction of the Light Rail System. (Doc. No. 65-3, Ex.1-A at 12 of 113; *see also*, Doc. No. 65-3, Ex.1-A at 14 of 114.) Finally, as broadly defined in the policy, the testing of the LRVs, which is part of the "entire completed construction or the various separately identifiable parts required to be furnished under the contract documents," clearly falls within the policy's definition of "work." Thus, because the provisions of the Umbrella policy are not limited to construction, the Court concludes that Lloyd's Motion for Summary Judgment on this ground is denied, and UP's Motion for Partial Summary Judgment on this issue is granted.

**6. Whether Alleged Violations Of The Conditions Precedent Preclude Coverage**

Metro and Lloyd's filed competing Motions for Summary Judgment regarding the issue of whether the conditions precedent to coverage under the Umbrella policy have been met. (Doc. No. 65 at 22; Doc. No. 66 at 15-16.) UP filed a response to Lloyd's Motion. (Doc. No. [**81] 81 at 11-14). The Court begins by addressing Metro's Motion.

In its Motion, Metro appears to seek a declaration that Lloyd's has waived "any challenge to Metro's averment that it 'has complied with and performed under [*809] the essential terms and elements of . . . the Lloyd's Policy and any defects in performance by Metro do not prevent the parties from accomplishing the purposes of the policies' [reference omitted], by not specifically, and with particularity, denying performance, as is required by the *Federal Rules of Civil Procedure 9(c)*." (Doc. No. 65 at 22.) Lloyd's responds that, contrary to Metro's assertions, when Lloyd's filed its Answer, it specifically denied Metro's performance of the conditions precedent. (Doc. No. 78 at 12.) The Court agrees. Metro's Motion for Partial Summary Judgment on the ground that Lloyd's waived compliance with the conditions precedent by failing to comply with *Rule 9(c) of the Federal Rules of Civil Procedure* is denied

Turning to the competing Motion, Lloyd's contends that coverage is precluded under the Umbrella policy on the grounds of (1) delayed notice, and (2) failure to obtain consent to settle or the "no-action" clause. (Doc. No. 66 at 15-17.) [**82] UP filed a response refuting each of Lloyd's arguments. The Court addresses each issue in turn.

**7. Whether Delayed Notice Precludes Coverage**

Lloyd's contends that the delayed notice by Metro and UP precludes coverage under the Umbrella policy. (Doc. No. 66 at 15.) [13] UP counters that Lloyd's has not established late notice and, even if they had, they have failed to show prejudice. (Doc. No. 81 at 11.)

13 Lloyd's complains that it did not receive timely notice of the accident or the suit and that it

was given less than 24 hours to consider a settlement offer to Plaintiff McGinnis.

The Umbrella policy requires Metro n 14 to notify Lloyd's "as soon as practicable of an Occurrence which may result in a claim under this policy." (Doc. No. 66, Ex. B at Bates UW/Wil 20.) The policy further provides that "[i]f a claim is made or suit is brought against any Insured that is reasonably likely to involve this policy [Metro] must notify [Lloyd's] in writing as soon as practicable." (Id.) This provision of the policy was further modified by Endorsement 17, which stated "[i]t is understood and agreed that notice of Occurrence, claim or Suit shall be made in accordance with Condition F. Duties In The Event [**83] Of An Occurrence, Claim Or Suit via the following entity: 'Willis of Texas.'" (*Id.* at Bates UW/Wil 40.) There is no dispute that Willis of Texas had notice of the accident and UP's claims shortly after the occurrence in 2004. Thus, pursuant to the terms of the agreement, notice to Willis of Texas satisfied the terms of this condition.

Notwithstanding this fact, under Texas law, an insured's failure to give timely notice will not defeat coverage absent a showing by the insurer that they have been prejudiced. *PAJ, Inc. v. Hanover Ins. Co., 243 S.W.3d 630, 636-37 (Tex. 2008)*; *Hernandez v. Gulf Group Lloyds, 875 S.W.2d 691, 693 (Tex. 1994)*; *Hanson Prod. Co. v. Americas Ins. Co., 108 F.3d 627, 629-30 (5th Cir. 1997)* (insurer must establish it was prejudiced by late notice). Prejudice will not be presumed from either delayed notice or "settlement without consent." *PAJ, 243 S.W.3d at 634*; *Hanson, 108 F.3d at 631*; *Comsys, 130 S.W.3d at 191-92*. Instead, an insurer "must demonstrate a material change in position to establish prejudice" and "may not disclaim coverage on the basis of prejudice that is only theoretical or presumed merely from [*810] the length of delay." *Coastal Refining & Marketing Inc. v. U.S. Fidelity & Guaranty Co., 218 S.W.3d 279, 288 (Tex.App.--Houston [14th Dist.] 2007, pet. denied)*. [**84] "Whether an insurer is prejudiced by delayed notice is generally a question of fact," but a court may determine the issue as a matter of law when the material facts are undisputed. *St. Paul Guardian Ins. Co. v. Centrum G.S. Ltd., 383 F.Supp.2d 891, 902 (N.D. Tex. 2003)*.

Willis of Texas notified Lloyd's of the loss sometime in late September 2006. There is no dispute that, in early November 2006, UP provided all the information requested by Lloyd's for the stated purpose of evaluating the coverage applicable to the accident. (*See* Doc. No. 66, Ex. C-1 at Bates W17054.) On November 28, 2006, UP communicated with Lloyd's regarding the direct settlement negotiations involving the claims made by Plaintiff McGinnis. (Doc. No. 66, Ex. C-1 at Bates W17052-54; Doc. No. 77, Ex. U.) Lloyd's did not affirm or deny coverage or tender a reservation of rights and also did not participate in the settlement negotiations or instruct either Metro or UP to refrain from settlement to allow Lloyd's to determine whether to participate. Following several telephone discussions with Lloyd's counsel, on February 27, 2007, UP's counsel, sent a letter to Lloyd's counsel in which he provided the status of the case, [**85] demanded a defense, demanded "first-dollar liability coverage under the Lloyd's Umbrella Policy for the Incident" or, in the alternative, "without waiver, Union Pacific demands that Lloyd's provide indemnity excess to the underlying scheduled policies," and demanded Lloyd's "immediately effect a settlement of the McGinnis claim." (Doc. No. 89, Ex. A-1.) On March 13, 2007, Lloyd's denied coverage under the Umbrella policy. (*See* Doc. No. 66, Ex. C-2.) On March 22 and 23, 2007, UP emailed counsel for Liberty Mutual and Lloyd's once again requesting their participation in the settlement and also informed them of UP's intent to accept the settlement offer sought by Plaintiff McGinnis unless directed not to by either carrier. (Doc. No. 66, Ex. C-2; Doc. No. 77, Exs. Y & Z.) Without hearing from Lloyd's, on March 23, 2007, after both insurers not only declined to participate in the settlement discussions, but also declined coverage, UP settled Plaintiff McGinnis' claims. (Doc. No. 66, Ex. C-2.) On March 27, 2007, a letter from Lloyd's counsel "reiterates" their declination of coverage. (*Id.*) In the letter, although having previously declined coverage, Lloyd's objected to the increased settlement [**86] amount contemplated by UP to settle Plaintiff McGinnis' claims, complained that they did not have adequate information upon which to evaluate the reasonableness of the new settlement amount, objected that UP gave them only 24 hours to consider Plaintiff's new settlement demand, and reserved their right to contest the reasonableness of the settlement amount. (*Id.*) Notably, however, Lloyd's was notified of the suit before trial and had previously been invited to participate in the settlement discussions. Lloyd's not only declined, but denied coverage under the policy before any settlement was reached.

As pointed out by UP, in its Motion for Summary Judgment, Lloyd's only specific claims of prejudice are as follows:

> [it was] prejudiced by the ultimate settlement Union Pacific entered into with Plaintiff McGinnis because the original settlement agreement reached between the two was for considerably less. See Exhibit "C." For reasons unknown to Underwriters, Union Pacific failed to formalize the original settlement, allowing a significant increase in the demands of Plaintiff McGinnis, to the extreme prejudice of Underwriters.

[*811] (Doc. No. 66 at 23.) To the extent that Lloyd's suggests that its [**87] inability or failure to obtain a smaller settlement, or more favorable settlement, constitutes prejudice sufficient to relieve an insurer of its duty to defend or indemnify its insured, any such assertion would not suffice to establish prejudice. *Centrum G.S. Ltd., 383 F.Supp.2d at 902* (recognizing that inability to obtain a more favorable judgment is not a circumstance that will establish prejudice). Based on the evidence presented, the Court cannot conclude that Lloyd's was prejudiced as a matter of law. *See Coastal Refining & Marketing, 218 S.W.3d at 290-92* (delayed notice to insurer of suit until less than a month before trial did not prejudice insurer where it learned of suit while defense and negotiations were still ongoing, insurer was provided access to litigation file, and insurer was invited to participate in settlement discussions). Lloyd's Motion for Summary Judgment on the ground of late notice is, therefore, denied.

**8. Whether "No Action" Clause Precludes Coverage**

Lloyd's next contends that the "no action" clause precludes coverage under the policy. (Doc. No. 66 at 16.) In particular, the Umbrella policy contains the following clause:

> There will be no right of action against [**88] us under this insurance unless:
>
> 1. You have complied with all the terms of this policy; and
>
> 2. The amount you owe has been determined with our consent or by actual trial and final judgment.

(Doc. No. 66, Ex. B at Bates UW/Wil 20.) UP responds that Lloyd's "reliance on the no-action clause . . . is misplaced because they denied coverage." (Doc. No. 81 at 14.) While it is true that "the insurance company may ordinarily insist upon compliance with this condition for its own protection" (*Gulf Ins. Co. v. Parker Prods. Inc., 498 S.W.2d 676, 679 (Tex. 1973)*), the law is well-settled that once an insurer has breached its duty to defend, the insured is free to proceed as he sees fit; he may engage his own counsel and either settle or litigate, at his option. *Great American Indemnity Co. v. Corpus Christi, 192 S.W.2d 917, 919 (Tex.Civ.App.-San Antonio 1946, writ ref'd n.r.e.)*. Having forfeited its right to conduct the defense, the insurer is bound by the judgment or settlement. *Ridgway v. Gulf Life Insurance Co., 578 F.2d 1026, 1029* (judgment), *reh'g denied, 583 F.2d 541 (5th Cir. 1978)*; *Ranger Insurance Co. v. Rogers, 530 S.W.2d 162, 166-67 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.)* (settlement).

Furthermore, [**89] another consequence of a breach of the duty to defend is the inability to enforce against the insured any conditions in the policy; the insured is no longer constrained by "no action" or "no voluntary assumption of liability" clauses. *Parker Products, Inc., 498 S.W.2d at 679*. Thus, a consequence of breach is that an insurer who wrongfully failed to defend its insured is liable for any damages assessed against the insured, up to the policy limits, subject only to the condition that any settlement be reasonable. *Western Alliance Ins. Co. v. Northern Ins. Co. of New York, 176 F.3d 825, 830 (5th Cir.1999)*. The insured must demonstrate only that, in settling, his conduct conformed to the standard of a prudent uninsured. *Simon v. Maryland Cas. Co., 353 F.2d 608, 612 (5th Cir. 1965)* (citing *United States Auto. Ass'n v. Russom, 241 F.2d 296, 301 (5th Cir. 1957))* (when the insurer repudiates coverage, an assured is entitled to exercise the judgment of a prudent uninsured person in compromising the claim); *Willcox v. American Home Assur. Co., 900 F.Supp. 850, 855-56 (S.D. Tex. 1995)* (recognizing that "[w]hen an insured compromises and settles the [*812] case without the sanction of a judgment, the [**90] insured may, in a separate suit initiated against the insurer, recover the amount of damages he paid or promised to pay in settlement of the case upon sufficient proof of facts establishing that the settlement was made in good faith, upon reasonable basis, and for a reasonable amount"); *see also, Atofina Petrochemicals, 256 S.W.3d at 677* (when an insurer wrongfully denies coverage and its insured enters into an agreed judgment, the insurer may not contest the reasonableness of the agreed judgment). Finally, when an insured settles a claim, without knowing whether or not it would be covered by the policies, this "leav[es] in place its motive to minimize the settlement amount in case it became solely responsible for payment." *Id. at 674*. Accordingly, Lloyd's Motion for Summary Judgment based on the "no-action" clause is denied.

**9. Whether Lloyd's Breached Duty to Defend**

In its Third-Party Complaint, UP alleges that Lloyd's breached its duty to defend. In its Motion for Summary Judgment, Lloyd's maintains that it had no duty to defend because the complaint alleged facts excluded by the policy. (Doc. No. 66 at 17.) The Umbrella policy, in relevant part, provides:

> II. Defense
>
> A. We shall have [**91] the right and duty to defend any claim or **suit** seeking damages covered by the terms and conditions of this policy when:

1. The applicable limits of Insurance of the underlying policies listed in the Schedule of Underlying Insurance and the limits of Insurance of any other Underlying Insurance providing coverage to the Insured have been exhausted by payment of claims to which this policy applies; or

2. Damages are sought for Bodily Injury, Property Damage, Personal Injury, or Advertising Injury covered by this policy but not covered by any underlying insurance listed in the Schedule of Underlying Insurance or any other underlying insurance providing coverage to the Insured.

(Doc. No. 66, Ex. B at Bates UW/Wil 7.) UP maintains that it "has demonstrated that the various suits filed against it arising out of the Accident fall within the scope of coverage" (Doc. No. 69 at 19), and Lloyd's "must defend [UP] under the Umbrella policy if (i) the RPL Policy covers the claims and is exhausted by payment; or (ii) if the RPL Policy does not cover the claims." The Court agrees. Since the Complaint's alleged facts fall within the scope of coverage and were not otherwise excluded by the policy, Lloyd's [**92] Motion for Summary Judgment on this ground is denied.

**10. Whether UP is Entitled to Attorney's Fees**

UP maintains that it is entitled to attorney's fees under *Section 38.001 of the Texas Civil Practice and Remedies Code* for bringing this action against Lloyd's for breach of contract. (Doc. No. 69 at 12.) While Lloyd's filed a response to UP's Motion, it did not address UP's argument that it is entitled to attorney's fees. (*See* Doc. Nos. 77 & 87.)

As previously discussed, in order to recover attorney's fees pursuant to *Section 38.001*, a party must be a prevailing party and recover actual damages on its claim. *See Mustang Pipeline Co., 134 S.W.3d at 201* (noting that even though the claimant had a valid claim, it "was not entitled to recover attorney's fees because it was not awarded damages on its breach of contract claim"); *Solis, 951 S.W.2d at 390* (where breach of contract was established, but jury awarded no damages for the breach, the party was not entitled to attorney's [*813] fees under statute). In this case, it is premature to consider UP's entitlement, if any, to attorney's fees under *Section 38.001*. *See Solis, 951 S.W.2d at 390*. Accordingly, UP's Motion for Partial [**93] Summary Judgment seeking attorney's fees under *Section 38.001* is denied without prejudice as premature.

**11. Whether No Coverage Under Policy Precludes Bad Faith Claim**

Lloyds argues that since no coverage existed under the policy, any claim that it acted in bad faith fails. (Doc. No. 66 at 17-18.) UP responds that, while the carriers "have correctly recited Texas law on the issue," to the extent coverage exists under the policy, additional discovery would be necessary and, thus, it would be "premature for the Court to consider and rule on the viability of the extra-contractual claims." (Doc. No. 81 at 15.) Insofar as coverage exists under the policy, the Court agrees with UP. Lloyd's Motion for Summary Judgment is denied on this point.

**VIII. CONCLUSION**

For all the reasons set forth above, the following is **ORDERED** by the Court:

A. Liberty Mutual's Motion for Summary Judgment (Doc. No. 64) is **GRANTED** as to the issue that UP is not an insured under the Wrap-Up policy, but **DENIED** as to all other relief sought within its Motion;

B. Metro's Motion for Partial Summary Judgment (Doc. No. 65) is **GRANTED** as to the following issues: (1) liability coverage exists for Metro under the Wrap-Up policy; (2) [**94] the auto exclusion does not apply to preclude coverage for Metro under the Wrap-Up policy; and (3) the Lease Agreement is an "insured contract" under the Wrap-Up policy, and **DENIED** as to all other relief sought within its Motion;

C. Lloyd's Motion for Summary Judgment (Doc. No. 66) is **DENIED** in its entirety;

D. UP's Motion for Partial Summary Judgment under the RPL Policy (Doc. No. 66) is **DENIED;** and

E. UP's Motion for Partial Summary Judgment under the Umbrella Policy (Doc. No. 69) is **GRANTED** as to the following issues: (1) UP is an additional insured under the Umbrella policy; (2) UP has standing to bring this action; (3) the auto exclusion does not apply to preclude coverage under the Umbrella policy; and (4) the Umbrella policy is not limited merely to construction, and **DENIED** as to all other relief sought within its Motion.

**IT IS SO ORDERED.**

**SIGNED** this 14th day of March, 2009.

/s/ Keith P. Ellison

KEITH P. ELLISON

UNITED STATES DISTRICT JUDGE



**R. K. MURPHY A/K/A KEN MURPHY D/B/A MURPHY'S EXXON AND D/B/A MURPHY'S CHEVRON, APPELLANT v. CINTAS CORPORATION, APPELLEE**

**NO. 12-94-00371-CV**

**COURT OF APPEALS OF TEXAS, TWELFTH DISTRICT, TYLER**

***923 S.W.2d 663*; *1996 Tex. App. LEXIS 750***

**February 23, 1996, delivered**
**February 23, 1996, filed**

**SUBSEQUENT HISTORY:** [**1] Rehearing Denied March 14, 1996. Motion for Rehearing of Application for Writ of Error Overruled November 15, 1996.

**PRIOR HISTORY:** APPEAL FROM THE COUNTY COURT AT LAW NO. 2. SMITH COUNTY, TEXAS.

**COUNSEL:** H.L. MCGEE.

RONNIE HORSLEY.

**JUDGES:** CHARLES R. HOLCOMB (AUTHOR), A. ROBY HADDEN, TOM B. RAMEY, JR. (NOT PARTICIPATING)

**OPINION BY:** CHARLES R. HOLCOMB

**OPINION**

[*664] Ken Murphy appeals from a judgment awarding Cintas Corporation $ 6,167.30 for breach of a uniform rental agreement. In the first six points of error, Murphy challenges the legal sufficiency of the evidence to support the court's award of liquidated damages. In his seventh point, Murphy contends that the court erred when it awarded liquidated damages because the stipulated damage clause in the contract was an unenforceable penalty, as a matter of law. In his last point, Murphy contends that the court erred when it refused to set aside the judgment and render a take-nothing judgment in his favor. In one cross-point, Cintas contends that the court erred when it permitted Murphy to file a trial amendment after the court had taken the case under advisement. We will affirm.

Cintas Corporation is a national company that [**2] rents uniforms, towels and mats to businesses on a weekly basis. Murphy owns and [*665] operates an Exxon and Chevron service station in Tyler, Texas. From 1988 until 1991, Murphy and Cintas entered into a series of contracts to rent uniforms. Initially, Cintas filed suit against Murphy alleging that he had failed to pay in accordance with their agreements which resulted in $ 8,724.59 in damages. As exhibits to its petition, Cintas attached the contracts, the invoices and Cintas's affidavit stating that the claim against Murphy was just and true, that it was due, and that all just and lawful credit had been allowed. *TEX. R. CIV. P. 185*.

Murphy answered by an unsworn denial, but alleged that Cintas "failed to furnish clean, high quality garments and failed to replace torn, damaged and worn garments when requested." Murphy also alleged that Cintas was not entitled to recover liquidated damages because the liquidated damage provision was an unenforceable penalty. After a non-jury hearing, the court rendered judgment in favor of Cintas. Neither party requested findings of fact and conclusions of law.

In points one, two, three, four, five, six and eight, Murphy challenges the legal [**3] sufficiency of the evidence to support the court's award of liquidated damages. According to Murphy, the record is void of any evidence regarding the amount of monetary loss that Cintas actually suffered as a result of the breach or the reasonableness of the liquidated damage provision. He also argues that the record is void of any evidence that the amount of liquidated damages was a reasonable forecast of just compensation. Therefore, Murphy concludes that the court erred when it awarded damages in accordance with the liquidated damage provision of the contract ra-

ther than awarding damages in accordance with common law contract law. We do not agree.

When findings and conclusions are neither requested nor filed, the trial court is presumed to have made all of the findings necessary to support its judgment. *Roberson v. Robinson, 768 S.W.2d 280, 281 (Tex. 1989)*. All questions of fact are presumed found in support of the judgment and the judgment will be upheld on any legal theory raised by the evidence. *Point Lookout West, Inc. v. Whorton, 742 S.W.2d 277, 278-79 (Tex. 1987)*. Further, Murphy's points of error are "no evidence" points. In deciding a "no evidence" point, we must [**4] consider only the evidence and inferences tending to support the finding and disregard all evidence and inferences to the contrary. *Davis v. City of San Antonio, 752 S.W.2d 518, 522 (Tex. 1988)*.

Here, we have a dispute between the parties about whether the court rendered judgment on a suit on sworn account or breach of contract. *TEX. R. CIV. P. 185*. To be a valid suit on sworn account, the account or liquidated money demand must involve a claim for goods, wares, merchandise, personal services rendered, labor done or labor or materials furnished. *Great-ness Prof. Serv. v. First Nat. Bank of Louisville, 704 S.W.2d 916, 917* (Tex. Civ. App. - Houston [14th] Dist. 1986, no writ). Had Cintas properly filed a suit on a sworn account in accordance with *Rule 185*, and Murphy had failed to file a written denial under oath, Murphy could not have denied Cintas's claim, he could not have disputed that he received the services, and he could not have disputed the correctness of the stated charges. *Vance v. Holloway, 689 S.W.2d 403, 404 (Tex. 1985)*; *Airborne Express Corp v. CRB Marketing, Inc., 566 S.W.2d 573, 575 (Tex. 1978)*. However, a lawsuit involving a breach of a lease [**5] agreement is not a valid claim on sworn account because a lease agreement does not involve a purchase and sale, and title to personal property has not passed from one party to another. *Id.* Thus, we hold that Cintas's cause of action against Murphy is not a suit on sworn account as a matter of law. *Id.*

Having determined that the court rendered judgment in favor of Cintas under a breach of contract, we will determine whether there is any evidence to support the damage award. Murphy argues that, because Cintas did not offer proof of its actual damages, there was no evidence in the record to show that the liquidated damage provision in the contract was reasonable. As an affirmative defense to Cintas's claim for liquidated damages, Murphy pled penalty. TEX. R. APP. P. 94; *Phillips v. Phillips, 820 S.W.2d 785, 789* [*666] *(Tex. 1991)*. In doing so, Murphy not Cintas had the burden to prove that the liquidated damage provision was unreasonable and a penalty. *Gorman v. Life Ins. Co. of North America, 811 S.W.2d 542, 546 (Tex. 1991)*. Murphy did not offer any evidence to prove the amount of Cintas' actual damages. Accordingly, points one, two, three, four, five, six and [**6] eight are overruled.

In his seventh point, Murphy contends that the court erred when it awarded Cintas liquidated damages because the contractual provision was, as a matter of law, an unenforceable penalty. The disputed liquidated damage clause stated:

> In the event of cancellation of this service agreement by the Customer prior to the termination date, other than for failure of the Company to perform under its guarantee, the Customer will pay the greater of 50% of the weekly service charge per person per week for the unexpired term, or buy back all of the garments in inventory at the rates listed above as replacement value.

Citing *Servisco v. Tramco Inc., 568 S.W.2d 434, 437* (Tex. App - Texarkana 1978, writ ref'd n.r.e); *Mayfield v. Hicks, 575 S.W.2d 571, 575* (Tex. App. - Dallas 1978, writ ref'd n.r.e.) and *Bethel v. Butler Drilling Co., 635 S.W.2d 834, 837* (Tex. App. - Houston, 1982, writ ref'd n.r.e), Murphy argues that a contract provision is a penalty and is unenforceable if it provides for unreasonable payments for a minor breach. In *Servico,* the court held that "a sum stipulated to be paid under an agreement should be treated as an unenforceable [**7] penalty if the agreement contains several matters of different degrees of importance and the sum stipulated is payable for the breach of any, even the least." Murphy argues that, under the language of the Cintas-Murphy agreement, Murphy could have been liable for the same amount of damages whether he breached the agreement by failing to pay the rental for all of the uniforms, by failing to pay for one shirt or by violating any of the other obligations contained in the contract. Murphy also contends that the harm caused by the breach must not be capable of estimation or difficult to estimate to be an enforceable liquidated damage stipulation. Because employees of Cintas testified that documentation of the actual damage that Cintas incurred as a result of the breach were available at the time of trial, Murphy concludes that Cintas admitted that the liquidated damage provision was unenforceable.

In *Stewart v. Basey*, the Supreme Court considered the difference between an enforceable liquidated damage provision and an unenforceable penalty. *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484 (1952)*. More recently, the courts have restated this two-part *Stewart* test when analyzing [**8] the validity of a contractual damages provision:

In order to enforce a liquidated damage clause, the court must find:

> (1) that the harm caused by the breach is incapable or difficult of estimation; and
>
> (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation.

*Phillips, 820 S.W.2d at 788*. For the provision to be an unenforceable penalty, the uncertainty of the damages and the reasonableness of the stipulation must have existed at the time when the contract was executed. *Oetting v. Flake Uniform & Linen Service, 553 S.W.2d 793, 796* (Tex. Civ. App. - Ft. Worth 1977, no writ). Even though Murphy contends that the actual damage incurred by Cintas could have been calculated at the time of trial, such testimony was long after the contract between Cintas and Murphy had been executed. To forecast the actual damages to Cintas as a result of Murphy's termination of the contract sixty months in advance would be fraught with uncertainty. Further, similar contracts for liquidated damages have been approved in *Liberty Sign Co. v. Newsom 426 S.W.2d 210 (Tex. 1968)*; *Blakeway v. National Credit Corporation, 439 S.W.2d 155* [**9] (Tex. Civ. App. - Austin 1969, writ ref'd n.r.e.); *Blakeway v. General Electric Credit Corporation, 429 S.W.2d 925* (Tex. Civ. App. - Austin 1968, writ ref'd n.r.e.); *Hyde v. Claude Neon Federal Co., 157 S.W.2d 952* (Tex. Civ. App. - Eastland 1941, writ dism'd); *White v. Wilbanks, 144 S.W.2d 941* (Tex. Civ. App. - Amarillo 1940, no writ). Accordingly, we hold that the liquidated [*667] damage clause is enforceable. Point seven is overruled.

In his last point of error, Murphy contends that the court erred when it refused to set aside the judgment and render a take-nothing judgment in his favor. However, he failed to cite any authority to support his position. Under *Rule 74(f)*, Murphy's point is not preserved for our review. *TEX. R. APP. P. 74(f)*; *Tobias v. Univ. of Texas at Arlington, 824 S.W.2d 201, 206-07* (Tex. App. - Fort Worth 1991, writ denied).

In one cross-point, Cintas contends that the court erred when it allowed Murphy to file a trial amendment after the ease had been heard by the court. According to Cintas, Murphy had failed to plead the defense of penalty to the contract action under Rule 94 until after both parties had closed and the court had taken [**10] the case under advisement. *TEX. R. CIV. P. 94*. However, the only answer in the transcript is Defendant's Second Amended Original Answer. The record before us does not contain any of the answers that precede Murphy's last amended answer, from which Cintas complains. Accordingly, we cannot determine from the record to what extent Murphy amended his prior pleadings. To complain of error on appeal, it is incumbent upon the complaining party to submit evidence in the record to support his claim. *TEX. R. APP. P. 50(d)*. Cintas's cross-point is overruled.

CHARLES HOLCOMB,

Justice

Opinion delivered February 23, 1996.



**NEXSTAR BROADCASTING, INC. D/B/A KBTV NBC 4, Appellant v. JENNIFER GRAY AND KTBS, INC., Appellees**

**NO. 09-07-364-CV**

**COURT OF APPEALS OF TEXAS, NINTH DISTRICT, BEAUMONT**

***2008 Tex. App. LEXIS 4736*; *27 I.E.R. Cas. (BNA) 1872***

**March 13, 2008, Submitted**
**June 26, 2008, Opinion Delivered**

**PRIOR HISTORY:** [*1]
On Appeal from the 60th District Court, Jefferson County, Texas. Trial Cause No. B-174,467.

**DISPOSITION:** REVERSED AND REMANDED.

**COUNSEL:** For APPELLANT: William L. Davis, Esq., Jackson Lewis LLP, Dallas.

For APPELLEES: Scott L. Zimmer, Cook, Yancey, King & Galloway, Shreveport, LA; Wyatt D. Snider, Snider & Byrd, L.L.P., Beaumont; Jason M. Byrd, Snider & Byrd, L.L.P., Beaumont.

**JUDGES:** Before McKeithen, C.J., Gaultney and Horton, JJ.

**OPINION BY:** DAVID GAULTNEY

**OPINION**

**MEMORANDUM OPINION**

Nexstar Broadcasting, Inc. d/b/a KBTV NBC 4 appeals a judgment rendered in a lawsuit filed against former employee Jennifer Gray for breach of contract and against Gray's subsequent employer, KTBS, Inc., for interference with the contract. A jury awarded Nexstar $ 1 in nominal damages from Gray on the breach of contract claim, and $ 2,000 in actual damages from KTBS on the tortious interference with the contract claim. The trial court granted Gray a declaratory judgment, ruling that a liquidated damages provision in the contract was an unenforceable penalty as a matter of law. The trial court ruled that Nexstar was not entitled to attorney's fees and awarded attorney's fees to Gray. The court granted KTBS's motion for judgment notwithstanding the verdict on the ground that there was no evidence of damages and rendered judgment that Nexstar take nothing from KTBS.

Nexstar asserts eight issues for appellate review. KTBS raises a cross-point attacking the sufficiency of the evidence to support the [*2] jury's finding of $ 2,000 in damages. *See TEX. R. CIV. P. 324(c)*. We reverse the trial court's judgment. The cause is remanded for a new trial.

BACKGROUND

Gray was originally hired by Nexstar as a reporter in 2003 and signed an employment contract. In 2004, Gray signed another contract with Nexstar as an on-air performer for a term of employment from April 11, 2004, to May 31, 2006. The contract contained a provision titled "Remedies and Procedure for Remedying Disputes," which stated:

> In the event Employee elects to breach this Agreement and leave employment prior to the conclusion of the term, the Company may accept as liquidated damages for said breach the amount of $ 10,000. In the event the Company determines that the liquidated damages amount described above is insufficient to cover all of its damages, the Company may seek to obtain additional compensatory and consequential damages by pursuing an action under paragraph 7(a) herein.

In February 2005, Gray gave notice that she would be resigning from her position. Nexstar sent her a letter reminding her of her continuing obligations under the contract. The letter informed Gray she would have to pay $ 10,000 if she left her employment. [*3] Nexstar learned

that KTBS was interested in hiring Gray and sent KTBS a letter stating that Gray was still under contract.

Gray stopped appearing as an on-air performer for Nexstar in March 2005. Within two weeks of Gray's departure, she began working for KTBS.

THE DECLARATORY JUDGMENT AND ATTORNEY'S FEES

Nexstar's lawsuit against Gray sought "liquidated damages from Gray and/or all actual and consequential damages proximately caused by her breach of contract." Gray filed a counterclaim seeking a declaratory judgment that the liquidated damages provision in the contract was an unenforceable penalty as a matter of law.

The trial court found that the liquidated damages provision in the employment contract was an unenforceable penalty. The jury awarded Nexstar $ 1.00 in nominal damages from Gray for the breach of contract. Nexstar and Gray stipulated to the amount of reasonable attorney's fees, but not to entitlement to attorney's fees. The trial court awarded Gray attorney's fees.

In issue one, Nexstar argues the trial court erred in granting the declaratory judgment, because Gray had simply re-asserted an affirmative defense as a request for declaratory judgment. In issue six, Nexstar contends [*4] the trial court erred in awarding Gray attorney's fees because Gray asserted the declaratory judgment counterclaim merely to recover attorney's fees that were otherwise not recoverable.

The purpose of the Declaratory Judgments Act is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations[.]" *TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b)* (Vernon 1997). A declaratory judgment is appropriate only if there is a justiciable controversy and the declaration sought will resolve the controversy. *Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995)*. The Act is not available to settle disputes already pending before the court. *BHP Petroleum Co. v. Millard, 800 S.W.2d 838, 841 (Tex. 1990)*.

A trial court may allow a counterclaim seeking a declaratory judgment if it is more than a mere denial of the plaintiff's cause of action and has greater ramifications than the original lawsuit. *See id. at 842*. Generally, a counterclaim will have greater ramifications than the original claim if it would have the effect of settling future disputes between the parties. *See, e.g., id.* (allowing declaratory judgment counterclaim that defined [*5] the parties' obligations under an ongoing contract for the foreseeable future); *Winslow v. Acker, 781 S.W.2d 322, 328 (Tex. App.--San Antonio 1989, writ denied)* (holding trial court did not err in allowing declaratory judgment counterclaim that would settle all future disputes regarding royalties under deed). The counterclaim must seek affirmative relief and allege that the defendant has a cause of action, independent of the plaintiff's claim, on which the defendant could recover benefits, compensation, or relief. *Millard, 800 S.W.2d at 841*; *HECI Exploration Co. v. Clajon Gas Co., 843 S.W.2d 622, 638-39 (Tex. App.--Austin 1992, writ denied)*. A counterclaim that presents no new controversy may not be asserted simply to recover attorney's fees. *Hitchcock Props. Inc. v. Levering, 776 S.W.2d 236, 239 (Tex. App.--Houston [1st Dist.] 1989, writ denied)*.

Gray sought a declaration that the remedies provision in the contract was an unenforceable penalty and void as a matter of law. This requested declaration is essentially a restatement of the "penalty" affirmative defense asserted in Gray's answer. *See Phillips v. Phillips, 820 S.W.2d 785, 789 (Tex. 1991)* (noting that "penalty" is an affirmative [*6] defense to an award of damages under a liquidated damages provision). She sought no greater relief in her counterclaim than she asserted in her affirmative defense; Gray denied Nexstar's entitlement to liquidated damages. *See Millard, 800 S.W.2d at 842*. Gray and Nexstar have no ongoing relationship. *See HECI Exploration Co., 843 S.W.2d at 639*. Gray's declaratory judgment counterclaim presented no new controversy. Under the circumstances, the award of attorney's fees to Gray under the Declaratory Judgments Act was unauthorized. *See Hitchcock Props., 776 S.W.2d at 239*. We sustain issues one and six. [1]

1 In issue seven, Nexstar also argues the trial court abused its discretion in awarding attorney's fees. We need not address this issue because of our resolution of issues one and six.

LIQUIDATED DAMAGES

In issue two, Nexstar argues the trial court erred in failing to award liquidated damages because Nexstar prevailed on the breach of contract claim, and the contract provision was enforceable as a matter of law. Nexstar argues that liquidated damages are appropriate because damages were difficult or incapable of estimation at the time the contract was signed, and $ 10,000 was a reasonable [*7] forecast of just compensation.

"Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law[.]" *Phillips, 820 S.W.2d at 788*. A liquidated damages provision may be enforceable if the harm caused by the breach is difficult to estimate and the amount of liquidated damages is a reasonable forecast of just compensation. *Id.* Evidence that the harm caused is difficult to estimate, and that the amount of liquidated damages is a reasonable forecast, must be viewed as of the time the parties executed the contract. *Baker v. Int'l Rec-*

*ord Syndicate, Inc., 812 S.W.2d 53, 55 (Tex. App.--Dallas 1991, no writ).*

Generally, a contractual provision that does not exclude further liability for actual damages is not a reasonable forecast of just compensation and is an unenforceable penalty. *Robert G. Beneke & Co., v. Cole, 550 S.W.2d 321, 322 (Tex. Civ. App.--Dallas 1977, no writ).* The provision must make clear that the amount of liquidated damages will be in lieu of other damages. *Birdwell v. Ferrell, 746 S.W.2d 338, 340 (Tex. App.--Austin 1988, no writ).*

The provision in this case provided for $ 10,000 as liquidated damages, but also stated [*8] that "[i]n the event the Company determines that the liquidated damages amount described above is insufficient to cover all of its damages, the Company may seek to obtain additional compensatory and consequential damages by pursuing an action under paragraph 7(a) herein." This provision does not limit Nexstar's recovery to liquidated damages or make clear that liquidated damages will be recovered in lieu of actual damages; under the provision, Nexstar could claim the "liquidated" damages and then claim any additional damages by taking the dispute to an arbitrator under paragraph 7(a). The trial court did not err in failing to award $ 10,000 as "liquidated" damages. Issue two is overruled.

ACTUAL DAMAGES

In issue three, Nexstar asserts the evidence conclusively established that Nexstar suffered damages in excess of the $ 1 awarded by the jury. Nexstar argues it provided undisputed evidence that it incurred $ 14,615.49 in actual damages; we understand Nexstar to argue in issue three that it proved $ 14,615.49 in damages as a matter of law. In the alternative, Nexstar argues in issue four that the jury's finding of $ 1 in actual damages is against the overwhelming weight of the evidence.

In [*9] issue eight, Nexstar argues the trial court erred in disregarding the jury's finding on damages against KTBS for tortious interference with the contract. A judgment notwithstanding the verdict is proper when no evidence supports the jury's finding. *Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 227 (Tex. 1990).* Nexstar contends the evidence supported a finding of at least $ 2,000 in damages, the amount found by the jury. KTBS argues by cross-point that the $ 2,000 finding is unsupported by the evidence.

A party attacking the legal sufficiency of evidence concerning an adverse finding on an issue on which it has the burden of proof must demonstrate that the evidence conclusively established all vital facts in support of the issue. *Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001).* If the proposition contrary to the verdict is established as a matter of law, an appellate court must render judgment for that proposition. *Id.*

In a factual sufficiency review, the appellate court considers and weighs all of the evidence and will set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong [*10] and unjust. *Id.*

Nexstar points out the jury instructions on damages for interference with the contract and breach of the contract were the same: "out of pocket" damages. The jury found $ 2,000 in "out of pocket" damages resulted from the interference with contract, but $ 1 in damages resulted from the breach of contract. Nexstar argued in a post-judgment pleading that it was entitled to contract damages, at the least, in "the same $ 2,000 awarded against Defendant KTBS." In its claim against Gray, Nexstar argues on appeal "it is clear that the jury improperly failed to consider the undisputed evidence regarding Nexstar being 'out of pocket' $ 2,000 for the speech pathologist/talent coach because it found Nexstar was 'out of pocket' this amount in its answer to the damages question against KTBS." [2]

> 2 We address the arguments made and issues raised despite Nexstar's failure to object to the asserted conflict before the jury was discharged. *See generally C. & R. Transport, Inc. v. Campbell, 406 S.W.2d 191, 195-96 (Tex. 1966)*; *Little Rock Furniture Mfg. Co. v. Dunn, 148 Tex. 197, 222 S.W.2d 985 (1949). But see Columbia Med. Ctr. of Las Colinas v. Bush, 122 S.W.3d 835, 861 (Tex. App.--Fort Worth 2003, pet. denied)*; [*11] *Coastal Chem, Inc. v. Brown, 35 S.W.3d 90, 99 (Tex. App.--Houston [14th Dist.] 2000, pet. denied).*

Nexstar also contends it paid $ 7,000 to promote a new morning show format that featured Gray as a meteorologist. The news director testified regarding this expense as follows:

> [Plaintiff's Counsel]: And how much was that total cost?
>
> [News Director]: I need to look. I'm not positive off the top of my head.
>
> [Q]: Well, just give me your best estimate.
>
> [A]: I believe it ran about $ 7,000.
>
> [Q]: Okay.

Nexstar did not show that it promoted the morning show format only because of Gray. At the time of trial, Nexstar still aired the morning show with the same format.

Nexstar also argues that it is entitled to the $ 146.31 in makeup expenses it paid to Gray. The employment contract states that Gray would be reimbursed for makeup expenses for up to $ 50 per month. Nexstar presented two checks spent in makeup reimbursements: $ 73.61 paid in November 2004; and $ 73.70 paid on April 20, 2004. KBTV's news director testified that Gray used the makeup while she worked for Nexstar. Nexstar would have paid these expenses even had Gray fully performed under the contract.

Nexstar asserts that it reimbursed Gray $ [*12] 3,110.07 for her meteorology school tuition. Gray acknowledged that Nexstar paid for her to attend meteorology school. KBTV's news director testified that Nexstar did not normally pay for meteorology school but agreed to pay Gray's tuition because she had "great potential." The trial court admitted into evidence the checks issued by Nexstar for Gray's tuition: $ 1,431.50 paid on January 16, 2004; $ 1,194.07 paid on June 1, 2004; and $ 484.50 paid on July 28, 2004. The last two tuition checks, for $ 1,194.07 and $ 484.50, were paid during the term of employment under the March 2004 contract. However, Nexstar was not required to reimburse Gray for her meteorology school tuition expenses under the March 2004 contract.

Nexstar argues that it paid $ 2,000 to a speech pathologist, or talent coach, who provided Gray with voice training. The talent coach trained all of the on-air performers. KBTV's news director would set a day planner for the coach and would allocate how much time each individual would spend with the coach. The time an individual would spend with the coach varied according to how long the individual worked with the station and how much potential they had. KBTV's general manager [*13] testified that when Gray first started working with the station, the coach spent more time with Gray to improve her voice. However, Nexstar did not present evidence showing how much time Gray spent with the coach, nor did it segregate Gray's time with the coach from the time the other on-air performers trained with the coach. The record does not show whether the training occurred when Gray was first hired under the original contract, or during the term of the second contract.

Finally, Nexstar also contends it incurred costs in hiring Gray's replacement and paid for an on-air performer to fill in for Gray. While Nexstar sought candidates to replace Gray, Gray's meteorology duties were covered by the station's chief and weekend meteorologists. Nexstar paid Gray's meteorology replacement $ 191.30 in traveling expenses, $ 750 in moving expenses, and $ 607.81 for a plane ticket. Nexstar also paid $ 810 to a freelance reporter who covered some of Gray's reporting duties. KTBS argues Nexstar would have been required to replace Gray at the end of her contract in any event and would have incurred the costs even without the alleged interference.

THE JURY'S FINDINGS

The findings by the jury, that [*14] Nexstar suffered $ 1 in out of pocket damages as a result of Gray's breach and $ 2,000 in out of pocket damages as a result of KTBS's tortious interference, address the same material fact. The measure of damages under the interference with contract claim is the same as that under the breach of contract claim in this case. *See Am. Nat'l Petroleum Co. & Oil Invs., Ltd. v. Transcon. Gas Pipe Line Corp., 798 S.W.2d 274, 278 (Tex. 1990)*.

The trial judge found no evidence to support the $ 2,000 damage finding and signed a judgment notwithstanding the verdict. There is legally sufficient evidence in this record of some damages, however. Though this record may not support an award of all of the costs of finding a replacement, the jury could reasonably conclude some of the costs incurred in covering Gray's job duties, hiring a freelance reporter, and finding a replacement on short notice could have been avoided if KTBS had not interfered with the contract. *See Guevara v. Ferrer, 247 S.W.3d 662, 670 (Tex. 2007)* ("[W]hen there is evidence to support some damages it is not appropriate to render judgment."). But the jury made conflicting jury findings on conflicting evidence concerning the same [*15] material fact. The jury also found the same evidence did not support more than $ 1 in damages for the breach of contract. On this record, a coherent judgment cannot be rendered. A new trial is required. [3]

3 In issue five, Nexstar argues the trial court erred in denying its request for attorney's fees because it prevailed on its breach of contract claim against Gray. Because we reverse and remand the cause for a new trial, we do not reach this issue.

CONCLUSION

The trial court's judgment is reversed. The cause is remanded for a new trial.

REVERSED AND REMANDED.

DAVID GAULTNEY

Justice

Submitted on March 13, 2008

Opinion Delivered June 26, 2008



**PATTI PATTERSON, M.D., INTERIM COMMISSIONER OF HEALTH, IN HER OFFICIAL CAPACITY, WILLIAM REYN ARCHER, RECENTLY APPOINTED COMMISSIONER OF HEALTH, IN HIS OFFICIAL CAPACITY, AND THE TEXAS DEPARTMENT OF HEALTH, APPELLANTS v. PLANNED PARENTHOOD OF HOUSTON AND SOUTHEAST TEXAS, INC., APPELLEE**

**No. 97-0889**

**SUPREME COURT OF TEXAS**

***971 S.W.2d 439*; *1998 Tex. LEXIS 104*; *41 Tex. Sup. J. 1001***

**February 4, 1998, Argued**
**June 23, 1998, Delivered**

**PRIOR HISTORY:** [**1] ON DIRECT APPEAL FROM THE 250TH JUDICIAL DISTRICT COURT OF TRAVIS COUNTY, TEXAS.

**DISPOSITION:** Vacated trial court's judgment and dismissed this case for want of jurisdiction.

**COUNSEL:** FOR APPELLANTS: Castro, Mr. Daniel R., Watt & Associates, Austin, TX. Wilburn, Ms. Debra L., Office of Attorney General of Texas, Dan Morales, A.G., Austin, TX. Watts, MR. Edward P., Watt & Associates, Austin, TX.

FOR APPELLEE: Dickie, Ms. Martha S., Minton Burton Foster & Collins, Austin, TX. Duggins, Mr. David C., Burton, Mr. Charles R., Clark Thomas & Winters, Austin, TX.

McCown, Judge, The Honorable F, Austin, TX.

**JUDGES:** JUSTICE HANKINSON delivered the opinion of the Court, in which CHIEF JUSTICE PHILLIPS, JUSTICE HECHT, JUSTICE ENOCH, JUSTICE SPECTOR, JUSTICE OWEN, and JUSTICE BAKER joined. JUSTICE GONZALEZ filed a concurring opinion, in which JUSTICE ABBOTT joined. JUSTICE GONZALEZ, joined by JUSTICE ABBOTT, concurring in the judgment.

**OPINION BY:** DEBORAH G. HANKINSON

**OPINION**

[*439] On direct appeal, the Texas Commissioner of Health asks us to reverse the judgment of [*440] the trial court declaring rider 14 to the 1997-1999 Department of Health family planning appropriation to be unconstitutional. The rider forbids the use of state funds to dispense prescription drugs to minors without parental consent. Planned Parenthood challenged rider 14 on the grounds that it conflicts with federal law and violates the unity-in-subject clause of the Texas Constitution. Because we determine that the challenge to rider 14 is not ripe, we vacate the trial court's judgment and dismiss this case for want of jurisdiction.

The State of Texas voluntarily participates in [**2] four federal programs that provide funds for family planning services: (1) Title X of the Public Health Service Act, *42 U.S.C. § 300*, which provides project grants to public and private agencies for family planning services; (2) Temporary Assistance to Needy Families, *42 U.S.C. § 701* (TANF, also known as the Welfare Reform Act), which provides grants to the states to assist needy families; (3) Title XIX of the Social Security Act, *42 U.S.C. § 1396* (Medicaid), which provides medical care to the needy through a cooperative federal-state program; and (4) Title XX of the Social Security Act, *42 U.S.C. § 1397*, which provides block grants to the states for social services, including family planning. The funds from these four programs compose the state's family planning appropriation, identified in the General Appropriations Act as Department of Health Strategy D.1.2. *See* General Appropriations Act, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 5663. The federal government is the sole source of funds for all the programs except Medicaid. As a voluntary participant in the Medicaid program, the state

agrees to match every nine dollars of federal funds with one dollar of state [**3] funds. *See 42 U.S.C. § 1396b(a)(5)*. In 1997 the legislature appropriated approximately $ 93 million for family planning services for each year of the coming biennium, with approximately $ 5.4 million per year representing the state's required matching funds for Medicaid. In 1997 the legislature also attached rider 14 to the family planning appropriation, declaring that "no state funds may be used to dispense prescription drugs to minors without parental consent." General Appropriations Act, 75th Leg., R.S., ch. 1452, 1997 Tex. Gen. Laws 5535, 5675.

As part of its family planning services, plaintiff Planned Parenthood of Houston and Southeast Texas, Inc., provides prescription medication, including contraceptives and drugs for treating sexually transmitted diseases, to minors without requiring parental consent. Planned Parenthood contracts with the state to receive funds for these services under Title X, Title XX, and TANF. Planned Parenthood is also an enrolled Medicaid provider, and is reimbursed on a fee-for-service basis by the Department of Health (through an insurance program) for the family planning services it provides to Medicaid-eligible individuals. The federal regulations [**4] governing these programs have been interpreted to proscribe the imposition of a parental notification or consent requirement. *See New York v. Heckler, 719 F.2d 1191, 1196 (2d Cir. 1983)* (invalidating federal regulation requiring parental notification of prescription contraceptives as unauthorized by Title X); *Planned Parenthood Ass'n v. Schweiker, 226 U.S. App. D.C. 139, 700 F.2d 710, 722 (D.C. Cir. 1983)* (explaining that federal regulations forbid state from denying Title X services to minors who lack parental consent); *T H v. Jones, 425 F. Supp. 873, 878 (D. Utah 1975), aff'd in part, 425 U.S. 986, 96 S. Ct. 2195, 48 L. Ed. 2d 811 (1976)* (invalidating state parental consent requirement for family planning services as conflicting with federal welfare and Medicaid requirements).

Concerned about what it perceived to be a conflict between the federal program rules' forbidding a parental consent requirement and rider 14's explicit parental consent requirement, Planned Parenthood asked defendant Texas Department of Health about the Commissioner of Health's opinion on the effect of rider 14 on family planning funds. The Department of Health and its commissioner are charged with administering [**5] and distributing funds the legislature appropriates for family planning services. The Commissioner in turn requested an opinion from the United States Department of Health and Human Services (DHHS). A regional health administrator for DHHS replied by letter that, in his view, rider 14 "is, on its face, inconsistent with the applicable Title X family [*441] planning legislative authority and implementing

regulations. Because the Title X Family Planning Program operates under total budgeting principles, if this Rider is fully implemented, the Texas Department of Health would be ineligible to receive Title X funding." The concept of "total budgeting principles" means that if a family planning program receives any money through Title X, Title X regulations apply to all of the funds in that program, "including but not limited to grant funds, grant-related income or matching funds." *42 C.F.R. 59.2 (1997)*.

In light of this express suggestion that Texas might lose its federal family planning funds, Planned Parenthood filed this action against the Department and its commissioner seeking a declaration that rider 14 is unconstitutional. It alleged that the rider violates the *Supremacy Clause, Article* [**6] *6, Clause 2, of the United States Constitution* by imposing a parental consent requirement in conflict with federal law, and violates the unity-in-subject clause, *article III, section 35, of the Texas Constitution* by amending or repealing certain provisions of the general law in an appropriations act.

At trial before the court, the parties stipulated to a number of facts, including that "effective September 1, 1997, Planned Parenthood will no longer be eligible to receive Medicaid funds for providing prescription medication to minors without consent." Planned Parenthood called as its sole witness Carol Pavlica, the director of the family planning program for the Department of Health. She explained that although the Department had not yet made any final or official decisions, it was considering two plans in its efforts to implement rider 14. Under the first plan (identified by the parties as "Plan A"), the state would simply require all minors receiving prescription drugs from family planning programs to have parental consent. She acknowledged that in her opinion this plan would jeopardize all federal family planning funds.

To avoid potentially jeopardizing federal family planning [**7] funds, the Department was considering a second plan ("Plan B"). Under Plan B, the state would continue to pay for prescriptions to minors without parental consent, but would pay for those prescriptions with federal funds other than Medicaid funds (Medicaid being the only program with a matching state component), including prescriptions for Medicaid-eligible minors. Thus under this plan, in Pavlica's opinion, the state could comply with the legislature's dictate that no state funds be used to dispense prescription drugs to minors lacking parental consent, without violating the federal rules that receipt of family planning services cannot be conditioned on parental consent, or jeopardizing other federal family planning funds. She made clear that under Plan B, neither Planned Parenthood nor its minor clients (including those eligible for Medicaid) would suffer any change in requirements, services, or funding; in other words, the state

does and will continue to pay for prescriptions for minors even if they lack parental consent, but from federal funds without a state matching fund component. She also testified she believed the state would not be jeopardizing its federal funds by implementing [**8] Plan B because the state would not in fact be imposing a parental consent requirement.

The trial court declared rider 14 unconstitutional on the bases that (1) it conflicts with the federal laws governing the four federal programs in the family planning appropriation, and (2) it violates *article III, section 35, of the Texas Constitution* by attempting to repeal or amend certain provisions of Chapter 32 of the Texas Human Resources Code. The court rendered judgment enjoining the Commissioner from implementing rider 14. It also issued detailed findings of fact and conclusions of law.

Under federal law, the trial court concluded that the rules governing the federal family planning programs in which the state participates forbid imposition of parental consent requirements, and preempt any state law to the contrary that would affect programs drawing on those federal funds. Although the trial court termed it "an admirable effort" to comply with both federal law and rider 14, the court concluded that the Department's proposed plan to track prescriptions and payments (Plan B) and use federal funds without a state matching component to [*442] pay for prescriptions without parental consent would [**9] not avoid the conflict with federal law: "While a state can restrict the use of state money appropriated solely for state purposes, a state cannot restrict the use of state money appropriated to match federal money. Under federal law, matching money must come without restrictions or it is not matching money."

Under Texas law, the trial court rejected Planned Parenthood's assertion that the rider amended or repealed Chapter 32 of the Family Code (permitting consent by a nonparent to treatment of a minor under certain circumstances), but ruled that it did amend or repeal certain provisions of Chapter 32 of the Human Resources Code (governing the state's medical assistance program for needy individuals). It determined that *section 32.024(a) of the Human Resources Code* requires the Department of Health to provide medical services to the needy in accordance with federal law, and section 32.031(b) authorizes the Department to spend state funds to do so. Thus the trial court concluded that the rider unconstitutionally amended general law by bringing the state out of compliance with the federal rules governing family planning funds: "Texas has chosen in its own general law to spend its funds [**10] consistent with federal law, and a rider cannot amend or repeal that general law." The trial court also concluded that Planned Parenthood had standing to bring its claims because it receives part of the funds that the state is placing at risk by enforcing a rider in conflict with federal law, and that even the Department's proposed plan to use federal funds without a state matching component did not resolve that conflict. Based on the letter from DHHS, the court concluded that "this threatened cut-off of federal funds -- which directly threatens Planned Parenthood -- is sufficient to give Planned Parenthood standing to force compliance with the law." The court also premised standing on its finding that the administrative costs of implementing Plan B would be paid for with funds that would otherwise be available to Planned Parenthood to assist needy individuals.

While the trial court framed this issue as one of standing, we view it more precisely as one of ripeness. Ripeness, like standing, is a threshold issue that implicates subject matter jurisdiction, *Mayhew v. Town of Sunnyvale, 905 S.W.2d 234, 244 (Tex. 1998)*, and like standing, emphasizes the need for a concrete injury [**11] for a justiciable claim to be presented. *See* DAVIS & PIERCE, II ADMINISTRATIVE LAW TREATISE, § 15.12, at 361 (3d ed. 1994) ("In many cases the two problems of standing and ripeness are merged; a party may lack standing because what has happened to him is not far enough developed, but the lack of development may be the essence of unripeness."). But if standing focuses on the question of who may bring an action, *see Barshop v. Medina County Underground Water Conservation Dist., 925 S.W.2d 618, 626-627 (Tex. 1996)*, ripeness examines when that action may be brought. At the time a lawsuit is filed, ripeness asks whether the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote. *See* Nichol, *Ripeness and the Constitution*, *54 U. CHI. L. REV. 153, 169 (1987)*; 13A WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE, § 3532.1, at 130 (2d ed. 1984). Ripeness thus focuses on whether the case involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." WRIGHT, *supra*, § 3532, at 112. By maintaining this focus, the ripeness doctrine serves to avoid premature [**12] adjudication. While the standing doctrine has been much criticized, ripeness, especially in its pragmatic focus, has found the approval of commentators. *See, e.g.*, Mansfield, *Standing and Ripeness Revisited: The Supreme Court's "Hypothetical" Barriers*, 68 N.D. L. REV. 1, 19-20 (1992); WRIGHT, *supra*, § 3532, at 112 ("As compared to standing, ripeness decisions have developed a generally satisfactory method for resolving the problems of prematurity.").

The constitutional roots of justiciability doctrines such as ripeness, as well as standing and mootness, lie in the prohibition on advisory opinions, which in turn stems from the separation of powers doctrine. *See TEX. CONST. art. II, § 1* (separation of powers), art. IV, §§ 1, 22 (attorney general is part of the executive department, and is

empowered to issue advisory opinions to the governor [*443] and other officials), art. V, § 8 (district court jurisdiction); *Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 444 (Tex. 1993)* (explaining that "we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial [**13] department"); *Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641, 646 (Tex. 1933)* (explaining that under the constitution, appellate court jurisdiction does not extend to issuing advisory opinions); *see also Farmers Tex. County Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997)* (reviewing justiciability principles in light of 1985 constitutional amendment to district court jurisdiction).

The courts of this state are not empowered to give advisory opinions. *Wessely Energy Corp. v. Jennings, 736 S.W.2d 624, 628 (Tex. 1987)*; *United Servs. Life Ins. Co. v. Delaney, 396 S.W.2d 855, 859 (Tex. 1965)*; *Alamo Express v. Union City Transfer, 158 Tex. 234, 309 S.W.2d 815, 827 (Tex. 1958)*. This prohibition extends to cases that are not yet ripe. *See Camarena v. Texas Employment Comm'n, 754 S.W.2d 149, 151 (Tex. 1988)*; *Public Util. Comm'n v. Houston Lighting & Power Co., 748 S.W.2d 439, 442 (Tex. 1987)*; *City of Garland v. Louton, 691 S.W.2d 603, 605 (Tex. 1985)*; *California Prod., Inc. v. Puretex Lemon Juice, 160 Tex. 586, 334 S.W.2d 780, 783 (Tex. 1960)*. A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have [**14] not yet come to pass. *See Camarena, 754 S.W.2d at 151* (holding trial court could not grant relief based on "a hypothetical situation which might or might not arise at a later date. District courts, under our Constitution, do not give advice or decide cases upon speculative, hypothetical or contingent situations").

The concerns addressed by the ripeness doctrine encompass more than a question of constitutional prohibition. The doctrine has a pragmatic, prudential aspect that is directed toward "[conserving] judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Mayhew, 964 S.W.2d 922, 928*; *see also* Nichol, *supra*, at 174 ("ripeness analysis carries the banner of prudence rather than power"). Refraining from issuing advisory opinions and waiting for cases' timely factual development is also essential to the proper development of the state's jurisprudence. *See* Entman, *Flawed Activism: The Tennessee Supreme Court's Advisory Opinions on Joint Tort Liability and Summary Judgment*, *24 MEM. ST. U.L. REV. 193, 199 (1994)*; Frankfurter, *A Note on Advisory Opinions*, 37 HARV. L. REV. 1002, [**15] 1002-03 (1924). "Litigation based upon hypothetical possibility rather than concrete fact is apt to be poor litigation. The demand for specificity, therefore, stems from a judicial desire for better lawmaking." Nichol, *supra*, at 177; WRIGHT, *supra*, § 3532.3, at 147 ("adjudication may be postponed until a better factual record is available, 'even though the challenged statute is sure to work the injury alleged.'") (quoting *Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 300, 60 L. Ed. 2d 895, 99 S. Ct. 2301 (1979))*. Moreover, avoiding premature litigation prevents courts from "entangling themselves in abstract disagreements over administrative policies" while at the same time serving to "protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *City of El Paso v. Madero Dev. & Constr. Co., 803 S.W.2d 396, 398-99* (Tex. App. -- El Paso 1991, writ denied) (citing *Abbott Lab. v. Gardner, 387 U.S. 136, 18 L. Ed. 2d 681, 87 S. Ct. 1507 (1967))*; *see also* DAVIS & PIERCE, *supra*, § 15.12, at 360 (explaining that ripeness law "limits the ability [**16] of courts to intrude excessively on the policymaking domains of the politically accountable [branches of government]"); Nichol, *supra*, at 178 (similarly noting that ripeness doctrine "allows the courts to postpone interfering when necessary so that other branches of government . . . may perform their functions unimpeded").

We examine the ripeness of Planned Parenthood's claims in light of these principles. Planned Parenthood argues that any implementation of rider 14 will result in it losing federal funds, at the very least those provided through Title X. Thus Planned Parenthood urges that it is in immediate danger [*444] of sustaining some direct injury because of the Department's planned implementation of rider 14. Planned Parenthood further argues that it is unclear whether the Department can legitimately separate federal and state funds, and that even if the Department can lawfully implement such a plan, Planned Parenthood is harmed by the administrative costs of implementation.

The record does not support Planned Parenthood's assertions. Pavlica, the sole witness, explained that the Department had not finalized its plans, but was leaning to Plan B, and had only just begun investigating [**17] what automation demands Plan B might require. She emphasized that Planned Parenthood and its clients would experience no change in actual services provided or paid for under Plan B, but that only the funding source for some of the prescriptions would change. She testified that the Department would not in fact require parental consent before paying for prescriptions to minors under Plan B: "We would not change the parental consent requirements so minors would continue to be served." The letter from DHHS does not specifically address Plan B, but refers to rider 14 "*on its face*," states that Texas may be ineligible to receive Title X funds "*if* [rider 14] is fully implemented," and clearly assumes that parental consent will be required before any drugs are prescribed. (Emphasis

added.) Nothing in the record demonstrates that the federal government has actually considered Plan B, much less suggested revoking or withdrawing funding based on it. Likewise, no evidence supports the trial court's conclusion that the administrative costs of implementing Plan B would come from family planning program funds that would otherwise have gone to Planned Parenthood, or even the actual amount [**18] of what those administrative costs would be. Pavlica testified that although she was "not exactly sure" what the administrative costs might be, based on her experience, she "would guess . . . [that] it would be several hundreds of thousands of dollars" to segregate the funds. She did not suggest or even speculate about where the administrative funds would come from. This testimony is not specific enough to support the conclusion that harm to Planned Parenthood is imminent.

This is precisely the kind of case in which resolution of the claim presented depends on the occurrence of contingent future events that may not occur as anticipated or may not occur at all. We simply do not know what the federal government will do if the state carries out its plan to segregate the funds, and the record does not even demonstrate what exactly the state will do. Without knowing what the federal government will do, Planned Parenthood cannot show a conflict between federal and state demands or that the state's proposed action will cause it any injury. While Planned Parenthood does not have to wait until its funds are actually revoked or cut off, its potential injury must be more certain; the threat [**19] must be established by something more definite than the DHHS letter presented in this case, which does not address whatever final action the Department of Health may take to meet its statutory obligations to the legislature and Congress. Because its alleged injury remains contingent, Planned Parenthood's claim is not yet ripe for review.

The essence of the ripeness doctrine is to avoid premature adjudication of just such a situation; to hold otherwise would be the essence of an advisory opinion, advising what the law would be on a hypothetical set of facts. Neither this Court nor the trial court has the power to do so. Accordingly, we vacate the trial court's judgment and dismiss this case for want of jurisdiction.

Deborah G. Hankinson

Justice

OPINION DELIVERED: June 23, 1998

**CONCUR BY:** RAUL A. GONZALEZ

**CONCUR**

I concur with the Court that the challenge to rider 14 is not ripe. I write separately to address the threshold issue the Court leaves open -- whether Planned Parenthood has standing to challenge rider 14, even assuming the case is ripe. I would dismiss the case because Planned Parenthood lacks standing either in its own right or on behalf of the minors of the State [**20] of Texas.

[*445] In Texas, "[a] two-part test governs whether a plaintiff has standing to challenge a statute." *Barshop v. Medina Underground Water Conservation Dist., 925 S.W.2d 618, 626 (Tex. 1996)*. First, the "plaintiff must . . . suffer some actual or threatened restriction under that statute." *Texas Workers' Compensation Comm'n v. Garcia, 893 S.W.2d 504, 518 (Tex. 1995)*. "Second, the plaintiff must contend that the statute unconstitutionally restricts the *plaintiff's* rights, not somebody else's." *Id.*

Planned Parenthood maintains that rider 14 "unconstitutionally restricts its own rights" in two ways. First, if the United States Department of Health and Human Services (DHHS) determines that Texas Department of Health's implementation of rider 14 will result in a loss of federal family planning funds, then Planned Parenthood "will not be able to subsidize all the costs of providing expensive prescription drugs to minor patients who cannot obtain parental consent." Second, even if the DHHS is satisfied that "Plan B" does not violate federal regulations, Planned Parenthood claims it is harmed by the administrative costs expended to implement Plan B. However, Planned [**21] Parenthood fails to identify the source of its "right" or "entitlement" to Texas tax revenues or to the most efficient and cost-effective administration of those tax revenues.

In *Texas Association of Business v. Texas Air Control Board, 852 S.W.2d 440 (Tex. 1993)*, we held that "the standing requirement stems from two *limitations* on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision." *Id. at 443* (emphasis added). The open courts provision provides:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

*TEX. CONST. art. I, § 13*. We held that this provision "contemplates access to the courts *only for those litigants suffering an injury*." *852 S.W.2d at 444* (emphasis added). This provision, which authorizes the courts to remedy injuries done in one's "lands, goods, person or reputation," implicitly defines the bounds of potentially justiciable issues. *Cf. Baptist Mem'l Hosp. Sys. v. Arredondo, 922 S.W.2d 120, 121 (Tex. 1996)* (recognizing that under the open courts provision, the legislature may limit a cause of action [**22] unless it unreasonably restricts "a well-recognized common law cause of action"). For a plaintiff to have standing, it must demonstrate that it at least arguably has some legal or liberty interest grounded in the constitution, a statute, or the common law. *See*

*Spring Branch I.S.D. v. Stamos, 695 S.W.2d 556, 561 (Tex. 1985)* ("A property or liberty interest must find its origin in some aspect of state law.").

Planned Parenthood, therefore, must have some arguable basis for asserting that rider 14 abrogates some legal or liberty interest of its own. Planned Parenthood has not alleged that rider 14 abridges any common law right arising under property, tort, or contract law. It has not identified any fundamental right to state subsidization, *see Board of Regents v. Roth, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)* ("To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, indeed, have a legitimate claim of entitlement to it."), or to the most efficient and least wasteful administration of the state's health care resources. *Cf. Flast v. Cohen*, [**23] *392 U.S. 83, 102, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968)* ("[To establish Article III standing] it will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute."). Generally, a state's choice of whether to fund a particular program or the efficiency of its administration is not actionable. Furthermore, Planned Parenthood does not identify any implicit right or entitlement owing it under the Texas Constitution or the Texas Human Resources Code abridged by rider 14, even if federal funds are cut off.

The unity-in-subject clause of the Texas Constitution does not, by itself, provide Planned Parenthood any legal or liberty interest. *See TEX. CONST. art. III, § 35*. This Court has previously invalidated riders as void under *Section 35 of Article III of the Texas Constitution*, but only where the plaintiff asserted an otherwise protected interest. [*446] In *LeCroy v. Hanlon, 713 S.W.2d 335, 338 (Tex. 1986)*, for example, this Court held that sections of an omnibus fee bill increasing filing fees violated the "caption requirement" of Article III, Section 35. However, the plaintiff's standing to raise this claim was [**24] not in doubt because he claimed that the filing fees burdened his personal, constitutional right to open courts. *See id. at 337*. In *Moore v. Sheppard, 144 Tex. 537, 192 S.W.2d 559, 562 (Tex. 1946)*, this Court held that an amendment to an appropriation bill directing that fees paid to clerks for either official or unofficial documents be deposited with the State Treasury violated the unity-in-subject clause. There, the plaintiffs' standing was also not in question, because they had an arguable property interest in the compensation they received "for [services] that they [had] no obligation, under the law, to perform." *192 S.W.2d at 560*.

Planned Parenthood asserts that rider 14 conflicts with the purposes of Section 32 of the Human Resources Code. That section provides, in pertinent part, that:

(a) This chapter shall be liberally construed and applied in relation to applicable federal laws and regulations so that adequate and high quality health care may be made available to all children and adults who need the care and are not financially able to pay for it.

(b) If a provision of this chapter conflicts with a provision of the Social Security Act or any other federal act [**25] and renders the state program out of conformity with federal law to the extent that federal matching money is not available to the state, the conflicting provision of state law shall be inoperative to the extent of the conflict but shall not affect the remainder of this chapter.

*TEX. HUM. RES. CODE § 32.002*. This section provides indigent children and adults with a statutory interest in maintaining the flow of federal health care funds, but it does not give Planned Parenthood, a conduit for these taxpayer-supported services, a similar statutory interest. The statute's purposes are directed to the beneficiaries of the state and federal funds, not to fund Planned Parenthood's budget.

What the Legislature gives the Legislature can take away. The adults and children deprived of further entitlements may have a remedy if the process by which the Legislature terminates them does not accord with due process. *See, e.g., Goldberg v. Kelly, 397 U.S. 254, 263-64, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970)* (holding that procedural due process requires that evidentiary hearing be held before public assistance payments to welfare recipients are terminated); *Goldsmith v. United States Bd.* [**26] *of Tax Appeals, 270 U.S. 117, 123, 70 L. Ed. 494, 46 S. Ct. 215 (1926)* (holding that Board's refusal to admit petitioner to the practice of law without a prior hearing or statement of reasons for denial violated due process). Planned Parenthood has no standing in its own right to challenge rider 14's alleged conflict with the provisions of the Texas Human Resources Code.

In its Original and First Amended Original Petition, Planned Parenthood argued that it has standing to represent the interests of the minors of the State of Texas. Under Texas law, however, only the parents or guardians of a minor may represent their legal interests. *See TEX. FAM. CODE § 151.003(a)(7)*. Planned Parenthood is not the surrogate parent of Texas's minor children. Its status as an advocacy organization for certain rights of minors (e.g., access to contraceptives without parental consent) does not confer it standing. *See, e.g., Texas Dep't of Mental Health and Mental Retardation v. Petty, 778 S.W.2d 156, 163-66* (Tex. App. -- Austin 1989, writ dism'd w.o.j.) (holding that Advocacy, Inc., a non-profit advocacy organization for the rights of the mentally disabled, lacked standing to sue on behalf [**27] of the rights of the mentally disabled).

The question of Planned Parenthood's standing to represent the minors of the state of Texas obscures the larger issue underlying this case -- parental rights. The purpose of rider 14 was to withhold state funds from a program that, as currently implemented, interferes with parental supervision over the health care and sexual behavior of minor children. Indeed, Planned Parenthood's policy of providing minors prescription drugs without parental consent, for which it seeks this state's subsidies, is inconsistent with Texas law. *Section 151.003(a)(6) of the Texas Family Code* provides, in pertinent part:

 [*447]  (a) A parent of a child has the following rights and duties:

. . .

(6) *the right to consent* to the child's marriage, enlistment in the armed forces of the United States, *medical* and dental care, and psychiatric, psychological and surgical treatment . . . .

*TEX. FAM. CODE § 151.003(a)(6)* (emphasis added).

The importance of parental involvement in minors' decisions to avail themselves of contraceptive or abortion services is aptly illustrated in the amicus brief of several families supporting rider 14 who unsuccessfully attempted [**28]  to intervene at the trial level. The daughter of one of the individuals filing the amicus brief was impregnated on two separate occasions by her mother's boyfriend while she was living with her mother. Both times, the live-in boyfriend took the daughter -- once when she was twelve and once when she was thirteen -- to an abortion clinic in order to conceal his criminal deeds. A parental consent requirement would have prevented the live-in boyfriend from being able to continue his abuse. The irony of Planned Parenthood's argument that it represents the state's minors is that when some of those minors sought to intervene to speak for themselves -- through their lawful representatives -- Planned Parenthood opposed their intervention.

Unlike the federal authorities the Court cites early in its opinion, other courts, including our own, have strongly affirmed the ancient and well-established right of parents to guide and direct the decisions of their minor children. "The natural right which exists between parents and their children is one of constitutional dimensions." *Wiley v. Spratlan, 543 S.W.2d 349, 352 (Tex. 1976)*. "The child is not the mere creature of the state; those who nurture [**29]  him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." *Pierce v. Society of Sisters, 268 U.S. 510, 535, 69 L. Ed. 1070, 45 S. Ct. 571 (1925)*. Only a generation ago, this Court recognized the fundamental importance of parental rights in reaffirming the doctrine of parental immunity:

We trust that it is not out of date for the state and its courts to be concerned with the welfare of the family as the most vital unit in our society. We recognize that peace, tranquility and discipline in the home are endowed and inspired by higher authority than statutory enactments and court decisions. Harmonious family relationships depend on filial and parental love and respect which can neither be created nor preserved by legislatures or courts. The most we can do is to prevent the judicial system from being used to disrupt the wide sphere of reasonable discretion which is necessary in order for parents to properly exercise their responsibility to provide nurture, care, and discipline for their children.

 *Felderhoff v. Felderhoff, 473 S.W.2d 928, 933 (Tex. 1971)*. These principles cannot be reiterated often enough, [**30]  especially in the context of a minor's health and sex-related decisions. To grant Planned Parenthood standing to represent the state's minors would usurp this vital parental role.

Accordingly, I would hold not only that the case is not ripe, but also that Planned Parenthood has failed to otherwise establish standing to challenge rider 14.

Raul A. Gonzalez

Justice

Opinion Delivered: June 23, 1998



**James W. Paulsen; Independent Bankers Association of Texas; Texas Bankers Association; and Texas Savings & Community Bankers Association, Appellants v. Texas Equal Access to Justice Foundation, Appellee**

**NO. 03-98-00709-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***23 S.W.3d 42*; *1999 Tex. App. LEXIS 8949***

**December 2, 1999, Filed**

**SUBSEQUENT HISTORY:** [**1] Motion for Rehearing of Petition for Review Denied April 26, 2001. Petition for Review Dismissed for Want of Jurisdiction January 18, 2001. Rehearing Overruled March 23, 2000. Released for Publication March 23, 2000.As Corrected December 13, 1999.

**PRIOR HISTORY:** FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT. NO. 98-06951, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING.

**DISPOSITION:** Judgment Vacated and Cause Dismissed.

**COUNSEL:** FOR APPELLANT: Mr. James Walter Paulsen, Houston, TX. Mr. Mark Schwartz, Mr. Howard Nirken, Jenkens & Gilchrist, Austin, TX.

FOR APPELLEE: Mr. Darrell E. Jordan, Hughes & Luce, L.L.P., Dallas, TX.

**JUDGES:** Before Justices Jones, Yeakel and Patterson.

**OPINION BY:** J. WOODFIN JONES

**OPINION**

[*43] Appellants James W. Paulsen (Paulsen), Independent Bankers Association of Texas, Texas Bankers Association, and Texas Savings and Community Bankers Association (collectively, Bankers) sued the Texas Equal Access to Justice Foundation (the Foundation), appellee, seeking declaratory and injunctive relief. The trial court denied all requested relief. The Texas Supreme Court then declined to hear a direct appeal. Before this Court, appellants have abandoned the request for injunctive relief and now seek only a declaration that (1) IOLTA ("interest on lawyers trust account") accounts generally and in this particular case are "general" not "special" accounts; (2) the relationship between an attorney-depositor and the financial institution that administers an IOLTA account is that of creditor and banker, respectively; (3) the financial institution holds legal title to all sums deposited in the IOLTA account at issue in this case; (4) the financial [**2] institution incurs no legal liability to third parties, including the attorney's clients, solely because it participates in the IOLTA program; and (5) Paulsen is not subject to professional discipline for failure to participate in the Texas IOLTA program, pending definitive resolution of that program's constitutionality. We will vacate the trial court's judgment and dismiss the cause for lack of a justiciable controversy.

**FACTUAL AND PROCEDURAL BACKGROUND**

The Texas IOLTA program, like similar programs instituted in almost every other state, was established to raise money to provide legal assistance to low-income Texans. The "Rules Governing the Operation of the Texas Equal Access to Justice Program" oblige attorneys to participate, subject to suspension of their law licenses. *See* Tex. R. Equal Access to Justice Prog. 24 (State Bar Rules art. 11). When an attorney holds client funds, the money should ordinarily be deposited into a trust account to earn interest for the client. But where the amount held is nominal, such that it could not be expected to earn enough interest to offset the cost of maintaining a separate trust account, the funds are required to be deposited into [**3] an IOLTA account. *See* Tex. R. Equal Access to Justice Prog. 4, 6. The IOLTA account pools all such deposits from the attorney; collectively, the sums generate interest where no individual deposit could. The interest is then

paid to the Foundation, which distributes the interest received from all IOLTA accounts in Texas to low-income legal services. *See* Tex. R. Equal Access to Justice Prog. 4, 10.

A constitutional takings challenge to Texas's IOLTA program was brought in *Phillips v. Washington Legal Foundation*, which resulted in a 1998 United States Supreme Court decision holding that interest [*44] earned on an IOLTA account is the private property of the clients of the attorney who established the account. *524 U.S. 156, 172, 118 S. Ct. 1925, 141 L. Ed. 2d 174 (1998)*. That case is now on remand to the United States District Court for the Western District of Texas for further proceedings to determine whether those funds have been "taken" by the state without just compensation. While *Phillips* did not decide the ultimate issue of whether compliance with the IOLTA program effectuates a governmental taking of client property, it is fair to say that the constitutionality of the program is uncertain [**4] in the wake of the Supreme Court's decision. It is that uncertainty that appellants hope to resolve in this action.

The *Phillips* decision left many questions unanswered, in part because of the procedural framework in which the case was brought. That case was an appeal from the trial court's grant of summary judgment and so arrived before the Supreme Court without the benefit of discovery. Since the record was essentially devoid of details, the *Phillips* decision made no reference to banking law or the particulars of an IOLTA contract between an attorney and bank. The *Phillips* decision therefore makes no reference to the distinction recognized in Texas banking law between "general" and "special" accounts; this distinction, appellants assert, would have led to a different ruling. Appellants urge us to clarify what they characterize as the Supreme Court's misstatement of Texas law and to hold that both the principal and the interest earned on "general" accounts--and IOLTA accounts are apparently all "general"--are the property of the *bank* and not the *client*. Since the interest earned is bank property, appellants argue, there is no unconstitutional taking involved when [**5] the bank pays that interest to the Foundation.

All parties to this suit agree on the constitutionality of IOLTA. Appellant Paulsen is an attorney who has received a $ 1,000 retainer from a client and claims uncertainty as to his rights and obligations with respect to this money. The Equal Access to Justice Rules require him to deposit the $ 1,000 in an IOLTA account or risk suspension of his license to practice law, yet he claims the *Phillips* decision exposes him to liability to his client for breach of fiduciary duties if he does deposit the funds. Bankers are the principal trade organizations for Texas financial institutions. They claim that the contracts signed by their members and attorneys establishing IOLTA accounts are brought into question by the *Phillips* decision. While the banks are contractually obligated to pay IOLTA interest to the Foundation, they also fear liability from threatened lawsuits should they continue to participate in the IOLTA program.

Appellee, the Foundation, does not disagree with appellants as to the constitutionality of the IOLTA program. In fact, the Foundation has vigorously defended the IOLTA program as a defendant in the ongoing *Phillips* [**6] litigation. It apparently disagrees with appellants only as to how far this Court should go in deciding the ultimate constitutional issues involved. This lack of adversarial debate between the parties was noted in an amicus brief tendered by David Furlow, an attorney who disputes the constitutionality of the IOLTA program.

**DISCUSSION**

The Uniform Declaratory Judgments Act gives courts the power to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." *Tex. Civ. Prac. & Rem. Code Ann. § 37.003* (West 1997). The determination of jurisdiction over a declaratory judgment action is a question of law and so is subject to *de novo* review. *See Texas Dep't of Pub. Safety v. Moore, 985 S.W.2d 149, 153* (Tex. App.--Austin 1998, no pet.).

An action for declaratory relief is subject to the same jurisdictional requirements [*45] as any other action brought in our courts. "Subject matter jurisdiction requires that the party bringing the suit have standing, that there be a live controversy between the parties, and that the case be justiciable." *State Bar of Tex. v. Gomez, 891 S.W.2d 243, 245 (Tex. 1994)* [**7] (plurality opinion) (citing *Texas Ass'n of Business v. Texas Air Control Bd., 852 S.W.2d 440, 443-46 (Tex. 1992))*. The parties before us cannot satisfy these threshold jurisdictional requirements. Because the trial court lacked subject matter jurisdiction over this case, we will vacate that court's judgment and dismiss the cause.

***Appellant Paulsen***

Paulsen seeks declaratory judgment because, by refusing to deposit a $ 1,000 client retainer in his IOLTA account, he claims he faces the imminent suspension of his law license. It is not at all clear from the record that the suspension of Paulsen's license is inevitable or imminent. In a post-submission brief, however, Paulsen attached a letter he received from the Foundation informing him that disciplinary action will be initiated if he does not comply with IOLTA rules. Assuming without deciding that we can consider this letter, and further assuming that the letter confers standing on Paulsen, we nonetheless conclude that his suit must be dismissed for want of jurisdiction, for he has not demonstrated any justiciable controversy with his putative opponent in this case.

The crux of the claimed dispute between [**8] Paulsen and the Foundation lies in the interpretation of the Supreme Court's *Phillips* decision. Paulsen argues that if we accept as a correct statement of Texas law the *Phillips* holding that interest earned in IOLTA accounts is client property, [1] then the decision places him in an ethical quandary. If he continues to participate in the IOLTA program, Paulsen believes he breaches his ethical duty to his client when he contracts with his bank to turn IOLTA interest over to the Foundation. On the other hand, if he does not give the interest to the Foundation, he breaches professional ethics rules and stands to lose his law license. The Foundation disagrees with Paulsen only as to whether *Phillips* creates ethical uncertainty. It believes that *Phillips* answered only the question of whether a client could *ever* have a property right in interest that would not exist without the IOLTA program; the Foundation believes *Phillips* did not establish conclusively that IOLTA interest is *always* client property. That question will be decided by the federal district court on remand. This dispute, then, centers on how broadly *Phillips* can be read.

1 Of course, Paulsen does not *really* want us to accept this as true at all. He frames the issue in these terms to attempt to create a justiciable controversy between himself and the Foundation. The real goal of the litigation is apparently to have this Court decide that the U.S. Supreme Court was wrong in so holding, and that consequently IOLTA is constitutional under Texas law. We discuss *infra* why the present case is an inappropriate one for deciding that issue.

[**9] What is troubling about this appeal is that the parties *all* believe that an attorney can ethically participate in the Texas IOLTA program. Paulsen merely claims that someone else might construe *Phillips* differently, and that such an alternate interpretation would put him in an ethical bind. With no true opponent in the Foundation, what Paulsen seeks, in essence, is an advisory opinion interpreting a decision from the Supreme Court to resolve his doubts about the IOLTA program. But, of course, the separation of powers doctrine prevents us from complying with this request. Neither the legislature nor the constitution has vested us with the authority to render an advisory opinion. *See Tex. Const. art. II, § 1*; *Olson v. Commission for Lawyer Discipline, 901 S.W.2d 520, 522* (Tex. App.--El Paso 1995, no writ). We therefore hold that Paulsen has presented [*46] no justiciable controversy between himself and the Foundation.

***Appellant Bankers***

Bankers claim to have standing in this declaratory relief action because they are faced with uncertainty and insecurity in their performance of current contracts with the Foundation. [2] The Uniform Declaratory [**10] Judgments Act specifically provides that "a contract may be construed either before or after there has been a breach." *Tex. Civ. Prac. & Rem. Code Ann. § 37.004(b)* (West 1997); *see also In re City of Dallas, 977 S.W.2d 798, 804* (Tex. App.--Fort Worth 1998, no pet.); *Hasty Inc. v. Inwood Buckhorn Joint Venture, 908 S.W.2d 494, 499* (Tex. App.--Dallas 1995, writ denied). *Section 37.004* does not, however, extend an open-ended invitation to parties seeking interpretation of their contracts. There must be some showing that litigation is imminent between the parties unless the contractual uncertainties are judicially resolved. *See Reuter v. Cordes-Hendreks Coiffures, Inc., 422 S.W.2d 193, 196* (Tex. Civ. App.--Houston [14th Dist.] 1967, no writ).

2 In an IOLTA contract, the Foundation is declared to be a third-party beneficiary to the contract between the financial institution and the attorney who establishes the account.

[**11] Bankers have not demonstrated any imminent contractual dispute with the Foundation. As primary proof of their grounds for uncertainty, Bankers cite a letter from Michael Mazzone [3] to appellant banking groups warning that the banks could face liability for the tort of conversion for any interest paid by them to the Foundation after the *Phillips* decision. In the letter, Mazzone ominously warned that he has "personal knowledge that there are lawyers who are planning a class action lawsuit against a number of banks."

3 Mazzone is a named plaintiff in the *Phillips* litigation.

Mazzone's letter is insufficient to support an action for declaratory judgment. It amounts to a threat from a stranger to this action who refers to unnamed sources who may be contemplating a lawsuit at some point in the future. Bankers' feared liability to theoretical litigants is simply too remote to support a claim for declaratory relief. Further, it does not appear that the litigation the Bankers fear would even involve [**12] the Foundation. Mazzone's letter warned banks that they could be liable for the tort of conversion if they continue to pay IOLTA interest to the Foundation. In that event, any liability for conversion would be to the clients of the depositing attorneys and not to the Foundation.

Bankers, as evidenced by their briefs, strongly believe that IOLTA is constitutional and apparently intend to honor their contracts establishing IOLTA accounts unless and until a court declares the IOLTA program unconstitutional. Even assuming that the Foundation would have standing to protect its right as third-party beneficiary to the interest earned on IOLTA accounts, there is no justiciable controversy where, as here, there is an absence of any real threat or intention to breach a

contract. *See id. (citing Spradley v. Whitehall, 314 S.W.2d 615, 619* (Tex. Civ. App.--Fort Worth 1958, no writ)). The trial court, therefore, lacked jurisdiction to grant the relief sought by Bankers.

***True Controversy***

The only issue on which the parties to this case seem to disagree is how broadly *Phillips* should be read. Appellants paint a doomsday picture that throws all banking practices [**13] into uncertainty unless we hold that the Supreme Court misstated Texas law, grant declaratory relief reiterating the distinction between "general" and "special" accounts, and explicitly hold that IOLTA is constitutional. Appellants assert in the alternative that if, despite their arguments to the contrary, we believe *Phillips* is correct, we should hold IOLTA expressly unconstitutional. The Foundation thinks the *Phillips* holding is [*47] more narrow than appellants read it; they have no qualms with a declaration from this Court that IOLTA is constitutional, but they urge us to refrain from deciding IOLTA is unconstitutional on the strength of the *Phillips* decision. They otherwise have no dispute with appellants' position and encourage us to grant the declaratory relief sought.

We must not decide a case that amounts to no more than a disagreement on how broadly the *Phillips* decision can be read. "A mere difference of opinion, not involving the assertion of adverse interests, is not sufficient to support an action for declaratory judgment." *Reuter, 422 S.W.2d at 196* (*quoting* 26 C.J.S. *Declaratory Judgments*, § 29 (1956)). In spite of the injuries [**14] and uncertainties appellants claim they will suffer, it seems they have no real dispute with the Foundation. This case has been marked throughout by a near-total lack of true controversy between the parties. The trial below was very brief. Paulsen was the only witness who testified, and cross-examination by the Foundation's lawyer was perfunctory, consisting of only three questions to confirm that the *Phillips* court did not determine the ultimate constitutionality of the IOLTA program. On appeal, the Foundation has not even raised the strongest reasons in support of the trial court's judgment--those jurisdictional issues we have detailed above; indeed, appellee's brief is a mere seven pages long. They are seven well-written and thoughtful pages, to be sure, but the brevity underscores the lack of true controversy in this case.

Whatever dispute appellants claim to have with the Foundation is clearly secondary to their desire to have this Court effectively overrule the U.S. Supreme Court, declaring that the Court misinterpreted Texas law in its *Phillips* ruling. Appellants' briefs focus almost exclusively on the constitutionality of IOLTA, paying only minor attention to the claimed [**15] dispute with the Foundation.

We are not unsympathetic to appellants' arguments. The *Phillips* decision does appear to have at least overlooked, if not misstated, a large body of Texas banking law that distinguishes between "general" and "special" accounts. *See, e.g., Texas Commerce Bank v. Townsend, 786 S.W.2d 53* (Tex. App.--Austin 1990, writ denied). In a general account, Texas law is clear that the financial institution holds title to the funds deposited. *See id. at 54*. Paulsen's contract with his bank establishing an IOLTA account expressly states that it is a general account. Since the *Phillips* court stated that "interest follows principal," *Phillips*, 524 U.S. at 165-66, the natural conclusion would be that the interest earned in an IOLTA account belongs to the banks as well. This appears to be in direct conflict with the actual *Phillips* holding that interest earned in an IOLTA account is the property of the attorney's client. *See Phillips*, 524 U.S. at 172.

Whatever our impressions of the constitutional arguments in support of IOLTA, however, this particular case provides a singularly inappropriate context for deciding [**16] those issues. Both appellants and the Foundation are committed to upholding the constitutionality of the IOLTA program. In its brief the Foundation candidly admits that it does not contest the central legal premises of appellants' argument, and emphasizes that the Foundation is making the same pro-IOLTA arguments in the ongoing *Phillips* litigation in the federal district court.

In their arguments, the parties attempt to demonstrate that they are not in unanimous agreement on how far this Court might go if we were to agree with the Supreme Court, but neither side ever seriously argues that IOLTA could be anything but constitutional. The hair-splitting difference between the parties' positions hardly presents the sort of robust debate a court should expect and demand when a major constitutional ruling is at issue. At core, both appellants and the Foundation [*48] are in total agreement that IOLTA should be declared constitutional. It would be inappropriate for us to decide an issue of such gravity where there has been no genuine debate. In fact, the Supreme Court has expressly held that where both litigants agree on the constitutionality of a statute being challenged and desire the same [**17] result, there is no case or controversy before the court. *See Moore v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 47, 48, *28 L. Ed. 2d 590, 91 S. Ct. 1292 (1971)*.

Truly, the appropriate forum for deciding the issues at the heart of this appeal is in the federal district court, where the *Phillips* litigation is now pending on remand and the court is faced squarely with the constitutionality of IOLTA. If the facts of this case were altered only slightly, we would be *required* to defer to that court's proceeding, for there is a wide body of law that would prevent us from deciding this declaratory judgment action if another action were pending between the same parties

which would adjudicate the issues involved in the present action. *See Texas Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970)*; *Tucker v. Graham, 878 S.W.2d 681, 683* (Tex. App.--Eastland 1994, no writ); *Southern Traffic Bureau v. Thompson, 232 S.W.2d 742, 750* (Tex. Civ. App.--San Antonio 1950, writ ref'd n.r.e.). Because the parties before us are not identical to those involved in the *Phillips* litigation, that doctrine [**18] cannot squarely dispose of this case. [4] The parties before us could, however, have intervened in the *Phillips* suit and presented their constitutional arguments in a more direct fashion to the district court. That case has been hotly contested and is certain to involve a much fuller and more balanced debate than has developed in the present cause. For that reason, the ongoing *Phillips* litigation would be a more appropriate forum for settling the question of whether the IOLTA program creates an unconstitutional taking of client property.

4 Paulsen is not a party to the *Phillips* case, but he was involved in the case to the extent that he drafted the *amicus curiae* briefs tendered to the Fifth Circuit Court of Appeals on behalf of the state bars of Texas, Mississippi, and Louisiana in support of IOLTA. The Foundation is a party to the ongoing *Phillips* litigation, but Bankers are not.

**CONCLUSION**

We hold that appellants have not presented this Court or the trial court with [**19] a justiciable controversy. Paulsen seeks an advisory opinion from this Court interpreting a United States Supreme Court opinion. Bankers face no imminent litigation over their IOLTA contracts, and their claimed uncertainty as to their rights and obligations is insufficient to present the court with a justiciable action. For these reasons, the trial court lacked subject matter jurisdiction over the action presented; we therefore vacate that court's judgment and dismiss the cause.

J. Woodfin Jones, Justice

Before Justices Jones, Yeakel and Patterson

Judgment Vacated and Cause Dismissed

Filed: December 2, 1999



**MARTHA JEAN PHILLIPS, PETITIONER v. HARRY S. PHILLIPS, ET AL., RESPONDENTS**

**No. D-0107**

**SUPREME COURT OF TEXAS**

***820 S.W.2d 785*; *1991 Tex. LEXIS 154*; *35 Tex. Sup. J. 220***

**December 11, 1991, Delivered**

**PRIOR HISTORY:** [**1] ON APPLICATION FOR WRIT OF ERROR TO THE COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS

**COUNSEL:** PET Wilk, Mr. Michael S. ATT 021478000 713/223-5181

Hirsch & Westheimer, P. C.

2500 RepublicBank Center

700 Louisiana

Houston, TX 77002

PET Stock, Ms. Anna L. ATT 019254000 713/223-5181

Hirsch & Westheimer, P.C.

2550 RepublicBank Center

700 Louisiana

Houston, TX 77002

PET Gross, Mr. Jay N. ATT 008532980 713/223-5181

Hirsch & Westheimer

25th Floor NCNB Center

700 Louisiana

Houston, TX 77002-2728

RSP Kelley, Mr. Patrick ATT 011203600 214/561-1600

Ireland, Carroll & Kelley, P.C.

6101 S. Broadway

Suite 500

Tyler, TX 75703

RSP Carroll, Mr. Otis ATT 003895700 903/561-1600

Ireland, Carroll & Kelley, P.C.

6101 S. Broadway

Suite 500

Tyler, TX 75703

**JUDGES:** HECHT, Gonzalez, Mauzy, Doggett

**OPINION BY:** NATHAN L. HECHT

**OPINION**

[*786] OPINION

We granted the applications for writ of error in this case to decide whether a contractual provision that requires payment of a multiple of actual damages for breach of trust is an unenforceable penalty, and if so, whether the defense of penalty was waived because it was not pleaded. The trial court and court of appeals refused [**2] to enforce the provision. *792 S.W.2d 269*. We affirm the judgment of the court of appeals.

During 32 years of marriage, Harry and Martha Phillips accumulated over $ 18 million in community property, primarily through the oil and gas business Harry managed. When they divorced, rather than break up their oil and gas holdings, they created Phillips & Phillips, Ltd., a limited partnership, and transferred the bulk of their assets to it. Each had an equal interest in the partnership. Harry, the only general partner, agreed to work for the partnership full-time without salary and to offer Martha the option to participate in any business opportunities he pursued outside the partnership. Martha, the only limited partner, agreed that she would have no right to participate in Harry's business decisions for the partnership and that she would leave each of her four children by Harry at least one-sixth of her estate.

The partnership agreement required Harry to pay himself and Martha each a minimum [*787] of $ 21,000 per month for 24 months, and then minimum monthly distributions adjusted for inflation and for oil and gas prices. It also required Harry to furnish Martha certain financial [**3] information about the partnership and to cooperate with her in auditing its affairs. The agreement contained the following provision: "If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breaches of trust. Errors of judgment shall not be considered breaches of trusts."

The value of the partnership increased under Harry's management, but Harry did not fully comply with the terms of the written agreement. In particular, after the first 20 months Harry distributed much less than the required minimum amounts, never actually calculating what payments the agreement required. He also failed to provide timely annual statements of operations and refused to cooperate fully with Martha's attempts to audit the partnership.

Martha eventually sued Harry for dissolution of the partnership and damages based upon Harry's breach of contractual and fiduciary duties. The case was tried to a jury, who found that Harry breached the partnership agreement by favoring himself in paying his personal expenses and encumbering partnership assets, thus endangering partnership distributions. The jury also [**4] found that Harry breached both the partnership agreement and his fiduciary duty to Martha by failing to keep current and complete partnership books, failing to prepare required annual statements, and interfering with Martha's efforts to examine partnership books and records. [1] The jury assessed Martha's actual damages at $ 300,000. None of the jury's findings are challenged by the parties on appeal.

1  The jury also found that Harry breached the partnership agreement by failing to calculate the

amount of distributions aired to be paid the partners and by failing to make all the distributions aired by the agreement, but that Martha ratified Harry's actions in making distributions other than as called for by the agreement.

During the trial the parties stipulated that a reasonable fee for legal services necessary for Martha's prosecution of the case was $ 235,302.14. The jury was aware of this stipulation, and the trial court surmised that the jury included this amount in its $ 300,000 finding. Accordingly, the [**5] trial court rendered judgment for Martha for a total of $ 300,000, $ 235,302.14 against the partnership and $ 64,697.86 against Harry, and refused to award Martha any additional amount for attorney fees. The trial court also ordered the partnership dissolved.

Martha appealed; Harry did not. The court of appeals held that the trial court erred in refusing to award Martha the $ 235,302.14 stipulated attorney fees in addition to the $ 300,000 damages found by the jury, but that the trial court did not err in refusing to award Martha decuple damages under the partnership agreement. Consequently, the appeals court reversed the judgment of the trial court in part and rendered judgment against Harry for a total of $ 535,302.14, plus interest. [2]

2  Harry contends that the court of appeals should Dot have disturbed the trial court's damage award. As a rule, however, the judgment in a case tried by a jury must conform to the verdict. See *TEX. R. CIV. P. 301*. The trial court properly did not ask the jury to include in its determination of Martha's actual damages a reasonable fee for legal services necessary to her prosecution of the case. See *Hammonds v. Hammonds, 158 Tex. 516, 313 S.W.2d 603, 605 (Tex. 1958)*. We must assume that the jury followed the trial court's instructions and answered the question put to them. See *Turner, Collie & Braden v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex. 1982)*. Given that assumption, we must conclude that the jury's answer of $ 300,000 to the trial court's question did not include attorney fees.

Harry argues that, logically, the jury must have arrived at their $ 300,000 finding by adding $ 37,585 accounting fees which Martha testified she incurred to the stipulated $ 250,000 in attorney fees. However plausible Harry's explanation of the jury's reasoning process may be, it cannot substitute for the jury's finding. bat the jury found, not why the jury found it, is the relevant inquiry absent jury misconduct. *First Nat'l Bank v. Zimmerman, 442 S.W.2d 674, 678 (Tex. 1969)*.

Under *Rule 301*, the trial court could properly have rendered judgment awarding Martha less than the $ 300,000 found by the jury as actual damages only if the finding had no support in the evidence. See *Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, 199 (Tex. 1952)*. See also 4 R. McDONALD, TEXAS CIVIL PRACTICE IN DISTRICT AND COUNTY COURTS & 17.32 nn. 7-8 (rev. 1984). Harry does not argue here that there is no evidence to support the jury's finding. Thus, we conclude that the court of appeals was correct in rendering judgment against Harry for the actual damages found by the jury plus stipulated attorney fees.

Harry also complains of the court of appeals' judgment that he, rather than the partnership, pay Martha's attorney fees. This point, however, was not raised in Harry's motion for rehearing in the court of appeals and is therefore not preserved. See TEX. R. APP. P. 131(e); *Oil Field Haulers Ass'n v. Railroad Commission, 381 S.W.2d 183, 189 (Tex. 1964)*.

[**6] [*788] Martha contends that she is entitled to recover liquidated damages equal to ten times the actual damages found by the jury, as provided by the limited partnership agreement. Harry contends that the contractual provision is not an enforceable agreement for liquidated damages but an unenforceable penalty. Martha argues that even if Harry is correct, he has waived any defense of penalty by failing to plead it as an affirmative defense.

We first considered the difference between an enforceable liquidated damages provision and an unenforceable penalty in *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 485-486 (Tex. 1952)*. There we explained:

Volumes have been written on the question of when a stipulated damage provision of a contract should be enforced as liquidated damages and when enforcement should be denied because it is a penalty provision. . . . All agree that to be enforceable as liquidated damages the damages must be uncertain and the stipulation must be reasonable.

. . .

The right of competent parties to make their own bargains is not unlimited. The universal rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually [**7] sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. A party has no right to have a court enforce a stipulation which violates the principle underlying that rule.

More recently, in *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2 (Tex. 1979)*, we restated the two-part Stewart test for determining whether to enforce a contractual damages provision as follows: "In order to enforce a liquidated damage clause, the court must find: (1) that the harm caused by the breach is incapable or difficult of estimation, and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." Cf. *TEX. BUS. & COM. CODE § 2.718(a).* [3]

3 "Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty."

[**8]

Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide. *Farrar v. Beeman, 63 Tex. 175, 181 (1885)*; see *Lefevere v. Sears, 629 S.W.2d 768, 771* (Tex. Civ. App.-El Paso 1981, no writ); *Muller v. Light, 538 S.W.2d 487, 488* (Tex. Civ. App.-Austin 1976, writ ref'd n.r.e.); *Schepps v. American Dist. Telegraph Co., 286 S.W.2d 684, 690* (Tex. Civ. App.-Dallas 1955, no writ); *Zucht v. Stewart Title Guar. Co., 207 S.W.2d 414, 418* (Tex. Civ. App.-San Antonio 1947, writ dism'd); *Bourland v. Huffhines, 244 S.W. 847, 849* (Tex. Civ. App.-Amarillo 1922, writ dism'd). Sometimes, however, factual issues must be resolved before the legal question can be decided. For example, to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were. See *Johnson Eng'rs, Inc. v. Tri-Water Supply Corp., 582 S.W.2d 555, 557* (Tex. Civ. App.-Texarkana 1979, no writ); *Oetting v. Flake Uniform & Linen Serv., Inc., 553 S.W.2d 793, 796-797* (Tex. Civ. App.-Fort Worth 1977, no [**9] writ); *Smith v. Lane, 236 S.W.2d 214, 215* (Tex. Civ. App.-San Antonio 1950, [*789] no writ); *Southern Plow Co. v. Dunlap Hardware Co., 236 S.W. 765, 766-767* (Tex. Civ. App.-Dallas 1922, no writ); *Walsh v. Methodist Episcopal Church, 212 S.W. 950, 952* (Tex. Comm'n App. 1919, judgm't adopted).

The enforceability of the contractual provision in this case involves no fact issues. A contractual provision like the one here by which one party agrees to pay the other some multiple of actual damages for breach of the agreement does not meet either part of the legal test for an enforceable liquidated damages provision. It cannot meet the first prong of the test because the harm caused by the

breach of the contract is not incapable or difficult of estimation. The provision assumes actual damages can and will be determined, indeed must be determined, before the prescribed multiplier can be applied. The provision cannot meet the second prong of the test because, instead of attempting to forecast actual damages, it calls for them to be determined and then multiplied. Cf. *Robert G. Beneke & Co. v. Cole, 550 S.W.2d 321* (Tex. Civ. App.-Dallas 1977, no writ) (contract provision which fixes [**10] liquidated damages without excluding additional liability for actual damages is not a reasonable forecast of just compensation and therefore a penalty). A contractual provision like the one in this case is thus, on its face, an unenforceable penalty.

Harry, however, did not plead penalty as an affirmative defense to an award of damages under the liquidated damages provision in the partnership agreement. Although penalty is not among the affirmative defenses enumerated in *Rule 94, TEX. R. CIV. P.*, the listing in that rule is not exclusive. Penalty is, in the language of the rule, a "matter constituting an avoidance or affirmative defense." *Johnson, 582 S.W.2d at 557*; *Oetting, 553 S.W.2d at 795-796*; *Robinson v. Granite Equip. Leasing Corp., 553 S.W.2d 633, 637* (Tex. Civ. App.-Houston [1st Dist.] 1977, writ ref'd n.r.e.); *Walter E. Heller & Co. v. B. C. & M., Inc., 543 S.W.2d 696, 697* (Tex. Civ. App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.); *LoBue v. United Serv. Planning Ass'n, 467 S.W.2d 574, 576* (Tex. Civ. App.-Fort Worth 1971, writ dism'd); *Young v. J. F. Zimmerman & Sons, Inc., 434 S.W.2d 926, 927* (Tex. Civ. App.-Waco 1968, writ dism'd); *Smith v. Waite, 424 S.W.2d* [**11] *691, 693* (Tex. Civ. App.-Waco 1968, writ ref'd n.r.e.); *Smith, 236 S.W.2d at 215*; *Southern Plow, 236 S.W. at 766-767*; *Walsh, 212 S.W. at 952*. As a general rule, an affirmative defense must be pleaded or it is waived. *TEX. R. CIV. P. 94*.

One exception to this rule is the defense of illegality, a defense specifically listed in *Rule 94*. "If the illegal nature of the document to be relied upon or sought to be enforced is apparent from the plaintiffs pleadings, it is not necessary that illegality be specially pleaded by the defendant in order to rely upon it as a defense." *Lewkowicz v. El Paso Apparel Corp., 625 S.W.2d 301, 303 (Tex. 1981)*; accord *Niles v. Harris County Fresh Water Supply Dist., 339 S.W.2d 562, 563* (Tex. Civ. App.-Waco 1960, writ ref'd); *Reid v. Associated Employers Lloyds, 164 S.W.2d 584, 585-586* (Tex. Civ. App.-Fort Worth 1942, writ ref'd); *Montgomery Ward & Co. v. Lusk, 52 S.W.2d 1110* (Tex. Civ. App.-Waco 1932, writ ref'd); *Texas & P. Coal Co. v. Lawson, 89 Tex. 400, 34 S.W. 919, 921 (Tex. 1896)*. Two principles support this exception to the general rule that affirmative defenses are waived if not pleaded. One is that "when a plaintiff in his pleadings anticipates [**12] defensive matters and pleads them, a defendant may rely upon the defenses though his only pleading is a general denial." *Raney v. White, 267 S.W.2d 199, 200* (Tex. Civ. App.-San Antonio 1954, writ ref'd). Pleading an agreement illegal on its face in effect anticipates the defense. The other principle is that the courts will not enforce a plainly illegal contract even if the parties do not object. *Lawson, 34 S.W. at 921*. Enforcement of an illegal agreement violates public policy. Id.

For the same reasons, we hold that the defense of penalty is not waived by the failure to plead it if it is apparent on the face of the petition and established as a matter of law. Enforcement of a penalty, like enforcement of an illegal contract, violates [*790] public policy. RESTATEMENT (SECOND) OF CONTRACT *§ 356*; see *State v. Alpha Oil & Gas, Inc., 747 S.W.2d 378 (Tex. 1988)*. It should not be done, even if the parties do not object. In this case Martha pleaded that she was "entitled to damages . . . in the amount of ten (10) times all losses suffered". Inasmuch as Martha's own pleading establishes that the contractual provision she relies upon is an unenforceable penalty under our decisions [**13] in Stewart and Campesi as a matter of law, Harry was not required to plead penalty as an affirmative defense.

Contrary to the dissent's very exaggerated alarms, we do not hold that the affirmative defense of penalty need never be pleaded. Whenever the defense is not clearly established on the face of the pleadings, as it is here, it must be pleaded. We do not "resurrect[] trial by ambush", post, at , or "retreat from . . . encouraging full disclosure during discovery", post, at . We apply a narrow but necessary exception, long and well established, to the general requirement that affirmative defenses be pleaded. We do not hold that penalty "can be asserted as a defense for the first time on appeal", post, at , in violation of *Rule 52(a), TEX. R. APP. P.* The record in this case reflects that the issue of penalty was raised in the trial court, and that the trial court refused to enforce the penalty provision of the partnership agreement.

* * * * *

Accordingly, we conclude that Martha is not entitled to recover ten times her actual damages. Finding no error in the judgment of the court of appeals, we affirm it.

NATHAN L. HECHT

Justice

Dissenting [**14] Opinion by Justice Gonzalez,

joined by Justices Mauzy and Doggett

OPINION DELIVERED: December 11, 1991

**DISSENT BY:** RAUL A. GONZALEZ

**DISSENT**

DISSENTING OPINION

Despite the clear language of *TEX. R. CIV. P. 94* and the collective wisdom of every court of appeals of this state that has considered the issue, the majority holds that a defendant need not affirmatively plead the defense of "penalty" in a contract action. This holding resurrects trial by ambush and rejects the notion that parties are entitled to know what theories of law they will face at trial. I would hold that by failing to plead it, Mr. Phillips waived his right to assert that the contract he entered into with his wife is unenforceable. Furthermore, since Mr. Phillips waived the penalty defense by failing to affirmatively plead it, I would not reach the question of whether the contractual provision in question is, on its face, an unenforceable penalty. I thus would reverse the judgment of the court of appeals and remand this cause to the trial court for entry of a judgment that enforces the provision.

Mr. and Mrs. Phillips were married for 32 years prior to getting a divorce. With the assistance of counsel, they entered [**15] into a pre-divorce agreement, whereby they transferred about $ 18 million of their assets into a partnership which Mr. Phillips would manage. Mr. Phillips in effect said to his soon-to-be ex-wife: "Trust me." As a disincentive to cheating or short changing Mrs. Phillips, Mr. Phillips pledged that he would pay her 10 times the amount of the losses if he violated the contract. [1] The agreement also recited that Mr. Phillips owed Mrs. Phillips a fiduciary duty, a higher standard of care than normally exists between parties to a contract. [2]

1  At trial, Mr. Phillips testified as follows:

Q There's another interesting provision in [the partnership agreement] that says if Mrs. Phillips can show that you have breached your fiduciary duty to her that you will be obliged to pay her 10 times any amount that she proves. Are you familiar with that?

A Yes sir.

Q How in the world did that get in there?

A I wanted her to let me-wanted to prove to her that I would not do anything wrong.

Q So-

A So I put it in myself.

Q Was it your idea?

A Yes, sir.

2  The partnership agreement provides:

16.1 *Fiduciary Capacity.* "The general partner shall act in a fiduciary capacity with respect to the limited partner."

16.2 Yes. If the general partner breaches his trust hereunder, he shall pay to the limited partner as liquidated damages ten times the amount she loses as a result of such breach. Errors of judgment shall not be considered breaches of trusts".

[**16] Eight years later, Mrs. Phillips sued Mr. Phillips, alleging that he violated the agreement. [*791] Mr. Phillips entered a general denial and asserted the affirmative defenses of limitations, laches, and equitable estoppel. In a unanimous verdict, the jury found that Mr. Phillips breached the agreement by interfering with Mrs. Phillips right to examine the books and records of the partnership, and by willfully underpaying Mrs. Phillips and overpaying himself.

AFFIRMATIVE DEFENSE

*Rule 94* enumerates specific affirmative defenses which are waived if not pleaded, such as accord and satisfaction, arbitration and award, fraud, illegality, statute of frauds, statute of limitations, "and any other matter constituting an avoidance or affirmative defense." *TEX. R. CIV. P. 94*. An affirmative defense does not tend to rebut factual propositions asserted by a plaintiff, but seeks to establish an independent reason why the plaintiff should not recover. *Gorman v. Life Ins. Co. of North America, 811 S.W.2d 542, 546 (Tex. 1991)*. Asserting the defense of penalty does not deny the facts pleaded by the plaintiff; instead, it is an independent reason why the contract should not be enforced as written. [**17] In other words, if the defendant asserts facts that defeat in whole or in part the plaintiff's claim, such assertion amounts to an affirmative defense that must be pleaded or it is waived. "Penalty" is a classic affirmative defense; in my view, it clearly falls within the purview of *Rule 94*.

The majority implies that as long as the issue does not depend upon evidence or findings, no purpose is served by requiring that it be specifically pleaded. But there is a valid purpose to serve, namely, the need for notice and fair play, so as to avoid trials by ambush.

The court refers to *Lewkowicz v. El Paso Apparel Corp., 625 S.W.2d 301, 303 (Tex. 1981)*, for its holding that pleading is not necessary if the affirmative defense appears on the face of the plaintiff's pleadings. That case is distinguishable because it involved the defense of illegality of contract. The defense of illegality is a special situation and a poor choice from which to draw a rule of general applicability. The rule that a court will not enforce an illegal contract is for the public's benefit rather than contending parties. *Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146, 151 (Tex. 1947)*. A strong policy reason supports [**18] the illegality exception. That is, courts should not have to validate contracts that are illegal on their face merely because a defendant has failed to plead illegality.

Here, the court seems to be saying that pleading and proof are not necessary, because the issue of whether the liquidated damages provision is a penalty is a question of law. In some contracts it may be possible to determine from their four corners that they impose a penalty. The classic example is the lease that assesses the same liquidated damages for every breach, regardless of how trivial. *Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 486 (Tex. 1952)*. But, in most cases, proof will be necessary. *Commercial Union Ins. Co. v. La Villa I.S.D., 779 S.W.2d 102, 106-107* (Tex. App. -- Corpus Christi 1989, no writ); See D. WENDORF, ET AL., TEXAS RULES OF EVIDENCE MANUAL, I-38 (3rd ed. 1991).

A good example of the need for proof is *Presnal v. Energy Corp., 788 S.W.2d 123, 127* (Tex. App. -- Houston [1st Dist. 1990], writ denied). In that case, a mineral lease provided that the lessee was required to drill a second well or pay $ 75,000, which the defendant contended was a penalty. There is no way a court could possibly [**19] know if this provision is a reasonable forecast of damages and therefore not a penalty, unless pleadings and proof develop the issue. It would be patently unfair not to require defendant to notify the plaintiff that the possible existence of penalty would be an issue and this is contrary to well establish case law.

Every intermediate appellate court considering this issue has held that penalty is an affirmative defense under *Rule 94* which is waived if not pleaded. *Bethel v. Butler Drilling Co., 635 S.W.2d 834, 838-839* (Tex. App. -- Houston [14th Dist.] 1982, writ ref'd n.r.e.); *Robinson v. Granite Equip. Leasing Corp., 553 S.W.2d 633, 637* (Tex. Civ. App. -- Houston [1st Dist.] 1977, [*792] writ ref'd n.r.e.); *Walter E. Heller & Co. v. B.C. & M., Inc., 543 S.W.2d 696, 697* (Tex. Civ. App. -- Houston [1st Dist.] 1976, writ ref'd n.r.e.); *LoBue v. United Serv. Planning Ass'n, 467 S.W.2d 574, 576* (Tex. Civ. App. -- Fort Worth 1971, writ dism'd); *Young v. J. F. Zimmerman & Sons, Inc., 434 S.W.2d 926, 927* (Tex. Civ. App. -- Waco 1968, writ dism'd); *Smith v. Waite, 424 S.W.2d 691, 693* (Tex. Civ. App. -- Waco 1968, writ ref'd n.r.e.).

There is no compelling reason for this [**20] court now to reject by implication the well-grounded pleading practice and disagree with the cases cited above that hold that as a rule penalty is an affirmative defense which must be pleaded or it is waived. In my view, this is a retreat from this court's recent trend towards encouraging full disclosure during discovery of all witnesses, facts and legal theories upon which a party intends to rely at trial. This trend not only encourages litigants to be well prepared for trial, but also enables disputes to be resolved on their true merits and not on "mere technicalities." It makes no sense to me to subject parties to a severe sanction for failing to disclose witnesses or to supplement discovery responses, but not require them to plead the legal theory upon which they intend to rely to defeat their opponent's claim. The majority has created an exception to *Rule 94* that has a visceral appeal, but collapses on its own logic. The court says that the contractual provision in issue is a penalty as a matter of law, and thus need not be pleaded (and can be asserted as a defense for the first time on appeal). But a defendant likewise may defeat a contract claim under a statute of limitations [**21] defense. And while the defendant may be entitled to a judgment as a *matter of law,* we nevertheless require affirmative pleading of the statute of limitations defense. The court ultimately rationalizes its de facto modification of *Rule 94* by relying on the *RESTATEMENT (SECOND) OF CONTRACTS § 356* to assert that public policy demands the result. The court expands the public policy exception to *Rule 94*'s pleading requirement beyond the exception for illegal contracts to include contracts that allegedly impose a penalty. This is a faulty rationale. First, this is not a case where pure contract principles apply. Mr. Phillips agreed to a higher standard of care (namely, a fiduciary's standard) than he normally would have owed Mrs. Phillips in a standard contractual relationship. Courts impose damages on parties who violate a fiduciary duty in order to punish the party's breach of trust. I agree with the *Restatement § 356*'s directive that the "central objective behind the system of contract remedies is compensatory, not punitive." *RESTATEMENT (SECOND) OF CONTRACTS § 356 comment a* (1979). But Mr. Phillips entered into this agreement with his eyes open, accepting a higher than normal [**22] standard of care and devising and adopting a measure of damages for his breach of that standard. I do not see how the it advances the best interest of the public to bail him out of his bargain. I would hold that penalty is an affirmative defense that must be pleaded and that Mr. Phillips waived this defense by failing to plead it. For the above reasons, I dissent.

Raul A. Gonzalez

Justice

OPINION DELIVERED: December 11, 1991

Justices Mauzy and Doggett join this opinion



Restatement of the Law, Second, Contracts
Copyright (c) 1981, The American Law Institute

Case Citations

Rules and Principles

Chapter 9 - The Scope of Contractual Obligations

Topic 2 - Considerations of Fairness and the Public Interest

Restat 2d of Contracts, § 208

§ 208 Unconscionable Contract or Term

**If a contract or term thereof is unconscionable at the time the contract is made a court may refuse to enforce the contract, or may enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result.**

**COMMENTS & ILLUSTRATIONS: Comment:**

*a. Scope*. Like the obligation of good faith and fair dealing (§ 205), the policy against unconscionable contracts or terms applies to a wide variety of types of conduct. The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect. Relevant factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular bargains or terms unenforceable on grounds of public policy. Policing against unconscionable contracts or terms has sometimes been accomplished "by adverse construction of language, by manipulation of the rules of offer and acceptance or by determinations that the clause is contrary to public policy or to the dominant purpose of the contract." Uniform Commercial Code § 2-302 Comment 1. Particularly in the case of standardized agreements, the rule of this Section permits the court to pass directly on the unconscionability of the contract or clause rather than to avoid unconscionable results by interpretation. Compare § 211.

*b. Historic standards*. Traditionally, a bargain was said to be unconscionable in an action at law if it was "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other;" damages were then limited to those to which the aggrieved party was "equitably" entitled. *Hume v. United States, 132 U.S. 406 (1889),* quoting *Earl of Chesterfield v. Janssen, 2 Ves. Sen. 125, 155, 28 Eng. Rep. 82, 100 (Ch. 1750).* Even though a contract was fully enforceable in an action for damages, equitable remedies such as specific performance were refused where "the sum total of its provisions drives too hard a bargain for a court of conscience to assist." *Campbell Soup Co. v. Wentz, 172 F.2d 80, 84 (3d Cir. 1948).* Modern procedural reforms have blurred the distinction between remedies at law and in equity. For contracts for the sale of goods, Uniform Commercial Code § 2-302 states the rule of this Section without distinction between law and equity. Comment 1 to that section adds, "The principle is one of the prevention of oppression and unfair surprise (Cf. Campbell Soup Co. v. Wentz, . . .) and not of disturbance of allocation of risks because of superior bargaining power."

*c. Overall imbalance*. Inadequacy of consideration does not of itself invalidate a bargain, but gross disparity in the values exchanged may be an important factor in a determination that a contract is unconscionable and may be sufficient ground, without more, for denying specific performance. See §§ 79, 364. Such a disparity may also corroborate indications of defects in the bargaining process, or may affect the remedy to be granted when there is a violation of a more specific rule. Theoretically it is possible for a contract to be oppressive taken as a whole, even though there is no weakness in the bargaining process and no single term which is in itself unconscionable. Ordinarily, however, an unconscionable contract involves other factors as well as overall imbalance.

**Illustrations:**

1. A, an individual, contracts in June to sell at a fixed price per ton to B, a large soup manufacturer, the carrots to be grown on A's farm. The contract, written on B's standard printed form, is obviously drawn to protect B's interests and not A's; it contains numerous provisions to protect B against various contingencies and none giving analogous protection to A. Each of the clauses can be read restrictively so that it is not unconscionable, but several can be read literally to give unrestricted discretion to B. In January, when the market price has risen above the contract price, A repudiates the contract, and B seeks specific performance. In the absence of justification by evidence of commercial setting, purpose, or effect, the court may determine that the contract as a whole was unconscionable when made, and may then deny specific performance.

2. A, a homeowner, executes a standard printed form used by B, a merchant, agreeing to pay $ 1,700 for specified home improvements. A also executes a credit application asking for payment in 60 monthly installments but specifying no rate. Four days later A is informed that the credit application has been approved and is given a payment schedule calling for finance and insurance charges amounting to $ 800 in addition to the $ 1,700. Before B does any of the work, A repudiates the agreement, and B sues A for $ 800 damages, claiming that a commission of $ 800 was paid to B's salesman in reliance on the agreement. The court may determine that the agreement was unconscionable when made, and may then dismiss the claim.

*d. Weakness in the bargaining process*. A bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party. But gross inequality of bargaining power, together with terms unreasonably favorable to the stronger party, may confirm indications that the transaction involved elements of deception or compulsion, or may show that the weaker party had no meaningful choice, no real alternative, or did not in fact assent or appear to assent to the unfair terms. Factors which may contribute to a finding of unconscionability in the bargaining process include the following: belief by the stronger party that there is no reasonable probability that the weaker party will fully perform the contract; knowledge of the stronger party that the weaker party will be unable to receive substantial benefits from the contract; knowledge of the stronger party that the weaker party is unable reasonably to protect his interests by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors. See Uniform Consumer Credit Code § 6.111.

**Illustration:**

3. A, literate only in Spanish, is visited in his home by a salesman of refrigerator-freezers for B. They negotiate in Spanish; A tells the salesman he cannot afford to buy the appliance because his job will end in one week, and the salesman tells A that A will be paid numerous $ 25 commissions on sales to his friends. A signs a complex installment contract printed in English. The contract provides for a cash price of $ 900 plus a finance charge of $ 250. A defaults after paying $ 32, and B sues for the balance plus late charges and a 20% attorney's fee authorized by the contract. The appliance cost B $ 350. The court may determine that the contract was unconscionable when made, and may then limit B's recovery to a reasonable sum.

*e. Unconscionable terms*. Particular terms may be unconscionable whether or not the contract as a whole is unconscionable. Some types of terms are not enforced, regardless of context; examples are provisions for unreasonably large liquidated damages, or limitations on a debtor's right to redeem collateral. See Uniform Commercial Code §§ 2-718, 9-501(3). Other terms may be unconscionable in some contexts but not in others. Overall imbalance and weaknesses in the bargaining process are then important.

**Illustrations:**

4. A, a packer, sells and ships 300 cases of canned catsup to B, a wholesale grocer. The contract provides, "All claims other than swells must be made within ten days from receipt of goods." Six months later a government inspector, upon microscopic examination of samples, finds excessive mold in the cans and obtains a court order for destruction of the 270 remaining cases in B's warehouse. In the absence of justifying evidence, the court may determine that the quoted clause is unconscionable as applied to latent defects and does not bar a claim for damages for breach of warranty by B against A.

5. A, a retail furniture store, sells furniture on installment credit to B, retaining a security interest. As A knows, B is a woman of limited education, separated from her husband, maintaining herself and seven children by means of $ 218 per month public assistance. After 13 purchases over a period of five years for a total of $ 1,200, B owes A $ 164. B then buys a stereo set for $ 514. Each contract contains a paragraph of some 800 words in extremely fine print, in the middle

of which are the words "all payments . . . shall be credited pro rata on all outstanding . . . accounts." The effect of this language is to keep a balance due on each item until all are paid for. On B's default, A sues for possession of all the items sold. It may be determined that either the quoted clause or the contract as a whole was unconscionable when made.

6. A, a corporation with its principal office in State X, contracts with B, a resident of State X, to make improvements on B's home in State X. The contract is made on A's standard printed form, which contains a clause by which the parties submit to the jurisdiction of a court in State Y, 200 miles away. No reason for the clause appears except to make litigation inconvenient and expensive for B. The clause is unconscionable.

*f. Law and fact*. A determination that a contract or term is unconscionable is made by the court in the light of all the material facts. Under Uniform Commercial Code § 2-302, the determination is made "as a matter of law," but the parties are to be afforded an opportunity to present evidence as to commercial setting, purpose and effect to aid the court in its determination. Incidental findings of fact are made by the court rather than by a jury, but are accorded the usual weight given to such findings of fact in appellate review. An appellate court will also consider whether proper standards were applied.

**Illustration:**

7. A, a finance company, lends money to B, a manufacturing company, on the security of an assignment by B of its accounts receivable. The agreement provides for loans of 75% of the value of assigned accounts acceptable to A, and forbids B to dispose of or hypothecate any assets without A's written consent. The agreed interest rate of 18% would be usurious but for a statute precluding a corporation from raising the defense of usury. Substantial advances are made, and the balance owed is $ 14,000 when B becomes bankrupt, three months after the first advance. A determination that the agreement is unconscionable on its face, without regard to context, is error. The agreement is unconscionable only if it is not a reasonable commercial device in the light of all the circumstances when it was made.

*g. Remedies*. Perhaps the simplest application of the policy against unconscionable agreements is the denial of specific performance where the contract as a whole was unconscionable when made. If such a contract is entirely executory, denial of money damages may also be appropriate. But the policy is not penal: unless the parties can be restored to their pre-contract positions, the offending party will ordinarily be awarded at least the reasonable value of performance rendered by him. Where a term rather than the entire contract is unconscionable, the appropriate remedy is ordinarily todeny effect to the unconscionable term. In such cases as that of an exculpatory term, the effect may be to enlarge the liability of the offending party.

**REPORTERS NOTES:** This Section is new; it follows Uniform Commercial Code § 2-302. See Davenport, Unconscionability and the Uniform Commercial Code, *22 U. Miami L. Rev. 121 (1967);* Ellinghaus, In Defense of Unconscionability, *78 Yale L.J. 757 (1969);* Leff, Unconscionability and the Code -- The Emperor's New Clause, *115 U. Pa. L. Rev. 485 (1967);* Shulkin, Unconscionability -- The Code, the Court and the Consumer, *9 B.C. Ind. & Com. L. Rev. 367 (1968);* Spanogle, Analyzing Unconscionability Problems, *117 U. Pa. L. Rev. 931 (1969);* Murray, Unconscionability: Unconscionability, *31 U. Pitt. L. Rev. 1 (1969);* Braucher, The Unconscionable Contract or Term, *31 U. Pitt. L. Rev. 337 (1970);* Leff, Unconscionability and the Crowd -- Consumers and the Common Law Tradition, *31 U. Pitt. L. Rev. 349 (1970);* Spiedel, Unconscionability, Assent and Consumer Protection, *31 U. Pitt. L. Rev. 359 (1970);* Comments, *58 Dick. L. Rev. 161 (1954), 18 U. Chi. L. Rev. 146 (1950); 45 Va. L. Rev. 583 (1959);* Annot., *18 A.L.R.3d 1305 (1968).*

*Comment a*. Uniform Commercial Code § 2-302 is literally inapplicable to contracts not involving the sale of goods, but it has proven very influential in non-sales cases. It has many times been used either by analogy or because it was felt to embody a generally accepted social attitude of fairness going beyond its statutory application to sales of goods. See *Seabrook v. Commuter Housing Co., 72 Misc.2d 6, 338 N.Y.S.2d 67 (Civ. Ct. 1972)* (apartment lease); *Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971)* (consumer fraud proceeding by Attorney General); *C & J Fertilizer, Inc. v. Allied Mut. Ins. Co., 227 N.W.2d 169, 179-81 (Iowa 1975)* (construction of burglary insurance policy); *Contract Buyers League v. F & F Investment, 300 F. Supp. 210 (N.D. Ill. 1969)* (class action with regard to sales of residential property -- no unconscionability found); see other examples listed in *Albert Merrill School v. Godoy, 78 Misc.2d 647, 357 N.Y.S.2d 378 (Civ. Ct. 1974).* In many of the cases cited contracts of adhesion were involved. It is to be emphasized that a contract of adhesion is not unconscionable per se, and that all unconscionable contracts are not contracts of adhesion. Nonetheless, the more standardized the agreement and the less a party may bargain meaningfully, the more susceptible the contract or a term will be to a claim of unconscionability. See Comment *c* to § 211; Note, Unconscionability and Standardized Con-

tracts, *5 N.Y.U. Rev. L. & Soc. Change 65 (1975);* 3 Corbin, Contracts § 559B (Supp. 1980). On adhesion contracts, see 3 id. §§ 559A-I (Supp. 1980).

*Comment c*. Illustration 1 is based on *Campbell Soup Co. v. Wentz, 172 F.2d 80 (3d Cir. 1948).* Cf. *Shell Oil Co. v. Marinello, 63 N.J. 402, 307 A.2d 598 (1973),* cert. denied, *415 U.S. 920 (1974)* (termination provision in service station franchise while facially neutral, in fact was one-sided in favor of oil company, and consequently was "void as against the public policy of this statute"). Illustration 2 is based on *American Home Improvement, Inc. v. MacIver, 105 N.H. 435, 201 A.2d 886 (1964);* cf. *Central Budget Corp. v. Sanchez, 53 Misc.2d 620, 279 N.Y.S.2d 391 (1967).*

*Comment d*. For examples of factors weighing in favor of a finding of unconscionability, see *Albert Merrill School v. Godoy, 78 Misc.2d 647, 357 N.Y.S.2d 378 (Civ. Ct. 1974)* (disproportionate levels of education, language difficulty and deceptive practices); *Seabrook v. Commuter Housing Co., 72 Misc.2d 6, 338 N.Y.S.2d 67 (Civ. Ct. 1972)* (long and complex lease printed in small type and containing many highly technical terms; landlord but not tenant represented by counsel; housing a scarce commodity); *Kugler v. Romain, 58 N.J. 522, 279 A.2d 640 (1971)* (goods were of extremely little use to buyers; price was two and one-half times a "reasonable market price"; sellers made many misrepresentations and deceptions; buyers were poor, uneducated and inexperienced); *Wheeler v. St. Joseph Hosp., 63 Cal. App.3d 345, 133 Cal. Rptr. 775 (1976)* (stress of hospital admitting room, superior bargaining position of hospital, failure to call patient's attention to arbitration clause) (it is not clear whether the court was relying on the unconscionability concept or on one limited to contracts of adhesion); *Weidman v. Tomaselli, 81 Misc.2d 328, 365 N.Y.S.2d 681* (Cty. Ct.), aff'd, *84 Misc.2d 782, 386 N.Y.S.2d 276 (App. Term 1975)* (overwhelming need for housing, no bargaining as to terms; landlord's dominant position; tenant forced to waive valuable statutory and constitutional rights; attorney's fees due from tenant whenever landlord commenced proceedings after tenant's default, even if suit was unsuccessful). For examples of cases rejecting unconscionability claims, see *Graziano v. Tortora Agency, 78 Misc.2d 1094, 359 N.Y.S.2d 489 (Civ. Ct. 1974)* (tenant was in real estate business and its principal was a sophisticated businessman; its counsel advised tenant not to sign lease; tenant had successfully litigated a claim based on a lease before); *Curtis Elev. Co. v. Hampshire House, Inc., 142 N.J. Super. 537, 362 A.2d 73 (1976)* (bargaining between experienced businessmen familiar with problems of industry -- provision excused performance in event of a strike and industry had history of labor troubles); *Frame v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 20 Cal. App.3d 668, 97 Cal. Rptr. 811 (1971)* (while bargaining strength was unequal, no unfair imposition would result from arbitration clause's enforcement) (adhesion contract -- "unconscionable" not used in opinion); *Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 519 P.2d 903 (1976)* (disparity of bargaining power alone is not enough); *Royal Indem. Co. v. Westinghouse Elec. Corp., 385 F. Supp. 520 (S.D.N.Y. 1974)* (very large industrial contract between large and knowledgeable companies; equal bargaining power, long negotiations); *Wheeler v. St. Joseph Hosp., supra,* (dissenting opinion) (while hospital admitting room is not an ideal locale for bargaining, arbitration clause did not contain very complicated language and patient, who was entering only for tests, had plenty of time to read and sign the document). See also *Madden v. Kaiser Fdtn. Hosps., 17 Cal.3d 699, 131 Cal. Rptr. 882, 552 P.2d 1178 (1976); Ciofalo v. Vic Tanny Gyms, Inc., 10 N.Y.2d 294, 220 N.Y.S.2d 962, 177 N.E.2d 925 (1961).* Illustration 3 is based on *Frostifresh Corp. v. Reynoso, 52 Misc.2d 26, 274 N.Y.S.2d 757 (Cty. Ct. 1966),* rev'd as to damages, *54 Misc.2d 119, 281 N.Y.S.2d 964 (App. Term 1967);* cf. *State by Lefkowitz v. ITM, Inc., 52 Misc.2d 39, 275 N.Y.S.2d 303 (Sup. Ct. 1966)* (referral sales, excessive price); *Jones v. Star Credit Corp., 52 Misc.2d 189, 298 N.Y.S.2d 264 (Sup. Ct. 1969)* (poor, uneducated buyers, excessive price); *Toker v. Perl, 103 N.J. Super. 500, 247 A.2d 701 (1968)* aff'd, *108 N.J. Super. 129, 260 A.2d 244 (1970)* (deceptive practice, excessive price). But cf. *Hernandez v. S.I.C. Fin. Co., 79 N.M. 673, 448 P.2d 474 (1968)* (debtor understood English).

*Comment e*. Illustration 4 is based on *Kansas City Wholesale Grocery Co. v. Weber Packing Corp., 93 Utah 414, 73 P.2d 1272 (1937);* cf. *Hardy v. General Motors Acceptance Corp., 38 Ga. App. 463, 144 S.E. 327 (1928); Wilson Trading Corp. v. David Ferguson, Ltd., 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968); Q. Vandenberg & Sons v. Siter, 204 Pa. Super. Ct. 392, 204 A.2d 494 (1964).* But cf. *Whitaker v. Cannon Mills Co., 132 Conn. 434, 45 A.2d 120 (1945).* Illustration 5 is based on *Williams v. Walker-Thomas Furniture Co., 350 F.2d 445 (D.C. Cir. 1965);* see also *Weidman v. Tomaselli, 81 Misc.2d 328, 365 N.Y.S.2d 681* (Cty. Ct.), aff'd, *84 Misc.2d 782, 386 N.Y.S.2d 276 (App. Term 1975);* cf. Uniform Consumer Credit Code § 2.409. Illustration 6 is based on *Paragon Homes, Inc. v. Carter, 56 Misc.2d 463, 288 N.Y.S.2d 817* (Sup. Ct.), aff'd mem., *30 A.D.2d 1052, 295 N.Y.S.2d 606 (1968);* cf. Uniform Consumer Credit Code § 1.201(9). But cf. *National Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311 (1964); The Monrosa v. Carbon Black Export, Inc., 359 U.S. 180 (1959)* (validity of choice-of-forum clause not decided); *Indussa Corp. v. S.S. Ranborg, 377 F.2d 200 (2d Cir. 1967)* (choice-of-forum clause invalid under Carriage of Goods by Sea Act); *Clinic Masters, Inc. v. District Court, 556 P.2d 473 (Colo. 1976)* (signatory was an educated professional; other party's ties were all with state of forum chosen).

*Comment f.* Illustration 7 is based on *In re Elkins-Dell Mfg. Co., 253 F. Supp. 864 (E.D. Pa. 1966);* compare *Royal Indem. Co. v. Westinghouse Elec. Corp., 385 F. Supp. 520 (S.D.N.Y. 1974).*

**CROSS REFERENCES:** ALR Annotations:

Doctrine of unconscionability as applied to insurance contracts. *86 A.L.R.3d 862.*
Construction and application of agreement by medical or social work student to work in particular position or at particular location in exchange for financial aid in meeting costs of education. *83 A.L.R.3d 1273.*
Validity and construction of "No Damage" clause with respect to delay in building or construction contract. *74 A.L.R.3d 187.*
Construction and effect of tenure provisions of contract or statute governing employment of college or university faculty member. *66 A.L.R.3d 1018.*
Validity and construction of provision (Escalator Clause) in land contract or mortgage that rate of interest payable shall increase if legal rate is raised. *60 A.L.R.3d 473.*
Employer's termination of professional athlete's services as constituting breach of employment contract. *57 A.L.R.3d 257.*
Construction of contract for installation of vending machine on another's premises. *53 A.L.R.3d 471.*
"Unconscionability" as ground for refusing enforcement of contract for sale of goods or agreement collateral thereto. *18 A.L.R.3d 1305.*
Construction and effect of agreement relating to salary of partners. *66 A.L.R.2d 1023.*
"Escalator" price adjustment clauses. *63 A.L.R.2d 1337.*
Validity, construction and effect of contract, option, or provision for repurchase by vendor. *44 A.L.R.2d 342.*
Validity and effect of promise not to make a will. *32 A.L.R.2d 370.*

Digest System Key Numbers:

Contracts 1

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Contracts LawDefensesUnconscionabilityGeneral Overview



Restatement of the Law, Second, Contracts
Copyright (c) 1981, The American Law Institute

Case Citations

Rules and Principles

Chapter 16 - Remedies

Topic 2 - Enforcement by Award of Damages

Restat 2d of Contracts, § 356

§ 356 Liquidated Damages and Penalties

**(1) Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.**
**(2) A term in a bond providing for an amount of money as a penalty for non-occurrence of the condition of the bond is unenforceable on grounds of public policy to the extent that the amount exceeds the loss caused by such non-occurrence.**

**COMMENTS & ILLUSTRATIONS: Comment:**

*a. Liquidated damages or penalty*. The parties to a contract may effectively provide in advance the damages that are to be payable in the event of breach as long as the provision does not disregard the principle of compensation. The enforcement of such provisions for liquidated damages saves the time of courts, juries, parties and witnesses and reduces the expense of litigation. This is especially important if the amount in controversy is small. However, the parties to a contract are not free to provide a penalty for its breach. The central objective behind the system of contract remedies is compensatory, not punitive. Punishment of a promisor for having broken his promise has no justification on either economic or other grounds and a term providing such a penalty is unenforceable on grounds of public policy. See Chapter 8. The rest of the agreement remains enforceable, however, under the rule stated in § 184(1), and the remedies for breach are determined by the rules stated in this Chapter. See Illustration 1. A term that fixes an unreasonably small amount as damages may be unenforceable as unconscionable. See § 208. As to the liquidation of damages and modification or limitation of remedies in contracts of sale, see Uniform Commercial Code §§ 2-718, 2-719.

*b. Test of penalty*. Under the test stated in Subsection (1), two factors combine in determining whether an amount of money fixed as damages is so unreasonably large as to be a penalty. The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable to the extent that it approximates the actual loss that has resulted from the particular breach, even though it may not approximate the loss that might have been anticipated under other possible breaches. See Illustration 2. Furthermore, the amount fixed is reasonable to the extent that it approximates the loss anticipated at the time of the making of the contract, even though it may not approximate the actual loss. See Illustration 3. The second factor is the difficulty of proof of loss. The greater the difficulty either of proving that loss has occurred or of establishing its amount with the requisite certainty (see § 351), the easier it is to show that the amount fixed is reasonable. To the extent that there is uncertainty as to the harm, the estimate of the court or jury may not accord with the principle of compensation any more than does the advance estimate of the parties. A determination whether the amount fixed is a penalty turns on a combination of these two factors. If the difficulty of proof of loss is great, considerable latitude is allowed in the approximation of anticipated or actual harm. If, on the other hand, the difficulty of proof of loss is slight, less latitude is allowed in that approximation. If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable. See Illustration 4.

**Illustrations:**

1. A and B sign a written contract under which A is to act in a play produced by B for a ten week season for $ 4,000. A term provides that "if either party shall fail to perform as agreed in any respect he will pay $ 10,000 as liquidated damages and not as a penalty." A leaves the play before the last week to take another job. The play is sold out for that week and A is replaced by a suitable understudy. The amount fixed is unreasonable in the light of both the anticipated and the actual loss and, in spite of the use of the words "liquidated damages," the term provides for a penalty and is unenforceable on grounds of public policy. The rest of the agreement is enforceable (§ 184(1)), and B's remedies for A's breach are governed by the rules stated in this Chapter.

2. A, B and C form a partnership to practice veterinary medicine in a town for ten years. In the partnership agreement, each promises that if, on the termination of the partnership, the practice is continued by the other two members, he will not practice veterinary medicine in the same town during its continuance up to a maximum of three years. A term provides that for breach of this duty "he shall forfeit $ 50,000 to be collected by the others as damages." A leaves the partnership, and the practice is continued by B and C. A immediately begins to practice veterinary medicine in the same town. The loss actually caused to B and C is difficult of proof and $ 50,000 is not an unreasonable estimate of it. Even though $ 50,000 may be unreasonable in relation to the loss that might have resulted in other circumstances, it is not unreasonable in relation to the actual loss. Therefore, the term does not provide for a penalty and its enforcement is not precluded on grounds of public policy. See Illustration 14 to § 188.

3. A contracts to build a grandstand for B's race track for $ 1,000,000 by a specified date and to pay $ 1,000 a day for every day's delay in completing it. A delays completion for ten days. If $ 1,000 is not unreasonable in the light of the anticipated loss and the actual loss to B is difficult to prove, A's promise is not a term providing for a penalty and its enforcement is not precluded on grounds of public policy.

4. The facts being otherwise as stated in Illustration 3, B is delayed for a month in obtaining permission to operate his race track so that it is certain that A's delay of ten days caused him no loss at all. Since the actual loss to B is not difficult to prove, A's promise is a term providing for a penalty and is unenforceable on grounds of public policy.

*c. Disguised penalties*. Under the rule stated in this Section, the validity of a term providing for damages depends on the effect of that term as interpreted according to the rules stated in Chapter 9. Neither the parties' actual intention as to its validity nor their characterization of the term as one for liquidated damages or a penalty is significant in determining whether the term is valid. Sometimes parties attempt to disguise a provision for a penalty by using language that purports to make payment of the amount an alternative performance under the contract, that purports to offer a discount for prompt performance, or that purports to place a valuation on property to be delivered. Although the parties may in good faith contract for alternative performances and fix discounts or valuations, a court will look to the substance of the agreement to determine whether this is the case or whether the parties have attempted to disguise a provision for a penalty that is unenforceable under this Section. In determining whether a contract is one for alternative performances, the relative value of the alternatives may be decisive.

**Illustration:**

5. A contracts to build a house for B for $ 50,000 by a specified date or in the alternative to pay B $ 1,000 a week during any period of delay. A delays completion for ten days. If $ 1,000 a week is unreasonable in the light of both the anticipated and actual loss, A's promise to pay $ 1,000 a week is, in spite of its form, a term providing for a penalty and is unenforceable on grounds of public policy.

*d. Related types of provisions*. This Section does not purport to cover the wide variety of provisions used by parties to control the remedies available to them for breach of contract. A term that fixes as damages an amount that is unreasonably small does not come within the rule stated in this Section, but a court may refuse to enforce it as unconscionable under the rule stated in § 208. A mere recital of the harm that may occur as a result of a breach of contract does not come within the rule stated in this Section, but may increase damages by making that harm foreseeable under the rule stated § 351. As to the effect of a contract provision on the right to equitable relief, see Comment *a* to § 359. As to the effect of a term requiring the occurrence of a condition where forfeiture would result, see § 229. Although attorneys' fees are not generally awarded to the winning party, if the parties provide for the award of such fees the court will award a sum that it considers to be reasonable. If, however, the parties specify the amount of such fees, the provision is subject to the test stated in this Section.

*e. Penalties in bonds*. Bonds often fix a flat sum as a penalty for non-occurrence of the condition of the bond. A term providing for a penalty is not unenforceable in its entirety but only to the extent that it exceeds the loss caused by the non-occurrence of the condition.

**Illustration:**

6. A executes a bond obligating himself to pay B $ 10,000, on condition that the bond shall be void, however, if C, who is B's cashier, shall properly account for all money entrusted to him. C defaults to the extent of $ 500. A's promise is unenforceable on grounds of public policy to the extent that it exceeds the actual loss, $ 500.

**REPORTERS NOTES:** This Section is based on former §§ 339 and 579, but Subsection (1) has been redrafted to harmonize with Uniform Commercial Code § 2-718(1). The Code's reference to "the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy" has been omitted as already being expressed by the language of Subsection (1), as explained in the Comment. See 5 Corbin, Contracts ch. 58 (1964 & Supp. 1980); 5 Williston, Contracts §§ 776-89 (3d ed. 1961); Clarkson, Miller & Muris, Liquidated Damages v. Penalties: Sense or Nonsense, *1978 Wis. L. Rev. 351;* Goetz & Scott, Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach, *77 Colum. L. Rev. 554 (1977);* Macneil, Power of Contract and Agreed Remedies, *47 Cornell L.Q. 495 (1962);* Sweet, Liquidated Damages in California, *60 Calif. L. Rev. 84 (1972);* The [English] Law Commission, Penalty Clauses and Forfeiture of Monies Paid (Law of Contract Working Paper No. 61, 1975). Notes, *45 Fordham L. Rev. 1349 (1977); 72 Nw. U.L. Rev. 1055 (1978).*

*Comment b*. Illustration 1 is based on Illustration 1 to former § 339; *H.J. McGrath Co. v. Wisner, 189 Md. 260, 55 A.2d 793 (1947).* Illustration 2 is based on Illustration 2 to former § 339; *Jaquith v. Hudson, 5 Mich. 123 (1858).* It is supported by 5 Corbin, Contracts § 1066 (1964 & Supp. 1980); McCormick, Damages § 151 (1935); and is consistent with the rationale behind § 184(2). But cf. *Bauer v. Sawyer, 8 Ill.2d 351, 134 N.E.2d 329 (1956); Management, Inc. v. Schassberger, 39 Wash.2d 321, 235 P.2d 293 (1951).* Illustration 3 is based on Illustration 3 to former § 339; *United States v. Bethlehem Steel Co., 205 U.S. 105 (1907); Banta v. Stamford Motor Co., 89 Conn. 51, 92 A. 665 (1914); Dave Gustafson & Co. v. State, 83 S.D. 160, 156 N.W.2d 185 (1968).* But cf. *Priebe & Sons v. United States, 332 U.S. 407 (1947); Hungerford Constr. Co. v. Florida Citrus Exposition, Inc., 410 F.2d 1229* (5th Cir.), cert. denied, *396 U.S. 928 (1969).* Illustration 4 is supported by *Massman Constr. Co. v. City Council of Greenville, Miss., 147 F.2d 925 (5th Cir. 1945); Northwest Fixture Co. v. Kilbourne & Clark Co., 128 F. 256 (9th Cir. 1904); Norwalk Door Closer Co. v. Eagle Lock and Screw Co., 153 Conn. 681, 220 A.2d 263 (1966).* It rejects the view of Illustration 7 to former § 339; *Southwest Eng'r Co. v. United States, 341 F.2d 998* (8th Cir.), cert. denied, *382 U.S. 819 (1965); McCarthy v. Tally, 46 Cal.2d 577, 297 P.2d 981 (1956);* cf. *Bethlehem Steel Corp. v. Chicago, 350 F.2d 649 (7th Cir. 1965).* That the difficulties of proof of loss are to be determined at the time the contract is made, not at the time of the breach, see *Hutchison v. Tompkins, 259 So.2d 129 (Fla. 1972).* As to whether the actual loss must be reasonably foreseeable, compare comment, *45 Fordham L. Rev. 1349, 1357 (1977),* with 1 N.Y.L. Rev'n Comm'n, Study of the Uniform Commercial Code, Leg. Doc. (1955) No. 65, p. 581 n. 468.

*Comment c*. Illustration 5 is based on Illustration 5 to former § 339.

*Comment d*. Allowing attorneys' fees, see *Puget Sound Mutual Sav. Bank v. Lillions, 50 Wash.2d 799, 314 P.2d 935 (1957),* cert. denied, *357 U.S. 926 (1958).* As to whether a specified sum as attorney's fees is a penalty, see *Equitable Lumber Corp. v. IPA Land Dev. Corp., 38 N.Y.2d 516, 381 N.Y.S.2d 459, 344 N.E.2d 391 (1976).*

*Comment e*. Illustration 6 is based on Illustration 8 to former § 339.

**CROSS REFERENCES:** ALR Annotations:

Damages for wrongful termination of automobile dealership contracts. *54 A.L.R.3d 324.*
Right and measure of recovery for breach of obligation to drill exploratory oil or gas wells. *4 A.L.R.3d 284.*
Measure of damages, to advertiser, for radio or television station's breach or wrongful termination of contract. *90 A.L.R.2d 1199.*
Liability of building or construction contractor for liquidated damages for breach of time limit provision where he abandons work after time fixed for its completion. *42 A.L.R.2d 1134.*
Measure and items of compensation of contractor under cost-plus contract which is terminated, without breach, before completion. *28 A.L.R.2d 867.*
Provision in land contract for forfeiture of payments as one for liquidated damages or penalty. *6 A.L.R.2d 1401.*

Digest System Key Numbers:

Damages 74-86

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Contracts LawRemediesForeseeable DamagesGeneral OverviewContracts LawRemediesLiquidated Damage



**CARROLL G. ROBINSON, BRUCE R. HOTZE, AND JEFFREY N. DAILY, PETITIONERS, v. ANNISE D. PARKER, MAYOR; CITY OF HOUSTON; HOUSTON CITY COUNCIL, ET AL., RESPONDENTS**

**NO. 08-0658**

**SUPREME COURT OF TEXAS**

***353 S.W.3d 753*; *2011 Tex. LEXIS 637*; *54 Tex. Sup. J. 1640***

**November 18, 2009, Argued**
**August 26, 2011, Opinion Delivered**

**SUBSEQUENT HISTORY:** Released for Publication October 28, 2011.
Rehearing denied by *Robinson v. Parker, 2011 Tex. LEXIS 809 (Tex., Oct. 21, 2011)*

**PRIOR HISTORY:** [**1]
ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS.
*White v. Robinson, 260 S.W.3d 463, 2008 Tex. App. LEXIS 2391 (Tex. App. Houston 14th Dist., 2008)*

**COUNSEL:** For Robinson, Ms. Carroll G., Petitioner: Mr. William A. 'Andy' Taylor, Ms. Amanda Eileen Staine Peterson, Andy Taylor & Associates, P.C., Houston TX.

For White, Mr. Bill, Respondent: Mr. Scott J. Atlas, Bill White for Texas, Houston TX; Ms. Melanie Plowman Sarwal, Weil Gothshal & Manges LLP, Austin TX; Honorable Patrick W. Mizel, Ms. Stacey Neumann Vu, Vinson & Elkins LLP, Houston TX; Mr. Stephen Douglas Pritchett Jr., Beck Redden & Secrest, L.L.P., Houston TX; Mr. Arturo G. Michel, City Attorney, City of Houston Legal Dept., Houston TX; Mr. Patrick Zummo, Law Offices of Patrick Zummo, Houston TX; Mr. John Berchmans Daily, Weil Gotshal & Manges LLP, Houston TX; Mr. David M. Gunn, Beck Redden & Secrest, L.L.P., Houston TX.

For Continental Airlines, Inc., Amicus Curiae: Mr. Jonathan Day, Andrews Kurth LLP, Houston TX; Mr. Warren W. Harris, Bracewell & Giuliani, LLP, Houston TX.

For Kubosh, Ms. Francis M., Amicus Curiae: Mr. David A. Furlow, Thompson & Knight, L.L.P., Houston TX; Mr. Levi James Benton, Benton Massey PLLC, Houston TX.

**JUDGES:** JUSTICE GREEN delivered the opinion of the Court. JUSTICE GUZMAN did not [**2] participate in the decision.

**OPINION BY:** Paul W. Green

**OPINION**

[*754] In this case, we are asked to decide (1) whether citizens who signed a petition proposing a local ballot initiative have standing to assert their declaratory judgment claims that the voter-approved initiative is valid and must be enforced; and (2) the validity of the voter-approved initiative. Because the citizens' claims are not ripe, however, we cannot reach those issues.

**I**

Petitioners Carroll G. Robinson, Bruce R. Hotze, and Jeffrey N. Daily are citizens of Houston who participated to varying degrees in efforts to place a proposition regarding city revenues and spending on the ballot for public referendum. Hotze and Daily organized the petition drive and helped draft the final language of the proposal. All three Petitioners signed the petition, donated time and money to campaigns promoting the passage of the proposition, and voted in favor of it.

On November 2, 2004, Houston voters passed the proposition, called Proposition 2, as well as Proposition 1, which the Houston City Council had placed on the ballot by its own act in response to Prop. 2.[1] Prop. 1 garnered

more votes, with 280,596 favorable votes, or 64% of the total, as opposed to 242,697 [**3] favorable votes for Prop. 2, or 56% of the total. However, the City of Houston determined that, because Prop. 1 and Prop. 2 conflict, Prop. 2 was ineffective and unenforceable. The City based that determination both on what Petitioners refer to as Prop. 1's "poison pill provision,"[2] and on the conflicting-ordinance provision in the Houston City Charter. *See* Hous., Tex., Code Ordinances, City Charter art. IX, § 19 (2006) ("[A]t any election for the adoption of amendments if the provisions of two or more proposed amendments approved at said election are inconsistent the amendment receiving the highest number of votes shall prevail."). The mayor therefore [*755] did not certify the results of the passage of Prop. 2 to the secretary of state, and the city council did not enter an order in the city records declaring that Prop. 2 had been adopted. *See TEX. LOC. GOV'T CODE §§ 9.005(b)* (requiring city council to pass an ordinance declaring the adoption of an initiative that receives a majority of the vote), *9.007* (requiring mayor to certify results of an election that passes a charter amendment to the secretary of state).

1 Prop. 2 was described on the ballot as:

> The City Charter of the City of Houston [**4] shall be amended to require voter approval before the City may increase total revenues from all sources by more than the combined rates of inflation and population, without requiring any limit of any specific revenue source, including water and sewer revenues, property taxes, sales taxes, fees paid by utilities and developers, user fees, or any other sources of revenues.

Prop. 1 was described on the ballot as:

> The Charter of the City of Houston shall be amended to require voter approval before property tax revenues may be increased in any future fiscal year above a limit measured by the lesser of 4.5% or the cumulative combined rates of inflation and population growth. Water and sewer rates would not increase more than the cumulative combined rates of inflation and population growth without prior voter approval. The Charter Amendment also requires minimum annual increases of 10% in the senior and disabled homestead property tax exemptions through the 2008 tax year.

2 Prop. 1 provides:

> If another proposition for a Charter amendment relating to limitations on increases in City revenues is approved at the same election at which this proposition is also approved, and if this proposition receives [**5] the higher number of favorable votes, then this proposition shall prevail and the other shall not become effective.

Petitioners sought relief from the court of appeals, which granted their petition for writ of mandamus, holding that the City had failed to perform the ministerial duties of certifying the results to the secretary of state and entering an order declaring the charter amendments to have been adopted. *In re Robinson, 175 S.W.3d 824, 826-32 (Tex. App.--Houston [1st Dist.] 2005, orig. proceeding)*. On the same day that they petitioned for mandamus relief, Petitioners filed the underlying suit seeking a declaratory judgment that Prop. 2 is effective and must be enforced. While that case was pending, the city council passed an ordinance recognizing that both Prop. 1 and Prop. 2 had passed but also declaring that Prop. 1 had received the higher number of votes. As a result, both propositions became part of the Houston City Charter. *See* Hous., Tex., Code Ordinances, City Charter art. III, § 1; art. VI-a, § 7; art. IX, § 20 (2006). The trial court ultimately granted summary judgment in favor of Petitioners. The court of appeals, however, ruled that Petitioners lacked standing to assert [**6] their claims, relying on our holding in *Brown v. Todd, 53 S.W.3d 297, 305 (Tex. 2001). 260 S.W.3d 463, 470-72 (Tex. App.--Houston [14th Dist.] 2008, pet. filed)*. The court remanded the case to the trial court to allow Petitioners to amend their pleadings and establish standing. *Id. at 466*.

Robinson, Hotze, and Daily petition for review on two grounds.[3] First, they assert that the court of appeals erred when it determined that Petitioners lack standing. Second, they ask us to consider the merits of their claim that Prop. 2 should be enforced.

3 The current Houston mayor has been substituted for her predecessor. *See TEX. R. APP. P. 7.2(a)* (automatic substitution when public officer is party in official capacity).

## II

Ripeness "is a threshold issue that implicates subject matter jurisdiction . . . [and] emphasizes the need for a concrete injury for a justiciable claim to be presented." *Patterson v. Planned Parenthood of Hous. & Se. Tex., 971 S.W.2d 439, 442 (Tex. 1998)*. In evaluating ripeness, we consider "whether, *at the time a lawsuit is filed*, the facts are sufficiently developed 'so that an injury has occurred or is likely to occur, rather than being contingent or remote.'" *Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 851-52 (Tex. 2000)* [**7] (emphasis in original) (quoting *Patterson, 971 S.W.2d at 442*). Although a claim is not required to be ripe at the time of filing, if a party cannot demonstrate a reasonable likelihood that the claim will soon ripen, the case must be dismissed. *See Perry v. Del Rio, 66 S.W.3d 239, 251 (Tex. 2001)*.

The record is silent as to whether the City has, in fact, failed to comply with the Prop. 2 spending caps. As the parties acknowledged at oral argument, the record in this case indicates that then-mayor Bill White, in response to Prop. 2's inclusion in the City Charter, stated his intention to comply with the caps Prop. 2 imposed. In an attempt to show noncompliance, Petitioners presented several documents with their post-submission brief. Petitioners point to a May 2009 letter from then-controller [*756] Annise Parker, who is now mayor of Houston, stating that the controller's office is "no longer responsible for analyzing the budget for compliance with Proposition 2." However, nothing in that letter or elsewhere in the record indicates that the City has actually failed or will soon fail to comply with Prop. 2's spending caps. Petitioners also point to a series of letters they sent to the City's [**8] accounting firm. In the letters, they demanded documentation of the City's compliance with Prop. 2, as well as correction of alleged errors in the City's calculation of its compliance with Prop. 2's allowable spending caps. In a transmittal letter to this Court, Petitioners stated that "proper calculations by an independent outside auditor would show that the City is not in compliance [with] the spending controls" set forth in Prop. 2. But a case is not ripe when the determination of whether a plaintiff has a concrete injury can be made only "on contingent or hypothetical facts, or upon events that have not yet come to pass." *Gibson, 22 S.W.3d at 852*. From such inconclusive documentation and mere allegations and speculation, we cannot ascertain with necessary certainty that the City has failed to comply with Prop. 2's spending caps or that it is likely to exceed the spending caps in the near future. *See Perry, 66 S.W.3d at 249* (stating that a case based on "uncertain or contingent future events" is not ripe for judicial determination); *Patterson, 971 S.W.2d at 444* (explaining that a potential injury cannot be ripe unless it is established with certain and definite documentation).

Because [**9] there is no showing that Petitioners have suffered a concrete injury, we hold that Robinson, Hotze, and Daily have failed to present a sufficiently ripe, justiciable claim. We express no opinion on whether, even if the case were ripe, Robinson, Hotze, and Daily would have standing to assert their declaratory judgment claims, as "[t]he essence of the ripeness doctrine is to avoid premature adjudication . . . [and] to hold otherwise would be the essence of an advisory opinion, advising what the law would be on a hypothetical set of facts." *Patterson, 971 S.W.2d at 444*.

## III

Because Petitioners' claims are not ripe for adjudication, the trial court did not have jurisdiction to hear this dispute. *See Gibson, 22 S.W.3d at 852*. Accordingly, we vacate the judgments of the court of appeals and trial court and dismiss the case for want of jurisdiction.

Paul W. Green

Justice

OPINION DELIVERED: August 26, 2011



**ROWAN COMPANIES, INC., Plaintiff-Appellant, v. Huey P. GRIFFIN, Defendant-Appellee**

**No. 88-3291**

**UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT**

***876 F.2d 26*; *1989 U.S. App. LEXIS 9696*; *1989 AMC 2371***

**June 22, 1989**

**SUBSEQUENT HISTORY:** [**1] Rehearing Denied July 31, 1989.

**PRIOR HISTORY:** Appeal from the United States District Court for the Eastern District of Louisiana.

**COUNSEL:** Lawrence E. Abbott, Elton F. Duncan, III, Attorneys for Appellant.

Michael X., Houma, Louisiana, David J. Shea, Attorneys for Appellee.

**JUDGES:** Politz and Jolly, Circuit Judges, and Hunter, [*] District Judge.

* District Judge for the Western District of Louisiana, sitting by designation.

**OPINION BY:** POLITZ

**OPINION**

[*27] POLITZ, Circuit Judge

Rowan Companies, Inc. appeals the dismissal of its suit for a declaratory judgment. Concluding that Rowan's suit against one of its employees, Huey P. Griffin, presents an actual controversy that is justiciable under the Declaratory Judgment Act, *28 U.S.C. § 2201*, we reverse and remand.

*Background*

For purposes of this appeal the following facts are taken as true. On June 10, 1987 Griffin sustained a back injury while working on a drilling rig owned and operated by Rowan. Rowan preserved its liability position relative to the accident, but nonetheless provided Griffin with maintenance, cure, and advance payments until January of 1988. At that time Rowan received a medical [**2] report from Griffin's physician indicating that Griffin had made full recovery. Rowan invoked the Declaratory Judgment Act and sought a judicial declaration of its obligation with reference to further maintenance and cure, in light of the medical report indicating maximum recovery. [1] The district court granted Griffin's motion to dismiss the declaratory judgment suit, assigning no reasons. Rowan's motion for reconsideration was summarily rejected. Again, no reasons were assigned for the court's refusal to resolve the declaratory judgment action. This appeal followed.

1 Rowan's complaint alleged diversity, *28 U.S.C. § 1332*, and maritime, *28 U.S.C. § 1333*, jurisdiction.

*Analysis*

The Declaratory Judgment Act, *28 U.S.C. § 2201*, provides in pertinent part:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other [**3] legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

In addressing the Act's restriction to cases of actual controversy the Supreme Court has stated:

> The Constitution limits the exercise of the judicial power to "cases" and "controversies." . . . The Declaratory Judgment Act of 1934, in its limitation to "cases of actual controversy," manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense. The word "actual" is one of emphasis rather than of definition . . .
>
> A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through [**4] a decree of a conclusive character, as distinguished from an opinion advising [*28] what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages.

*Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-41, 57 S. Ct. 461, 463-64, 81 L. Ed. 617 (1937)* (citations omitted); *see also* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2757 (1983).

While recognizing the difficulty of fashioning a precise test for identifying a justiciable controversy, the Court has clearly instructed that "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S. Ct. 510, 512, 85 L. Ed. 826 (1941)*. [**5] Moreover, "it is immaterial that frequently, in the declaratory judgment suit, the positions of the parties in the conventional suit are reversed; the inquiry is the same in either case." *Id.* Guided by these teachings, this court has applied the following rule when determining whether a request for declaratory judgment relief presents an actual controversy:

> A controversy, to be justiciable, must be such that it can presently be litigated and decided and not hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never develop.

*Brown & Root, Inc. v. Big Rock Corp., 383 F.2d 662, 665 (5th Cir. 1967)*.

Mindful of these principles, we address the instant appeal. The dispute presented by Rowan's complaint is whether Rowan's legal obligation to provide Griffin with maintenance and cure has been extinguished because Griffin has reached maximum cure. This is not a hypothetical, conjectural, or conditional question, or one based upon the possibility of a factual situation that may never develop. Rather, the controversy is real, definite, and concrete, and therefore justiciable, for all of the acts necessary [**6] for resolution of the merits of the claim -- Griffin's injury and the course of his subsequent medical recovery -- occurred prior to the filing of Rowan's complaint.

Griffin contends that there is no justiciable controversy because he had not made a formal or informal demand for continued maintenance and cure payments prior to Rowan's request for a declaratory judgment. We disagree. Such a demand is not a requisite for use of this judicial problem-solver. The purpose of the Declaratory Judgment Act is "'to afford one threatened with liability an early adjudication without waiting until his adversary should see fit to begin an action after the damage has accrued.'" *Government Employees Ins. Co. v. LeBleu, 272 F. Supp. 421, 427 (E.D.La. 1967)* (quoting 3 Barron & Holtzoff, Federal Practice and Procedure (Wright Edition) § 1262). The declaratory judgment vehicle also is intended to provide a means of settling an actual controversy before it ripens into a violation of the civil or criminal law, or a breach of a contractual duty. *Scott-Burr Stores Corp. v. Wilcox, 194 F.2d 989, 990 (5th Cir. 1952)*.

Our conclusion that Rowan's complaint presents a [**7] justiciable controversy does not mean that the district court is obliged to entertain the action. It is well established that a district court "is not required to provide declaratory judgment relief, and it is a matter for the dis-

trict court's sound discretion whether to decide a declaratory judgment action." *Mission Ins. Co. v. Puritan Fashions Corp., 706 F.2d 599, 601 (5th Cir. 1983)* (citing *Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 62 S. Ct. 1173, 86 L. Ed. 1620 (1942)*); *see also Dresser Indus., Inc. v. Insurance Co. of N. Am., 358 F. Supp. 327, 330* (N.D.Tex.) (Declaratory Judgment Act "gives the court a choice, not a command"), *aff'd, 475 F.2d 1402 (5th Cir. 1973)*. And, although a district court may not dismiss a request for declaratory judgment relief "on the basis of whim or [*29] personal disinclination," *Hollis v. Itawamba County Loans, 657 F.2d 746, 750 (5th Cir. 1981)*, the court may consider a variety of factors in determining whether to decide a declaratory judgment suit. For example, declaratory judgment relief may be denied because of a pending state court proceeding [**8] in which the matters in controversy between the parties may be fully litigated, *Brillhart, 316 U.S. at 494-95, 62 S. Ct. at 1175-76*; *Hollis, 657 F.2d at 750*; *Employers' Liab. Assurance Corp. v. Mitchell, 211 F.2d 441, 443* (5th Cir.), *cert. denied, 347 U.S. 1014, 74 S. Ct. 869, 98 L. Ed. 1137 (1954)*, because the declaratory complaint was filed in anticipation of another suit and is being used for the purpose of forum shopping, *Pacific Employers Ins. Co. v. M/V CAPT. W.D. CARGILL, 751 F.2d 801, 804* (5th Cir.), *cert. denied, 474 U.S. 909, 106 S. Ct. 279, 88 L. Ed. 2d 244 (1985)*; *Puritan Fashions, 706 F.2d at 602*, because of possible inequities in permitting the plaintiff to gain precedence in time and forum, *id.*, or because of inconvenience to the parties or the witnesses, *id.* [2]

2 In *Puritan Fashions, 706 F.2d at 601 n.1*, a panel of this court rejected application of *Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)*, to declaratory judgment actions. In *Cone* and its companion case, *Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976)*, the Supreme Court narrowly circumscribed the instances in which a district court may dismiss an action because of parallel state court litigation, absent traditional grounds for abstention. The Court listed several factors a district court must balance in determining the appropriateness of a dismissal in the interest of wise judicial administration, and stressed that the balance should be weighted heavily in favor of the exercise of jurisdiction. Neither *Colorado River* nor *Moses Cone*, however, involved a declaratory judgment suit. Recognizing this, the *Puritan Fashions* panel held that "the purely remedial and equitable nature of declaratory judgments vests the court with discretion, and sets declaratory judgments outside the scope of *Cone*." *706 F.2d at 601 n. 1*.

Five years later, the panel in *Evanston Ins. Co. v. Jimco, Inc., 844 F.2d 1185 (5th Cir. 1988)*, inadvertently overlooked *Puritan Fashions* and its rejection of *Moses Cone*, as applied to declaratory judgment proceedings. In *Jimco* the panel held that in considering whether to dismiss a declaratory judgment action a district court should apply the *Colorado River-Moses Cone* factors. *Jimco* thus placed stricter limitations than *Puritan Fashions* on the district court's exercise of discretion. The tension between *Puritan Fashions* and *Jimco* was recognized in *Sandefer Oil & Gas, Inc. v. Duhon, 871 F.2d 526 (5th Cir. 1989)*.

In the case at bar we follow *Puritan Fashions*. We do so because we are bound to follow the decision of the first panel. *See Ryals v. Estelle, 661 F.2d 904 (5th Cir. 1981)*. In addition, we are persuaded that *Puritan Fashions* states the better rule, more consistent with the essence of the Declaratory Judgment Act.

[**9] In *Mission Ins. Co. v. Puritan Fashions Corp., 706 F.2d 599, 601 & n. 2 (5th Cir. 1983)*, we addressed the standard to be applied when reviewing a district court's decision to dismiss a declaratory judgment complaint. Noting that dismissals under the Declaratory Judgment Act and dismissals under the doctrine of *forum non conveniens* typically are based on many of the same considerations, we perceived no reason for the standard of review to vary. *Forum non conveniens* dismissals are reviewed under an abuse of discretion standard. *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981)*. In *Puritan Fashions* we held that standard applicable to the review of dismissals of declaratory judgment actions.

In the instant case the district court did not assign reasons for its dismissal of Rowan's complaint. A reading of the sparse record leads us to surmise that the dismissal was based on the trial court's conclusion that Rowan's complaint failed to state a justiciable controversy, for the argument focused on this issue. If that be the case, the district court erred as a matter of law for the court does have jurisdiction. [**10] However, after addressing the relevant factors the court will be free to exercise its discretion to maintain or reject the suit. [3]

3 Subsequent to the district court's dismissal of Rowan's complaint for declaratory judgment relief, Griffin filed a maintenance and cure suit against Rowan in Texas state court. This is an important factor that the district court should take into account. *See Brillhart; Hollis; Mitchell*. Fur-

ther, in an appropriate setting it may be significant that a maintenance and cure claim joined with a Jones Act claim must be submitted to a jury when both arise out of one set of facts. *Fitzgerald v. United States Lines Company, 374 U.S. 16, 83 S. Ct. 1646, 10 L. Ed. 2d 720 (1963)*.

If our surmising is incorrect and the district court concluded that an actual controversy [*30] existed but exercised its discretion to reject the suit, we nevertheless must remand. Without an assignment of reasons for the district court's action, we cannot perform the appellate function. [**11] In determining whether a district court abused its discretion in dismissing on the basis of *forum non conveniens*, we observed that "it is difficult to formulate a list of examples which will always be abuses of discretion." *In re Air Crash Disaster Near New Orleans, 821 F.2d 1147, 1166 (5th Cir. 1987)* (en banc), *vacated on other grounds, Pan American World Airways, Inc. v. Lopez, 490 U.S. 1032, 109 S. Ct. 1928, 104 L. Ed. 2d 400 (1989)*. However, we have said definitively, that in the context of a *forum non conveniens* dismissal "a district court abuses its discretion when it summarily denies or grants a motion to dismiss without either written or oral explanation" or "when it fails to address and balance the relevant principles and factors of the doctrine." *Id.* As in *Puritan Fashions*, we perceive no reason why these requirements should not also apply to a district court's dismissal under the Declaratory Judgment Act, and we now hold that they do.

The judgment of the district court is REVERSED and the matter is REMANDED for further proceedings in conformity herewith.



**RUSK STATE HOSPITAL, PETITIONER, v. DENNIS BLACK AND PAM BLACK, INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF TRAVIS BONHAM BLACK, DECEASED, RESPONDENTS**

**NO. 10-0548**

**SUPREME COURT OF TEXAS**

***392 S.W.3d 88*; *2012 Tex. LEXIS 731*; *55 Tex. Sup. J. 1320***

**October 6, 2011, Argued**
**August 31, 2012, Opinion Delivered**

**SUBSEQUENT HISTORY:** Released for Publication October 12, 2012.

**PRIOR HISTORY:** [**1]
ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS.
*Rusk State Hosp. v. Black, 379 S.W.3d 283, 2010 Tex. App. LEXIS 4687 (Tex. App. Tyler, June 23, 2010)*

**COUNSEL:** For Rusk State Hospital, Petitioner: Clarence Andrew Weber, Kelly Hart & Hallman LLP, Austin TX; Daniel T. Hodge, First Asst. Attorney General, Austin TX; David C. Mattax, Director of Defense Litigation, Timothy Edward Boughal, Office of the Attorney General, Austin TX; David S. Morales, Office of the Attorney General of Texas, Deputy First Assistant Attorney General, Austin TX; Greg W. Abbott, Attorney General of Texas, Austin TX; James C. Ho, Gibson Dunn & Crutcher LLP, Dallas TX; Jonathan F. Mitchell, Solicitor General Office of the Attorney General, Austin TX; Michael P. Murphy, Asst. Solicitor General, Austin TX; William (Bill) J. Cobb III, Attorney General's Office, Deputy Atty. General for Civil Litigation, Austin TX.

For Black, Dennis and Pam Black, Individually and as Representatives of the Estate of Travis Bonham Black, Deceased, Respondent: Dennis Gerald Black, Jeremy Mitchell Skaggs, Black & Skaggs, P.C., Tyler TX.

**JUDGES:** JUSTICE JOHNSON delivered the opinion of the Court, in which JUSTICE HECHT, JUSTICE WAINWRIGHT, JUSTICE GREEN, JUSTICE WILLETT, and JUSTICE GUZMAN joined. JUSTICE HECHT filed a concurring [**2] opinion. JUSTICE LEHRMANN filed a concurring and dissenting opinion, in which CHIEF JUSTICE JEFFERSON and JUSTICE MEDINA joined.

**OPINION BY:** Phil Johnson

**OPINION**

[*91] In this health care liability claim the trial court denied Rusk State Hospital's challenge to the plaintiffs' expert reports. The Hospital filed an interlocutory appeal from that ruling. On appeal the Hospital, for the first time, asserted it was immune from suit. The court of appeals refused to consider the immunity issue because it had not been presented to the trial court. After addressing the merits of the Hospital's challenge to the expert reports, the court of appeals remanded the case to the trial court for further proceedings.

We conclude that the court of appeals erred by refusing to consider the immunity claim because immunity from suit implicates courts' subject-matter jurisdiction. After considering the immunity claim, which was briefed and argued in this Court, however, we affirm the judgment of the court of appeals remanding the case to the trial court because (1) the pleadings and record neither establish a waiver of the Hospital's immunity nor conclusively negate such a waiver; and (2) the Hospital has not shown conclusively that [**3] either the plaintiffs had a full, fair opportunity in the trial court to develop the record as to immunity and amend their pleadings, or that if the case is remanded and the plaintiffs are given such an opportunity they cannot show immunity has been waived.

**I. Background**

Travis Black was a psychiatric patient in Rusk State Hospital when he was found unconscious with a plastic bag over his head. Efforts to resuscitate him were unsuccessful and he died. Delbert Van Dusen, M.D., performed an autopsy, determined Travis died of asphyxiation, and concluded that he committed suicide.

Travis's parents, Dennis and Pam Black, filed a health care liability suit against the Hospital and other entities that are not parties to this appeal.[1] The Blacks alleged that the Hospital (1) was negligent by providing or allowing Travis access to a plastic bag that was inherently dangerous in an inpatient psychiatric setting, and the negligence involved a condition, use, or misuse of tangible personal property; (2) was negligent in training and supervising its employees, which resulted in Travis's death either by assisted suicide or murder; and (3) acted with deliberate indifference to Travis's medical and psychiatric [**4] needs by depriving him of sleep and refusing to prescribe appropriate medication.

1 The Blacks also sued the State of Texas and the Texas Department of State Health Services. The court of appeals dismissed the claims against the State and the Department. S.W.3d , . The Blacks do not complain of that action.

The Blacks timely served the Hospital with an expert report from psychologist Dennis Combs, Ph.D., and a copy of Dr. Van Dusen's autopsy report. *See* *TEX. CIV. PRAC. & REM. CODE § 74.351*. The Hospital moved for dismissal of the suit on the basis that these reports failed to satisfy the statutory requirements of *section 74.351*. *See id*. The trial court denied the motion and the Hospital appealed. *See id. § 51.014(a)(9)* (providing that a person may immediately appeal an interlocutory trial court order that denies all or part of the relief sought by a motion under *section 74.351(b)*).

[*92] On interlocutory appeal the Hospital argued that the trial court erred by denying its motion to dismiss and, for the first time, asserted it had sovereign immunity from suit. Regarding its immunity claim, the Hospital argued that the Blacks' pleadings did not allege a cause of action for which the [**5] Hospital's immunity was waived and therefore the Blacks failed to meet their burden of showing the trial court had jurisdiction. S.W.3d , . The Blacks responded that their filings complied with statutory expert report requirements; the court of appeals could not consider the Hospital's immunity argument because it was neither presented to nor considered by the trial court; and in any event their pleadings were sufficient to demonstrate a claim for which the Hospital's immunity was waived. *Id*. at .

The court of appeals did not address the immunity issue because "the weight of authority" precluded it from considering the issue on interlocutory appeal when it had not been presented to or ruled on by the trial court. *Id*. at . The appeals court, considering both Dr. Combs's report and Dr. Van Dusen's autopsy report as statutory reports, concluded that the Blacks' claims regarding sleep deprivation, failure to prescribe adequate medication, and indifference to Travis's medical needs were not addressed by them, so it dismissed those claims with prejudice. *Id*. at . Although the appeals court also concluded that the Blacks' expert reports were deficient with respect to their [**6] remaining negligence claims, it determined the reports nonetheless represented a good-faith effort to comply with *section 74.351* and remanded for the trial court to consider whether to grant a 30-day extension for the Blacks to cure the deficiencies. *See TEX. CIV. PRAC. & REM. CODE § 74.351(c)* (providing that "the court may grant one 30-day extension to the claimant in order to cure the deficiency" if it concludes the claimant's timely filed expert reports are deficient); *Leland v. Brandal, 257 S.W.3d 204, 205 (Tex. 2008)* (holding that "when elements of a timely filed expert report are found deficient, either by the trial court or on appeal, one thirty-day extension to cure the report may be granted" and remanding the case to the trial court for it to consider whether to grant an extension).

The Blacks did not seek review of the court of appeals' decision, but the Hospital did and we granted its petition for review. *54 Tex. Sup. Ct. J. 1156 (June 17, 2011)*. The Hospital argues that immunity from suit deprives the trial court of subject-matter jurisdiction and the interlocutory appeal statute did not preclude the court of appeals from determining the jurisdictional issue. The Hospital [**7] then argues that we should dismiss the case because the Blacks' pleadings, even if true, do not allege a claim for which the Hospital's immunity has been waived by the Tort Claims Act (TCA). *See TEX. CIV. PRAC. & REM. CODE §§ 101.001-.109*.

We begin by addressing our jurisdiction over the interlocutory appeal.

## II. Interlocutory Appeal Jurisdiction

Generally, Texas appellate courts have jurisdiction only over final judgments. *Bally Total Fitness Corp. v. Jackson, 53 S.W.3d 352, 352 (Tex. 2001)*. An exception exists for certain interlocutory orders. *See TEX. CIV. PRAC. & REM. CODE § 51.014(a)*; *Jackson, 53 S.W.3d at 355*. In relevant part, *section 51.014(a)* provides that

> A person may appeal from an interlocutory order of a district court, county court at law, or county court that:
>
> . . .

> (8) grants or denies a plea to the jurisdiction by a governmental unit . . . ; [or]
>
> . . .
>
> [*93] (9) denies all or part of the relief sought by a motion under *Section 74.351(b)*, except that an appeal may not be taken from an order granting an extension under *Section 74.351*.

*TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8), (9)*. *Section 74.351(b)*, which *section 51.014(a)(9)* references, specifies that a court must dismiss a health [**8] care liability claim if the plaintiff does not timely serve an expert report and the defendant physician or health care provider properly objects. *See id. § 74.351(b)*.

When an interlocutory appeal is taken pursuant to *section 51.014(a)*, the court of appeals' judgment ordinarily is conclusive. *See TEX. GOV'T CODE § 22.225(b)(3)*. But we may consider an interlocutory appeal when the court of appeals' decision conflicts with the decision of another court of appeals on a material issue of law. *Id. §§ 22.001(a)(2), (e)*; *22.225(c)*. This case presents an issue on which the courts of appeals are in conflict: May an appellate court consider on interlocutory appeal whether a governmental entity has immunity when the trial court did not address the issue first. *Compare* S.W.3d. at ("[W]e hold that the weight of authority precludes our consideration on interlocutory appeal of jurisdictional challenges not presented to or ruled on by the trial court."), *with Fort Bend Cnty. Toll Road Auth. v. Olivares, 316 S.W.3d 114, 118 (Tex. App.--Houston [14th Dist.] 2010, no pet.)* ("An appellate court must consider challenges to the trial court's subject-matter jurisdiction on interlocutory appeal, regardless [**9] of whether such challenges were presented to or determined by the trial court."). We have jurisdiction to resolve the conflict. *TEX. GOV'T CODE § 22.001(a)(2)*.

## III. Sovereign Immunity

### A. Nature of Immunity

The doctrine of sovereign immunity derives from the common law and has long been part of Texas jurisprudence. *See Hosner v. De Young, 1 Tex. 764, 769 (1847)* (holding that the State could not be sued in her own courts absent her consent "and then only in the manner indicated"); *see also City of Dallas v. Albert, 354 S.W.3d 368, 373 (Tex. 2011)* ("[The] boundaries [of sovereign immunity] are established by the judiciary, but we have consistently held that waivers of it are the prerogative of the Legislature.").

Sovereign immunity in Texas embodies two concepts: immunity from liability and immunity from suit. *Albert, 354 S.W.3d at 373*. Immunity from liability protects governmental entities from judgments, while immunity from suit completely bars actions against those entities unless the Legislature expressly consents to suit. *Reata Constr. Corp. v. City of Dallas, 197 S.W.3d 371, 374 (Tex. 2006)*; *Tooke v. City of Mexia, 197 S.W.3d 325, 332 (Tex. 2006)* ("[I]mmunity from suit . . . bars suit [**10] against [a governmental] entity altogether."); *Wichita Falls State Hosp. v. Taylor, 106 S.W.3d 692, 696 (Tex. 2003)* ("Unlike immunity from suit, immunity from liability does not affect a court's jurisdiction to hear a case and cannot be raised in a plea to the jurisdiction."); *Tex. Natural Res. Conservation Comm'n v. IT-Davy, 74 S.W.3d 849, 857 (Tex. 2002)* ("We again reaffirm that it is the Legislature's sole province to waive or abrogate sovereign immunity."); *Tex. Dep't of Transp. v. Jones, 8 S.W.3d 636, 638 (Tex. 1999)* (per curiam).[2]

> 2 In this case we address immunity from suit, so references to immunity will be references only to immunity from suit unless specified otherwise.

[*94] The Legislature has waived governmental entities' immunity from certain claims by means of the Tort Claims Act (TCA). *See TEX. CIV. PRAC. & REM. CODE §§ 101.001-.109*. But the TCA embodies only limited waivers of sovereign immunity; it does not abolish it. *See Kerrville State Hosp. v. Clark, 923 S.W.2d 582, 584 (Tex. 1996)*.

### B. Immunity and Interlocutory Appeals

Referencing our decision in *Waco Independent School District v. Gibson, 22 S.W.3d 849, 851 (Tex. 2000)*, the Hospital argues that immunity from suit is an [**11] issue of subject-matter jurisdiction that may be raised for the first time on interlocutory appeal in the same manner as standing and ripeness. Conversely, the Blacks argue that *Gibson* is distinguishable and other cases cited by the Hospital do not support its position because they involved either appeals from final judgments or interlocutory appeals in which the trial court had granted or denied a plea to the jurisdiction.

In *Gibson*, the trial court granted, in part, Waco Independent School District's (WISD) motion to dismiss for want of jurisdiction. *22 S.W.3d at 851*. The motion was based on WISD's claim that the Gibsons failed to exhaust their administrative remedies before filing suit. *Id*. The Gibsons filed an interlocutory appeal. *Id*. WISD responded not only by re-urging its argument concerning exhaustion of remedies, but also by challenging the trial court's jurisdiction on standing and ripeness grounds. *See id. at 851*. The court of appeals refused to address WISD's standing and ripeness arguments, reasoning that those

issues were not preserved for appeal because WISD had not presented them to the trial court in its motion to dismiss. *Id*. This Court reversed:

> [T]he court [of appeals] [**12] concluded that standing and ripeness were not properly preserved for its review. We disagree. We decided in [*Texas Association of Business v. Texas Air Control Board, 852 S.W.2d 440, 445 (Tex. 1993)]* that because subject matter jurisdiction is essential to the authority of a court to decide a case, it cannot be waived and may be raised for the first time on appeal.

*Id*.

The Blacks are correct that *Gibson* does not precisely square with the facts and posture of this case. *Gibson* involved an interlocutory appeal from a trial court order granting a plea to the jurisdiction, whereas here no jurisdictional argument was presented to or ruled on by the trial court. *Compare id. at 851*, *with* S.W.3d at . The jurisdictional issues in *Gibson* were also different: there the questions concerned standing and ripeness rather than immunity. *See Gibson, 22 S.W.3d at 851*. Further, in *Gibson* the school district pled that the Gibsons' claims were not ripe and that the Gibsons did not have standing. *Id*. But we disagree that these differences dictate a different outcome here.

The court of appeals reasoned that *section 51.014(a)* precluded it from reviewing an immunity claim that was neither raised nor ruled [**13] upon in the trial court. *See* S.W.3d . The Hospital argues that this reasoning misapprehends the analysis regarding *section 51.014(a)* because the statute does not supplant the constitutional requirement that courts must have jurisdiction to adjudicate a dispute. We agree with the Hospital. The inquiry is not whether *section 51.014(a) grants* appellate courts authority to review an immunity claim; rather, it is whether *section 51.014(a) divests* appellate courts of such authority. We conclude that it does not.

[*95] We have said on numerous occasions that sovereign immunity deprives courts of subject-matter jurisdiction. *See, e.g., Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225-26 (Tex. 2004)*; *Jones, 8 S.W.3d at 638*; *see also State v. Lueck, 290 S.W.3d 876, 880 (Tex. 2009)* (recognizing that a plea to the jurisdiction properly presents the immunity issue). It has been suggested that while immunity *implicates* subject-matter jurisdiction, it does not necessarily *equate* to a lack of subject-matter jurisdiction. *See Reata, 197 S.W.3d at 381* ("[S]overeign immunity includes concerns about both subject-matter and personal jurisdiction but is identical to neither.") (Brister, J., [**14] concurring). The dissent echoes that theme today. But regardless of whether immunity equates to a lack of subject-matter jurisdiction for all purposes, it implicates a court's subject-matter jurisdiction over pending claims. So if a governmental entity validly asserts that it is immune from a pending claim, any court decision regarding that claim is advisory to the extent it addresses issues other than immunity, and the Texas Constitution does not afford courts jurisdiction to make advisory decisions or issue advisory opinions. *Valley Baptist Med. Ctr. v. Gonzalez, 33 S.W.3d 821, 822 (Tex. 2000)* (per curiam) ("Under *article II, section 1 of the Texas Constitution*, courts have no jurisdiction to issue advisory opinions."); *see also TEX. CONST. art. IV, §§ 1, 22* (empowering the attorney general, as part of the executive department of government, to issue advisory opinions to the governor and other officials).

*Section 51.014(a)* expands the jurisdiction of courts of appeals. It specifies circumstances in which a litigant may immediately appeal from an order that would otherwise be unappealable because a final judgment has not been rendered in the matter. *See TEX. CIV. PRAC. & REM. CODE § 51.014(a)*; [**15] *see also Cherokee Water Co. v. Ross, 698 S.W.2d 363, 365 (Tex. 1985)* (orig. proceeding) (per curiam) ("Unless there is a statute specifically authorizing an interlocutory appeal, the Texas appellate courts have jurisdiction only over final judgments."). Because *section 51.014(a)* is a limited exception to the general rule that a party may appeal only from final judgments or orders, it is strictly construed. *See Bally, 53 S.W.3d at 355*. Strictly construing a statute, however, does not call for reading restrictions into it that violate constitutional principles. The court of appeals effectively construed *section 51.014(a)* to require appellate courts to address the merits of cases without regard to whether the courts have jurisdiction. That construction violates constitutional principles. *TEX. CONST. art. II, § 1*. But *section 51.014(a)* can be construed in a way so that it does not conflict with the Constitution. *See Stockton v. Offenbach, 336 S.W.3d 610, 618 (Tex. 2011)*; *Brooks v. Northglen Ass'n, 141 S.W.3d 158, 169 (Tex. 2004)*. *See also TEX. GOV'T CODE § 311.021(1)* (specifying that the Legislature intends statutes to comply with the Constitution). We hold that if immunity is first asserted [**16] on interlocutory appeal, *section 51.014(a)* does not preclude the appellate court from having to consider the issue at the outset in order to determine whether it has jurisdiction to address the merits. We disapprove of those cases in which courts of appeals have held differently.[3]

3 *E.g., Clear Lake City Water Auth. v. Friendswood Dev. Co., 256 S.W.3d 735, 747 n.14 (Tex. App.--Houston [14th Dist.] 2008, pet. dism'd)*; *City of Celina v. Dynavest Joint Venture, 253 S.W.3d 399, 404 (Tex. App.--Austin 2008, no*

> *pet.)*; *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia, 244 S.W.3d 455, 461-62 (Tex. App.--Dallas 2007), aff'd on other grounds, 324 S.W.3d 544 (Tex. 2010)*; *Kinney Cnty. Groundwater Conservation Dist. v. Boulware, 238 S.W.3d 452, 461 (Tex. App.--San Antonio 2007, no pet.)*; *Austin Indep. Sch. Dist. v. Lowery, 212 S.W.3d 827, 834 (Tex. App.--Austin 2006, pet. denied)*; *Brenham Hous. Auth. v. Davies, 158 S.W.3d 53, 61 (Tex. App.--Houston [14th Dist.] 2005, no pet.)*; *City of Dallas v. First Trade Union Sav. Bank, 133 S.W.3d 680, 687-88 (Tex. App.--Dallas 2003, pet. denied)*.

[*96] In addition to the constitutional concerns set out above, we note a practical significance to precluding appellate [**17] review of immunity on interlocutory appeal: precluding such review would be inconsistent with the purpose of *section 51.014(a)*. If we agreed with the court of appeals' reasoning--as the Blacks ask us to do and the dissent contends we should do--then on remand the Hospital could assert immunity and file a plea to the jurisdiction. If its plea were denied the Hospital could file another interlocutory appeal. *See TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8)*. Such a process would work against the main purpose of the interlocutory appeal statute, which is to increase efficiency of the judicial process. *See Tex. A&M Univ. Sys. v. Koseoglu, 233 S.W.3d 835, 845 (Tex. 2007)*.

But as we have previously acknowledged, a plaintiff may not have had fair opportunity to address jurisdictional issues by amending its pleadings or developing the record when the jurisdictional issues were not raised in the trial court. *See Gibson, 22 S.W.3d at 853* (recognizing that safeguards are necessary to protect a plaintiff when an appellate court considers an issue of subject-matter jurisdiction in the first instance because the plaintiff has not had an opportunity to amend its pleadings, but concluding that the Gibsons [**18] could not show their claim was ripe even with "every available opportunity to generate record evidence opposing WISD's challenges"). Under such circumstances appellate courts must construe the pleadings in favor of the party asserting jurisdiction, and, if necessary, review the record for evidence supporting jurisdiction. *Tex. Ass'n of Bus., 852 S.W.2d at 446*. In some instances the pleadings or record may conclusively negate the existence of jurisdiction, in which case the suit should be dismissed. *See Miranda, 133 S.W.3d at 227* ("If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend."). But if the pleadings and record neither demonstrate jurisdiction nor conclusively negate it, then in order to obtain dismissal of the plaintiff's claim, the defendant entity has the burden to show either that the plaintiff failed to show jurisdiction despite having had full and fair opportunity in the trial court to develop the record and amend the pleadings; or, if such opportunity was not given, that the plaintiff would be unable to show the existence of jurisdiction if the cause [**19] were remanded to the trial court and such opportunity afforded. If the governmental entity meets this burden, then the appellate court should dismiss the plaintiff's case. *See Koseoglu, 233 S.W.3d at 840* ("[W]e agree that Koseoglu deserves the opportunity to amend his pleadings if the defects can be cured. But Koseoglu's pleading defects cannot be cured, and he has made no suggestion as to how to cure the jurisdictional defect."); *Gibson, 22 S.W.3d at 853* ("With every available opportunity to generate record evidence opposing WISD's challenges, the Gibsons could not have done so because the evidence required to do so did not exist."). If, however, the governmental entity does not meet this burden, the appellate court should remand the case to the trial court for further proceedings. [*97] *See Westbrook v. Penley, 231 S.W.3d 389, 395 (Tex. 2007)* ("If the pleadings are insufficient to establish jurisdiction but do not affirmatively demonstrate an incurable defect, the plaintiff should be afforded an opportunity to replead."); *Cnty. of Cameron v. Brown, 80 S.W.3d 549, 559 (Tex. 2002)* (remanding a case to the trial court for repleading when the pleadings failed to show jurisdiction but did not [**20] affirmatively demonstrate an incurable jurisdictional defect).

**C. Response to the Dissent**

The dissent urges that we fully re-examine the basis for our numerous prior statements that immunity deprives courts of subject-matter jurisdiction.[4] What the dissent effectively urges is a change in the nature of immunity in Texas, and in the relationship between the legislative and judicial branches of government regarding management of the public fisc. That is a significant issue, but the parties did not raise it in the courts below or this Court. Addressing it would take us beyond what is necessary to decide this appeal and we decline to do so, except to the extent it is addressed by our opinion and holding.

> 4 *See Tex. Dep't of Ins. v. Reconveyance Servs., Inc., 306 S.W.3d 256, 258 (Tex. 2010)* (per curiam); *Univ. of Tex. at El Paso v. Herrera, 322 S.W.3d 192, 202 (Tex. 2010)*; *Lueck, 290 S.W.3d at 880-81*; *Koseoglu, 233 S.W.3d at 843*; *State v. Shumake, 199 S.W.3d 279, 283 (Tex. 2006)*; *Reata, 197 S.W.3d at 374*; *Harris Cnty. v. Sykes, 136 S.W.3d 635, 638 (Tex. 2004)*; *Miranda, 133 S.W.3d at 225-26*; *Hoff v. Nueces Cnty., 153 S.W.3d 45, 48 (Tex. 2004)* (per curiam); *Dallas Area Rapid Transit v. Whitley, 104 S.W.3d 540, 542 (Tex. 2003)*; [**21] *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez, 82*

*S.W.3d 322, 327 (Tex. 2002)*; *IT-Davy, 74 S.W.3d at 855*; *Dep't of Transp. v. Garza, 70 S.W.3d 802, 803 (Tex. 2002)*; *Travis Cnty. v. Pelzel & Assocs., Inc., 77 S.W.3d 246, 248 (Tex. 2002), superseded on other grounds by statute as recognized in, Tooke, 197 S.W.3d at 342*; *Tex. Natural Res. Conservation Comm'n v. White, 46 S.W.3d 864, 866 (Tex. 2001)*; *Tex. Dep't of Criminal Justice v. Miller, 51 S.W.3d 583, 585 (Tex. 2001)*; *Kinnear v. Tex. Comm'n on Human Rights ex rel. Hale, 14 S.W.3d 299, 300 (Tex. 2000)* (per curiam).

**IV. The Blacks' Claim**

**A. The Tort Claims Act**

The court of appeals did not address the Hospital's claim of immunity. Rather than remanding the case to the court of appeals for it to do so, however, we address the issue in the interest of judicial economy. *See TEX. R. APP. P. 53.4*; *Reid Road Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd., 337 S.W.3d 846, 855 (Tex. 2011)*.

As relevant to the Blacks' claim against the Hospital, the TCA provides that a governmental unit is liable for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit [**22] would, were it a private person, be liable to the claimant according to Texas law." *TEX. CIV. PRAC. & REM. CODE § 101.021(2)*. *Section 101.021(2)* waives immunity for claims based upon the "use" of tangible personal property only when the governmental unit itself uses the property. *See id.*; *San Antonio State Hosp. v. Cowan, 128 S.W.3d 244, 245-46 (Tex. 2004)*. A governmental unit does not "use" property within the meaning of the TCA when it merely allows someone else to use it. *Cowan, 128 S.W.3d at 246*; *see Dallas Cnty. v. Posey, 290 S.W.3d 869, 871 (Tex. 2009)*. Immunity is waived for claims based on a "condition" of tangible property if the condition proximately causes personal injury or death. *See TEX. CIV. PRAC. & REM. CODE § 101.021(2)*; *Posey, 290 S.W.3d at 872*; *Dallas Cnty. Mental Health & Mental Retardation v. Bossley, 968 S.W.2d 339, 343 (Tex. 1998)*. A condition does not proximately [*98] cause an injury or death if it does no more than furnish the means to make injury or death possible; that is, immunity is waived only if the condition (1) poses a hazard in the intended and ordinary use of the property and (2) actually causes an injury or death. *See Posey, 290 S.W.3d at 871, 873*; *Bossley, 968 S.W.2d at 343*. [**23] The TCA does not waive immunity for claims arising from intentional torts. *See TEX. CIV. PRAC. & REM. CODE § 101.057(2)* ("This chapter does not apply to a claim . . . arising out of assault, battery, . . . or any other intentional tort.").

**B. Was the Hospital's Immunity Waived?**

The Hospital contends the Blacks' allegations that it provided or failed to prohibit access to a plastic bag, or that a Hospital employee either murdered Travis or assisted his suicide, do not fit within the TCA's limited waiver of immunity, even if they are true. The Blacks disagree. They emphasize that the Hospital's policy classified the plastic bag as inherently dangerous in an inpatient psychiatric setting. The Blacks argue that their pleadings assert the Hospital was negligent in providing, furnishing, or allowing Travis to access the bag; its negligence involved a use or condition of tangible personal property; and the negligence proximately caused Travis's death. They suggest such pleadings sufficiently allege a claim within the TCA's waiver of immunity. We disagree with the Blacks.

Neither providing nor prohibiting access to the bag was a "use." The Blacks' "use" argument erroneously equates providing, [**24] furnishing, or allowing access to tangible property with putting or bringing the property into action or service or applying the property to a given purpose. *See Cowan, 128 S.W.3d at 245-46* (explaining that "use" means "to put or bring into action or service; to employ for or apply to a given purpose" (citations omitted)). Comparing *Cowan* to the case at bar illustrates this point. *Cowan* involved the death of James Roy Cowan, a psychiatric patient at San Antonio State Hospital. *Id. at 245*. The hospital allowed Cowan access to suspenders and a walker, which Cowan then used in causing his own death. *Id*. We held that the hospital's immunity was not waived by the TCA because the hospital did not "use" the suspenders and walker within the meaning of *section 101.021(2)* by merely giving them to Cowan. *See id. at 246* ("[T]he Hospital's immunity can be waived only for its own use of Cowan's walker and suspenders, and not by Cowan's use of them."). Here, the Blacks allege the Hospital allowed Travis access to the plastic bag that was used in causing his death. These allegations do not present a claim for which the Hospital's immunity is waived by the TCA because, as we held in *Cowan*, a hospital [**25] does not "use" tangible personal property (*e.g.*, a plastic bag) within the meaning of *section 101.021(2)* by merely providing, furnishing, or allowing a patient access to it.

The Blacks also allege that a "condition" of the plastic bag caused Travis's death. They emphasize the plastic bag was a contraband item and inherently dangerous in the inpatient psychiatric setting. These facts, they argue, bring their claim under the TCA's waiver of immunity pursuant to our decision in *Lowe v. Texas Tech University, 540 S.W.2d 297 (Tex. 1966)*. The Hospital responds that the Blacks' reliance on *Lowe* is misplaced because in that case the property was being put to its intended and ordinary use when a defect in the property caused an injury. The Hospital argues that because the plastic bag was not being put to its ordinary, intended use when it caused

Travis's [*99] death, the Hospital's immunity is not waived for a claim based on the alleged condition of the bag. The Hospital is correct.

In *Lowe*, the plaintiff alleged that he injured his knee playing football after the University's football coach ordered him to remove his knee brace and reenter a game without it. *Id. at 302* (Greenhill, C.J., concurring). [**26] The Court concluded that the knee brace was an integral part of Lowe's football uniform and held that the TCA waived the University's immunity because the uniform it gave Lowe was defective due to its lack of a knee brace. *See id. at 300* (majority opinion). We subsequently limited the precedential value of *Lowe* "to claims in which a plaintiff alleges that a state actor has provided property that lacks an integral safety component and that lack of this integral component led to the plaintiff's injuries." *Kerrville State Hosp. v. Clark, 923 S.W.2d 582, 585 (Tex. 1996)*.

Here, the Blacks argue that the Hospital's act of furnishing Travis with a plastic bag considered inherently dangerous in the inpatient psychiatric setting was analogous to giving him property that lacked an integral safety component. They support this assertion by pointing out that we framed the issue in *Cowan* as "whether merely providing someone with personal property that is *not itself inherently unsafe* is a 'use' within the meaning of the Act." *128 S.W.3d at 245* (emphasis added). But, as the Hospital maintains, the Blacks' argument fails to recognize that the TCA waives immunity for an inherently dangerous condition [**27] of tangible personal property only if the condition poses a hazard when the property is put to its intended and ordinary use, which the plastic bag was not. *See Posey, 290 S.W.3d at 872*. In the circumstances of Travis's care at the Hospital, any inherently dangerous aspects of the plastic bag were at most a means to make his death possible. *Cf. id*. (reasoning that exposed telephone wires did not proximately cause an inmate's death because the exposed wires were no more than a condition of the property that the inmate used to form a ligature to take his life).

The Blacks alternatively urge that the Hospital's negligence resulted in Travis's death by assisted suicide or murder. Their argument focuses on the possibility that a Hospital employee assisted Travis in committing suicide, and they contend that aiding suicide is not an intentional tort within the meaning of *section 101.057*. *See TEX. CIV. PRAC. & REM. CODE § 101.057(2)* (providing that the TCA does not apply to claims arising out of intentional torts). The Hospital's response is twofold. It first asserts that the TCA waives immunity only for certain torts, and assisted suicide is a crime, not a tort. Second, the Hospital argues [**28] that even if assisted suicide falls within the ambit of the TCA, it is more akin to an intentional tort than negligence because it requires an intent to cause injury or death, *see TEX. PENAL CODE § 22.08(a)*, and *section 101.057(2)* specifies that the Hospital's immunity is not waived for such a claim. *See TEX. CIV. PRAC. & REM. CODE § 101.057(2)*. We first address the Hospital's second argument because it is dispositive.

A person commits the criminal offense of aiding suicide if "with intent to promote or assist the commission of suicide by another, he aids or attempts to aid the other to commit suicide." *TEX. PENAL CODE § 22.08(a)*. The statute proscribes action taken with the intent that a suicide result. Actions taken with the specific intent to inflict harm are characterized as intentional torts. *See Reed Tool Co. v. Copelin, 689 S.W.2d 404, 406 (Tex. 1985)*. Thus, assuming, without deciding, that assisting [*100] suicide or murder is a tort, it requires actions taken with intent to cause harm and is an intentional tort. The Hospital's immunity as to such a tort is not waived. *See City of Laredo v. Nuno, 94 S.W.3d 786, 789 (Tex. App.--San Antonio 2002, no pet.)* (holding that *section 101.057(2)* [**29] applied to claims against a police officer in part because the officer's conduct was referable to an intentional decision to seize a vehicle illegally).

In sum, even construed in their favor, the Blacks' pleadings do not allege a cause of action within the TCA's waiver of the Hospital's immunity. And the record does not contain any evidence to support jurisdiction.

The Hospital argues that if we reach this point in our analysis, we should dismiss the Blacks' claims with prejudice because they failed to carry their burden to show the trial court had jurisdiction. *See, e.g., Miranda, 133 S.W.3d at 226-27*; *City of Garland v. Louton, 691 S.W.2d 603, 605 (Tex. 1985)*. But because the Hospital made its immunity argument for the first time in the court of appeals, the case will be remanded for further proceedings on the jurisdictional issue unless the Hospital shows that one of three situations exist: (1) the Blacks' pleadings or the record conclusively negate jurisdiction; (2) the Blacks had a full and fair opportunity in the trial court to develop the record and amend their pleadings to show jurisdiction yet failed to do so; or (3) if the Blacks did not have such an opportunity, they cannot [**30] show jurisdiction even if the case is remanded to the trial court and they are given the opportunity to develop the record as to jurisdiction and amend their pleadings. We next look to see whether the Hospital has conclusively shown one of the above situations.

The Blacks contend that they did not have a fair opportunity in the trial court to develop the record as to jurisdiction. They note that there have been no oral depositions of the parties and they have been unable to explore the basis of statements contained in a report based on the Texas Department of Family and Protective Service's investigation into Travis's death--particularly

statements of another Hospital patient who claimed to have seen a Hospital staff member putting a bag over Travis's head.

We agree with the Blacks, in part. The Hospital has not shown conclusively by this record either that they had a full and fair opportunity in the trial court to develop the record as to jurisdiction and amend their pleadings, or that if the case is remanded to the trial court for further proceedings they will be unable to show jurisdiction. Thus, the cause will be remanded to the trial court for further proceedings.

**VI. Conclusion**

The [**31] judgment of the court of appeals is affirmed. The Blacks' claims against the Hospital are remanded to the trial court for further proceedings consistent with this opinion.

Phil Johnson

Justice

**OPINION DELIVERED**: August 31, 2012

**CONCUR BY:** Nathan L. Hecht; Debra H. Lehrmann

**CONCUR**

We recently wrote that "we, like the U.S. Supreme Court, have recognized that our sometimes intemperate use of the term 'jurisdictional' has caused problems."[1] All we decide in this case is [*101] whether an appellate court in an interlocutory appeal permitted by statute can decide an issue of governmental immunity from suit outside the scope of the appeal. The Court answers yes and wisely stops there.

1 *In re United Servs. Auto. Ass'n, 307 S.W.3d 299, 306 (Tex. 2010)* (footnote omitted).

Rusk State Hospital appealed from the trial court's denial of its motion to dismiss this health care liability claim for want of an adequate expert report required by the Medical Liability Act ("MLA"),[2] but also argued that its governmental immunity from suit has not been waived by the Texas Tort Claims Act ("TTCA"),[3] an argument it did not make in the trial court. The statute permitting this interlocutory appeal from the denial of the Hospital's motion to [**32] dismiss does not extend to issues of immunity,[4] and the court of appeals, mindful that its jurisdiction over interlocutory appeals is limited to that provided by statute,[5] refused to consider the Hospital's TTCA argument, deciding only that the trial court erred in failing to dismiss some of the claims against the Hospital on its motion to dismiss under the MLA.[6] But immunity from suit implicates subject-matter jurisdiction, as the Court states, and thus "involves a court's power to hear a case",[7] which must be ascertained by every court in every case.[8] A statute authorizing an interlocutory appeal does not empower a court to decide issues in a case over which it lacks subject-matter jurisdiction.

2 *TEX. CIV. PRAC. & REM. CODE § 74.351*.
3 *Id. §§ 101.021, 101.025*.
4 *Id. § 51.014(a)(9)* (providing that a person may appeal from an interlocutory order that "denies all or part of the relief sought by a motion under *Section 74.351(b)*").
5 *Cherokee Water Co. v. Ross, 698 S.W.2d 363, 365 (Tex. 1985)* ("Unless there is a statute specifically authorizing an interlocutory appeal, the Texas appellate courts have jurisdiction only over final judgments.").
6 S.W.3d (Tex. App.--Tyler 2010).
7 *Tellez v. City of Socorro, 226 S.W.3d 413, 413 (Tex. 2007)* [**33] (per curiam) (quoting *United States v. Cotton, 535 U.S. 625, 630, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002))*.
8 *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser, 140 S.W.3d 351, 358 (Tex. 2004)* ("[A] court is *obliged* to ascertain that subject matter jurisdiction exists regardless of whether the parties have questioned it." (emphasis in original)).

For two reasons, I agree that immunity from suit "sufficiently partakes of the nature of a jurisdictional bar"[9] that it must be considered on interlocutory appeal, even if not raised in the trial court. One is that if immunity is ultimately established, the decision on the merits of the interlocutory appeal will have been advisory at the time it was rendered and therefore outside the court of appeals' jurisdiction.[10] The other reason is practical: an interlocutory appeal is also permitted from a denial of immunity,[11] and it would conserve time and expense to decide the issue in one interlocutory appeal instead of two. Because an appellate court *can* decide an immunity issue beyond the scope of an interlocutory appeal, and there are reasons why it *should*, I agree with the Court that it *must* [*102] do so unless, as in this case, the record has not been sufficiently developed.

9 *Edelman v. Jordan, 415 U.S. 651, 678, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974)* [**34] (referring to *Eleventh Amendment* immunity).
10 *Valley Baptist Med. Ctr. v. Gonzalez, 33 S.W.3d 821, 822 (Tex. 2000)* (per curiam) ("Under *article II, section 1 of the Texas Constitution*, courts have no jurisdiction to issue advisory opinions.").
11 *TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8)* (providing that a person may appeal from an interlocutory order that "grants or denies a plea to

the jurisdiction by a governmental unit"); *see Tex. A&M Univ. Sys. v. Koseoglu, 233 S.W.3d 835, 843 (Tex. 2007)* ("Pleas to the jurisdiction asserting sovereign immunity are the subject of *Section 51.014(a)(8)*.").

12 *8 S.W.3d 636, 638 (Tex. 1999)* (per curiam).

13 *8 S.W.3d at 639*. We have since held that a denial of immunity from suit can be immediately appealed regardless of the procedural vehicle used to raise the issue. *Tex. Dep't of Crim. Justice v. Simons, 140 S.W.3d 338, 349 (Tex. 2004)*.

But the Court does not equate immunity to a lack of subject-matter jurisdiction. The similarities between the two led us to state in *Texas Department of Transportation v. Jones* that "the law in Texas has been that absent the state's consent to suit, a trial court lacks subject matter jurisdiction."[12] But the only issue in [**35] that case was whether immunity from suit can be asserted in a plea to the jurisdiction so that the government can immediately appeal an adverse ruling.[13] *Jones* cannot fairly be read to equate immunity from suit with a lack of subject-matter jurisdiction.

There are important differences between immunity from suit and lack of subject-matter jurisdiction.[14] For one thing, the government can waive immunity from suit, either for broad classes of claims or on a case-by-case basis.[15] But it cannot waive subject-matter jurisdiction, for example, by consenting to suit on a claim beyond the court's jurisdiction. For another, while a court is obliged to examine its subject-matter jurisdiction on its own in every case, we have never suggested that a court should raise immunity on its own whenever the government is sued. This case is more typical: not only did the trial court not raise immunity, the government itself did not raise the issue and has no explanation why.

14 *See Reata Constr. Corp. v. City of Dallas, 197 S.W.3d 371, 381 (Tex. 2006)* ("[S]overeign immunity includes concerns about both subject matter and personal jurisdiction, but is identical to neither.") (Brister, J., concurring).

15 *TEX. CIV. PRAC. & REM. CODE §§ 107.001-.004*; [**36] *see also Reata, 197 S.W.3d at 378* (a city's decision to file suit for damages "encompassed a decision to leave its sphere of immunity from suit" for monetary claims against the city that are "germane to, connected with, and properly defensive to" the city's affirmative claims; the city was not immune to monetary claims against it to the extent those claims would offset the city's affirmative claims).

"'Jurisdiction,' it has been observed, 'is a word of many, too many, meanings.'"[16] Not all of them have been, or can be, attributed to immunity from suit. With that understanding, I join in the Court's opinion.

16 *Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 90, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)* (quoting *United States v. Vanness, 85 F.3d 661, 663 n.2, 318 U.S. App. D.C. 95 (D.C. Cir. 1996))*; *see also Morales v. Liberty Mut. Ins. Co., 241 S.W.3d 514, 516 n.1 (Tex. 2007)* ("Of course, 'jurisdiction' has many meanings, and both courts and legislators often use it to mean something other than a court's power to adjudicate a case. Both the United States Supreme Court and this Court have cautioned against assuming 'jurisdiction' means 'subject-matter jurisdiction' due to the stark consequences that accompany the latter term." (citations [**37] omitted)).

Nathan L. Hecht

Justice

OPINION DELIVERED: August 31, 2012

**DISSENT BY:** Debra H. Lehrmann

**DISSENT**

Although I concur that this case should be remanded to the trial court, I respectfully dissent, in part, from the Court's judgment. While I agree that subject matter jurisdiction issues such as mootness and ripeness must be considered by an appellate court even if they were not first presented to the trial court, I disagree that sovereign immunity is of the same character. While sovereign immunity [*103] does, as the Court notes, implicate subject matter jurisdiction, it also implicates personal jurisdiction. However, acknowledging that sovereign immunity implicates subject matter jurisdiction does not mean that the harsh rules associated with that label necessarily apply. Because we should look to the jurisdictional rules individually, applying them according to the purpose behind the doctrine of sovereign immunity, I would require governmental entities to raise the issue first in the trial court.

**I. SOVEREIGN IMMUNITY**

The Court rests its decision on the notion that sovereign immunity "implicates subject matter jurisdiction," but carefully avoids squarely determining that it is an issue of subject matter jurisdiction. [**38] I write separately to explain why I would hold that it is not, were we to reach the issue.

This Court first recognized sovereign immunity in 1847, holding that "no State can be sued in her own courts without her consent and then only in the manner indicat-

ed." *Hosner v. De Young, 1 Tex. 764, 769 (1847)*. The Court has frequently referred to sovereign immunity as jurisdictional. *See, e.g., Anderson, Clayton & Co. v. State ex rel. Allred, 122 Tex. 530, 62 S.W.2d 107, 110 (Tex. 1933)* (holding that when the State waived immunity by filing suit, the trial court "acquired jurisdiction of the parties and subject-matter"); *Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 224-26 (Tex. 2004)*. We have often held that sovereign immunity is properly asserted in the trial court by a plea to the jurisdiction. *See, e.g., Miranda, 133 S.W.3d at 225-26*; *Tex. Dep't of Transp. v. Jones, 8 S.W.3d 636, 638-39 (Tex. 1999)* (per curiam).

Although we have consistently referred to sovereign immunity as jurisdictional, we have not clearly defined that term. Subject matter jurisdiction and personal jurisdiction are jurisdictional; a court cannot render judgment without both. *CSR Ltd. v. Link, 925 S.W.2d 591, 594 (Tex. 1996)*. [**39] Subject matter jurisdiction involves a court's power to hear and resolve the legal and factual issues of a class of cases. *Middleton v. Murff, 689 S.W.2d 212, 213 (Tex. 1985)* (per curiam) (citing *Deen v. Kirk, 508 S.W.2d 70, 72 (Tex. 1974))*. Subject matter jurisdiction cannot be waived or conferred by agreement, can be raised at any time, and must be considered by a court sua sponte. *Reata Constr. Corp. v. City of Dallas, 197 S.W.3d 371, 379 (Tex. 2006)* (Brister, J., concurring) (citing *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser, 140 S.W.3d 351, 358 (Tex. 2004))*; *see also Waco Indep. Sch. Dist. v. Gibson, 22 S.W.3d 849, 850 (Tex. 2000)*. In contrast, personal jurisdiction involves a court's power to bind a particular party. *CSR Ltd., 925 S.W.2d at 594*. Unlike subject matter jurisdiction, personal jurisdiction can be voluntarily waived by an appearance. *Reata, 197 S.W.3d at 379* (Brister, J., concurring) (citing *Hilburn v. Jennings, 698 S.W.2d 99, 100 (Tex. 1985))*.

In the last decade, we have sometimes referred to sovereign immunity as a matter of subject matter jurisdiction, beginning with a per curiam opinion in *Texas Department of Transportation v. Jones, 8 S.W.3d at 639* [**40] (holding that the court of appeals had to determine whether the driver's pleadings in a suit for damages stated a claim under the Texas Tort Claims Act before affirming the trial court's denial of the Department of Transportation's plea to the jurisdiction); *see also, e.g., Univ. of Tex. at El Paso v. Herrera, 322 S.W.3d 192, 202 (Tex. 2010)*; *Reata, 197 S.W.3d at 374*; *Miranda, 133 S.W.3d at 225-26*. However, these cases did not involve a governmental unit attempting [*104] to raise sovereign immunity for the first time on interlocutory appeal; instead, in every case the governmental unit had raised the issue of sovereign immunity to the trial court. *See Herrera, 322 S.W.3d at 193*; *Tex. Dep't of Ins. v. Reconveyance Servs., Inc., 306 S.W.3d 256, 258 (Tex. 2010)* (per curiam); *State v. Lueck, 290 S.W.3d 876, 879 (Tex. 2009)*; *State v. Shumake, 199 S.W.3d 279, 282 (Tex. 2006)*; *Hoff v. Nueces Cnty., 153 S.W.3d 45, 47 (Tex. 2004)* (per curiam); *Reata, 197 S.W.3d at 373*; *Harris Cnty. v. Sykes, 136 S.W.3d 635, 637 (Tex. 2004)*; *Miranda, 133 S.W.3d at 221-22*; *Dallas Area Rapid Transit v. Whitley, 104 S.W.3d 540, 541 (Tex. 2003)*; *State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez, 82 S.W.3d 322, 325 (Tex. 2002)*; [**41] *Travis Cnty. v. Pelzel & Assocs., Inc., 77 S.W.3d 246, 247 (Tex. 2002)*; *Tex. Natural Res. Conservation Comm'n v. IT--Davy, 74 S.W.3d 849, 851 (Tex. 2002)*; *Tex. Dep't of Transp. v. Garza, 70 S.W.3d 802, 804 (Tex. 2002)*; *Tex. Dep't of Crim. Justice v. Miller, 51 S.W.3d 583, 586 (Tex. 2001)*; *Tex. Natural Res. Conservation Comm'n v. White, 46 S.W.3d 864, 866 (Tex. 2001)*; *Jones, 8 S.W.3d at 637*. Moreover, in none of these cases has the Court analyzed the legal issues involved in holding that sovereign immunity is an issue of subject matter jurisdiction.

**A. Sovereign Immunity Implicates Aspects of Both Subject Matter Jurisdiction and Personal Jurisdiction**

Characterizing an issue as subject matter jurisdiction has profound consequences. Therefore, we should be cautious when we apply that label and should not default to using it in circumstances when it is not clear that the issue is solely one of subject matter jurisdiction. I would hold that, because sovereign immunity implicates aspects of both personal jurisdiction and subject matter jurisdiction, but is identical to neither, the rules associated with subject matter jurisdiction do not apply generally. Rather, jurisdictional rules apply individually, [**42] according to the purposes underlying the doctrine of sovereign immunity. *Reata, 197 S.W.3d at 382* (Brister, J., concurring).

Although some of our recent cases have, with no analysis, referred to sovereign immunity as an issue of subject matter jurisdiction, sovereign immunity implicates elements of both personal jurisdiction and subject matter jurisdiction, and has always had its own set of jurisdictional rules. In the earliest Texas cases, sovereign immunity was addressed in terms of amenability to suit, a term borrowed from personal jurisdiction. *Reata, 197 S.W.3d at 380 & n.16* (Brister, J., concurring) ("'[I]t is one of the essential attributes of sovereignty not to be amenable to the suit of a private person without its own consent . . . .'" (quoting *Bd. of Land Comm'rs v. Walling, Dallam 524 (Tex. 1843)))*. These cases were not anomalies, as sovereign immunity has been traditionally considered a problem of personal jurisdiction. In his *Commentaries on the Laws of England*, Blackstone concluded that sovereign immunity arose from the nature of the sovereign party, not the subject matter of the case:

> Hence, it is, that no suit or action can be brought against the king, even in civil [**43] matters, because no court can have jurisdiction over him. For all jurisdiction implies superiority of power: authority to try would be vain and idle, without an authority to redress; and the sentence of a court would be contemptible, unless that court had power to command the execution of it: but, who . . . shall command the king?

1 WILLIAM BLACKSTONE, COMMENTARIES *242. The Founders also referred to sovereign immunity in terms of personal jurisdiction. *See* Caleb Nelson, *Sovereign Immunity as* [*105] *a Doctrine of Personal Jurisdiction, 115 HARV. L. REV. 1559, 1565-66 (2002)* (explaining that the Founders believed sovereign immunity was more relevant to personal jurisdiction than subject matter jurisdiction). In addressing the question of state sovereign authority, Alexander Hamilton borrowed the language of personal jurisdiction when he wrote in the Federalist Papers, "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." THE FEDERALIST NO. 81 (Alexander Hamilton); *see also, e.g., Kawasaki Steel Corp. v. Middleton, 699 S.W.2d 199, 200 (Tex. 1985)* (per curiam) (listing the defendant being "amenable to the jurisdiction of the court" [**44] as one of the elements of personal jurisdiction).

As I have noted, sovereign immunity implicates elements of both subject matter jurisdiction and personal jurisdiction. While the decision whether to compensate particular claimants may raise separation of powers concerns, implicating policy issues beyond the traditional realm of judicial proceedings, *see Tex. Parks & Wildlife Dep't v. Sawyer Trust, 354 S.W.3d 384, 401 (Tex. 2011)* (Hecht, J., concurring in part and dissenting in part), and invoking subject matter jurisdiction issues, these considerations also arise from the fact that the State is the party being sued. While it is true that the judiciary is not the proper branch of government to decide how the State should spend its money, the authority to render judgment that obliges parties to pay is not related to whether the party can or should pay. The sovereign immunity doctrine flows from the fact that the State is the party at risk--an issue more closely aligned with personal jurisdiction. At its core, there is something incongruous about saying that traditional contract and tort suits are beyond the subject matter of the judiciary simply because one party is a governmental entity. [**45] *See* Scott Dodson, *Mandatory Rules, 61 STAN. L. REV. 1, 20 (2008)* ("The primary function of state sovereign immunity--granting a state the right not to be subject to a lawsuit at the insistence of an individual--speaks to a right of a particular party, not to a limitation on the court's power to hear the case."). A suit against the State is beyond the judicial cognizance of the courts because of the State's role as a party, not because of the subject matter of the suit. Despite sometimes referring to sovereign immunity as an issue of subject matter jurisdiction, we have also held that the State no longer had immunity because it filed an affirmative claim for relief. *Reata, 197 S.W.3d at 377* (holding that the City of Dallas's decision to file suit "encompassed a decision to leave its sphere of immunity" for related claims); *see also Kinnear v. Tex. Comm'n on Human Rights, 14 S.W.3d 299, 300 (Tex. 2000)* (per curiam) (holding that the trial court had jurisdiction over claims against the State in a case where the State had filed suit); *IT--Davy, 74 S.W.3d at 861* (Hecht, J., concurring) ("[T]he State can waive immunity by filing suit."). These decisions are inconsistent with the absolute nature [**46] of subject matter jurisdiction, which cannot be waived and can be raised at any time. *See Gibson, 22 S.W.3d at 850* ("[S]ubject matter jurisdiction challenges cannot be waived, and may be raised for the first time on appeal."); Scott Dodson, *Hybridizing Jurisdiction, 99 CALIF. L. REV. 1439, 1473 (2011)* (noting that sovereign immunity lacks some features of subject matter jurisdiction). The ability of states to waive immunity or consent to suit is an important feature which is inconsistent with the characterization of sovereign immunity as an issue of subject matter jurisdiction:

> The state legislature may wish to waive immunity in an entire class of cases, such as discrimination cases. Or, the [*106] state may wish to consent to a particular lawsuit from which it would otherwise be immune. Public pressure or individualized considerations of fairness and justice may motivate a state's decision to waive or consent. On the other hand, equally important concerns for the state fisc might justify a decision not to waive immunity or consent to suit. In short, the [non-subject matter jurisdiction] characteristics of waiver and consent provide an opportunity for the states to strike a balance between [**47] the legitimate concerns of suing a state and the need for redress of injuries caused by the state. The importance of the ability to waive immunity or consent to suit supports a [non-subject matter jurisdictional] characterization.

*Dodson, Mandatory Rules, supra*, at 23 (citations omitted). It is clear that "sovereign immunity is difficult--perhaps impossible--to characterize as [subject

matter jurisdiction] because it can be waived or consented to." Dodson, *Hybridizing Jurisdiction, supra*, at 1483.

Similarly, in federal courts, sovereign immunity is not synonymous with subject matter jurisdiction. See *Idaho v. Coeur D'Alene Tribe of Idaho, 521 U.S. 261, 267, 117 S. Ct. 2028, 138 L. Ed. 2d 438 (1997)* (holding that the *Eleventh Amendment* "enacts a sovereign immunity from suit, rather than a nonwaivable limit on the Federal Judiciary's subject-matter jurisdiction"); Katherine Florey, *Insufficiently Jurisdictional: The Case Against Treating State Sovereign Immunity as an Article III Doctrine, 92 CALIF. L. REV. 1375, 1399 (2004)* ("[S]tate sovereign immunity and [subject matter] jurisdictional requirements are more different than alike."). Federal courts have recognized that states may waive their sovereign immunity, revealing [**48] an inconsistency with subject matter jurisdiction, which cannot be created by waiver or consent. *See Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 851, 106 S. Ct. 3245, 92 L. Ed. 2d 675 (1986)* (explaining that parties cannot confer subject matter jurisdiction beyond the limitations imposed by Article III by consent (citing *United States v. Griffin, 303 U.S. 226, 229, 58 S. Ct. 601, 82 L. Ed. 764 (1938)))*; *Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 238, 105 S. Ct. 3142, 87 L. Ed. 2d 171 (1985)* (noting that a State may waive its immunity and consent to suit in federal court); *Ballew v. Cont'l Airlines, Inc., 668 F.3d 777, 786 (5th Cir. 2012)* (noting that parties cannot create subject matter jurisdiction by consent or waiver (citing *Buchner v. FDIC, 981 F.2d 816, 818 (5th Cir. 1993)))*; *Elam v. Kan. City S. Ry. Co., 635 F.3d 796, 802 (5th Cir. 2011)* ("Litigants cannot bestow subject matter jurisdiction on federal courts by waiver or consent."); *Meyers ex rel. Benzing v. Tex., 410 F.3d 236, 255 (5th Cir. 2005)* ("[W]hen Texas removed this case to federal court it voluntarily invoked the jurisdiction of the federal courts and waived its immunity from suit in federal court." (citing *Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 122 S. Ct. 1640, 152 L. Ed. 2d 806 (2002)))*; Nelson, *supra*, at 1610 [**49] ("In deriving its doctrine of sovereign immunity, the [Supreme] Court has therefore mixed together two very different sorts of ideas; it has blended concepts drawn from the law of personal jurisdiction with concepts drawn from the law of subject matter jurisdiction."). One scholar summed up the difficulties inherent in federal courts treating sovereign immunity as a subject matter jurisdiction issue:

> [S]overeign immunity doctrine contains elements that are inconsistent with regarding it as a limit on subject matter jurisdiction. While parties cannot ordinarily create a basis for federal jurisdiction by consenting to litigate in federal [*107] court, a state may waive sovereign immunity both explicitly and by its conduct during litigation. A court *may* raise an *Eleventh Amendment* issue *sua sponte*; by contrast, it *must* address Article III matters, such as standing or an absence of federal question jurisdiction, as soon as they come to its attention. Congress may, when acting pursuant to its Fourteenth Amendment authority, abrogate state sovereign immunity; it has no corresponding power with respect to any other Article III doctrine. Finally, state sovereign immunity, unlike any other Article [**50] III question, is subject to a broad and important exception: under the doctrine of *Ex parte Young*, a suit for prospective injunctive relief against a state official is not considered a suit against the state and may be pursued in federal court.

*Florey, supra*, at 1379-80 (citations omitted). The ability of states to waive sovereign immunity or consent to suit is inconsistent with the characterization of sovereign immunity as a subject matter jurisdiction issue under both federal and Texas case law.

Additionally, in many states, sovereign immunity is not considered an element of subject matter jurisdiction. *See, e.g., Sea Hawk Seafoods, Inc. v. State, 215 P.3d 333, 339 (Alaska 2009)* (describing state sovereign immunity as an affirmative defense "that does not affect a court's subject-matter jurisdiction"); *Washington v. Whitaker, 317 S.C. 108, 451 S.E.2d 894, 898 (S.C. 1994)* ("[W]e overrule the antiquated rule that sovereign immunity is a jurisdictional bar and, accordingly, cannot be waived. We join those jurisdictions which hold that sovereign immunity is an affirmative defense that must be pled." (citations omitted)). Indeed, some states have held that sovereign immunity is an issue of personal jurisdiction [**51] rather than an issue of subject matter jurisdiction. *See, e.g., German v. Wis. Dep't of Transp., Div. of State Patrol, 2000 WI 62, 235 Wis. 2d 576, 612 N.W.2d 50, 55 (Wis. 2000)* ("If sovereign immunity is properly raised, then the court is without personal jurisdiction over the state."); *Data Gen. Corp. v. Cnty. of Durham, 143 N.C. App. 97, 545 S.E.2d 243, 246 (N.C. Ct. App. 2001)* ("[S]overeign immunity presents a question of personal jurisdiction rather than subject matter jurisdiction . . . ."). Sovereign immunity is far from universally considered a subject matter jurisdiction issue.

Given that sovereign immunity implicates aspects of both subject matter and personal jurisdiction, it becomes apparent that its jurisdictional rules cannot be derived simply by labeling sovereign immunity subject matter or

personal jurisdiction. Accordingly, it is time to recognize that "sovereign immunity has always had its own set of jurisdictional rules because jurisdiction over private and public parties is simply different." *Reata, 197 S.W.3d at 379* (Brister, J., concurring).

**B. The Implications of Treating Sovereign Immunity as a Subject Matter Jurisdiction Issue**

A decision that sovereign immunity presents a question of subject matter jurisdiction [**52] would have profound implications. Since subject matter jurisdiction "'cannot be conferred upon any court by consent or waiver,' a judgment [against a governmental actor] will never be considered final if the court lacked subject-matter jurisdiction." *Dubai Petrol. Co. v. Kazi, 12 S.W.3d 71, 76 (Tex. 2000)* (quoting *Fed. Underwriters Exch. v. Pugh, 141 Tex. 539, 174 S.W.2d 598, 600 (Tex. 1943))*. In *Wisconsin Department of Corrections v. Schacht*, Justice Kennedy noted problems with allowing States to belatedly assert sovereign immunity:

> [*108] [W]e allow States to proceed to judgment without facing any real risk of adverse consequences. Should the State prevail, the plaintiff would be bound by principles of res judicata. If the State were to lose, however, it could void the entire judgment simply by asserting its immunity on appeal.

*524 U.S. 381, 394, 118 S. Ct. 2047, 141 L. Ed. 2d 364 (1998)* (Kennedy, J., concurring). Even a losing plaintiff would be able to avoid the entire judgment by asserting the State's sovereign immunity on appeal. If sovereign immunity deprives the courts of subject matter jurisdiction, governmental entities could attack years-old judgments by asserting sovereign immunity because without subject matter jurisdiction, the [**53] judgments would be void. Due to the dramatic effects and perpetual uncertainty caused by characterizing an issue as one of subject matter jurisdiction, this Court in *Dubai* noted that "the modern direction of policy is to reduce the vulnerability of final judgments to attack on the ground that the tribunal lacked subject matter jurisdiction." *12 S.W.3d at 76* (quoting *RESTATEMENT (SECOND) OF JUDGMENTS § 11 cmt. e* (1982) (internal quotation marks omitted)).

**II. ASSERTING SOVEREIGN IMMUNITY ON INTERLOCUTORY APPEAL**

Generally, appellate jurisdiction exists only in cases where a court has rendered a final judgment disposing of all issues and parties. *See TEX. CIV. PRAC. & REM. CODE § 51.012*. The Legislature provided a narrow exception for interlocutory appeals in *section 51.014*, which allows them under certain circumstances, including when the trial court denies a plea to the jurisdiction by a governmental entity. *See id. § 51.014(a)(8)*; *Bally Total Fitness Corp. v. Jackson, 53 S.W.3d 352, 355 (Tex. 2001)* (noting "the Legislature's intent that *section 51.014* be strictly construed"). Our courts of appeals have repeatedly held that sovereign immunity should be raised in the trial court, and that [**54] issues not presented to the trial court on a plea to the jurisdiction may not be raised in an interlocutory appeal. *See Scott v. Alphonso Crutch LSC Charter Sch., Inc., S.W.3d , , 2010 Tex. App. LEXIS 6811 (Tex. App.--Austin 2010, pet. filed)* (mem. op.); *Scott v. Alphonso Crutch Life Support Ctr., S.W.3d , , 2009 Tex. App. LEXIS 5111 (Tex. App.--Austin 2009, pet. filed)* (mem. op.); *Clear Lake City Water Auth. v. Friendswood Dev. Co., 256 S.W.3d 735, 747 n.14 (Tex. App.--Houston [14th Dist.] 2008, pet. dism'd)*; *City of Celina v. Dynavest Joint Venture, 253 S.W.3d 399, 404 (Tex. App.--Austin 2008, no. pet.)*; *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia, 244 S.W.3d 455, 461-62 (Tex. App.--Dallas 2007), aff'd on other grounds, 324 S.W.3d 544 (Tex. 2010)*; *Kinney Cnty. Groundwater Conservation Dist. v. Boulware, 238 S.W.3d 452, 461 (Tex. App.--San Antonio 2007, no pet.)*; *Austin Indep. Sch. Dist. v. Lowery, 212 S.W.3d 827, 834 (Tex. App.--Austin 2006, pet. denied)*; *Brenham Hous. Auth. v. Davies, 158 S.W.3d 53, 61 (Tex. App.--Houston [14th Dist.] 2005, no pet.)*; *City of Dallas v. First Trade Union Sav. Bank, 133 S.W.3d 680, 687-88 (Tex. App.--Dallas 2003, pet. denied)*. *But see Tex. Dep't of Transp. v. Olivares, 316 S.W.3d 89, 95 (Tex. App.--Houston [14th Dist.] 2010, no pet.)*.

Looking [**55] to the purposes behind the doctrine of sovereign immunity for guidance, I agree with those courts of appeals that have held that an immunity defense may not be raised for the first time on appeal. First, immunity from suit protects the government from the expense involved in defending lawsuits. *Reata, 197 S.W.3d at 382* (Brister, J., concurring). Requiring the government to raise the issue of sovereign immunity in the trial court reduces [*109] such expense by avoiding ongoing, unnecessary litigation early in the process. Because sovereign immunity's modern rationale is the protection of the public fisc, it should be asserted as early as possible. *See Tooke v. City of Mexia, 197 S.W.3d 325, 331-32 (Tex. 2006)* (stating that an important purpose of sovereign immunity is "to shield the public from the costs and consequences of improvident actions of their governments"); *Wichita Falls State Hosp. v. Taylor, 106 S.W.3d 692, 695 (Tex. 2003)* (noting that states have retained immunity to "protect the public treasury"). The purpose of protecting the public fisc is ill-served by allowing immunity to be raised post-judgment, possibly even years after litigation has ended. *See* Dodson, *Mandatory Rules, supra*, at 24 [**56] (noting that a governmental actor

"has little to gain by asserting immunity only late in the proceedings"). Taxpayers are penalized when the State is not required to bring the matter up early to get the case dismissed before money is expended defending the lawsuit. When attorneys for the State fail to raise sovereign immunity in the trial court, that failure might not be based on oversight. The State's attorneys often make tactical decisions in deciding which issues they choose to raise. By not requiring the State to raise the issue of sovereign immunity in the trial court, the Court is providing it with a strategic advantage that other parties lack. Moreover, such a lenient rule penalizes taxpayers by dissuading conscientious attorneys for the State from developing procedures to ensure that the matter is raised timely (in order to avoid subsequent liability), resulting in unnecessary and costly litigation. Second, the doctrine should not result in "one law for the sovereign and another for the subject," as such a rule would look "less like sovereign immunity than sovereign inequity." *Reata, 197 S.W.3d at 383* (Brister, J., concurring). Whether the failure to assert immunity in the [**57] trial court is intentional or not, no other party is excused from raising an issue due to inadvertence; the State should not be treated differently. For these reasons, I would hold that governmental entities may not raise sovereign immunity for the first time on appeal.

**III. Conclusion**

I concur in the Court's judgment remanding the case to the trial court, but for the reason set forth by the court of appeals--so that the trial court may consider granting the Blacks a thirty-day extension to cure the deficiencies in their reports--rather than for the reasons expressed by this Court today. Any issues dealing with sovereign immunity should be raised at that time in the trial court. I disagree that the government is entitled to raise the issue for the first time on appeal.

Debra H. Lehrmann

Justice

**OPINION DELIVERED**: August 31, 2012



**Southern Union Company, Appellant v. CSG Systems, Inc., Appellee**

**NO. 03-04-00172-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***2005 Tex. App. LEXIS 564***

**January 27, 2005, Filed**

**SUBSEQUENT HISTORY:** [*1] 53.7(F) mot. for extension of time filed by, 03/14/2005

**PRIOR HISTORY:** FROM THE DISTRICT COURT OF TRAVIS COUNTY, 201ST JUDICIAL DISTRICT NO. GN-100403, HONORABLE PAUL DAVIS, JUDGE PRESIDING.

**DISPOSITION:** Affirmed as Modified.

**COUNSEL:** For APPELLANT: Ms. Cynthia Keely Timms, Mr. W. Scott Hastings, LOCKE, LIDDELL & SAPP, L.L.P., Dallas, TX, Mr. John L. Foster, MINTON, BURTON, FOSTER & COLLINS, Ms. Jennifer Ramsey, CANTEY & HANGER, L.L.P., Austin, TX.

For APPELLEE: Mr. Scott S. Cooley, Mr. Patton G. Lockridge, Mr. Travis C. Barton, McGINNIS, LOCKRIDGE & KILGORE, L.L.P., Austin, TX.

**JUDGES:** Before Justices Kidd, Patterson and Puryear; Justice Kidd not participating.

**OPINION BY:** Jan P. Patterson

**OPINION**

**MEMORANDUM OPINION**

Southern Union Company, a gas utility provider, contracted with CSG Systems, Inc., a printing company, to outsource Southern Union's print-and-mail operations. The conversion of services was more problematic than anticipated, causing Southern Union to cease operations and sue CSG for breach of contract. Following trial, the jury found in favor of CSG. Accordingly, the trial court entered a final judgment awarding damages to CSG. Southern Union appeals only the amount of damages awarded and does not challenge liability. Because there is legally sufficient evidence in the record to support the judgment, we affirm the award except as modified.

**BACKGROUND**

Beginning in the late 1990's, Southern Union experienced technological difficulties and realized that its [*2] computer system was no longer capable of printing and mailing approximately one million bills per month to its customers. [1] Southern Union investigated companies to which it could outsource these operations and then requested proposals from several potential vendors. CSG responded to Southern Union's request in February 2000. Southern Union selected CSG's bid from the field of candidates, and the two companies engaged in formal negotiations from April until September.

1 At the time, Southern Union had a contract with Pitney Bowes for that company to package the mailings after Southern Union processed and printed them, but that contract was set to expire in December 2001.

A contract was finalized and signed by representatives from both Southern Union and CSG as of October 13, 2000. The contract contained a "discontinuance fee" provision, obligating Southern Union to pay a specified amount of damages to CSG in the event that Southern Union terminated the agreement before its five-year term expired. [*3] The parties agree that the provision was intended as a liquidated damages provision.

After the contract was finalized, CSG provided Southern Union with a written project plan contemplating December 1, 2000 as the date for CSG to "go live" with the print-and-mail operations. In the months leading up to that deadline, implementation problems arose on both sides and the conversion fell behind schedule. The companies continued discussions in an attempt to solve the

problems until the first week of January 2001, when Southern Union ceased work on the project. Southern Union filed suit against CSG on February 7, asserting breach of contract among other causes of action.

In its verdict, the jury found that Southern Union and CSG were both in breach of the agreement, but that CSG's breach was excused, and that CSG would be fairly and reasonably compensated by an award of $ 2.1 million for the discontinuance fee; $ 111,000 for the cost of paper and envelopes purchased by CSG; $ 1,045,944 for CSG's lost profits; and $ 140,000 for the cost of software licenses provided by CSG to Southern Union. Beneath the last element of damages, the jury wrote "upon return of 300 licenses to CSG, the answer [*4] would be $ 0." The trial court determined that, as a matter of law, it was proper to award liquidated damages in lieu of actual damages, and therefore entered a final judgment in conformance with the jury's verdict, for a total amount of $ 2,351,000, plus interest and attorney's fees.

**ANALYSIS**

On appeal, Southern Union challenges the award of damages to CSG Systems, claiming that CSG should not be awarded any liquidated damages pursuant to the discontinuance fee provision, but rather that CSG's recovery should be confined to $ 1,045,944 in lost profits. Southern Union first asserts that, based on the timing of its breach, the proper calculation of the fee results in a zero sum. Alternatively, Southern Union asserts that even if the proper calculation is $ 2.1 million, CSG is not entitled to recover the award because that amount constitutes an illegal penalty. Southern Union also claims that prejudgment interest should not be awarded on CSG's damages for the discontinuance fee or lost profits. Finally, Southern Union urges that it is entitled to a remittitur of $ 140,000 because it returned the software licenses to CSG.

**The Discontinuance Fee Provision**

Southern [*5] Union's first issue, asserting that the timing of Southern Union's breach results in zero damages for the discontinuance fee, turns on a construction of the provision's terms. We agree with the parties that the provision is unambiguous. We therefore review this issue as a matter of law, looking only to the contract's four corners and interpreting its plain meaning. *See French v. Chevron U.S.A., Inc., 896 S.W.2d 795, 796-97, 38 Tex. Sup. Ct. J. 445 (Tex. 1995)*. The discontinuance fee provision states:

> The parties have mutually agreed upon the fees for the Services to be provided hereunder based upon certain assumed volumes of processing activity, and the length of the term of Agreement. Customer [2] acknowledges and agrees that, without the certainty of revenue promised by the commitments set forth in this Agreement, CSG would have been unwilling to provide the Services at the fees set forth in the Agreement. **Because of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term, Customer agrees that prior to such termination and** [*6] **in addition to all other amounts then due and owing to CSG, Customer will pay to CSG (as a contract and not as a penalty) an amount equal to a percentage of the total Subscriber Statement Minimum for the remaining term of the Agreement, as defined in Schedule C, times the then current ESP Processing Fees for the First Physical Page, as defined in Schedule C beginning with the calendar month in which termination occurs ("Discontinuance Fee"). If any such termination occurs prior to the first anniversary of the Effective Date of this Agreement, the percentage shall be fifty percent (50%).** If between the first and second anniversary of the Effective Date it shall be thirty percent (30%) and if following the second anniversary of the Effective Date it shall be ten percent (10%). **Customer acknowledges and agrees that the Discontinuance Fee is a reasonable estimation of the actual damages which CSG would suffer if CSG were to fail to receive the amount of processing business contemplated by this Agreement.** Customer shall not be required to pay the Discontinuance Fee if CSG terminates this Agreement other than as a result of Customer's breach of its obligations hereunder or if Customer [*7] terminates the Agreement for a material, uncured breach by CSG. The Discontinuance Fee shall be CSG's sole remedy resulting from a termination or other breach of this Agreement by Customer resulting in a termination of this Agreement before the expiration of the then-current term. In the event of a sale or transfer of all or substantially all of Southern Union Company's assets to a third party, the percentages used to calculate the Discontinuance Fee shall be

twenty-five percent (25%), fifteen percent (15%) and five percent (5%), respectively.

(Emphasis added.)

2 The provision refers to Southern Union as "Customer."

The parties agree that, given the plain meaning of the relevant language, the proper way to calculate the discontinuance fee for a breach within the first year of signing the agreement is to multiply the applicable "Subscriber Statement Minimum" by the applicable "ESP Processing Fees" and then take fifty percent of that total. The parties disagree, however, on how to determine one [*8] factor of this equation: the Subscriber Statement Minimum. Southern Union asserts that, pursuant to Schedule C, the minimum does not accrue until after the "commencement date." [3] Because Southern Union breached this agreement prior to the commencement date, [4] it claims that the minimum was zero, and that the total calculation should therefore be zero.

3 Schedule C states that, within the first year of the contract, the "minimums begin ninety (90) days . . . following the initiation date of services ('Commencement Date'). . . ." The contract defines the commencement date as "the first day of the calendar month in which the Services commence." Schedule D discusses "services" as including a list of activities related to the printing, inserting and mailing of customer bills in a specified carrier envelope, during specified billing cycles.

4 CSG agrees that the commencement date had not yet occurred at the time of Southern Union's breach.

CSG interprets the provision to mean that, [*9] although Schedule C prevents Southern Union from having to pay the monthly minimum until after the commencement date, that time restriction does not apply to Southern Union's liability under the discontinuance fee provision. CSG asserts that Southern Union's interpretation is wrong because it allows Southern Union to breach the contract without consequence, so long as it does so within ninety days of the commencement date, regardless of the significant time and money invested by CSG during the implementation phase. According to CSG, the liquidated damages provision is most necessary during this initial time period because of the parties' unequal contributions and because of the difficulty in calculating potential damages before any actual profits have been made.

We agree with CSG's reading of the contract. Nothing in the provision limits its applicability to a breach occurring after the commencement of services. The provision specifies the circumstances in which Southern Union is excused from paying the discontinuance fee, and none impose such a timing limitation. To the contrary, the provision's express terms state that Southern Union shall be liable for the discontinuance fee, at [*10] a rate of fifty percent, should it cause "*any* termination" within one year of signing the contract.

Testimony of witnesses from both Southern Union and CSG also supports CSG's assertion that the provision was intended to apply during the implementation phase, to protect the significant up-front contributions made by CSG before it had received any profits from the agreement. Pamela Vanlandingham, CSG's Senior Vice President and General Manager of the statement processing center, testified that during November and December, the CSG team "worked around the clock" to complete the project, which included working "very hard over the holidays," and that "CSG [had] expended right at 500 to 600 hours" when Southern Union breached the contract. Southern Union officials confirmed that the nature of this contract required front-loaded efforts by CSG and that, prior to terminating the agreement, they were aware of the money CSG invested on supplies and equipment, and of the hours CSG put toward programming, testing, and implementing the new system. David Kvapil, the Chief Financial Officer for Southern Union, testified that he knew CSG had worked "well beyond the number of hours they were [*11] going to dedicate to the project," that CSG had provided a "significant batch of bills" to Southern Union for approval, and that CSG had spent over $ 100,000 on envelopes and paper by the end of December 2000. Christine Shores, a business analyst for Southern Union's mail services division, testified that Southern Union approved the order for paper and envelopes prior to CSG placing it, and that Southern Union was aware of the time and money spent by CSG in its efforts to commence live operations.

Based on the plain meaning of the provision, as supported by the witnesses' testimony, Southern Union's liability for the discontinuance fee is not limited to a breach occurring after the commencement of live operations. Southern Union is liable under the discontinuance fee for its breach of the agreement during the implementation phase. The amount of fair and reasonable damages pursuant to the discontinuance fee was therefore properly calculated by the jury, and affirmed by the trial court, as $ 2.1 million. Southern Union's first issue is overruled.

**Liquidated Damages**

Southern Union claims in its second issue that, if the discontinuance fee is properly calculated as $ 2.1 million, [*12] then CSG is not entitled to any recovery of that amount because it constitutes an improper penalty. For the purposes of this case, the parties agree that the discon-

tinuance fee should be treated as an award of liquidated damages.

A liquidated damages provision may only be enforced when the court finds "(1) that the harm caused by the breach is incapable or difficult of estimation and (2) that the amount of liquidated damages called for is a reasonable forecast of just compensation." *Phillips v. Phillips, 820 S.W.2d 785, 788, 35 Tex. Sup. Ct. J. 220 (Tex. 1991)*. The party challenging the award of liquidated damages has the burden to establish that the two-prong test is not satisfied and that, instead, the award of liquidated damages is an unenforceable penalty. *See Dominzo v. Progressive County Mut. Ins. Co., 54 S.W.3d 867, 875 (Tex. App.--Austin 2001, pet. denied)*. Whether the liquidated damages provision is enforceable is a question of law. *Phillips, 820 S.W.2d at 788*.

*Difficulty of Estimation*

Southern Union seeks to satisfy the first part of its burden by claiming that CSG's damages were easy to estimate. Southern Union bases this claim on a "price projection" [*13] document prepared by CSG before entering the agreement, which anticipated that CSG would earn a total profit of $ 1,045,944 over the five-year term of its contract with Southern Union. Because the jury ultimately awarded this exact amount to CSG as lost profits, Southern Union argues that CSG was capable of precisely estimating its damages, and therefore the liquidated damages provision is an unenforceable penalty from which CSG is not entitled to recover. The record, however, shows otherwise.

The language of the discontinuance fee provision supports the trial court's determination that an award of liquidated damages was proper because CSG's actual damages were not easy to estimate. The provision expressly states that it was included in the contract "because of the difficulty in ascertaining CSG's actual damages for a termination or other breach of the Agreement," and that "CSG would have been unwilling to provide the Services at the fees set forth in the Agreement" had Southern Union not promised "certainty of revenue" by obligating itself to pay the discontinuance fee in the event that it breached the contract. This provision was a bargained-for exchange, negotiated and approved [*14] by both companies.

When a provision is mutually bargained for by equally competent parties, we give deference to its enforcement. *See Shel--Al Corp. v. American Nat'l Ins. Co., 492 F.2d 87, 94 (5th Cir. 1974)*. Stanley Mayer, Southern Union's Chief Information Officer, testified that the provision's terms were negotiated between attorneys representing both companies. From the face of the contract, Southern Union understood at the time it entered the agreement that CSG's damages would be difficult to estimate and therefore agreed a liquidated damages provision was necessary.

"The fundamental purpose of a valid liquidated damages provision is to provide a reasonable measure of compensation in the event of a breach where, at the time the provision is agreed to the damages are indeterminable or will be otherwise difficult to prove." 24 Williston on Contracts § 65:3, at 250 (4th ed. 2002). It is well established that lost profits can be inherently difficult to estimate. *See Texas Inst., Inc. v. Teletron Energy Mgmt., Inc., 877 S.W.2d 276, 279, 37 Tex. Sup. Ct. J. 676 (Tex. 1994)*. Frequently, lost profits are too speculative to recover because their calculation depends on "uncertain [*15] and changing conditions, such as market fluctuations," and this uncertainty is heightened where no profits have been made at the time the contract is breached. *Id.* The contract reflects that Southern Union and CSG sought to avoid such speculation in agreeing to the liquidated damages provision. The sliding scale of damages recognized the front-loaded value to be provided by CSG. As argued by CSG, had there not been a discontinuance fee to rely on, in the event of a breach by Southern Union--particularly early in the contract term--then CSG would have risked being unable to recover because of the uncertainty in calculating its lost profits.

That CSG prepared a projection of its prices, and that the jury looked to the projection as a reasonable calculation for lost profits, does not satisfy Southern Union's burden. The purpose of the document was not to define CSG's potential damages. Rather, as Vanlandingham testified, the projection was an internal tool used by CSG to outline the prices it anticipated charging for its print-and-mail services, so that CSG could make an informed bid in response to Southern Union's request for proposal. Vanlandingham also testified that the projection [*16] was prepared with a "conservative accounting approach to pricing." CSG excluded several items from its calculations because, prior to entering the contract, the parties had not assigned a value to these items. This increased the difficulty of estimating damages. CSG's expert confirmed the difficulty of this estimation by explaining several different ways that CSG's lost profits could be calculated, with the results ranging between approximately $ 1 million to $ 4 million. After hearing this evidence, the jury determined that $ 1,045,944 was a reasonable award of lost profits. But their verdict does not establish that the estimation was either an easy or precise one to make. Given the mutually agreed-upon terms of the provision, and the evidence in support of its plain meaning, we are unpersuaded by Southern Union's assertion that CSG's damages were easy to estimate.

*Reasonable Forecast of Just Compensation*

Southern Union seeks to satisfy the second part of its burden by showing that the discontinuance fee provision is an unenforceable penalty because the amount awarded to CSG as liquidated damages is unreasonable. Southern Union claims that this is established simply by the fact [*17] that the $ 2.1 million awarded to CSG pursuant to the discontinuance fee is double the amount found by the jury as lost profits. A liquidated damages provision will be considered an unenforceable penalty if the amount awarded is so disproportionate to the actual or anticipated damages that it in effect punishes the breach, thereby coercing performance of the contract by making it too costly to not adhere to its terms. 24 Williston on Contracts § 65:3, at 249 (4th ed. 2002); *see also Kothe v. R.C. Taylor Trust, 280 U.S. 224, 226, 74 L. Ed. 382, 50 S. Ct. 142 (1930)*.

But Southern Union fails to cite, and we are unaware of, any cases in support of its claim that a two-to-one ratio of liquidated-to-actual damages is unreasonable *per se*. There is, however, authority to the contrary. In *Baker v. International Record Syndicate, Inc*., our sister court approved a liquidated damages award of $ 51,000, which was more than triple the $ 15,000 found as actual damages. *812 S.W.2d 53, 56 (Tex. App.--Dallas 1991, no writ)*. The Texas Supreme Court also upheld a trial court's judgment awarding $ 790,000 in liquidated damages, which was twice the $ 395,000 found as actual damages. [*18] *Sealock v. Texas Fed. Sav. & Loan Assoc., 755 S.W.2d 69, 70, 31 Tex. Sup. Ct. J. 511 (Tex. 1988)*.

Southern Union seeks to distinguish such cases by urging that, even if it is normally reasonable to award liquidated damages in an amount that is double the actual damages, this ratio is unreasonable in a case where the amount at issue involves millions rather than thousands of dollars, as here. Again, while no cases support Southern Union's claim, there is authority to the contrary. In a case involving high-end commercial real estate, the Fifth Circuit held that a liquidated damages award of $ 5 million was reasonable, despite an internal memorandum stating that the anticipated damages were $ 1.4 million. *Thanksgiving Tower Partners v. Anros Thanksgiving Partners, 64 F.3d 227, 232 (5th Cir. 1995)*. Thus, as a matter of law, it is not unreasonable *per se* to award liquidated damages in an amount that is double the actual damages. Moreover, in this case, the reasonableness of CSG's award is supported by the record.

The discontinuance fee expressly states that it "is not a penalty" and that it "is a reasonable estimation of the actual damages which CSG would suffer if CSG were [*19] to fail to receive the amount of processing business as contemplated by this Agreement." Although parties cannot avoid a challenge to a liquidated damages provision simply by characterizing it as "reasonable," such express language is instructive of the parties' intent when the terms are mutually bargained for between equally competent parties. *See Shel--Al Corp., 492 F.2d at 94*; *Loggins Constr. Co. v. Stephen F. Austin State Univ. Bd. of Regents, 543 S.W.2d 682, 685 (Tex. App.--Tyler 1976, writ ref'd)*. Southern Union's own witnesses testified that the language of the discontinuance fee provision was bargained for and intended by the parties, and that the amount awarded under the discontinuance fee was reasonable. In response to questions on cross-examination, Stanley Mayer agreed that the provision was mutually negotiated, that he approved its terms, and that he knew Southern Union would be responsible for paying the fee if it breached the contract. When David Kvapil was asked whether he was aware at the time Southern Union filed suit against CSG "that the calculation of the discontinuance fee would be approximately $ 2 million," he responded that, [*20] "Yeah. I think that's what it calculates to." Kvapil further agreed that Southern Union understood the purpose of the discontinuance fee was "to compensate CSG for all the work they have done and all their expectation" and that this was "fair."

The jury was asked to determine what amount would be "fair and reasonable" to award CSG pursuant to the discontinuance fee, and it responded "$ 2.1 million." A jury's findings on damages should be upheld if there is sufficient evidence in the record to show that the amount is fair and reasonable compensation. *Dillard Dep't Stores, Inc. v. Silva, 148 S.W.3d 370, 371, 48 Tex. Sup. Ct. J. 63 (Tex. 2004)*. Here, the jury was entitled to make this finding based on both the express language of the contract and on the testimony of Southern Union's witnesses. We find that this is sufficient evidence from which the jury could determine that it was reasonable to award CSG $ 2.1 million in liquidated damages. Southern Union's second issue is overruled.

**Prejudgment Interest**

Southern Union urges in its third issue that, regardless of whether CSG is awarded lost profits or the discontinuance fee, CSG is not entitled to recover prejudgment interest on [*21] either award because both encompass elements of future damages, and *section 304.1045 of the finance code*, as amended in 2004, specifically prohibits recovery of prejudgment interest on awards of future damages. *Tex. Fin. Code Ann. § 304.1045* (West Supp. 2004-05). CSG counters that the finance code does not prevent prejudgment interest in this case because, by its express terms, the provision only applies to cases involving "wrongful death, personal injury, or property damage." *Tex. Fin. Code Ann. §§ 304.101, .1045* (West 1998 & Supp. 2004-05). Southern Union asserts in response that, despite its express terms, *section 304.1045* prevents prejudgment interest here based on the Texas Supreme Court's holding that the

statutory framework should be applied to all cases, not just those involving "wrongful death, personal injury, and property damage." *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 514, 530, 41 Tex. Sup. Ct. J. 268 (Tex. 1998)*. CSG argues, however, that even if *section 304.1045* prevents prejudgment interest on future damages in a breach-of-contract case, it is still proper for CSG to recover prejudgment interest [*22] on the amount awarded as the discontinuance fee because it is an award of liquidated, not future, damages. We review the trial court's award of prejudgment interest for an abuse of discretion. *Purcell Const., Inc. v. Welch, 17 S.W.3d 398, 402 (Tex. App.--Houston [1st Dist.] 2000, no pet.)*.

Southern Union and CSG agree that the discontinuance fee was intended to be a liquidated damages provision. Liquidated damages are given *in lieu of* actual damages and thus they are not considered "future damages," even though aspects of the liquidated award may compensate the party for what would have otherwise been recovered as future losses. *See Lafarge Corp. v. Wolff, Inc., 977 S.W.2d 181, 188 n.13 (Tex. App.--Austin 1998, pet. denied)*; *Eberts v. Businesspeople Personnel Servs., Inc., 620 S.W.2d 861, 864-65 (Tex. App.--Dallas 1981, no writ)*. Liquidated damages are distinct from future damages because the measure of liquidated damages is stipulated to before the occurrence of a breach and thus, unlike future damages, the amount of liquidated damages can be immediately ascertained at the time of the breach. *See Phillips, 820 S.W.2d at 788.* [*23] It is permissible for a trial court to award prejudgment interest when a contract "provides the conditions on which liability depends and . . . fixes a measure by which the sum payable can be ascertained with reasonable certainty." *Wheat v. American Title Ins. Co., 751 S.W.2d 943, 944-45 (Tex. App.--Houston [1st Dist.] 1988, no writ)*; *see also Sealock, 755 S.W.2d. at 70* (upholding award of prejudgment interest on liquidated damages); *Perry Roofing Co. v. Olcott, 744 S.W.2d 929, 932, 31 Tex. Sup. Ct. J. 213 (Tex. 1988)* (Wallace, J., dissenting) ("The Legislature has given contracting parties notice that if they enter into and subsequently breach agreements in which damages are liquidated or otherwise ascertainable, they may be held liable for prejudgment interest. Parties to contracts have always had this corresponding obligation and right . . . .").

We decline to reach the issue of whether the finance code prevents recovery of prejudgment interest on future damages in a breach-of-contract case because we agree with CSG's argument that liquidated damages are distinct from future damages and, as such, *section 304.1045* does not prohibit the recovery of prejudgment [*24] interest on liquidated damages. The trial court therefore did not abuse its discretion in awarding prejudgment interest to CSG on the $ 2.1 million it recovered pursuant to the discontinuance fee.

**Remittitur**

In its final issue, Southern Union asserts that the judgment should be modified to remit $ 140,000 of CSG's damages. The jury expressly stated in the verdict that if Southern Union returned the software licenses provided to it by CSG, then CSG would be entitled to zero damages for the licenses. It is undisputed that Southern Union returned the licenses. The trial court awarded CSG $ 140,000 for the licenses, over Southern Union's objection. CSG does not oppose a remittitur of $ 140,000. Southern Union's fourth issue is sustained and we modify the judgment accordingly. In all other respects, the trial court's judgment is affirmed.

Jan P. Patterson, Justice



**SOUTHWESTERN BELL TELEPHONE COMPANY, Petitioner, v. EUGENE C. DELANNEY, Respondent**

**No. C-8282**

**SUPREME COURT OF TEXAS**

***809 S.W.2d 493*; *1991 Tex. LEXIS 25*; *34 Tex. Sup. J. 402***

**March 6, 1991, Delivered**

**SUBSEQUENT HISTORY:** [**1] Dissenting Opinion of June 19, 1991.

**PRIOR HISTORY:** From Galveston County; Sixth District.

**JUDGES:** Thomas R. Phillips, Chief Justice. Concurring Opinion by Justice Raul A. Gonzalez. Concurring Opinion by Justice Lloyd Doggett. Dissenting Opinion by Justice Oscar H. Mauzy.

**OPINION BY:** PHILLIPS

**OPINION**

[*493] *OPINION*

We consider whether a cause of action for negligence is stated by an allegation that a telephone company negligently failed to perform its contract to publish a Yellow Pages advertisement. The court of appeals held that the company's failure to perform its contract was a basis for recovery in tort as well as contract, and that the clause limiting the telephone company's liability could not apply to limit tort damages. *762 S.W.2d 772*. We reverse the judgment of the court of appeals and render judgment in favor of Bell.

*Facts*

Eugene DeLanney advertised his real estate business in the Galveston Yellow Pages for several years. For the 1980-1981 directory, he again contracted with Bell for a Yellow Pages advertisement. At this time DeLanney had two business phones, a rotary line and a single line. Prior to publication of the 1980-1981 directory, DeLanney's wife asked [**2] Bell to cancel the single line and add a third number to their existing rotary line. The Yellow Pages advertisement was billed to DeLanney's single line. When that line was canceled, DeLanney's Yellow Pages advertisement was automatically deleted from the directory due to Bell's internal procedures.

When the advertisement was not published as promised, DeLanney sued Bell, alleging negligence and violation of the Texas Deceptive Practices -- Consumer Protection [*494] Act ("DTPA"), *TEX. BUS. & COM. CODE §§ 17.41-17.63*. Bell answered and urged by special exception that DeLanney's petition failed to state a cause of action for negligence. No ruling was made on this special exception, and DeLanney proceeded to trial on both claims.

After DeLanney rested his case in chief, Bell moved for a directed verdict on both theories of liability. The trial court granted Bell's motion as to the DTPA claim, but denied it as to negligence. The remaining issues were submitted to a jury.

The jury found that Bell was negligent in omitting DeLanney's advertisement from the Yellow Pages and that such negligence was a proximate cause of damages to DeLanney. The jury assessed these damages at $ 109,000 [**3] for lost profits in the past and $ 40,000 for lost profits in the future. After ordering a partial remittitur which reduced future lost profits to $ 21,480, the trial court rendered judgment for DeLanney. Bell appealed.

*Breach of Contract or Negligence*

The court of appeals, with one justice concurring and one justice dissenting, affirmed. A majority of the court

held that Bell's cancellation of DeLanney's Yellow Pages advertisement was correctly submitted as a negligence claim. The dissenting justice argued that because DeLanney sought damages for breach of a duty created under the contract, rather than a duty imposed by law, the claim sounded only in contract. We agree with the dissent.

The majority below relied on *Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947),* where we quoted from 38 AM. JUR. Negligence § 20 (1941) as follows:

Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions is a tort, as well as a breach of the contract.In Scharrenbeck, the defendant agreed to repair [**4] a water heater in plaintiff's home. A short time after repair, the heater ignited the roof, destroying the house and its contents. Although the contract obligated the defendant to put the water heater back in good working order, the law also implied a duty to the defendant to act with reasonable skill and diligence in making the repairs so as not to injure a person or property by his performance. In failing to repair the water heater properly, the defendant breached its contract. In burning down plaintiff's home, the defendant breached a common-law duty as well, thereby providing a basis for plaintiff's recovery in tort.

The principle recognized in *Scharrenbeck* has also been recognized by commentators in this area. As one prominent authority has explained: "Tort obligations are in general obligations that are imposed by law -- apart from and independent of promises made and therefore apart from the manifested intention of the parties -- to avoid injury to others." W. KEETON, D. DOBBS, R. KEETON & D. OWEN, PROSSER AND KEETON ON THE LAW OF TORTS § 92 at 655 (5th Ed. 1984) [hereinafter "PROSSER AND KEETON"]. If the defendant's conduct -- such as negligently burning down a house [**5] -- would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may also sound in tort. Conversely, if the defendant's conduct -- such as falling to publish an advertisement -- would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract. [1]

1 Of course, some contracts involve special relationships that may give rise to duties enforceable as torts, such as professional malpractice.

In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss. When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract. See PROSSER AND KEETON at 656; 1 J. EDGAR, JR. & J. SALES, TEXAS TORTS AND REMEDIES § 1.03[4][b] at 1-36 (1990). We applied this analysis in *Jim Walter Homes,* [*495] *Inc. v. Reed, 711 S.W.2d 617, 618 (Tex. 1986)*, where we wrote:

The [**6] acts of a party may breach duties in tort or contract alone or simultaneously in both. The nature of the injury most often determines which duty or duties are breached. When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone.

Bell's duty to publish DeLanney's advertisement arose solely from the contract. DeLanney's damages, lost profits, were only for the economic loss caused by Bell's failure to perform. Although DeLanney pleaded his action as one in negligence, he clearly sought to recover the benefit of his bargain with Bell. We hold that Bell's failure to publish the advertisement was not a tort. [2] Under our analysis in Reed, DeLanney's claim was solely in contract.

2 Prosser and Keeton suggest seven generalizations as helpful in distinguishing between tort and contract liability. Those which are useful to this case include: (1) obligations imposed by law are tort obligations; (2) misfeasance or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things; (3) recovery of intangible economic losses is normally determined by contract law; and (4) there is no tort liability for nonfeasance, i.e., for failing to do what one has promised to do in the absence of a duty to act apart from the promise made. PROSSER AND KEETON at 656-57.

[**7] DeLanney, however, did not request jury questions on breach of contract, and he did not object to their omission. Because the jury was asked only questions as to liability resulting from Bell's negligence, DeLanney waived any claim for breach of contract. *Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex. 1990)* (the plaintiff has the "burden to obtain affirmative answers to jury questions as to the necessary elements of his cause of action") (citing *TEX. R. CIV. P. 279*).

DeLanney did obtain an affirmative answer to the question whether there was a disparity in bargaining power between the parties in negotiating the Yellow Pages agreement. The court of appeals correctly determined that disparity in bargaining power is irrelevant in a negligence suit. Perhaps the issue was submitted because DeLanney pled that Bell's conduct was unconscionable under the DTPA. Because of his failure to comply with

the notice requirements of the DTPA, however, DeLanney's entire cause of action under the DTPA, including any claim of unconscionability, was dismissed by a directed verdict. For this reason, and because DeLanney submitted no contract issues, the jury finding concerning disparity of [**8] bargaining power is of no effect.

For the foregoing reasons, the judgment of the court of appeals is reversed, and judgment is rendered that DeLanney take nothing.

**CONCUR BY:** GONZALEZ; DOGGETT

**CONCUR**

*CONCURRING OPINION*

Raul A. Gonzalez, Justice, concurring.

I agree with the court that Bell's failure to publish the advertisement was not a tort and that it sounded solely in contract. I also agree that DeLanney failed to discharge his burden to obtain affirmative findings to jury questions on the contract. However, I do not fault the court of appeals for its confusion. We have muddled the law of "contorts" and an all encompassing bright line demarcation of what constitutes a tort distinct from breach of contract has proven to be elusive. *See generally* W. PROSSER & W. KEETON, THE LAW OF TORTS § 1 (5th ed. 1984); *see also American Nat'l Petro. Co. v. Transcontinental Gas Pipe Line Corp., 798 S.W.2d 274, 280 (1990)* (Gonzalez, J., dissenting).

DeLanney and the court of appeals rely heavily on the statement in *Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 204 S.W.2d 508, 510 (Tex. 1947)*, that:

Accompanying every contract is a common-law duty to perform with [**9] care, still, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these conditions [*496] is a tort, as well as a breach of the contract.

Despite this broad language, not every breach of contract accompanied by negligence creates a cause of action in tort. In *International Printing Pressman & Assistants' Union v. Smith, 145 Tex. 399, 198 S.W.2d 729, 735 (Tex. 1946)*, we acknowledged that no single concise rule will define the rights of parties in every situation. We nonetheless wrote:

Generally speaking, "actions in contract and in tort are to be distinguished in that an action in contract is for the breach of a duty arising out of a contract either express or implied, while an action in tort is for a breach of duty imposed by law. . . ." "If the action is not maintainable without pleading and proving the contract, where the gist of the action is the breach of the contract, either by malfeasance or nonfeasance, it is, in substance an action on the contract, whatever may be the form of the pleading." (citations omitted).*Id. at 735*. I believe that this formulation comes closer than *Scharrenbeck* to [**10] stating a general rule to distinguish contract from tort and that the broad language in *Scharrenbeck* must be read in light of the particular circumstances of that case. The opinion in *Scharrenbeck* is correct in its observation that a contract may be the occasion that brings the parties together, but it is the relationship or situation of the parties that gives rise to a duty in law, the breach of which is a tort. *See Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523 (Tex. 1990).* Had Montgomery Ward repaired the water heater gratuitously, it would have owed Scharrenbeck a duty not to create a dangerous condition. *See Colonial Sav. Ass'n v. Taylor, 544 S.W.2d 116, 119 (Tex. 1976)*; *Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S.W. 517, 520 (Tex. 1922)*; *RESTATEMENT (SECOND) OF TORTS § 323* (1965). Thus the duty to not create a dangerous condition existed independent of any contractual relationship.

In summary, when a party must prove the contents of its contract and must rely on the duties created therein, the action is "in substance an action *on the contract,* even though it is denominated an action for negligent performance of the contract." *Bernard* [**11] *Johnson, Inc. v. Continental Constructors, Inc., 630 S.W.2d 365, 368* (Tex. App. -- Austin 1982, writ ref'd n.r.e.) (emphasis in original).

*Bell's Duty*

The majority in the court of appeals also suggested that negligence was a proper theory because Bell carelessly deleted DeLanney's advertisement while making changes to his telephone service. In this manner, the court endeavored to connect the omission of the Yellow Pages advertisement to Bell's duty of public service.

The gravamen of DeLanney's complaint, however, was not with his telephone service, which was changed according to request and apparently to his satisfaction. Rather, his complaint was with Bell's failure to publish his advertisement as promised, and this was a matter of private contract. *A-ABC Appliance, Inc. v. Southwestern Bell Tel. Co., 670 S.W.2d 733, 735* (Tex. App. -- Austin 1984, writ ref'd n.r.e.). Although Bell is a regulated public utility, all of its functions are not in the realm of public service. The "printing, distribution, or sale of advertising in telephone directories" is not a public service function. TEX. REV. CIV. STAT. ANN. art. 1446c, § 3(s) (Vernon Supp. 1991).

*Limitation of Liability*

[**12] The connection drawn by the court of appeals between the Yellow Pages advertisement and DeLanney's telephone service also affected the court's

view regarding the validity of a limitation of liability clause contained in the contract between Bell and DeLanney. This clause provided:

The applicant agrees that the telephone company shall not be liable for errors in or omissions of the directory advertising beyond the amount paid for the directory advertising omitted in which error occurs for the issue life of the directory involved.DeLanney argued that the clause was unenforceable and, in the context of DeLanney's [*497] negligence claim, the court of appeals agreed. *762 S.W.2d at 776*.

In an apparent attempt to resolve conflicting decisions, the court of appeals suggested that the clause might be enforced to limit a claim for breach of contract, *see Wade v. Southwestern Bell Tel. Co., 352 S.W.2d 460* (Tex. Civ. App. -- Austin 1961, no writ), but could not be applied to limit liability for negligence. *See Reuben H. Donnelly Corp. v. McKinnon, 688 S.W.2d 612* (Tex. App. -- Corpus Christi 1985, writ ref'd n.r.e.); *see also Helms v. Southwestern Bell Tel. Co.* [**13] *, 794 F.2d 188 (5th Cir. 1986)*. The conflict between *Wade* and *McKinnon* mirrors a larger split of authority regarding the validity of such limitation of liability clauses. *See* Annotation, *Liability of Telephone Company for Mistakes in or Omissions From its Directory, 47 A.L.R. 4th 882 (1986)*.

*McKinnon* follows a minority line of cases which refuse to enforce such provisions. *See Morgan v. South Cent. Bell Tel. Co., 466 So.2d 107 (Ala. 1985)*; *Allen v. Michigan Bell Tel. Co., 61 Mich. App. 62, 232 N.W.2d 302 (Mich. Ct. App. 1975)*; *Rozeboom v. Northwestern Bell Tel. Co., 358 N.W.2d 241 (S.D. 1984)*; *Discount Fabric House, Inc. v. Wisconsin Tel. Co., 117 Wis. 2d 587, 345 N.W.2d 417 (Wis. 1984)*. The unifying theme of these decisions is that directory advertising is a unique advertising medium inextricably linked to the telephone company's public service function. Thus on the premise of Bell's status as a public utility monopoly, these courts have rejected the limitation of liability as contrary to the public interest or unconscionable.

A larger number of jurisdictions, however, have upheld similar liability limitation clauses for directories. In [**14] *Helms v. Southwestern Bell Telephone Co.*, the Fifth Circuit lists decisions from twenty-six states which have upheld similar clauses. *Helms, 794 F.2d at 192 n.9*; see *generally* Annotation, *Liability of Telephone Company for Mistakes in or Omissions From its Directory, 47 A.L.R. 4th 882*. These decisions have generally recognized Yellow Pages advertising to be a matter of private contract, rather than a public service function. The majority view is compatible with Texas law, which also excludes the sale of advertising in directories from Bell's public service function. TEX. REV. CIV. STAT. ANN. art. 1446c, § 3(s); *see also A-ABC Appliance, 670 S.W.2d at 735*. I therefore believe that the majority view presents the sounder approach.

*Unconscionability*

Even though the Yellow Pages is a matter of private contract, DeLanney may still recover the full value of the consequential damages caused by Bell's breach of contract if the clause limiting Bell's liability is unenforceable because a court may deny enforcement of an unconscionable clause or contract. See *Tri-Continental Leasing Corp. v. Burns, 710 S.W.2d 604, 609* (Tex. App. -- Houston [1st Dist.] 1985, [**15] writ ref'd n.r.e.) (Levy, J., dissenting); *see also Universal C.I.T. Credit Corp. v. Daniel, 150 Tex. 513, 243 S.W.2d 154, 159-60 (Tex. 1951)*; *RESTATEMENT (SECOND) OF CONTRACTS § 208* (1979); *TEX. BUS. & COM. CODE ANN. § 2.302* (Tex. UCC)(Vernon 1968). We must consider then whether the clause limiting Bell's liability for errors or omissions to the cost of the Yellow Pages advertising is unconscionable under the circumstances of this case.

DeLanney argues that it is. Because he had no meaningful choice and no bargaining power in the transaction, he contends that his contract with Bell was one of adhesion. Yellow Pages was the only commercial telephone directory in DeLanney's market area at the time. The only way to buy space in this directory was on Bell's terms dictated through a non-negotiable, standardized contract. DeLanney concludes that his inability to negotiate more favorable terms rendered the limitation of liability clause unenforceable. In support of this argument, he relies on a jury finding that a disparity in bargaining power existed between himself and Bell when the contract was made. [1]

1 The following question was submitted to the jury over Bell's objections:

Do you find from a preponderance of the evidence that there was a disparity of bargaining power between the plaintiff and the defendant in negotiating the contract for Yellow Page advertising.

Instruction: A disparity of bargaining power exists when one party has no real choice in accepting a agreement limiting the liability of the other party.

The jury found there was a disparity of bargaining power.

[**16] [*498] Bell responds that the validity of the clause limiting liability was not a question of fact for the jury, but one of law for the court. I agree. [2] This is clearly the case under the Uniform Commercial Code. *TEX. BUS. & COM. CODE § 2.302* comments 1 & 3

(Tex. UCC)(Vernon 1968); G. WALLACH, THE LAW OF SALES UNDER THE UNIFORM COMMERCIAL CODE para. 5.04 at 5-5 (1981); *see also RESTATEMENT SECOND OF CONTRACTS § 208, comment f* (1979). Although the UCC does not expressly apply to service transactions, such as the sale of advertising in the Yellow Pages, the provision pertaining to unconscionability "has been applied to numerous transactions outside the coverage of Article 2 of the Code." J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS § 9-39 at 420 (3d Ed. 1987); *see also* J. WHITE & R. SUMMERS, THE UNIFORM COMMERCIAL CODE § 4-32 at 200 (3d ed. 1989).

2 Here we are concerned with unconscionability under the common law as distinguished from unconscionability under the DTPA. The DTPA defines "unconscionable action or course of action" and, unlike the common law, makes it an issue of fact for the jury. *Tex. Bus. & Com. Code Ann. § 17.45 (5)*; *see also Chastain v. Koonce, 700 S.W.2d 579, 582 (Tex. 1985)*.

[**17] I also agree with Bell that bargaining disparity alone does not establish unconscionability. Comments to the UCC indicate that the principle of unconscionability is "not of disturbance of allocation of risks because of superior bargaining power." *TEX. BUS. & COM. CODE ANN. § 2.302* comment 1. A comment to the Restatement provides that a "bargain is not unconscionable merely because the parties to it are unequal in bargaining position, nor even because the inequality results in an allocation of risks to the weaker party." *RESTATEMENT (SECOND) OF CONTRACTS § 208 comment d*. The Code and Restatement thus agree that a disparity in bargaining power, while relevant, is not the litmus test for unconscionability. See *Wade v. Austin, 524 S.W.2d 79, 85-86* (Tex. Civ. App. -- Texarkana 1975, no writ). Something more must be shown.

How much more is a difficult question, however, because the term unconscionable has no precise legal definition. Courts and commentators have struggled with its meaning. In *Wade v. Austin*, the court wrote that a determination of unconscionability must be made from "the entire atmosphere in which the agreement was made." *Id. at 86*. One authority has [**18] written that unconscionability cannot be defined because "it is not a *concept, but a determination* to be made in light of a variety of factors not unifiable into a formula." 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 4-3 at 203 (3d ed. 1988)(emphasis in original). The UCC [3] and Restatement [4] recognize the doctrine of unconscionability, but provide only a rough outline of its meaning.

3 The comment to UCC *section 2.302* provides:

> The basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. . . . The principal is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power.

*Tex. Bus. & Com. Code Ann. § 2.302* comment 1.

4 A comment to *section 208 of the Restatement* provides:

> The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect. Relevat factors include weaknesses in the contracting process like those involved in more specific rules as to contractual capacity, fraud, and other invalidating causes; the policy also overlaps with rules which render particular bargains or terms unenforceable on grounds of public policy.

*RESTATEMENT (SECOND) OF CONTRACTS § 208 comment a* (1979).

[**19] Although many factors are relevant and no single formula exists, [5] proof of a claim [*499] of unconscionability begins with two broad questions: (1) How did the parties arrive at the terms in controversy; and (2) Are there legitimate commercial reasons which justify the inclusion of these terms? Mallor, *Unconscionability in Contracts Between Merchants,* 40 SW. L.J. 1065, 1072 (1986); 1 J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE, § 4-3, 4-4 (3d ed. 1988); J. CALAMARI & J. PERILLO, THE LAW OF CONTRACTS, § 9-40 (3d. 1987); R. HILLMAN, J. MCDONNELL & S. NICKLES, COMMON LAW AND EQUITY UNDER THE UNIFORM COMMERCIAL CODE para. 6.02 [2][b-d] (1985); *Williams v. Walker-Thomas Furniture Co., 121 App. D.C. 315, 350 F.2d 445 (DC Cir. 1965)*. The first question, often described as the procedural aspect of unconscionability, [6] is concerned with assent and focuses on the facts surrounding the bargaining process. Mallor, *Unconscionability in Contracts Between Merchants,* 40 SW. L.J. 1065, 1072 (1986). The second question, often described as the substantive aspect of unconscionability, is concerned with the fairness of the resulting agreement. *Id.*

5 The Supreme Court of Kansas has identified ten factors as useful aids in determining unconscionability questions. They are: (1) the use of printed form contracts drawn by the party in the

strongest economic position, which establish industry-wide standards offered on a take it or leave it basis; (2) excessive price; (3) a denial of basic rights and remedies to a consumer buyer; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including commercial setting; (6) the hiding of disadvantageous clauses in a mass of fine print or in inconspicuous places; (7) phrasing clauses in language that is incomprehensible to a layman or that diverts his attention from the problems they raise; (8) a overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated, and the illiterate; and (10) inequality of bargaining or economic power. *Wille v. Southwestern Bell Tel. Co., 219 Kan. 755, 549 P.2d 903, 906-07 (Kan. 1976)*.

6 As & framework for decision commentators and courts have generally followed the analysis proposed by Professor Arthur Leff. Leff, *unconscionability and the Code -- The Emperor's New Clause*, 115 U. Pa. L. Rev. 485, 487 (1967). Professor Leff labelled the different types of unconscionability as "substantive" and "procedural," distinguishing the content of the contract from the process by which the allegedly offensive terms found their way into the agreement.

[**20] DeLanney concentrates on the procedural aspect, emphasizing the absence of any meaningful choice in the bargain. Bell, on the other hand, contends that the provision was nevertheless fair and reasonable under the existing commercial circumstances.

Bell submits that its contract merely sought to reallocate the commercial risk inherent in its business in a reasonable manner. This risk existed because the directory was to run for one year and mistakes could not be corrected during this period. Bell contends that the enormous benefit derived from Yellow Pages advertising by some subscribers when compared to the relatively modest amount charged by Bell, coupled with Bell's inability to mitigate damages, created a business risk it needed to reallocate. This it attempted to do by limiting its liability.

Bell further submits that the clause limiting liability was not one-sided or grossly unfair because it benefitted both parties. It benefitted the subscriber by keeping Yellow Pages rates low in relation to other types of advertising and in relation to the return expected by the subscriber. It benefitted Bell by shielding it from a risk of potential liability which was out of proportion [**21] to the consideration charged by Bell. Although it would not negotiate, Bell argues that DeLanney had other suitable advertising alternatives such as newspapers, magazines, direct mail, phone solicitation, the Multiple Listing Service, Board of Realtors, yard signs, radio and television. After weighing all of the above, I am not convinced that the clause limiting Bell's liability for errors or omissions to the cost of the Yellow Pages advertising is unconscionable.

For the foregoing reasons, I concur with the judgment.

*CONCURRING OPINION*

Lloyd Doggett, Justice

I concur in the court's judgment but write separately because it should, and could, be based solely upon our holding in *Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 618 (Tex. 1986)*. Today's brief writing concerning the nature of torts and contracts unnecessarily adds more confusion than clarity.

[*500] The court does recognize that in some as yet unspecified instances a tort action may lie between contracting parties. It appropriately observes that a tort action may arise based upon a number of relationships that could be created by contract. Although the court offers only one example of a contractual relationship [**22] creating duties the breach of which gives rise to actions both in tort and contract, S.W.2d at n.1 (the relationship between a professional and client), our developing jurisprudence recognizes others. *See. e.g., Viles v. Security Nat'l Ins. Co., 788 S.W.2d 566, 567 (Tex. 1990)* (relationship between insured and insurer). In addition, the court correctly recognizes that the breach of certain common-law duties creates liability in tort; the existence of a contract does not alter those duties.

It is thus incumbent upon the trial courts not to begin and end their inquiry with the contract but to examine the circumstances surrounding the parties' relationship, including any duties imposed by law, in determining whether a tort action may be maintained.

**DISSENT BY:** MANZY

**DISSENT**

*DISSENTING OPINION*

Oscar H. Manzy, Justice, dissenting.

I respectfully dissent. The contractual relationship creates duties not only under contract law, but under tort law as well. A contract may create the state of things which furnishes the occasion for the tort. *Montgomery Ward & Co. v. Scharrenbeck, 146 Tex. 153, 157, 204 S.W.2d 508, 510 (1947)*.

Every contract is accompanied by a duty [**23] to perform that contract with care, skill, reasonable expedi-

ence and faithfulness, and the negligent failure to observe any of the conditions imposed by this duty constitutes a tort. *Id.* In determining whether the action is one in contract or tort or both, the court must look to the substance of the cause of the action, and not necessarily the manner in which it was pleaded. *Jim Walter Homes, Inc. v. Reed, 711 S.W.2d 617, 617-18 (Tex. 1986)*(citing *International Printing Pressman and Ass't Union v. Smith, 145 Tex. 399, 198 S.W.2d 729 (Tex. 1946))*. Where the injury involves failure to perform a contract and the only loss is that economic loss that is the substance of the contract itself, the action sounds only in contract and not in tort. *Jim Walter Homes, 711 S.W.2d at 618*.

However, this case not only involves the *failure* to perform a contract, it also involves the *negligent* performance of a second contract. DeLanney had two contracts with Bell. For several years he had contracted with Bell for Yellow Pages advertisements. Prior to the incident the subject of this lawsuit, he had already contracted with Bell for a 1980-81 Yellow Pages listing. In addition [**24] to the Yellow Pages advertisement contract, DeLanney had a separate contract with Bell for telephone service.

Prior to the publication of the 1980-81 telephone directory, DeLanney contracted to alter his telephone service by canceling his single line and adding a third number to his two-number rotary line. When the alteration of the telephone service was requested, the separate contract for the Yellow Pages advertisement was not modified or even mentioned by either party. Cancellation of the single telephone line, pursuant to the telephone service contract, resulted in the cancellation of the Yellow Pages advertisement because the advertisement was billed to that number. The Yellow Pages advertisement itself, was not even contemplated within the telephone service contract. It was the negligent performance of the telephone service contract that the jury found was the proximate cause of DeLanney's damages. [1] Southwestern Bell breached its duty to perform the telephone service contract with care, skill and faithfulness.

1   In its answers to the special issues, the jury specifically found Bell to be negligent.

Issue (1)(a) Whether Bell was negligent in failing to inform DeLanney that the installation of a rotary system would cancel the Yellow Pages listing.

Issue (1)(b) Whether Bell was negligent in failing to adequately train and inform its employees that a order to cancel one of the telephone numbers would cancel the Yellow Pages advertisement; and

Issue (i)(c) Whether Bell was negligent in failing to recognize that the automatic cancellation of the Yellow Pages advertisement would occur when the billing procedure was changed.

The jury further found that each of these acts of negligence proximately caused DeLanney's injuries.

[**25] This case was correctly tried in the trial court, and the jury's verdict formed the basis of the trial court's judgment, which the court of appeals affirmed.

I would affirm the judgment of the court of appeals.

Oscar H. Mauzy, Justice.



**SP TERRACE, L.P. AND TYEE MANAGEMENT, LLC, Appellants v. MERITAGE HOMES OF TEXAS, LLC, Appellee**

**NO. 01-09-00155-CV**

**COURT OF APPEALS OF TEXAS, FIRST DISTRICT, HOUSTON**

***334 S.W.3d 275*; *2010 Tex. App. LEXIS 8448***

**October 21, 2010, Opinion Issued**

**SUBSEQUENT HISTORY:** Released for Publication April 6, 2011.

**PRIOR HISTORY:** [**1]
On Appeal from the 165th District Court, Harris County, Texas. Trial Court Cause No. 2007-43637.
*SP Terrace, L.P. v. Meritage Homes of Tex., LLC, 2010 Tex. App. LEXIS 3438 (Tex. App. Houston 1st Dist., May 6, 2010)*

**COUNSEL:** For APPELLANT: Michael C. O'Connor, O'Connor, Craig, Gould & Evans, P.C., Houston, TX.

For APPELLEE: David Watkin Jones, Beck, Redden & Secrest, LLP, Houston, TX.

**JUDGES:** Panel consists of Chief Justice Radack and Justices Bland and Massengale.

**OPINION BY:** Jane Bland

**OPINION**

[*279] **OPINION ON REHEARING**

In this dispute over an earnest money contract to develop a plat of real estate, the trial court granted summary judgment in favor of Meritage Homes of Texas, LLC (Meritage) on its breach of contract claim against SP Terrace, LP, and Tyee Management, LLC (collectively, SP Terrace). The trial court summarily rejected SP Terrace's counterclaims for breach of contract against Meritage.

The contract called for SP Terrace to file a subdivision plat by December 31, 2005. SP Terrace concedes that it did not meet this deadline. But it argues that the contract extended the deadline, or alternatively that its compliance was excused. It claims fact issues exist on its affirmative defenses of oral modification, waiver, delay and interference by Meritage, on the amount of attorney's fees, and on its counterclaim against Meritage. We conclude [**2] that SP Terrace raises a fact issue on the issues of waiver and delay, but not as to contract modification or interference. We therefore reverse the trial court's summary judgment and remand the case for trial. We grant rehearing and withdraw our opinion and judgment dated May 6, 2010, to address an argument that SP Terrace raises in its motion for rehearing. Our disposition is unchanged.

**Background**

*Underlying Facts*

SP Terrace entered into an earnest money contract with Meritage to develop and sell ninety-six lots in a proposed Harris County subdivision. The development plan required small and narrow lots, and Meritage was one of a few builders who could construct houses to fit the particular lot sizes. The contract terms required SP Terrace to improve the overall subdivision. In particular, it required SP Terrace to file a subdivision plat with Harris County by a December 31, 2005 substantial completion deadline. After substantial completion, Meritage would then purchase the lots in a series of transactions. The total purchase price was $ 2,688,000. Meritage deposited ten percent of this price, $ 268,000, with SP Terrace as earnest money. If SP Terrace did not achieve substantial completion [**3] by December 31, 2005, Meritage could terminate the contract and recover its earnest money deposit. But, if Meritage delayed SP Terrace's performance of its contractual obligations, the substantial completion deadline would "be extended to the extent of any such delay."

On November 30, representatives from Meritage and SP Terrace met to discuss [*280] the project. At this point, SP Terrace was ready to file the subdivision plat. Meritage asked for changes to the plat, and it requested that SP Terrace postpone filing the plat to accommodate those changes. SP Terrace agreed, but informed Meritage that a six-month extension of the substantial completion deadline would be necessary to address these and any future changes to the development. According to Tyler Todd, the president of Tyee Management, SP Terrace's general partner, and Kelly Smalley, the project manager, the parties orally agreed to extend the substantial completion deadline, and the representatives of Meritage agreed to sign a written extension memorializing the oral modification. Smalley mailed a written agreement to Meritage before December 31, 2005. She never received a response.

The parties continued to work together to make changes [**4] and improvements to the development into early February 2006. But on February 3, Meritage informed SP Terrace that, due to SP Terrace's failure to meet the substantial completion deadline, Meritage was terminating the contract and demanding the return of its earnest money deposit.

*Procedural History*

After SP Terrace refused to return the earnest money deposit, Meritage sued for breach of contract. SP Terrace counterclaimed for breach of contract, alleging that Meritage (1) delayed SP Terrace's performance, (2) failed to cooperate with SP Terrace, and (3) breached their oral agreement to extend the substantial completion deadline by six months, all of which entitled SP Terrace to retain the earnest money deposit and recover actual damages in addition to the earnest money it kept.

Meritage moved for traditional and no-evidence summary judgment on its claims against SP Terrace and on SP Terrace's counterclaim. Meritage contended that the parties never agreed to extend the substantial completion deadline. Meritage argued that SP Terrace's counterclaim failed as a matter of law because it did not state a claim for affirmative relief and the liquidated damages provision in the contract precluded [**5] SP Terrace from recovering actual damages in excess of the earnest money deposit. Meritage contended that SP Terrace's waiver defense failed because Meritage never renounced its right to terminate the contract, and the forty-eight days that had passed between the substantial completion deadline and the date Meritage demanded the return of its earnest money deposit was not long enough to show that Meritage intended to yield its right to terminate. Meritage argued that any oral modification of the contract is unenforceable because it materially altered the obligations of the underlying written contract. Meritage also noted that SP Terrace failed to present any evidence that the amount of liquidated damages was an unreasonable forecast of the amount of its damages.

SP Terrace responded with the Todd and Smalley affidavits to show that fact issues existed regarding (1) an agreement to extend the substantial completion deadline; (2) whether Meritage, through its oral agreement to extend the deadline and its continued work with SP Terrace after December 31, 2005, waived the deadline; and (3) whether Meritage breached its duties to cooperate with SP Terrace and to not delay or interfere with [**6] SP Terrace's performance of its contractual obligations. SP Terrace also argued that the liquidated damages provision of the contract, which limited SP Terrace's recovery to retention of the earnest money deposit, was unenforceable penalty because it hypothetically would allow the forfeiture of the deposit due to any breach by Meritage, including a trivial one.

[*281] The trial court granted Meritage's motions. Shortly thereafter, Meritage moved for entry of a final judgment, asking the trial court to award it $ 268,000 in damages, $ 71,170.50 in attorney's fees incurred in prosecuting its claims in the trial court proceedings, $ 40,000 in attorney's fees if SP Terrace appeals to an intermediate appellate court, and an additional $ 27,500 in attorney's fees if Meritage ultimately prevails after full briefing and oral argument to the Texas Supreme Court.

SP Terrace moved the trial court to reconsider the summary judgment. SP Terrace attached excerpts from the deposition of Michael Pizzitola, taken after the original submission of the summary judgment motions, to further support its contentions. SP Terrace also attached the affidavit of its counsel of record opposing Meritage's requested amount [**7] of attorney's fees. The trial court's docket sheet includes the following entry for December 8, 2008: "D. (seller) Motion for leave of court to file additional evidence granted." The trial court did not memorialize the docket entry in any order, even though SP Terrace submitted a proposed order and requested that the trial court sign it. The trial court entered a final judgment in favor of Meritage, awarding the $ 268,000 earnest money deposit as damages and the full amount of attorney's fees requested by Meritage.

**Discussion**

*Standard of Review*

We review de novo the trial court's grant of a motion for summary judgment. *Provident Life & Accid. Ins. Co. v. Knott, 128 S.W.3d 211, 215-16 (Tex. 2003).* After an adequate time for discovery, a party may move for no-evidence summary judgment if there is no evidence of one or more essential elements of a claim or defense on

which the adverse party bears the burden of proof at trial. *TEX. R. CIV. P. 166a(i)*. Once a party moves for no-evidence summary judgment, the burden shifts to the non-movant to present evidence raising a genuine issue of material fact on each element specified in the motion. *Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006)*. [**8] We review the evidence in the light most favorable to the non-movant, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289 S.W.3d 844, 848 (Tex. 2009)* (citing *City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005))*.

When we construe a contract, we must "ascertain and give effect to the parties' intentions as expressed in the document." *Frost Nat'l Bank v. L & F Distribs., Ltd., 165 S.W.3d 310, 311-12 (Tex. 2005)* (per curiam). We consider the contract as a whole in order to give effect to all provisions of the contract. *See id. at 312*. We give contractual terms their plain, ordinary, and generally accepted meaning unless the contract shows that the parties intended a different meaning to control. *See Heritage Res. v. NationsBank, 939 S.W.2d 118, 121 (Tex. 1996)*.

*Late-Filed Summary Judgment Evidence*

SP Terrace initially contends that the trial court erred in granting summary judgment because the late-filed deposition testimony of Meritage's Michael Pizzitola creates fact issues. *Texas Rule of Civil Procedure 166a(c)* provides that "[e]xcept on leave of [**9] court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response." *TEX. R. CIV. P. 166a(c)*. A trial court may accept late-filed summary judgment evidence, but it must affirmatively indicate that it accepted or considered that [*282] evidence. *See Stephens v. Dolcefino, 126 S.W.3d 120, 133-34 (Tex. App.--Houston [1st Dist.] 2003, pet. denied)*. If no order in the record indicates that the court gave leave to file untimely evidence, then we presume that the trial court did not consider the evidence. *See Benchmark Bank v. Crowder, 919 S.W.2d 657, 663 (Tex. 1996)*; *Dixon v. E.D. Bullard Co., 138 S.W.3d 373, 375-76 (Tex. App.--Houston [14th Dist.] 2004, pet. granted, judgm't vacated w.r.m.)*; *Farmer v. Ben E. Keith Co., 919 S.W.2d 171, 176 (Tex. App.--Fort Worth 1996, no writ)*.

SP Terrace relies on the trial court's docket entry as sufficient indication that the trial court granted it leave to late-file the Pizzitola deposition as summary-judgment evidence. We previously have held, however, that a docket entry "forms no part of the record we may consider; it is a memorandum made for the trial court and clerk's convenience. [**10] This rule results, in part, from the inherent unreliability of docket entries." *Miller v. Kendall, 804 S.W.2d 933, 944 (Tex. App.--Houston [1st Dist.] 1990, no writ)* (citing *Energo Int'l Corp. v. Modern Indus. Heating, Inc., 722 S.W.2d 149, 151-52 (Tex. App.--Dallas 1986, no writ)* ("Consequently, there is no indication in the record that permission of the court was requested or obtained to file the amended answer and that the amended answer was properly before the court.")). SP Terrace contends that our holding in *Dolcefino* supports its argument despite these cases. In *Dolcefino*, however, the trial judge stated on the record at the motion for reconsideration hearing that "the court will include the evidence offered today in the summary judgment record. The court, even taking this evidence into the record, denies Plaintiff's motion for new trial." *See Dolcefino, 126 S.W.3d at 134*. We noted that the trial judge's statement on the record indicated that the judge had accepted the evidence as belatedly offered summary judgment evidence. *See id*. Here, in contrast, SP Terrace requested that the trial court sign an order granting leave to file the additional evidence that it had attached to [**11] the motion for reconsideration. It attached the docket sheet and a proposed order, but the trial court never entered the order. Following *Miller*, we decline to extend the *Dolcefino* analysis to docket sheet entries, and thus hold that this evidence is not part of the summary judgment record.

In a similar vein, Meritage, in its response to SP Terrace's motion for reconsideration, attached excerpts from the deposition of Tyler Todd that it had not previously filed with the trial court. Meritage did not request leave of court to late-file these excerpts from Todd's deposition, and thus these excerpts do not form part of the summary judgment record. *See TEX. R. CIV. P. 166a(c)*; *Dolcefino, 126 S.W.3d at 133*.

*Oral Modification of the Substantial Completion Deadline*

Turning to the merits, SP Terrace first contends that an oral modification to the contract exists and thus it is not liable for any breach associated with missing the December 31 deadline. Under the statute of frauds, a contract for the sale of real estate must be in writing and signed by the party charged with compliance with its terms. *TEX. BUS. & COM. CODE ANN. § 26.01(b)(4)* (Vernon 2009). Generally, if a contract falls within [**12] the statute of frauds, then a party cannot enforce any subsequent oral material modification to the contract. *See Dracopoulas v. Rachal, 411 S.W.2d 719, 721 (Tex. 1967)*; *see also Walker v. Tafralian, 107 S.W.3d 665, 670 (Tex. App.--Fort Worth 2003, pet. denied)*.

In *Dracopoulas*, the Texas Supreme Court held unenforceable an oral modification [*283] that extended the time for performance indefinitely. *See Dracopoulas, 411 S.W.2d at 722*. The court reasoned that the termination date of the contract was the "hinge upon which still other contractual rights and duties turn," and extending

the termination date indefinitely would destroy other contractual provisions that depended on the termination date to become operative. *See id.; see also King v. Texacally Joint Venture, 690 S.W.2d 618, 620 (Tex. App.--Austin 1985, writ ref'd n.r.e.)* ("It has been held that attempted alteration of the time for performance in real estate contracts is a material alteration." (citing *Vendig v. Traylor, 604 S.W.2d 424 (Tex. Civ. App.--Dallas 1980, writ ref'd n.r.e.))). But see Triton Comm'l Props., Ltd. v. Norwest Bank Tex., N.A., 1 S.W.3d 814, 819 (Tex. App.--Corpus Christi 1999, pet. denied)* (holding that extending [**13] the time for performance does not, by itself, materially alter the underlying obligations, even if the contract would otherwise terminate). In the right circumstances, an extension for the time for performance can be a material alteration.

This case presents one of those circumstances. Even if the oral modification extending performance would not ordinarily materially alter the underlying written contract, when a party relies on the modification to assert that the other party is in material breach to excuse further performance, the modification then becomes material and unenforceable unless in writing. *See Walker, 107 S.W.3d at 670*; *King, 690 S.W.2d at 620*.

Todd and Smalley described the November 30 meeting between Meritage and SP Terrace representatives. Each averred that, at this meeting, Meritage representatives requested that SP Terrace delay filing the subdivision plat to allow the parties to continue making changes to the development. SP Terrace agreed, but requested a six-month extension of the December 31 deadline. According to Todd and Smalley, Meritage's representatives agreed to extend the deadline and to sign a written agreement confirming that extension. Smalley mailed a [**14] written extension to Meritage before December 31, and although Meritage never returned a signed extension, it also never objected.

Meritage points to a January 20, 2006, letter from Smalley to Steve Harding as evidence that the parties did not agree to extend the deadline:

> I had previously sent you an addendum to the Earnest Money Contract prior to the end of the year extending the date of the contract to June 30, 2006. As of this date, I have not received an executed addendum. I know there are still questions to be answered, but we need some assurance that we can reach an agreement and declare some sort of modified substantial completion.

It is thus undisputed that the parties never signed a written agreement to extend the deadline beyond December 31. In addition, SP Terrace viewed the extension of time to be a material alteration to the contract, sufficient to excuse it from further performance, stating to the trial court:

> Meritage agreed to extend the substantial completion date and/or caused a default or delay in the substantial completion. Meritage then refused to perform under the Contract by its February 3, 2006 letter. This evidence is sufficient to show a prior or anticipatory [**15] breach by Meritage, which would excuse further performance by SP Terrace.

SP Terrace thus asserts that Meritage's breach of the alleged oral extension of the substantial completion deadline was sufficient to excuse any further performance by SP Terrace. The modification here is a [*284] material term--as such, it is unenforceable because it was never reduced to writing. *See Walker, 107 S.W.3d at 670*; *King, 690 S.W.2d at 620*. We hold that the trial court correctly granted summary judgment on SP Terrace's affirmative defense of modification.

*Waiver of the Substantial Completion Deadline*

SP Terrace next contends that a fact issue exists regarding Meritage's waiver of the December 31 deadline. A party establishes waiver by demonstrating (1) the express renunciation of a known right or (2) silence or inaction for so long as to show the intent to yield a known right. *See Motor Vehicle Bd. v. El Paso Indep. Auto Dealers, 1 S.W.3d 108, 111 (Tex. 1999)*. Waiver can also result from acts that induce the other party to believe that the party will not insist on exact performance within the contractual time limits. *See Kennedy Ship & Repair, LP v. Pham, 210 S.W.3d 11, 20 (Tex. App.--Houston [14th Dist.] 2006, no pet.)*; [**16] *see also KMI Continental Offshore Prod. Co. v. ACF Petrol. Co., 746 S.W.2d 238, 243 (Tex. App.-- Houston [1st Dist.] 1987, writ denied)* ("[A] waiver can occur if a party knowingly possessing the right acts in such a manner that the party misleads the opposing party into believing that a waiver has occurred."); *Alfred, Meroney & Co. v. Rowe, 619 S.W.2d 210, 213 (Tex. App.--Amarillo 1981, writ ref'd n.r.e.)*.

The surrounding facts and circumstances must plainly demonstrate a party's intent to waive a known right. *See El Paso Indep. Auto Dealers, 1 S.W.3d at 111*. Waiver may result when: (1) a party assents to the other party's continued performance without objection to the delay; (2) a party states that it will not require strict compliance with a deadline or acts such that the other party reasonably believes strict compliance will not be

required; or (3) a party insists on performance by the other party even after breach of the agreement. *See Delgado v. Methodist Hosp., 936 S.W.2d 479, 485 (Tex. App.--Houston [14th Dist.] 1996, no writ)*; *Fairfield Fin. Group, Inc. v. Gawerc, 814 S.W.2d 204, 209 (Tex. App.--Houston [1st Dist.] 1991, no writ)*; *Seismic & Digital Concepts, Inc. v. Digital Res. Corp., 590 S.W.2d 718, 721 (Tex. Civ. App.--Houston [1st Dist.] 1979, no writ)*. [**17] Ordinarily waiver is a fact question; however, we decide a waiver issue as a matter of law if the facts and circumstances are admitted or established. *See El Paso Indep. Auto Dealers, 1 S.W.3d at 111*.

Todd and Smalley aver that, at the end of November, SP Terrace was prepared to file the subdivision plat, but delayed the filing at Meritage's request. They both averred that they told Meritage that delaying the filing of the plat would require a six-month extension of the substantial completion deadline and that Meritage orally agreed to this extension, which suggested to them that Meritage would not insist upon the December 31 deadline. Smalley further averred that she mailed the written extension prior to December 31 and never received any objections to the extension. Todd and Smalley continued to work with Meritage on the development into February 2006. Smalley participated in a January 10, 2006, meeting with Steve Harding of Meritage to "discuss the proposed subdivision changes."

Meritage cites *Beal Bank, S.S.B. v. Schleider, 124 S.W.3d 640 (Tex. App.--Houston [14th Dist.] 2003, pet. denied)*, to support its contention that SP Terrace does not raise a fact issue on waiver. In *Beal Bank*, [**18] the Fourteenth Court of Appeals held that representations that "an extension would not be a problem," the parties were "set to go," and the bank would "get [*285] back to" Schleider were insufficient to establish waiver. *See id. at 654*. In contrast, here, Todd and Smalley aver that Meritage continued to participate in meetings with SP Terrace representatives and work with SP Terrace on further changes to the development even after the December 31 deadline, indicating that it continued to insist on performance after breach of the agreement. In his affidavit, Tyler Todd states that SP Terrace "continued to work with [Meritage] under the Contract and to accommodate changes requested by [Meritage] throughout December 2005, January 2006, and into February 2006." Kelly Smalley states that a Meritage representative participated in a meeting to discuss the proposed subdivision changes on January 10, 2006, after the deadline. We hold that SP Terrace raises a fact issue as to whether Meritage waived the December 31 substantial completion deadline and its right to terminate the contract on this basis, particularly in light of the contract provision that the substantial completion deadline "would be [**19] extended" to the extent of any delay caused by Meritage. *See Delgado, 936 S.W.2d at 485* ("A party to a contract may effectively waive a breach by the other party by continuing to insist on performance by the other party even after a breach.").

*Delay and Interference by Meritage*

SP Terrace contends that fact issues exist as to whether Meritage caused delays and interfered with SP Terrace's performance of its contractual obligations thus breaching an implied duty to cooperate.

We examine the written contract to determine the obligations of the parties. *See Bank One, Tex., N.A. v. Stewart, 967 S.W.2d 419, 435 (Tex. App.--Houston [14th Dist.] 1998, pet. denied), cited with approval in Keck v. Nat'l Union Fire Ins. Co., 20 S.W.3d 692, 701 (Tex. 2000)*; *Nalle v. Taco Bell Corp., 914 S.W.2d 685, 687 (Tex. App.--Austin 1996, writ denied)*. We do not imply a covenant regarding a matter specifically covered by the terms of the written contract, but we imply a duty to cooperate to the extent necessary for the contract's performance. *See Stewart, 967 S.W.2d at 434*. Thus, a party cannot "hinder, prevent, or interfere with [another's] ability to perform [its] duties under [the] agreement." *See id. at 435*. [**20] The implied covenant to cooperate differs from the broader implied covenant of good faith and fair dealing, which the Texas Supreme Court has rejected. *See Case Corp. v. Hi-Class Bus. Sys. of Am., Inc., 184 S.W.3d 760, 770 (Tex. App.--Dallas 2005, pet. denied)* (citing *Tex. Nat'l Bank v. Sandia Mtg. Corp., 872 F.2d 692, 698-99 (5th Cir. 1989))*.

When one party prevents another from timely performing its contractual obligations, the failure to timely perform is excused. *See Anderson Dev. Corp. v. Coastal States Crude Gathering Co., 543 S.W.2d 402, 406 (Tex. Civ. App.--Houston [14th Dist.] 1976, writ ref'd n.r.e.)*; *see also Dorsett v. Cross, 106 S.W.3d 213, 217 (Tex. App.--Houston [1st Dist.] 2003, no pet.)* ("Prevention of performance by one party excuses performance by the other party."). According to Todd and Smalley, SP Terrace prepared to file the subdivision plat in November 2005, but at Meritage's request, it delayed filing it. Smalley also stated the following:

> The development was often delayed by lack of information, delays in approvals and changes in plans and designs from [Meritage]. For example, I could not obtain timely approval from [Meritage] for finalizing the design of the [**21] fences, the location of the electrical service, Steve Harding's failure to attend a meeting on November 16, 2005 with CenterPoint Energy and failure to respond to CenterPoint Energy on various [*286] issues. These

failures and delays caused a delay in the substantial completion of the subdivision.

Section 16(k) of the contract provides that: "Seller [SP Terrace] shall not be responsible for any damage or delay caused by Purchaser [Meritage] or Purchaser's agent . . . and the time limits for Seller's performance hereunder shall be extended to the extent of any such delay." [1] We hold that SP Terrace's summary judgment evidence raises a fact issue as to whether a delay caused by Meritage extended the substantial completion deadline.

1 The contract provides in section 16(k) that the substantial completion deadline "would be extended" if Meritage caused the delay of the deadline. Meritage argued in the trial court that SP Terrace's reference to section 16(k) in an amended pleading filed after its motion for partial summary judgment was filed came too late to support its contractual defenses. We disagree, in so much as SP Terrace expressly argued in its summary judgment response that "by words, actions [**22] and inaction, Meritage caused the default and/or delay in the substantial completion."

*Summary Judgment on SP Terrace's Counterclaim*

SP Terrace also sues Meritage for breach of contract, and seeks damages beyond the earnest money deposit. The trial court rejected this claim, and SP Terrace appeals. Meritage responds that SP Terrace's counterclaim is not one for affirmative relief, but in any event, SP Terrace's recovery is limited to the earnest money contract.

*A. Claim for Affirmative Relief*

Meritage argues that SP Terrace's asserted contractual defense to the refund of Meritage's earnest money deposit is not an affirmative claim for relief. To qualify as a claim for affirmative relief, the defendant must allege a cause of action independent of the plaintiff's claim, on which the defendant can recover benefits, compensation, or relief, even though the plaintiff may abandon or fail to establish its claim. *See Gen. Land Office v. OXY USA, Inc., 789 S.W.2d 569, 570 (Tex. 1990)*. If the defendant only resists the plaintiff's right to recover, then it does not state a claim for affirmative relief. *See id*.

In its "Second Amended Answer and First Amended Counterclaim," SP Terrace stated that Meritage's [**23] "actions, promises and representations" constituted a prior breach of the contract by Meritage, which excused SP Terrace from further performance and entitled SP Terrace to retain the earnest money deposit and recover actual damages, including lost profits, of at least $ 1,400,000.

Meritage argues that because SP Terrace always possessed the earnest money deposit, and if SP Terrace prevailed or Meritage abandoned its claim, SP Terrace would simply retain the earnest money. Therefore, SP Terrace's counterclaim, which asks the trial court to determine that SP Terrace is entitled to the earnest money, is essentially a claim for declaratory relief. We disagree. SP Terrace asked the trial court to determine it has a right to the earnest money deposit, but it also seeks actual damages beyond the earnest money deposit. *See Howell v. Mauzy, 899 S.W.2d 690, 706 (Tex. App.--Austin 1994, writ denied)* ("A court may allow a declaratory-judgment counterclaim, however, if it is something more than a mere denial of the plaintiff's claim and has greater ramifications than the original suit. A counterclaim has greater ramifications than the original suit if it seeks affirmative relief.") (internal citations [**24] omitted). We hold that SP Terrace's allegations state a claim for relief independent of Meritage's breach of contract [*287] claim. If the trier of fact concludes that Meritage has waived performance of the substantial completion deadline and was in breach of the agreement, then SP Terrace is entitled to pursue its claim for breach.

*B. Earnest Money as Liquidated Damages*

SP Terrace asked the trial court to set aside the earnest money liquidated damages provision for a breach by Meritage, contending that it penalizes Meritage because it requires Meritage to forfeit its earnest money no matter how trivial its breach. SP Terrace requests this interpretation of the contract so that its damages claim against Meritage can exceed the earnest money deposit it kept after Meritage terminated the contract. The clause in question provides that, upon default by Meritage, SP Terrace, as its sole remedy, may terminate the contract and retain the earnest money deposit.

We enforce a liquidated damages clause if (1) the harm caused by the breach is incapable or difficult of estimation, and (2) the amount of liquidated damages is a reasonable forecast of just compensation. *See Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex. 1991)*. [**25] An assertion that a liquidated damages provision constitutes an unenforceable penalty is an affirmative defense, and the party asserting penalty bears the burden of proof. *See Urban Television Network Corp. v. Liquidity Solutions, 277 S.W.3d 917, 919 (Tex. App.--Dallas 2009, no pet.)*; *Fluid Concepts, Inc. v. DA Apts., LP, 159 S.W.3d 226, 231 (Tex. App.--Dallas 2005, no pet.)*. Generally, that party must prove the amount of actual damages, if any, to demonstrate that "the actual loss was not an approximation of the stipulated sum." *Baker v. Int'l Record Syndicate, Inc., 812 S.W.2d 53, 55 (Tex. App.--Dallas 1991, no writ)*. If the amount stipulated in the liquidated damages clause is "shown to be disproportionate to actual damag-

es," we should declare that the clause is a penalty and limit recovery to actual damages. *Johnson Eng'rs, Inc. v. Tri-Water Supply Corp., 582 S.W.2d 555, 557 (Tex. Civ. App.-- Texarkana 1979, no writ)*; *see also TEX. BUS. & COM. CODE ANN. § 2.718(a)* (Vernon 2009) ("A term fixing unreasonably large liquidated damages is void as a penalty."). Whether a liquidated damages clause is an unenforceable penalty is a question of law for the court, but sometimes factual issues [**26] must be resolved before the court can decide the legal question. *See Phillips, 820 S.W. 2d at 788*. For example, in *Phillips*, the Texas Supreme Court observed that "to show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were." *Id*.

SP Terrace adduced no evidence in the trial court that Meritage's forfeit of its earnest money operated as a penalty because Meritage's breach was a trivial one. Its aim was just the opposite--it was to prove that Meritage's breach caused damages far higher than the earnest money amount, although it offered no proof of that theory either. We decline to remove a limitation of remedy provision absent any evidence that the liquidated amount in the contract is unreasonably high or low in light of the alleged breach. *See Urban Television, 277 S.W.3d at 919*; *Fluid Concepts, Inc., 159 S.W.3d at 231*.

SP Terrace relies on cases in which courts have disregarded liquidated damages provisions as unreasonable in their approximation of actual damages for trivial breaches. *See Stewart v. Basey, 150 Tex. 666, 245 S.W.2d 484, 487 (Tex. 1952)* [**27] ("Our conclusion is that, since the contract provided the same reparation for the breach of each [*288] and every covenant, and since it would be unreasonable and a violation of the principle of just compensation to enforce it as to some of them, the provision for stipulated damages should be treated as a penalty."); *Community Dev. Serv., Inc. v. Replacement Parts Mfg., Inc., 679 S.W.2d 721, 727 (Tex. App.--Houston [1st Dist.] 1984, no writ)* (holding that liquidated damages clause in earnest money contract was unenforceable penalty, because even though it provided reasonable damages for major breaches of the contract, it also allowed unreasonable damages for trivial breaches); *Bethel v. Butler Drilling Co., 635 S.W.2d 834, 837-38 (Tex. App.--Houston [14th Dist.] 1982, writ ref'd n.r.e.)* (holding same). These cases are distinguishable in that either it was the breaching party who argued that the provision was a penalty, or in that the party seeking to set aside the provision adduced evidence that the liquidated damages clause was not a reasonable approximation of damages caused by the breach. *See Stewart, 245 S.W.2d at 487* (where actual damages incurred by breaching party amounted to $ 38.50, [**28] "stipulation to pay several

thousand dollars . . . would be so unreasonable that no court would lend its power to enforce it"); *Community Dev., 679 S.W. 2d at 727* (jury findings and evidence supported claim that earnest money provision operated as penalty); *Bethel, 635 S.W.2d at 843* (upholding trial court's determination that liquidated damages clause was penalty against breaching party, and limiting plaintiff's recovery to actual damages).

A liquidated damages provision is a penalty if it punishes the breaching party by subjecting it to a disproportionately high amount of damages relative to reasonably anticipated actual damages. Absent evidence that the earnest money amount here was not a reasonable approximation of an anticipated breach, limiting recovery to the earnest money deposit and preventing a party from recovering actual damages in excess of the bargained for liquidated amount does not constitute a penalty to the breaching party. [2] We decline to hold as a matter of law that the earnest money provision in this case is a penalty. *Cf. Phillips, 820 S.W.2d at 788-89* (no fact issue that provision was penalty against breaching party because it provided that actual damages be determined [**29] and multiplied tenfold).

> 2   Other jurisdictions that have addressed this issue have held similarly, and refused to strike the liquidated damages provision on the ground that it is an unenforceable penalty. *See, e.g., Mahoney v. Tingley, 85 Wn.2d 95, 529 P.2d 1068, 1070 (Wash. 1975)* ("A penalty exists where there is an attempt to enforce an obligation to pay a sum fixed by agreement of the parties as a punishment for the failure to fulfill some primary contractual obligation. In this case, it is not the party in default who seeks relief from an excessively high liquidated damages provision. Rather, the provision operates to limit the recovery of the party who incurred a loss as a result of the other parties' breach. There being no element of punishment involved, it cannot be said that plaintiff is being penalized in any sense.")(internal citations omitted); *Margaret H. Wayne Trust v. Lipsky, 123 Idaho 253, 846 P.2d 904, 910 (Idaho 1993)* (following *Mahoney* and refusing to strike down liquidated damages provision as penalty when non-breaching party sought damages in excess of provision amount).

*Required Notice to Recover Earnest Money*

Finally, SP Terrace contends that it did not receive thirty days' notice and an opportunity [**30] to cure the default. Section 9(c) of the contract states:

> In the event Seller shall default in Seller's obligations hereunder . . . Pur-

> chaser shall give Seller thirty (30) days written notice and opportunity to cure such default. If Seller fails to cure its default within the thirty day period provided in [*289] the notice, Purchaser, as its sole and exclusive remedies, may either (i) terminate this Contract and obtain the return of its Earnest Money or (ii) enforce specific performance of Seller's obligation to convey the Lot(s) upon payment of the Purchase Price.

Meritage responds that the contract does not require notice and an opportunity to cure because section 4(i) states that if "Substantial Completion does not occur by December 31, 2005 at option of Purchaser this Contract shall terminate and Purchaser is *relieved of any obligation hereunder*." We agree, and hold that once Meritage exercised its option to terminate due to SP Terrace's failure to meet the deadline, Meritage was relieved of further contractual obligations, including the requirement of providing notice and an opportunity to cure. Reading the contract to require notice and an opportunity to cure before recovering the earnest [**31] money, even if SP Terrace did not achieve substantial completion by December 31, would render section 4(i)'s provision that failure to achieve substantial completion by December 31 relieves Meritage of *any* contractual obligation a nullity. *See J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003)* ("[W]e must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless."). We therefore hold that SP Terrace was not entitled to notice and a thirty day opportunity to cure any failure to comply with the substantial completion deadline.

**Conclusion**

We hold that SP Terrace failed to raise a fact issue on its affirmative defenses of modification and interference by Meritage, but raises fact issues whether Meritage waived performance of the December 31 substantial completion deadline and whether Meritage caused delay that extended the time for performance. We further hold that SP Terrace's counterclaim states a claim for affirmative relief, but that SP Terrace fails to prove on this record that the earnest money provision of the contract is unenforceable as a matter of law. We therefore [**32] reverse and remand the case for further proceedings. [3]

3 SP Terrace also contends that the trial court awarded unreasonable and excessive attorney's fees to Meritage. Because we reverse and remand on the merits, we vacate the award of attorney's fees.

Jane Bland

Justice



**The State of Texas, Appellant, v. Harry W. Margolis et al., Appellees**

**No. 11654**

**Court of Civil Appeals of Texas, Third District, Austin**

***439 S.W.2d 695*; *1969 Tex. App. LEXIS 2467*; *1969 Trade Cas. (CCH) P72,751***

**March 26, 1969**

**SUBSEQUENT HISTORY:** [**1] N.R.E.

**PRIOR HISTORY:** From the District Court of T5avis County, 167th Judicial District, No. 161990, Honorable Herman Jones, Judge Presiding.

**JUDGES:** Trueman E. O'Quinn, Associate Justice.

**OPINION BY:** O'QUINN

**OPINION**

[*697] Appellees sought and obtained a declaratory judgment in district court holding that they did not violate State statutes, prohibiting monopolies, trusts, or conspiracies in restraint of trade, by operating a merchandising conception designed to avoid the restraints of a penal statute making it unlawful for any person to sell certain goods on both of the two consecutive days of Saturday and Sunday.

The State of Texas, defendant below, has appealed from this judgment and contends that appellees are engaged in a monopoly or trust that fixes, maintains, affects, or controls prices and that their activity tends to lessen competition. The State also urges that the statute under which this suit was brought for a declaratory judgment violates provisions of the State Constitution forbidding the rendition of advisory opinions by the courts.

Appellees are individuals and corporations engaged in an arrangement under which Sundaco, Inc., a retail store entity organized for the purpose [**2] of making the arrangement, is open for business only on Sundays, and the other appellee corporations are open only on Mondays through Saturdays. The purpose of this system of merchandising is to avoid violation of Article 286a, Texas Penal Code, which makes unlawful the sale by any person of certain goods on both Saturday and Sunday. The plan operates by means of contracts under which Sundaco each Saturday night acquires from the other appellee corporations all merchandise in their stores and, after conducting business through Sunday, returns the stores to the corporations that operate the remaining days of the week. Profits made on Sunday are divided between Sundaco and the other corporations.

Appellees brought suit for declaratory judgment under *Section 15.12 of the Texas Business and Commerce Code* which purports to authorize suit when petitioner is "* * * uncertain of whether or not his action *or proposed action* violates or *will violate* the prohibition contained in *Section 15.04* of this code * * *" (Emphasis supplied). *Section 15.04* of the code prohibits all monopolies, trusts, and conspiracies in restraint of trade and declares such combinations illegal.

We have decided [**3] that because there is absent from the record any showing that a presently justiciable controversy exists between the State and the appellees, any judgment under the record would be an advisory opinion the courts are not authorized to render. We do not reach the State's points of error as to price control and lessening competition, and will notice only briefly the point under which validity of *Section 15.12* is challenged. We will order the cause dismissed.

Appellees alleged the following with regard to the existence of a presently justiciable controversy:

> "The Defendant, The State of Texas, acting under its Attorney General and/or District Attorney of Tarrant County, Texas, and other Counties in which a corporate Plaintiff has operations, has contended that the actions and/or proposed actions of all of the Plaintiffs, their agents and employ-

> ees, violate or will violate the prohibitions contained in *Section 15.04 of the Business and Commerce Code*. It is contended by said Defendant that said actions or proposed actions of the Plaintiffs, their employees and agents, constitute a monopoly, trust, and/or conspiracy in restraint of trade, as defined in Section 15.01, 15.02, and 15.03, [**4] of the Business and Commerce Code. That by reason of said actions and/or proposed actions, the Plaintiffs are subject to the civil and criminal penalties provided for in Section 15.29 through *Section 15.33 of the Business and Commerce Code*. Further, said Defendant has indicated its intention to [*698] proceed against the Plaintiffs pursuant to said penalty provisions of said Code, which has given rise to a bona fide controversy and created justiciable issues which the Court has authority to determine."

At the trial no evidence was introduced and none was offered by appellees to prove any of the allegations set out above. If the State had "indicated its intention to proceed against the plaintiffs" and invoke the penalty provisions of the code, as appellees alleged in their petition, such intention is not reflected in the record. The State filed an answer to the petition, specially denying numerous allegations, and generally denied each and every allegation in the petition. The State by its answer did not seek penalties, nor did the State pray for injunctive relief to restrain appellees. The State's answer was in all respects purely defensive.

The State's general denial [**5] put appellees in the position of having to prove every material fact of their cause of action. *Boswell v. Handley, 397 S.W.2d 213 (Tex. 1965)*. The burden was upon appellees to establish that the trial court had authority to entertain the suit by proving that a justiciable controversy existed. *Reuter v. Cordes-Hendreks Coiffures, Inc., 422 S.W.2d 193* (Tex.Civ.App., 1967, Houston (14th Dist.), no writ).

*Section 15.12*, in which it is provided that a person "* * * uncertain of whether or not his action or proposed action violates or will violate * * *" *Section 15.04* of the code is authorized to file suit against the state for declaratory judgment, cannot confer upon the courts power to render an advisory opinion to the person who is "uncertain" as to the legality of his actions or proposed actions. Even in declaratory actions, the courts may render opinions only if there exists a justiciable controversy between the parties. *California Products, Inc. v. Puretex Lemon Juice, Inc., 160 Tex. 586, 334 S.W.2d 780 (1960)*; *Lee v. Calvert, 356 S.W.2d 840* (Tex.Civ.App., 1962, Austin, writ ref. n.r.e.). It is the duty of the court to decide whether a justiciable controversy exists. *Ainsworth* [**6] *v. Oil City Brass Works, 271 S.W.2d 754* (Tex.Civ.App., 1954, Beaumont, no writ).

The Supreme Court recently declared, "In the absence of a constitutional provision authorizing the Texas courts to render advisory opinions, such power does not exist and may not be conferred by agreement of the parties." *Firemen's Insurance Company of Newark, New Jersey v. Burch, 442 S.W.2d 331, 12 Tex.Sup.Ct. Jour. 49* (October 11, 1968).

The State contends that *Section 15.12 of the Business and Commerce Code* is unconstitutional in providing for declaratory judgments where there is a lack of justiciable controversy. "The provisions of *Section 15.12*," the State argues, "which authorize the courts to consider the prospective actions of an individual expressly negates the necessity of their (there) being a justiciable controversy ripe for determination."

We agree with the State that insofar as *Section 15.12* purports to empower courts to pass on prospective actions, the statute contravenes the provisions of Section 1, Article II, of our State Constitution prescribing separation of powers. The courts of this State, because of this provision of the Constitution, are prohibited from rendering advisory opinions [**7] and the power may not be conferred by the Legislature. *Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641, 646 (1933)*.

Appellees argue in response to the State's contention, that the State's "* * * argument is made * * * after ten continuous months of litigation before the trial court, both in pretrial procedures and in trial and post trial procedures, after a trial of approximately three and a half days, filling approximately four hundred and forty-five pages of a statement of facts and after the preparation of a brief * * *" in this Court. "The justiciable [*699] controversy," appellees say, "between the appellant and the appellees is obvious from the record before this Court."

We do not agree with appellees that a justiciable controversy, required to be pleaded and proved, is obvious from the record. As we have observed, appellees alleged in their petition, as a basis for showing a justiciable controversy, that the State "has indicated its intention to proceed against the Plaintiffs pursuant to said penalty provisions of said Code, which has given rise to a bona fide controversy and created justiciable issues which the Court has authority to determine."

It is obvious from [**8] the record that appellees filed their petition seeking advice from the courts because they were "uncertain of whether or not (their) action or

proposed action" in carrying on the Sundaco scheme "violates or will violate" *Section 15.04* prohibiting monopolies, trusts, and conspiracies in restraint of trade. Even if all but the prospective aspects of *Section 15.12* are valid, and we do not decide that question, the suit for declaratory judgment will not lie unless proof is made of a bona fide threat of interference by the State invoking the anti-trust laws.

Discretion rests with the Attorney General as to whether anti-trust suits will be brought by the State to interdict the Sundaco operations and invoke penalties. The record is devoid of any showing that appellees had been ordered to discontinue their operations. There is no evidence of a threat to interfere with Sundaco activities as a violation of *Section 15.04*. No threat of interference by the State with the rights of appellees appears beyond that implied by the existence of the statute and the State's answer defending against the petition for declaratory judgment. Appellees may not compel the Attorney General to exercise his [**9] discretion by filing suit for declaratory judgment.

The power of courts to pass upon the "uncertainty" appellees have with regard to their actions will arise only when the interest of appellees require the use of judicial authority for their protection against actual interference. A threat that is only hypothetical is not enough. *United Public Workers v. Mitchell, 330 U.S. 75, 67 S. Ct. 556, 91 L. Ed. 754 (1947)*. In *Hitchcock v. Kloman, 196 Md. 351, 76 A.2d 582 (Md. 1950)* the Court of Appeals of Maryland refused to entertain suit for declaratory judgment in the absence of a threat to interfere with activities of petitioner, although the attorney general had delivered opinions that similar activities came within the state statute petitioner asked the court to construe. There it was held that mere existence of the statute did not pose such a threat as to present a justiciable controversy.

In the absence of proof that there existed a justiciable controversy, the courts are without jurisdiction. For the reasons we have stated, this cause is dismissed for want of [**10] jurisdiction.

Dismissed for want of jurisdiction.



**E. C. Stewart et ux v. James Marvin Basey**

**No. A-3346**

**Supreme Court of Texas**

***150 Tex. 666*; *245 S.W.2d 484*; *1952 Tex. LEXIS 373***

**January 16, 1952, Decided**

**PRIOR HISTORY:** [***1] Error to the Court of Civil Appeals for the Third District, in an appeal from Travis County.

**DISPOSITION:** The judgment of the Court of Civil Appeals is affirmed.

**HEADNOTES**

**Damages -- Intention.**

Liquidated damages are unenforcible unless the amount therefor was uncertain in the contemplation of the parties at the time the contract was executed, and the stipulation therefor must be reasonable.

**Measure of Damages -- Contracts -- Leases.**

Parties competent to contract, while having the right to make their own bargain, should not be permitted to have a court enforce a stipulation which would violate the rule that a breach of said contract should be the just compensation for the loss or damage actually sustained, and the damaged party should be awarded neither less nor more than his actual damage.

**Damages -- Leases -- Appeal and Error -- Penalties.**

The proviso in a lease contract that should lessees fail to make their monthly payment of the rents, and lessors should exercise their option to terminate the contract for that reason, or for some other breach of the contract, lessee would become obligated to pay a lump sum at that time equal to the total for each and [***2] every month of the unexpired term of the contract, was not a provision for stipulated damages, but was a penalty and was unenforcible. It was not error for the court of civil appeals to remand said case to the trial court to determine the actual amount of damages suffered by lessors.

**SYLLABUS**

This was a suit by E. C. Stewart and his wife to collect from James Marvin Basey rents for the unexpired term of a lease of certain buildings which he had rented under a five year contract claiming the right to enforce a provision in their lease contract that should the lease be forfeitured, lessees should pay as liquidated damages the sum of $ 150.00 per month for each and every month of the unexpired term of the lease contract. They also sued, in the alternative, for actual damages. They actually occupied and paid rent for 11 months. The trial court awarded damages of $ 38.50 for the destruction of a door, but denied all other relief. The Court of Civil Appeals reversed that judgment and remanded the cause to the trial court to determine the actual damages sustained by lessors, *241 S.W. 2d 353*. The Stewarts have brought error to the Supreme Court.

**COUNSEL:** *E. M. DeGeurin*, of Austin, for petitioners.

[***3] The Court of Civil Appeals erred in not rendering judgment in favor of petitioners in the amount of the unliquidated damages as agreed to in the lease contract. *Galveston, H. & S.A. Ry. Co. v. Johnson, 74 Texas 256*; *Rio Bravo Oil Co. v. Weed, 121 Texas 427, 50 S.W. 2d 1080*; Fidelity & Dep. Co. of Md. v. Walker, 75 Fed. 2d 115-118.

*W. R. Smith, Jr.*, of Austin, for respondents.

**JUDGES:** Mr. Chief Justice Hickman delivered the opinion of the Court.

**OPINION BY:** HICKMAN

**OPINION**

[*667] [**485] The controlling question in this case is whether the language quoted below stipulating the damages recoverable for [*668] the breach of a lease contract is a provision for liquidated damages or for a penalty. The trial court construed it as a provision for a penalty and, finding that the lessor suffered no damages by lessee's breach except $ 38.50 caused by the destruction of a partition door in one of the leased buildings, rendered judgment for that amount only. The Court of Civil Appeals upheld the trial court in its refusal to award liquidated damages, but reversed that portion of the judgment awarding only $ 38.50 as damages and remanded the case to the trial court for the sole purpose [***4] of determining the amount of actual damages sustained by the lessor. *241 S.W. 2d 353*.

By a contract in writing petitioners, E. C. Stewart and wife, leased to respondent, James Marvin Basey, three store buildings on South Congress Avenue in the city of Austin. The lease stated that it was for a term of five years, beginning on January 1, 1949, and ending at midnight on December 31, 1954. The dates cover a period of six years, but for the purposes of this opinion it is immaterial whether the term was five years or six years. The lease provided for a monthly rental of $ 325.00, payable each month in advance. Respondent went into possession under the lease and paid the monthly rentals through November, 1949, during which month he vacated the buildings. On the following December 5th the keys were returned to petitioners upon their request, since which time they have executed leases to other tenants. The provision of the contract which we are called upon to construe reads as follows:

"The failure to pay any monthly installment of rental when such installment is due shall terminate this lease at the option of Lessors. The failure of Lessee to make said payment or payments or the [***5] breach of this contract otherwise by him shall render him liable to Lessors, as agreed liquidated damages, the sum of One Hundred Fifty (150) Dollars per month for each and every month of the unexpired term of this lease which shall become due and payable when the option to terminate this lease is exercised or at the time of the breach of this contract otherwise by Lessee if any, and the payment thereof be secured by lien on the property of Lessee in said Store Buildings at said time."

Another provision of the contract is:

"That the violation of any term of this lease by either party hereto shall terminate the same at the option of the other."

It will be observed that liability for the payment of $ 150.00 [*669] per month as liquidated damages is not limited to the breach of any one particular covenant of the contract. The covenant to pay the rent when due is but one of the covenants the breach of which would give rise to a claim by the lessors for $ 150.00 per month for each and every month of the unexpired term of the lease.

Volumes have been written on the question of when a stipulated damage provision of a contract should be enforced as liquidated damages and when [***6] enforcement [**486] should be denied because it is a penalty provision. One line of cases, of which *Eakin v. Scott, 70 Texas 442, 7 S.W. 777*, is typical, states that the intention of the parties governs and another line states that their intention is immaterial, but when the results are examined there appears but little disparity between them. All agree that to be enforceable as liquidated damages the damages must be uncertain and the stipulation must be reasonable. There is a statement in the opinion in *Eakin v. Scott, supra*, which, standing alone, would lead to the conclusion that the damages in that case were certain in amount. But when the entire opinion is read, it becomes obvious that the damages were very uncertain in the contemplation of the parties when the contract was executed; and that is the true test of uncertainty. The true theory is well expressed in Williston on Contracts, Revised Edition, Sec-779, p. 2192, in this language:

"But as has been seen, the chief, almost the only, means of determing whether the parties in good faith endeavored to assess the damages is afforded by the amount of damages stipulated for, and the nature of the breach upon which the [***7] stipulation was agreed to become operative. This is but saying in other words that the reasonableness or unreasonableness of the stipulation is decisive."

The cases which hold that the intention of the parties controls impute to the parties an intention to provide for a penalty when it would be unreasonable and unjust to do otherwise, even though their language clearly expresses the contrary intention. They indulge in a presumption in order to arrive at the justice of the case. The cases which disregard the intention of the parties treat the question as one of the legality of the stipulation. The reasoning in *Langever v. R. G. Smith & Co., Comm. App., 278 S.W. 178, 179*, is typical of that employed in cases which announce that the intention of the parties controls. The statement in the opinion that "the real intention of the parties when ascertained will control" is followed by the statement that such intention "is not necessarily ascertained by the words [*670] employed." Regardless of which line of cases is followed, the courts will not be bound by the language of the parties.

The right of competent parties to make their own bargains is not unlimited. The universal [***8] rule for measuring damages for the breach of a contract is just compensation for the loss or damage actually sustained. By the operation of that rule a party generally should be awarded neither less nor more than his actual damages. A party has no right to have a court enforce a stipulation which violates the principle underlying that rule. In those cases in which courts enforce stipulations of the parties as a measure of damages for the breach of covenants, the principle of just compensation is not abandoned and another principle substituted therefor. What courts really do in those cases is to permit the parties to estimate in advance the amount of damages, provided they adhere to the principle of just compensation. Restatement of Contracts, Sec. 339, accurately expresses the rule as follows:

"(1) An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless.

"(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

"(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate [***9] estimation."

This comment on subsection (1) follows:

"b. Contracts are frequently made in which performance of very different degrees of importance and value are promised and one large sum of money is made payable as damages for any breach whatever. Since such a contract promises the same reparation for the breach of a trivial or comparatively unimportant stipulation as for the breach of the most important one or of the whole contract, it is obvious that the parties have not adhered to the rule of just compensation. In this matter neither the intention of the parties nor their expression of intention is the governing consideration. The payment promised may be a penalty, though described expressly as liquidated damages, and vice versa."

[**487] The rule as declared in that comment is in effect the same as that declared in Williston on Contracts, Revised Edition, Vol. 3, Sec. 783, p. 2204; McCormick on Damages, Sec. 151; 15 Am. Jur., Damages, Sec. 253; and 25 C.J.S., damages, Sec. [*671] 111. Early in the history of this court in *Durst v. Swift, 11 Texas 273, 282*, the rule was stated in this language: "* * * where the agreement contains several matters of different [***10] degrees of importance, and yet the sum named is payable for the breach of any, even the least * * * the sum stipulated to be paid has been treated as a penalty." That rule was followed in *Palestine Ice, Gin & Fuel Co. v. Walter Connally & Co., 148 S.W. 1109*, error refused, and in Sanders Nursery Co. v. J.C. Engleman, Inc., *- 109 S.W. 2d 1131*, error dismissed.

When that rule is applied to the provisions in the contract before us it seems clear that the stipulation should be construed as a provision for a penalty and not for liquidated damages. Obviously, the stipulation was not carefully drawn. It provides that for the failure of lessee to pay any installment of rent when due or for his breach of any other obligation of the contract, the lessors could, at their option, terminate the lease. Should they elect to terminate it, the lessee would be obligated to pay them at that time a sum of money arrived at by multiplying $ 150.00 by the number of months of the unexpired term of the lease. Should they not elect to terminate the lease they could, nevertheless, demand that amount in a lump sum on the date of the breach. The lease contains several covenants other than the covenant to [***11] pay rent when due. One is a covenant of indemnity in this language:

"Lessee further covenants and agrees to keep Lessors free and harmless from any and every claim, demand, or cause of action arising in or on the leased premises during the term of this lease."

Another is a covenant that lessee will prudently use the premises and avoid injuries thereto, except usual wear and tear, and another that lessee will "make such repairs as are not caused by Lessors or their agents and the usual depletion of said property."

It is not necessary for us to decide whether petitioners would have been entitled to liquidated damages had the lease contract contained no covenant except the covenant to pay rent, and we therefore pass that question by without discussion. It is clear that petitioners should not be awarded a large sum for liquidated damages for the breach of the other covenants just mentioned. Take, for instance, the covenant for indemnity. Whatever amount respondent might have been called upon to pay petitioners as an indemnity would have been a [*672] definite amount measured by the liability theretofore adjudged against petitioners. An obligation to pay an indemnity is [***12] nothing more than an obligation to pay a sum of money theretofore ascertained, and a provision that failure to pay a definite sum of money upon default of performance of a covenant in a contract entitles the obligee to recover liquidated damages in excess of the interest rate will not be enforced. *Langever v. R. G. Smith & Co., Comm. App., 278 S.W. 178*.

With respect to the other covenants above mentioned, it was found by the trial court that respondent breached them, and damages of $ 38.50 were assessed against him therefor. A stipulation to pay several thousand dollars

for the breach of a covenant which might well result in damages of $ 38.50 or even less would be so unreasonable that no court would lend its power to enforce it.

Our conclusion is that, since the contract provided the same reparation for the breach of each and every covenant, and since it would be unreasonable and a violation of the principle of just compensation to enforce it as to some of them, the provision for stipulated damages should be treated as a penalty.

We approve the action of the Court of Civil Appeals on rehearing in remanding the case for the purpose of determining the actual damages instead [***13] of rendering it.

The judgment of the Court of Civil Appeals is affirmed.

Opinion delivered January 16, 1952.



**TEXAS ASSOCIATION OF BUSINESS, APPELLANT v. TEXAS AIR CONTROL BOARD AND TEXAS WATER COMMISSION, APPELLEES**

**NO. C-9556**

**SUPREME COURT OF TEXAS**

***852 S.W.2d 440*; *1993 Tex. LEXIS 22*; *36 Tex. Sup. J. 607***

**March 3, 1993, Delivered**

**PRIOR HISTORY:** [**1] ON DIRECT APPEAL FROM THE 250TH DISTRICT COURT, TRAVIS COUNTY, TEXAS.

**COUNSEL:** For APPELLANT: Golemon, Mr. R. Kinnan, ATT 008108000, 512/472-5456, Checkley, Jr., Mr. James W., ATT 004170500, 512/479-9732, Axe, Jr., Mr. Albert R., ATT 001415740, 512/472-5456, Alexander, Mr. Douglas W., ATT 000992350, 512/472-5456, Brown McCarroll & Oaks Hartline, 1400 Franklin Plaza, 111 Congress Avenue, Austin, TX 78701-4043.

For APPELLEES: Caroom, Mr. Douglas G., ATT 003832700, 512/472-8021, Dugat III, Mr. William D., ATT 006173600, 512/472-8021, Bickerstaff, Heath & Smiley, San Jacinto Center, Suite 1800, 98 San Jacinto Boulevard, Austin, TX 78701. Kelly, Ms. Mary E., ATT 011235650, 512/479-8125, Henry, Kelly, Johnson & Lowerre, 2103 Rio Grande, Austin, TX 78705. Lynch, Ms. Nancy N., ATT 012731400, 512/463-2012, Office of the Attorney General of Texas, Dan Morales, A.G., P. O. Box 12548, Capitol Station, Austin, TX 78711. Johnson, Ms. Amy R., ATT 010679550, 512/322-4143, Office of Public Insurance Counsel, 816 Congress Avenue, Suite 1400, Austin, TX 78701-2430.

**JUDGES:** Cornyn, Doggett, Gammage, Spector

**OPINION BY:** JOHN CORNYN

**OPINION**

[*441] OPINION

The Texas Association of Business (TAB), on behalf [**2] of its members, brought this declaratory judgment action seeking a ruling that statutes empowering two state administrative agencies to levy civil penalties for violations of their regulations conflict with the open courts and jury trial provisions of the Texas Constitution. The administrative agencies denied TAB's claims, and along with two Intervenors, [1] filed counterclaims seeking a declaration [*442] that the same statutes and regulations comport with those constitutional provisions.

1 The League of Women Voters and the Lone Star Chapter of the Sierra Club intervened in the suit and were aligned as defendants with the Texas Air Control Board and the Texas Water Commission. Justice Doggett contends that the standing of the Intervenors should be addressed along with TAB's. We disagree. Standing concerns a party's faculty to invoke the court's subject matter jurisdiction. Once it has been invoked by a plaintiff, a court's subject matter jurisdiction is not affected by the status of defendants or intervenors aligned in interest with defendants.

[**3] Following a bench trial, the trial court denied the relief sought by TAB, and as requested by the State and Intervenors, declared that section 4.041 of the Texas Clean Air Act, *sections 26.136* and *27.1015* of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act, as well as the rules and regulations promulgated under those statutes, are constitutional with regard to the open courts and jury trial provisions. We affirm the trial court's judgment as it relates to TAB's jury trial challenge and reverse its judgment as to TAB's open courts challenge.

An overview of the regulatory scheme enacted by the legislature and these agencies is essential to an understanding of this case. In 1967, the Texas Legislature en-

acted the Clean Air Act of Texas. Clean Air Act of Texas, 60th Leg., R.S., ch. 727, 1967 Tex. Gen. Laws 1941. The Clean Air Act was designed to safeguard the state's air resources without compromising the economic development of the state. *Id.* at § 1. The Act created the Texas Air Control Board and granted it the authority to promulgate regulations to accomplish the Act's goals. *Id.* at § 4(A)(2)(a). In the event the Air Control Board determined that [**4] a violation of its regulations had occurred, it was authorized to enforce those regulations in district court. Upon a judicial determination that a violation of the Air Control Board's regulations had occurred, two cumulative remedies were available, injunctive relief to prohibit further violations and assessment of a fine ranging from $ 50 to $ 1,000 for each day the violations persisted. *Id.* at § 12(B).

In 1969, the Texas Legislature enacted the Solid Waste Disposal Act. Solid Waste Disposal Act, 61st Leg., R.S., ch. 405, 1969 Tex. Gen. Laws 1320. The express purpose for this legislation was to protect public health and welfare by regulating the "collection, handling, storage, and disposal of solid waste." *Id.* at § 1. The Texas Water Quality Board was designated the primary agency to effectuate the Disposal Act's purpose. *Id.* at § 4(f). Like the Air Control Board, the Water Quality Board was authorized to enforce its rules and regulations in state district court. The Solid Waste Disposal Act provided the same remedies as the Clean Air Act. *See id.* at § 8(c).

In the last of the relevant statutory enactments, in 1969, the Texas Legislature promulgated a revised [**5] version of the Water Quality Act. Water Quality Act - Revision, 61st Leg., R.S., ch. 760, 1969 Tex. Gen. Laws 2229. By that Act, the Water Quality Board was given the power to develop a statewide water quality plan, to perform research and investigations, and to adopt rules and issue orders necessary to effectuate the Act's purposes. *Id.* at § 3.01-3.10. The Water Quality Act provided the same remedies as the Solid Waste Management Act and the Clean Air Act. *See id.* at § 4.02.

Originally, neither the Water Quality Board nor the Air Control Board had the power to levy civil penalties directly in the event it determined that its regulations or orders had been violated. Instead, each board was required first to file suit against the violator in district court. Only the district court had the power to assess civil penalties.

The legislature substantially changed this enforcement scheme in 1985. That year the Air Control Board and the Water Commission (formerly the Water Control Board) were granted the power to assess civil penalties directly of up to $ 10,000 per day per violation. [2] Both administrative bodies also retained the option to pursue civil penalties in district [**6] court. TEX. HEALTH [*443] & SAFETY CODE §§ 361.224, *382.081*; TEX. WATER CODE § 26.123. This was the regulatory scheme in effect when the district court rendered judgment in this case. [3]

2 Act of June 14, 1985, 69th Leg., R.S., ch. 637, § 33, 1985 Tex. Gen. Laws 2350, 2359 (amending Texas Clean Air Act codified at TEX. REV. CIV. STAT. ANN. art. 4.041 (Vernon 1976), currently codified as amended at TEX. HEALTH & SAFETY CODE § 382.088; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 6.001, 1985 Tex. Gen. Laws 2719, 2813 (amending Solid Waste Disposal Act codified at TEX. REV. CIV. STAT. ANN. art. 4477-7 (Vernon 1976), currently codified as amended at TEX. HEALTH & SAFETY CODE § 361.252; Act of June 15, 1985, 69th Leg., R.S., ch. 795, § 5.007, 1985 Tex. Gen. Laws 2719, 2806 (amending *TEX. WATER CODE § 26.136*).

3 Although some amendments have been adopted since, they are not relevant to the issue presented in this case. *See* Diana C. Dutton, *ENVIRONMENTAL*, 45 SW. L.J. 389 (1991)(summarizing statutory developments).

[**7] After the Air Control Board or Water Commission assesses a penalty, the offender must either timely pay the penalty or file suit in district court. However, a supersedeas bond or cash deposit paid into an escrow account, in the full amount of the penalty, is a prerequisite to judicial review. TEX. HEALTH & SAFETY CODE §§ 382.089(a),(b), 361.252(k),(l); *TEX. WATER CODE § 26.136(j)*. A party who fails to make a cash deposit or file a bond forfeits all rights to judicial review. TEX. HEALTH & SAFETY CODE §§ 361.252(m), 382.089(c); *TEX. WATER CODE § 26.136(k)*.

TAB alleges that it is a Texas not-for-profit corporation, that its members do business throughout Texas, and that it is authorized to represent its members on any matter that may have an impact on their businesses.

TAB filed this suit under the Declaratory Judgments Act, *TEX. CIV. PRAC. & REM. CODE §§ 37.001-37.011*, alleging that some of its members had been subjected to civil penalties assessed by either the Air Control Board or the Water Commission. TAB further alleged that all of its other members that operate their businesses pursuant to the pertinent provisions of the Texas Clean Air Act, the Texas Water Code, or the Texas [**8] Solid Waste Disposal Act or any rules or orders issued pursuant to those provisions were put at "substantial risk (if not certainty)" of being assessed civil penalties by the Air Control Board or the Water Commission. Thus this suit does not challenge specific instances of the Air Control Board's or the Water Commission's exercise, or threatened exercise, of the civil penalty power. Instead, TAB's suit is a

facial challenge to the constitutionality of this administrative enforcement scheme under the Texas Constitution.

The Defendants and Intervenors counterclaimed seeking a declaratory judgment that the statutes, rules, and regulations challenged by TAB do not, on their face, conflict with the open courts and jury trial provisions of our constitution. The trial court granted the Defendants' and Intervenors' requested declaratory judgment and denied TAB's request for a declaratory judgment. The court also denied TAB's request for injunctive relief.

TAB appealed directly to this court. *See TEX. GOV'T CODE § 22.001(c)*; [4] TEX. R. APP. P. 140. In this court, TAB has limited its challenges to claims of unconstitutional denial of a jury trial and violation of our constitution's open [**9] courts provision.

4 "An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." *TEX. GOV'T CODE § 22.001(c)*.

*I. Standing*

Before we reach the merits of this case, we first consider the matter of the trial court's jurisdiction, as well as our own; specifically we determine whether TAB has standing to challenge the statutes and regulations in question. Because TAB's standing to bring this action is not readily apparent, and because our jurisdiction as well as that of the trial court depends on this issue, we requested supplemental briefing on standing at the oral argument of this case. In response, the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal. We disagree.

Subject matter jurisdiction is essential to the authority of a court to decide a case. Standing [**10] is implicit in the concept of subject matter jurisdiction. The standing requirement stems from two limitations on subject matter jurisdiction: the separation of powers doctrine and, in Texas, the open courts provision. Subject matter jurisdiction [*444] is never presumed and cannot be waived. [5]

5 Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See TEX. R. CIV. P. 120a*.

One limit on courts' jurisdiction under both the state and federal constitutions is the separation of powers doctrine. *See TEX. CONST. art. II, § 1*; *Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471-74, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982)*; *Warth v. Seldin, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1974)*; *see also*, Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 18 SUFFOLK U. L. Rev 881, 889 n.69 (1983)(noting that [**11] the dicta of *Flast v. Cohen, 392 U.S. 83, 100, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968)*, suggesting that standing is unrelated to the separation of powers doctrine has since been disavowed). Under this doctrine, governmental authority vested in one department of government cannot be exercised by another department unless expressly permitted by the constitution. Thus we have construed our separation of powers article to prohibit courts from issuing advisory opinions because such is the function of the executive rather than the judicial department. [6] *Firemen's Ins. Co. v. Burch, 442 S.W.2d 331, 333 (Tex. 1969)*; *Morrow v. Corbin, 122 Tex. 553, 62 S.W.2d 641, 644 (Tex. 1933)*. Accordingly, we have interpreted the Uniform Declaratory Judgments Act, *TEX. CIV. PRAC. & REM. CODE §§ 37.001-.011*, to be merely a procedural device for deciding cases already within a court's jurisdiction rather than a legislative enlargement of a court's power, permitting the rendition of advisory opinions. *Firemen's Ins. Co., 442 S.W.2d at 333*; *United Serv. Life Ins. Co. v. Delaney, 396 S.W.2d 855, 863 (Tex. 1965)*; *California Prods., Inc. v. Puretex Lemon Juice, Inc., 160 Tex. 586,* [**12] *334 S.W.2d 780 (1960)*.

6 The analysis is the same under the federal constitution. *See e.g.* Correspondence of the Justices, Letter from Chief Justice John Jay and the Associate Justices to President George Washington, August 8, 1793 in Laurence H. Tribe, *American Constitutional Law* 73 n.3 (2nd ed. 1988).

The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties. *Alabama State Fed'n of Labor v. McAdory, 325 U.S. 450, 461, 89 L. Ed. 1725, 65 S. Ct. 1384 (1945)*; *Firemen's Ins. Co., 442 S.W.2d at 333*; *Puretex Lemon Juice, Inc., 160 Tex. at 591, 334 S.W.2d at 783*. An opinion issued in a case brought by a party without standing is advisory because rather than remedying an actual or imminent harm, the judgment addresses only a hypothetical injury. *See Allen v. Wright, 468 U.S. 737, 751, 82 L. Ed. 2d 556, 104 S. Ct. 3315 (1984)*. Texas courts, like federal courts, have no jurisdiction to render such opinions.

The separation [**13] of powers doctrine is not the only constitutional basis for standing. Under federal law, standing is also an aspect of the Article III limitation of the judicial power to "cases" and "controversies." *Sierra Club v. Morton, 405 U.S. 727, 731, 31 L. Ed. 2d 636, 92 S. Ct. 1361 (1972)*. To comport with Article III, a federal court may hear a case only when the litigant has been

threatened with or has sustained an injury. *Valley Forge Christian College, 454 U.S. at 471*. Under the Texas Constitution, standing is implicit in the open courts provision, which contemplates access to the courts only for those litigants suffering an injury. Specifically, the open courts provision provides:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

*TEX. CONST. art. I, § 13* (emphasis added). Because standing is a constitutional prerequisite to maintaining a suit under both federal and Texas law, we look to the more extensive jurisprudential experience of the federal courts on this subject for any guidance it may yield.

Under federal law, a lack of standing deprives a court of subject [**14] matter jurisdiction because standing is an element of such [*445] jurisdiction. *Carr v. Alta Verde Indus., 931 F.2d 1055, 1061 (5th Cir. 1991)*; *Simmons v. Interstate Commerce Comm'n, 900 F.2d 1023, 1026 (7th Cir. 1990)*; *M.A.I.N. v. Commissioner, Maine Dept. of Human Serv., 876 F.2d 1051, 1053 (1st Cir. 1989)*; *Haase v. Sessions, 266 U.S. App. D.C. 325, 835 F.2d 902, 908 (D.C. Cir. 1987)*; *Page v. Schweiker, 786 F.2d 150, 153 (3d Cir. 1986)*; *see also Lujan v. Defenders of Wildlife, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)*; *Heckler v. Mathews, 465 U.S. 728, 737, 79 L. Ed. 2d, 104* S. Ct. 1387 (1984); *Warth, 422 U.S. at 511*. Other states have followed this analysis in construing their own constitutions. [7] *See e.g., Prudential-Bache Sec., Inc. v. Commissioner of Revenue, 588 N.E.2d 639, 642 (Mass. 1992)*; *Bennett v. Board of Trustees for Univ. of N. Colorado, 782 P.2d 1214, 1216* (Colo. App.), *cert. denied, 797 P.2d 748 (Colo. 1989)*; *Pace Constr. Co. v. Missouri Highway and Transp. Comm'n, 759 S.W.2d 272, 274 (Mo. App. 1988)*; *Terracor v. Utah Bd. of State Lands Forestry, 716 P.2d 796, 798-99 (Utah 1986)*; *State by McClure* [**15] *v. Sports and Health Club, Inc., 370 N.W.2d 844, 850 (Minn. 1985), appeal dism'd, 478 U.S. 1015 (1986)*; *Smith v. Allstate Ins. Co., 483 A.2d 344, 346 (Me. 1984)*; *Ardmare Constr. Co. v. Freedman, 191 Conn. 497, 467 A.2d 674, 675 n.4, 676-77 (Conn. 1983)*; *Horn v. County of Ventura, 24 Cal. 3d 605, 596 P.2d 1134, 1142 (Cal. 1979)*; *Stewart v. Board of County Comm'rs of Big Horn County, 175 Mont. 197, 573 P.2d 184, 186, 188 (Mont. 1977)*; *Albritton v. Moore, 238 La. 728, 116 So.2d 502, 504 (La. 1959)*.

7 Of the states listed by Justice Doggett, only Illinois, Iowa, Kentucky, New York, South Dakota, and perhaps Ohio, Pennsylvania and Washington actually treat jurisdictional standing as waivable. *See* ___ S.W.2d at ___. The other state cases cited deal with the waiver of objections to join a real party in interest or to a party's capacity to sue rather than to jurisdictional standing. *See International Depository, Inc. v. State, 603 A.2d 1119, 1122 (R.I. 1992)*(addressing real party in interest objection); *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust, 413 S.W.2d 599, 603 n.1 (Va. 1992)*(addressing real party in interest objection); *Sanford v. Jackson Mall Shopping Ctr. Co., 516 So.2d 227, 230 (Miss. 1987)*(addressing real party in interest objection); *Jackson v. Nangle, 677 P.2d 242, 250 n.10 (Alaska 1984)*(addressing real party in interest objection); *Poling v. Wisconsin Physicians Serv., 120 Wis. 2d 603, 357 N.W.2d 293, 297-98 (Wisc. App. 1984)*(addressing real party in interest objection); *Torrez v. State Farm Mut. Auto Ins. Co., 130 Ariz. 223, 635 P.2d 511, 513 n.2 (Ariz. App. 1981)*(addressing real party in interest objection); *Brown v. Robinson, 354 So.2d 272, 273 (Ala. 1977)*; *Cowart v. City of West Palm Beach, 255 So.2d 673, 675 (Fla. 1971)*(addressing capacity objection).

[**16] Subject matter jurisdiction is an issue that may be raised for the first time on appeal; it may not be waived by the parties. *Texas Employment Comm'n v. International Union of Elec., Radio and Mach. Workers, Local Union No. 782, 163 Tex. 135, 352 S.W.2d 252, 253 (Tex. 1961)*; *RESTATEMENT (SECOND) OF JUDGMENTS § 11, comment c* (1982). This court recently reiterated that axiom in *Gorman v. Life Insurance Co., 811 S.W.2d 542, 547* (Tex.), *cert. denied, 116 L. Ed. 2d 60, 112 S. Ct. 88 (1991)*. Because we conclude that standing is a component of subject matter jurisdiction, it cannot be waived and may be raised for the first time on appeal. [8]

8 Justice Doggett disagrees that standing is a component of subject matter jurisdiction, yet he declines to explain what role standing plays in our jurisprudence. From his harsh critique of the doctrine, it seems that he not only objects to the conclusion that standing cannot be waived but also to the conclusion that standing is a requirement to initiate a lawsuit.

[**17] If we were to conclude that standing is unreviewable on appeal at least three undesirable consequences could result. First and foremost, appellate courts would be impotent to prevent lower courts from exceeding their constitutional and statutory limits of authority. Second, appellate courts could not arrest collusive suits. Third, by operation of the doctrines of res judicata and collateral estoppel, judgments rendered in suits addressing only hypothetical injuries could bar relitigation of

issues by a litigant who eventually suffers an actual injury. We therefore hold that standing, as a component of subject matter [*446] jurisdiction, cannot be waived in this or any other case and may be raised for the first time on appeal by the parties or by the court.

We are aware that this holding conflicts with *Texas Industrial Traffic League v. Railroad Commission, 633 S.W.2d 821, 823 (Tex. 1982)* (per curiam). [9] The analysis that leads us to the conclusion we reach here, however, compels us to overrule *Texas Industrial Traffic League* and disapprove of all cases relying on it to the extent that they conflict with this opinion. [10] Although our concern for the rule of stare [**18] decisis makes us hesitant to overrule any case, when constitutional principles are at issue this court as a practical matter is the only government institution with the power and duty to correct such errors. *See Payne v. Tennessee, 115 L. Ed. 2d 720, 111 S.Ct. 2597, 2609-11 (1991)* (observing that reexamination of constitutional decisions is appropriate when "correction through legislative action is practically impossible").

9 *Texas Industrial Traffic League* relied on two cases to support its holding that standing cannot be raised for the first time on appeal: *Coffee v. Rice University, 403 S.W.2d 340, 341 (Tex. 1966),* and *Sabine River Authority v. Willis, 369 S.W.2d 348, 350 (Tex. 1963)*. We need not overrule these two cases, however, because unlike *Texas Industrial Traffic League*, we believe that standing was present in the trial court in these cases. Our concern is with a party's right to initiate a lawsuit and the trial court's corresponding power to hear the case *ab initio*. Standing is determined at the time suit is filed in the trial court, and subsequent events do not deprive the court of subject matter jurisdiction. *Carr, 931 F.2d at 1061*.

[**19]

10

Justice Doggett claims that we overrule three additional decisions of this court. *See Central Educ. Agency v. Burke, 711 S.W.2d 7 (Tex. 1986)*(per curiam); *American Gen. Fire & Casualty Co. v. Weinberg, 639 S.W.2d 688 (Tex. 1982)*; *Cox v. Johnson, 638 S.W.2d 867 (Tex. 1982)*(per curiam). We disagree. These cases hold that matters not raised in the trial court are waived. One exception noted by these decisions, however, is a lack of jurisdiction which may be raised by a party, or the court, for the first time on appeal. Justice Doggett does not believe that standing falls within that exception because he contends that standing is not jurisdictional.

Consequently, we proceed to determine here, on our own motion, whether TAB has standing to bring this suit.

Because standing is a component of subject matter jurisdiction, we consider TAB's standing under the same standard by which we review subject matter jurisdiction generally. That standard requires the pleader to allege facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Richardson v. First* [**20] *Nat'l Life Ins. Co., 419 S.W.2d 836, 839 (Tex. 1967)*. When reviewing a trial court order dismissing a cause for want of jurisdiction, Texas appellate courts "construe the pleadings in favor of the plaintiff and look to the pleader's intent." *Huston v. Federal Deposit Ins. Corp., 663 S.W.2d 126, 129* (Tex. App.--Eastland 1983, writ ref'd n.r.e. 1984); *see also* W. Wendell Hall, *Standards of Appellate Review in Civil Appeals*, 21 ST. MARY'S L.J. 865, 870 (1990).

Here, however, we are not reviewing a trial court order of dismissal for want of jurisdiction, we are considering standing for the first time on appeal. A review of only the pleadings to determine subject matter jurisdiction is sufficient in the trial court because a litigant has a right to amend to attempt to cure pleading defects if jurisdictional facts are not alleged. *See TEX. R. CIV. P. 80*. Failing that, the suit is dismissed. When an appellate court questions jurisdiction on appeal for the first time, however, there is no opportunity to cure the defect. Therefore, when a Texas appellate court reviews the standing of a party sua sponte, it must construe the petition in favor of the party, and if necessary, [**21] review the entire record to determine if any evidence supports standing.

TAB asserts standing on behalf of its members. The general test for standing in Texas requires that there "(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Board of Water Engineers v. City of San Antonio, 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955)*. Texas, however, has no particular test for determining the standing of an organization, such as TAB. *See e.g., Touchy v.* [*447] *Houston Legal Found., 432 S.W.2d 690, 694 (Tex. 1968)*; *Texas Highway Comm'n v. Texas Ass'n of Steel Importers, Inc., 372 S.W.2d 525, 530-31 (Tex. 1963)*. While we agree with the statement of the general test for standing set out in *Board of Water Engineers*, we foresee difficulties in relying on it alone to determine the standing of an organization like TAB. For instance, when members of an organization have individual standing, but the organization was not established for the purpose of protecting the particular interest at issue, it is not necessarily in the members' best interest to allow such a disinterested organization to sue [**22] on their behalf. Furthermore, an organization should not be allowed to sue on behalf of its members when the claim asserted requires the participation of the members individually rather than as an association, such as when the

members seek to recover money damages and the amount of damages varies with each member.

The United States Supreme Court has articulated a standard for associational standing that lends itself to our use. We adopt that test today. In *Hunt v. Washington State Apple Advertising Commission*, the Court held that an association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *432 U.S. 333, 343 (1977)*; *see also New York State Club Ass'n. v. City of New York, 487 U.S. 1, 9, 101 L. Ed. 2d 1, 108 S. Ct. 2225 (1988)*; *International Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock, 477 U.S. 274, 282, 91 L. Ed. 2d 228, 106 S. Ct. 2523 (1986)*. This standard [**23] incorporates the standing analysis we adopted in *Board of Water Engineers*, yet addresses the additional concerns we have noted.

We now apply the *Hunt* standard to the case before us. Reviewing the record in its entirety for evidence supporting subject matter jurisdiction, and resolving any doubt in TAB's favor, we conclude that TAB has standing to pursue the relief it seeks in this case.

The first prong of the *Hunt* test requires that TAB's pleadings and the rest of the record demonstrate that TAB's members have standing to sue in their own behalf. This requirement should not be interpreted to impose unreasonable obstacles to associational representation. In this regard the United States Supreme Court stated that " the purpose of the first part of the *Hunt* test is simply to weed out plaintiffs who try to bring cases, which could not otherwise be brought, by manufacturing allegations of standing that lack any real foundation." *New York State Club Ass'n, 487 U.S. at 9*. We are satisfied that TAB has not manufactured this lawsuit. A comparison of the association's membership roster with the list of businesses subjected to state penalties indicates individual TAB members [**24] have been assessed administrative penalties pursuant to the challenged enactments. Additionally, TAB has alleged that other of its members remain at substantial risk of penalty. A substantial risk of injury is sufficient under *Hunt*. *See e.g., Pennell v. City of San Jose, 485 U.S. 1, 7, 99 L. Ed. 2d 1, 108 S. Ct. 849 n.3 (1988)*(concluding that association of landlords had standing based on pleadings that individual members would likely be harmed by rent ordinance). Thus TAB satisfies the first prong of the *Hunt* test.

The second prong of *Hunt* requires that TAB's pleadings and the rest of the record demonstrate that the interests TAB seeks to protect are germane to the organization's purpose. TAB was chartered to "represent the interests of its members on issues which may impact upon its members' businesses." Considering a very similar question in *New York State Club Association*, the United States Supreme Court held that: "The associational interests that the consortium seeks to protect are germane to its purpose: appellant's certificate of incorporation states that its purpose is 'to promote the common business interests of its [*448] [member clubs].'" [**25] *487 U.S. at 10 n.4*. (bracketed language in original). Likewise, the interests TAB desires to protect are germane to the organization's purpose, and thus the second prong is met.

Under the third and final prong of the *Hunt* test, TAB's pleadings and the record must demonstrate that neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit. The Supreme Court has interpreted this prong as follows:

> Whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Hunt*, 432 U.S. at 343, (quoting *Warth, 422 U.S. at 515*).

By seeking damages on behalf of its members, necessitating that each individual prove lost profits particular to its operations, the organization in *Warth* lacked standing to sue; rather, each individual member had to be a party to the [**26] suit. These facts are distinguishable from *Brock*, in which the union challenged an administrative interpretation of statutory provisions relating to unemployment compensation. *477 U.S. 274*. Recognizing that the suit raised "a pure question of law," and that "the individual circumstances" of any aggrieved member were not in issue, the Court held that the UAW had standing to challenge the government's actions. *Id. at 287-88, 290*; *see also Pennell, 485 U.S. at 7 n.3* (facial challenge to rent ordinance does not require participation of individual landlords). Here, TAB seeks only prospective relief, raises only issues of law, and need not prove the individual circumstances of its members to obtain that relief, thus meeting the third prong of *Hunt*.

Having found that TAB meets all three prongs of the *Hunt* test, we conclude that TAB has standing to pursue the relief it seeks in this case.

II. Open Courts

TAB contends that the prepayment requirements of the statutes and regulations in question violate the open courts provision of the Texas Constitution by unreasonably restricting access to the courts. After the agency has found a party to be in violation of any [**27] of these statutes and regulations, the offender must either tender a cash deposit or post a supersedeas bond in the full amount of the penalties assessed, or forfeit the right to judicial review. [11]

> 11 In most other jurisdictions, such prepayment provisions are required only to stay execution of judgments and are not prerequisites to the right to appeal itself. *See* Gary Stein, *Expanding the Due Process Rights of Indigent Litigants: Will Texaco Trickle Down?, 61 N.Y.U. L. REV. 463, 469 (1986)*.

Historically, we have recognized at least three separate constitutional guarantees emanating from our open courts provision. First, courts must actually be open and operating, so that, for example, the legislature must place every county within a judicial district. *Runge & Co. v. Wyatt, 25 Tex. Supp. 294 (1860)*. Second, citizens must have access to those courts unimpeded by unreasonable financial barriers, so that the legislature cannot impose a litigation tax in the form of increased filing fees to enhance [**28] the state's general revenue, *LeCroy v. Hanlon, 713 S.W.2d 335, 342 (Tex. 1986)*. Finally, meaningful legal remedies must be afforded to our citizens, so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress. *Sax v. Votteler, 648 S.W.2d 661, 665-66 (Tex. 1983)*.

Here the second guarantee is applicable. This is not a question of the abrogation of any well-established common law cause [*449] of action, [12] just as it is not a question of the physical absence of a court to which a complaint may be brought. The issue before us is access to the courts. In previous cases involving this issue, we did not predicate our decision on whether the party whose access had been restricted was attempting to assert a common law cause of action. In *LeCroy*, for example, the court did not permit increased filing fees for statutory causes of action while denying them for common law claims. *713 S.W.2d 335*. Likewise in *Dillingham v. Putnam*, when the court struck down a statute requiring a supersedeas bond as a condition of appeal, the court did not [**29] concern itself with whether the particular appeal being restricted involved a common law or statutory claim. *14 S.W. 303 (Tex. 1890)*. Similarly, in the present case, the issue is simply whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state interest involved.

> 12 Thus, contrary to Justice Doggett's reading of our opinion, the *Sax* test is inapplicable.

The stated purpose of the regulatory statutes at issue here is to protect our state's natural resources. [13] There is no question that this is an important state interest. [14] The state argues that the prepayment provisions further this interest by increasing the deterrent effect of the penalties and by aiding in their collection. The state maintains that a violator will be less deterred by an administrative penalty if it can delay payment without bond while appealing the case in the courts. The state also argues that delay may render the penalty uncollectible, as the violator may become insolvent. [**30]

> 13 The Clean Air Act was implemented to "safeguard the state's air resources from pollution by controlling or abating air pollution and emissions of air contaminants . . . ." *TEX. HEALTH & SAFETY CODE § 382.002(a)*. The Texas Water Code was implemented to "maintain the quality of water in the state consistent with the public health and enjoyment . . ." *TEX. WATER CODE § 26.003*.
>
> 14 The importance is evidenced by article XVI, section 59(a) of our constitution, which provides in relevant part that: "The conservation and development of all the natural resources of this State . . . and the preservation and conservation of all such natural resources . . . are each and all . . . public rights and duties." *TEX. CONST. art. XVI, § 59(a)*.

In considering these rationales, we note that the prepayment provisions actually consist of two elements. First, the assessed penalty must be paid, or financial security provided, within thirty days; enforcement is not stayed pending any period of judicial review. [15] Second, [**31] if payment is not made or financial security provided within the thirty-day period, the right to judicial review is forfeited. We agree that the rationales advanced by the state justify the first of these elements. Requiring expeditious payment of the administrative penalties increases their effectiveness. The legislature, however, could have imposed the first element without the second. It could have provided the agency with the right to collection of assessed penalties unless a supersedeas bond is posted, yet provided for judicial review. The requirement of immediate payment, without the corresponding forfeiture provision, would not have implicated the open courts provision, as the charged party could have obtained judicial review regardless of payment. This approach would have been in accordance with the usual procedure

governing appeals of trial court judgments. *See TEX. R. APP. P. 40*. Any litigant may appeal without superseding the trial court's judgment, but the mere pendency of an appeal does not stay enforcement of the judgment. [16] [*450] Our specific focus for purposes of our open courts analysis, therefore, is not whether the requirement of immediate payment is [**32] reasonable, but whether the forfeiture of the right of judicial review, if the penalties are not superseded, is reasonable.

15 If the person charged does not make payment or post bond within thirty days, the agency may forward the matter to the attorney general for enforcement. TEX. HEALTH & SAFETY CODE § 382.089(c), § 361.252(m); *TEX. WATER CODE § 26.136(k)*.

16 It has been argued that our procedure of allowing immediate enforcement of trial court judgments violates federal due process when the judgment debtor is financially unable to post a supersedeas bond and immediate enforcement will cause irreparable injury. *Texaco, Inc. v. Pennzoil Co., 784 F.2d 1133 (2d Cir. 1986)*, *rev'd on other grounds*, *481 U.S. 1, 95 L. Ed. 2d 1, 107 S. Ct. 1519 (1987)*. A similar argument could be fashioned under the Texas open courts provision, but TAB does not assert that argument here. TAB's open courts challenge centers not on the requirement of immediate payment, but on the forfeiture of judicial review if payment is not made.

[**33] We conclude that the forfeiture provision is an unreasonable restriction on access to the courts. While the requirement of prepayment or the posting of a bond to stay enforcement furthers the state's important environmental interests by creating a strong incentive for timely payment of the assessed penalties, the forfeiture provision serves no additional interest. [17] The state may accomplish its goals by enforcing the prepayment requirements without infringing on a party's right to its day in court. Accordingly, we hold that the statutes and regulations at issue facially violate our open courts provision. [18]

17 Thus, contrary to Justice Doggett's assertion, we do not strike down the penalties themselves. Nothing in this opinion prohibits the state's collection of assessed penalties. We hold as violative of our open courts provision only the requirement that the penalties be paid as a condition to judicial review. Furthermore, nothing in our opinion requires that penalties already paid be refunded.

18 That the affected parties may be able to afford prepayment is irrelevant. The guarantee of constitutional rights should not depend on the balance in one's bank account.

[**34] III. Jury Trial

TAB also claims that the statutes empowering these agencies to assess civil penalties violate the right to a jury trial guaranteed by the Texas Constitution. [19] We disagree.

19 TAB claims that the lack of a jury trial before the agency as well as the lack of a trial de novo violate article I, section 15. We limit our inquiry to the absence of a trial de novo because, as this court has said: "Trial by jury cannot be claimed in an inquiry that is non-judicial in its character, or with respect to proceedings before an administrative board." *Middleton v. Texas Power & Light Co., 108 Tex. 96, 185 S.W. 556, 561-62 (Tex. 1916)*. Even if the right to a jury is denied before an administrative agency, the dispositive question is whether a trial de novo and the corresponding right to a jury trial is constitutionally required upon judicial review of the agency's decision. *See Cockrill v. Cox, 65 Tex. 669, 674 (1886)*("The right of jury trial remains inviolate, though denied in the court of first instance [in civil cases], if the right to appeal and the jury trial on appeal are secured.")(bracketed language in original).

[**35] Article I, section 15 of our constitution [20] preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted. *E.g., State v. Credit Bureau of Laredo, 530 S.W.2d 288, 291 (Tex. 1975)*; *White v. White, 108 Tex. 570, 196 S.W. 508 (1917)*; *Hatten v. City of Houston, 373 S.W.2d 525* (Tex. Civ. App.--Houston 1963, writ ref'd n.r.e.); *Hickman v. Smith, 238 S.W.2d 838* (Tex. Civ. App.--Austin 1951, writ ref'd). A jury trial is not mandated by this provision for any other judicial proceeding. *Id.*

20 Article I, section 15, provides, in pertinent part:

> The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. * * * .

TAB has not presented in this court, as it did below, its complaint that the statutes and regulations also violate of the right to jury trial under *article V, section 10 of the Texas Constitution.*

[**36] In *Credit Bureau*, we concluded that a suit for civil penalties for violation of an injunction issued

pursuant to the Texas Deceptive Trade Practices Act was analogous to the common law action for debt, tried to a jury at the time our constitution was adopted. *530 S.W.2d at 293*. Thus, we held that the right to a jury trial for that action remained inviolate. *Id.* We observed in *Credit Bureau*, however, that in certain types of adversary proceedings the constitutional right to a jury trial does not attach. Among the proceedings we referred to are appeals from administrative decisions. [21] *Id.* (citing *State v. De Silva, 105 Tex. 95, 145 S.W. 330 (1912)*, and *Texas* [*451] *Liquor Control Bd. v. Jones, 112 S.W.2d 227* (Tex. Civ. App.--Houston 1963, writ ref'd n.r.e.)). Consistent with this noted exception in *Credit Bureau*, we conclude that these agencies' assessments of environmental penalties are not actions, or analogous actions, to those tried to a jury at the time the constitution of 1876 was adopted. To hold that these environmental statutes and regulations promulgated in the late 1960s merely parrot common law and statutory rights triable to a [**37] jury in 1876 would turn a blind eye to the emergence of the modern administrative state and its profound impact on our legal and social order. In the late 19th century, ours was primarily a sparsely-populated agrarian society. *See generally*, T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans*, 279-324 (1983). By contrast, concentrated industrial activity and its by-products, including the wide-spread emission of pollutants, with their resulting potential for significant damage to our natural resources are phenomena of relatively recent origin. In response to such phenomena, regulatory schemes, such as those challenged here, were designed to balance mounting environmental concerns with our state's economic vitality. In 1876 no governmental schemes akin to these existed. [22] Thus, we conclude that the contested proceedings are not analogous to any action tried to a jury in 1876. Accordingly, we hold that no right to a jury trial attaches to appeals from administrative adjudications under the environmental statutes and regulations at issue here. [23]

21 While the *Credit Bureau* court specifically referred to the broader jury trial provision in article V, section 10 when it discussed the administrative proceeding exception, that exception necessarily also applies to the narrower provision found in article I, section 15.

[**38]

22 We do not consider nineteenth century criminal nuisance laws comparable to modern environmental regulations. *See* ___ S.W.2d ___.

23 Despite Justice Doggett's trumpeting of our constitution's guarantee of trial by jury, he agrees that the right does not attach under the circumstances of this case.

We should not be misunderstood to say that the legislature may abrogate the right to trial by jury in any case by delegating duties to an administrative agency. Here, we simply reaffirm what this court held almost a half century ago, in *Corzelius v. Harrell 143 Tex. 509, 186 S.W.2d 961 (1945)*. In *Corzelius*, we concluded that certain judicial functions, including fact finding, may be delegated constitutionally by the legislature to administrative agencies in furtherance of the preservation and conservation of the state's natural resources. The decision in *Corzelius* was based on article XVI, section 59(a) of our constitution, which provides in relevant part: "The conservation and development of all the natural resources of this State . . . and the preservation and conservation [**39] of all such natural resources . . . are each and all . . . public rights and duties; and the Legislature shall pass all such laws as may be appropriate thereto." *TEX. CONST. art. XVI, § 59(a)*. "By the use of the broad language used in Article XVI, Section 59(a)," the court stated, "the Legislature is authorized to enact such laws as are necessary to carry out the purposes for which such constitutional amendment was adopted." *Corzelius, 186 S.W.2d at 964*. [24]

24 Justice Doggett contends that the basis for our jury trial holding is overbroad. Instead, he would have us adopt the "imperfectly employed" federal test first enunciated in *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442 (1977)*. *infra*, ___ S.W.2d at ____. The basis for our decision is more limited, arising as it does out of *TEX. CONST. article XVI, section 59(a)* and our decision in *Corzelius*.

There is no doubt that the legislature delegated the power to assess these civil penalties to the Air Control [**40] Board and the Water Commission as a manifestation of the public's interest in preserving and conserving the state's air and water resources. That intent is apparent from the policy statements of the relevant statutes. [25] [*452] We conclude, therefore, that the delegation of the fact-finding function by the legislature to the Air Control Board and the Water Commission under this statutory scheme was within the legislature's constitutional authority.

25 The Clean Air Act proclaims:

> The policy of this state and the purpose of this chapter to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of public health, general welfare, and phys-

ical property of the people, including the aesthetic enjoyment of air resources by the public and the maintenance of adequate visibility.

*TEX. HEALTH & SAFETY CODE § 382.002*.

The Texas Water Code proclaims in relevant part:

It is the policy of this state and the purpose of the subchapter to maintain the quality of water in the state consistent with the public health and enjoyment

. . .

*TEX. WATER CODE § 26.003*.

[**41] Of course, the fact that no jury trial is provided by the legislature to an alleged violator of these environmental protection laws does not mean that the agencies' power to assess penalties is unbridled. [26] The Air Control Board and the Water Commission may act only within constitutional and statutory parameters.

26

The actions of the agencies involved in this proceeding are subject to the Administrative Procedure and Texas Register Act (APTRA), which specifically affords a "full panoply of procedural safeguards" to a party to contested case before those agencies. *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex., 571 S.W.2d 503, 507 (Tex. 1978)*. These procedural safeguards include the right to notice, the making of a full record of the proceeding before the agency, the taking of depositions, the right to subpoena witnesses, the application of the rules of evidence, the preparation of proposal for decision and the filing of exceptions and briefs, as well as separately stated findings of fact and conclusions of law. TEX. CIV. STAT. ANN. art. 6252-13a § 19 (Vernon Supp. 1993). Judicial review is provided by section 19(e) under the substantial evidence rule, which directs a reviewing court to reverse and remand the agency adjudication if the agency decision is:

1) in violation of constitutional or statutory provisions;

2) in excess of the statutory authority of the agency;

3) made upon unlawful procedure;

4) affected by other error of law;

5) not reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole; or

6) arbitrary and capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Id.*

We have held that judicial review under APTRA based on the record developed before the agency "furnishes more assurance of due process and a surer means of determining whether an agency acted arbitrarily, capriciously and without due regard for the evidence." *Imperial Am. Resources Fund, Inc. v. Railroad Comm'n of Tex., 557 S.W.2d 280, 285 (Tex. 1977)*; *see also, Southwestern Bell Tel. Co., 571 S.W.2d at 509*.

[**42] For the reasons set out above, we reverse that portion of the trial court's judgment declaring that section 4.041 of the Texas Clean Air Act, *sections 26.136* and *27.1015* of the Texas Water Code, and section 8b of the Texas Solid Waste Disposal Act and the rules and regulations promulgated under those statutes comport with the open courts provision of our constitution, article I, *section 13*. We declare that the requirement of a supersedeas bond or cash deposit paid into an escrow account as a prerequisite to judicial review under TEX. HEALTH & SAFETY CODE §§ 382.089(a),(b), 361.252(k),(l), and *TEX. WATER CODE § 26.136(j)* is unconstitutional. We affirm that portion of the trial court's

judgment declaring that the listed statutes, rules, and regulations do not violate the jury trial provision of our constitution, article I, section 15.

John Cornyn

Justice

Concurring and Dissenting Opinion by Justice Doggett.

Concurring and Dissenting Opinion by Justice Gammage.

Concurring and Dissenting Opinion by Justice Spector.

Justice Hightower not sitting.

OPINION DELIVERED: March 3, 1993

**CONCUR BY:** BOB GAMMAGE (In Part); LLOYD DOGGETT (In Part); ROSE SPECTOR (In Part)  [**43]

**DISSENT BY:** BOB GAMMAGE (In Part); LLOYD DOGGETT (In Part); ROSE SPECTOR (In Part)

**DISSENT**

CONCURRING AND DISSENTING OPINION

BOB GAMMAGE

Though I would prefer not to write separately, I find I am unable to agree entirely with any single opinion of the court's other members. I must write this concurring and dissenting opinion because, while I agree with the disposition of this cause, I disagree with substantial portions of the reasoning and language in the majority's opinion and I agree with part of Justice Doggett's concurring and dissenting opinion.

I agree with the preliminary portion of Justice Cornyn's majority opinion, which correctly sets forth the regulatory scheme and basic dispute.

I agree *substantially* with Part II of Justice Doggett's opinion and his jury trial discussion. In my view, whether or not a suit is a "cause" for purposes of the right to a jury trial is not controlled by whether it was first determined by an administrative agency. I also agree with Part III of Justice Doggett's opinion relating to standing, which I will further address below. I agree with Part II of Justice Cornyn's majority opinion. The statutes may not condition access to the courts on prepayment [**44] of a *penalty*. The principle here is the same as for a supersedeas bond. The statute may condition the right to restrain the prevailing party (the State) from executing (enforcing) its judgment (administrative order) on the posting of a bond for the full amount. It may not, however, condition the *right to appeal* the judgment on posting of the full *penalty*

imposed.  *Dillingham v. Putnam, 109 Tex. 1, 5-6, 14 S.W. 303, 304 (1890)*. This is true even if that "judgment" takes the form of an administrative agency decision. Administrative agency decisions, for the most part, entitle an appellant to only "substantial evidence" as opposed to *de novo* review. To further burden those regulated with prepayment of the "judgment" as the only alternative to total loss of even substantial evidence review violates the basic concept of our constitutional open courts in Texas.

As to the issue (or non-issue) of standing, the majority in effect adopts the position of federal courts that standing is a *jurisdictional* question. Otherwise it cannot be fundamental error to be addressed when no party raises it. Standing was not raised and should not be addressed in this cause.

Even assuming [**45]  standing is an element of subject matter jurisdiction, the court should not write on the issue in this case. Even though a judgment is void and subject to collateral attack at any point if there is an absence of subject matter jurisdiction, *see Mercer v. Phillips Natural Gas Co.,*  [*477]  *746 S.W.2d 933, 936* (Tex. App. -- Austin 1988, writ denied), unassigned error of lack of jurisdiction should be addressed only if jurisdiction is in fact lacking. Since the majority concludes there was standing in this case, and since no party raised its existence as an issue, there is no reason to address it at all, even if it would be *fundamental error* if *lacking*.

The basis for the majority's discussion is its sudden revelation that "standing is implicit in the concept of subject matter jurisdiction." __ S.W.2d at __. Their opinion then claims this implication comes from the separation of powers doctrine and the open courts provision of the Texas Constitution. It is a curiosity of legal scholarship, however, that in the 156 prior years of its existence, this court never before found standing "implicit" in those constitutional provisions, but in fact wrote that standing could be [**46]  waived and hence was not fundamental error.  *Texas Indus. Traffic League v. Railroad Comm'n, 633 S.W.2d 821, 823 (Tex.1982)*. Justice Doggett's opinion adequately addresses why there is no implication from those provisions that standing is jurisdictional.

The majority's struggle to put standing in issue when it is not prompts me to address two statements in its opinion which strike me as either misleading or just plain wrong. The majority asserts, without citation to authority, that "subject matter jurisdiction is never presumed," __ S.W.2d at __, and in a footnote repeats that assertion in urging that "Justice Doggett confuses subject matter jurisdiction with personal jurisdiction. Only the latter can be waived when uncontested. *See TEX. R. CIV. P. 120a*." __ S.W.2d at __n.5. The majority's claim that subject matter

jurisdiction is never presumed is at its very best misleading.

Connected with this discussion is the implicit assertion in another footnote that there is a "jurisdictional standing" that is different from "objections to join a real party in interest or to a party's capacity to sue rather than jurisdictional standing." __ S.W.2d at __n.7. These remarks are made [**47] in an attempt to distinguish the cases cited by Justice Doggett from those of other states holding that standing is not jurisdictional. I suppose we should be encouraged to find out that there are some types of "standing" that will not be jurisdictional, but it occurs to me that by using the term "jurisdictional standing" the court is begging the question -- if it is jurisdictional, then it must be fundamental. The problem is that the Texas cases, at least as I read them, define "standing" in terms of "the party's capacity to sue," [1] which is one example we are given of non-jurisdictional standing. The majority opinion is calculated -- no, guaranteed -- to cause confusion because apparently this court will henceforth tell litigants on a case-by-case basis whether the standing problems in their cases are "jurisdictional" or merely formal.

1 Before it adopts a federal test and federal gloss, the majority asserts the "general test for standing in Texas" is what it quotes from *Board of Water Engineers v. City of San Antonio, 155 Tex. 111, 114, 283 S.W.2d 722, 724 (1955)*. The majority overrules the *Texas Industrial Traffic League* case, which addressed standing in the context of "justiciable interest" discussed in the more recent cases of *Coffee v. Rice University, 403 S.W.2d 340 (Tex. 1966)*, and *Sabine River Authority v. Willis, 369 S.W.2d 348 (Tex. 1963)*. The context of the cases differed from *Board of Water Engineers*, of course. The precise meaning of "standing" in fact depends on the context. The majority adopts a federal gloss, and the federal courts have stated, "Generalizations about standing to sue are largely worthless as such." *Association of Data Proc. Serv. Orgs. v. Camp, 397 U.S. 150, 151 (1970)*. Using "standing" to mean a party's legal capacity to sue is my best description of the labyrinth of different cases the majority uses interchangeably.

[**48] There is no need to create this confusion. The majority's fomenting it, however, requires that I address it to some extent. I will discuss the "subject matter never presumed" proposition first, then weave into the "jurisdictional standing" language.

I agree that subject matter jurisdiction is never presumed in one respect. Subject matter jurisdiction exists when the nature of the case falls within a general category of cases the court is empowered to adjudicate under the applicable constitutional and statutory provisions. *See Pope v. Ferguson,* [*478] *445 S.W.2d 950, 952 (Tex. 1969), cert. denied, 397 U.S. 997, 25 L. Ed. 2d 405, 90 S. Ct. 1138 (1970)*; *Bullock v. Briggs, 623 S.W.2d 508, 511* (Tex. App. -- Austin 1981, writ ref'd n.r.e.), *cert. denied, 452 U.S. 1135 (1982)*. In this sense, there is no presumption because if the case is not one over which the court had constitutional and statutory authority to act one does not "presume" subject matter jurisdiction to make it valid. If a justice of the peace grants a divorce, the judgment is void because that is not the type of case the constitution and legislature entrusts to that court, and appellate courts will [**49] not "presume" the justice court had jurisdiction in order to make the judgment valid.

But what the majority addresses here under the rubric of "standing" is not a court assuming jurisdiction over a type of dispute for which the statutes do not grant it power. The district court undoubtedly had jurisdiction over the declaratory judgment and injunction action brought there, since district courts may entertain declaratory judgment and injunction actions. The question of standing the majority gratuitously addresses here is related to an incidental *party* issue.

This court has expressly held that some facts or similar matters relating to party issues *are presumed*. For example, for many years the subject matter jurisdiction for certain trial courts as set by the statutes has included a jurisdictional amount, sometimes as a minimum amount in controversy and sometimes as both a maximum and minimum. *Womble v. Atkins, 160 Tex. 363, 370, 331 S.W.2d 294, 299 (1960)*. This court has held that jurisdiction, so far as the amount in controversy is concerned, is determined by the pleadings unless facts disclose that a party fraudulently or in bad faith pleaded claims to make it disclose [**50] there was jurisdiction over the case where there was not. *Brown v. Peters, 127 Tex. 300, 94 S.W.2d 129, 130* (Tex. Comm'n App. B 1936). Despite the supposed requirement that the pleadings demonstrate jurisdiction, we have also held that unless the pleadings affirmatively show there is *no* jurisdiction, the court will *presume* the existence of jurisdiction in the trial court. *Peek v. Equipment Serv. Co., 779 S.W.2d 802, 804 (Tex. 1989)*. [2] This is not the only sense in which subject matter jurisdiction is "presumed" as to collateral matters. If a defendant contests jurisdiction and alleges in a verified pleading that plaintiff's fraudulent pleading amount was for the purpose of conferring jurisdiction on the trial court, but the trial judge still renders judgment in the case, on appeal the fact issue of jurisdiction is *presumed* decided against the defendant. *Ellis v. Heidrick, 154 S.W.2d 293, 294* (Tex. Civ. App. -- San Antonio 1941, writ ref'd); *see also Maddux v. Booth, 108 S.W.2d 329, 331* (Tex. Civ. App. -- Amarillo 1937, no writ)(appeal

bond from county court to district court did not show filemark making the appeal timely, held "the absence of such a [**51] question being made in the trial court the presumption is that the court had jurisdiction"). Further, if the very power of the judge who sits is in question, that authority too may be presumed. It is presumed that the assignment of a retired judge was properly made pursuant to all statutory requirements absent an express showing to the contrary in the record. *Texaco, Inc. v. Pennzoil Co., 729 S.W.2d 768, 855* (Tex. App. -- Houston [1st Dist.] 1987, writ ref'd n.r.e.).

2 *Richardson v. First Nat'l Life Ins. Co., 419 S.W.2d 836 (Tex. 1967)*, relied upon by the majority for the proposition that pleadings must "affirmatively show that the court has jurisdiction to hear the cause," ___ S.W.2d at ___, was expressly distinguished in *Peek*. This unanimous opinion written for the Court by Chief Justice Phillips explained that *Richardson* really meant that if the pleadings affirmatively showed there was *no* jurisdiction, then the case should be dismissed, but otherwise there was a presumption that the amount omitted from the pleading would support jurisdiction. *Peek, 779 S.W.2d at 804*.

[**52] There is a type of lack of standing that this court formerly held to be fundamental error. When there was a joint interest in property involved in the litigation, and the joint owner was not joined as a party, this court earlier held that the party defect was jurisdictional fundamental error that could be raised for the first time on appeal. The injustice which that rule caused prompted [*479] this court to reduce those "*indispensable*" necessary parties to near nonexistence. *Petroleum Anchor Equip., Inc. v. Tyra, 406 S.W.2d 891, 893-94 (Tex. 1966)*; *see also Cooper v. Texas Gulf Indus., Inc., 513 S.W.2d 200, 203 (Tex. 1974)*. It was no accident that this court listed the case which the majority today overrules, *Texas Indus. Traffic League v. Railroad Comm'n, 633 S.W.2d 821 (Tex. 1982)*, as one of the cases showing that "fundamental or unassigned error is a discredited doctrine" as applied to these collateral defect-in-party type claims. *Cox v. Johnson, 638 S.W.2d 867, 868 (Tex. 1982)*. After more than a hundred years of trying to narrow fundamental error exceptions, the majority today takes a quantum leap *backward*.

In an appeal of or other *direct* [**53] *attack* on a trial court default judgment, it is service on the defendant and related due process requirements which must affirmatively appear on the record. In such cases *personal* jurisdiction cannot be presumed. *Capitol Brick, Inc. v. Fleming Mfg. Co., 722 S.W.2d 399, 401 (Tex. 1986)*; *Uvalde Country Club v. Martin Linen Supply Co., 690 S.W.2d 884, 885 (Tex. 1985)*; *McKanna v. Edgar, 388 S.W.2d 927, 928 (Tex. 1965)*. Lack of personal jurisdiction can be waived by the party, and personal jurisdiction is presumed *in a collateral attack* on the judgment, whereas error in assuming constitutional or statutory jurisdiction not conferred upon the court in question can be neither waived nor ignored. *See Crawford v. McDonald, 88 Tex. 626, 631-32, 33 S.W. 325, 328 (1895)*. This court has long recognized that there may be party issues, i.e., the matter is "a mere matter of procedure" as opposed to the constitutional or statutory *power* of a court to render judgment, that may be presumed as to either type of jurisdiction. *Id. at 630, 33 S.W. at 327*.

The majority should not adopt the federal courts' position that "standing" is jurisdictional. There is a fundamental [**54] difference between federal law and state law that controls here. Federal courts are courts of *limited* jurisdiction. *Marbury v. Madison, 5 U.S.(1 Cranch) 137, 178-79, 2 L. Ed. 60 (1803)*. The parties asserting a claim must plead and prove (when not obvious) that jurisdiction exists. *FED. R. CIV. P. 8(a)*. A party suing under a statute must establish his right to claim under that statute - his *standing* - in order to establish jurisdiction. *General Comm., Brotherhood of Locomotive Eng'rs v. Missouri-Kansas-Texas Ry. Co., 320 U.S. 323, 337-38 (1943)*. Consequently, standing is a part of jurisdiction under federal procedure, related to the "case" or "controversy" requirement of the federal constitution. *Association of Data Proc. Serv. Orgs. v. Camp, 397 U.S. 150, 151 (1970)*. But there is no "case" or "controversy" limitation language in the Texas Constitution. In state courts of general jurisdiction, the power to entertain any suit not prohibited by either the federal constitution or federal law is *presumed*. *Cincinnati v. Louisville & N. Ry. Co., 223 U.S. 390, 56 L. Ed. 481, 32 S. Ct. 267 (1912)*. State courts have all residual jurisdiction that federal courts [**55] lack. *Id.*; *see generally* 2 CHESTER J. ANTIEAU, MODERN CONSTITUTIONAL LAW § 10:1 at 4-5 (1969). We should continue to recognize that "standing," like other procedural issues, may be waived. There is no reason to overrule the *Texas Industrial Traffic League* case, or its related progeny.

BOB GAMMAGE

JUSTICE

Opinion Delivered: March 3, 1993.

CONCURRING AND DISSENTING OPINION

Lloyd Doggett

*"Don't Mess With Texas"*

-- A motto that captures the Texas spirit.

Texans understand the directive "Don't Mess With Texas"; the majority does not. If the mess is big enough, if the stench is strong enough, no matter how great the danger to public health and safety, an industrial litterer can "mess" with Texas without fear of immediate punishment or legally effective citizen action.

And what an occasion for permitting polluters to "mess" with Texas air and water. Our state tops the nation in total toxic emissions and ranks dead last among the fifty states in important measures of environmental quality. [1] Although last in air [*453] and water cleanliness, Texas today becomes the first state to strike down the imposition of penalties by administrative [**56] agencies to enforce statutes protecting the environment. I dissent from today's manipulation of the law to paralyze anti-pollution efforts, tragically announced at a time when protecting the quality of the air we breathe and the water we drink is so critical.

1 Statistics compiled from data sent by companies to the Environmental Protection Agency show that in 1990 535.7 million pounds of toxic chemicals were released into the Texas environment, more than in any other state. Texas also ranked first in the release of chemicals known to cause both cancer and birth defects. *See* Texas Citizen Action, *Poisons in Our Neighborhoods, Toxic Pollution in Texas*, Sept. 1992, at 1; *see also* John Sharp, Texas Comptroller of Public Accounts, *Texas at Risk: Environmental Hazards Threaten State's Air, Land, and Water*, Fiscal Notes Aug. 1991 (noting the release of about 800 million pounds of toxic substances in 1989). Additionally, only two states ranked below Texas in the American Public Health Association's Pollution Standard Index, based on data gathered between 1989 and 1991. *See* American Public Health Ass'n, *America's Public Health Report Card: A State-by-State Report on the Health of the Public* 59 (1992).

[**57] Today's opinion delivers a double whammy to protection of our natural resources. Polluters are first shielded from swift punishment for harming our environment, and then the courthouse door is slammed shut in the face of Texans who organize to object. Incredibly, this second punch was not even sought by the corporate organization that brought this challenge; it was wholly designed by the majority during the three years that this cause has lingered in this court. Announced today is an easily manipulable "friends in, foes out" rule to prevent further actions by those who organize to protect taxpayers, consumers or the environment.

Through its broad writing designed to eviscerate administrative enforcement of our state's environmental laws, the majority has also created significant new uncertainties for a wide range of state governmental activity -- tax collection is imperiled, laws to protect nursing home residents are effectively voided, and even a leading weapon in the war on drugs is threatened. At a time of budgetary crisis exacerbated by the majority's great misadventure in public school finance, [2] today's opinion raises a substantial question of whether the State will be required [**58] to return to those who despoil Texas millions of dollars in administrative penalties collected during the almost eight years this case has wandered through the judicial system.

2 *See Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489, 537 (Tex. 1992)* (Doggett, J., dissenting).

This major blow to our environment is matched only by the threat to our system of justice lurking in the arcane language of today's opinion. Hidden within its lengthy legal mumbo-jumbo is an unprecedented blow to our jury system. The constitutional right of trial by jury, already suffering at the hands of this majority, is no longer inviolate; it may be abrogated at any time. Instead of walking into a courthouse, where a jury is guaranteed, citizens may be detoured to an administrative agency, to explain their problems to bureaucrats not directly answerable to the community.

Today precedent and tradition have been trampled as the majority's long-standing fear of ordinary people in our legal [**59] system has taken firm hold. The drafters of our Texas Constitution realized something that the majority has long ceased to appreciate -- ordinary Texans can make an extraordinary contribution to our system of justice. The more their collective voice expressed in a jury verdict is disregarded, the more new barriers are contrived to shut them out of our system of justice, the less justice that system will offer.

I. Open Courts

The ability of state agencies to enforce environmental laws through the assessment of administrative penalties is declared unconstitutional by the majority as contradicting our state guarantee of open courts. While concluding that TAB certainly has a right to judicial review on behalf of its members, I disagree that the statutory restrictions it challenges unreasonably restrict access to the courts.

Access to the courts is unquestionably a fundamental constitutional and common law right. *Article I, section 13 of the Texas Constitution* forms the nucleus of this protection:

> [*454] The open courts provision specifically guarantees all litigants the

> right to redress their grievances -- to use a popular and correct phrase, the right to their day [**60] in court. This right is a substantial state constitutional right.

*LeCroy v. Hanlon, 713 S.W.2d 335, 341 (Tex. 1986)* (citations omitted). This court has a long history of assuring that the right of access remains guaranteed to Texas citizens. [3]

3 *See, e.g., H. Runge & Co. v. Wyatt, 25 Tex. Supp. 291 (1860)* (placement of counties within judicial districts); *Dillingham v. Putnam, 109 Tex. 1, 14 S.W. 303 (Tex. 1890)* (striking requirement of supersedeas bond as a prerequisite to appeal); *Hanks v. City of Port Arthur, 121 Tex. 202, 48 S.W.2d 944 (1932)* (requirement that city be notified of street defect within twenty-four hours of accident unreasonable restriction on right of access to courts); *Sax v. Votteler, 648 S.W.2d 661 (Tex. 1983)* (striking statute of limitations barring action of minor); *LeCroy, 713 S.W.2d 335 (Tex. 1986)* (holding unconstitutional increased filing fees designed to generate state revenues).

In *Sax v. Votteler, 648 S.W.2d 661 (Tex. 1983)*, we [**61] required a litigant alleging an unconstitutional denial of access to the courts to show that: (1) a cognizable common law cause of action is being restricted and (2) the limitation is unreasonable or arbitrary when balanced against the purpose and basis of the statute. The majority today appropriately eliminates the first showing in certain cases. In some circumstances the distinction between common law and statutory causes of action clearly does not affect whether access to the courts has been denied.

The second part of the *Sax* test, however, continues to be applied in all open courts cases. [4] Thus, in determining whether the open courts provision of the Texas Constitution is violated by the requirement that administrative penalties be paid as a prerequisite to judicial review, we must balance two competing interests: the right of TAB's members to access to the courts and the state's concern with effective and timely enforcement of its laws protecting the environment. The majority today restates in rather vague terms this second prong: "whether the prepayment requirement is an unreasonable financial barrier to access to the courts in light of the state interest involved." S.W.2d [**62] at . As we held in *LeCroy*:

4 Oddly, the majority asserts that "the *Sax* test is inapplicable" to today's open courts decision, S.W.2d at n.12, even as it explicitly relies on the analysis used in *LeCroy*, which in turn applied the *Sax* test. Nor does the majority attempt to explain how its analysis today differs from that employed in *Sax* and *LeCroy*.

> Because a substantial right is involved, the legislature cannot arbitrarily or unreasonably interfere with a litigant's right of access to the courts. Thus, the general open courts provision test balances the legislature's actual purpose in enacting the law against that law's interference with the individual's right of access to the courts. *The government has the burden to show that the legislative purpose outweighs the interference with the individual's right of access.*

*713 S.W.2d at 341* (citations omitted; emphasis supplied).

Applying this test, we have permitted certain restrictions on access to the courts, while disallowing [**63] others. *Compare LeCroy, 713 S.W.2d at 341* (court filing fee unreasonably restricts access to judicial system), and *Dillingham v. Putnam, 109 Tex. 1, 14 S.W. 303 (1890)* (supersedeas bond as prerequisite to appeal, without regard to ability to pay, unconstitutional), *with Clanton v. Clark, 639 S.W.2d 929 (Tex. 1982)* (court may constitutionally dismiss suit for failure to timely file cost bond), and *Federal Crude Oil Co. v. Yount-Lee Oil Co., 122 Tex. 21, 52 S.W.2d 56 (1932)* (requirement that franchise taxes be paid prior to filing suit upheld under article I, *§ 13*); *compare Lucas v. United States, 757 S.W.2d 687 (Tex. 1988)* (limitations on damages for medical malpractice unconstitutional), *with Rose v. Doctors Hosp., 801 S.W.2d 841 (Tex. 1990)* (same limitations upheld under open courts provision in wrongful death cases). I favor a more complete and predictable open courts analysis designed to discourage such anomalous results.

[*455] Today's implementation of the second prong of the *Sax* test demonstrates its malleability. After perfunctorily reciting the purpose of administrative penalties, the majority, without any further analysis, concludes [**64] that: "the forfeiture provision is an unreasonable restriction on access to the courts," S.W.2d at, and "the forfeiture provision serves no additional [state] interest." *Id.* at . Enacted by the Legislature as an important means of enforcing our state's environmental laws, these penalties are today judicially extinguished. The majority determines that these laudable legislative objectives are not sufficiently "important" to justify the possibility that the use of penalties may perhaps someday

impose some slight financial strain on some hypothetical polluter.

Whether examined under either the vague test employed today or my more exacting formulation, the majority's conclusory analysis suffers from at least three major flaws: (1) a failure to recognize the compelling interest, grounded in our state constitution, served by administrative penalties, including prepayment provisions; (2) a disregard of the extensive statutory constraints on penalty usage which represents the least restrictive means to achieve this purpose; and (3) an assumption that the prepayment provision interferes with individual access to the courts unsupported by even a single specific instance of such a restrictive [**65] effect.

The balancing required by *Sax* mandates careful consideration of the rights being affected. The more significant the right the litigant asserts, the more onerous the government's burden becomes. TAB has asserted a right to judicial review of penalties imposed against its members. This interest is encompassed within the right of access to the courts, which we declared a "substantial state constitutional right." *LeCroy, 713 S.W.2d at 341*.

The State has met its burden by demonstrating a compelling interest in employing administrative penalties reflected in constitutionally-guaranteed protection of our state's natural resources. Although not critical in overcoming an open courts challenge, a constitutional predicate for the state's interest is a highly persuasive factor in the balancing process. As declared in article XVI, section 59(a) [5] :

5 This natural resources provision receives conflicting treatment in today's opinion, amply demonstrating both the malleability of the *Sax* test as applied by the majority and the majority's disdain for the right to trial by jury. While declaring that article XVI, § 59(a) will not permit payment of even the most modest penalties under our open courts provision, the majority inexplicably finds that it forms an insurmountable barrier to the right to jury trial. The majority makes no attempt to reconcile its inconsistent analysis of these constitutional guarantees.

[**66]

> The preservation and conservation of all . . . natural resources of the State are each and all declared public rights and duties; and the Legislature shall pass all laws as may be appropriate thereto.

This very mandate of the people, as well as protection of the public health and safety was effectuated in the Clean Air Act, [6] the Texas Water Code, [7] and the Solid Waste Disposal Act, [8] including the right to assess administrative penalties. Protection of Texas' air, water and land is undeniably a compelling interest.

6 *Tex. Health & Safety Code § 382.002*, provides that:

> It is the policy of this state and the purpose of this Act to safeguard the air resources of the state from pollution by controlling or abating air pollution and emissions of air contaminants, consistent with the protection of health, general welfare, and physical property of the people, including the aesthetic enjoyment of the air resources by the people and the maintenance of adequate visibility.

7 *Tex. Water Code § 26.003*, provides that:

> It is the policy of this state and the purpose of this subchapter to maintain the quality of water in this state consistent with the public health and enjoyment, the propagation and protection of terrestrial and aquatic life, the operation of existing industries, and the economic development of the state . . ..

[**67]

8 *Tex. Health & Safety Code § 361.002*, declares that:

> It is the policy of this state and the purpose of this Act to safeguard the health, welfare, and physical property of the people, and to protect the environment, through controlling the management of hazardous wastes, including the accounting for hazardous wastes generated.

[*456] The form of these particular administrative penalties has certainly been fashioned to serve this im-

portant state interest through the least restrictive means. Penalty usage is substantially limited and can in no way be said to be arbitrarily imposed. All three statutes at issue require that, once a violation is established, the agency assessing a penalty must consider such factors as the seriousness of the violation, including but not limited to the nature, circumstance, extent, and gravity of the prohibited acts; the hazard or potential hazard created to the public health or safety of the public; the history of previous violation; the amount necessary to deter future violations; and efforts to correct the violation. [9] There is thus statutory [**68] assurance that the amount of any resulting penalties will be directly related to the conduct.

9 Tex. Health & Safety Code § 382.088(c)(1-5) (Clean Air Act), § 361.251(c)(1-5) (Solid Waste Disposal Act); *Tex. Water Code § 26.136(c)*. The Texas Water Code imposes additional considerations, including "the impact of the violation on a receiving stream or underground water reservoir, on the property owners . . . and on water users," as well as the extent of previous violations, the degree of culpability involved, any good faith effort to correct the violation and any economic benefit gained as a result of the illegal conduct. *Tex. Water Code § 26.136(c)*.

Requiring that assessed penalties be paid, or a bond in the same amount be posted, prior to challenging the agency action in court is not unreasonable under these circumstances. Unlike the filing fee held violative of the open courts provision in *LeCroy*, the legislative purpose is not to raise money by making it more expensive for citizens to enforce their [**69] legal rights. Instead, the legislative objective is to *deter and punish* violations of the law that pose an environmental threat.

The wheels of justice grind slowly, with final resolution often years in reaching. Indeed, in this court they sometimes hardly grind at all. Clearly those willing to profit from polluting our natural resources will not hesitate to employ the delays in the judicial system to their advantage. A declaration of bankruptcy by a perhaps deliberately undercapitalized corporation during the pendency of a suit is likely to relieve the polluter of any responsibility to remedy the damage it has caused.

Showing no awareness of the purpose of and need for administrative penalties, the majority finds that "expeditious payment" is adequately guaranteed by the ability of the agency, through the attorney general, to initiate an enforcement action to collect the amount assessed. S.W.2d at & n.15. In other words, the purpose of immediate deterrence of violation of environmental laws is ensured by the filing of a lawsuit that may take as many years to resolve as this case has. These agencies charged with protecting our natural resources have long had the ability to bring [**70] an enforcement action in state court. *See* Tex. Water Code § 26.123; *Tex. Health & Safety Code § 382.081*; *id.* § 361.224. The effort of the Texas Legislature to improve the effectiveness of enforcement through the use of administrative penalties is today rendered a nullity.

Given the time and expense that must be devoted to pursuing an enforcement action in court, the State will have the capability to proceed against only the most egregious wrongs. The vast majority of administrative penalties to date have been relatively small, reflecting technical yet important statutory violations. [10] In the absence of an administrative penalty power, most of these would have gone unpunished, even though collectively the environmental impact of small violations could be more profound than a major catastrophe. Relieving polluters from immediate sanctions dismantles the effectiveness of our laws protecting natural resources; no lesser means has been identified that provides for prompt enforcement. I would hold that the state has demonstrated a compelling interest in environmental protection that has been implemented by the least restrictive means, thus overriding any modest impediment [**71] that the prepayment of penalties may impose on access to the courts.

10 See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission.

[*457] Not even the slightest evidence has been provided to this court to suggest any actual restrictive effect. No affidavit of any member of the Texas Association of Business appears in the record stating that an inability to pay an administrative penalty has barred judicial review. As to most of the penalties assessed, $ 5,000 or less in amount, it is doubtful that such a contention could be made. The majority necessarily concludes that imposing fines of $ 2,000 against Exxon Chemical Company, Shell Oil Company and Union Carbide Corporation has left those entities financially unable to pursue an appeal. [11] While the enormity of some future penalty could in fact unconstitutionally bar judicial access, that is certainly not the case here. *See Jensen v. State Tax Comm'n, 835 P.2d 965, 969 (Utah 1992)* (payment of assessed taxes, penalties [**72] and interest as precondition to suit "not unconstitutional in all cases," but only those in which taxpayer financially barred from prosecuting appeal); *see also Morrison v. Chan, 699 S.W.2d 205, 207 (Tex. 1985)* (medical malpractice statute of limitations not unconstitutional as applied to facts of case).

11 See Appendices to Brief of Appellees Texas Air Control Board and Texas Water Commission at 27, 44, 55.

Eliminating the need to prove actual restrictive effect, the majority declares "irrelevant" that "the affected parties

may be able to afford prepayment." S.W.2d n.18. Unexplained is how this statement can be reconciled with *Dillingham*, in which this court found of critical importance the failure to accommodate those financially unable to post a supersedeas bond as a prerequisite to judicial review. Opining that "the guarantee of constitutional rights should not depend on the balance in one's bank account," *id.*, the majority would accord our state's largest businesses the same treatment as [**73] indigents in avoiding financial responsibility for court and other litigation costs.

Nor is the majority restrained by Texas decisional law validating similar requirements. We long ago upheld against this same type of challenge the condition that a corporation pay its franchise taxes in order to file a court action. *Federal Crude Oil Co. v. Yount-Lee Oil Co., 122 Tex. 21, 52 S.W.2d 56 (Tex. 1932)*; *accord Rimco Enterprises, Inc. v. Texas Elec. Svc. Co., 599 S.W.2d 362* (Tex. Civ. App.--Fort Worth 1980, writ ref'd n.r.e.). Various statutory requirements that taxes, penalties and interest be paid prior to contesting them in court have likewise sustained an open courts challenge. *See Filmstrips and Slides, Inc. v. Dallas Central Appraisal Dist., 806 S.W.2d 289* (Tex. App.--Dallas 1991, no writ) (property taxes); *Robinson v. Bullock, 553 S.W.2d 196* (Tex. Civ. App.--Austin 1977, writ ref'd n.r.e.), *cert. denied, 436 U.S. 918, 56 L. Ed. 2d 759, 98 S. Ct. 2264 (1978)* (sales taxes).

The majority also ignores the certainty that far more than three statutes are impacted by today's decision. A broad range of regulatory enforcement programs vital to protection of the public [**74] health and safety will be stripped of their most timely and effective sanctions to deter harmful conduct. Laws designed to protect the old -- residents in nursing homes [12] -- the young -- our children away at camp [13] -- the sick and the injured, [14] and those we have lost [15] will be substantially weakened. Others, ensuring the sanitariness of food, drugs and cosmetics, [16] as well as the slaughter and [*458] disposition of dead animals, [17] will be similarly rendered less effective. [18] Even where such penalties have not been frequently enforced, their potential use may promote law enforcement.

12 *See Tex. Health & Safety Code § 242.066* (administrative penalty for statutory violations "threatening the health and safety of a resident" of a convalescent or nursing home); *id.* § 242.069 (penalty must be prepaid or a bond posted prior to judicial review).

13 *Tex. Health & Safety Code §§ 141.016-141.018* (providing for administrative penalties for violation of laws regulating youth camps and requiring their payment or the posting of a bond prior to judicial review).

14 *Tex. Health & Safety Code §§ 773.065-.067* (administrative penalties to enforce Emergency Medical Services Act).

[**75]

15 Tex. Rev. Civ. Stat. Ann. art. 4582b, § 6G (Vernon Supp. 1992) (administrative penalties for violation of statutes governing funeral directing and embalming).

16 *Tex. Health & Safety Code §§ 431.054-.056* (Texas Food, Drug & Cosmetic Act); *id.* § 466.043 (regulation of narcotic drug treatment programs).

17 *Tex. Health & Safety Code §§ 433.094-.096* (Texas Meat & Poultry Inspection Act); *id.* §§ 144. 081-.083 (Texas Renderers' Licensing Act).

18 *See also* Tex. Rev. Civ. Stat. Ann. art. 5069-51.17 (Vernon 1987 & Supp. 1992) (administrative penalties for violation of the Texas Pawnshop Act).

The most widespread damage, however, from today's decision will be in the enforcement of laws protecting our environment, where the Legislature has determined again and again that such penalties are the most effective means of assuring compliance and preventing pollution of our air, water and land. [19] The majority ensures that those who pollute will be brought to justice very slowly or not at all.

19 Tex. Rev. Civ. Stat. Ann. art. 1446c, § 73A (Vernon Supp. 1992) (permitting assessment of civil penalty for violation of Public Utility Regulatory Act "resulting in pollution of the air or water of this state or posing a threat to the public safety"); *Tex. Rev. Civ. Stat. Ann. art. 4477-3a, § 16* (Vernon Supp. 1992) (Texas Asbestos Health Protection Act); *Tex. Rev. Civ. Stat. Ann. art. 5920-11, § 30* (Vernon Supp. 1992) (Texas Coal Mining and Surface Reclamation Act); *Tex. Rev. Civ. Stat. Ann. art. 6053-2* (Vernon Supp. 1992) (safety standards for transportation of gas and for gas pipeline facilities); Tex. Rev. Civ. Stat. Ann. art. 8905, § 9 (Vernon Supp. 1992) (Water Well Pump Installers Act); *Tex. Nat. Res. Code § 40.254* (Oil Spill Prevention and Response Act); *id.* § 81.0531-.0533 (assessment of penalties for violation of Railroad Commisssion statutes and rules "which pertain to safety or the prevention or control of pollution"); *id.* § 116.143-.145 (violation of laws relating to compressed natural gas "resulting in pollution of the air or water of this state or posing a threat to the public safety"); *id.* § 131.2661-.2663 (violations of Uranium Surface Mining and Reclamation Act "resulting in pollution of the air or water of this state or posing a threat to the public safety"); *id.* § 141.013-.015 (violation of geothermal resources regulations

"pertaining to safety or the prevention or control of pollution"); *id. Tex. Water Code 13.4151* (regulation of water and sewer utilities); *id.* § 27.1013-.1015 (Injection Well Act); *id.* § 28.067 (regulation of water wells and mine shafts); *id.* § 29.047 (Salt Water Haulers Act); *id.* § 33.009 (regulation of water well pump installers); Tex. Rev. Civ. Stat. Ann. art. 7621e, § 8A; *Tex. Health & Safety Code § 372.004* (water saving performance standards); *id.* § 401.389 (Texas Radiation Control Act).

[**76] Other statutes that impose administrative penalties permit the filing of an affidavit of inability to pay in lieu of prepayment or the posting of a bond. [20] Because the majority's reasoning strikes down administrative penalties without reference to financial ability, S.W.2d at n., these statutes similarly cannot be enforced.

20 *Tex. Ag. Code § 12.020 (L)* (violation of agricultural statutes); *id.* § 76.1555 (failure to comply with pesticide regulations); Tex. Water Code § 34.011 (irrigation regulation); *Tex. Rev. Civ. Stat. Ann. art. 41a-1, § 21D(f)* (Vernon Supp. 1992) (public accounting); *Tex. Rev. Civ. Stat. Ann. art. 135b-6, § 10B(k)* (Vernon Supp. 1992) (Structural Pest Control Act); Tex. Rev. Civ. Stat. Ann. art. 5155, § 5(h) (Vernon Supp. 1992) (labor wage laws); Tex. Rev. Civ. Stat. Ann. art. 5282c, § 23A(k) (Vernon Supp. 1992) (Professional Land Surveying Practices Act); Tex. Rev. Civ. Stat. Ann. art. 6573a, § 19A(k) (Vernon Supp. 1992) (Real Estate License Act); Tex. Rev. Civ. Stat. Ann. art. 9100, § 17(m) (Vernon Supp. 1992) (Texas Department of Licensing and Regulation).

[**77] Today's writing poses a potentially crippling effect for collection of taxes. All of our state statutes in this area require that assessed taxes, penalty and interest be prepaid before a suit challenging them may be filed. *See generally Tex. Tax Code §§ 112.051, 112.101*. If such requirements are unconstitutionally void even to fulfill a constitutional mandate of environmental protection, their validity for tax collection is certainly subject to question. *See R Communications, Inc. v. Sharp, 839 S.W.2d 947* (Tex. App.--Austin 1992, writ granted).

Nor has the majority sought to consider the consequences of its decision for a major weapon in the war against drugs, forfeiting *prior to judicial review* money, vehicles and other property alleged to have been used in violating our criminal laws. *Tex. Crim. Proc. Code art. 59.02-.011*. Most frequently invoked to seize assets from drug dealers, such as money and cars that could finance their defense, this statute provides for the return of property prior to trial only [*459] on the posting of a bond for the full value. *Id.* art. 59.02(b).

Procedures within our judicial system are also threatened. Why is not the requirement [**78] that corporations and other organizations appear in court only through counsel a violation of the open courts provision, since the cost of retaining an attorney in most cases exceeds the average administrative penalty considered here?

Inadequately considered by the majority's opinion is its effect on the millions of dollars in administrative penalties that have already been paid under the statutes now declared unconstitutional. Yet, under the general rule that our decisions apply retroactively, past violators of environmental laws may stand to reap a substantial windfall. [21] In the firm grasp of this majority, "open courts" may have been rewritten to mean open coffers. While claiming that nothing in today's writing suggests that a refund is required, the majority apparently once again concludes that monies extracted by the state under the coercion of an unconstitutional system may be retained. *See Carrollton-Farmers Indep. Sch. Dist., 826 S.W.2d at 515-23* (holding tax unconstitutional, but requiring taxpayers to continue payment for two years).

21 Under recent and highly erratic writings determining retroactivity, of course, anything can happen. *See, e.g., Carrollton-Farmers Indep. Sch. Dist., 826 S.W.2d at 515-23*; *Elbaor v. Smith*, S.W.2d (Tex. 1992) (creating uncertainty by disapproval of a type of pre-trial agreements previously upheld by this court).

[**79] The majority today throws a large wrench into the workings of the important administrative mechanism of our Texas government. By severely limiting enforcement powers, the majority leaves law enforcers little choice but to forego prosecution of law violators. Our laws designed to protect and conserve our natural resources are substantially weakened at the time their strength is most needed.

II. Trial by Jury

The harm caused to our environment by today's writing is equalled only by the severe blow struck against our fundamental right of trial by jury. In holding that TAB and its members have no right to a jury trial, the majority employs an analysis that has far-reaching ramifications. While I recognize the need to accommodate the evolution of the administrative state, the history of this important guarantee mandates that only the narrowest of exceptions be permitted.

The ability of each individual to have a case heard by other members of the community is a vital part of our heritage and law. Long ago, Texans emphasized the paramount importance of this guarantee, stating in their grievances against the Mexican government:

> It has failed and refused to secure, on a firm [**80] basis, the right of trial by jury, that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the citizen.

The Declaration of Independence of the Republic of Texas (1836), *reprinted in* Tex. Const. app. 519, 520 (Vernon 1955). A strong guarantee of this right had been unsuccessfully sought in an 1833 draft constitution, [22] which was submitted to Mexico by Stephen F. Austin [23] and was later incorporated in the 1836 Texas Independence Constitution. [24]

22 "The right of trial by jury, and the privilege of the Writ of Habeas Corpus shall be established by law, and shall remain inviolable." *Proposed Constitution for the State of Texas* art. 4 (1833), *reprinted in Documents of Texas History,* 80 (Ernest Wallace ed., 1963).

23 *See* Eugene C. Barker, *Stephen F. Austin, in The Handbook of Texas* 84 (Walter Prescott Webb ed., 1952).

24 Constitution of the Republic of Texas, Declaration of Rights, Section 9 (1836), *reprinted in* Tex. Const. app. 523, 536 (Vernon 1955), provided that "the right of trial by jury shall remain inviolate."

[**81] The central role of the jury as a democratic institution was firmly recognized, indeed celebrated, in our early jurisprudence by the Supreme Court of the Republic of Texas:

> The institution of jury trial has, perhaps, seldom or never been fully appreciated. It has been often eulogized in sounding [*460] phrase, and often decried and derided. An occasional corrupt, or biased, or silly verdict is not enough for condemnation; and when it is said the institution interposes chances of justice and checks against venality and oppression, the measure of just praise is not filled. Its immeasurable benefits, like the perennial springs of the earth, flow from the fact that considerable portions of the communities at stated periods are called into the courts to sit as judges of contested facts, and under the ministry of the courts to apply the laws . . . . Let us then preserve and transmit this mode of trial not only inviolate, but if possible purified and perfected.

*Bailey v. Haddy*, Dallam 35, 40-41 (Tex. 1841). [25]

25 In our time this great constitutional principle continues to be reaffirmed:

> It is fundamental to our system of justice and the intention and policy of the law to permit all persons to have a trial by jury of disputed fact issues essential for a determination of [their rights]. The right of trial by jury is a valuable right which should be guarded jealously by all state courts.

*Steenland v. Texas Commerce Bank Nat'l Ass'n, 648 S.W.2d 387, 391* (Tex. App.--Tyler 1983, writ ref'd n.r.e.); *see also Lopez v. Lopez, 691 S.W.2d 95, 97* (Tex. App.--Austin 1985, no writ) ("trial by jury should be granted zealously by all the courts of this state").

[**82] In 1845, expanding the scope of this right was the subject of spirited debate in the deliberations over the new constitution for statehood. In addition to the previous guarantee, which was carried forward in a new Bill of Rights, [26] further protection was included in the Judiciary Article. *Tex. Const. art. IV, § 16* (1845). While under our national Constitution and those of almost all of our sister states trial by jury is available only for those actions that could have been brought at common law, the Texas Constitution since 1845 has also preserved that right in cases that historically would have been brought in equity. Thus, even when a private party seeks injunctive relief that will inure to the public's benefit, any derogation of the right to a jury nonetheless violates the Texas Constitution.

26 *Tex. Const. art. I, § 12* (1845) (retaining identical language from 1836 provision).

Urging support of the additional Judiciary Article guarantee, Convention President Thomas Rusk declared:

> It is a dangerous [**83] principle to trust too much power in the hands of one man. Would it not be better to trust a power of this nature in the hands of twelve men, than to confide it to the breast of one?

William F. Weeks, *Debates of the Texas Convention* 268 (1846). He was opposed by John Hemphill, later the first Chief Justice of this court, who actually "preferred the

civil law" system, *id. at 271-73*, and Jefferson County delegate James Armstrong, who insisted the new section would "operate very injuriously." *Id. at 270*. He declared:

> It would be better, in my opinion, to leave it to the legislature to apply these things; it is enough for us to say in the constitution that the trial by jury shall be preserved inviolate. If we intend the jury to determine every thing, it would be better to dispense with the judge altogether, as a useless appendage of the court.

*Id*. Today it is this same fear of juries, fortunately rejected in 1845, that now unfortunately prevails.

The original language providing for trial by jury in the Judiciary Article of 1845 was retained in later constitutions, *Tex. Const. art. IV, § 16* (1861), *Tex. Const. art. IV, § 20* (1866), but was thereafter [**84] extended to "all cases of law or equity." *Tex. Const. art. V, § 16* (1869). It took its final form in our present Constitution of 1876, which continues to afford not one but two assurances on this vital subject:

> In the trial of all causes in the District Courts, the plaintiff or defendant shall, upon application made in open court, have the right to trial by jury . . . .

*Tex. Const. art. V, § 10*.

> The right of trial by jury shall remain inviolate.

*Tex. Const. art. I, § 15*. Rather than keeping it "inviolate," the majority today severely violates this right.

[*461] Our heritage is now rejected by the majority in favor of a deliberately overbroad writing that treats trial by jury as a mere anachronism. This is consistent with the majority's increasing disfavor of decisionmaking by ordinary citizens composed as a jury. [27] Today's opinion insists that our constitutional assurance of trial by jury does not offer protection against legislative delegation of factfinding to an administrative bureaucracy. In essence, the majority engages in a massive redistribution of power from the people to the bureaucratic arm of state government. This extreme position [**85] is totally unjustified in view of the staunch legal and historical underpinnings of our constitutional commitment to afford Texans a jury of their peers.

27 *See, e.g., May v. United Services*, ___ S.W.2d ___, ___ (Tex. 1992) (Doggett, J., dissenting); *Boyles v. Kerr*, ___ S.W.2d ___, ___ (Tex. 1992) (Doggett, J., dissenting); *Leleaux v. Hamshire-Fannett Indep. Sch. Dist., 835 S.W.2d 49, 55-56 (Tex. 1992)* (Doggett, J., dissenting); *Reagan v. Vaughn, 804 S.W.2d 463, 491 (Tex. 1991)* (Doggett, J., concurring and dissenting); *Greater Houston Transp. Co. v. Phillips, 801 S.W.2d 523, 527 (Tex. 1990)* (Doggett, J., dissenting).

Today's opinion accurately describes one element of the dual constitutional protection for this fundamental liberty:

> Article I, section 15 of our constitution preserves a right to trial by jury for those actions, or analogous actions, tried to a jury at the time the constitution of 1876 was adopted.

S.W.2d at (footnote omitted). Then the majority grossly [**86] misconstrues this standard while making selective and misleading use of jurisprudence developed under the further guarantee of article V.

With its hangnail sketch of Texas history limited to one historian's very generalized description of Texas in the era "between 1835 and 1861", [28] S.W.2d at, the majority ignores our longstanding concerns regarding threats to our natural resources. As early as 1860, the Legislature acted to penalize polluters, providing that:

28 T.R. Fehrenbach, Lone Star: A History of Texas and the Texans 279 (1983).

> If any person . . . shall in anywise pollute, or obstruct any water course, lake, pond, marsh or common sewer, or continue such obstruction or pollution so as to render the same unwholesome or offensive to the county, city, town or neighborhood thereabouts, or shall do any act or thing that would be deemed and held to be a nuisance at common law, shall be . . . fined in any sum not exceeding five hundred dollars . . . . [29]

29 Act of Feb. 11, 1860, Tex. Gen Laws 97, a later version of which was referenced by this court in *Gulf, Colo. & Santa Fe Ry. v. Reed, 80 Tex. 362, 15 S.W. 1105, 1107 (1891)*.

[**87]

In an early decision considering whether a criminal nuisance was posed by a tallow factory near Galveston at which cattle were slaughtered and their carcasses and offal were allowed to accumulate, this court stated:

> It requires no aid of the common law to convince any one accustomed to pure air, and who has been brought by accident or necessity within the sickening and malarious influence of one of our modern tallow and beef factories, that it is a disgusting and nauseous nuisance, even for miles around it . . . [those] so offending should be indicted and punished to the extent of the law.

*Allen v. State, 34 Tex. 230, 233-34 (1871)*. How significantly has this court's once vigorous enforcement of anti-pollution laws waned.

Defilement of the environment was not only made punishable as a crime, but also subject to a common law action for nuisance. *See generally* Horace Wood, Wood's Law of Nuisances 501-21, 576-692 (2d ed. 1883) (discussing nuisance recovery at common law for various forms of air and water pollution). Such actions were regularly brought in Texas before 1876 to halt activities harmful to our air and water. In 1856, this court recognized [**88] that "what constitutes a nuisance is well defined." [30] [*462] *Burditt v. Swenson, 17 Tex. 489 (1856)*. Considering an action to enjoin operation of a livery stable on Congress Avenue in Austin because "manure and filth has already accumulated to such an extent, that it now causes an unhealthy and disagreeable effluvia, exceedingly offensive and prejudicial," *id. at 492*, this court concluded such "noisome smells" constituted a nuisance. *Id. at 502-03*. In *City of Fort Worth v. Crawford, 74 Tex. 404, 12 S.W. 52, 54 (Tex. 1889)*, an individual asserted that, because of the dumping of garbage, filth and bodies of dead animals on city land,

> 30 The court further stated: "The word means, literally, annoyance; in law, it signifies, according to Blackstone, 'anything that worketh hurt, inconvenience, or damage.' . . . . 'So closely (says Blackstone) does the law of England enforce that excellent rule of Gospel morality, of doing to others as we would they should do unto ourselves.'" *Id. at 492. Accord Miller v. Burch, 32 Tex. 208, 210 (1869).*

[**89]

> his home was rendered almost uninhabitable; his family and himself were kept in bad health; and he was, in the language of a witness, "a walking skeleton."

This court further observed that

> The stench was so offensive that he had to shut the doors to eat and sleep. . . . The testimony shows that the filth on this place of deposit was so indescribable, and was so offensive as to make persons sick, and could be perceived a mile away.

*Id.* Affirming the judgment declaring the dump a common law nuisance, this court declared:

> There is also no doubt that every person has a right to have the air diffused over his premises free from noxious vapors and noisome smells . . . .

*Id.* [31]

> 31 *See also Rhodes v. Whitehead, 27 Tex. 304, 316 (1863)*(remanding for trial a complaint against a dam across the San Antonio river, recognizing that the creation "of pools of stagnant and putrid water" or the "tendency to cause sickness in [the plaintiff's] family or immediate neighborhood," was sufficient to constitute a nuisance); *Jung v. Neraz, 71 Tex. 396, 9 S.W. 344, 344-45 (1888)* (nuisance properly alleged by claim that "interment of dead bodies in [proposed cemetery] would infect, poison, and injure [plaintiffs'] wells, and the use of low grounds, and further injure plaintiffs' health by the foul odors from the decomposition of said bodies.").

[**90]

The majority's suggestion that "pollutants . . . are phenomena of relatively recent origin," S.W.2d at, is contradicted by the nineteenth century legislative response of criminalizing pollution and the common use of the common law of nuisance to fight soiling of the air and water. With the ongoing construction of the railroads, the mining of coal and sulphur, the emergence of industry and the nascence of our oil and gas industry, our state's natural resources were by no means pure and unthreatened in 1876. *See* James C. Cobb, Industrialization and Southern Society 1877-1984, 128 (1984) (describing pollution relating to increased rail usage, lumbering and urban

sewage); *see also* Robert A. Calvert & Arnoldo De Leon, The History of Texas 186-191 (1990) (discussing the development of Texas industry in the late 1800's, including lumbering, beef processing and mining); Louis J. Wortham, 5 A History of Texas (1924) (examining industrial development in the nineteenth century). Only the scope and depth of the problem has changed. But even if the fouling of the environment were a recent technological "innovation" of the past century, that would be irrelevant. As I recently wrote [**91] in another context,

> The law is not irretrievably locked in the days before televisions and videocameras, nor limited to operators of telegraphs and horse-drawn carriages.

*Boyles v. Kerr*, ___ S.W.2d ___, ___ (Tex. 1992) (Doggett, J., dissenting). There is nothing about technological change that has made trial by jury any less vital. [32]

32 Although some critics allege that juries are not competent to deal with complex scientific and technological issues, empirical data demonstrates otherwise.

> Research shows . . . that the opportunity exists for meaningful [juror] participation in a wide range of adjudicatory and regulatory proceedings. . . . To the extent that juries encounter difficulties, these difficulties often vex judges as well. . . . The full potential of lay participation in adjudication has not been realized.

Joe Cecil, Valerie Hans, and Elizabeth Wiggins, *Citizen Comprehension of Difficult Issues: Lessons From Civil Jury Trials, 40 Am. U. L. Rev. 727, 773-74 (1991)*.

[**92] But because there was no modern bureaucracy in 1876, the majority insists: "no governmental schemes akin to these existed." *Id.* at . While our laws and society have grown more complicated, the mandate [*463] of our constitution has not. As we concluded in *State v. Credit Bureau of Laredo, Inc., 530 S.W.2d 288, 292 (Tex. 1975)*: "The right to a trial by jury is not limited to the precise form of action . . . at common law." If there was an analogous cause of action with a right to jury trial in 1876, then our article I jury trial guarantee requires it today. Yet the majority ignores the fact that even the earliest of pollution statutes was designed to deter and punish those who harm our environment. Our jury trial article is thus decreed as dependent on form, not substance; not analogy, but exactitude. Under the majority's analysis, *Credit Bureau* was wrongly decided since a regulatory prohibition against deceptive non-disclosure or ambiguous language with the capacity to deceive was beyond the "deceptive acts" of common law fraud or deceit as it existed in 1876.

Seizing upon the rather obvious proposition that the administrative state had not yet been created in [**93] 1876, the majority concludes that there is no right to trial by jury in judicial review of an administrative proceeding. But under article I it is the nature of the cause of action that controls, not the procedures under which it is enforced. Each of the three statutes considered today defines "pollution" of air, water or land to incorporate early nuisance concepts. *Tex. Health & Safety Code § 382.003(3)*(contaminants that "are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation or property [or] interferes with the normal use and enjoyment of animal life, vegetation, or property"); *id.* § 361.003(44) ("contamination of any land land or surface or subsurface water in the state that renders the land or water harmful, detrimental, or injurious to humans, animal life, vegetation"); *Tex. Water Code § 26.001(13)*(contamination that "renders the water harmful, deterimental, or injurious to humans, animal life, vegetation, or property"). The majority fails to examine these provisions and makes no attempt to distinguish their substance from nuisance actions at the time the constitution was adopted. The focus must be on the nature of civil [**94] and criminal nuisance actions as they existed in 1876, not on whether administrative agencies existed then to bring such actions. That the creation of some administrative agency was not contemplated in 1876 does not mean that any type of factfinding transferred to that agency in 1993 or hereafter is beyond the purview of a jury. With its new approach, the majority is only clearing the way for a steady expansion of factfinding and decisionmaking by bureaucracy at the expense of trial by jury.

Concluding that no common law action analogous to the assessment of administrative penalties existed in 1876, the majority professes a superficial limit on its holding tied to *article XVI, § 59(a) of the Texas Constitution*, as interpreted in *Corzelius v. Harrell, 143 Tex. 509, 186 S.W.2d 961 (1945)*. S.W.2d at n.24. Nothing in this provision affects the determination of whether a nuisance action for pollution is analogous to an enforcement action for the same conduct. Clearly, the majority's reasoning rests solely on the fact that no administrative agency was charged in 1876 with protecting the state's resources. Nor does *Corzelius* in any way address the right to jury trial. Under the [**95] majority's asserted "narrow" holding, the right to trial by jury can be immediately abrogated in

any case in which natural resources are even remotely involved, including private disputes that this court has held are subject to jury trial, such as those involving mineral ownership, contract rights, or mineral lease terms. *See, e.g., Amarillo Oil Co. v. Energy-Agri Prod., Inc., 794 S.W.2d 20, 26 (Tex. 1990)*.

The constitutional limitation on legislative power to delegate away the people's right to trial by jury was amply demonstrated by the writing of this court in *White v. White, 108 Tex. 570, 196 S.W. 508 (Tex. 1917)*. There a husband had his wife, who apparently did not contest that she was a "lunatic," committed to a state asylum. Commitment proceedings had been statutorily transferred to a "commission" appointed by a county judge and comprised of six members, "as many of [whom] shall be physicians as may be possible." Act of [*464] April 8, 1913, 33rd Leg., ch. 163, art. 152, 1913 Tex. Gen. Laws 342. Although a review of decisions of other states and of federal practice indicated substantial support for what appeared to be a quite reasonable legislative attempt [**96] to entrust the determination of mental competency to the expertise of the medical profession, *196 S.W. at 514-15*, this Court rightly concluded there that

> trial by jury means something more than a hearing before a commission. . . .

*Id. at 511*. Such "a hearing before a commission, in lieu of the time-honored trial by jury, is invalid." *Id. at 515*. Moreover,

> [contrary] reasoning [in other jurisdictions] as to the right of the legislature to dispense with jury trials is not applicable to our judicial system and laws, and it is obnoxious to our [Texas] Constitution . . . ."

*Id.* I maintain that the wholesale transfer of authority for factfinding from juries to the bureaucracy announced here is no less offensive to the rights our Constitution guarantees.

Beginning with the constitutional amendment that led to the creation of the Railroad Commission, [33] the use of administrative agencies in Texas has steadily increased. Today this arm of government implements broad legislative plans regulating many areas of public concern, including the conduct of public utilities, the development and conservation of energy resources, and the protection [**97] of the environment.

33 *See Tex. Const. art. X, § 2* and interp. commentary (Vernon 1955) (noting that the provision was added to authorize the Legislature to regulate railroads after the people had issued strong complaints against them).

To preserve the workings of modern government, some exception for administrative proceedings may be necessary, but it should be drawn narrowly so as not to encompass every conceivable action that could arguably be assigned to some existing or future administrative body. And that is precisely what, until today, our Texas courts have usually done. In two decisions concerning administrative cancellation of a permit to sell liquor, courts narrowly recognized that no "cause of action" was involved. The court in *Bradley v. Texas Liquor Control Bd., 108 S.W.2d 300* (Tex. Civ. App.--Austin 1937, writ ref'd n.r.e.), specifically excluded from its ruling cases "based upon a civil right of [an individual] to compensation." Relying on *Bradley,* [34] the court in *Texas Liquor* [**98] *Control Bd. v. Jones, 112 S.W.2d 227, 229-30* (Tex. Civ. App.--Texarkana 1937, no writ), noted that unlike other administrative proceedings that might involve rights of the same character as a "cause of action," the cancellation of a liquor license is a proceeding brought by the state pursuant to its police power to protect the "welfare, health, peace . . . and safety of the people of Texas."

34 *See also State v. De Silva, 105 Tex. 95, 145 S.W. 330 (Tex. 1912)* (also holding that cancellation of liquor license is not a "cause").

This concern for "the safety of the people of Texas" -- the rights and needs of the public, *id.*, is not dissimilar from the doctrine of "public rights" rather imperfectly employed by the federal courts. State cancellation of a liquor license essentially represents a "public right." In *Atlas Roofing Co. v. Occupational Safety & Health Review Comm'n, 430 U.S. 442 (1977)*, the court distinguished between cases involving governmental action to protect the public health and [**99] safety and those involving only private rights:

> At least in cases in which "public rights" are being litigated -- e.g., cases in which the government sues in its sovereign capacity to enforce public rights created by statutes . . . [the constitutional right to a jury trial] does not prohibit . . . assign[ment of] the factfinding function to an administrative forum with which the jury would be incompatible.

*Id. at 450*.

*Bradley* and *Jones* are also consistent with writings in other jurisdictions strictly excluding from any adminis-

trative public rights exception actions invoking private [*465] rights for which the Constitution mandates a right to trial by jury:

> Although the award of general compensatory damages may have substantive effect, in that it deters violation of the regulatory scheme . . . when the damages awarded advance a substantial private interest in remuneration that is disproportionate to the concept of public relief, the right to a jury trial is implicated and a jury is required.

*McHugh v. Santa Monica Rent Control Bd., 49 Cal. 3d 348, 777 P.2d 91, 117 (Cal. 1989)* (Panelli, J., concurring); *Bishop Coal* [**100] *Co. v. Salyers, 380 S.E.2d 238, 246 (W.Va. 1989)* (subjective determinations of damages are constitutionally entrusted to juries); *Broward County v. La Rosa, 505 So.2d 422, 424 (Fla. 1987)* (constitutional right to jury precludes administrative awards of unliquidated damages).

Fortunately the rights of Texans are not constrained by whether the right to a jury trial was preserved in analogous actions in 1876. We have written quite clearly that an even broader right to trial by jury is afforded under article V, section 10 than under article I, section 15. [35] *State v. Credit Bureau of Laredo, Inc., 530 S.W.2d 288, 292 (Tex. 1975)*. Relying on *Walsh v. Spencer, 275 S.W.2d 220, 223* (Tex. Civ. App.--San Antonio 1954, no writ), which described the "much broader guarantee" of the Judiciary Article, and *Tolle v. Tolle, 104 S.W.2d 1049, 1050 (Tex. 1907)*, which said of the provision, "language cannot be more comprehensive than this," we expressly disapproved of earlier cases "mistakenly" treating the two provisions

> 35 In the commentary for recommended article V, section 14(e) of the proposed 1974 Constitution, the significance of holdings regarding this more expansive language was also noted:
>
> > The right of trial by jury guaranteed in Article V, Section 10 of the 1876 Constitution is not dependent on the existence of the right at the time the Constitution was adopted in 1876. The guarantee extends to any "cause" instituted in the district court. A "cause" is defined as a suit or action concerning any question, civil or criminal, contested before a court of justice.
>
> *See* Texas Constitutional Revision Commission, *A New Constitution for Texas: Text, Explanation, Commentary* 120-21 (1973).

[**101]

> as identical in meaning, that is, as protecting the right of trial by jury only as it existed at common law or by statutes in effect at the time of the adoption of the Constitution.

*530 S.W.2d at 292* (citing *Hickman v. Smith, 238 S.W.2d 838* (Tex. Civ. App.--Austin 1951, writ ref'd), as improperly assigning the two provisions equivalent meaning). We held that the Judiciary Article affords a unique right to trial by jury even for causes of action unknown at the time of the Constitution's adoption. *Id.* [36]

> 36 The *Credit Bureau* opinion was authored for the court by now former Chief Justice Jack Pope, who had written previously, "the struggle for survival by the institution we call the jury is truly the epic of our law." Jack Pope, *The Jury*, 39 Tex. L. Rev. 426 (1961). That struggle continues today.

Instead of heeding this holding, the majority seizes upon a citation to a commentary in that writing as an excuse to rewrite the Constitution. In the discussion of the article V jury [**102] trial guarantee in *Credit Bureau*, which involved no administrative action, we noted a few "isolated" proceedings that do not constitute a "cause" that have been identified on a "case-by-case determination." *Id. at 293*. We made shorthand reference to a commentator's brief list of exceptions carved from the otherwise inviolate right to trial by jury. *Id.* (citing Whitney R. Harris, *Jury Trial in Civil Cases -- A Problem in Constitutional Interpretation*, 7 Sw. L.J. 1, 8 (1953) (listing child custody by habeas corpus and adoption proceedings, election contests, and contempt proceedings)). Additionally, Harris relied upon *Jones* for the broader proposition that proceedings originally brought before administrative agencies are excepted from constitutional jury rights. 7 Sw. L.J. at 12-13. [37]

> 37 Though he wrote in unnecessarily global terms regarding this exception, even Harris recognized that
>
> > the plain language of the Judiciary section conferring the right of trial by jury in all causes in the district courts would seem to enti-

tle parties to jury trials irrespective of whether that right existed at the time of the adoption of the Constitution.

Harris, *supra*, at 6-7.

[**103] [*466] Today the majority overexpands this exception before considering the rule it prefers that exception to swallow. In *Credit Bureau* we attributed "broad meaning [to] the word 'cause.'" *530 S.W.2d at 292*. In defining it, we did not limit its meaning in the past, but turned to a relatively contemporary dictionary as well as older authority. *Id.* Clearly this term must adapt to modern developments; our understanding of a "cause" is not frozen in 1876. *See Davenport v. Garcia, 834 S.W.2d 4, 19 (Tex. 1992)*. Both the text of our Constitution and its historical backdrop demand that the right to trial by jury remain "inviolate." When, as here, however, changing circumstances require reexamination of the scope of this right in order to preserve the evolved workings of government, we must ensure that any exception does not destroy the guarantee. [38] We should instead follow the command of our Constitution in light of our contemporary situation, by limiting any exception in the most narrow way possible without completely undermining the administrative state.

38 The majority notes the existence of other statutory procedural protections, such as those contained in the Administrative Procedure and Texas Register Act, *Tex. Rev. Civ. Stat. art. 6252-13a, § 19(e)*. S.W.2d at n.26. While important, these measures certainly do not constitute a complete substitute for a jury trial. If the Texas Constitution guarantees a right to trial by jury, no lesser protection will suffice.

[**104]

I would accordingly clarify any existing exception for administrative proceedings to preserve the right to trial by jury in all suits except those in which the state is enforcing a regulation or statute protecting the public. If construed too broadly, however, even this exception limited to "public rights" could destroy our traditional reliance on the jury system. [39] Indeed, despite the writing in *Atlas Roofing*, such erosion has already begun at the federal level. [40] Properly limited, however, a "public rights" administrative exception to the right to trial by jury is both constitutionally sound and easy to apply. While perhaps far-reaching in other contexts, "public rights" that conflict with the right of each member of the public to have factual disputes resolved by a public jury must be narrowly construed. I would not permit the concept of "public rights" to be perverted to deny such a fundamental right. In this limited circumstance, I would define proceedings involving "public rights" as those in which the government, as a real party in interest, enforces a regulatory or statutory scheme. Contrary to the majority, I do not suggest that we follow its standard preference [**105] for copying a "federal test," S.W.2d at n.24. Rather, I recommend a narrow and clear Texas standard that looks to Texas law predating *Atlas Roofing*, and which learns from the misapplication of this doctrine in the federal courts.

39 To some extent every action legislatively entrusted to an administrative agency involves a public right. At the same time even actions by private parties may have incidental regulatory effects and are unquestionably invested with a public interest. *See The Dallas Morning News, Inc. v. Fifth Court of Appeals*, ___ S.W.2d ___, ___ (Tex. 1992, orig. proceeding) (Doggett, J., dissenting from overruling of motion for leave to file petition for writ of mandamus).

40 The "public rights" concept has been recently muddled by the federal courts. In *Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 106 L. Ed. 2d 26, 109 S. Ct. 2782 (1989)*, the court, although upholding the right to a jury trial for defendants sued for fraudulent conveyance by a trustee in bankruptcy, broadened the scope of its "public rights" exception to include all cases "involving statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency." *Id. at 55 n.10*. *See also Thomas v. Union Carbide Agric. Prod. Co., 473 U.S. 568, 586 (1985)* (rejecting the view that the government must bring suit in order for litigation to involve "public rights"). I believe that such an expansive reading of "public rights" would not be consistent with the broad state constitutional protection of the right to trial by jury in Texas.

[**106] Here TAB's members are not entitled to a jury trial because the state is enforcing public regulations by imposing administrative penalties. Although this action is analogous to a common law nuisance claim, here the state is protecting the public's right to a clean environment rather than an [*467] individual's use and enjoyment of private property.

The right to trial by jury is a critical state constitutional guarantee. Denigrating my concern with protecting this liberty, the majority dismisses my writing as "trumpeting." S.W.2d at n.23. The trumpet call has sounded from the very earliest days of our Republic, heralding our right to trial by jury, a clarion to our citizens to shout out to preserve their heritage against attack. It demands that any intrusion on this right be narrow in scope, clear-

ly-announced and thoughtfully considered. The majority's refusal to define with certainty its erosion of the right to trial by jury sounds a weak and shaky chord, reflecting a lack of commitment to this fundamental guarantee. Attempting to let the strong note drown the weak, the majority seeks to hide its equivocation by reference to my conclusion that a jury trial is not required under [**107] these anti-pollution statutes, *id.*, and by criticizing the narrow, clear and thoughtful exception I have drawn today. *Id.*

The inviolate nature of the right to trial by jury demands that this vital guarantee be circumscribed in only the most extraordinary circumstances and that any exception to it be clearly and narrowly construed. Although I do not disagree with the result announced by the majority, the analysis employed is designed to destroy one of our most precious freedoms as Texans. The alternative I offer would permit our administrative bodies to implement efficiently their regulations, while ensuring that efficiency concerns do not envelop a fundamental civil liberty. [41]

41 In view of recent attacks nationwide on the jury system, a recent study determined that

> Our central conclusion is that the civil jury system is valuable and works well. . . . It is [not] "broken," and therefore it need not be "fixed." The jury system is a proven, effective, an important means of resolving civil disputes.

The Brookings Institution, Charting a Future for the Civil Jury System 2 (1992).

[**108] III. Standing

The issue of standing is a stranger to this litigation. No party before this court has ever asserted that the Texas Association of Business lacked capacity to challenge the actions of state government. How rare the occasion when all litigants agree

on the proper resolution of an issue, but how truly extraordinary is such unanimity when the parties are two state regulatory agencies, the Texas Association of Business, the Sierra Club and the League of Women Voters. This, nonetheless, is the exceptional circumstance in which we find ourselves today as all of these diverse parties have urged the court not to decide this matter in the manner adopted. Addressing the question of standing solely at the belated insistence of the majority, all parties asserted that this issue was not in dispute; that, under recent precedent, standing had been waived; [42] and, alternatively, that the record adequately demonstrated the right of the Texas Association of Business under Texas law to initiate this litigation. Why then does the majority insist on writing? Because it dare not pass up the opportunity to close access to our courts to those citizens who choose to challenge environmental [**109] degradation, neighborhood destruction and consumer abuse. Through a narrowly crafted test, the majority extends an invitation to TAB to come into the courts while telling other public interest groups to stay out.

42 As the majority recognizes, "the parties insist that any question of standing has been waived in the trial court and cannot be raised by the court for the first time on appeal." S.W.2d at .

While devoting over half of today's opinion to a nonissue in this litigation, the majority oddly limits its inquiry to only one of the three organizations asserting standing here. Nothing is said as to the League of Women Voters and the Sierra Club, both of which intervened in the trial court and were aligned as defendants with the State. Asserting the interests of its members in water and air quality, as well as its involvement in protecting the state's natural resources, the League of Women Voters claimed standing to defend the challenged regulations. Similarly, the Sierra Club [*468] based its standing [**110] on its purpose of environmental enhancement and conservation of natural resources. By completely ignoring whether these groups were proper parties and by embracing a federal standing test hostile to their participation, the majority erects new barriers to deny Texans access to Texas courts.

To achieve this result, the majority must overcome what, until recently, was viewed as a considerable obstacle -- Texas law. This court has repeatedly held that the issue of standing may not be raised for the first time on appeal, either by the parties or by the court. In *Texas Industrial Traffic League v. Railroad Comm'n of Texas, 633 S.W.2d 821, 822-23 (Tex. 1982)*, we concluded:

> A party's lack of justiciable interest must be pointed out to the trial court . . . in a written plea in abatement, and a ruling thereon must be obtained or the matter is waived.
>
> No plea challenging the standing of [the party] was filed in the district court. The issue of standing was therefore waived, and the court of appeals erred in writing on the issue at all.

(Emphasis supplied). The sole issue presented in *Coffee v. William Marsh Rice University, 403 S.W.2d 340 (Tex. 1966)*, [**111] was whether the court of appeals erred in dismissing a case, on its own motion, for want of standing. This court held that, because standing had not been challenged in the trial court, that issue could not deprive the court of appeals of subject matter jurisdiction. *Id. at 347-48*. Assuming that standing was lacking in *Sabine River Authority of Texas v. Willis, 369 S.W.2d 348, 349-50 (Tex. 1963)*, [43] this court nonetheless held that dismissal was erroneous, because the absence of a justiciable interest was not first raised in the trial court. We have repeatedly cited these decisions with approval. *See Central Educ. Agency v. Burke, 711 S.W.2d 7, 8 (Tex. 1986)* (per curiam); *American General Fire & Casualty Co. v. Weinberg, 639 S.W.2d 688 (Tex. 1982)*; *Cox v. Johnson, 638 S.W.2d 867, 868 (Tex. 1982)* (per curiam).

43 Despite the clear statement in *Sabine River* that "we assume without deciding that Sabine has no justiciable interest," *369 S.W.2d at 349*, the majority today asserts that "standing was present" in the trial court in that case. S.W.2d at n.9.

[**112] Time and time again, the courts of appeals have also refused to consider challenges to standing not first raised in the trial court. [44] Until today, the only criticism of our prior holdings to this effect has [*469] consisted primarily of writings authored by one appellate judge. [45]

44 *See, e.g., Espiricueta v. Vargas, 820 S.W.2d 17, 20* (Tex. App.--Austin 1991, writ denied); *Integrated Title Data Systems v. Dulaney, 800 S.W.2d 336* (Tex. App.--El Paso 1990, no writ); *State v. Eurest*i, *797 S.W.2d 296, 299* (Tex. App.--Corpus Christi 1990, no writ); *Cissne v. Robertson, 782 S.W.2d 912, 917* (Tex. App.--Dallas 1989, writ denied); *Broyles v. Ashworth, 782 S.W.2d 31, 34* (Tex. App.--Fort Worth 1989, no writ); *Horton v. Robinson, 776 S.W.2d 260, 263* (Tex. App.--El Paso 1989, no writ); *L.G. v. State, 775 S.W.2d 758, 760* (Tex. App.--El Paso 1989, no writ); *Wilson v. United Farm Workers of America, 774 S.W.2d 760, 764* (Tex. App.--Corpus Christi 1989, no writ); *Smiley v. Johnson, 763 S.W.2d 1, 4* (Tex. App.--Dallas 1988, writ denied); *Ex Parte McClain, 762 S.W.2d 238, 242* (Tex. App.--Beaumont 1988, no writ); *Goeke v. Houston Lighting & Power Co., 761 S.W.2d 835, 837 n.1* (Tex. App.--Austin 1988), *rev'd on other grounds, 797 S.W.2d 12 (Tex. 1990)*; *Group Medical and Surgical Service, Inc. v. Leong, 750 S.W.2d 791, 794-95* (Tex. App.--El Paso 1988, writ denied); *City of Fort Worth v. Groves, 746 S.W.2d 907, 913* (Tex. App.--Fort Worth 1988, no writ); *Barron v. State, 746 S.W.2d 528, 530* (Tex. App.--Austin 1988, no writ); *Reynolds v. Charbeneau, 744 S.W.2d 365, 367* (Tex. App.--Beaumont 1988, writ denied); *Champion v. Wright, 740 S.W.2d 848, 851* (Tex. App.--San Antonio 1987, writ denied); *Texas Low-Level Radioactive Waste Disposal Authority v. El Paso County, 740 S.W.2d 7, 8* (Tex. App.--El Paso 1987, writ dism'd w.o.j.); *S.I. Property Owners' Ass'n v. Pabst Corp., 714 S.W.2d 358, 360* (Tex. App.--Corpus Christi 1986, writ ref'd n.r.e.); *Gonzales v. City of Lancaster, 675 S.W.2d 293, 294-95* (Tex. App.--Dallas 1984, no writ); *Mabe v. City of Galveston, 687 S.W.2d 769, 771* (Tex. App.--Houston [1st Dist.] 1985, writ dism'd); *Develo-cepts, Inc. v. City of Galveston, 668 S.W.2d 790, 793* (Tex. App.--Houston [14th Dist.] 1984, no writ); *Griffith v. Pecan Plantation Owners Ass'n, Inc., 667 S.W.2d 626, 628* (Tex. App.--Fort Worth 1984, no writ); *City of Houston v. Public Utility Comm'n of Texas, 656 S.W.2d 107, 110 n.1* (Tex. App.--Austin 1983, writ ref'd n.r.e.); *Public Utility Comm'n v. J.M. Huber Corp., 650 S.W.2d 951, 955-56* (Tex. App.--Austin 1983, writ ref'd n.r.e.); *Vaughn Bldg. Corp. v. Austin Co., 620 S.W.2d 678* (Tex. App.--Dallas 1981), *aff'd, 643 S.W.2d 113 (Tex. 1982)*; *War-Pak, Inc. v. Rice, 604 S.W.2d 498* (Tex. App.--Waco 1980, writ ref'd n.r.e.).

[**113]

45 *Texas Dep't of Mental Health v. Petty, 778 S.W.2d 156, 166* (Tex. App.--1989, writ dism'd w.o.j.) (opinion by Powers, J.); *Public Utility Comm'n v. J.M. Huber Corp., 650 S.W.2d 951, 954-56* (Tex. App.--Austin 1983, writ ref'd n.r.e.)(opinion by Powers, J.); *Hooks v. Texas Dep't of Water Resources, 645 S.W.2d 874* (Tex. App.--Austin 1983, writ ref'd n.r.e.) (opinion by Powers, J.); *see also Kircus v. London, 660 S.W.2d 869, 872 n.3* (Tex. App.--Austin 1983, no writ) (opinion by Phillips, C.J.).

The majority has a simple way to deal with this venerable body of law -- overrule only one case, making today's abrupt change in the law appear less drastic, while ignoring the rest. In fact, six Texas Supreme Court cases must be overruled and no less than twenty-five decisions of the courts of appeals must be disapproved to reach today's result. The concept of reliance on the prior decisions of Texas courts has long since ceased to offer the slightest restraint on this majority. [46]

46 *See, e.g., Boyles v. Kerr*, S.W.2d, (Tex. 1992) (Doggett, J., dissenting) (objecting to majority's overruling of landmark Texas Supreme Court decision permitting recovery for negligence resulting in emotional distress); *Walker v. Packer, 827 S.W.2d 833, 835* (Tex. 1992, orig. proceeding) (Doggett, J., dissenting) (noting majority's "mass execution of precedent," encompassing "a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals"); *Carrollton-Farmers Branch Indep. Sch. Dist.*, S.W.2d at (Tex. 1992) (Doggett, J., dissenting) (discussing rejection by majority of its own decision issued less than one year previously); *Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 12 (Tex. 1991)* (Doggett, J., dissenting) (majority disregards its own recent precedent, looking instead to overruled case); *Rose v. Doctors Hosp., 801 S.W.2d 841, 852 (Tex. 1990)* (Doggett, J., dissenting) (disapproving of rejection of recent controlling precedent).

[**114] Bulldozing a new path through this jurisprudential forest, the majority vaults standing to a new and remarkable prominence by suddenly discovering that it has not just one but two constitutional bases. And what unusual constitutional pillars each of these new finds represents. First, the proscription of the separation of powers doctrine against issuance of advisory judicial opinions allegedly requires rigorous enforcement of standing even when no party debates its existence. This link between standing and separation of powers is not predicated on any directly relevant prior court decision, [47] but instead is entirely premised on an article openly antagonistic to standing for environmental groups. S.W.2d at, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983). The current majority may be the first in the nation to anchor standing on this constitutional theory.

47 The United States Supreme Court has clearly stated that standing does not implicate separation of powers concerns. *See Flast v. Cohen, 392 U.S. 83, 100, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968)* ("The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of . . . Government.").

[**115] The authorities addressing the prohibition on advisory opinions cited in support of this proposition, of course, in no way implicate the question of standing. This precedent-setting concern with advisory opinions contrasts markedly with the eagerness to issue this very type of writing within the last year. *See Edgewood Indep. Sch. Dist. v. Kirby, 804 S.W.2d 491, 501 (Tex. 1991)* (Doggett, J., concurring); *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist., 826 S.W.2d 489, 537 (Tex. 1992)* (Doggett, J., dissenting) (advisory opinions issued and retracted as necessary to thwart efforts to satisfy the constitutional command of equity and efficiency in our public schools). Writing on an issue not raised by any party, as the majority reaches out to revise the law of standing today, seems to me the very essence of an "advisory" opinion.

The second newly-announced constitutional basis is equally ironic -- our state's vital guarantee that "all courts shall be open," *Tex. Const. art. I, § 13*, in some inexplicable way, mandates that they be closed to some and requires continual judicial monitoring of all who attempt to enter. No authority of any type is cited [**116] for this [*470] proposition that "open" courts really means "closed" courts. Nothing in the history or text of the provision justifies this reading nor has any Texas court previously attempted such converse interpretation. This constitutional guarantee is used today as a two-edged sword: the majority invokes the open courts provision to bar environmental groups from seeking judicial assistance in enforcing the laws, while in the very same opinion misinterpreting this provision to allow continued violation of statutes protecting our precious natural resources. [48]

48 *See* section I, *supra*.

Then, with a final flourish, standing is conveniently classified as a nonwaivable component of subject matter jurisdiction. Until today, Texas followed the rule, adopted by many of our sister states considering the issue, that objections to a party's standing are waived if not first raised in the trial court. [49] No Texas case is cited for the proposition that standing is part of nonwaivable subject matter jurisdiction [**117] because, until today, this court had repeatedly stated precisely the very opposite -- that standing is not jurisdictional. [50]

49 *See, e.g., Brown v. Robinson, 354 So. 2d 272, 273 (Ala. 1977)*; *Jackson v. Nangle, 677 P.2d 242, 250 n.10 (Alaska 1984)*; *Torrez v. State Farm Mut. Auto Ins. Co., 130 Ariz. 223, 635 P.2d 511, 513 n.2 (Ariz. App. 1981)*; *Cowart v. City of West Palm Beach, 255 So. 2d 673, 675 (Fla. 1971)*; *Lyons v. King, 397 So.2d 964 (Fla. App. 1981)*; *Greer v. Illinois Housing Development Auth., 524 N.E.2d 561, 582 (1988)*; *Matter of Trust of Rothrock, 452 N.W.2d 403, 405 (Iowa 1990)*; *Tabor v. Council for Burley Tobacco, Inc., 599 S.W.2d 466, 468 (Ky. App. 1980)*; *Sanford v. Jackson Mall Shopping Ctr. Co., 516 So. 2d 227, 230 (Miss. 1987)*; *Fossella v. Dinkins, 66 N.Y.2d 162, 495 N.Y.S.2d*

*352, 485 N.E.2d 1017, 1019 (1985)*; *Public Square Tower One v. Cuyahoga County Bd. of Revision, 516 N.E.2d 1280, 1281 n.2 (Ohio App. 1986)*; *Federman v. Pozsonyi, 365 Pa. Super. 324, 529 A.2d 530, 532 (Pa. Super. 1987)*; *McMullen v. Zoning Board of Harris Township, 494 A.2d 502 (Pa. Commw. Ct. 1985)*; *International Depository, Inc. v. State, 603 A.2d 1119, 1122 (R.I. 1992)*; *State v. Miller, 248 N.W.2d 377, 380 (S.D. 1976)*; *Princess Anne Hills Civ. League, Inc. v. Susan Constant Real Estate Trust, 243 Va. 53, 413 S.E.2d 599, 603 n.1 (Va. 1992)*; *Tyler Pile Industries, Inc. v. State Dep't of Revenue, 714 P.2d 123, 128 (Wash. 1986)*; *Poling v. Wisconsin Physicians Serv., 120 Wis. 2d 603, 357 N.W.2d 293, 297-98 (Wisc. App. 1984)*. The majority's odd attempt to distinguish some of these cases, all of which are predicated in terms of standing, as involving solely the question of whether the litigant was a proper "real party in interest" has never been drawn previously in the published decisions of any Texas court addressing the question of standing. *See* cases cited at notes 44, *supra*, and 50, *infra*.

[**118]

50 *See Texas Industrial Traffic League, 633 S.W.2d at 822-23*; *Central Educ. Agency v. Burke, 711 S.W.2d at 8*; *American General Fire & Casualty Co. v. Weinberg, 639 S.W.2d 688*; *Cox v. Johnson, 638 S.W.2d at 868*. To avoid overruling these, the majority claims all three recognized that lack of subject matter jurisdiction can initially be raised on appeal. True, but ignored is the conclusion of each that subject matter jurisdiction cannot be waived while standing can be.

Texas has with good reason determined that standing is not excepted from traditional rules of appellate procedure. Our appellate system is predicated on the requirement of presentation of complaints to the lower court coupled with preservation and briefing in the reviewing court. *See Tex. R. App. P. 52*; 74(d), 131(e). Appellate courts face considerable difficulties in deciding an issue not presented to the trial court; ordinarily, the necessary facts will not be fully developed. The unstated effect of today's opinion is to require trial courts to develop facts as to undisputed issues or risk subsequent appellate [**119] reversal. This is not an effective use of our limited judicial resources.

The requirement that issues first be presented to the trial court serves another function -- preventing parties from "laying behind the log":

> The reason for the requirement that a litigant preserve a trial predicate for complaint on appeal is that one should not be permitted to waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time.

*Pirtle v. Gregory, 629 S.W.2d 919, 920 (Tex. 1982)*. While this court has condemned "trial by ambush," *Gutierrez v. Dallas indep. School Dist, 729 S.W.2d 691, 693* [*471] *(Tex. 1987)*, today the majority promotes "ambush on appeal."

Three purported policy justifications for the majority's actions are offered, with not a single supporting authority. The first concern is that a strict standing rule is necessary to prevent collusive litigation. Under Texas law, the filing of a fictitious suit constitutes contempt by counsel, *Tex. R. Civ. P. 13*, and may serve as the basis for a host of sanctions, including dismissal with prejudice. *Tex. R. Civ. P. 215-2b(5)*. Nor [**120] does our Texas judiciary lack the ability to reject collusive litigation. *Felderhoff v. Felderhoff, 473 S.W.2d 928, 932* ("We believe that our laws and judicial system are adequate to ferret out and prevent collusion. . . ."); *cf. Whitworth v. Bynum, 699 S.W.2d 194, 197 (Tex. 1985)* (refusing to uphold Texas Guest Statute because of danger of collusion). Adhering to precedent today would in no way undermine the power to dismiss fraudulent suits.

The second virtue proclaimed for today's holding is the guarantee that the lower courts will be restrained from exceeding their jurisdictional powers. S.W.2d at . This concern is derived solely from the federal law mandate that a federal appellate court is duty-bound to verify not only its own jurisdiction but that of the lower courts as well. Federal courts, however, have limited jurisdiction; Texas courts do not. Our Texas Constitution creates courts of general jurisdiction, investing them with all of the "judicial power of this State." *Tex. Const. art. V, § 1*. The differences are evident in our procedural rules. While a federal court must affirmatively ascertain jurisdiction over parties appearing before it, a Texas court's jurisdiction [**121] is presumed until proven lacking by a contesting party. *See Tex. R. Civ. P. 120a*.

Lastly, the majority expresses concern as to the res judicata effect on other potential litigants of a judgment rendered in the absence of genuine standing. S.W.2d at . Aware of this concern, the very federal judiciary that this majority is so eager to emulate has failed to perceive it as a problem of significance. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock, 477 U.S. 274, 290, 91 L. Ed. 2d 228, 106 S. Ct. 2523 (1986)*. If representation is inadequate, or a conflict of interest between members exists, any judgment will have minimal preclusive effect. *Id.* Instead of completely barring access to the courts, pro-

cedural safeguards can ameliorate any potentially overbroad effects. *See generally* Charles A. Wright, Arthur R. Miller & Edward H. Cooper, 18 Federal Practice & Procedure § 4456 at 490-94 (1981 & Supp. 1991).

The manufactured nature of the majority's concerns becomes all the more evident when the real world experience of Texas is considered. The majority is unable to point to a single example of collusion during the three [**122] decades our Texas rule, which allows the issue of standing to be waived, has been in place. During this period there have likewise been no examples of lower courts making a grab for extrajurisdictional power, nor of oppressed litigants shackled by the res judicata effect of contrived litigation.

In defining state requirements for standing, we are in no way bound by federal jurisprudence founded upon converse jurisdictional principles from our own. Texas courts can afford their citizens access to justice in circumstances where they would have been unable to establish standing in the federal courts. *See City of Los Angeles v. Lyons, 461 U.S. 95, 113, 75 L. Ed. 2d 675, 103 S. Ct. 1660 (1983)* ("state courts need not impose the same standing . . . requirements that govern federal-court proceedings"); *Doremus v. Board of Education, 342 U.S. 429, 434, 96 L. Ed. 475, 72 S. Ct. 394 (1952)* (state courts not restrained by "case or controversy" limitations of Federal Constitution); *Greer v. Illinois Housing Development Auth., 122 Ill.2d 462, 524 N.E.2d 561, 120 Ill. Dec. 531 (1988)* ("We are not, of course, required to follow the Federal law on issues of justiciability and standing."). [**123]

The differences between our Texas Constitution and the Federal Constitution not only justify, but also require, that citizen groups be accorded a broader right of access [*472] to our state courts. The Texas Constitution contains no express limitation of courts' jurisdiction to "cases" or "controversies," as provided by the federal charter. U.S. Const. art. III, § 2. Instead, it affirmatively protects the rights of litigants to gain access to our judicial system:

> All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

*Tex. Const. art. 1, § 13*. As this court has recognized,

> The provision's wording and history demonstrate the importance of the right of access to the courts. . . . The right of access to the courts has been at the foundation of the American democratic experiment.

*LeCroy v. Hanlon, 713 S.W.2d 335, 339 (Tex. 1986)*.

This constitutional mandate is reflected in decisions of this court adopting an "open courts" approach to standing in general and associational standing in particular. On several occasions, we have recognized the power of the [**124] Legislature to exempt litigants from proof of "special injury." *Scott v. Board of Adjustment, 405 S.W.2d 55, 56 (Tex. 1966)* (standing may be shown even in the absence of particular damage); *Spence v. Fenchler, 107 Tex. 443, 180* S.W.597 (1915) (under statute, "any citizen" able to seek injunction, without showing particular interest or personal damage). [51] In enacting the Uniform Declaratory Judgments Act, the Texas Legislature has granted a broad right of standing: any person "whose rights, status or other legal relations *are affected by* a statute" may seek a declaration of those rights. *Tex. Civ. Prac. & Rem. Code § 37.004* (emphasis supplied).

51 Our past acknowledgement of the legislative power to expand access to Texas courts is inconsistent with today's conclusion that we must narrowly limit access. *See* Mark V. Tushnet, *The New Law of Standing: A Plea for Abandonment*, 62 Corn. L. Rev. 663 (1977) (because court decisions do not question legislative power to confer standing by statute, they suggest that standing rules are not constitutionally grounded).

[**125] This court has previously extended its "open courts" approach to groups representing the interests of their members. [52] In *Texas Highway Comm'n v. Texas Ass'n of Steel Importers, 372 S.W.2d 525, 530-31 (Tex. 1963)*, we permitted a business association to challenge an administrative order. Although the order addressed only the import of foreign products for highway construction, this court recognized standing of an organization whose interest in foreign imports was not so limited:

52 Despite the participation of associational litigants before this court, we have never before questioned standing on our own motion. *See, e.g., Austin Indep. Sch. Dist. v. Sierra Club, 495 S.W.2d 878 (Tex. 1973)*.

> Some of [the respondents] are owners of imported foreign manufactured products suitable for highway construction purposes. All of them are actively engaged in the sale and use of imported manufactured products. . . .Such parties clearly have the right and litigable interest to have the challenged . . [**126] . Order declared null and void.

*Id. at 531*. Similarly, in *Touchy v. Houston Legal Foundation, 432 S.W.2d 690 (Tex. 1968)*, the court considered whether an organization of attorneys had standing to maintain a suit against a charitable corporation to restrain violations of ethical canons governing the practice of law. Based solely on "the special interest attorneys have in their profession," the court held standing was established.

The "open courts" approach [53] of *Touchy* and *Texas Highway Commission* is quite sufficient to allow TAB access to the Texas [*473] courts. [54] These two associational standing cases are all but ignored today, brushed aside as setting forth "no particular test." S.W.2d at .

53 *See Safe Water Foundation of Texas v. City of Houston, 661 S.W.2d 190, 193* (Tex. App.--Houston [1st Dist.] 1983, writ ref'd n.r.e.) (recognizing precedent of this court as according broad right of standing), *app. dism'd, 469 U.S. 801 (1983)*; *Texas Industrial Traffic League v. Railroad Comm'n of Texas, 628 S.W.2d 187* (Tex. App.--Austin) (discussing Supreme Court's expansive approach to standing to allow access to Texas courts), *rev'd, 633 S.W.2d 821 (Tex. 1982)* (per curiam), *overruled by Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, S.W.2d (Tex. 1992).

[**127]

54 *Accord Hunt v. Bass, 664 S.W.2d 323, 324 (Tex. 1984)* (recognizing statutorily-granted standing of litigants to seek mandamus to reduce substantial delays in court operations); *Safe Water Foundation of Texas v. City of Houston, 661 S.W.2d 190* (Tex. App.--Houston [1st Dist.], writ ref'd n.r.e.), *app. dism'd, 469 U.S. 801 (1983)* (drinking water consumer group had standing to contest fluoridation of city water).

Yet in these cases in which the merits of standing are preserved for appellate court review, the Texas test applied has not been complicated. We simply look to whether a party has a stake in the action sufficient to ensure adversarial presentation of the issues and to whether the court's judgment will have any effect on those before it. *See Board of Water Engineers v, City of San Antonio, 155 Tex. 111, 283 S.W.2d 722, 724 (1955)*("there shall be a real controversy between the parties, which . . . will be actually determined by the judicial declaration sought."). Because both of these considerations are met in the instant case, reference to federal law is wholly [**128] unnecessary.

Today, however, to justify meddling with Texas standing law, the majority declares that "we foresee difficulties" not here with TAB, but in future cases involving organizational standing. S.W.2d at . To cure these perceived but as yet totally unrealized woes, the majority imposes a difficult to meet, easy to manipulate standard drawn from federal law "that lends itself to our use." *Id.* at . Never needing an invitation to impose more federal requirements on Texas citizens, the majority writes into our Texas law books the confused and troubling federal standing limitations. Not surprisingly, that law has taken a regressive turn, denying standing to public interest associations, including those seeking to protect the environment. *See* Gene R. Nichol, Jr., *Abusing Standing: A Comment on Allen v. Wright, 133 U. Pa. L. Rev. 635, 659 (1985)* ("One could perhaps be forgiven for confusing standing's agenda with that of the New Right.").

The benefits of permitting an association to represent the concerns of its members are manifest. As recognized in *United Auto Workers, 477 U.S. at 290*, "The primary reason people join an organization is often to create an effective [**129] vehicle for vindicating interests that they share with others." Judicial economy is promoted when one litigant can, in a single lawsuit, adequately represent many members with similar interests, thus avoiding repetitive and costly actions. The wider range of resources often available for associations enhances their effectiveness in litigation:

> Special features, advantageous both to the individuals represented and to the judicial system as a whole, . . .distinguish suits by associations on behalf of their members . . . . An association suing can draw upon a pre-existing reservoir of expertise and capital. "Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack." . . . These resources assist both courts and plaintiffs.

*Id. at 289-90*. In some cases, an injury that is substantial as to many may have an individual financial impact too small to make a challenge economically feasible. Associational representation may be the only means of redressing conduct when the harm is limited in degree but substantial segments of society are affected. Additionally, [**130] in challenging policies of government, organizations are generally less susceptible than individuals to retaliation by the bureaucrats they challenge.

These benefits are ignored as the majority declares that henceforth the right of associations to bring suit in Texas courts will be constricted by a three-part federal test set forth in *Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977)*, requiring that "(a) its members would oth-

erwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's [*474] purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." [55]

55 These requirements are allegedly necessary to protect "the members' best interest." S.W.2d at . Perhaps an organization's members are in a better position than this court to determine what is in their best interest.

Yet the *Hunt* test won't hunt in [**131] Texas. It is adopted purportedly because of the similarities between the state and federal constitutional underpinnings of the standing doctrine. Two critical factors are ignored: (1) the significant differences between the Texas and United States Constitutions and (2) the fact that much of federal standing doctrine is not mandated by the federal charter, but is imposed solely on the grounds of judicial "prudence." *Warth v. Seldin, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1974)* ("This [standing] inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.").

The majority works a grave disservice to our Texas Constitution by equating our open courts provision, affirmatively guaranteeing all Texans access to our judicial system, with an express federal constitutional limitation on the right to seek redress in court. Despite the fact that the two provisions are vastly different in language, history and purpose, the majority nonetheless determines to "look to the more extensive jurisprudential experience of the federal courts" to determine standing. This is clearly an erroneous course. *See Davenport v.* [**132] *Garcia, 834 S.W.2d 4*, (Tex. 1992, orig. proceeding) (in blindly adhering to federal law, "based on different language, different history and different cases, "from our treasured state heritage, law and institutions . . . [we] derive nothing. . . .").

Even the federal constitutional constraint is a simple one, looking to whether "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of the court's remedial powers on his behalf." *Warth, 422 U.S. at 498, quoting Baker v. Carr, 369 U.S. 186, 204, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962)*. In fact, this bare-bones test closely resembles the approach that Texas courts have long chosen to follow. To the extent *Hunt* constructs additional barriers to access to our judicial system, they are wholly court-created. [56] No justification for their adoption is contained in the majority opinion.

56 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure, § 3531.3, at 418 ("The problems [of standing] are difficult enough without the compounding effect of constitutional attribution.").

[**133] Moreover, in turning to the federal law of standing, the majority invokes a doctrine that has been criticized more heavily and justifiably than perhaps any other. *See, e.g.*, Gene R. Nichol, Jr., *Rethinking Standing*, *72 Cal. L. Rev. 68, 68 (1984)*; Mark V. Tushnet, *The "Case or Controversy" Controversy*, 93 Harv. L. Rev. 1698, 1713-21 (1980). Even the United States Supreme Court has recognized that federal standing requirements have an "iceberg quality," *Flast v. Cohen, 392 U.S. 83, 94, 20 L. Ed. 2d 947, 88 S. Ct. 1942 (1968)*; yet the majority fails to navigate a course, not unlike the captain of the Titanic, that would steer Texas well away from this potential disaster.

The concept of standing is "employed to refuse to decide the merits of a legal claim." Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure § 3531, at 338. Critics of the doctrine's complexity and uncertainty have recognized how subject it is to manipulation: "standing . . . is no more than a convenient tool to avoid uncomfortable issues or to disguise a surreptitious ruling on the merits." *Id. at 348* (citing commentaries). [57] Important rights can be left unprotected [**134] [*475] as a result. *Id.* at § 3531.3, 416-17 ("Standing decisions present courts with an opportunity to avoid the vindication of unpopular rights, or even worse to disguise a decision on the merits in . . . opaque standing terminology . . . . Unarticulated and arbitrary predilection, cast as standing, defeats rights that deserve judicial protection.").

57 *See also, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 490, 70 L. Ed. 2d 700, 102 S. Ct. 752 (1982)* (Brennan, J., dissenting); Abram Chayes, *The Supreme Court, 1981 Term -- Foreword: Public Law Litigation and the Burger Court, 96 Harv. L. Rev. 4, 23 (1982)* (Having ritually recited the standing formula, "the Court then chooses up sides and decides the case."); Michael A. Wolff, *Standing to Sue: Capricious Application of Direct Injury Standard*, 20 St. L. U. L.J. 663, 678 (standing barrier "raised or lowered based on the degree of hostility to, or favoritism for, consideration of the issues on their merits"); Albert Broderick, *The* Warth *Optional Standing Doctrine: Return to Judicial Supremacy?* 25 Cath. U. L. Rev. 467, 504, 516-17 (1976).

[**135] Even during the three years that this particular cause has been pending here, the federal courts have been hard at work to manipulate standing requirements to bar public interest groups from seeking judicial vindication of rights common to their members. In *Lujan*

*v. National Wildlife Federation*, ___ U.S. ___, *497 U.S. 871, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)*, a nationally-recognized environmental group challenged a new development classification for certain federal wilderness areas that allegedly violated several federal statutes. The suit was dismissed for lack of standing based upon a rigid construction of the requirement of injury to the association's members. This decision has been widely criticized as significantly impairing the ability of public interest groups to represent their members, particularly those that seek to protect this nation's environment and natural resources. [58] Today the majority eagerly positions itself to give the same treatment to those Texans who would petition our state courts to protect the public interest. The majority not only conspicuously relies on *Lujan*, S.W.2d at, but also embraces the extremist anti-environmental stance propounded [**136] in an article openly critical of judicial opinions permitting citizens to complain of harm inflicted upon our natural resources. *Id.* at, citing Atonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881 (1983).

58 *See* Katherine B. Steuer and Robin L. Juni, *Court Access for Environmental Plaintiffs: Standing Doctrine in* Lujan v. National Wildlife Federation, 15 Harv. Envtl. L. Rev. 187, 232-33 (1991); Sarah A. Robichaud, Note, Lujan v. National Wildlife Federation: *The Supreme Court Tightens the Reins on Standing for Environmental Groups, 40 Cath. U. L. Rev. 443, 470-74 (1991)*; V. Maria Cristiano, Note, *In Determining an Environmental Organization's Standing to Challenge Government Actions Under the Land Withdrawal Review Program, the Use of Lands in the Vicinity of Lands Adversely Affected by the Order of the Bureau of Land Management Does Not Constitute Direct Injury*--Lujan v. National Wildlife Federation, 2 Seton Hall Const. L.J. 445 (1991); Michael J. Shinn, Note, *Misusing Procedural Devices to Dismiss an Environmental Lawsuit, 66 Wash. L. Rev. 893, 904-12 (1991)*; Lynn Robinson O'Donnell, Note, *New Restrictions in Environmental Litigation: Standing and Final Agency Action After* Lujan v. National Wildlife Federation, 2 Vill. Envtl. L.J. 227, 251 (1991); Bill J. Hays, Comment, *Standing and Environmental Law: Judicial Policy and the Impact of* Lujan v. National Wildlife Federation, 39 Kan. L. Rev. 997, 1042-43 (1991).

[**137] Rather than a careful consideration of our Texas precedent and our unique Texas Constitution, today Texans are handed yet another unthinking embrace of federal law. Claiming "guidance" from federal precedent, S.W.2d at, the majority overrules all Texas cases treating standing as a procedural issue, then unnecessarily modifies all Texas precedent addressing the merits of standing. Without explanation, today's opinion simply photocopies into our Texas law books the federal law of standing with all of its much-criticized complexities. Once again the majority chooses more Washington wisdom for Texas when what we need is more Texas thinking in Washington. *See Bexar County Sheriff's Civ. Service Comm'n v. Davis, 802 S.W.2d 659, 665 (Tex. 1990)* (Doggett, J., dissenting).

While today the corporate members of the Texas Association of Business are permitted to challenge the bureaucracy, tomorrow this same reasoning will be employed to bar public interest, neighborhood, environmental and consumer groups from vindicating the rights of their members. Today's opinion not only repudiates our past "open courts" approach to access to the judicial system but also eliminates the long-recognized [**138] appellate requirement that [*476] error be preserved. The majority has charged well beyond traditional constraints in its writing.

To the extent this case is about standing, it is about standing still, about closing the courthouse door, once standing open. For today the majority extends a standing invitation to those who would harm our environment to act without fear of citizen challenge in the Texas courts.

IV. Conclusion

Today the environment is the immediate victim. Those who pollute our rivers, release toxins into our air, and damage our land cannot be promptly penalized. Instead, only after the very slow wheels of our judicial system have creaked to a stop will violators of environmental protection laws be held accountable.

Yet the environment is not the whole story. Much as a river may seem pure and clear even at the place where illegal sewage is being pumped into it, the danger from a court's opinion may not be immediately apparent on its surface. Only after the reasoning is applied in other cases is the severity of the resulting harm to our system of justice revealed. Today's impairment of the ability of concerned citizens to vindicate the rights of many in our [**139] courts and the majority's knockout punch to the right of trial by jury will unfold in future cases to bar participation of ordinary citizens in Texas courts.

The mess in Texas is not only with our environment but with the misinterpretation of the law.

Lloyd Doggett

Justice

Opinion Delivered: March 3, 1993

CONCURRING AND DISSENTING OPINION

Rose Spector

I agree with the substance of the concurring and dissenting opinion by Justice Doggett. I write separately, however, to explain why I would uphold the statutory requirement that those who run afoul of environmental laws make timely payment of administrative penalties before seeking judicial review.

In two other causes decided today, this court has considered open courts challenges to the statutory requirement that state mineral lessees prepay administrative deficiency assessments before seeking judicial review of those assessments. *State v. Flag-Redfern Oil Co.* and *State v. Rutherford Oil Corp.*, ___ S.W.2d ___ (Tex. 1993) (considering *Tex. Nat. Res. Code § 52.137*). Our analysis in those cases focused on the [*480] public interest at stake: the State's only interest in the prepayment requirement, we noted, [**140] was its financial interest in immediate access to disputed royalty payments. *Id.* at ___. Thus, we concluded that the prepayment requirement of *section 52.137* was no different, in constitutional terms, from the litigation tax disapproved in *LeCroy v. Hanlon, 71 S.W.2d 335, 342 (Tex. 1986)*. *Id.*

The present case, in contrast, does not involve a litigation tax. The Clean Air Act, the Solid Waste Disposal Act, and the Water Quality Act embody this state's commitment to protect the environment; and the prepayment requirements struck down today were intended to give force to that commitment, not to raise revenue. Without the need to prepay administrative penalties, polluters will be left with little if any incentive to timely comply with environmental laws and regulations.

The effects of today's decision, though, extend far beyond the statutes at issue in this case. By rejecting these prepayment requirements, without regard to the state interest involved, the majority has struck a severe blow to this state's ability to enforce a broad range of regulations in the public interest. The similar statutory provisions identified in the opinion by Justice Doggett, ___ S.W.2d at ___, [**141] cannot be dismissed as minor technicalities; they are carefully-crafted measures that the legislature considered vital to protect the public from recalcitrant lawbreakers. Casting those provisions aside will seriously disrupt the effective operation of our state government.

The Texas Constitution cannot be construed in absolutes. The basic right of access to the courts must be balanced against the need to protect the public's health and safety. While the restriction at issue in this case may be substantial, I would hold that the public's interest in clean air and water, combined with the due process afforded to TAB's members in the administrative process, tips the balance in favor of the prepayment requirement. I therefore dissent.

Rose Spector

Justice

OPINION DELIVERED: March 3, 1993



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***

CIVIL PRACTICE AND REMEDIES CODE
TITLE 2. TRIAL, JUDGMENT, AND APPEAL
SUBTITLE C. JUDGMENTS
CHAPTER 37. DECLARATORY JUDGMENTS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Civ. Prac. & Rem. Code § 37.002* (2014)

§ 37.002. Short Title, Construction, Interpretation

(a) This chapter may be cited as the Uniform Declaratory Judgments Act.

(b) This chapter is remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered.

(c) This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees.



LexisNexis (R) Texas Annotated Statutes
Copyright © 2014 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group
All rights reserved.

*** This document is current through the 2013 3rd Called Session ***

CIVIL PRACTICE AND REMEDIES CODE
TITLE 2.   TRIAL, JUDGMENT, AND APPEAL
SUBTITLE C.   JUDGMENTS
CHAPTER 37.   DECLARATORY JUDGMENTS

**GO TO TEXAS CODE ARCHIVE DIRECTORY**

*Tex. Civ. Prac. & Rem. Code § 37.004*   (2014)

§ 37.004.   Subject Matter of Relief

   (a) A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

   (b) A contract may be construed either before or after there has been a breach.

   (c) Notwithstanding *Section 22.001, Property Code*, a person described by Subsection (a) may obtain a determination under this chapter when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties.



**Texas Department of Public Safety, Appellant v. Charles V. Moore, Appellee**

**NO. 03-98-00135-CV**

**COURT OF APPEALS OF TEXAS, THIRD DISTRICT, AUSTIN**

***985 S.W.2d 149*; *1998 Tex. App. LEXIS 7354***

**November 30, 1998, Filed**

**PRIOR HISTORY:** [**1] FROM THE DISTRICT COURT OF TRAVIS COUNTY, 250TH JUDICIAL DISTRICT. NO. 95-00349, HONORABLE PAUL R. DAVIS, JR., JUDGE PRESIDING.

**DISPOSITION:** Affirmed in Part; Reversed and Rendered in Part.

**COUNSEL:** FOR APPELLANT: The Honorable Dan Morales, Attorney General, Mr. Martin J. Thompson, Jr., Assistant Attorney General, Austin, TX.

FOR APPELLEE: Mr. Paul Dodson, White, Huseman & Pletcher, Corpus Christi, Tx.

**JUDGES:** Before Justices Powers, Jones and Kidd.

**OPINION BY:** MACK KIDD

**OPINION**

[*152] Appellant, the Texas Department of Public Safety (the "Department"), failed to recommend appellee Charles Moore for promotion to the position of Assistant Commander of the Criminal Intelligence Service. Moore sued under the Human Rights Act claiming reverse discrimination and, by later amendment, under the Uniform Declaratory Judgments Act (the "UDJA") seeking a declaration that the Department acted outside its statutory authority in filling four high-ranking positions without examining applicants based on merit. The trial court granted summary judgment against Moore on the discrimination claim. The trial court also granted partial summary judgment in favor of Moore, declaring that the Department acted outside its statutory authority in filling the four positions, and ordered those positions vacated. The Department appeals. In its points of error, the Department challenges (1) the trial court's jurisdiction under *section 411.007 of the* [**2] *Texas Government Code* and the UDJA; (2) the trial court's decision to order the four positions vacated; and (3) the trial court's discretion in awarding attorney's fees. We will affirm the trial court's order in part and reverse in part.

**BACKGROUND**

In October 1993, the Department announced a vacancy in the position of Assistant Commander of the Criminal Intelligence Service. Commander Don Plemons, the officer charged with making the recommendation for appointment to fill the vacancy, orally interviewed seven candidates. Among these candidates were Charles Moore, a white male, and Enrique Garcia, an Hispanic male. Plemons recommended Garcia, and Garcia was appointed to the position. Moore sued in district court.

Moore originally brought suit under the Human Rights Act claiming he was the victim of reverse racial discrimination when he was denied promotion in favor of Garcia. [1] Moore later amended his petition to include a declaratory judgment claim based upon the Department's alleged failure to comply with *section 411.007(b) of the Texas Government Code*, which requires that the Department make promotions or appointments based upon merit determined by examination. [**3] *See Tex. Gov't Code Ann. § 411.007(b)* (West 1998). The trial court granted cross motions for summary judgment; declaring that the Department failed to comply with all the requirements of *section 411.007(b)* in promoting Garcia to Assistant Commander of the Criminal Intelligence Service, and dismissing Moore's discrimination claim for failure to exhaust the necessary administrative remedies. [2] Moore does not appeal the dismissal of his discrimination claim.

1 The relevant statute provides:

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

*Tex. Labor Code Ann. § 21.051* (West 1996).

[**4]

2 An employee of the State of Texas who alleges employment discrimination must file a complaint with the Texas Commission on Human Rights not later than the 180th day after the date the alleged unlawful employment practice occurred. *Tex. Labor Code Ann. § 21.202* (West 1996). Furthermore, any federal complaint of employment discrimination shall be filed with the Equal Employment Opportunity Commission within 180 days; except that if the employee files with a state agency then the employee has 300 days to file. *42 U.S.C.S. § 2000e-5(c) (1989)*.

A plaintiff's failure to file a complaint and pursue administrative remedies creates a jurisdictional bar to his claim. *See Schroeder v. Texas Iron Works, 813 S.W.2d 483, 488 (Tex. 1991)*.

Before the trial court rendered final judgment, the Department filled the positions of Commander of the Criminal Intelligence Service, Commander of Narcotics, and Assistant [*153] Commander of Narcotics; also by appointment, and also, allegedly, without a competitive examination. The trial court allowed amendment of Moore's petition to ask for declaratory relief [**5] regarding these three additional positions. Subsequently, the trial court rendered final judgment declaring that the Department failed to comply with the competitive examination requirements of *section 411.007(b)* in hiring the four aforementioned positions, and ordered them vacated and filled through competitive examination. The trial court also awarded Moore attorney's fees. The Department brings this appeal.

**DISCUSSION**

The Department initially challenges the trial court's jurisdiction to hear Moore's claim. Specifically, the Department argues that *section 411.007(b)* only establishes norms for the Department in promoting its employees, and fails to create any cause of action in Moore. Additionally, the Department contends that the UDJA likewise fails to create a cause of action in Moore, and cannot be used as a vehicle to interpret section 411.007(b) of the Labor Code. The determination of jurisdiction under the UDJA is a question of law. *See Ainsworth v. Oil City Brass Works, 271 S.W.2d 754, 760* (Tex. Civ. App.--Beaumont 1954, no writ). We will look first to the jurisdiction of the trial court before deciding whether the court erred in entering its order.

[**6] ***Jurisdiction and the Declaratory Judgments Act***

Enacted in 1943, the UDJA confers on Texas courts the authority to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." *Tex. Civ. Prac. & Rem. Code Ann. § 37.003* (West 1997). The Legislature intended the UDJA to be remedial, to settle and afford relief from uncertainty and insecurity with respect to rights, and to be liberally construed. *Tex. Civ. Prac. & Rem. Code Ann. § 37.002* (West 1997). Describing the subject matter available for relief, the UDJA provides:

A person interested under a deed, will, written contract, or other writings constituting a contract or *whose rights, status, or other legal relations are affected by a statute*, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

*Tex. Civ. Prac. & Rem. Code Ann. § 37.004* (West 1998) (emphasis added).

A suit under the UDJA is not confined to cases in which the parties have a cause of action apart from [**7] the Act itself. *Transportation Ins. Co. v. Franco, 821 S.W.2d 751, 754* (Tex. App.--Amarillo 1992, writ denied). A declaratory judgment, however, is appropriate only if (1) a justiciable controversy exists as to the rights and status of the parties; and (2) the controversy will be resolved by the declaration sought. *See Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995)* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993))*; *see also City of Austin v. L.S. Ranch, Ltd., 970 S.W.2d 750, 754*, (Tex. App.--Austin 1998, no pet.). A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest and not merely a theoretical dispute. *See Beadle, 907 S.W.2d at 467*. A justiciable controversy must be distinguished from an advisory opinion, which is prohibited under both the Texas and federal constitutions. *See Texas Air Control Bd., 852 S.W.2d at 444*. A judgment under the UDJA depends on a finding that the issues

are not hypothetical or contingent, and the questions presented must resolve an actual controversy. *Empire Life Ins. Co. v. Moody, 584 S.W.2d 855,* [**8] *858 (Tex. 1979)*. A justiciable controversy, however, does not necessarily equate with a fully ripened cause of action:

It is not necessary that a person who seeks a declaration of rights under this statute shall have incurred or caused damage or injury in a dispute over rights and liabilities, but it has frequently been held that an action for declaratory judgment would [*154] lie when the fact situation manifests the presence of 'ripening seeds of a controversy.' Such appear where the claims of several parties are present and indicative of threatened litigation in the immediate future which seems unavoidable, even though the differences between the parties as to their legal rights have not reached the state of an actual controversy.

*Ainsworth, 271 S.W.2d at 761*.

The crux of this appeal concerns the application of section 411.007(b) to the advancement of personnel within the Department through appointment or promotion. In the section entitled "Officers and Employees," section 411.007(b) provides:

Appointment or promotion of an officer or employee must be based on merit determined by examination under commission rules that take into consideration the applicant's age, physical [**9] condition, experience, and education. Each person who has an application on file for a position in the department shall be given reasonable written notice of the time and place of those examinations.

*Tex. Gov't Code Ann. § 411.007(b)* (West 1998). The Department originally contends that *section 411.007(b)* creates no cause of action in Moore, and, therefore, the trial court had no jurisdiction to hear the case. The trial court received its jurisdiction from the controversy created by the Department's application of *section 411.007(b)* to Moore, not from the words of the statute itself. The UDJA provides for a declaration of rights for persons "whose rights, status, or other legal relations are affected by a statute . . . ." *Tex. Civ. Prac. & Rem. Code Ann. § 37.004* (West 1998). Jurisdiction under the UDJA primarily depends on the nature of the controversy; whether the controversy is merely hypothetical or rises to the justiciable level. *See Empire Life Ins., 584 S.W.2d at 858*.

Moore's interest in being treated according to statute when applying for vacant positions in the Department clearly implicates the UDJA's purpose of clarifying rights affected by statute. The controversy [**10] lies not in the actions of the Department in reviewing Moore's application for Assistant Commander of Criminal Intelligence, but in the Department's application of its promotional rules to future appointment vacancies. The Department has already taken an adverse stance to Moore's position by allegedly not requiring competitive examinations when filling the initial vacancy. The Department's repetition of the same behavior in filling three subsequent positions emphasizes the actuality of the controversy. There is clearly a justiciable controversy sufficient to invoke the court's jurisdiction through the UDJA to clarify Moore's, and any other applicant's, rights as they pertain to the Department's hiring procedure. Furthermore, the trial court's declaration resolves the controversy by informing the Department that its actions in filling Assistant Commander and Commander positions without examining applicants based on merit falls outside its statutory authority.

The Department next argues that sovereign immunity shields the Department as an agency of the state. The Department argues that the UDJA does not act to waive the State's ordinary immunity from liability. Suits challenging an [**11] agency's action as being outside the scope of its delegated authority are not suits against the State requiring legislative or statutory authority. *Public Util. Comm'n v. City of Austin, 728 S.W.2d 907, 911* (Tex. App.--Austin 1987, writ ref'd n.r.e.). Because Moore's suit under the UDJA sought a declaration that the Department acted outside its statutory authority in appointing various high-level positions without examining applicants based on merit, no explicit waiver by the State was necessary. Therefore, Moore's suit was not barred by sovereign immunity. We hold the trial court had jurisdiction to hear Moore's claim under the UDJA and overrule the Department's points of error in that regard.

***The Requirement of "Merit-Based" Promotion***

We must now determine whether the trial court erred in holding that the Department acted outside its statutory authority when filling the four vacancies. The enabling statutes of the Department clearly provide for merit-based promotion and appointment. *See Tex. Gov't Code Ann.* [*155] *§ 411.007(b)* (West 1998). That same section further provides for a competitive examination of some sort, and provides that all applicants "shall receive [**12] notice of the time and place of such examinations." *Id*. While it is true that the statute, under the section entitled "Duties of Director," reserves for the Director's discretion some positions to be filled by "direct appointment," the section limits these direct appointments to *chiefs of bureaus*. *See Tex. Gov't Code Ann. § 411.006(6)* (West 1998) (emphasis added). [3] No other positions are mentioned.

3 The relevant section of the statute provides: "The director shall: . . . appoint, with the advice and consent of the commission, the chiefs of bu-

reaus provided for by this chapter." *Tex. Gov't Code Ann. § 411.006(6)* (West 1998).

Pursuant to *section 411.004(3)*, the Public Safety Commission (the "Commission") promulgated rules governing appointments and promotions. *See Tex. Gov't Code § 411.004(3)* (West 1998). [4] These rules include the policy that the Department shall make *all* appointments based on merit. *See* 37 Tex. Admin. Code § 1.21(a) (1998). In keeping with [**13] the policy of making appointments based on merit, the rules provide that "examinations will be conducted for all positions *excepting* unskilled labor, trades, and *direct appointments* made by the Director." 37 Tex. Admin. Code § 1.27 (1998) (emphasis added). Reading the rule in conjunction with the statute, the rule exempts from competitive examination *only* unskilled labor, trades, and the chiefs of bureaus. However, despite the language of the statute restricting directorial appointments to bureau chiefs, and despite the Department's own rules advocating the policy of promotions based on merit, the Department seeks in its General Manual to expand the number of director appointments exempted from competitive examination:

4 The relevant section of the statute provides: "The commission shall . . . adopt rules necessary for carrying out the department's work." *Tex. Gov't Code Ann. § 411.004(3)* (West 1998).

Positions of major division chief, assistant major division chief, division chief, [**14] regional commander, commander, assistant commander, senior Ranger captain, assistant supervisor of Rangers, Director and Assistant Director of Personnel and of Training, other positions deemed necessary and appropriate by the Director and positions of the Director's staff will be filled by direct appointment of the Director.

Texas Department of Public Safety General Manual, Chap. 7, § 26.04(4).

The Department argues that the Assistant Commander and Commander positions are exempt from competitive examination by virtue of the discretion granted the Department by statute coupled with the listing of director appointments found in the Department's General Manual. In the alternative, the Department argues that, should the Assistant Commander position be subject to competitive examination, the oral interview by Commander Plemons given to applicants should suffice. While we agree with the Department that the statute does provide discretion to the Commission and the Department to create its own rules and to define examination based on merit for purposes of promotional appointments, we reject the notion that the Assistant Commander and Commander positions are exempt, or that the oral [**15] interview could fulfill the statutory requirement of a competitive examination. The language of the statute, and that of the Department's own rules, clearly envisions a merit-based promotional system for all those positions not specifically exempted as director appointments. And, according to statute and the rules promulgated by the Commission, Assistant Commander and Commander are not positions so exempted. Furthermore, the mere existence of section 26.04(4) in the Department's General Manual expanding the number of exemptions beyond statutory limits both exceeds the Department's authority and belies the Department's argument that the oral interviews given applicants fulfilled the requirement of a competitive examination.

Moore argues that the statute contemplates *written* examinations as the proper manifestation of *competitive* examinations. To the extent that Moore seeks affirmation from this Court for his position, we reject it. The Department maintains the discretion to [*156] create procedures for competitive examinations regarding promotive appointments, provided such procedures make a good faith effort to comply with the statutory and agency requirement of "merit-based" promotions. [**16] The Department should bear in mind, however, that the written notice requirements of the statute regarding a stated time and location for the competitive examination seem to mandate some type of formalized and structured examination. [5] *See Tex. Gov't Code Ann. § 411.007(b)* (West 1998).

5 We reject, for example, the suggestion made by the Department at oral argument that an official with the Department could discharge the Department's responsibility to offer a competitive examination by merely *examining* the personnel records of the applicants.

***The Injunctive Order***

The Department next contends that even if the trial court had jurisdiction to declare that the Department failed to comply with *section 411.007(b)* in hiring Garcia and the others without resort to competitive examination, the trial court had no jurisdiction, or, alternatively, abused its discretion, in ordering the Department to vacate the four positions contested by Moore. We note initially that actions under [**17] the UDJA are *sui generis*; they are unique in that the declarations of "rights, status and other legal relations" are not truly legal or equitable. *See Cobb v. Harrington, 144 Tex. 360, 190 S.W.2d 709, 713 (Tex. 1945)*; *see also Texas Liquor Control Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970)*. We further note that, at the time of the trial court's rendition of final judgment, Moore's discrimination claim had been dismissed through summary judgment; thus the trial court's authority to act was based on the UDJA alone. Moore argues that the UDJA allows the trial court to grant

the injunctive relief requested, namely the vacation of the four positions, as ancillary to the declaratory relief awarded. *See Tex. Civ. Prac. & Rem. Code § 37.011* (West 1998); *see also Davis v. Pletcher, 727 S.W.2d 29, 35* (Tex. App.--San Antonio 1987, writ ref'd n.r.e.). Under the facts presented here, we disagree.

As Moore suggests, the UDJA allows for injunctive relief ancillary to a declaration of rights in some situations: "Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper. The application must be by petition to [**18] a court having jurisdiction to grant relief." *Tex. Civ. Prac. & Rem. Code. Ann. § 37.011* (West 1998). [6] This power to grant ancillary relief is conditioned on such relief being *necessary and proper*. For the following reasons, such relief in this case is inappropriate.

6 Several courts, including this one, have interpreted *section 37.011* of the UDJA as allowing parties to combine a request for declaratory relief with a request for injunction. *See Weaver v. AIDS Servs. of Austin, Inc., 835 S.W.2d 798, 803* (Tex. App.--Austin 1992, writ denied) (AIDS services group seeking declaration of rights and injunction barring protestors from interfering with workshops); *Davis, 727 S.W.2d at 35* (purchaser of real property seeking declaration interpreting various property conveyances and injunction to halt triggering of acceleration clause).

Regarding Moore's original reverse discrimination claim, filing a complaint with the Human Rights Commission and exhausting administrative remedies was a mandatory [**19] prerequisite to filing a civil action alleging a violation of the Human Rights Act under the Texas Labor Code. *Schroeder v. Texas Iron Works, Inc., 813 S.W.2d 483, 488 (Tex. 1991)*. The rationale for this result is that the Human Rights Act provides the *exclusive remedy* for alleged discrimination in administrative agency personnel decisions. *See Stinnett v. Williamson County Sheriff's Dep't, 858 S.W.2d 573, 577* (Tex. App.--Austin 1993, writ denied). Thus, Moore's failure to exhaust his administrative remedies was a jurisdictional bar to filing a discrimination claim in district court, and the trial court properly granted summary judgment against Moore's claim. *Schroeder, 813 S.W.2d at 488*.

This procedural posture becomes important with regard to the trial court's award of injunctive relief based solely on jurisdiction under the UDJA because it allows Moore to circumvent the exclusive remedies provided for, and the purposes contained in, the Human Rights Act. [*157] The Human Rights Act includes a provision for injunctive relief from unlawful employment practices. *See Tex. Labor Code Ann. § 21.210* (West 1996). This provision represented Moore's exclusive injunctive [**20] remedy until his administrative remedies had been exhausted. Moore could have sought an injunction to halt the Department from promoting Garcia and the other three appointments had he followed the proper administrative procedures. He failed to do so. He sought and received in district court a declaration that the Department had misinterpreted and misapplied *section 411.007(b)*. This declaration clarified Moore's rights and status regarding future vacancies in the Department. However, the order by the trial court retroactively vacating the four Assistant Commander and Commander positions rewarded Moore for failing to follow the exclusive remedies provided for him by law. Declaratory relief creates no substantive rights. *State v. Morales, 869 S.W.2d 941, 947 (Tex. 1994)*. It provides a procedural device for the determination of controversies which are already within the jurisdiction of the court. *Id*. The remedy afforded by the UDJA is additional and does not supplant any existing remedy. *Cobb, 190 S.W.2d at 713*; *Crow v. City of Corpus Christi, 146 Tex. 558, 209 S.W.2d 922, 924 (Tex. 1948)*. Because the exclusive remedy available to Moore regarding his reverse discrimination [**21] claim is the Human Rights Act, which contains the right to injunctive relief, the trial court erred in vacating the positions in the Department based solely on the ancillary injunctive power contained in the UDJA.

Furthermore, the trial court's order undercut the purpose of the Human Rights Act to create a comprehensive administrative review. *See Stinnet, 858 S.W.2d at 577*. The Human Rights Act was intended to embody the policies embedded in Title VII, *42 U.S.C. § 2000e et seq.*, including "administrative procedures involving informal conference, conciliation and persuasion, as well as judicial review of administrative action." *Schroeder, 813 S.W.2d at 487*. Allowing the jurisdiction created by the UDJA to circumvent the procedures and remedies provided by the Human Rights Act could create a back door to district court not contemplated by the Legislature. The proper remedy for Moore is prospective. His declaratory judgment carries preclusive effect in any future lawsuit, whether administrative or judicial, should the Department fail to offer him notice and the opportunity for merit-based promotion as required by *section 411.007(b)*. *See Valley Oil Co. v. City of Garland*, [**22] *499 S.W.2d 333, 335* (Tex. Civ. App.--Dallas 1973, no writ). Thus, the retroactive injunctive relief ordered by the trial court was not "necessary and proper" as required under the UDJA before ancillary injunctive relief could be awarded. We reverse the trial court's order vacating the Department's appointments of Assistant Commander of Criminal Intelligence Service, Commander of Criminal Intelligence Service, Commander of Narcotics, and Assistant Commander of Narcotics.

***Attorney's Fees***

The trial court awarded Moore attorney's fees under the UDJA. The UDJA provides that "in any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." *Tex. Civ. Prac. & Rem. Code Ann. § 37.009* (West 1997). The Texas Supreme Court has expressly held that "by authorizing declaratory judgment actions to construe the legislative enactments of governmental entities and authorizing awards of attorney fees, the UDJA necessarily waives governmental immunity for such awards." *Texas Educ. Agency v. Leeper, 893 S.W.2d 432, 446 (Tex. 1994)*. The grant or denial of attorney's fees in a declaratory judgment lies within [**23] the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused that discretion. *Oake v. Collin County, 692 S.W.2d 454, 455 (Tex. 1985)*.

The Department argues that the UDJA may not be used solely as a vehicle for attorney's fees. *See HECI Exploration Co. v. Clajon Gas Co., 843 S.W.2d 622, 637* (Tex. App.--Austin 1992, writ denied). Since we have held that the trial court had jurisdiction to construe *section 411.007(b)* and that the trial court's construction of that statute favors Moore, Moore has achieved a declaration [*158] of rights entitling him to seek the additional relief of attorney's fees. *See Tex. Civ. Prac. & Rem. Code Ann. § 37.009* (West 1997). The Department's argument fails. The Department also objects to the award of attorney's fees in the final judgment based upon affidavits of the competing parties, claiming that the affidavits do not represent competent evidence that the attorney's fees were reasonable and necessary. *See Stewart Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991)*. We refuse to hold that this procedure for determining attorney's fees rises to the level of an abuse of discretion. [**24] We overrule the Department's point of error regarding attorney's fees.

**CONCLUSION**

We affirm the order of the trial court declaring that the Department acted outside its statutory duty pursuant to *section 411.007(b)* in filling four Assistant Commander and Commander positions without examining applicants based on merit. We further affirm the order of the trial court awarding attorney's fees. We reverse the order of the trial court vacating the four Assistant Commander and Commander positions and hold that Moore's only injunctive relief must be prospective.

Mack Kidd, Justice

Before Justices Powers, Jones and Kidd

Affirmed in Part; Reversed and Rendered in Part

Filed: November 30, 1998



**Texas Rules**
**Copyright (c) 2015 by Matthew Bender & Company, Inc.**
**a member of the LexisNexis Group.**
**All rights reserved.**

***** This document is current through January 2, 2015 *****

**STATE RULES**
**TEXAS RULES OF APPELLATE PROCEDURE**
**SECTION TWO. APPEALS FROM TRIAL COURT JUDGMENTS AND ORDERS**

***Tex. R. App. P. Rule 43*** **(2015)**

**Rule 43 Judgment of the Court of Appeals**

**43.1** ***Time.*** **--The court of appeals should render its judgment promptly after submission of a case.**

**43.2** ***Types of Judgment.*** **--The court of appeals may:**

**(a) affirm the trial court's judgment in whole or in part;**

**(b) modify the trial court's judgment and affirm it as modified;**

**(c) reverse the trial court's judgment in whole or in part and render the judgment that the trial court should have rendered;**

**(d) reverse the trial court's judgment and remand the case for further proceedings;**

**(e) vacate the trial court's judgment and dismiss the case; or**

**(f) dismiss the appeal.**

**43.3** ***Rendition Appropriate Unless Remand Necessary.*** **--When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when:**

**(a) a remand is necessary for further proceedings; or**

**(b) the interests of justice require a remand for another trial.**

**43.4** ***Judgment for Costs in Civil Cases.*** **--In a civil case, the court of appeals' judgment should award to the prevailing party the appellate costs - including preparation costs for the clerk's record and the reporter's record - that were incurred by that party. But the court of appeals may tax costs otherwise as required by law or for good cause.**

**43.5** ***Judgment Against Sureties in Civil Cases.*** **--When a court of appeals affirms the trial court judgment, or modifies that judgment and renders judgment against the appellant, the court of appeals must render judgment against the sureties on the appellant's supersedeas bond, if any, for the performance of the judgment and for any costs taxed against the appellant.**

**43.6** ***Other Orders.*** **--The court of appeals may make any other appropriate order that the law and the nature of the case require.**



Texas Rules
Copyright (c) 2015 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** This document is current through January 2, 2015 ***

STATE RULES
TEXAS RULES OF CIVIL PROCEDURE
PART II. RULES OF PRACTICE IN DISTRICT AND COUNTY COURTS
SECTION 4. Pleading
C. PLEADINGS OF DEFENDANT

*Tex. R. Civ. P. 94*  (2015)

Rule 94 Affirmative Defenses

   In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. Where the suit is on an insurance contract which insures against certain general hazards, but contains other provisions limiting such general liability, the party suing on such contract shall never be required to allege that the loss was not due to a risk or cause coming within any of the exceptions specified in the contract, nor shall the insurer be allowed to raise such issue unless it shall specifically allege that the loss was due to a risk or cause coming within a particular exception to the general liability; provided that nothing herein shall be construed to change the burden of proof on such issue as it now exists.

Tex. R. Civ. P. 166a

This document is current through February 4, 2015

Rule 166a Summary Judgment

(a) ***For Claimant.*** --A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to amount of damages.

(b) ***For Defending Party.*** --A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

(c) ***Motion and Proceedings Thereon.*** --The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted.

(d) ***Appendices, References and Other Use of Discovery Not Otherwise on File.*** --Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

(e) ***Case Not Fully Adjudicated on Motion.*** --If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel, ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

(f) ***Form of Affidavits; Further Testimony.*** --Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments

will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

**(g)** ***When Affidavits Are Unavailable.*** --Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**(h)** ***Affidavits Made in Bad Faith.*** --Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

**(i)** ***No-Evidence Motion.*** --After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.



**TRANSCONTINENTAL REALTY INVESTORS, INC., Appellant v. ORIX CAPITAL MARKETS, LLC, Appellee**

**No. 05-10-00655-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

***353 S.W.3d 241*; *2011 Tex. App. LEXIS 8272***

**October 19, 2011, Opinion Filed**

**SUBSEQUENT HISTORY:** Released for Publication December 1, 2011
Rehearing denied by *Transcon. Realty Investors, Inc. v. Orix Capital Mkts. LLC, 2011 Tex. App. LEXIS 9388 (Tex. App. Dallas, Nov. 21, 2011)*
Petition for review denied by *Orix Capital Mkts., LLC v. Transcon. Realty Investors, Inc., 2012 Tex. LEXIS 191 (Tex., Mar. 2, 2012)*

**PRIOR HISTORY:** [**1]
On Appeal from the 134th Judicial District Court, Dallas County, Texas. Trial Court Cause No. 09-05999-G.
*ECF N. Ridge Assocs., L.P. v. Orix Capital Mkts., L.L.C., 336 S.W.3d 400, 2011 Tex. App. LEXIS 1839 (Tex. App. Dallas, 2011)*

**COUNSEL:** For APPELLANT: Mitchell Madden, Thomas V. Murto, III, The Law Offices of Mitchell Madden, Dallas, TX.

For APPELLEE: Talmage Boston, Kent B. Pearson, Winstead P.C., Dallas, TX; Nicola Hobeiche, Gregory D. May, Orix USA Corporation, Dallas, TX.

**JUDGES:** Before Justices Morris, O'Neill, and Filmore. Opinion By Justice O'Neill.

**OPINION BY:** MICHAEL J. O'NEILL

**OPINION**

[*242] Opinion By Justice O'Neill

Appellant Transcontinental Realty Investors, Inc. appeals a declaratory judgment granted in favor of Orix Capital Markets, LLC. In three issues, Transcontinental generally contends: (1) the trial court erred in granting declaratory relief because no justiciable controversy existed and because Orix had previously filed, but abandoned, a breach of contract claim raising the same contentions, (2) the declaratory judgment act did not authorize the award of attorneys' fees in this case, and (3) the attorneys' fees award was improper because Orix did not segregate the fees expended on the declaratory judgment claim from fees expended on the abandoned breach of contract claim. For the following reasons, we vacate the trial court's judgment and dismiss the cause.

This suit involves a Guaranty in which Transcontinental guaranteed payment of attorneys' fees Orix expended in a suit against a Transcontinental subsidiary, TCI 9033 Wilshire Boulevard, Inc. (TCI). TCI was the owner [**2] of commercial real estate subject to a mortgage loan serviced by Orix. A dispute arose as to whether Orix could require that TCI purchase terrorism insurance. Orix demanded that TCI purchase [*243] such insurance and TCI refused. Orix then declared the loan in default and began charging interest at the default rate. TCI filed suit for breach of contract and declaratory relief. Orix counterclaimed -- also for breach of contract and declaratory relief.

Meanwhile, a third party sought to purchase the TCI property. The mortgage documents required Orix to consent to any sale of the property. Before Orix would consent, it required TCI's parent company, Transcontinental, to guarantee any attorneys' fees that might be awarded to Orix in the TCI litigation, which was to continue. To facilitate the sale, Transcontinental agreed and signed the Guaranty.

Orix ultimately prevailed in the underlying litigation and obtained a judgment against TCI that included

$241,380.39 in attorneys' fees as well as appellate costs and fees in the event TCI unsuccessfully appealed. TCI did appeal that judgment. A few months later, while the appeal was pending, Orix filed the instant suit. In its original petition, Orix alleged [**3] Transcontinental breached the Guaranty. Specifically, Orix contended that after the TCI judgment was signed, it made a demand upon Transcontinental to "comply with its obligations" under the agreement, but Transcontinental refused to "accept" its responsibilities and indebtedness created under the Guaranty. As damages, it alleged the $241,380.39 that had been awarded, as well as any additional appellate attorneys' fees that might later be incurred in the TCI appeal if Orix prevailed.

Transcontinental answered with a general denial and also asserted the affirmative defense of duress asserting the Guaranty was unenforceable. Transcontinental also filed a motion to abate or stay asserting the trial court should not determine the validity of the Guaranty until the TCI appeal was resolved because no determination could be made as to whether it was liable until Transcontinental's liability was first finally resolved.

Orix responded by amending its petition to abandon its breach of contract claim and replace it with a claim for declaratory relief. In its First Amended Petition, Orix sought a global declaration that the Guaranty was valid and enforceable and that Transcontinental was obligated [**4] to pay Orix all expenses, attorneys' fees, and other costs incurred at all levels of litigation of the TCI lawsuit as well as in any separate proceeding.

Orix filed a motion for summary judgment asserting the Guaranty was valid as a matter of law and was not procured by duress. Orix stated it was seeking a determination that Transcontinental was liable for the attorneys' fees ultimately awarded *if* they were affirmed on appeal. It asserted the pendency of the appeal in the underlying judgment should not prevent it from obtaining declaratory relief because it was not seeking to recover any attorneys' fees from the TCI lawsuit yet, but was only seeking a declaration of liability for such fees (and all additional appellate fees in that case) "if and when" the TCI appeal was concluded in Orix's favor. Orix also expressly requested the trial court to "extinguish" all affirmative defenses to the Guaranty. Transcontinental responded to the motion asserting the trial court lacked jurisdiction because whether any controversy about the Guaranty existed was not ripe for review.

The trial court granted declaratory relief declaring the Guaranty "valid and enforceable" to which Transcontinental had [**5] "no viable affirmative defense." The court also declared that Transcontinental was obligated to pay all attorneys' fees and costs awarded to Orix in the TCI litigation at all levels. In this appeal, Transcontinental asserts the trial court erred in [*244] granting declaratory relief because validity of the Guaranty did not present a justiciable issue. We agree.

A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, or ordinance, contract or franchise and obtain a declaration of rights, status, or other legal relations thereunder. *TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a)* (West 2008). The purpose of the Declaratory Judgments Act is "to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." *TEX. CIV. PRAC. & REM.CODE ANN. § 37.002(b)* (West 2008). It is "remedial" and "is to be liberally construed." *Id.*

The Declaratory Judgments Act cannot be used to obtain an advisory [**6] opinion, which Texas courts lack subject-matter jurisdiction to give. *Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 444 (Tex.1993)*. Declaratory judgment is appropriate only when a real controversy exists between the parties and the entire controversy may be determined by the judicial declaration. *Brooks v. Northglen Ass'n, 141 S.W.3d 158, 163-64 (Tex. 2004)*; *OAIC Commercial Assets, L.L.C. v. Stonegate Village, L.P., 234 S.W.3d 726, 745 (Tex. App.--Dallas 2007, pet. denied)*. The Act does not give a litigant the right to try a case piecemeal. *United Servs. Life Ins. Co. v. Delaney, 396 S.W.2d 855, 858 (Tex. 1965)*; *SW Airlines Co. v. Tex. High-Speed Rail Auth., 863 S.W.2d 123, 125 (Tex. App.--Austin 1993, writ denied)*.

Ripeness is a requirement of justiciability. *Perry v. Del Rio, 66 S.W.3d 239, 249 (Tex. 2001)*; *Patterson v. Planned Parenthood of Houston & Se. Tex., Inc., 971 S.W.2d 439, 442 (Tex. 1998)*. The ripeness doctrine conserves judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes. *Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928 (Tex. 1998)*; *TCI West End, Inc. v. City of Dallas, 274 S.W.3d 913, 918 (Tex. App.--Dallas 2008, no pet.)*. [**7] The doctrine prohibits suits involving "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Patterson, 971 S.W.2d at 442*. A case is not ripe if its resolution depends on contingent facts or upon events that have yet to come to pass. *See id. at 443*.

The declaration sought in this case concerned validity of a Guaranty for payment for attorneys' fees awarded to Orix from TCI in underlying litigation. The Guaranty obligated Transamerica to pay these fees to Orix if TCI did not. Because Transcontinental's liability under the Guaranty in this case would arise only if TCI was found

liable for attorney's fees, its liability can be compared to liability that arises in indemnity cases. In *Firemen's Insurance Co. v. Burch, 442 S.W.2d 331, 332 (Tex. 1968)*, the Texas Supreme Court held that a trial court cannot determine a claim for indemnity before liability is established in the underlying case because any such opinion would be purely advisory. *See also State Farm Lloyds v. C.M.W., 53 S.W.3d 877, 893 (Tex. App.--Dallas 2001, pet. denied)*. The Court later limited this holding in *Farmers Texas County Mutual Insurance, Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997)*, [**8] concluding that, under limited circumstances, a claim for indemnity could be litigated while the underlying litigation remained pending. Specifically, the Court held "the duty to indemnify is justiciable before the insured's liability is determined in the liability [*245] lawsuit when the insurer has the duty to defend *and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify*." *Griffin, 955 S.W.2d at 84* (emphasis in original). It reasoned that under those circumstances, "no facts could be developed" in the underlying tort suit that could alter the court's conclusion no duty to indemnify existed. *Id*.

Here, Orix was seeking a general declaration of validity of the Guaranty and lack of viable defenses. Orix pleaded it was entitled to declaratory relief because Transcontinental had failed to "acknowledge" its liability under the Guaranty and because, in response to its abandoned breach of contract claim, it had pleaded duress. It was not seeking guidance with respect to what was then currently required under the Guaranty. Indeed, in oral argument Orix conceded that Transcontinental was not obligated until appeals concluded [**9] and admitted it sought declaratory relief to make collection efforts more expedient *"if* and when" the judgment was finally affirmed.

The issue presented in determining justiciability is whether all the facts surrounding the Guaranty and defenses to it were sufficiently developed such that Transcontinental's liability could not have been affected by subsequent events. In its motion for summary judgment, Orix admitted that Transcontinental's liability was triggered "assuming the Final Judgment is affirmed on appeal." It complained Transcontinental did not "acknowledge" its responsibility "in the event" the trial court's judgment is affirmed. Orix thus admits that if the underlying judgment was reversed, the entire proceedings -- in the trial court and in this court -- would be completely meaningless. Further, the declaration sought - and the declaration given - was that Transcontinental was responsible for any fees awarded in the TCI litigation at all trial and appellate levels. Thus, the trial court declared Transcontinental's liability for fees that had yet to even be expended. Moreover, this case concerned a guarantee of payment for fees TCI incurred and was liable for. Future events [**10] could certainly alter TCI's willingness or ability to pay its fees itself. Any such payment by TCI would effect Transcontinental's liability on the Guaranty.

Finally, and perhaps most importantly, Orix's attempt to "extinguish" any defenses to the Guaranty and get a declaration that no defenses existed was not proper. According to Orix's rationale, Transcontinental should be forced to litigate any potential defenses it might have to liability before liability has even been established. A defendant may not use a declaratory judgment to prematurely adjudicate defenses to liability that may not yet exist. *Cf. Calderon v. Ashmus, 523 U.S. 740, 118 S. Ct. 1694, 140 L. Ed. 2d 970 (1998)* (under federal constitution, party may not use a declaratory judgment to get advance ruling on an affirmative defense); *see also Cohen v. Orthalliance New Image, Inc., 252 F. Supp.2d 761, 766 (N.D. Ind. 2003)* (assessing the success of a defense to a potential claim (breach-of-contract or otherwise) is generally the type of hypothetical question federal courts endeavor to avoid). Not all affirmative defenses depend upon facts that exist at the time of contract formation. Any determination that no defenses could exist would be completely advisory. [**11] Even if we could say Transcontinental's answer pleading duress may have put that specific defense in controversy, the declaratory judgment was not intended to permit the piecemeal trial of lawsuits. *Delaney, 396 S.W.2d at 858*. We conclude the trial court had no jurisdiction to declare the Guaranty valid and that Transcontinental had no defenses to [*246] it. Consequently, we vacate the trial court's judgment and dismiss this cause.

MICHAEL J. O'NEILL

JUSTICE



**TRANSPORTATION INSURANCE COMPANY, NATIONAL FIRE INSURANCE COMPANY OF HARTFORD, VALLEY FORGE INSURANCE COMPANY, AND CONTINENTAL CASUALTY COMPANY, Appellants v. WH CLEANERS, INCORPORATED, Appellee**

**No. 05-10-00654-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

***372 S.W.3d 223*; *2012 Tex. App. LEXIS 4508***

**June 7, 2012, Opinion Filed**

**SUBSEQUENT HISTORY:** Released for Publication July 13, 2012.

**PRIOR HISTORY:** [**1]

On Appeal from the 162nd Judicial District Court, Dallas County, Texas. Trial Court Cause No. 10-06208-I.

**DISPOSITION:** Reverse and Remand.

**COUNSEL:** For APPELLANT: Greta Ayn Matzen, Taber Estes Thome & Carr PLLC, Dallas, TX; Levon G. Hovnatanian, Bruce E. Ramage, Martin, Disiere, Jefferson & Wisdom, L.L.P., Houston, TX.

For APPELLEE: Werner A. Powers, Charles C. Keeble, Jr., Haynes & Boone, L.L.P., Dallas, TX.

**JUDGES:** Before Justices Bridges, Richter, and Murphy. Opinion By Justice Murphy.

**OPINION BY:** MARY MURPHY

**OPINION**

[*225] Opinion By Justice Murphy

The issue we must resolve in this declaratory-judgment action is whether the trial court had subject-matter jurisdiction to declare the duties of insurance carriers, once they denied coverage, related to a pending lawsuit against the insured in Indiana. The carriers, Transportation Insurance Company, National Fire Insurance Company of Hartford, Valley Forge Insurance Company, and Continental Casualty Company, appeal the trial court's order granting WH Cleaners, Incorporated's plea to the jurisdiction. We conclude under the circumstances presented that a justiciable controversy exists and the trial court erred by granting WHC's plea to the jurisdiction. We reverse the trial court's order and remand for further proceedings.

**BACKGROUND**[1]

1 The underlying declaratory-judgment action involves multiple parties and insurance policies and contains a complicated history of the relationship among WHC and the other defendants in the Indiana suit. Although an exposition [**2] of those facts is necessary to resolve the merits of the declaratory-judgment action, a complete factual background is not relevant here. Rather, we focus on only those facts necessary for our disposition.

WHC is a Texas corporation involved in the dry-cleaning business. Between 1997 and 2003, WHC leased retail space or otherwise controlled the space through subleases in a shopping center in Greenwood, Indiana. In 2006, the owner of the shopping center learned the property was contaminated by various hazardous substances used in dry cleaning. After the Indiana Department of Environmental Management required the owner to investigate and clean up the contamination, the owner filed suit in Indiana against WHC and its former president, Robert Hitch, as well as others that operated dry cleaning businesses in the shopping center; the owner alleged WHC and the other defendants caused the contamination through their business operations and should pay [*226] for the cleanup. The Indiana action has not yet proceeded to judgment.

The carriers issued various comprehensive general liability insurance policies to WHC and other defendants in the Indiana suit during the relevant time period. By letter dated [**3] August 11, 2008, and as required by the policies, WHC[2] told the carriers about the Indiana suit, attached a 2 copy of the complaint, and asserted entitlement "to defense and indemnity of all claims with respect to this property under any and all policies issued by [the carriers]." The letter included the policy number for each policy implicated, including policies issued to other defendants and under which WHC sought coverage as an additional insured. WHC also emphasized that the policies specifically covered "costs of remediation of environmental contamination" because the Indiana Supreme Court had ruled the pollution exclusion in such policies was ambiguous and unenforceable. The letter ended with a request that the carriers contact WHC's counsel "to arrange for payment of the costs of defense, indemnity and possible settlement" of the matter.

2 The letter was written by counsel for WHC, Hitch, and Coaster Management, Inc., all defendants in the Indiana suit. For simplicity and because WHC is the only appellant before the Court, we reference only WHC.

The carriers issued a formal response, denying coverage for the environmental cleanup claims asserted in the Indiana suit.[3] Shortly thereafter, [**4] the carriers filed the petition 3 for declaratory judgment in Texas against WHC, Hitch, and Bargain Cleaners, Inc.[4] that is the subject of this appeal. The carriers sought a judicial declaration that they had no duty to defend or indemnify WHC and Hitch in the Indiana suit under any of the policies because of the pollution exclusions contained in the policies. The carriers also alleged WHC was not entitled to coverage in the capacity of an additional insured under the other defendants' policies.

3 The letter denying coverage is not included in the record before us. WHC asserts, and the carriers do not dispute, that the letter was dated February 25, 2009. There is also no dispute that the letter indicated the carriers were denying coverage for the claims brought against WHC in the Indiana suit.

4 Bargain, a Texas corporation, is a defendant in the Indiana suit but is not a party to this appeal.

WHC and Hitch filed a plea to the jurisdiction and special exceptions in response to the carriers' declaratory-judgment action, challenging the trial court's subject-matter jurisdiction. They argued the carriers were, in effect, seeking "a declaration that their denial of coverage to [WHC and Hitch] [**5] was not a breach of their insurance contract" and such a determination is not a proper subject of a declaratory judgment. They also claimed the carriers' request for declaratory relief with respect to their duty to indemnify "fails to present a justiciable controversy."

The trial court sustained WHC's plea to the jurisdiction and signed an order dismissing the carriers' claims against WHC; Hitch was non-suited from the case before the trial court issued its ruling. The trial court also granted a motion to sever the claims asserted against WHC from those against Bargain and signed a judgment in May 2010 in favor of WHC in the severed action.[5]

5 Although the judgment recites that the carriers "take nothing" against WHC, no party asserts the judgment adjudges anything other than the finality of the order sustaining WHC's plea to the jurisdiction and dismissing the carriers' declaratory-judgment claims without prejudice.

[*227] **DISCUSSION**

The carriers challenge the trial court's order sustaining WHC's plea to the jurisdiction. The carriers list four "issues" on appeal, yet the questions presented are sub-parts of the first issue of whether the trial court erred in granting WHC's plea to the jurisdiction [**6] based on lack of subject-matter jurisdiction. We address that issue.

**Legal Standards & Applicable Law**

Subject-matter jurisdiction is essential to a trial court's power to decide a case and may be challenged by a plea to the jurisdiction. *Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 553-54 (Tex. 2000)*. The question of whether a trial court has subject-matter jurisdiction is one of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004)*; *Noell v. Air Park Homeowners Ass'n, Inc., 246 S.W.3d 827, 831 (Tex. App.--Dallas 2008, pet. denied)*. The plaintiff bears the burden to plead facts affirmatively demonstrating the court's jurisdiction to hear the case. *Miranda, 133 S.W.3d at 226* (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex. 1993))*. When reviewing a trial court's order dismissing a case for lack of jurisdiction, we liberally construe the plaintiff's pleadings in favor of jurisdiction, and we look to the plaintiff's intent. *Tex. Ass'n of Bus., 852 S.W.2d at 446*.

The Texas Uniform Declaratory Judgments Act gives Texas courts the power to "declare rights, status, and other legal relations whether or not further [**7] relief is or could be claimed." *TEX. CIV. PRAC. & REM. CODE ANN. § 37.003(a)* (West 2008). The Act is a remedial statute, the purpose of which is to settle and afford relief from uncertainty and insecurity with respect to those matters, and

is to be liberally construed and administered. *Id. § 37.002(b)*; *Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995)*; *Cobb v. Harrington, 144 Tex. 360, 190 S.W.2d 709, 713 (Tex. 1945)* (declaratory-judgment action is "an instrumentality to be wielded in the interest of preventative justice and its scope should be kept wide and liberal, and should not be hedged about by technicalities").

The Act does not create or augment a trial court's subject-matter jurisdiction--it is "merely a procedural device for deciding cases already within a court's jurisdiction." *Tex. Ass'n of Bus., 852 S.W.2d at 444*. A declaratory-judgment action will lie within the trial court's subject-matter jurisdiction when a justiciable controversy exists as to the rights and status of the parties before the court for adjudication, and the requested declaration will actually resolve the controversy. *Brooks v. Northglen Ass'n, 141 S.W.3d 158, 163-64 (Tex. 2004)*; *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P., 234 S.W.3d 726, 745 (Tex. App.--Dallas 2007, pet. denied)*. [**8] A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest and not merely a theoretical dispute. *Bonham State Bank, 907 S.W.2d at 467*; *Trinity Universal Ins. Co. v. Sweatt, 978 S.W.2d 267, 270 (Tex. App.--Fort Worth 1998, no. pet.)* (justiciable controversy is "real controversy between the parties that will be actually determined by the judicial declaration sought"). A justiciable controversy is to be distinguished from an advisory opinion, which is prohibited under the Texas and federal constitutions. *Tex. Ass'n of Bus., 852 S.W.2d at 444*. If a justiciable controversy does not exist, the trial court must dismiss the case for lack of subject-matter jurisdiction. *Di Portanova v. Monroe, 229 S.W.3d 324, 330 (Tex. App.--Houston [1st Dist.] 2006, pet. denied)*.

[*228] Ripeness is one aspect of justiciability. *See Noell, 246 S.W.3d at 832* (citing *Perry v. Del Rio, 66 S.W.3d 239, 249 (Tex. 2001))*. But a justiciable controversy need not be a "fully ripened cause of action." *Id.* (citing *Tex. Dep't of Pub. Safety v. Moore, 985 S.W.2d 149, 153 (Tex. App.--Austin 1998, no pet.))*. To confer jurisdiction on the trial court, the fact [**9] situation must manifest the "ripening seeds of a controversy." *Moore, 985 S.W.2d at 153-54*. Thus, a declaratory-judgment action may include a pending cause of action or threatened litigation in the immediate future that seems unavoidable. *Monk v. Pomberg, 263 S.W.3d 199, 207 (Tex. App.--Houston [1st] Dist. 2007, no pet.)*; *Taylor v. State Farm Lloyds, Inc., 124 S.W.3d 665, 669 (Tex. App.--Austin 2003, pet. denied)* ("[T]here must either be a pending cause of action between the parties or such a clear indication of the extent of the parties' differences that a court may presume one is imminent.").

In Texas, the determination of whether a carrier has the responsibility to defend its insured constitutes a justiciable controversy. *See Bituminous Cas. Corp. v. Commercial Standard Ins. Co., 639 S.W.2d 25, 26 (Tex. 1982)*; *Colony Ins. Co. v. H.R.K., Inc., 728 S.W.2d 848, 852 (Tex. App.--Dallas 1987, no writ)*; *see also MBM Fin. Corp. v. Woodlands Operating Co., L.P., 292 S.W.3d 660, 668 (Tex. 2009)* (noting suit by insurers to declare non-liability under duty-to-defend clause as among most common suits filed under the Act). Likewise, the determination of whether a carrier has a duty to indemnify is [**10] justiciable before the underlying suit proceeds to judgment when the same reasons that negate the carrier's duty to defend also negate any possibility the carrier will have to indemnify for any judgment. *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 83 (Tex. 1997)* (per curiam); *Collier v. Allstate Cnty. Mut. Ins. Co., 64 S.W.3d 54, 62 (Tex. App.--Fort Worth 2001, no pet.)*.

**Analysis**

We begin with the statute and look to the carriers' petition for declaratory judgment to determine whether they pleaded a controversy within the scope of the Act. *See Miranda, 133 S.W.3d at 226*. Under the Act, any "person interested" under a written contract "may have determined any question of construction or validity" arising under that contract and "obtain a declaration of rights, status, or other legal relations thereunder." *TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a)*; *cf. Trinity Universal Ins. Co., 978 S.W.2d at 271* ("Construction and validity of contracts are the most obvious and common uses of the declaratory judgment action."); *Barnett v . Aetna Life Ins. Co., 723 S.W.2d 663, 665 (Tex. 1987)* (insurance policies are contracts). The contract may be construed before or after the breach, [**11] *TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(b)*, and the Act contemplates declarations that are negative (nonliability) and affirmative (liability). *Id. § 37.003(b)*.

The carriers alleged that they issued liability coverage policies to WHC and the other defendants in the Indiana suit. They pleaded WHC notified them of the Indiana suit in the August 2008 letter and "asserted [it was] entitled to coverage as a named insured under certain comprehensive general liability insurance policies that [the carriers] purportedly issued to [WHC] from 1997 to 2001." The carriers further pleaded WHC asserted entitlement to coverage as an "additional insured" under policies issued to the other defendants in the Indiana suit. The carriers stated they "formally denied coverage" and that they are "seeking a judicial declaration that they have no coverage obligation" as to [*229] WHC. In particular, the requested declaration includes construing the "who is an insured" provision in the various policies to determine WHC's status under each policy (as an insured,

additional insured, or otherwise), as well as the pollution exclusion to determine if the exclusion precluded coverage.

That the Act allows the carriers to [**12] have a trial court declare their rights under the insurance contracts is clear--as parties to those contracts, they are "persons interested" whose rights, status, or other legal relations are affected by the contracts. *See id. § 37.004(a)*. The carriers sought to obtain a clarification of those rights and guidance from the court with respect to what they were required to do under the contracts. They specifically asked the court to determine questions of construction as to WHC's status as an insured and the validity of the pollution exclusion under the contracts. Stated more generally, they are asking the trial court to construe certain terms or provisions of the contracts to determine whether they owe WHC a defense or indemnity. The resolution of their questions would serve to remove uncertainties with respect to their legal obligations--WHC notified them expressly the pollution exclusion is unenforceable and demanded a defense and indemnity as an insured and "additional insured" under the policies. *See id. § 37.002(b)* (purpose of Act is to afford relief from uncertainty and insecurity with respect to rights). In arguing the trial court lacked jurisdiction to hear this case, WHC does [**13] not assert that the carriers' requested relief is not authorized by the terms of the Act. Nor does it deny that courts routinely exercise jurisdiction over declaratory-judgment actions that resolve questions related to a carrier's obligations to defend or indemnify an insured under a policy. Rather, WHC focuses on the fact that the carriers denied coverage to WHC before they sought declaratory relief.[6]

6 WHC attempts to distinguish cases cited by the carriers in which the facts reveal the carriers in those cases also filed declaratory-judgment actions after denying coverage. *See, e.g., Collier, 64 S.W.3d at 57* ("Upon being sued, [insureds] requested that Allstate provide a defense and indemnify them for any judgment in the suit . . . . Allstate denied coverage and asserted that it had no duty to defend or indemnify" and filed an action seeking declaratory relief.); *Flores v. Great Am. Ins. Co., 401 S.W.2d 690, 692 (Tex. Civ. App.--Waco 1966, writ ref'd n.r.e.)* ("Flores gave notice to plaintiff Insurance Company and called upon it to defend the suit. Great American declined to defend, and filed this case for declaratory judgment that it had no obligation to defend (or pay judgment)."). [**14] WHC maintains these cases do not address or hold that "an insurer can properly seek declaratory relief after it denies coverage to its insured" because there was no challenge in those cases to the "insurer's post-denial-of-coverage invocation of the declaratory judgment remedy." This distinction is not helpful to our analysis of whether the specific pleading and circumstances here presented a justiciable controversy invoking the trial court's subject-matter jurisdiction.

WHC presents essentially three arguments supporting its claim the trial court had no subject-matter jurisdiction because of a lack of justiciable controversy. First, it argues any controversy among the parties was "effectively mooted" when the carriers denied its request for a defense and indemnity. According to WHC, a carrier may not both deny coverage and then sue for a declaration of its rights under the insurance policy. WHC claims these two options are mutually exclusive. It argues that when the carriers denied coverage, they had "no need" to seek declaratory relief because the carriers themselves "had already determined the parties' rights" and therefore faced "no uncertainty or insecurity with respect to [their] [**15] rights, [*230] status, or legal relations" under the policies.

As support for its contentions, WHC relies on *Drawdy v. Direct General Insurance Company, 277 Ga. 107, 586 S.E.2d 228 (Ga. 2003)*, in which the Georgia Supreme Court precluded a carrier from bringing a declaratory-judgment action after the carrier expressly denied coverage. In *Drawdy*, the insured's nephew was involved in two automobile accidents, one of which killed his passenger. *Id. at 229*. The carrier conducted an investigation, and one month later, sent the insured and the passenger's estate a letter denying all coverage under the policy for the collisions. *Id*. Nearly a year later, the carrier sought a declaration that it had no duty to defend or indemnify the insured or his nephew. *Id*.

The Georgia Supreme Court first framed the question before the court, in part, as "whether an automobile insurer, after expressly denying coverage without qualification or conditions, may bring an action for declaratory judgment to determine its contractual duties to its insured *when no litigation is pending against the insured at the time the declaratory judgment action is filed* . . . ." *Id*. (emphasis added). The court recited that declaratory relief was [**16] not available to a party "merely to test the viability of its defenses" and concluded the carrier was "neither uncertain nor insecure" as to its rights because the carrier had already denied coverage for the claims at issue. *Id. at 230*. When the carrier sought declaratory relief nearly a year after the accident, it had provided its insured with "an unconditional and unqualified denial of coverage" and had done nothing to indicate the question of coverage was still an issue. *Id. at 230-31*.

At the time the carrier in *Drawdy* filed the declaratory-judgment action, no lawsuit had been filed by the

passenger's estate and no demand for coverage had been made by the insured. Even though the estate eventually filed suit against the insured, no facts were presented indicating the insured had presented the claim to the carrier or that he intended to rely on the carrier for coverage. The insured took no position whatsoever on coverage. Thus, the facts of *Drawdy* reveal there was no real dispute between the carrier and its insured requiring direction from the court. Significantly, the Georgia Declaratory Judgment Act has no direct corollary to the Texas Act's provision permitting any person interested [**17] under a "written contract" to seek a declaration to resolve questions related to the construction or validity of that contract. *Compare GA. CODE ANN. §§ 9-4-1 to -10, with TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a)*. Consequently, WHC's reliance on *Drawdy* is not persuasive.

Just because a carrier takes a position and denies coverage to an insured does not mean there is no coverage and that the matter has been resolved. A court can determine otherwise. And uncertainty can exist with respect to the parties' rights or duties regarding coverage, especially when the parties take adverse positions on a carrier's obligations under an insurance contract. *See Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 242, 57 S. Ct. 461, 81 L. Ed. 617 (1937)* (concluding controversy existed warranting declaratory judgment when carrier denied insured's claim but insured had yet to file coverage dispute because parties took opposing positions as to existing obligations before suit filed); *see also J.E.M. v. Fid. & Cas. Co. of N.Y., 928 S.W.2d 668, 671 (Tex. App.--Houston [1st Dist.] 1996, no writ)* (Act is intended "as a means for determining the rights of parties when a controversy has arisen").

[*231] Under the Texas Act, either [**18] party may seek declaratory relief if there is a question regarding rights, status, or other legal relations arising under a written contract. *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a)*. If WHC had filed the declaratory-judgment suit instead of the carriers after the carriers' denial, there would be no question that the controversy is of a justiciable nature. The inquiry is "essentially the same" whether it is presented by the insured or the carrier. *See Haworth, 300 U.S. at 244* (stating it is "the nature of the controversy, not the method of its presentation or the particular party who presents it, that is determinative"). And a declaration of rights under the circumstances presented has practical consequences. For example, if the trial court made declarations in WHC's favor, the carriers would have to change course and provide WHC with a defense. If the trial court made declarations in the carriers' favor, the carriers would be relieved of any requirement that they maintain a reserve with respect to those policies. *See id. at 239*.

Of course, the Act does not constitute "an open-ended invitation to parties seeking interpretation of their contracts." *Paulsen v. Tex. Equal Access to Justice Found., 23 S.W.3d 42, 46 (Tex. App.--Austin 1999, pet. denied)*. [**19] Although the status of the parties' differences need not have reached the state of an actual controversy, a justiciable controversy within the trial court's jurisdiction requires an indication of ripeness to the extent the trial court may presume a cause of action is imminent or unavoidable as indicated by the parties' differences over the insurance contract. *Taylor, 124 S.W.3d at 669*.

WHC's second contention focuses on the imminence of a cause of action, and it argues there is no imminent disagreement among the parties because it was not going to contest the carriers' denial of coverage. In oral argument, WHC characterized its August 2008 letter in which it asserted entitlement to a defense and indemnity (and cited a ruling from the Indiana Supreme Court that the pollution exclusion is unenforceable) as mere tender of a lawsuit as required under its policies. WHC claims that in the absence of a showing that it threatened the carriers with litigation or otherwise disputed the carriers' coverage denial, such tender cannot constitute a justiciable controversy.

The only record support for WHC's claim it does not intend to contest the denial of coverage is counsel's statement in a response [**20] to the carriers' motion to compel that WHC "simply does not have the funds available to it to fight the deep-pocketed" carriers and "is willing to enter a mutually acceptable agreed judgment to the effect that it is not entitled to coverage for the underlying suit." But the record contains no formal withdrawal of WHC's request for a defense and indemnity, no agreement that it was not entitled to coverage under any of the policies, no waiver, concession, or settlement of the claims, or anything else to indicate WHC had changed or relinquished its position of entitlement and demand for coverage as stated in its August 2008 letter. And in oral argument, WHC admitted it had not done anything to establish it was not contesting coverage. We decline to make the existence of a justiciable controversy dependent on the subjective state of mind and intention of one party. It is enough that WHC took the position it is entitled to defense costs and indemnity and the carriers disputed that position for a justiciable controversy to exist. *See Haworth, 300 U.S. at 242*.

Finally, WHC argues the trial court had no jurisdiction to render a declaratory [*232] judgment because after the carriers denied coverage, [**21] the "only thing" left for the trial court to declare was whether that denial constituted a breach of the insurance contracts. WHC claims such a declaration is improper. This argument also is not persuasive. Contrary to WHC's assertion, the carriers asked the trial court to construe certain pro-

visions of the insurance contract and determine WHC's rights and the carriers' duties in the context of the Indiana suit; the carriers asked the trial court to determine whether WHC was an insured or additional insured and whether the pollution exclusion applied. The petition for declaratory judgment contains no request to have the trial court determine whether the carriers breached any terms of the insurance contracts.

**CONCLUSION**

After considering the carriers' allegations for declaratory relief and the arguments of the parties, we conclude the trial court was presented with a real controversy among the parties involving a genuine conflict of tangible interest that was within the scope of the Act. *See Bonham State Bank, 907 S.W.2d at 467*; *Trinity Universal Ins. Co., 978 S.W.2d at 270*. Specifically, the carriers' request for the court to determine whether it owed WHC a defense in the Indiana suit [**22] is a justiciable issue. *See Bituminous Cas. Corp., 639 S.W.2d at 26*. And because the same provisions (the "who is an insured" provision and pollution exclusion) the carriers claim negate their duty to defend would also negate the possibility they will have to indemnify WHC for any judgment, the question of whether the carriers owe WHC a duty to indemnify is also a justiciable issue for declaratory relief. *See Griffin, 955 S.W.2d at 83*. Consequently, the trial court had subject-matter jurisdiction over this case, and the trial court erred when it sustained WHC's plea to the jurisdiction and dismissed the action. We sustain the carriers' issue. We reverse the trial court's judgment and remand this case for further proceedings.

MARY MURPHY

JUSTICE

**JUDGMENT**

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings. It is **ORDERED** that appellants Transportation Insurance Company, National Fire Insurance Company of Hartford, Valley Forge Insurance Company, and Continental Casualty Company recover their costs of this appeal from appellee WH Cleaners, Incorporated.

Judgment entered June [**23] 7, 2012.

/s/ Mary Murphy

MARY MURPHY

JUSTICE



**TRITON 88, L.P. F/K/A TRITON 88, L.L.C. AND TRITON 2000, L.L.C., Appellants v. STAR ELECTRICITY, L.L.C. D/B/A STARTEX POWER, Appellee**

**NO. 01-10-00601-CV**

**COURT OF APPEALS OF TEXAS, FIRST DISTRICT, HOUSTON**

***411 S.W.3d 42*; *2013 Tex. App. LEXIS 10090***

**August 13, 2013, Opinion Issued**

**SUBSEQUENT HISTORY:** Appeal dismissed by, Sub nomine at *Bjvsd Bird Family P'ship, L.P. v. Star Elec., 413 S.W.3d 780, 2013 Tex. App. LEXIS 10088 (Tex. App. Houston 1st Dist., Aug. 13, 2013)*

**PRIOR HISTORY:** [**1]

On Appeal from the 190th District Court, Harris County, Texas. Trial Court Case No. 0958846.

**COUNSEL:** For APPELLANT: Anthony L. Laporte, Benjamin C. Wilson, Kent M. Hanszen, Hanszen Laporte, L.L.P., Houston, TX.

For APPELLEE: Joshua Huber, Rodney Lee Drinnon, Ronald Edward Wright, Jr., Drinnon & Wright, PLLC, Houston, TX.

**JUDGES:** Panel consists of Justices Keyes, Sharp, and Huddle. Justice Sharp concurring in the judgment only.

**OPINION BY:** Evelyn V. Keyes

**OPINION**

[*46] Appellants, Triton 88, L.P. *f/k/a* Triton 88, L.L.C. and Triton 2000, L.L.C. (collectively, "Triton"), appeal the trial court's grant of summary judgment and a receivership order entered in favor of appellee, Star Electricity, L.L.C. *d/b/a* StarTex Power ("StarTex"). Triton presents fourteen issues for appellate consideration. In its first seven issues, Triton argues that (1) the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim because (2) the trial court misinterpreted and misapplied the law applicable to the claims and defenses asserted by the parties; (3) StarTex's summary judgment evidence did not establish that it was entitled to judgment as a matter of law on its breach of contract claim; (4) Triton's summary judgment evidence raised genuine issues of material fact as to one or more elements of StarTex's breach of contract claim; (5) genuine issues of material fact existed as to Triton's claims for offset and credit based on StarTex's [**2] use of improper and incorrect billing and StarTex's use of estimated billing; (6) genuine issues of material fact existed as to StarTex's billing practices and procedures and whether those procedures constituted a breach by StarTex of the parties' contract; and (7) genuine issues of material fact existed regarding whether Triton objected [*47] to StarTex's billing practices and procedures and to invoices submitted to Triton by StarTex and whether StarTex failed to fulfill its legal obligations for handling such complaints.

Triton further argues that (8) StarTex's failure to comply with the legal requirements for handling complaints concerning retail electric service and Triton's pending complaint against StarTex before the Texas Public Utility Commission acted to stay the judgment and enforcement of the judgment. Triton attacks the trial court's damages award, arguing that the trial court erred in awarding StarTex (9) liquidated damages pursuant to the early termination provisions in the contract because such an award constitutes an impermissible and unenforceable penalty; (10) early termination fee damages based on unidentified and unproven monthly billings; (11) early termination fee damages [**3] based on estimated billing and billings for periods outside the term of the contract that Triton allegedly terminated early; and (12) attorney's fees because the fees awarded were excessive and unreasonable, were for legal services not proven to be necessary, and were not properly proven by the summary judgment evidence. Finally, Triton appeals the order of the trial court appointing a receiver, arguing that (13) the trial court erred in appointing a receiver and ordering Triton to turn over to the receiver confidential records and

all proceeds and revenue generated by Triton's businesses and that (14) Triton is entitled to immediate relief from the order appointing a receiver and is entitled to recover all records and revenue turned over pursuant to the order, including all funds that have been disbursed, paid, relinquished, distributed, or in any way disposed of by the receiver.

We affirm.

**Background**

Texas deregulated its electric utility market beginning in 1999. *See TEX. UTIL. CODE ANN. § 39.051(a)* (Vernon 2007) ("On or before September 1, 2000, each electric utility shall separate from its regulated utility activities its customer energy services business activities that are otherwise [**4] also widely available in the competitive market."); *Tex. Indus. Energy Consumers v. CenterPoint Energy Houston Elec., LLC, 324 S.W.3d 95, 97 (Tex. 2010)*. The Utilities Code provides that electric utilities must separate their business activities from one another into three units: (1) a power generation company; (2) a retail electric provider; and (3) a transmission and distribution utility. *TEX. UTIL. CODE ANN. § 39.051(b)*.

Retail electric providers, like StarTex, essentially buy electricity from a transmission and distribution utility and resell it to Texas consumers. *See AEP Tex. N. Co. v. Pub. Util. Comm'n of Tex., 297 S.W.3d 435, 439 (Tex. App.--Austin 2009, pet. denied)* (citing *TEX. UTIL. CODE ANN. § 39.051*). The transmission and distribution utility's rates are still regulated by the Texas Public Utility Commission ("PUC"). *Tex. Indus. Energy Consumers, 324 S.W.3d at 97*. Transmission and distribution utilities provide metering services, charge retail electric providers for "nonbypassable delivery charges" under rates approved by the PUC, and may also bill retail customers directly at the request of the retail provider. *Id. at 97-98*. Thus, Texas's electric utilities have "voluntarily [**5] interconnected their transmission systems" to form a single grid managed by the Electric Reliability Council of Texas ("ERCOT"). *Pub. Util. Comm'n of Tex. v. City Pub. Serv. Bd. of San Antonio, 53 S.W.3d 310, 312 (Tex. 2001)*. Electricity is produced by a generating facility, transmitted to a point of interconnection with the ERCOT grid, [*48] and then distributed to end users who purchase it from retail electric providers.

It is in this context that Triton, as owner of five commercial buildings, entered into an Electric Services Agreement ("ESA") in May 2006 with StarTex, a retail electricity provider. StarTex agreed to supply Triton with electricity, and Triton agreed to pay at a fixed rate for a term of twelve months. Regarding invoicing and payment, the ESA provided that

> [StarTex] shall render to Customer [Triton] on a monthly basis, or as mutually agreed by [StarTex] and Customer but not less frequent than monthly, an invoice that is due and payable fifteen (15) days from the date of the invoice. If the payment of all undisputed amounts is not received by the due date, Customer will be charged a late fee equal to five percent (5%) of the past due amount. Customer must provide to [StarTex] [**6] written notice setting forth in particular detail any disputed amount, including the calculations with respect to any errors or inaccuracies claimed. If it is subsequently determined that Customer owes [StarTex] any portion of the disputed amount, Customer shall remit to [StarTex] within five (5) business days following such resolution the outstanding balance plus interest . . . . Any amounts that may have been overpaid or underpaid shall be applied to the next monthly invoice.

The ESA also contained the following language:

> **Early Termination Fee**. In the event that Customer terminates this agreement or Customer defaults as described [below], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs. For purposes of this fee the mark to market costs shall be calculated by multiplying the difference between the initial cost of power procured to satisfy the ESA and the final net liquidated value of said power at the time of termination by the total amount of power procured from the Customer Location for the remainder of the original term of the ESA. . . .
>
> . . . .
>
> **Customer** [**7] **Acknowledgments**. Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP)]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In the absence of such information from the TDSP or

> ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.
>
> . . . .
>
> **Event of Default**. An Event of Default occurs upon:
>
>> a. failure of Customer to pay amounts due under the ESA within 5 business days of receipt of written notice of payment due;
>>
>> b. failure of either Party to perform a material term of this ESA[.]
>>
>> . . . .

In April 2007, Triton and StarTex extended their agreement, under modified terms, for another twelve months ("First Amendment"). Triton elected to replace the fixed-rate pricing schedule with the Market Clearing Price of Energy [*49] ("MCPE"). The First Amendment [**8] provided:

> 1. PRICE FOR ENERGY: The term for this Amendment shall commence upon the Customer's normal meter read during the month of May 2007, and continue through the Customer's normal meter read during the month of May 2008. Customer agrees to purchase electricity from STARTEX at a variable rate based on the Electric Reliability Council of Texas ("ERCOT")'s Balancing Energy price ("Contract Price") for the Congestion Zone in which the Customer's location resides. The price calculated by ERCOT in the market for Balancing Energy is referred to as the Market Clearing Price for Energy ("MCPE") in the ERCOT protocols. . . .
>
> 2. Except as herein changed and amended, the Agreement [ESA] shall remain in full force and effect as written. Any changes made in this Amendment that are disputed by Customer will be replaced by the original Agreement's terms and conditions.

In 2008, the parties again extended their agreement under the MCPE pricing terms for a term of thirty-six months ("Second Amendment"). The Second Amendment contained language identical to that in the First Amendment, except that the term of the Second Amendment commenced "upon the Customer's normal meter read during the month of May [**9] 2008 and continued through the Customer's normal meter read during the month of May 2011."

Triton objected to some of StarTex's billing practices. This eventually led to Triton's terminating its contract with StarTex in October 2008 and seeking electricity from a different retail electricity provider.

On September 14, 2009, StarTex filed suit against Triton alleging breach of contract, and, in the alternative, suit on a sworn account and quantum meruit. StarTex asserted that Triton owed it $319,094.11, consisting of unpaid utility service and contractual fees, interest, and liquidated damages. StarTex also sought attorney's fees under Civil Practice and Remedies Code chapter 38. StarTex attached to its petition an affidavit from Robert Verhage, its Collections Manager, copies of the ESA and First and Second Amendments, copies of its unpaid invoices, and a claim presentment letter from its counsel to Triton demanding payment of the unpaid amounts.

On October 12, 2009, Triton answered. Triton generally denied StarTex's allegations and asserted that the liquidated damages provision was invalid and unenforceable and that the attorney's fees sought were not reasonable and necessary.

Triton [**10] also asserted that

> the account on which [StarTex] sues . . . is not just and true, and all just and lawful offsets, payments, and credits have not been applied to [Triton's] account. [Triton] does not owe [StarTex] $319,094.11 in damages, because [StarTex] seeks to recover $197,323.95 in damages based on an invalid liquidated damages provision. Furthermore, based on the inaccuracies in [StarTex's] billing and estimates since 2007, [Triton] also challenge[s] [StarTex's] allegation that [it owes] $105,034.18 to [StarTex] for services rendered.

Attached to its answer, Triton provided the affidavit of Bill Bird, who averred:

> I am responsible for and have knowledge of Triton's business dealings with Plaintiff [StarTex]. Triton began doing business with Plaintiff in 2006. In the summer of 2007, Plaintiff began providing usage estimates to Triton, which reflected very high usage. Triton brought this issue to Plaintiff's attention, and the [*50] issue was not resolved. Triton contests the validity of Plaintiff's account, and denies that it owes $105,034.18 to Plaintiff for services rendered.

On January 20, 2010, StarTex moved for summary judgment on its breach of contract claim. StarTex argued that [**11] the parties had a valid contract and that the First and Second Amendments of the contract required Triton to pay for the electricity received under the MCPE pricing schedule through May 2011. Copies of the ESA and First and Second Amendments were attached as summary judgment evidence. StarTex stated that "[t]he MCPE is a variable rate plan wherein the price changes every fifteen (15) minutes to reflect the supply and demand for power in a particular market."

StarTex argued,

> Due to the numerous price changes involved in an MCPE contract, StarTex had to customize its purchase to fit the particular consumption needs of Triton. Every customer's consumption needs differ, and StarTex must carefully time its purchases so that it has sufficient power for the customer during their peak usage hours and so that it does not over-purchase during down times. This is referred to in the industry as the "shape" of a particular customer, and like a fingerprint, no two customers have an identical "shape." Triton's meters are located at commercial office buildings, and therefore, the "shape" of StarTex's purchase was designed to accommodate heavy usage from the hours of 8:00 a.m. to 5:00 p.m., with a slight [**12] decrease during the lunch hour, and minimal usage for the remaining hours of the day. Therefore, in order to service Triton's Contract, not only did StarTex commit to purchase sufficient power to cover the life of the Contract, but it also committed to make purchases every fifteen (15) minutes that mirror the kWh used by Triton during each fifteen (15) minute interval.

This argument was supported by the affidavit of Stephen Madden, the Senior Vice-President of Supply for StarTex.

StarTex asserted that it provided power to Triton throughout the term of the contract and submitted invoices to Triton "based on meter reads performed by CenterPoint Energy ("CenterPoint"), the Transmission and/or Distribution Services Provider ("TDSP") for the Houston area." StarTex further argued that:

> On several occasions, StarTex was required to generate [Triton's] monthly invoice using estimated reads based on historical usage. This was a result of CenterPoint being unable to gain access to [Triton's] meters to obtain the actual usage amounts. All such estimated reads were reconciled on subsequent invoices once CenterPoint obtained access to the meters, such that the final invoice reflected only actual usage. [**13] All estimated reads and subsequent reconciliations were detailed on [Triton's] monthly invoices.

StarTex provided invoices and the affidavit of Robert Verhage, the Director of Credit and Collections for StarTex, substantiating these arguments. Verhage averred that the invoices attached as summary judgment evidence were true and correct copies of Triton's monthly invoices. Verhage testified that, after Triton terminated the ESA on approximately October 19, 2008, "StarTex generated one final invoice that contained the final, outstanding balance that was reconciled to correct all estimated reads." The final invoice reflected that Triton owed $155,034.18, and Verhage averred that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing. Thus, StarTex argued that Triton breached the ESA [*51] when it failed to pay for $105,034.18 worth of electricity provided under the ESA and subsequent amendments.

StarTex also asserted that Triton breached the ESA when it terminated the ESA early. StarTex stated in its motion, and Madden averred in his affidavit, that when StarTex entered into the Second Amendment extending the terms of the ESA through May 2011, it contracted with the [**14] electricity producer "to purchase enough power to service the entire thirty-six (36) month term of the Second Amendment and the purchases were tailored

to fit Triton's particular 'shape'." Thus, the ESA contained a liquidated damages clause for early termination of the contract which entitled StarTex to $197,323.95 in liquidated damages after Triton unilaterally terminated the contract on October 10, 2008, approximately thirty-one months before the contract term was set to expire in May 2011.

StarTex argued, based on Madden's statements in his affidavit, that this early termination clause was a valid liquidated damages provision because, "[i]n the case of an MCPE contract, it is impossible to calculate the total damages that stem from an early termination until the term of the breached contract has expired and StarTex has been able to complete its attempts at mitigating the damages." StarTex argued that it "must continue to purchase Triton's power from its supplier until May of 2011" and that it was required to "purchase this power in Triton's particular 'shape'" even though StarTex did not have another customer to sell it to because StarTex "would have to find a new customer who not [**15] only wants an MCPE contract, but has the exact same term and volume requirements and 'shape' as Triton." StarTex thus calculated its liquidated damages as $197,323.25, based on the sum of Triton's three highest monthly bills because the mark-to-market losses were incapable of calculation until May 2011.

Finally, StarTex argued that it was entitled to attorney's fees on its breach of contract claim. It argued that, under its fee agreement with its counsel, it would incur attorney's fees "in an amount equal to twenty-five percent (25%) of all amounts recovered from [Triton]," or $75,589.36, and that this amount was reasonable and necessary. The summary judgment motion was accompanied by the affidavit of Rodney Drinnon, counsel for StarTex, who averred to the specific services provided by his firm and stated that the services described were reasonable and necessary and that "twenty-five percent (25%) is a reasonable contingency fee for the services provided."

On January 28, 2010, Triton amended its answer, adding claims that StarTex "materially breached the contract, which was modified by agreement," that Triton "complied with the terms of the modified contract," that Triton was "discharged [**16] from performing under the contract after [StarTex] materially breached same," and that StarTex failed "to mitigate its damages as required under applicable law, limitation of warranty, limitation of liability, laches, and waiver." Triton also sought a continuance of the summary judgment hearing, which the trial court granted.

On April 5, 2010, Triton responded to StarTex's summary judgment motion. Triton did not contest StarTex's statements that the ESA and subsequent amendments were valid contracts. However, Triton asserted that StarTex "made several promises to [Triton] and [orally] modified the terms of the parties' agreements." Triton argued that Michael Gary, Triton's property manager, "had several discussions with John Bejger, a representative of StarTex, relating to StarTex's estimated usage and Triton's disputes over [*52] the StarTex invoices." As supported by Gary's affidavit in Triton's summary judgment evidence, Gary represented to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing. Gary also averred that Triton had "done everything in its power" [**17] to give CenterPoint access to the meters and that Triton would not continue the business relationship with StarTex "if the estimations and errors in billing continued on a month to month basis." Gary further averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Triton's response asserted that Gary's affidavit about his discussions with Bejger raised a disputed issue of material fact as to whether there was a meeting of the minds in reaching a valid modification.

Triton also argued that it was excused from performing under the ESA based on StarTex's material breach of the agreements "when it failed to provide [Triton] with accurate and correct billings for the electricity that it actually delivered." Triton's motion referenced the invoices sent by StarTex and provided details regarding which specific invoices were based on estimated usage, including several instances [**18] in which it was invoiced based on estimated usage in consecutive months.

Triton presented Gary's affidavit, averring that Gary first contacted StarTex to resolve the billing problems during the original term of the ESA and that StarTex responded by saying that CenterPoint could not access and read the electricity meters in Triton's buildings. Triton included in its summary judgment evidence various e-mails between Gary and StarTex in which Gary raised questions and disputes over the amounts billed in the invoices and StarTex provided information reconciling its charges. Gary's e-mails did not contain any specific calculations or amounts with regard to the alleged errors or inaccuracies. StarTex's e-mail reflects that it sent Triton a spreadsheet demonstrating how StarTex reconciled the bills and comparing Triton's usage and rates. Triton also included an e-mail from CenterPoint to StarTex, received in response to StarTex's inquiry regarding the difficulty of

getting actual meter readings. The CenterPoint representative stated,

> I disagree that CenterPoint is at fault for the estimations. Triton does not provide us unencumbered, permanent, ongoing access to our meters. The estimation reasons [**19] are specific to each address, but on some accounts Triton has their meters locked inside a mechanical room to which we're supposed to go track down an employee and a key, apparently unsuccessfully at times, perhaps because the right employee can't be found. On other accounts, we're supposed to enter through a locked gate where the gate code we have on record has been changed. Triton has a responsibility to keep us updated if access arrangements change.

Triton's summary judgment evidence also included the affidavit of Jim Phillips, the Vice President of IEA Engineering, an energy engineering company. Phillips stated that he reviewed StarTex's billing invoices and Triton's historical electricity usage. He averred that he found

> various and repeated errors and irregularities in the billings for the Triton [*53] buildings. These errors include, without limitation:
>
> o several errors in math (multiplication of energy consumption by the cost of energy);
>
> o excessive estimated energy readings;
>
> o estimated energy readings at one site (meter) while the next site (meter) was actually read in the same month, again repeatedly;
>
> o three meters had a monthly load factor greater than 100%, which is an impossibility [**20] (LF is the maximum demand used over hours of the month--over 100% is more hours than in that month);
>
> o several examples where the ending energy reading of one month did not match the beginning reading of the next month;
>
> o energy costs are not consistent across meters in the same month;
>
> o multiple corrections from earlier months' estimated energy reading make analysis difficult; and
>
> o it is improbable that back to back months would have the same exact energy consumption readings and that demand would remain the same for several months in a row.

Phillips provided his opinion about other errors and problems with StarTex's billing practices, without providing specific contested amounts, and concluded:

> In summary, the total value of the errors I analyzed came to almost $97,000.00. This is not an inclusive value and with additional time to review the invoices and billing, this amount should significantly increase. The numbers and values I used assume that StarTex's numbers were correct; however, I found that some of these numbers and values were not correct when compared to each other. To this amount and the other uncalculated errors, taxes must be added since they are a percentage of the energy [**21] and [TDSP] charges. The error value is therefore compounded.

Thus, Triton argued that it "created a fact issue on each element of [its] affirmative defense" of prior material breach and that it raised a fact issue regarding whether StarTex conclusively proved the proper amount of damages.

Triton further responded to StarTex's summary judgment motion by arguing that StarTex violated the ESA "by estimating Triton's electricity usage for no apparent justifiable reasons" and by estimating Triton's usage over consecutive months.

Triton also argued that summary judgment on the liquidated damages issue was not proper "because (1) a reasonable basis for estimating just compensation in an event of default does exist under the circumstances, and (2) there are factual issues that must be resolved before the legal question of liquidated damages is determined." Finally, Triton argued that StarTex was not entitled to recover attorney's fees because it "made an excessive demand on [Triton] before filing its lawsuit."

Triton also objected to Drinnon's affidavit, arguing that it "wholly fails to describe the time that was required

and expended in prosecuting [StarTex's] claim, the hourly rate usually charged [**22] by [StarTex's] counsel, the novelty and difficulty of the questions involved in this lawsuit, and the skill required to perform the legal service properly under the circumstances." Triton also objected because Drinnon's affidavit was not supported by any documents other than the engagement letter.

On April 13, 2010, StarTex replied to Triton's response. StarTex presented the affidavit of John Bejger, contesting Gary's representations that the parties entered [*54] into an oral modification of their agreement. StarTex also argued that, "because the TDSP [CenterPoint], not StarTex, is solely authorized by the State of Texas to provide actual and estimated readings[,] Bejger would not have made" any representations regarding discontinuing the use of estimated meter readings in the monthly invoices. Finally, StarTex argued that the parties entered into the Second Amendment after the alleged oral representations and thus Triton's argument that Texas law allows modification of a written agreement by later oral representations was inapplicable.

StarTex also argued that it did not breach the ESA. Specifically, StarTex argued that Phillips, Triton's energy engineer expert, did not specifically identify [**23] any breach by StarTex. StarTex argued that it was permitted by the ESA and Texas law to bill Triton based on estimated usage; that, under the terms of the ESA, it is irrelevant why CenterPoint provided Triton's estimated usage rather than actual usage; and that Triton did not follow the contractual provisions requiring it to pay undisputed portions of the invoice and to set forth in detail "calculations with respect to any errors or inaccuracies claims."

StarTex again argued that the liquidated damages provision was enforceable. Finally, StarTex argued that its original demand to Triton was not excessive, and thus that ground did not preclude it from recovering attorney's fees.

On April 16, 2010, following the summary judgment hearing, Triton filed its "Supplemental Response" to StarTex's summary judgment motion. StarTex objected to the supplemental response and asked the trial court to strike it from consideration because it was filed outside the time permitted by *Texas Rule of Civil Procedure 166a* and without leave of the trial court. Triton also objected to the affidavit of John Bejger, attached to StarTex's reply to Triton's response.

On April 26, 2010, the trial court granted StarTex's [**24] motion. The trial court's order stated that it considered "the Motion, the response, the pleadings, the affidavits, other evidence on file with the Court, and arguments of counsel." The trial court awarded StarTex $105,034.18 "as actual damages for [Triton's] failure to pay for electricity provided by [StarTex]." The trial court

awarded StarTex $197,323.25 "as liquidated damages for [Triton's] early termination of the [ESA]." Finally, the trial court awarded StarTex $12,000 as reasonable and necessary attorney's fees, as well as additional attorney's fees conditioned on an unsuccessful appeal by Triton.

On May 12, 2010, StarTex moved for a turnover order.

On May 25, 2010, Triton moved for reconsideration or a new trial. Triton supported this motion with new affidavits from Jim Phillips, Michael Gary, and Montague Morgan, attorney for Triton, who attempted to authenticate documents attached to Phillips' affidavit. StarTex objected to and moved to strike these affidavits on the ground that Triton did not timely file them and on the ground that Gary's affidavit was not based on his personal knowledge and was made in bad faith. The trial court granted StarTex's motion and struck the affidavits [**25] of Phillips, Gary, and Morgan that were attached to Triton's motion for new trial.[1]

> 1  StarTex moved this Court to strike the affidavits Triton submitted with its motion for reconsideration or new trial from the appellate record. Those affidavits were part of Triton's motion, and "any filing that a party designates to have included in the record" is a proper part of the clerk's record. *TEX. R. APP. P. 34.5(a)(13)*. Therefore, we DENY StarTex's motion. We note, however, that the affidavits attached to Triton's motion for reconsideration or new trial are not relevant to our review of the trial court's summary judgment. *See TEX. R. CIV. P. 166a(c)*; *Marek v. Tomoco Equip. Co., 738 S.W.2d 710, 712 (Tex. App.--Houston [14th Dist] 1987, no writ)* ("The trial court considers the record only as it properly appears when the motion for summary judgment is heard.").

[*55] On June 21, 2010, the trial court denied Triton's motion for reconsideration/new trial and stated that it did not consider the stricken affidavits. On July 6, 2010, the trial court signed a modified order stating:

> On this day, after hearing [Triton's] Motion for Reconsideration/New Trial ("Motion"), the Court, relying solely [on] the summary [**26] judgment evidence on file, arguments of counsel and without considering the stricken, untimely supplement filed by [Triton], is of the opinion that [Triton's] Motion should be, in all things, DENIED.
>
> It is therefore ORDERED, ADJUDGED and DECREED that [Triton's] Motion is denied and that the Court's order

> of April 26, 2010, granting Plaintiff's Traditional Motion for Summary Judgment is hereby, in all things, REAFFIRMED.

On July 28, 2010, the trial court signed an order granting StarTex's motion for a turnover order and appointing a receiver. On September 9, 2010, the trial court signed another order requiring the receiver to pay to StarTex as the judgment creditor the balance of the rents collected during his receivership and any rents collected in the future until the full amount of the judgment is paid.

**Summary Judgment**

**A. Standard of Review**

We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005)*. The movant must establish that no material fact issue exists and that it is entitled to judgment as a matter of law. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000)*. Thus, for a plaintiff to prevail on [**27] its motion for summary judgment, it must show that it is entitled to prevail on each element of its cause of action. *Hourani v. Katzen, 305 S.W.3d 239, 248 (Tex. App.--Houston [1st Dist.] 2009, pet. denied)* (citing *MMP, Ltd. v. Jones, 710 S.W.2d 59, 60 (Tex. 1986))*. Only if the movant conclusively establishes its cause of action does the burden shift to the nonmovant to respond to the summary judgment. *Willrich, 28 S.W.3d at 23*. When reviewing a motion for summary judgment, we take the nonmovant's evidence as true, indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in favor of the nonmovant. *Id*.

In its first through seventh issues, Triton argues that the trial court erred in granting summary judgment in favor of StarTex on its breach of contract claim. The trial court awarded StarTex summary judgment on both grounds of StarTex's breach of contract claim against Triton: that Triton breached (1) by failing to pay the invoices for electricity provided and (2) by wrongfully terminating the contract early.

**B. Summary Judgment on StarTex's Breach of Contract Claim for Triton's Failure to Pay for Invoiced Electricity**

In its first and second issues, Triton argues [**28] that the trial court erred in granting summary judgment because it misinterpreted and misapplied the law applicable to StarTex's breach of contract claim and to Triton's defenses. In its third issue, Triton argues that StarTex's summary [*56] judgment evidence did not establish that it was entitled to judgment as a matter of law.

To prevail on a breach of contract claim, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; and (4) the plaintiff's damages as a result of the breach. *Prime Prod., Inc. v. S.S.I. Plastics, Inc., 97 S.W.3d 631, 636 (Tex. App.--Houston [1st Dist.] 2002, pet. denied)*. The interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003)*. Thus, StarTex had to conclusively establish that a valid contract existed between it and Triton, that it performed under that contract, that Triton breached the contract, and that StarTex suffered damages as a result of Triton's breach.

***1. Evidence Establishing Elements of StarTex's Claim***

Attached to its summary judgment [**29] motion, StarTex included copies of the ESA and First and Second Amendments. Neither party disputes that these documents constitute a valid contract between them.

StarTex also provided summary judgment evidence, including multiple invoices and the affidavits of two corporate representatives, that it provided electricity to Triton. Triton does not dispute that StarTex provided it with electricity up until Triton terminated the ESA.

StarTex provided invoices and affidavits demonstrating that Triton owed $105,034.18 under the unpaid invoices. The account summary on the final invoice showed that Triton owed $155,034.18 as of November 15, 2008. Verhage's affidavit testimony provided that Triton subsequently made $50,000.00 in payments, leaving $105,034.18 due and owing.

We conclude that StarTex conclusively established its right to recover $105,034.18 from Triton for Triton's breach of contract by failing to pay the invoices. Thus, the burden shifted to Triton to respond to the motion for summary judgment and present evidence raising a fact issue on at least one of the elements of StarTex's claim or to present a valid defense. *See Willrich, 28 S.W.3d at 23*.

***2. Triton's Response***

In its fourth [**30] issue, Triton argues that it presented summary judgment evidence controverting StarTex's evidence and raising genuine issues of material fact as to one or more elements of StarTex's breach of contract claim. Triton does not dispute that StarTex provided electricity to its buildings throughout the term of the contract up until Triton terminated the agreement. Neither does Triton dispute that it did not pay amounts invoiced by StarTex for the electricity provided. However, Triton disputes (1) the terms of the contract as presented by StarTex, alleging that the parties orally modified their

agreement; (2) StarTex's satisfactory performance under the contract and its own excuse from performance by StarTex's prior material breach; (3) the sufficiency of StarTex's evidence to support the amount of damages awarded by the trial court; and (4) the trial court's implicit determination that it was not entitled to any offsets or credits.

***(a) The alleged oral modification of the contract***

Triton argues that, according to Gary's affidavit testimony, the agreement between the parties was orally modified by representations Bejger made prior to execution of the Second Amendment that invoices based on [**31] estimated usage would no longer be used. Gary testified that he [*57] represented to Bejger that the practice of estimating electricity usage for several consecutive months was causing damage to Triton because Triton could not bill its tenants based on estimated billing and that Triton would not continue the business relationship with StarTex if it continued to use estimations and make errors in the monthly invoices. Gary averred that Bejger represented that the errors would be corrected, that StarTex was attempting to resolve the allegations that CenterPoint did not have access to Triton's meters, and "that StarTex's previous practice of estimating usage of consecutive months would not continue." Gary stated that Triton entered into the Second Amendment based on these representations by Bejger. Thus, on appeal, Triton argues that it agreed to the Second Amendment "only after receiving assurances that the billing errors and repeated use of estimated billing would be addressed and corrected by [StarTex]."

A written agreement not required by law to be in writing may be modified by a later oral agreement. *Double Diamond, Inc. v. Hilco Elec. Coop., Inc., 127 S.W.3d 260, 267 (Tex. App.--Waco 2003, no pet.)*; [**32] *Mar-Lan Indus., Inc. v. Nelson, 635 S.W.2d 853, 855 (Tex. App.--El Paso 1982, no writ)*. However, this principle does not apply here. The statements Gary related in his affidavit as being made by Bejger and orally modifying the contract were made before the parties entered into the Second Amendment. Thus, the statements Triton asserts as oral modifications are, at most, extraneous evidence of negotiations prior to entering a written contract, which constitutes parol evidence.[2]

2 StarTex also presented Bejger's affidavit testimony that he did not make the representations alleged by Gary. Triton objected to this evidence in the trial court, but it is not clear whether Triton is arguing on appeal that Bejger's affidavit should not be considered. However, it is unnecessary for us to consider Bejger's testimony as the terms of the contract are established as a matter of law.

"An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden, 266 S.W.3d 447, 450 (Tex. 2008)*. Whether a contract is ambiguous is a question [**33] of law. *Id. at 451*. We may not use extrinsic evidence to contradict or vary the meaning of the explicit language of a written contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 521 (Tex. 1995)*.

Here, the Second Amendment expressly provided that, except for the extension of the term of the contract and the pricing scheme outlined in paragraph one, the ESA "shall remain in full force and effect as written." This includes the "Customer Acknowledgments" section of the ESA, which expressly stated that StarTex's "ability to invoice Customer is dependent on the [TDSP's] ability to furnish . . . meter readings" and that StarTex "may invoice Customer based on estimated meter reading." As matter of law, we conclude that the Second Amendment is not ambiguous. It extended the terms of the ESA, including the express provision allowing StarTex to invoice Triton based on estimated meter readings, to the new 36-month term.

Triton failed to establish that the parties orally modified the contract.

***(b) Triton's entitlement to be excused from performing under the contract***

Triton also argues it was excused from performance under the ESA and the subsequent [*58] amendments by StarTex's prior [**34] material breach.

"[T]he contention that a party to a contract is excused from performance because of a prior material breach by the other contracting party is an affirmative defense. . . ." *See City of The Colony v. N. Tex. Mun. Water Dist., 272 S.W.3d 699, 746 (Tex. App.--Fort Worth 2008, pet. dism'd)*. The burden of proving an affirmative defense is on the party asserting it. *See Am. Petrofina, Inc. v. Allen, 887 S.W.2d 829, 830 (Tex. 1994)*. Thus, Triton had to present evidence raising a fact question on each element of its defense to defeat StarTex's motion for summary judgment. *See id.* (holding, where "response was in the nature of an affirmative defense," that party asserting defense "could only have defeated summary judgment with sufficient evidence to raise a fact question for each of the elements" of defense).

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 196 (Tex. 2004)*. A breach of contract occurs when a party fails to perform an

act that it has expressly or impliedly promised [**35] to perform. *Henry v. Masson, 333 S.W.3d 825, 835 (Tex. App.--Houston [1st Dist.] 2010, no pet.)*. The materiality of a breach--the question of whether a party's breach of a contract will render the contract unenforceable--generally presents a dispute for resolution by the trier of fact. *Id*. Here, however, because we determine that StarTex's actions did not breach the contract as a matter of law, we need not consider whether Triton raised a fact issue on materiality.

To raise a material fact issue on every element of its affirmative defense, Triton had to raise a fact question on StarTex's prior breach of contract. Triton argues that StarTex's use of estimated billing was not proper under the contract because StarTex did not establish that the conditions precedent to using estimated billing had occurred because StarTex did not prove that CenterPoint was unable to access Triton's meters.

The ESA provides:

> **Customer Acknowledgments**. Customer acknowledges that [StarTex's] ability to invoice Customer is dependent on the [transmission and distribution provider (TDSP)]'s or ERCOT's ability to furnish [StarTex] all necessary information including meter readings or recorded data, as applicable. In [**36] the absence of such information from the TDSP or ERCOT, [StarTex] may invoice Customer based on estimated meter reading according to the Usage Profile. As soon as practical, and after receipt of Customer's Energy Consumption and settlement charges from the TDSP and/or ERCOT, [StarTex] will reconcile on the next invoice any difference(s) between estimated and actual consumption and settlement charges.

Thus, the plain, unambiguous language of the ESA provided that StarTex could invoice Triton based on estimated usage in the absence of actual meter readings or other necessary information from CenterPoint, the TDSP. This contract provision is consistent with the legislatively mandated division of business activities in the electric utility market. *See* TEX. UTIL. CODE ANN. *§ 39.051(b)* (providing that electricity utilities must separate their business activities into three units--power generation company, retail electric provider, and transmission and distribution utility); *Tex. Indus. Energy Consumers, 324 S.W.3d at 97-98* [*59] (observing that transmission and distribution service providers are responsible for providing metering services).

StarTex provided the affidavit of Robert Verhage, who averred [**37] that, on several occasions, it had to rely on estimated usage because CenterPoint did not provide Triton's actual meter usage. The summary judgment evidence also contained an e-mail from a CenterPoint representative stating that Triton was to blame for CenterPoint's failure to obtain actual meter readings. This e-mail shows that CenterPoint acknowledged that it provided StarTex with estimated usage rather than actual readings on several occasions and that StarTex was not at fault for CenterPoint's inability to access and read the meters.

The ESA expressly permits invoicing based on estimated usage. Triton did not present any summary judgment evidence that StarTex used estimates in its invoices on occasions when CenterPoint had provided actual meter readings. Thus, this argument is without merit.

Triton also argues that, even if StarTex was permitted to use estimates in invoicing Triton for its electricity usage, StarTex was required to reconcile any charges based on estimated usage on the next bill. However, the plain language of the contract provides that StarTex must reconcile the estimated usage with the actual usage "[a]s soon as practical, and after receipt of Customer's Energy [**38] Consumption and settlement charges from the TDSP." Triton's argument that the actual usage was required to be reconciled on the next month's bill is not supported by the plain language of the contract.

Therefore, we conclude that Triton has not raised a fact issue on any element of its claim that StarTex committed a prior material breach of the contract.

***(c) StarTex's alleged failure to prove damages***

In its fifth, sixth, and seventh issues, Triton argues that the invoices relied on by StarTex in establishing the amount of damages were inadequate estimates and were properly objected to and disputed by Triton. Thus, Triton argues that StarTex failed to prove its damages as a matter of law.

StarTex acknowledges that it used estimates in some of its bills, and we have already concluded that it was permitted to do so by the plain language of the contract. Furthermore, StarTex presented the actual invoices it sent Triton and Verhage's affidavit stating that the final invoice relied on in calculating the amount due and owing "contained the final, outstanding balance that was reconciled to correct all estimated reads."

Triton presented Gary's affidavit testimony that he disputed several invoices [**39] and objected to numerous charges. It also presented e-mail correspondence between Gary, Triton's property manager, and StarTex, in

which Gary made general objections to several invoices without providing specific amounts or portions of the invoices that he believed were inaccurate. Triton also presented an expert affidavit pointing out general complaints about the invoices without specifying particular amounts in controversy.

Triton argues that StarTex was legally obligated to address Triton's objections to StarTex's billing practices before collecting on the unpaid invoices and that this evidence raises a fact question regarding the amount Triton owed to StarTex.

The contract provides a method for disputing charges on invoices. The ESA provides that the "Customer must provide to [StarTex] written notice setting forth in particular detail any disputed [*60] amount, including the calculations with respect to any errors or inaccuracies claimed." The record contains no evidence that Triton complied with this procedure. Neither Gary's and Phillips' affidavit testimony nor the e-mails sent to StarTex contain specific amounts or calculations. Triton did not produce any evidence that it provided [**40] StarTex with written notice articulating the particular disputed amount or calculations regarding claimed inaccuracies.

Thus, Triton failed to present evidence raising a fact issue on the accuracy of the invoices StarTex used to support its claim for the unpaid amounts for electricity usage.

***(d) Triton's entitlement to offsets and credits***

Triton also argues that it was entitled to $97,000 in offsets and credits, based on Phillips' affidavit.

"The right of offset is an affirmative defense." *Brown v. Am. Transfer & Storage Co., 601 S.W.2d 931, 936 (Tex. 1980)*. Triton must show its entitlement to an offset and the amount. *See id*. (holding that party asserting right of offset bears burden of pleading offset and proving facts necessary to support it). Thus, Triton must present evidence raising a fact question on its offset defense to defeat StarTex's motion for summary judgment. *See Am. Petrofina, 887 S.W.2d at 830*.

Triton presented Phillips' affidavit, in which Phillips, as an electricity engineer, stated that the invoices contained errors entitling Triton to offsets and credits worth at least $97,000. However, as we have already stated, Triton did not provide a proper challenge to any particular [**41] charge or invoice. Phillip's conclusory statements in his affidavit, by themselves, do not support Triton's claim for offsets and credits. *See TEX. R. CIV. P. 166a(f)* (providing that supporting affidavit must set forth facts that would be admissible in evidence); *Wadewitz v. Montgomery, 951 S.W.2d 464, 466 (Tex. 1997)* (holding that expert's testimony will support summary judgment only if it is "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted" and that conclusory statements by an expert are insufficient to support or defeat summary judgment).

Thus, we conclude that Triton failed to raise a fact issue on any element of StarTex's breach of contract claim against Triton for failure to pay the invoices. The trial court did not err in determining that Triton was entitled to summary judgment on this issue as a matter of law.

**C. Summary Judgment on StarTex's Breach of Contract Claim for Triton's Early Termination of the Contract**

In parts of its first through seventh issues, Triton also argues that the trial court erred in granting summary judgment on StarTex's breach of contract claim for Triton's wrongful [**42] early termination of the agreement.

***1. Evidence Establishing Elements of StarTex's Claim***

As we have discussed, StarTex established the existence of a valid contract between itself and Triton, and it established that it performed under that contract. StarTex provided a copy of the Second Amendment, which provided that the parties agreed to extend the ESA through May 2011.

The ESA contained the following early termination provision:

> **Early Termination Fee**. In the event that Customer terminates this agreement [*61] or Customer defaults as described [in the ESA], then an Early Termination Fee will be assessed. The Early Termination Fee shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs.

StarTex presented Verhage's affidavit testimony that Triton terminated the agreement on October 10, 2008, approximately thirty-one months earlier than the Second Amendment's contractual termination date of May 2011, and Triton's final invoice reflecting a termination date in the middle of October 2008.

StarTex likewise provided Madden's affidavit testimony that StarTex was harmed by Triton's early termination. Madden averred that when StarTex entered into the [**43] Second Amendment extending the terms of the ESA through May 2011, it contracted with its electricity producer "to purchase enough power to service the entire

thirty-six (36) month term of the Second Amendment and the purchases were tailored to fit Triton's particular 'shape'." After Triton unilaterally terminated the contract on October 10, 2008, StarTex was still obligated to continue to purchase power from its supplier through May 2011 "in Triton's particular 'shape,'" even though StarTex no longer had a customer to whom to sell it. Madden testified that it was almost impossible to sell that electricity to another customer because StarTex "would have to find a new customer who not only wants an MCPE contract, but has the exact same term and volume requirements and 'shape' as Triton." According to Madden, these particular characteristics of a MCPE payment arrangement made it very difficult to calculate the mark-to-market losses because StarTex had no way of knowing what the exact cost of the future electricity would be. StarTex thus calculated its liquidated damages as $197,323.25 based on the sum of Triton's three highest monthly bills.

***2. Triton's response***

Triton does not contest [**44] that it terminated the contract in October 2008, approximately thirty-one months before the termination date provided in the Second Amendment. Triton again argues that its early termination was excused by StarTex's prior breach by billing based on estimated usage. We have already concluded that StarTex did not breach the ESA when it invoiced Triton based on its estimated usage.

Triton also raises several issues specific to the early termination clause and the trial court's award of liquidated damages. In its ninth issue, Triton argues that the early termination fee clause is unenforceable as an impermissible penalty. Triton argues in its tenth and eleventh issues that even if the early termination fee clause is enforceable as a matter of law, StarTex did not present summary judgment evidence establishing the amount of the early termination fee in compliance with the contract's terms.

***(a) Enforceability of early termination clause***

Triton argues that the early termination fee clause constitutes an impermissible penalty. Triton argues that it is impermissible both under the common law standard set out in *Phillips v. Phillips, 820 S.W.2d 785 (Tex. 1991)*, and under the Texas Business and Commerce [**45] Code.

Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide. *Dorsett, 164 S.W.3d at 664* (citing *Phillips, 820 S.W.2d at 788*). Valid liquidated damages clauses "fix in advance the compensation to a party accruing from the failure to [*62] perform specified contractual obligations." *Dorsett, 164 S.W.3d at 664*. To enforce a liquidated damages clause, the court must find that (1) the harm caused by the breach is incapable or difficult of estimation and (2) the amount of liquidated damages called for is a reasonable forecast of just compensation. *Phillips, 820 S.W.2d at 788*; *GPA Holding, Inc. v. Baylor Health Care Sys., 344 S.W.3d 467, 475 (Tex. App.--Dallas 2011, pet. denied)*. The party asserting that the provision is unenforceable bears the burden of proof. *GPA Holding, 344 S.W.3d at 475*.

Triton argues that the harm caused by its breach is not incapable or difficult of estimation. Triton argues that StarTex "could determine the amount of electricity that would have been purchased by Triton but for the purported breach . . . and determine what the electricity was sold for to an alternate customer versus [**46] what it would have been sold for to Triton." However, StarTex's Senior Vice-President of Supply, Stephen Madden, provided affidavit testimony that it is almost impossible to know what the cost of Triton's future energy use would have been because of the constantly fluctuating prices involved in the MCPE pricing structure. He averred that the price of electricity changes as often as every fifteen minutes, that StarTex committed to buy electricity in fifteen minute increments to meet its obligation to provide electricity conforming to Triton's unique "shape" of energy consumption, and thus it would be very difficult to find another consumer to use that energy. Accordingly, it was not possible to determine, at the time of Triton's early termination, the cost of the energy that would have been purchased by Triton but for the breach, and it was also very difficult for StarTex to predict whether it would find another consumer to purchase the electricity according to Triton's unique usage pattern, and if so, how much such a consumer would pay.

Triton did not present any evidence regarding the parties' ability to estimate actual damages when the contract was formed, and it did not controvert [**47] Madden's description of the pricing model applicable to the ESA and Second Amendment. Thus, we conclude that it was impossible to determine the actual harm that would be caused by early termination. *See Phillips, 820 S.W.2d at 788*.

Triton also appears to argue that the amount of the liquidated damages was not a reasonable forecast of StarTex's actual damages because it was unreasonably large. The ESA provided that the early termination fee "shall be equal to the greater of a) the three months highest bills for Customer or b) any mark to market costs." In this instance, due to the length of the term remaining on the terminated contract and the uncertainties of pricing, the "mark to market costs" could not be calculated. Thus, Madden testified that StarTex calculated its damages based on Triton's three highest monthly bills, which totaled $197,323.25.

Triton did not present any evidence regarding what a reasonable forecast of damages would have been at the time the contract was formed, nor did it present any evidence of StarTex's actual damages. Thus, we conclude that, when viewed as of the time the contract was executed, the ESA's method for calculating the amount of liquidated damages [**48] provided a reasonable forecast of just compensation. *See id*.

This same reasoning also demonstrates that Triton failed to show that the early termination fee violated *Business and Commerce Code section 2.718*. *Section 2.718* provides that a liquidated damages clause is unenforceable if (1) the [*63] agreed amount is unreasonable in light of the anticipated or actual harm caused by breach, (2) the proof of actual harm is not difficult, (3) obtaining an adequate remedy for breach is not inconvenient or not feasible, or (4) the agreed amount is unreasonably large. *See* TEX. BUS.& COM. CODE ANN. *§ 2.718* (Vernon 2009). As we have already discussed, the proof of actual harm is difficult, and obtaining an adequate remedy for breach is not feasible because StarTex could not have calculated the future cost of the electricity, nor could it predict the extent to which it could mitigate its damages. And, the agreed amount was not unreasonably large or unreasonable in light of the anticipated or actual harm. StarTex was obligated to buy thirty-one months' worth of electricity that it had no ability to resell. In that light, liquidated damages calculated from Triton's three highest monthly invoices are not [**49] unreasonable.

Triton failed to raise a fact question on its claim that the early termination fee clause constituted an impermissible penalty.

***(b) StarTex's proof of liquidated damages***

Triton also argues that StarTex failed to prove the amount of liquidated damages permitted under the ESA. Several of Triton's arguments on this issue again challenge the accuracy of StarTex's billing and StarTex's use of estimates in its invoices. However, we have already determined that Triton has failed to raise a fact question regarding the accuracy or propriety of StarTex's invoices. Thus, we do not address those arguments again.

Triton argues that StarTex failed to identify which three invoices it relied on in calculating the liquidated damages. It also argues that no three invoices from the term of the Second Amendment add up to $197,323.95, and, thus, StarTex improperly used invoices dated prior to the execution of the Second Amendment to calculate the early termination fee. However, the early termination fee provision did not limit the time period from which the three highest bills could be taken, and Triton failed to present these arguments to the trial court. *See* TEX. R. CIV. *P. 166a(c)* ("Issues [**50] not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal."); *City of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979)* (holding that nonmovant could not raise for first time on appeal additional fact issue that was not raised in its response).

We hold that the trial court did not err in granting summary judgment and awarding StarTex $105,034.18 on its claim that Triton failed to pay for electricity provided under the ESA and $197,323.25 as liquidated damages on its claim for Triton's early termination of the ESA as extended by the Second Amdendment.

We overrule Triton's first through seventh, ninth, tenth, and eleventh issues.

**Attorney's Fees**

In its twelfth issue, Triton argues that the trial court erred in awarding StarTex $12,000 in attorney's fees because that amount was not properly proven and was excessive and unreasonable. Triton also argues that StarTex was not entitled to recover attorney's fees because it made an excessive demand prior to filing this lawsuit.

**A. Standard of Review**

The prevailing party in a breach of contract suit is entitled to attorney's fees. TEX. CIV. PRAC.& REM. CODE ANN. *§ 38.001(8)* [**51] (Vernon 2008); *Haden v.* [*64] *David J. Sacks, P.C., 332 S.W.3d 503, 510 (Tex. App.--Houston [1st Dist.] 2009, pet. denied)*. An award of attorney's fees must be supported by evidence that the fees are reasonable and necessary. *See Stewart Title Guar. Co. v Sterling, 822 S.W.2d 1, 10 (Tex. 1991)*. A trial court determines the reasonableness of an attorney's fees award by considering the factors enumerated in *Arthur Andersen & Co. v. Perry Equipment Corp. 945 S.W.2d 812, 818 (Tex. 1997)* (holding that evidence of contingency fee agreement alone does not support award of reasonable and necessary attorney's fees and that trial court must still consider other factors). The reasonableness of attorney's fees is generally a fact issue. *Haden, 332 S.W.3d at 512*. We review attorney's fees awards for an abuse of discretion. *Ridge Oil Co., Inc. v. Guinn Invs., Inc., 148 S.W.3d 143, 163 (Tex. 2004)*.

An attorney's affidavit constitutes expert testimony that will support an award of attorney's fees in a summary judgment proceeding. *Haden, 332 S.W.3d at 513*; *see* TEX. R. CIV. P. *166a(c)*; *Gensco, Inc. v. Transformacions Metalurgicias Especiales, S.A., 666 S.W.2d 549, 554 (Tex. App.--Houston [14th Dist.] 1984, writ dism'd)*. [**52] *Civil Practice and Remedies Code section 38.003* provides that "usual and customary attorney's fees" are presumed to be reasonable. TEX. CIV. PRAC. & REM. CODE ANN. *§ 38.003* (Vernon 2008). Although the statutory

presumption that usual and customary fees are reasonable is rebuttable, *see id*., once triggered by an attorney's supporting affidavit, the presumption of reasonableness remains in effect when there is no evidence submitted to challenge the affidavit proof of the summary judgment movant. *Haden, 332 S.W.3d at 513*.

**B. Analysis**

In its motion for summary judgment, StarTex sought $75,589.36 in attorney's fees, and its attorney, Rodney Drinnon, submitted an affidavit in support of an award for attorney's fees. Drinnon averred that the contingency fee agreement awarding twenty-five percent of damages recovered from any successful trial award constituted usual and customary attorney's fees; he provided a list of specific tasks he and his law practice undertook during the course of representing StarTex; and he stated that his fee was supported by several, listed *Arthur Andersen* factors. Drinnon's description was "'clear, positive, and direct, otherwise credible' and [was] neither internally [**53] inconsistent nor [contradictory]" and could have been readily controverted by Triton. *See id. at 514*. Based on Drinnon's affidavit, submitted as evidence in support of the request for attorney's fees, StarTex was entitled to the statutory presumption that its attorney's usual and customary fees were reasonable. *See TEX. CIV. PRAC. & REM. CODE ANN. § 38.003*; *see also Haden, 332 S.W.3d at 514* (holding attorney's affidavit sufficient to warrant summary judgment when it (1) contained recitals establishing attorney's competency to swear to facts stated and other requirements of *Rule of Civil Procedure 166a(f)*, (2) described work encompassed by the fees sought, and (3) specified factors that formed basis of his statement that amount claimed was reasonable and necessary, tracking seven of eight *Arthur Andersen* factors).

Triton filed a written objection to Drinnon's affidavit, arguing that it failed to describe the time required to prosecute StarTex's claim, to provide counsel's hourly rate, and to discuss two of the *Arthur Andersen* factors. We have already concluded that Drinnon's affidavit was sufficient [*65] to support StarTex's claim for attorney's fees. *See Haden, 332 S.W.3d at 514*. Triton [**54] did not file a controverting affidavit or any other evidence disputing Drinnon's evidence. Because Triton did not present any controverting evidence, Triton cannot overcome the presumption of reasonableness accorded to Drinnon's affidavit in support of an award of attorney's fees. *See id. at 514-16* (holding that because nonmovant "did not controvert [attorney's] affidavit or otherwise dispute the law firm's evidence, the law firm was . . . entitled to the statutory presumption that the requested amount was both reasonable and necessary").

Triton also argues that StarTex is not entitled to attorney's fees on the basis of its affirmative defense that StarTex made an excessive demand on Triton prior to filing suit. *See Kurtz v. Kurtz, 158 S.W.3d 12, 21 (Tex. App.--Houston [14th Dist.] 2004, pet. denied)*. When a claimant makes an "excessive" demand and will not accept a lesser amount, the claimant is not entitled to attorney's fees expended in litigation thereafter, even if it prevails on its breach of contract claim. *See, e.g., McMillin v. State Farm Lloyds, 180 S.W.3d 183, 209 (Tex. App.--Austin 2005, pet. denied)* (citing *Findlay v. Cave, 611 S.W.2d 57, 58 (Tex. 1981))*. Demand is not excessive [**55] simply because it is greater than the amount eventually awarded. *See Findlay, 611 S.W.2d at 58*. The dispositive question is whether the claimant acted unreasonably or in bad faith in making the demand. *See Standard Constructors, Inc. v. Chevron Chem. Co., 101 S.W.3d 619, 627-28 (Tex. App.--Houston [1st Dist.] 2003, pet. denied)*.

StarTex's demand letter requested $105,034.18 as principal on the unpaid invoices, $14,290.98 in interest and fees, $197,323.95 in liquidated damages, and $68,329.82 in attorney's fees. It stated that Triton should pay the listed amounts within thirty days or make arrangements to satisfy the debt. Thus, the amounts demanded by StarTex prior to filing suit were not so much greater than the amount it was eventually awarded as to be "excessive" or to indicate that the demand was made in bad faith. Triton presented no evidence that StarTex would have refused tender of the $314,358.13 awarded by the trial court. Triton has failed to establish that this exception to StarTex's statutory right to attorney's fees is met. *See Findlay, 611 S.W.2d at 58*; *McMillin, 180 S.W.3d at 209*.

We hold that the trial court did not err in awarding StarTex $12,000 in attorney's fees.

We [**56] overrule Triton's twelfth point of error.

**Other Issues**

**A. PUC Rules and Procedures for Disputed Charges**

In its eighth issue, Triton argues that its pending claim against StarTex before the PUC acted to stay the judgment and enforcement of the judgment. In its brief, Triton also argues that StarTex failed to properly investigate Triton's complaints according to the PUC's rules and procedures. However, Triton did not present these arguments to the trial court. Furthermore, the only indication before this Court that Triton actually filed a complaint with the PUC is Triton's statement in its appellate brief. We conclude that these complaints are not properly presented for our review. *See TEX. R. CIV. P. 166a(c)*; *Marek v. Tomoco Equip. Co., 738 S.W.2d 710, 712 (Tex. App.--Houston [14th Dist] 1987, no writ)* ("The trial court considers the record only as it properly appears when the

motion for summary judgment is heard."); *see also TEX. R. APP. P. 33.1(a)* (providing that, "[a]s a prerequisite [*66] to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court by a timely request, objection or motion").

We overrule Triton's eighth issue.

**B. Receivership** [**57] **and Turnover Order**

In its thirteenth and fourteenth issues, Triton argues that, because the trial court erred in granting summary judgment, the trial court also erred in appointing a receiver and in ordering Triton to turn over to the receiver confidential records and all proceeds and revenues generated by its businesses. Thus, Triton argues that it is entitled to immediate relief from the order appointing a receiver and the turnover order, including return of all records and revenues turned over to or seized by the receiver. We have already concluded that the trial court did not err in granting summary judgment. Therefore, this argument fails.

We overrule Triton's thirteenth and fourteenth issues.

**Conclusion**

We affirm the judgment of the trial court.

Evelyn V. Keyes

Justice



**URBAN TELEVISION NETWORK CORPORATION, Appellant v. CREDITOR LIQUIDITY SOLUTIONS, L.P., Appellee**

**No. 05-07-01629-CV**

**COURT OF APPEALS OF TEXAS, FIFTH DISTRICT, DALLAS**

***277 S.W.3d 917*; *2009 Tex. App. LEXIS 850***

**February 6, 2009, Opinion Issued**

**PRIOR HISTORY:** [**1]
On Appeal from the 162nd District Court, Dallas County, Texas. Trial Court Cause No. 06-10753-I.

**COUNSEL:** For APPELLANT: Kevin S. Wiley, Jr., Law Offices of Kevin S. Wiley, Jr., Dallas, TX.

For APPELLEE: Todd Alan Hoodenpyle, Singer & Levick, P.C., Addison, TX.

**JUDGES:** Before Justices Bridges, Richter, and Mazzant. Opinion By Justice Mazzant.

**OPINION BY:** AMOS L. MAZZANT

**OPINION**

[*918] Opinion By Justice Mazzant

Urban Television Network Corporation appeals the summary judgment rendered against it in the breach of contract suit brought by Westar Satellite Services, L.P. Westar subsequently transferred its interest in the judgment to Creditor Liquidity Solutions, L.P. Appellant brings one issue, asserting the trial court erred in granting Westar's motion for summary judgment on the liquidated damages provision of the contract because that provision was an unenforceable penalty. We affirm the trial court's judgment.

In 2005, appellant and Westar entered into a five-year Master Services Agreement in which appellant promised to pay Westar $ 8800 each month and Westar promised to provide appellant satellite uplink services for local television programming and distribution. Paragraph 7 of the agreement contained a liquidated damages provision:

> 7. Early Termination Liability. In the event that Customer [appellant] terminates Service prior to the expiration of the Term specified on the appropriate [**2] Service Agreement or other request for Service other than for cause, or in the event that Company [Westar] terminates this Agreement as a result of Customer's failure to abide by the terms and conditions herein, Customer shall pay a termination charge equal to 100% of the monthly charges multiplied by the number of months remaining on the Term of the Service Agreement or any additional requests for Service, as applicable.

In 2007, appellant defaulted on its obligations under the agreement. Westar terminated the agreement and sued appellant for breach of contract seeking an award of damages under paragraph 7. In response to Westar's motion for summary judgment, appellant admitted it defaulted on the agreement, but it asserted that paragraph 7 was an unenforceable penalty. The trial court granted Westar's motion for summary judgment and awarded Westar damages pursuant to paragraph 7. [1]

> 1 Besides its default on the Master Services Agreement, appellant also defaulted on a promissory note payable to Westar. Westar sued for breach of the promissory note as well breach of the agreement, and Westar sought foreclosure of its security interest in appellant's property. The trial court granted Westar's [**3] motion for summary judgment on the breach of the note and foreclosure of the collateral. Appellant's issue and

argument on appeal do not assert error in the rendition of judgment on those claims.

To prevail on a summary judgment motion brought under *Texas Rule of Civil Procedure 166a(c)*, a movant must show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *TEX. R. CIV. P. 166a(c)*; *Little v. Tex. Dep't of Criminal Justice, 148 S.W.3d 374, 381 (Tex. 2004)*. If the movant establishes a right to summary judgment, the burden shifts to the nonmovant to raise a genuine issue of material fact in order to defeat summary judgment. *Teter v. Comm'n for Lawyer Discipline, 261 S.W.3d 796, 798 (Tex. App.--Dallas 2008, no pet.)*. A plaintiff who establishes entitlement to judgment as a matter of law on its cause of action will not be prevented from obtaining summary judgment merely because the defendant has asserted an affirmative defense. *Wilson v. Gen. Motors Acceptance Corp., 897 S.W.2d 818, 823 (Tex. App.--Houston [1st Dist.] 1994, no writ)*. An affirmative defense will prevent summary judgment only if each element of the defense is raised [**4] by evidence that would be admissible at trial. *Id*. (citing *Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984))*.

[*919] We review the trial court's granting of a motion for summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n, 253 S.W.3d 184, 192 (Tex. 2007)*; *Teter, 261 S.W.3d at 799*. We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003)*.

An assertion that a liquidated damages provision is a penalty is an affirmative defense that the defendant has the burden of pleading and proving. *Murphy v. Cintas Corp., 923 S.W.2d 663, 665-66 (Tex. App.--Tyler 1996, writ denied)*; *see TEX. R. CIV. P. 94*; *see also Fluid Concepts, Inc. v. DA Apartments Ltd. P'ship, 159 S.W.3d 226, 231 (Tex. App.--Dallas 2005, no pet.)*. Thus, to avoid summary judgment, appellant had to present some evidence showing the liquidated damages provision was a penalty. *See Wilson, 897 S.W.2d at 823*; *see also Fluid Concepts, Inc., 159 S.W.3d at 231*.

A liquidated damages provision is enforceable and is not a penalty when the damages are uncertain and [**5] the stipulated damages are reasonable. *Phillips v. Phillips, 820 S.W.2d 785, 788 (Tex. 1991)* (quoting *Stewart v. Basey, 150 Tex. 666, 669, 245 S.W.2d 484, 486 (1952))*. Appellant argues the trial court erred in granting summary judgment because Westar presented no evidence showing the damages were uncertain or that the stipulated damages were reasonable. Appellant, not Westar, had the burden of presenting evidence that the liquidated damages provision was a penalty, and appellant presented no evidence showing the damages were not uncertain or that the stipulated damages were unreasonable. *See Murphy, 923 S.W.2d at 665-66*.

Appellant also argues the liquidated damages provision is a penalty on its face because, appellant asserts, it "applies to breach of any covenant of the agreement, and not merely to payment provisions." Appellant cites *Bethel v. Butler Drilling Co., 635 S.W.2d 834 (Tex. Civ. App.--Houston [14th Dist.] 1982, writ ref'd n.r.e.)*, which stated that a liquidated damages provision is a penalty as a matter of law when "it applied equally to any breach of any provision of the contract by appellee irrespective of the importance or triviality of such breach." *Id. at 837*. The [**6] court observed that "[u]nder the liquidated damage clause as written, appellant would be entitled to the full amount of monthly payments for the full term of the contract irrespective of the nature of the breach or appellant's actual loss or damage." *Id*.

We disagree, however, with appellant's assertion that the liquidated damages provision applied to any breach of the agreement, no matter how trivial. Paragraph 7 permits Westar to recover the liquidated damages when Westar terminates the agreement for appellant's failure to abide by the terms of the agreement. Paragraphs 13 and 14 define the types of defaults for which Westar could terminate the agreement. Paragraph 13 authorizes termination when appellant fails to make full and timely payments under the agreement. Paragraph 14 authorizes termination for an "Other Default," that is, a default other that a failure to pay the amounts due. However, Paragraph 14 defines "Other Default" as occurring when "either party fails to perform or observe any *material* term or obligation . . . ." (Emphasis added.) This requirement of breach of a "material term or obligation" before termination may occur distinguishes this agreement from the contract [**7] in *Bethel*.

[*920] Appellant has not established that the liquidated damages provision is unenforceable on its face or presented evidence raising a genuine issue of material fact as to its enforceability. We overrule appellant's issue on appeal.

We affirm the trial court's judgment.

AMOS L. MAZZANT

JUSTICE



# VALENCE OPERATING COMPANY, PETITIONER, v. ELMAGENE W. DORSETT, RESPONDENT

**NO. 03-0836**

**SUPREME COURT OF TEXAS**

***164 S.W.3d 656*; *2005 Tex. LEXIS 392*; *48 Tex. Sup. J. 671*; *162 Oil & Gas Rep. 511***

**September 29, 2004, Argued**
**May 20, 2005, Delivered**

**PRIOR HISTORY:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE SIXTH DISTRICT OF TEXAS.
*Dorsett v. Valence Operating Co., 111 S.W.3d 224, 2003 Tex. App. LEXIS 5009 (Tex. App. Texarkana, 2003)*

**COUNSEL:** For APPELLANT Valence Operating Company: Mr. Michael E. Warwick, Mr. Thomas A. Zabel, Abney & Warnick, Marshall, TX.

For RESPONDENT Elmagene W. Dorsett: Mr. Edwin E. Buckner, Law Offices of Edwin E. Buckner, Jr., Marshall, TX.

For AMICUS CURIAE Texas Oil and Gas Association: Mr. Edward A. Marseglia, Burn Wooley Marseglia & Zabel, L.L.P., Houston, TX.

For AMICUS CURIAE Citation Oil & Gas Corp: Mr. Morgan L. Copeland, Jr., Vinson & Elkins, L.L.P., Houston, TX. Ms. Catherine B. Smith, Vinson & Elkins, L.L.P., Houston, TX., Ms. Ara L. Ayles, Vinson & Elkins, L.L.P., Houston, TX., Mr. Gary C. Johnson, Senior Vice President & General Contractor, Houston, TX., Mr. Thomas A. Zabel, Burns Wooley Marseglia & Zabel, L.L.P. Houston, TX.

**JUDGES:** JUSTICE WAINWRIGHT delivered the opinion of the Court. JUSTICE BRISTER delivered a concurring opinion. JUSTICE JOHNSON did not participate in the decision.

**OPINION BY:** J. Dale Wainwright

**OPINION**

[*658] In this case we construe the meaning of certain notice provisions of a commonly used oil and [**2] gas operating agreement. Working interest owner Elmagene Dorsett sued Valence Operating Company in a dispute arising from a joint operating agreement. The trial court granted partial summary judgment against Dorsett on her breach of contract claims, finding that Dorsett failed to consent to participate in the wells at issue, and that a contractual non-consent penalty for that failure was enforceable against her. The court of appeals reversed and rendered judgment in favor of Dorsett, holding that Valence breached contract provisions that required Valence to give notice to Dorsett before commencing drilling operations. *111 S.W.3d 224*. The determinative issue before us is whether the agreement requires a thirty-day notice period to expire before the operator can commence work on the proposed operations. Because the non-consent penalty is enforceable and because we find nothing in the agreement prohibiting Valence from commencing work on the proposed operations before the expiration of the notice period, we reverse the court of appeals and render judgment in favor of Valence.

## I. Factual and Procedural Background

Elmagene Dorsett is a 4.05391 percent working interest [**3] owner in 677.04666 acres in the Mobley Gas Unit in Harrison County, Texas. In 1981, Dorsett, with three other minority working interest owners, and TXO Production Corporation, as operator and majority working interest owner, executed a modified 1977 American Association [*659] of Petroleum Landmen Form 610 Model Form Operating Agreement. [1] The Model Form Agreement is a contract between oil and gas lease owners and interest holders for the exploration and development of designated oil and gas within the geographical area

described in the Agreement. A.A.P.L. Form 610-1977, preamble (1977). The Model Form Agreement designates a single party as "operator" who is responsible for the management and control of drilling, development, and production activities. *Id*. preamble, art. V., VI.A., C. All other parties are designated "non-operators." *Id*. preamble. The parties to the Agreement have the option on each project to share operating costs and liabilities, to own equipment, and, if exercised, to then benefit by sharing in production revenues in proportion to their respective percentages of ownership. In such cases, these participants are called "consenting parties." *Id*. art.

1 The parties modified several provisions of the Model Form Agreement, but none of the changes affect the outcome of this case.

[**4] I.G., VI.B. Parties who elect not to participate in a proposed operation, called "non-consenting parties," are subject to a "non-consent penalty" which operates as a temporary relinquishment of the interest owner's share of production revenue from the project to the consenting parties. [2] *Id*. art. I.H., VI.B. After the consenting parties recoup their investment costs and receive a limited return on their investments, the non-consenting parties share in production revenues in proportion to their ownership interests. *Id*.

The relevant portion of the Model Form Agreement is Article VI.B. on Subsequent Operations:

> 1. Proposed Operations: Should any party hereto desire to drill any well on the Contract Area . . ., the party desiring to drill . . . shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation . . . [**5] . Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. Any notice or response given by telephone shall be promptly confirmed in writing.
>
> 2. Operations by Less than All Parties: If any party receiving such notice as provided in Article VI.B.1. or VI.E.1. elects not to participate in the proposed operation, then, in order to be entitled to the benefits of this article, the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days . . . actually commence work on the proposed operation and complete it with due diligence. . . .
>
> . . . .
>
> . . . Upon commencement of operations for the drilling, completing, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting [*660] Parties shall own and be entitled to receive, in proportion to their respective interests, [**6] all of such Non-Consenting Party's interest in the well and share of production there from until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold (after deducting production taxes, royalty, overriding royalty and other interests existing on the effective date hereof, payable out of or measured by the production from such well accruing with respect to such interest until it reverts) shall equal the total of the following:
>
> (a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment beyond the wellhead connections (including, but not limited to, stock tanks, separators, treaters, pumping equipment and piping), plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article, it being agreed that each Non-Consenting Party's share of such costs and equipment will be that interest which would have been chargeable to each Non-Consenting Party had it participated in the well from the beginning of [**7] the operation; and
>
> (b) 300% of that portion of the costs and expenses of drilling reworking, deepening, or plugging back, testing and

completing, after deducting any cash contributions received under Article VIII.C., and 300% of that portion of the cost of newly acquired equipment in the well (to and including the wellhead connections), which would have been chargeable to such Non-Consenting Party if it had participated therein.

. . . .

If and when the Consenting Parties recover from a Non-Consenting Party's relinquished interest the amounts provided for above, the relinquished interests of such Non-Consenting Party shall automatically revert to it, and, from and after such reversion, such Non-Consenting Party shall own the same interest in such well, the material and equipment in or pertaining thereto, and the production therefrom as such Non-Consenting Party would have been entitled to had it participated in the drilling, completing reworking, deepening or plugging back of said well. Thereafter, such Non-Consenting Party shall be charged with and shall pay its proportionate part of the further costs of the operation of said well in accordance with the terms of this agreement and [**8] the Accounting Procedure, attached hereto.

2 We do not agree that this non-consent penalty is, as its name suggests, a forfeiture or punitive provision, but we will use the industry's nomenclature.

A.A.P.L. Form 610-1977, art. VI.B. (1977).

In 1981, TXO drilled the initial test well, Mobley Well No. 1. In 1994, Valence acquired ownership of 94.28446 percent of the working interest in the unit from Marathon Oil Company (successor to TXO) and became unit operator. From 1996 to 2001, Valence drilled eight more gas wells in the unit. Valence provided Dorsett with written notice of its intent to drill each of the eight wells, as required by the Model Form Agreement, but in each case began preparatory work, and in some cases drilling, before thirty days had elapsed after Dorsett's receipt of the notice. Dorsett received the notices but did not consent to and did not contribute to any of the costs incurred in drilling the wells. Valence then imposed on Dorsett the non-consent penalty described in the Model [**9] Form Agreement.

Dorsett disputed the imposition of the non-consent penalty. Specifically, Dorsett contended that the Model Form Agreement [*661] required Valence to allow the thirty-day notice period to elapse before commencing work on proposed operations. She argued that Valence's failure to do so constituted a breach of contract, thereby preventing enforcement of the non-consent penalty. She also contended that the non-consent penalty was an unenforceable liquidated damages provision. In 2000, Dorsett sued Valence for breach of contract, specific performance, and conversion. She asserted causes of action for damage to the surface of her land stemming from Valence's failure to accommodate surface use and negligence; she also requested a declaratory judgment of her rights under the Agreement and a full accounting.

The parties filed cross-motions for partial summary judgment. Dorsett moved for partial summary judgment on the breach of contract, accounting, and declaratory judgment claims and requested severance of her surface damage claims. Valence moved for partial summary judgment on the contract claims as well. The trial court granted Valence's motion for partial summary judgment on the [**10] breach of contract claims, finding that Dorsett failed to elect to participate in the eight wells and that the non-consent penalty was enforceable against her. The trial court then severed the contract claims. The court of appeals reversed and rendered judgment in favor of Dorsett, holding that Valence failed to comply with the Model Form Agreement provisions for notice of proposed operations, thus making the non-consent penalty inapplicable to Dorsett. *111 S.W.3d at 235*.

**II. Standard of Review**

We review the trial court's summary judgment de novo. *Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215, 47 Tex. Sup. Ct. J. 174 (Tex. 2003)*. When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Knott, 128 S.W.3d at 215*; *Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911, 40 Tex. Sup. Ct. J. 438 (Tex. 1997)*. When both parties move for partial summary judgment on the same issues and the trial court grants one motion and denies the other, as here, the reviewing court considers the summary judgment evidence presented by both [**11] sides, determines all questions presented, and if the reviewing court determines that the trial court erred, renders the judgment the trial court should have rendered. *See FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872, 43 Tex. Sup. Ct. J. 835 (Tex. 2000)*.

**III. Notice Period**

Dorsett argues that because Valence did not satisfy the Agreement's notice requirements, her share of new production could not be reduced pursuant to the penalty. Dorsett interprets the Model Form Agreement to require Valence to deliver notice at least thirty days before the commencement of proposed operations. Valence argues that the Agreement requires notice of proposed subsequent operations to be given to working interest owners, who then have thirty days to elect to participate in the drilling of the well. Under Valence's construction, the operator may commence work on the proposed operations during the thirty-day notice period or even before the thirty-day notice period begins. To support this interpretation, Valence argues that the phrase stating that the operator "shall, within sixty (60) days after the expiration of the notice period of thirty (30) days . . . actually commence work on the [**12] proposed operation and complete it with due diligence" illustrates that the provision's purpose is not to prohibit the early commencement of work, but to ensure that work is not unreasonably delayed after the [*662] consent deadline. A.A.P.L. Form 610-1977, art. VI.B.2. (1977).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229, 47 Tex. Sup. Ct. J. 196 (Tex. 2003)*; *Gulf Ins. Co. v. Burns Motors, Inc., 22 S.W.3d 417, 423, 43 Tex. Sup. Ct. J. 647 (Tex. 2000)*; *Coker v. Coker, 650 S.W.2d 391, 393, 26 Tex. Sup. Ct. J. 368 (Tex. 1983)*. To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *J.M. Davidson, Inc., 128 S.W.3d at 229*; *Coker, 650 S.W.2d at 393*. Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Heritage Res., Inc.v. NationsBank, 939 S.W.2d 118, 121, 39 Tex. Sup. Ct. J. 537 (Tex. 1996)*; [**13] *W. Reserve Life Ins. Co. v. Meadows, 152 Tex. 559, 261 S.W.2d 554, 557 (Tex. 1953)*; *see also Knott, 128 S.W.3d at 219*.

The notice provision of the Model Form Agreement provides:

> [T]he party desiring to drill, complete, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation . . . . Failure of a party receiving such notice to reply within the period above fixed shall constitute an election by that party not to participate in the cost of the proposed operation. . . .
>
> . . . .
>
> . . . [I]n order to be entitled to [impose the non-consent penalty], the party or parties giving the notice and such other parties as shall elect to participate in the operation shall, within sixty (60) days after the expiration of the notice period of thirty (30) days . . [**14] . actually commence work on the proposed operation and complete it with due diligence.

A.A.P.L. Form 610-1977, art. VI.B.1.-2. (1977).

We agree with Valence that this provision places no temporal limitation on Valence's ability to commence work on the proposed projects. The Agreement clearly states that "[t]he parties receiving such a notice shall have thirty (30) days after receipt of the notice within which to notify the parties wishing to do the work whether they elect to participate in the cost of the proposed operation." *Id*. art. VI.1. This plain language in the Agreement describes Dorsett's right to receive notice of proposed operations and to elect to participate in those operations. It places no restrictions on when Valence may commence drilling or preparations for drilling. Dorsett does not dispute that she received notice of all of the proposed operations, nor does she contend that she elected to participate in the drilling of Mobley Wells 2 through 9. Her undisputed failure to consent to the proposed operations within thirty days was a "[f]ailure . . . to reply within the period above fixed" and "constitut[ed] an election by that party not to participate in the cost [**15] of the proposed operation," thus making the non-consent penalty applicable to Dorsett. *Id*.

In short, the thirty-day notice period sets a deadline for Dorsett to decide whether to participate in proposed operations. Nothing in the language of the Agreement forbids the operator from commencing [*663] work before the end of the notice period. However, there is a temporal limit in the Agreement on Valence that sets a deadline, not a required start date, on Valence's commencement of work. The Agreement requires the operator to commence work no later than sixty days after the expiration of the thirty-day notice period. A.A.P.L. Form 610-1977, art. VI.B.2. (1977). The distinction between the

two notice periods in the Agreement retains the working interest owner's right to thirty days notice before being required to make a decision, while also requiring the operator to commence work no later than ninety days after formally proposing the operation to the interest owners. [3]

3 The resolution of this case does not require us to determine whether the phrase "actually commence work," as used in the Model Form Agreement, requires the commencement of drilling or the commencement of other preparatory work no later than ninety days after formally proposing the operation. Therefore, we express no opinion on this issue.

[**16] This interpretation effectuates the written agreement of the parties. We recognize that this interpretation allows an operator to commence a new operation before the thirty-day notice period has expired; however, potential benefits may accrue to the owners for an operator's "early" commencement. For example, an early start may avoid detrimental occurrences such as the draining of an oil field by a neighboring operator or the expiration of an oil and gas lease. Moreover, the risk of early commencement of such operations falls entirely on the operator because if none of the working interest owners consent to participation within thirty days, the operator bears the full cost of operations. The parties do not identify any negative consequences to the working interest owners that arise from commencement of operations within the thirty-day notice period.

**IV. Non-Consent Penalty**

Dorsett received notice of each of the proposed subsequent operations. She acknowledges that she did not consent to any of the proposed operations within thirty days of receiving notice. She therefore is a non-consenting party under Article VI.B.1. of the Model Form Agreement, and the non-consent penalty [**17] applies to her.

The relevant portion of the Model Form Agreement provides:

> "Upon commencement of operations for the drilling, completing, reworking, deepening or plugging back of any such well by Consenting Parties in accordance with the provisions of this Article, each Non-Consenting Party shall be deemed to have relinquished to Consenting Parties, and the Consenting Parties shall own and be entitled to receive, in proportion to their respective interests, all of such Non-Consenting Party's interest in the well and share of production therefrom until the proceeds of the sale of such share, calculated at the well, or market value thereof if such share is not sold . . . shall equal the total of the following:
>
> (a) 100% of each such Non-Consenting Party's share of the cost of any newly acquired surface equipment . . . plus 100% of each such Non-Consenting Party's share of the cost of operation of the well commencing with first production and continuing until each such Non-Consenting Party's relinquished interest shall revert to it under other provisions of this Article . . .; and
>
> (b) 300% of that portion of the costs and expenses of drilling reworking, deepening, or plugging [**18] back, testing and completing, after deducting any cash contributions received under Article VIII.C., and 300% of that portion of the [*664] cost of newly acquired equipment in the well . . ., which would have been chargeable to such Non-Consenting Party if it had participated therein."

A.A.P.L. Form 610-1977, art. VI.B.2. (1977). This clause allows consenting parties to recoup up to 100 percent of the non-consenting party's share of the costs of any new surface equipment and operation of the well and up to 300 percent of the non-consenting party's share of the costs and expenses of drilling and new equipment in the well, subject to deductions. After the consenting parties have recouped these costs, then the non-consenting party returns to sharing in production revenues in proportion to his or her ownership interest. *Id.*; *see also Nearburg v. Yates Petroleum Corp., 1997 NMCA 69, 123 N.M. 526, 943 P.2d 560, 565 (N.M. Ct. App. 1997)* (explaining operation of the Model Form Agreement's non-consent penalty provision).

Whether a contract term is a liquidated damages provision is a question of law for the court to decide. *Phillips v. Phillips, 820 S.W.2d 785, 788, 35 Tex. Sup. Ct. J. 220 (Tex. 1991)* [**19] (citing *Farrar v. Beeman, 63 Tex. 175, 181 (1885)*). Dorsett contends that the non-consent penalty is an unenforceable liquidated damages provision. We disagree. This clause is different from a liquidated damages clause. Liquidated damages clauses fix in advance the compensation to a party accruing from the failure to perform specified contractual obligations, whereas non-consent penalties reward consenting parties for undertaking a defined risk. *See Nearburg, 943 P.2d at 567* ("[T]he non-consent penalty is

the agreed-upon reward to [a consenting party] for taking the risk . . . . As a contractual arrangement, the carried interest is subject to negotiation and modification, and the parties' rights and obligations depend upon their contract."); *RESTATEMENT (SECOND) OF CONTRACTS § 356* (1981) ("Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss."). The non-consent penalty provision in this oil and gas operating agreement is the mechanism utilized to allow [**20] the consenting parties the opportunity to recover their investments and receive defined returns from future operations. For such operations, they undertake a financial risk that the non-consenting parties do not. Here, the non-consenting party is not being punished for breaching a contract; she simply agreed not to participate in a return on an investment she did not make. Indeed, after the provision's requirements are met, she receives additional revenues from new wells for which she paid nothing. One Texas court of appeals, in its consideration of whether a non-consent penalty was enforceable, characterized the penalty as a liquidated damages clause and decided that it was enforceable against the non-consenting working interest owner. *Hamilton v. Tex. Oil & Gas Corp., 648 S.W.2d 316, 321 (Tex. App.--El Paso 1982, writ ref'd n.r.e.)*. While *Hamilton* reached the correct result, we disapprove of its treatment of the non-consent penalty as a liquidated damages provision.

There is a second reason why Dorsett's assertion is unpersuasive. Assuming, *arguendo*, that Dorsett was correct in claiming that the non-consent penalty is a liquidated damages clause, her argument [**21] still fails because, traditionally, liquidated damages are recoverable only where there has been a failure to perform contractual obligations. *Phillips, 820 S.W.2d at 788*; *Rio Grande Valley Sugar Growers, Inc. v. Campesi, 592 S.W.2d 340, 342 n.2, 23 Tex. Sup. Ct. J. 142 (Tex. 1979)*. As the court in *Nearburg* noted, "a non-consent election cannot convincingly be characterized as a [*665] breach. . . . Therefore, we do not regard the non-consent penalty provision as involving liquidated damages or an unenforceable penalty." *Nearburg, 943 P.2d at 566*. We have held that Valence complied with the terms of the Agreement by properly sending notices to Dorsett. Dorsett failed to consent to the proposed operations. Neither party breached the contract.

To interpret the provision as Dorsett suggests would not only contradict its plain language, but would vanquish the incentive for parties to consent and incur costs and liabilities for new projects. If all working interest owners shared equally in production revenues from subsequent projects, whether they consented or not, none would consent because there would be no incentive to do so. In fact, the incentives would strongly [**22] favor not consenting because, under Dorsett's approach, a non-consenting party would be able to reap the rewards of new operations without incurring any expense. The non-consent penalty is designed to allow reasonable compensation for working interest owners who undertake the risk of developing new wells. *See Phillips, 820 S.W.2d at 788*. Other terms sometimes used to describe the non-consent penalty--"sole risk clause" and "risk charges"--more accurately convey this rationale. *See 111 S.W.3d at 226 n.1*.

**V. Conclusion**

We conclude that Valence provided timely notice to Dorsett of its proposed subsequent operations; consequently, Valence did not breach the Agreement. The non-consent penalty is not an unenforceable liquidated damages provision and is enforceable against Dorsett. Therefore, we reverse the court of appeals' judgment and render judgment that Dorsett take nothing.

J. Dale Wainwright, Justice

**CONCUR BY:** Scott Brister

**CONCUR**

JUSTICE BRISTER, concurring.

Casual readers may not understand how a court could possibly hold that a "non-consent penalty" is not a "penalty." Although fully joining the Court's opinion and judgment, I write briefly [**23] to explain.

The Court discloses in a footnote that "non-consent penalty" is industry vernacular. 164 S.W.3d at 659 n.2. The term does not appear in the Operating Agreement, and interpretation of that contract is a question of law for the Court. *Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 783, 45 Tex. Sup. Ct. J. 232 (Tex. 2001)*. What the parties call a clause is parol evidence, and thus inadmissible unless a contract is ambiguous. *Friendswood Development Co. v. McDade + Co., 926 S.W.2d 280, 283, 39 Tex. Sup. Ct. J. 874 (Tex. 1996)* (per curiam). This one is not.

Generally, a liquidated damages provision providing for a multiple of actual damages is an unenforceable penalty. *Phillips v. Phillips, 820 S.W.2d 785, 789, 35 Tex. Sup. Ct. J. 220 (Tex. 1991)*. But while the clause here is certainly liquidated, [1] it is not a liquidated-damages clause. [2]

1 *See* BLACK'S LAW DICTIONARY 494 (8th ed. 2004) ("liquidated, adj. 1. (Of an amount or debt) settled or determined, esp. by agreement.").

2 *See id.* ("liquidated-damages clause. A contractual provision that determines in advance the measure of damages if a party breaches the agreement.").

[**24] The parties' contract provides unambiguously that Dorsett is not required to contribute to subsequent operations. Thus, there is no breach of contract if she opts out.

[*666] The contract also provides unambiguously that those who do not consent nevertheless get additional revenues (after recoupment by those who do), for which they pay nothing. This is not a penalty but a bonus. [3]

3 *See id.* at 134 ("bonus. 1. A premium paid in addition to what is due or expected <<year-end bonus>.").

The contract also provides unambiguously that those who do consent get 300% recoupment of certain costs, for which nonconsenting parties again pay nothing. These are not damages. [4]

4 *See id.* at 416 ("damages, n. pl. Money claimed by, or ordered to be paid to, a person as compensation for loss or injury the plaintiff seeks $ 8,000 in damages from the defendant).

I recognize that in some situations receiving less is the economic [**25] equivalent of paying more. But bonuses for a star athlete or salesman are not intended to penalize their employers, but to increase returns for all concerned. Unless an oilfield can be completely emptied from existing wells, further development is not a zero-sum game.

Those in the oil industry widely use and rely on clauses like the one here, and certainly consider them enforceable. *See* John R. Reeves & J. Matthew Thompson, *The Development of the Model Form Operating Agreement: An Interpretive Accounting, 54 Okla. L.R. 211, 254-55 (2001)*. Dorsett provides precedent in neither law nor logic suggesting that liquidated bonus clauses should be unenforceable, nor why she should get a bonus for a risk she never took. Accordingly, this is not a "non-consent penalty."

Scott Brister, Justice



**WESTERNGECO, L.L.C. AND SCHLUMBERGER TECHNOLOGY CORPORATION, Appellants v. INPUT/OUTPUT, INC., Appellee**

**NO. 14-06-00357-CV**

**COURT OF APPEALS OF TEXAS, FOURTEENTH DISTRICT, HOUSTON**

***246 S.W.3d 776*; *2008 Tex. App. LEXIS 480***

**January 24, 2008, Judgment Rendered**
**January 24, 2008, Majority and Concurring Opinions Filed**

**PRIOR HISTORY:** [**1]
On Appeal from the 164th District Court, Harris County, Texas. Trial Court Cause No. 04-67890.

**COUNSEL:** For APPELLANTS: Kendall Matthew Gray, Joel W. Mohrman, Houston, TX.

For APPELLEES: Charles S. Baker, Houston, TX.

**JUDGES:** Panel consists of Justices Frost, Seymore, and Guzman. (Guzman, J., concurring).

**OPINION BY:** Kem Thompson Frost

**OPINION**

[*778] **MAJORITY OPINION**

This case arises out of a dispute over the terms of a settlement agreement between business competitors. One party brought a declaratory judgment action seeking various declarations regarding the terms of the settlement agreement. The trial court granted the plaintiff's motion for summary judgment, impliedly making the three declarations sought in the motion. The defendants never sought declaratory relief; rather, they asserted in a cross-motion for summary judgment that all of the requested declarations should be denied as a matter of law. We reverse and render in part and affirm in part.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 1998, appellant Schlumberger Technology Corporation ("Schlumberger") filed suit asserting various contract and tort claims against appellee Input/Output, Inc. ("Input") and former Schlumberger employees working for Input. Schlumberger sought damages and also asked the court to permanently enjoin Input from (1) using or disclosing Schlumberger's confidential [**2] information and (2) soliciting for employment any Schlumberger employee who is involved in the design of seismic data acquisition systems or who has been exposed to confidential Schlumberger information regarding seismic data acquisition systems. To resolve the 1998 lawsuit the parties entered into a settlement agreement in November 1998 ("Settlement Agreement"). The material terms are as follows:

> This Settlement Agreement is made by and among Schlumberger Technology Corporation ("Schlumberger"), a Texas corporation . . ., acting on behalf of itself and its Affiliates; Input/Output, Inc. ("I/O"), a Delaware corporation . . ., acting on behalf of itself and its Affiliates; and the following individuals: Rex K. Reavis, James "Jerry" Iseli, and Kambiz Afkhami (these three individuals collectively referred to herein as the "Individual Defendants").
>
> WHEREAS, the Geco-Prakla division of Schlumberger ("Geco-Prakla") provides seismic services to the oil industry, and I/O supplies seismic equipment and systems to various companies, including Schlumberger, that provide such seismic services (such seismic services and seismic equipment and systems referred to herein as "Seismic Field"); . . .

> . [**3] . .
>
> 4. I/O agrees that it will not offer employment to or engage as a consultant any current or former employee [*779] of Schlumberger who is working or has worked in the Seismic Field unless at least two (2) years have passed from the date such employee or former employee either ceased working for Schlumberger in the Seismic Field or has left Schlumberger.
>
> . . .
>
> 13. This Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective successors in interest and legal representatives.
>
> . . .
>
> 15. As used herein, "Affiliate" means any present or future corporation that directly or indirectly controls, is controlled by, or is under common control with either party, where "control" means the ownership, direct or indirect, of at least 50% of voting securities of such corporation.

Approximately two years later, in September 2000, Schlumberger and Baker Hughes, Inc. entered into a Master Formation Agreement, in which Schlumberger transferred to a joint venture all of its seismic business assets, including but not limited to, contracts, claims against third parties, intellectual property, and information technology. The summary-judgment evidence does not show whether appellant [**4] WesternGeco, L.L.C. ("WesternGeco") is the joint venture to which this transfer was made, and it does not reflect whether WesternGeco is an affiliate of Schlumberger. [1] For the purposes of this appeal, we presume, without deciding, that Schlumberger and Baker Hughes created WesternGeco to handle their seismic business and that WesternGeco is an "Affiliate" of Schlumberger, as defined in the Settlement Agreement.

1 The trial court struck two paragraphs from the affidavit of Dale Gaudier, in which Gaudier stated that WesternGeco is the successor-in-interest to Schlumberger's seismic business and that Schlumberger owns at least 50% of the voting securities in WesternGeco. Although Schlumberger and WesternGeco challenge this evidentiary ruling on appeal, we need not address this issue to adjudicate this appeal.

After WesternGeco threatened to sue Input to enforce the above paragraph 4 of the Settlement Agreement (hereinafter "Paragraph 4"), Input filed this lawsuit against Schlumberger and WesternGeco (hereinafter the "Schlumberger Parties") asking the court to make various declarations regarding the proper construction of Paragraph 4 and also seeking attorney's fees. [2] The Schlumberger [**5] Parties never asserted a counterclaim for declaratory relief; they simply argued that, as a matter of law, Input was not entitled to the relief it sought.

2 Although the parties often refer generally to the Settlement Agreement, it is clear that the implied declarations before this court on appeal pertain only to Paragraph 4.

Input filed a motion for summary judgment seeking a declaration that the Settlement Agreement is void on the alleged grounds that it is (1) an illegal restraint of trade, and (2) a covenant not to compete that violates *section 15.50 of the Texas Business and Commerce Code*. The trial court denied this motion.

Input filed a second motion for summary judgment asserting that the trial court should render a summary judgment making the following declarations:

> (1) Because Paragraph 4 is silent as to its duration, either party may terminate it at will.
>
> (2) Alternatively, any implied reasonable time period during which Paragraph 4 was not terminable at will [*780] already has expired so that Paragraph 4 is now terminable at will.
>
> (3) Paragraph 4 applies to Schlumberger employees who are within its scope but not to WesternGeco employees.

Input also sought attorney's fees. In its second [**6] motion, Input did not seek a final summary judgment because, even if the trial court granted all the relief sought in this motion, Input still had pending requests in its petition for additional declaratory relief. The Schlumberger Parties filed a cross-motion for summary judgment, in which they argued that, as a matter of law, the trial court should deny all of the requests for declaratory relief in Input's petition and award Chapter 37 attorney's fees to the Schlumberger Parties. In this cross-motion the Schlumberger Parties did seek a final judgment.

After a hearing on these cross-motions, the trial court signed an interlocutory order in which it granted Input's motion and did not mention the Schlumberger Parties' motion. Input then filed a motion to modify the sum-

mary-judgment order. Input asked the trial court to modify its order to (1) deny the Schlumberger Parties' motion, (2) deny Input's request for Chapter 37 attorney's fees, and (3) deny all of Input's claims the court did not expressly grant in the partial summary judgment in its favor. The trial court granted this motion and rendered a final judgment as requested. Even though in its motion for summary judgment Input sought [**7] alternative and inconsistent declarations, the trial court did not make any declarations in its judgment. Instead, the court simply stated that it granted Input's second motion for summary judgment. No party has complained about the form of the trial court's judgment; therefore, we need not address the omission of express declarations in the court's declaratory judgment. We treat the trial court's judgment as having impliedly made the three declarations requested in the motion. The Schlumberger Parties have appealed from the trial court's final judgment. [3] Input has not appealed.

3 The Schlumberger Parties seek a reversal of the trial court's judgment for lack of a justiciable controversy, or in the alternative, a reversal and rendition of judgment based on their cross-motion. No party has sought a reversal and remand to the trial court.

**II. STANDARDS OF REVIEW**

In a traditional motion for summary judgment, if the movant's motion and summary-judgment evidence facially establish its right to judgment as a matter of law, the burden shifts to the nonmovant to raise a genuine, material fact issue sufficient to defeat summary judgment. *M.D. Anderson Hosp. & Tumor Inst. v. Willrich, 28 S.W.3d 22, 23 (Tex. 2000)*. [**8] In our de novo review of a trial court's summary judgment, we consider all the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Mack Trucks, Inc. v. Tamez, 206 S.W.3d 572, 582 (Tex. 2006)*. The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary-judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes, 236 S.W.3d 754, 756 (Tex. 2007)*.

We may review the trial court's denial of the Schlumberger Parties' motion because in it they sought a final summary judgment. *See CU Lloyd's of Texas v. Feldman, 977 S.W.2d 568, 569 (Tex. 1998)*. When both parties move for summary judgment, each party must carry its own burden, and neither can prevail because of the failure of the other to discharge its [*781] burden. *INAC Corp. v. Underwriters at Lloyd's, 56 S.W.3d 242, 247 (Tex. App.--Houston [14th Dist.] 2001, no pet.)*. Because each party was a movant, the burden for each was the same: to establish entitlement to a summary judgment by conclusively proving all the elements [**9] of the claim or defense as a matter of law. *Id.*

**III. ISSUES AND ANALYSIS A. Is there a justiciable case or controversy to support this court's jurisdiction?**

The Schlumberger Parties have filed a motion to dismiss this appeal for lack of jurisdiction asserting that there is no case or controversy. The Texas Declaratory Judgment Act is a remedial statute whose purpose is to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations. *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b)* (Vernon 1997); *Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex. 1995)*. We must construe and administer this statute liberally. *See TEX. CIV. PRAC. & REM. CODE ANN. § 37.002(b)*; *Bonham State Bank, 907 S.W.2d at 467*. A court of record, acting within its jurisdiction, has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. *TEX. CIV. PRAC. & REM. CODE ANN. § 37.003(a)*. A person with an interest in a written contract may ask a court to determine any question of construction or validity arising under the contract and obtain a declaration of rights, status, or other legal relations thereunder. *Id. § 37.004(a)*. [**10] A contract may be construed either before or after a breach. *Id. § 37.004(b)*.

A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought. *Bonham State Bank, 907 S.W.2d at 467*. For a justiciable controversy to exist, there must be a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute. *Id.* The Schlumberger Parties have described Input as a "business competitor" who had been "poaching" Schlumberger employees in 1998 in an effort to have these employees work on seismic systems that would compete directly with the systems on which they had worked at Schlumberger, making disclosure of Schlumberger's confidential information inevitable. Schlumberger filed suit against Input and others, and the parties settled that case in 1998 by means of the Settlement Agreement. The summary-judgment evidence contains the affidavit of Input's Vice President and General Counsel, in which he testifies as follows:

> It is [Input's] belief that it has fully performed all of its obligations under the Settlement Agreement, [**11] and the terms thereof, including Paragraph 4, are no longer in force. [WesternGeco], on the other hand, has represented to [Input] that

> it is the successor-in-interest to Schlumberger's rights under the Settlement Agreement and is entitled to and intends to enforce the language of Paragraph 4. [WesternGeco] has asserted to [Input] that the language of Paragraph 4 prevents, in perpetuity, [Input] from hiring any current or former employee of [WesternGeco], or any of its affiliates, who have any connection to the seismic industry. [WesternGeco] has also threatened to bring suit against [Input] to enforce the provision.

No summary-judgment evidence contradicts this testimony. Input also attached to its motion for summary judgment a prior filing in the trial court in which the Schlumberger Parties state that Input "declares that it is suffering from a material [*782] competitive disadvantage in the seismic industry" and has apparently determined that it must break its promise [not to solicit for employment any of Schlumberger's employees who worked in the seismic field until two years after they have left the company] . . . ." [4]

> 4 The Schlumberger Parties are quoting from an affidavit that Input [**12] filed in support of its first motion for summary judgment. This exhibit is not a judicial admission but it is part of the summary-judgment evidence.

The undisputed summary-judgment evidence supports a conclusion that Input wants to hire the Schlumberger Parties' employees in the Seismic Field and that WesternGeco is threatening to sue Input to prevent it from taking such action. WesternGeco asserts that its employees are protected by Paragraph 4 because they constitute "current or former employee[s] of Schlumberger" under Paragraph 4. Even though WesternGeco did not exist in 1998 when the Settlement Agreement was signed, WesternGeco asserts that Schlumberger entered into the Settlement Agreement on its behalf.

The Schlumberger Parties do not argue that Input must offer employment to or engage as a consultant a Schlumberger or WesternGeco employee who has worked or is working in the Seismic Field before there can be a justiciable controversy. The Schlumberger Parties acknowledge that their construction of the Settlement Agreement differs significantly from Input's construction; however, they contend that this controversy is not justiciable because (1) "[Input] has not identified -- even [**13] anonymously -- one current or former Schlumberger employee that it would otherwise hire if not for the [Settlement Agreement]," (2) "[t]here is no indication that [Input] is threatening to hire any particular current or former Schlumberger employee," and (3) Input has not shown that it has "any present or prospective intention to violate the Settlement Agreement." Schlumberger argues that to show a justiciable controversy, Input must identify in some way a current or former Schlumberger employee that it wants to hire but cannot hire if Paragraph 4 is still in effect. We conclude Input is not required to do so.

This case presents a bona fide, concrete controversy ripe for resolution by way of declaratory judgment. *See Bonham State Bank, 907 S.W.2d at 467*. The record reflects a real and substantial controversy involving a genuine conflict of tangible interests and not merely a theoretical dispute. *See id.; City of Dallas v. VSC, LLC, 242 S.W.3d 584, 597, 2008 Tex. App. LEXIS 50, *26, 2008 WL 54484, at *8-9 (Tex. App.--Dallas 2008, no pet. h.)*; *Monk v. Pomberg, No. 01-05-00429-CV, S.W.3d , , 2007 Tex. App. LEXIS 2513, *17-18, 2007 WL 926491, at *6 (Tex. App.--Houston [1st Dist.] Mar. 29, 2007, no pet.)*. Furthermore, [**14] presuming, without deciding, that it is necessary to show a justiciable controversy, the evidence mentioned above indicates that Input is threatening to hire current or former employees of the Schlumberger Parties whom the Schlumberger Parties claim are covered by Paragraph 4. A justiciable controversy exists. Therefore, we deny the Schlumberger Parties' motion to dismiss.

**B. Did the trial court err by concluding that Paragraph 4 has been impliedly terminable at will since the execution of the Settlement Agreement?**

Under their first issue, the Schlumberger Parties challenge the trial court's implied declaration that Paragraph 4 is impliedly terminable at will by either party. In Paragraph 4, Input agreed not to offer employment to or engage as a consultant any current or former employee of Schlumberger who is working or has worked in the Seismic Field unless at least [*783] two years have passed from the date such employee or former employee either ceased working for Schlumberger in the Seismic Field or has left Schlumberger. The Settlement Agreement is silent as to the duration of Input's covenant in Paragraph 4. The trial court ruled as a matter of law that there is an implied contractual [**15] term under which Paragraph 4 is terminable at will by either party.

There is uncertainty as to the legal standard for determining the duration of an agreement that contains no express term. In some cases courts indicate that the implied term should be terminable at will, while in other cases courts state that the implied term should be for a reasonable time. *See Clear Lake City Water Auth. v. Clear Lake Utilities Co., 549 S.W.2d 385, 390-91 (Tex. 1977)*. In one of the cases upon which Input relies, *Clear Lake City Water Authority v. Clear Lake Utilities Co.*, the Texas

Supreme Court noted both lines of cases. *See id.* However, the *Clear Lake City Water Authority* court stated that it did not need to decide which line of cases to follow because the court was required to imply the contract was terminable at will given that one of the parties was a governmental entity incapable of contracting for a reasonable time for performance. *See id.* Because the high court's holding was based on one of the parties' status as a governmental entity, *Clear Lake City Water Authority* is not on point in the case at hand, and the court's statements regarding the two lines of cases are obiter dicta. *See id.* Likewise, [**16] the other statements from cases upon which Input relies for implying a terminable-at-will provision are either based on one of the parties' status as a governmental entity or are obiter dicta. [5] Neither the *Clear Lake City Water Authority* opinion nor any other Texas case appears to explain how courts should determine whether to imply that an agreement is terminable at will or to imply that it lasts for a reasonable time. However, we need not address how this determination should be made today.

5 One of these cases is based on one of the parties' status as a governmental entity. *See City of Corpus Christi v. Taylor, 126 S.W.3d 712, 722-23 (Tex. App.--Corpus Christi 2004, pet. withdrawn)*. Others are cited for statements that are obiter dicta. *See Kennedy v. McMullen, 39 S.W.2d 168, 174 (Tex. Civ. App.--Beaumont 1931, writ ref'd)* "overruling appellate contention based on appellants" inability to terminate contract unless they stopped operating a bus line while stating in dicta that generally a contract that does not specify duration may be terminated at will); *Farah v. Mafrige & Kormanik, P.C., 927 S.W.2d 663, 678 (Tex. App.--Houston [1st. Dist.] 1996, no writ)* (stating that contract was [**17] also terminable at will only after concluding the contract was too indefinite to be enforced); *Ingram Freezers v. Atchison, T & S. F. Ry. Co., 464 S.W.2d 915, 920 (Tex. Civ. App.--Dallas 1971, writ ref'd n.r.e.)* (concluding that trial court correctly rendered directed verdict because there was no agreement to furnish rail service and then stating that another reason for affirming the directed verdict is that any such agreement would have been terminable-at-will); *Tanenbaum Textile Co. v. Sidran, 423 S.W.2d 635, 637 (Tex. Civ. App.--Dallas 1967, writ ref'd n.r.e.)* (indicating that agreement was terminable at will in the course of holding that contract was not valid for being indefinite because it did not specify a time for performance).

To imply a term into an agreement, it must appear that it is necessary to do so in order to effectuate the purposes of the contract as a whole as gathered from the written instrument. *See HECI Exploration Co. v. Neel, 982 S.W.2d 881, 888 (Tex. 1998)*; *Fein v. R.P.H., Inc., 68 S.W.3d 260, 268 (Tex. App.--Houston [14th Dist.] 2002, pet. denied)*. In the Settlement Agreement, the parties settled a lawsuit in which Schlumberger sought a permanent injunction [**18] precluding Input from (1) using or disclosing Schlumberger's confidential information [*784] and (2) soliciting for employment at Input any Schlumberger employee who is involved in the design of the seismic data acquisition systems or who has been exposed to confidential Schlumberger information regarding seismic data acquisition systems. In the Settlement Agreement, Input agreed that it would not solicit or induce, directly or indirectly, the use or disclosure of certain confidential information belonging to Schlumberger. This covenant remains in effect beyond December 1, 2001, until that information, as defined in the Settlement Agreement, no longer exists. Part of Input's agreement in Paragraph 4 is to not offer employment to any current Schlumberger employee who is working in the Seismic Field unless at least two years have passed from the date the employee either stopped working for Schlumberger in the Seismic Field or left Schlumberger. Implying an agreement that Input's covenant in Paragraph 4 is terminable at will is not necessary to effectuate the purposes of the Settlement Agreement as a whole as gathered from the written instrument; in fact, it would contradict these purposes. [**19] Therefore, we conclude that the trial court erred by implicitly declaring an implied term that Paragraph 4 is terminable at will by either party. *See HECI Exploration Co., 982 S.W.2d at 888*; *Fein, 68 S.W.3d at 268*. The trial court should have denied Input's motion in this regard and granted the Schlumberger Parties' motion seeking a take-nothing judgment as a matter of law as to this requested declaration. We sustain the Schlumberger Parties' first issue to this extent.

**C. Did the trial court err by concluding that Paragraph 4 is terminable at will because any implied reasonable duration has expired as a matter of law?**

Under their first issue, the Schlumberger Parties also challenge the trial court's implied declaration that Input's covenant under Paragraph 4 is terminable at will because any reasonable time period during which Paragraph 4 was not terminable at will already has expired, so that Paragraph 4 is now terminable at will. Though obiter dicta in *Clear Lake City Water Authority* suggests such an implied duration may be possible, precedent from the Texas Supreme Court and this court shows that, if the "reasonable duration" rule applies, this court would imply that Paragraph 4 [**20] expires after a reasonable period of time rather than becoming terminable at will after a reasonable time. *Compare Clear Lake City Water Auth., 549 S.W.2d at 390-91* (stating in dicta that, under one line of cases,

courts imply a reasonable duration during which time the agreement is not terminable at will), *with Hall v. Hall, 158 Tex. 95, 308 S.W.2d 12, 16 (Tex. 1957)* (stating that "[w]hen the parties omit an express stipulation as to time, it is in accord with human experience and accepted standards of law for us to assume that they meant whatever term of days or years might be reasonable in the light of the circumstances before them at the date of the contract"); *Cheek v. Metzer, 116 Tex. 356, 291 S.W. 860, 864 (Tex. 1927)* (holding that, in the absence of a stipulation as to the time for performing the terms of a contract, the law allows a reasonable time); *Hart v. Bullion, 48 Tex. 278, 289 (Tex. 1877)* (stating that, where a contract does not fix a time for performance, the law allows a reasonable time for performance); *Metromarketing Services, Inc. v. HTT Headwear, Ltd., 15 S.W.3d 190, 195-96 (Tex. App.--Houston [14th Dist.] 2000, no pet.)* (stating that when the parties do not fix the time of performance, [**21] courts imply a reasonable time for performance). For this reason, the trial court erred in ruling [*785] as a matter of law that Paragraph 4 is terminable at will because any implied reasonable time period during which Paragraph 4 was not terminable at will already has expired. The trial court should have denied Input's motion in this regard [6] and granted the Schlumberger Parties' motion seeking a take-nothing judgment as a matter of law as to this requested declaration. We sustain the Schlumberger Parties' first issue to this extent.

6 In addition, even if the trial court had ruled that any reasonable duration for Input's covenant in Paragraph 4 has expired as a matter of law, this ruling still would have been error. If a reasonable time is implied, the determination of what is a reasonable time is generally a question of fact that is based on the circumstances surrounding the adoption of the agreement, the situation of the parties when they entered into the agreement, and the subject matter of the agreement. *See Hall, 308 S.W.2d at 16-17*; *Cheek, 291 S.W.2d at 864*; *Hart, 48 Tex. at 289*; *Metromarketing Services, Inc., 15 S.W.3d at 195-96*. Although summary judgment would be possible if the [**22] evidence is uncontroverted regarding these matters, the only evidence that Input provided the trial court in this regard is the Settlement Agreement itself. Lacking any extrinsic evidence bearing on this issue, the trial court could not have determined as a matter of law that any reasonable duration for Input's covenant in Paragraph 4 has expired. *See Hall, 308 S.W.2d at 16-17*; *Cheek, 291 S.W.2d at 864*; *Hart, 48 Tex. at 289*; *Metromarketing Services, Inc., 15 S.W.3d at 195-96*.

**D. Did the trial court err by concluding that Paragraph 4 applies to Schlumberger employees who are within its scope but not to WesternGeco employees?**

Under their third issue, the Schlumberger Parties also challenge the trial court's implied declaration that Paragraph 4 applies to Schlumberger employees who are within its scope but not to WesternGeco employees. [7] Input's covenant in Paragraph 4 covers "any current or former employee of Schlumberger who is working or has worked in the Seismic Field unless at least two (2) years have passed from the date such employee or former employee either ceased working for Schlumberger in the Seismic Field or has left Schlumberger." In the Settlement Agreement, "Schlumberger" [**23] is defined as "Schlumberger Technology Corporation." WesternGeco is a separate corporate entity from Schlumberger, and there has been no pleading or proof of any theory by which the corporate veil between these two entities may be pierced. The trial court correctly determined that under the unambiguous language of the Settlement Agreement, Paragraph 4 applies to Schlumberger employees who are within its scope but not to WesternGeco employees. *See Humble Explor. Co. v. Amcap Petroleum Associates-1977, 658 S.W.2d 860, 862 (Tex. App.--Dallas 1983, writ ref'd n.r.e.)* (applying unambiguous contractual definition in declaratory-judgment case).

7 They also argue that Input's affiliates are subject to the Settlement Agreement. However, because the trial court made no such implied declaration, that issue is not before us.

The Schlumberger Parties assert that the term "Schlumberger," as used in the Settlement Agreement, must include WesternGeco to avoid rendering meaningless the language making WesternGeco a party to the Settlement Agreement. The Schlumberger Parties base this argument on the following reasoning:

> . The Settlement Agreement defines "Affiliates" as "any present or future corporation [**24] that directly or indirectly controls, is controlled by, or is under common control with either party, 'where control' means the ownership, direct or indirect, of at least 50% of voting securities of such corporation."
>
> [*786] . WesternGeco is an "affiliate" of Schlumberger because it is a future corporation that is controlled by Schlumberger, where "control" means the ownership, direct or indirect, of at least 50% of voting securities of such corporation.

. The Settlement Agreement states that it was made by, among other parties, "Schlumberger Technology Corporation ("Schlumberger"), a Texas corporation . . ., acting on behalf of itself and its Affiliates . . ."

. Because Schlumberger entered into the Settlement Agreement on behalf of its Affiliates, including WesternGeco, the term "Schlumberger," as used in the Settlement Agreement, includes WesternGeco.

. The Schlumberger Parties' proffered interpretation is necessary to give meaning to the contractual language making WesternGeco a party to the Settlement Agreement because, if "Schlumberger" does not include WesternGeco, then the Settlement Agreement imposes no burden on WesternGeco and gives no benefit to WesternGeco. The Schlumberger Parties [**25] assert that this result would render meaningless the language making WesternGeco a party to the Settlement Agreement.

The Settlement Agreement contains language under which Schlumberger purportedly "makes" the agreement "on behalf of" its future affiliates. However, when Schlumberger entered into the Settlement Agreement in 1998, WesternGeco, allegedly one of its "future affiliates," did not exist. Because WesternGeco and Schlumberger are separate entities, a contract with Schlumberger is generally not a contract with WesternGeco. *See In re Merrilllynch Trust Co. FSB, 235 S.W.3d 185, 191 (Tex. 2007)*. Moreover, because a non-existent entity cannot enter into a contract, Schlumberger could not and did not bind WesternGeco merely by signing a contract in which Schlumberger states that it is acting on behalf of itself and its future affiliates. The Schlumberger Parties' argument fails because they seek to give meaning to language that could not have been effective as to WesternGeco. [8]

8 Even if Schlumberger stated in the Settlement Agreement that its non-existent, future affiliates are parties to the Settlement Agreement, that would not bind these future affiliates to the agreement unless [**26] they are so bound under a legal theory such as piercing the corporate veil, agency, estoppel, or ratification. *See, e.g., CNOOC Southeast Asia Ltd. v. Paladin Res. (SUNDA) Ltd., 222 S.W.3d 889, 899 (Tex. App.--Dallas 2007, pet. denied)* (stating that to bind an affiliate under agency principles, there must be evidence of conduct by the affiliate that would give rise to actual or apparent authority). However, any facts that might bind WesternGeco under these theories would not have come into existence until after WesternGeco was created. The trial court's third implied declaration addresses the meaning of Paragraph 4 and does not address whether, after its creation, WesternGeco engaged in acts that would bind it to the Settlement Agreement under one of these theories. Therefore, we need not address these theories; rather, we are addressing the Schlumberger Parties' argument that we must interpret "Schlumberger" to include WesternGeco, because otherwise the language making future affiliates parties to the Settlement Agreement would be rendered meaningless.

Furthermore, even presuming that the Settlement Agreement includes WesternGeco as a party, that would not render the language meaningless [**27] or leave WesternGeco without a burden or benefit, as the Schlumberger Parties urge, because the Settlement Agreement still would refer to WesternGeco in stating that the agreement is binding upon and inures to the benefit of the parties thereto and that the parties agree that Texas law will apply. [*787] The statement that the agreement is binding upon WesternGeco could refer to WesternGeco's binding agreement that Texas law governs. In addition, because the Settlement Agreement seeks to protect certain confidential information belonging to Schlumberger, these protections could inure to the benefit of WesternGeco.

In sum, the unambiguous definition of "Schlumberger" in the Settlement Agreement does not include alleged future affiliates such as WesternGeco, and Paragraph 4 does not apply to WesternGeco employees. In addition, even presuming, without deciding, that WesternGeco is an affiliate on whose behalf Schlumberger entered into the Settlement Agreement, this fact would not render any language of the Settlement Agreement meaningless. Accordingly, we overrule the Schlumberger Parties' challenge to the trial court's implied declaration that Paragraph 4 applies to Schlumberger employees who [**28] are within its scope but not to WesternGeco employees. We have addressed all the issues necessary to the disposition of this appeal. [9]

9 Input asserts that the issue of whether Paragraph 4 is an illegal restraint of trade is before this court. We disagree. This issue was a ground in Input's first motion for summary judgment, which the trial court denied. The Schlumberger Parties have not argued on appeal that the trial court erred

in denying Input's first motion for summary judgment. The illegal-restraint-of-trade issue was not a ground in Input's second motion for summary judgment, which the trial court granted. Furthermore, by stating that the grant of its second motion and denial of the Schlumberger Parties' motion "ended the dispute" and by moving the trial court to render a take-nothing judgment as to all the declaratory relief sought in Input's petition but not in its second motion, Input waived all of these requests, including the requested declaration that Paragraph 4 is an illegal restraint of trade. This reality is not altered by the Schlumberger Parties' appeal of the trial court's final judgment or by their briefing on appeal in support of the proposition that Paragraph [**29] 4 is not an illegal restraint of trade.

**IV. CONCLUSION**

We deny the Schlumberger Parties' motion to dismiss for lack of jurisdiction because a justiciable controversy exists. The trial court erred in impliedly declaring as a matter of law that (1) Paragraph 4 is terminable at will by either party and (2) alternatively, Paragraph 4 is terminable at will because any implied reasonable time period during which Paragraph 4 was not terminable at will already has expired. Accordingly, we reverse these portions of the trial court's judgment and render judgment that Input take nothing as to these two requested declarations. Under the unambiguous language of the Settlement Agreement, the trial court correctly determined that Paragraph 4 applies to Schlumberger employees who are within its scope but not to WesternGeco employees. Accordingly, we affirm the remainder of the trial court's judgment.

/s/ Kem Thompson Frost

Justice

Judgment rendered and Majority and Concurring Opinions filed January 24, 2008.

Panel consists of Justices Frost, Seymore, and Guzman. (Guzman, J., concurring).

Publish -- *TEX. R. APP. P. 47.2(b)*.

**CONCUR BY:** Eva M. Guzman

**CONCUR**

I join the majority's opinion expressed in sections III. A, III. B, and [**30] III. C, and concur in the result reached in section III. D.

The Settlement Agreement was made between Schlumberger, acting on behalf of itself and its Affiliates, and Input, acting on behalf of itself and its Affiliates. These parties agreed that the term "Affiliates" would refer to "any present or future corporation that directly or indirectly controls, is controlled by, or is under common control with either party, where 'control' means the ownership, direct or indirect, of at least 50% of voting securities of such corporation." In addition, Input agreed:

> [*788] that it will not offer employment to or engage as a consultant any current or former employee of Schlumberger who is working or has worked in the Seismic Field unless at least two (2) years have passed from the date such employee or former employee either ceased working for Schlumberger in the Seismic Field or has left Schlumberger.

Settlement Agreement, P 4. And in paragraph 13 of the Settlement Agreement, Schlumberger and Input agreed, on their own behalf and on behalf of their respective Affiliates, that "[t]his Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective successors in interest [**31] and legal representatives."

I agree with the majority that WesternGeco is not encompassed within the parties' agreed definition of the term "Schlumberger," which is instead defined by the parties as "Schlumberger Technology Corporation, a Texas corporation having a place of business" at a specific address in Sugar Land, Texas. Thus, I agree that Paragraph 4 of the Settlement Agreement requires Input to refrain from offering employment to current or recent employees of Schlumberger Technology Corporation, but does not prohibit Input from hiring WesternGeco's current or recent employees in the Seismic Field.

For reasons that differ somewhat from those expressed by the majority, I also agree that it is unnecessary to expand the definition assigned by the parties to the term "Schlumberger" in order to give full effect to the Agreement. The purpose of the Agreement was "to settle and compromise the issues raised in the [Fort Bend] Lawsuit . . . ." Thus, the unambiguous language of the Agreement manifests the parties' intent to resolve the existing dispute, i.e., the alleged "poaching" of Schlumberger employees by Input. The record does not indicate that any issue was raised in the Fort Bend [**32] Lawsuit concerning Input's recruitment of WesternGeco's present or former employees. Although similar, that is a separate dispute not addressed in the former lawsuit or in the Settlement Agreement. This construction, which is required by the plain meaning and the defined terms of the Settlement

Agreement, does not deprive WesternGeco of any benefit actually conferred by the Agreement.

Because it is unnecessary to the disposition of the case, I would not address the question of whether the Agreement binds WesternGeco in the absence of pleading and proof of legal theories such as piercing the corporate veil, agency, estoppel, or ratification. Regardless of whether WesternGeco is bound by the Agreement, the Agreement does not bar Input from hiring WesternGeco employees. I therefore concur in the result reached in section III. D.

/s/ Eva M. Guzman

Justice

Judgment rendered and Majority and Concurring Opinions filed January 24, 2008.